**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| JOEL TAVERA, MARITZA TAVERA, JOSE LUCIANO TAVERA, ADAM JEFFERY MCCANN, ANDREW JOHN LENZ, ARAGORN THOR WOLD, CATHERINE S. WOLD, BENJAMIN ROBERT JENSEN, BRIAN MICHAEL GLIBA, CHARLES JOSEPH VANCHERI, CORY ROBERT HOWARD, LESLIE HOWARD, DALE MARTIN HINKLEY, SANDRA MARIE HINKLEY, DANIEL CLAYTON VOTROBEK, JR., LENORE JEAN HARP, DANIEL CLAYTON VOTROBEK, SR., DANIEL JOEL FOSTER, DERRICK JERMALE MITCHELL, DEYONNE MITCHELL, RAPHAEL MITCHELL, DYLAND LINDSEY DUNWELL, JOYCE DUNWELL, LEMARD DUNWELL, CARL DUNWELL, EARL ANTHONY MCCRACKEN, EDWARD B. JOHNSON, JR., HANNIBAL ALEXANDER VEGUILLA, MARISA CARMEL VEGUILLA, S.C.V., A MINOR CHILD, JASON TODD MORRIS, JASON THOMAS WOODLIFF, JEFFREY MARVIN NICOLAS, FRANCOIS NICOLAS, ALISSA NICOLAS, JESSICA MARIE GRIGGS, JIMMY OWEKA OCHAN, JOHN WILLIAM FUHRMAN, JOSE LUIS TREVINO, BIVIAN KAY TREVINO, JOSHUA DEAN CRUTCHER, LARRY DEAN CRUTCHER, JOSHUA MITCHELL ROUNTREE, LEIGH ROUNTREE, JULIO ALEXANDER GUZMAN, JUSTIN DAVIN SABO, LATHAN HILL, CATHLEEN HOLY, LAURENCE RICHARD HILL, LISA HILL BAZAN, LOUIS MICHAEL POPE, EDWARD JOSEPH PULIDO, KAREN PULIDO, K.P., A MINOR CHILD, ANGELITA PULIDO RIVERA, MANUEL J. PULIDO, MANUEL "MANNIE" PULIDO, YADIRA PULIDO HOLMES, MARCUS JAMIL SULLEN, EUNICE HENDERSON SULLEN, FREDERICK DANIEL YOUNG, JR., ARIK BRYNE SULLEN, MATTHEW | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | **PLAINTIFFS' COMPLAINT** **JURY TRIAL DEMANDED** Case No.: _____ |

WALKER GOWIN, AMANDA LYNN §
GOWIN, OBED JIMENEZ, RAY BOYD §
ROBINSON, APRIL D. MCTIGHE, §
AURORA D. ROBINSON, FAITH §
ROBINSON, DAKOTAH ROBINSON, §
SHAUN DAVID GARRY, S.D., A MINOR §
CHILD, SUSAN GARRY, ROBERT GARRY, §
PATRICK GARRY, MEGHAN GARRY, §
BRIDGET GARRY, GILBERT MATTHEW §
BOYNTON, SOFIA T. BOYNTON, §
CHARLES BOYNTON, ROBERT A. §
BOYNTON, BRIAN MICHAEL YORK, §
EDWARD RAYMOND YORK, ELIZABETH §
ANNE YORK, DAMIEN CARL WEEKS, §
DELILAH L. GRIFFITH, JESSE DAVID §
CORTRIGHT, MICHAELA FAYE NOCERA §
CORTRIGHT, HANNA VICTORIA §
CORTRIGHT, DIANA HOTALING, JOSEPH §
CORTRIGHT, JESSE JAMES JACKSON, §
LEONDRAE DEMORRIS RICE, BRANDON §
LEONDRAE RICE, GLORIA ERVIN §
WILLIAMS, WILLIE JAMES RICE, §
PAMELA RICE HARRIS, JOSEPH TYRELL §
ERVIN, DIAMOND LESHAE MARIE RICE, §
MARTIN FLORES-DOMINGUEZ, CARMEN §
FLORES, JESSICA FLORES, KASANDRA §
FLORES, KATHERINE SCHELL, THOMAS §
TAVTIGIAN, CLAUDIA TAVTIGIAN, §
COURTNEY MARSHALL, VINCENT §
WILLIAM GIZZARELLI, MARK ANTONY §
HALL, ATHENA L. HALL, M.J.H., A §
MINOR CHILD, M.G.H., A MINOR CHILD, §
A.M.H., A MINOR CHILD, KAITLYN §
ADAMS, KIERSTEN HALL, ABIGAIL §
HALL, ESTATE OF NICHOLAS WILLIAM §
BAART BLOEM, RACHEL GABRIELA §
BLOEM, S.R.B., A MINOR CHILD, DEBRA §
LEIGH BLOEM, ALCIDES NICHOLAS §
BLOEM, JR., ALCIDES ALEXANDER §
BLOEM, VICTORIA LETHA BLOEM, §
FLORENCE ELIZABETH BLOEM, §
CATHERINE GRACE BLOEM, SARAH §
ANTONIA BLOEM, CHRISTINA JEWEL §
CHARLSON, JULIANA JOY SMITH, §
HENRY PAUL MADSON, ALYSIA L. §
MADSON, KAYLEE R. MADSON, §

EKATERINA BRUMIT, STACEY DARRELL §
RICE, BRENT JASON WALKER, SUSAN H. §
WALKER, LELAND F. WALKER, §
BENJAMIN L. WALKER, KYLE A. §
WALKER, CHRISTOPHER FRANKLIN §
SWARTZ, ESDRAS JEAN, MARIE ZAIE §
JEAN, FRANCOIS JEAN, FRANKLIN JEAN, §
ZACHARY JEAN, LUC FRANCOIS JEAN, §
JOSUE JEAN, JOEL SAMUEL JEAN, §
NAOMIE LORE HALL, GILBERT PAUL §
PAIZ, JR., JOSEPH FREDERICK LOWIT, §
ANTHONY ALLEN MATHENY, EDGAR D. §
MALDONADO, EVELISA MALDONADO, §
J.M.M., A MINOR CHILD, ANA M. §
MALDONADO, JOSE L. MALDONADO, §
ANTHONY MALDONADO, YANITZA §
MALDONADO, MARCEL KIM §
D'ENTREMONT, RALEIGH JAMES §
HEEKIN III, MISTY DAWN HEEKIN, S.J.H., §
A MINOR CHILD, TANNER BRENNON §
HEEKIN, LYNN HEEKIN, PATRICK §
KEIRAN HEEKIN, ROBERT LOUIS §
DUNHAM, MICHELLE DUNHAM, ESTATE §
OF KAREEM RASHAD SULTAN KHAN, §
ELVENA ELSHEBA MOHAMMED ALI §
KHAN, FEROZE KHAN, ENESHA BAKSH, §
TENESHA CHARLES, DONNA SQUIRES, §
JODIE MARIE DENNISON, CHAD §
FRANCIS SQUIRES, ESTATE OF BRUCE §
TERRENCE DURR, WALTER RAY SMITH, §
SR., WALTER RAY SMITH, JR., LAURA §
NANITRA WEATHERSBY, DAWN §
MONESICA TRAXLER, PEGGIE ANNE §
JONES, ESTATE OF DUANE JOSEPH §
DREASKY, CHERYL LYNN DREASKY, §
ROGER JAMES DREASKY, DAWN MARIE §
HARVEY, ESTATE OF THOMAS OLIVER §
KEELING, SHARON THERESE BERRY, §
ROBERT JAMES BERRY, KRISTEN ANN §
KEELING SUROVY, ERIN LYNN §
KEELING KURINCIC, ESTATE OF §
JOSHUA RYAN HAGER, KRIS LYLE §
SILAS HAGER, ESTATE OF BRIAN LEE §
PORTWINE, PEGGY J. PORTWINE, §
ESTATE OF MATTHEW DAVID HUNTER, §
WENDY KAY HUNTER, MEREDITH §

HUNTER-STUBBS, ESTATE OF ROBERT §
ADRIAN WORTHINGTON, RHONDA S. §
WORTHINGTON, KAYLIN §
WORTHINGTON, ANDREW PATRICK §
NALLY, DANYELLE M. NALLY, §
ANDREW MICHAEL NALLY, JASMIN M. §
GRADY, BRITTANY R. NALLY, ANDREA §
D. NALLY, DAVID ROBERT BAXTER, JR., §
NICOLE MICHELLE BAXTER, DAVID §
ROBERT BAXTER, SR., MARK ALLEN §
WHETZEL, JENNIFER DAWN WHETZEL, §
DIANNA ELIZABETH WHETZEL, §
STEPHEN KENNETH VALYOU, N.G.V., A §
MINOR CHILD, TERRY RAY CARTER, §
LINDA SUE CARTER, SENE PE'A POLU, §
ROSALIND KEMUKISA POLU, CHARLEY §
S. POLU, CHAZITY OLIANA ELESI POLU, §
DANIEL ALTON ROCCO, CHAD A. §
CHRISTENSEN, JOHN PAUL KAISER, JR., §
TINA ELIZABETH KAISER, KACEE §
ELIZABETH KEATING, DANIEL SCOTT §
WEBB, PATRICK JOHN BRADY, DEBRA §
A. BRADY, SARAH E. MALONE, §
EDWARD J. BRADY III, BRETT ADAM §
MILLER, FAITH A. MILLER, BRIAN §
MICHAEL HAYDEN, CORY LAMAR §
EGGLESTON, DANIEL FRANCIS §
PEARSON, HOLLY ANN PEARSON, ERIK §
ERNST SANDSTROM, J.M.S., A MINOR §
CHILD, JEFFREY DAVID EVANS, JERRY §
MATTHEW TEAL, MICHAEL ZIPP §
HANNA, MICHAEL ALEXANDER §
HANNA, RALPH EDWARD SWARTZ II, §
BRITTANY M. SWARTZ, V.M.S., A MINOR §
CHILD, LEATHA M. SWARTZ, RALPH E. §
SWARTZ, SR., LYDIA A. HILL, ROBERT A. §
SWARTZ, RUSSELL LEE COOK, JR., §
SHAWN ALI NELSON, THELMA NELSON, §
ROBERT NELSON, DAVID LEE SELLS, §
MISTY LYNN SELLS, MATTHEW KANE §
SELLS, BRETT LACI SELLS, JEREMY §
GEORGE CASHWELL, SHANE TROY §
ULANDAY, CHER ULANDAY, TIMOTHY §
PETER BENNETT, AMANDA JANE §
BENNETT, T.P.B., A MINOR CHILD, §
SAVANNA LINDSEY BENNETT, §

BRITTANY AMBER BENNETT, WALTER §
LEE HAM, JR., ESTATE OF TIMOTHY §
JAMES SEAMANS, MONICA SEAMANS, §
DAVID ROBERT SEAMANS, ASHLEY §
MARIE KNAPP, ESTATE OF KRISTOPHER §
ALLAN HIGDON, RONDA ELAINE §
HIGDON, BRITTON SHANE HIGDON, §
BRYAN ALAN WINTON, TABITHA §
WINTON, B.M.W., A MINOR CHILD, §
CHARLES ANTHONY KELLER, CHARLES §
EUGENE RUSSELL, JEREMY MICHAEL §
GIRDLER, JOHN PATRICK HARRIS, JOHN §
JESSE GREENE, KENNETH LEE SMITH, §
J.A.S., A MINOR CHILD, MIGUEL ANGEL §
GONZALEZ, ELISA GONZALEZ, NOAH §
PARKER MUTRIE, ASHLEY MUTRIE, J.M., §
A MINOR CHILD, B.M., A MINOR CHILD, §
ALEXANDRA MUTRIE, EMANUEL §
VALENCIA ALVAREZ, JAMIE LEE §
FRAZIER, JOSEPH MONFORTE, JR., §
AMANDA MONFORTE, VICTORIA §
MONFORTE, MARYLOU MONFORTE, §
KRISTEN MARTINEZ, ESTATE OF §
BRANDON ABBOTT MEYER, EUGENIA §
MARIE MEYER, TERRY LYNN MEYER, §
DESIREE SUZANNE MEYER-RODER, §
RICHARD EZELL PHILEMON, JR., CASIE §
S. PHILEMON, RENATA LAWSON, §
DENNIS A. PHILEMON, ROBERT LANCE §
CAVER,  TRICIA ANN CAVER, N.R.C., A §
MINOR CHILD, ALICIA JOY CAVER, §
SHAWN MICHAEL DURNEN, MARGARET §
DURNEN, DON DURNEN, SHAWN LARRY §
NICHOLS, T.A.N., A MINOR CHILD, TATE §
WAYNE MALLORY, TRISTIN WAYNE §
MALLORY, CHEYENNE SHARON §
MALLORY, SHANIA SHAE MALLORY, §
T.W.M., A MINOR CHILD, WAYLAND §
TODD ALLEN, TANJA BLACKWELL, §
BRAYDON ALLEN, KOBY ALLEN, §
DEBRA ALLEN, RONALD JENE ALLEN, §
TRENTON ALLEN, COEDY DALE JAMES, §
LISA JAMES, JERRY DANIEL WALKER, §
JOHN ALLEN GENTRY, JR., JOHN F. §
KUNKEL, JR., JORDAN KALEB SMITH, §
MATTHEW PATRICK HALEY, ADAM §

THOMAS GAULDIN, GEORGIA GRYDER, §
MICHAEL BRIAN GAULDIN, MICHAEL §
RYAN GAULDIN, PATRICK GAULDIN, §
BRIAN BUCK WILHELM, A.M.W., A §
MINOR CHILD, RHONDA WILHELM, §
MICHAEL WILHELM, DANIEL MICHAEL §
JACOBS, JARED RAY WHITE, TINA §
SCATES, CLINTON R. WHITE, BRENNA §
WHITE, JOSEPH RAY EASON, SR., F.L.E., §
A MINOR CHILD, ASHLEY R. REBSTEIN, §
KYLE MATTHEW LEMIEUX, ELIZABETH §
LYNN COFFIN, NATHAN RAINES, §
RICHARD GEORGE MOORE, JR., §
STEPHEN LAMONTE EDWARDS, JR., §
MONIQUE A. VALDEZ-EDWARDS, §
LAUREN E. BOLOBOV, TAMI RENEI §
KEMPER-PENA, SEAN PATRICK LYNCH, §
DAVID KEVIN GASKIN, DAMIL GASKIN, §
D.G., A MINOR CHILD, JACOB DEWAIN §
HOUSEHOLDER, JANET BAXTER, JAMES §
C. HOUSEHOLDER, MARCUS S. BAXTER, §
CAELEN A. BAXTER, JASON RICHARD §
GOLBRANSON, NICHOLAS MICHAEL §
LATONA, THOMAS WHITTFIELD §
THORNHILL, DESIREE ANNE §
THORNHILL, G.B.T., A MINOR CHILD, §
DEVIN JAY MEURER, DONALD J. §
MEURER, MARNIE MEURER, DUSTIN J. §
MEURER, JAMES MICHAEL HURST, §
ALVIA MASAYON HURST, BAUSTEN §
COLE HURST, CLAYTON TILTON §
CROWELL, JUSTIN LEE SINGLETON, §
A.E.S., A MINOR CHILD, I.D.S., A MINOR §
CHILD, S.K.S., A MINOR CHILD, §
MALCOLM CHRISTOPHER CANADA, §
BARBARA JEAN CANADA, ROBERT §
PAUL POTTS III, JOHN TYLER LEE, J.T.L., §
A MINOR CHILD, M.A.L., A MINOR §
CHILD, RICKY AARON BAXTER, ELBA §
BAXTER, CHRISTOPHER ROBERT §
GALKA, K.Z.G., A MINOR CHILD, MARIA §
THERESA GALKA, MARK GREGORY §
GALKA, CARRIE ELIZABETH §
KIETZMAN, BRANDON LAMAR DALE, §
DEBBIE SIMMONS, FREDDIE LEE KING, §
JR., SEDA KING, KIRK THOMAS §

MCPHERON, WILLIAM MATTHEW §
PFEIFER, H.S.P., A MINOR CHILD, §
DOROTHY K PFEIFER, DANIEL RYAN §
KULICKA, JARED MICHAEL ROGERS, §
C.J.R., A MINOR CHILD, FRANCIS §
DANIEL GARREN, DAVID L. GARREN, §
MARY KATHRYN JOHNSTON, SERGE §
HAGOPIAN, ANAHEID MIKAELIAN, §
SEVAG HAGOPIAN, CHRISTINE §
HAGOPIAN, GREGORY JOSEPH REGAN, §
JR., BRADLEY CHRISTIAN TANDE, JR., §
DIANNA D. TANDE, BRIAN LEE §
RUDOLPH, CHARLES FOSTER HARMON, §
CHRISTOPHER LEE OLSEN, STACIE §
OLSEN, WALLACE CASEY NELSON III, §
D.J.N., A MINOR CHILD, HANNAH ROSE §
NELSON, RAYMOND H. JAMES, §
YVENSON GALA, ESTATE OF WILLIAM §
DAVID O'BRIEN, DAWN R. WILLIAMSON, §
JOHN A. O'BRIEN, J.A.S., A MINOR §
CHILD, ESTATE OF SCOTT ALAN §
MILLER, SUSAN E. MILLER, ROBERT D. §
MILLER, MARK D. MILLER, PAUL E. §
MILLER, JONATHAN SCOTT MALLARD, §
CONNIE MALLARD, JESSICA MALLARD §
FANCHER, BRIAN E. MALLARD, ROBBIE §
DON CHEATHAM, CHRISTOPHER NEIL §
SHELL, LISA ANN SHELL, CURTIS L. §
SHELL, DAVID LEE SHELL, JR., RICHARD §
LEE BURGE, JR., JAMES H. SPERRY, §
ESTATE OF TRAVIS SCOTT BACHMAN, §
AMBER JOLENE BACHMAN WILSON, §
T.S.B., A MINOR CHILD, K.P.B., A MINOR §
CHILD, ELISHA JOSEPH ABBOTT, §
BENJAMIN EDWARD TRAINER, §
EDWARD JAMES TRAINER, GEORGE §
ROBERT HARRISON, JR., JODY LEWIS §
HARRISON, DEBBI HARRISON, GEORGE §
ROBERT HARRISON, SR., MARY §
HARRISON, TABBITHA LYNE NORRIS, §
TROY R. HARRISON, SR., JUSTIN §
ASHLEY GAGE, JUSTIN RAY MORGAN, §
AARON SMITH,  ESTATE OF JEREMY §
SCOTT JONES, JENNIFER LAURA JONES, §
A.J.J., A MINOR CHILD, M.A.J., A MINOR §
CHILD, DIANE KATHLEEN JONES, §

JOSEPH SCOTT JONES, ABBI MIRANDA          §
CARRETO, ESTATE OF DARREN DEAN            §
HOWE, NAKIA LAREE HOWE, G.H., A           §
MINOR CHILD, S.H., A MINOR CHILD,         §
BRANDON A. HOWE, ALEXANDER G.             §
KLAUS, CHRISTOPHER MICHAEL RAY,           §
ESTATE OF LARRY ALLAN STILWELL,           §
RYAN C. STILWELL, RACHEL L. VERA,         §
JIMMY STILWELL, SHAWN MICHAEL             §
CUMMINGS, LISA M. CUMMINGS,               §
GEORGIA ROSE CUMMINGS, NATASHA            §
ANNMARIE O'NEILL, JAMES MICHAEL           §
CUMMINGS, RUSSELL L. BALDWIN,             §
STEPHEN JOHN DESROSIER, REGINA            §
LYNN DESROSIER, STEPHEN JOHN              §
DESROSIER II, LARRY ALBERT CARR,          §
JR., HUNTER CARR, ALEXIS CARR,            §
CHRISTOPHER CARR, NATHANIEL RAY           §
LAMBERT, JANNELL D. LAMBERT,              §
MATTHEW DENNIS BENACK, DENNIS             §
BENACK, ANTOINETTE VERNESTINE             §
SCOTT, RENEE BALINCIA ROBINSON,           §
BRYTTNI DESHAUN HAWKINS, RHONDA           §
JOHNETTE HAWKINS, C.S.S., A MINOR         §
CHILD, JENNIE S. GLASGOW, MICOLA          §
KRISTY GLASGOW, ANTHONY B.                §
HAWKINS, DESMOND LEVAR                    §
ANTHONY, GARY LYNN STRICKLAND,            §
MARNITA L. MARLER, RIKKI LYNNE            §
MARLER, MARIO ALBERTO MENA,               §
LEROY ESCO, JR., TARYN ESCO, A.P., A      §
MINOR CHILD, JADE LEE-ESCO, K. P., A      §
MINOR CHILD, L. E., A MINOR CHILD,        §
MADISON ROTH, ROBIN ANTHONY               §
HONEYCUTT, JANICE KWILOS-                 §
EDMONDS, JESSE ALAN GEER, ERIC            §
ZACHARY HURST, DWAYNE HURST,              §
DEVIN TYLER HURST, SIERRA HURST,          §
DONALD MARTIN, BONNIE OSMER,              §
CORY OSMER, TODD EDWARD MILLER,           §
L.E.M., A MINOR CHILD, BEVERLY ANN        §
MILLER, EDWARD C. MILLER, TANIA           §
RENEE BARRETT, DAVID MATTHEW              §
BUTCHER, GLORIA MARIE BUTCHER,            §
B.W.B., A MINOR CHILD, ELIZABETH          §
DUFF SPEAKS, LESLIE GLENN SPEAKS,         §

JOHNNY CASTILLO, LAURA CASTILLO,          §
CHARLES LOY JORDAN, JR., ROY              §
ANTHONY BISCARR, GABRIEL                  §
ALEXANDER BISCARR, KHRISTIE               §
ALEXA BISCARR, ANGELA CLAUSET,            §
WILLIAM JOHN COLWELL, JANELLE D.          §
COLWELL, ALANNA COLLEEN                   §
COLWELL, MICHAEL JEREMIAH                 §
BIEBER-RICE, JOSHUA PAUL COLWELL,         §
ADAM NATHAN ENGELHART, ACIE               §
NATHANIEL RAINWATER, JEFFERY              §
ALAN MURTHA, CHRISTOPHER                  §
MICHAEL KNAPP, RODRICK BERNARD            §
ANDERSON, RAENA BLAIR ANDERSON,           §
RANCE BREVIN ANDERSON, RYLER              §
BRICE ANDERSON, LUDIE ELLEN               §
SHINAULT, CHRISTOPHER DAVID               §
CONDREY, DILLON J. CANNON,                §
PATRICIA A. CANNON, KELSEY J.             §
CANNON, FELICIA FLAKE, KEVIN SCOTT        §
JOHNSON, ANNTONETTE JANE                  §
JOHNSON, JACOB SCOTT JOHNSON,             §
JULIANNE KATHERINE JOHNSON,               §
MARTIN LYNN WAGNER, JR., ANNA             §
WAGNER, AMANDA WAGNER ELLIS,              §
MATTHEW BADILLO, MATTHEW                  §
TERRANCE WHITESIDE, KANDI                 §
DANIELLE WHITESIDE, M.T.W., A             §
MINOR CHILD, SHARON SMITHEY               §
WHITESIDE, MARK KEVIN WHITESIDE,          §
KEVIN CASEY WHITESIDE, JACKSON            §
WILEY WHITESIDE, CHRISTOPHER              §
DEWAYNE WHITESIDE, MICHAEL BASS           §
LOCKE, WILLIAM ALVIN LOCKE,               §
WILLIAM DAVID LOCKE III, PHILLIP          §
LAWRENCE BELL, MAXINE C. BELL,            §
THOMAS J. BELL, JEFFREY K. BELL,          §
JOSEPH T. BELL, TYLER NICHOLAS            §
OGDEN, SHERYL ANN CHEN, JERRIN            §
MATTHEW OGDEN, WILLIAM LEE                §
NELSON, TRAVIS EUGENE GINGRICH,           §
JUSTIN PERRY SEDELMAIER, AMBER            §
NICOLE SEDELMAIER, JOIE LEE               §
WILLIAMS, ANNETTE WILLIAMS,               §
SHENNA GREEN, DORIS JEAN COGER,           §
ROBERT JUSTIN MOULTRIE, PAUL ERIC        §

HAINES, RONDA KAY HAINES, KAREN §
MAE HAINES, JEREMY BENJAMIN §
HAINES, ROBERT FRANKLIN HARR, LUZ §
HARR, ARTHUR LAVERNE RIZER III, §
A.R., A MINOR CHILD, ARTHUR §
GABRIEL RIZER, ARTHUR L. RIZER, JR., §
NICOLE RIZER, STEPHANIE M. RIZER, §
JAMES MICHAEL LOTT, GAIL FORTNER §
LOTT, RONALD EVERETT LOTT, §
SAMUEL ADAM KAUFMAN, FRANCISCO §
RAMIREZ, DELFINA ZARATE, §
FRANCISCO RAMIREZ FIGUEROA, §
MARIO AURELIO NUNEZ, HECTOR §
RAMIREZ PEREZ, MARISELA RAMIREZ §
PEREZ, SALVADOR RAMIREZ, JOSHUA §
JOHN WOLCOTT, SHAUN CHRISTOPHER §
STILTNER, WALTER SCOTT GRIGG, §
GARTH LEVI BENEDICT, ASHOT §
MALKHASSIAN, CHAKEN ZANAZANIAN, §
JESSE JAMES LONGORIA, DOLORES §
LONGORIA, RAY LONGORIA, DAVID §
KENNETH WILLIAMS, ANDREW JOHN §
HARRIS, LANCE RAYMOND BLYTHE, §
RICHARD WILSON SCARLETT, §
DEBORAH SCARLETT, R.H.S., A MINOR §
CHILD, A.W.S., A MINOR CHILD, DEREK §
PAUL HADFIELD, ASHLEY NICOLE §
HADFIELD, KRISTI LYNN HADFIELD, §
ROBERT WALTER HADFIELD II, §
JENNIFER CHRISTINE ROTON, TIMOTHY §
GRANT CHANDLER, CHARLES FREDDIE §
WADE, JR., ROBYN WADE, R.W., A §
MINOR CHILD, H.W., A MINOR CHILD, §
C.W., A MINOR CHILD, JAMES MICHAEL §
BUONO, NUALA KALUOKAU TAYLOR, §
CHRISTOPHER DAVID TAYLOR, §
BETHENI KEANAAINA, X.W.T., A MINOR §
CHILD, TANIN NICHOLAS TAYLOR, §
ANTHONY SAMUEL FARINA, ESTATE OF §
JUSTIN LEE VASQUEZ, RILEY NICOLE §
VASQUEZ, JENNIFER LYNN AREBALO, §
JANNEKE LEANN EIKENBERG, ROWDY §
ZANE BURNEY, CARLOS ANTONIO §
MARTINEZ, HAROLD THOMAS §
ATKINSON, JR., SALVADOR BELTRAN- §
SOTO, JAMES SALVADOR BELTRAN- §

DAVES, SIDNEY YLENNE PARTIDA,                  §
ALONSO BELTRAN-SOTO, VALENTIN                  §
BELTRAN, FRANCISCO FELIX BELTRAN,              §
BEATRIZ BELTRAN, MICHAEL ROY                   §
RENFRO, KURT DUANE BROOKS,                     §
MCKENZIE PAIGE BROOKS, K.F.B., A               §
MINOR CHILD, AARON SCOTT ARTHUR                §
BURKS, SR., MICHAEL FRANK JACKSON,             §
MICHELE A. BRUNO, JOHN L. KOLMAR,              §
BOBBY GENE CHRISTOPHER III, DEBI               §
JEAN NOELKE, BOBBY GENE                        §
CHRISTOPHER, JR., ANGIE JENE                   §
CHRISTOPHER, BRIAN CHAD                        §
BECKWITH, MARCO ANTONIO                        §
VILLEGAS, H.S.V., A MINOR CHILD,               §
CHASE VILLEGAS, H.A.V., A MINOR                §
CHILD, LARRY DIAZ CABRAL,JR.,                  §
DAVID VINCENT BEDNARCIK, RENE                  §
BEDNARCIK, VINCENTINE L.                       §
BEDNARCIK, JONATHAN CUNEY,                     §
GEORGE L. CUNEY, AMANDA CUNEY                  §
LOPEZ, JOSEPH PETER BROWN, A.E.B., A           §
MINOR CHILD, J.M.B., A MINOR CHILD,            §
RICHARD WAYNE TUGWELL, JR., AMIE               §
N. CARWILE - TUGWELL, C.C.T., A                §
MINOR CHILD, R.W.T., A MINOR CHILD,            §
DAVID ALAN CONWAY II, KRISTIE                  §
CONWAY, DAVID A. CONWAY,                       §
CHRISTOPHER CONWAY, DALLAS                     §
CONWAY, LEE PAUL HAYWOOD, JOHN                 §
DAVID, JR., SHAWNDRA DAVID, JUSTUS             §
GETTY, L.J.D., A MINOR CHILD, KORBIN           §
L. DAVID, ABELARDO ROSAS,                      §
GUADALUPE ROSAS, JUAN ALBERTO                  §
ROSAS, SANDRA CLAMON, J.J.C., A                §
MINOR CHILD, JELISSA TALAMANTE,                §
STEVEN MICHAEL SHAUER, B.S.S., A               §
MINOR CHILD, PAULA SUE HORNING,                §
JOSEPH A. SCHMIDT, EDWARD RONALD               §
SCHMIDT, JR., ROBERT CHARLES                   §
SCHMIDT, RICHARD LLANCE SCHWAN,                §
M.A.S., A MINOR CHILD, JASEN WATTS,            §
JOHN DUANE TIVIS, JARED LUIS TIVIS-            §
WATTS, JESSE DUANE TIVIS-WATTS,                §
WILLIAM BARNS ALLEN, E.G.A., A                 §
MINOR CHILD, LARRY JAMES MAYS,                 §

JR., WILLIAM COLBY FRASIER, ROBERT §
ALLEN HAAF, MONICA ELIZABETH §
HAAF, J.A.H., A MINOR CHILD, ASHLEY §
MAE SIMS, MARY AGNUS HAAF, JAMES §
JOSEPH HAAF, ADAM CURTIS §
BIRDSELL, RANDALL JOSEPH BENNETT §
II, AENEAS ROBERT TOCHI, KEELAN §
MILES SOUTHERLAND, ROBERT ADAM §
BELL, MICHAEL LAWRENCE NEUMANN, §
JASMINE NAGEL, JORIE MILLER, CALEB §
NEUMANN, R.N., A MINOR CHILD, §
TAMMY BOWMAN, VICKI AVERSANO, §
CRAIG BOWES, PATRICK ANDREW §
DIENER, DEIDRE THERESA DIENER, §
HANNAH MARIA DIENER, CARLOS §
GOMEZ PEREZ, SAMANTHA IZAGUIRRE- §
GOMEZ, J.C.I-G., A MINOR CHILD, §
JEFFREY JAMES SECKINGER, MICHELLE §
SECKINGER, MICHAEL VINCENT PRATO, §
TESS RAE PRATO, CHARLENE F. HOLM, §
VINCENT M. PRATO, MADELINE PRATO, §
TYLER A. HIGUERA, NICOLE C. PRATO, §
CHRISTOPHER T. HIGUERA, RYAN M. §
PRATO, ESTATE OF BRANDON SCOTT §
SCHUCK, MEGAN BETH CASH, G.S.S., A §
MINOR CHILD, JACOB ALBERT BARR, §
KRISTINA BARR, E.B., A MINOR CHILD, §
MICHAEL JOSEPH JAMES, NESSIM §
EDWARD FOURNIER, JASON KILLENS §
THOMPSON, KYLE WILLIAM §
DAVENPORT, JOSEF ERNEST BAUMANN, §
MICHAEL LEE OWEN BOLLEY, DAKODA §
MARIE BOLLEY, MICHAEL LEE OWEN §
BOLLEY II, DEMI LYNN BOLLEY, K.T.B., §
A MINOR CHILD, JUDY C. BOLLEY, §
DONNIE LEE BOLLEY, BILLY DON §
BOLLEY, KIMBERLY DAWN DEUEL, §
TRACY ALLEN BOLLEY, BRIAN DALE §
CURRIER, JOANNE CURRIER, VINCENT §
JOSEPH SENN, SHANNON SENN, S.L.S., A §
MINOR CHILD, BRYAN ALEXANDER §
SNYDER, JAIME CHIRIE SNYDER, RYAN §
PATRICK VALLERY, SANDRA VALLERY, §
PATRICK VALLERY, MICHELLE §
RENOWDEN, JAMES NELSON SPARKS III, §
CARLA WHITE SPARKS, VALERIE §

CAROLINE EARMAN, JAMES NELSON §
SPARKS IV, EVE MARIE SPARKS, §
JARRAD JEROME DAVENPORT, LATOYA §
SHANTIA DAVENPORT, JARRAD ELIJAH §
DAVENPORT, DARRIUS X. DAVENPORT, §
X.C.D., A MINOR CHILD, GRAHAM §
JACOB THOMAS LINDSEY, ESTATE OF §
JOSHUA TODD BYERS, MARY A. BYERS, §
LLOYD CHARLES BYERS, MILAM §
BYERS, JARED RYAN BYERS, DAVID §
WILSON BRONSON, GEORGE OVID §
SIMMONS, ESTATE OF JASON ALAN §
BENFORD, KIMBERLY ANN BENFORD, §
J.A.B., A MINOR CHILD, LANE ALAN §
BENFORD, ESTATE OF RICHARD ALLEN §
HARDY, DORIS HARDY, RICHARD DEAN §
HARDY, JESSICA TACKETT, §
KRISTOPHER KENNETH SIEMON, §
PENNIE SIEMON, KENNETH SIEMON, §
TEDDIE HERNANDEZ, WENDIE SIEMON- §
THIEL, WILLIAM LEE NESTOR, §
TIMOTHY EARL BREDBERG, JR., §
ANDREW JOSEPH HIGGINS, MICHAEL §
EVERETTE GREEN, MELANIE GREEN, §
STEVEN GREEN, MATTHEW JOSEPH §
POLOGRUTO, GARY DON WHITE, §
VANESSA WHITE, A.W., A MINOR CHILD, §
ROYETTA WHITE, MATTHEW ALBERT §
JORDAN, KATELYNN JORDAN, O.J., A §
MINOR CHILD, SCOTT BRADLEY RAY, §
KERSTIN RAY, MICHAEL L. WELLS, §
JOSEPH RICHARD BEEMAN, EDDIE §
SANTOS FERNANDEZ, RICARDO §
ALFREDO BRIZUELA, JR., ALEXANDER §
ANTHONY BRIZUELA, MATTHEW N. §
WOOTEN, JR., MATTHEW N. WOOTEN III, §
RONALD ALLEN EATON, MICHAEL §
JUNG HYUN PASCO, CORTNEY MCCABE §
ROBINSON, MATTHEW P. ROBINSON, §
CHRISTOPHER MICHAEL ROBINSON, §
NICHOLE RENNEA HOSKINS, KORYLEE §
CHARLES KAAI, A.C.K., A MINOR CHILD, §
STEVEN MICHAEL MURPHY, KENNETH §
ROBERT GORDON, BRANDON WILLIAM §
LISTON, SCOTT WILLIAM LISTON, §
STANLEY GOODIN III, J.G., A MINOR §

CHILD, MOHAMAD KAMAL AKHTAR,                §
JENNIFER AKHTAR, TAYLOR AKHTAR,             §
SAMIRA FATHY, PERVEZ AKHTAR,                §
JEFFREY LEE PICKARD, NATASHA                §
PICKARD, TYLER PICKARD, E.P., A             §
MINOR CHILD, D.P., A MINOR CHILD,           §
P.P., A MINOR CHILD, WILLIAM JONES          §
IV, LISA LYNN LUZIUS, WILLIAM JONES         §
III, JARROD SCOTT HALLMAN, ERICK            §
CASTRO, GEORGE PEREZ, HECTOR                §
MANUEL LOPEZ, JR., CATHERINE                §
LOPEZ, ROBERT VALLE, E.L., A MINOR          §
CHILD, PATRICIA SANTANA, HECTOR M.          §
LOPEZ, SR., VIVIAN LOPEZ, ISAAC             §
LOPEZ, MARK ANTHONY HAMBLIN, JR.,           §
M.H., A MINOR CHILD, RENE IVAN              §
GONZALEZ, JR., YVETTE GONZALEZ,             §
TOLIVER EUGENE NOEY, T.G.N., A              §
MINOR CHILD, JOSEPHINE CUELLAR,             §
MICHAEL RICHARD DRUMMOND,                   §
CHRISTOPHER GODDARD DUNLAP,                 §
ROBERT LEROY GERTSCH, JR., STEPHEN          §
KENT FERGUSON, CLOTILDE JOY                 §
SZELKOWSKI, ROBERT EUGENE                   §
FERGUSON,JR., OWEN EUGENE                    §
CHISMAR II, BRYAN EDWARD PLUM,              §
BRUCE LEONARD MORROW, BRUCE                 §
LEONARD MORROW, JR., ROBERT                 §
THOMAS WARDZINSKI-MORROW,                   §
GEMINI NICHOLE WARDZINSKI-                  §
MORROW, MANUEL FIGUEROA, J.C.F., A          §
MINOR CHILD, PAK SON FIGUEROA,              §
GILBERT FIGUEROA, GILBERT                   §
FIGUEROA, JR., TIMMY FIGUEROA,              §
SAMUEL FIGUEROA, CHRISTOPHER                §
JOHN SHIMA, CHRISTINA LOUISE                §
SHIMA, A.G.S., A MINOR CHILD, DARYN         §
JAMES SWALLOW, JAMIE LEE                    §
WHITAKER, TIMOTHY PADRAIC                   §
MCKENZIE, SARA JAYNE MCKENZIE,              §
MICHAEL THOMAS BEHRENS, TAYLOR              §
M. BEHRENS, HUNTER W. BEHRENS,              §
CAITLYNN BEHRENS, KENDYL                    §
ELIZABETH BEHRENS, JEFFERSON A.             §
BEHRENS, ADAM SHAFFER BARTON,               §
T.B., A MINOR CHILD, TAMMY SELVEY-          §

BROCK, STEPHEN BARTON, ERIC LEON                    §
HORTON, MARTIN ANTHONY MCCLUNG                      §
II, JANEL MARIE MCCLUNG, M.A.M., A                  §
MINOR CHILD, PEGGY JOYCE                            §
MCCLUNG, JAMES MCCLUNG,                             §
CHRISTOPHER JERID RODRIGUEZ,                        §
BENJAMIN VERNON DOLBY, DELORES                      §
ARNOLD, ABBIGAIL DOLBY, VALERIE                     §
VICKERY, VICKI DOLBY, VERNON                        §
DOLBY, ESTATE OF JEREMY JAMES                       §
FISCHER, SARAH A. WATTIER,                          §
HARRISON MANYOMA, PATRICK                           §
CHRISTOPHER WICKENS, JUDY LYNN                      §
WICKENS, LARRY DUANE WILSON,JR.,                    §
ALLYSA BROOKE WILSON, TRAVIS                        §
EUGENE SCHNEIDER, MICHAEL                           §
ANDREW HURD,SR., MAMTA HURD,                        §
C.A.H., A MINOR CHILD, M.A.H., A                    §
MINOR CHILD, KAREN ANN CLOVER,                      §
GERALD ANDREW HURD, JOHN                            §
DERRICK FLAMER, THELMA FLAMER,                      §
DERRICK LAMAR FLAMER, KENNARD                       §
WILLIAMS, OLIVIA J. FLAMER,                         §
CHERLYN F. WILLIAMS, REGINALD                       §
BOYD, DANIEL WILLIAM BARRON,                        §
RICKY ALLEN PATA, R.A.P., A MINOR                   §
CHILD, R.R.P., A MINOR CHILD, DANIEL                §
JARED WILKERSON, BRANDON                            §
MICHAEL PARROTT, TERRI L. STORMS,                   §
DONALD M. STORMS, JUSTIN LANCE                      §
CAMPLIN, T.J.C., A MINOR CHILD, C.R.C.,             §
A MINOR CHILD, M.B.C., A MINOR                      §
CHILD, MARIO L. BORREGO, WILLIAM                    §
JAMES MORDEN, RICHARD RANDALL                       §
HEDGECOCK II, SHAUN SCOTT                           §
CHANDLER, JULEONNA CLARKE                           §
CHANDLER, CHESTER J. ROGERS,                        §
JUSTIN NEIL CARY, SUZANE ELIZABETH                  §
CARY, BRITTANNIE COX, N.M., A MINOR                 §
CHILD, SANDRA D. CARY, KIMBERLY                     §
MARIE CARY, ALEX DUNCAN CARY,                       §
AUDREY CARY LANGE, MICHAEL                          §
BENAVIDES, JR., JOSEPH BENAVIDES,                   §
I.M.B., A MINOR CHILD, Z.M.B., A MINOR              §
CHILD, LINDA BENAVIDES, MICHAEL                     §
BENAVIDES, DANIEL BENAVIDES,                        §

DEVIN SAMUEL HARVEY, ROBERT §
STEVEN BAUGHN, KARLY ANN §
BAUGHN, GIOVANNI ALEXANDER §
AVALOS, MARIA AVALOS, J.A., A MINOR §
CHILD, KARL R. SIMANDL, ALEXANDER §
RESTIFO, NANCY A. RESTIFO, §
SALVATORE A. RESTIFO, ESTATE OF §
KENNETH JAMES IWASINSKI, TRACY §
JEAN TAYLOR, DOMINICK VICTOR §
IWASINSKI, AMANDA LYNN TAYLOR, §
MICHAEL SCOTT ERB, JOSHUA DIVON §
TRAVIS, M.D.T., A MINOR CHILD, A.C.J., §
A MINOR CHILD, D.R.G., A MINOR §
CHILD, J.S.A., A MINOR CHILD, RONALD §
ANDRE SAMS, SR., MATTHEW LEE §
ANDREAS, PHILIP LEE CHILDREY, §
STEPHANIE CHILDREY, TIMOTHY §
MICHAEL HATCH, JEREMY EDWARD §
SMITH, ANTHONY JOHN FERRIS, ERIC §
EUGENE RODRIQUEZ, JOHN §
FITZGERALD COLEMAN, FRANKLYN §
LEE DOSS, JUANITA DOSS, THOMAS §
MATTHEW BROOKS, LYNDA L. BROOKS, §
JOHN ELDON ADAMIC, ESTATE OF §
JUSTIN WILLIAM HEBERT, JESSICA §
MICHELE HEBERT, MATTHEW NEIL §
BOWMAN, M.E.B., A MINOR CHILD, §
NICKOLAS CARL STOWMAN, RAYNA L. §
MONCRIEF, TREY NORMAN BAILEY, §
MCKENZIE BAILEY, JESSE BRITTON §
EVANS, MICHAEL GAMBLE, SHIRLEY §
GAMBLE, CHRISTOPHER BRIAN §
SAUNDERS, CECELIA ANNE SAUNDERS, §
SALVADOR LUIS LOERA, JR., MONICA E. §
LOERA, SALVADOR LOERA, SR., §
MIGUEL LOERA, LORI A. LOERA, §
CAROLYN V. LEE, MICHAEL WAYNE §
CHRISTOPHERSON, LUIS ALFREDO §
RANERO, TOMMY LEE FOWLER, §
QUANTE MAURICE EGGLESTON, TANYA §
MERLON DIGGS, TERRA SIMONE §
EGGLESTON, JOSHUA DALE COY, §
MICHAEL JOHN SIPPEL, KELLY LYNN §
OTTMAR, M.J.S., A MINOR CHILD, §
MARLENE MARIE GRANA, JOHN §
PATRICK SIPPEL, ESTATE OF MICHAEL §

EGAN, MARIA EGAN, S.D.E., A MINOR            §
CHILD, ESTATE OF ADAM MICHAEL                §
MALSON, DEBRA LYNN MALSON, BEN               §
W. MALSON, JR., DAVID PHILLIP                §
MALSON, AMY MALSON FLY, BRIAN                §
THOMAS SKRABA, OLEIN NASHAN                  §
TSINNIJINNIE, ROSS TSINNIJINNIE,             §
RANESSA TSINNIJINNIE, SHELDREANN             §
TSINNIJINNIE, SHALESHIA                      §
TSINNIJINNIE, ROSSIEANNE                     §
TSINNIJINNIE, ABRAHAM MARTINEZ-              §
AYALA, LUCINA MARTINEZ-AYALA,                §
SEBASTIAN SOLIS-PEREZ, JASON                 §
REGESTER, DEAN MICHAEL GRAHAM,               §
ESTATE OF MATTHEW CHARLES                    §
HENDERSON, JAIMIE K. EGGE, OWEN L.           §
HENDERSON, JOSEPH ANDREW                     §
TALBERT, SEAN PATRICK REED,                  §
DERRICK DEANDRE HEMPHILL, J.R.H., A          §
MINOR CHILD, MARILYN MARIE                   §
HEMPHILL, MARLO LAUNDREA LEWIS,              §
LESTER LATRON WESTBROOKS,                    §
MARLON MARQUET WASHINGTON,                   §
LUKEISHA DIMING, THOMAS ANTHONY              §
HENSHALL, JR., YESENIA HENSHALL              §
PEREZ, DANIELLE BOWEN, THOMAS A.             §
HENSHALL, SR., BRIAN DAVID GOULD,            §
ROBERT LEE MCCORMICK, APRIL                  §
MCCORMICK, JUSTIN MCCORMICK,                 §
BRITTNEY MCCORMICK, MACKENZIE                §
MCCORMICK, SHEILA MCCORMICK,                 §
TIMOTHY A. MCCORMICK, TIM                    §
MCCORMICK, THOMAS A. MCCORMICK,              §
MATTHEW DEAN ANDERSON, JOSEPH                §
MICHAEL LOWE, STEVE NUÑEZ, JR.,              §
AUDREY O'DONNELL, DOMINIC                    §
FRANKLIN MOODY, DHUNTHA SHAYRE               §
WYATT, DAVID ANTHONY ROSALES,                §
AMY LYNN ROSALES, MADISON HALEY              §
ROSALES, NICHOLAS BERT ANDREWS,              §
KENDRICK LEE DIXON, KADAIVION                §
LATRELL DIXON, RICHARD DEWAYNE               §
FOSTER, BRANDON MICHAEL FOSTER,              §
MATTHEW RYAN FOSTER, ROBERT                  §
ARTHUR DIXON, BRIAN PATRICK                  §
JOYCE, JR., DAVID ROBERT WENZEL,             §

ANDREW SCOTT FAYAL, DANIEL J. §
ERBE, EARLENE E. ERBE, BRIAN J. ERBE, §
ELIZABETH E. ERBE, STEPHANIE A. §
ERBE, RICHARD ALAN CRAWFORD, §
ANTWON LAVANTE CHILDERS, §
CHRISTOPHER MAX HEIDLING, §
STANLEY C. HEIDLING, TERRA §
LORRAINE RHOADS, ANTHONY §
TERMAINE PLUNKETT,SR., Z.L.P., A §
MINOR CHILD, D.M.P., A MINOR CHILD, §
ESTATE OF LEA ROBERT MILLS, §
KEESHA MILLS, DELORES MILLS, §
ROBERT MILLS, PARKER MILLS, §
JEREMY LEE BALLARD, CRAIG STEVEN §
HALL, D.H., A MINOR CHILD, ANDRE §
DEWAYNE JOSEPH, BARBETTE JOSEPH, §
QAMAR JOSEPH, JOEY JAMES BRAMME, §
DANIEL EUZEB COWART, SARAH §
EARLS-COWART, A.R.C., A MINOR §
CHILD, A.S.C., A MINOR CHILD, §
THERESA L. COWART, CLIFFORD §
COWART, ESTATE OF JASON BRENT §
DANIEL, LINDA MAY DANIEL, RAMON §
JUNIOR BEJARANO, ALEX §
PHONGPHACHONE, LAUREN MACEY §
PHONGPHACHONE, RYAN MICHAEL §
PHONGPHACHONE, JASON WILLIAM §
ROLLISON, SHARON SCHINETHA §
STALLWORTH, ESTATE OF SCOTT §
ALEXANDER MCINTOSH, GWEN C. §
MCINTOSH, ALEXANDER G. MCINTOSH, §
ERIC G. MCINTOSH, JUAN MARTINEZ §
RUBIO, JOSHUA KRIS LUTZ, LUTHER §
DARRELL BROWN, LINDA FAYE §
BROWN, ARTHUR LEE BROWN, §
MATTHEW LAYDELL BROWN, §
AUNDREA GERONTO BROWN, AKEISHA §
BROWN MCFADDEN, JUSTIN MURRAY §
CROCKER, GEORDAN EDWARD GANKA, §
THOMAS ALAN GANKA, CHARLES §
THOMAS GANKA, THOMAS JARED §
GANKA, TIMOTHY FRANCIS GRAJKO, §
ALAINA LOCURCIO, KATHLEEN J. §
GRAJKO, WALTER E. GRAJKO, MICHAEL §
J. GRAJKO, ESTATE OF TAYLOR §
BRADLEY PRAZYNSKI, CLAUDIA §

CATHERINE PIERCE, JOHN FRANCIS §
PRAZYNSKI, CAROL ROSE PRAZYNSKI, §
RYAN ANDREW BLOMER, BRIAN §
MICHAEL TANCO, MARK LEE §
FLETCHER, CHRISTOPHER JAMES §
DUNN, SANDY DUNN, STEVE DUNN, §
RONALD DEAN STARK II, KATIE STARK, §
DOUGLAS ARTHUR STARK, ELIZABETH §
GRAYCEROSE STARK, A.D.S., A MINOR §
CHILD, STEVEN RENALD PEOPLES, AJAI §
LASHAWN PEOPLES, A.K.P., A MINOR §
CHILD, JAYLA DANIELLE PEOPLES, §
MARTREL JA'QUEZ PEOPLES, ESTATE §
OF MATTHEW JOSEPH VOSBEIN, LYNDA §
L. VOSBEIN, CONNOR VOSBEIN, JOHN §
VOSBEIN, BRANDON JACKSON, ANNA §
WILLIAMS, TIM LINGLE, JASON LINGLE, §
TIMOTHY J.B. LINGLE, HAGLE §
WILLIAMS III, CHRIS WILLIAMS, §
JEREMY LINGLE, LUCAS LINGLE, §
HAGLE WILLIAMS, JR, GERARD LOUIS §
MENNITTO, C.L.M., A MINOR CHILD, §
JACQUELYN YUSKO, TROY MENNITTO, §
HENRY JESSIE BREWER III, JOHN §
LAURENCE LAWTON, JR., ARLENE F. §
LAWTON, PATRICIA LYNN LAWTON, §
JASON RANDY SMITH, MATTHEW §
CARNELL BEATTY, ANDREW JAMES §
GREEN, ANNE CHRISTINE PEEL, §
GILLIAN GREEN, A.G., A MINOR CHILD, §
GREGORY MICHAEL PFAFF, ARTHUR §
LEE MOYE, DEBRA BLACKMON MOYE, §
SHAYLA FINKLEA-PETTWAY, JADE §
MOYE BERRONG, EDDIE MAE MOYE, §
LEO PATRICK MCKEON, KEITH P. §
MCKEON, DONALD EVAN GRZENA, §
ROBERT ALLEN MANSFIELD, ALICE §
MANSFIELD, FELICIA MANSFIELD, §
LIONEL A. MANSFIELD, LARRY FIELDS, §
SIGURD MORRIS MATHISEN, JR., SEAN §
TAYLOR SCRUGGS, CHEYENNE ROSE §
SCRUGGS, CHEROKEE RAINE SCRUGGS, §
JOHN CHARLES SCRUGGS, SANDRA DEE §
BRICE, GAIL LINDLEY FRYER, MESHALL §
ELAINE WINNEGAN, DEVIN WINNEGAN, §
JAMES JACKSON, JAZMEN NICOLE §

SAMPSON, RONALD Q. RICE, TYRONE §
ADAMS, WILLIAM FRANKLIN GUNTER, §
DIANNE GUNTER, CLIFFORD EDWARD §
GUNTER, VICTORIA LEE GUNTER, SARA §
MOON, PATRICIA SUE MALPASS, PEGGY §
ANN LEWIS, MICHAEL WAYNE MYERS, §
JAMES EDWARD WRIGHT, CARMEL §
FITZGERALD, NORA ANN FOUTZ, §
MATTHEW WRIGHT, MICHAEL ANDRE §
DARCY, ROOSEVELT ROSS, JR., TRINITY §
G. ROSS, ROOSEVELT ROSS SR., DAREL §
ROSS, HELEN ROSS, DEBORAH §
BARNETT ROSS, ETHEL ROSS GOWDY, §
CONILIA ROSS YOBO, JOHN HENRY §
ROSS, JEMILIA ROSS POLIUS, THERESA §
ROSS JONES, SYDERIA ROSATE ROSS, §
ESTATE OF STEVEN MICHAEL PACKER, §
ROBIN RENEE DAVIDSON, DANIELLE §
ALLYSON PACKER, CHRISTOPHER §
DAVID PACKER, ZACHARY TYLER §
DAVIDSON, JASON NOLAN DAVIDSON, §
STUART HUNTER MCKENZIE, CALISE §
ANN PATTERSON, COLIN JADE §
DARROW, JOSHUA CODY BIRCH, §
HEATHER M. BIRCH, CARYN M. §
GIROUX, JOHN R. BIRCH, JR., JAROD L §
BIRCH, JUDD W. BIRCH, ALFONSO §
GEOMAR MATOS MESA, POLIBIA §
MATOS, FABIAN A. MATOS, ALFONSO §
ARGENIS MATOS, NICHOLAS TUBBS, §
VANESSA MEREDITH, TROY MEREDITH, §
SAMUEL SPARKS III, CASSANDRA §
WILLIAMS SPARKS, SAMUEL SPARKS §
IV, BRANDON M. WILLIAMS, DOUGLAS §
SPARKS, BRENDA ELAINE STEPHENS, §
PAMELA SPARKS-SMITH, JUSTIN ROY §
ROJAS, AMANDA ROJAS, DANIEL RAYE §
DUITSMAN, MICHAEL PAUL SAVOIE, §
PHILLIP FREDERICK MCCOTTER, §
WILLIAM ROBERT INGRAM, W.J.I., A §
MINOR CHILD, X.R.I., A MINOR CHILD, §
ESTATE OF AUBREY DALE BELL, §
PHILANDRIA EZELL, LA'DARIUS §
BERNARD EZELL, TIFFANY NICOLE §
EZELL, KYSER EZELL, D'ZUNDRIA §
EZELL, ROXIE BELL, WESLEY ALLEN §

GAUTREAUX, MISAEL NIETO, J.N.1, A §
MINOR CHILD, J.N.2, A MINOR CHILD, §
WESLEY J. HALLECK, IAN M. BROWN, §
BRENDAN W. HALLECK, KIMBERLY §
ANN BROWN, CHARLEY D. HALLECK, §
FLOYD C. PETERS, JR., CHRISTINA §
PETERS, KATLIN PETERS, SANTANA §
MARIE PETERS, G.P., A MINOR CHILD, §
A.P., A MINOR CHILD, FLOYD ANDREW §
PETERS, LINDA PETERS, FLOYD C. §
PETERS, SR., JOY WHITE, LISA PETERS §
SMETHURST, DISA PETERS CLASEN, §
DONALD DANIEL GRANT, BEVERLY §
GRANT, BRIONNA DENISE GRANT, JOHN §
PAUL ALVAREZ, CHARLES EDWARD §
SLACKS, JR., SCOTT BRONSON LYON, §
OLNEY EUGENE JOHNSON, JASON ERIC §
BELL, STEVEN GRANT GILBOY, TIM §
THOMAS JULIANO, BRANDON JOHN §
BERHOW-GOLL, JENNIFER JEAN §
BERHOW-HANSON, KEVIN DOUGLAS §
HANSON, MATTHEW PAUL SCHAFFER, §
LUCIA A. SCHAFFER, AMY JO §
FINNEGAN, ESTATE OF ARMANDO V. §
HERNANDEZ, MARTHA HERNANDEZ, §
DELIA NAVA LOERA, RAQUEL §
SANDOVAL, JOHN JAMES DAWDY, §
PATTIE ANN BLACK, MICHAEL JOHN §
BLACK, JENNIFER NICOLE §
BURELSMITH, WENDY ANN LAW, §
ALLEN LAMAR PRATT, CHRISTOPHER §
TODD HASS, MATTHEW GENE RAUL §
MERCADO, K.M.M., A MINOR CHILD, §
M.L.M., A MINOR CHILD, SAUNDRA §
MERCADO, RAUL MERCADO, PAUL §
ALLEN JACKSON, JASON BARRETT §
CARNEY, ALBA RYAN TANNER, §
BARBARA WEST, TIFFANY TANNER- §
PINES, SCOTT J. WEST, CARL WEST, §
EDWARD JAMES TERRY, SR., §
GLENNDON MILTON TERRY, EDWARD §
JAMES TERRY, JR., PETER KEVIN §
LANDSTEINER, FLORENCE L. EICHTEN- §
LANDSTEINER, JACOB DAKOTA §
LANDSTEINER, JACKSON COLE §
LANDSTEINER, WENDELL DONALD §

CHAVIS, CAROL OSBOURNE PHILLIPS,  §
AUDREY A. JACKSON, DESIRRA L.  §
BANKS, SHIRLEY A. CHAVIS, WENDALL  §
D. PATTERSON, SARAH LOUISE  §
PARKER, DAWN Y. CHAVIS, ALPHONSO  §
L. CHAVIS, CRYSTAL N. CHAVIS,  §
WENDALL CHAMBERS, DORENDA  §
BRANNON, DERRICK MELTON,  §
LORENZO CHAMBERS, LONNIE  §
MICHAEL FREDRICK GORMAN, CECILIA  §
A. BERNAL, CARL WILLIE OLIVER, JADE  §
LOREN OLIVER, TIMOTHY DEMETRIUS  §
JORDAN, CAROLYN JORDAN, CHASTITY  §
J. JORDAN, TIMEKA DENISE TYLER,  §
LINDA ROSE JORDAN, DENSON JORDAN,  §
SR., DENSON JORDAN, JR., MONIQUE  §
JORDAN, SAMARIA JORDAN, MELANIE  §
JORDAN THOMAS, DONALD LEE III,  §
JENNIE LEE, S.D.P.L., A MINOR CHILD,  §
CATHERINE N. GOBLE, ANNA C. LEE,  §
ERNESTO SIERRA, MARIA CRISELDA  §
SIERRA, KRISTINA LEE SIERRA,  §
CASSANDRA SIERRA, RENE FRANCISCO  §
AVENDAÑO, JR., OLINDA AVENDAÑO,  §
BLANCA LEE AVENDAÑO, RHONDA  §
AVENDAÑO, BLAKE COLIN COLE,  §
LYNDA SUE MURRAY, GREG ROBERT  §
COLE, TONY ALLEN COVELL, BRIAN  §
DOUGLAS KING, NATHAN ZACHARY  §
KING, SAMANTHA ROSE WENDLAND,  §
AMANDA MARIE WENDLAND, YVETTE  §
RENEE RENNAKER, KEVIN MICHAEL  §
DOHERTY, SR., CHERYL LEE DOHERTY,  §
KEVIN MICHAEL DOHERTY, JR.,  §
NICHOLAS DEAN LAMICA, THEODORE  §
EDWARD SILL, TRAVIS JAMES LAMICA,  §
LIANE LAMICA, MELISSA LYNN  §
DOHERTY, DAVID MICHAEL SIMMS,  §
ALEXIS B. RILEY, JEFFREY  §
CHRISTOPHER HARPER, JR., ENDI  §
CISNEROS HERRERA, CORY LEE  §
THOMAS, N.A.T., A MINOR CHILD, A.L.T.,  §
A MINOR CHILD, MATTHEW MCIVOR,  §
JACOB RICHARD DEVRIES, SUSAN M.  §
MOULTON, JERRY L. DEVRIES,  §
RIGOBERTO LOPEZ GARCIA, MANUEL  §

ROMAN, ARACELLYS JASMIN ROMAN,  §
THALIA YARIE ROMAN, JAMILEX YALI  §
ROMAN, ESTRELLA ROMAN PADILLA,  §
MANUEL ROMAN, SR., MARIA  §
CHRISTINA MURPHY, MARCO  §
ANTHONY ROMAN, JEFFERY HARMON,  §
JACOB P. DAVID, ANTHONY FRANCIS  §
DEMATTIA, ABRAM WILLIAM MARVIN,  §
ISRAEL GONZALEZ AREVALO, ALICIA  §
GONZALEZ, JESUS GONZALEZ  §
PLASCENCIA, RICARDO GONZALEZ,  §
JOSHUA MICHAEL KRUEGER, JILL  §
KATHERINE KRUEGER, KAREN JEAN  §
KRUEGER, MICHAEL WAYNE KRUEGER,  §
DON ANTHONY WALLS, DAYSHA  §
SHALEE WALLS, YUN HUI MIYAMURA,  §
SYLVESTER WALLS, DORTHY L. MACK,  §
DOUGLAS MACK, MATTHEW SLATE  §
HAEGER, ESTATE OF BRYAN LUCKEY,  §
CATHERINE MAKIMAY LUCKEY, PAULA  §
HUTTON LUCKEY, PATRICK BRYAN  §
LUCKEY, JOSHUA C. LUCKEY,  §
MATTHEW LUCKEY, JASON PETER  §
SCHAUBLE, JAMES RYAN MCPHERSON,  §
JANICE B. ROSE, JOHN L. PARCELL,  §
KYLA PARCELL, JOHN R. PARCELL, JODI  §
L. PARCELL, SERGIO DANIEL LOPEZ,  §
S.C.L., A MINOR CHILD, ESTATE OF  §
DALE ALAN BURGER, JR., MARTINA  §
CATHERINE BURGER, JENNIFER  §
CHRISTINE BURGER, RACHEL  §
ELIZABETH BURGER, JASON BRADLEY  §
FINCH, ELIZABETH MARY FINCH,  §
BRADLEY LOUIS FINCH, KENNETH  §
CHRISTIAN ANDERSON, COLLEN  §
MATTHEW WEST, CARLA WEST, TIM  §
WEST, BRENDEN WEST, ALLISON WEST-  §
SOUTHERN, KIERA PAUL, MIKE  §
SWEENEY, ESTATE OF JORDAN  §
WILLIAM BOWLING, JR., D.B., A MINOR  §
CHILD, J.B., A MINOR CHILD, RONDA  §
MELTON, JORDAN W. BOWLING, SR.,  §
SHELLEY LYNN ABBOTT, ESTATE OF  §
PATRICK MARC M. RAPICAULT, VERA  §
RAPICAULT, NICOLE RAPICAULT,  §
CHARLES LEE STORLIE, MARIAN LEIGH  §

TISE, CHADWICK WILLIAM STORLIE,                §
RICHARD NELS STORLIE, JORDAN                   §
ANTONIAZZO MADONNA JONJU, RAY                  §
LEONARD LOPEZ, SIERRA M. VASQUEZ,              §
CASSANDRA M. NUNEZ, SUSANNE M.                 §
LOPEZ, SONIA M. LOPEZ, JOHN R.                 §
STANLEY, REBECCA VASQUEZ, TYLER                §
DAVID NEUMEISTER, ELYSE FINK,                  §
KIMBERLEE MORGAN HINKLEY,                      §
SHOSHONE NADENE BOUDREAU,                      §
ENRIQUE LINAN, JR., BLAIR ELLIS DELL,          §
CANDUS ANGEL DELL, V.J.D., A MINOR             §
CHILD, SHANE MICHAEL PITTS,                    §
VIRGINIA SUMMER, MATTHEW PAUL                  §
DALRYMPLE, MICHAEL RAFAEL                      §
HERNANDO, BRYANT JOSHUA SCHILTZ,               §
ANDRE LEONARD MAISON, DERRICK                  §
ADAM ANTHONY, FRANCES ELIZABETH                §
ANTHONY, DANIEL ALAN ANTHONY,                  §
ADAM NATHAN FLEURY, FRANCIS                    §
MARTIN HURD, SHERMANDRE WESLEY                 §
JACKSON, JOHN JUJU WILLIAMS,                   §
CHIQUITA S. WILLIAMS, D.I.W., A                §
MINOR CHILD, STEVEN ANDREW MAY,                §
SHANE KEVIN HOUSMANS, NICOLE M.                §
HOUSMANS, C.F.H., A MINOR CHILD,               §
JEREMIAH KEOHANE LEIBRANDT, BILL               §
HUDSON GROSS II, TONEY MAURICE                 §
THOMPSON, JOHN RICHARD CHAO,                   §
ROBERT ANTHONY PEDREIRO, MARTIN                §
J. GONZALEZ, BETTY J. GONZALEZ,                §
TOMAS RIVERA GONZALEZ, VUTHA                   §
EANG, DAVID GLENN MCKENZIE, SR.,               §
DAVID GLENN MCKENZIE, JR., DONNA               §
LAGINA REID, PEARL JEAN MCKENZIE,              §
ROSEMARY MIDDLETON, LISA JEAN                  §
CROWDER, IAN REESER,  RYAN                     §
PATRICK CLEMENTS, ROBIN                        §
CLEMENTS, NICHOLAS NEGRALLE,                   §
PETER NEGRALLE, C.C., A MINOR                  §
CHILD, DIANE L. CLEMENTS, PATRICK              §
L. CLEMENTS, LUCAS CLEMENTS,                   §
MICHAEL LAMOYNE BURNS, ROBYN                   §
JEANNE BURNS, MICHAELA NICOLE                  §
BURNS, P.M.B., A MINOR CHILD,                  §
ASHLEY MARIAH BURNS, MADISSON                  §

ROSE BURNS, ROGER FRANKLIN
GRAVES, STEVEN MICHAEL PADDISON,
TRAVIS PADDISON, EMILY LYNN
PADDISON, EILEEN VIVIAN PADDISON,
JAMES W. PADDISON, JENNIFER J.
LEWIS, KAREN LOUISE BURR, RUSSELL
J. PADDISON, LUKE PETER HARVEY,
L.K.K., A MINOR CHILD, SUSAN A.
HARVEY, JOHN K. HARVEY, ERIK
DOUGLAS JOHNSON, MARTIN
CHRISTOPHER JONES, MELISSA JONES,
MORGAN JONES, BEVERLY JONES, JIMI
MCMAHON, D.J.M., A MINOR CHILD, S
M.M., A MINOR CHILD, RYAN EARL
GWALTNEY, HOLLY ANN MROZINSKI,
TIMOTHY EARL GWALTNEY,
CHRISTOPHER JOSEPH MROZINSKI,
TIMOTHY JACOB GWALTNEY, A.M., A
MINOR CHILD, NATHAN ALLEN
ROLENS, ERWIN DAVID SADDI, SHEILA
SADDI, S.M.S.1, A MINOR CHILD, S.M.S.2,
A MINOR CHILD, S.F.S., A MINOR CHILD,
JONATHAN CHANCE THOMAS, FRIEDA
STEPHANIE MELTON, JOHN BURK
THOMAS, JACK RYAN WILKERSON,
JESSIE MELTON MORGAN, ASHLEY
THOMAS GIBSON, NICKIE MARIE
VELEZ, ESTATE OF JOSE A. VELEZ,
MONICA VELEZ, BEAU ANTHONY
MATTIODA, KEVIN A. MADACHIK,
ALFREDA IRENE MADACHIK, THOMAS
JOHN MADACHIK, LAUREN C.
MADACHIK, STEPHEN MADACHIK,
JARED FULTON BROWN, BRIAN
GEORGE THURMOND, MARY BARWICK,
GEORGE THURMOND, JENNIFER
COALSON, JOHN WESLEY URQUHART,
CATHERINE ELIZABETH URQUHART,
GARLAND WESLEY URQUHART,
CHRISTINA WILKERSON, CAROLINE
URQUHART, MARY ELIZABETH
URQUHART, VIRGINIA URQUHART,
DANIEL JAMES GRIEGO, AMY GRIEGO,
PRISCILLA GRIEGO, NOAH JAMES
GRIEGO, LENA PARKER, CYNTHIA
LEONARD, FRED GRIEGO, NICHOLAS

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

ANTHONY WEST, CHRISTINE WEST,               §
ESTATE OF DERRICK JOSHUA                     §
COTHRAN, ELENA MARTINEZ                      §
COTHRAN,  THEODORE MICHAEL                   §
COTHRAN,SR., THEODORE MICHAEL               §
COTHRAN, JR.,  ANTOINETTE COTHRAN           §
HEBERT, JOEL K. GORBUTT, GREGORY            §
P. BLINCOE, CARRIE BLINCOE, Z.B., A          §
MINOR CHILD, CONNIE ARGIER,                  §
WILLIAM JOSEPH PUOPOLO, STEPHANIE           §
MARIE PUOPOLO, JOHN IOANNIS                  §
OUZOUNIDIS, RONALD PAUL MCLANE,             §
CANDIE NICOLE REED-MCLANE, J.P.M.,          §
A MINOR CHILD, WILLIAM ENRIQUEZ             §
SANTOS, JR., BRADLEY SCOTT                   §
SHADDEN, MATTHEW PAUL UKEN,                 §
JASON EDWARD MIKOLAJCIK,                     §
TIMOTHY GEORGE BRANDON SVEJDA,              §
VICTORIA C. LEVSEN, DANIEL                   §
WILLIAMS, DAVID ANDREW HOLLEY,              §
TERI TARANTINO, NELSON ANTONIO              §
MARTINEZFLORES, SHAWN DAVID                 §
SPITZER, PHILIP RYAN TRIMBLE, JANET         §
M. SCHOONOVER, ANDREW L. TRIMBLE,          §
RICHARD OREN TRIMBLE, CHARLOTTE             §
RAE TEETSEL, KAYELEEN ANNE                   §
LULOFF, LADONNA RENEE                        §
LANGSTRAAT, JOHN A. TRIMBLE, JOEL           §
BENJAMIN DAMIN, R.E.D., A MINOR             §
CHILD, REBECCA S. DAMIN-MOSS,               §
ALEXANDER RODRIGUEZ BRYANT,                 §
JOHN MICHAEL DRNEK, TINA M.                  §
DRNEK, CHRIS M. DRNEK, KELLY N.             §
SNYDER, JOHN DANIEL SHANNON,                §
TORREY LISA SHANNON, DOMINICK              §
PAUL SHANNON, TALON DAKOTA                   §
SHANNON, D.R.S., A MINOR CHILD,             §
ESTATE OF ERIC WAYNE MORRIS,                §
JOLENE ELLEN MORRIS, CHYAN N.               §
JACHE, CHYNA M. JACHE, ANTHONY             §
LEE MIELE, SIMON PETER FLARITY,            §
JAMES RYAN MOBLEY, BRYON                     §
MAURICE SLAY, AKOS SLAY, B.D.B.S., A       §
MINOR CHILD, SHARON SLAY DUBOSE,           §
WILBERT DUBOSE, JERRELL SLAY,              §
RYAN DAVID SAWYER, LAURA                    §

SAWYER, MONACA LOUISE GILMORE,                §
M.L.G., A MINOR CHILD, T.M.G., A               §
MINOR CHILD, MARIA PETTIS, DARRYL              §
OWEN DOTSON, JR., SIMON MIGUEL                 §
GARCIA, ALICIA R. GARCIA, RYAN                 §
CHRISTOPHER SAURS, JAMES THOMAS                §
OLSON, ESTATE OF ABRAHAM                       §
SIMPSON, MARIA LUZ SIMPSON, JAMES              §
T. SIMPSON, DAVID SIMPSON, PAUL                §
SIMPSON, SHANE FITZSIMMONS, JOHN               §
FITZSIMMONS, KAITLYN MARTINEZ,                 §
DAVID KARL LIND, DAVID A. LIND,                §
CATHERINE JACKMAN, MICHAEL LIND,               §
BRADLEY JOSEPH LIND, MARIO                      §
DONTAE WHITAKER, SR., JORGE                     §
ALEXANDER ROMAN, DIANA CANALES,                §
GABRIEL MARTINEZ, ROCKY                         §
MARTINEZ, BRYAN DANIEL ESCOBEDO,               §
JOSS WADE PURDON, SHAWNA                        §
PURDON, AUSTIN PURDON, JACOB                    §
PURDON, DENVER WESLEY HOUCK, JR.,              §
JENNIFER HOUCK, L.A.H., A MINOR                 §
CHILD, POLLY HOUCK, BRIAN ELDON                §
WILLIAMS, KIMBERLY KAYE                         §
WILLIAMS, STEVEN ELDON WILLIAMS,               §
COLBY ALLAN WILLIAMS, DOMINIC                   §
ANGEL FRANCO, YICENIA FELO-                     §
FRANCO, X.F., A MINOR CHILD,                    §
VALERIE PETERSON, STEVE PETERSON,              §
MATTHEW JOSEPH SOLBERG, LAURIE                 §
HEBBE, ROGER HEBBE, SAM HEBBE,                  §
JACOB HEBBE, BRADLEY CHARLSON,                  §
TANIA MAHINDA, NICOLE CHARLSON,                §
JESUS ALVAREZ GARCIA, DEREK                     §
DAVID MCGINNIS, ANDREA MICHELLE                §
MCGINNIS, DONNELL DRAIL NELSON II,             §
TROY JAMES TUSCHEL, DANIEL DENNIS              §
IBACH, MARY ANN IBACH, DENNIS                   §
BURNELL IBACH, BRIAN JOHN                       §
JOHNSON, TIMOTHY JOHN JOHNSON,                 §
ARTHUR LOUIS TOMPKINS, ESTATE OF               §
BRENTON THOMAS GRAY, COURTNAY                  §
SCOTT GRAY, C.S.G., A MINOR CHILD,             §
GARY JAROMIR RUC, XENIE HLADIK,                §
EDDIE MICHAEL ABBEY, ESTATE OF                 §
JONATHAN WILLIAMS BOWLING,                      §

ROBIN BOWLING FERON, DARRELL                    §
CONNOR BOWLING, BROOKE                          §
ELIZABETH WEXLER, ASHLEY                        §
BOWLING NOGUEIRA, ANDRE                         §
CORNELIOUS MOYE, ANTONIO JOSE                   §
MORA, A.R.M., A MINOR CHILD,                    §
FRANCIS M. LOVATO, CLINTON                      §
DEWARD DURHAM, D.N.D., A MINOR                  §
CHILD, DORIS MARTIN, CLINTON                    §
DURHAM, SR., CLINTON DURHAM, JR.,               §
TROY SMITH, CARRITTEE MICHELLE                  §
SMITH, SABRINA DURHAM, SHEILA                   §
DURHAM, JACKSON ENRIQUE LUNA,                   §
J.A.L., A MINOR CHILD, S.G.L., A MINOR          §
CHILD, NANCY BALLESTAS, ANA                     §
GREGORIA AMOROS, JOHN MICHAEL                   §
BRASHEAR, JOSEPH JOAQUIN TELLEZ,                §
ISABEL G. TELLEZ, RICHARD A. TELLEZ,            §
SADIE S. LAFROMBOISE, LEONARD                   §
BERT SLOAN, MARIA L. SLOAN,                     §
LEONARD J. SLOAN, LUIS HUMBERTO                 §
GUTIERREZ, JR., DIANA GUTIERREZ,                §
L.A.D., A MINOR CHILD, ROBERT                   §
JOSEPH D'AGOSTINO, SCOTT WADE                   §
FRITZ, KRISTEN J. FRITZ, THOMAS                 §
LOCKWOOD JOHNSON, VAITOGI SANI                  §
TAETULI, LETICIA TAETULI,                       §
CASSANDRA MARTINEZ, MARISOL                     §
OJEDA, ROLAND CASSO, TAETULI SANI,              §
LIKE SANI VILI, CRAIG SCOTT                     §
SOTEBEER, MARIA CATHERINE                       §
SOTEBEER, JOSE MIGUEL JAUREGUI,                 §
GRISELDA JAUREGUI, JOSE JAUREGUI,               §
JOSEFINA JAUREGUI, ALFREDO                      §
JAUREGUI, LUCIO JAUREGUI, RONNY                 §
PORTA, RENE EVA PORTA, FELIX A.                 §
PORTA, NATALI PORTA, OCTAVIO                    §
SANCHEZ, VANETTE C. SANCHEZ,                    §
JACOB ANDREW SANCHEZ, OCTAVIO                   §
MANUEL SANCHEZ, J.S., A MINOR                   §
CHILD, GARY DAVID MORAN, ANNETTE                §
C. MORAN, G.D.M., A MINOR CHILD,                §
SAVANNAH K. DISMUKE-MORAN, ERIC                 §
G. MORAN, ERICKA T. MORAN -                     §
BACORDO, ALAN CHARLES JONES,                    §
PATRICIA ANN JONES, SARAH P. JONES,             §

JAMES ALAN BELL, LINDA S. BELL,                    §
DAVID CRAIG, JON G. BELL, ESTATE OF                §
RANDY LEE STEVENS, DAVID L.                        §
STEVENS, CONNIE WEST, JACOB LEE                    §
MAXWELL, GINA LEE STEVENS, ESTATE                  §
OF ROBERT WILLIAM BRIGGS,                          §
MICHELLE L. BRIGGS, C.A.B., A MINOR                §
CHILD, ASHLEA GABRIELLE TADLOCK,                   §
TERRY LYNN MCELWAIN, JULIA                         §
DANTONG MCELWAIN, S.M., A MINOR                    §
CHILD, R.M., A MINOR CHILD, ELEANOR                §
E. MCELWAIN, TRACY ROSARIO, ANGEL                  §
MICHELLE HUGHES, TRAVIS                            §
MCELWAIN, JAMES S. MCELWAIN,                       §
ANTHONY GEORGE BRUCE, JOSHUA                       §
MATTHEW BOWER, JEFFERY SHANE                       §
REDMAN, ESTATE OF JOSHUA ALLEN                     §
WARD, PATRICIA IRENE WARD, JACE                    §
ALRIC BADIA, K.R.B., A MINOR CHILD,                §
KYLE LEE WELCH, KEVIN DANIEL                       §
SNOW, ADRIENNE SNOW, N.A.P.S., A                   §
MINOR CHILD, G.L.A.S., A MINOR CHILD,              §
JASMYNE H. ARQUIETT, PHILLIP                       §
CHRISTOPHER BAILEY, TIMOTHY                        §
BAILEY, JASON MINTER, JASON KELLY                  §
WASHBURN, COLIN ALFRED BENJAMIN                    §
ANDERSON, ELIZABETH ANDERSON,                      §
JANE ANDERSON, KARL ANDERSON,                      §
KRISTI BAO, HEIDI MARTINEZ, LAURIE                 §
ANDERSON, ROBERT JOSEPH BARTHEL,                   §
D.N.B., A MINOR CHILD, T.M.B., A                   §
MINOR CHILD, A.A.B., A MINOR CHILD,                §
ESTATE OF GWILYM JOSEPH NEWMAN,                    §
SAMANTHA L.N. TJADEN, G.A.N., A                    §
MINOR CHILD, CHRISTINE A. CURTIS,                  §
BRITTANY M. GREENE, PATRICK D.                     §
NEWMAN, TYLER JAMES MARTIN,                        §
CHAD RICHARD BANGERTER, KRISTI                     §
ANN BANGERTER, MASON CHAD                          §
BANGERTER, TREVOR REED SMITH, JOE                  §
SANCHEZ, JR., CINDY JO SANCHEZ,                    §
SANDY JO MOLINA, ARTHURWAYNE                       §
D'AMATO, RORY HAMILTON COMPTON,                    §
RUTH ELIZABETH COMPTON, LYNETTE                    §
MARIE COOPER, TODD DUANE COOPER,                   §
CURTIS JOSEPH MIGHACCIO, GUNHILD                   §

MIGHACCIO, MARTIN MIGHACCIO,                    §
JUSTIN ANDREW BOSWOOD, CARRIE L.                §
BOSWOOD, ESTATE OF JAMES DAVID                  §
BLANKENBECLER, LINNIE ALMA                      §
BLANKENBECLER, JOSEPH ALEXANDER                 §
MORALES, JESSICA MARIE SCADUTO,                 §
AMANDA MARIE VILLALOBOS,                        §
MICHAEL ANTHONY MENDOZA, KELLY                  §
MENDOZA, S.M.M., A MINOR CHILD,                 §
GERARDO CONTRERAS, JOSE LUIS                    §
CONTRERAS, SR., JOSE LUIS                       §
CONTRERAS, JR., ELIZABETH                       §
CONTRERAS, NELLY VIVEROS, DANNY                 §
TRAM, JAMES MICHAEL GEIGER III,                 §
PATRICIA L. GEIGER, JAMES M. GEIGER,            §
JR., ELIZABETH E. GEIGER, JOSHUA H.             §
GEIGER, KEVIN BRADLEY OLECH,                    §
JOHNNY JEFFERSON CRAIN, TONJA                   §
DAVENPORT, DARBY JANE CRAIN,                    §
JOHN SAWYER CRAIN, AMARIS BROOK                 §
CRAIN, WILMA JANE KIDD, JUSTIN                  §
HULLETT, GEORGINA ELAINE GORDON,                §
RONNIE HULLETT, JOEY ADAM                       §
HULLETT, ROBBIE JAY HULLETT,                    §
KELSEY NOEL ADAMS, ESTATE OF                    §
CHRISTIAN ANTHONY SARACHO                       §
GARCIA, ANGELA M. GARCIA,                       §
CHRISTOPHER SATTERFIELD, JOEL                   §
HERNANDEZ, VICTORIA HERNANDEZ,                  §
K.M.G., A MINOR CHILD, K.R.G., A                §
MINOR CHILD, TERRY LEON STEWARD,                §
DARLENE MORGAN-STEWARD, LARRY                   §
DWAIN GRIFFIS, ANTHONY WILLIAM                  §
GREEN, JOAN M. GREEN, MICHAEL T.                §
GREEN, MATTHEW T. GREEN,                        §
SIGIFREDO APODACA, VANITA                       §
APODACA, MANUEL APODACA, SAUL                   §
APODACA, DEBRA APODACA, ALEXIA                  §
FELIX, REX DONALD LACEBY, TYLER R.              §
LACEBY, DOLORES SCHAFFER,                       §
DONALD S. LACEBY, ESTATE OF                     §
SASCHA GRENNER-CASE, KAREN K.                   §
GRENNER-CASE, MYRA R. BARDO,                    §
TROY A. GRENNER-CASE, SAMUEL                    §
WILLIAMS, DEREK BENJAMIN KOLB,                  §
ROBERT ALLEN LEATHERWOOD, JR.,                  §

DEBBIE LEE ZENK, ROBERT ALLEN          §
LEATHERWOOD, SR., WENDY DEANNE         §
LEATHERWOOD, KENNETH WAYNE             §
LEATHERWOOD, KENNETH CLAYTON           §
RONALD WILHELM, STACEY BROOKE          §
LEATHERWOOD, LINDSAY DEANNE            §
REYES, ESTATE OF JAMES HEATH           §
PIRTLE, URSULA YOUNGERMAN              §
PIRTLE, SHANE KANIELA                  §
YOUNGERMAN, KAI SAMUEL                 §
YOUNGERMAN, KAY LYNN BEEMAN,           §
LANNIE DOYLE PIRTLE, HOUSTON TY        §
PIRTLE, JARROD MATTHEW PIRTLE,         §
RANGER IRA PIRTLE, BERNABE             §
CARRELL MONTEJANO, FAITH               §
MONTEJANO, SARAH M. HUMPHREY,          §
KRISTOPHER HARRY QUINTANA,             §
ESTHER SCAMAN, JOHN W. SCAMAN,         §
JUSTIN W. SCAMAN, CASSIE QUINTANA      §
VASQUEZ, ANDREW HOWARD                 §
ROTHMAN, MATTHEW GRANT                 §
HAVILAND, NICHOLAS HAMILTON            §
KYLE, MICHAEL RAYMOND KYLE,            §
ESTATE OF RICKY SALAS, JR., APRIL      §
BACA-SALAS, JO.R.S., A MINOR CHILD,    §
JA.R.S., A MINOR CHILD, BRENDA SUE     §
ROBERTSON, ROGER SALAS, DANIEL         §
SALAS, RANDY SALAS, MELISSA            §
GUTIERREZ, DAVID JOSEPH BICKNELL,      §
PATRICIA BICKNELL, RICHARD             §
BICKNELL, LAUREN BICKNELL,             §
GARRETT MICHAEL MARSH, BRIAN           §
PATRICK MCPHERSON, ESTATE OF           §
EDDIE EUGENE MENYWEATHER,              §
VERONICA M. MENYWEATHER, EDDIE         §
E. MENYWEATHER, JR., GYNIA M.          §
MENYWEATHER, MOLIVERE M.               §
MENYWEATHER, EDDIE E. EDWARDS,         §
ALFRED D. MENYWEATHER, GARY A.         §
MENYWEATHER, LINDA E.                  §
MENYWEATHER, KATHERINE L.              §
LAWLER, STEPHANIE M.                   §
MENYWEATHER, DOROTHY M.                §
MENYWEATHER, SHARON D.                 §
MENYWEATHER, LILLIE R.                 §
MENYWEATHER, BILLIE JOYCE              §

EDWARDS, LATONYA R. EDWARDS,　§
EDDIE E. EDWARDS, JR., SHARON D.　§
EDWARDS, SHONTAE T. EDWARDS,　§
MARTAVEON C. EDWARDS, TODD　§
EDWARD WINN, LINDA LORRAINE　§
WINN, ALLISON LORRAINE WHARTON,　§
SAMUEL JAMES MORTIMER, KRISTINE　§
MORTIMER, KEVIN DALE MILLER,　§
LADONNA SUE MILLER, RONNIE DALE　§
MILLER, KEITH EDWARD ROGERS,　§
ESTATE OF JOHN DAVID FRY, MALIA　§
FRY, C.L.F., A MINOR CHILD, KATHRYN　§
FRY, GIDEON FRY, CHARLES FRY,　§
MELISSA INMAN, LAURA PRICER,　§
JACOB ANDREW MILLER, RACHEL　§
AMBER MILLER, LAFONDA MILLER,　§
LYLE MILLER, ZACHARY MILLER,　§
DESHAWN DAVID TURNER, ANITA A.　§
TURNER, ESTATE OF CODY CLARK　§
GRATER, ANITA D. LEWIS, DANIEL　§
LEONARD POULSEN, CINDY BAIER,　§
ALLEN BAIER, ERIK POULSEN, BRIAN　§
POULSEN, BRADLEY ARNOLD BLAZEK,　§
TERRI MACHELLE BLAZEK, ESTATE OF　§
ADAM J. KOHLHAAS, HENRY　§
KOHLHAAS, PAULA KOHLHAAS　§
MILLER, BRADLEY ALAN KNEPPER,　§
TERRY LAMONT FLEMING, IDA LEE　§
FLEMING, ELAINE F. BENNETT, AYRON　§
L. BENNETT, VICTOR JEROME　§
DOMINGUEZ, V.D., A MINOR CHILD,　§
IVONNE DOMINGUEZ, ANTONIO　§
APONTE, ESTATE OF MERLIN GERMAN,　§
LOURDES GERMAN, ARIEL GERMAN,　§
GLENN GILBERT GEFFERT, PAMELA A.　§
GEFFERT, AIDAN M. GEFFERT, IAN C.　§
DRINKWATER, TRISTAN G.　§
DRINKWATER, ANDREW JAMES　§
RAYMOND, DIANA L. RAYMOND, A.J.R.,　§
A MINOR CHILD, CALEB A. RAYMOND,　§
HANNAH E. RAYMOND, PHYLLIS M.　§
RAYMOND, ESTATE OF TROMAINE K.　§
TOY, SR., TYRELL R. TOY, ESTATE OF　§
ANTHONY CAPRA, JR., ANGIE CAPRA,　§
MARK CAPRA, VICTORIA CAPRA, A.C., A　§
MINOR CHILD, J.C., A MINOR CHILD,　§

S.C., A MINOR CHILD, SHARON CAPRA,      §
ANTHONY CAPRA, SR., DANIELLE            §
CAPRA, EMILY CAPRA, JACOB D.            §
CAPRA, JOANNA CAPRA, JOSEPH E.          §
CAPRA, JULIA-ANNE CAPRA, MICHAEL        §
L. CAPRA, RACHEL M. CAPRA LEE,          §
SARAH CAPRA JOHNSON, JASON              §
CAPRA, JOSEPH CHRISTOPHER               §
FERRARO,                                §
                                        §
                                        §
            Plaintiffs,                 §
                                        §
vs.                                     §
                                        §
HSBC BANK USA, N.A.; HSBC HOLDINGS      §
Plc; HSBC BANK Plc; HSBC BANK           §
MIDDLE EAST LIMITED; HSBC NORTH         §
AMERICA HOLDINGS, INC.; BARCLAYS        §
BANK Plc; BARCLAYS BANK Plc, NEW        §
YORK BRANCH; STANDARD                   §
CHARTERED BANK; STANDARD                §
CHARTERED BANK, NEW YORK                §
BRANCH; ROYAL BANK OF SCOTLAND          §
PLC (n/k/a NATWEST MARKETS PLC);        §
ROYAL BANK OF SCOTLAND N.V.;            §
ROYAL BANK OF SCOTLAND PLC (n/k/a       §
NATWEST MARKETS PLC), NEW YORK          §
BRANCH; CREDIT SUISSE AG; CREDIT        §
SUISSE AG, NEW YORK BRANCH; BNP         §
PARIBAS S.A.; BNP PARIBAS, S.A., NEW    §
YORK BRANCH; DEUTSCHE BANK AG;          §
DEUTSCHE BANK AG, NEW YORK              §
BRANCH; CRÉDIT AGRICOLE S.A.;           §
CRÉDIT AGRICOLE CORPORATE &             §
INVESTMENT BANK; CRÉDIT AGRICOLE        §
CORPORATE & INVESTMENT BANK,            §
NEW YORK BRANCH; COMMERZBANK            §
AG; COMMERZBANK AG, NEW YORK            §
BRANCH; and BANK SADERAT Plc.           §
                                        §
            Defendants.                 §
                                        §

## **TABLE OF CONTENTS**

I.     NATURE OF ACTION ................................................................................... 1

     1.   IRAN'S INTERNATIONAL TERRORISM NETWORK........................................... 4

     2.   BANKS ARE THE FRONTLINE DEFENDERS AGAINST TERROR FINANCING - IRANIAN SANCTIONS AND BANKS' AFFIRMATIVE DUTIES TO PREVENT TERROR FINANCING........................................................................................ 10

     3.   DEFENDANTS KNOWINGLY HELPED IRAN EVADE SANCTIONS .............. 21

     4.   THE CONSPIRACY ................................................................................... 23

II.    JURISDICTION AND VENUE ................................................................. 33

     1.   THIS COURT HAS JURISDICTION OVER ALL CLAIMS AND ALL PARTIES 33

        A.  SUBJECT MATTER JURISDICTION ................................................. 33

        B.  PERSONAL JURISDICTION............................................................ 33

     2.   VENUE IS PROPER IN THIS COURT................................................. 36

III.   THE DEFENDANTS........................................................................... 37

     1.   THE HSBC DEFENDANTS ................................................................. 37

     2.   DEFENDANTS BARCLAYS BANK PLC & BARCLAYS BANK PLC, NEW YORK BRANCH............................................................................................ 41

     3.   DEFENDANTS STANDARD CHARTERED BANK & STANDARD CHARTERED BANK, NEW YORK BRANCH ........................................................ 42

     4.   DEFENDANTS ROYAL BANK OF SCOTLAND PLC, NATWEST MARKETS PLC, & ROYAL BANK OF SCOTLAND N.V........................................................ 43

     5.   DEFENDANTS CREDIT SUISSE AG AND CREDIT SUISSE AG, NEW YORK BRANCH ............................................................................................ 45

     6.   DEFENDANTS BNP PARIBAS S.A. & BNP PARIBAS, S.A. NEW YORK BRANCH ............................................................................................ 46

     7.   DEFENDANTS DEUTSCHE BANK A.G. & DEUTSCHE BANK AG, NEW YORK BRANCH............................................................................................ 47

8.  DEFENDANTS CRÉDIT AGRICOLE S.A., CRÉDIT AGRICOLE CORPORATE & INVESTMENT BANK, & CRÉDIT AGRICOLE CORPORATE & INVESTMENT BANK, NEW YORK BRANCH .................................................. 48

9.  DEFENDANTS COMMERZBANK AG & COMMERZBANK AG, NEW YORK BRANCH .................................................................................... 49

10. DEFENDANT BANK SADERAT PLC ................................. 51

IV.  FACTUAL ALLEGATIONS ................................................. 52

1.  IRAN'S LONG HISTORY OF SUPPORTING AND FINANCING INTERNATIONAL TERRORISM ........................................... 52

2.  U.S. SANCTIONS AND IRAN'S RELIANCE ON U.S. DOLLARS ...................... 53

3.  IRAN CONTINUALLY EVADED U.S., EUROPEAN UNION, AND UNITED NATIONS' SANCTIONS ......................................... 55

4.  THE EURODOLLAR MARKET – IRAN'S MONEY LAUNDERING AND ILLICIT EXPORT NEXUS WITH DEFENDANT BANKS.................................. 58

    A.  THE CONSPIRACY'S SHARED GOALS........................... 58

    B.  EURODOLLAR MARKET OPERATIONS........................... 59

5.  THE IRANIAN U-TURN EXEMPTION AND ITS REVOCATION ...................... 60

6.  LETTERS OF CREDIT – AN ALTERNATIVE METHOD OF UNDERMINING THE IRANIAN SANCTIONS PROGRAM.............................. 66

    A.  THE BASICS OF TRADE FINANCE ................................. 66

    B.  THE U.S. TRADE EMBARGO – UNITED STATES MUNITIONS LIST (USML) AND COMMERCE CONTROL LIST (CCL) ...................... 68

7.  IRAN'S ILLEGAL ARMS SHIPMENTS THROUGH THE ISLAMIC REPUBLIC OF IRAN SHIPPING LINES ("IRISL") .................................... 70

8.  IRAN'S AGENTS, HEZBOLLAH, THE IRGC, AND MOIS FOMENT TERRORISM IN IRAQ.................................................. 74

9.  IRAN FUNDED THE DESIGN, PRODUCTION, PROCUREMENT, PROVISION AND DEPLOYMENT OF EXPLOSIVELY FORMED PENETRATORS ("EFPS") USED TO KILL OR INJURE AMERICANS, INCLUDING PLAINTIFFS ........... 79

10. IRAN FUNDED THE DESIGN, PRODUCTION, PROCUREMENT, PROVISION AND DEPLOYMENT OF ROCKETS, MORTARS AND IRAMS USED TO KILL OR INJURE AMERICANS, INCLUDING PLAINTIFFS. ...................... 84

11. IRAN FUNDED THE DESIGN, PRODUCTION, PROCUREMENT, PROVISION AND DEPLOYMENT OF OTHER LETHAL WEAPONS AND TACTICS USED TO KILL OR INJURE AMERICANS, INCLUDING PLAINTIFFS. ....................... 86

12. IRAN USED THE IRGC AND FTO HEZBOLLAH TO MATERIALLY SUPPORT THE SPECIAL GROUPS IN ORDER TO AUTHORIZE, PLAN, AND COMMIT TERRORIST ATTACKS IN IRAQ. .......................................................... 91

    A. THE BADR CORPS / BADR ORGANIZATION ................................. 91

    B. JAYSH AL MAHDI ("JAM" OR THE "MAHDI ARMY") ............................... 94

    C. ASA'IB AHL AL-HAQ ("AAH" OR "THE LEAGUE OF THE RIGHTEOUS") ........................................................................................ 97

    D. KATA'IB HEZBOLLAH ("KH") ......................................................... 98

    E. FTO HEZBOLLAH AUTHORIZED THE SHIA SPECIAL GROUPS' TERRORIST ATTACKS AGAINST AMERICANS IN IRAQ ....................... 104

    F. FTO HEZBOLLAH PLANNED THE SHIA SPECIAL GROUPS' TERRORIST ATTACKS AGAINST AMERICANS IN IRAQ ................................ 109

    G. IRAN, THROUGH FTO HEZBOLLAH, PROVIDED THE SHIA SPECIAL GROUPS WITH WEAPONS TO CARRY OUT TERRORIST ATTACKS AGAINST AMERICANS IN IRAQ ................................................. 118

    H. IRAN MATERIALLY SUPPORTED SUNNI FTOS AL QAEDA ("AQ") AND ANSAR AL ISLAM ("AAI") TO PLAN, COMMIT, AND AUTHORIZE TERRORIST ATTACKS AGAINST AMERICANS IN IRAQ ....................... 119

13. IRAN'S HISTORY OF SUPPORTING SUNNI TERROR GROUPS ................... 121

    A. FTO AL QAEDA ("AQ") ................................................................... 121

    B. FTO AL QAEDA IN IRAQ ("AQI") ................................................. 129

    C. FTO ANSAR AL ISLAM ("AAI") ..................................................... 134

    D. IRAN'S SUNNI FTO NETWORK IN IRAQ PLANNED AUTHORIZED & COMMITTED ATTACKS AGAINST PLAINTIFFS ....................................... 141

14. ALL OF THE ATTACKS AT ISSUE IN THIS COMPLAINT WERE ACTS OF INTERNATIONAL TERRORISM ....................................................... 143

V.     OVERVIEW OF THE CONSPIRACY ......................................................... 147

    1. AGREEMENT AND KNOWLEDGE ....................................................... 147

2. ACTS AND EFFECTS ........................................................................................ 151

3. DEFENDANT BANK SADERAT PLC'S AGREEMENT TO, AND
   PARTICIPATION IN, THE CONSPIRACY ......................................................... 154

4. THE CENTRAL BANK OF IRAN'S AGREEMENT TO, AND PARTICIPATION
   IN, THE CONSPIRACY ...................................................................................... 159

5. BANK MELLI IRAN AND MELLI BANK PLC'S AGREEMENT TO, AND
   PARTICIPATION IN, THE CONSPIRACY ......................................................... 163

6. BANK MELLAT'S AGREEMENT TO, AND PARTICIPATION IN, THE
   CONSPIRACY ..................................................................................................... 170

7. BANK SEPAH'S AGREEMENT TO, AND PARTICIPATION IN, THE
   CONSPIRACY ..................................................................................................... 171

8. THE HSBC DEFENDANTS' AGREEMENT TO, AND PARTICIPATION IN, THE
   CONSPIRACY ..................................................................................................... 173

9. HSBC-EUROPE'S 2001 "BANK MELLI PROPOSAL" ...................................... 177

10. DEFENDANT HSBC-US'S AGREEMENT TO, AND PARTICIPATION IN, THE
    CONSPIRACY IN VIOLATION OF 18 U.S.C. § 2332D ...................................... 184

11. DEFENDANT BARCLAYS BANK PLC'S AND BARCLAYS BANK PLC, NEW
    YORK BRANCH'S AGREEMENT TO, AND PARTICIPATION IN, THE
    CONSPIRACY ..................................................................................................... 193

12. DEFENDANTS STANDARD CHARTERED BANK'S AND STANDARD
    CHARTERED BANK, NEW YORK BRANCH'S AGREEMENT TO, AND
    PARTICIPATION IN, THE CONSPIRACY ......................................................... 200

    A. STANDARD CHARTERED BANK AND STANDARD CHARTERED BANK,
       NEW YORK BRANCH (TOGETHER "SCB") CONSPIRED TO CONCEAL
       IRAN'S FINANCIAL ACTIVITIES AND TRANSACTIONS FROM
       DETECTION, SCRUTINY, AND MONITORING BY U.S. REGULATORS,
       LAW ENFORCEMENT, AND/OR DEPOSITORY INSTITUTIONS. ............ 200

    B. SCB FACILITATED TRANSACTIONS ON BEHALF OF MODAFL, MAHAN
       AIR AND OTHER INSTRUMENTALITIES OF IRANIAN STATE-
       SPONSORED TERROR (INCLUDING A HEZBOLLAH AFFILIATED
       ENTITY) IN FURTHERANCE OF NUMEROUS VIOLATIONS OF THE U.S.
       TRADE EMBARGO, THEREBY SUBSTANTIALLY CONTRIBUTING TO
       THE PLAINTIFFS' INJURIES. ...................................................................... 209

    C. STANDARD CHARTERED BANK KNOWINGLY PROVIDED ILLEGAL
       FINANCING TO MAHAN AIR. ..................................................................... 211

D.  STANDARD CHARTERED BANK KNOWINGLY PROVIDED ILLEGAL FINANCING TO MODAFL COMPANIES: AIO, IACI, IHRSC AND HESA.216

E.  STANDARD CHARTERED BANK'S TRADE-FINANCE TRANSACTIONS WITH MODAFL'S [IRAN] AVIATION INDUSTRIES ORGANIZATION (IAIO) ........................................................................................................... 217

F.  STANDARD CHARTERED BANK'S TRADE-FINANCE TRANSACTIONS WITH MODAFL-IAIO FRONT COMPANY DOWNTOWN TRADING LTD. ......................................................................................................................... 217

G.  STANDARD CHARTERED BANK'S TRADE-FINANCE TRANSACTIONS WITH MODAFL-IAIO FRONT COMPANY MAC AVIATION..................... 219

H.  STANDARD CHARTERED BANK'S TRADE-FINANCE TRANSACTIONS WITH MODAFL-IAIO FRONT COMPANY MONARCH AVIATION (SINGAPORE) .................................................................................................. 223

I.  STANDARD CHARTERED BANK'S TRADE FINANCE TRANSACTIONS WITH MODAFL-IAIO FRONT COMPANY JETPOWER INDUSTRIAL LTD (HONG KONG)................................................................................................. 227

J.  STANDARD CHARTERED BANK'S TRADE-FINANCE TRANSACTIONS IRAN POWER DEVELOPMENT COMPANY ("IPDC"), MAPNA AND ZENER ELECTRONICS SERVICES (AN AGENT OF HEZBOLLAH)......... 230

K.  STANDARD CHARTERED BANK'S TRADE-FINANCE TRANSACTIONS WITH NATIONAL IRANIAN OIL COMPANY (NIOC) SUBSIDIARIES .... 232

L.  STANDARD CHARTERED BANK'S TRADE-FINANCE TRANSACTIONS WITH IRANIAN FRONT COMPANY KHORAM SANAT PRODUCING CO.-IRAN ................................................................................................................ 234

M.  REGULATORY ACTIONS AND CRIMINAL INVESTIGATIONS AGAINST STANDARD CHARTERED BANK FROM 2012 – PRESENT....................... 236

13. DEFENDANT ROYAL BANK OF SCOTLAND N.V.'S, ROYAL BANK OF SCOTLAND PLC/NATWEST MARKETS PLC'S, AND ROYAL BANK OF SCOTLAND PLC/NATWEST MARKETS PLC NEW YORK BRANCH'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY ............... 242

14. DEFENDANT CREDIT SUISSE'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY ............................................................................... 253

15. DEFENDANT BNP PARIBAS S.A.'S AND DEFENDANT BNP PARIBAS, S.A., NEW YORK BRANCH'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY ................................................................................................. 265

16. DEFENDANT DEUTSCHE BANK AG'S AND DEUTSCHE BANK AG, NEW YORK BRANCH'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY ...................................................................... 282

17. DEFENDANT CREDIT AGRICOLE S.A., CREDIT AGRICOLE CORPORATE & INVESTMENT BANK, AND CREDIT AGRICOLE CORPORATE & INVESTMENT BANK, NEW YORK BRANCH'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY ........................................... 293

18. DEFENDANT COMMERZBANK AG'S AND COMMERZBANK AG NEW YORK BRANCH'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY .................................................................................. 314

19. DEFENDANT COMMERZBANK AG'S DIRECT FUNDING OF HEZBOLLAH THROUGH ITS CUSTOMER, ORPHANS PROJECT LEBANON E.V. .............. 322

VI.    THE PLAINTIFFS.................................................................................. 323

1. THE MARCH 12, 2008 ATTACK – TALLIL AIR BASE..................................... 324

   A. PLAINTIFFS THE JOEL TAVERA FAMILY................................................ 324

2. THE NOVEMBER 2, 2011 ATTACK – DIWANIYAH ......................................... 325

   A. PLAINTIFFS THE MARCUS JAMIL SULLEN FAMILY ............................. 325

3. THE JULY 8, 2011 ATTACK – BAGHDAD.......................................................... 326

   A. PLAINTIFFS THE TYLER NICHOLAS OGDEN FAMILY .......................... 326

4. THE JULY 3, 2011 ATTACK – AL AMARRA .................................................... 327

   A. PLAINTIFFS THE MATTHEW TERRANCE WHITESIDE FAMILY .......... 327

5. THE JUNE 29, 2011 ATTACK – ZURBATIYAH................................................ 329

   A. PLAINTIFF JOSEPH ANDREW TALBERT.................................................... 329

6. THE JUNE 18, 2011 ATTACK – AL DAWINIYAH............................................. 329

   A. PLAINTIFFS THE MARK ANTONY HALL FAMILY .................................. 329

7. THE JUNE 15, 2011 ATTACK – JSS SIFER ........................................................ 331

   A. PLAINTIFFS THE JARRAD JEROME DAVENPORT FAMILY ................... 331

8. THE MAY 13, 2011 ATTACK – NASIRIYAH ..................................................... 332

   A. PLAINTIFFS THE MATTHEW TERRANCE WHITESIDE FAMILY .......... 332

9.   THE MAY 4, 2011 ATTACK – CAMP TAJI ........................................................ 333

     A.  PLAINTIFF OBED JIMENEZ ............................................................... 333

10. THE APRIL 29, 2011 ATTACK – BAGHDAD ................................................. 334

     A.  PLAINTIFFS THE TREY NORMAN BAILEY FAMILY ............................ 334

11. THE APRIL 15, 2011 ATTACK – SADR CITY ............................................... 335

     A.  PLAINTIFF MICHAEL JUNG HYUN PASCO ................................... 335

12. THE APRIL 2, 2011 ATTACK – FOB KALSU, ISKANDARIYA ...................... 336

     A.  PLAINTIFF DARRYL OWEN DOTSON, JR ........................................ 336

13. THE APRIL 2, 2011 ATTACK – ISKANDARIYA ............................................ 336

     A.  PLAINTIFFS THE CHRISTIAN ANTHONY SARACHO GARCIA FAMILY
         ....................................................................................................... 336

14. THE FEBRUARY 9, 2011 ATTACK – TALLIL .................................................. 338

     A.  PLAINTIFF SHARON SCHINETHA STALLWORTH ................................. 338

15. THE JANUARY 17, 2011 ATTACK – BAGHDAD ............................................ 338

     A.  PLAINTIFF OLNEY EUGENE JOHNSON ......................................... 338

16. THE OCTOBER 11, 2010 ATTACK – MOSUL ................................................. 339

     A.  PLAINTIFF RICHARD RANDALL HEDGECOCK, II ................................ 339

17. THE SEPTEMBER 1, 2010 ATTACK – AL AMARRA ........................................ 339

     A.  PLAINTIFFS THE MATTHEW TERRANCE WHITESIDE FAMILY ........... 339

18. THE JULY 14, 2010 ATTACK – KADHIMIYAH ................................................ 341

     A.  PLAINTIFF JEREMY GEORGE CASHWELL ................................... 341

19. THE JUNE 9, 2010 ATTACK – TAJI ............................................................... 342

     A.  PLAINTIFFS THE DESHAWN DAVID TURNER FAMILY ....................... 342

20. THE APRIL 20, 2010 ATTACK – KIRKUK ...................................................... 342

     A.  PLAINTIFFS THE JEFFREY LEE PICKARD FAMILY ............................... 342

21. THE APRIL 3, 2010 ATTACK – NEAR TAJI .................................................... 344

A.  PLAINTIFFS THE JEFFREY MARVIN NICOLAS FAMILY ........................ 344

22. THE FEBRUARY 10, 2010 ATTACK – FOB WARHORSE ................................. 345

A.  PLAINTIFF SAMUEL ADAM KAUFMAN ....................................................... 345

23. THE FEBRUARY 4, 2010 ATTACK – MOSUL ...................................................... 345

A.  PLAINTIFF JASON KILLENS THOMPSON ................................................... 345

24. THE JANUARY 22, 2010 ATTACK – BASRA ...................................................... 346

A.  PLAINTIFFS THE ROBIN ANTHONY HONEYCUTT FAMILY ................. 346

25. THE DECEMBER 24, 2009 ATTACK – AL AMARAH ....................................... 347

A.  PLAINTIFFS THE RICHARD WILSON SCARLETT FAMILY ................... 347

26. THE DECEMBER 16, 2009 ATTACK – BASRA ................................................... 348

A.  PLAINTIFF JEFFREY DAVID EVANS ............................................................. 348

27. THE NOVEMBER 24, 2009 ATTACK – MOSUL ................................................. 349

A.  PLAINTIFF MATTHEW DEAN ANDERSON ................................................. 349

28. THE OCTOBER 12, 2009 ATTACK – JALAWLA ................................................ 349

A.  PLAINTIFF MATTHEW JOSEPH POLOGRUTO ........................................... 349

29. THE SEPTEMBER 1, 2009 ATTACK – GHAZALIYA ........................................ 350

A.  PLAINTIFFS THE THOMAS ANTHONY HENSHALL, JR. FAMILY ......... 350

30. THE AUGUST 31, 2009 ATTACK - TARMIYAH ................................................ 351

A.  PLAINTIFF DANIEL JARED WILKERSON ...................................................... 351

31. THE AUGUST 15, 2009 ATTACK – DISTRICT OF BAJI ................................... 351

A.  PLAINTIFFS THE LUKE PETER HARVEY FAMILY ................................... 351

32. THE AUGUST 13, 2009 ATTACK – KIRKUK ...................................................... 353

A.  PLAINTIFF JERRY MATTHEW TEAL ............................................................. 353

33. THE AUGUST 2, 2009 ATTACK – MIQDADIYAH ............................................. 353

A.  PLAINTIFFS THE KENNETH LEE SMITH FAMILY ................................... 353

34. THE JULY 31, 2009 ATTACK – KIRKUK .......................................................... 354

    A.  PLAINTIFF JERRY MATTHEW TEAL........................................................ 354

35. THE JULY 12, 2009 ATTACK – SHARQAT ...................................................... 355

    A.  PLAINTIFFS THE DAVID ALAN CONWAY, II, FAMILY........................... 355

36. THE JULY 1, 2009 ATTACK - TARMIYAH ...................................................... 356

    A.  PLAINTIFF DANIEL JARED WILKERSON................................................... 356

37. THE JUNE 7, 2009 ATTACK – HABBANIYAH ................................................. 356

    A.  PLAINTIFF BRYAN EDWARD PLUM ......................................................... 356

38. THE MAY 25, 2009 ATTACK – BALAD ........................................................... 357

    A.  PLAINTIFFS THE JOSE LUIS TREVINO FAMILY ...................................... 357

39. THE APRIL 23, 2009 ATTACK – QAYYARAH ................................................. 358

    A.  PLAINTIFFS THE MICHAEL ANDREW HURD, SR. FAMILY .................. 358

40. THE APRIL 22, 2009 ATTACK – TIKRIT .......................................................... 359

    A.  PLAINTIFF MATTHEW CARNELL BEATTY ............................................. 359

41. THE APRIL 20, 2009 ATTACK – BAQUBAH .................................................... 360

    A.  PLAINTIFFS THE BRENT JASON WALKER FAMILY ............................... 360

42. THE APRIL 15, 2009 ATTACK – BALAD .......................................................... 361

    A.  PLAINTIFFS THE MESHALL ELAINE WINNEGAN FAMILY.................. 361

43. THE APRIL 12, 2009 ATTACK – MOSUL .......................................................... 362

    A.  PLAINTIFFS THE CORY LEE THOMAS FAMILY ...................................... 362

44. THE APRIL 1, 2009 ATTACK – BAGHDAD ...................................................... 363

    A.  PLAINTIFF MARK LEE FLETCHER ............................................................ 363

45. THE MARCH 14, 2009 ATTACK – MOSUL ....................................................... 364

    A.  PLAINTIFFS THE MATTHEW ALBERT JORDAN FAMILY ..................... 364

46. THE MARCH 1, 2009 ATTACK – MADA'IN ...................................................... 365

A.  PLAINTIFFS THE MIGUEL ANGEL GONZALEZ FAMILY ....................... 365

47. THE FEBRUARY 18, 2009 ATTACK – AL AMARAH ........................................ 366

A.  PLAINTIFF RICHARD RANDALL HEDGECOCK, II ................................... 366

48. THE FEBRUARY 15, 2009 ATTACK –AS SALAM ............................................. 366

A.  PLAINTIFFS THE SHAWN MICHAEL DURNEN FAMILY ........................ 366

49. THE FEBRUARY 14, 2009 ATTACK – HUSAYBAH ......................................... 367

A.  PLAINTIFFS THE JUSTIN PERRY SEDELMAIER FAMILY ...................... 367

50. THE FEBRUARY 11, 2009 ATTACK – BAGHDAD ............................................. 368

A.  PLAINTIFF GRAHAM JACOB THOMAS LINDSEY ................................... 368

51. THE FEBRUARY 11, 2009 ATTACK – BAGHDAD ............................................. 369

A.  PLAINTIFFS THE CHRISTOPHER JAMES DUNN FAMILY ...................... 369

52. THE FEBRUARY 9, 2009 ATTACK – MOSUL ..................................................... 370

A.  PLAINTIFFS THE JOSHUA ALLEN WARD FAMILY ................................. 370

53. THE DECEMBER 23, 2008 ATTACK – BALAD ................................................... 371

A.  PLAINTIFF KEELAN MILES SOUTHERLAND ........................................... 371

54. THE NOVEMBER 22, 2008 ATTACK – VILLAGE OF BEJAT .......................... 371

A.  PLAINTIFFS THE GARY DON WHITE FAMILY ......................................... 371

55. THE NOVEMBER 21, 2008 ATTACK – FALLUJAH ........................................... 372

A.  PLAINTIFF KYLE WILLIAM DAVENPORT ................................................ 372

56. THE OCTOBER 30, 2008 ATTACK – NEAR HOSSEINIA ................................. 373

A.  PLAINTIFF EMANUEL VALENCIA ALVAREZ ........................................... 373

57. THE OCTOBER 15, 2008 ATTACK – GHAZALIYA .......................................... 373

A.  PLAINTIFFS THE THOMAS ANTHONY HENSHALL, JR. FAMILY ......... 373

58. THE OCTOBER 8, 2008 ATTACK – BAGHDAD ................................................. 375

A.  PLAINTIFFS THE MARK ALLEN WHETZEL FAMILY .............................. 375

59. THE SEPTEMBER 6, 2008 ATTACK – BAQUBAH.............................................. 376

    A.  PLAINTIFFS THE JAMES RYAN MCPHERSON FAMILY ......................... 376

60. THE AUGUST 31, 2008 ATTACK – AGUR QUF ............................................... 376

    A.  PLAINTIFF RICHARD GEORGE MOORE, JR................................................ 376

61. THE AUGUST 15, 2008 ATTACK – SAMARA ................................................... 377

    A.  PLAINTIFF KENNETH CHRISTIAN ANDERSON...................................... 377

62. THE AUGUST 14, 2008 ATTACK – AL KHALIS ................................................ 378

    A.  PLAINTIFFS THE THOMAS TAVTIGIAN FAMILY .................................... 378

63. THE AUGUST 14, 2008 ATTACK – BALAD RUZ.............................................. 379

    A.  PLAINTIFFS THE CLINTON DEWARD DURHAM FAMILY .................... 379

64. THE JULY 23, 2008 ATTACK – BAGHDAD....................................................... 380

    A.  PLAINTIFFS THE RODRICK BERNARD ANDERSON FAMILY .............. 380

65. THE JULY 10, 2008 ATTACK – AL QAIM ......................................................... 381

    A.  PLAINTIFFS THE JUSTIN HULLETT FAMILY ........................................... 381

66. THE JULY 8, 2008 ATTACK – KHANDAHARI................................................... 383

    A.  PLAINTIFF VUTHA EANG .......................................................................... 383

67. THE JULY 8, 2008 ATTACK – KHANDAHARI................................................... 383

    A.  PLAINTIFFS THE ROBERT JOSEPH BARTHEL FAMILY ......................... 383

68. THE JULY 8, 2008 ATTACK – KHANDAHARI................................................... 384

    A.  PLAINTIFF NATHAN ALLEN ROLENS ..................................................... 384

69. THE JULY 8, 2008 ATTACK – KHANDAHARI................................................... 385

    A.  PLAINTIFFS THE ERWIN DAVID SADDI FAMILY ................................... 385

70. THE JULY 7, 2008 ATTACK – FALLUJAH......................................................... 386

    A.  PLAINTIFF BRYANT JOSHUA SCHILTZ .................................................... 386

71. THE JUNE 20, 2008 ATTACK - MUKHISA........................................................ 387

A.  PLAINTIFF BRIAN DAVID GOULD ............................................................. 387

72. THE JUNE 20, 2008 ATTACK – FOB MAHMOUDIYAH ................................... 387

A.  PLAINTIFFS THE MARK ALLEN WHETZEL FAMILY .............................. 387

73. THE JUNE 19, 2008 ATTACK – SADR CITY, BAGHDAD ............................... 388

A.  PLAINTIFF DANIEL RYAN KULICKA .................................................... 388

74. THE JUNE 17, 2008 ATTACK – BALAD (JOINT BASE BALAD) .................... 389

A.  PLAINTIFFS THE JUSTIN NEIL CARY FAMILY ...................................... 389

75. THE JUNE 12, 2008 ATTACK – UMM QASR ...................................................... 390

A.  PLAINTIFF SEAN PATRICK LYNCH .................................................... 390

76. THE JUNE 11, 2008 ATTACK – BAGHDAD ......................................................... 391

A.  PLAINTIFFS THE RONALD PAUL MCLANE FAMILY ............................. 391

77. THE JUNE 5, 2008 ATTACK – FALLUJAH ........................................................... 392

A.  PLAINTIFFS THE JACOB DEWAIN HOUSEHOLDER FAMILY ............... 392

78. THE MAY 26, 2008 ATTACK – BALD RUZ ....................................................... 393

A.  PLAINTIFFS THE WILLIAM BARNS ALLEN FAMILY ............................. 393

79. THE MAY 21, 2008 ATTACK – MOSUL ............................................................. 394

A.  PLAINTIFFS THE PHILIP LEE CHILDREY FAMILY .................................. 394

80. THE MAY 15, 2008 ATTACK – HADITHA DAM ................................................. 395

A.  PLAINTIFF TRAVIS EUGENE SCHNEIDER ................................................. 395

81. THE MAY 14, 2008 ATTACK – MUKESHEFAH ................................................. 395

A.  PLAINTIFFS THE CHRISTOPHER NEIL SHELL FAMILY ........................ 395

82. THE MAY 10, 2008 ATTACK – BUHRIZ ........................................................... 396

A.  PLAINTIFFS THE NOAH PARKER MUTRIE FAMILY .............................. 396

83. THE MAY 7, 2008 ATTACK – SADR CITY ......................................................... 398

A.  PLAINTIFF HENRY JESSIE BREWER, III ................................................... 398

84. THE MAY 3, 2008 ATTACK – BAGHDAD ........................................................... 398

    A.  PLAINTIFFS THE ERIC ZACHARY HURST FAMILY ................................ 398

85. THE APRIL 30, 2008 ATTACK – SADR CITY ..................................................... 399

    A.  PLAINTIFF KYLE LEE WELCH ....................................................................... 399

86. THE APRIL 29, 2008 ATTACK – BAGHDAD ...................................................... 400

    A.  PLAINTIFF JEFFREY CHRISTOPHER HARPER, JR. ................................. 400

87. THE APRIL 28, 2008 ATTACK – FALLUJAH ...................................................... 401

    A.  PLAINTIFFS THE JACOB DEWAIN HOUSEHOLDER FAMILY ............... 401

88. THE APRIL 27, 2008 ATTACK – SADR CITY ..................................................... 402

    A.  PLAINTIFF ANTHONY SAMUEL FARINA ................................................... 402

89. THE APRIL 21, 2008 ATTACK – BAIJI ................................................................ 402

    A.  PLAINTIFFS THE ADAM J. KOHLHAAS FAMILY ..................................... 402

90. THE APRIL 19, 2008 ATTACK – TAJI .................................................................. 403

    A.  PLAINTIFFS THE JESSE DAVID CORTRIGHT FAMILY ........................... 403

91. THE APRIL 9, 2008 ATTACK – BALAD ............................................................... 404

    A.  PLAINTIFFS THE ANTHONY CAPRA, JR. FAMILY ................................. 404

92. THE APRIL 7, 2008 ATTACK – BAGHDAD ........................................................ 407

    A.  PLAINTIFF CHARLES FOSTER HARMON .................................................. 407

93. THE APRIL 3, 2008 ATTACK – BAGHDAD ........................................................ 407

    A.  PLAINTIFF DESMOND LEVAR ANTHONY .................................................. 407

94. THE APRIL 2, 2008 ATTACK – BAGHDAD ........................................................ 408

    A.  PLAINTIFF GREGORY JOSEPH REGAN, JR. ............................................... 408

95. THE APRIL 2, 2008 ATTACK – BAQUBAH ......................................................... 409

    A.  PLAINTIFFS THE SENE PE'A POLU FAMILY ............................................. 409

96. THE MARCH 29, 2008 ATTACK – FALLUJAH ................................................... 410

A.  PLAINTIFFS THE DEVIN JAY MEURER FAMILY ...................................... 410

97. THE MARCH 28, 2008 ATTACK – SADR CITY ..................................................... 411

A.  PLAINTIFFS THE LEROY ESCO JR. FAMILY .............................................. 411

98. THE MARCH 28, 2008 ATTACK – BAGHDAD..................................................... 412

A.  PLAINTIFFS THE CHARLES FREDDIE WADE, JR. FAMILY ................... 412

99. THE MARCH 27, 2008 ATTACK – KAHDIMIYAH ............................................. 413

A.  PLAINTIFF WALTER SCOTT GRIGG.......................................................... 413

100.  THE MARCH 27, 2008 ATTACK – SADR CITY ............................................... 414

A.  PLAINTIFF HENRY JESSIE BREWER, III.................................................... 414

101.  THE MARCH 23, 2008 ATTACK – BAGHDAD ................................................. 415

A.  PLAINTIFFS THE PHILIP RYAN TRIMBLE FAMILY ................................ 415

102.  THE MARCH 19, 2008 ATTACK – BAGHDAD ................................................. 416

A.  PLAINTIFFS THE DAVID ROBERT BAXTER JR. FAMILY ...................... 416

103.  THE MARCH 15, 2008 ATTACK – BAGHDAD ................................................. 417

A.  PLAINTIFFS THE WILLIAM DAVID O'BRIEN FAMILY .......................... 417

104.  THE MARCH 10, 2008 ATTACK –BAGHDAD.................................................. 418

A.  PLAINTIFFS THE SCOTT ALEXANDER MCINTOSH FAMILY ............... 418

105.  THE MARCH 8, 2008 ATTACK – KIRKUK ...................................................... 419

A.  PLAINTIFFS THE WILLIAM MATTHEW PFEIFER FAMILY ................... 419

106.  THE MARCH 7, 2008 ATTACK – BAGHDAD................................................... 420

A.  PLAINTIFFS THE DEREK PAUL HADFIELD FAMILY ............................. 420

107.  THE MARCH 5, 2008 ATTACK – TALLIL ....................................................... 421

A.  PLAINTIFF JOHN PATRICK HARRIS .......................................................... 421

108.  THE FEBRUARY 25, 2008 ATTACK – TIKRIT ............................................... 422

A.  PLAINTIFFS THE RICKY ALLEN PATA FAMILY ..................................... 422

109.  THE FEBRUARY 17, 2008 ATTACK – SENEIA TOWN ................................. 423

    A.  PLAINTIFF JASON RANDY SMITH ................................................ 423

110.  THE FEBRUARY 14, 2008 ATTACK – AL TAJI................................................ 423

    A.  PLAINTIFFS THE DAVID ANDREW HOLLEY FAMILY ........................... 423

111.  THE FEBRUARY 5, 2008 ATTACK – BALAD ................................................ 424

    A.  PLAINTIFFS THE KRISTOPHER KENNETH SIEMON FAMILY .............. 424

112.  THE JANUARY 28, 2008 ATTACK – MOSUL................................................ 425

    A.  PLAINTIFFS THE BRANDON ABBOTT MEYER FAMILY ...................... 425

113.  THE JANUARY 28, 2008 ATTACK – NASIRIYAH ......................................... 426

    A.  PLAINTIFF DAVID ROBERT WENZEL ........................................ 426

114.  THE JANUARY 21, 2008 ATTACK – SAMARRA ............................................ 427

    A.  PLAINTIFFS THE CHARLES LEE STORLIE FAMILY ............................... 427

115.  THE DECEMBER 16, 2007 ATTACK – BALAD ............................................... 428

    A.  PLAINTIFFS THE SEAN TAYLOR SCRUGGS FAMILY ........................... 428

116.  THE DECEMBER 13, 2007 ATTACK – BAGHDAD........................................ 429

    A.  PLAINTIFFS THE DONALD MARTIN FAMILY................................... 429

117.  THE DECEMBER 9, 2007 ATTACK – ISKANDARIYA ................................. 430

    A.  PLAINTIFFS THE KENDRICK LEE DIXON FAMILY ................................ 430

118.  THE DECEMBER 5, 2007 ATTACK – BAQUBAH ......................................... 431

    A.  PLAINTIFF JORDAN KALEB SMITH ............................................ 431

119.  THE DECEMBER 5, 2007 ATTACK – BAQUBAH ......................................... 431

    A.  PLAINTIFFS THE SHAUN DAVID GARRY FAMILY ................................ 431

120.  THE NOVEMBER 10, 2007 ATTACK – QARYAT AL-ASHIG ...................... 433

    A.  PLAINTIFFS THE JORDAN WILLIAM BOWLING, JR. FAMILY.............. 433

121.  THE OCTOBER 31, 2007 ATTACK – NASIRIYAH .......................................... 434

A.  PLAINTIFFS THE ABRAHAM MARTINEZ-AYALA FAMILY ................... 434

122.  THE OCTOBER 31, 2007 ATTACK – FALLUJAH............................................. 435

A.  PLAINTIFF CHRISTOPHER DAVID CONDREY ........................................ 435

123.  THE OCTOBER 28, 2007 ATTACK – BAQUBAH ............................................ 436

A.  PLAINTIFFS THE LUIS HUMBERTO GUTIERREZ, JR. FAMILY ............. 436

124.  THE OCTOBER 22, 2007 ATTACK – BAGHDAD............................................ 437

A.  PLAINTIFFS THE ROBERT ALLEN HAAF FAMILY ................................ 437

125.  THE OCTOBER 18, 2007 ATTACK – MOSUL .................................................. 438

A.  PLAINTIFF JOSHUA JOHN WOLCOTT ..................................................... 438

126.  THE OCTOBER 14, 2007 ATTACK – BAGHDAD............................................ 439

A.  PLAINTIFFS THE KENNETH JAMES IWASINSKI FAMILY ..................... 439

127.  THE OCTOBER 10, 2007 ATTACK – BAGHDAD............................................ 440

A.  PLAINTIFFS THE KEVIN DANIEL SNOW FAMILY .................................. 440

128.  THE SEPTEMBER 30, 2007 ATTACK – MOSUL ............................................ 441

A.  PLAINTIFF ADAM NATHAN ENGELHART ................................................ 441

129.  THE SEPTEMBER 26, 2007 ATTACK – BAGHDAD ....................................... 441

A.  PLAINTIFFS THE SHAUN SCOTT CHANDLER FAMILY ......................... 441

130.  THE SEPTEMBER 24, 2007 ATTACK –BAQUBAH........................................ 442

A.  PLAINTIFFS THE WAYLAND TODD ALLEN FAMILY ............................ 442

131.  THE SEPTEMBER 24, 2007 ATTACK – DIYALA ........................................... 444

A.  PLAINTIFFS THE ROY ANTHONY BISCARR FAMILY ........................... 444

132.  THE SEPTEMBER 3, 2007 ATTACK – FALLUJAH ........................................ 445

A.  PLAINTIFFS THE RONALD DEAN STARK, II FAMILY............................ 445

133.  THE AUGUST 31, 2007 ATTACK – FALLUJAH .............................................. 446

A.  PLAINTIFFS THE GREGORY P. BLINCOE FAMILY ................................. 446

134. THE AUGUST 30, 2007 ATTACK – NORTH WEST HADITHA ..................... 447

    A. PLAINTIFF LUIS ALFREDO RANERO ........................................ 447

135. THE AUGUST 29, 2007 ATTACK – AL KARMAH ......................................... 448

    A. PLAINTIFF JAMES RYAN MOBLEY ......................................... 448

136. THE AUGUST 29, 2007 ATTACK – AL KARMAH ......................................... 448

    A. PLAINTIFFS THE DAVID JOSEPH BICKNELL FAMILY .......................... 448

137. THE AUGUST 29, 2007 ATTACK – AL KARMAH ......................................... 449

    A. PLAINTIFFS THE TYLER JAMES MARTIN FAMILY ................................ 449

138. THE AUGUST 28, 2007 ATTACK – BUHRIZ ................................................. 450

    A. PLAINTIFFS THE NOAH PARKER MUTRIE FAMILY ............................ 450

139. THE AUGUST 28, 2007 ATTACK – NEAR FALLUJAH ................................. 452

    A. PLAINTIFFS THE ADAM SHAFFER BARTON FAMILY ........................... 452

140. THE AUGUST 25, 2007 ATTACK – MOSUL .................................................. 453

    A. PLAINTIFF ADAM NATHAN ENGELHART ................................... 453

141. THE AUGUST 22, 2007 ATTACK – HOR AL BOSH ...................................... 453

    A. PLAINTIFFS THE BRYAN ALEXANDER SNYDER FAMILY................... 453

142. THE AUGUST 18, 2007 ATTACK – BAGHDAD .............................................. 454

    A. PLAINTIFFS THE TIMOTHY PETER BENNETT FAMILY ....................... 454

143. THE AUGUST 16, 2007 ATTACK – SAQLAWIYAH ..................................... 455

    A. PLAINTIFFS THE DONALD LEE, III, FAMILY ........................................ 455

144. THE AUGUST 15, 2007 ATTACK – TAJI ....................................................... 456

    A. PLAINTIFFS THE NUALA KALUOKAU TAYLOR FAMILY .................... 456

145. THE AUGUST 14, 2007 ATTACK – ROUTE SIOUX FALLS NEAR CAMP BUCCA................................................................................................................ 458

    A. PLAINTIFFS THE JACOB ALBERT BARR FAMILY ................................. 458

146. THE AUGUST 12, 2007 ATTACK – SADR CITY ............................................ 459

A.  PLAINTIFF ANTWON LAVANTE CHILDERS ............................................ 459

147.  THE AUGUST 9, 2007 ATTACK – MOSUL ...................................................... 459

A.  PLAINTIFF ABRAM WILLIAM MARVIN ............................................... 459

148.  THE AUGUST 7, 2007 ATTACK – TARMIYAH ............................................. 460

A.  PLAINTIFFS THE SHANE TROY ULANDAY FAMILY ............................. 460

149.  THE AUGUST 6, 2007 ATTACK – BAQUBAH ................................................ 461

A.  PLAINTIFFS THE KAREEM RASHAD SULTAN KHAN FAMILY ............. 461

150.  THE AUGUST 5, 2007 ATTACK – BAGHDAD ................................................ 462

A.  PLAINTIFFS THE ROBERT STEVEN BAUGHN FAMILY ......................... 462

151.  THE AUGUST 4, 2007 ATTACK – BAGHDAD ................................................ 463

A.  PLAINTIFF ANTHONY ALLEN MATHENY ............................................. 463

152.  THE AUGUST 4, 2007 ATTACK – SOUTHERN BAGHDAD ......................... 463

A.  PLAINTIFF SEAN PATRICK REED .......................................................... 463

153.  THE AUGUST 1, 2007 ATTACK – MOSUL ...................................................... 464

A.  PLAINTIFFS THE TRAVIS SCOTT BACHMAN FAMILY .......................... 464

154.  THE JULY 30, 2007 ATTACK – AL KARMAH ................................................ 465

A.  PLAINTIFFS THE DENVER WESLEY HOUCK, JR. FAMILY ................... 465

155.  THE JULY 29, 2007 ATTACK – BAGHDAD ..................................................... 466

A.  PLAINTIFFS THE CODY CLARK GRATER FAMILY ................................ 466

156.  THE JULY 28, 2007 ATTACK – RAMADI ......................................................... 467

A.  PLAINTIFF RANDALL JOSEPH BENNETT, II ............................................ 467

157.  THE JULY 27, 2007 ATTACK – BAGHDAD ..................................................... 467

A.  PLAINTIFFS THE SCOTT WADE FRITZ FAMILY ..................................... 467

158.  THE JULY 17, 2007 ATTACK – BAGHDAD ..................................................... 468

A.  PLAINTIFFS THE ADAM THOMAS GAULDIN FAMILY ........................... 468

159.  THE JULY 17, 2007 ATTACK – KHAN BANI SAAD ....................................... 469

    A.  PLAINTIFFS THE GEORGE ROBERT HARRISON, JR. FAMILY .............. 469

160.  THE JULY 16, 2007 ATTACK – BAGHDAD ...................................................... 471

    A.  PLAINTIFFS THE NOAH PARKER MUTRIE FAMILY .............................. 471

161.  THE JULY 15, 2007 ATTACK – BAGHDAD ...................................................... 472

    A.  PLAINTIFFS THE MARK ANTHONY HAMBLIN, JR. FAMILY ................ 472

162.  THE JULY 14, 2007 ATTACK – BAGHDAD ...................................................... 473

    A.  PLAINTIFF EARL ANTHONY MCCRACKEN ............................................ 473

163.  THE JULY 5, 2007 ATTACK – KARMAH ........................................................ 473

    A.  PLAINTIFFS THE NICHOLAS TUBBS FAMILY .......................................... 473

164.  THE JULY 5, 2007 ATTACK – BESMAYA ...................................................... 474

    A.  PLAINTIFF JESSE BRITTON EVANS ........................................................ 474

165.  THE JULY 4, 2007 ATTACK – FALLUJAH....................................................... 475

    A.  PLAINTIFF TIMOTHY GRANT CHANDLER................................................ 475

166.  THE JULY 2, 2007 ATTACK – HADITHA.......................................................... 475

    A.  PLAINTIFF MATTHEW PAUL UKEN............................................................ 475

167.  THE JUNE 28, 2007 ATTACK – AR-RUTBAH ................................................. 476

    A.  PLAINTIFF CARLOS ANTONIO MARTINEZ................................................ 476

168.  THE JUNE 26, 2007 ATTACK – BAGHDAD...................................................... 477

    A.  PLAINTIFFS THE JOHNNY CASTILLO FAMILY ....................................... 477

169.  THE JUNE 24, 2007 ATTACK – SAQLAWIYAH.............................................. 477

    A.  PLAINTIFF KIRK THOMAS MCPHERON..................................................... 477

170.  THE JUNE 23, 2007 ATTACK – BAGHDAD...................................................... 478

    A.  PLAINTIFF MATTHEW MCIVOR ................................................................ 478

171.  THE JUNE 23, 2007 ATTACK – HOR AL-BOSH ............................................. 479

A.  PLAINTIFF JEREMY EDWARD SMITH ...................................................... 479

172.  THE JUNE 21, 2007 ATTACK – BASRA PALACE ........................................... 479

A.  PLAINTIFFS THE TERRY RAY CARTER FAMILY ................................... 479

173.  THE JUNE 21, 2007 ATTACK – BAGHDAD ...................................................... 480

A.  PLAINTIFF JASON REGESTER .................................................................... 480

174.  THE JUNE 20, 2007 ATTACK – BAGHDAD ...................................................... 481

A.  PLAINTIFFS THE STEVEN MICHAEL PADDISON FAMILY ................... 481

175.  THE JUNE 20, 2007 ATTACK – BAGHDAD ...................................................... 482

A.  PLAINTIFFS THE EDWARD JAMES TERRY, SR. FAMILY ...................... 482

176.  THE JUNE 20, 2007 ATTACK – BAGHDAD ...................................................... 483

A.  PLAINTIFFS THE ANDREW JAMES RAYMOND FAMILY ...................... 483

177.  THE JUNE 20, 2007 ATTACK – KARMAH ....................................................... 484

A.  PLAINTIFFS THE GARY DAVID MORAN FAMILY .................................. 484

178.  THE JUNE 20, 2007 ATTACK – KARMAH ....................................................... 486

A.  PLAINTIFF JOSHUA MATTHEW BOWER .................................................. 486

179.  THE JUNE 20, 2007 ATTACK – BAGHDAD ...................................................... 486

A.  PLAINTIFF TIM THOMAS JULIANO ........................................................... 486

180.  THE JUNE 15, 2007 ATTACK – BAGHDAD ...................................................... 487

A.  PLAINTIFFS THE DAVID MATTHEW BUTCHER FAMILY ..................... 487

181.  THE JUNE 14, 2007 ATTACK – SAQLAWIAH................................................... 488

A.  PLAINTIFFS THE DAVID KARL LIND FAMILY ........................................ 488

182.  THE JUNE 14, 2007 ATTACK – SAQLAWIAH................................................... 489

A.  PLAINTIFFS THE BRIAN GEORGE THURMOND FAMILY ..................... 489

183.  THE JUNE 14, 2007 ATTACK – SAQLAWIYAH................................................ 490

A.  PLAINTIFFS THE SIGIFREDO APODACA FAMILY .................................. 490

184.  THE JUNE 13, 2007 ATTACK – BAGHDAD .................................................... 491

    A.  PLAINTIFF JOEL K. GORBUTT .................................................... 491

185.  THE JUNE 13, 2007 ATTACK – RAMADI .................................................... 492

    A.  PLAINTIFF STEVEN GRANT GILBOY .................................................... 492

186.  THE JUNE 11, 2007 ATTACK – BAGHDAD .................................................... 493

    A.  PLAINTIFF CHRISTOPHER JERID RODRIGUEZ .................................................... 493

187.  THE JUNE 11, 2007 ATTACK – AL KARMAH .................................................... 493

    A.  PLAINTIFF BILL HUDSON GROSS, II .................................................... 493

188.  THE JUNE 11, 2007 ATTACK – BAGHDAD .................................................... 494

    A.  PLAINTIFFS THE NOAH PARKER MUTRIE FAMILY .................................................... 494

189.  THE JUNE 10, 2007 ATTACK – FOB Q-WEST .................................................... 495

    A.  PLAINTIFFS THE LARRY DUANE WILSON, JR. FAMILY .................................................... 495

190.  THE JUNE 9, 2007 ATTACK – BAQUBAH .................................................... 496

    A.  PLAINTIFFS THE SCOTT ALAN MILLER FAMILY .................................................... 496

191.  THE JUNE 6, 2007 ATTACK – BAYJI .................................................... 497

    A.  PLAINTIFFS THE GEORDAN EDWARD GANKA FAMILY .................................................... 497

192.  THE JUNE 3, 2007 ATTACK – SABAA AL BOUR .................................................... 498

    A.  PLAINTIFFS THE JARED MICHAEL ROGERS FAMILY .................................................... 498

193.  THE JUNE 3, 2007 ATTACK – BAQUBAH .................................................... 499

    A.  PLAINTIFFS THE MICHAEL FRANK JACKSON FAMILY .................................................... 499

194.  THE MAY 30, 2007 ATTACK – RISALA .................................................... 500

    A.  PLAINTIFF MATTHEW BADILLO .................................................... 500

195.  THE MAY 27, 2007 ATTACK – MOSUL .................................................... 500

    A.  PLAINTIFF CHRISTOPHER FRANKLIN SWARTZ .................................................... 500

196.  THE MAY 25, 2007 ATTACK – RADWANIYAH .................................................... 501

A.  PLAINTIFFS THE ROBERT ALLEN MANSFIELD FAMILY ...................... 501

197.  THE MAY 25, 2007 ATTACK – FALLUJAH ...................................... 502

A.  PLAINTIFFS THE CORY ROBERT HOWARD FAMILY ........................... 502

198.  THE MAY 22, 2007 ATTACK – RAMADI ...................................... 503

A.  PLAINTIFFS THE DANIEL FRANCIS PEARSON FAMILY ....................... 503

199.  THE MAY 22, 2007 ATTACK –TAJI .................................................. 504

A.  PLAINTIFFS THE KRISTOPHER ALLAN HIGDON FAMILY ................... 504

200.  THE MAY 22, 2007 ATTACK – TAJI .................................................. 504

A.  PLAINTIFFS THE ROBERT ADRIAN WORTHINGTON FAMILY ............ 504

201.  THE MAY 21, 2007 ATTACK – BAGHDAD ...................................... 505

A.  PLAINTIFF JOHN IOANNIS OUZOUNIDIS ...................................... 505

202.  THE MAY 20, 2007 ATTACK – BAGHDAD ...................................... 506

A.  PLAINTIFFS THE GIOVANNI ALEXANDER AVALOS FAMILY.............. 506

203.  THE MAY 17, 2007 ATTACK – RUSHDI MULLAH ...................... 507

A.  PLAINTIFFS THE STEVEN MICHAEL PACKER FAMILY ...................... 507

204.  THE MAY 14, 2007 ATTACK – BAGHDAD ...................................... 508

A.  PLAINTIFFS THE TERRY LAMONT FLEMING FAMILY ......................... 508

205.  THE MAY 13, 2007 ATTACK – SAMARRA ...................................... 509

A.  PLAINTIFFS THE DANIEL EUZEB COWART FAMILY ......................... 509

206.  THE MAY 13, 2007 ATTACK – WESTERN BAGHDAD ................. 510

A.  PLAINTIFF JERRY MATTHEW TEAL ............................................ 510

207.  THE MAY 12, 2007 ATTACK – UMM QASR .................................... 511

A.  PLAINTIFFS THE DAVID KEVIN GASKIN FAMILY ................................ 511

208.  THE MAY 12, 2007 ATTACK – UMM QASR .................................... 512

A.  PLAINTIFFS THE ANDRE DEWAYNE JOSEPH FAMILY ......................... 512

209.  THE MAY 5, 2007 ATTACK – BARWANAH.....................................................513

    A.  PLAINTIFFS THE RONNY PORTA FAMILY ................................513

210.  THE MAY 3, 2007 ATTACK – BAQUBAH .....................................................514

    A.  PLAINTIFFS THE JUSTIN LANCE CAMPLIN FAMILY............................514

211.  THE MAY 1, 2007 ATTACK – BAGHDAD .....................................................515

    A.  PLAINTIFF WILLIAM COLBY FRASIER .....................................515

212.  THE APRIL 28, 2007 ATTACK – HADITHA..................................................516

    A.  PLAINTIFFS THE THEODORE MICHAEL COTHRAN, JR. FAMILY........516

213.  THE APRIL 27, 2007 ATTACK –AL-ISHAQI..................................................517

    A.  PLAINTIFFS THE CRAIG STEVEN HALL FAMILY ...................................517

214.  THE APRIL 25, 2007 ATTACK – BAGHDAD ..................................................518

    A.  PLAINTIFF SHAUN CHRISTOPHER STILTNER..........................................518

215.  THE APRIL 20, 2007 ATTACK – SAQLAWIYAH............................................518

    A.  PLAINTIFF STEVEN ANDREW MAY .........................................................518

216.  THE APRIL 18, 2007 ATTACK – TARMIYAH ................................................519

    A.  PLAINTIFFS THE MATTHEW GENE RAUL MERCADO FAMILY ..........519

217.  THE APRIL 13, 2007 ATTACK – BAQUBAH ..................................................520

    A.  PLAINTIFFS THE MICHAEL FRANK JACKSON FAMILY .......................520

218.  THE APRIL 12, 2007 ATTACK – TARMIYAH ................................................521

    A.  PLAINTIFFS THE GWILYM JOSEPH NEWMAN FAMILY.......................521

219.  THE APRIL 10, 2007 ATTACK – AL RUSAFA ................................................522

    A.  PLAINTIFFS THE MALCOLM CHRISTOPHER CANADA FAMILY .........522

220.  THE APRIL 5, 2007 ATTACK – BAGHDAD ...................................................523

    A.  PLAINTIFFS THE RENE IVAN GONZALEZ, JR. FAMILY ........................523

221.  THE APRIL 2, 2007 ATTACK – FALLUJAH...................................................524

A.  PLAINTIFF IAN REESER.................................................................................. 524

222.  THE MARCH 31, 2007 ATTACK – BAGHDAD ................................................. 525

A.  PLAINTIFF GILBERT PAUL PAIZ, JR. .......................................................... 525

223.  THE MARCH 31, 2007 ATTACK – BAGHDAD ................................................. 525

A.  PLAINTIFFS THE BRADLEY ARNOLD BLAZEK FAMILY ...................... 525

224.  THE MARCH 30, 2007 ATTACK – MOSUL ....................................................... 526

A.  PLAINTIFF RICHARD LEE BURGE, JR. ........................................................ 526

225.  THE MARCH 29, 2007 ATTACK – NOWFAL .................................................... 527

A.  PLAINTIFFS THE STEPHEN KENNETH VALYOU FAMILY .................... 527

226.  THE MARCH 29, 2007 ATTACK – BAGHDAD ................................................. 528

A.  PLAINTIFFS THE MANUEL ROMAN FAMILY ........................................... 528

227.  THE MARCH 26, 2007 ATTACK – BAGHDAD ................................................. 529

A.  PLAINTIFFS THE MICHAEL LEE OWEN BOLLEY FAMILY ................... 529

228.  THE MARCH 26, 2007 ATTACK – BAQUBAH .................................................. 531

A.  PLAINTIFF MARIO DONTAE WHITAKER, SR. ........................................... 531

229.  THE MARCH 23, 2007 ATTACK – MOSUL ....................................................... 531

A.  PLAINTIFFS THE MICHAEL THOMAS BEHRENS FAMILY .................... 531

230.  THE MARCH 22, 2007 ATTACK – MOSUL ....................................................... 533

A.  PLAINTIFFS THE STEVEN MICHAEL SHAUER FAMILY ........................ 533

231.  THE MARCH 19, 2007 ATTACK – BAGHDAD ................................................. 534

A.  PLAINTIFF MATTHEW LEE ANDREAS ....................................................... 534

232.  THE MARCH 16, 2007 ATTACK – BUHRIZ ...................................................... 534

A.  PLAINTIFFS THE WILLIAM ROBERT INGRAM FAMILY ........................ 534

233.  THE MARCH 15, 2007 ATTACK – SAMARRA ................................................. 536

A.  PLAINTIFF BRADLEY ALAN KNEPPER ...................................................... 536

234. THE MARCH 14, 2007 ATTACK – BAQUBAH ................................................. 536

    A. PLAINTIFF MICHAEL SCOTT ERB ................................................ 536

235. THE MARCH 11, 2007 ATTACK – AL RUSAFA ................................................ 537

    A. PLAINTIFFS THE MALCOLM CHRISTOPHER CANADA FAMILY ......... 537

236. THE MARCH 5, 2007 ATTACK – BAQUBAH .................................................. 538

    A. PLAINTIFFS THE MICHAEL FRANK JACKSON FAMILY ...................... 538

237. THE MARCH 4, 2007 ATTACK – RAMADI .................................................... 539

    A. PLAINTIFFS THE JOSHUA DEAN CRUTCHER FAMILY ......................... 539

238. THE MARCH 3, 2007 ATTACK - SAQLAWIYAH ............................................. 539

    A. PLAINTIFFS THE RORY HAMILTON COMPTON FAMILY ..................... 539

239. THE MARCH 1, 2007 ATTACK – NASIRIYAH ................................................ 541

    A. PLAINTIFF KARL R. SIMANDL .................................................... 541

240. THE FEBRUARY 28, 2007 ATTACK – MAHMUDIYA ................................. 541

    A. PLAINTIFF MICHAEL WAYNE MYERS ....................................... 541

241. THE FEBRUARY 22, 2007 ATTACK – RAMADI ........................................... 542

    A. PLAINTIFFS THE RALEIGH JAMES HEEKIN III FAMILY ....................... 542

242. THE FEBRUARY 22, 2007 ATTACK – SADR AL YUSIFIYAH ..................... 543

    A. PLAINTIFFS THE HANNIBAL ALEXANDER VEGUILLA FAMILY ......... 543

243. THE FEBRUARY 22, 2007 ATTACK – RAMADI ........................................... 544

    A. PLAINTIFFS THE JOSHUA RYAN HAGER FAMILY ................................ 544

244. THE FEBRUARY 21, 2007 ATTACK – KHALIDIYAH ................................... 545

    A. PLAINTIFF JOSHUA MATTHEW BOWER .................................... 545

245. THE FEBRUARY 20, 2007 ATTACK – BAGHDAD ........................................ 545

    A. PLAINTIFF CHARLES ANTHONY KELLER ................................. 545

246. THE FEBRUARY 19, 2007 ATTACK – TARMIYAH ...................................... 546

A. PLAINTIFF CRAIG BOWES ........................................................................... 546

247. THE FEBRUARY 19, 2007 ATTACK – TARMAYIH ..................................... 547

A. PLAINTIFF JEREMY EDWARD SMITH ......................................................... 547

248. THE FEBRUARY 17, 2007 ATTACK – FALLUJAH ..................................... 547

A. PLAINTIFF SHERMANDRE WESLEY JACKSON ...................................... 547

249. THE FEBRUARY 15, 2007 ATTACK – FALLUJAH ..................................... 548

A. PLAINTIFFS THE RYAN PATRICK CLEMENTS FAMILY ........................ 548

250. THE FEBRUARY 8, 2007 ATTACK – AL KARMA ....................................... 549

A. PLAINTIFF JOHN JESSE GREENE .............................................................. 549

251. THE FEBRUARY 7, 2007 ATTACK – FALLUJAH ....................................... 550

A. PLAINTIFF JOSHUA KRIS LUTZ .................................................................. 550

252. THE FEBRUARY 5, 2007 ATTACK – BAGHDAD ........................................ 550

A. PLAINTIFFS THE OLEIN NASHAN TSINNIJINNIE FAMILY ................... 550

253. THE JANUARY 26, 2007 ATTACK - MIQDADIYAH ................................... 552

A. PLAINTIFF DOMINIC FRANKLIN MOODY ................................................ 552

254. THE JANUARY 25, 2007 ATTACK – ABU GHRAIB .................................... 552

A. PLAINTIFF WESLEY ALLEN GAUTREAUX ............................................... 552

255. THE JANUARY 23, 2007 ATTACK – FADHIL .............................................. 553

A. PLAINTIFFS THE BRYAN ALAN WINTON FAMILY ................................. 553

256. THE JANUARY 22, 2007 ATTACK – NORTH OF YSAFIYAH ...................... 554

A. PLAINTIFF CHRISTOPHER MICHAEL RAY ............................................... 554

257. THE JANUARY 20, 2007 ATTACK – KARBALA ........................................... 554

A. PLAINTIFFS THE ESDRAS JEAN FAMILY ................................................. 554

258. THE JANUARY 18, 2007 ATTACK – BAGHDAD ........................................... 556

A. PLAINTIFF THE WILLIAM JOSHUA RECHENMACHER FAMILY .......... 556

259.  THE JANUARY 14, 2007 ATTACK – BAGHDAD...........................................557

    A.  PLAINTIFF RIGOBERTO LOPEZ GARCIA....................................557

260.  THE JANUARY 10, 2007 ATTACK – BAGHDAD...........................................557

    A.  PLAINTIFF JAMES MICHAEL BUONO.......................................557

261.  THE JANUARY 9, 2007 ATTACK – BAGHDAD..............................................558

    A.  PLAINTIFFS THE ROBERT FRANKLIN HARR FAMILY...........................558

262.  THE DECEMBER 30, 2006 ATTACK – BAGHDAD...........................................559

    A.  PLAINTIFFS THE CHRISTOPHER MAX HEIDLING FAMILY..................559

263.  THE DECEMBER 29, 2006 ATTACK – BAQUBAH...........................................560

    A.  PLAINTIFFS DILLON J. CANNON FAMILY.................................560

264.  THE DECEMBER 29, 2006 ATTACK – BAGHDAD...........................................561

    A.  PLAINTIFFS THE GIOVANNI ALEXANDER AVALOS FAMILY.............561

265.  THE DECEMBER 22, 2006 ATTACK – MOSUL..............................................562

    A.  PLAINTIFF ADAM NATHAN ENGELHART.................................562

266.  THE DECEMBER 19, 2006 ATTACK – MOSUL..............................................562

    A.  PLAINTIFFS THE HECTOR MANUEL LOPEZ, JR. FAMILY...................562

267.  THE DECEMBER 16, 2006 ATTACK – MOSUL..............................................564

    A.  PLAINTIFF CHRISTOPHER FRANKLIN SWARTZ.....................564

268.  THE DECEMBER 7, 2006 ATTACK – BAGHDAD............................................564

    A.  PLAINTIFF DEAN MICHAEL GRAHAM.......................................564

269.  THE DECEMBER 6, 2006 ATTACK – BAQUBAH............................................565

    A.  PLAINTIFFS THE WILLIAM JOHN COLWELL FAMILY.....................565

270.  THE DECEMBER 4, 2006 ATTACK – BAGHDAD............................................566

    A.  PLAINTIFF JESSE JAMES JACKSON.......................................566

271.  THE DECEMBER 4, 2006 ATTACK – HIT.................................................567

A.  PLAINTIFFS THE JUSTIN LEE SINGLETON FAMILY ............................... 567

272.  THE DECEMBER 4, 2006 ATTACK – BAGHDAD............................................ 568

A.  PLAINTIFFS THE BRIAN LEE PORTWINE FAMILY .................................. 568

273.  THE DECEMBER 1, 2006 ATTACK – FALLUJAH............................................ 569

A.  PLAINTIFF BRIAN MICHAEL TANCO ....................................................... 569

274.  THE NOVEMBER 21, 2006 ATTACK – ABU GHRAIB ................................. 569

A.  PLAINTIFFS THE JONATHAN SCOTT MALLARD FAMILY ................... 569

275.  THE NOVEMBER 21, 2006 ATTACK – BAGHDAD ....................................... 570

A.  PLAINTIFFS THE GIOVANNI ALEXANDER AVALOS FAMILY............. 570

276.  THE NOVEMBER 18, 2006 ATTACK – SAQLAWIYAH ................................. 571

A.  PLAINTIFF FRANCIS MARTIN HURD........................................................... 571

277.  THE NOVEMBER 15, 2006 ATTACK – DOWNTOWN BAGHDAD.............. 572

A.  PLAINTIFFS THE LONNIE MICHAEL FREDRICK GORMAN FAMILY .. 572

278.  THE NOVEMBER 14, 2006 ATTACK – BAGHDAD ....................................... 573

A.  PLAINTIFFS THE ROBERT LEE MCCORMICK FAMILY ......................... 573

279.  THE NOVEMBER 14, 2006 ATTACK – BAGHDAD ....................................... 574

A.  PLAINTIFF LARRY DIAZ CABRAL, JR. ........................................................ 574

280.  THE NOVEMBER 11, 2006 ATTACK – RAMADI............................................ 575

A.  PLAINTIFFS THE JACE ALRIC BADIA FAMILY ........................................ 575

281.  THE NOVEMBER 9, 2006 ATTACK – RUTBA ................................................ 576

A.  PLAINTIFFS THE BRIAN JOHN JOHNSON FAMILY ................................ 576

282.  THE NOVEMBER 8, 2006 ATTACK – RAMADI............................................. 577

A.  PLAINTIFF ANDREW SCOTT FAYAL ......................................................... 577

283.  THE OCTOBER 26, 2006 ATTACK – BAGHDAD............................................ 577

A.  PLAINTIFFS THE MATTHEW NEIL BOWMAN FAMILY ......................... 577

284. THE OCTOBER 23, 2006 ATTACK - BALAD.................................................. 578

    A. PLAINTIFF ERIC LEON HORTON ................................................ 578

285. THE OCTOBER 17, 2006 ATTACK – MURADIYAH ...................................... 579

    A. PLAINTIFF WILLIAM ENRIQUEZ SANTOS, JR. ....................... 579

286. THE OCTOBER 17, 2006 ATTACK – ANAH ................................................ 579

    A. PLAINTIFFS THE TATE WAYNE MALLORY FAMILY ............ 579

287. THE OCTOBER 16, 2006 ATTACK – BAGHDAD.......................................... 580

    A. PLAINTIFFS THE JOHN PAUL KAISER JR. FAMILY ............... 580

288. THE OCTOBER 16, 2006 ATTACK – BAGHDAD.......................................... 581

    A. PLAINTIFFS THE GERARD LOUIS MENNITTO FAMILY ........ 581

289. THE OCTOBER 13, 2006 ATTACK – HABBANIYAH .................................... 583

    A. PLAINTIFFS THE JOHN TYLER LEE FAMILY ........................... 583

290. THE OCTOBER 11, 2006 ATTACK – RAWAH............................................... 584

    A. PLAINTIFF JASON WILLIAM ROLLISON................................. 584

291. THE OCTOBER 8, 2006 ATTACK – BALAD .................................................. 584

    A. PLAINTIFFS THE RICHARD EZELL PHILEMON, JR., FAMILY .............. 584

292. THE OCTOBER 4, 2006 ATTACK – RAHWAH............................................... 585

    A. PLAINTIFF JOHN RICHARD CHAO .......................................... 585

293. THE OCTOBER 3, 2006 ATTACK – AL TAQADDUM .................................. 586

    A. PLAINTIFFS THE DALE MARTIN HINKLEY FAMILY ............ 586

294. THE OCTOBER 3, 2006 ATTACK – DORA.................................................... 587

    A. PLAINTIFF ANTHONY FRANCIS DEMATTIA .......................... 587

295. THE OCTOBER 1, 2006 ATTACK – FALLUJAH............................................ 587

    A. PLAINTIFF JASON EDWARD MIKOLAJCIK ............................. 587

296. THE SEPTEMBER 30, 2006 ATTACK – SOUTH OF BAIJI ............................ 588

A.  PLAINTIFFS THE JOHN DAVID, JR. FAMILY ............................................. 588

297.  THE SEPTEMBER 30, 2006 ATTACK – RAMADI ........................................... 589

A.  PLAINTIFF NICHOLAS BERT ANDREWS .................................................. 589

298.  THE SEPTEMBER 21, 2006 ATTACK – BAQUBAH ....................................... 590

A.  PLAINTIFFS THE VINCENT JOSEPH SENN FAMILY ............................... 590

299.  THE SEPTEMBER 20, 2006 ATTACK - BAQUBAH ....................................... 591

A.  PLAINTIFF DOMINIC FRANKLIN MOODY ................................................. 591

300.  THE SEPTEMBER 19, 2006 ATTACK – FALLUJAH ..................................... 591

A.  PLAINTIFF JEREMIAH KEOHANE LEIBRANDT ...................................... 591

301.  THE SEPTEMBER 17, 2006 ATTACK – SADR CITY ................................... 592

A.  PLAINTIFF ENDI CISNEROS HERRERA ...................................................... 592

302.  THE SEPTEMBER 15, 2006 ATTACK – MOSUL ............................................ 592

A.  PLAINTIFF TAMI RENEI KEMPER-PENA ................................................... 592

303.  THE SEPTEMBER 15, 2006 ATTACK – MOSUL ............................................ 593

A.  PLAINTIFFS THE GILBERT MATTHEW BOYNTON FAMILY ................ 593

304.  THE SEPTEMBER 14, 2006 ATTACK – FALLUJAH ..................................... 594

A.  PLAINTIFFS THE CHRISTOPHER BRIAN SAUNDERS FAMILY ............ 594

305.  THE SEPTEMBER 7, 2006 ATTACK – FALLUJAH ........................................ 595

A.  PLAINTIFFS THE BENJAMIN EDWARD TRAINER FAMILY .................. 595

306.  THE AUGUST 29, 2006 ATTACK – SADR AL YUSIFIYAH .......................... 596

A.  PLAINTIFFS THE MATTHEW JOSEPH VOSBEIN FAMILY .................... 596

307.  THE AUGUST 27, 2006 ATTACK – HIT ............................................................ 598

A.  PLAINTIFFS THE ALBA RYAN TANNER FAMILY ................................... 598

308.  THE AUGUST 26, 2006 ATTACK – TIKRIT .................................................... 599

A.  PLAINTIFF ANDRE CORNELIOUS MOYE ................................................... 599

309.  THE AUGUST 21, 2006 ATTACK – RAMADI .................................................. 599

    A.  PLAINTIFFS THE SHAWN ALI NELSON FAMILY ..................................... 599

310.  THE AUGUST 18, 2006 ATTACK – BUHRIZ .................................................. 600

    A.  PLAINTIFF MATTHEW PATRICK HALEY ................................................ 600

311.  THE AUGUST 18, 2006 ATTACK – BAGHDAD ............................................. 601

    A.  PLAINTIFFS THE BRENTON THOMAS GRAY FAMILY .......................... 601

312.  THE AUGUST 15, 2006 ATTACK – HADITHA ............................................... 602

    A.  PLAINTIFFS THE TIMOTHY FRANCIS GRAJKO FAMILY ...................... 602

313.  THE AUGUST 6, 2006 ATTACK – BAQUBAH................................................ 603

    A.  PLAINTIFF MATTHEW PATRICK HALEY ................................................ 603

314.  THE AUGUST 4, 2006 ATTACK – KARMAH................................................. 603

    A.  PLAINTIFFS THE MICHAEL ANTHONY MENDOZA FAMILY ............... 603

315.  THE AUGUST 2, 2006 ATTACK – HIT........................................................... 604

    A.  PLAINTIFFS THE HENRY PAUL MADSON FAMILY................................ 604

316.  THE JULY 28, 2006 ATTACK – BAGHDAD................................................... 606

    A.  PLAINTIFFS THE WESLEY J. HALLECK FAMILY .................................... 606

317.  THE JULY 27, 2006 ATTACK – RAMADI........................................................ 607

    A.  PLAINTIFFS THE ALFONSO GEOMAR MATOS MESA FAMILY ........... 607

318.  THE JULY 26, 2006 ATTACK – MOSUL......................................................... 608

    A.  PLAINTIFFS THE SHAWN MICHAEL CUMMINGS FAMILY .................. 608

319.  THE JULY 22, 2006 ATTACK – FALLUJAH................................................... 609

    A.  PLAINTIFF ANDREW JOHN HARRIS ........................................................ 609

320.  THE JULY 21, 2006 ATTACK – RAMADI....................................................... 610

    A.  PLAINTIFF GREGORY MICHAEL PFAFF .................................................. 610

321.  THE JULY 20, 2006 ATTACK – KHALIDIYAH ............................................. 610

A.  PLAINTIFFS THE PATRICK ANDREW DIENER FAMILY ........................ 610

322.  THE JULY 20, 2006 ATTACK – RAMADI ..................................................... 611

A.  PLAINTIFFS THE NICHOLAS ANTHONY WEST FAMILY ..................... 611

323.  THE JULY 15, 2006 ATTACK – RAMADI ..................................................... 612

A.  PLAINTIFFS THE LATHAN HILL FAMILY .................................................. 612

324.  THE JULY 15, 2006 ATTACK – RAMADI ..................................................... 613

A.  PLAINTIFF WALTER LEE HAM JR. ............................................................. 613

325.  THE JULY 13, 2006 ATTACK – MUQDADIYAH ......................................... 614

A.  PLAINTIFFS THE VICTOR JEROME DOMINGUEZ FAMILY .................. 614

326.  THE JULY 10, 2006 ATTACK – BAGHDAD .................................................. 615

A.  PLAINTIFFS THE JEFFREY JAMES SECKINGER FAMILY ...................... 615

327.  THE JULY 10, 2006 ATTACK – BALAD ....................................................... 616

A.  PLAINTIFF DHUNTHA SHAYRE WYATT .................................................. 616

328.  THE JULY 1, 2006 ATTACK – FALLUJAH ................................................... 616

A.  PLAINTIFFS THE BRANDON WILLIAM LISTON FAMILY ..................... 616

329.  THE JUNE 29, 2006 ATTACK – MOSUL ....................................................... 617

A.  PLAINTIFFS THE BRYAN LUCKEY FAMILY ............................................ 617

330.  THE JUNE 27, 2006 ATTACK – JURF SAKHAR ......................................... 618

A.  PLAINTIFFS THE JEREMY SCOTT JONES FAMILY ................................ 618

331.  THE JUNE 22, 2006 ATTACK – AL QAIM .................................................... 619

A.  PLAINTIFF BRYAN DANIEL ESCOBEDO .................................................. 619

332.  THE JUNE 16, 2006 ATTACK - BAQUBAH .................................................. 620

A.  PLAINTIFF ANTHONY GEORGE BRUCE .................................................. 620

333.  THE JUNE 10, 2006 ATTACK –HABBANIYAH ........................................... 621

A.  PLAINTIFFS THE JACKSON ENRIQUE LUNA FAMILY ........................... 621

334.  THE JUNE 7, 2006 ATTACK – BAGHDAD .................................................... 622

    A.  PLAINTIFF JERRY DANIEL WALKER ........................................... 622

335.  THE JUNE 4, 2006 ATTACK - TAJI ........................................................... 622

    A.  PLAINTIFFS THE PAUL ERIC HAINES FAMILY ...................................... 622

336.  THE JUNE 4, 2006 ATTACK – BAIJI ........................................................ 624

    A.  PLAINTIFFS THE HECTOR MANUEL LOPEZ, JR. FAMILY ................... 624

337.  THE JUNE 3, 2006 ATTACK – KIRKUK ........................................................ 625

    A.  PLAINTIFFS THE MICHAEL BASS LOCKE FAMILY ............................... 625

338.  THE MAY 25, 2006 ATTACK – RAMADI ...................................................... 626

    A.  PLAINTIFFS THE JOSEPH MONFORTE, JR., FAMILY ............................... 626

339.  THE MAY 24, 2006 ATTACK – RAMADI ...................................................... 627

    A.  PLAINTIFF JOHN PAUL ALVAREZ ................................................ 627

340.  THE MAY 15, 2006 ATTACK – BAGHDAD .................................................... 628

    A.  PLAINTIFFS THE BRADLEY CHARLSON FAMILY ................................. 628

341.  THE MAY 12, 2006 ATTACK – BALAD ........................................................ 629

    A.  PLAINTIFF JOHN MICHAEL BRASHEAR ........................................... 629

342.  THE MAY 11, 2006 ATTACK – AL MAZRAA .................................................. 629

    A.  PLAINTIFF DEVIN SAMUEL HARVEY ............................................. 629

343.  THE MAY 6, 2006 ATTACK – ABU GHRAIB .................................................. 630

    A.  PLAINTIFF ROWDY ZANE BURNEY ............................................... 630

344.  THE APRIL 28, 2006 ATTACK – HADITHA .................................................... 630

    A.  PLAINTIFFS THE JAMES MICHAEL LOTT FAMILY ................................ 630

345.  THE APRIL 28, 2006 ATTACK – HADITHA .................................................... 631

    A.  PLAINTIFFS THE LEA ROBERT MILLS FAMILY ...................................... 631

346.  THE APRIL 24, 2006 ATTACK – KARABILAH ................................................ 632

A. PLAINTIFFS THE SALVADOR LUIS LOERA, JR. FAMILY ...................... 632

347. THE APRIL 23, 2006 ATTACK – TAJI .................................................................. 634

A. PLAINTIFFS THE JASON BRENT DANIEL FAMILY .................................. 634

348. THE APRIL 16, 2006 ATTACK – AL KARMAH .............................................. 634

A. PLAINTIFF JOEY JAMES BRAMME ............................................................ 634

349. THE APRIL 15, 2006 ATTACK - SAQLAWIYAH ........................................... 635

A. PLAINTIFFS THE DERRICK JOSHUA COTHRAN FAMILY .................... 635

350. THE APRIL 13, 2006 ATTACK – AL KARMAH .............................................. 636

A. PLAINTIFF JOEY JAMES BRAMME ............................................................ 636

351. THE APRIL 7, 2006 ATTACK – FOB FALCON .............................................. 637

A. PLAINTIFFS THE JOSHUA DIVON TRAVIS FAMILY ............................... 637

352. THE APRIL 1, 2006 ATTACK – UM QASSR ..................................................... 638

A. PLAINTIFF GARTH LEVI BENEDICT ........................................................... 638

353. THE MARCH 30, 2006 ATTACK – BAGHDAD ................................................ 638

A. PLAINTIFFS THE FLOYD C. PETERS, JR. FAMILY ................................. 638

354. THE MARCH 28, 2006 ATTACK – HABBANIYAH ........................................ 640

A. PLAINTIFFS THE PHILLIP LAWRENCE BELL FAMILY ........................... 640

355. THE MARCH 25, 2006 ATTACK – ABU GHRAIB ......................................... 641

A. PLAINTIFFS THE MICHAEL JOHN SIPPEL FAMILY ................................ 641

356. THE MARCH 21, 2006 ATTACK – MSR TAMPA, NEAR BAGHDAD .......... 643

A. PLAINTIFF ROBBIE DON CHEATHAM ........................................................ 643

357. THE MARCH 17, 2006 ATTACK – RAMADI .................................................... 643

A. PLAINTIFF JEFFERY ALAN MURTHA ......................................................... 643

358. THE MARCH 14, 2006 ATTACK – SADR YUSUFIYAH ................................ 644

A. PLAINTIFF JEFFERY SHANE REDMAN ...................................................... 644

359. THE MARCH 13, 2006 ATTACK – BALAD ...................................................... 644

    A. PLAINTIFF JASON ERIC BELL ...................................................... 644

360. THE MARCH 8, 2006 ATTACK – KHALIDIYAH ........................................... 645

    A. PLAINTIFFS THE JOHN DAVID FRY FAMILY ........................... 645

361. THE MARCH 7, 2006 ATTACK – MOSUL ..................................................... 646

    A. PLAINTIFFS THE RICKY SALAS, JR. FAMILY ........................... 646

362. THE MARCH 4, 2006 ATTACK – HAQLANIYAH ......................................... 648

    A. PLAINTIFF MATTHEW GRANT HAVILAND ............................. 648

363. THE MARCH 4, 2006 ATTACK – HAQLANIYAH ......................................... 648

    A. PLAINTIFFS THE JORGE ALEXANDER ROMAN FAMILY ...................... 648

364. THE MARCH 4, 2006 ATTACK – HAQLANIYAH ......................................... 649

    A. PLAINTIFFS THE NICHOLAS HAMILTON KYLE FAMILY ...................... 649

365. THE MARCH 4, 2006 ATTACK – HAQLANIYAH ......................................... 650

    A. PLAINTIFFS THE GERARDO CONTRERAS FAMILY ............... 650

366. THE MARCH 4, 2006 ATTACK – HAQLANIYAH ......................................... 651

    A. PLAINTIFFS THE COLIN ALFRED BENJAMIN ANDERSON FAMILY ... 651

367. THE FEBRUARY 28, 2006 ATTACK – BAGHDAD ........................................ 653

    A. PLAINTIFF JEREMY MICHAEL GIRDLER ................................. 653

368. THE FEBRUARY 27, 2006 ATTACK – SAYDIYA, WEST RAHEED ............. 653

    A. PLAINTIFF JOHN ALLEN GENTRY, JR. ....................................... 653

369. THE FEBRUARY 25, 2006 ATTACK – RAMADI ........................................... 654

    A. PLAINTIFF DANIEL MICHAEL JACOBS ...................................... 654

370. THE FEBRUARY 24, 2006 ATTACK – MOSUL ............................................ 654

    A. PLAINTIFF ROBERT LEROY GERTSCH, JR. ............................... 654

371. THE FEBRUARY 23, 2006 ATTACK – BAGHDAD ........................................ 655

A.  PLAINTIFF RONALD ANDRE SAMS, SR. .................................................. 655

372.  THE FEBRUARY 18, 2006 ATTACK – KIRKUK .......................................... 656

A.  PLAINTIFF CHRISTOPHER DAVID CONDREY ......................................... 656

373.  THE FEBRUARY 14, 2006 ATTACK – BAGHDAD ........................................ 656

A.  PLAINTIFFS THE RICHARD WAYNE TUGWELL JR. FAMILY ............... 656

374.  THE FEBRUARY 10, 2006 ATTACK – AD-DAWR ......................................... 657

A.  PLAINTIFFS THE RICKY AARON BAXTER FAMILY ............................... 657

375.  THE FEBRUARY 7, 2006 ATTACK – FALLUJAH ......................................... 658

A.  PLAINTIFFS THE ABELARDO ROSAS FAMILY ........................................ 658

376.  THE FEBRUARY 6, 2006 ATTACK – ALBAGHDADI ................................... 659

A.  PLAINTIFF NICHOLAS MICHAEL LATONA ............................................. 659

377.  THE FEBRUARY 6, 2006 ATTACK – RAMADI .............................................. 660

A.  PLAINTIFF NATHAN RAINES ...................................................................... 660

378.  THE FEBRUARY 6, 2006 ATTACK – HIT ...................................................... 660

A.  PLAINTIFF JIMMY OWEKA OCHAN ........................................................... 660

379.  THE FEBRUARY 6, 2006 ATTACK – ALBAGHDADI ................................... 661

A.  PLAINTIFFS THE BRANDON SCOTT SCHUCK FAMILY ........................ 661

380.  THE FEBRUARY 4, 2006 ATTACK – RAMADI .............................................. 662

A.  PLAINTIFF NATHAN RAINES ...................................................................... 662

381.  THE JANUARY 23, 2006 ATTACK – BABIL PROVINCE .............................. 662

A.  PLAINTIFFS THE MATTHEW DAVID HUNTER FAMILY ........................ 662

382.  THE JANUARY 17, 2006 ATTACK – RAMADI ............................................... 663

A.  PLAINTIFFS THE JAMES NELSON SPARKS, III FAMILY ........................ 663

383.  THE JANUARY 17, 2006 ATTACK – TAL AFAR ........................................... 664

A.  PLAINTIFFS THE GARY JAROMIR RUC FAMILY .................................... 664

384. THE JANUARY 16, 2006 ATTACK – BAGHDAD ............................................. 665

    A. PLAINTIFFS THE JOSEPH PETER BROWN FAMILY ................................. 665

385. THE JANUARY 12, 2006 ATTACK – RAMADI .................................................. 666

    A. PLAINTIFFS THE RALPH EDWARD SWARTZ, II FAMILY ..................... 666

386. THE JANUARY 4, 2006 ATTACK – NORTH OF MAHMUDIYAH ............... 668

    A. PLAINTIFFS THE SERGIO DANIEL LOPEZ FAMILY ............................... 668

387. THE DECEMBER 30, 2005 ATTACK – BAGHDAD ....................................... 668

    A. PLAINTIFF MARCEL KIM D'ENTREMONT ............................................... 668

388. THE DECEMBER 29, 2005 ATTACK – HIT ..................................................... 669

    A. PLAINTIFF ANDRE LEONARD MAISON .................................................... 669

389. THE DECEMBER 26, 2005 ATTACK – BAQUBAH ....................................... 670

    A. PLAINTIFFS THE SANDRA CLAMON FAMILY ......................................... 670

390. THE DECEMBER 24, 2005 ATTACK – MOSUL .............................................. 671

    A. PLAINTIFF TOMMY LEE FOWLER ............................................................ 671

391. THE DECEMBER 21, 2005 ATTACK – BAGHDAD ....................................... 671

    A. PLAINTIFF JEREMY MICHAEL GIRDLER .................................................. 671

392. THE DECEMBER 16, 2005 ATTACK – BALAD ............................................... 672

    A. PLAINTIFF JAMIE LEE WHITAKER ............................................................ 672

393. THE DECEMBER 6, 2005 ATTACK – BAGHDAD ......................................... 672

    A. PLAINTIFF DANIEL WILLIAMS .................................................................. 672

394. THE DECEMBER 5, 2005 ATTACK – ISKANDARIYA ................................. 673

    A. PLAINTIFF CHRISTOPHER TODD HASS .................................................... 673

395. THE NOVEMBER 28, 2005 ATTACK – HAQLANIYAH ............................... 674

    A. PLAINTIFFS THE GERARDO CONTRERAS FAMILY ............................... 674

396. THE NOVEMBER 28, 2005 ATTACK – HADITHA ......................................... 675

A.  PLAINTIFFS THE TODD EDWARD WINN FAMILY ................................... 675

397.  THE NOVEMBER 25, 2005 ATTACK – HIT ...................................................... 676

A.  PLAINTIFF JEFFERY HARMON ..................................................................... 676

398.  THE NOVEMBER 24, 2005 ATTACK – MOSUL .............................................. 676

A.  PLAINTIFF TOMMY LEE FOWLER .............................................................. 676

399.  THE NOVEMBER 21, 2005 ATTACK – HABBANIYAH ................................. 677

A.  PLAINTIFFS THE DUANE JOSEPH DREASKY FAMILY .......................... 677

400.  THE NOVEMBER 20, 2005 ATTACK – HADITHA ........................................... 678

A.  PLAINTIFFS THE JOHN WESLEY URQUHART FAMILY ......................... 678

401.  THE NOVEMBER 19, 2005 ATTACK – BAIJI ................................................... 679

A.  PLAINTIFFS THE WALLACE CASEY NELSON III FAMILY .................... 679

402.  THE NOVEMBER 9, 2005 ATTACK – FALLUJAH ........................................... 680

A.  PLAINTIFF MARIO ALBERTO MENA ......................................................... 680

403.  THE NOVEMBER 8, 2005 ATTACK – HAQLANIYAH .................................. 681

A.  PLAINTIFFS THE DOMINIC ANGEL FRANCO FAMILY .......................... 681

404.  THE NOVEMBER 8, 2005 ATTACK – HAQLANIYAH .................................. 682

A.  PLAINTIFFS THE JOE SANCHEZ, JR. FAMILY ........................................... 682

405.  THE NOVEMBER 7, 2005 ATTACK – HADITHA ............................................. 683

A.  PLAINTIFFS THE TODD EDWARD WINN FAMILY ................................... 683

406.  THE NOVEMBER 7, 2005 ATTACK – HADITHA ............................................. 684

A.  PLAINTIFFS THE JAMES MICHAEL GEIGER, III FAMILY ...................... 684

407.  THE NOVEMBER 6, 2005 ATTACK – HADITHA ............................................. 685

A.  PLAINTIFFS THE TERRY LYNN MCELWAIN FAMILY ........................... 685

408.  THE NOVEMBER 5, 2005 ATTACK – HUSAYBAH ........................................ 687

A.  PLAINTIFFS THE BRIAN ELDON WILLIAMS FAMILY ........................... 687

409.  THE NOVEMBER 5, 2005 ATTACK – BAGHDAD ......................................... 688

    A.  PLAINTIFFS THE LEO PATRICK MCKEON FAMILY ........................... 688

410.  THE NOVEMBER 3, 2005 ATTACK – SAQLAWIYAH .................................. 688

    A.  PLAINTIFFS THE ABELARDO ROSAS FAMILY ....................................... 688

411.  THE OCTOBER 29, 2005 ATTACK – TAL AFAR ........................................... 689

    A.  PLAINTIFFS THE BRANDON LAMAR DALE FAMILY ........................... 689

412.  THE OCTOBER 27, 2005 ATTACK – RAMADI ............................................... 690

    A.  PLAINTIFFS THE BRUCE LEONARD MORROW FAMILY ...................... 690

413.  THE OCTOBER 26, 2005 ATTACK – BAIJI ..................................................... 691

    A.  PLAINTIFF ROGER FRANKLIN GRAVES ................................................ 691

414.  THE OCTOBER 25, 2005 ATTACK – RUTBAH ............................................... 692

    A.  PLAINTIFFS THE JIMI MCMAHON FAMILY .............................................. 692

415.  THE OCTOBER 25, 2005 ATTACK – BAGHDAD ............................................ 693

    A.  PLAINTIFF JARED FULTON BROWN ......................................................... 693

416.  THE OCTOBER 20, 2005 ATTACK – HIT ...................................................... 693

    A.  PLAINTIFF ROBERT JUSTIN MOULTRIE .................................................. 693

417.  THE OCTOBER 18, 2005 ATTACK – AR RUTBAH ........................................ 694

    A.  PLAINTIFF BRIAN PATRICK JOYCE, JR. .................................................. 694

418.  THE OCTOBER 17, 2005 ATTACK –SAMARRA ............................................ 695

    A.  PLAINTIFFS THE DARREN DEAN HOWE FAMILY .................................. 695

419.  THE OCTOBER 15, 2005 ATTACK –RAMADI.................................................. 696

    A.  PLAINTIFFS THE RICHARD ALLEN HARDY FAMILY ............................ 696

420.  THE OCTOBER 15, 2005 ATTACK – RAMADI................................................. 697

    A.  PLAINTIFFS THE RYAN PATRICK VALLERY FAMILY ........................... 697

421.  THE OCTOBER 13, 2005 ATTACK – TUZ KHURMATU ................................. 698

A.  PLAINTIFF CLAYTON TILTON CROWELL .................................................. 698

422.  THE OCTOBER 12, 2005 ATTACK – FALLUJAH............................................ 698

A.  PLAINTIFFS THE MARTIN CHRISTOPHER JONES FAMILY ................... 698

423.  THE OCTOBER 12, 2005 ATTACK – SAQLAWIYAH.................................... 699

A.  PLAINTIFF PAUL ALLEN JACKSON .......................................................... 699

424.  THE OCTOBER 6, 2005 ATTACK – HIT ......................................................... 700

A.  PLAINTIFFS THE TIMOTHY GEORGE BRANDON SVEJDA FAMILY .... 700

425.  THE OCTOBER 4, 2005 ATTACK – RAMADI ................................................. 701

A.  PLAINTIFF STEVEN MICHAEL MURPHY ................................................. 701

426.  THE SEPTEMBER 29, 2005 ATTACK – JABOUR, SOUTHWEST OF
BAGHDAD....................................................................................................... 702

A.  PLAINTIFFS THE JASEN WATTS FAMILY ................................................. 702

427.  THE SEPTEMBER 27, 2005 ATTACK – RAMADI ......................................... 703

A.  PLAINTIFFS THE JASON ALAN BENFORD FAMILY ............................... 703

428.  THE SEPTEMBER 26, 2005 ATTACK – KADHIMIYAH ............................... 704

A.  PLAINTIFFS THE ALAN CHARLES JONES FAMILY ................................ 704

429.  THE SEPTEMBER 25, 2005 ATTACK – BAGHDAD ...................................... 705

A.  PLAINTIFF DEREK BENJAMIN KOLB ....................................................... 705

430.  THE SEPTEMBER 22, 2005 ATTACK – AL ZAIDAN .................................... 705

A.  PLAINTIFF LEE PAUL HAYWOOD.............................................................. 705

431.  THE SEPTEMBER 22, 2005 ATTACK – RAMADI ......................................... 706

A.  PLAINTIFF CHRISTOPHER GODDARD DUNLAP ..................................... 706

432.  THE SEPTEMBER 20, 2005 ATTACK – BETWEEN BALAD & AL DULOIYA..
........................................................................................................................... 706

A.  PLAINTIFFS THE TERRY LEON STEWARD FAMILY ............................... 706

433.  THE SEPTEMBER 20, 2005 ATTACK – BAGHDAD ...................................... 707

A.  PLAINTIFFS THE COEDY DALE JAMES FAMILY ...................................... 707

434.  THE SEPTEMBER 20, 2005 ATTACK – BETWEEN BALAD & AL DULOIYA .. ................................................................................................................. 708

A.  PLAINTIFFS THE SASCHA GRENNER-CASE FAMILY ............................ 708

435.  THE SEPTEMBER 19, 2005 ATTACK – AL KARMA ..................................... 709

A.  PLAINTIFFS THE BOBBY GENE CHRISTOPHER, III FAMILY ............... 709

436.  THE SEPTEMBER 19, 2005 ATTACK – RAMADI ........................................... 710

A.  PLAINTIFFS THE MICHAEL EGAN FAMILY ............................................... 710

437.  THE SEPTEMBER 19, 2005 ATTACK – AL-KARMAH .................................. 711

A.  PLAINTIFF MATTHEW PAUL DALRYMPLE ............................................... 711

438.  THE SEPTEMBER 19, 2005 ATTACK – RAMADI ........................................... 712

A.  PLAINTIFFS THE RALPH EDWARD SWARTZ, II FAMILY ...................... 712

439.  THE SEPTEMBER 19, 2005 ATTACK – AL KARMAH .................................. 713

A.  PLAINTIFFS THE MARTIN ANTHONY MCCLUNG II FAMILY .............. 713

440.  THE SEPTEMBER 19, 2005 ATTACK – RAMADI ........................................... 714

A.  PLAINTIFF JEFFERY ALAN MURTHA ......................................................... 714

441.  THE SEPTEMBER 17, 2005 ATTACK – TAJI .................................................. 715

A.  PLAINTIFFS THE MARTIN CHRISTOPHER JONES FAMILY ................... 715

442.  THE SEPTEMBER 15, 2005 ATTACK – HADITHA ........................................ 716

A.  PLAINTIFF LARRY DWAIN GRIFFIS .......................................................... 716

443.  THE SEPTEMBER 15, 2005 ATTACK – HADITHA ........................................ 716

A.  PLAINTIFFS THE ANTHONY WILLIAM GREEN FAMILY ...................... 716

444.  THE SEPTEMBER 15, 2005 ATTACK – BAIJI ................................................. 717

A.  PLAINTIFFS THE KURT DUANE BROOKS FAMILY ................................. 717

445.  THE SEPTEMBER 15, 2005 ATTACK – ABU GHRAIB .................................. 718

A.  PLAINTIFF ROBERT JOSEPH D'AGOSTINO ............................................... 718

446.  THE SEPTEMBER 12, 2005 ATTACK – SAMARRA ........................................ 719

    A.  PLAINTIFFS THE BRANDON MICHAEL PARROTT FAMILY .................. 719

447.  THE SEPTEMBER 12, 2005 ATTACK – SAMARRA ........................................ 720

    A.  PLAINTIFFS THE DANIEL FRANCIS PEARSON FAMILY ....................... 720

448.  THE SEPTEMBER 11, 2005 ATTACK – RAWAH ........................................... 721

    A.  PLAINTIFF JEREMY LEE BALLARD ............................................................ 721

449.  THE SEPTEMBER 11, 2005 ATTACK –RAMADI ......................................... 721

    A.  PLAINTIFF CHRISTOPHER GODDARD DUNLAP ..................................... 721

450.  THE SEPTEMBER 9, 2005 ATTACK – SAMARRA ........................................ 722

    A.  PLAINTIFF DAVID WILSON BRONSON ..................................................... 722

451.  THE SEPTEMBER 9, 2005 ATTACK – SAMARRA ........................................ 723

    A.  PLAINTIFF ACIE NATHANIEL RAINWATER ............................................ 723

452.  THE SEPTEMBER 9, 2005 ATTACK – HIT .................................................... 723

    A.  PLAINTIFFS THE ARAGORN THOR WOLD FAMILY ............................... 723

453.  THE SEPTEMBER 8, 2005 ATTACK – YUSUFIYAH ................................... 724

    A.  PLAINTIFF MICHAEL L. WELLS ................................................................. 724

454.  THE SEPTEMBER 4, 2005 ATTACK – HIT .................................................... 725

    A.  PLAINTIFF CHARLES JOSEPH VANCHERI ................................................ 725

455.  THE SEPTEMBER 4, 2005 ATTACK – HIT .................................................... 725

    A.  PLAINTIFF BENJAMIN ROBERT JENSEN ................................................... 725

456.  THE SEPTEMBER 4, 2005 ATTACK – ISKANDARIYA ............................... 726

    A.  PLAINTIFF MICHAEL WAYNE CHRISTOPHERSON ............................... 726

457.  THE SEPTEMBER 1, 2005 ATTACK – BAJI ................................................... 726

    A.  PLAINTIFF MATTHEW CARNELL BEATTY ............................................... 726

458.  THE AUGUST 28, 2005 ATTACK – RAMADI ................................................ 727

    A.  PLAINTIFFS THE SHAWN LARRY NICHOLS FAMILY ............................ 727

459.  THE AUGUST 27, 2005 ATTACK – BAQUBAH ................................................. 728

    A.  PLAINTIFFS THE JOHN MICHAEL DRNEK FAMILY ............................... 728

460.  THE AUGUST 25, 2005 ATTACK – AL-QAIM ................................................. 729

    A.  PLAINTIFFS THE DANIEL DENNIS IBACH FAMILY ............................... 729

461.  THE AUGUST 25, 2005 ATTACK –TIKRIT ...................................................... 730

    A.  PLAINTIFFS THE KEVIN SCOTT JOHNSON FAMILY .............................. 730

462.  THE AUGUST 23, 2005 ATTACK – RAMADI ................................................... 731

    A.  PLAINTIFFS THE RYAN PATRICK VALLERY FAMILY .......................... 731

463.  THE AUGUST 23, 2005 ATTACK – RAMADI ................................................... 732

    A.  PLAINTIFF WILLIAM LEE NESTOR ................................................................ 732

464.  THE AUGUST 23, 2005 ATTACK – RAMADI ................................................... 732

    A.  PLAINTIFF GEORGE OVID SIMMONS ......................................................... 732

465.  THE AUGUST 23, 2005 ATTACK – RAMADI ................................................... 733

    A.  PLAINTIFF NESSIM EDWARD FOURNIER ................................................. 733

466.  THE AUGUST 23, 2005 ATTACK – RAMADI ................................................... 734

    A.  PLAINTIFF ANDREW JOSEPH HIGGINS ..................................................... 734

467.  THE AUGUST 23, 2005 ATTACK – RAMADI ................................................... 734

    A.  PLAINTIFFS THE SCOTT BRADLEY RAY FAMILY ................................. 734

468.  THE AUGUST 23, 2005 ATTACK – RAMADI ................................................... 735

    A.  PLAINTIFFS THE MANUEL FIGUEROA FAMILY ..................................... 735

469.  THE AUGUST 22, 2005 ATTACK – AL KARMAH ......................................... 736

    A.  PLAINTIFFS THE ARTHUR LAVERNE RIZER III FAMILY..................... 736

470.  THE AUGUST 19, 2005 ATTACK – FALLUJAH ............................................. 738

    A.  PLAINTIFF ADAM CURTIS BIRDSELL....................................................... 738

471. THE AUGUST 18, 2005 ATTACK – SAMARRA ................................................. 738

    A. PLAINTIFFS THE TIMOTHY JAMES SEAMANS FAMILY ........................ 738

472. THE AUGUST 12, 2005 ATTACK – KHALIDIYA ............................................. 739

    A. PLAINTIFFS THE LARRY ALLAN STILWELL FAMILY ........................... 739

473. THE AUGUST 11, 2005 ATTACK – BETWEEN KIRKUK AND MOSUL ...... 740

    A. PLAINTIFFS THE BRETT ADAM MILLER FAMILY ................................. 740

474. THE AUGUST 10, 2005 ATTACK – BAGHDAD ............................................. 741

    A. PLAINTIFF JOSEPHINE CUELLAR ................................................. 741

475. THE AUGUST 9, 2005 ATTACK – BAGHDAD ................................................. 742

    A. PLAINTIFF EDWARD B. JOHNSON JR. ................................................. 742

476. THE AUGUST 7, 2005 ATTACK – MOSUL ...................................................... 742

    A. PLAINTIFFS THE GLENN GILBERT GEFFERT FAMILY ........................ 742

477. THE AUGUST 4, 2005 ATTACK – BAIJI .......................................................... 743

    A. PLAINTIFFS THE WENDELL DONALD CHAVIS FAMILY ...................... 743

478. THE AUGUST 3, 2005 ATTACK –HADITHA ................................................... 745

    A. PLAINTIFFS THE NICHOLAS WILLIAM BAART BLOEM FAMILY ........ 745

479. THE AUGUST 1, 2005 ATTACK – HIT .............................................................. 747

    A. PLAINTIFF DANIEL JOEL FOSTER ................................................. 747

480. THE AUGUST 1, 2005 ATTACK – HIT .............................................................. 748

    A. PLAINTIFF LOUIS MICHAEL POPE ................................................. 748

481. THE JULY 31, 2005 ATTACK – HIT ................................................................. 748

    A. PLAINTIFF ANDREW JOHN LENZ ................................................. 748

482. THE JULY 29, 2005 ATTACK – FALLUJAH ..................................................... 749

    A. PLAINTIFFS THE BOBBY GENE CHRISTOPHER, III FAMILY ............... 749

483. THE JULY 29, 2005 ATTACK – SAMARRA ..................................................... 750

A. PLAINTIFF THE JUSTIN DAVIN SABO ......................................................... 750

484. THE JULY 25, 2005 ATTACK – SAMARRA ...................................................... 751

A. PLAINTIFFS THE MONACA LOUISE GILMORE FAMILY ....................... 751

485. THE JULY 24, 2005 ATTACK – KHALIDIYAH ................................................ 752

A. PLAINTIFFS THE JOSS WADE PURDON FAMILY .................................... 752

486. THE JULY 24, 2005 ATTACK – KHALIDIYAH ................................................ 753

A. PLAINTIFFS THE BERNABE CARRELL MONTEJANO FAMILY ............. 753

487. THE JULY 24, 2005 ATTACK – KHALIDIYAH ................................................ 754

A. PLAINTIFFS THE JACOB ANDREW MILLER FAMILY ............................ 754

488. THE JULY 16, 2005 ATTACK – KIRKUK .......................................................... 755

A. PLAINTIFFS THE CHRISTOPHER LEE OLSEN FAMILY .......................... 755

489. THE JULY 15, 2005 ATTACK – BAGHDAD ....................................................... 756

A. PLAINTIFF JOHN WILLIAM FUHRMAN ................................................... 756

490. THE JULY 10, 2005 ATTACK – MOSUL ............................................................ 756

A. PLAINTIFF JARROD SCOTT HALLMAN ................................................... 756

491. THE JULY 9, 2005 ATTACK – TAL AFAR ........................................................ 757

A. PLAINTIFF RYAN CHRISTOPHER SAURS ................................................ 757

492. THE JUNE 29, 2005 ATTACK – HABBANIYAH ............................................... 757

A. PLAINTIFF CHARLES EUGENE RUSSELL ................................................ 757

493. THE JUNE 28, 2005 ATTACK – FOB O'RYAN ................................................. 758

A. PLAINTIFF JOSEPHINE CUELLAR ............................................................ 758

494. THE JUNE 22, 2005 ATTACK – BAGHDAD ...................................................... 759

A. PLAINTIFF JESSICA MARIE GRIGGS ........................................................ 759

495. THE JUNE 16, 2005 ATTACK – RAMADI.......................................................... 759

A. PLAINTIFFS THE OCTAVIO SANCHEZ FAMILY ...................................... 759

496.  THE JUNE 15, 2005 ATTACK – BATAWEEN NEIGHBORHOOD, BAGHDAD . ................................................................................................ 760

    A.  PLAINTIFF ERIC EUGENE RODRIQUEZ .................................................... 760

497.  THE JUNE 9, 2005 ATTACK – HAQLANIYAH ................................................ 761

    A.  PLAINTIFFS THE BRAD DUANE SQUIRES FAMILY ............................... 761

498.  THE JUNE 9, 2005 ATTACK - HAQLANIYAH ................................................ 762

    A.  PLAINTIFFS THE THOMAS OLIVER KEELING FAMILY ........................ 762

499.  THE JUNE 7, 2005 ATTACK – RAMADI ............................................................ 763

    A.  PLAINTIFFS THE JOSEPH JOAQUIN TELLEZ FAMILY ........................... 763

500.  THE JUNE 5, 2005 ATTACK – RASHEED .......................................................... 764

    A.  PLAINTIFFS THE JUSTIN LEE VASQUEZ FAMILY .................................. 764

501.  THE MAY 21, 2005 ATTACK – HADITHAH DAM ........................................... 765

    A.  PLAINTIFF JASON THOMAS WOODLIFF ................................................... 765

502.  THE MAY 15, 2005 ATTACK – TREBIL ........................................................... 765

    A.  PLAINTIFF DANIEL WILLIAM BARRON ................................................... 765

503.  THE MAY 13, 2005 ATTACK – BALAD ........................................................... 766

    A.  PLAINTIFF CHRISTOPHER FRANKLIN SWARTZ .................................... 766

504.  THE MAY 11, 2005 ATTACK – RAMADI .......................................................... 767

    A.  PLAINTIFF SCOTT BRONSON LYON ........................................................... 767

505.  THE MAY 11, 2005 ATTACK – BALAD ........................................................... 767

    A.  PLAINTIFF AENEAS ROBERT TOCHI ......................................................... 767

506.  THE MAY 9, 2005 ATTACK – HASWA ........................................................... 768

    A.  PLAINTIFF DONNELL DRAIL NELSON, II .................................................. 768

507.  THE MAY 9, 2005 ATTACK – AL KARMAH ................................................... 768

    A.  PLAINTIFFS THE TAYLOR BRADLEY PRAZYNSKI FAMILY ................ 768

508.  THE MAY 8, 2005 ATTACK – AL QA'IM ....................................................... 769

A.  PLAINTIFF JOSEPH MICHAEL LOWE.............................................................. 769

509.  THE MAY 8, 2005 ATTACK – NEW UBAYDI.................................................... 770

A.  PLAINTIFFS THE COLLEN MATTHEW WEST FAMILY ........................... 770

510.  THE MAY 3, 2005 ATTACK – MOSUL .............................................................. 771

A.  PLAINTIFFS THE KYLE MATTHEW LEMIEUX FAMILY ........................ 771

511.  THE MAY 1, 2005 ATTACK – BAGHDAD ........................................................ 772

A.  PLAINTIFFS THE JOHN JUJU WILLIAMS FAMILY ................................. 772

512.  THE APRIL 28, 2005 ATTACK – TAL AFAR .................................................... 773

A.  PLAINTIFFS THE ERIC WAYNE MORRIS FAMILY .................................. 773

513.  THE APRIL 26, 2005 ATTACK – HIT ................................................................ 774

A.  PLAINTIFF JACOB P. DAVID............................................................................ 774

514.  THE APRIL 24, 2005 ATTACK – HIT ................................................................ 775

A.  PLAINTIFF ADAM JEFFERY MCCANN ......................................................... 775

515.  THE APRIL 22, 2005 ATTACK – HABBANIYAH ........................................... 775

A.  PLAINTIFFS THE JAMES MICHAEL HURST FAMILY ............................. 775

516.  THE APRIL 21, 2005 ATTACK – RAMADI....................................................... 776

A.  PLAINTIFFS THE DAVID VINCENT BEDNARCIK FAMILY ................... 776

517.  THE APRIL 19, 2005 ATTACK – BAGHDAD ................................................... 777

A.  PLAINTIFFS THE JOEL BENJAMIN DAMIN FAMILY ............................. 777

518.  THE APRIL 16, 2005 ATTACK – RAMADI....................................................... 778

A.  PLAINTIFFS THE JOSE MIGUEL JAUREGUI FAMILY ............................ 778

519.  THE APRIL 16, 2005 ATTACK – RAMADI....................................................... 779

A.  PLAINTIFFS THE TROMAINE K. TOY, SR., FAMILY ................................ 779

520.  THE APRIL 16, 2005 ATTACK – RAMADI....................................................... 780

A.  PLAINTIFFS THE ROBERT WILLIAM BRIGGS FAMILY ......................... 780

521.  THE APRIL 16, 2005 ATTACK – RAMADI ............................................... 781

    A.  PLAINTIFFS THE RANDY LEE STEVENS FAMILY .................................. 781

522.  THE APRIL 15, 2005 ATTACK – KARADA NEIGHBORHOOD, BAGHDAD 782

    A.  PLAINTIFF JOSEF ERNEST BAUMANN ...................................... 782

523.  THE APRIL 13, 2005 ATTACK – FOB HIT ............................................ 783

    A.  PLAINTIFF TIMOTHY MICHAEL HATCH .................................. 783

524.  THE APRIL 10, 2005 ATTACK – FALLUJAH ........................................ 783

    A.  PLAINTIFF MATTHEW PAUL DALRYMPLE ............................. 783

525.  THE APRIL 10, 2005 ATTACK – FOB FALCON ................................... 784

    A.  PLAINTIFFS THE JOSHUA DIVON TRAVIS FAMILY ............................. 784

526.  THE APRIL 5, 2005 ATTACK – DORA-SOUTHERN BAGHDAD ................ 785

    A.  PLAINTIFFS THE STEVE NUÑEZ, JR. FAMILY ............................. 785

527.  THE APRIL 5, 2005 ATTACK – SOUTHERN BAGHDAD ............................. 786

    A.  PLAINTIFFS THE CHRISTOPHER JOHN SHIMA FAMILY ...................... 786

528.  THE APRIL 2, 2005 ATTACK – ABU GHRAIB ................................. 787

    A.  PLAINTIFF JASON TODD MORRIS .......................................... 787

529.  THE APRIL 2, 2005 ATTACK – ABU GHRAIB ................................. 788

    A.  PLAINTIFFS THE CORTNEY MCCABE ROBINSON FAMILY ................. 788

530.  THE APRIL 2, 2005 ATTACK – ABU GHRAIB ................................. 789

    A.  PLAINTIFFS THE WILLIAM JOSEPH PUOPOLO FAMILY ...................... 789

531.  THE APRIL 2, 2005 ATTACK – ABU GHRAIB ................................. 790

    A.  PLAINTIFFS THE LEONDRAE DEMORRIS RICE FAMILY ..................... 790

532.  THE APRIL 1, 2005 ATTACK – MOSUL ........................................ 791

    A.  PLAINTIFFS THE KYLE MATTHEW LEMIEUX FAMILY ........................ 791

533.  THE MARCH 28, 2005 ATTACK – SAMARRA ................................. 792

A.  PLAINTIFFS THE MICHAEL EVERETTE GREEN FAMILY ...................... 792

534.  THE MARCH 27, 2005 ATTACK – CAMP AL-TAQAADUM.......................... 793

A.  PLAINTIFFS THE EDGAR D. MALDONADO FAMILY .............................. 793

535.  THE MARCH 25, 2005 ATTACK – HIT ................................................. 794

A.  PLAINTIFF BRIAN CHAD BECKWITH.................................................... 794

536.  THE MARCH 18, 2005 ATTACK – SADR CITY ................................... 795

A.  PLAINTIFFS THE DERRICK DEANDRE HEMPHILL FAMILY ................ 795

537.  THE MARCH 17, 2005 ATTACK – RAMADI.......................................... 796

A.  PLAINTIFFS THE DANIEL J. ERBE FAMILY.......................................... 796

538.  THE MARCH 13, 2005 ATTACK – AR RUTBAH ................................... 797

A.  PLAINTIFF BRIAN THOMAS SKRABA .................................................. 797

539.  THE MARCH 12, 2005 ATTACK - BAGHDAD.................................... 798

A.  PLAINTIFFS THE BRUCE TERRENCE DURR FAMILY ........................... 798

540.  THE MARCH 9, 2005 ATTACK – DORA NEIGHBORHOOD, BAGHDAD ... 799

A.  PLAINTIFF ERIC EUGENE RODRIQUEZ .................................................. 799

541.  THE MARCH 7, 2005 ATTACK – RAMADI.......................................... 800

A.  PLAINTIFFS THE BRIAN DALE CURRIER FAMILY.................................. 800

542.  THE FEBRUARY 28, 2005 ATTACK – BAGHDAD ......................................... 800

A.  PLAINTIFFS THE STEPHEN JOHN DESROSIER FAMILY......................... 800

543.  THE FEBRUARY 28, 2005 ATTACK – FALLUJAH ........................................ 801

A.  PLAINTIFFS THE JOSHUA MICHAEL KRUEGER FAMILY ..................... 801

544.  THE FEBRUARY 26, 2005 ATTACK – NIPPUR ................................................. 802

A.  PLAINTIFFS THE TOLIVER EUGENE NOEY FAMILY ............................. 802

545.  THE FEBRUARY 23, 2005 ATTACK – BAQUBAH ......................................... 803

A.  PLAINTIFFS THE EDWARD JAMES TERRY, SR. FAMILY ...................... 803

546. THE FEBRUARY 21, 2005 ATTACK – SAMARRA ........................................ 804

    A. PLAINTIFF EDDIE MICHAEL ABBEY ........................................................ 804

547. THE FEBRUARY 21, 2005 ATTACK – RAMADI ............................................ 805

    A. PLAINTIFFS THE MERLIN GERMAN FAMILY .......................................... 805

548. THE FEBRUARY 19, 2005 ATTACK – SAMARRA ........................................ 806

    A. PLAINTIFFS THE PATRICK JOHN BRADY FAMILY ................................ 806

549. THE FEBRUARY 19, 2005 ATTACK – KADHIMIYAH DISTRICT IN
    BAGHDAD.......................................................................................................... 807

    A. PLAINTIFF JOSHUA DALE COY .................................................................. 807

550. THE FEBRUARY 19, 2005 ATTACK – BAGHDAD ........................................ 807

    A. PLAINTIFFS THE ADAM MICHAEL MALSON FAMILY .......................... 807

551. THE FEBRUARY 12, 2005 ATTACK – MOSUL .............................................. 808

    A. PLAINTIFF JASON BARRETT CARNEY ..................................................... 808

552. THE JANUARY 28, 2005 ATTACK – BAGHDAD ........................................... 809

    A. PLAINTIFF BRIAN LEE RUDOLPH ............................................................. 809

553. THE JANUARY 26, 2005 ATTACK – HADITHA ............................................ 810

    A. PLAINTIFFS THE JONATHAN WILLIAMS BOWLING FAMILY .............. 810

554. THE JANUARY 26, 2005 ATTACK – HADITHA ............................................ 811

    A. PLAINTIFF ANDREW HOWARD ROTHMAN ............................................. 811

555. THE JANUARY 24, 2005 ATTACK – HAQLANIYAH ................................... 811

    A. PLAINTIFF JUAN MARTINEZ RUBIO ........................................................ 811

556. THE JANUARY 23, 2005 ATTACK – SAMARRA ........................................... 812

    A. PLAINTIFF AARON SMITH ........................................................................... 812

557. THE JANUARY 13, 2005 ATTACK – MOSUL ................................................ 813

    A. PLAINTIFF RICHARD ALAN CRAWFORD ................................................. 813

558. THE JANUARY 13, 2005 ATTACK – MOSUL ................................................ 813

A.  PLAINTIFFS THE MATTHEW PAUL SCHAFFER FAMILY ...................... 813

559.  THE JANUARY 13, 2005 ATTACK – KIRKUK ................................ 814

A.  PLAINTIFF CHARLES LOY JORDAN, JR. .................................... 814

560.  THE JANUARY 13, 2005 ATTACK – DUJAIL.................................. 815

A.  PLAINTIFFS THE DAVID LEE SELLS FAMILY ........................... 815

561.  THE JANUARY 11, 2005 ATTACK – TIKRIT.................................. 816

A.  PLAINTIFF BRIAN MICHAEL GLIBA.......................................... 816

562.  THE JANUARY 9, 2005 ATTACK – HIT .......................................... 816

A.  PLAINTIFF ENRIQUE LINAN JR. ................................................. 816

563.  THE JANUARY 8, 2005 ATTACK – MOSUL .................................... 817

A.  PLAINTIFFS THE DON ANTHONY WALLS FAMILY ............... 817

564.  THE JANUARY 7, 2005 ATTACK – ISKANDARIYA ..................... 818

A.  PLAINTIFF JOHN F. KUNKEL, JR. ............................................... 818

565.  THE JANUARY 5, 2005 ATTACK – RAMADI.................................. 819

A.  PLAINTIFFS THE DAVID ANTHONY ROSALES FAMILY....... 819

566.  THE JANUARY 3, 2005 ATTACK – AMIRIYAH ............................ 820

A.  PLAINTIFF JASON PETER SCHAUBLE........................................ 820

567.  THE JANUARY 3, 2005 ATTACK – BAGHDAD.............................. 820

A.  PLAINTIFFS THE SERGE HAGOPIAN FAMILY......................... 820

568.  THE JANUARY 3, 2005 ATTACK – BALAD .................................... 821

A.  PLAINTIFFS THE KEVIN MICHAEL DOHERTY, SR. FAMILY ............... 821

569.  THE JANUARY 1, 2005 ATTACK – HADITHA................................ 823

A.  PLAINTIFF JUAN MARTINEZ RUBIO ......................................... 823

570.  THE DECEMBER 29, 2004 ATTACK – MOSUL............................... 823

A.  PLAINTIFF JARROD SCOTT HALLMAN ..................................... 823

571.  THE DECEMBER 27, 2004 ATTACK – MOSUL ................................................ 824

    A.  PLAINTIFF JOSEPH RICHARD BEEMAN .................................................... 824

572.  THE DECEMBER 25, 2004 ATTACK – KHAN AL-BAGHDADI .................... 825

    A.  PLAINTIFFS THE ANTHONY TERMAINE PLUNKETT, SR. FAMILY ..... 825

573.  THE DECEMBER 20, 2004 ATTACK – MOSUL ................................................ 826

    A.  PLAINTIFFS THE JOSHUA DIVON TRAVIS FAMILY ............................... 826

574.  THE DECEMBER 20, 2004 ATTACK – AMIRIYAH ....................................... 827

    A.  PLAINTIFFS THE JAMES ALAN BELL FAMILY ....................................... 827

575.  THE DECEMBER 13, 2004 ATTACK – BAGHDAD ........................................ 828

    A.  PLAINTIFFS THE TODD EDWARD MILLER FAMILY ............................... 828

576.  THE DECEMBER 12, 2004 ATTACK – FALLUJAH ....................................... 829

    A.  PLAINTIFFS THE JONATHAN CUNEY FAMILY ....................................... 829

577.  THE DECEMBER 12, 2004 ATTACK – HIT ...................................................... 830

    A.  PLAINTIFFS THE RENE FRANCISCO AVENDAÑO, JR. FAMILY ........... 830

578.  THE DECEMBER 12, 2004 ATTACK – FALLUJAH ....................................... 831

    A.  PLAINTIFFS THE SAMUEL JAMES MORTIMER FAMILY ...................... 831

579.  THE DECEMBER 10, 2004 ATTACK – BALAD ................................................ 832

    A.  PLAINTIFFS THE STEPHEN LAMONTE EDWARDS, JR. FAMILY ......... 832

580.  THE NOVEMBER 28, 2004 ATTACK – HABBANIYAH ................................ 833

    A.  PLAINTIFFS THE FRANCIS DANIEL GARREN FAMILY ........................ 833

581.  THE NOVEMBER 28, 2004 ATTACK – NORTH OF FALLUJAH .................. 834

    A.  PLAINTIFF ARTHUR WAYNE D'AMATO .................................................. 834

582.  THE NOVEMBER 26, 2004 ATTACK – FALLUJAH ....................................... 835

    A.  PLAINTIFFS THE ROBERT LOUIS DUNHAM FAMILY ............................ 835

583.  THE NOVEMBER 26, 2004 ATTACK – RAMADI ............................................ 835

A.  PLAINTIFF ROBERT ADAM BELL...................................................... 835

584. THE NOVEMBER 23, 2004 ATTACK – AVGHANI ........................................ 836

A.  PLAINTIFF RUSSELL L. BALDWIN.................................................. 836

585. THE NOVEMBER 23, 2004 ATTACK – ABU GHRAIB ................................. 837

A.  PLAINTIFFS THE JOHN L. PARCELL FAMILY.................................. 837

586. THE NOVEMBER 18, 2004 ATTACK – FALLUJAH...................................... 838

A.  PLAINTIFFS THE DERRICK ADAM ANTHONY FAMILY...................... 838

587. THE NOVEMBER 18, 2004 ATTACK – LSA ANACONDA............................ 839

A.  PLAINTIFFS THE ANDREW JAMES GREEN FAMILY............................. 839

588. THE NOVEMBER 15, 2004 ATTACK – FALLUJAH...................................... 840

A.  PLAINTIFFS THE TERRY LYNN MCELWAIN FAMILY ........................... 840

589. THE NOVEMBER 15, 2004 ATTACK – FALLUJAH...................................... 841

A.  PLAINTIFF GARRETT MICHAEL MARSH.................................... 841

590. THE NOVEMBER 15, 2004 ATTACK – RAMADI....................................... 842

A.  PLAINTIFFS THE PATRICK MARC M. RAPICAULT FAMILY ................ 842

591. THE NOVEMBER 15, 2004 ATTACK – FALLUJAH...................................... 843

A.  PLAINTIFF BRIAN MICHAEL HAYDEN ........................................ 843

592. THE NOVEMBER 14, 2004 ATTACK – FALLUJAH...................................... 843

A.  PLAINTIFFS THE DALE ALAN BURGER JR. FAMILY ........................... 843

593. THE NOVEMBER 14, 2004 ATTACK – FALLUJAH...................................... 844

A.  PLAINTIFF SAMUEL WILLIAMS ................................................ 844

594. THE NOVEMBER 14, 2004 ATTACK – FALLUJAH...................................... 845

A.  PLAINTIFFS THE JOE SANCHEZ, JR. FAMILY................................. 845

595. THE NOVEMBER 14, 2004 ATTACK – FALLUJAH...................................... 846

A.  PLAINTIFFS THE CURTIS JOSEPH MIGHACCIO FAMILY...................... 846

596.  THE NOVEMBER 13, 2004 ATTACK – FALLUJAH........................................ 847

    A.  PLAINTIFFS THE SHANE KEVIN HOUSMANS FAMILY ......................... 847

597.  THE NOVEMBER 13, 2004 ATTACK –FALLUJAH........................................ 848

    A.  PLAINTIFFS THE JOSE A. VELEZ FAMILY.................................................. 848

598.  THE NOVEMBER 13, 2004 ATTACK – RAMADI........................................... 849

    A.  PLAINTIFFS THE JOHN DANIEL SHANNON FAMILY............................. 849

599.  THE NOVEMBER 13, 2004 ATTACK – FALLUJAH........................................ 850

    A.  PLAINTIFFS THE STANLEY GOODIN, III FAMILY .................................. 850

600.  THE NOVEMBER 12, 2004 ATTACK – AL KARMAH ................................... 851

    A.  PLAINTIFFS THE DANIEL CLAYTON VOTROBEK JR. FAMILY ............ 851

601.  THE NOVEMBER 12, 2004 ATTACK – BAIJI .................................................. 852

    A.  PLAINTIFF JUSTIN MURRAY CROCKER.................................................... 852

602.  THE NOVEMBER 12, 2004 ATTACK – FALLUJAH........................................ 852

    A.  PLAINTIFFS THE SAMUEL JAMES MORTIMER FAMILY....................... 852

603.  THE NOVEMBER 12, 2004 ATTACK – FALLUJAH........................................ 853

    A.  PLAINTIFFS THE BLAKE COLIN COLE FAMILY ..................................... 853

604.  THE NOVEMBER 11, 2004 ATTACK – HAWIJUH.......................................... 854

    A.  PLAINTIFFS THE LUTHER DARRELL BROWN FAMILY ........................ 854

605.  THE NOVEMBER 11, 2004 ATTACK – FALLUJAH........................................ 855

    A.  PLAINTIFF RAMON JUNIOR BEJARANO.................................................... 855

606.  THE NOVEMBER 10, 2004 ATTACK – FALLUJAH........................................ 856

    A.  PLAINTIFFS THE MARTIN J. GONZALEZ FAMILY.................................. 856

607.  THE NOVEMBER 10, 2004 ATTACK – FALLUJAH........................................ 857

    A.  PLAINTIFF BEAU ANTHONY MATTIODA................................................... 857

608.  THE NOVEMBER 10, 2004 ATTACK – TAJI................................................... 857

A.  PLAINTIFFS THE MICHAEL ZIPP HANNA FAMILY ................................. 857

609.  THE NOVEMBER 10, 2004 ATTACK – FALLUJAH........................................ 858

A.  PLAINTIFFS THE MICHAEL VINCENT PRATO FAMILY ........................ 858

610.  THE NOVEMBER 10, 2004 ATTACK – FALLUJAH........................................ 860

A.  PLAINTIFFS THE ROBERT ALLEN LEATHERWOOD JR. FAMILY ........ 860

611.  THE NOVEMBER 9, 2004 ATTACK –FALLUJAH........................................... 861

A.  PLAINTIFFS THE ABRAHAM SIMPSON FAMILY .................................... 861

612.  THE NOVEMBER 9, 2004 ATTACK – FALLUJAH.......................................... 862

A.  PLAINTIFFS THE DEREK DAVID MCGINNIS FAMILY ........................... 862

613.  THE NOVEMBER 9, 2004 ATTACK – FALLUJAH.......................................... 863

A.  PLAINTIFFS THE TERRY LYNN MCELWAIN FAMILY ........................... 863

614.  THE NOVEMBER 9, 2004 ATTACK – FALLUJAH.......................................... 865

A.  PLAINTIFF DANNY TRAM...................................................................... 865

615.  THE NOVEMBER 9, 2004 ATTACK – MUSAYIB............................................ 865

A.  PLAINTIFF VINCENT WILLIAM GIZZARELLI.......................................... 865

616.  THE NOVEMBER 9, 2004 ATTACK – FALLUJAH.......................................... 866

A.  PLAINTIFFS THE JAMES ALAN BELL FAMILY ....................................... 866

617.  THE NOVEMBER 9, 2004 ATTACK – FALLUJAH.......................................... 867

A.  PLAINTIFF GARRETT MICHAEL MARSH................................................. 867

618.  THE NOVEMBER 8, 2004 ATTACK – MOSUL ............................................... 867

A.  PLAINTIFF ARTHUR LOUIS TOMPKINS.................................................. 867

619.  THE NOVEMBER 6, 2004 ATTACK – RAMADI............................................. 868

A.  PLAINTIFF ERIK DOUGLAS JOHNSON.................................................... 868

620.  THE NOVEMBER 5, 2004 ATTACK – RAMADI............................................. 869

A.  PLAINTIFFS THE JAMES MICHAEL HURST FAMILY ............................. 869

621.  THE NOVEMBER 4, 2004 ATTACK – FALLUJAH .......................................... 870

    A.  PLAINTIFF ALLEN LAMAR PRATT ............................................... 870

622.  THE NOVEMBER 2, 2004 ATTACK – BAGHDAD ......................................... 870

    A.  PLAINTIFF KENNETH ROBERT GORDON ................................... 870

623.  THE NOVEMBER 1, 2004 ATTACK – BAGHDAD ......................................... 871

    A.  PLAINTIFFS THE BRADLEY CHRISTIAN TANDE, JR. FAMILY ............ 871

624.  THE OCTOBER 27, 2004 ATTACK – BALAD ................................................ 872

    A.  PLAINTIFFS THE ALEXANDER RESTIFO FAMILY ................................ 872

625.  THE OCTOBER 27, 2004 ATTACK – BAGHDAD ........................................... 873

    A.  PLAINTIFFS THE MARTIN FLORES-DOMINGUEZ FAMILY .................. 873

626.  THE OCTOBER 24, 2004 ATTACK – HASWA .............................................. 874

    A.  PLAINTIFF MICHAEL RAFAEL HERNANDO .............................. 874

627.  THE OCTOBER 15, 2004 ATTACK – ISKANDARIYA ................................... 874

    A.  PLAINTIFF VINCENT WILLIAM GIZZARELLI ............................ 874

628.  THE OCTOBER 14, 2004 ATTACK – BAGHDAD ........................................... 875

    A.  PLAINTIFF CHESTER J. ROGERS ................................................ 875

629.  THE OCTOBER 12, 2004 ATTACK – AL KARMAH ....................................... 875

    A.  PLAINTIFF SIMON PETER FLARITY .......................................... 875

630.  THE OCTOBER 12, 2004 ATTACK – AL KARMAH ....................................... 876

    A.  PLAINTIFFS THE MATTHEW JOSEPH SOLBERG FAMILY ................... 876

631.  THE OCTOBER 11, 2004 ATTACK – FALLUJAH .......................................... 877

    A.  PLAINTIFFS THE RAY LEONARD LOPEZ FAMILY ................................ 877

632.  THE OCTOBER 11, 2004 ATTACK – FOB RAMADI ...................................... 878

    A.  PLAINTIFF JOSEPH CHRISTOPHER FERRARO .......................... 878

633.  THE OCTOBER 11, 2004 ATTACK – RAMADI ............................................... 879

A.  PLAINTIFF EDDIE SANTOS FERNANDEZ .................................................. 879

634.  THE OCTOBER 9, 2004 ATTACK – KARMAH ................................................. 880

A.  PLAINTIFFS THE DANIEL LEONARD POULSEN FAMILY ..................... 880

635.  THE OCTOBER 9, 2004 ATTACK – KARMAH ................................................. 881

A.  PLAINTIFF KEITH EDWARD ROGERS ....................................................... 881

636.  THE OCTOBER 4, 2004 ATTACK – HASWA .................................................... 881

A.  PLAINTIFF MICHAEL PAUL SAVOIE ......................................................... 881

637.  THE OCTOBER 2, 2004 ATTACK – AL-KHALIDIYAH ................................. 882

A.  PLAINTIFF LANCE RAYMOND BLYTHE .................................................... 882

638.  THE OCTOBER 1, 2004 ATTACK – SAMARRA .............................................. 883

A.  PLAINTIFF MICHAEL RICHARD DRUMMOND ........................................ 883

639.  THE SEPTEMBER 30, 2004 ATTACK – MOSUL ............................................ 883

A.  PLAINTIFFS THE CHRISTOPHER ROBERT GALKA FAMILY ................ 883

640.  THE SEPTEMBER 30, 2004 ATTACK – FALLUJAH ...................................... 884

A.  PLAINTIFFS THE DYLAND LINDSEY DUNWELL FAMILY ................... 884

641.  THE SEPTEMBER 26, 2004 ATTACK – AL KARMAH .................................. 885

A.  PLAINTIFFS THE JONATHAN CHANCE THOMAS FAMILY.................... 885

642.  THE SEPTEMBER 20, 2004 ATTACK – RAMADI ........................................... 887

A.  PLAINTIFFS THE REX DONALD LACEBY FAMILY ................................ 887

643.  THE SEPTEMBER 19, 2004 ATTACK – BAGHDAD ...................................... 888

A.  PLAINTIFF ROBERT ARTHUR DIXON ........................................................ 888

644.  THE SEPTEMBER 13, 2004 ATTACK – CAMP SATHER, BAGHDAD.......... 888

A.  PLAINTIFF ROBERT PAUL POTTS, III ........................................................ 888

645.  THE SEPTEMBER 13, 2004 ATTACK – MOSUL ............................................ 889

A.  PLAINTIFF JAMIE LEE FRAZIER ................................................................. 889

646. THE SEPTEMBER 12, 2004 ATTACK – BAGHDAD ....................................... 890

    A. PLAINTIFFS THE MARCO ANTONIO VILLEGAS FAMILY ..................... 890

647. THE SEPTEMBER 12, 2004 ATTACK – KIRKUK ........................................... 891

    A. PLAINTIFF WILLIAM JAMES MORDEN ...................................... 891

648. THE SEPTEMBER 10, 2004 ATTACK – BALAD RUZ................................... 891

    A. PLAINTIFF JOSEPH FREDERICK LOWIT ................................... 891

649. THE SEPTEMBER 10, 2004 ATTACK – SADR CITY .................................... 892

    A. PLAINTIFFS THE FRANKLYN LEE DOSS FAMILY ................................. 892

650. THE SEPTEMBER 6, 2004 ATTACK – BAGHDAD ......................................... 893

    A. PLAINTIFF TONY ALLEN COVELL................................................... 893

651. THE SEPTEMBER 5, 2004 ATTACK – TAL AFAR ......................................... 893

    A. PLAINTIFFS THE ERIK ERNST SANDSTROM FAMILY........................... 893

652. THE SEPTEMBER 4, 2004 ATTACK – FALLUJAH ........................................ 894

    A. PLAINTIFFS THE JAMES MICHAEL LOTT FAMILY ................................ 894

653. THE SEPTEMBER 3, 2004 ATTACK – FALLUJAH ........................................ 895

    A. PLAINTIFFS THE JAMES MICHAEL LOTT FAMILY ................................ 895

654. THE AUGUST 26, 2004 ATTACK – AL KARMAH .......................................... 896

    A. PLAINTIFFS THE PHILLIP CHRISTOPHER BAILEY FAMILY ................ 896

655. THE AUGUST 26, 2004 ATTACK – BAGHDAD .............................................. 897

    A. PLAINTIFFS THE JARED RAY WHITE FAMILY ....................................... 897

656. THE AUGUST 25, 2004 ATTACK – NAJAF .................................................... 898

    A. PLAINTIFF ARTHUR WAYNE D'AMATO ................................................. 898

657. THE AUGUST 23, 2004 ATTACK – NAJAF .................................................... 899

    A. PLAINTIFFS THE VAITOGI SANI TAETULI FAMILY .............................. 899

658. THE AUGUST 22, 2004 ATTACK – AL KARMAH .......................................... 900

A. PLAINTIFFS THE KEVIN A. MADACHIK FAMILY .................................... 900

659. THE AUGUST 22, 2004 ATTACK – AL KARMAH ........................................ 901

A. PLAINTIFF JAMES H. SPERRY ...................................................... 901

660. THE AUGUST 18, 2004 ATTACK – MAHMOUDIYAH ................................. 902

A. PLAINTIFF PHILLIP FREDERICK MCCOTTER........................................... 902

661. THE AUGUST 17, 2004 ATTACK – FALLUJAH ............................................ 902

A. PLAINTIFFS THE RYAN DAVID SAWYER FAMILY ................................ 902

662. THE AUGUST 17, 2004 ATTACK – BAQUBAH............................................... 903

A. PLAINTIFFS THE EDWARD JOSEPH PULIDO FAMILY ........................... 903

663. THE AUGUST 16, 2004 ATTACK – AL KARMAH ........................................ 904

A. PLAINTIFFS THE SHANE FITZSIMMONS FAMILY ................................. 904

664. THE AUGUST 16, 2004 ATTACK – AL KARMAH ........................................ 905

A. PLAINTIFFS THE RYAN EARL GWALTNEY FAMILY ............................ 905

665. THE AUGUST 15, 2004 ATTACK – FALLUJAH ............................................ 907

A. PLAINTIFFS THE PHILLIP CHRISTOPHER BAILEY FAMILY ................ 907

666. THE AUGUST 15, 2004 ATTACK – NAJAF ................................................... 908

A. PLAINTIFFS THE STANLEY GOODIN, III FAMILY ................................. 908

667. THE AUGUST 10, 2004 ATTACK – SADR CITY ............................................ 908

A. PLAINTIFFS THE NICKOLAS CARL STOWMAN FAMILY...................... 908

668. THE AUGUST 7, 2004 ATTACK – BAGHDAD ................................................ 909

A. PLAINTIFFS THE WILLIAM JONES IV FAMILY ....................................... 909

669. THE AUGUST 6, 2004 ATTACK – GHAZALIYA............................................ 910

A. PLAINTIFFS THE JARED RAY WHITE FAMILY ....................................... 910

670. THE AUGUST 5, 2004 ATTACK – NAJAF .................................................... 911

A. PLAINTIFF JESUS ALVAREZ GARCIA ...................................................... 911

671.  THE AUGUST 5, 2004 ATTACK – NAJAF ..................................................... 912

    A.  PLAINTIFF ROBERT ANTHONY PEDREIRO ............................... 912

672.  THE AUGUST 5, 2004 ATTACK – AL NASR WAL SALAM ......................... 912

    A.  PLAINTIFFS THE SAMUEL JAMES MORTIMER FAMILY...................... 912

673.  THE AUGUST 1, 2004 ATTACK –BALAD....................................................... 913

    A.  PLAINTIFFS THE ARMANDO V. HERNANDEZ FAMILY ........................ 913

674.  THE JULY 24, 2004 ATTACK – RAMADI...................................................... 914

    A.  PLAINTIFFS THE JASON BRADLEY FINCH FAMILY ............................. 914

675.  THE JULY 24, 2004 ATTACK – RAMADI...................................................... 915

    A.  PLAINTIFFS THE JESSE JAMES LONGORIA FAMILY ........................... 915

676.  THE JULY 21, 2004 ATTACK – SAMARRA ..................................................... 916

    A.  PLAINTIFFS THE LARRY ALBERT CARR, JR. FAMILY ........................ 916

677.  THE JULY 21, 2004 ATTACK – AL-DHULUIYA ............................................ 917

    A.  PLAINTIFF BRADLEY SCOTT SHADDEN.................................................. 917

678.  THE JULY 20, 2004 ATTACK – AL KARMAH................................................ 918

    A.  PLAINTIFF JAMES THOMAS OLSON......................................................... 918

679.  THE JULY 20, 2004 ATTACK – FALLUJAH.................................................... 918

    A.  PLAINTIFFS THE KRISTOPHER HARRY QUINTANA FAMILY ............. 918

680.  THE JULY 15, 2004 ATTACK – HADITHA...................................................... 920

    A.  PLAINTIFFS THE MOHAMAD KAMAL AKHTAR FAMILY ................... 920

681.  THE JULY 12, 2004 ATTACK – BAGHDAD..................................................... 921

    A.  PLAINTIFF TONEY MAURICE THOMPSON................................................ 921

682.  THE JULY 12, 2004 ATTACK – RAMADI........................................................ 921

    A.  PLAINTIFF MARIO L. BORREGO................................................................ 921

683.  THE JULY 11, 2004 ATTACK – NEAR SAMARRA ........................................ 922

A.  PLAINTIFFS THE JEREMY JAMES FISCHER FAMILY ............................... 922

684.  THE JULY 8, 2004 ATTACK – SAMARRA ........................................................ 923

A.  PLAINTIFF DARYN JAMES SWALLOW ..................................................... 923

685.  THE JULY 7, 2004 ATTACK – QARYAT ASH SHAHABI ............................. 923

A.  PLAINTIFFS THE JUSTIN ANDREW BOSWOOD FAMILY ...................... 923

686.  THE JULY 7, 2004 ATTACK – TIKRIT .............................................................. 924

A.  PLAINTIFF HAROLD THOMAS ATKINSON, JR. ....................................... 924

687.  THE JULY 6, 2004 ATTACK – BAJI .................................................................. 925

A.  PLAINTIFF TRAVIS EUGENE GINGRICH .................................................. 925

688.  THE JULY 2, 2004 ATTACK – BAGHDAD ....................................................... 925

A.  PLAINTIFF HARRISON MANYOMA ............................................................ 925

689.  THE JUNE 27, 2004 ATTACK –HIT .................................................................. 926

A.  PLAINTIFF MARIO ALBERTO MENA ......................................................... 926

690.  THE JUNE 26, 2004 ATTACK – BAGHDAD ..................................................... 926

A.  PLAINTIFFS THE ROBERT LANCE CAVER FAMILY .............................. 926

691.  THE JUNE 21, 2004 ATTACK – SADR CITY .................................................... 927

A.  PLAINTIFFS THE ISRAEL GONZALEZ AREVALO FAMILY ................... 927

692.  THE JUNE 21, 2004 ATTACK – SADR CITY .................................................... 929

A.  PLAINTIFFS THE LEONARD BERT SLOAN FAMILY .............................. 929

693.  THE JUNE 17, 2004 ATTACK – AL ANBAR PROVINCE .............................. 930

A.  PLAINTIFF MARIO ALBERTO MENA ......................................................... 930

694.  THE JUNE 16, 2004 ATTACK - BALAD ............................................................ 930

A.  PLAINTIFF RONALD ALLEN EATON ......................................................... 930

695.  THE JUNE 16, 2004 ATTACK – BALAD ........................................................... 931

A.  PLAINTIFFS THE ERNESTO SIERRA FAMILY ........................................... 931

696.  THE JUNE 11, 2004 ATTACK – FALLUJAH...................................................... 932

    A.  PLAINTIFF TIMOTHY EARL BREDBERG, JR. ............................................. 932

697.  THE JUNE 7, 2004 ATTACK – MOSUL.......................................................... 932

    A.  PLAINTIFFS THE MATTHEW WALKER GOWIN FAMILY ...................... 932

698.  THE JUNE 6, 2004 ATTACK – BAGHDAD...................................................... 933

    A.  PLAINTIFFS THE JOHN LAURENCE LAWTON, JR. FAMILY ................. 933

699.  THE JUNE 4, 2004 ATTACK – BAGHDAD...................................................... 934

    A.  PLAINTIFF JESSE ALAN GEER ................................................................. 934

700.  THE JUNE 4, 2004 ATTACK – BAGHDAD...................................................... 935

    A.  PLAINTIFFS THE CARL WILLIE OLIVER FAMILY ................................... 935

701.  THE JUNE 3, 2004 ATTACK – RAMADI.......................................................... 936

    A.  PLAINTIFFS THE MATTHEW DENNIS BENACK FAMILY...................... 936

702.  THE JUNE 3, 2004 ATTACK – RAMADI.......................................................... 936

    A.  PLAINTIFF DANIEL RAYE DUITSMAN........................................................ 936

703.  THE MAY 29, 2004 ATTACK – RAMADI ........................................................ 937

    A.  PLAINTIFFS THE MISAEL NIETO FAMILY ............................................... 937

704.  THE MAY 26, 2004 ATTACK – HIT.................................................................. 938

    A.  PLAINTIFFS THE MATTHEW CHARLES HENDERSON FAMILY .......... 938

705.  THE MAY 25, 2004 ATTACK – ISKANDARIYA ............................................. 939

    A.  PLAINTIFFS THE THOMAS MATTHEW BROOKS FAMILY.................... 939

706.  THE MAY 24, 2004 ATTACK – BAGHDAD .................................................... 940

    A.  PLAINTIFFS THE THOMAS WHITTFIELD THORNHILL FAMILY .......... 940

707.  THE MAY 19, 2004 ATTACK – RAMADI ........................................................ 941

    A.  PLAINTIFF SHAWN DAVID SPITZER ........................................................ 941

708.  THE MAY 19, 2004 ATTACK – RAMADI ........................................................ 941

A.  PLAINTIFFS THE KEVIN DALE MILLER FAMILY .................................... 941

709.  THE MAY 14, 2004 ATTACK – ISKANDARIYA ............................................. 942

A.  PLAINTIFF FELICIA FLAKE .......................................................................... 942

710.  THE MAY 14, 2004 ATTACK – MUHMADIYA ............................................. 943

A.  PLAINTIFFS THE PATRICK CHRISTOPHER WICKENS FAMILY............ 943

711.  THE MAY 7, 2004 ATTACK – KARBALA ...................................................... 944

A.  PLAINTIFFS THE WILLIAM ROBERT INGRAM FAMILY ....................... 944

712.  THE MAY 6, 2004 ATTACK – BAGHDAD ..................................................... 945

A.  PLAINTIFF STACEY DARRELL RICE .......................................................... 945

713.  THE MAY 6, 2004 ATTACK – BAGHDAD ..................................................... 945

A.  PLAINTIFFS THE SIMON MIGUEL GARCIA FAMILY .............................. 945

714.  THE MAY 5, 2004 ATTACK – BAGHDAD ..................................................... 946

A.  PLAINTIFFS THE DANIEL ALTON ROCCO FAMILY ............................... 946

715.  THE MAY 5, 2004 ATTACK – BAGHDAD ..................................................... 947

A.  PLAINTIFFS THE RICHARD LLANCE SCHWAN FAMILY ...................... 947

716.  THE MAY 5, 2004 ATTACK – BALAD ........................................................... 948

A.  PLAINTIFF DONALD EVAN GRZENA ......................................................... 948

717.  THE MAY 4, 2004 ATTACK – RAMADI ......................................................... 948

A.  PLAINTIFFS THE BRYON MAURICE SLAY FAMILY ............................... 948

718.  THE MAY 2, 2004 ATTACK – RAMADI ......................................................... 950

A.  PLAINTIFF THOMAS LOCKWOOD JOHNSON ........................................... 950

719.  THE MAY 2, 2004 ATTACK – BAGHDAD ..................................................... 950

A.  PLAINTIFFS THE MARTIN LYNN WAGNER, JR. FAMILY...................... 950

720.  THE MAY 2, 2004 ATTACK – RAMADI ......................................................... 951

A.  PLAINTIFFS THE BRYON MAURICE SLAY FAMILY ............................... 951

721.  THE APRIL 27, 2004 ATTACK – RAMADI ........................................... 952

    A.  PLAINTIFF KEVIN BRADLEY OLECH ...................................... 952

722.  THE APRIL 26, 2004 ATTACK – FALLUJAH ...................................... 953

    A.  PLAINTIFFS THE CARLOS GOMEZ PEREZ FAMILY ............... 953

723.  THE APRIL 25, 2004 ATTACK – TAJI .............................................. 954

    A.  PLAINTIFFS THE JOIE LEE WILLIAMS FAMILY .................... 954

724.  THE APRIL 23, 2004 ATTACK – BAQUBA ........................................ 955

    A.  PLAINTIFF JUSTIN ASHLEY GAGE .................................... 955

725.  THE APRIL 19, 2004 ATTACK – BAGHDAD ..................................... 956

    A.  PLAINTIFF JOHN FITZGERALD COLEMAN ........................ 956

726.  THE APRIL 13, 2004 ATTACK – BAGHDADI .................................... 956

    A.  PLAINTIFF SIGURD MORRIS MATHISEN, JR. ..................... 956

727.  THE APRIL 9, 2004 ATTACK – BAGHDAD ....................................... 957

    A.  PLAINTIFFS THE JUSTIN ROY ROJAS FAMILY .................. 957

728.  THE APRIL 8, 2004 ATTACK – FALLUJAH ...................................... 958

    A.  PLAINTIFFS THE ASHOT MALKHASSIAN FAMILY .............. 958

729.  THE APRIL 8, 2004 ATTACK – MAHMUDIYA ................................... 959

    A.  PLAINTIFFS THE BRIAN MICHAEL YORK FAMILY .............. 959

730.  THE APRIL 7, 2004 ATTACK – FALLUJAH ...................................... 960

    A.  PLAINTIFFS THE DANIEL JAMES GRIEGO FAMILY ............. 960

731.  THE APRIL 7, 2004 ATTACK – FALLUJAH ...................................... 961

    A.  PLAINTIFFS THE JAMES EDWARD WRIGHT FAMILY .......... 961

732.  THE APRIL 7, 2004 ATTACK – FALLUJAH ...................................... 962

    A.  PLAINTIFF ANTHONY LEE MIELE .................................... 962

733.  THE APRIL 7, 2004 ATTACK – FALLUJAH ...................................... 963

A.  PLAINTIFFS THE TYLER DAVID NEUMEISTER FAMILY ....................... 963

734.  THE APRIL 7, 2004 ATTACK – RAMADI ................................................... 964

A.  PLAINTIFF ELISHA JOSEPH ABBOTT .......................................... 964

735.  THE APRIL 7, 2004 ATTACK – FALLUJAH ................................................ 964

A.  PLAINTIFFS THE MICHAEL ANTHONY MENDOZA FAMILY ............... 964

736.  THE APRIL 7, 2004 ATTACK – BAIJI ...................................................... 965

A.  PLAINTIFFS THE CRAIG SCOTT SOTEBEER FAMILY ........................... 965

737.  THE APRIL 7, 2004 ATTACK – LATIFIYA ................................................. 966

A.  PLAINTIFFS THE STEPHEN KENT FERGUSON FAMILY ...................... 966

738.  THE APRIL 7, 2004 ATTACK – FALLUJAH ................................................ 967

A.  PLAINTIFF JULIO ALEXANDER GUZMAN ................................. 967

739.  THE APRIL 7, 2004 ATTACK – FALLUJAH ................................................ 968

A.  PLAINTIFFS THE BLAIR ELLIS DELL FAMILY ........................................ 968

740.  THE APRIL 5, 2004 ATTACK – ZAIDON ................................................... 969

A.  PLAINTIFFS THE BRANDON JOHN BERHOW-GOLL FAMILY .............. 969

741.  THE APRIL 4, 2004 ATTACK – SADR CITY .............................................. 970

A.  PLAINTIFFS THE JOSHUA MITCHELL ROUNTREE FAMILY ................ 970

742.  THE APRIL 4, 2004 ATTACK – SADR CITY .............................................. 970

A.  PLAINTIFF ALEXANDER RODRIGUEZ BRYANT .................................... 970

743.  THE APRIL 4, 2004 ATTACK – SADR CITY .............................................. 971

A.  PLAINTIFFS THE FRANKLYN LEE DOSS FAMILY .................................. 971

744.  THE APRIL 4, 2004 ATTACK – SADR CITY .............................................. 972

A.  PLAINTIFFS THE SALVADOR BELTRAN-SOTO FAMILY ....................... 972

745.  THE APRIL 4, 2004 ATTACK – SADR CITY .............................................. 973

A.  PLAINTIFFS THE RICHARD DEWAYNE FOSTER FAMILY .................... 973

746.  THE APRIL 4, 2004 ATTACK – SADR CITY ...................................................... 974

    A.  PLAINTIFFS THE MATTHEW GENE RAUL MERCADO FAMILY ........... 974

747.  THE APRIL 4, 2004 ATTACK – SADR CITY ...................................................... 975

    A.  PLAINTIFF ANTHONY JOHN FERRIS ........................................................... 975

748.  THE APRIL 4, 2004 ATTACK – SADR CITY ...................................................... 976

    A.  PLAINTIFFS THE MATTHEW N. WOOTEN, JR. FAMILY ........................ 976

749.  THE APRIL 4, 2004 ATTACK – KIRKUK ......................................................... 977

    A.  PLAINTIFFS THE GARY LYNN STRICKLAND FAMILY .......................... 977

750.  THE MARCH 30, 2004 ATTACK – ISKANDARIYA ....................................... 978

    A.  PLAINTIFF ADAM NATHAN FLEURY ........................................................... 978

751.  THE MARCH 30, 2004 ATTACK – ISKANDARIYA ....................................... 978

    A.  PLAINTIFFS THE JACOB RICHARD DEVRIES FAMILY .......................... 978

752.  THE MARCH 30, 2004 ATTACK – ISKANDARIYA ....................................... 979

    A.  PLAINTIFFS THE STUART HUNTER MCKENZIE FAMILY ..................... 979

753.  THE MARCH 30, 2004 ATTACK – ISKANDARIYA ....................................... 980

    A.  PLAINTIFFS THE SHANE MICHAEL PITTS FAMILY ............................... 980

754.  THE MARCH 30, 2004 ATTACK – ISKANDARIYA ....................................... 981

    A.  PLAINTIFF MATTHEW SLATE HAEGER .................................................... 981

755.  THE MARCH 25, 2004 ATTACK – FOB SPEICHER ....................................... 982

    A.  PLAINTIFFS THE JOSHUA CODY BIRCH FAMILY ................................... 982

756.  THE MARCH 19, 2004 ATTACK – AL ANBAR PROVINCE ........................... 983

    A.  PLAINTIFF MARIO ALBERTO MENA .......................................................... 983

757.  THE MARCH 19, 2004 ATTACK – FALLUJAH ................................................ 984

    A.  PLAINTIFFS THE JOHN JAMES DAWDY FAMILY .................................... 984

758.  THE MARCH 19, 2004 ATTACK – FALLUJAH ................................................ 985

    A. PLAINTIFF MICHAEL ROY RENFRO ............................................................ 985

759. THE MARCH 13, 2004 ATTACK – RAMADI.................................................... 985

    A. PLAINTIFF BRIAN PATRICK MCPHERSON.................................................. 985

760. THE MARCH 10, 2004 ATTACK – ISKANDARIYA ....................................... 986

    A. PLAINTIFF LARRY JAMES MAYS, JR......................................................... 986

761. THE MARCH 2, 2004 ATTACK – BAGHDAD.................................................. 986

    A. PLAINTIFFS THE DAVID MICHAEL SIMMS FAMILY ............................. 986

762. THE FEBRUARY 4, 2004 ATTACK – SAMARRA .......................................... 987

    A. PLAINTIFFS THE JOSHUA CODY BIRCH FAMILY ................................... 987

763. THE JANUARY 31, 2004 ATTACK – AL ANBAR PROVINCE....................... 989

    A. PLAINTIFFS THE MICHAEL LAWRENCE NEUMANN FAMILY ............. 989

764. THE JANUARY 31, 2004 ATTACK – MOSUL ................................................. 990

    A. PLAINTIFFS THE NATHANIEL RAY LAMBERT FAMILY........................ 990

765. THE JANUARY 27, 2004 ATTACK – BAGHDAD............................................ 991

    A. PLAINTIFFS THE DAVID GLENN MCKENZIE, SR. FAMILY .................. 991

766. THE JANUARY 24, 2004 ATTACK - KHALIDIYAH ...................................... 992

    A. PLAINTIFF DAVID KENNETH WILLIAMS.................................................. 992

767. THE JANUARY 18, 2004 ATTACK – BAGHDAD............................................ 993

    A. PLAINTIFF CORY LAMAR EGGLESTON ................................................... 993

768. THE JANUARY 7, 2004 ATTACK – BAGHDAD.............................................. 993

    A. PLAINTIFFS THE MICHAEL BENAVIDES, JR. FAMILY .......................... 993

769. THE DECEMBER 31, 2003 ATTACK – WEST OF SADR CITY ..................... 995

    A. PLAINTIFFS THE BENJAMIN VERNON DOLBY FAMILY........................ 995

770. THE DECEMBER 27, 2003 ATTACK – BAGHDAD......................................... 996

    A. PLAINTIFFS THE RICHARD DEWAYNE FOSTER FAMILY .................... 996

771.  THE DECEMBER 25, 2003 ATTACK – FOB SPEICHER ................................. 997

    A.  PLAINTIFFS THE JOSHUA CODY BIRCH FAMILY .................................. 997

772.  THE DECEMBER 25, 2003 ATTACK – BAQUBA ............................................ 998

    A.  PLAINTIFFS THE TIMOTHY PADRAIC MCKENZIE FAMILY................. 998

773.  THE DECEMBER 15, 2003 ATTACK – ADHAMIYA...................................... 999

    A.  PLAINTIFFS THE STEVEN RENALD PEOPLES FAMILY ........................ 999

774.  THE DECEMBER 10, 2003 ATTACK – MOSUL ........................................... 1000

    A.  PLAINTIFF AARON SCOTT ARTHUR BURKS, SR. ................................ 1000

775.  THE DECEMBER 4, 2003 ATTACK – TIKRIT ............................................. 1001

    A.  PLAINTIFFS THE KORYLEE CHARLES KAAI FAMILY ........................ 1001

776.  THE NOVEMBER 23, 2003 ATTACK –BAQUBAH ...................................... 1001

    A.  PLAINTIFFS THE EDDIE EUGENE MENYWEATHER FAMILY ............ 1001

777.  THE NOVEMBER 20, 2003 ATTACK – KIRKUK........................................... 1004

    A.  PLAINTIFF MICHAEL JOSEPH JAMES ................................................ 1004

778.  THE NOVEMBER 20, 2003 ATTACK – ISKANDARIYA ............................. 1005

    A.  PLAINTIFFS THE MICHAEL LAMOYNE BURNS FAMILY.................... 1005

779.  THE NOVEMBER 12, 2003 ATTACK – AL-NASIRIYAH ............................. 1006

    A.  PLAINTIFFS THE FREDDIE LEE KING, JR. FAMILY .............................. 1006

780.  THE NOVEMBER 12, 2003 ATTACK – NASIRIYA ...................................... 1007

    A.  PLAINTIFFS THE FLOYD C. PETERS, JR. FAMILY ................................. 1007

781.  THE NOVEMBER 11, 2003 ATTACK – BAGHDAD ...................................... 1009

    A.  PLAINTIFFS THE ANTOINETTE VERNESTINE SCOTT FAMILY.......... 1009

782.  THE NOVEMBER 9, 2003 ATTACK – KIRKUK............................................. 1010

    A.  PLAINTIFFS THE ANDREW PATRICK NALLY FAMILY ........................ 1010

783.  THE NOVEMBER 7, 2003 ATTACK – BAGHDAD ........................................ 1011

A. PLAINTIFF RUSSELL LEE COOK JR. ......................................................... 1011

784. THE NOVEMBER 7, 2003 ATTACK – BAGHDAD ....................................... 1012

A. PLAINTIFF JOHN ELDON ADAMIC............................................................. 1012

785. THE NOVEMBER 2, 2003 ATTACK – LATIFIYA......................................... 1013

A. PLAINTIFFS THE TIMOTHY DEMETRIUS JORDAN FAMILY ............... 1013

786. THE NOVEMBER 1, 2003 ATTACK – BAQUBAH ....................................... 1014

A. PLAINTIFFS THE DERRICK JERMALE MITCHELL FAMILY ............... 1014

787. THE OCTOBER 27, 2003 ATTACK – BAGHDAD......................................... 1015

A. PLAINTIFFS THE AUBREY DALE BELL FAMILY ................................. 1015

788. THE OCTOBER 27, 2003 ATTACK – BAGHDAD......................................... 1016

A. PLAINTIFF TROY JAMES TUSCHEL ........................................................ 1016

789. THE OCTOBER 27, 2003 ATTACK – BAGHDAD......................................... 1017

A. PLAINTIFFS THE ROOSEVELT ROSS, JR. FAMILY................................ 1017

790. THE OCTOBER 25, 2003 ATTACK – BAQUBA ............................................ 1019

A. PLAINTIFFS THE TIMOTHY PADRAIC MCKENZIE FAMILY............... 1019

791. THE OCTOBER 22, 2003 ATTACK – KADIMIYAH ..................................... 1020

A. PLAINTIFF JUSTIN RAY MORGAN ............................................................ 1020

792. THE OCTOBER 21, 2003 ATTACK – ABU GHRAIB .................................... 1020

A. PLAINTIFFS THE JOHN DERRICK FLAMER FAMILY .......................... 1020

793. THE OCTOBER 11, 2003 ATTACK – TAJI.................................................... 1021

A. PLAINTIFF JASON RICHARD GOLBRANSON......................................... 1021

794. THE OCTOBER 10, 2003 ATTACK – KIRKUK ............................................. 1022

A. PLAINTIFFS THE KORYLEE CHARLES KAAI FAMILY ........................ 1022

795. THE OCTOBER 7, 2003 ATTACK –BALAD .................................................. 1023

A. PLAINTIFFS THE BRIAN BUCK WILHELM FAMILY............................. 1023

796. THE OCTOBER 7, 2003 ATTACK – BAGHDAD ............................................ 1024

    A. PLAINTIFFS THE DONALD DANIEL GRANT FAMILY ........................... 1024

797. THE OCTOBER 3, 2003 ATTACK – BALAD, SALAH AD DIN ................... 1025

    A. PLAINTIFFS THE PETER KEVIN LANDSTEINER FAMILY ................... 1025

798. THE OCTOBER 3, 2003 ATTACK - SADIYAH ............................................. 1026

    A. PLAINTIFFS THE JAMES HEATH PIRTLE FAMILY ............................... 1026

799. THE OCTOBER 1, 2003 ATTACK - SAMARRA ........................................... 1027

    A. PLAINTIFFS THE JAMES DAVID BLANKENBECLER FAMILY ........... 1027

800. THE SEPTEMBER 26, 2003 ATTACK – BAGHDAD .................................... 1028

    A. PLAINTIFFS THE BRIAN DOUGLAS KING FAMILY .............................. 1028

801. THE SEPTEMBER 18, 2003 ATTACK – BAGHDAD .................................... 1030

    A. PLAINTIFFS THE WILLIAM FRANKLIN GUNTER FAMILY ................. 1030

802. THE SEPTEMBER 14, 2003 ATTACK – FALLUJAH .................................... 1031

    A. PLAINTIFF GEORGE PEREZ ....................................................................... 1031

803. THE SEPTEMBER 1, 2003 ATTACK – BALAD ............................................ 1032

    A. PLAINTIFFS THE ALEX PHONGPHACHONE FAMILY ........................... 1032

804. THE AUGUST 30, 2003 ATTACK – DORA ................................................... 1033

    A. PLAINTIFF WILLIAM LEE NELSON ......................................................... 1033

805. THE AUGUST 28, 2003 ATTACK – ABU GHRAIB ...................................... 1033

    A. PLAINTIFF CHRISTOPHER MICHAEL KNAPP ........................................ 1033

806. THE AUGUST 25, 2003 ATTACK – FALLUJAH ........................................... 1034

    A. PLAINTIFF ERICK CASTRO ........................................................................ 1034

807. THE AUGUST 16, 2003 ATTACK – KIRKUK ............................................... 1034

    A. PLAINTIFFS THE FRANCISCO RAMIREZ FAMILY ................................ 1034

808. THE AUGUST 11, 2003 ATTACK – NEAR BAGHDAD ................................ 1036

A.  PLAINTIFFS THE ANTONIO JOSE MORA FAMILY ................................ 1036

809.  THE AUGUST 1, 2003 ATTACK – JAR SILAH .............................................. 1037

A.  PLAINTIFFS THE JUSTIN WILLIAM HEBERT FAMILY ......................... 1037

810.  THE JULY 31, 2003 ATTACK – BAGHDAD.................................................. 1037

A.  PLAINTIFFS THE SAMUEL SPARKS, III FAMILY .................................. 1037

811.  THE JULY 30, 2003 ATTACK – NASIRIYAH................................................ 1039

A.  PLAINTIFFS THE DAMIEN CARL WEEKS FAMILY .............................. 1039

812.  THE JULY 23, 2003 ATTACK – RAMADI..................................................... 1040

A.  PLAINTIFFS THE JOSHUA TODD BYERS FAMILY ............................... 1040

813.  THE JULY 15, 2003 ATTACK – TIKRIT........................................................ 1041

A.  PLAINTIFF JASON KELLY WASHBURN ................................................. 1041

814.  THE JULY 8, 2003 ATTACK – BAGHDAD.................................................... 1041

A.  PLAINTIFFS THE JOHNNY JEFFERSON CRAIN FAMILY ..................... 1041

815.  THE JULY 8, 2003 ATTACK – BAGHDAD.................................................... 1042

A.  PLAINTIFFS THE RAY BOYD ROBINSON FAMILY ............................... 1042

816.  THE JULY 5, 2003 ATTACK – BAGHDAD.................................................... 1044

A.  PLAINTIFFS THE RICARDO ALFREDO BRIZUELA, JR. FAMILY ......... 1044

817.  THE JULY 3, 2003 ATTACK – RAMADI....................................................... 1044

A.  PLAINTIFFS THE JOSEPH RAY EASON, SR. FAMILY .......................... 1044

818.  THE JUNE 30, 2003 ATTACK – HASWA ...................................................... 1045

A.  PLAINTIFF NELSON ANTONIO MARTINEZFLORES ............................ 1045

819.  THE JUNE 3, 2003 ATTACK – BALAD RUZ ................................................ 1046

A.  PLAINTIFF MICHAEL ANDRE DARCY ................................................... 1046

820.  THE MAY 28, 2003 ATTACK – BAGHDAD .................................................. 1047

A.  PLAINTIFFS THE MICHAEL GAMBLE FAMILY ..................................... 1047

821.  THE MAY 8, 2003 ATTACK – BAGHDAD ...................................................... 1048

    A.  PLAINTIFFS THE BRIAN DOUGLAS KING FAMILY ............................... 1048

822.  THE MAY 8, 2003 ATTACK – BAGHDAD ...................................................... 1049

    A.  PLAINTIFFS THE ARTHUR LEE MOYE FAMILY .................................... 1049

823.  THE MAY 5, 2003 ATTACK – SAMAWAH ..................................................... 1050

    A.  PLAINTIFF CHARLES EDWARD SLACKS, JR. ........................................ 1050

824.  THE MAY 1, 2003 ATTACK – BASRAH ......................................................... 1050

    A.  PLAINTIFF YVENSON GALA .................................................................... 1050

825.  THE MAY 1, 2003 ATTACK – BAGHDAD ...................................................... 1051

    A.  PLAINTIFFS THE QUANTE MAURICE EGGLESTON FAMILY .............. 1051

VII.   CLAIMS FOR RELIEF ......................................................................................... 1052

FIRST CLAIM FOR RELIEF ........................................................................................ 1052

SECOND CLAIM FOR RELIEF .................................................................................... 1061

THIRD CLAIM FOR RELIEF ........................................................................................ 1074

FOURTH CLAIM FOR RELIEF .................................................................................... 1086

FIFTH CLAIM FOR RELIEF ........................................................................................ 1092

SIXTH CLAIM FOR RELIEF ........................................................................................ 1107

SEVENTH CLAIM FOR RELIEF .................................................................................. 1114

EIGHTH CLAIM FOR RELIEF ..................................................................................... 1120

NINTH CLAIM FOR RELIEF ........................................................................................ 1122

TENTH CLAIM FOR RELIEF ....................................................................................... 1127

ELEVENTH CLAIM FOR RELIEF ............................................................................... 1130

TWELFTH CLAIM FOR RELIEF .................................................................................. 1136

THIRTEENTH CLAIM FOR RELIEF ........................................................................... 1140

VIII.  PRAYER FOR RELIEF ........................................................................................ 1144

# INDEX OF ACRONYMS

**AAH** – Asa'ib Ahl Al Haq or the "League of the Righteous"

**AAI** – Ansar al Islam

**AIO** – Aerospace Industries Organization

**AML –** Anti-money laundering

**AO –** Area of Operation

**ATA** – Anti-terrorism Act, 18 U.S.C. § 2333, *et seq.*

**BIC –** Bank Identifier Code

**BNP** – BNP Paribas S.A.

**BSA -** Bank Secrecy Act

**CACIB –** Crédit Agricole Corporate and Investment Bank

**CAIS** - Crédit Agricole Indosuez (Suisse)

**CASA** - Crédit Agricole S.A.

**CBI –** Central Bank of Iran

**CHIPS-NY** – Clearing House Interbank Payment System

**CIF –** Customer Information File

**CL –** Crédit Lyonnais

**CLS –** Credit Lyonnais (Suisse) S.A.

**CSAM** – Credit Suisse Asset Management Limited, United Kingdom

**DB** – Deutsche Bank AG

**DFAC** – Dining Facility

**DFS –** Department of Financial Services

**DIO** – Defense Industries Organization

**DN** – Specially Designated Nation

**DOJ -** Department of Justice

**DPA** – Deferred Prosecution Agreement

**EFP** – Explosively formed penetrators

**FATF –** Financial Action Task Force

**FinCEN** – Financial Crimes Enforcement Network

**FINMA –** The Swiss Financial Market Supervisory Authority

**FOB** – Forward Operating Base

**FRBNY –** Federal Reserve Board of New York

**FTO** – Foreign Terrorist Organization

**HBEU –** HSBC Bank Plc aka HSBC-London

**HBME –** HSBC Middle East Limited aka HSBC-Middle East

**HSBC-US –** HSBC Bank USA, N.A.

**HRHS** – The Headquarters for the Restoration of Holy Shrines

**IAMIC –** Iran Aircraft Manufacturing Industrial Company aka HESA

**ICC Statute** – Rome Statute of the International Criminal Court

**ICEI -** Imensazen Consultant Engineers Institute

**IED** – Improvised explosive device

**IEEPA –** International Emergency Economic Powers Act

**IHL** – International Humanitarian Law

**IHRL** – International Human Rights Law

**IHSRC –** Iran Helicopter Support and Renewal Company aka PAHNA

**IOVB –** Bank Saderat in London

**IRAM** – Improvised Rocket Assisted Munitions

**IRGC** – Islamic Revolutionary Guard Corps

**IRGC-QF** – Islamic Revolutionary Guard Corps-Qods Force

**IRISL** – Islamic Republic of Iran Shipping Lines

**ISIL** – Islamic State of Iraq and the Levant aka "ISIS" or "Daesh"

**ITR** – Iranian Transactions Regulations

**ITRSHRA** – Iran Threat Reduction and Syrian Human Rights Act of 2012

**JAM** – Jaysch al Mahdi or the "Mahdi Army"

**JASTA** – Justice Against Sponsors of Terrorism Act, Pub. L. 114-222, Sept. 28, 2016, 130 Stat. 852

**KAA -** Khatam al-Anbiya Construction Company (a/k/a Khatam al-Anbiya Construction Headquarters, Qaragah-e Sazandegi-ye Khatam al-Anbiya, or "Seal of the Prophets")

**KH** – Kata'ib Hizballah

**LC** – Letter of Credit

**MNF-I** – Multi National Forces in Iraq

**MODAFL** – Iran's Ministry of Defense and Armed Forces Logistics

**MOIN –** Monitoring and Investigations Unit

**MOIS –** Iran's Ministry of Intelligence and Security

**MPD –** Multicurrency Payments Department

**MT –** Message Type

**NIOC** – National Iranian Oil Company

**NSN –** National Stock Number

**OFAC –** U.S. Department of Treasury Office of Foreign Asset Control

**OPEC** - Organization of Petroleum Exporting Countries

**PAHNA** – *See* IHSRC

**PCM** – Payment and Cash Management

**PDB** – Promised Day Brigades

**RBS Plc** – The Royal Bank of Scotland Plc

**RBS Group** – The Royal Bank of Scotland Group Plc

**RBS N.V.** – The Royal Bank of Scotland N.V.

**SCB** – Standard Chartered Bank

**SDGT** – Specially Designated Global Terrorist

**SDN** – Specially Designated National

**SDT** – Specially Designated Terrorist

**SWIFT –** Society for Worldwide Interbank Financial Telecommunication

**TBI** – Traumatic Brain Injury

**UAE –** United Arab Emirates

**UBL** – Usama bin Laden

**USD** – United States Dollars

**VBIED –** Vehicle-Borne Improvised Explosive Device a/k/a car bomb

**WMD** – Weapons of Mass Destruction

Plaintiffs by and through their attorneys, allege the following:

## I.      NATURE OF ACTION

1.      In perhaps one of the most egregious instances of placing profit over people, Defendants[1] conspired with Iran and its Agents and Proxies,[2] including Defendant Bank Saderat,[3] to illegally misuse the U.S. banking system to provide material support for terrorism. The Defendants did this by deliberately evading U.S. economic sanctions, conducting illicit trade-finance transactions, using evasive money-laundering tactics and disguising financial payments to and from U.S. dollar-denominated accounts, which resulted in the foreseeable deaths and injuries to thousands of U.S. nationals in Iraq.

2.      As Secretary of State Colin Powell observed in 2001, "money is the oxygen of terrorism. Without the means to raise and move money around the world, terrorists cannot function."

3.      Iran is the world's leading state sponsor of terrorism. In order to fund, direct, and

---

[1] Defendants are: (1) HSBC Bank USA, N.A.; (2) HSBC Holdings Plc; (3) HSBC Bank Plc; (4) HSBC Bank Middle East Limited; (5) HSBC North America Holdings, Inc.; (6) Commerzbank A.G.; (7) Commerzbank A.G., New York Branch; (8) Barclays Bank Plc; (9) Barclays Bank Plc, New York Branch; (10) BNP Paribas S.A.; (11) BNP Paribas S.A., New York Branch; (12) Standard Chartered Bank; (13) Standard Chartered Bank, New York Branch; (14) Royal Bank of Scotland N.V.; (15) Royal Bank of Scotland Plc (n/k/a NatWest Markets Plc); (16) Royal Bank of Scotland Plc (n/k/a NatWest Markets Plc), New York Branch; (17) Crédit Agricole S.A.; (18) Crédit Agricole Corporate & Investment Bank; (19) Crédit Agricole Corporate & Investment Bank, New York Branch; (20) Credit Suisse A.G.; (21) Credit Suisse A.G., New York Branch; (22) Deutsche Bank A.G.; (23) Deutsche Bank A.G, New York Branch; (24) Bank Saderat Plc.

[2] Iran's Agents and Proxies include the individuals and entities listed on the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") Sanctions Lists including, but not limited to: (1) Bank Markazi Jomhouri Islami Iran ("Bank Markazi") (a/k/a the "Central Bank of the Islamic Republic of Iran"); (2) Bank Melli Iran; (3) Melli Bank Plc; (4) Bank Mellat; (5) Bank Tejarat; (6) Bank Refah; (7) Bank Sepah; (8) Bank Saderat Plc; (9) the Islamic Republic of Iran Shipping Lines ("IRISL"); (10) Mahan Air; (11) Iran Air; (12) National Iranian Oil Company ("NIOC"); (13) the Islamic Revolutionary Guard Corps ("IRGC"); (14) Islamic Revolutionary Guard Corps-Qods Force ("IRGC-QF"); (15) Iranian Ministry of Intelligence and Security (MOIS); (16) Khatam-al Anbiya Construction; and (17) the Terrorist Groups (*see* fn. 5). Pursuant to 31 C.F.R. § 560.304, IRGC, IRGC-QF, MOIS, Bank Markazi, Bank Sepah, Bank Melli, IRISL, Khatam-al Anbiya, and the NIOC are considered part of the government of Iran.

[3] According to the Treasury Department, Tehran used its state-owned banks, including Defendant Bank Saderat, to channel funds to designated Foreign Terrorist Organizations, including Hezbollah, Hamas, the Popular Front for the Liberation of Palestine-General Command, and Palestinian Islamic Jihad. U.S. Dept., of Treasury Fact Sheet: *Treasury Strengthens Preventive Measures Against Iran No. 1258* (Nov. 6, 2008), https://www.treasury.gov/press-center/press-releases/Pages/hp1258.aspx.*See also,* Avi Jorisch, *Iran's Dirty Banking – How the Islamic Republic Skirts International Financial Sanctions* (2010).

support its terrorism campaign against Coalition Forces in Iraq, Iran required access to billions of United States dollars ("USDs"), as well as Eurodollars,[4] both because waging terrorism is expensive, and because the USD is the currency of international terrorism. Iran's own domestic currency, the Rial, is one of the world's least valued currencies and is essentially worthless outside of Iran. Additionally, if Iran used its own currency to fund terrorism those funds could be more easily traced back to Iran.

4.      To obtain USDs, Iran needed access to the U.S. financial system. However, because of economic sanctions imposed against Iran due to Iran's well-known status as a state sponsor of terror, Iran could not obtain that access or USDs without Defendants' help to break the law and evade those sanctions. The very purpose of these sanctions was to deny Iran and the terrorists the USD needed to fund, direct, and support terrorism.

5.      Defendants laundered money for Iran's Agents and Proxies, including the Terrorist Groups[5], and obstructed law enforcement's efforts to cut off the flow of USDs to Iran, sanctioned entities, and terrorists.

6.      Defendants knew, or were deliberately indifferent to the fact Iran intended to, and did, use the laundered money to materially support the Terrorist Groups, thereby enabling them to plan, authorize and commit heinous acts of international terrorism against United States

---

[4] Eurodollar refers to a deposit denominated in USD maintained by a bank outside the United States. Payment transactions in the Eurodollar market are not typically settled by the physical transfer of USD-denominated banknotes from one counterparty to another. Instead, Eurodollar transactions are settled electronically in New York through a bank-owned clearinghouse and then maintained by book entries of credits and debits in the respective counterparties' accounting systems (based on the SWIFT-NET) messages sent between the counterparties and their correspondent banks. The global Eurodollar market involves a network of banks outside the United States that makes loans and accepts deposits denominated in U.S. dollars, and nearly all U.S. dollar transactions initiated outside the United States are processed through correspondent banks located almost exclusively in New York.

[5] As used herein, the term "Terrorist Groups" refers to Hezbollah (designated a Foreign Terrorist Organization "FTO" on October 8, 1997), al Qaeda, (designated an FTO on October 8, 1999), all al Qaeda subgroups, (including al Qaeda in Iraq, which was designated an FTO on December 17, 2004), Ansar al Islam/Ansar al Sunna (designated an FTO on March 22, 2004), the Iranian Special Groups (including Jaysch al Mehdi, Badr Organization/Badr Brigades, Kata'ib Hizballah (designated an FTO on July 2, 2009), Asa'ib Ahl al Haq, Promised Day Brigades, Abu Mustafa Al-Sheibani network, Abu Mahdi al-Muhandis network, and others discussed below, which were responsible for the terrorist attacks at issue in this Action.

2

nationals, including Plaintiffs. One of the most fundamental duties and obligations a bank owes is "Know Your Customer." Defendants had a duty to know their customers and report all suspicious and/or illegal transactions to the U.S. Government. Defendants not only failed to report these transactions, but actively engaged in wrongful and evasive money laundering conduct to cover up these repeated transactions over a multiple year period to provide material support to Terrorist Groups in Iraq.

7.      Defendants' state of mind and contempt for the sanctions and related banking regulations that were designed to stop Iran's sponsorship of terrorism is demonstrated in the response by Standard Chartered Bank Group's Executive Director to an October 2006 email from Standard Chartered's CEO.

8.      In pertinent part, the CEO wrote, "we believe [the Iranian business] needs urgent reviewing at the Group level to evaluate if its returns and strategic benefits are . . . still commensurate with the potential to cause *very serious or even catastrophic reputational damage to the Group*… [T]here is equally important potential of risk of subjecting management in US and London (e.g. you and I) and elsewhere to personal reputational damages and/*or serious criminal liability*."[6]

9.      The Group Director's response was: "*You f---ing Americans. Who are you to tell us, the rest of the world, that we're not going to deal with Iranians.*"[7]

10.     Iran's actions were more recently confirmed, on October 13, 2017, in an official White House statement, wherein President Donald J. Trump stated:

In Iraq and Afghanistan, groups supported by Iran have killed hundreds of

---

[6] Memorandum entitled *Business with Iran – USA Perspective* by SCB's CEO, Americas to SCB's Group Executive Director for Risk, its Group Head of Public Affairs dated October 5, 2006, SCB INT 0005759-5762 (Emphasis added).
[7] Note of Interview with SCB's Head of Cash Management Services (2002-2005), Head of Compliance (2005-2007) at the New York branch, SCB INT 0004733-4734. (Emphasis added).

American military personnel. The Iranian dictatorship's aggression continues to this day. The regime remains the world's leading state sponsor of terrorism, and provides assistance to al Qaeda, the Taliban, Hezbollah, Hamas, and other terrorist networks. It develops, deploys, and proliferates missiles that threaten American troops and our allies. It harasses American ships and threatens freedom of navigation in the Arabian Gulf and in the Red Sea. It imprisons Americans on false charges. And it launches cyberattacks against our critical infrastructure, financial system, and military.

11.     This Civil Action is brought on behalf of U.S. nationals and the families of U.S. nationals who were serving as members of, or contractors for, the U.S. armed forces at the time they were injured or killed by Terrorist Groups in Iraq from 2003 to 2011 pursuant to the Anti-Terrorism Act (18 U.S.C. § 2331, et seq.) (hereinafter "ATA") and the Justice Against Sponsors of Terrorism Act (Pub. L. 114-222, Sept. 28, 2016, 130 Stat. 852) ("JASTA").

12.     JASTA was enacted by Congress "to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States."

13.     Plaintiffs listed herein were killed or injured by acts of international terrorism, which were funded by Defendants, while serving in Iraq and assisting in the peacekeeping mission designed to stabilize Iraq and establish a free and democratic government.

## 1.     IRAN'S INTERNATIONAL TERRORISM NETWORK

14.     Since 1984, Iran has been the world's leading state sponsor of terror.

15.     Iran, through its Agents and Proxies (including the Terrorist Groups – especially Hezbollah),[8] has been actively involved in supporting and promoting terrorism in Iraq since

---

[8] The pronunciation and spelling of "Hezbollah" (also known as "Hizbollah" and "Hizbu'llah), is based on region and dialect, but all translate to the "Party of Allah." As used herein, Hezbollah and Hizbollah refer to a Shiite Muslim militant group the United States and European Union consider a Foreign Terrorist Organization.

before the U.S. invasion in 2003.

16.     Since then, Iran continually supplied money, weapons, training and safe haven to insurgent groups, both Sunni and Shia, in Iraq and supported the groups as they targeted Coalition Forces,[9] Iraqi security forces, and the Iraqi government itself.

17.     The Iranian Ministry of Defense and Armed Forces Logistics ("MODAFL") is the principal procurement arm of Iran's military and terror apparatus. In November 2000, the U.S. government learned that MODAFL controls the Iranian Defense Industries Organization, which was sanctioned under the Arms Export Control Act and Export Administration Act for its involvement in missile technology proliferation activities. In October 2007, the United States designated MODAFL as a Specially Designated National ("SDN").[10]

18.     The Islamic Revolutionary Guard Corp ("IRGC") is a subordinate directorate of MODAFL. The IRGC-QF, also known as the Qods Force, is a special branch of the IRGC.

19.     The IRGC-QF was designated as a Specially Designated Global Terrorist ("SDGT") in October 2007 for its long history of supporting Hezbollah's terrorist activities, operating training camps, and supplying guidance, funding, weapons, intelligence and logistical support to terrorists. The Treasury report designation of IRGC-QF as a SDGT specifically linked the group to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces

---

[9] The Coalition Forces comprised armed service members from the United States, United Kingdom, Australia, Spain, and Poland.
[10] U.S. Dept. of Treasury, Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism, United States Department of the Treasury (2007), https://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx (last visited December 20, 2018). "SDN" is the commonly-used acronym for "Specially Designated National," that is, a person or entity designated and sanctioned by the United States Treasury Department pursuant to Executive Order 13382. The Office of Foreign Assets Control, "OFAC," administers and enforces economic sanctions program against SDNs and others. "SDN" refers to individuals and companies "owned or controlled by, or acting for or on behalf of, targeted countries," and also "lists individuals, groups, and entities, such as terrorists and narcotics traffickers designated under programs that are not country-specific." Resource Center, United States Department of the Treasury (2018), https://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx (last visited December 20, 2018). ***"SDN" is an umbrella term that includes sanctioned entities, including FTOs and SDGTs, and their individual members or front companies.***

and innocent Iraqi civilians.[11]

20.     The IRGC-QF uses MODAFL to procure and develop weapons and equipment for its use.

21.     Iran's Ministry of Intelligence and Security ("MOIS") functions as Iran's intelligence service and was a primary facilitator and conduit for Iranian weapons, personnel, money, and technologies into Iraq.

22.     Iran's terrorism campaign in Iraq was directly overseen by the IRGC-QF, MOIS, Hezbollah, and cell leaders in Iraq.

23.     The IRGC-QF was responsible for the creation of Hezbollah in 1983. Hezbollah, a Shi'a Islamist militant group based in Lebanon, is one of the most influential groups the IRGC-QF has created.

24.     Hezbollah serves as a proxy for Iran to support terrorists in Iraq.

25.     As the *New York Times* recently noted:

Hezbollah is involved in nearly every fight that matters to Iran and, more significantly, has helped recruit, train and arm an array of new militant groups that are also advancing Iran's agenda…. Hezbollah has evolved into a virtual arm of Iran's Islamic Revolutionary Guards Corps, providing the connective tissue for the growing network of powerful militia… The roots of that network go back to the American invasion of Iraq in 2003, when Iran called on Hezbollah to help organize Iraqi Shiite militias that in the coming years killed hundreds of American troops and many more Iraqis.[12]

26.     Hezbollah is a major component of the Iranian terrorism apparatus.

---

[11] The United States Department of the Treasury designates SDGTs pursuant to Executive Order 13224 of September 23, 2001. *See* 31 C.F.R. § 594.310 ("The term specially designated global terrorist or SDGT means any person whose property and interests in property are blocked pursuant to § 594.201(a)"). This designation allows for the United States to block property and prohibit transactions with the designated entity. While every designation is accompanied by a specific set of factual findings as to the entity's actions, Executive Order 13224 itself makes a finding of a "need . . . for further consultation and cooperation with, and sharing of information by, United States and foreign financial institutions as an additional tool to enable the United States to combat the financing of terrorism." SDGTs are frequently associated with terrorist organizations designated as "FTOs." *Id.*

[12] Ben Hubbard, *Iran Out to Remake Mideast With Arab Enforcer: Hezbollah*, New York Times (Aug. 27, 2017), (https://www.nytimes.com/2017/08/27/world/middleeast/hezbollah-iran-syria-israel-lebanon.html?smid=tw-share

27.     In 1995, the United States designated Hezbollah a Specially Designated Terrorist ("SDT"). In 1997, Hezbollah was designated a Foreign Terrorist Organization ("FTO") pursuant to 8 U.S.C. § 1189 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which authorizes the Secretary of State to designate an FTO based on certain findings, including that the organization engages in terrorist activity that threatens the security of U.S. nationals or the national security of the United States.

28.     Al Qaeda, which was designated an FTO on October 8, 1999, and Al Qaeda in Iraq, which was designated an FTO on December 17, 2004, Ansar al Islam/Ansar al Sunna, which was designated an FTO on March 22, 2004, and Kata'ib Hizballah, which was designated an FTO on July 2, 2009, are, like Hezbollah, major components of the Iranian terrorism apparatus.

29.     During times relevant to the claims alleged herein, Hezbollah, Al Qaeda, Al Qaeda in Iraq, Ansar al Islam/Ansar al Sunna, and Kata'ib Hizballah, helped Iran to arm, train, and fund a variety of Special Groups[13] in an effort to kill or maim Coalition Forces, to coerce the United States into withdrawing those forces, and to terrorize Iraq's civilian population in order to increase Iran's own influence in Iraq.

30.     The Islamic Republic of Iran Shipping Lines ("IRISL") is Iran's state-owned shipping line that has a long history of facilitating arms shipments on behalf of the IRGC, including copper disks that are a key component in EFPs. In 2007, a diplomatic cable from the State Department noted concern over IRISL shipments of Chinese arms to Iran, "particularly given Iran's clear policy of providing arms and other support to Iraqi insurgents and terrorist

---

[13] The term "Special Groups" refers to terrorist organizations established and funded by Iran, including Jaysch al Mehdi, Badr Organization/Badr Brigades, Kata'ib Hizballah (designated an FTO on July 2, 2009), Asa'ib Ahl al Haq, Promised Day Brigades, Abu Mustafa Al-Sheibani network, Abu Mahdi al-Muhandis network, and others discussed below.

groups like the Taliban and Hezbollah." The cable referred specifically to an "IRISL-flagged vessel" loaded at a Chinese port with cartridges to be used in AK-47 assault rifles, and stated that "[w]e have specific information that Chinese weapons and components for weapons transferred to Iran are being used against U.S. and Coalition Forces in Iraq, which is a grave U.S. concern."

31.     On September 10, 2008, IRISL and several IRISL subsidiaries were designated by the United States as SDNs. The designations were based on evidence that the IRISL network had engaged in the proliferation of weapons of mass destruction and had "pursued new strategies which could afford it the potential to evade future detection of military shipments."

32.     The National Iranian Oil Company ("NIOC") has been identified as an agent of the IRGC and was designated as a SDN in 2008. (*Id*. ¶ 152).[14] NIOC used its own helicopters to conduct surveillance on bases occupied by Coalition Forces along the Iranian border. The Iran Threat Reduction and Syria Human Rights Act of 2012 reflects Congress' belief that NIOC "provide[s] significant support to Iran's Revolutionary Guard Corps and its affiliates."

33.     According to the U.S. Treasury Department, Mahan Air, a privately-operated Iranian airline, facilitated the covert transport of IRGC-QF officers into and out of Iraq by bypassing normal security procedures and omitting certain information on flight manifests to eliminate any record of the IRGC travel. In addition, Mahan Air transported arms shipments on behalf of the IRGC-QF and has been the conduit for radio frequency modules recovered from IED devices used to target the Coalition Forces in Iraq.

34.     The Treasury Department's 2011 notice designating Mahan Air as a SDGT indicated that Mahan Air provided transportation services to Hezbollah and transported personnel, weapons, and goods on behalf of Hezbollah and omitted from Mahan Air cargo

---

[14] *See* OFAC Changes to List of Specially Designated Nationals and Blocked Persons Since January 1, 2008, United States Department of the Treasury (2008), https://www.treasury.gov/resource-center/sanctions/SDN-List/Documents/sdnew08.pdf (last visited December 20, 2018).

manifests secret weapons shipments bound for Hezbollah.

35.     Iran openly acknowledged its terroristic goals in Iraq. In 2003, for example, Ayatollah Ahmad Janati, the secretary general of Iran's Council of Guardians, called on Iraqis to commit attacks against U.S.-led forces in Iraq. Two months later, Coalition Forces uncovered a fatwa (religious edict) issued by Iran urging "holy fighters" in Iraq to attack U.S. nationals.

36.     There is no question that Iran, from 2003 to 2011 and beyond, substantially and materially supported and promoted terrorism against U.S. nationals in Iraq.

37.     The support included, among other things, money, weapons, training, safe haven, intelligence, and advisors and solidified an operational relationship between Hezbollah and various Special Groups.

38.     The IRGC-QF established and controlled a network of cells in Iraq the aim of which was to assassinate key leaders, support death squads, and distribute highly lethal weapons for use against American forces and Iraqi citizens.

39.     The IRGC-QF developed a distribution channel for the transfer of weapons from Iran to Iraq through the Ilam region in western Iran, as well as other main supply routes. The weapons included mortars, rockets, sniper rifles, road side bombs,[15] bullets, and rocket propelled grenades ("RPGs").

40.     In December 2003, for instance, Iranian agents shipped 1,000 rocket-propelled grenades and several boxes of explosives from Iran to Iraqi Terrorist Groups.

41.     Hezbollah and the IRGC-QF's network of terrorist cells were responsible for firing Iranian rockets and mortars at Americans in Baghdad and at bases around Iraq.

---

[15] One of the signature weapons supplied by the IRGC-QF is a device known as an explosively formed penetrator ("EFP"). EFPs are highly lethal explosive devices capable of penetrating tank armor. EFPs have been used in terrorist attacks in Iraq against U.S. forces since 2004 and were used in some of the Terrorist Attacks that injured or killed the Plaintiffs. The EFPs used to kill or injure U.S. forces and other civilians during the times relevant to this Action were first used by Hezbollah against Israeli armor in Lebanon.

42.     U.S. military forces estimated that the IRGC-QF, alone, provided up to $3 million worth of equipment and funding to Terrorist Groups in Iraq every month.

43.     American officials estimate that Iran supplied at least $100 - $200 million per year to Iraqi Terrorist Groups, in addition to at least $70 million per year supplied to the Badr Organization and $700 - $800 million per year to Hezbollah.

**2.      BANKS ARE THE FRONTLINE DEFENDERS AGAINST TERROR FINANCING - IRANIAN SANCTIONS AND BANKS' AFFIRMATIVE DUTIES TO PREVENT TERROR FINANCING**

44.     As evidenced by the hundreds of attacks alleged in this Complaint, our world harbors a contingent of unscrupulous minds with nefarious hearts whose goal is to kill, maim, and terrorize U.S. citizens.

45.     Because of the inherent trust, security, and every-day-necessity provided by (and bestowed to banks), they are expected to play a critical role in preventing crime and wrongdoing. This role is defined (and assumed) through a series of controls, regulations, duties, and responsibilities governing the banking system. Without this system of trust, criminals and terrorists would enjoy unmitigated freedom to facilitate financial transactions across the globe to support their illicit activities, including committing terrorist attacks on U.S. Citizens.

46.     Since 1984, the U.S. government has implemented a host of laws designed to thwart Iran's sponsorship of terrorism, and that rely primarily on the cooperation and diligence of financial institutions, including Defendants.

47.     Which is why over many years, governments, regulators, and the banking industry, have imposed comprehensive controls and regulations on banks with international operations or correspondent bank relationships, in order to disrupt and dismantle the financing of fraudulent, criminal, and terrorist enterprises.

48.     On January 19, 1984, Iran was designated by the United States as a State Sponsor

of International Terrorism pursuant to Section 6(j) of the Export Administration Act, Section 40 of the Arms Export Control Act, and Section 620 of the Foreign Assistance Act. Such a designation is made by the U.S. Secretary of State, who must first determine the government in question has repeatedly provided support for acts of international terrorism. Iran's designation is still in force.

49.     In 1996, Congress passed the Iran and Libya Sanctions Act, which was designed to prevent acts of international terrorism by "deny[ing] Iran the financial means" to sustain its various weapons programs.

50.     All banks, including Defendants, that "have international operations or relationships with correspondent banks have a duty, based on international banking norms, to adopt know-your-customer ('KYC'), anti-money laundering ('ATL') and anti-terrorist financing ('ATF') standards, as defined by and enforced by the Financial Action Task Force ('FATF') and its supporting governments." *Weiss v. National Westminster Bank PLC*, 453 F. Supp. 2d 609, 619 (E.D.N.Y. 2006).

51.     The adoption and enforcement of these standards elevate the banks from mere passive providers of financial services to having critical affirmative obligations to know customer identities (establish KYC standards), to investigate, detect, and report suspicious customers and transactions, and to implement AML and ATF programs and controls.

52.     Through these controls, regulations, duties, responsibilities, obligations, and standards, banks are intended to be—and have agreed to be—frontline defenders against terrorism financing.

53.     The effectiveness of these laws and policies inherently relies upon banks, including Defendants, to uphold their duties and obligations.

54.     The sources and authorities for the controls, regulations, duties, responsibilities, standards, and obligations placed on and agreed to by the Defendants include U.S. laws and regulations, the FATF Recommendations and standards, the Wolfsberg Group principles, the Basel Committee standards, the Department of the Treasury and Office of Foreign Assets Control regulations, and other governments and international groups and their laws, regulations, and standards.

55.     **U.S. Laws and Regulations, & Executive Orders**: The Bank Secrecy Act, 31 U.S.C. §§ 5311 *et seq.,* enacted in 1970 and augmented over the years,[16] combats money laundering and terrorism financing by assigning important responsibilities to banks,[17] who are required to work hand in hand with the U.S. government to prevent terrorism financing.[18]

56.     The Bank Secrecy Act is intended to prevent banks and other financial institutions from being used as intermediaries for, or to hide the transfer or deposit of money derived from, criminal activity. The Office of the Comptroller of the Currency (OCC) monitors bank compliance with the Bank Secrecy Act and its implementing regulations,[19] and authors publications[20] to ensure compliance with anti-money laundering laws and anti-terrorist financing legislation.

57.     The Bank Secrecy Act requires banks to undertake a number of AML and ATF efforts to ensure they do not become conduits for terrorist financing. Those AML and ATF

---

[16] Titles I and II of Public Law 91-508, Oct. 26, 1970, as amended, codified at 12 U.S.C. § 1829b, 12 U.S.C. §§ 1951-1959, and 31 U.S.C. § 5311 et seq.; Money Laundering Control Act (1986), 18 U.S.C. § 1956; The Money Laundering Prosecution Improvements Act, 31 U.S.C. §§ 5312, 5321; The Annunzio-Wylie Anti-Money Laundering Act (1992)(Pub. L. 102-550, Title XV, Oct. 28, 1992, 106 Stat. 4044), 31 U.S.C. 5318(h); The Money Laundering and Financial Crimes Strategy Act (1998), 31 U.S.C. §§ 5341(b) and 5342(b).

[17] *See generally* https://www.ffiec.gov/bsa_aml_infobase/pages_manual/OLM_002.htm, last visited December 16, 2018.

[18] *See generally* https://www.occ.treas.gov/topics/compliance-bsa/bsa/index-bsa.html last visited December 16, 2018.

[19] *See* 31 CFR 103 § 103, *et seq.* (regulations recodified in 2010 at 31 CFR Chapter X).

[20] *See, e.g.,* OCC BULLETIN 2008-13, "Guidance to Financial Institutions on the Continuing Money Laundering Threat Involving Illicit Iranian Activity."

efforts include the creation of explicit written policies and procedures to designate a compliance officer, to train employees in all aspects of the Bank Secrecy Act regulations, internal compliance, and AML policies and procedures, to establish internal recordkeeping and auditing processes, to establish and follow "Know Your Customer" standards, and to file reports identifying suspicious activities. Other government agencies play a critical role in implementing the Bank Secrecy Act regulations, including the U.S. Treasury, FinCEN, the Federal Reserve Board of Governors, and the FDIC.

58.     The banks' obligations under the Bank Secrecy Act are detailed in a manual published by the Federal Reserve,[21] which reminds banks that "[t]errorist networks are able to facilitate their activities if they have financial means and access to the financial system" and that "[t]errorist groups develop sources of funding that are relatively mobile to ensure that funds can be used to obtain material and other logistical items needed to commit terrorist acts. Thus, money laundering is often a vital component of terrorism financing."

59.     The Federal Reserve manual outlines the obligations of banks to "develop, implement, and maintain effective AML programs that address the ever-changing strategies of money launderers and terrorists who attempt to gain access to the financial system."

60.     One of the mandatory and critical AML programs is a program by which banks must determine "whether the customer appears on any federal government list of known or suspected terrorists or terrorist organizations." Those organizations, as well as countries designated as state sponsors of terrorism, are considered "high risk"—the highest category of risk the Federal Reserve manual contemplates.

---

[21] *See generally* https://www.ffiec.gov/bsa_aml_infobase/pages_manual/OLM_002.htm, last visited December 16, 2018.

61.     The Patriot Act,[22] which augmented the Bank Secrecy Act, was adopted in response to the September 11, 2001 terrorist attacks and is intended, along with its implementing regulations, to strengthen U.S. measures to prevent, detect, and prosecute international money laundering and the financing of terrorism. Under The Patriot Act, banks were required to establish AML programs, report suspicious activity, verify the identity of customers, and apply enhanced due diligence to certain types of accounts involving foreign persons.

62.     The Iran Sanctions Act, first enacted in 1996, further regulates the financial industry to, *inter alia*, deny Iran the financial ability to support acts of international terrorism.[23]

63.     U.S. Presidential Executive Orders over the years have further regulated the financial industry to prohibit business and transactions with Iran in order to avoid terrorism financing.[24]

64.     **The Financial Action Task Force ("FATF"):** The FATF is an intergovernmental body originally established by the 1989 Paris G-7 Summit to develop and promote standards and policies to combat money-laundering. The FATF currently includes 36 Member countries, 2 regional organizations, 2 Observer countries, 9 international organization Associate Members, and 23 Observer Organizations, including the major financial center countries of Europe, North America, and Asia. At all relevant times, the United States, the United Kingdom, Germany, France and Switzerland, were all participants in the FATF.

---

[22] 107 P.L. 56, 115 Stat. 272 *, 107 P.L. 56, 2001 Enacted H.R. 3162, 107 Enacted H.R. 3162.

[23] Iran Sanctions Act of 1996. Act Aug. 5, 1996, P.L. 104-172, 110 Stat. 1541; Aug. 3, 2001, P.L. 107-24, § 2(a) (applicable to investments made on or after 6/13/2001, as provided by § 2(b) of such Act), §§ 3-5, 115 Stat. 199; Aug. 4, 2006, P.L. 109-267, § 1, 120 Stat. 680; Sept. 30, 2006, P.L. 109-293, Title II, § 201, § 202(a), (b) (applicable to actions taken on or after 6/6/2006, as provided by § 202(c) of such Act), §§ 203-205(g)(1), 120 Stat. 1345, 1346.

[24] *See, e.g.,* Executive Order No. 12211 of April 17, 1980; Executive Order 12613 of October 29, 1987; Executive Order 12957 of March 15, 1995; Executive Order 12959 of May 6, 1995; Executive Order 13059 of August 19, 1997.

65.     Except for Defendant HBME,[25] Defendants are all headquartered in countries that are members of the FATF and therefore are all obligated to comply with the standards set by the FATF. Thus, the Defendants and their directors operating in and from these countries are bound by the FATF standards.

66.     The Recommendations developed by the FATF in 1990 and revised in 1996, 2001, 2003, and most recently in 2012, are recognized as the international standard for combating money laundering, the financing of terrorism, and the proliferation of weapons of mass destruction. They form the basis for a coordinated response to these threats.

67.     The FATF monitors the progress of its members in implementing necessary measures, reviews money laundering and terrorist financing techniques and counter-measures, and promotes the adoption and implementation of appropriate measures globally. In collaboration with other international stakeholders, the FATF works to identify national-level vulnerabilities with the aim of protecting the international financial system from misuse.

68.     In 1990, and updated in 1996 and 2003, the FATF issued a set of Forty Recommendations that establish a minimum for international AML standards. These Recommendations have been endorsed by the countries in which the Defendants do business.

69.     Among those Forty Recommendations, banks are to "develop programmes against money laundering and terrorist financing" and should include the "development of internal policies, procedures and controls, including appropriate compliance management arrangements, and adequate screening procedures to ensure high standards when hiring employees; an ongoing employee training programme; and an independent audit function to test the system."

---

[25] The Co-operation Council for the Arab States of the Gulf, which includes the United Arab Emirates, has also been a regional organization member since 1991. FATF evaluations are conducted jointly with the regional AML/CFT body for the FATF associated member, the Middle East and North Africa Financial Action Task Force, (MENAFATF), of which United Arab Emirates is a member

70.     Complementing the Forty Recommendations, the FATF addressed terrorist financing directly in October 2001 by establishing a set of Eight Special Recommendations on Terrorist Financing. Under those Special Recommendations, banks that "suspect or have reasonable grounds to suspect that funds are linked or related to, or are to be used for terrorism, terrorist acts or by terrorist organizations," are required to report their suspicions to the government.

71.     These standards set forth by FATF "include a due diligence obligation to monitor publicly accessible information relating to 'high risk' customers."[26] *Weiss,* 453 F. Supp. 2d 609, 619 (E.D.N.Y. 2006).

72.     In April 2002, the FATF issued a report, entitled "Guidance for Financial Institutions in Detecting Terrorist Financing," to all major financial institutions, including Defendants, to "ensure that financial institutions do not unwittingly hide or move terrorist funds. Financial institutions will thus be better able to protect themselves from being used as a conduit for such activity…"

73.     That April 2002 report underscored to banks, including Defendants, the risks to financial institutions of terrorist financing:

> Regardless of whether the funds in a transaction are related to terrorists for the purposes of national criminal legislation, business relationships with such individuals or other closely associated persons or entities could, under certain circumstances, expose a financial institution to significant reputational, operational, and legal risk. This risk is even more serious if the person or entity involved is later shown to have benefited from the lack of effective monitoring or willful blindness of a particular institution and thus was to carry out terrorist acts.

74.     The FATF has also warned banks that mere financial accounting and auditing

---

[26]These high-risk customers include charities and other non-profit organizations. Non-profit organizations, particularly those held out as charitable organizations, constitute high-risk accounts warranting enhanced due diligence and scrutiny, because the mechanism of charitable fundraising has, been used to provide a cover for the financing of terror. The duty to monitor and profile charity customers arises independently of any particular transaction.

might be insufficient protection against the abuse: "Direct field audits of programmes may be, in some instances, the only method for detecting misdirection of funds. Examination of field operations is clearly a superior mechanism for discovering malfeasance of all kinds, including diversion of funds to terrorists."[27]

75.    **The Wolfsberg Group:** The Wolfsberg Group is an association of large global banks that, in 2000, developed and agreed to a set of global AML principles and guidelines for international private banks to promote transparency in financial transactions and to increase the effectiveness of global anti- money laundering and anti-terrorist financing programs.[28]

76.    The standards and principles developed by the Wolfsberg Group of banks affect the correspondent banks of Wolfsberg Group member financial institutions. At the relevant times hereto, Defendants Barclays, Credit Suisse, Deutsche, HSBC, Standard Chartered, and RBS, have been members of the Wolfsberg Group.

77.    The Wolfsberg Principles for the Suppression of Terror Financing committed the banks to "implement 'procedures for consulting applicable lists and taking reasonable and practicable steps to determine whether a person involved in a prospective or existing business relationship appears on such a list.'"[29]

78.    The Wolfsberg AML principles require significant due diligence to collect and record account information, including the identity of the principle beneficial owners of an account (whether natural persons, legal entities, or unincorporated associations); the purpose and

---

[27] FATF Task Force on Money Laundering; *Combating the Abuse of Non-Profit Organisations,* (October 11, 2002).

[28] The banks initially involved included, but was not limited to, Barclays Bank, Credit Suisse Group, Deutsche Bank AG, Royal Bank of Scotland (ABN AMRO Bank) and HSBC. The Group's purpose is to develop financial services industry standards for "Know Your Customer," Anti-Money Laundering, and Counter Terrorism Financing Policies. The Wolfsberg Anti-Money Laundering Principles for Private banking were published in October 2000 (and revised in May 2002). In January 2002, the Group published a Statement on the Financing of Terrorism and, in November 2002, released the Wolfsberg Anti-Money Laundering Principles for Correspondent Banking. The Wolfsberg Group's most recent Statement, on Monitoring Screening and Searching, was published in September 2003. The standards are widely known.

[29] *Weiss*, 453 F. Supp. 2d at 619, 626-27.

17

reasons for opening the account; anticipated account activity; source of wealth (description of the economic activity which has generated net worth); estimated net worth; source of funds (description of the origin and the means of transfer for monies that are accepted for the account opening); and references or other sources to corroborate reputation information.

79.     According to the Wolfsberg AML principles, a "bank will endeavor to accept only those clients whose source of wealth and funds can be reasonably established to be legitimate…Mere fulfillment of internal review procedures does not relieve the private banker of this basic responsibility."

80.     On April 19, 2007, the Wolfsberg Group issued a statement "endorsing measures to enhance the transparency of international wire transfers to promote the effectiveness of global AML and anti-terrorist financing programs. The measures include both the development of an enhanced payment message format, which would include more detailed information about those conducting wire transfers in certain instances, as well as calling for the global adoption of basic messaging principles aimed at promoting good practice with respect to the payment system."

81.     This April 2007 statement was directed to the increasingly apparent risks inherent in MT 202 "cover payments"—one of the methods Defendants used to conceal their illegal USD funds transfers on behalf of Iran through the Eurodollar market, as further alleged and detailed in this Complaint.

82.     Defendants ABN Amro (RBS N.V.), Barclays, Credit Suisse, DB, and HSBC were all listed on the April 19, 2007 press statement.

83.     **The Basel Committee on Banking Supervision**: In 1988, the Basel Committee, an international standards organization of central banks, bank supervisors, and regulators, which formulates broad supervisory standards and guidelines and recommends statements of best

banking practices, including those regarding customer due diligence, set out the following principles, among others:

   a. Banks' management should ensure that business is conducted in conformity with high ethical standards and that laws and regulations pertaining to financial transactions are adhered to;

   b. Banks should not set out to offer services or provide active assistance in transactions which they have good reason to suppose are associated with money-laundering activities;

   c. Banks should cooperate fully with national law enforcement authorities to the extent permitted by specific local regulations relating to customer confidentiality. Care should be taken to avoid providing support or assistance to customers seeking to deceive law enforcement agencies through the provision of altered, incomplete or misleading information; and

   d. Where banks become aware of facts which lead to the reasonable presumption that money held on deposit derives from criminal activity or that transactions entered into are themselves criminal in purpose, appropriate measures, consistent with the law, should be taken, for example, to deny assistance, sever relations with the customer and close or freeze accounts.[30]

84.    These standards were at all relevant times known by the Defendants.

85.    **The U.S. Department of the Treasury - Office of Foreign Assets Control**: The Office of Foreign Assets Control ("OFAC") of the U.S. Department of Treasury administers and enforces economic and trade sanctions against targeted foreign countries, terrorism sponsoring organizations, and international narcotics traffickers.

86.    As part of its enforcement efforts, OFAC publishes a list of individuals and companies owned or controlled by, or acting for or on behalf of, targeted countries as well as individuals, groups, and entities, such as terrorists and narcotics traffickers designated under programs that are not country-specific. These are, collectively, called SDNs.[31]

---

[30] Basel Committee, *Prevention of Criminal Use of the Banking System for the Purpose of Money-Laundering, State of Principles* (Dec. 1988), reprinted in BSA Manual, Section 1501.0 (September 1977).
[31] *See* paragraph 17, footnote 11, above.

87.     Naturally, because of the obvious risks, banks are prohibited from conducting transactions with SDNs. The law, including the Trading With the Enemy Act (50 U.S.C. §§4301 *et seq.*), the International Emergency Economic Powers Act (50 U.S.C. §§ 1701 *et seq.*), the Anti-Terrorism and Effective Death Penalty Act of 1996 (Pub. L. No. 104-132, 110 Stat. 1214), and the Foreign Narcotics Kingpin Designation Act (21 U.S.C. § 1901 *et seq.*), prohibit transactions with SDN's and required banks, including the Defendants, to ensure that no wire transfers were made to or from any SDNs.

88.     The U.S. Department of the Treasury also developed the "Terrorist Finance Tracking Program" to use banking information to identify, track, and pursue suspected foreign terrorists, like Hamas, Hezbollah, and Al Qaeda and their financial supporters and relies on complete and accurate SWIFT data to do so. Based on information provided by the banks, the U.S. Government, through its Program, conducts targeted searches in order to trace financial transactions related to suspicious terrorist activity.[32]

89.     The efficacy of the Terrorist Finance Tracking Program depended on the integrity of the banks, including Defendants, and the accuracy and completeness of the SWIFT data.

90.     The Department of the Treasury has also issued publications and advisories to provide standards and guidance to financial institutions, including Defendants, on the money laundering threat involving illicit Iranian activity.[33]

91.     **Other International Standards:** International standards applicable to the financial services industry likewise impose on banks the duty to implement and enforce AML and ATF procedures, including the requirement to scrutinize customers by monitoring publicly

---

[32] U.S. Dep't of the Treasury, *Terrorist Finance Tracking Program Fact Sheet* (June 23, 2006), https://www.treasury.gov/press-center/press-releases/Pages/js4340.aspx, last visited December 17, 2018.
[33] For example, Department of the Treasury – Financial Crimes Enforcement Network Advisory # FIN-2008-A002 Issued: March 20, 2008.

accessible information and allegations in relation to "high risk" customers, and by identifying the true beneficial owners of accounts, and by not engaging in "willful blindness" when it comes to terrorism financing.

92.     To the extent the United States has accepted membership or agreed to implement standards or principles of any organization promulgating such standards or principles, those standard or principles are requirements for financial institutions, including Defendant Banks, to conduct business in the United States.

93.     Despite being fully aware of the duties and responsibilities imposed on Defendants, and agreed to by Defendants, as outlined above, Defendants knowingly and intentionally violated the controls, regulations, duties, and responsibilities governing their conduct, as more fully described herein in order to facilitate the transfer hundreds of billions of dollars used to finance terrorism.

### 3.     DEFENDANTS KNOWINGLY HELPED IRAN EVADE SANCTIONS

94.     To Iran, Defendants were familiar faces. Many of Iran's state controlled banks had already developed banking relationships with these Defendants, several of which operated branches in Tehran.

95.     During all times relevant to this Action, Defendants used the U.S. financial system to funnel hundreds of billions of USDs to Iran and its Agents and Proxies.

96.     This practice/action was illegal, and Defendants knew it was illegal.

97.     Defendants, knowing the type of USD transfers they performed on behalf of sanctioned Iranian entities were illegal, devised clever ways of evading the laws and the U.S. government's mechanisms of enforcement.  They intentionally disguised financial payments to and from USD-denominated accounts and conducted illicit trade-finance transactions on Iran's

behalf. By doing so, Defendants provided the billions of dollars of support Iran needed to fund its terrorism campaign in Iraq that U.S. sanctions would otherwise have denied them.

98.     One of the mechanisms used by the U.S. Government, which is related to international wire transfers, is administered and enforced by OFAC.

99.     OFAC enforces economic sanctions by blocking sanctioned entities from accessing the U.S. banking system.

100.    To block illegal financial transactions, OFAC mandates the use of filters that automatically flag transactions to or from sanctioned entities. To evade the filtering mechanism, Defendants purposefully removed key information from the wire transfers, a practice known as "stripping."

101.    Defendants stripped the wire transfers of information that would trigger the detection systems. Defendants would then manually re-enter the payment information so the transfer would be processed undetected by regulators. The transfers were executed through correspondent bank accounts in New York and through the Federal Reserve Bank in New York.

102.    Defendants went even further by providing expert training and advice to Iranian entities concerning how to deceive OFAC and ensure payments would be processed without delay or interference.

103.    By intentionally disguising financial payments to and from USD-denominated accounts and conducting illicit trade-finance transactions on Iran's behalf, Defendants provided the billions of dollars of support Iran needed to fund its terrorism campaign in Iraq.

104.    These resources enabled Iran and its agents to provide a combination of funding, weapons, munitions, intelligence, logistics, and training to Hezbollah, the IRGC-QF, and Iran's terrorist agents (including the Special Groups), who killed, injured, or maimed the U.S nationals,

including Plaintiffs and/or their family members, in Iraq from 2003 to 2011.

105.    Eventually, after many years, the scheme was uncovered by U.S. law enforcement, and Defendants entered into criminal plea agreements and/or deferred prosecution agreements.

106.    Defendants admitted to willfully evading U.S. laws and regulations, conducting illicit trade-finance transactions, and intentionally disguising financial payments to and from USD-denominated accounts.

107.    Defendants further admitted to laundering billions of dollars on behalf of Iran and Iran-sanctioned entities.

108.    The amounts Defendants laundered were reflected in the various agreements they signed, as summarized in the following chart:

### 4.    THE CONSPIRACY

109.    Each Defendant committed acts of international terrorism and violated 18 U.S.C. § 2339A, § 2339B, and § 2332d when it conspired with Iran to provide material support for terrorism. They accomplished these acts of terrorism by evading U.S. economic sanctions and arms embargos against Iran, knowing, or being deliberately indifferent to the fact, that Iran would use the laundered funds[34] to finance the Terrorist Groups for the purpose of killing and maiming, *inter alia*, American citizens serving as part of the Coalition Forces in Iraq from 2003 to 2011.

110.    As used in this Complaint, "the Conspiracy" refers to an illegal criminal agreement to commit international terrorism, beginning in 1987 and, continuing to the present, between Iran, its banking agents and various international financial institutions by and through

---

[34] USD funds include the following U.S. dollar-denominated financial instruments: deposit balances in domestic or Eurodollar bank accounts, repurchase agreements, letters of credit, bills of exchange, payment orders, checks, banknotes and coins.

23

which Defendants participated in a scheme whereby they agreed to alter, falsify or omit information from bank to bank payment orders in order to:

    a) Conceal Iran's dollar-denominated financial activities and transactions from detection, scrutiny, or monitoring by U.S. regulators, law enforcement, and/or depository institutions;

    b) Facilitate illicit transactions totaling at least $50 million USD for the benefit of Hezbollah;

    c) Facilitate illicit transactions totaling at least $100 million in USD funds for the direct benefit of the IRGC and billions in USD funds for the benefit of the NIOC, then controlled by the IRGC;

    d) Facilitate at least hundreds of illicit transactions totaling more than $60 million on behalf of IRISL, including over 150 "stripped" transactions after IRISL was designated a SDN;

    e) Facilitate tens of millions of dollars in illicit transactions on behalf of MODAFL, the IRGC, Mahan Air and other instrumentalities of Iranian state-sponsored terror to further numerous violations of the U.S. trade embargo against Iran, conceal Iran's efforts to evade U.S. sanctions and enable Iran's acquisition from the United States of goods and technologies prohibited by U.S. law to be sold or transferred to Iran, including components of IEDs deployed against Coalition Forces in Iraq; and

    f) Enable Iran, the Iranian Bank Co-conspirators (including Defendant Bank Saderat Plc), the IRGC, MOIS, Hezbollah, the Special Groups, and Al Qaeda, Ansar al Islam to plan for, conspire to, and perpetrate acts of international terrorism under 18 U.S.C. § 2331(1); homicides, attempted homicides, or conspiracies to commit homicide under 18 U.S.C. § 2332(a)-(c); bombings using destructive devices under 18 U.S.C. § 2332a; bombings and attempted bombings under 18 U.S.C. § 2332f; engaging in terrorist activity under 18 U.S.C. § 1189(a)(3)(B)(iii)-(iv); and/or engaging in terrorism under 22 U.S.C. § 2656f.

    111.    The object of the Conspiracy was to provide material support for, and to commit, international terrorism.

    112.    In addition to monetary support described in more detail in this Complaint, the terrorist attacks themselves constitute "material support," in that they advanced the overall object of the Conspiracy.

113.   As noted by the U.S. Treasury Department's Financial Crimes Enforcement Network in a March 20, 2008 advisory: "Through state-owned banks, the Government of Iran disguises its involvement in proliferation and terrorism activities through an array of deceptive practices specifically designed to evade detection."[35]

114.   Although the Conspiracy was effectuated in a variety of ways, four primary techniques were used by Defendants acting in concert with Iran and its Agents and Proxies as follows:

a)   Defendants removed or altered the names and other identifying information of the Iranian Bank co-conspirators or Iranian counter-parties in the payment orders sent through U.S. correspondent banks via SWIFT-NET– a practice commonly known and referred to as "stripping" SWIFT-NET messages;

b)   Defendants converted ordinary transactions involving SWIFT-NET message type 103 ("MT 103") payment orders (that would disclose the details of the counter-parties to the transactions) into bank-to-bank transfers known as SWIFT-NET message type 202 ("MT 202") payment orders (that did not require the transmitting bank to include information disclosing the originator, beneficiary, and counter-parties), for the specific purpose of concealing the origin and destination of Iranian funds transfers;

c)   Defendants deliberately chose not to conduct the required screening of Iran-linked SWIFT-NET messages[36] and letters of credit documents, worth at least tens of millions in USD funds on an annual basis, for compliance with the OFAC list of SDNs; the U.S. State Department's United States Munitions List of defense-related export controlled items; and/or the U.S. Bureau of Industry and Security's Commerce Control List of dual-use export controlled items, and Denied Persons List of export denied entities; and

d)   Defendants knowingly and willfully facilitated the illicit export and import of Iranian petroleum products for the NIOC and other sanctioned Iranian entities. These petrodollar transactions, including trade-finance and foreign exchange, provided Iran with illegal access to billions of dollars, including the direct funding through the Defendants of the IRGC and its network of front companies.

---

[35] *See*, https://www.fincen.gov/statutes_regs/guidance/pdf/fin-2008-a002.pdf.

[36] Including, but not limited to, SWIFT-NET messages for customer credit transfers ("MT 100" series messages), bank-to-bank transfers ("MT 200" series messages), foreign exchange ("MT 300" series messages), trade finance ("MT 400" and "MT 700" series messages), precious metals trading ("MT 600" series messages), and account management ("MT 900" series messages).

115.    The specific conduct of the Defendants as detailed in this Complaint, were overt

acts in furtherance of the Conspiracy and were themselves illegal and violated criminal laws in

the United States including: 1) Bank Secrecy Act, Title 31, United States Code, Section 5311 et

seq. (the "BSA"); 2) Title 31, United States Code, Section 5318(h)(1) and Title 12, Code of

Federal Regulations, Section 21.21, which required the Defendants to establish and maintain an

anti-money laundering ("AML") compliance program; 3) Pursuant to Title 31, United States

Code, Section 5318(i)(1), banks that manage private banking or correspondent accounts in the

United States for non-U.S. persons must establish due diligence, and, in some cases, enhanced

due diligence, policies, procedures, and controls that are designed to detect and report suspicious

activity related to certain specified accounts. For foreign correspondent accounts, the

implementing regulations require that the due diligence requirements set forth in Section

5318(i)(1) include an assessment of the money laundering risk presented by the account based on

all relevant factors, including, as appropriate: (i) the nature of the foreign financial institutions'

business and the market it serves; (ii) the type, purpose, and anticipated activity of the account;

(iii) the nature and duration of the bank's relationship with the account holder; (iv) the AML and

supervisory regime of the jurisdiction issuing the license for the account holder; and (v)

information reasonably available about the account holder's AML record.  4) The International

Emergency Economic Powers Act; 5) Trading with the Enemy Act; 6) Iranian Transaction

Regulations; 7) New York State Banking Law 8) OFAC Regulations.  OFAC promulgates

regulations to administer and enforce the economic sanctions laws, including regulations for

economic sanctions against specific countries, as well as sanctions against Specially Designated

Nationals ("SDNs"). SDNs are individuals, groups, and entities that have been designated by

OFAC as terrorists, financial supporters of terrorism, proliferators of weapons of mass

26

destruction, and narcotics traffickers.

116.    Absent the criminal collusion and conspiratorial conduct of the Defendants, Iran and its Agents and Proxies could not have successfully conducted or disguised the large volume of illegal USD transactions.

117.    Iran's goals were not secret. Its pursuit and development of Weapons of Mass Destruction—including IEDs, EFPs, and similar explosive munitions, its role supporting Terrorist Groups, and its role in using munitions in Iraq, were the subject of numerous publicly available news reports, U.S. government reports, and congressional testimony, as well as U.N. Security Council resolutions and European Union regulations prior to and during the period of the Conspiracy.

118.    Multiple news reports from the BBC in 2005 and 2006 discussed Iran's supplying weapons and technology to Shi'a extremist groups. CNN, in September 2008, reported that Iran had provided Shi'a militias in Iraq with millions of dollars in funding as well as high-grade military explosives and military equipment.

119.    State Department reports issued in 2006, 2007, and 2008 documented Iran's efforts to provide terrorists in Iraq munitions, training, and funding.

120.    These official reports and other publicly disseminated information demonstrate that, by agreeing to participate in the illegal funding scheme, Defendants knew, or were deliberately indifferent to the fact that, they were providing material support for terrorism, particularly since Iran had been designated as a State Sponsor of Terrorism in 1984 and was subjected to sanctions in 1996, long in advance of Defendants' conduct.

121.    In addition to various efforts by law enforcement and intelligence agencies to thwart Iranian efforts to circumvent U.S. economic sanctions and embargo, the Treasury

27

Department and Commerce Department blacklisted Iranian front companies and middlemen believed to be complicit in the efforts to avoid U.S. sanctions.

122.     In 2006, the U.S. Treasury and State Department launched a campaign to warn a number of major international banks about the risks of conducting business with Iran. Defendants Standard Chartered, Commerzbank and HSBC were briefed at that time about these risks of terror financing in conducting business in Iran.

123.     Defendants RBS, Barclays, Credit Suisse, Deutsche Bank, Standard Chartered, and HSBC were also part of the Wolfsberg Group, an association of global banks that issued a statement in 2007, endorsing certain measures to promote transparency in financial transactions and to increase the effectiveness of global anti-money laundering and anti-terrorist financing programs. The Wolfsberg Principles for the Suppression of Terror Financing committed the banks to "implement 'procedures for consulting applicable lists and taking reasonable and practicable steps to determine whether a person involved in a prospective or existing business relationship appears on such a list.'" *Weiss*, 453 F. Supp. 2d at 619, 626-27.

124.     Despite Defendants' knowing Iran had been designated a State Sponsor of International Terrorism by the United States, each Defendant took affirmative steps to assist Iran and its agents in clandestinely routing billions of dollars through the United States to hide its unlawful conduct, and each Defendant knew or was deliberately indifferent to the well-publicized fact that Iran and its terror proxies were killing and maiming American civilians and servicemen in Iraq and that U.S. nationals would foreseeably be injured or killed as a result of the substantial assistance those dollars provided to the IRGC and Hezbollah.

125.     Each of the Defendants knew about the existence of the Conspiracy; directly conspired with Iran, through Defendant Bank Saderat Plc, Bank Melli Iran, the CBI and others,

to advance the Conspiracy through affirmative, extensive, and unlawful actions over long periods of time; and was aware of the existence and participation of other co-conspirators, including other Defendants named herein.

126.    In fact, on numerous occasions, three or more of the Defendants acted jointly to facilitate the same illegal trade-finance transaction (*e.g.* providing material assistance to Mahan Air because the Iranian airline wanted to purchase U.S. manufactured aircraft and needed help circumventing U.S. export restrictions against Iran).

127.    Each of the Defendants engaged in a multitude of transactions over a period of years, involving manipulative and deceptive methods designed to conceal the identity of the Iranian participants.

128.    Each of the Defendants, at the time it agreed to join and actively take part in the Conspiracy, knew that Iran was a U.S.-designated State Sponsor of International Terrorism and that Iran was clandestinely routing billions of dollars through the United States to hide its unlawful conduct; and each Defendant took affirmative steps to help Iran in its unlawful conduct.

129.    Each of the Defendants also knew, or was deliberately indifferent to, the fact that Iran, as a U.S.-designated State Sponsor of  International Terrorism, would (and, in fact, did) channel hundreds of millions of the dollars Defendants helped launder and conceal from U.S. regulators and law enforcement agencies to the IRGC, MOIS, and the Terrorist Groups.

130.    Each of the Defendants also knew, or was deliberately indifferent to, the well-publicized fact that Iran and its terror proxies were killing and maiming American civilians and servicemen in Iraq as part of a sustained campaign of international terrorism, and that U.S. nationals would foreseeably be injured or killed as a result of the substantial assistance those dollars provided to the IRGC, MOIS, and the Terrorist Groups.

131.    Each of the Defendants also knew, or was deliberately indifferent to, the foreseeable (and inevitable) consequences of providing Iran, a State Sponsor of International Terrorism, with access to hundreds of *billions* of dollars of concealed payments and the resulting funding of Iranian-controlled organizations and terrorism proxies that targeted American civilians and servicemen through acts of international terrorism in Iraq from 2003 to 2011.

132.    Without the active participation of the Defendants in the Conspiracy, Iran could not have transferred the same volume of USD to the IRGC, MOIS and the Terrorist Groups, to carry out the terrorist attacks nor could it have done so with the same ease and efficiency.

133.    Without the active participation of the Defendants in the Conspiracy, Iran could not have successfully violated U.S. export controls, financed its illicit arms shipments or manufactured the same volume and sophistication of factory-grade EFPs, Rockets, Mortar and other munitions to kill and maim Americans in Iraq, as discussed below.

134.    Without the Defendant Banks' funding, the Terrorist Groups would not have been able to engage in the overt acts of authorizing, planning, and committing the attacks that killed or injured Plaintiffs to the same extent and magnitude as they did, and Iran and its Agents and Proxies would have been severely hampered in its terror financing and operations.

135.    Violence against American and other Coalition troops and civilians as a result of Defendants' role on the Conspiracy was within the foreseeable scope of and done in furtherance of the Conspiracy to provide material support for terrorism and commit terrorism.

136.    Each member of the Conspiracy played a crucial role in the success of the Conspiracy: (1) Defendants provided funding to Iran and its agents through their methods for circumventing U.S. sanctions and regulations; (2) Bank Saderat and other agents of Iran, including the IRGC, MOIS, MODAFL and others, were conduits for the funds; (3) the funds

were then transferred to the Terrorist Groups that committed, planned, and /or authorized the terror acts.

137.    As set forth below, the HSBC Defendants, Commerzbank, Commerzbank AG New York Branch, Standard Chartered Bank, Standard Chartered Bank New York Branch, Barclays, Barclays Bank PLC, New York Branch, and Credit Suisse AG altered, falsified, and omitted information from payment order messages that they facilitated on behalf of Bank Saderat, knowing, or deliberately indifferent to the fact, that Bank Saderat was engaged in money laundering on behalf of a State Sponsor of Terrorism, and after October 2007, that Bank Saderat was a SDGT that provided material support to Iran's terrorist activities, and, in the case of the HSBC Defendants, knew there was direct evidence of Bank Saderat's "funding of Hezbollah."

138.    As set forth below, the HSBC Defendants, Defendants Standard Chartered Bank, Standard Chartered Bank New York Branch, ABN Amro (RBS N.V.), The Royal Bank of Scotland Plc, New York Branch, Commerzbank and Commerzbank AG, New York Branch facilitated numerous payments totaling more than $60 million on behalf of IRISL knowing, or deliberately indifferent to the fact, that IRISL was designated a SDN by the United States for, as stated in the U.S. Treasury Department's September 10, 2008 press release announcing IRISL's designation, "facilitating shipments of military cargo destined for the (Iranian) Ministry of Defense and Armed Forces Logistics (MODAFL)," which could be used for terrorist attacks on Coalition Forces, including American nationals. IRISL, in fact, facilitated shipments of military cargo to Hezbollah.

139.    As alleged below, Defendants Standard Chartered Bank, Credit Suisse, Bank Saderat Plc and Commerzbank all altered, falsified, or omitted information from payment

messages (worth billions of U.S. dollars) that they facilitated on behalf of the NIOC, knowing the risk involved in rendering those payments without any transparency to U.S. regulators and law enforcement, and thereby directly providing the IRGC with access to billions of USD that it could move – undetected – through the global financial system.

140.    As alleged below, Defendants Standard Chartered Bank and Standard Chartered Bank, New York Branch also knowingly and actively financed and facilitated illegal trade-finance transactions worth hundreds of millions of dollars on behalf of MODAFL, the IRGC and various instrumentalities of Iranian state-sponsored terror, including companies working directly for Hezbollah and the IRGC-Qods Force.

141.    Furthermore, as alleged below, Defendants committed acts of international terrorism in violation of 18 U.S.C. § 2332d.

142.    Defendant HSBC Bank USA, N.A. is a U.S. person that knowingly conducted financial transactions with Iran in the United States in violation of 18 U.S.C. § 2332d, and it was reasonably foreseeable that Iran would provide material support to acts of international terrorism that killed and injured American citizens in Iraq.

143.    Plaintiffs further allege that the U.S. branches of Defendants Deutsche Bank, BNP Paribas, Credit Agricole, Barclays, Standard Chartered Bank, ABN Amro (RBS N.V.), and Commerzbank, including but not limited to Deutsche Bank AG, New York Branch, BNP Paribas, S.A. New York Branch, Credit Agricole Corporate & Investment Bank, New York Branch, Barclay's Bank PCL, New York Branch, Standard Chartered Bank, New York Branch, The Royal Bank of Scotland Plc, New York Branch and Commerzbank AG, New York Branch are U.S. persons that knowingly conducted financial transactions with Iran in the United States in violation of 18 U.S.C. § 2332d, and it was reasonably foreseeable that Iran would provide

material support to acts of international terrorism that killed and injured American citizens in Iraq.

144.    Each Plaintiff was injured as a result of an act of international terrorism for which Iran and its terrorism apparatus, including FTOs Hezbollah, Al Qaeda, and Ansar Al Islam, provided material support and which were within the foreseeable scope of and in furtherance of the Conspiracy.

## II.   JURISDICTION AND VENUE

### 1.   THIS COURT HAS JURISDICTION OVER ALL CLAIMS AND ALL PARTIES

#### A.   SUBJECT MATTER JURISDICTION

145.    This Court has subject-matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 2338 since all claims are being brought under 18 U.S.C. § 2333.

#### B.   PERSONAL JURISDICTION

146.    This Court properly exercises personal jurisdiction over all of Defendants.

147.    Personal jurisdiction is appropriate under Fed. R. Civ. P. 4(k)(1)(A) because each defendant is subject to personal jurisdiction in a court of general jurisdiction in New York state and personal jurisdiction comports with the U.S. Constitution.

148.    Each defendant is subject to personal jurisdiction in a court of general jurisdiction in New York state pursuant to N.Y. C.P.L.R. 302 because this case arises out of Defendants' laundering of USD in New York by executing tens of thousands of fund transfers totaling hundreds of billions of dollars through the Federal Reserve Bank of New York as well as Defendants' New York branches and correspondent accounts in New York.

149.    Such activity constitutes "transacting business" within New York state pursuant to C.P.L.R. 302(a)(1).

150.     Defendants sent or cleared USD payments through the U.S., including clearing done through U.S. subsidiaries.

151.     Defendants maintained correspondent bank accounts at financial institutions in New York and utilized the accounts to effectuate a significant number of fund transfers on behalf of Iran and its Agents and Proxies.

152.     Defendants purposefully directed their activities at residents of this forum, and this litigation results from injuries arising out of and related to those activities. Defendants' culpable conduct stems from their use of the Federal Reserve Bank of New York and the New York branches of other financial institutions.

153.     Defendants' fund-transfer activities also fall within C.P.L.R. 302(a)(2) because by executing the transfers Defendants committed tortious acts within New York state.

154.     In furtherance of the Conspiracy, Defendants executed numerous USD transfers knowing (or being deliberately indifferent to the fact) the money would be used to provide material support and resources to a state sponsor of terror to enable terrorist organizations to carry out terrorist attacks, including the terrorist attacks in which the plaintiffs and their family members were injured or killed.

155.     The transferred funds did in fact provide material support and resources to the Terrorist Groups who committed the acts of terrorism that caused injuries or death to plaintiffs and their family members.

156.     Defendants deliberately and repeatedly directed their money laundering activities toward New York's banking system specifically and the United States generally by executing the nefarious fund transfers in New York and, in doing so, knowingly provided substantial financial support to the Terrorist Groups whose aim was to target American interests generally by

attacking United States nationals.

157.    The financial support enhanced the Terrorist Groups' ability to plan, prepare for, and carry out the terrorist attacks.

158.    Personal jurisdiction over Defendants comports with the Due Process Clause of the Fourteenth Amendment because Defendants purposefully availed themselves of the privilege of doing business in New York (by executing thousands of transfers worth billions of dollars) and because this lawsuit arises out of and relates to Defendants' deliberate and recurring contacts with and activity in New York state.

159.    Congress issued findings when it enacted JASTA, indicating that personal jurisdiction is proper over entities that, like Defendants, "knowingly or recklessly contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism that threaten the security of nationals of the United States or the national security, foreign policy, or economy of the United States, necessarily direct their conduct at the United States." Congress found that those entities "should reasonably anticipate being brought to court in the United States to answer for such activities."

160.    Section 317 of the Patriot Act further shows that Defendants who are foreign entities should reasonably anticipate defending suit in the United States for their money-laundering activities directed towards New York. It provides that district courts have jurisdiction over a defendant if service of process is made and "the foreign person commits an offense under subsection (a) involving a financial transaction that occurs in whole or in part in the United States;" or "the foreign person is a financial institution that maintains a bank account at a financial institution in the United States."

161.    Defendants expressly aimed their illegal conduct at New York.

35

162.   This Court's exercise of personal jurisdiction over Defendants is proper, reasonable, and comports with traditional notions of fair play and substantial justice.

163.   This Court therefore has specific personal jurisdiction over Defendants.

164.   This Court also has specific personal jurisdiction over most of Defendants pursuant to the nationwide service of process provision of the Anti-Terrorism Act, 18 U.S.C. § 2334(a), which provides that "[a]ny civil action under section 2333 of this title against any person may be instituted in the district court of the United States for any district where any plaintiff resides or where any defendant resides or is served, or has an agent. Process in such a civil action may be served in any district where the defendant resides, is found, or has an agent."

165.   All Defendants can be served with process in the United States, with the exception of HSBC Holdings Plc ("HSBC Holdings"), HSBC Middle East, and Bank Saderat.

166.   This Court's exercise of personal jurisdiction over said Defendants comports with the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

167.   Said Defendants have sufficient minimum contacts with the United States as a whole and they purposefully availed themselves of the benefit of the U.S. banking system when they executed the numerous illegal fund transfers.

168.   This Court also has general personal jurisdiction over the following Defendants, who, as detailed below, are either headquartered in New York or have their principal place of business in New York: HSBC North America Holdings, Inc. ("HSBC North America"); HSBC Bank USA, N.A.; and Commerzbank AG, New York Branch.

## 2.     VENUE IS PROPER IN THIS COURT

169.   Venue is proper under 18 U.S.C. § 2334(a) because several Plaintiffs reside in this District and at least one defendant resides, was served, or has an agent in this District.

170.   Venue is also proper in this district, in the alternative, pursuant to 28 U.S.C. §

1391(b)(3) because Defendants are subject to the Court's personal jurisdiction with respect to this action.

## III.    THE DEFENDANTS

### 1.    THE HSBC DEFENDANTS

171.    **Defendant HSBC Holdings Plc** ("HSBC Holdings") is a public limited company organized under the laws of the United Kingdom. HSBC Holdings directly or indirectly owns, *inter alia*, Defendant HSBC North America Holdings, Inc., Defendant HSBC Bank Plc, Defendant HSBC Bank Middle East Limited, and Defendant HSBC Bank USA, N.A. (as noted above, referred to herein collectively as the "HSBC Defendants"). HSBC Holdings is occasionally referred to internally (and in this Complaint) as "HSBC Group," or "The Group," and members and affiliates of HSBC Holdings (including the named HSBC Defendants herein) are occasionally referred to herein as "HSBC Group members."

172.    Defendant HSBC Holdings constitutes the ultimate parent company of one of the world's largest banking and financial services groups with approximately 6,300 offices in over 75 countries and territories.

173.    HSBC Holdings is listed on the New York Stock Exchange ("NYSE"), London Stock Exchange ("LSE") and Hong Kong Stock Exchange ("SEHK").

174.    HSBC Group members comprise financial institutions throughout the world that are owned by various intermediate holding companies, and ultimately, but indirectly, by Defendant HSBC Holdings, which, as alleged above, is incorporated and headquartered in England.

175.    HSBC Holdings may be properly served in accordance with the Hague Convention at its agent located at 8 Canada Square, London E14 5HQ, England.

176.    **Defendant HSBC Bank Plc**: Also known as "HSBC-London," and often referred

to internally by members of HSBC Group as "HBEU," is a financial institution registered under the laws of England and Wales, and operates nearly 1,000 branches in the United Kingdom, Isle of Man, and the Channel Islands.

177.    HSBC-London is one of the four major clearing banks in the United Kingdom and is a wholly owned subsidiary of HSBC Holdings.

178.    HSBC-London may be properly served in accordance with the Hague Convention, at its registered office at 8 Canada Square, London E14 5HQ, England or its authorized agent at HSBC-London, 11 West 39th Street, New York, New York 10018.

179.    **Defendant HSBC Bank Middle East Limited**: Also known as "HSBC-Middle East," and often referred to internally by members of HSBC Group as "HBME," is a financial institution headquartered Dubai, United Arab Emirates ("UAE"), and registered under the laws of the Jersey Channel Islands.

180.    HBME maintained correspondent bank accounts at financial institutions in New York and utilized the respective account to effectuate a significant number of wire transfers on behalf of Iran, its Agents and Proxies, and the Terrorist Groups.

181.    HBME may be properly served in accordance with the Hague Convention through its agent located at Unit GV08-1st Floor-Full Floor, L Gate Village Building 8 Dubai AE.

182.    **Defendant HSBC North America Holdings, Inc**.: Known "HSBC North America," and often referred to internally by members of HSBC Group as "HNAH," is a Delaware corporation and is an indirect subsidiary of HSBC Holdings.

183.    According to fact sheets published on HSBC's official website, HSBC North America is headquartered in New York City and Illinois.

184.    HSBC North America is the holding company for HSBC Holding's operations in

38

the United States.

185.   HSBC North America's businesses serve customers in retail banking and wealth management, commercial banking, private banking, and global banking and markets.

186.   HSBC North America may be properly served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

187.   **Defendant HSBC Bank USA, N.A.**: Also known as "HSBC-US," and often referred to internally by members of HSBC Group as "HBUS," is a national bank chartered under the National Bank Act (12 U.S.C. § 2 et seq.) that constitutes a "U.S. person" under the definitions set forth in 31 C.F.R. Part 560.314 of the Iranian Transactions Regulations (the "ITR") and 18 U.S.C. § 2332d(b)(2) of the Anti-Terrorism Act.

188.   According to the fact sheets published on HSBC-US's official website, HSBC-US's headquarters are in McLean, VA, and it has its principal office in New York City.

189.   HSBC-US operates more than 240 bank branches throughout the United States, with offices and branches in New York, California, Connecticut, Delaware, Washington, D.C., Florida, Maryland, New Jersey, Oregon, Pennsylvania, Virginia, and Washington State.

190.   HSBC-US is the principal subsidiary of HSBC USA Inc., which is, in turn, an indirect, wholly-owned subsidiary of HSBC North America.

191.   HSBC-US is a federally chartered banking institution under the National Bank Act (12 U.S.C. ch. 2 et seq.), is registered, organized, or incorporated in New York.

192.   The Department of the Treasury, Office of the Comptroller of the Currency is HSBC Bank USA's primary regulator.

193.   The HSBC-US "Global Banking and Markets" line of business, with offices in

more than 60 countries, provides a wide range of "tailored financial solutions" to major government, corporate, and institutional clients. This line of business includes an extensive network of correspondent banking relationships in which HSBC-US provides banks from other countries with USD accounts to transact business in the United States. Due to its affiliates in over 80 countries, HSBC is one of the largest providers of correspondent banking services in the world.

194.   In 2010, HSBC-US had about 2,400 correspondent customers, including more than 80 HSBC affiliates. Among other services, HSBC-US provides financial institution clients with access to the U.S. financial system by handling international wire transfers, clearing a variety of USD instruments, including travelers' checks and money orders, and providing foreign exchange services. HSBC-US Payment and Cash Management is a key banking division, located in New York, and supports HSBC-US' correspondent relationships.

195.   In addition, as part of this line of business, until 2010, HSBC-US housed the Global Banknotes Department, which used offices in New York City, London, Hong Kong, and elsewhere to buy, sell, and ship large amounts of physical USD. The Banknotes Department derived its income from the trading, transportation, and storage of bulk cash, doing business primarily with other banks and currency exchange businesses, but also with HSBC affiliates. In addition, for a number of years, HSBC-US held a contract with the U.S. Federal Reserve Bank of New York ("FRBNY") to operate U.S. currency vaults in several cities around the world to assist in the physical distribution of USD to central banks, large commercial banks, and businesses involved with currency exchange. In June 2010, however, HSBC-US exited the wholesale U.S. banknotes line of business.[37]

---

[37] United States Senate Permanent Subcommittee on Investigations, *U.S. Vulnerabilities to Money Laundering, Drugs, and Terrorist Case Financing: HSBC Case History* (Jul. 17, 2012),

196.    HSBC-US may be properly served through its registered agent, The Corporation Trust, Incorporated, 2405 York Road, Suite 201, Lutherville Timonium, MD 21093.

197.    The HSBC Defendants routinely conducted business in the State of New York through a correspondent account it maintained at its New York branch, and utilized that account to clear USD transfers requested by its customers.

**2.      DEFENDANTS BARCLAYS BANK PLC & BARCLAYS BANK PLC, NEW YORK BRANCH**

198.    Defendant Barclays Bank Plc ("Barclays") is a global financial services provider headquartered in London, England. Barclays is a wholly owned subsidiary of Barclays Plc, a public limited liability company organized under the laws of England and Wales. This complaint refers to the subsidiary company.

199.    Barclays maintains an extensive network of twelve corporate and investment banking branches and subsidiaries in the United States spread throughout Georgia, Massachusetts, Illinois, Texas, California, Florida, New York, Washington, and Washington D.C.

200.    Barclays resides, is found, or has an agent in New York, Nevada, New Jersey, Delaware, Ohio, Texas, Maine, Georgia, Massachusetts, Illinois, California, Florida, Washington and Washington, D.C.

201.    Barclays lists its corporate banking office in the United States as its New York City branch and this branch functioned as its primary clearance house for USD transactions for itself, its affiliates and clients.

202.    At all relevant times, Barclays maintained a New York ("Barclays-NY") branch

---

https://www.hsgac.senate.gov/subcommittees/investigations/hearings/us-vulnerabilities-to-money-laundering-drugs-and-terrorist-financing-hsbc-case-history. Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby adopt and incorporate by reference the HSBC Senate Report as if fully set forth herein.

that functioned as the primary USD clearer for all of Barclays, its affiliates, and its customers.

203.    Barclays-NY has more than 500 employees and total assets in excess of $36 billion.

204.    Barclays has operated in and been licensed and regulated by the State of New York since 1963.

205.    Barclays-NY thus constitutes a "U.S. person" under the definitions set forth in § 560.314 of the ITR and 18 U.S.C. § 2332d(b)(2).

206.    Barclays and Barclays-NY may be properly served through their agent for service at its offices located at 745 7th Avenue, New York, New York 10019.

### 3.    DEFENDANTS STANDARD CHARTERED BANK & STANDARD CHARTERED BANK, NEW YORK BRANCH

207.    Defendant Standard Chartered Bank ("SCB") is one of the world's largest international banks, with over 1,700 branches, offices, and outlets in more than 70 countries. SCB operates principally in Asia, Africa, and the Middle East, but maintains its principal place of business in London.

208.    SCB-London is listed on the London Stock Exchange ("LSE") and Hong Kong Stock Exchange ("SEHK").

209.    SCB resides, is found, or has an agent in New York, New Jersey, Texas, California, Florida, and Washington D.C.

210.    Since 1976, SCB has been licensed by the state of New York to operate as a foreign bank branch in New York, New York ("SCB-NY"). SCB-NY is the seventh largest U.S. dollar correspondent bank in the world. The branch provides wholesale banking services, primarily U.S.-dollar clearing for international wire payments.

211.    SCB-NY provides wholesale banking services, primarily clearing for international

wire payments, at approximately $195 Billion in USD funds per day.

212.   SCB-NY constitutes a "U.S. person" under the definitions set forth in § 560.314 of the ITR and 18 U.S.C. § 2332d(b)(2).

213.   SCB may be properly served through its registered agent CT Corporation System, 818 W 7th Street, Ste. 930, Los Angeles, CA 90017 or through its agent authorized to receive process at its offices located at 1095 Avenue of the Americas New York, New York 10036.

### 4.   DEFENDANTS ROYAL BANK OF SCOTLAND PLC, NATWEST MARKETS PLC, & ROYAL BANK OF SCOTLAND N.V.

214.   The Royal Bank of Scotland Plc, a/k/a NatWest Markets Plc ("RBS Plc") is an international banking and financial services institution and a wholly owned subsidiary of The Royal Bank of Scotland Group Plc ("RBS Group").[38]

215.   At all relevant times, RBS Plc was licensed by the New York Department of Financial Services ("DFS") to operate as a foreign bank branch in New York.

216.   In October 2007, a consortium consisting of Fortis, the RBS Group, and Banco Santander, acquired ABN Amro Holding N.V., the parent company of ABN Amro Bank N.V., using the acquisition vehicle, RBS Holdings.

217.   The former ABN Amro Bank N.V. subsequently underwent a restructuring process to transfer its Dutch State-acquired businesses and activities out of the existing ABN Amro Group. To do so, the relevant Dutch State-acquired businesses were first transferred to a new legal entity owned by ABN Amro Holding N.V.

218.   On February 5, 2010, through a statutory demerger process, the former ABN Amro Bank N.V. was renamed Royal Bank of Scotland, N.V. ("RBS N.V.")

219.   Ultimately, RBS Group acquired ABN Amro Holding N.V. As such, RBS Group

---

[38] Effective April 30, 2018, The Royal Bank of Scotland plc changed its name to NatWest Markets Plc. *See*, https://www.newyorkfed.org/markets/fxcplist-180430ap.html (last visited Dec. 21, 2018).

acquired the New York and Chicago branches of ABN Amro Bank N.V. and began integrating certain business lines handled by these branches into its other U.S. operations.

220.    These former branches constitute a "U.S. person" under the definitions set forth in § 560.314 of the ITR and 18 U.S.C. § 2332d(b)(2).

221.    RBS Plc and RBS N.V. are collectively referred to herein as "RBS."

222.    At all times relevant to this Complaint and through 2015, RBS Group conducted banking operations in the United States through branches of RBS Plc in New York, New York and Stamford, Connecticut, and branches of RBS N.V. in New York (Royal Bank of Scotland N.V., (New York)) and Chicago, Illinois (Royal Bank of Scotland N.V., (Chicago)).

223.    RBS currently provides banking services and products in the United States through its offices in Stamford, Connecticut.

224.    RBS routinely conducted business in the State of New York through a correspondent account it maintained at that branch, utilizing that account to clear USD transfers requested by its customers.

225.    RBS is subject to supervision and regulation by a variety of U.S. state and federal regulatory agencies, including the Connecticut Department of Banking and the Federal Reserve.

226.    RBS N.V. may be properly served through its agent for service at 600 Washington Blvd., Stamford, CT 06901.

227.    RBS Plc may be properly served through its registered agent, Corporation Service Company which does business in California as CSC – Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, CA 95833.

228.    RBS Group may be properly served through its agent for service at 600 Washington Blvd., Stamford, CT 06901.

44

229.    This Court may exercise personal jurisdiction over RBS pursuant to Fed. R. Civ. P. 4(k)(1)(C).

## 5.    DEFENDANTS CREDIT SUISSE AG AND CREDIT SUISSE AG, NEW YORK BRANCH

230.    Defendant Credit Suisse AG ("Credit Suisse") is a financial services company headquartered in Zurich, Switzerland. Credit Suisse serves clients worldwide and, at the time of the events giving rise to this action, Defendant Credit Suisse conducted business in the United States, and continues to do business in the United States.

231.    Specifically, (according to its official corporate website), Credit Suisse conducts business in the United States through numerous offices and branches, including offices/branches in Atlanta, Georgia; Birmingham, Michigan; Boston, Massachusetts; Chicago, Illinois (2 offices/branches); Dallas, Texas; Houston, Texas; Los Angeles, California; Montgomery, Alabama; New York, New York; Northbrook, Illinois; Portland, Oregon; Raleigh, North Carolina; San Diego, California; San Francisco, California (2 offices/branches); Washington, D.C.; West Conshohocken, Pennsylvania; and West Palm Beach, Florida.

232.    Credit Suisse's United States headquarters is located at 11 Madison Avenue, New York, New York.

233.    In addition to its direct operations in the United States, Credit Suisse further transacts business in the United States though certain subsidiaries, including Credit Suisse Holdings (USA) Inc., Credit Suisse Securities, (USA) LLC, and Credit Suisse (USA), Inc.

234.    Credit Suisse's operations in the United States are subject to oversight and regulation by the Board of Governors of the U.S. Federal Reserve System, the Securities and Exchange Commission, and various state banking regulatory agencies.

235.    Credit Suisse's New York branch is licensed by the New York Superintendent of

45

Financial Services, examined by the DFS, and subject to laws and regulations applicable to a foreign bank operating a New York branch.

236.    Credit Suisse's New York branch constitutes a "U.S. person" under the definitions set forth in § 560.314 of the ITR and 18 U.S.C. § 2332d(b)(2).

237.    According the CHIPS-NY website, Credit Suisse used the following U.S. financial institutions in New York to clear and settle its Eurodollar transactions:

a)  Defendant HSBC Bank USA, N.A. (identified by CHIPS-NY participant number 0108 and Fedwire routing number 021001088);

b)  The Bank of New York Mellon (identified by CHIPS-NY participant number 0001 and Fedwire routing number 011001234);

c)  Defendant Deutsche Bank's subsidiary Deutsche Bank Trust Company Americas (identified by CHIPS-NY participant number 0103 and Fedwire routing number 021001033); and

d)  Wells Fargo Bank NY International (identified by CHIPS-NY participant number 0509 and Fedwire routing number 026005092).

238.    Defendant Credit Suisse may be properly served through its registered agent, Corporation Service Company located at 80 State Street, Albany, New York 12207-2543 or through its agent for service at its Principal Executive Office located at 11 Madison Avenue, New York, New York 10010.

239.    This Court may exercise personal jurisdiction over Credit Suisse pursuant to Fed. R. Civ. P. 4(k)(1)(C).

**6.    DEFENDANTS BNP PARIBAS S.A. & BNP PARIBAS, S.A. NEW YORK BRANCH**

240.    Defendant BNP Paribas S.A. ("BNP") is the largest bank in France and is one of the five largest banks in the world by total assets. BNP has branches all through the world, including the United States.

241.     Its operations in the United States are headquartered in New York, with branch offices in California, Texas, and Illinois.

242.     BNP's New York branch is located at 787 Seventh Ave., New York, New York, and is licensed by the New York Superintendent of Financial Services, examined by the DFS, and subject to laws and regulations applicable to a foreign bank operating a New York branch.

243.     BNP's New York branch constitutes a "U.S. person" under the definitions set forth in § 560.314 of the ITR and 18 U.S.C. § 2332d(b)(2).

244.     BNP routinely conducted business in the State of New York through a correspondent account it maintained at its New York branch, utilizing that account to clear USD transfers requested by its customers.

245.     BNP may be properly served through its General Counsel, Peter Cooke, at 787 7th Avenue, New York, NY 10019 and in accordance with the Hague Convention at is offices located at 16, boulevard des Italiens, Pris, Ile-de-France, France.

246.     This Court may exercise personal jurisdiction over BNP pursuant to Fed. R. Civ. P. 4(k)(1)(C).

**7.     DEFENDANTS DEUTSCHE BANK A.G. & DEUTSCHE BANK AG, NEW YORK BRANCH**

247.     Deutsche Bank AG ("DB") is a large international bank with over 98,000 employees and over $1.6 trillion dollars in total assets. DB is headquartered in Taunusanlage 12, Frankfurt, Germany.

248.     DB operates a branch in located at 60 Wall St. New York, New York, ("DB New York") and through which it conducts correspondent banking services and USD clearing activities for its international branches and customers. Specifically, DB conducted business in the United States through its offices in New York, California, Texas, Florida, Illinois, and

Washington, D.C., among others.

249.    In addition to the New York branch, DB operates over thirty banking locations throughout the United States in 18 different states.

250.    DB New York is subject to the oversight and regulation by the Board of Governors of the U.S. Federal Reserve System and the New York State Banking Department. The branch thus constitutes a "U.S. Person" under the Iranian Transaction Regulations and 18 U.S.C. § 2332d(b)(2).

251.    DB and DB New York may be properly served through their agents located at Deutsche Bank AG, 60 Wall Street, New York, NY 10005 or its registered agent CT Corporation System 1200 South Pine Island Road, Plantation, FL 33324.

252.    This Court may exercise personal jurisdiction over DB and DB New York pursuant to Fed. R. Civ. P. 4(k)(1)(C).

**8.      DEFENDANTS CRÉDIT AGRICOLE S.A., CRÉDIT AGRICOLE CORPORATE & INVESTMENT BANK, & CRÉDIT AGRICOLE CORPORATE & INVESTMENT BANK, NEW YORK BRANCH**

253.    Defendant Crédit Agricole S.A. ("CASA") is the largest retail banking group in France and is headquartered in Montrogue, France. Defendant Crédit Agricole Corporate and Investment Bank ("CACIB") have a number of subsidiaries and affiliated entities.

254.    In June of 2003, CASA purchased Crédit Lyonnais ("CL"). CL owned a subsidiary named Credit Lyonnais (Suisse) S.A. ("CLS"). CLS then merged with a CACIB subsidiary in Switzerland, Crédit Agricole Indosuez (Suisse) S.A. ("CAIS"). The resulting entity became Crédit Agricole (Suisse) S.A.

255.    CACIB is the result of a 2004 transfer of the corporate and investment banking operations of CL to another CASA subsidiary, Crédit Agricole Indosuez. CACIB initially operated as "Caylon." In 2010, it began operating under its current name, CACIB. Hereinafter,

48

regardless of whether the entity was operating under the name Caylon or CACIB, the entity is identified as CACIB.

256.     CACIB resides, is found, has an agent, and operates a branch, Crédit Agricole Corporate & Investment Bank, New York Branch, in New York.

257.     CACIB's New York branch is subject to oversight and regulation by the Board of Governors of the U.S. Federal Reserve System and the New York State Banking Department.

258.     CASA and CACIB routinely conducted business in the State of New York through a correspondent account it maintained at that branch, utilizing that account to clear USD transfers requested by its customers.

259.     CACIB's New York branch constitutes a "U.S. person" under the definitions set forth in § 560.314 of the ITR and 18 U.S.C. § 2332d(b)(2).

260.     CASA may be properly served in accordance with the Hague Convention by and through its agent for service, at its headquarters located at 50 avenue Jean Jaurès 92 120 Montrouge, France, or its agent for service at its offices located at 1301 Avenue of the Americas, New York, New York 10019.

261.     CACIB may be properly served through its registered agent Corporation Company of Miami, 200 S. Biscayne Blvd., Ste. 4100 (GR), Miami, FL 33131.

262.     This Court may exercise personal jurisdiction over Defendants CASA and CACIB pursuant to Fed. R. Civ. P. 4(k)(1)(C).

### 9.     DEFENDANTS COMMERZBANK AG & COMMERZBANK AG, NEW YORK BRANCH

263.     Defendant Commerzbank AG ("Commerzbank") is a financial services company formed under the laws of Germany and headquartered in Frankfurt, Germany and has over 1,200 branches in Germany alone.

264.   Commerzbank is listed on stock exchanges in Germany, London, and Switzerland.

265.   Commerzbank has locations in 50 countries, including a representative office in Tehran, Iran and a New York branch licensed by the State of New York since 1967.

266.   Commerzbank AG, New York Branch ("Commerzbank New York") is headquartered in New York, New York.

267.   Commerzbank New York constitutes a "U.S. person" under the definitions set forth in § 560.314 of the ITR and 18 U.S.C. § 2332d(b)(2)

268.   According to the CHIPS-NY website, Commerzbank AG used, *inter alia*, the following U.S. financial institutions in New York to clear and settle its Eurodollar transactions:

   a) Defendant Commerzbank's New York branch (identified by CHIPS-NY participant number 0804 and Fedwire routing number 026008044);

   b) Defendant HSBC Bank USA, N.A. (identified by CHIPS-NY participant number 0108 and Fedwire routing number 021001088);

   c) Defendant SCB-NY (identified by CHIPS-NY participant number 0256 and Fedwire routing number 026002561); and

   d) Defendant Deutsche Bank's subsidiary, Deutsche Bank Trust Company Americas (identified by CHIPS-NY participant number 0103 and Fedwire routing number 021001033).

269.   Commerzbank and Commerzbank New York may be properly served through their agents for service at their offices located at 225 Liberty Street, New York, New York 10281.

270.   This Court may exercise personal jurisdiction over Commerzbank and Commerzbank New York pursuant to Fed. R. Civ. P. 4(k)(1)(C).

271.   Defendants HSCBC Group members, Barclays, Standard Chartered Bank, RBS, Credit Suisse, BNP, DB, CASA/CACIB, Commerzbank, and their individual New York

branches are sometimes referred to herein collectively as "the Western Bank Defendants."

### 10.    DEFENDANT BANK SADERAT PLC

272.    Bank Saderat Iran is one of the largest banks in Iran. It has approximately 3,400 offices worldwide, including, as discussed herein, a United Kingdom subsidiary, Defendant Bank Saderat Plc, and branches in Frankfurt, Paris, Athens, Dubai and Beirut.

273.    Bank Saderat Iran was nationalized after the Iranian Revolution, but allegedly privatized in 2009. According to Bank Saderat Iran, 49% of its shares are owned by the Iranian government, but it is technically a non-governmental entity.

274.    In 2002, Bank Saderat Iran's London bank branch, Defendant Bank Saderat Plc, became a wholly-owned bank subsidiary, incorporated under United Kingdom law.

275.    Defendant Bank Saderat Plc is the legal successor in interest to the Iran Overseas Investment Bank, London.

276.    Iran Overseas Investment Bank changed its name to Bank Saderat Plc in March 2002.

277.    On July 1, 2005, OFAC determined that Bank Saderat Iran and its branches at 707 Wilshire Boulevard, Suite 4880, Los Angeles CA 90017 and at Lothbury, London EC2R 7HD, England are financial institutions owned or controlled by the Government of Iran within the meaning of 31 C.F.R. § 560.313.

278.    On September 8, 2006, the United States Department of Treasury designated Bank Saderat as a SDGT, declaring that "Bank Saderat facilitates Iran's transfer of hundreds of millions of dollars to Hizballah and other terrorist organizations each year. We will no longer allow a bank like Saderat to do business in the American financial system, even indirectly."[39]

---

[39] See U.S. Dep't. of Treasury, *Treasury Cuts Iran's Bank Saderat off From U.S. Financial System* (Sept. 8, 2006) https://www.treasury.gov/press-center/press-releases/Pages/hp87.aspx.

279.    In October 2007, Defendant Bank Saderat Plc, together with its parent company Bank Saderat Iran, was designated a SDGT by the United States pursuant to Executive Order ("E.O.") 13224. The U.S. Treasury Department's 2007 press release regarding Bank Saderat's designation stated:

> Bank Saderat, which has approximately 3200 branch offices, has been used by the Government of Iran to channel funds to terrorist organizations, including Hezbollah and European Union-designated terrorist groups Hamas, PFLP-GC, and Palestinian Islamic Jihad. For example, from 2001 to 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hezbollah fronts in Lebanon that support acts of violence.

280.    On March 3, 2008, The United Nations Security Council adopted Resolution 1803 (UNCSR 1803, 2008) by a vote of 14 in favor and none against, with 1 abstention (Indonesia), essentially black listing *all* banks domiciled in Iran, in particular Bank Saderat, and its branches and subsidiaries abroad, including Bank Saderat Plc.

281.    Bank Saderat Plc maintains its principal office in London, United Kingdom.

282.    Defendant Bank Saderat Plc may be served in accordance with the Hague Convention by and through its registered office of Bank Saderat Plc, at 5 Lothbury, London, EC2R 7HD, England.

## IV.    FACTUAL ALLEGATIONS

### 1.    IRAN'S LONG HISTORY OF SUPPORTING AND FINANCING INTERNATIONAL TERRORISM

283.    Since the Iranian Revolution in 1979, Iran has been a principal source of extremism and terrorism throughout the Middle East and the rest of the world, responsible for bombings, kidnappings and assassinations across the globe.

284.    As noted above, the United States designated Iran a State Sponsor of International Terrorism on January 19, 1984. That designation has remained in force throughout the relevant

time period to this Action.

285.    Since its 1984 designation, the United States has attempted to constrain and deter Iran's sponsorship and conduct of terrorist activities, as well as its development of Weapons of Mass Destruction, by imposing a wide variety of trade and economic sanctions intended to reduce the flow of financial resources, especially U.S. dollar-denominated assets, for Iran's support of such activities.

## 2.    U.S. SANCTIONS AND IRAN'S RELIANCE ON U.S. DOLLARS

286.    On June 25, 1996, a truck bomb decimated a building at the Khobar Towers complex in Saudi Arabia that was used to house American military personnel, killing 19 Americans and wounding another 372 people.

287.    It was soon established that the terrorist operatives responsible for the bombing were trained and equipped by the IRGC.

288.    Soon thereafter, Congress responded by passing the 1996 Iran-Libya Sanctions Act finding that:

(1)    The efforts of the Government of Iran to acquire weapons of mass destruction and the means to deliver them *and its support of acts of international terrorism* endanger the national security and foreign policy interests of the United States and those countries with which the United States shares common strategic and foreign policy objectives.

(2)    The objective of preventing the proliferation of weapons of mass destruction and *acts of international terrorism* through existing multilateral and bilateral initiatives *requires additional efforts to deny Iran the financial means* to sustain its nuclear, chemical, biological, and missile weapons programs. (Emphasis added.)

289.    To ensure that U.S. financial institutions that process international wire transfers in the Eurodollar market do not assist Iran in its support of international terrorism and weapons proliferation or facilitate other prohibited transactions, U.S. financial institutions have been (and are) required to use sophisticated computer systems and software algorithms to monitor and

53

screen all wire transfer activities.

290.    Banks in New York that process most of the world's Eurodollar payments and foreign exchange transactions depend on these automated systems to prevent Iran and other sanctioned entities (as well as terrorists, money launderers, and other criminals) from gaining access to the United States banking system. In this way, U.S. financial institutions are supposed to be the first line of defense to prevent Iran from accessing the U.S. financial system to fund or otherwise engage in terrorism and other prohibited conduct.

291.    At the same time, because, on average, 60 percent of Iranian government revenues and 90 percent of Iran's export revenues originated from the sale of its oil and gas resources, a market largely denominated in USD (known as "petrodollars"[40]), and because Iran's currency, the Rial, was (in part due to U.S. sanctions) one of the world's least valued currencies, the Iranian regime was desperately dependent on access to the USD funds it maintained in the Eurodollar market, and the interest income these petrodollar deposits generated.[41]

292.    Thus, reliably consistent access to, and the ability to facilitate trade in, the Eurodollar market has been critical to the capacity of the Iranian regime to fund its terror proxies such as Hezbollah in Lebanon, and to fuel its other terrorism and weapons proliferation activities through the IRGC.

293.    To Iran, the importance of funding Hezbollah, the IRGC and subsequently, the Terrorist Groups in Iraq, became even more acute after the 2003 U.S. invasion of Iraq. After that event, Iran directed Hezbollah to create "Unit 3800" (discussed below) and began devoting greater financial resources to gain influence in Iraq, inflict casualties on American citizens in Iraq, and intensify its quest for Weapons of Mass Destruction.

---

[40] The petrodollar market developed because, *inter alia*, the United States was the largest producer and consumer of oil in the world; the world oil market has been priced in USD since the end of World War II.
[41] The Eurodollar interest rate is also known as the London Interbank Offered Rate ("LIBOR").

294.    None of these goals could be accomplished by Iran without USD funds, access to the Eurodollar market, and the agreement of Western financial institutions, such as the Western Bank Defendants, to shield Iran's unlawful Eurodollar and trade-finance activities from detection.

### 3.    IRAN CONTINUALLY EVADED U.S., EUROPEAN UNION, AND UNITED NATIONS' SANCTIONS

295.    Congress and successive Administrations have enacted several laws and executive orders that imposed sanctions on countries and firms that sell Weapons of Mass Destruction technology and military equipment to Iran.

296.    On March 16, 1995, as a result of Iranian sponsorship of international terrorism and Iran's active pursuit of Weapons of Mass Destruction, President Clinton issued Executive Order 12957 prohibiting U.S. involvement with petroleum development in Iran.

297.    On May 6, 1995, President Clinton signed Executive Order 12959, pursuant to the International Emergency Economic Powers Act ("IEEPA"),[42] as well as the 1985 International Security and Development Cooperation Act ("ISDCA"), substantially tightening sanctions against Iran.

298.    On August 19, 1997, President Clinton signed Executive Order 13059 clarifying Executive Orders 12957 and 12959, and confirming that virtually all trade and investment activities with Iran by U.S. persons, wherever located, were prohibited.

299.    In order to thwart U.S. sanctions efforts, Iran cultivated close relationships with foreign arms suppliers, including Russia, China, and North Korea.

300.    In addition, Iran sought to clandestinely acquire dual-use technologies from

---

[42] On October 16, 2007, President Bush signed into law the International Emergency Economic Powers (IEEPA) Enhancement Act, Public Law No. 110-96, amending IEEPA section 206. The Act enhanced criminal and administrative penalties that could be imposed under IEEPA.

European manufacturers, and certain export-controlled defense products, aircraft parts, dual-use technologies and materials from the United States.

301.   For years, U.S. law enforcement officials, customs agents and intelligence services have worked to thwart Iranian efforts to circumvent U.S. economic sanctions and arms embargos.

302.   A few brief examples illustrate the larger U.S. government effort:

- On March 12, 2001, criminal and civil sanctions were imposed on Refinery Industries, Inc., of Budd Lake, New Jersey, for attempted exports of gas detection equipment to Iran.

- On June 11, 2001, Saeed Homayouni and Yew Leng Fung, officials of Multicore, Inc., pled guilty in the U.S. in connection with the firm's purchase of commercial and military aircraft parts and missile components for export to Iran.

- In March 2007, the U.S. led efforts to pass U.N. Security Council Resolution 1747 that declared: "Iran shall not supply, sell or transfer directly or indirectly from its territory or by its nationals or using its flag vessels or aircraft any arms or related materiel."

- In March 2008, the U.S. led efforts to pass U.N. Security Council Resolution 1803 that called upon all member states "to exercise vigilance over the activities of financial institutions in their territories with all banks domiciled in Iran, in particular with Bank Melli and Bank Saderat, and their branches and subsidiaries abroad" and "to inspect the cargoes to and from Iran, of aircraft and vessels, at their airports and seaports, owned or operated by Iran Air Cargo and Islamic Republic of Iran Shipping Line, provided there are reasonable grounds to believe that the aircraft or vessel is transporting [prohibited] goods…"

- On September 17, 2008, the U.S. Department of Justice unsealed a criminal indictment against 16 foreign-based defendants related to Mayrow General Trading Company, for their involvement in providing Weapons of Mass Destruction-related, military, and dual-use items to Iran, specifically components found in IEDs in Iraq that caused deaths and injuries to U.S. military personnel.

- On December 11, 2009, at the request of the U.S. government, the Thai government detained a Russian aircraft containing a cargo of

56

weapons from North Korea destined for Iran.

- On June 23, 2010, the U.S. Department of Justice charged an Iranian company and citizen, as well as Opto Electronics PTE, Ltd., a Singapore company and others with, *inter alia*, violations of the Arms Export.

- Control Act (22 U.S.C. §2778) for facilitating the unlawful transfer of long range radio frequency modules used in IEDs targeting Coalition Forces in Iraq. The modules were flown to Iran by Mahan Air.

- On May 11, 2010, Balli Aviation Ltd., a subsidiary of the U.K.-based Balli Group Plc., was sentenced in the District of Columbia to pay a $2 million fine, and to serve a five-year corporate period of probation after pleading guilty to a two-count criminal information in connection with its illegal export of a commercial Boeing 747 aircraft from the United States to Iran.

- In December 2012, the U.S. Department of Justice charged Business Machinery World Wide, an Iranian corporation based in Tehran, Iran; three of its subsidiary companies located in Dubai, United Arab Emirates; and nine officers and individuals for conspiring to violate the IEEPA by facilitating the shipment of computers to the United Arab Emirates for delivery to Iran.

- In April 2014, John Alexander Talley was sentenced to 30 months in prison for conspiracy to violate the IEEPA and Iranian Transaction and Sanctions Regulations. Talley's company, Tallyho Peripherals, Inc., was also sentenced to one year of probation. According to court documents, from 2009 to September 2012, Talley and his company conspired with others to unlawfully export sophisticated computer equipment from the United States to Iran. The shipments of the computers and the payments transited through the United Arab Emirates.

303. In addition, both the U.S. Treasury Department and Commerce Department have blacklisted a long list of Iranian front companies, shell companies and middlemen that the U.S. has determined to be complicit in Iran's sanctions evasion efforts.

4.     **THE EURODOLLAR MARKET – IRAN'S MONEY LAUNDERING AND ILLICIT EXPORT NEXUS WITH DEFENDANT BANKS**

A.     **THE CONSPIRACY'S SHARED GOALS**

304.     As noted *supra*, Iran needed access to the Eurodollar market in order to sustain the Islamic Revolutionary government that has ruled Iran since 1979.

305.     Specifically, the Government of Iran used the Eurodollar market for the following economic activities:

> a.     Investing petrodollar (in USD funds) revenue from Iran's oil and gas export sales;
>
> b.     Exporting the Iranian Islamic Revolution through acts of international terrorism; and
>
> c.     Illicitly acquiring U.S.-manufactured equipment, parts and technology to further its nuclear and conventional weapons programs.

306.     Iran did not have a legitimate need to access the Eurodollar market for the benefit of any Iranian civilian agency, operation or program. It could have operated with funds denominated in any number of other Eurocurrencies[43] (deciding, instead, to continually conduct its international trade primarily in Eurodollars).

307.     Specifically, Iran did in fact have access to viable alternative options both for foreign exchange and time deposits in Eurocurrencies (other than Eurodollars) to meet the needs of its civilian programs, including, but not limited to, its credit at the European Central Bank denominated in Euros, its credit at the International Monetary Fund ("IMF") denominated in Special Drawing Rights ("SDRs"), its credit at the Asian Clearing Union ("ACU") denominated in Asian Monetary Units ("AMUs"), or its domestic credit denominated in Iranian Rial.

---

[43] The term Eurocurrency refers to deposits of funds transferred to, and maintained by, banks outside of the home country for the respective currency. Thus, had Iran chosen to convert its petrodollars into Japanese Yen, it would have held "Euroyen" deposits at banks outside of Japan.

58

308.    However, Iran would not have been able to move its funds undetected through the Eurodollar market without the covert operational and technical assistance it received from the Defendants.

309.    Likewise, Iran would not have been able to substantially fund Hezbollah and Shi'a militias in Iraq—and acquire U.S.-manufactured products (including dual-use technologies and export-controlled manufacturing equipment)—without access to USD funds through the Eurodollar market.

310.    In mid-2012, Iran's access to the Eurodollar market through the Defendant Banks was cut-off by SWIFT-Brussels.

311.    Soon thereafter, Iran's domestic currency collapsed.

312.    The CBI was forced to intensify the use of its gold reserves in order to prop-up the Rial's value.

313.    Absent the Defendant Banks providing Iran and its proxies with decades of clandestine access to the Eurodollar market, Iran's foreign policy goal of furthering its Islamic Revolution through the financing of terrorism—including Iran's sponsorship of terrorist attacks against Coalition Forces in Iraq between 2003 and 2011—would have been severely constrained.

## B.    EURODOLLAR MARKET OPERATIONS

314.    As mentioned above, the global Eurodollar market is a wholesale, bank-to-bank market where a correspondent network of banks, bank branches and other bank affiliates outside the United States make loans and accept deposits denominated in U.S. dollars.

315.    According to the FRB-NY, the Eurodollar market emerged after World War II due to a large increase in U.S. dollars funds circulating outside of the United States from, *inter alia*, the Marshall Plan expenditures to rebuild Europe after the war.

316.    Prior to the launch of SWIFT-NET in 1977, most transactions in the Eurodollar

market were conducted electronically by telegraphic transfer ("TELEX").

317.    By the time of the 1979 Iranian Revolution, the Bank of International Settlements ("BIS-Basel") estimated that the size of the Eurodollar market was over $600 billion.

318.    A mid-2015 report by the Bank of International Settlements ("BIS-Basel") estimated that the size of the Eurodollar market by the end of 2014 was over twenty-one trillion in USD funds.

319.    As mentioned *supra*, nearly all U.S. dollar transfers initiated through banks outside the United States are processed electronically by correspondent banks in the United States, almost exclusively in New York.

320.    The Clearing House Interbank Payment System ("CHIPS-NY") represents that it processes 95 percent of those Eurodollar funds transfers.

### 5.    THE IRANIAN U-TURN EXEMPTION AND ITS REVOCATION

321.    Alongside its economic sanctions against Iran, the United States government designed an exception process to permit Iran's circumscribed access to U.S. dollars through a narrowly-tailored exemption to the Iranian Trade Regulations, known as the "U-Turn exemption" (Section 560.516 of the Iranian Trade Regulations). At the same time, the U.S. government insisted that U.S. financial institutions operating in the Eurodollar market conduct careful monitoring of all Iranian transactions to both deter and detect the financing of sanctioned entities involved in, *inter alia*, Iran's terrorism and weapons proliferation activities.

322.    The purpose of the U-Turn exemption was to permit Iranian parties indirect access to USD funds, *provided* that these transactions were fully disclosed to U.S. correspondent banks; were strictly for Iran's legitimate agencies, operations and programs; and were not earmarked for terrorist, WMD proliferation or other proscribed purposes.

323.    Until November 2008, U.S. financial institutions were authorized to process

60

certain funds transfers (under the U-Turn exemption) for the direct or indirect benefit of Iranian banks, other persons in Iran or the Government of Iran, *provided* such payments were initiated offshore by a non-Iranian, non-U.S. financial institution and only passed through the U.S. financial system en route to another offshore, *non-Iranian,* non-U.S. financial institution; *and* provided that none of the parties to the transactions had been designated a SDN, or that the transaction was for a SDN's benefit.

324.   The U-Turn exemption was therefore conditioned on transparency to permit the careful monitoring of all Iranian transactions, both to deter and detect terror financing and weapons proliferation activities.

325.   Because so much of Iran's international trade has historically flowed through the United States for the clearing and settlement and because Iran's primary terrorist proxy, Hezbollah, operates in Lebanon (itself a dollarized economy and largely dependent on U.S. currency) maintaining transparency in the processing of Iranian USD transactions has been a vital part of the architecture of U.S. national security for decades and was reflected as such in the Iranian Trade Regulations.

326.   Iran's access through the U-Turn exemption was to be closely monitored filtering all U-Turn exemption transactions through sophisticated computer systems used by U.S. financial institutions to monitor and screen all USD-denominated wire transfers.

327.   Because Iran could have correctly and transparently used the U-Turn exemption to access USD for its legitimate governmental purposes, the Western Bank Defendant's illegal manipulation and abuse the U-Turn process on behalf of sanctioned Iranian entities establishes that the Western Bank Defendants understood that the USD to which they provided Iran access could and would be used for Iran's illegitimate and illegal activities, including acts of

international terrorism.

328.     The Western Bank Defendants, despite their duties and obligations to prevent terrorism financing, knowingly and intentionally agreed to, and did, manipulate tens of thousands of payment order messages (SWIFT-NET MT 103 and MT 202) and the records of such transactions to defeat such monitoring and screening, and prevent transparency, in order to provide USD funds to Iran for unlawful uses, which foreseeably included the support of Iranian terrorism and terrorist organizations.

329.     Over time, however, U.S. authorities began to understand the contours of the Conspiracy involving Iran and the Defendants that is set forth in this Complaint.

330.     Initially, the realization that Iran was engaging in "deceptive banking practices" led the U.S. to target key Iranian financial institutions, entities, and individuals under proliferation, counter-terrorism, and Iran-related sanctions (i.e., E.O. 13382, E.O. 13224, and E.O. 13438, respectively).

331.     The apparent assumption made initially by U.S. authorities was that Iran and its banking agents (Iranian Bank Co-conspirators Bank Sepah, Bank Melli, Bank Saderat and others) were engaged in deception that was exploiting unwitting Western financial institutions that were engaged in high risk but legal, foreign exchange, precious metals, and trade-finance business with Iran.

332.     The truth was otherwise.

333.     *First*, despite Iran's feeble domestic economy during the entire relevant period of time, its oil and natural gas exports still provided the Iranian regime with substantial revenues denominated in U.S. dollars.

334.     *Second*, Iran's petrodollar revenues were managed by, and through, among others,

the Central Bank of Iran ("CBI") and the Iranian Ministry of Petroleum (including the National Iranian Oil Company; later designated a SDN pursuant to E.O. 13382 and identified as an agent or affiliate of the IRGC).[44]

335.    *Third*, the challenge Iran faced was that it was almost entirely dependent on USD funds, but U.S. economic sanctions—and the attendant monitoring of Iran's financial activities— were incompatible with its terror financing and Weapons of Mass Destruction proliferation goals.

336.    *Fourth*, between 2004 and 2011, both Lebanon (where Iran's agent, Hezbollah, is based) and Iraq (where Iran's proxies were launching terror attacks, killing and maiming the Plaintiffs) were U.S.-dollarized economies, a fiscal reality that made Iran's funding of its terror proxies a highly "dollar-sensitive" endeavor.

337.    *Fifth*, in order to free itself from U.S. economic sanctions, and circumvent the U.S., European Union ("EU") and United Nations ("U.N.") monitoring of its financial activities, Iran needed more than a single willing partner among western financial institutions to assist its illegal goals.

338.    *Finally*, Iran needed the active assistance of at least several of the world's largest (non-U.S.) multinational banks that were already accustomed to handling large volumes of dollar clearing and settlement transactions, and thus would be less likely to raise suspicions with U.S. authorities.

339.    For example, in early 2001, the Central Bank of Iran asked Defendant Standard Chartered Bank to act as its correspondent bank with respect to Iranian petrodollar payments, trade-finance and foreign exchange transactions on behalf of NIOC.

340.    As set forth *infra*, Standard Chartered Bank agreed to participate in the

---

[44] That designation was removed in January 2016.

Conspiracy and deliberately removed identifying data on NIOC's payment orders (SWIFT-NET MT 103 and MT 202 payment order messages) for these and other wire transfers.

341.    The sheer size and volume of these NIOC transactions would have raised numerous red flags if not undertaken by a bank of SCB's size and existing USD clearing and settlement volume.

342.    However, even the large international banks worried about attracting attention from U.S. authorities when their illegal dollar clearing activities for Iran markedly increased.

343.    As detailed below, in 2003, Defendant Commerzbank's employees expressed concern that Commerzbank's increased volume of illegal Eurodollar clearing activities on behalf of Bank Melli and Bank Saderat would draw unwanted attention.

344.    In the spring of 2006, the Manhattan District Attorney's Office first discovered evidence of the Conspiracy engaged in by certain European banks (including the Western Bank Defendants herein) on behalf of Iran and Iranian banks.

345.    As the New York State Department of Financial Services ("DFS") later observed:

> By 2008 it was clear that this system of wire transfer checks had been abused, and that U.S. foreign policy and national security could be compromised by permitting U-Turns to continue. In November 2008, the U.S. Treasury Department revoked authorization for "U-Turn" transactions because it suspected Iran of using its banks – including the CBI/Markazi, Bank Saderat and Bank Melli – to finance its nuclear weapons and missile programs. *The U.S. also suspected that Iran was using its banks to finance terrorist groups, including Hezbollah, Hamas and the Palestinian Islamic Jihad, and engaging in deceptive conduct to hide its involvement in various other prohibited transactions, such as assisting OFAC-sanctioned weapons dealers.*

(Emphasis added.)

346.    These findings led to a wide-ranging investigation that ultimately resulted in the entry of a series of Deferred Prosecution Agreements ("DPAs") with the Western Bank Defendants (as well as other European and Japanese banks), and it exposed catastrophic

vulnerabilities in America's counter-financing of terrorism ("CFT") security architecture inherent in the U-Turn exemption because foreign banks, including the Western Bank Defendants herein, were actively conspiring with Iran to help it evade U.S. economic sanctions and secret hundreds of billions of dollars through the U.S. financial system undetected.

347. On October 11, 2007, the Financial Action Task Force (FATF) released a statement of concern that "Iran's lack of a comprehensive anti-money laundering/counterterrorist finance regime represents a significant vulnerability within the international financial system."

348. FATF's October 11, 2007 statement further noted that "FATF members are advising their financial institutions to take the risk arising from the deficiencies in Iran's AML/CFT regime into account for enhanced due diligence."

349. The U.S. criminal investigations would ultimately find that "the risk arising from the deficiencies in Iran's AML/CFT regime" ultimately included willful money laundering and terror financing by Iran with the *active, **critical*** assistance of the Defendants herein.

350. Based on figures from both the International Monetary Fund and the Central Bank of Iran, from 2004 through 2011 Iran's total revenues from oil and natural gas export sales totaled approximately $972.9 billion USD.

351. Without the Conspiracy between the Defendants herein, and other foreign financial institutions, Iran could not have (a) transferred the overall volume of USD funds through the international financial system that it did; (b) surreptitiously transferred large amounts of these USD funds for the benefit of Hezbollah and the IRGC; and (c) exploited the Iranian U-Turn exemption to blind U.S. regulators and law enforcement to the degree, and for the duration, that it did.

352. As former Manhattan District Attorney Robert M. Morgenthau pointedly told

Congress in 2009, "the U-Turn exemption constituted a glaring hole that undermined both the enforcement of, and the rationale behind, the Iranian sanctions program."

353.    Effective November 10, 2008, OFAC revoked the U-Turn exemption in its entirety, and, as of that date, U.S. depository institutions were no longer authorized to process any Iranian U-Turn payments.

354.    In revoking the U-Turn exemption, the U.S. government explained:

> Iran's access to the international financial system enables the Iranian regime to facilitate its support for terrorism and proliferation. The Iranian regime disguises its involvement in these illicit activities through the use of a wide array of deceptive techniques, specifically designed to avoid suspicion and evade detection by responsible financial institutions and companies. Iran also is finding ways to adapt to existing sanctions, including by turning to non-designated Iranian banks to handle illicit transactions.

> The Treasury Department is taking a range of measures, including today's action, to counter these deceptive activities.

## 6.    LETTERS OF CREDIT – AN ALTERNATIVE METHOD OF UNDERMINING THE IRANIAN SANCTIONS PROGRAM

### A.    THE BASICS OF TRADE FINANCE

355.    Letters of Credit ("LCs") are often used in international transactions to ensure that payment will be received. Due to the nature of international transactions, including factors such as the distance goods must travel, differing laws in each country, and the difficulty of trading parties knowing each party personally, the use of LCs has become a very important aspect of international trade.

356.    The LC transaction process begins when an "Applicant" opens the Letter of Credit with a bank.

357.    Normally, the Applicant is the purchaser of goods and the LC is opened with his/her bank according to the terms and conditions of the purchase order and business contract

between buyer and seller.

358.    The "Beneficiary" of the LC is the party to the transaction who receives the payment amount agreed upon in the LC.

359.    In order to receive payment for the goods, the Beneficiary company submits all required documents under the terms and conditions of the LC.

360.    When an LC is required to be secured, an "Issuing Bank" agrees to guarantee payment for its customer upon the completion of the terms and conditions of the LC.

361.    The Issuing Bank's role is to provide a guarantee to the seller that if the required documentation is presented, the bank will examine the documents and pay the contract sum if these documents comply with the terms and conditions set out in the LC.

362.    Typically, the documents requested will include a commercial invoice, a transport document such as a bill of lading or airway bill and an insurance document; there are many other documents such as certificates of origin, packing lists and inspection certificates that can be included. LC transactions deal in documents, not in the underlying goods themselves.

363.    An "Advising Bank" is usually a foreign correspondent bank of the Issuing Bank that will advise the beneficiary of the transaction. Generally, a Beneficiary of an LC wants to use a local bank to insure that the LC is valid.

364.    In addition, the Advising Bank is usually responsible for sending the documentation to the Issuing Bank. Generally, the Advising Bank has no other obligation under the LC. If the Issuing Bank does not pay the beneficiary, the Advising Bank is not obligated to pay the obligation under the LC.

365.    The "Confirming Bank" is usually a correspondent bank that confirms the LC for the Beneficiary. At the request of the Issuing Bank, the Confirming Bank obligates itself to

ensure payment under the LC.

366.   Because the Confirming Bank does not confirm the credit until it evaluates the country and bank where the LC originates, the Confirming Bank usually acts as the Advising Bank.

367.   In the middle of this serpentine process is the "Negotiating Bank," which negotiates documents delivered by the Beneficiary of the LC.

368.   The Negotiating Bank examines the drafts and/or documents, and verifies and confirms the terms and conditions under the LC on behalf of the Beneficiary to avoid discrepancies.

369.   A Negotiating Bank gives value to, and relies upon (or may rely upon), such drafts and/or documents, and may purchase or agree to purchase the drafts and/or documents presented.

370.   A Reimbursing Bank usually pays part or all of the amount due to the Beneficiary of the LC on behalf of the Issuing Bank once it receives a statement from the Negotiating Bank that the documents required comply with the LC's terms; however, in certain cases a Reimbursing Bank serves only as a guarantor for the payment by the Issuing Bank.

**B.   THE U.S. TRADE EMBARGO – UNITED STATES MUNITIONS LIST (USML) AND COMMERCE CONTROL LIST (CCL)**

371.   For decades, U.S. trade with Iran has been carefully circumscribed by the International Traffic in Arms Regulations ("ITARs"), Export Administration Regulations ("EARs"), and Iran Trade Regulations ("ITRs").

372.   Certain types of U.S. defense articles and defense services, such as nuclear or conventional weapon systems, are identified based on the ITARs promulgated by the U.S. Department of State and its Directorate of Defense Trade Controls through a publically available

United States Munitions List ("USML").[45]

373.   In addition to USML items, certain types of U.S. dual-use products, such as nuclear materials, aerospace and other potentially sensitive materials, are identified based on the EARs and ITRs by the U.S. Department of Commerce and its Bureau of Industry and Security ("BIS") on a publicly available Commerce Control List ("CCL").[46]

374.   Dual-use items that are not published on the CCL by BIS are commonly referred to by U.S. manufacturers and shipping companies as "EAR99."

375.   These EAR99 items generally consist of low-technology consumer goods and do not always require a license; however, shipment from the United States of an EAR99 item to Iran, or any other embargoed country, often requires disclosure to BIS in addition to a license from the Commerce Department.

376.   As set forth below, one of the aims of the Conspiracy was to evade the U.S. ITARs, ITRs, and EARs—and also various EU decisions and U.N. Security Council Resolutions—prohibiting Iran from conducting both conventional weapons-trafficking and WMD proliferation.

377.   To facilitate this aim, Iran and its Co-Conspirators, including the Defendants herein, used LCs drawn on the CBI and other Iranian banks (and "stripped" the underlying payment orders), to clandestinely obtain and transport goods, technologies and weapons that were listed on the USML and/or CCL.

378.   Because the IRGC and Hezbollah needed to transport their terrorist operatives and weapons into Iraq, U.S. export-controlled item acquisitions financed by Letters of Credit were

---

[45] The updated USML is available at:
https://www.pmddtc.state.gov/regulations_laws/documents/official_itar/ITAR_Part_121.pdf.
[46] The updated list is available at http://www.bis.doc.gov/index.php/regulations/export-administration-regulations-ear.

instrumental in facilitating the activities of these terrorist organizations, including, but not limited to, helping Iran acquire component parts and technologies used to make the IEDs, EFPs, and Improvised Rocket-Assisted Munitions ("IRAMs") that were deployed by the Iraqi Special Groups against Coalition Forces.

### 7.   IRAN'S ILLEGAL ARMS SHIPMENTS THROUGH THE ISLAMIC REPUBLIC OF IRAN SHIPPING LINES ("IRISL")

379.   As Iran's national maritime carrier, IRISL has a long history of facilitating arms shipments on behalf of the IRGC and the Iranian military, including copper discs that are a key component in EFPs (discussed below) used to kill and maim many of the Plaintiffs herein.[47]

380.   For example, a November 2007 State Department cable noted:

> Washington remains concerned about on-going conventional arms transfers from China to Iran, particularly given Iran's clear policy of providing arms and other support to Iraqi insurgents and terrorist groups like the Taliban and Hezbollah….
>
> We have specific information that Chinese weapons and components for weapons transferred to Iran are being used against U.S. and Coalition Forces in Iraq, which is a grave U.S. concern.

381.   The diplomatic cable went on to note that an IRISL-flagged vessel was loaded at a Chinese port with multiple containers of cargo bound for delivery at the port of Bandar Abbas, Iran.

382.   The   cargo   included   Iranian   Defense   Industries   Organization   ("DIO")[48] manufactured ammunition cartridges (7.62 x 39 rounds for AK-47 assault rifles).

383.   DIO   is   an   Iranian   government-owned   weapons   manufacturer   controlled   by

---

[47] Improvised Explosive Device ("IED") is a term commonly used by the U.S. military as shorthand for a roadside bomb. However, unlike IEDs, the EFPs deployed by the IRGC, Hezbollah and the Special Groups in Iraq were not "improvised," but, instead, these advanced weapons were professionally manufactured and specifically designed to defeat the armor plating that protected the vehicles used by U.S. and Coalition Forces.
[48] DIO was designated a SDN by the U.S. on March 30, 2007. IRGC Brigadier-General Seyyed Mahdi Farahi was the Managing Director of DIO and has been sanctioned by the EU since 2008 (*see,* http://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX%3A32008D0475). He was later sanctioned by the U.S. on January 17, 2016.

MODAFL.

384.    An April 2008 State Department cable warned of an IRISL shipment of chemical weapons precursors from China aboard the IRISL-leased, Iranian flagged merchant vessel ("M/V") *Iran Teyfouri.*

385.    In September 2008, the U.S. Treasury Department designated IRISL a SDN, stating: "Not only does IRISL facilitate the transport of cargo for U.N. designated proliferators, it also falsifies documents and uses deceptive schemes to shroud its involvement in illicit commerce."

386.    The Treasury Department further noted that:

> [i]n order to ensure the successful delivery of military-related goods, IRISL has deliberately misled maritime authorities through the use of deception techniques. These techniques were adopted to conceal the true nature of shipments ultimately destined for MODAFL [Iran's Ministry of Defense and Armed Forces Logistics].

387.    In January 2009, a former Russian merchant ship chartered by IRISL—named the M/V *Monchegorsk* and flying a Cypriot flag—was spotted leaving the Iranian port of Bandar Abbas and heading for the Suez Canal.

388.    Egyptian authorities were alerted by the U.S. Navy, and the M/V *Monchegorsk* was forced into an Egyptian port to be searched. Iran's DIO was later determined to be the shipper of the military-related cargo.

389.    Munitions, believed headed for Gaza, were found hidden in the cargo, including components for mortars and thousands of cases of powder, propellant, and shell casings for 125mm and 130mm guns.

390.    In October 2009, U.S. troops boarded a German-owned freighter, the M/V *Hansa India*, in the Gulf of Suez and found eight containers full of ammunition that were headed to Syria from Iran.

391.    The vessel carried seven containers of small arms ammunition (including *12 million bullet casings*), as well as one container containing copper discs of the type used in EFPs to kill and maim many of the Plaintiffs herein.

392.    The acronym "IRISL" was painted in large block letters on the exterior side walls of each shipping container, and the barrels of munition parts discovered inside the containers were marked with the inscription "SAEZMANE SANAYE DEFA," a common transliteration from Farsi to English of the name for Iran's Defense Industries Organization (DIO).

393.    The M/V *Hansa India* was registered to the Hamburg-based shipping company Leonhardt & Blumberg, but had been under charter to IRISL for several years.

394.    In November 2009, the Government of Israel intercepted an IRISL-flagged ship, the M/V *Francop*, headed for Beirut, Lebanon and then Latakia, Syria. The vessel was loaded with munitions crates that were either stamped "IRISL" or included documentation marked with the IRGC-QF logo.

395.    The munitions found onboard included over two thousand 107mm "Katyusha" rockets, more than six hundred 122mm "Grad 20" rockets, and also various rocket fuses, mortar shells, rifle cartridges, fragment grenades and 7.62mm bullets.

396.    The M/V *Francop*, owned by the Cypriot shipping company UFS, was carrying shipping containers clearly marked IRISL.

397.    United Nations Security Council Resolution 1929, adopted on June 9, 2010, froze certain assets of IRISL and called on the international community to cease providing financial and insurance services to both the IRGC and IRISL.

398.    In addition, a July 2010 European Union ("EU") sanctions implementing regulation confirmed that IRISL conducted deceptive business practices in order to access USD

funds.

399.    Specifically, EU Council Implementation Regulation Number 668/2010 stated that "IRISL subsidiaries have used US dollar-denominated bank accounts registered under cover-names in Europe and the Middle East to facilitate routine fund transfers."

400.    Similarly, the June 2011 indictment of IRISL in New York stated:

> In many aspects of global commerce, including the international maritime industry, contracts and payments are denominated in U.S. dollars. Such U.S. dollar transactions are primarily executed, or "cleared," through correspondent banks in the United States. The U.S. dollar clearing operations for many large U.S. financial institutions are processed through correspondent bank accounts domiciled in New York County.

> In order to deceive and bypass these OFAC filters, SDNs designated under OFAC's non-proliferation of weapons of mass destruction program must falsify, or cause to be falsified, the originator and/or beneficiary information in wire transfers. In other words, by omitting or falsifying data regarding their roles as the true originators or beneficiaries, SDNs are able to send and receive wire transfers that would otherwise be blocked by U.S. financial institutions. Through the fraudulent use of a web of subsidiary entities and front companies, IRISL and the other defendants were able to deceive U.S. financial institutions and maintain their access to the U.S. financial system.

401.    Because the DIO, as discussed infra, was one of MODAFL's three main weapons systems manufacturers, it was required to use IRISL for most of its illicit shipments of military-related raw-materials, parts and finished products for, and from, foreign suppliers, Iranian arms dealers and terrorist organizations.

402.    Iran's DIO was listed as an entity of concern for military procurement activities in an early warning document distributed by the German government to industry in July 2005.

403.    The DIO was also designated by the United Nations in 2006 for its involvement in Iran's WMD program.

404.    During 2006 and 2007, weapons caches seized by Coalition Forces from the Special Groups in Iraq contained large quantities of weapons produced by Iran; including many

73

107 millimeter artillery rockets with closely clustered DIO lot numbers and production dates between 2005 and 2007, as well as rounds and fuses for 60 millimeter and 81 millimeter mortars with DIO lot markings and 2006 production dates.

405.    In sum, at no point in time was the DIO a legitimate agency of the Iranian government.

406.    According to the U.S. State Department, the DIO was the owner of a Eurodollar account that was maintained by Bank Melli Iran's branch in Hamburg; and this bank account was used to send and receive USD funds transfer transactions for the benefit of the DIO.

407.    Bank Melli Iran's branch in Hamburg was a customer of Defendant Commerzbank during the relevant period, and both Bank Melli Iran and Commerzbank were active participants in the Conspiracy set forth herein.

### 8.    IRAN'S AGENTS, HEZBOLLAH, THE IRGC, AND MOIS FOMENT TERRORISM IN IRAQ

408.    As previously noted, Iran has had a long, deep, strategic partnership with the Lebanese-based Foreign Terrorist Organization Hezbollah, which historically has served as Iran's proxy and agent, enabling Iran to project extremist violence and terror throughout the Middle East and around the globe.

409.    Through its proxy, agent, and strategic partner Hezbollah, Iran orchestrated a series of kidnappings of Westerners in Lebanon, including several Americans, in the 1980s; killed more than two hundred U.S. Marines at their barracks in Beirut, Lebanon, in 1983; hijacked TWA flight 847 in 1985; and launched two major attacks in the 1990s on Jewish targets in Buenos Aires, Argentina, namely the 1992 bombing of the Israeli Embassy (killing twenty-nine people) and the 1994 bombing of a Jewish community center (killing eighty five people).

410.    As a result of its mission, conduct, and terrorist activities, on January 25, 1995,

74

Hezbollah was designated a Specially Designated Terrorist ("SDT") by the United States.

411.    On October 8, 1997, Hezbollah was designated an FTO by the United States. It has retained that designation since that time.

412.    On October 31, 2001, pursuant to E.O. 13224, Hezbollah was designated a SDGT by the United States.

413.    For more than 30 years, Iran, through MOIS and the IRGC, has funded, trained and equipped Hezbollah.

414.    The IRGC-QF's "Department 2000" manages Iran's relationship with Hezbollah, which includes the flow of some of Iran's most sophisticated weapons systems, including military grade EFPs, anti-tank guided missiles ("ATGMs"), and various rockets, such as the Fajr-5.

415.    Beginning with the 2003 U.S. overthrow of Saddam Hussein's regime in Iraq, Iran has assiduously worked to expand its influence in Iraq and throughout the region in a variety of ways, including by fomenting violence and terrorism when such activities have served its ambitions.

416.    In doing so, Iran has primarily relied on MOIS, the IRGC, and Hezbollah, along with the terrorist network these entities supported.

417.    According to a December 20, 2004 *Washington Post* article, "Western diplomats and political analysts in Beirut estimated that Hezbollah received $200 million a year from Iran." (More recent reports estimate this amount closer to $1 billion per year).

418.    Iran provided tens of millions of U.S. dollars in funding to Hezbollah through the international financial system, including $50 million USD that Defendant Bank Saderat Plc provided to Hezbollah.

419.   Sometime after the 2003 U.S. invasion of Iraq, Hezbollah created "Unit 3800," an entity dedicated to supporting Iraqi Shi'a terrorist groups targeting Multi National Forces in Iraq ("MNF-I").

420.   Unit 3800 was established by Hezbollah leader Hassan Nasrallah at Iran's request.

421.   Unit 3800 has trained and advised various Shi'a militias in Iraq, later termed the "Special Groups."

422.   Hezbollah training camps in southern Lebanon and Iran, and Hezbollah's expertise in the use of EFPs, kidnapping, communications and small-unit operations, were critical to the IRGC's operations in Iraq between 2004 and 2011.

423.   Iran's support of Terrorist Groups in Iraq was described in the U.S. State Department's 2005 *Country Reports on Terrorism*, which observed:

> Iran has provided political and ideological support for several terrorist and militant groups active in Iraq. Attractive to terrorists in part because of the limited presence of the United States and other Western governments there, Iran is also a safe haven in that known terrorists, extremists, and sympathizers are able to transit its territory and cross the long and porous border into Iraq. Iran also equips terrorists with technology and provides training in extremist ideology and militant techniques.

424.   The IRGC's subversion of Iraq has not been limited to terrorism.

425.   The IRGC has also infiltrated Iraqi society, providing "political and ideological support" via charitable associations such as the Khomeini Social Help Committee – in Karbala, Najaf, Kut, and Sadr City – and the Imam Mohammad Bagher Institute in Najaf.

426.   The IRGC also purchased or developed seven television stations in Iraq, and at least three radio stations.

427.   All of these "investments" required substantial funding in USD funds (as Iraqi local currency was not widely accepted in Iraq during this time period).

428.   According to the same U.S. State Department's 2005 Country Reports on

Terrorism: "[t]he IRGC was increasingly involved in *supplying lethal assistance* to Iraqi militant groups, which destabilizes Iraq …Senior Iraqi officials have publicly expressed concern over Iranian interference in Iraq, and there were reports that *Iran provided funding, safe passage, and arms to insurgent elements*." (Emphasis added).

429.    By early 2005, the presence of Hezbollah operatives in Iraq became an open secret when Iraqi Interior Minister Falah al-Naquib announced the arrest of eighteen Lebanese Hezbollah members on terrorism charges.

430.    Two years later, according to U.S. intelligence estimates—and following the 2007 arrest and interrogation of Hezbollah's senior operative in Iraq—the IRGC-QF provided Hezbollah and one of its local trainers, Ali Musa Daqduq (discussed in greater detail below), up to $3 million in U.S. currency *every month*.

431.    In October 2007, the IRGC-QF was designated as a SDGT pursuant to E.O. 13324 for its terrorism-related activities.

432.    The U.S. Treasury Department's press release announcing the designation noted that:

> The Qods Force has had a long history of supporting Hizballah's military, paramilitary, and terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support. The Qods Force operates training camps for Hizballah in Lebanon's Bekaa Valley and has reportedly trained more than 3,000 Hizballah fighters at IRGC training facilities in Iran. The Qods Force provides roughly $100 to $200 million in funding a year to Hizballah and has assisted Hizballah in rearming in violation of UN Security Council Resolution 1701.
>
> *In addition, the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians.*

(Emphasis added).

433.    In 2008, Pentagon Press Secretary Geoff Morrell reported on the "smuggling

77

system—in which the Iranians are providing their allies within Iraq, these special groups, with the munitions that are then used to take on us, whether it be EFPs or rockets or conventional arms. These are being used by these special groups and being provided by the Iranians."

434.     Because of the perceived unreliability and value of the post-Hussein regime Iraqi currency, Special Groups in Iraq used U.S. currency almost exclusively.

435.     According to Brigadier Gen. Kevin J. Bergner, a U.S. military spokesman who previously served as the Deputy Commanding General for Multi-National Forces in Mosul, Iraq, "the Qods Force has provided armor-piercing weapons to extremist groups in Iraq, funneling them up to $3 million a month and training Iraqi militiamen at three camps near Tehran."

436.     General Bergner added, "[t]he Iranian Qods Force is using Lebanese Hezbollah essentially as a proxy, as a surrogate in Iraq ... Our intelligence reveals that senior leadership in Iran is aware of this activity."

437.     On January 9, 2008, the U.S. Treasury Department designated four individuals and one entity under E.O. 13438 for threatening the peace and stability of Iraq and the government of Iraq. Three of the individuals, Ahmed Foruzandeh (a Brigadier General in the IRGC-QF), Abu Mustafa Al-Sheibani, and Isma'il Hafiz Al Lami (a/k/a "Abu Dura") were all based in Iran and/or received funding from Iran.

438.     Regarding the designation of Abu Mustafa Al-Sheibani, the Treasury Department press release stated:

> Iran-based Abu Mustafa Al-Sheibani leads a network of Shia extremists that commit and provide logistical and material support for acts of violence that threaten the peace and stability of Iraq and the Government of Iraq. Al-Sheibani's Iran-sponsored network was created to affect the Iraqi political process in Iran's favor. The network's first objective is to fight U.S. forces, attacking convoys and killing soldiers. Its second objective is to eliminate Iraqi politicians opposed to Iran's influence.

> *Elements of the IRGC were also sending funds and weapons to Al-Sheibani's network.*
>
> Al-Sheibani's network – consisting of several hundred members – conducted IED attacks against Americans in the Baghdad region. As of March 2007, Al-Sheibani, known to transport Katyusha rockets to be used for attacks against Coalition Forces, launched rockets against Americans and made videos of the attacks to get money from Iran. *As of April 2007, a member of Al-Sheibani's network supervised the transport of money and explosives from Iran for eventual arrival in Baghdad.* In early - May 2007, Al-Sheibani's network assisted members of a Shia militia group by transporting them to Iran for training and providing them with weapons for their activities in Iraq.
>
> Additionally, Al-Sheibani commands several pro-Iranian insurgent groups in southern Iraq that work to destabilize Iraq and sabotage Coalition efforts. These groups use a variety of weapons, to include mortars, Katyusha rockets, and anti-tank landmines. *Ordered by IRGC headquarters to create disorder, the task of these groups is to attack bases of Coalition Forces in southern Iraq, particularly British forces.*

(Emphasis added).

439.    To that end, Iran (with Hezbollah's aid) has armed, trained, and funded a variety of Special Groups and infiltrated and co-opted Iraqi security forces in an effort to kill or maim Coalition Forces to coerce the United States into withdrawing those forces and to terrorize Iraq's civilian population in order to increase Iran's own influence.

**9.      IRAN FUNDED THE DESIGN, PRODUCTION, PROCUREMENT, PROVISION AND DEPLOYMENT OF EXPLOSIVELY FORMED PENETRATORS ("EFPS") USED TO KILL OR INJURE AMERICANS, INCLUDING PLAINTIFFS**

440.    As noted above, the EFPs deployed by the IRGC and Hezbollah in Iraq were not truly "improvised" explosive devices but professionally manufactured and specifically designed to target U.S. and Coalition Forces' armor.

441.    EFPs constitute "weapons of mass destruction" as that term is defined in 18 U.S.C. § 2332a(2)(A).

442.    First used by Hezbollah against Israeli armor in Lebanon, EFPs are categorized by

the U.S. military as a type of shaped-charge weapon. They are usually made by placing a precision-manufactured concave copper disk in front of high-explosives that have been packed into a steel tube with a cap welded to one end.

443.    In Iraq, EFPs were often triggered by a passive infra-red device that ultimately set off an explosion within the steel casing of the EFP, forcing the copper disk forward, and turning it into a high-velocity molten slug that could pierce the military-grade armor of most U.S. vehicles deployed in Iraq.

444.    To produce these weapons, copper sheets are often loaded onto a punch press to yield copper discs. These discs are annealed in a furnace to soften the copper. The discs are then loaded into a large hydraulic press and formed into the disk-like final shape.

445.    This munitions manufacturing process is critical to the design and concomitant lethality of the EFP weapon. If not perfectly and precisely milled and assembled, the EFP loses its functionality as a weapon.

446.    Unlike homemade explosive devices such as traditional IEDs, EFPs are far more sophisticated and are specifically designed to target vehicles such as armored patrols and supply convoys, nevertheless Hezbollah and the Special Groups indiscriminately deployed them against both military and civilian soft targets.

447.    Iran and Hezbollah's signature and specialized weapons knowledge spread like wildfire throughout its terror network in Iraq, the U.S. State Department's 2006 Country Reports on Terrorism further documented Iran's success with lethal EFPs to ambush and murder U.S. and other Coalition Forces, stating:

> Iran provided guidance and training to select Iraqi Shia political groups, and weapons and training to Shia militant groups to enable anti-Coalition attacks. Iranian government forces have been responsible for at least some of the increasing lethality of anti-Coalition attacks by providing Shia

> militants with the capability to build IEDs with explosively formed projectiles similar to those developed by Iran and Lebanese Hezbollah. The Iranian Revolutionary Guard was linked to armor-piercing explosives that resulted in the deaths of Coalition Forces. The Revolutionary Guard, along with Lebanese Hezbollah, implemented training programs for Iraqi militants in the construction and use of sophisticated IED technology. *These individuals then passed on this training to additional militants in Iraq.*

(Emphasis added.)

448.    In 2006, Brigadier Gen. Michael Barbero, Deputy Chief of Staff for Strategic Operations of the Multi-National Force – Iraq stated: "Iran is definitely a destabilizing force in Iraq. I think it's irrefutable that Iran is responsible for training, funding and equipping some of these Shi'a extremist groups and also providing advanced IED technology to them, and there's clear evidence of that."

449.    That same year, the Deputy Chief of Staff for Intelligence with the MNF-I, U.S. Army Major General Richard Zahner, declared that:

> Labels on weapons stocks seized inside and outside Iraq point to Iranian government complicity in arming Shiite militias in Iraq […] Iran is funneling millions of dollars for military goods into Iraq […] You'll find a red label on the C-4 [explosive] printed in English and will tell you the lot number and name of the manufacturer.

450.    Major General Zahner further added:

> [T]he control of military-grade explosives in Iran is controlled through the state apparatus and is not committed through rogue elements right there. It is a deliberate decision on the part of elements associated with the Iranian government to affect this type of activities.

451.    General Bergner commented on Iran funding Hezbollah operatives in Iraq:

> Actions against these Iraqi groups have allowed coalition intelligence officials to piece together the Iranian connection to terrorism in Iraq […] Iran's Quds Force, a special branch of Iran's Revolutionary Guards, is training, funding and arming the Iraqi groups. […] It shows how Iranian operatives are using Lebanese surrogates to create Hezbollah-like capabilities. And it paints a picture of the level of effort in funding and arming extremist groups in Iraq.

452.     Bergner further noted that:

The groups operate throughout Iraq. They planned and executed a string of bombings, kidnappings, sectarian murders and more against Iraqi citizens, Iraqi forces and coalition personnel. They receive arms—including explosively formed penetrators, the most deadly form of improvised explosive device—and funding from Iran. They also have received planning help and orders from Iran.

453.     In May 2007, the Commander of the Multinational Division-Center, U.S. Army

Major General Richard Lynch, stated that:

Most of our casualties have come from improvised explosive devices. That's still the primary threat to our soldiers—IEDs. And we have an aggressive campaign to counter those IEDs, but they still are taking a toll on our soldiers: 13 killed, 39 soldiers wounded. *What we're finding is that the technology and the financing and the training of the explosively formed penetrators are coming from Iran.* The EFPs are killing our soldiers, and we can trace that back to Iran." (Emphasis added.)

454.     According to the U.S. State Department's 2007 *Country Reports on Terrorism*:

Despite its pledge to support the stabilization of Iraq, Iranian authorities continued to provide lethal support, including weapons, training, funding, and guidance, to some Iraqi militant groups that target Coalition and Iraqi security forces and Iraqi civilians. In this way, Iranian government forces have been responsible for attacks on Coalition forces. The Islamic Revolutionary Guard Corps (IRGC)-Qods Force, continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, mortars that have killed thousands of Coalition and Iraqi Forces, and explosively formed projectiles (EFPs) that have a higher lethality rate than other types of improvised explosive devices (IEDs), and are specially designed to defeat armored vehicles used by Coalition Forces. The Qods Force, in concert with Lebanese Hezbollah, provided training outside Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry. These individuals then passed on this training to additional militants inside Iraq, a "train-the-trainer" program. In addition, the Qods Force and Hezbollah have also provided training inside Iraq. In fact, Coalition Forces captured a Lebanese Hezbollah operative in Iraq in 2007.

455.     Other U.S. Government reports, such as the Department of Defense's 2007

*Measuring Stability and Security in Iraq* quarterly report to Congress, similarly concluded that:

> The Iranian regime's primary tool for exercising clandestine influence in Iraq is the Islamic Revolutionary Guard Corps' (IRGC) Qods Force (QF), which provides arms, intelligence, funds, training, and propaganda support to Iraqi Shi'a militants targeting and killing Coalition and Iraqi forces, as well as Iraqi civilians. The QF seeks to increase long-term Iranian strategic influence in Iraq and the withdrawal of U.S. forces. Among the weapons it provides to Iraqi militants are improvised explosive devices (IEDs), advanced IED technologies (including explosively formed projectiles (EFPs)), and rockets and mortars used for indirect fire attacks.

456.    These observations continued in 2008.

457.    According to the U.S. State Department's 2008 *Country Reports on Terrorism*:

> The Qods Force, an elite branch of the Islamic Revolutionary Guard Corps (IRGC), is the regime's primary mechanism for cultivating and supporting terrorists abroad. The Qods Force provided aid in the form of weapons, training, and funding to HAMAS and other Palestinian terrorist groups, Lebanese Hezbollah, Iraq-based militants, and Taliban fighters in Afghanistan.…

> Despite its pledge to support the stabilization of Iraq, Iranian authorities continued to provide lethal support, including weapons, training, funding, and guidance, to Iraqi militant groups that targeted Coalition and Iraqi forces and killed innocent Iraqi civilians. Iran's Qods Force continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, and mortars that have killed Iraqi and Coalition Forces as well as civilians. Tehran was responsible for some of the lethality of anti-Coalition attacks by providing militants with the capability to assemble improvised explosive devices (IEDs) with explosively formed projectiles (EFPs) that were specially designed to defeat armored vehicles. The Qods Force, in concert with Lebanese Hezbollah, provided training both inside and outside of Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry.

458.    One of the ways in which the IRGC provided "militants with the capability to assemble improvised explosive devices (IEDs) with explosively formed projectiles (EFPs) that were specially designed to defeat armored vehicles" included providing them with manufacturing supplies such as copper and steel, as well as machinery—including hydraulic presses used to form copper into the shape of disks used in EFPs.

459.    Likewise, the State Department's 2011 Country Reports on Terrorism reported:

Despite its pledge to support the stabilization of Iraq, Iran continued to provide lethal support, including weapons, training, funding, and guidance, to Iraqi Shia militant groups targeting U.S. and Iraqi forces, as well as civilians. Iran was responsible for the increase of lethal attacks on U.S. forces and provided militants with the capability to assemble explosives designed to defeat armored vehicles. The IRGC-QF [Islamic Revolutionary Guard Corps-Quds Force], in concert with Lebanese Hezbollah, provided training outside of Iraq as well as advisors inside Iraq for Shia militants in the construction and use of sophisticated improvised explosive device technology and other advanced weaponry.

460.     Similarly, in 2011, the U.S. Ambassador to Iraq, James F. Jeffrey, was quoted as saying:

[F]resh forensic testing on weapons used in the latest deadly attacks in the country bolsters assertions by U.S. officials that Iran is supporting Iraqi insurgents with new weapons and training. […] We're not talking about a smoking pistol. There is no doubt this is Iranian.

461.     According to a 2013 New York Times report, EFPs were the "single most lethal weapon American forces faced in Iraq."[49]

462.     According to one declassified CENTCOM study, there were at least 1,534 EFP detonations in Iraq between July 2005 and December 2011, resulting in at least 196 Americans killed in action and at least 861 Americans wounded in action.[50]

463.     Hezbollah-trained terrorist operatives typically used EFPs by placing them on public roadways.

**10.     IRAN FUNDED THE DESIGN, PRODUCTION, PROCUREMENT, PROVISION AND DEPLOYMENT OF ROCKETS, MORTARS AND IRAMS USED TO KILL OR INJURE AMERICANS, INCLUDING PLAINTIFFS.**

464.     In addition to EFPs, Iran also provided material support to the Terrorist Groups by providing them with rockets, mortars, and Improvised Rocket Assisted Munitions (IRAMs).

---

[49] *See* John Ismay, *The Most Lethal Weapon Americans Faced in Iraq*, N.Y. Times (Oct. 18, 2013), https://atwar.blogs.nytimes.com/2013/10/18/the-most-lethal-weapon-americans-faced-in-iraq/?_r=1.
[50] *See* U.S. Army Central Command, "OIF EFP Detonations by Month," https://admin.govexec.com/media/gbc/docs/pdfs_edit/enclosure_tab_a_document_for_review_%28150813_oif_efp_pull_no_summary%29_%281%29.pdf.

465.    Along with EFPs, rockets, mortars and IRAMs were a signature weapon of terrorists in Iraq that were supplied by Hezbollah and the IRGC.

466.    **IRAMs**: An IRAM is a rocket-fired improvised explosive device made from a large metal canister—such as a propane gas tank—filled with explosives, scrap metal, and ball bearings and propelled by rockets, most commonly 107 mm rockets launched from fixed or mobile sites by remote control. They are designed to cause catastrophic damage and inflict mass casualties.

467.    According to The Joint Improvised Explosive Device Defeat Organization of the U.S. Department of Defense, IRAMs were first introduced by Iran in November 2007 against U.S. personnel in Iraq.

468.    Although Iran's use of IRAMs was publicly disclosed by U.S. officials after their introduction in 2007, systematic identification of specific attacks as IRAM attacks was not publicly disclosed until 2010.

469.    IRAM attacks occurred primarily in Baghdad and in the Shi'a dominated areas in southern Iraq, where Iranian-backed militias primarily operate.

470.    **Mortars.** A mortar is an artillery-like weapon that fires explosives at short ranges. Iranian-supported terrorists frequently used mortars against Americans in Iraq. Between January 2007 and June 2008, there were more than 1,500 mortar attacks in Baghdad alone. In raids within the Iranian-proxy group Jaysh al-Mahdi's stronghold of Sadr City in October 2008, Iraqi forces discovered numerous weapons caches containing mortars and other munitions traced to Iran.

471.    **Rockets.** Iranian-sponsored Terrorist Groups fired a variety of rockets at Coalition targets on numerous occasions in Iraq. The rockets fired by these groups included

107mm rockets, 122mm rockets, and man-portable air-defense systems commonly associated with Iran and its Agents and Proxies. The purpose of the rocket attacks was to terrorize the civilian residents of the Green Zone – including American political and civilian personnel. The rocket attacks were a key part of the broader of Iran's terror campaign, as Iran's Agents & Proxies boasted about America's alleged inability to protect civilians in the Green Zone. In one instance, Hezbollah operatives used Misagh-1 surface-to-air missiles to destroy at least one American helicopter. In March 2008, Iranian-sponsored operatives within Sadr City launched coordinated rocket attacks on the International Zone (commonly known as the "Green Zone") in southeast Baghdad, several miles away. Officials estimated that the ensuing violence – all directly caused by these rocket attacks on the Green Zone – killed 925 people and injured 2,605 others.[51]

### 11. IRAN FUNDED THE DESIGN, PRODUCTION, PROCUREMENT, PROVISION AND DEPLOYMENT OF OTHER LETHAL WEAPONS AND TACTICS USED TO KILL OR INJURE AMERICANS, INCLUDING PLAINTIFFS.

472.    Not only did Iran, through IRGC, MOIS and Hezbollah provide the large sophisticated explosive munitions discussed above, but it spent millions of dollars, arming, training and directing its terrorist proxies to commit a variety of terrorist attacks using a vast array of tactics and weapons against Coalition forces and Iraqi citizens. These other distinctive weapons and tactics used by Iran-sponsored terrorists include the following:

473.    **IEDs**. Improvised explosive devices ("IEDs") are homemade bombs that are often used as booby traps by terrorist organizations. Frequently, IEDs are set up as roadside bombs that terrorists can detonate when a vehicle passes by. According to a 2013 New York Times

---

[51] *See* David E. Johnson *et al.*, *The 2008 Battle of Sadr City: Reimagining Urban Combat* 23 (RAND Corp. 2013) ("*2008 Battle of Sadr City*"), https://www.rand.org/content/dam/rand/pubs/research_reports/RR100/RR160/RAND_RR160.pdf at 98.

report, at times IEDs have caused as many as 80% of Coalition casualties in Iraq.[52] IEDs were a signature weapon of Iranian-sponsored terrorists in Iraq. For example, just one area of operation of an Iranian proxy group (Jaysh al-Mahdi's Sadr City headquarters), experienced more than 1,500 IED attacks between January 2007 and June 2008. In raids within Sadr City in 2008, Coalition forces discovered numerous weapons caches containing IEDs and bomb-making materials. One specific IED technique reportedly used by Jaysh al-Mahdi involved "daisy-chains" of multiple 122mm or 155mm artillery shells. IEDs require significant skill to successfully and secretly source, manufacture, emplace and trigger.

474. **RPGs**. Iranian-sponsored terrorists expertly used rocket-propelled grenades ("RPGs") against Coalition forces on numerous occasions. In one such attack in May 2007, Hezbollah-trained terrorists killed 12 people and wounded another 75. Iraqi and Coalition forces discovered numerous weapons caches containing RPGs in raids within areas controlled by Iranian proxy groups.

475. **Complex Attacks**. Iranian-sponsored terrorists in Iraq frequently carried out professed "complex attacks" against American peacekeeping forces. Complex attacks involve multiple teams of terrorists using different weapons and tactics in concert. In March 2008 for example, an Iranian-trained operative explained to journalists that, to attack a vehicle, one group of terrorists would attack it with a barrage of small-arms fire to distract the soldiers while another group planted an IED underneath the vehicle.[53] In other complex attack scenarios experienced by certain Plaintiffs, terrorists would detonate EFPs/IEDs which were then immediately followed by attacking the disoriented victims with highly accurate and well-coordinated multi-directional

---

[52] *See* John Ismay, *The Most Lethal Weapon Americans Faced in Iraq*, N.Y. Times (Oct. 18, 2013), https://atwar.blogs.nytimes.com/2013/10/18/the-most-lethal-weapon-americans-faced-in-iraq/?_r=1.
[53] *See* Sudarsan Raghavan, *19 Tense Hours in Sadr City Alongside the Mahdi Army*, Wash. Post (Mar. 29, 2008), http://www.washingtonpost.com/wp-dyn/content/article/2008/03/28/AR2008032803810.html?sid=ST2008032804069.

small-arms fire. Or the opposite, terrorists would "bait" Coalition forces by attacking patrols or Iraqi citizens with small arms fire, and draw a larger responsive force into a coordinated EFP/IED/Mortar/Sniper attack. Such tactics are commonly associated with training by Hezbollah and the IRGC.

476.    **Permissive Environments**. Iran, through its FTO Agents and Proxies, established, maintained and exploited permissive operational environments throughout Iraq in which they could effectively plan and commit terrorist attacks that killed and/or injured Americans, including the Plaintiffs. In order to successfully plan and execute terrorist attacks, terrorists need freedom of movement, local support, concealment, controlled positions, intelligence, and other tactical advantages. The single most effective means of creating and maintaining a permissive environment is money. Iranian-sponsored terrorists successfully created and maintained such environments throughout Iraq, and insurgent or terrorist activity in such areas only occurred at Iran's behest.

477.    **Personnel & Manpower**: Iran funded and provided a steady supply of well-trained foreign (non-Iraqi) and domestic jihadists used to command, lead or otherwise advise and support the Terrorist Groups. This manpower filled ranks, promoted "the revolution," inspired confidence, and shared expert advice gained in Iranian-funded and Iranian-hosted training camps (discussed in detail below).[54] These individuals were hardened terror operatives with command and leadership skills, bomb making ability, and knowledge of advanced tactics, training and procedures specifically developed by Iran and Hezbollah to lethally engage and defeat Coalition

---

[54] *See e.g.* Combating Terrorism Ctr. at West Point Harmony Program, *Translated Iraq Intelligence Report (October 2000)*, https://ctc.usma.edu/app/uploads/2013/09/Iraqi-Intelligence-Study-of-the-Iranian-Revolutionary-Guard-Corps-Translation.pdf; *see also*, Combating Terrorism Ctr. at West Point Harmony Program, *Translated Iraqi Intelligence Report about the Quds Force Activities in Iraq (trans. April 7, 2005)*, https://ctc.usma.edu/app/uploads/2013/09/Iraqi-Intelligence-Report-about-the-Quds-Force-Activities-in-Iraq-Translation.pdf

forces.[55] Iran covered the attendant costs and logistics of providing this reliable source of personnel, including the effective training, transportation into, shelter, safe haven, embedment, and movement of operatives throughout, Iraq.[56]

478.   **Direct Financing & USD Currency**: The common thread that ties all of Iran's material support to the Terrorist Groups in Iraq is money. Not only did Iran use its unfettered access to USD to fund the design, production, provision, and deployment of the above-listed weapons, training, and personnel, it ensured that its massive investment had guaranteed returns. Iran provided financial support to the Terrorist Groups that best effectuated its long term strategy of killing Americans, expelling the United States from Iraq, and preventing the stabilization of the new government. Iran fueled the Terrorist Groups with monetary incentives in the form of rewards, bounties and bonuses to those who attacked Coalition Forces. For example, Iran, through MOIS and IRGC, offered **$150,000.00** USD rewards for every killed or captured American Special Forces soldier.[57] "Iran also paid the Terrorist Groups between **$4,000 - $13,000** USD per rocket or roadside bomb attack, depending on the circumstances."[58] Iranian operatives also lured locals into their plans by offering locals money to emplace IEDs. For example, in August 2007, a "recruiter and organizer for [JAM/SG/Badr]… suspected of using local charities as a front to screen and recruit individuals by offering them **$500** to emplace improvised explosive devices." It was also believed that this same detainee was also "facilitating cross-border training, garnering financial support, and transporting equipment and weapons with

---

[55] Megan Greenwell, "Iran Trains Militiamen Inside Iraq, U.S. Says," Washington Post (Aug. 20, 2007), http://www.washingtonpost.com/wp-dyn/content/article/2007/08/19/AR2007081901394.html (Last accessed on Dec. 11, 2018).

[56] *See e.g.* U.S. Dept. of Defense, American Forces Press Service, News Release, *Petraeus: Interrogations Reveal Iranian Influence in Iraq*, (April 26, 2007).

[57] WikiLeaks - (https://wikileaks.org/wiki/US_Iraq_Intelligence_Summary_-_Iran_-_COA_Scimitar_-_Muqtada_Al_Sadr_-_Mahdi_Militia_(June_3,_2006)

[58] Michael Knights, *The Evolution of Iran's Special Groups in Iraq,* CTC Sentinel (Nov. 2010) available at: https://www.washingtoninstitute.org/uploads/Documents/opeds/4d06325a6031b.pdf (Last accessed on Dec. 11, 2018)

Persian [Iranian] militant groups to be used against Iraqi and coalition forces and supplying the IED that killed two coalition soldiers in Karbala and is linked to other deadly attacks in Diwaniyah, Najaf and Karbala."[59] Such funding was agreed to by no later than June 2003, when Iran began to fund domestic Iraqi terror groups, including JAM and the Special Groups.[60] Furthermore, in return for their violent efforts, Iran financed the Special Groups' ability to provide posthumous support and services to families of "martyrs" – in the overall average amount of **$2 million** USD per month.[61] In 2004, Iran provided JAM with **$80 million**.[62] In 2007, Iran was providing AAH **$20 million** a month to train its members.[63] In 2008, U.S diplomats estimated Iran's financial "largesse" to its "Iraqi surrogates" at **$100 - $200 million per year**."[64] Such funds were above and beyond the **$700 - $800 million** per year Iran provides Hezbollah and the annual budgets for the IRGC and Qods Force.[65]

479. All of the foregoing support from Iran and its Agents & Proxies for attacks on Coalition Forces and Iraqi civilians was financed and facilitated, in substantial part, by funds transfers initiated by Iran through Iranian banks (including, *inter alia*, the Central Bank of Iran, Bank Melli Iran and Defendant Bank Saderat Plc) on behalf of, and for the benefit of, the IRGC, MOIS, IRISL and the Terrorist Groups as part of the Conspiracy set forth in detail herein.

480. Because of the size and scope of Iran's efforts to murder Americans in Iraq—and

---

[59] Dept. of Defense, American Forces Press Service, News Release, *Coalition Forces Target al Qaeda Leaders Around Baghdad*, (Aug. 7, 2007) (available at: http://archive.defense.gov/news/newsarticle.aspx?id=46974).

[60] *See* Summary of Interrogation of Qayis al-Khazali, Report No. 4 (March 23, 2007), (available at https://www.aei.org/spotlight/qayis-al-khazali-papers/

[61] Summary of tactical Interrogation of Qayis al-Khazali, Enclosure 1-16, Report No. 200243-008 (June 30, 2007), (available at https://www.aei.org/spotlight/qayis-al-khazali-papers/).

[62] Geoffrey Gresh, *Instigating Instability: Iran's Support of Non-State Armed Groups in Iraq*, Al Nakhlah Online Journal, The Fletcher School, Tufts Univ. (Spring 2006).

[63] Michael Weiss, *Trust Iran Only as Far as You Can Throw It*, Foreign Policy (June 23, 2014), https://foreignpolicy.com/2014/06/23/trust-iran-only-as-far-as-you-can-throw-it/

[64] WikiLeaks - https://wikileaks.org/plusd/cables/09BAGHDAD2992_a.html

[65] David Adesnik, *Iran Spends $16 Billion Annually to Support Terrorists and Rogue Regimes*, FDD Policy Brief (January 10, 2018), https://www.fdd.org/analysis/2018/01/10/iran-spends-16-billion-annually-to-support-terrorists-and-rogue-regimes/

subvert the U.S.-sponsored and freely elected Iraqi government, Iran required access to hundreds of millions of dollars that it could only be reliably and effectively transferred through the global financial system with the illicit assistance of the Western Bank Defendants.

## 12.    IRAN USED THE IRGC AND FTO HEZBOLLAH TO MATERIALLY SUPPORT THE SPECIAL GROUPS IN ORDER TO AUTHORIZE, PLAN, AND COMMIT TERRORIST ATTACKS IN IRAQ.

### A.    THE BADR CORPS / BADR ORGANIZATION

481.    The Badr Corps was established in 1982 in Iran as the military wing of the Supreme Council for Islamic Revolution in Iraq.

482.    Badr Organization is an international terrorist organization and not a "military force" and intentionally violates all core provisions of international humanitarian laws (laws of war), IHRL, and the ICC Statutes.

483.    From its headquarters in Iran, the Badr Corps operated extensive networks throughout Iraq in the 1990s. The group smuggled men and weapons into Iraq to conduct attacks against the Iraqi regime of Saddam Hussein.

484.    Iran intended the Special Groups to operate like Hezbollah, and thus, the Badr Corps established clandestine offices in businesses and social organizations in Iraq.

485.    The Badr Corps also used Iraqi front companies to recruit operatives, collect intelligence, and circulate propaganda materials in Shi'a populated areas.

486.    Before 2003, the Badr Corps served as Iran's most important surrogate inside Iraq, acting as a *de facto* arm of the IRGC-QF.

487.    The Badr Corps received training and weapons from Iran through the IRGC and Hezbollah.

488.    After Saddam Hussein's overthrow, the Badr Corps renamed itself the Badr

Organization, and many of its operatives joined the newly formed Iraqi security forces.

489.    Published reports indicate that thousands of members of the Badr Organization remained on the IRGC-QF payroll after 2004.

490.    Several senior Badr Corps operatives later emerged as key conduits for funneling weapons to Iranian Agents and Proxies and the Terrorist Groups in Iraq from 2004 through at least 2011, including Abu Mustafa al-Sheibani, a key smuggler of deadly Iranian IEDs, and Jamal Ja'far Muhammad, a/k/a Abu Mahdi al-Muhandis (a/k/a "The Engineer"), who later led Kata'ib Hezbollah ("KH," discussed below).

491.    "Department 1000" of the IRGC-QF, known as the Ramezan Corps, is in charge of Iraqi operations and remains the largest IRGC-QF command outside of Iran. It coordinated, armed, and influenced the Badr Organization.

492.    The Badr Organization played a significant role in facilitating Special Groups' operations in Iraq. A number of Special Groups commanders such as Al-Muhandis are, or were, Badr Corps agents and operatives.

493.    Through the Badr Corps, the IRGC inserted hundreds of its Iranian-trained operatives into Iraq's state security organs (e.g. the Iraqi Ministry of Interior Intelligence structure) during the time relevant to this Action.

494.    According to seized Iraqi intelligence documents, the Badr Corps employed a *modus operandi*—common among Iranian-sponsored groups—of establishing clandestine offices in businesses, hospitals, and nongovernmental organizations in Iraq. One undated Iraqi intelligence report explained that among the many functions of these fronts was to help "secure and support the Badr Corps, and the different groups belonging to the al-Qods Force, such as the movement of Hezbollah."

92

495.     In addition to participating in some of the terrorist attacks that are the subject of this lawsuit, Badr Organization intentionally targeted civilians, diplomats, hospitals, religious institutions, military personnel, and non-combatants alike, and perpetrated acts of mass murder, assassinations, and kidnappings, intended to terrorize, intimidate, and coerce civilian populations, governments, and international institutions. For example:

a)  During at least 2003-2004, Badr Organization inserted numerous assassination teams from its bases in Iran who systematically murdered hundreds of Sunni former (Hors de combat) Iraqi army pilots and officers;

b)  On May 14, 2005, Ahmed al-Khafaji, a top leader in the Badr Organization, ordered the arrest and torture of retired (Hors de combat) Brigadier General Muhammed al-Azzawi and the torture and extrajudicial killing of his brother and 11 other civilians;

c)  On February 16, 2006, U.S. Maj Gen Joseph Peterson reported that U.S. forces had arrested 22 Iraqi policemen in northern Baghdad, members of Badr Organization death squad, who told U.S. soldiers they were taking a Sunni man away to be shot dead.[66] Hundreds of thousands of Sunni civilians have been kidnapped, tortured and killed by Badr Organization death squads;

d)  Badr Organization leader Hadi al-Amiri personally ordered attacks on up to 2,000 Iraqi Sunni civilians from 2004-2006 (when 2,000 were killed and an unknown number were wounded);

e)  Al-Amiri's preferred methods of killing allegedly involved using a power drill to pierce the skulls of his adversaries;[67]

f)   In July 2005, the morgue in Baghdad received 1,100 Sunni bodies, about 900 of which bore evidence of torture or summary execution;[68] and

g)  On November 13, 2005, there was a discovery of a detention center in Baghdad, run by Iraqi intelligence officials linked to Badr, where captives, mostly Sunni Arabs, were beaten, blindfolded, or subjected to electric shocks.[69]

---

[66] BBC News, *Iraq 'death squad caught in act'* (Feb. 16, 2006), http://news.bbc.co.uk/2/hi/middle_east/4719252.stm.

[67] Loveday Morris, *Appointment of Iraq's new interior minister opens door to militia and Iranian influence*, Wash. Post, (Oct. 18, 2014), https://www.washingtonpost.com/world/appointment-of-iraqs-new-interior-minister-opens-door-to-militia-and-iranian-influence/2014/10/18/f6f2a347-d38c-4743-902a-254a169ca274_story.html?utm_term=.6ddc94d5364a.

[68] Andrew Buncombe & Patrick Cockburn, *Iraq's death squads: On the brink of civil war*, Independent, (Feb. 26, 2006), http://www.independent.co.uk/news/world/middle-east/iraqs-death-squads-on-the-brink-of-civil-war-6108236.html.

496.     The Badr Corps' control of a wide array of Iraq government, cultural and social institutions allowed Iran to provide its Agents and Proxies with falsified, albeit legitimately produced credentials, passports, security badges, uniforms and other material support used to commit terrorism in Iraq.

497.     Badr Corps also controlled and directed specific military units of the Iraqi Army. When its members were not personally carrying out terrorist attacks, Badr Corps capitalized on its military control of various regions of Iraq to provide safe haven, support, access, and permissive operational environments for other Terrorist Groups to operate.

498.     Defendants knew, or were deliberately indifferent to, the fact Iran provided funding, financial services, and material support to the Badr Corps/Organization.

## B.     JAYSH AL MAHDI ("JAM" OR THE "MAHDI ARMY")

499.     Jaysh al Mahdi ("JAM" or the "Mahdi Army") was established by radical Shi'a cleric Muqtada al-Sadr in June 2003. On April 18, 2004, it led the first major armed confrontation by Shi'a militia against U.S.-led forces in Iraq.

500.     JAM and its subsidiary, the Promise Day Brigades ("PDB"), are international terrorist organizations and not "military forces" and intentionally violate all core provisions of international humanitarian laws (laws of war), IHRL, and the ICC Statute.

501.     JAM was co-founded by Imad Mughniyah, once the terrorism chief of Hezbollah and "an agent of Iran and a direct role in Iran's sponsorship of terrorist activities."[70] Prior to

---

[69] Council on Foreign Relations, *Shiite Militias and Iraq's Security Forces* (Nov. 30, 2005), https://www.cfr.org/backgrounder/shiite-militias-and-iraqs-security-forces.

[70] "Imad Fayez Mughniyah (a/k/a Hajj Radwan) was, for decades prior to his death in February 2008, the terrorist operations chief of Hizballah. Mughniyah played a critical role in a series of imaginative high-profile terrorist attacks across the globe, and his abilities as a terrorist coordinator, director, and operative was an order of magnitude beyond anything comparable on the scene between 1980-2008. Mughniyah was, since the early 1980s, an agent of the Islamic Republic of Iran, where he lived for many years. Imad Mughniyah had a direct reporting relationship to Iranian intelligence [MOIS] and a direct role in Iran's sponsorship of terrorist activities." *In re Terrorist Attacks on September 11, 2001*, 2011 U.S. Dist. LEXIS 155899, at *106–07.

September 11, 2001, Mughniyah was ranked number one on the FBI's most wanted list for leading the attacks which killed 183 Marines in the bombing of the Holiday Inn in Beirut, the hijacking of a TWA plane and murder of a U.S. Navy diver, and the bombing of the U.S. Embassy in Beirut (replaced as number one most wanted by Usama bin Laden).

502.   In Iraq, JAM expanded its territorial control of mixed or predominantly Shi'a neighborhoods and displaced or killed the local Sunni population.

503.   JAM was able to gain initial control in many of the neighborhoods in and around Baghdad (such as Sadr City) by offering the Shi'a population protection and social services.

504.   In a Department of Defense news briefing on August 24, 2007, General Rick Lynch confirmed that on August 7, 2006, the 3rd Brigade Combat Team "conducted a raid on a militant house . . . about 20 miles east of Baghdad . . . They arrested one of our division's most valued targets, . . . [who] acted as a link between Iran and the [JAM]. He was the main Shia conduit in that region for getting Iranian EFPs and rockets into Baghdad, . . ."[71]

505.   In addition to participating in some of the terrorist attacks that are the subject of this lawsuit, Jaysh al-Mahdi and PDB intentionally targeted civilians, diplomats, hospitals, religious institutions, military personnel, and non-combatants alike, and perpetrated acts of mass murder, assassinations, and kidnappings, intended to terrorize, intimidate, and coerce civilian populations, governments, and international institutions, and engage in widespread and systematic acts of mass murder, torture, ethnic cleansing, and genocide. For example:

   a)   On April 2, 2004, in a sermon, Muqtada al Sadr issued what became known as the hawasim fatwa. Asserting the fundamental illegitimacy of Saddam Hussein's regime, he declared that any claims of ownership of goods or property were invalid – and that looters were entitled to the fruits of their plunder so long as they paid khums, a 20 percent religious tax on its value, to Sadrist officials;

   b)   In a subsequent sermon, Muqtada proclaimed the September 11th attacks on the

---

[71] Kimberly Kagan, *The Surge: A Military History* (2010).

United States were "a miracle and blessing from God;"

c)  Muqtada further threatened that "[i]f America persists [in advocating for independent Sunni and Kurdish states], then it will cease to exist;"

d)  On July 9, 2006, JAM terrorists set up checkpoints across the Hay al Jihad neighborhood of Baghdad, asking drivers and passengers for identification. All Sunni males were taken to a bus and driven to a waste ground where over 50 civilian Sunni captives were murdered. In addition, JAM perpetrated numerous suicide bombings across Sunni neighborhoods in Baghdad from July 4-9, 2006, killing over 150 civilians as part of its widespread and systematic campaign of ethnic cleansing;

e)  In October 2006 in Samara, the group carried out an attack which resulted in 18 civilian casualties and 90 injuries;

f)  In March 2008 in Baghdad, JAM militants fired up to 30 mortar rounds and rockets at the International Green Zone, killing 14 civilians, including several children, one U.S. government contractor, wounding between 4 and 8 people, between 39-47 civilians, including several children; and

g)  On June 24, 2009, a JAM/PDB vehicle-borne IED resulted in 62 civilian deaths and 120 civilian casualties.

506.  Al-Sadr dissolved part of his militia after 2007, but maintained a small group of Iranian-supported militants called the PDB to carry out terrorist attacks against Coalition Forces and U.S. nationals, including certain Plaintiffs.

507.  PDB and JAM have received funding, training, and weapons from the IRGC and are two of the Special Groups.

508.  PDB and JAM actively targeted U.S. nationals, including Plaintiffs and U.S. forces, in an attempt to disrupt security operations and further destabilize Iraq.

509.  For example, on June 28, 2011, the PDB issued a statement claiming responsibility for ten (10) mortar and Katyusha rocket attacks against U.S. Military convoys in which U.S. officials confirmed that three U.S. service members were killed.

510.  Defendants knew, or were deliberately indifferent to, the fact Iran provided

funding, financial services and material support to JAM/PDB

### C. ASA'IB AHL AL-HAQ ("AAH" OR "THE LEAGUE OF THE RIGHTEOUS")

511.    Asa'ib Ahl Al Haq (or the "League of the Righteous") terrorist organization is a Shi'a Special Group supported by Hezbollah and the IRGC-QF that conducted assassinations and operations in Iraq against Coalition Forces and various individuals and U.S. nationals.

512.    AAH was originally established by Senior Sadrist and MDF-I detainee Qais al-Khazali. His brother, Laith Khazali, also helped lead the organization.

513.    AAH split from al-Sadr's JAM in 2006. Since that time, AAH has conducted: thousands of IED attacks against U.S. and Iraqi forces; targeted kidnappings of Westerners and Iraqis; rocket and mortar attacks on the U.S. Embassy; murders of American and British soldiers; and assassinations of Iraqi officials.

514.    AAH is an international terrorist organization and not a "military force" and intentionally violates all core provisions of international humanitarian laws (laws of war), IHRL, and the ICC Statutes.

515.    During the time relevant to this Action, AAH received significant funding from Iran, and had links to Iran's IRGC-QF and Hezbollah.

516.    Senior Lebanese Hezbollah operative Ali Musa Daqduq provided training to AAH terrorists.

517.    Daqduq reported to Youssef Hashim, the head of Lebanese Hezbollah Special Operations, and the latter reported to Abdul Reza Shahlai, the director of the IRGC-QF External Operations.

518.    In addition to participating in some of the terrorist attacks which are the subject of this lawsuit, AAH intentionally targeted civilians, diplomats, hospitals, religious institutions,

military personnel, and non-combatants alike, and perpetrated acts of mass murder, assassinations, and kidnappings, intended to terrorize, intimidate, and coerce civilian populations, governments, and international institutions. For example:

a)      AAH has launched over 6,000 attacks in Iraq, thousands of which targeted civilians, including the October 3, 2007 attempted assassination of Gen. Edward Piertrzyk, the Polish ambassador to Iraq. Three bombs struck the embassy's three-car convoy (all bearing Polish flags) killing three members of the Polish embassy, injuring the ambassador and 8 other civilians and 3 soldiers.

b)      In May 2007, AAH kidnapped Peter Moore, a British IT expert, along with four bodyguards from a government building in Baghdad. Peter Moore was beaten on a near-daily basis and the bodyguards were tortured and murdered.

c)      In February 2010, AAH kidnapped Department of Defense civilian employee Issa T. Salomi who was released in March 2010 in exchange for the release of 4 AAH terrorists held in Iraqi custody.

519.    AAH is one of the Iranian entities determined to be legally responsible (along with Iran), for the January 20, 2007, attack on the Provincial Joint Coordination Center ("PJCC"), in Karbala, Iraq, that killed and injured U.S. nationals.[72]

520.    Defendants knew, or were deliberately indifferent to, the fact Iran provided funding, financial services and material support to AAH.

## D.    KATA'IB HEZBOLLAH ("KH")

521.    KH has functioned as Iran's go-to militia in Iraq and received support from Lebanese Hezbollah, including training in weapons use; IED construction and operation; and sniper, rocket, and mortar attacks.

522.    Historically, KH operated mainly in Shi'a areas of Baghdad, such as Sadr City, and throughout the south.

523.    KH is an international terrorist organization and not a "military force" and intentionally violates all core provisions of international humanitarian laws (laws of war), IHRL,

---

[72] *See Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54 (D.D.C. 2018).

and the ICC Statutes.

524.   On June 24, 2009, the United States designated KH an FTO.

525.   The State Department's notice of KH's FTO designation stated that:

> The organization has been responsible for numerous violent terrorist attacks since 2007, including improvised explosive device bombings, rocket propelled grenade attacks, and sniper operations. Kata'ib Hezbollah [sic] also targeted the International Zone in Baghdad in a November 29, 2008 rocket attack that killed two UN workers. In addition, KH has threatened the lives of Iraqi politicians and civilians that support the legitimate political process in Iraq.

526.   KH was also simultaneously designated a SDGT under E.O. 13224, because it was "responsible for numerous terrorist acts against Iraqi, U.S., and other targets in Iraq since 2007."

527.   The U.S. Treasury Department also designated KH pursuant to E.O. 13438.

528.   The Treasury Department's 2009 press release announcing KH's designation explained that KH had "committed, directed, supported, or posed a significant risk of committing acts of violence against Coalition and Iraqi Security Forces…."

529.   The press release also quoted then-Under Secretary for Terrorism and Financial Intelligence Stuart Levey as stating "[t]hese designations play a critical role in our efforts to protect Coalition troops, Iraqi security forces, and civilians from those who use violence against innocents to intimidate and to undermine a free and prosperous Iraq."

530.   The Treasury press release also stated: "[f]urther, the IRGC-Qods Force provides lethal support to Kata'ib Hizballah and other Iraqi Shia militia groups who target and kill Coalition and Iraqi Security Forces."

531.   The 2009 press release further reported that between March 2007 and June 2008, KH led a number of attacks against U.S. forces in Iraq, advising:

[a]s of 2008, Kata'ib Hizballah was funded by the IRGC-Qods Force and received weapons training and support from Lebanon-based Hizballah. In one instance, Hizballah provided training--to include building and planting IEDs and training in coordinating small and medium arms attacks, sniper attacks, mortar attacks, and rocket attacks--to Kata'ib Hizballah members in Iran.

532.    Furthermore, the 2009 U.S. Treasury Department press release noted:

Recordings made by Kata'ib Hizballah for release to the public as propaganda videos further demonstrate that Kata'ib Hizballah conducted attacks against Coalition Forces. In mid-August 2008, Coalition Forces seized four hard drives from a storage facility associated with a Kata'ib Hizballah media facilitator. The four hard drives included approximately 1,200 videos showing Kata'ib Hizballah's sophisticated planning and attack tactics, techniques, and procedures, and Kata'ib Hizballah's use of the most lethal weapons--including RPG-29s, IRAMs, and EFPs--against Coalition Forces in Iraq.

One of the hard drives contained 35 attack videos edited with the Kata'ib Hizballah logo in the top right corner. Additionally, between February and September 2008, Al-Manar in Beirut, Lebanon, broadcast several videos showing Kata'ib Hizballah conducting multiple attacks against Coalition Forces in Iraq.

Immediately preceding the Government of Iraq's approval of the United States-Iraq security agreement in late November 2008, Kata'ib Hizballah posted a statement that the group would continue fighting Coalition Forces and threatened to conduct attacks against the Government of Iraq if it signed the security agreement with the United States.

533.    In 2008, the U.S. Department of Defense described the linkages it found between

KH, Iran and multiple terrorist attacks against Coalition Forces in Iraq—including KH's use of

EFPs:

…also known as Hezbollah Brigades, is a terrorist group believed to receive funding, training, logistics and material support from Iran to attack Iraqi and coalition forces using what the military calls 'explosively formed penetrators' – roadside bombs designed to pierce armor-hulled vehicles – and other weapons such as rocket-assisted mortars.

534.    As noted above—and as stated by the U.S Treasury Department in its July 2009

press release—throughout 2008, *Al-Manar*, Hezbollah's official television outlet in Lebanon

(and itself a designated SDGT since May 2006), played numerous videos of KH launching rocket and IED attacks against U.S. troops.

535.    In this manner, Hezbollah helped publicize KH's activities and increase its profile among leading Shi'a terrorist groups.

536.    In addition to committing some of the terrorist attacks that are the subject of this lawsuit, KH intentionally targeted civilians, diplomats, hospitals, religious institutions, military personnel, and non-combatants alike, and perpetrated acts of mass murder, assassinations, and kidnappings, intended to terrorize, intimidate, and coerce civilian populations, governments, and international institutions. For example:

　　　　a)　On June 4, 2008, KH killed 18 and injured 29 Iraqi civilians, destroying 19 homes;

　　　　b)　On November 29, 2008, KH launched a rocket attack, killing 2 U.N. contractors and injuring 15 other civilians;

　　　　c)　In July 2009, KH threatened the lives of Iraqi politicians and civilians who supported Iraq's political process;

　　　　d)　On July 2011, KH issued a statement threatening Kuwait and the workers who were building a port near Kuwait's border with Iraq;

　　　　e)　In June 2014, Human Rights Watch found KH and AAH and other Shite terrorist groups had carried out "indiscriminate attacks in civilian areas," and had also conducted kidnapping operations and carried out summary executions of Sunnis in the towns of Buhriz, Mada'in, al-Heetawy, and other towns;

　　　　f)　In November 2008, KH threatened to attack the Iraq government if it signed the security agreement with the United States; and

　　　　g)　KH kidnapped 18 Turkish construction workers in Baghdad, in September 2015.

537.    KH committed a systematic and widespread campaign of ethnic cleansing, terrorism, torture, extrajudicial killings, kidnappings, and mayhem against Sunni civilians across areas of Iraq formerly held by the Islamic State. For example:

a) On July 5, 2016, Zeid Ra'ad Al Hussein, United Nations High Commissioner for Human Rights, said more than 700 Sunni men and boys (out of the 1,500 Sunni males over the age of 15 taken captive by KH) are missing two months after the Islamic State was vanquished from Fallujah. The men and boys were shot, beaten with rubber hoses, and in at least 4 cases, beheaded. At least 69 have been summarily executed or tortured to death while in the initial custody of KH;

b) On May 27, 2016, approximately 90 males aged 15 and older were taken by KH and have not been located since;

c) On May 29, 2016, twenty men from a group of fleeing men, women, and children were killed. Another group of families, raising white flags, surrendered. The males were separated and 17 of them were then summarily shot and killed by KH; and

d) On June 3, 2016 KH rounded up 1,500 Sunnis males, aged 15 and older from the town of Saqlawiya, and moved them into warehouses and an Iraqi base called Camp Tariq. The survivors described being crammed into small rooms and halls and denied food and water, straining to breathe in the stifling heat. KH terrorists, using sticks, pipes, and hoses, beat the detainees and declared that they were taking revenge for Camp Speicher – a June 2014 massacre by the Islamic State of 1,566 Shi'ite and other non-Sunni Air Force cadets. A 47-year-old survivor described how he watched his 17-year-old son repeatedly beaten and the corpses of 15 other men carried off who appeared to have been beaten to death. The man was one of the 605 survivors released on June 5, 2016. His son was not among them, he said; the boy hasn't been seen since.

538.   Although KH's leadership remains in the shadows, one individual reportedly associated with the group is Abu Mahdi al-Muhandis.

539.   Al-Muhandis is wanted in Kuwait for his alleged role in the 1983 bombings of the American and French embassies in Kuwait City, as well as for his alleged involvement in the assassination attempt on the Kuwaiti Emir in 1985.

540.   The U.S. Treasury Department designated al-Muhandis a SDGT in July 2009, and announced the designation in the same press release announcing KH's designation.

541.   The press release noted:

As of early 2007, al-Muhandis formed a Shia militia group employing instructors from Hizballah to prepare this group and certain Jaysh al-Mahdi (JAM) Special Groups for attacks against Coalition Forces. The

groups received training in guerilla warfare, handling bombs and explosives, and employing weapons--to include missiles, mortars, and sniper rifles. In another instance as of September 2007, al-Muhandis led networks that moved ammunition and weapons--to include explosively formed penetrators (EFPs)--from Iran to Iraq, distributing them to certain JAM militias to target Coalition Forces. As of mid-February 2007, al-Muhandis also ran a weapons smuggling network that moved sniper rifles through the Iran-Iraq border to Shia militias that targeted Coalition Forces.

Al-Muhandis also provided logistical support for attacks against Iraqi Security Forces and Coalition Forces conducted by JAM Special Groups and certain Shia militias. In one instance, in April 2008, al-Muhandis facilitated the entry of trucks--containing mortars, Katyusha rockets, EFPs, and other explosive devices--from Iran to Iraq that were then delivered to JAM Special Groups in Sadr City, Baghdad. Additionally, al-Muhandis organized numerous weapons shipments to supply JAM Special Groups who were fighting Iraqi Security Forces in the Basrah and Maysan provinces during late March-early April 2008.

In addition to facilitating weapons shipments to JAM Special Groups and certain Shia militias, al-Muhandis facilitated the movement and training of Iraq-based Shia militia members to prepare them to attack Coalition Forces. In one instance in November 2007, al-Muhandis sent JAM Special Groups members to Iran to undergo a training course in using sniper rifles. Upon completion of the training course, the JAM Special Groups members had planned to return to Iraq and carry out special operations against Coalition Forces. Additionally, in early March 2007, al-Muhandis sent certain Shia militia members to Iran for training in guerilla warfare, light arms, marksmanship, improvised explosive devices (IED) and anti-aircraft missiles to increase the combat ability of the militias to fight Coalition Forces.

In addition to the reasons for which he is being designated today, al-Muhandis participated in the bombing of Western embassies in Kuwait and the attempted assassination of the Emir of Kuwait in the early 1980s. Al-Muhandis was subsequently convicted in absentia by the Kuwaiti government for his role in the bombing and attempted assassination.

542.    In a July 2010 press briefing, U.S. General Ray Odierno identified KH as the group behind increased threats to U.S. bases in Iraq.

543.    General Odierno confirmed that KH operatives had gone to Iran for special training and then returned to Iraq.

544.    General Odierno stated, "[T]hey are clearly connected to Iranian IRGC [Iranian

Revolutionary Guard Corps].”

###### E.  FTO HEZBOLLAH AUTHORIZED THE SHIA SPECIAL GROUPS' TERRORIST ATTACKS AGAINST AMERICANS IN IRAQ

545.   After helping to create Jaysh al-Mahdi in April 2003, Hezbollah began a wide-ranging public propaganda campaign to authorize and incite Shi'a in Iraq to join Jaysh al-Mahdi's campaign of terrorism against Americans in Iraq. It did so primarily through two channels. First, Hezbollah took advantage of the reverence that Iraqi Shi'a felt towards Hezbollah's senior leadership – and in particular Secretary-General Hassan Nasrallah and Grand Ayatollah Fadlallah – by having those leaders issue repeated calls to Iraqi Shi'a to join Jaysh al-Mahdi and attack Americans in Iraq. Second, Hezbollah encouraged senior members of Jaysh al-Mahdi, including Sadr himself, to carry out such attacks. As a Middle East Intelligence Bulletin dispatch explained in March 2004, Hezbollah operatives in Iraq “have focused mainly on establishing lines of communication with Iraqi Shiite leaders and distributing anti-American propaganda, but the groundwork is clearly being laid for incitement of violence in the future.”[73]

546.   Hezbollah's message of authorization was effective because The Special Groups and many of their members looked to Hezbollah as a moral and religious authority on par with Iraqi Shia figures, including al-Sadr himself. As early as 2004, propaganda posters picturing Sadr side-by-side with Secretary-General Nasrallah appeared throughout Baghdad. In August 2006, tens of thousands of Special Group operatives staged a massive, public, pro-Hezbollah rally in Sadr City. Rally-goers burned American flags, chanted “Death to America,” and displayed the portraits of Sadr and Nasrallah side-by-side in the streets of Baghdad. Members of the rally wore white shrouds to symbolize their willingness to die for Hezbollah and asked for “victory to

---

[73] *See, e.g.,* Gary C. Gambill, *Dossier: Hassan Nasrallah*, Middle East Intell. Bull. (Feb.-Mar. 2004).

Hassan Nasrallah."[74] Jaysh al-Mahdi members also asked "al-Sadr to consider them an extension of Hizbullah" and "expressed a genuine desire to participate with Hizbullah against" the Coalition government in Iraq.[75] In a subsequent demonstration in July 2007, Jaysh al-Mahdi members again carried signs featuring the pictures of Sadr and Nasrallah side-by-side. And, after Hezbollah terrorist mastermind Imad Mugniyeh was killed in 2008, Jaysh al-Mahdi held a public funeral service for him where senior members of Jaysh al-Mahdi again declared their allegiance to Hezbollah.

547.   Grand Ayatollah Muhammad Hussein Fadlallah, whom the U.S. Treasury Department has called "Hizballah's Spiritual Leader,"[76] occupied a similarly exalted position among Iraqi Shi'a. Fadlallah himself became a Specially Designated Terrorist in 1995[77] as a result of his role as a "Leading Ideological Figure of Hizballah."[78] Among other things, the U.S. government concluded that "Sheikh Muhammad Hussein Fadlallah, Hizballah's chief 'spiritual leader,' reportedly issued the fatwa (religious ruling) authorizing the Marine Corps barracks bombing" in Beirut in 1983,[79] which was the deadliest terrorist attack against America before September 11th. Although he was of Lebanese descent, Fadlallah was born in Najaf, grew up in Najaf, studied in Najaf, reportedly spoke with an Iraqi accent, was a respected Shi'a theologian, and was close with the Sadr family, including the First and Second Martyrs as well as Muqtada

---

[74] *Shiites Hold pro-Hezbollah Rally in Baghdad*, NBC News (Aug. 4, 2006), http://www.nbcnews.com/id/14179529/ns/world_news-mideast_n_africa/t/shiites-hold-pro-hezbollah-rally-baghdad/.

[75] *Middle East Media Research Inst., Iraqi Shi'a View of the Lebanon Crisis, Inquiry & Analysis Series No. 290 (Aug. 11, 2006), https://www.memri.org/reports/iraqi-shia-views-lebanon-crisis.*

[76] *Press Release, U.S. Dep't of Treasury, Treasury Designates Islamic Extremist, Two Companies Supporting Hizballah in Tri-Border Area (June 10, 2004), https://www.treasury.gov/press-center/press-releases/Pages/js1720.aspx.*

[77] *Id.*

[78] *U.S. Dep't of Treasury, Publication of the Hizballah International Financing Prevention Act of 2015 Related Sanctions Regulations; Counter Terrorism Designations Updates; Syria Designations Updates (Apr. 15, 2016),* https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20160415.aspx; *see also* Harvey W. Kushner, *Encyclopedia of Terrorism* 128 (Sage Publications 2003)

[79] Government's Written Proffer in Support of Its Request for Detention Pending Trial at 7, *United States v. D-2 Elfat El Aouar*, Crim. No. 06-20248 (E.D. Mich. filed May 22, 2006), ECF No. 8.

himself. When Fadlallah died in 2010, Muqtada al-Sadr called on his followers to observe three days of mourning in honor of Hezbollah's spiritual leader.

548.    Hezbollah's religious and moral authority was especially powerful because The Special Groups, like many other terrorist organizations, looked to religious authorities for validation. As Professor Bruce Hoffman has explained, "'Shiites do not believe in the legitimate authority of secular governments.'"[80] Instead, "religion serves as a legitimizing force – conveyed by sacred text or imparted via clerical authorities claiming to speak for the divine."[81] Thus, for religious terrorist organizations such as The Special Groups, "violence first and foremost is a sacramental act or divine duty executed in direct response to some theological demand or imperative."[82] As prominent voices in Shi'a Islam, Grand Ayatollah Fadlallah and Secretary-General Nasrallah were especially influential among members of The Special Groups.

549.    Hezbollah's leaders leveraged their moral and religious authority over The Special Groups by publicly calling for "jihad" and issuing fatwas against Americans in Iraq.[83] An April 2003 dispatch from the Middle East Intelligence Bulletin reported that "Hezbollah has recently begun a campaign to incite opposition to American forces in Iraq" by broadcasting propaganda to millions of Arab viewers (including Shi'a in Iraq) on its television station al-Manar.[84] Such propaganda, which explicitly called for acts of "resistance" against Americans in Iraq, made up more than one-quarter of al-Manar's content.[85]

550.    In furtherance of this campaign, Secretary-General made repeated and direct

---

[80] *Bruce Hoffman, "Holy Terror": The Implications of Terrorism Motivated by a Religious Imperative, 18 Stud. in Conflict & Terrorism 271, 274 (1995) (quoting Marvin Zonis & Daniel Brumberg, Behind Beirut Terrorism, N.Y. Times (Oct. 8, 1984)).*
[81] *Id. at 272.*
[82] *Id.*
[83] *Niles* Lathem, *House of Jihad*, N.Y. Post (Feb. 5, 2007), http://nypost.com/2007/02/05/house-of-jihad/.
[84] Avi Jorisch, *Al-Manar and the War in Iraq*, Middle East Intell. Bull. (Apr. 2003), http://www.washingtoninstitute.org/policy-analysis/view/al-manar-and-the-war-in-iraq.
[85] *Id.*

communications to Iraqi Jaysh al-Mahdi members to attack Americans:

- In a March 2003 speech, Nasrallah publicly declared Hezbollah's support for attacks against Americans, promising that "peoples of this part of the world will receive [America] . . . *with guns, blood, weapons, and martyrdom operations*."[86]

- In an April 2003 speech, Nasrallah directly called on Iraqi Shi'a to attack Americans in Iraq, declaring that "*[t]he Iraqi people must resist this occupation*" and that "[w]e can bet that the Iraqi people will resist the American occupation and liberate themselves."[87]

- In an October 2006 interview that aired on Al-Jazeera, Nasrallah stated: "We consider the resistance in Iraq . . . to be legitimate resistance, which is justified and appropriate . . . and *we support and endorse this resistance*."[88]

- In a January 2007 interview broadcast on al-Manar, Nasrallah declared: "We support the option of a comprehensive Iraqi resistance, with all its aspects, especially the military aspect. We believe that the solution in Iraq begins with adopting the option of armed resistance – *jihad against the occupation forces*."[89]

- In a December 2009 speech broadcast on al-Manar, Nasrallah promised "*all-out war*" against "the Great Satan" of America over a chorus of "Death to America" chants.[90]

551.    Nasrallah's call for "jihad" was particularly potent because of its religious significance. As one federal court has explained, a "jihad" is a "religiously sanctioned resistance against perceived enemies of Islam."[91] This religious sanctioning was thus highly significant to members of The Special Groups, militantly Shi'a terrorist organizations that frequently engaged in religious violence.

---

[86] Nicholas Noe, Voice of Hezbollah: The Statements of Sayyed Hassan Nasrallah 285 (2007).

[87] Deborah Horan, *Hezbollah Chief to Iraqis: Resist U.S.*, Chi. Trib. (Apr. 23, 2003), http://articles.chicagotribune.com/2003-04-23/news/0304230260_1_hezbollah-iraqi-shiites-iraqi-people.

[88] Excerpts from Interview with Hassan Nasrallah, Middle East Media Research Inst. TV Monitor Project (Oct. 31, 2006), https://www.memri.org/tv/hizbullah-secretary-general-hassan-nasrallah-when-we-were-young-i-cannot-forget-sight-american/transcript (last accessed Sept. 21, 2017).

[89] Niles Lathem, *House of Jihad*, N.Y. Post (Feb. 5, 2007), http://nypost.com/2007/02/05/house-of-jihad/.

[90] Excerpts from December 25, 2009 Speech by Hassan Nasrallah, Middle East Media Research Inst. (Dec. 29, 2009), https://www.memri.org/reports/hizbullah-secretary-general-hassan-nasrallah-al-manar-tv-us-beast-one-bite-our-nation-and (last accessed Sept. 21, 2017).

[91] *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 7 (D.D.C. 2016).

552.     Grand Ayatollah Fadlallah echoed similar themes in an August 2004 fatwa in which he instructed the Shi'a in Iraq that it was their religious duty to attack American military and civilian personnel in Iraq as a means of resisting the occupation. "A Fatwa is an edict of a religious leader, authorizing a faithful Muslim to commit murder."[92] The Grand Ayatollah's fatwa, which received widespread coverage in the Iraqi and Western media, was a critical green light for Special group terrorists in Iraq to attack Americans in Iraq.

553.     Until Fadlallah's death in 2010, he consistently incited his Shi'a followers in Iraq and Lebanon to attack Americans. In at least six Friday sermons in the Imam Hassanayn Mosque in Beirut that took place between February and April 2003 – sermons that would have been widely shared in Iraq and would have undoubtedly been known to The Special Groups – Fadlallah blessed the calls made by others such as Nasrallah for Iraqi Shiites to violently resist the U.S. occupation.

554.     Information gathered by Coalition forces during raids upon the Special Groups confirmed the power of Nasrallah's and Fadlallah's messages of authorization. For example, according to a U.S. military incident report (as published by WikiLeaks), an October 9, 2008 raid on a JAM safe house in Basra yielded "religious Iranian video clips," "MAS [i.e., Muqtada al-Sadr] literature," a "[n]otebook with JAM computer training dated 11 Jan 2007," and a "[p]icture of Mohammad Hussein Fadala [sic]" who was identified in the report as a "Deputy of Hassan Wasrala [sic] (Hezbollah)."[93]

555.     Hezbollah also wielded significant influence over Special Group leadership, including personally leading the Special Groups during critical times or during specific attacks. Special Groups were modeled after Hezbollah and had deep personal ties to Hezbollah's leaders.

---

[92] *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 103 n.8 (D.D.C. 2000).
[93] 358 *WikiLeaks* (Oct. 9, 2008), https://wikileaks.org/irq/report/2008/10/IRQ20081009n11927.html.

For example, The Arab Weekly reported that al-Sadr was "greatly inspired by Hassan Nasrallah" in part because "both men rose to lead their parties at a fairly young age."[94] According to a March 2007 report by the Jamestown Foundation, a counterterrorism think tank, Sadr "has looked up to Hezbollah of Lebanon as a model of Shiite military success[,] [because] [h]e respects the leadership of the organization and admires [Hassan Nasrallah]."[95] Accordingly, Sadr publicly declared his loyalty to Hezbollah, co-founded JAM with the help of Hezbollah's chief terrorist mastermind, Imad Mugniyeh, expressly modeled his organization on Hezbollah, and travelled to Beirut (where Hezbollah is headquartered) several times from 2005-2009.

556.    Hezbollah used its close relationship with The Special Groups to authorize and incite The Special Groups to organize a terror campaign that would inflict "mass casualties" against Americans in Iraq.

557.    Hezbollah's leaders have directly connected Hezbollah's authorization of terror attacks against Americans in Iraq to Hezbollah's terrorist objective of forcing the U.S. to abandon Iraq. For example, in a speech on October 25, 2011, Nasrallah stated that "resistance groups" Hezbollah had backed (that is, the Terrorist Groups) pressured the U.S. to reduce its presence in Iraq. In the same speech, Nasrallah boasted that the Hezbollah-JAM campaign of terror against Americans in Iraq should be considered a model for terrorist campaigns against the U.S. and its allies around the world.

### F.    FTO HEZBOLLAH PLANNED THE SHIA SPECIAL GROUPS' TERRORIST ATTACKS AGAINST AMERICANS IN IRAQ

558.    Hezbollah trained The Special Groups in the use of weapons and tactics that were specifically designed to target Americans in Iraq – and that The Special Groups in fact used

---

[94]    Sami Moubayed, *Iran Invests in Iraq's Mahdi Army*, Arab Weekly (May 22, 2016), http://www.thearabweekly.com/Iran/5187/Iran-invests-in-Iraq%E2%80%99s-Mahdi-Army.

[95]    Babak Rahimi, *Moqtada al-Sadr's New Alliance with Tehran*, Jamestown Found. (Mar. 1, 2007), https://jamestown.org/program/moqtada-al-sadrs-new-alliance-with-tehran/.

successfully to perpetrate terrorist attacks against Americans in Iraq. This training began with JAM at its inception in April 2003, when Imad Mugniyeh recruited and trained some of JAM's first 300 fighters in Lebanon. It continued through at least 2008, when Hezbollah held training camps for Special Group fighters in Iran (in conjunction with Iran's Qods Force), Lebanon, and Iraq. According to a captured JAM operative, paraphrased in an unclassified (as redacted) U.S. military-intelligence report, "[w]ithout a doubt, all training received in Iran" – at Hezbollah-run camps – "is intended for use against [Coalition forces]."[96]

559.   From 2003-2008, Special Group recruits travelled to Hezbollah training camps in Lebanon and Iran through meticulously planned routes. Because of the logistical challenges associated with bringing Special Group militants into Iran and Lebanon, Hezbollah occasionally trained members of The Special Groups to become "master trainers," who learned terrorist tactics from Hezbollah in Iran or Lebanon and then passed that knowledge on to other Special Group members in Iraq.[97] U.S. officials have referred to this practice as "training the trainer."[98] Hezbollah also trained members of The Special Groups inside of Iraq, including, but not limited to, in Sadr City, Najaf, Basra, and Safwan.

560.   Although Hezbollah training in Iran often occurred in conjunction with the Iranian Qods Force, Hezbollah's role was crucial to The Special Groups for at least three reasons. First, Hezbollah operatives had considerably more experience with terrorist tactics and explosives than their Qods Force counterparts. Second, Hezbollah operatives typically spoke Arabic, the language spoken by most Special Group members, while members of the Qods Force did not. Third, Hezbollah and Special Group shared a cultural affinity; captured Iraqi fighters

---

[96] Combating Terrorism Ctr. at West Point Harmony Program, Redacted Intelligence Report 002, at 2 (Spring 2007-Early 2008), https://ctc.usma.edu/app/uploads/2013/10/Redacted-Intelligence-Report-002-Summary.pdf
[97] Michael R. Gordon, Hezbollah Trains Iraqis in Iran, Officials Say, N.Y. Times (May 5, 2008), http://www.nytimes.com/2008/05/05/world/middleeast/05iran.html.
[98] Id.

have expressed their strong preference for training with Hezbollah over the Qods Force.

561.    Hezbollah's training was rigorous. According to unclassified (as redacted) U.S. military-intelligence reports, Hezbollah's training camps lasted anywhere from three weeks to several months.[99] Trainees were awakened at 5:30 a.m. every day to pray and exercise. Classes started at 8:00 a.m. and continued until dusk. Each class lasted roughly 50 minutes, with 10-minute breaks in between classes. Some classes were held in actual classrooms with whiteboards and projectors; others were held at firing ranges and other outdoor locations. The training included programs in a myriad of skills, including "[w]eapons, bomb-making, intelligence, assassinations, the [gamut] of skill sets," according to a U.S. intelligence official quoted in the New York Times in November 2006.[100] The topics covered in these training programs included the following:

562.    **Basic Weapons Training**. Many Special Group recruits had little to no combat experience or weapons training when they joined the organization, because the only qualification that prospective Special Group recruits were expected to have was the ability to read and write. Accordingly, Hezbollah provided basic training intended to give new Special Group recruits a broad overview of terrorist attack tactics and weapons use, as well as specific training in the use of pistols, AK-47s, machine guns, and sniper rifles.

563.    **IEDs**. Hezbollah trained Special Group members in the creation and deployment of IEDs. For instance, Hezbollah provided an IED Specialty Training Course to members of Special Groups at its training camps designed to teach Special Group fighters how to create and deploy improvised explosives such as roadside bombs.

---

[99] *See* Combating Terrorism Ctr. at West Point Harmony Program, Redacted Intelligence Report 005, at 2-3 (Spring 2007-Early 2008), https://ctc.usma.edu/v2/wp-content/uploads/2013/10/Redacted-Intelligence-Report-005-Summary.pdf.
[100] Michel R. Gordon & Dexter Filkins, *Some Mahdi Army Fighters Trained with Hezbollah*, N.Y. Times (Nov. 28, 2006), http://www.nytimes.com/2006/11/28/world/africa/28iht-militia.3702222.html?pagewanted=2&_r=0.

564. **EFPs**. In 2004, Hezbollah "introduced [to Iraq] a new breed of roadside bomb more lethal than any seen before" – the EFP.[101] Hezbollah trained members of the Special Groups in the deployment of EFPs, which were expressly designed to penetrate the American armor. Hezbollah was essential to those EFP training efforts because Hezbollah fighters had direct experience using EFPs against Israeli armor in Lebanon. Indeed, at that point, Hezbollah was the world's foremost expert on EFPs. Hezbollah also provided the Special Groups with the complex expert knowledge required to precisely and successfully manufacture and use EFPs, by drawing on its experience in Lebanon. Hezbollah instructed the Special Groups to use EFPs against American soldiers. The New York Times reported in 2013 that "Iran passed E.F.P. technology to the Lebanese militia Hezbollah, which in turn passed E.F.P. kits to proxy groups fighting in Iraq."[102] In October 2008, Iraqi forces discovered and EFP factory in JAM's Sadr City stronghold that was built using the EFP technology that Hezbollah had provided to JAM. As a declassified British intelligence report concluded, EFPs used in Iraq during this time period were "exclusively associated with Hizballah."[103]

565. Hezbollah planned the Special Group EFP terrorist attack campaign (as with the other Special Group attacks outlined in this Complaint) in Iraq through the extensive training and coordination set forth above. Hezbollah's planning of the Special Group's EFP attacks against Americans included: (1) targeting specific geographies in Iraq, such as Baghdad and Basra, where Special Groups were permitted to launch EFP attacks; (2) instructing Special Groups to use EFPs against American armored vehicles in the first instance; (3) providing technical assistance to Special Groups with respect to EFP design schematics and concepts; (4) helping

---

[101] Michael Ware, *Inside Iran's Secret War for Iraq*, Time (Aug. 22, 2005).

[102] John Ismay, *The Most Lethal Weapon Americans Faced in Iraq*, N.Y. Times (Oct. 18, 2013), https://atwar.blogs.nytimes.com/2013/10/18/the-most-lethal-weapon-americans-faced-in-iraq/.

[103] Minute, Deputy Chief of Assessments Staff to Sir Nigel Sheinwald, Iraq: Lebanese Training including manuscript comment Blair (May 3, 2007).

manufacture EFPs for use against Americans in Iraq; (5) training senior Special Group terrorist commanders in Lebanon, Baghdad, and Iran with respect to all aspects of the EFP network, from design, to manufacture, to transportation, to attack strategy; (6) training lower-level Special Group members in camps in Lebanon, Sadr City, and Iran with respect to EFP tactics; (7) preparing and distributing sophisticated, high production value Arabic-language CD-ROMs and instructional videos concerning EFPs; and (8) forward deploying senior Hezbollah terrorists, including but not limited to Daqduq, to coordinate EFP attacks against Americans.

566.   **Rockets**. Hezbollah trained members of The Special Groups in the use of rocket launchers and anti-aircraft missiles. In particular, Hezbollah directed Special Group members to launch indirect-fire rocket attacks on the Green Zone and other U.S Installations, and it instructed them on how to do so. Hezbollah's direction to fire rockets on the Green Zone specifically included the indirect-fire attacks in early 2008 that precipitated the Battle of Sadr City. During these attacks in 2008, JAM rocket teams showed an ability to hit specific targets several miles away, demonstrating the effectiveness of Hezbollah's instruction. By that point, Hezbollah had become renowned for its use of rockets during the 2006 Israel-Hezbollah war, when it fired rockets at civilian targets in northern Israel. Indeed, the Long War Journal reported that the rockets JAM fired into Baghdad's Green Zone were "the same rockets Hezbollah fired into northern Israel from Lebanon during the Israel-Hezbollah war in the summer of 2006."[104]

567.   **Mortars**. Hezbollah trained Special Group members in the use of mortars, including by providing a Mortar Specialty Training Course to members of Special Groups at its training camps in Iran. The purpose of this training was to teach Special Group members to hit distant targets with mortar strikes. American military personnel have noted that The Special

---

[104] Bill Roggio, *Mahdi Rocket Teams Destroyed in Sadr City*, Long War J. (June 3, 2007), http://www.longwarjournal.org/archives/2007/06/mahdi_rocket_teams_d.php.

Group mortar strikes were particularly accurate.

568.    **RPGs and Anti-Tank Missiles.** Hezbollah trained Special Group operatives in the use of RPGs and advanced anti-tank missiles, including assembly, firing procedures, target acquisition, and the use of various kinds of munitions. Hezbollah's RPG and anti-tank missile training focused on attacks against armored vehicles and command structures such as the ones the United States used in Iraq. For example, a Hezbollah "planning guide" that U.S. forces recovered from Daqduq provided tactical instructions to Special Group terrorists for the use of RPGs against Americans, including commands concerning volume of fire and specific vehicles in the convoy to target in order to inflict maximum casualties.

569.    **Complex Attacks**. Hezbollah training programs emphasized "complex attacks" and small-group tactics that combine different types of attacks by different members of a team. One unclassified (as redacted) U.S. military-intelligence report summarized these tactics:

> For example, an engineer team may be responsible for emplacing and detonating IEDs on a convoy while a Support Weapons team is simultaneously responsible for launching mortars or rockets at the same vehicles. A conventional weapons team would then be responsible for firing at the vehicles with small arms and assaulting the vehicles. The Support Weapons team would be responsible for launching mortars at the vehicles again once the conventional weapons team pulled back. Each team functions together but does not get involved in what the other team is doing. A plan would be worked out ahead of time for this, and one individual in each team would be responsible for coordinating with the other team leaders during the attack.[105]

570.    Hezbollah also instructed Special Group operatives "on how to conduct precision, military style kidnappings," according to a 2006 U.S. government cable (as quoted in the New

---

[105] Combating Terrorism Ctr. at West Point Harmony Program, Redacted Intelligence Report 001, at 3 (Spring2007-Early 2008), https://ctc.usma.edu/app/uploads/2013/10/Redacted-Intelligence-Report-001-Summary.pdf.

York Times).[106]

571.   **Kidnappings**. Hezbollah is well-known for its kidnapping operations. In 2006, for example, Hezbollah agents conducted cross-border raids into Israel and abducted a number of Israeli soldiers. Hezbollah also trained Special Group operatives "on how to conduct precision, military style kidnappings," according to a 2006 U.S. government cable (as quoted in the New York Times).[107] JAM/KH, together with the Qods Force and Hezbollah, put this training to use during the 2007 raid on the Provincial Joint Coordination Center in Karbala, where JAM/AAH terrorists kidnapped four U.S. soldiers and killed another. And a 2011 letter from five U.S. Senators documented that Hezbollah operative Daqduq instructed "Iraqi extremists" who were part of Special Groups on "how to conduct intelligence and kidnapping operations."

572.   The extent of Hezbollah's involvement in Special Groups' attacks was demonstrated by evidence gathered in connection with Daqduq's capture in 2007, which included a document described by five U.S. Senators as a 22-page "planning guide" memorializing Hezbollah's wide-ranging involvement in the terrorist attacks detailed above. This "planning guide" included specific instructions describing how to plant IEDs and carry out abductions of Americans. Hezbollah's instruction as reflected in this "planning guide" enabled The Special Groups to execute an array of sophisticated attacks against Americans that it otherwise would have been unable to carry out.

573.   Hezbollah trained, and coordinated with, Special Group terrorists who were responsible for Hezbollah-authorized terrorist attacks throughout Iraq. This sophisticated training and coordination extended to the following areas (among others):

---

[106] *The War Logs: Secret Dispatches From the War in Iraq, Alleged Jaysh Al-Mahdi Plans to Kidnap U.S. Soldiers in Baghdad, Iraq*, N.Y. Times (Dec. 22, 2006), http://www.nytimes.com/interactive/world/iraq-war-logs.html?_r=report/ABD1B1E9-D673-93B1-757861100C0728BC.
[107] *Id.*

- **Baghdad – West Al Rashid District.** Al Rashid includes a main approach to Baghdad International Airport ("BIAP") and Victory Base Complex, a consolidated facility containing a range of Coalition military and civilian personnel that surrounded Baghdad International Airport ("BIAP") and so was a focus of Special Group attacks in western Baghdad. Special Groups coordinated attacks against Coalition forces in the Al Rashid District with Hezbollah. According to a U.S. military incident report (as published by *WikiLeaks*), "JAM/Hizballah members operating" in Al Rashid coordinated through Haji Abu Ali and Mohammad Kawtharani, the latter of whom personally advised Nasrallah. Such coordination also reportedly involved Jabbar Abdalnabi Alzarjawi, a "JAM leader" in Al Rashid who "facilitated . . . the movement of Hizballah members from Iran" into western Baghdad.[108]

- **Baghdad – Kadamiyah District.** Kadamiyah was one of The Special Groups' strongholds in western Baghdad. Hezbollah training and coordination enabled Special Groups to target Americans in Kadamiyah. According to a U.S. military incident report (as published by *WikiLeaks*), Salah Aldeen Fayath, his brother, and his daughter, whom the U.S. government determined "was a member of Hezbollah," provided targeting support for JAM operations against Coalition forces in Kadamiyah.[109]

- **Baghdad – Rusafa District.** Rusafa is a Special Group stronghold in eastern Baghdad. Hezbollah trained, locally supported, and coordinated with the Special Group IED/EFP cells operating in and near Rusafa. For example, JAM cells trained by Hezbollah in Iran used Rusafa to launch rocket attacks on the Green Zone.

- **Baghdad – Sadr City (Thawra District).** Sadr City serves as JAM/AAH's command-and-control center, safe haven, and principal power base in Iraq. Hezbollah trained, locally supported, and coordinated with JAM/AAH IED/EFP cells operating in and near Sadr City, with respect to both the attacks themselves and the subsequent Hezbollah and JAM/AAH propaganda concerning such attacks. For example, an August 12, 2008 U.S. military incident report (as published by *WikiLeaks*) confirmed that a "Hezbollah IED/EFP . . . cell" was active in and near Sadr City and was coordinating EFP attacks against Coalition forces with a "recon [JAM] element working in the area."[110]

- **Baghdad – New Baghdad District, Karadah District, and FOB Rustamiyah.** New Baghdad, Karadah, and the area near Forward Operating Base ("FOB") Rustamiyah were focal points for Hezbollah-coordinated attacks by Special Groups in eastern Baghdad. For example, one U.S. military report (as published by *WikiLeaks*) concluded that, with respect to attacks near FOB Rustamiyah, it was "most likely" that "Hezbollah operatives [were] directing SG to conduct [indirect fire] attacks against [Coalition forces] in [the] Baghdad area."[111] Similarly, according to an arrest report (as published by *WikiLeaks*), Abu Aloze served as "JAM leadership" in the area, was responsible for coordinating attacks against Americans in the New Baghdad and Karadah Districts

---

[108] *WikiLeaks* (Nov. 22, 2008), https://wikileaks.org/irq/report/2008/11/IRQ20081122n11950.html.

[109] *WikiLeaks* (Oct. 19, 2006), https://wikileaks.org/irq/report/2006/10/IRQ20061019n5720.html.

[110] *WikiLeaks* (Aug. 12, 2008), https://wikileaks.org/irq/report/2008/08/IRQ20080812n11209.html.

[111] *WikiLeaks* (Mar. 16, 2008), https://wikileaks.org/irq/report/2008/03/IRQ20080316n10618.html.

(including against FOBs in the area), and was specifically trained by Hezbollah in Lebanon.[112]

- **Babil, Wasit, and Salman Pak (Central Iraq).** Hezbollah trained, locally supported, and coordinated with Special Group cells operating in central Iraq, including Babil, Wasit, and Salman Pak. As published by *WikiLeaks*, Ahmad Sahib Ghali was a commander of JAM's "assassination cell and IED cell" in Hillah.[113] Ghali and his co-commanders were JAM terrorists who were trained by Hezbollah to conduct attacks against Coalition forces near Hillah.

- **Basra, Amarah and Nasiriyah (Southern Iraq).** Basra, Amarah and Nasiriyah are Special Group strongholds in southern Iraq. Hezbollah trained, locally supported, and coordinated with Special Group cells operating in and near Basra and Amarah. For example, in July and August 2008, U.S. government reports (as published by *WikiLeaks*) confirmed that five terrorist squads, comprised of "a combination of Hezbollah and JAM who finished their training in Iran" were "heading to Basrah to attack [Coalition forces]" and "carry out terrorist activities" after "coming back from Iran," where they had been "trained" on how to "use [indirect fire] techniques" and "manufactur[e] IEDs."[114]

- **Diyala (Northern Iraq).** Diyala is a province in northern Iraq and was (and remains) a central area of emphasis for Hezbollah and Special Groups (as well as Iranian-supported Sunni terrorist cells, discussed below) because of the critical role its capital, Baqubah, plays with respect to the Shiite terrorists' desire to have a secure land corridor linking Iran to Syria. Hezbollah trained, locally supported, and coordinated with Special Group cells operating in and near Diyala. As published by *WikiLeaks*, on June 23, 2008, Coalition forces detained a JAM commander in Baqubah, Rezul Sami Mohammed, who was "in possession of JAM and Hezbollah propaganda material."[115] Similarly, on September 27, 2008, as published by *WikiLeaks*, Coalition forces conducted a raid to capture Hezbollah operative Mohammed Radam in order to "reduce Hezbollah influence" near Baqubah.[116]

- **Kirkuk (Northern Iraq).** Kirkuk is a province in northern Iraq that played (and continues to play) a key role in radical Shiite terrorists' transportation, logistics, and communications networks. Consequently, Hezbollah and Special Groups have had a longstanding presence in Kirkuk. Hezbollah trained, supported, and coordinated with Special Group cells operating in and near Kirkuk. As published by *WikiLeaks*, a March 9, 2006 Department of State cable reported that a senior Kurdish official, when addressing the security challenges in Kirkuk province with U.S. counterparts, specifically identified the threat posed in Kirkuk province by Muqtada al- Sadr, whom

---

[112] *WikiLeaks* (June 23, 2008), https://wikileaks.org/irq/report/2008/06/IRQ20080623n11207.html.

[113] *WikiLeaks* (June 15, 2008), https://wikileaks.org/irq/report/2008/06/IRQ20080615n11261.html

[114] *WikiLeaks* (July 16, 2008), https://wikileaks.org/irq/report/2008/07/IRQ20080716n11210.html; and *WikiLeaks* (July 20, 2008), https://wikileaks.org/irq/report/2008/07/IRQ20080720n11400.html.

[115] *WikiLeaks* (June 23, 2008), https://wikileaks.org/irq/report/2008/06/IRQ20080623n11209.html.

[116] *WikiLeaks* (Sept. 27, 2008), https://wikileaks.org/irq/report/2008/09/IRQ20080927n11997.html.

the Kurdish official noted "was in league with Iran, Syria and Hezbollah."[117]

## G.   IRAN, THROUGH FTO HEZBOLLAH, PROVIDED THE SHIA SPECIAL GROUPS WITH WEAPONS TO CARRY OUT TERRORIST ATTACKS AGAINST AMERICANS IN IRAQ

574.   Hezbollah supplied many of the weapons that Special groups used to commit acts of terror against Americans in Iraq – and Special Groups also required money and resources (derived in significant part from their relationship to Iran) to acquire those weapons and transport them to the appropriate cells in Iraq. A JAM commander told journalists in June 2007 that "[a]ll of the Mahdi Army's weapons except for the AK-47 rifles come from Iran."[118]

575.   Hezbollah facilitated the flow of these weapons from Iran into Iraq by working with The Special Groups to set up cross-border smuggling networks. The *Long War Journal* reported in June 2007 that rockets that JAM fired into Baghdad's Green Zone were "the same rockets Hezbollah fired into northern Israel from Lebanon during the Israel-Hezbollah war in the summer of 2006."[119] Later that year, on August 12, 2008, Coalition forces arrested nine Hezbollah members who had been funneling weapons into Iraq. Hezbollah's involvement in these smuggling operations accorded with its longstanding role as Iran's weapons smuggler (including its attempt in 2003 to smuggle 50 tons of weapons from Iran to the Palestinian Authority, the largest Iranian-linked smuggling operation ever uncovered).

576.   Hezbollah has also purchased weapons for Special Groups outright. For example, according to a U.S. military-intelligence document (as quoted in *U.S. News & World Report* in 2004), "Hezbollah was 'buying rocket-propelled grenades . . . antitank missiles' and other

---

[117] U.S. State Dep't Cable, *Kurdistan Regional Government PUK Prime Minister Pushes for Kirkuk Against Spread of Political Islam and Iranian Influence* (Mar. 9, 2006), https://wikileaks.org/plusd/cables/06KIRKUK58_a.html.
[118] Leila Fadel, *Chilling Stories from the Mahdi Army*, McClatchy DC (June 22, 2007), http://www.mcclatchydc.com/news/nation-world/world/article24465475.html.
[119] Bill Roggio, *Mahdi Rocket Teams Destroyed in Sadr City*, Long War J. (June 3, 2007), http://www.longwarjournal.org/archives/2007/06/mahdi_rocket_teams_d.php.

weapons for Sadr's militia."[120]

**H.     IRAN MATERIALLY SUPPORTED SUNNI FTOS AL QAEDA ("AQ") AND ANSAR AL ISLAM ("AAI") TO PLAN, COMMIT, AND AUTHORIZE TERRORIST ATTACKS AGAINST AMERICANS IN IRAQ**

577.   In order to sow discord and with the intent to expel Coalition forces from Iraq, Iran supported both Shia and Sunnis groups – the common goal of which was to kill Americans.

578.   The 9/11 Commission reported that "[t]he relationship between al Qaeda and Iran demonstrated that Sunni-Shia divisions did not necessarily pose an insurmountable barrier to cooperation in terrorist operations."[121]

579.   From the beginning, Iran also supported FTOs al Qaeda ("AQ") and Ansar al-Islam ("AAI," also known as Ansar al-Sunna), a radical terrorist group with close ties to al Qaeda and JAM.

580.   Iran used Hezbollah, IRGC and MOIS to materially support these terrorist groups within Iraq and elsewhere, allowing them to authorize, plan and commit attacks against Americans in Iraq.

581.   In his speech, Hezbollah Secretary-General Hassan Nasrallah incited and pledged to support not only for the Shiite special groups (which he refers to as "Resistance Groups," but also for Sunni religious groups—which necessarily include AAI and AQ). In relevant part, Nasrallah stated as follows:

> Our march today is to defend every grain of dust in Iraq and all its cities from Najaf to Karbala to Fallujah to Al-Qaim to Baghdad to Basra and to Rafah and the olive and Gaza neighborhoods and to every location where there is a conflict between the resistance and the occupiers. . . Today in

---

[120] Edward T. Pound, *Special Report: The Iran Connection,* U.S. News & World Report (Nov. 22, 2004), http://www.iranfocus.com/en/index.php?option=com_content&view=article&id=741:the-iranconnection&catid=33&Itemid=115 (alteration in original).
[121] The National Commission on Terrorist Attacks Upon the United States, T*he 9/11 Commission Report*, p. 61 (July 22, 2004), https://govinfo.library.unt.edu/911/report/911Report.pdf.

Iraq, what we demand is that the nation defends all of Iraq and the people of Iraq as a whole, from the entire Iraqi population and from the resistance[122] in all its forms in Iraq. . . . There is one camp called America and "Israel," and we say to this camp: Death to America…And we say to the same killers in Rafah, Najaf, and Karbala, and Qaim: Death to "Israel" . . . We know how to continue this battle to end the defeat of the enemy and our victory, we bear the burden of blood and loss and sacrifices, and I affirm that our solidarity with our people in Palestine and Refah and our people in Iraq is not incompatible with our national interests, because here we do not pretend, we do not challenge our partners at home, but we challenge the enemies of our homeland and the enemies of our nation who if they managed to eliminate part of this nation will continue to eliminate the rest of this nation. [123]

582.    Hezbollah Commander Talal Hamiyeh worked closely with Imad Moughniyeh and Hezbollah's External Security Organization, (also known as 910 unit), to orchestrate and execute terror attacks outside of Lebanon,[124] including attacks in Iraq involving AQ and AAI.

583.    According to Lebanese sources, Hamiyeh traveled to Iraq frequently and was in close contact with the leaders of Terrorist Groups who were attacking Coalition forces.[125]

584.    Hezbollah's Hamiyeh played a key role in trafficking foreign jihadists into Iraq for the sole purpose of attacking Americans, and he "has been responsible for… and sending Al-Qaida volunteers to Iraq via Syria."[126]

585.    Iran assisted AQ to infiltrate Iraq from Syria, and attack Americans in the Northern and Western areas of Iraq, supplied and supported by the rat lines flowing from Syria.

586.    In November 2017, The U.S. Central Intelligence Agency declassified hundreds

---

[122] The term "resistance" is a Hezbollah code word meaning armed struggle, including terrorism.

[123] *See* https://archive.alahednews.com.lb/alahed.org/archive/2004/2805/file/doc1.htm (last visited, Oct. 15, 2017) (translation to English available).

[124] Thomas Joscelyn, "Analysis: 2 US cases provide unique window into Iran's global terror network", The Washington D.C. based think tank Foundation for Defense of Democracies' Long War Journal, June 23, 2007, https://www.longwarjournal.org/archives/2017/06/analysis-2-us-cases-provide-unique-window-into-irans-global-terror-network.php

[125] *See* "Who Are the Two Hezbollah Military Commanders Wanted by the U.S.?," Haaretz, October 11, 2017, https://www.haaretz.com/us-news/who-are-the-two-hezbollah-leaders-wanted-by-the-u-s-1.5456968; *See also* "Who are the Two Hezbollah Senior Officials Whom [the U.S.] Offered 12 Million Dollars Rewards for Information [Leading to their Arrest] ", BBC Arabic, October 11, 2017, http://www.bbc.com/arabic/middleeast-41583624

[126] *Id*.

of thousands of pages of documents, images and computer files recovered during the raid on Usama bin Laden's compound in Abbottabad, Pakistan. This included a 19-page document containing:

> a senior jihadist's assessment of the group's relationship with Iran. The author explains that Iran offered some 'Saudi brothers' in al Qaeda 'everything they needed,' including 'money, arms' and 'training in Hezbollah camps in Lebanon, in exchange for striking American interests in Saudi Arabia and the Gulf.' Iranian intelligence facilitated the travel of some operatives with visas, while sheltering others. Abu Hafs al-Mauritani, an influential ideologue prior to 9/11, helped negotiate a safe haven for his jihadi comrades inside Iran… the author explains that al Qaeda is not at war with Iran and some of their 'interests intersect,' especially when it comes to being an enemy of America.[127]

587.    In a previously released letter, bin Laden described Iran as al Qaeda's "**main artery for funds, personnel, and communication**."[128]

## 13.    IRAN'S HISTORY OF SUPPORTING SUNNI TERROR GROUPS

### A.    FTO AL QAEDA ("AQ")

588.    AQ is a designated international terrorist organization, widely recognized as such by all civilized nations and the United Nations, and is not a legitimate "*military force*" or a recognized sovereign state.

589.    The United States has designated AQ, including its branches, subsidiaries and "franchisees" (including al-Qaeda in Iraq) as a FTO and a SDGT. AQ was designated as a FTO on October 8, 1999.

590.    Commencing in the early 1990s and continuing until at least 2011, Iran (and Sudan) provided AQ significant indispensable funding, weapons, safe haven, training, intelligence, passports, and centers for command and control. Iran also provided undocumented transport between Afghanistan, Iraq and Pakistan across its borders and other significant material

---

[127] *See* Thomas Joscelyn and Bill Roggio, *Analysis: CIA Releases Massive Trove of Osama bin Laden's files*. Long War J. (Nov. 1, 2017), https://www.longwarjournal.org/archives/2017/11/analysis-cia-releases-massive-trove-of-osama-bin-ladens-files.php
[128] *Id*.

support.

591.    In the 1990s, AQ developed a close relationship with Iran and the IRGC. Usama bin Laden ("UBL") and Ayman al Zawahiri held clandestine meetings with Imad Mughniyah and Ahmad Vahidi (then commander of the Qods Force) which "lead to an informal agreement to cooperate in providing support for actions carried out primarily against Israel and the United States…Thereafter, senior AQ operatives and trainers traveled to Iran to receive training in explosives. [UBL] also sent senior aides to Iran for training with the IRGC and to Lebanon for training with Hizballah."[129]

592.    On June 30, 1989, General Omar Hassan al-Bashir led a coup d'état toppling the exiting regime in Sudan. The radical Salafi cleric, Hassan Abd Allah al Turabi served as the "intellectual architect," or "the power behind the throne," sometimes officially as leader of the National Islamic Front and sometimes as speaker of the parliamentary assembly.

593.    In 1990-1991, Turabi founded the Popular Arab and Islamic Congress, which included representatives from the Palestine Liberation Organization, Hamas, Egyptian Islamic Jihad, AQ, Algerian Islamic Jihad, Hezbollah, Abu Nidal Group, and the Islamic Revolutionary Guard Corp.

594.    In 1991, the Kingdom of Saudi Arabia expelled AQ leader UBL") and UBL moved his base of operations to Sudan.

595.    The Sudanese army protected UBL's home in Khartoum and his terrorist training bases within the country as well as providing AQ with access to the international and United States financial networks. In addition, Sudan provided AQ with 200 Sudanese passports, allowing AQ operatives to travel under fictitious identities.

596.    Turabi brought together UBL and leaders of the IRGC-QF and leaders of

---

[129] *In re Terrorist Attacks on September 11, 2001*, 2011 U.S. Dist. LEXIS 155899, at *110–11.

Hezbollah. Commencing in April, 1991, Turabi hosted meetings bringing together leaders from AQ, Hezbollah and Iranian and Sudanese officials. According to AQ shura council member Abu Hajer al-Iraqi, the purpose of these meetings was to focus on common enemies, the West and the United States.

597.    In 1991, Hezbollah opened a base of operations in Khartoum, Sudan.

598.    On December 13, 1991, Iranian President Ali Akbar Hashemi Rafsanjani arrived in Khartoum, Sudan for a six-day visit, by a delegation of 157 members, including Mohsen Rezai then Commander of the IRGC, Iranian Intelligence Minister Ali Fallahian and Iranian Defense Minister Ali Akbar Torkan. Various agreements were signed between Iran and Sudan, pursuant to which, *inter alia*, Iran delivered $300 million of Chinese weapons and 2,000 IRGC operatives were sent to train Sudan's Popular Defense Forces.

599.    According to the 9/11 Commission Report, in late 1991 or 1992, discussions in Sudan between AQ and Iranian operatives led to an agreement to cooperate in providing support - specifically, training - for actions carried out primarily against Israel and the United States. Not long afterward, senior AQ operatives and trainers traveled to Iran to receive training in explosives.

600.    Iran was a valuable connection for UBL and AQ, and AQ was highly beneficial to Iran, given AQ's extreme and violent position against America and its animosity against the Kingdom of Saudi Arabia. Iran and Hezbollah played significant roles in the buildup of AQ's terrorist capabilities.

601.    As a result of the creation of this terrorist alliance, AQ leader Ayman al Zawahiri repeatedly visited Tehran during the 1990s and met with Minister Ali Fallahian and other officers of MOIS, and IRGC-QF Commander Ahmad Vahidi.

602.    Throughout the 1990s, the AQ-Iran-Hezbollah terrorist training arrangement continued. Hezbollah leader Imad Mughniyah coordinated these training activities, including training of AQ personnel, with Iranian government officials in Iran and with IRGC officers working undercover at the Iranian embassy in Beirut, Lebanon.

603.    AQ operative Ali Mohammed provided security for one prominent meeting between Hezbollah's chief external operations officer, Imad Mughniyah, and UBL in Sudan. Mohammed testified at his plea hearing that "*Hezbollah provided explosives training for al Qaeda and al Jihad. Iran supplied Egyptian Jihad with weapons. Iran also used Hezbollah to supply explosives that were disguised to look like rocks*."

604.    Iran trained Saif al-Adel, head of AQ security, and other AQ members, including shura council members, at Hezbollah training camps in the mid-1990s. AQ leader Mustafa Hamid was one of AQ's primary points of contact with IRGC. He negotiated the agreement between AQ and Iran, which secured safe transit between Iran and Afghanistan and to Iraq for AQ members.

605.    These training camps were used by AQ in planning and perpetrating the terrorist attacks conducted against U.S. civilians, diplomats, and servicemen and women, such as: the suicide bombing of U.S. Air Force personnel and their families in Khobar, Saudi Arabia; the U.S. embassies in Nairobi and Dar es Salaam; and the World Trade Center on September 11, 2001.

606.    In 1995 and again in 1996, UBL approached MOIS and asked to join forces against the United States. UBL's phone records, obtained by U.S. investigators working on the U.S. embassy bombings in Kenya and Tanzania, show that 10% of phone calls made by UBL and his lieutenants were to Iran.

607.    Seif al-Adl, one of AQ's top-ranking leaders at the time, was the liaison between Iranians and AQ. He coordinated meetings with the IRGC's leaders and MOIS officials.

608.    On June 25, 1996, Iranian-backed Hezbollah terrorists, with the support of AQ, bombed the Khobar Towers housing complex in Dhahran, Saudi Arabia, killing 19 U.S. servicemen and wounding approximately 500 others. FBI investigators concluded: the operation was undertaken on direct orders from senior Iranian government leaders; the bombers had been trained and funded by the IRGC in Lebanon's Bekaa Valley; and senior members of the Iranian government, including Ministry of Defense, Ministry of Intelligence and Security and the Supreme Leader's office, had selected Khobar as the target and commissioned Hezbollah to carry out the operation.

609.    AQ was involved in the planning and preparations for the Khobar Towers bombing. UBL tried to facilitate a shipment of explosives to Saudi Arabia, and, on the day of the operation, UBL was, according to NSA intercepts, congratulated on the telephone.[130]

610.    The 9/11 Commission examined classified CIA documents establishing that IRGC-QF commander Ahmad Vahidi planned the Khobar Towers attack with Ahmad al Mugassil, a Saudi-born al Qaeda operative.

611.    Iran aided, abetted and conspired with Hezbollah, UBL, and AQ to launch the large-scale bombing attacks against the United States embassies in Nairobi and Dar es Salaam on August 7, 1998. Prior to their meetings with Iranian officials and agents, UBL and AQ did not possess the technical expertise required to carry out the embassy bombings. The Iranian defendants, through Hezbollah, provided explosives training to UBL and AQ and rendered direct assistance to AQ operatives.[131]

---

[130] The 9/11 Commission, https://www.9-11commission.gov/report/911Report.pdf.
[131] *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 139. D.D.C. 2011.

612.    As stated in the 9/11 Report, "Iran made a concerted effort to strengthen relations with al Qaeda after the October 2000 attack on the *USS Cole…*" For example, Iranian officials facilitated the travel of AQ members – including at least 8 of the 9/11 hijackers – through Iran on their way to and from Afghanistan, where the hijackers trained at AQ's terrorist training camps.[132]

613.    U.S., Saudi, and Egyptian political pressure on the Sudanese eventually forced them to expel UBL in May 1996. Radical Afghan Sunni warlord Gulbuddin Hekmatyar, a strong Iranian ally, invited UBL to join him in Afghanistan. UBL then relocated to Afghanistan with the assistance of the Iranian intelligence services.[133]

614.    Iran provided material support to AQ after the 9/11 attacks in several ways, most significantly by providing safe haven to AQ leaders and operatives, keeping them safe from retaliation by U.S. forces, which invaded Afghanistan. According to the U.S. Treasury Department press release on January 16, 2009, in late 2001, while in Tehran, AQ senior operative Mustafa Hamid negotiated with the Iranians to relocate AQ families to Iran after the 9/11 attacks.

615.    In the fall of 2001, Iran facilitated the exit from Afghanistan, into Iran, of numerous AQ leaders, operatives, and their families. The Iran-Afghanistan safe passageway, established earlier to get AQ recruits into and out of the training camps in Afghanistan, was utilized to evacuate hundreds of AQ fighters and their families from Afghanistan into Iran for safe haven there. The IRGC knew of, and facilitated, the border crossings of these AQ fighters and their families entering Iran.

616.    Among the high-level AQ officials who arrived in Iran from Afghanistan at this

---

[132] The 9/11 Commission, https://www.9-11commission.gov/report/911Report.pdf.
[133] *Id*. at 65.

time were Saad bin Laden and the man who would soon lead FTO al Qaeda in Iraq ("AQI"), Abu Musab al Zarqawi.

617.    In late 2001, Sa'ad bin Laden facilitated the travel of UBL's family members from Afghanistan to Iran. Thereafter, Sa'ad bin Laden made key decisions for AQ and was part of a small group of AQ members involved in AQ from Iran.

618.    By 2002, AQ had established in Iran its 'management council,' a body that UBL reportedly tasked with providing strategic support to the organization's leaders in Pakistan. Key members of the council included Saif al-Adel, Sulayman Abu Ghayth, Abu al-Khayr al-Masri, Abu Muhammad al-Masri, and Mahfouz Ould al-Walid (a.k.a. Abu Hafs al-Mauritani). All five senior operators remained influential over the next several years and retained close ties to UBL. Adel organized groups of fighters to overthrow Hamid Karzai's regime in Afghanistan and provided support for the May 12, 2003 terrorist attacks in Riyadh.[134]

619.    The Iranian regime offered AQ this safe haven in order to advance its own interests. Having AQ operatives in the country gave Iran a bargaining chip and important leverage with the U.S. and Saudi Arabia. In addition, it enabled Iran to protect itself from a possible attack against targets in Iran. The deal enabled Iran to cause chaos in Iraq and thus preventing it from becoming a Muslim democratic regime, which would endanger the security of the Iranian regime by the example and influence it would pose to the tens of thousands of Iranian pilgrims who visit the Shiite shrines in Iraq each year.

620.    The deal was reportedly reached between IRGC-QF commander Qassem Soleimani and AQ senior commander Abu Hafs al-Mauritani at Iran's Zahedan (near the

---

[134] Seth Jones, *Al Qaeda in Iran* (Jan. 29, 2012), https://www.foreignaffairs.com/articles/iran/2012-01-29/al-qaeda-iran.

Pakistani and Afghanistan border) during December 2001.[135]

621.    In testimony before the U.S. Senate in February 2003, CIA Director George Tenet said, "we see disturbing signs that al Qaeda has established a presence in both Iran and Iraq."[136]

622.    Senior AQ members continued to conduct terrorist operations from inside Iran. For example, U.S. intercepted communications from Saif al Adel, then in Mashad, Iran, to AQ assassination teams in Saudi Arabia just before their May 12, 2003 assault on three housing compounds in Riyadh. AQ leaders in Iran planned and ordered the Riyadh bombing.

623.    CIA Director General Michael Hayden noted UBL understood that Iran was providing safe harbor to AQ. For example, he quoted communications between senior AQ commanders and UBL, found on UBL's computer:

> "everybody is threatened – as long as he moves – by a missile…There is an idea preferred by some of the brothers to avoid attrition [loss of staff, leaders, and the organization's old elites] the idea is that some brothers will travel to 'safe' areas with their families, just for protection." The author offers some ideas for safe havens: Sind, Baluchistan, Iran. Two months later bin Laden agrees they should be taking refuge in safer areas."[137]

624.    After the September 19, 2008 attack on the American embassy in Sana'a, Yemen, which killed 19 people, Ayman al Zawahiri sent a letter to IRGC (which was intercepted) which stated: "Al-Qaeda's leadership pays tribute to Iran's generosity, stating that *without its 'monetary and infrastructure assistance' it would have not been possible for the group to carry out the terror attacks*.[138] (Emphasis added).

---

[135] Cathy Scott-Clark & Adrian Levy, *The Exile: The Stunning Inside Story of Osama bin Laden and Al-Qaeda in Flight* (2017).
[136] David Johnston, *Threats and Responses: Washington; Top U.S. Officials Press Case Linking Iraq to Al Qaeda*, N.Y Times (Feb. 12, 2003), http://www.nytimes.com/2003/02/12/world/threats-responses-washington-top-us-officials-press-case-linking-iraq-al-qaeda.html.
[137] Michael W. Hayden, *American Intelligence in the Age of Terror – Playing to The Edge*, at 339-340 (2016).
[138] Con Coughlin, *Iran receives al Qaeda praise for role in terrorist attacks*, THE TELEGRAPH (Nov. 23, 2008), http://www.telegraph.co.uk/news/worldnews/middleeast/iran/3506544/Iran-receives-al-Qaeda-praise-for-role-in-terrorist-attacks.html.

625.    Testifying before the Senate Foreign Relations Committee on March 16, 2010, then commander of U.S. Central Command General David Petraeus stated that AQ "[c]ontinues to use Iran as a key facilitation hub, where facilitators connect al Qaeda's senior leadership to regional affiliates..."[139]

626.    Defendants knew, or were deliberately indifferent to, the fact that Iran provided funding, financial services, and material support to AQ.

### B.    FTO AL QAEDA IN IRAQ ("AQI")

627.    In 1999, Abu Musab Zarqawi founded and was the operational leader of Al Tawhid al Jihad (a/k/a Jund al-Islam), an organization with close personal and organizational links to the AQ terror network. UBL provided Zarqawi $200,000 to set up a training camp in Afghanistan near the border with Iran. In 2000, a Jordanian court sentenced Zarqawi in absentia to fifteen years of hard labor for his role in the AQ millennial terror plot targeting Western interests in Jordan.

628.    In early September 2001, Zarqawi met Mohamed Abu Dhess, one of the Tawhid cell operatives in Germany, in Iran. During the meeting, Zarqawi instructed Abu Dhess to commit terrorist attacks against Jewish or Israeli facilities in Germany. Zarqawi's cell operatives included Mohamed Abu Dhess, Shadi Abdalla, Aschraf Aidagma, and Ismail Shalabi, who were living in Beckum, Germany. The members of the cell planned to use various weapons in order to attack a busy square in a German town or city and another German town in the immediate vicinity of an Israeli or Jewish property with the aim of killing as many people as possible, but were arrested by the German authorities on April 23, 2002.[140]

---

[139]Combatting Terrorism Center at West Point, *CTC Sentinel* (Apr. 2007), https://ctc.usma.edu/marriage-of-convenience-the-evolution-of-iran-and-al-qaidas-tactical-cooperation/.
[140] U.S. Dep't of the Treasury, *Treasury Designates Six Al-Qaeda Terrorists* (Sept. 24, 2003), *available at* https://www.treasury.gov/press-center/press-releases/Pages/js757.aspx.

629.    On September 23, 2001, Tawhid (together with Iranian-sponsored Ansar al Sunna, discussed below) took hostages, tortured, and murdered (the majority of which were beheaded) 42 Peshmerga security officers in the Iraqi Kurd border town (on the border with Iran).

630.    In early 2002, Zarqawi escaped from U.S. forces in Afghanistan to Iran with other AQ leaders and operatives.[141] While staying in Iran, Zarqawi operated under the control of the IRGC and the IRGC-QF. Intelligence officials claimed the time Zarqawi spent in Iran was crucial for rebuilding his network before relocating to Iraq to establish the AQ subgroup al Qaeda in Iraq ("AQI").[142]

631.    AQI is an international terrorist organization and not a "military force" and intentionally violates all core provisions of international humanitarian laws (laws of war), IHRL, and the ICC Statutes.

632.    Several months later, Zarqawi returned to the Ansar al-Islam camp in northern Iraq, run by his Jund al-Islam/Tawhid lieutenants.[143]

633.    On September 24, 2003, the U.S. Treasury designated Zarqawi and several of his associates as SDGTs, stating that Zarqawi not only has "ties" to Hezbollah, but that plans were in place for his deputies to meet with both Hezbollah and Asbat al Ansar (a Lebanese Sunni

---

[141] The Washington Institute, *Untangling the Terror Web: Identifying and Counteracting the Phenomenon of Crossover Between Terrorist Groups* (Spring 2004),
https://www.washingtoninstitute.org/uploads/Documents/opeds/4224dcca0249e.pdf.
[142] United Against Iran, *Alliance Against America: Al Qaeda and Iran*,
https://www.unitedagainstnucleariran.com/node/3295 (last visited Oct. 14, 2017). United Against Iran was founded in 2008 by Ambassador Mark D. Wallace, the late Ambassador Richard Holbrooke, former CIA Director Jim Woolsey and Middle East expert Ambassador Dennis Ross.
[143] Matthew Levitt, *Untangling the Terror Web: Identifying and Counteracting the Phenomenon of Crossover Between Terrorist Groups*, SAIS Review (Winter-Spring 2004) (*available at*
https://www.washingtoninstitute.org/uploads/Documents/opeds/4224dcca0249e.pdf).

terrorist group tied to AQ).[144]

634.   In 2004, Zarqawi changed the name of his group from Al Tawhid to al Qaeda in Iraq, and sworn allegiance to AQ.

635.   US Department of Treasury designated Tawhid al Jihad as an FTO and SDGT on October 15, 2004.[145] OFAC SDN designation was updated on December 1, 2004 to the other known names of al Qaeda in Iraq.[146]

636.   MOIS and IRGC-QF are under the general command of Section 101, also called the Leader's Intelligence and Security office. They cooperate and share intelligence in "exporting the revolution" (which is a euphemism for fomenting violence and destabilizing other regimes, primarily via acts of international terrorism).[147]

637.   Department 15 of MOIS handles liaison responsibilities with foreign terror groups while the IRGC relies on its IRGC-QF for many of the same functions.[148]

638.   On June 10, 2003, American intelligence officials asserted that MOIS and the IRGC-QF are deeply involved in supporting AQ.[149]

639.   In December 2006, two IRGC-QF agents were arrested in Baghdad, possessing "weapons lists, documents pertaining to shipments of weapons into Iraq, organizational charts, telephone records and maps, among other sensitive intelligence information… [and] information about importing modern specially shaped explosive charges into Iraq. Officials were particularly

---

[144] *Supra* n. 140. [U.S. Dep't of the Treasury, *Treasury Designates Six Al-Qaeda Terrorists* (Sept. 24, 2003), *available at* https://www.treasury.gov/press-center/press-releases/Pages/js757.aspx.]
[145] U.S. Dep't of the Treasury, *Recent OFAC Actions* (Oct. 15, 2004), https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20041015.aspx.
[146] U.S. Dep't of the Treasury, *Recent OFAC Actions* (Dec. 1, 2004), https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20041201.aspx.
[147] Stratfor, *Iranian Intelligence and Regime Preservation* (June 22, 2010), https://worldview.stratfor.com/article/special-series-iranian-intelligence-and-regime-preservation.
[148] William Tucker, *A Reported Shift in Iran's IRGC* (Sept. 29, 2015), http://inhomelandsecurity.com/a-reported-shift-in-irans-irgc/. In Homeland Security Chief Correspondent William Tucker is a former terror specialist in the United States Army.
[149] *U.S. says Iran harbors al Qaeda 'associate'*, The Washington Times (June 10, 2003), http://www.washingtontimes.com/news/2003/jun/10/20030610-125659-6237r/.

concerned by the fact the Iranians had information about importing modern, specially shaped explosive charges into Iraq, weapons that have been used in roadside bombs to target U.S. military armored vehicles."[150] An American intelligence official said these documents "show how the [IRGC-QF]… is working with individuals affiliated with al Qaeda in Iraq and Ansar Al Sunna." [151] One of the detainees was – according to General Stanley McChrystal – Mohsen Chizari, commander of IRGC-QF's Operations and Training staff.[152]

640.    "Iranian involvement in Iraq with the Sunni terrorists has been an open secret in military and intelligence circles since the Fallujah uprising in March of 2004. Iranian mines and weapons were funneled to Zarqawi's terrorists in Fallujah and elsewhere throughout Sunni dominated Anbar province."[153]

641.    On February 16, 2012, the U.S. Department of Treasury designated MOIS, indicating that it has facilitated al Qaeda operatives in Iran and provided them with documents, identification cards, and passports. The Treasury also stated that MOIS provided money and weapons to AQI, and negotiated prisoner releases of al Qaeda operatives.[154]

642.    Under Secretary for Terrorism and Financial Intelligence David S. Cohen on July 28, 2011, said that, "[b]y exposing Iran's secret deal with [al Qaeda], allowing it to funnel funds and operatives through its territory, we are illuminating yet another aspect of Iran's unmatched support for terrorism. Today's action [designating the following al Qaeda terrorists and others] also seeks to disrupt this key network and deny [al Qaeda's] senior leadership much-needed

---

[150] *Iraq Expels 2 Iranians Detained by U.S.*, THE WASHINGTON TIMES (Dec. 30, 2006), http://www.washingtonpost.com/wp-dyn/content/article/2006/12/29/AR2006122901510.html.
[151] Eli Lake, *Iran's Secret Plan for Mayhem*, N.Y. SUN (Jan. 3, 2007), http://www.nysun.com/foreign/irans-secret-plan-for-mayhem/46032/.
[152] Michael Weiss & Hassan Hassan, *ISIS: Inside the Army of Terror* (2015).
[153] Bill Roggio, *Iran and Al Qaeda in Iraq*, *FDD'S Long War Journal* (Jan. 6, 2007), *available at* http://www.longwarjournal.org/archives/2007/01/iran_and_alqaeda_in.php.
[154] U.S. Dep't of the Treasury, *Treasury Designates Iranian Ministry of Intelligence and Security for Human Rights Abuses and Support for Terrorism* (Feb. 16, 2012), https://www.treasury.gov/press-center/press-releases/Pages/tg1424.aspx.

support…Iran is a critical transit point for funding to support al-Qa'ida's activities in Afghanistan and Pakistan." Among terrorists designated was Ezedin Abdel Aziz Khalil (a/k/a Yasin al-Suri).[155]

643.    Ezedin Abdel Aziz Khalil, a prominent AQ facilitator, who has been operating under a secret agreement between AQ and the Iranian government. The Iranian regime has permitted Khalil to operate within its borders since 2005 and maintain a relationship with him. Khalil moved money and recruits from across the Middle East into Iran, then on to Pakistan for the benefit of AQ senior leaders. He was responsible for moving significant amounts of money via Iran for onward passage to AQ leadership in Iraq and Afghanistan.

644.    Muhsin al-Fadhli, was considered then "an [al Qaeda] leader in the Gulf countries." His 2005 designation states he was "considered an al Qaeda leader in the Gulf" who "provided support to Iraq-based fighters for attacks against" the U.S.-led Coalition. Al-Fadhli was also a "major facilitator" for deceased AQI leader Abu Musab al Zarqawi…Al-Fadhli began working with [al Qaeda's] Iran-based facilitation network in 2009 and was later arrested by the Iranians. He was subsequently released by the Iranians in 2011 and went on to assume the leadership of the facilitation network from AQ leader Yasin al-Suri later that year.

645.    AQ leader Yasin al-Suri along with five other terrorist operatives used his safe harbor in Iran to move funds and recruits from Iran's neighboring Gulf countries to South Asia and elsewhere. Al Suri's network assisted senior AQ operatives in Iraq and Pakistan.

646.    On February 5, 2014, the U.S. Treasury Department designated senior AQ member Jafar al-Uzbeki, part of an AQ network which operates in Iran "with the knowledge of Iranian authorities." The Treasury added that this network "uses Iran as a transit point for

---

[155] U.S. Dep't of Treasury, *Treasury Targets Key Al-Qa'ida Funding and Support Network Using Iran as a Critical Transit Point* (July 28, 2011), https://www.treasury.gov/press-center/press-releases/Pages/tg1261.aspx.

moving and funding foreign fighters through Turkey to support AQ-affiliated elements inside Syria."

647.    Defendants knew, or were deliberately indifferent to, the fact that Iran provided funding, financial services, and material support to AQI.

### C.    FTO ANSAR AL ISLAM ("AAI")

648.    AAI is a Kurdish Sunni Muslim insurgent group and separatist movement in Iraq with well-established ties to Iran, AQ, and JAM.

649.    Mullah Krekar, aka Faraj Ahmad Najmuddin, reportedly founded AAI in December 2001 (at that time, with funding and logistical support from al-Qaeda and UBL, as well as support from Iran).

650.    AAI has a number of aliases and/or subgroups, including Ansar al-Sunna; Ansar al-Sunna Army; Devotees of Islam; Followers of Islam in Kurdistan; Helpers of Islam; Jaish Ansar al-Sunna; Jund al-Islam; Kurdish Taliban; Kurdistan Supporters of Islam; Partisans of Islam; Soldiers of God; Soldiers of Islam; and Supporters of Islam in Kurdistan.

651.    The United States has designated AAI/Ansar al Sunna as an FTO and an SDGT. AAI was designated as a FTO on March 22, 2004.

652.    AAI is an international terrorist organization and not a "military force" and intentionally violates all core provisions of international humanitarian laws (laws of war), IHRL, and the ICC Statutes.

653.    AAI seeks to expel western interests from Iraq and establish an independent Iraqi state based on its interpretation of Sharia law. AAI has been mostly active in the northern part of Iraq, western Iraq-Anbar province, and in the areas surrounding and including Mosul and Kirkuk since 2003.

654.    In 2001, AAI seized control of several villages near the town of Halabja and

established an administration ruled by Shari'a Law.

655.    In late March 2003, the majority of AAI members fled across the border and regrouped in Iran with the assistance of the IRGC and the Iranian regime. Many of those fighters reentered Iraq and took active part in anti-Coalition activities. From Iran, the group continued to operate under Abu Abdullah Shafi's leadership and was temporarily renamed Ansar al-Sunna (although it officially re-adopted the name Ansar al-Islam in 2007).

656.    Shortly after the U.S.-led invasion of Iraq in March 2003, the majority of AAI members were captured, killed, or fled to neighboring Iran. Mullah Krekar fled to Norway where he has remained ever since. In his place, Abu Abdullah al-Shafi, also known as Warba Holiri al-Kurdi, assumed command of the remnants of the organization. From Iran, the group continued to operate under Shafi's leadership and was temporarily renamed Ansar al-Sunna (it officially re-adopted the name AAI in 2007).

657.    According to AAI prisoners held by the Patriotic Union of Kurdistan in Sulaymaniyah, AAI used Iran as a base from which to plan operations against U.S. forces in Iraq.

658.    During the summer of 2004, the jihadists began migrating back into Iraq. A large number of the returning jihadists chose to settle in Mosul. In October 2004, Lt. Gen. Norton Schwartz, who at the time was the Director of the Joint Staffs at the Pentagon (and from 2008-2012 was Chief of Staff of the Air Force), warned that AAI had reemerged as the coalition's "principal organized terrorist adversary in Iraq."

659.    In addition to committing terrorist attacks that are the subject of this lawsuit, AAI intentionally targeted civilians, diplomats, hospitals, religious institutions, military personnel, and non-combatants alike, and perpetrated acts of mass murder, assassinations, and kidnappings, intended to terrorize, intimidate, and coerce civilian populations, governments, and international

institutions. For example:

    a)    The September 23, 2002 massacre at the village of Kheli Hama during which 42 police officers and Pershmerga (military forces of Iraqi Kurdistan) were killed, tortured, and beheaded;

    b)    The February 1, 2004 suicide bombing attacks on the offices of the two main Iraqi Kurdish political parties, the Kurdish Democratic Party, and the People's Union of Kurdistan party, killing at least 109 and injuring 130 civilians and elected officials;

    c)    Kidnappings of numerous foreign civilians in Iraq in 2004, and the subsequent broadcasting of their beheadings via the internet;

    d)    The June 27, 2004 video of a captured and blindfolded Marine. On July 3, 2004, Ansar al-Sunna claimed it had murdered hostage U.S. Marine Cpl. Wassef Ali Hassoun;

    e)    At 7:15 on September 7, 2004, Ansar al-Islam kidnapped journalists Scott Taylor (Canadian freelancer) and Zeynep Tugrul (Turkish journalist for Turkish Sabah newspaper) holding them for 5 days and continually torturing, beating, and threatening them with execution before releasing them;

    f)    Beheading of 12 civilian Nepalese hostages seized in Iraq (broadcast via video on the internet) claiming the hostages were "fighting the Muslims and serving Jews and the Christians" and "believing in Buddha as their God;" and

    g)    The October 3, 2004 beheading of an Iraqi contractor and videotaped message threatened to kill other Iraqis working with Americans.

    660.    From 2003-2007, AAI continued to target Coalition Forces and U.S. Nationals, including Plaintiffs. Its deadliest attack during this period occurred on February 1, 2004, when it launched multiple simultaneous suicide car bombings at PUK offices in Erbil, killing over 100 civilians and injuring over 130 more. By February 2007, AAI had claimed responsibility for over 1,600 attacks in Iraq, including against American nationals. AAI openly cooperated with AQI; however, it adamantly refused to formally join the Islamic State of Iraq, which was an umbrella organization established by AQI. Instead, in May 2007, AAI joined with the Mujahideen Army, the Islamic Army in Iraq, and Ansar al-Sunna Shariah (a splinter group that had broken from

AAI in early 2007 because its members wished to take a harder line against AQI) to form an anti-Coalition umbrella organization called the Reformation and Jihad Front. The Reformation and Jihad Front was a pan-Islamist organization that challenged AQI for leadership of the Iraqi Sunni Islamist movement.

661.   U.S. and British intelligence reports in 2004 "concluded that [AAI] was working closely with Iran, and also al Qaeda, in its terrorist attacks against coalition forces." One British defense report noted "Intelligence indicates that elements of Iran's [IRGC-QF] 'are providing safe haven and basic training to Iran-based [AAI] cadres.'" (Brackets in original).[156]

662.   On December 21, 2004, AAI subgroup Jamaat Ansar al-Sunna launched a suicide bomb attack on FOB Marez in Mosul, Iraq. AAI insurgent Abu Museli, disguised as an Iraqi Security Services officer, entered the base mess tent and detonated the explosive vest he was wearing. The blast killed fourteen U.S. soldiers, four U.S. citizen Halliburton employees, and four Iraqi soldiers allied with the U.S. military. An additional fifty-one U.S. soldiers and twenty-one others sustained non-fatal injuries. AAI, through Jamaat Ansar al-Sunna, claimed credit for the attack.

663.   Another British intelligence source "said that Iranian government agencies were also secretly helping [AAI] members cross into Iraq from Iran, as part of a plan to mount sniper attacks against coalition forces."[157] American sources confirmed this information, adding that "an Iranian was aiding [AAI] 'on how to build and set up' IED's."[158]

664.   In February 2004, Kurdish intelligence officials uncovered a cache of Syrian, Yemeni, and Saudi passports—all bearing Iranian entry stamps—in an AAI safe-house on the Iranian side of the border. The fact the passports found had Iranian stamps on them indicated the

---

[156] Edward T. Pound, *Special Report: The Iran Connection*, U.S. News and World Report, Nov. 14, 2004.
[157] *Id.*
[158] *Id.*

terrorists did not secretly infiltrate into Iran, but that they entered with the cognizance and full knowledge of the Iranian authorities.

665.   According to Iraqi intelligence officers, captured AAI militants have admitted to receiving assistance from Iranian officials.

666.   Iran played a significant role in supporting AAI. Iran openly allowed the group to operate along its borders despite the group's alleged affiliation with the al-Qaeda network. AAI was tasked with conducting checks on cars, leaving their stronghold to go into Iran, indicating coordination with the Islamic Republic.

667.   According to a document from Iraqi intelligence dated June 13, 2002, and seized by U.S. forces in Iraq, a trust worthy source reported that Mullah Kraykar (Krekar), the head of the AAI organization arrived in Iran for negotiations with several Iranian officials. The information indicated the purpose of the visit was to confirm a unified strategy and to guarantee continuous Iranian support to that group.

668.   According to other sources, Mullah Krekar spent many years in Iran and was arrested in Amsterdam after a flight from Tehran.

669.   In March 2005, The Washington Post published an interview with then-U.S. Ambassador to Iraq Zalmay Khalilzad, in which the Ambassador charged that Iran's security services–most notably the IRGC–were training, financing, and supplying AAI.

670.   On January 2, 2006, U.S. Forces in Iraq learned of an AAI cell formed to carry out terrorist attacks in Kirkuk. This AAI cell was formed and initiated by MOIS, who sent a MOIS operative to supervise the cell. The cell was specifically instructed to perform terrorist attacks in Kirkuk using explosives and car bombs that were delivered using rat lines from Iran, through Tuz Khurmatu, Iraq.

671.    AAI operations decreased substantially by 2006, but the group continued to maintain an extensive support and financial infrastructure in Europe that it used to recruit and send jihadists to Iraq.

672.    Over the course of 2007-2008, AAI moved increasingly away from the Reformation and Jihad Front and strengthened its ties to AQI. It coordinated with AQI on several attacks against U.S. and PUK troops and began to adopt AQI's hardline attitude against Sunni Iraqis who worked for the U.S. or Iraqi governments.

673.    On May 4, 2010, AAI's leader Abu Abdullah al-Shafi was captured and imprisoned by U.S. forces in Baghdad. On December 15, 2011, AAI announced a new leader: Abu Hashim Muhammad bin Abdul Rahman al Ibrahim.

674.    AAI also had close operational ties to JAM. In 2003, AAI leader Abu Abdallah al-Hassan bin Mahmud told Beirut political weekly "Al-Muharrir" that his group works with al-Sadr's JAM. This cooperation is further substantiated by a note from al-Sadr's father, Muhammad Sadiq al-Sadr, that said if he is martyred his sons should "follow the fatwas of [Ayatollah] Al-Sayyid [Kazim] al-Ha'iri and Shaykh Dr. Ahmad al-Kubaysi. You must unite with the Sunnis." Subsequently, AAI and JAM exchanged personnel and shared a relationship described as "intimate."[159]

675.    AAI conducted attacks against a wide range of targets including Iraqi government and security forces, as well as U.S. and Coalition Forces and U.S. nationals, including Plaintiffs. AAI has conducted numerous kidnappings, executions, and assassinations of Iraqi citizens and politicians. The group has either claimed responsibility or is believed to be responsible for attacks in 2011 that resulted in 24 deaths and 147 wounded.

676.    On February 19, 2003, The Bank of England ordered British financial institutions

---

[159] *See* https://www.rferl.org/a/1342699.html (last accessed Dec. 9, 2018).

to freeze AAI assets.

677.    The U.S. Department of Treasury designated AAI a SDT under E.O 13224 on February 20, 2003. The U.S. Department of State designated AAI a FTO on March 22, 2004.

678.    The United Nations Security Council Resolution 1267 Committee designated AAI as an AQ affiliate pursuant to UNCSRs 1267, 1390, and 1455 on February 27, 2003. The resolutions subjected it to the following sanctions:

> **ARMS EMBARGO**: Prevent the direct or indirect supply, sale, and transfer from their territories or by their nationals outside their territories, or using their flag vessels or aircraft, of arms and related materiel of all types, spare parts and technical advice, assistance, or training related to military activities, to designated individuals and entities.

> **ASSETS FREEZE**: Freeze without delay the funds and other financial assets or economic resources of designated individuals and entities, ensure that no funds, financial assets or economic resources are made available, directly or indirectly for their benefit.

679.    Australia, New Zealand, Canada, and the European Union have designated AAI as terrorist organization. The U.S. Treasury Department designated Mullah Krekar as an individual providing assistance to terrorism and thus subject to having all international assets frozen in December 2006.

680.    As such, AAI required alternate and clandestine sources of U.S. currency to continue its terror operations in Iraq. This source was Iran.

681.    Iran provided significant logistical support to AAI by facilitating the flow of goods and weapons from Iran proper, and by providing safe haven in Iranian territory just behind AAI's mountain enclave, as well as permissive environments within Iraq for it to operate.

682.    Defendants knew, or were deliberately indifferent to, the fact that Iran provided funding, financial services, and material support to AAI.

### D.   IRAN'S  SUNNI  FTO  NETWORK  IN  IRAQ  PLANNED AUTHORIZED  &  COMMITTED  ATTACKS  AGAINST PLAINTIFFS

683.   As detailed above, Iran trained, armed, sheltered, and funded Sunni FTOs AQ, AQI and AAI that were responsible for terrorist attacks throughout Iraq. This material support from Iran extended to areas within the "Sunni Triangle," a 100-square-mile area between Baghdad, Ramadi and Tikrit, as well as other areas in Northern and Western Iraq. The permissive operational environments created with Iran's material support within which in these groups operated included the following areas (among others):

- **Ramadi** - 68 miles west of Baghdad, Ramadi is the capital of the Al Anbar Governorate, and in 2004, was a city with 400,000 inhabitants, controlled by AQ and its Iraqi allies (AAI) who desired to make the city the capital of its Islamic caliphate.160 Through 2007 AQ/AQI had a significant organizational infrastructure in Ramadi and its outskirts.161 From April 2004 to September 2007, AQ/AQI routinely and lethally attacked Coalition Forces in the area, and continued to ambush American and Iraqi Security forces with IEDs, complex attacks, and VBIEDS through 2011. Both AQ and AAI have claimed responsibility for numerous attacks against Coalition Forces and Iraq civilians.

- **Baghdad** – Specific areas and neighborhoods of Baghdad were controlled by Iranian-funded elements of AQ/AQI and AAI throughout 2003 – 2011. In August 2003, Abu Musab al-Zarqawi and his Iraqi Sunni militant group, Tawhid wa al-Jihad, bombed the UN's headquarters in Baghdad, which left 22 people dead, including UN envoy Sergio Vieira de Mello. In October 2004, al-Zarqawi, pledged allegiance to AQ, forming AQI, and perpetrated attacks in and around Baghdad.[162] In 2007, AQ, using its unique methods of car bombings and suicide attacks, conducted attacks in the city, including at least two mass casualty attacks killing 31 and maiming 57 people.[163] In 2008, Coalition Forces and Shiite Iraqi's continued to be attacked by AQ/AQI/AAI in the area, and in that year alone 3 AQ senior commanders were captured or killed in Baghdad and the immediate surroundings.[164]

- **Baghdad's East al Rashid** - (also known as "Dora") – falling along sectarian fault lines

---

[160] Bill Roggio, *The Anbar Tribes vs. al Qaeda, Continued,* FDD Long War Jurn., (Nov. 22, 2006), http://www.longwarjournal.org/archives/2006/11/the_anbar_tribes_vs.php.
[161] Anthony Cordesman, *Iraq's Sunni Insurgents: Looking Beyond Al Qa'ida*, Center for Strategic and International Studies, (July 16, *2007) at 2.*
[162] British Broadcasting Corp., *Timeline: Al-Qaeda*, (Aug. 7, 2008), http://news.bbc.co.uk/1/hi/7546355.stm#2003.
[163] BILL ROGGIO, *The Iraq Offensive*, FDD's Long War Jun., (June 28 2007), https://www.longwarjournal.org/archives/2007/06/the_iraq_offensive.php.
[164] Bill Roggio, *Targeting Al Qaeda In Iraq's Network April-May 2008*, FDD's Long War Jun. (May 7, 2008), https://www.longwarjournal.org/archives/2008/05/targeting_al_qaeda_i_2.php

in Baghdad, this neighborhood was predominately Sunni and was controlled by AQ and AQI through 2005. As the Special Groups gained more control of Baghdad and pushed Sunni elements out, JAM and the Special Groups launched attacks against Americans in this area in 2006. AQI eventually regained control of the neighborhood and used it as area of operations from 2007 onward.

- **Baghdad's Arab Jabour and Fadil Neighborhoods:** These wo neighborhoods Baghdad were home to a Sunni populace who permitted AQ and AQI operations from 2003 – 2011, and these groups launcehd attacks agaisnt Coalition forces routinely in these areas.

- **Baghdad's Iskan and Washash of West Baghdad:** Two neighborhoods in which Sunni and Shia control fluctuated over time, and with this so did the tactics used by the terrorist groups who operated in the area. From 2003 – 2005, AQ and AQI attacked Coalition Forces, but as Shia groups pushed into the area and committed atrocities against the Sunni residents, the area came under Special Group and JAM control from 2006 through 2011.

- **Fallujah** - According to CTC's study, Zarqawi's group has used car bombs, IEDs, ambushes, and large-scale defensive tactics as in Fallujah.[165] In addition, FDD's AQ expert Bill Roggio stated in 2007 "Iranian mines and weapons were funneled to Zarqawi's terrorists in Fallujah and elsewhere throughout Sunni dominated Anbar province."[166]

- **Mosul** – Mosul was one of the main epicenters for Sunni insurgents and terror groups. "It is a critical hub for AQI funding and foreign terrorist facilitation."[167] In the second week of November 2004, AQI and AAI began attacking Coalition and Iraqi Security Forces across the city and targeting Kurds in eastern Mosul.[168] According to the U.S. Department of State, "[i]n Mosul alone, Zarqawi affiliates are reportedly responsible for more than 1,700 attacks on Coalition and Iraqi forces over a three month period in 2005."[169] In April 2008, U.S. and Iraqi forces killed or captured five senior al Qaeda leaders in Mosul, where AQ was attempting to reinvigorate its terror network. And Mosul remained an AQ "hotspot" through 2011.[170]

- **Samarra** – Located on the east bank of the Tigris River within the Saladin Governorate, 78 miles north of Baghdad. Despite being the home of several important Shia holy sites,

---

[165] "Exploiting al-Qa'ida's Organizational Vulnerabilities", Combating Terrorism Center: United States Military Academy, February 14, 2006, p. 37, https://ctc.usma.edu/app/uploads/2010/06/Harmony-and-Disharmony.pdf.

[166] Bill Roggio, The Diyala Salvation Front, FDD's Long War Jun., (May 10, 2007), http://www.longwarjournal.org/archives/2007/05/the_diyala_salvation.php

[167] Eric Hamilton, "The Fight For Mosul", March 2003 - March 2008, Institute for the Study of War, p 3.

[168] Eric Hamilton, "The Fight For Mosul", March 2003 - March 2008, Institute for the Study of War, p. 9.

[169] Department of State: https://www.state.gov/documents/organization/65462.pdf

[170] Bill Roggio, *Targeting Al Qaeda In Iraq's Network, April – May 2008*, FDD's Long War Jun., (May 7, 2008), https://www.longwarjournal.org/archives/2008/05/targeting_al_qaeda_i_2.php; *see also* Bill Roggio, *Background on Ansar al Islam and its links to al Qaeda and Iran,* FDD's Long War Jun., *August 4, 2009* http://www.longwarjournal.org/archives/2009/08/iraqi_troops_detain.php

the population was dominated by Sunni until recently. In 2006, AQ fatally attacked the Shiite al-Askari Mosque.[171] The Iraqi Government claimed to arrest the AQ senior commander who commanded the attack.[172]

- **Tal Afar** – A city and district in the Nineveh Governorate, located 40 miles west of Mosul. With a dominate Sunni population75% Sunni and AQI fighters operated in the city from at least 2004 and onward. The area was considered critical to AQ infrastructure by Coalition Forces and used by AQ/AQI as a staging area for foreign fighters recruited and transported into Iraq by MOIS through the Syrian border, and from where AQ/AQI facilitated terror attacks throughout Iraq. On March 2007, AQ claimed responsibility for dual suicide attacks in Shia markets in Tal Afar.

- **Habbaniyah** – Located near a lake that bears the same name, this city marks the halfway point  between Ramadi and Fallujah Sunni terror groups that controlled the Habbaniyah region were dominated by al Qaeda and Iranian-supported foreign fighters, who had the cash and expertise to drive the violence and attacks against Iraqi and U.S. forces. These groups easily coopted local Sunni insurgents, and "[h]ard core al Qaeda eventually gained control[.]"[173]

- **Diyala Province- Baqubah**.  Baqubah also spelled Baquba and Baqouba is the capital of Iraq's Diyala Governorate. The city is located some 50 km (31 mi) to the northeast of Baghdad, on the Diyala River. Al Qaeda in Iraq made Baqubah a center for its Islamic State of Iraq in 2006.   AQ and AQI used IEDs and some EFPs in attacks against Coalition Forces in this area.[174]

## 14.   ALL OF THE ATTACKS AT ISSUE IN THIS COMPLAINT WERE ACTS OF INTERNATIONAL TERRORISM

684.   At no time relevant to this Action did the United States declare war or enact an Authorization for the Use of Military Force against Iran.

685.   At no time relevant to this Action did the United States engage in an armed conflict with the military forces of Iran, or Iran's military forces or their agents engage in lawful acts of war against The United States.

---

[171] "Iraq Shrine Blast Suspect Arrested", CBS, June 28 2006, https://www.cbsnews.com/news/iraq-shrine-blast-suspect-arrested/
[172] "Al Qaeda's Saedi 'triggered sectarian violence'", ABC, September 4 2006, http://www.abc.net.au/news/2006-09-04/al-qaedas-saedi-triggered-sectarian-violence/1254288
[173]  Bill Roggio, "Habbaniyah and the 3/3-1 Snake Eaters", FDD's Long War Jun., (Jan, 19 2007), https://www.longwarjournal.org/archives/2007/01/habbaniyah_and_the_3.php
[174]  Bill Roggio, *The Battle of Baqubah I*, FDD's Long War Jun. (June 19 2007), http://www.longwarjournal.org/archives/2007/06/the_battle_of_baquba.php

686.    All of the violent acts described herein that resulted in death and/or injury to Plaintiffs were acts of international terrorism which were not the result of an "act of war" as that term is defined in 18 USCS § 2331.

687.    On October 3, 2018, the bipartisan Anti-Terrorism Clarification Act of 2018 was signed into law. Section 2 of the ATCA expressly amended 18 U.S.C. § 2331 and excluded from the "act of war" exception to the ATA's civil-liability provision two specific categories of government-designated terrorist organizations – "Foreign Terrorist Organizations" and "Specially Designated Global Terrorists." Pursuant to § 2331(6), the term "military force" does not include any person that:

> (A) has been designated as a:
>> i. Foreign Terrorist Organization by the Secretary of State under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189); or
>> ii. Specially Designated Global terrorists (as such term is defined in section 594.310 of title 31, Code of Federal Regulations) by the Secretary of State or the Secretary of the Treasury; or
> (B) has been determined by the court not to be a "military force."

18 U.S.C § 2331(6).

688.    The specific attacks alleged herein were all carried out by foreign terrorist organizations ("FTOs") and/or SDGTs like Hezbollah, The Special Groups, AQ, AAI, and the Qods Force, not by the armed forces of recognized governments or military forces.

689.    The deaths and injuries Plaintiffs sustained were not the result of, nor did they occur in the course of, a declared war with Iran, or an armed conflict between the United States and Iran.

690.    At no time relevant to this action did the operatives of Iran, Hezbollah, the IRGC, MOIS, the Special Groups, AQ or AAI, who killed and injured Coalition Forces in Iraq and civilians (including Plaintiffs) carry fixed distinctive signs recognizable at a distance, carry arms

openly, conduct their operations in accordance with the laws and customs of war, or enjoy any form of combatant immunity for their acts.

691. The conduct of Iran, the IRGC, Hezbollah, The Special Groups, AQ and AAI violated the laws of armed conflict (including, e.g., AAH/JAM operatives masquerading as members of U.S. armed forces and executing defenseless prisoners), and the attacks upon Iraqi and other civilians constituted a substantial, rather than an incidental, part of their objectives and conduct.

692. The acts of Iran, the IRGC, MOIS, Hezbollah, the Special Groups, AQ and AAI that injured the Plaintiffs were acts of international terrorism within the meaning of 18 U.S.C. § 2331, involving violent acts intended to influence the United States by coercion (by coercing the withdrawal of Coalition Forces from Iraq) and to intimidate and coerce the Iraqi population, and were also acts constituting terrorist activities within the meaning of 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), and/or engaging in terrorism within the meaning of 22 U.S.C. § 2656f.

693. The Western Bank Defendants not only conspired to, aided and abetted, and otherwise caused and/or substantially contributed to these acts of international terrorism, but their specific conduct contributing to the attacks against Plaintiffs satisfies the definition of "international terrorism" set forth in 18 U.S.C. § 2331(1), as follows:

694. **Defendants' Acts Were Dangerous to Human Life**: The Western Bank Defendants committed acts that were dangerous to human life by knowingly, purposefully and blatantly disregarding their legal duties to ensure compliance with counterterrorism financing regulations, standards, and protocols. These acts constituted violations of the criminal laws of the United States and the State of New York. Defendants purposefully designed, offered, used, and trained Iran and its Agents and Proxies, including the Terrorist Groups, with specialized expert

knowledge on specific methods and tactics to successfully launder money and disguise transactions in order to circumvent U.S., E.U., and U.N. counter-terrorism sanctions and trade embargos. Defendants did this knowing that Iran and its Agents & Proxies were designated terrorist entities (including FTOs) that intended to commit terrorism against Americans, such as Plaintiffs. Defendants willingly and purposefully facilitated undetectable financial transactions for the benefit of known terrorists and sponsors of terror for many years, thousands of times, and in the amount of, at least, hundreds of billions of dollars. Because the reasonably foreseeable consequence of such acts is the successful support and commission of terrorism, such acts are inherently dangerous to human life.

695. **Defendants' Activities Appear to be Intended to Influence the Policy of the United States Government by Coercion**: The Western Bank Defendants' activities not only appear to be, but were in fact, intended to influence the economic and foreign policies of the United States. Defendants utilized their unique position within the global financial system in conjunction with their enormous economic power and control to neutralize the U.S. counterterrorism and WMD sanctions programs, and ultimately, undermine the U.S. policies designed specifically to prevent terrorism financing. Rather than comply with the laws and rules related to OFAC-sanctioned entities, Defendants intentionally violated those laws, ignored their duties, and circumvented sanctions such that the policies of the United States could not achieve their intended purposes – the prevention of terrorism, collection of intelligence, and the interdiction of illicit funds. Defendants' own statements, as described herein, demonstrate that they intended to, through their coercive conduct, influence these U.S. policies or, at a minimum, prevent them from achieving their objectives. Defendants' success in this regard was fully evident in 2008 when the U.S. revoked the U-Turn exemption once it realized that Iran (with

assistance from the Defendants) was using its banks to finance terrorist groups, including Hezbollah, and engaging in deceptive conduct to hide other prohibited transactions.

696.    **Defendants' Activities Transcended National Boundaries**: The Western Bank Defendants' conduct occurred on a global scale, transcending national boundaries. The correspondent banking and trade finance transaction methods employed by Defendants involved accounts and bank branches in the United States, Europe, Asia, and the Middle East (among other areas). Ultimately, the result of such conduct was the realization of the overarching goal of the Conspiracy - the sponsorship and commission of international terrorism by Iran and the Terrorist Groups in Iraq, against Coalition Forces.

## V.    OVERVIEW OF THE CONSPIRACY

### 1.    AGREEMENT AND KNOWLEDGE

697.    As noted above, "the Conspiracy" identified in this Complaint first began in the years immediately after Iran was first designated by the United States as a State Sponsor of Terrorism in 1984.

698.    As a result of that designation, Iran developed various ways to circumvent U.S. economic sanctions levied against the regime and to facilitate the free movement of U.S. dollars that Iran obtained (largely from the sale of petroleum and natural gas) without detection by the government in order to pursue foreseeably illicit objectives, including:

a) Concealing hundreds of billions of dollars of Iran's U.S. dollar- denominated transactions from detection, scrutiny, or monitoring by U.S. regulators, U.S. law enforcement, and/or U.S. depository institutions;

b) Assisting Iran in transferring at least $150 million to the IRGC-QF, Hezbollah, the Special Groups, and other instruments of Iranian state- sponsored terrorism; and

c) Assisting Iran in acquiring technology and components for its illegal Weapons of Mass Destruction program and illicit conventional arms trade.

699.   To further those objectives, Iran enlisted several Iranian state-owned banks as well as Defendant Bank Saderat Plc and various international financial institutions, including the Western Bank Defendants in this Action, which agreed to alter, falsify, or omit information from payment order messages that involved Iran or Iranian parties, in particular several Iranian banks (as noted above, referred to herein occasionally as the "Iranian Bank Co-conspirators" (including Defendant Bank Saderat Plc)), as well as IRISL, for the express purpose of concealing Iran's financial transactions in the Eurodollar market from detection, scrutiny, or monitoring by U.S. regulators, law enforcement, and/or depository institutions.

700.   The Conspiracy between Iran, the IRGC, IRISL, Defendant Bank Saderat Plc, the other Iranian Bank Co-conspirators, and the Western Bank Defendants began no later than 1987, and continues to the present (though individual Defendants joined the Conspiracy at different dates).

701.   The Conspiracy orchestrated by Iran made it possible for Iran to transfer: (1) hundreds of billions in U.S. dollar-denominated funds from its Eurodollar accounts maintained by various international banks, including the Defendants, through the United States in a manner designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies; and (2) hundreds of millions of dollars to Hezbollah, the IRGC, and other terrorist organizations actively engaged in murdering and maiming U.S. servicemen and civilians in Iraq.

702.   Each of the Defendants knowingly entered into an agreement with Iran and its agents, including but not limited, to Defendant Bank Saderat Plc, other Iranian Bank Co-conspirators, including but not limited to, the Central Bank of Iran, Bank Melli (including Bank Melli's United Kingdom subsidiary Melli Bank Plc), and Bank Sepah (which are all instrumentalities of Iran), as well as the IRGC-controlled IRISL, under which the conspirators

agreed to alter, falsify, or omit information from payment order messages for USD-denominated Eurodollar, trade-finance, precious metals and foreign exchange transactions that were purposefully directed at, and processed through, the United States, for the purpose of funding Iran's illegitimate activities, including sponsoring terrorism.

703.    As alleged in detail below, each Defendant committed numerous overt acts in furtherance of the Conspiracy and knowingly and unlawfully agreed to engage in "stripping" hundreds of millions – and in some cases, billions – of U.S. dollar-denominated transactions on behalf of Iran knowing that Iran was a designated State Sponsor of Terrorism.

704.    Each Defendant entered into its agreement with Iran and the Iranian Bank Co-conspirators (including Defendant Bank Saderat Plc) aware that other co-conspirators (either the Defendants herein, or other foreign financial institutions) were also actively participating in the Conspiracy, and shared the common goal of the scheme's purpose of providing Iran and the Iranian Bank Co-conspirators (including Defendant Bank Saderat Plc) the ability to illegally transfer billions of dollars (undetected) through the United States, and were aware of many of the (often same or similar) methods being used by other members of the Conspiracy to effectuate it.

705.    Accordingly, each Defendant understood that its conduct was part of a larger scheme engineered by Iran to further its sponsorship of terrorism; each Defendant knew the participation of other conspirators was essential to the Conspiracy's success; and each Defendant knew of and joined in the overriding scheme and sought to achieve and facilitate a common goal of helping Iran transfer billions of dollars through the United States while avoiding detection, scrutiny, or monitoring by U.S. regulators, U.S. law enforcement, and/or U.S. depository institutions, so that it could continue to sponsor terror.

706.    In addition, each Defendant also knew, or was deliberately indifferent to, several

of the Conspiracy's foreseeable purposes and criminal objectives that included:

a) Facilitating illicit transactions totaling at least $50 million USD for the benefit of Hezbollah;

b) Facilitating illicit transactions totaling at least $100 million in USD funds for the direct benefit of the IRGC and billions in USD funds for the benefit of the NIOC, then controlled by the IRGC;

c) Facilitating at least hundreds of illicit transactions totaling more than $60 million on behalf of IRISL including over 150 "stripped" transactions after IRISL was designated a SDN;

d) Facilitating tens of millions of dollars in illicit transactions on behalf of MODAFL, the IRGC, Mahan Air and other instrumentalities of Iranian state sponsored terror to further numerous violations of the U.S. trade embargo against Iran, conceal Iran's efforts to evade U.S. sanctions and enable Iran's acquisition from the United States of goods and technologies prohibited by U.S. law to be sold or transferred to Iran, including components of IEDs deployed against Coalition Forces in Iraq; and

e) Enabling Iran, the Iranian Bank Co-conspirators (including Defendant Bank Saderat Plc), the IRGC, Hezbollah, and the Special Groups to plan for, conspire to, and perpetrate acts of international terrorism under 18 U.S.C. § 2331(1); homicides, attempted homicides, or conspiracies to commit homicide under 18 U.S.C. § 2332(a)-(c); bombings using destructive devices under 18 U.S.C. § 2332a; bombings and attempted bombings under 18 U.S.C. § 2332f; engaging in terrorist activity under 8 U.S.C. § 1189(a)(3)(B)(iii)-(iv); and/or engaging in terrorism under 22 U.S.C. § 2656f.

707. As set forth below, each of the Defendants knew that Iran was a U.S.-designated State Sponsor of Terrorism, and that U.S. law and regulations required it to fully disclose all funds transfers through the United States made on behalf of Iran, Iranian entities and Iranian banks.

708. Despite that knowledge, each of the Defendants knowingly conspired with Iran and its agents (including Defendant Bank Saderat Plc) to violate those U.S. laws and to conceal hundreds of millions (and in some cases, billions) of dollars in funds transfers routed through the Eurodollar correspondent banking network for clearance and settlement in the United States on behalf of Iran, IRISL, and the Iranian Bank Co-conspirators, including Defendant Bank Saderat

Plc.

709.    From 2003 through 2011, and as set forth in greater detail herein, each of the Defendants knowingly agreed to join the Conspiracy; knowingly and willfully participated in the Conspiracy; knew or was deliberately indifferent to the Conspiracy's criminal purposes and objectives; took initiatives to improve its workings; and was aware of the participation of many (if not all) of its members.

## 2.    ACTS AND EFFECTS

710.    Through the Conspiracy, Iran provided material support to IRGC, MOIS and the Terrorist Groups, which targeted American citizens in Iraq, and with substantial assistance from the Western Bank Defendants, concealed and disguised the nature, location, source, and origin of the material support it provided to these terrorists, knowing and intending that the funds be used in preparation for and in carrying out acts of terrorism against Americans and others, including civilians, in Iraq.

711.    As part of the Conspiracy, each of the Defendants took affirmative steps to violate U.S. criminal laws and to conceal from U.S. depository institutions, law enforcement, regulators, bank auditors, and counter-terrorism agencies the flow of hundreds of millions (and in some cases, billions) of U.S. dollars it was clearing and settling in the United States, including transfers for the benefit of the IRGC, MOIS, and the Terrorist Groups, and through them to individuals actively engaged in murdering and maiming U.S. servicemen and civilians in Iraq.

712.    The conduct of each Defendant, its awareness of other Defendants' and Co-conspirators' participation and conduct, and the resulting "glaring hole" in America's counter-financing of terrorism and sanctions architecture described by former Manhattan District Attorney Robert M. Morgenthau, provided Iran with vital access to the U.S. financial system.

713.    U.S. "dollar clearing and settlement" – primarily (in this case) through the

151

Clearing House Interbank Payments System in New York or "CHIPS-NY" system and the Federal Reserve Bank of New York ("FRB-NY") – is an elaborate inter-bank system in the U.S. by which banks clear and settle credits and debits in their Eurodollar accounts with other banks all across the globe on a daily basis.

714. The U.S. "dollar clearing and settlement" system is critical not only to the workings of the global economy, but provides financial institutions (and nation states) with critical, essential access to global trade-finance credit denominated in U.S. dollars.

715. Thus, once Iran gained clandestine access to the U.S. "dollar clearing and settlement" system in New York, it could not only launder billions of dollars through its accounts in the Eurodollar market, but it could also borrow against the Eurodollar deposits it held in the Defendants' banks – facilitating further undetected transactions around the world in USD – both for ordinary commercial purposes and the illegal aims and objectives of the Conspiracy.

716. This broad-based access to the U.S. "dollar clearing and settlement" system was essential to Iran because of the scope of Iran's global ambitions at the time, which included driving the United States and its Coalition partners out of Iraq, dominating that country, and acquiring Weapons of Mass Destruction.

717. Thus, among the effects of the Conspiracy, a State Department diplomatic cable from March 2008 noted that:

> Bank Melli and the Central Bank of Iran also provide crucial banking services to the Qods Force, the IRGC's terrorist supporting arm that was headed by UNSCR 1747 designee Commander Ghassem Soleimani. Soleimani's Qods Force leads Iranian support for the Taliban, Hezbollah [sic], Hamas [sic] and the Palestinian Islamic Jihad. Entities owned or controlled by the IRGC or the Qods Force use Bank Melli for a variety of financial services. From 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force. Bank Melli use of Deceptive Banking Practices … When handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to

obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from payment instructions for US dollar denominated transactions.

718.    In addition, absent the clandestine access to the U.S. "dollar clearing and settlement" system afforded to Bank Saderat (and the Iranian Bank Co-conspirators), by the Western Bank Defendants, both Iran and Hezbollah's uncontrolled access to USDs would have been extinguished, and Iran's ability to transfer large sums of USD to the Terrorist Groups would have been substantially impaired.

719.    By knowingly agreeing to enter into the Conspiracy, and by knowing or being deliberately indifferent to its lethal purposes, and by committing multiple overt acts in furtherance of the Conspiracy, the Defendants provided Iran with the means by which it could transfer more than $150 million to the IRGC, Hezbollah and the Terrorist Groups, which were actively engaged in planning and perpetrating the murder and maiming of hundreds of Americans in Iraq during the same period of time that the Conspiracy was proceeding, thereby substantially enhancing Iran, the IRGC's, Hezbollah's, and Terrorist Groups' ability to inflict the deaths and injuries described herein.

720.    The Conspiracy was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' deaths and injuries because the Conspiracy substantially assisted Iran, the IRGC, MOIS, IRISL, Mahan Air, Hezbollah, and the Terrorist Groups in committing the acts of international terrorism that killed and injured the Plaintiffs herein, by providing them collectively with more than $200 million U.S. dollars in funding that were used, *inter alia*, to arm, train and fund Iranian terror proxies in Iraq that targeted American citizens.

721.    By knowingly agreeing to enter the Conspiracy, and participating in and committing overt acts in the course of the Conspiracy that resulted in damage and injury to the Plaintiffs, Defendants committed acts of international terrorism as defined by 18 U.S.C. §§ 2331,

2339A and 2339B that caused death and injury to the Plaintiffs in this action, and are civilly liable under 18 U.S.C. § 2333(a) of the Anti-Terrorism Act ("ATA") to the Plaintiffs, American citizens who have been killed and injured by reason of acts of international terrorism perpetrated by Iran through its agents, including the IRGC, MOIS, and the Terrorist Groups.

722.   Defendant HSBC-US not only knowingly participated in the Conspiracy, but as a U.S. person within the meaning of 18 U.S.C. § 2332d also committed further acts of international terrorism in violation of 18 U.S.C. §§ 2331 and 2332d by knowingly (or with reason to know) facilitating financial transactions directly with Iran, which it knew was a designated State Sponsor of Terrorism. HSBC-US's acts were a cause of the deaths and injuries sustained by the Plaintiffs in this action, and HSBC-US is therefore civilly liable under 18 U.S.C. § 2333(a) of the ATA to the Plaintiffs.

723.   Defendants Barclays, Barclay's Bank PLC, SCB, ABN Amro (RBS N.V.), BNP Paribas, DB, CACIB, Commerzbank and their U.S. New York branches not only knowingly participated in the Conspiracy, but because their respective New York branches constitute U.S. persons within the meaning of 18 U.S.C. § 2332d, these Defendants also committed further acts of international terrorism in violation of 18 U.S.C. §§ 2331 and 2332d by knowingly (or with reason to know) facilitating financial transactions directly with Iran, which each such Defendant knew was a designated State Sponsor of Terrorism. Those acts were a cause of the deaths and injuries sustained by the Plaintiffs in this action, and these Defendants are therefore civilly liable under 18 U.S.C. § 2333(a) of the ATA to the Plaintiffs.

### 3.   DEFENDANT BANK SADERAT PLC'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

724.   On September 8, 2006, the U.S. Office of Foreign Assets Control ("OFAC") amended § 560.516 of the ITRs and excluded Bank Saderat from the Iranian U-Turn exemption.

725.    In announcing the 2006 change to the ITRs excluding Bank Saderat Iran from the U-Turn exemption, OFAC stated:

> OFAC has amended the Iranian Transactions Regulations (ITR) to cut off Bank Saderat, one of Iran's largest government-owned banks, from the U.S. financial system. Bank Saderat has been a significant facilitator of Hezbollah's financial activities and has served as a conduit between the Government of Iran and Hezbollah….

726.    According to then-Under Secretary for Terrorism and Financial Intelligence Stuart Levey, "Bank Saderat facilitates Iran's transfer of hundreds of millions of dollars to Hezbollah and other terrorist organizations each year. We will no longer allow a bank like Saderat to do business in the American financial system, even indirectly."

727.    The Treasury Department press release announcing the changes to the ITR stated that "a Hezbollah-controlled organization has received $50 million directly from Iran through Bank Saderat since 2001."

728.    Assistant Treasury Secretary for Terrorist Financing Daniel Glaser testified before the Senate Committee on Banking, Housing and Urban Affairs that "Hezbollah uses Saderat to send money to other terrorist organizations as well."

729.    For many years preceding the revocation of its U-Turn exemption, Bank Saderat illegally routed its USD transactions through the United States with the assistance of various Western commercial banks, including the Defendants herein.

730.    From 2002 forward, Defendant Bank Saderat Plc continued Bank Saderat's existing practice of: (1) illegally routing its USD transactions through the United States; and (2) transferring tens of millions of dollars to Hezbollah and other designated Terrorist Groups.

731.    As detailed in a January 9, 2009, Deferred Prosecution Agreement entered into by Lloyds TSB Bank Plc ("Lloyds") with U.S. law enforcement, Defendant Bank Saderat Plc directed illegal funds transfers to the U.S. and worked with Lloyds to strip its USD transactions

of any reference to Iran or Bank Saderat.

732.   In 2003, Lloyds exited its relationship with Bank Saderat Plc, and Defendant Credit Suisse assumed Lloyds' role of illegally transferring USD through the United States while stripping references to Bank Saderat Plc and Iran from the transactions (as set forth below and, as also discussed below, in a Deferred Prosecution Agreement that Defendant Credit Suisse signed in 2009).

733.   Notwithstanding the revocation of its access to the Iranian U-Turn exemption, Bank Saderat (and Bank Saderat Plc) continued to illegally direct USD transactions through the United States with the active assistance of the other Defendants listed herein.

734.   On February 13, 2004, Defendant SCB opened accounts for Bank Saderat Plc. It also maintained other accounts for Bank Saderat Iran, including an account at SCB, Dubai.

735.   From 2003 to 2011, and as described in more detail below, Bank Saderat Plc, working in concert with Standard Chartered Bank, financed the illegal acquisition of various U.S.-origin export-controlled goods on behalf of Mahan Air and various sub-agencies of MODAFL.

736.   For example, Standard Chartered Bank facilitated at least 10 transactions involving Letters of Credit valued at $1,559,127, which involved the shipment of U.S.-origin export-controlled aircraft parts sold by the Singapore-based Monarch Aviation, a company that was part of Iran's illegal procurement network, to various MODAFL sub-agencies.

737.   A sub-agency of MODAFL obtained a Letter of Credit issued by Bank Refah, Iran, and sent it to Standard Chartered's branch in Singapore (where the Iranian front company Monarch Aviation maintained accounts) while reimbursement authorization was sent to the Iran Overseas Investment Bank London, *i.e.* Bank Saderat Plc's predecessor, which in turn either

directly financed the illegal acquisition of goods from the United States, or provided a surety for Bank Refah's payment.[175]

738.   The goods were shipped by Iran Air[176] from Kuala Lumpur Airport, Malaysia, to Tehran Airport, Iran.

739.   The LCs were refinanced by Standard Chartered's Dubai branch through its credit facility with the CBI, with payment being made to Monarch Aviation's account with Standard Chartered, Singapore through the latter's U.S. dollar account with Standard Chartered Bank, London, which in turn received the funds into its USD nostro account with Standard Chartered's New York branch.

740.   In another instance discussed infra, Bank Saderat Plc knowingly sent a concealed and illegal payment via Standard Chartered's New York branch and JP Morgan Chase, New York, to Standard Chartered Bank in Dubai on behalf of a MODAFL's subsidiary, the Iran Helicopter Support and Renewal Company ("IHSRC").

741.   The payment facilitated IHSRC's acquisition (via a company named Jetpower) of U.S. manufactured helicopter parts through an elaborate money laundering scheme intended to conceal from U.S. authorities: (1) the unlawful acquisition of U.S.-manufactured equipment for Iran's military; (2) the complex layering of the transaction involving Bank Melli's branches in London and Hong Kong; and (3) Bank Refah and Bank Saderat's involvement with SCB.

742.   The HSBC Defendants also maintained one or more accounts for Bank Saderat

---

[175] The Reimbursing Bank usually pays the Negotiating Bank (in this case SCB) against a valid reimbursement authority received from the Issuing Bank (in this case Bank Refah) and a validated statement from the Negotiating Bank that the documents complied with LC terms, but in certain cases it only serves as a surety for the payment. SCB-London was also one of Bank Refah's correspondent banks in the UK.

[176] Iran Air was designated by the U.S. Treasury Department in 2011: "Iran's national airline carrier, Iran Air, is a commercial airline used by the IRGC and Iran's Ministry of Defense and Armed Forces Logistics (MODAFL) to transport military related equipment…. Iran Air has provided support and services to MODAFL and the IRGC through the transport and/or transfer of goods for, or on behalf of, these entities. On numerous occasions since 2000, Iran Air shipped military-related electronic parts and mechanical equipment on behalf of MODAFL."

Plc during the relevant time period.

743. In an October 9, 2006 email, Defendant HSBC-Middle East's Regional Head of Legal and Compliance noted the U.S. government's "direct evidence against Bank Saderat particularly in relation to the alleged funding of Hezbollah" but nonetheless maintained the account(s) thereafter and continued to facilitate transactions for Bank Saderat Plc.

744. As noted *supra*, in October 2007, Bank Saderat Iran (including Defendant Bank Saderat Plc), was designated a SDGT pursuant to E.O. 13224.

745. The U.S. Treasury Department's press release regarding Bank Saderat's designation stated:

> Bank Saderat, its branches, and subsidiaries: Bank Saderat, which has approximately 3200 branch offices, has been used by the Government of Iran to channel funds to terrorist organizations, including Hezbollah and EU-designated terrorist groups Hamas, PFLP-GC, and Palestinian Islamic Jihad. For example, from 2001 to 2006, Bank Saderat *transferred $50 million from the Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hezbollah fronts in Lebanon that support acts of violence.* (Emphasis added.)

746. As set forth below, Defendant Barclays closed its Eurodollar accounts for Bank Saderat Plc, in 2008, months *after* Bank Saderat Plc was designated a SDGT, and more than a year after the U.S. Treasury Department reported that "Bank Saderat facilitates Iran's transfer of hundreds of millions of dollars to Hezbollah and other terrorist organizations each year."

747. The HSBC Defendants, and Defendants Commerzbank, SCB, Barclays, and Credit Suisse altered, falsified, or omitted information from Eurodollar payment order messages that they facilitated on behalf of Bank Saderat (and Bank Saderat Plc) at all times knowing, or deliberately indifferent to the fact, that Bank Saderat was facilitating Iranian-sponsored terrorism and, after October 2007, knowing, or deliberately indifferent to the fact, that Bank Saderat (including Bank Saderat Plc) was a SDGT so-designated for its very role as a "significant

facilitator of Hezbollah's financial activities and has served as a conduit between the Government of Iran and Hezbollah."

748.    Moreover, as a Lebanese-based terrorist organization, Hezbollah was (and remains) particularly in need of USD funds because much of the Lebanese economy is "dollarized" (*i.e.,* banking and retail transactions, credit and debt instruments are often, if not primarily, conducted in USD funds).

749.    Accordingly, Bank Saderat Plc's provision of tens of millions of dollars to Hezbollah provided Hezbollah with substantial assistance in carrying out its terrorist activities in Iraq, including Hezbollah's participation in the terrorist attacks that killed and injured the Plaintiffs.

750.    Moreover, Plaintiffs' deaths and injuries herein were a reasonably foreseeable result of Bank Saderat Plc's provision of tens of millions of dollars to Hezbollah.

### 4.    THE CENTRAL BANK OF IRAN'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

751.    The Central Bank of Iran ("CBI") is fully controlled and run by individuals directly appointed by the Government of Iran.

752.    At all relevant times, the CBI has not functioned in the same manner as central banks in Western countries that are institutionally designed to be independent from political interference, nor is its purpose limited to "regulating" Iranian banks and managing Iran's currency and internal interest rates.

753.    Instead, the CBI is an alter-ego and instrumentality of the Iranian government and its Supreme Leader, and it has routinely used Iranian banks like Bank Melli Iran and Bank Saderat Iran as conduits for terror financing and weapons proliferation on behalf of the Iranian regime.

159

754.    At all relevant times, the CBI was an active participant in the Conspiracy.

755.    For example, leading up to the adoption of UN Security Council Resolution 1747 (March 2007), which resulted in the freezing of assets belonging to Iran's Bank Sepah, the CBI furthered the Conspiracy by using non-Iranian financial institutions to shield Bank Sepah's assets from the impact of impending sanctions.

756.    Throughout the relevant time period, the CBI maintained Eurodollar accounts at Bank Melli Iran, Bank Melli Plc, Bank Saderat Iran and Defendant Bank Saderat Plc in various currencies, including USD.

757.    Bank Melli Iran's U.K. subsidiary (later Bank Melli Plc) managed the CBI's Eurodollar accounts in Europe.

758.    In the wake of U.S. and later European Union designations against Iranian banks (including Bank Saderat and Bank Melli), the CBI often acted as a secret proxy for those designated entities.

759.    As part of the Conspiracy, the CBI utilized Defendant Bank Saderat Plc to transfer USD funds to Hezbollah.

760.    The CBI also maintained Eurodollar accounts, and unlawfully transferred USD funds in furtherance of the Conspiracy, with the assistance of Defendants SCB, ABN Amro (RBS N.V.) and the HSBC Defendants, including facilitating billions of dollars in USD funds transfers on behalf of the IRGC, through the aforementioned NIOC, which was designated as a SDN by the United States because it was an IRGC agent during the relevant time period.

761.    As such, illicit transfers on behalf of the NIOC at that time were not for the

benefit of a legitimate agency, operation or program of Iran.[177]

762.    In addition, the Iran Threat Reduction and Syria Human Rights Act 2012 stated that:

> It is the sense of Congress that the National Iranian Oil Company and the National Iranian Tanker Company are not only owned and controlled by the Government of Iran but that those companies provide significant support to Iran's Revolutionary Guard Corps and its affiliates.[178]

763.    Moreover, according to a published report, the National Iranian Oil Company even took an active role in support of Iran's terrorist activities in Iraq by providing intelligence in support of attacks against Coalition Forces along the Iranian border by using its own helicopters to conduct surveillance on Coalition Forces' Forward Operating Bases ("FOBs").

764.    In early 2001, and in furtherance of the Conspiracy, the CBI asked Defendant Standard Chartered Bank to act as its correspondent bank with respect to Eurodollar payments on behalf of the NIOC.

765.    As alleged herein, SCB agreed to participate in the Conspiracy and remove identifying data on SWIFT-NET messages for these and other wire transfers.

766.    Thereafter, between 2001 and 2006, the CBI sent approximately 2,226 payment order messages for a total value of *$28.9 billion* to Standard Chartered in London, the vast majority of which were illegally routed through the U.S. as described herein.

767.    During the same time period, the CBI also maintained a Eurodollar credit facility at Standard Chartered Bank's branch in Dubai, UAE, which it used to assist Iran in illegally acquiring technology and components on behalf of MODAFL.

768.    As detailed further below, and in furtherance of the Conspiracy, the CBI and

---

[177] The Superseding Indictment filed in *U.S. v. Zarrab* (filed in the S.D.N.Y (1:15-cr-00867)) demonstrates that NIOC continued to participate in the Conspiracy and launder U.S. dollars through U.S. financial institutions in 2013, https://www.courtlistener.com/recap/gov.uscourts.nysd.455095.7.0.pdf.
[178] https://www.treasury.gov/resource-center/sanctions/Documents/hr_1905_pl_112_158.pdf

Defendant ABN Amro (RBS N.V.) (which also maintained Eurodollar accounts for the CBI, and had numerous financial and business dealings with the CBI) conspired to provide illegal material support to Iran and Iranian parties.

769.     Between 2002 and 2004, Defendant ABN Amro (RBS N.V.) accepted USD Eurodollar deposits from the CBI on a regular basis with an average deposit size in the range of $200 million USD, and the CBI instructed, and ABN Amro (RBS N.V.) agreed, to follow illegal procedures to launder USD-denominated Eurodollar deposits to the CBI's Eurodollar and local currency accounts with other European banks with branches or offices in London.

770.     In furtherance of the Conspiracy, the CBI coordinated with Defendant ABN Amro (RBS N.V.)'s Central Bank Desk in Amsterdam regarding the procedure to be followed for repayment of USD deposits to their Eurodollar accounts with European banks with offices or branches in London.

771.     This procedure stipulated that payment order messages sent to U.S. clearing banks for payment of USD funds to the CBI should not contain any reference to the Central Bank of Iran, or any other reference relating to Iran.

772.     In 2001, the CBI also approached members of the HSBC Group, specifically Defendants HSBC-Middle East and HSBC-London, to obtain their agreement to move the CBI's clearing and settlement business from National Westminster Bank Plc to the HSBC Defendants, and intended to clear USD funds transactions through Defendant HSBC-US.

773.     Pursuant to that agreement, the CBI eventually moved its Eurodollar accounts to the HSBC Defendants, and by late 2003, the CBI was one of six Iranian banks that used members of the HSBC Group for (mostly illegal) correspondent banking through the U.S. dollar clearing and settlement in New York.

774.    With Defendant HSBC Holdings' knowledge, and in furtherance of the Conspiracy, Defendants HSBC-Middle East and HSBC-London manually intervened in the processing of payment orders by the CBI by removing: the Central Bank of Iran's name; its SWIFT-NET account (identified by BIC address BMJIIRTH); and country of origin (Iran).

775.    Defendant HSBC-US also knew that other HSBC Defendants were altering and omitting information in SWIFT-NET payment order messages regarding Iranian parties, *i.e.* "stripping" these transactions, but nevertheless knowingly continued processing transactions despite that very knowledge.[179]

### 5.    BANK MELLI IRAN AND MELLI BANK PLC'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

776.    Bank Melli Iran, one of the largest banks in Iran, was established in 1927 by order of the Iranian Parliament.

777.    Following the Iranian Revolution in 1979, all banks in Iran were nationalized, and even today most are effectively controlled by the Iranian regime.

778.    Melli Bank Plc in London, England, was established in January 2002 as a wholly-owned subsidiary of Bank Melli Iran.

779.    According to the U.S. government, from 2004 to 2011, Bank Melli Iran and Melli Bank Plc in London transferred approximately $100 million USD to the IRGC-QF, which trained, armed, and funded Terrorist Groups that targeted, killed and maimed American and Iraqi forces and civilians.

780.    Specifically, according to the U.S. government in a November 10, 2009

---

[179] In furtherance of the Conspiracy, the CBI also conducted illegal precious metals transactions, primarily in gold bullion. For example, the December 2012 Consent Order entered into between OFAC and Defendant HSBC Holdings Plc stated that, "[o]n May 24, 2006, the London branch of HBUS acted as a clearing bank in a book entry transfer of 32,000 ounces of gold bullion, valued at $20,560,000, for the ultimate benefit of Bank Markazi, Iran [the CBI], in apparent violation of the prohibition against the "exportation . . . , directly or indirectly, from the United States, ... of any ... services to Iran or the Government of Iran." Located at: https://www.treasury.gov/resource-center/sanctions/CivPen/Documents/121211_HSBC_Settlement.pdf

diplomatic cable:

> [The] Islamic Revolutionary Guards Corps (IRGC) and IRGC-Qods Force, who channel funds to militant groups that target and kill Coalition and Iraqi forces and innocent Iraqi civilians, have used Bank Melli and other Iranian banks to move funds internationally. Bank Melli used deceptive banking practices to obscure its involvement from the international banking system by requesting that its name be removed from financial transactions when handling financial transactions on behalf of the IRGC.

781. Bank Melli Iran and Melli Bank Plc were designated as SDNs pursuant to E.O. 13382 in October 2007, and included on OFAC's SDN list, which resulted in, *inter alia*, their exclusion from the U-Turn exemption for Iranian Eurodollar transactions.

782. The U.S. Treasury Department press release announcing the designation stated:

> Bank Melli also provides banking services to the [Iranian Revolutionary Guard Corps] and the Qods Force. Entities owned or controlled by the IRGC or the Qods Force use Bank Melli for a variety of financial services. From 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force. When handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from financial transactions.

783. In April 2008, Assistant Treasury Secretary for Terrorist Financing Daniel Glaser testified before the House Committee on Foreign Affairs, Subcommittee on the Middle East and South Asia and the Subcommittee on Terrorism, Nonproliferation and Trade, confirmed that:

> Entities owned or controlled by the IRGC or the Qods Force use Bank Melli for a variety of financial services. From 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force. When handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from financial transactions.

784. In mid-2007, Bank Melli Iran's branch in Hamburg ("Bank Melli-Hamburg") transferred funds for the Defense Industries Organization ("DIO").

785. DIO is an Iranian government-owned defense manufacturer whose name, logo

and/or product tracking information was stamped on munitions found in weapons caches that were seized from the Special Groups in Iraq; including large quantities of weapons produced by DIO in 2006 and 2007 (for example, 107 millimeter artillery rockets, as well as rounds and fuses for 60 millimeter and 81 millimeter mortars.)

786.     Since at least the mid-1980s, Bank Melli has maintained Eurodollar accounts, at one time or another, with Defendants ABN Amro (RBS N.V.), Barclays, Credit Suisse, SCB, Commerzbank and the HSBC Defendants.

787.     As early as 1987, Bank Melli instructed Defendant Barclays to process Eurodollar transactions in favor of Bank Melli's London branch by referencing only Bank Melli's Eurodollar account number at Midland Bank Plc in London without referencing Bank Melli Iran's name in the SWIFT-NET payment orders.

788.     Bank Melli further instructed Barclays to send separate payment order message instructions, which included full transaction details, to Bank Melli's London Branch.

789.     Barclays agreed and assisted Bank Melli in its illegal conduct and continued to do so even after Bank Melli was designated by the United States and publicly identified as a major source of the IRGC's funding.

790.     No later than December 2000, Bank Melli opened a Eurodollar account with Defendant ABN Amro (RBS N.V.)'s branch in Dubai, United Arab Emirates ("UAE") and worked with ABN Amro (RBS N.V.) to strip its U.S. dollar-denominated transactions.

791.     Similarly, in July 2003, Defendant SCB learned that a competitor was exiting the Iranian business completely and sought to pick up this business and add Eurodollar accounts for five Iranian banks at SCB-London. Bank Melli was among the banks whose business SCB expressly sought to (and did) acquire.

792.    In January 2004, SCB decided to proceed with the Iranian business, and no later than February 13, 2004, SCB opened Eurodollar accounts for Bank Melli and thereafter participated in the Conspiracy by facilitating unlawful transactions for Bank Melli.

793.    In addition, Bank Melli Iran's branch in the UAE was instrumental in facilitating U.S. sanctions-evading trade-finance and Eurodollar payment transactions on behalf of Mahan Air and MODAFL.

794.    For example, Bank Melli issued a Letter of Credit to Mahan Air in August 2004 through Standard Chartered Bank, Dubai in favor of a UAE-based company called Aeronautical & Security for the shipment of an aircraft engine (identified by model number CF6-50C2) manufactured by General Electric and shipped from Luxemburg to Tehran, Iran.

795.    Bank Melli UAE instructed Credit Suisse, Zurich to make the payment, which in turn instructed Bank of New York in New York (one of Credit Suisse's U.S. clearing and settlement banks) to credit SCB's New York branch for further credit to the account of SCB-Dubai, which then credited Aeronautical & Security's Eurodollar account.

796.    The following flow-chart shows the overall flow of USD funds involved with Mahan Air's illegal acquisition of a U.S.-manufactured, export-controlled aircraft engine:



797.    In another example, Bank Refah Kargaran, Iran issued a Letter of Credit in USD to a MODAFL sub-agency through Standard Chartered Bank, Dubai in favor of a Dubai-based company called FP Aeroparts for the illegal shipment (via Iran Air) of U.S. aircraft parts.

798.    Bank Melli served as the Reimbursing Bank on the trade-finance transaction, and it subsequently instructed Credit Suisse, Zurich to debit its Eurodollar account as part of the flow of USD funds between the LCs counterparties.

799.    As the LC transaction proceeded, Credit Suisse then further instructed The Bank of New York to pay Standard Chartered Bank's New York branch (the clearing bank for the transaction), which further credited the USD account it maintained for SCB, Dubai with the amount due for the shipment of aircraft parts.

800.    To close-out the LC transaction, SCB, Dubai then credited the Eurodollar account it maintained on behalf of FP Aeroparts Middle East for the amount of the shipment.

801.    The following flow-chart shows the overall flow of USD funds involved with MODAFL's illegal acquisition of the U.S.-manufactured aircraft parts:



802.    As reflected in the above flow-chart, and during the relevant time period, Defendant Credit Suisse maintained Eurodollar accounts in Zurich, Switzerland on behalf of Bank Melli.

803.    Credit Suisse also instructed and trained Bank Melli employees, and conspired with Bank Melli, on ways to format Bank Melli's payment orders so that the resulting SWIFT-NET messages would avoid detection by the automated filter algorithms in U.S. depository

institutions' automated OFAC sanction screening software.

804.    During the relevant time period (and beginning no later than July 2003), Defendant Commerzbank also conspired with Bank Melli to route its Eurodollar clearing and settlement business through Commerzbank's correspondent banking relationships and SWIFT-NET accounts.

805.    Commerzbank further advised Bank Melli to list "non ref" in the ordering party field in all payment order messages because it would trigger a manual review of the overall Eurodollar payment transaction, thereby enabling Commerzbank personnel to ensure that the SWIFT-NET messages did not contain any information linked to Iran.

806.    Defendant HSBC-London also maintained Eurodollar accounts for Bank Melli Iran, and it used HSBC-US to provide illegal USD funds clearing and settlement services for Bank Melli during the relevant period.

807.    Yet despite the fact that several SWIFT-NET payment order messages were supposed to have been fully "stripped" by HSBC-London—before their transmittal to the U.S.— they were nevertheless blocked by the HSBC-US OFAC filter in New York because Bank Melli was referenced in error (thus placing HSBC-US on notice that HSBC-London was working in concert with Bank Melli to evade U.S. law, regulations and economic sanctions against Iran).

808.    Even with these blatant warning signs, HSBC-US continued to routinely provide Eurodollar clearing and settlement services to the HSBC Defendants, knowing full well that they were violating U.S. laws and regulations by laundering money on behalf of Bank Melli.

809.    Because, as discussed below, HSBC-US knew of this unlawful conduct—and continued to facilitate it— HSBC-US violated, *inter alia*, 18 U.S.C. § 2332d.

6.    **BANK MELLAT'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY**

810.    Bank Mellat provides banking services in support of Iran's Weapons of Mass Destruction program through the Atomic Energy Organization of Iran ("AEOI") and Novin Energy Company.

811.    In 2007, Bank Mellat was designated by the U.S. Treasury Department for providing "banking services in support of Iran's nuclear entities, namely the Atomic Energy Organization of Iran (AEOI) and Novin Energy Company. Both AEOI and Novin Energy have been designated by the United States under E.O. 13382 and by the UN Security Council under UNSCRs 1737 and 1747."

812.    During the relevant time period, Bank Mellat provided financial services and maintained Eurodollar accounts for AEOI and Novin Energy Company, and as part of the Conspiracy, Bank Mellat affirmatively worked to prevent disclosure of its dollar-denominated transactions on behalf of these designated customers.

813.    In June 2006, Bank Mellat was involved in a transfer totaling over $250 million dollars into a Eurodollar account it held for Novin Energy Company.

814.    As part of the Conspiracy, the CBI effectuated the payment(s) in USD funds to Bank Mellat's Eurodollar account in London for further credit to the Eurodollar account of Bank Mellat's client – Novin Energy Company.[180]

815.    In 2007, Bank Sepah facilitated payments in USD funds to Eurodollar accounts at Bank Mellat on behalf of entities associated with Iran's Aerospace Industries Organization ("AIO"), a subsidiary of Iran's Ministry of Defense and Armed Forces Logistics ("MODAFL")

---

[180] Novin Energy Company was designated by the U.S. Treasury Department under E.O 13382 and by the United Nations Security Council in Resolution 1747.

that was designated by the United States on June 28, 2005.[181]

816.     The AIO is the Iranian organization responsible for ballistic missile research, development and production activities and organizations, including the Shahid Hemmat Industries Group ("SHIG") and the Shahid Bakeri Industries Group ("SBIG"), which were both listed under U.N. Security Council Resolution 1737 and designated by the United States under E.O. 13382.

817.     Bank Mellat was designated by the United States on October 25, 2007 in connection with Weapons of Mass Destruction proliferation activities, and was included on OFAC's SDN list. The designation, *inter alia*, excluded Bank Mellat from accessing the U-Turn exemption for Iranian Eurodollar transactions.

818.     In 2002, together with Iran's Bank Tejarat, Bank Mellat merged its London branch to form Persia International Bank Plc in the United Kingdom.

819.     During the relevant time period, both Defendant HSBC-London and Defendant Barclays maintained Eurodollar accounts for Persia International Bank Plc and served as its "principal bankers" in the Eurodollar market.

### 7.     BANK SEPAH'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

820.     Bank Sepah is an Iranian government-owned and government-controlled financial institution.

821.     In 2007, the U.S. Treasury Department designated Bank Sepah for providing support and services to designated Iranian proliferation firms. The designation was effectuated pursuant to E.O. 13382, due to Bank Sepah's Weapons of Mass Destruction proliferation-related

---

[181] When Bank Sepah was designated by the U.S. in January 2007, the U.S. government noted that Iran's missile industry, arranging financing and processing dozens of multi-million dollar transactions for AIO and its subordinates…" *See*, https://www.treasury.gov/press-center/press-releases/Pages/hp219.aspx. "Bank Sepah is AIO's bank of choice, and since at least 2000, Sepah has provided a variety of critical financial services to [Iran]."

activities.

822.   Bank Sepah International Plc, a wholly-owned subsidiary of Bank Sepah in the United Kingdom, was also designated.

823.   According to the U.S. Treasury Department, Bank Sepah was the financial linchpin of Iran's missile procurement network and actively assisted Iran's pursuit of missiles capable of carrying Weapons of Mass Destruction.

824.   As a result of the designation, Bank Sepah (including Bank Sepah International Plc) was excluded from accessing the U-Turn exemption for Eurodollar transactions.

825.   During the relevant time period, Defendant HSBC-London provided illegal Eurodollar clearing and settlement services to Bank Sepah.

826.   During the relevant time period, Standard Chartered Bank provided illegal Eurodollar clearing and settlement services for Bank Sepah, as well as facilitating US dollar-denominated Letters of Credit for Bank Sepah. SCB, as discussed infra, also provided Eurodollar payments and trade-finance services for Bank Saderat and Bank Melli.

827.   As detailed below, Bank Sepah, acting in concert with SCB, illegally financed the acquisition of U.S. goods on behalf of Mahan Air.

828.   For example, in February 2006, Credit Suisse in Zurich paid SCB Dubai almost $30 million dollars (cleared and settled through the United States) on behalf of Bank Sepah, which had, in turn, financed Mahan Air's acquisition of an Airbus A320-232 and several aircraft engines.[182]

829.   In another case in 2002, Bank Sepah financed (in USD funds) the purchase of U.S. aircraft parts from an Iranian front company—the Malaysian and UK exporter Downtown

---

[182]   Part of the trade-finance transaction was cleared through Standard Chartered's New York branch, and the paperwork indicates that SCB was aware that the transaction involved U.S. origin parts prohibited by U.S. sanctions.

Trading Ltd—on behalf of a MODAFL-controlled entity.

830.    As part of the illegal scheme, once the U.S.-manufactured goods were transported from Malaysia to Iran by Iran Air, Downtown Trading Ltd., Malaysia sent documents to its bank, Maybank, Malaysia to collect payment against the Letter of Credit.

831.    Maybank then presented documents under Bank Sepah's Letter of Credit to SCB, Dubai (the Negotiating Bank) for validation and subsequent clearing and settlement of the transaction's final Eurodollar payment through Citibank, New York.

832.    Thus, Bank Sepah, with the assistance of Maybank and SCB, financed the illegal acquisition of U.S. aircraft parts by MODAFL, and induced Citibank in New York to provide dollar clearing and settlement to consummate the transaction.

833.    As detailed below, Defendant Commerzbank AG's New York branch also provided illegal Eurodollar clearing and settlement services for Bank Sepah.

### 8.    THE HSBC DEFENDANTS' AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

834.    The HSBC Defendants have a longstanding relationship with Iran.

835.    In 1999, HSBC Group established a relationship with the Tehran office of Bank Melli Iran, and it launched an "Iran Representative" office in Tehran, Iran that same year.

836.    In December 2000, HSBC Group members entered into a $500 million project finance agreement with six Iranian commercial banks: Bank Saderat Iran, Bank Melli Iran, Bank Mellat, Bank Tejarat, Bank Sepah and the Export Development Bank of Iran ("EDBI").

837.    Beginning in the late 1990s, Defendant HBSC-Europe and Defendant HSBC-Middle East devised a procedure whereby their Iranian Bank Co-conspirators put a cautionary note in their SWIFT-NET payment order messages including language such as, "*care sanctioned country*," "*do not mention our name in NY*," and "*do not mention Iran*."

838.    Eurodollar payment transactions with these cautionary notes automatically fell into what Defendant HSBC-Europe termed a "repair queue," where employees of HBSC-Europe and HSBC-Middle East manually removed all references to Iranian-sanctioned entities from the SWIFT-NET messages associated with each transaction.

839.    Between 2001 and 2007, the HSBC Defendants actively participated in the Conspiracy by repeatedly undertaking various methods to facilitate Eurodollar payments, trade finance and foreign exchange transactions on behalf of Iran through the United States that would evade U.S. sanctions by disguising Iran's financial activities as its USD funds were cleared and settled by U.S. financial institutions, including Defendant HSBC-US.

840.    Unlawful Iranian transfers of USD funds from HSBC-Europe and HSBC-Middle East were sent through the HSBC Group's USD correspondent accounts at HSBC-US by:

a)  Deleting references to Iran from the payment instructions (a.k.a. "stripping" the transactions), or otherwise altering the SWIFT-NET messages, to either omit or falsify information that would have otherwise indicated Iran's involvement in the transaction; and

b)  Styling transactions as bank-to-bank "cover" transactions between two non-Iranian banks, solely because the MT 202 payment order message format used for such transactions did not expressly obligate HSBC to identify the transaction's originator and beneficiary, thus avoiding any disclosure of the transaction's Iranian connections, and blocking HSBC-US's electronic filter algorithms from recognizing the transaction, let alone assessing whether it qualified for any OFAC exemption or license.

841.    Defendant HSBC-Europe created detailed plans to avoid triggering HSBC-US's automated OFAC filter software and reduce the need for "manual intervention" (*e.g.,* the re-formatting Eurodollar transactions), thus sparing HSBC-Europe's employees from the need to manually alter the SWIFT-NET messages in order to remove references that might otherwise identify the presence of Iranian parties to the transaction, and associated scrutiny.

842.    This enabled the HSBC Defendants' business with Iran in the Eurodollar market

174

to proceed quickly and profitably.

843.   In 2010, facing U.S. government investigations, HSBC-US hired Deloitte LLP as its outside auditor to identify and examine HSBC Group's OFAC sensitive USD funds transactions involving Iran and other prohibited countries or persons that went through the bank.

844.   That "review" identified more than 25,000 illegal transactions that involved Iran, worth a total of more than $19.4 billion in USD funds.

845.   The payment orders had been sent to HSBC-US and other financial institutions in the United States without referencing Iran, ensuring that the Eurodollar payment transactions would be processed without delay and not be blocked nor rejected by the algorithms in the automated OFAC filtering systems.

846.   The HSBC Defendants deliberately amended SWIFT-NET payment order messages and used MT 202 cover payments to conceal the nature of the transactions from HSBC-US automated OFAC sanction screening filters and those of other financial institutions in the United States, and HSBC-US was aware that the other HSBC Defendants used such methods to alter payment order messages.

847.   At the same time, the HSBC Defendants further trained, mentored and educated their Iranian Co-conspirators on how to deceptively format SWIFT-NET payment order messages, *inter alia*, to avoid detection and scrutiny by U.S. financial institutions, thus ensuring that Iran could solicit other conspirators to facilitate Eurodollar payments in a like manner.

848.   Accordingly, the HSBC Defendants' (and other Defendants' and Co-conspirators') willingness to process payments in this manner enabled Iran to flood the global financial system with undetectable U.S. dollar payment transactions and effectuate—what would have otherwise been preventable—transfers of USD funds to Hezbollah and the IRGC.

849.   Defendant HSBC Holdings was aware of Defendants HBSC-Europe and HSBC-Middle East's involvement in the Conspiracy with Iran as early as 2000.

850.   For example, HSBC Group AML Compliance Head Susan Wright received an email on June 9, 2000, from Bob Cooper, an HSBC colleague, informing Wright of an existing procedure that the HSBC Defendants were already employing to avoid OFAC filter detection.

851.   Cooper explained:

a)  A client bank had been "*automatically replacing a remitter's name with that of*" the client bank and that bank was utilizing bank-to-bank "cover payments" because the payment message formats did not expressly require identification of either the underlying party originating the transaction or the transaction's ultimate beneficiary.

b)  In the future, for OFAC sensitive transactions, that bank would "*arrange cover for the payment using MT202/203 remittances.*"

c)  In addition, that bank planned to send a separate 'MT100 message' to the recipient bank, providing full payment details for the originator and ultimate beneficiary.

852.   Cooper's email overtly acknowledged that "[i]n this way a payment in US$ can be made for an individual or company on the OFAC list, without the name being 'detected' by the OFAC filters that all US banks would apply."

853.   Several days later, on June 14, 2000, Wright forwarded Cooper's June 9, 2000 email to the then-current Head of HSBC Group Compliance, Matthew King.

854.   In her cover email, Wright stated that the "practice" detailed by Cooper was "unacceptable" and informed King that it was her position that:

a)  "We advised them that this was contrary to SWIFT guidelines (drawn up to address FATF concerns re money laundering via wire transfers) which required that the full details (names and addresses) of remitters and beneficiaries are included."

b)  "From a Group perspective I consider the continuation of this practice [the client bank's future plan to conceal OFAC sensitive transactions behind bank-

176

> to-bank transfers] to be unacceptable as a deliberate and calculated method to avoid US OFAC sanctions and has the potential to raise serious regulatory concerns and embarrass the Group."

855.    Senior HSBC Group officials were aware of the Conspiracy, including the specific methods and overt acts by which Iran, the Iranian banks and the HSBC Defendants were carrying it out.

856.    However, despite this awareness, senior compliance officials of HSBC Group and its subsidiary banks and entities (including compliance officials at Defendants HSBC Holdings, HSBC-Europe, HSBC-Middle East, and HSBC-US) did not put an end to this illicit banking "practice" with Iran. Instead, with clear knowledge of its purpose—and awareness that other banks participated in the Conspiracy—they knowingly employed similar techniques to evade OFAC requirements, thus allowing the HSBC Defendants to continue deploying and refining their respective "procedures" to facilitate illegal Eurodollar payments from and for Iran in USD funds.

857.    In late 2000, in coordination with the CBI, HSBC signed a project finance framework agreement with six Iranian commercial banks: including Bank Melli, Bank Saderat, Bank Mellat, Bank Tejarat, Bank Sepah and the Export Development Bank of Iran.

### 9.    HSBC-EUROPE'S 2001 "BANK MELLI PROPOSAL"

858.    In or around January 2001, Bank Melli's London branch maintained Eurodollar accounts with several other major international banks, but was interested in establishing a relationship with HSBC that would give HSBC the majority of Bank Melli's USD funds clearing and settlement business.

859.    In an April 30, 2001 letter, Defendant HSBC-Europe presented Bank Melli in London with a proposal (the "Bank Melli Proposal") for processing Bank Melli payments. HSBC-Europe's proposal boasted that HSBC-Europe was "…confident that we have found a

177

solution to processing your payments with minimal manual intervention."

860. The Bank Melli Iran Proposal expressly underscored that, if it adopted HSBC-Europe's "solution," Bank Melli would not be identified as a sender in any payment order message and, thus, HSBC-Europe would ensure that Iranian transactions involving USD funds would not run into any 'speed bumps' or other obstacles.

861. The "solution" provided specific alternative wording, as it explained:

> "The key is to **always** populate field 52 – if you do not have an ordering party then quote 'One of our Clients,' **never leave blank**. This means that the outgoing payment instruction from HSBC will not quote 'Bank Melli' as sender – just HSBC London and whatever is in field 52. This then negates the need to quote 'DO NOT MENTION OUR NAME IN NEW YORK' in field 72." (Emphasis in original.)

862. HSBC-Europe's proposal further requested, "In order to test our proposed solution we would appreciate if you used the following templates when submitting your next payments to the following customer, or alternatively submit a USD 1 test payment" and provided the following:

**MT202**
20:     *Your Ref….*
21:     *Related Ref….*
32:     *Amount/currency/Value date….*
50:     <u>**DO NOT QUOTE IF IRANIAN**</u>
52:     *Customer Name* **OR** *One of our clients* **MUST BE COMPLETED**
53:     */68296908*
54:
56:
57:     *Beneficiary Banker (SWIFT codes where possible)*
58:     *Beneficiary (SWIFT codes where possible)*
70:     *Any Payments details for beneficiary…*
72:     **Please leave blank**
**MT100**
Pay as above.

(Emphasis in the original.)

863. Thus, the Bank Melli Proposal documented the HSBC Defendants' active

178

coordination and participation in the Conspiracy to illegally remove, omit or falsify essential information from SWIFT-NET messages so as not to trigger OFAC sanctions screening filters or otherwise permit HSBC-US or other U.S depository institutions to detect Iranian transactions in USD funds.[183]

864.    In 2001, John Wilkinson served as HSBC-Europe's Institutional Banking Relationship Manager for HSBC-Europe's Bank Melli account.

865.    In a June 28, 2001 email titled "Re: Bank Melli" to HSBC-US, Wilkinson discussed the Bank Melli Proposal, describing HSBC-Europe's "usual method" to alter the wording of Iranian payment order messages, and the rationale for doing so:

- "Once the proposition goes live, we have instructed Bank Melli to alter the format of its [sic] payments to achieve straight through processing. The field 52 input of 'one of our clients' is a standard phrase used by MPD [Multicurrency Payments Department] in these situations."

- "Since sending the letter we have further asked them to only put 'One of our clients' in field 52, thus removing the chance of them inputting an 'Iranian referenced' customer name, that causes fall out of the cover payment sent to HSBC-US and a breach of OFAC regulations."

866.    In further support of his position to continue this standard 'procedure,' Wilkinson explained that a payment involving an Iranian bank had been blocked because HSBC-Europe's MPD [Multicurrency Payments Department] "failed to spot the poor input and did not follow the normal procedure of altering the payment."

867.    In other words, the HSBC Defendants' "normal" procedure was to conspire with Iranian banks, including Bank Melli, to *deliberately* alter payment order messages prior to sending them to New York for the express purpose of avoiding detection and analysis by U.S. banks, regulators and law enforcement.

---

[183] An internal HSBC memorandum that was associated with the Bank Melli Proposal also makes clear HSBC's awareness of Defendant Standard Chartered Bank's role as NIOC's primary (Western) banker at the time.

868.     In an email exchange in October 2001 between David Bagley, Defendant HSBC-Middle East's Regional Head of Legal and Compliance, and Matthew King, a member (and later Head of) HSBC Group's Audit Department, King noted:

> We also have to bear in mind pending US legislation which will in effect give the US extraterritorial authority over foreign banks, particularly if we are unfortunate enough to process a payment which turns out to be connected to terrorism. My own view therefore is that some of the routes traditionally used to avoid the impact of US OFAC sanctions may no longer be acceptable.

869.     HSBC Group AML Head Susan Wright and Money Laundering Control Officer John Allison received copies of King's e-mail.

870.     King's email further confirms that senior executives and managers within the HSBC Group comprehended what the HSBC Defendants (and other foreign banks) had "traditionally" been doing for years when they used "routes" (a euphemism for altering payment order messages prior to routing them to U.S. financial institutions through SWIFT-NET) to avoid disclosing a transaction's Iranian connections, and that some of those transactions might prove to be "connected to terrorism."

871.     A January 2003 memorandum authored by HSBC-Middle East and disseminated to other members of the HSBC Defendants confirms not only the HSBC Defendants' ongoing participation in the Conspiracy, but also their knowledge of the participation of other co-conspirators, and Iran's desire to further evade U.S. sanctions.

872.     The memorandum stated in relevant part:

- "It is believed that some service providers amend the payments to ensure Iran is not mentioned in the body of the payment instruction to their USD correspondent. This process minimizes the risk of payment being referred to OFAC."

- "Currently, it is estimated that Iranian banks issue up to 700 USD payments a day using their USD providers, mainly banks in the

> UK and Europe, which in turn use their New York USD correspondents to effect the payments."

873.    In addition to acknowledging the existence of the Conspiracy, the HSBC-Middle East memorandum also advised:

> "[T]here is substantial income opportunity to sell a USD payments proposition to Iranian banks in view of the impending FATF regulations...The [requirements of the] new regulations…increases the risk of Iranian payments being held in the USA as they may fall foul of the OFAC regulations. The Iranian Banks have now prioritized this issue and are now actively seeking a solution from their banks, including HSBC."

874.    From at least 2003 forward, HSBC provided banking and payment services in the Eurodollar market to, among other Iranian entities, the NIOC (which, as noted previously, was later designated pursuant to E.O. 13382 and identified as an agent or affiliate of the IRGC during the relevant time period).[184]

875.    Over the course of the next several years, the HSBC Defendants continued their participation in the Conspiracy.

876.    In an October 9, 2006 email, David Bagley [HSBC-Middle East's Regional Head of Legal and Compliance] informed senior HSBC Group officials that key U.S. policymakers were "…in favour of withdrawing the U-Turn exemption from all Iranian banks. This on the basis that, whilst having direct evidence against Bank Saderat particularly in relation to the alleged funding of Hezbollah, they suspected all major Iranian State owned banks of involvement in terrorist funding and WMD [weapons of mass destruction] procurement."

877.    Further demonstrating his awareness of the risks HSBC was engaged in with Iran,

---

[184] The HSBC Defendants also provided Eurodollar, trade-finance, and foreign exchange services for NIOC. For example, the aforementioned January 2003 HSBC-Middle East memorandum stated that:

> L/C's [Letters of Credit] issued for Iranian Companies Abroad – Various Group Offices. HSBC offices are developing relationships with Iranian Government and non-Government companies. The L/C's issued are normally denominated in USD. Following NIOC's acceptance of HSBC as one of its listed banks, HSBC Bank Middle East now handles Iran's oil export L/C's. Turnover for this business is about USD400M [million] per year.

Bagley was listed as the contact person on the April 19, 2007 Wolfsberg Group press release calling for more transparency for international wire transfers "to promote the effectiveness of global anti-money laundering and anti-terrorist financing programs."

878.   Eight months later, in a June 8, 2007 email, Bagley informed HSBC Holding's CEO, Michael Geoghegan, and others, that "[U.S. Treasury Under Secretary for Counter Terrorist Financing and Sanctions] Levey essentially threatened that if HSBC did not withdraw from relationships with [redacted] we may well make ourselves a target for action in the US."

879.   Bagley's email thus confirmed that various relationships continued to exist in the Eurodollar market with Iran and Iranian banks, including Bank Saderat.

880.   Bagley not only acknowledged that HSBC had "…an agency banking relationship in HSBC-EUROPE both for [redacted] and other Iranian banks," but he confessed that "[t]here are further complications surrounding the process of closure with all Iranian banks as we have some USD 9m in reimbursements due from Sepah, where we are running off trade lines, where we may need cooperation from Central Bank of Iran."

881.   On December 11, 2012, the U.S. Department of Justice ("DOJ") announced that Defendants HSBC Holdings and HSBC-US had admitted to Anti-Money Laundering ("AML") and OFAC sanctions violations, and had agreed to enter into a Deferred Prosecution Agreement and pay a $1.256 billion forfeiture. As explained further infra, DOJ issued a press release announcing the DPA, and summarizing the HSBC Defendants' illegal conduct.[185]

882.   In connection with the DPA, DOJ filed a four-count felony criminal information against HSBC Holdings and HSBC-US, charging them with: (1) willfully failing to maintain an effective AML program; (2) willfully failing to conduct due diligence on their foreign

---

[185]   Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby adopt and incorporate by reference the DPA entered into between the HSBC Defendants and the DOJ on or about December 11, 2012, as if fully set forth herein.

correspondent affiliates; (3) violating the International Emergency Economic Powers Act ("IEEPA"); and (4) violating the Trading with the Enemy Act ("TWEA"). HSBC Holdings and HSBC-US waived federal indictment, agreed to the filing of the information, and claimed to have accepted responsibility for HSBC's and its employees' criminal conduct.

883.    Despite its agreement to overhaul its U.S. and global compliance functions, HSBC remained a conduit for illicit funds.

884.    On December 9, 2010, the U.S. Treasury Department designated Tajco, describing it as "a multipurpose, multinational business venture involved in international trade as well as real estate and presided over by Ali Husayn and Kassim Tajideen…. Since at least December 2007, Ali Tajideen used Tajco Sarl, operating as Tajco Company LLC, as the primary entity to purchase and develop properties in Lebanon on behalf of Hizballah."

885.    The designation also covered Kairaba Supermarket, a subsidiary business of Tajco Ltd.

886.    A July 13, 2012 article published by *Reuters* entitled "Special Report: HSBC's Money-Laundering Crackdown Riddled With Lapses" reported that an HSBC-US compliance officer had identified suspicious transactions involving Hezbollah, specifically Tajco and Kairaba Supermarket.

887.    In December 2013, the Treasury Department announced that Defendant HSBC-US agreed to remit $32,400 to settle potential civil liability for three apparent violations of the Global Terrorism Sanctions Regulations, 31 C.F.R. Part 594.

888.    The fine reflected the fact that HSBC-US facilitated transactions in late 2010 and early 2011 worth about $40,000 that benefited Tajco.

889.    Although a relatively small sum, the facilitation of terrorism financing for

Hezbollah a considerable time <u>after</u> Defendants HSBC Holdings and HSBC-US began negotiating their deal with DOJ, strongly suggests that, as of early 2011, the HSBC Defendants had not seriously remediated their AML/CFT controls and procedures, even after being caught committing hundreds of felonies.

### 10. DEFENDANT HSBC-US'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY IN VIOLATION OF 18 U.S.C. § 2332D

890. As alleged in greater detail below, even though at all relevant times Defendant HSBC-US was aware that: the HSBC Defendants were participating in the Conspiracy to unlawfully transmit Iranian USD funds through U.S. banks (including HSBC-US); and periodically complained about Defendants HSBC-Middle East and HSBC-London's conduct and proposed new procedures and policies for HSBC Group members that would have provided HSBC-US improved transparency, HSBC-US took no measures to prevent HSBC-US from facilitating hundreds of millions of dollars of payments to Iran in violation of 18 U.S.C. § 2332d. Accordingly, in addition to violating § 2332d, HSBC-US's conduct evidenced its agreement to continue participating in the Conspiracy despite its complaints, its knowledge or deliberate indifference to the Conspiracy's criminal objectives and purposes, and its commission of multiple overt acts in furtherance of the Conspiracy.

891. One key example of HSBC-US's failure to take substantive measures to ensure that it would not facilitate the HSBC Defendants' provision of illegal material support and services to Iran is reflected in a July 12, 2001 e-mail to senior employees at HSBC-US (containing a memorandum authored by HSBC Group Representative for Iran, John Richards).

892. Richards's memorandum outlined the business opportunities members of the HSBC Group were presented with in connection with prospects to expand and grow HSBC Group's relationships with Iran, the CBI and Bank Melli, explaining:

a) "We have been approached by the Central Bank of Iran to take back their USD clearing business from Natwest. In principal I am keen to do this but on the clear proviso that it can be done profitably and on a sustainable basis."

b) "One of our key objectives for the year is to develop HSBC's Asset Management activities in Iran and with the Central Bank now managing the oil price stabilization fund amounting to some USD10bn there is considerable scope for this. Obviously many foreign banks are chasing the same business and so we need to demonstrate some competitive or relational advantage. The proposal from the Central Bank was therefore not unwelcome…The Central Bank manages their transactions through Bank Melli London…"

c) "In summary if we can make this business independently profitable and sustainable the benefits that we can derive particularly from the Treasury Asset Management and Investment spin offs will be substantial."

893. Richards's memorandum also demonstrates the HSBC Defendants' awareness that other foreign banks (including Defendants) were eagerly pursuing U.S. dollar clearing and settlement business with the CBI in the Eurodollar market.

894. On July 12, 2001, Denise Reilly, HSBC-US's Senior Manager in Payment Operations, sent an e-mail titled "*Re: Bank Melli*" to various senior HSBC-US employees in which she stated, "It was relayed to us that the Group (with the Backing of Bond) [the Chairman] was looking to significantly grow our presence in Iran." Reilly also explained that the "current lines of credit [for Iran] were reported to be $800m, trade lines of $150m and growth was anticipated in trade, cash management and internet banking."

895. Thus, HSBC-US senior employees understood the significance to the HSBC Defendants of their Iranian business and specifically, the HSBC Defendants' relationship with Bank Melli.

896. As early as 2001, senior HSBC-US payments, compliance and business managers were informed that Iranian Eurodollar payment transactions were being sent by Defendant HSBC-London to HSBC-US for clearing and settlement in USD funds after references to Iran had been deleted.

897.   HSBC-US employees were also informed of an HSBC-London proposal to streamline the processing of Iranian U-turn transactions by omitting references to Iran so that the payment orders would not be halted by OFAC's sanctions screening filter in the United States. Emails at the time show that senior HSBC-US officials expressed discomfort with the HSBC-London proposal, but took no other action to stop or prevent the activity already occurring.

898.   As noted above, a senior HSBC-US employee received an e-mail on June 28, 2001 titled "Re: Bank Melli," which described HSBC-London's "usual method" of altering payment order messages and the reasons for doing so.

899.   Another example of HSBC-US' knowledge and acquiescence in the Conspiracy is memorialized in a November 14, 2002 memorandum entitled "COMPLIANCE-OFAC ISSUES IN GENERAL AND SPECIFIC TO IRAN" authored by HSBC-London's Multicurrency Payments Department Head Malcolm Eastwood ("the Eastwood Memorandum").

900.   The Eastwood Memorandum was sent to both HSBC-US and HSBC-London employees and forwarded to additional HSBC-US employees in separate emails.

901.   The Eastwood Memorandum discussed both HSBC's "cover payment method" of evading U.S. sanctions and the specific actions taken by HSBC to modify the contents of payment messages. In relevant parts, the Eastwood Memorandum stated:

- "As the custodian of HSBC-Europe's payments operation I currently feel that we may be exposing ourselves to unnecessary and unacceptable Reputational and Operational Risk when we are handling payments originating from FIs [financial institutions] domiciled in or who are a local branch of an FI domiciled in an OFAC regulated country."

- "HSBC-Europe's historical practice has been to send these types of payments where the U Turn principal applies (ie funds are generally moving from an European bank to another European bank for the credit of an OFAC regulated entity) via the Cover Payment method. This means that the payment instructions received by HSBC-US contains no mention of the country or entity involved. My understanding is that this has been accepted practice for many years and that

HSBC-Europe IBL hold accounts, some in USD for FIs domiciled in these countries ie Cuban, Iranian etc."

- "The Iranian banks continue to send us what I describe as conditional payment instructions which for HSBC-Europe require an element of amendment by ourselves. This introduces operational risk and under FATF principles we should not be amending these payments instructions. Acceptance of these items over many years means that we are bound by the precedents currently in place, and I believe that we need to break these precedents…"

- "[W]e need…[t]o agree a 'template' payment instruction for these U Turn Payments which can be used by PCM Sales and the RM team and sent to the Iranian Banks stipulating that payments must be formatted in this way, confirming that we will be sending these via the Serial method and that any deviation from this template will be at the Iranian Banks own risk."

- "Whilst I am told that there are significant business opportunities particularly with countries such as Iran there are also substantial Reputational and Operational Risks, not to mention financial losses associated with it."

902.   In addition, HSBC-US's OFAC filter occasionally stopped an Iranian-related transaction, sent by an HSBC Group affiliate, in which the identifying information had inadvertently been retained, demonstrating that undisclosed Iranian U-Turn exemption transactions continued to be sent through HSBC-US correspondent accounts.

903.   HSBC-US employees were copied on similar memoranda issued by other HSBC Defendants during the relevant period. For example, a January 2003 memorandum circulated by HSBC-Middle East (and received by several HSBC-US employees) also noted that "[t]he Group now has an excellent relationship with all Iranian banks and some very larger Iranian corporates such as National Iranian Oil Co, National Petrochemical Co, National Iranian Gas Co, National Iranian Steel Co, top Iranian insurance companies, Ministry of Power, Ministry of Post and Telecommunications, etc."

904.   The memorandum also confirmed the HSBC Defendants' awareness that other non-Iranian banks were participating in the Conspiracy, stating:

- "It is believed that some service providers amend the payments to ensure Iran is not mentioned in the body of the payment instruction to their USD correspondent. This process minimizes the risk of payment being referred to OFAC."

- "Currently, it is estimated that Iranian banks issue up to 700 USD payments a day using their USD providers, mainly banks in the UK and Europe, which in turn use their New York USD correspondents to effect the payments."

- "[T]here is substantial income opportunity to sell a USD payments proposition to Iranian banks in view of the impending FATF regulations...The [requirements of the] new regulations…increases the risk of Iranian payments being held in the USA as they may fall foul of the OFAC regulations. The Iranian Banks have now prioritized this issue and are now actively seeking a solution from their banks, including HSBC."

905. An October 2003 document entitled "IRAN-STRATEGY DISCUSSION PAPER" circulated to senior HSBC-US employees further documented the HSBC Defendants' eagerness to facilitate USD funds transfers for Iran, noting: "One of the reasons to accelerate our process of engagement is to demonstrate, to the authorities within Iran, that we are committed to the development of their country. This is seen to be particularly important given the more aggressive/pragmatic approach to Iranian business adopted by French and German competitor banks."

906. Nevertheless, despite being copied on such memos, HSBC-US took no further action to stop the unlawful activities.

907. Even when HSBC-US blocked Iranian payment transactions, it failed to take further action to ensure that other HSBC Defendants would not continue these illegal practices.

908. For example, in late December 2002, HSBC-US's OFAC sanctions screening filter stopped and rejected a payment order listing Bank Melli as the originator of the SWIFT-NET message that contained a field that read, "**Do not mention our name in NY.**"

909. An internal HSBC-US email dated December 30, 2002, informed HSBC-US's compliance team about the Bank Melli payment, which once again confirmed the HSBC

Defendants' ongoing process of altering payment order messages.

910. On June 13, 2003, HSBC-US's OFAC filter stopped another transaction, this time for $150,000 in USD funds, because it included both a reference to Bank Melli and the words "*do not mention our name*."

911. In a June 16, 2003 email entitled "PLC-Re do not mention our name," HSBC-US compliance officers were notified about the June 13 blocked transaction and received additional confirmation of the HSBC Defendants' illegal practice of altering fields within Iranian payment order messages for the express purpose of escaping detection in the United States.

912. During 2004, in furtherance of the Conspiracy, HSBC Group members sent approximately *7,000* Iranian Eurodollar transactions through various SWIFT-NET network accounts for clearance and settlement by Defendant HSBC-US and other correspondent banks in the United States without disclosing their source.

913. HSBC-US did not report any of the HSBC Defendants' illegal conduct involving Iran to any of its regulators or to U.S. law enforcement at that time.

914. During 2005, in furtherance of the Conspiracy, HSBC-London and HSBC-Middle East together sent about 5,700 Iranian Eurodollar transactions through various SWIFT-NET network accounts for clearance and settlement by Defendant HSBC-US and other correspondent banks in the United States without disclosing their source.

915. On April 19, 2005, HSBC-US's OFAC filter again stopped a $362,000 payment order from Bank Melli because it contained the phrase "*do not mention our name in New York*."

916. HSBC-London re-submitted the same payment on April 22, 2005, but HSBC-US stopped it again, this time sending HSBC-London a SWIFT-NET message requesting full disclosure of the name and address of the underlying originator and ultimate beneficiary of the

USD funds.

917.    In early May 2005, HSBC-US stopped a $6.9 million USD payment order originating with Defendant Credit Suisse in Zurich because the SWIFT-NET message details included the phrase "*Bank Melli Iran*."

918.    In fact, forty-four of the payments stopped by HSBC-US's OFAC filter in May 2005 alone (inadvertently) disclosed Iranian involvement.

919.    On June 3, 2005, HSBC-US informed Defendant HSBC Holdings that additional HSBC-London transfers in the amounts of $1.9 million USD and $160,000 USD had been stopped by HSBC-US due to the lack of full disclosure of the originator, beneficiary, and purpose of the payment transaction.

920.    HSBC-London responded that both payment orders were foreign exchange related, the originators were Bank Tejarat and Bank Melli,186 and the beneficiaries of the USD funds were Persia International Bank and Defendant Credit Suisse's Zurich office, respectively.

921.    HSBC-US responded by requesting that HSBC-London follow up with the banks to obtain the names and addresses of the initial originators and ultimate beneficiaries, as well as confirmation of the underlying purpose of the payments.

922.    According to information provided by Bank Melli through HSBC-London, the $160,000 payment denoted an internal transfer from Bank Melli's Eurodollar account with HSBC-London to Bank Melli's Eurodollar account with Defendant Credit Suisse's Zurich office.

923.    From July 2005 to June 2006, HSBC-Middle East sent more than 2,500 Iranian Eurodollar transactions – through its various SWIFT-NET network accounts for clearance and settlement by Defendant HSBC-US and/or other correspondent banks in the United States – that illegally concealed the required data relating to Iran.

---

186 HSBC-London also maintained correspondent accounts for Bank Refah.

924.    On November 23, 2005, in an email entitled "Cover payment processed to Credit Suisse re 'Bank Melli' – USD 100,000," an HSBC-US OFAC Compliance officer notified HSBC-London that, on November 7, 2005, a $100,000 transaction involving Bank Melli had been processed through HSBC-London's USD account at HSBC-US without transparent documentation:

> We are bringing this to your attention as this situation indicates that cover payment involving Iran are still being processed by PLC [referring to HSBC-London]. It was our understanding that Group payments involving Iran would be fully disclosed as to the originators and beneficiaries.

925.    In furtherance of the Conspiracy, from April 2006 through December 2007, about 50% of the estimated *700* Iranian Eurodollar payment transactions sent by HSBC-London – through its various SWIFT-NET network accounts for clearance and settlement by Defendant HSBC-US and/or other correspondent banks in the United States – continued to not disclose their connection to Iran.

926.    In addition, through March 2010, HSBC-US was the conduit for at least twenty-four post-U.S. designation Eurodollar transactions on behalf of IRISL and/or its various subsidiaries and front companies.

927.    During the relevant time period, HSBC-US knew that Iran was a designated State Sponsor of Terrorism, and that HSBC-US's USD clearing and settlement operations with CHIPS-NY (Eurodollar clearing and settlement), CLS Bank (foreign exchange) and FRB-NY (domestic USD clearing and settlement and central bank lender of last resort for the Eurodollar market) were being used by the HSBC Defendants to facilitate unlawful transactions in USD funds on behalf of Iran in furtherance of the Conspiracy.

928.    As noted above, on December 11, 2012, Defendants HSBC Holdings and HSBC-US entered into a Deferred Prosecution Agreement with DOJ.

929.   DOJ issued a press release announcing the 2012 DPA's entry, including the fact that the DPA resulted in HSBC Holdings and HSBC-US admitting to AML and sanctions violations, as well as the fact that they would pay a $1.256 billion USD forfeiture.

930.   In addition to the $1.256 billion forfeiture under the DPA, HSBC Holdings and HSBC-US also agreed to pay $665 million in civil penalties – $500 million to the OCC and $165 million to the Federal Reserve – for the HSBC Defendants' AML/CFT program violations with Iran, other sanctioned countries, and transnational drug cartels.[187]

931.   DOJ's press release announcing the DPA quoted then-Assistant Attorney General Lanny Breuer:

> HSBC is being held accountable for stunning failures of oversight – and worse – that led the bank to permit narcotics traffickers and others to launder hundreds of millions of dollars through HSBC subsidiaries, and to facilitate hundreds of millions more in transactions with sanctioned countries. The record of dysfunction that prevailed at HSBC for many years was astonishing.

932.   The United States Attorney for the Eastern District of New York Loretta Lynch was quoted as stating:

> HSBC's willful flouting of U.S. sanctions laws and regulations resulted in the processing of hundreds of millions of dollars in OFAC-prohibited transactions. Today's historic agreement, which imposes the largest penalty in any [Bank Secrecy Act] prosecution to date, makes it clear that all corporate citizens, no matter how large, must be held accountable for their actions.

933.   Manhattan District Attorney Cyrus R. Vance Jr. was quoted in the same press release as stating:

> New York is a center of international finance, and those who use our banks as a vehicle for international crime will not be tolerated. … Sanctions enforcement is of vital importance to our national security and

---

[187] Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby adopt and incorporate by reference the Settlement Agreement entered into between the HSBC Defendants and the United States Department of Treasury on or about December 11, 2012, as if fully set forth herein.

the integrity of our financial system. The fight against money laundering and terror financing requires global cooperation, and our joint investigations in this and other related cases highlight the importance of coordination in the enforcement of U.S. sanctions.

## 11. DEFENDANT BARCLAYS BANK PLC'S AND BARCLAYS BANK PLC, NEW YORK BRANCH'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

934. Until at least May 2008, Defendant Barclays maintained correspondent banking relationships with several of the Iranian Bank Co-conspirators, including Bank Saderat and Bank Melli.

935. Barclays is a member of SWIFT-Brussels and has historically used the SWIFT-NET system to transmit international payment messages from and for financial institutions around the world.

936. Barclays originally processed USD payment messages through numerous global locations.

937. Over time, Barclays consolidated its USD payment processing so that the payments were predominately processed at Barclays' Payment Processing Centre located in Poole, England ("Poole").

938. Barclays knowingly and willfully engaged in conduct that caused its New York branch and other financial institutions in the United States to process Eurodollar payment transactions in violation of U.S. sanctions.

939. As part of this effort to evade U.S. sanctions against Iran, Barclays:

a) Followed instructions from Iran and its agents not to mention their names in USD payment transaction messages sent to Barclays-New York and to other U.S. financial institutions for clearance and settlement in USD funds;

b) Routed transactions through an internal Barclays sundry account, thereby hiding the payment transactions' connection to Iranian entities;

193

    c) Amended or reformatted SWIFT-NET payment order messages to remove information identifying Iranian entities involved in the transfer of USD funds; and

    d) Re-sent Iranian entities' SWIFT-NET MT 103 payment order messages as cover payments to take advantage of the lack of transparency as to the ultimate originator/beneficiary that was achieved by using the MT 202 bank-to-bank cover payment message format.

940.   Beginning in 1987, Bank Melli Iran instructed Barclays to process USD transactions in favor of Bank Melli's London branch by referencing only Bank Melli's Eurodollar account number at Midland Bank Plc and without referencing Bank Melli's name.

941.   Bank Melli further instructed Barclays to send separate payment order instructions, which included full details about the Eurodollar payment transactions to Midland Bank Plc and Bank Melli's London Branch.

942.   In response, Barclays memorialized Bank Melli's instructions for Eurodollar market transactions in a memorandum sent by its Head Office to Barclays' international offices, and, as early as the late 1990s, included them in Barclays' "List of Correspondents" ("LOC"), which contained information related to Barclays' correspondent banking relationships and assisted Barclays' employees in effectuating international payment transactions involving USD funds.

943.   Barclays' LOC contained instructions on how to process payments for both sanctioned and non-sanctioned banks with which Barclays had correspondent relationships.

944.   Over time, the LOC grew to include instructions for payments related to several of Barclays' correspondent bank clients and included instructions to use cover payments (SWIFT-NET MT 202 payment order messages) when processing payments in USD funds for clearing and settlement in the United States, and omitting the names of U.S.-sanctions targets from the payment order messages so that U.S. financial institutions could not identify the

194

sanctions nexus of the payments.

945.    In a November 1987 Head Office Circular, Barclays distributed payment instructions received from an Iranian bank directing Barclays "to amend the procedures governing the transfer of U.S. Dollars for any purpose in favour of our London branch" and to route such payments "without mentioning the name of our bank."

946.    The reason for, and effect of, these instructions was to disguise Iranian sanctioned entity payments from Barclays' correspondents in the United States so that such correspondents would unwittingly process the illegal payments.

947.    Barclays' employees followed the instructions in the LOC when processing USD payments involving sanctioned Iranian banks, thereby ensuring that the name of the bank would not appear in any MT 202 cover payment messages sent to Barclays' New York branch for clearing and settlement through CHIPS-NY and FRB-NY. For example, with regard to USD payments sent on behalf of an Iranian bank, the LOC stated, "[t]he cover MT202 for the direct Payment Order to be arranged by the remitting Bank without mentioning [the Iranian bank's] name ...." (Underlined in the original.)

948.    Barclays' LOC also contained instructions to contact the remitter or beneficiary for routing instructions for certain payments of USD funds involving Iranian sanctioned entities. The general instructions for Iranian banks stated:

USD PAYMENTS TO IRAN

Certain payments may be blocked by the US Authorities. Therefore, any branch with a USD transfer is advised to contact the remitter beneficiary or beneficiary's bankers to request specific routing instructions.

949.    Barclays' standard operating procedures allowed and even educated its employees on how to bypass the sanction screening algorithms in both Poole's and the U.S. financial institution's OFAC filters to permit illegal payment transactions in USD funds.

950.    Pursuant to these "standard" procedures, when the Poole filter identified a Eurodollar payment transaction that referenced an Iranian entity, that payment order message was stopped for further review by Barclays' employees in Poole.

951.    If the Poole-based employees found that the payment order message referenced an Iranian entity, they would follow one of the following procedures: (i) return the payment order message to the remitting entity via a pre-formatted fax cover sheet; (ii) alter or delete fields in the SWIFT-NET payment order message; or (iii) change the message type from a serial payment (MT 103) to a cover payment (MT 202) in order to hide any connection to the Iranian entity.

952.    The then-Senior Manager for Barclays Group Payments Industry Management in Poole explained that if the MT 202 payment order message contained beneficiary information that caused it to be stopped by the OFAC filter in the U.K, that information was removed to ensure the payment transaction was not stopped by the OFAC filter when resubmitted.

953.    The same Senior Manager noted that he was aware that Defendant Barclays' payment operators amended payment order messages in order to facilitate the transfer of USD funds to Iran and that this was a "*common practice*" at Barclays.

954.    As noted above, consistent with Barclays' "standard" procedures, when an Iranian payment was flagged by the Poole OFAC filter, Barclays' employees generally returned the flagged payment order message to the original remitting bank.

955.    Barclays' employees used a specific fax cover sheet to advise the remitting area of Barclays that the payment message had been cancelled and would further identify the specific words in the payment message that had caused the message to be stopped by the Poole sanctions screening filter.

956.    The Barclays fax cover sheet contained the following language:

> OFAC ITEM: Wording below is contained in the message and does not comply with the Office of Foreign Assets Control regulations applicable to all payments sent via the U.S.A. Payments to U.S.A. must NOT contain the word listed below.

957.   Subsequently, because Barclays was advising the remitting bank of the prohibited language, some of these payment order messages would thereafter be re-sent by the remitting bank on the SWIFT-NET network without the "offending" language.

958.   This deliberate omission enabled the payment order messages to pass through the Poole sanctions screening filter without being blocked, and thereby be cleared to settle in USD funds by Barclays' New York branch and unwitting U.S. financial institutions, giving Iran and/or other sanctioned Iranian entities/individuals undetectable access to USD that could and would be used to finance terrorism,

959.   In November 2001, the use of the fax cover sheet was identified by Barclays' internal auditors as problematic because (according to a Barclays internal audit report) "without adequate guidance the recipient of the fax advice may not be aware of the implications and may merely remove the offending text and re-submit the payment without any wider consideration."

960.   In early 2002, as a result of this internal audit report, the language of the fax template was re-worded in an attempt to mitigate these issues. The fax language was changed to:

> OFAC ITEM: Wording below is contained in the message and does not comply with the U.S.A. / U.K. / E.C. / U.N. Sanctions.

961.   Despite the altered wording in the fax cover sheet, no implementing guidance was circulated, and Barclays' "standard" practices nevertheless continued, as did the resubmission of prohibited OFAC-sanctioned transactions with the offending text removed.

962.   Barclays' employees generated internal correspondence that documented Barclays' awareness and acceptance of the fact that transactions were being processed via MT 202 cover payments for the specific purpose of hiding the identity of Iranian entities in order to

197

ensure that Barclays could continue its unfettered processing of USD funds transfers involving Iranian entities through Barclays' New York branch.

963.    For example, one Barclays employee explained in an email:

> [W]e can get around [OFAC seizure] by sending only cover payments to US banks and then make MT103 direct to beneficiary's bank. The MT202 cover must not mention of [sic] the offending entity which could cause funds to be seized. A good example is Cuba which the US says we shouldn't do business with but we do.

964.    Barclays' employees understood the advantage of using bank-to-bank cover payments. The cover payment message format (MT 202), with its limited information fields, was a better mechanism to process OFAC-prohibited transactions than using a more detailed serial payment message format (MT 103).

965.    A Barclays employee noted in an email: "If we were to route the payment via the serial payment method ... the payment would clearly be seized by the US authorities" but by using cover payments, "the US Treasury [would] remain blissfully unaware of [the payment's] existence."

966.    In December 2002, internal correspondence also brazenly acknowledged Barclays' use of MT 202 cover payment messages to detour U.S. Iranian sanctions, stating:

> To circumvent US legislation, [Barclays is] currently rout[ing] US$ items for sanctioned institutions via unnamed account numbers, without mention of the sanctioned party. For customer transfers, payment cover is routed via MT202 to New York, naming only the account holding bank. A direct MT103 is them [sic] sent to the account holding bank. Further investigation suggests that we are carrying out this practice on behalf of four [Iranian bank] customers….

967.    A January 2004 report provided to Barclays' Group Risk Oversight Committee noted that a recent failure "illustrat[ed] why the whole sanctions process needs to be reviewed and brought up to date."

968.    In July 2004, an internal assessment of Barclays' payments processing explained:

> Cover payments are an issue for this project as they are effectively a way of by passing [sic] sanctions.... There is nothing in these payment messages [MT 103 and MT 202] that identifies them as linked for the purpose of screening.

969.    In April 2005, Barclays noted in an internal memo the risk of using MT 202 cover payments rather than MT 103 serial payments, and also acknowledged that other financial institutions such as the Western Bank Defendants facilitated payments for Iran in the same manner:

> Changing to different message types would be much more expensive to us. *Moral risk exists if we carry on using cover payments but that is what the industry does.* I[n] M[y] H[umble] O[pinion] we should carry on using cover payments and accept that there is a risk of these being used on occasion to hide true beneficiaries (who may or may not be sanctioned individuals or entities). (Emphasis added.)

970.    In the spring of 2006, Barclays' senior management learned that four cover payments involving sanctioned parties had been routed through Barclays' New York branch and were processed because the cover payments did not mention the sanctioned beneficiary or originator.

971.    Throughout this entire time period, Barclays knew that Iran was a designated State Sponsor of Terrorism and knew that Barclays was facilitating unlawful payments on behalf of Iran in furtherance of the Conspiracy.

972.    Barclays also continued to facilitate unlawful payments on behalf of Bank Saderat after Barclays knew that Bank Saderat had been designated a SDGT for enabling the transfer of USD funds to Hezbollah.

973.    Barclays also continued facilitating unlawful Eurodollar payments on behalf of Bank Melli after Barclays knew that Bank Melli had been designated by the United States in part for its enabling the transfer of USD funds to the IRGC.

974.    On August 18, 2010, DOJ announced that Barclays had entered into a Deferred

Prosecution Agreement with federal and New York State prosecutors, and agreed to forfeit $298 million dollars in connection with violations of IEEPA and TWEA.[188]

975.     A criminal information was filed on August 16, 2010, in the U.S. District Court for the District of Columbia charging Barclays with one count of violating the IEEPA, and one count of violating TWEA. Barclays waived indictment, agreed to the filing of the information, and accepted and acknowledged responsibility for its criminal conduct.

976.     In the press release announcing the DPA, then-FBI Assistant Director-in-Charge Janice K. Fedarcyk was quoted stating:

> Barclays Bank has admitted a decade-long pattern of violating U.S. banking laws, and taking certain steps to conceal prohibited transactions. Corporate responsibility entails more than just acting discreetly on behalf of one's clients. It means, first and foremost, acting lawfully.

**12.     DEFENDANTS STANDARD CHARTERED BANK'S AND STANDARD CHARTERED BANK, NEW YORK BRANCH'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY**

**A.     STANDARD CHARTERED BANK AND STANDARD CHARTERED BANK, NEW YORK BRANCH (TOGETHER "SCB") CONSPIRED TO CONCEAL IRAN'S FINANCIAL ACTIVITIES AND TRANSACTIONS FROM DETECTION, SCRUTINY, AND MONITORING BY U.S. REGULATORS, LAW ENFORCEMENT, AND/OR DEPOSITORY INSTITUTIONS.**

977.     Defendant SCB provided, *inter alia*, trade-finance, Eurodollar and foreign exchange banking services to Iranian clients starting in or about 1993.

978.     At some point thereafter, SCB began formulating plans to participate in and further the Conspiracy with Iran.

---

[188] Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby adopt and incorporate by reference: 1) the DPAs entered into between Barclays and the New York Department of Financial Services and the DOJ on or about August 16, 2010; and 2) the Settlement Agreements entered into between Barclays and the United States Department of Treasury in August 2010, as if fully set forth herein.

979.   For example, on June 1, 1995, SCB's General Counsel wrote an e-mail advising SCB's regulatory compliance staff: "if SCB London were to ignore OFACs regulations AND SCB NY were not involved in any way & (2) had no knowledge of SCB Londons [sic] activities & (3) could not be said to be in a position to control SCB London, then IF OFAC discovered SCB London's [sic] breach, there is nothing they could do against SCB London, or more importantly against SCBNY."

980.   The SCB General Counsel also instructed that a memorandum containing this plan was "highly confidential & MUST NOT be sent to the US."

981.   In the ensuing years, Standard Chartered Bank actively conspired with the CBI, Bank Melli Iran, Bank Saderat Plc's predecessor (Iran Overseas Investment Bank) and many other entities to assist Iran evade U.S. sanctions.

982.   Standard Chartered Bank's role in the Conspiracy grew dramatically in early 2001, when the CBI approached SCB to act as the Central Bank of Iran's recipient bank for U.S. dollar proceeds from daily oil sales made by the NIOC in the Eurodollar market.[189]

983.   An e-mail dated February 19, 2001, from SCB's Head of Inbound Sales, Institutional Banking, characterized the CBI's solicitation of Standard Chartered as "*very prestigious*" because "*in essence, SCB would be acting as Treasurer to the CBI ...*"

984.   Thus, Standard Chartered was knowingly laundering billions of dollars in violation of multiple U.S. laws for the benefit of, among others, the IRGC.

985.   In a follow up e-mail dated March 23, 2001, SCB's Group Legal Advisor wrote to its Product Manager, Corporate & Institutional Banking and its General Counsel (the e-mail was also forwarded to SCB's Group Head of Audit) that "our payment instructions [for Iranian Clients] should not identify the client or the purpose of the payment."

---

[189] At some point, SCB Dubai also opened a Eurodollar credit facility for the CBI.

986.    Standard Chartered Bank and the CBI quickly developed operating procedures for USD funds transfers to mask the involvement of Iranian entities in payment orders sent to Standard Chartered's New York branch ("SCB-NY").

987.    When the beneficiary bank of a CBI Eurodollar payment transaction was an Iranian bank, SCB-London would send a SWIFT-NET MT 100 or MT 103 to the beneficiary bank's non-U.S., non-Iranian correspondent bank with full details of the Iranian beneficiary bank, and a *separate* MT 202 to SCB-NY with no mention of the Iranian beneficiary bank.

988.    In fact, SCB-London set up routing rules within its payment system to route all incoming SWIFT-NET messages from the CBI to a repair queue, meaning that the payments were subject to manual review and processing by wire operators, to prevent Standard Chartered Bank - London from automatically processing outbound payment instructions for clearance and settlement in the United States with a reference to the CBI in the payment message.

989.    Standard Chartered Bank - London's payment processing team initially instructed the CBI to insert Standard Chartered Bank - London's SWIFT-NET BIC address (identified as SCBLGB2L) in field 52 (ordering institution) of its incoming payment order messages so that SCB's payment system would not populate that field with the CBI's SWIFT-NET BIC address (identified as BMJIIRTH).

990.    When the CBI failed to remove its BIC address and insert Standard Chartered's BIC address into each SWIFT-NET message, Standard Chartered Bank - London wire operators would manually change field 52 to reference SCB - London's BIC in order to mask the CBI's involvement in the payments.

991.    Standard Chartered's willingness to further the Conspiracy in this manner attracted more illicit business.

202

992.    As early as February 2002, several additional Iranian banks approached Standard Chartered Bank - London to discuss the possibility of opening new accounts.

993.    SCB - London's Legal, Compliance, and Cash Management groups identified the need for written procedures for the operation of these additional Iranian banks' dollar-denominated accounts.

994.    SCB's central role in the Conspiracy was memorialized in an internal memorandum regarding SCB's procedures for processing payments sent through the United States from the Iranian banks.

995.    The document was entitled "Standard Chartered Bank Cash Management Services UK - Quality Operating Procedure: Iranian Bank Processing."

996.    It was first issued to SCB London staff on February 20, 2004, and included detailed instructions regarding the omission of the Iranian remitting bank's BIC:

> Ensure that if the field 52 of the payment is blank or that of the remitting bank that it is overtyped at the repair stage to a "." (Note: if this is not done then the Iranian Bank SWIFT code may appear - depending on routing - in the payment message being sent to [SCB-NY]).

997.    In addition to inserting a "." in field 52, the memorandum also instructed staff to use cover payments to process Iranian bank payments, which resulted in SCB London omitting any reference to the involvement of Iranian beneficiaries or beneficiary banks in SWIFT-NET payment order messages sent to Standard Chartered Bank's New York branch.

998.    This element of the Conspiracy was particularly important to Defendant Bank Saderat Plc, which repeatedly served as the Reimbursing Bank on Letters of Credit for other Iranian banks that were financing various illegal sanctions-evading transactions on behalf of the IRGC and MODAFL through the United States.

999.    Approximately 60,000 payments related to Iran, totaling **$250 billion**, were

eventually processed by Standard Chartered Bank as part of the Conspiracy.

1000.   An e-mail dated March 9, 2003, from SCB's Head of Transactional Banking Solutions, UK/Europe Corporate & Institutional Banking to several of SCB's wholesale bank business managers indicates that Standard Chartered Bank learned that another bank was "*withdrawing their services*" with one of its Iranian client banks "primarily for reputational risk reasons."

1001.   In a memorandum accompanying the news of the aforementioned bank's reduction in Iranian business entitled "Summary of the Risks/Issues to be Addressed with Regard to Iranian Bank USD Clearing that Require Management Direction from Middle East Senior Management Team," the risks posed by additional Iranian business that might "trigger an action" from OFAC, "leaving SCB exposed, with potential reputational damage" were considered, but ultimately rejected in favor of pursuing additional Iranian business.

1002.   An October 15, 2003 e-mail from SCB's Manager, Cash Management Services, London to SCB's Product Manager, Corporate & Institutional Banking and its Head of Cash Management Services, UK (forwarded to SCB's Head of Legal & Compliance, Americas and Head of Legal for Corporate & Institutional Banking) outlined how the CBI was instructed to "send in their MT 202's with a [SCB London's business identifier code] as this is what we required them to do in the initial set up of the account. Therefore, the payments going to NY do not appear to NY to have come from an Iranian Bank."

1003.   When Standard Chartered Bank anticipated that its business with the Iranian Bank Co-conspirators, including Defendant Bank Saderat Plc, would grow too large for SCB employees to manually "repair" the payment order messages for New York bound wire transfers, SCB automated the process by building an electronic repair system with "specific repair queues"

for each Iranian client.

1004.  Standard Chartered Bank's payment "Quality Operations Procedures" manual contained instructions on how to manually "repair" or "over-type field 52 as [SCB London]" in SWIFT-NET MT 202 payment message fields to hide CBI's role as originator of the MT 202 cover payment transactions SCB was processing through New York in USD funds.

1005.  In October 2004, SCB consented to a formal enforcement action and executed a written agreement with the N.Y. State Banking Department and the Federal Reserve Board of New York ("FRB-NY"), which required SCB to adopt sound Bank Secrecy Act and Anti-Money Laundering ("BSA/AML") practices with respect to foreign bank correspondent accounts (the "Written Agreement").

1006.  The Written Agreement arose as a result of identified flaws in AML risk controls at Standard Chartered Bank's New York branch and it required SCB to adopt sound AML practices with respect to foreign bank correspondent accounts.

1007.  The Written Agreement also required SCB to hire an independent consultant to conduct a retrospective transaction review for the period of July 2002 through October 2004.

1008.  The review was intended to identify suspicious activity involving accounts or transactions at, by, or through Standard Chartered Bank's New York branch.

1009.  Standard Chartered Bank failed to inform the N.Y. State Banking Department and the Federal Reserve Board of New York that its London and Dubai operations were secretly clearing hundreds of billions of dollars through Standard Chartered Bank's New York branch at the same time that it was promising to reform its AML practices.

1010.  SCB also failed to inform the N.Y. State Banking Department and the Federal Reserve Board of New York that its London, Dubai, Bahrain, Singapore and Hong Kong

operations were secretly helping MODAFL and the IRGC evade U.S. sanctions at a time when they were illegally acquiring a wide range of U.S. equipment and technologies, including components for IEDs and EFPs used to kill and maim Coalition Forces in Iraq.

1011.   Standard Chartered Bank retained Deloitte & Touche LLP ("Deloitte") to conduct the required "independent" review and to report its findings to the regulators.

1012.   On August 30, 2005, and again on September 17, 2005, Deloitte provided Standard Chartered Bank confidential historical transaction review reports that Deloitte had prepared for two other major foreign banking clients that were under investigation for OFAC violations and money laundering activities.

1013.   Deloitte's reports contained detailed and highly confidential information concerning foreign banks involved in illegal U.S. dollar clearing activities.

1014.   SCB then asked Deloitte to delete from its draft "independent" report any reference to certain types of payments that could ultimately reveal Standard Chartered Bank's illegal Iranian-related practices.

1015.   In an e-mail dated October 1, 2005, SCB's Group Head of Legal & Compliance, Wholesale Bank, forwarding the *Quality Operating Procedure* to SCB's Group Head of Compliance and Regulatory Risk, its Group Legal Advisor and its Head of Financial Crime Risk Systems and Monitoring, observed that "read in isolation, is clearly ... designed to hide, deliberately, the Iranian connection of payments."

1016.   A few days later, in an e-mail dated October 8, 2005, Deloitte's Global Leader of Anti-Money Laundering/Trade Sanctions Division wrote to SCB's Head of Compliance, that Deloitte had "agreed" to accede to Standard Chartered Bank's request that Deloitte delete from its draft "independent" report any reference to certain types of payments that could ultimately

reveal Standard Chartered Bank's illegal Iranian U-Turn practices because "this is too much and too politically sensitive for both SCB and Deloitte. That is why I drafted the watered-down version."

1017.   In a December 1, 2005 internal memorandum entitled "*Project Gazelle*," SCB's Group Head of Compliance and Regulatory Risk and its CEO in the United Arab Emirates wrote to SCB's Group Executive Director for Risk and its Group Head of Global Markets, acknowledging that Standard Chartered Bank repair procedures for U-Turn exemption transactions did "not provide assurance that it does not relate to a prohibited transaction, and therefore SCB NY is exposed to the risk of a breach of sanctions."

1018.   A February 23, 2006 internal memorandum entitled "Iranian Business" sent from Standard Chartered Bank's General Counsel to SCB's Audit and Risk Committee confirmed SCB's continued recognition that the Conspiracy was expressly designed to enable Iran and the Iranian Bank Co-conspirators (including Defendant Bank Saderat Plc) to evade U.S. detection of their transactions and confirmed that "certain US$ clearing transactions handled in London were processed with the name of the Iranian Bank excluded or removed from the 'remitter field'" despite the "requirement that due diligence in respect of 'U-turn' payments should be undertaken by our office in New York."

1019.   In September 2006, New York State regulators requested that SCB provide them with statistics on Iranian U-Turns SCB handled, including the number and dollar volume of such transactions for a 12-month period.

1020.   In response, SCB searched its records for 2005 and 2006.

1021.   In a September 26, 2006 email from SCB's Project Manager for the Lookback Review to SCB's Head of Cash Management Services (2002-2005) and Head of Compliance

(2005-2007) at Standard Chartered Bank's New York branch, SCB's Head of Operations and Head of Cash SCB identified 2,626 transactions totaling over $16 billion (for Iranian banks).

1022.   Faced with the prospect of disclosing billions of dollars in Iranian transactions, Standard Chartered Bank's New York branch's Head of Compliance was directed by his superiors at SCB to provide instead only ***four days*** of U-Turn data to regulators; these four days were masquerading as a log covering two-years of transaction data.

1023.   In October 2006, the CEO for SCB's U.S. Operations e-mailed the SCB Group Executive Director in London:

> Firstly, we believe [the Iranian business] needs urgent reviewing at the Group level to evaluate if its returns and strategic benefits are . . . still commensurate with the potential to cause very serious or even catastrophic reputational damage to the Group. Secondly, there is equally importantly potential of risk of subjecting management in US and London (e.g. you and I) and elsewhere to personal reputational damages and/or serious criminal liability.

1024.   SCB's Group Executive Director responded (as quoted by a Standard Chartered Bank's New York branch officer): "You f---ing Americans. Who are you to tell us, the rest of the world, that we're not going to deal with Iranians."

1025.   In 2007, SCB successfully convinced the N.Y. State Banking Department and FRBNY to lift their consent order on SCB based on the watered down D&T report and its other fraudulent disclosures.

1026.   As noted above, from approximately January 2001 through 2007, SCB transferred at least *$250 billion* through Standard Chartered Bank's New York branch on behalf of the Iranian Bank Co-conspirators, including Bank Melli Iran and the CBI, as well as Defendant Bank Saderat Plc.

1027.   Standard Chartered Bank's New York branch processed **approximately 60,000 wire transfers** on behalf of the Iranian Bank Co-conspirators, with roughly half the transactions

originating with SCB's London office, and the other half with SCB's branch in Dubai, UAE.

1028.   In early 2009, after being contacted by U.S. law enforcement authorities, SCB conducted yet another "internal investigation" into its OFAC sanctions screening procedures, business practices and technology.

1029.   Nonetheless, Standard Chartered Bank's New York branch was the conduit for at least 50 post-U.S. designation transactions on behalf of IRISL and its various front companies through June 2010.

1030.   As of 2011, however, even after its internal investigation and open law enforcement investigations commenced in the U.S., the New York State Banking Department still found that Standard Chartered Bank's New York branch had:

    a)  No documented evidence of investigation before the release of funds for transactions with parties whose names matched the OFAC-sanctioned list; and

    b)  Outsourced Standard Chartered Bank's New York branch's entire OFAC compliance process to Chennai, India, with no evidence of any oversight or communication between the Chennai and Standard Chartered Bank's New York branch.

**B.    SCB FACILITATED TRANSACTIONS ON BEHALF OF MODAFL, MAHAN AIR AND OTHER INSTRUMENTALITIES OF IRANIAN STATE-SPONSORED TERROR (INCLUDING A HEZBOLLAH AFFILIATED ENTITY) IN FURTHERANCE OF NUMEROUS VIOLATIONS OF THE U.S. TRADE EMBARGO, THEREBY SUBSTANTIALLY CONTRIBUTING TO THE PLAINTIFFS' INJURIES.**

1031.   From at least 2001 to 2007, SCB illegally facilitated more than 1,300 Letters of Credit through stripping or cover payment methods that purposefully concealed the participation of Iranian counterparties in the transactions.[190]

1032.   Many of those LCs were issued for the benefit of Iran's military / terror apparatus, facilitating and financing the IRGC's, MODAFL's and Hezbollah's illegal acquisitions of

---

[190] A more accurate accounting would probably exceed 9,000 trade-finance and Eurodollar payment transactions.

materials and technologies, including materials unlawfully obtained from the United States and components for IEDs and EFPs used against Coalition Forces in Iraq.

1033.   SCB knowingly facilitated and financed the illegal export to Iran of U.S.-manufactured, export-controlled defense and dual-use products worth tens of millions of dollars. These were acquired by various Iranian-controlled front companies on behalf of, *inter alia*, the following entities:

    a)   Mahan Air;

    b)   Four MODAFL subsidiaries: the AIO, the IACI, the IHRSC, and HESA;

    c)   The Iran Power Development Company ("IPDC"), MAPNA and Zener Electronics Services (an agent of Hezbollah);

    d)   The National Iranian Oil Company ("NIOC") and several of its subsidiaries; and

    e)   Khoram Sanat Producing Co. – Iran.

1034.   None of these aforementioned entities is (or was) a legitimate agency, operation, or program of the Iranian government.

1035.   On the contrary, Mahan Air is a SDGT that, according to the U.S. government, "facilitated the covert travel of suspected IRGC-QF officers into and out of Iraq;" (2) "facilitated IRGC-QF arms shipments"; and (3) "transported personnel, weapons and goods on behalf of Hezbollah. [sic]"

1036.   Mahan Air was also later identified as the conduit to Iran of *thousands* of radio frequency modules recovered by Coalition Forces in Iraq from IED devices that were used to target, kill and maim U.S. and Coalition Forces.

1037.   Similarly, MODAFL is the principal procurement arm of Iran's military and terror apparatus.

1038.   The Mapna group is also a key component of MODAFL and the IRGC's

procurement chain.

1039.  Abbas Aliaabadi, Chairman of Mapna International FZE and President of the Mapna Group, is a former member of the Iranian Ministry of Construction Jihad and of the Iranian Air Force. Aliaabadi was also a key member of the Ministry of Culture & Islamic Guidance instrumental in the creation of Hezbollah and has close links to the IRGC.

1040.  During the relevant time period, the National Iranian Oil Company was not only controlled by the IRGC but also served as the lifeblood of the Iranian regime's illicit financing activities, providing it with access to billions of dollars in oil and natural gas revenues that enabled the IRGC to gain access (through the Conspiracy) to the global financial system.

1041.  Standard Chartered Bank knowingly conspired with Iran to facilitate illicit trade for all of these entities in violation of U.S. law, thereby substantially assisting Iran in its criminal (and specifically terrorist) conduct in Iraq. The foreseeable consequence of that assistance was to enable Iran, the IRGC and Hezbollah to kill or wound, or try to kill, or conspire to kill more Americans in Iraq.

1042.  At all relevant times, SCB was fully aware of both the Iran Trade Regulations and the Export Administration Regulations, the U.S. State Department's United States Munitions List ("USML") and their many restrictions.

### C.   STANDARD CHARTERED BANK KNOWINGLY PROVIDED ILLEGAL FINANCING TO MAHAN AIR.

1043.  Between 2000 and 2006, Standard Chartered Bank facilitated LCs for the benefit of Mahan Air totaling more than $120 million.

1044.  As noted above, the Treasury Department designated Mahan Air in 2011, finding that:

> Mahan Air also facilitated the covert travel of suspected IRGC-QF officers into and out of Iraq by bypassing normal security procedures and not

211

including information on flight manifests to eliminate records of the IRGC-QF travel.

Mahan Air crews have facilitated IRGC-QF arms shipments. Funds were also transferred via Mahan Air for the procurement of controlled goods by the IRGC- QF.

In addition to the reasons for which Mahan Air is being designated today, Mahan Air also provides transportation services to Hezbollah [sic], a Lebanon-based designated Foreign Terrorist Organization. Mahan Air has transported personnel, weapons and goods on behalf of Hezbollah [sic] and omitted from Mahan Air cargo manifests secret weapons shipments bound for Hezbollah [sic].

1045.   Mahan Air also transported to Iran *thousands* of radio frequency modules illegally imported by OPTO Electronics in Singapore, NEL Electronics PTE Ltd. and Corezing International PTE Ltd. from the United States.[191]

1046.   These modules were recovered by Coalition Forces in Iraq from IED devices that were used to target U.S. and Coalition Forces.

1047.   The modules had encryption capabilities and a particularly long range that allowed Special Groups operatives to operate them across significant distances.

1048.   In 2008, Mahan Air transported the IED components from Singapore and Thailand to Tehran, Iran.

1049.   Under Secretary of Commerce Eric L. Hirschhorn described this supply chain as "egregious conduct by… foreign companies and individuals who have endangered the lives of U.S. and coalition forces in Iraq."

1050.   Five LCs facilitated by Standard Chartered Bank listed Mahan Air as the "Applicant" and involved the illegal acquisition of materials ranging from aviation parts to a U.S. shipment of an Airbus A320.

1051.   The Issuing Banks for the LC included Defendant Bank Saderat Plc, Bank Melli

---

[191] *See*, *Superseding Indictment in U.S. v. Larijani* at: https://www.justice.gov/opa/file/837996/download.

Iran and Bank Sepah.

1052.   SCB's New York branch served as the clearing bank for these LCs.

1053.   Furthermore, in another transaction, Mahan Air was the listed Beneficiary of a $21 million dollar LC facilitating the leasing of several second-hand Airbus A320s from Europe.[192]

1054.   In facilitating these trade-finance transactions, often for explicitly "Non-EAR 99" goods of U.S. origin – *i.e.,* products on the Commerce Control List, Standard Chartered Bank knew that it was (1) working with Iranian banks, (2) concealing the Iranian connection to the trade-finance and Eurodollar transactions and (3) facilitating the unlawful delivery of these U.S. export controlled parts or products to Iranian entities in Iran.

1055.   For at least two transactions facilitated on behalf of Mahan Air (including one for export controlled goods of entirely U.S. origin), Credit Suisse in Zurich facilitated the payment on the LC to Standard Chartered Bank, Dubai, and on at least one of those transactions, the payment was routed by Credit Suisse in Zurich through New York on behalf of Bank Melli in the UAE with the transaction being cleared and settled in USD funds by Standard Chartered Bank's New York branch.

1056.   On one occasion, Mahan Air purchased an Airbus (aircraft) using Blue Sky Aviation as its intermediary. Standard Chartered Bank, Dubai provided the nearly $30 million to Blue Sky for the purchase, and Bank Sepah (Iran) guaranteed the payment through a re-payment made by Credit Suisse on its behalf in 2006.

1057.   The front companies listed as beneficiaries of the LCs facilitated by Standard Chartered Bank included Sirjanco Trading LLC ("Sirjanco") and Blue Sky Aviation Co FZE

---

[192] Mahan Air was the target of a Temporary Denial Order ("TDO") by the U.S. Department of Commerce in March 2008 for, *inter alia*, "knowingly re-exporting to Iran three US-origin aircraft, specifically Boeing 747." The Bureau of Industry and Security's TDO was renewed subsequently several times.

("BSA FZE" or "BSA"), both later designated by the U.S. Treasury as SDGTs, in part, because of the illegal sanctions evading conduct facilitated and enabled by Standard Chartered.

1058. Hamidreza Malekouti Pour served simultaneously as the Regional Manager for Mahan Air in the UAE, and Managing Director of Sirjanco and BSA FZE – effectively demonstrating how these companies are all part of the same IRGC supply chain. Pour has also been designated as a SDGT for, *inter alia*, supplying equipment to the IRGC-QF.

1059. When designated by the U.S. Treasury Department in 2013 as a Specially Designated Global Terrorist,[193] Sirjanco was described as "a United Arab Emirates-based company designated pursuant to E.O. 13224 for acting for or on behalf of Mahan Air."

1060. Sirjanco was established specifically to serve as a financial front for Mahan Air. Sirjanco has also served as a front for Mahan Air's acquisition of aircraft. Additionally, Iran's IRGC-QF has used Sirjanco to procure sanctioned goods."

1061. A 2005 LC facilitated by Standard Chartered Bank listed Mahan as the Applicant, and Sirjanco as the beneficiary, for a total of $32,500,000.

1062. Bank Melli financed the payment through Credit Suisse, which sent the payment order through New York (clearing and settling in USD funds through Standard Chartered Bank's New York branch).

1063. The payment was made by Standard Chartered Bank, Dubai to Sirjanco's account with Bank Saderat, Dubai.

1064. At least two other LCs facilitated by Standard Chartered Bank listed Mahan Air as the Applicant, and Blue Sky Aviation as the Beneficiary, for a total of over $60,000,000.[194] All told, between 2000 and 2006, Standard Chartered Bank facilitated at least 11 LCs for the

---

[193] Sirjanco was previously the target of a Temporary Denial Order by the U.S. Department of Commerce in 2011.
[194] Plaintiffs' estimates are based on only one Promontory report. SCB's historical relationship with the Blue Sky Group was the subject of a separate Promontory Report not (yet) available.

"Blue Sky Group" for a total of more than $125 million.

1065.   When the U.S. Treasury Department designated Blue Sky Aviation in 2014, it described it as "a UAE-based company that is owned or controlled by Mahan Air and acts for or on behalf of the airline.

1066.   BSA FZE's primary function has been to serve as a payment channel for Mahan Air to obscure the origination of funds. Mahan Air has used BSA to make payments to oil suppliers, and purchase aircraft, engines, and parts."

1067.   In sum, Standard Chartered Bank was vital to Mahan Air's continued operations and its ability to facilitate travel by IRGC-QF officers and arms shipments in and out of Iraq, transport IED technologies into Iraq as well as transit personnel, weapons and goods on behalf of Hezbollah, which helped facilitate terrorist attacks in Iraq during the relevant time period.

1068.   While neither Mahan Air nor Blue Sky Aviation was designated as a terrorist at the time the LCs identified above were financed, Standard Chartered Bank engaged in criminal conduct in furtherance of the Conspiracy in order to aid these IRGC supply chain entities to evade U.S. sanctions knowing that its own conduct was illegal.

1069.   At the time it agreed to engage in overt acts in furtherance of the Conspiracy, Standard Chartered Bank knew that: (1) Iran was a U.S.-designated State Sponsor of Terrorism; (2) the U.S. had imposed strict sanctions and export controls on Iran and Iranian trade; (3) Mahan Air was seeking to illegally acquire U.S. export controlled defense and dual-use materials; and (4) Mahan Air was using front companies to do so.

1070.   In sum, Standard Chartered Bank affirmatively chose to facilitate Iran's illegal conduct and provide material support to its terror apparatus, including Mahan Air, Blue Sky Aviation and Sirjanco. All of these entities were later designated as SDGTs in part because of the

types of trade-finance and Eurodollar transactions facilitated by Standard Chartered Bank.

   **D.   STANDARD CHARTERED BANK KNOWINGLY PROVIDED ILLEGAL FINANCING TO MODAFL COMPANIES: AIO, IACI, IHRSC AND HESA.**

1071.  Iran's Ministry of Defense and Armed Forces Logistics ("MODAFL") operates the [Iran] Aviation Industries Organization ("IAIO"), the Aerospace Industries Organization ("AIO") and the Defense Industries Organization ("DIO"). MODAFL was designated by the United States on October 25, 2007.[195]

1072.  The AIO was designated on June 28, 2005 for weapons proliferation. Standard Chartered Bank knowingly provided financing for both the AIO directly, and for 3 major sub-agencies of MODAFL's IAIO: the Iran Aircraft Industries ("IACI")[196] a/k/a SAHA, the Iran Helicopter Support and Renewal Company ("IHSRC") a/k/a PANHA, and the Iran Aircraft Manufacturing Industrial Company ("IAMI" a/k/a "HESA"). Support for any of these entities, as sub-agencies of MODAFL and the IAIO, was not for legitimate agencies, operations or programs of SCB Trade-Finance Transactions with MODAFL's Aerospace Industries Organization (AIO).

1073.  In 2002, Standard Chartered Bank facilitated an LC for MODAFL's Aerospace Industries Organization that cleared through SCB's New York branch valued at $57,662 USD for the illegal purchase of U.S. export controlled goods.[197]

1074.  That transaction was not for the benefit of any legitimate agencies, operations or programs of Iran.

---

[195] MODAFL was also sanctioned, pursuant to the Arms Export Control Act and the Export Administration Act, in November 2000.
[196] IACI was also formerly listed by the European Union on July 26, 2010, and described as an entity that "[m]anufactures, repairs, and conducts overhauls of airplanes and aircraft engines and procures aviation-related parts often of US-origin typically via foreign intermediaries. IACI and its subsidiaries also have been detected using a worldwide network of brokers seeking to procure aviation-related goods." IACI was also formerly sanctioned by Switzerland, Norway, Japan, Australia, Canada, and the UK. It was designated by the United States in 2013.
[197] AIO was reportedly responsible for developing anti-tank guided weapons; artillery rocket systems; anti- tank missiles; precision machining and metal forming for a variety of Iranian weapons systems.

### E.   STANDARD   CHARTERED   BANK'S   TRADE-FINANCE TRANSACTIONS   WITH   MODAFL'S   [IRAN]   AVIATION INDUSTRIES ORGANIZATION (IAIO)

1075.   On numerous additional occasions, Standard Chartered Bank illegally facilitated trade-finance and Eurodollar transactions on behalf of other MODAFL sub-agencies, including HESA. On September 17, 2008, the U.S. Treasury Department designated HESA,[198] finding that it is:

> owned or controlled by MODAFL, and also because it has provided support to the Iranian Revolutionary Guard Corps (IRGC). The IRGC, which was designated under Executive Order 13382 on October 25, 2007, is considered to be the military vanguard of Iran and has been outspoken about its willingness to proliferate ballistic missiles capable of carrying WMD.

> HESA utilizes its own facilities for the inspection, maintenance, repair overhaul research, development, and manufacture of military and civilian aircraft and related military logistic systems. HESA conducts research on, development of, production of, and flight operations for unmanned aerial vehicles (UAVs) in Iran. The IRGC utilizes the "Ababil" UAV, manufactured by HESA. HESA produces different variants of the Ababil UAV, which can be used for surveillance and attack. Farasakht Industries is a subsidiary of HESA that specializes in the manufacturing of various aerospace tools and equipment.

### F.   STANDARD   CHARTERED   BANK'S   TRADE-FINANCE TRANSACTIONS   WITH   MODAFL-IAIO FRONT COMPANY DOWNTOWN TRADING LTD.

1076.   Between 1998 and 2002, Standard Chartered Bank facilitated ten LCs involving a company based in Malaysia (and with links to a same named company registered in the U.K.), Downtown Trading Ltd ("Downtown Trading").

1077.   The total value of these ten LCs involving Downtown Trading amounted to $1,067,575.

---

[198] HESA was previously identified in a document distributed by the German government in July 2005, warning of its potentially illicit activities. It was also identified by the UK government in February 1998 as having procured goods and/or technology for WMD programs.

1078.   MODAFL-IAIO's subsidiary Iran Aircraft Industries ("IACI") was the Applicant on these LCs, i.e. the purchaser of the U.S. origin aircraft engine parts in question for seven of these transactions, while Downtown Trading was the reported Beneficiary.

1079.   In most or all of these transactions, primarily those for 2002, Bank Sepah (Iran) served as the Issuing Bank, Bank Sepah (London) served as the Reimbursing Bank, SCB Dubai served as the Negotiating Bank, and SCB's New York branch helped facilitate the transactions by serving as the Clearing Bank.

1080.   With respect to at least four of these transactions, the U.S. aircraft parts were transported by Iran Air, later designated as "a commercial airline used by the IRGC and Iran's Ministry of Defense and Armed Forces Logistics (MODAFL) to transport military related equipment…. Iran Air has provided support and services to MODAFL and the IRGC through the transport and/or transfer of goods for, or on behalf of, these entities."

1081.   IACI's illegal procurements were often financed by Bank Sepah (as the Issuing Bank), but Standard Chartered Bank in Dubai frequently served as the Negotiating Bank and

1082.   SCB's New York branch usually served as the Clearing Bank for these same trade-finance transactions, in at least one case paying Citibank in New York the fund due.

1083.   Citibank then paid Maybank, Malaysia, which effected the ultimate payment to the Eurodollar account of Downtown Trading.

1084.   Standard Chartered Bank also facilitated similar LCs in USD funds for Downtown Trading after April 2005.

1085.   In facilitating these transactions – 70% of which explicitly involved export-controlled "Non-EAR 99" goods of U.S. origin (i.e., products on the Commerce Control List) – Standard Chartered Bank knew that it was: (1) working with Iranian banks; (2) concealing the

Iranian connection to the transactions; (3) facilitating the unlawful delivery of goods on the U.S. Commerce Control List to Iran's military and/or the IRGC; and (4) that these transactions were not for legitimate agencies, operations, or programs of Iran.

### G. STANDARD CHARTERED BANK'S TRADE-FINANCE TRANSACTIONS WITH MODAFL-IAIO FRONT COMPANY MAC AVIATION

1086.   Mac Aviation is an Irish trading company incorporated in 1993 that purported to engage in the purchase and sale of aircraft and helicopter parts.

1087.   The company and its owners[199] were indicted in 2008 for, among other things, violations of the IEEPA, the ITR, and U.S. export controls.

1088.   During the relevant time period, Mac Aviation was a customer of Standard Chartered Bank in London.

1089.   According to the indictment, between June 2005 and July 2008 Mac Aviation solicited purchase orders from customers in Iran for U.S. origin aircraft parts and then forwarded these requests for the parts to U.S. companies.

1090.   The indictment further alleges that Mac Aviation wired funds to banks in the U.S. as payment for these parts, and concealed from U.S. sellers the ultimate end-use and Iranian end-users of the purchased parts.

1091.   The indictment also alleges that Mac Aviation caused the export of these parts from the U.S. to third countries, including Malaysia, before sending their shipments onward to Iran.

1092.   At least one of those shipments, directed by Mac Aviation in February 2006, resulted in a shipment to be made from a firm called Microset Systems Sdn Bhd in Kuala

---

[199] In 1994, one of the owners of Mac Aviation, Thomas McGuinn, was convicted by a Florida court for exporting defense products to Iran. He pled guilty and was sentenced on April 19, 1996, to time served and 3 years of supervision on release. McGuinn was also barred from receiving licenses for exporting U.S. defense articles.

Lumpur, Malaysia, to Sasadja Moavanate Bazargani in Tehran, Iran, an alter ego of Iran's Defense Industries Organization (DIO), which had been designated by Germany, the United Nations, and the United States as a procurer of unlawful weapons components beginning as early as 2005.

1093.  As noted above, weapons caches seized from Special Groups by Coalition Forces in Iraq included many 107mm artillery rockets with closely clustered DIO lot numbers and production dates between 2005 and 2007, as well as rounds and fuses for 60mm and 81mm mortars with DIO lot markings and 2006 production dates.

1094.  In another example, in January 2006, police in the southern Iraqi city of Amara, near the Iranian border, captured seventy blocks of TNT explosives and seventy-nine blocks of plastic explosive, which were used by the Special Groups as components of IEDs, all with markings and lot numbers showing that they were produced by DIO.

1095.  In July 2010, the DOJ obtained a 27-count superseding indictment in *USA v. Mac Aviation et al.*, charging the company and its officers with:

> [p]urchasing F-5 fighter aircraft parts, helicopter engines and other aircraft components from U.S. firms and illegally exporting them to Iran.…
>
> […] Beginning as early as August 2005… through July 2008, the defendants solicited purchase orders from customers in Iran for U.S.-origin aircraft engines and parts and then sent requests for aircraft components to U.S. companies. These parts included helicopter engines, aircraft bolts and vanes, and canopy panels for the F-5 fighter aircraft. The defendants wired money to banks in the U.S. as payment for these parts and concealed from U.S. sellers the ultimate end-use and end-users of the purchased parts.
>
> The defendants caused these parts to be exported from the U.S. to third countries like Malaysia before causing them to be transshipped to Iran. […]
>
> From 2005 [… to] 2006, the defendants caused canopy panels designed for the F-5 fighter aircraft, valued at approximately $44,500, to be exported from the U.S. to Iran. The defendants falsely stated that the end

user for the F-5 panels was the Republic of Nigeria. Instead, the panels were sold by the defendants to Sasadja Moavanate Bazargani, in Tehran, Iran for $86,400. The purchase was arranged through the Iran Aircraft Manufacturing Industrial Company, known by its Iranian acronym as HESA.

1096. According to the superseding indictment, Mac Aviation also shipped fifteen helicopter engines to Iran Aircraft Industrial Manufacturing Company ("HESA").

1097. These included ten Rolls-Royce Model 250 C-20B turboshaft engines, and five Rolls-Royce Model 250 C-20R2 turboshaft engines.

1098. Rolls-Royce Model 250 engines are used on HESA's 278 Shahed (military) helicopters (converted or adapted from the design of the American Bell 206B-III "Jet Ranger" and Bell 206L "Long Ranger" aircraft) flown by and developed for the IRGC.

1099. Between 2001 and 2005, Standard Chartered Bank facilitated at least 21 LCs involving Mac Aviation for a total of close to $8 million dollars.

1100. In each case, Mac Aviation was the nominal purchaser of the aircraft parts (Applicant), and the listed importer was either Iran Aircraft Industries ("IACI"), Iran Helicopter Support and Renewal Industries ("IHSRC"), or Iran Aircraft Manufacturing Industrial Company ("HESA").[200]

1101. Most, if not all of these LCs appear to have been financed, at least in part, by: Bank Saderat in London (IOVB) serving as the Reimbursing Bank; Bank Refah Iran serving as the Issuing Bank; Standard Chartered Bank in London serving as the Advising Bank; SCB in Dubai serving as the Negotiating Bank; and Standard Chartered Bank's New York branch serving as the Clearing Bank.

---

[200] Iran used an Iranian national named Hossein Ali Khoshnevisrad as an intermediary. Khoshnevisrad used two Iranian companies – Ariasa AG (Tehran) and Onakish Co. (Kish Island, Iran) – to deal directly with Mac Aviation. Khoshnevisrad was arrested in the U.S. in 2009 and "charged with purchasing helicopter engines and advanced aerial cameras for fighter bombers from U.S. firms and illegally exporting them to Iran using companies in Malaysia, Ireland and the Netherlands. Among the alleged recipients of these U.S. goods was ... HESA."

1102.   Some of the transactions were financed through the CBI's Eurodollar credit line with Standard Chartered Bank.

1103.   The other transactions were financed through reimbursements in USD funds claimed by Standard Chartered Bank, London primarily from Defendant Bank Saderat Plc with funds deposited received into Standard Chartered Bank London's U.S. dollar account with Standard Chartered's New York branch for further credit to the Eurodollar account of Mac Aviation (SCB's customer).

1104.   Iran Air was often used to deliver the illegally procured equipment to Iran.

1105.   Notably, Bank Refah Iran was designated on February 17, 2011, by the U.S. Treasury Department for:

> providing financial services to the Iranian Ministry of Defense and Armed Forces Logistics (MODAFL) and the Iran Aircraft Manufacturing Industrial Company (HESA). In recent years, Bank Refah has facilitated millions of dollars of weapons-related purchases by MODAFL. These purchases included missiles and tanks and enabled Iran's leadership to maintain its fighter jets and submarines. Bank Refah also facilitated payments from HESA to businesses and individuals linked to Iran's weapons-related procurement.[201]

1106.   Standard Chartered Bank's financing of MODAFL's clandestine and illegal acquisition of U.S. military (aircraft) spare parts did not fund or facilitate Iran's legitimate agencies, operations, or programs.

1107.   Rather, Standard Chartered Bank actively participated in a criminal conspiracy to help Iran's military and terror apparatus obtain critical machinery and equipment and aircraft spare parts it desperately needed to sustain its violent and unlawful activities.

---

[201] Standard Chartered Bank maintained correspondent accounts for Bank Refah in Bangladesh, China, Hong Kong, India, Indonesia, Japan, South Korea, Malaysia, Qatar, Singapore, Sri Lanka, Taiwan, Thailand and UAE.

## H.   STANDARD CHARTERED BANK'S TRADE-FINANCE TRANSACTIONS WITH MODAFL-IAIO FRONT COMPANY MONARCH AVIATION (SINGAPORE)

1108.   Monarch Aviation was an Iranian front company based in Singapore that was owned and controlled by husband and wife, Brian Douglas Woodford, a UK citizen, and Laura Wang-Woodford, a dual U.S. and UK citizen.

1109.   It purported to be a manufacturer, dealer, and repairer of aircrafts and related parts. At least during the period between 2001 and 2007, Standard Chartered Bank in Singapore ("SCB-Singapore) maintained accounts for Monarch Aviation, Brian Douglas Woodford, and Laura Wang-Woodford.

1110.   At least one Monarch Aviation account at the SCB-Singapore Battery Road branch was listed as account number ACU- 26-0-000106-3.

1111.   Defendant Credit Suisse's Singapore Branch at 80 Raffles Place also maintained a U.S. dollar account for Monarch Aviation with the account number K0100340.01.

1112.   On January 15, 2003, Woodford and Wang-Woodford were indicted for, among other things, violations of the IEEPA, and U.S. export control laws.[202]

1113.   Laura Wang-Woodford was arrested on December 23, 2007, and later pled guilty to conspiring to violate the U.S. trade embargo by exporting U.S. origin aircraft components to Iran.

1114.   According to the Superseding Indictment, between January 1998 and December 2007, Monarch Aviation, Jungda International Pte Ltd. (a Singapore based successor to Monarch Aviation), Brian Douglas Woodford and his wife, Laura Wang-Woodford, exported U.S. aircraft parts to Singapore and Malaysia, and then re-exported those items to companies in Tehran, Iran, without obtaining the required U.S. government licenses, while falsely listing their companies as

---

[202] A Superseding Indictment was returned on May 22, 2008.

the ultimate recipients of the parts on export documents filed with the U.S. government.

1115. Specifically, according to the Superseding Indictment and the U.S. Justice Department's Sentencing Recommendation, the funds transferred by Monarch Aviation paid for Boeing CH-47 ("Chinook") helicopter parts, including vane assemblies and bevel gears that were listed under category VIII on the United States Munitions List ("USML") and illegally exported to Iran.

1116. The vane assemblies, part number 2-080-090-02 and national stock number ("NSN")[203] 2840-01-022-7142, and bevel gears, part number 2-080-013-03 and NSN 3020-00-860-7419, were manufactured by Honeywell International Inc., commercial and government entity ("CAGE")[204] code 99193, in Phoenix, Arizona.

1117. These export controlled, U.S. manufactured helicopter parts were used in Iran's fleet of Boeing CH-47 Chinook heavy-lift utility helicopters that were refurbished by HESA.

1118. Iran's CH-47 helicopters are operated by the Islamic Republic of Iran Army Aviation ("IRIAA") and the Islamic Republic of Iran Air Force ("IRIAF").

1119. The Superseding Indictment also listed the following parts, *inter alia*, that were illegally exported to Iran by Monarch Aviation: o-rings, shear bolts, bushings, and rotary wing shields.

1120. The o-rings, identified by part numbers S6135-20059-102 (NSN 5331-01-270-1765) and S6135-20059-106 (NSN 5331-01-270-1766), were manufactured by Sikorsky Aircraft Corporation (CAGE code 78266) in Stamford, Connecticut.

---

[203] The U.S. National Stock Number (NSN) is a unique thirteen-digit numerical identifier assigned to each part used by the U.S. Department of Defense (DOD). The NSN system is managed by DOD's Defense Logistics Agency ("DLA"). The DLA system of NSNs was mandated by the 1952 Defense Cataloging and Standardization Act (Pub L No 82-436).

[204] The CAGE code is a unique identifier assigned to, *inter alia*, U.S. defense contractors and DOD maintenance facilities. The CAGE code provides a standardized method of identifying a given government or defense contractor facility at a specific location.

1121.   These export controlled, U.S. manufactured parts were used in Iran's fleet of Sikorsky SH-3D ("Sea King") medium-lift utility/anti-submarine warfare helicopters that were refurbished by Iran HESA.

1122.   Iran's SH-3D helicopters are operated by the Islamic Republic of Iran Navy Aviation ("IRINA").

1123.   The following parts were manufactured by Bell Helicopter Textron, Inc. (CAGE code 97499) in Fort Worth, Texas:

a)   Shear bolts, identified by part number NAS625-44 (NSN 5306-00-924- 6261);

b)   Bushings, identified by part number 205-030-477-11 (NSN 1560-00-413- 1492); and

c)   Rotary-wing shields, identified by part number 204-012-118-1 (NSN 1615-00- 865-7914).

1124.   These export controlled, U.S. manufactured parts were used in the following Iranian rotary-wing aircraft:

a)   Bell AH-1J ("Cobra") air-assault helicopters (refurbished by HESA);

b)   Bell UH-1 ("Iroquois") utility transport helicopters (refurbished by HESA);

c)   Iranian Helicopter Support and Renewal Company ("PAHNA") 2091 ("Toufan") air-assault helicopters (the PAHNA 2091 is an Iranian remanufactured version of the Bell AH-1J helicopter); and

d)   PAHNA 2-75 ("Shabaviz") utility transport helicopters (the PAHNA 2-75 is an Iranian remanufactured version of the Bell UH-1 helicopter).

1125.   Iran's fleet of Bell AH-1J, Bell UH-1, PAHNA 2091 and PAHNA 2-75 helicopters are operated by the Iranian Revolutionary Guard Corps Air Force ("IRGC-AF") and IRIAA.

1126.   From 1998 to 2005 (and likely thereafter), Standard Chartered facilitated at least 10 LCs financed by the CBI and Bank Refah with a total value of more than $1.5 million dollars

involving the shipment of U.S. origin aircraft parts sold by Monarch Aviation to MODAFL's sub-agencies Iran Aircraft Industries ("IACI"), Iran Helicopter Support and Renewal Co. ("IHSRC"), and HESA.

1127.    Defendant Bank Saderat Plc served as the Reimbursing Bank on most, if not all, of these transactions, which cleared through Standard Chartered Bank's New York branch on their way to Monarch Aviation's accounts at Standard Chartered in Singapore.

1128.    The aircraft parts were transported by Iran Air from Kuala Lumpur Airport, Malaysia, to Tehran Airport, Iran.

1129.    SCB in Dubai served as the Negotiating Bank, and funds from the financing were paid to Monarch Aviation's account with Standard Chartered Bank, Singapore through SCB Singapore's account with Standard Chartered, London, which in turn received the funds into its U.S. Dollar nostro account with Standard Chartered's New York branch from Standard Chartered Bank - Bahrain's Offshore Booking Unit ("OBU").[205]

1130.    In sum, various overseas branches of Standard Chartered Bank conspired with multiple MODAFL sub-agencies and Monarch Aviation, and used Standard Chartered's New York branch to both assist Iran's military in illegally acquiring contraband U.S. goods and to illegally disguise the illicit financing of those acquisitions through the Standard Chartered Bank's New York accounts.[206]

1131.    Standard Chartered Bank facilitated at least 316 <u>additional</u> transactions totaling $12,110,565 in USD funds that involved Monarch Aviation at its accounts at SCB in Singapore. Dozens of those transactions post-date Woodford and Wang-Woodford's 2003 indictment.

---

[205] SCB, Bahrain's Offshore Booking Unit sent proceeds of the Eurodollar loan as payment of Letter of Credit through SCB's New York branch to credit SCB London's USD account in New York for further payment to SCB Singapore.

[206] SCB, Singapore presented documents under Bank Refah Letter of Credit to SCB, Dubai (the Negotiating Bank) for negotiation and payment in USD funds through SCB's New York branch.

1132. Standard Chartered Bank's financing of MODAFL's clandestine and illegal acquisition of U.S. military spare parts through Monarch Aviation did not fund or facilitate Iran's legitimate agencies, operations, or programs. Rather, Standard Chartered Bank actively participated in a criminal conspiracy to help Iran's military and terror apparatus obtain critical machinery and (aircraft) spare parts it desperately needed to sustain its violent and unlawful activities.

### I. STANDARD CHARTERED BANK'S TRADE FINANCE TRANSACTIONS WITH MODAFL-IAIO FRONT COMPANY JETPOWER INDUSTRIAL LTD (HONG KONG)

1133. Jetpower Industrial Ltd ("Jetpower") was a Hong-Kong based Iranian front company purporting to be a trading company in aircraft parts controlled by Hok Shek Chan, a/k/a John Chan.

1134. In 2011, Chan was sentenced to 42 months for conspiring to illegally export, and attempting to illegally export, 10 indicators, used in C-130 military flight simulators, in violation of the Arms Export Control Act.

1135. According to the U.S. Department of Justice:

> In 1993, Chan's company, Jetpower Industrial, was convicted in Hong Kong of export violations related to his export of U.S. military parts to Iran. Chan then changed his business practices to avoid detection. Rather than shipping U.S. origin goods directly from Hong Kong to Iran, Chan set up a sophisticated procurement network involving front companies and an experienced freight forwarder in Malaysia. Using his network, the defendant was engaged in the illegal procurement and export of aircraft parts from the U.S. for customers located in Iran, including several military related entities in Iran such as the Iranian Air Force, in direct violation of the U.S. Embargo against Iran since 1997.

1136. In fact, according to U.S. officials, Jetpower repeatedly and illicitly exported arms

to Iran prior to Mr. Chan's arrest and conviction.[207]

1137.   At all relevant times, Jetpower was a customer of Bank Melli in Hong Kong.

1138.   The full scope of Standard Chartered Bank's involvement with and facilitation of Jetpower was extensive (involving at least dozens of transactions) but not yet fully known.

1139.   Illegal payments totaling close to $3 million dollars have specifically been identified, but the totals could be much higher.

1140.   What is clear is that Standard Chartered Bank repeatedly and knowingly facilitated the illegal shipment of U.S. origin aircraft parts sold by Jetpower to one of MODAFL's sub-agencies (IHSRC), and that Jetpower was a significant link in Iran's illegal weapons procurement chain.

1141.   For example, in 2001-2002, Bank Refah (the Issuing Bank) issued a LC to MODAFL's sub-agency IHSRC that was to be reimbursed by Bank Saderat Plc (known then as Iran Overseas Investment Bank), then amended the LC to be available with SCB-Dubai. Standard Chartered Bank's branches in New York, Singapore and Hong Kong were all instrumental in enabling Jetpower's receipt of payments at its Eurodollar account(s) with Bank Melli in Hong Kong.

1142.   When Jetpower transported the contraband goods (U.S. helicopter parts) to MODAFL (using Iran Air), it asked Bank Melli in Hong Kong to present the documents required under the LC for payment to Standard Chartered Bank Dubai.

1143.   However, in many instances, Standard Chartered Bank Dubai took at least four extra steps before Bank Melli in Hong Kong received the Eurodollar payment for Jetpower.

1144.   Upon acceptance of the documents from Bank Melli, Standard Chartered Bank

---

[207] At least one Jetpower shipment was seized by UAE officials in 2007 along with several other containers that U.S. officials feared might contain parts or materials that could be used in manufacturing IEDs and EFPs. Bank Mellat financed the transaction, and—according to the LC supporting documentation—the goods were consigned to HESA.

Dubai used the CBI's Eurodollar credit facility with Standard Chartered Bank Dubai and sent instructions for a Eurodollar loan to be issued by Standard Chartered Bank, Bahrain.

1145.   Standard Chartered Bank, Bahrain booked the loan and sent the proceeds in USD funds as payment under the Letter of Credit through Standard Chartered Bank's New York branch to National Westminster Bank's New York correspondent account for further credit to National Westminster, London for the Eurodollar account of its customer, Bank Melli, London.

1146.   Standard Chartered Bank, Dubai then sent instructions to Bank Melli, London to pay Bank Melli, Hong Kong upon receipt of USD funds.

1147.   Variations on this process were undertaken on multiple LCs in USD funds for the benefit of MODAFL's sub-agency.

1148.   In these cases, Standard Chartered Bank, Bahrain knowingly cleared U.S. dollars through Standard Chartered's New York branch for the illegal trade-finance transactions by repackaging the payments on the LCs as loans that secretly routed through the U.S. to Bank Melli Iran through various British banks.

1149.   Jetpower, in most cases, ultimately received payment in USD funds to its Eurodollar bank account with Bank Melli Plc's branch in Hong Kong for these illicit transactions with IHSRC.

1150.   According to BIS-Basel and the Hong Kong Monetary Authority ("HKMA"),[208] all USD transfers from SCB-Hong Kong to Jetpower's account with Bank Melli Plc's Hong Kong branch were cleared by the Hong Kong Clearing House Automated Transfer System, and settled by HSBC's Hong Kong subsidiary.

1151.   None of this illegal conduct was undertaken for the benefit of a legitimate agency, operation or program of Iran.

---

[208] HKMA is the *de facto* central bank of Hong Kong.

229

J. **STANDARD CHARTERED BANK'S TRADE-FINANCE TRANSACTIONS IRAN POWER DEVELOPMENT COMPANY ("IPDC"), MAPNA AND ZENER ELECTRONICS SERVICES (AN AGENT OF HEZBOLLAH)**

1152.  The Iran Power Development Company ("IPDC"), an Iranian government-controlled entity, has worked extensively for years with a network of Iranian companies known as the Mapna Group.[209]

1153.  Mapna International FZE is a UAE-based subsidiary. One of its directors, Mousa Refan, previously served as the first commander of the Air Force of the "Army of the Guardians of the Islamic Revolution [IRGC]."[210]

1154.  Another director, Afshin Rezaei, pled guilty in the U.S. District Court for the Northern District of Georgia on April 24, 2008, to:

> one count of violating the IEEPA for the unlicensed export of computers to Iran via the United Arab Emirates. The computers were controlled for anti-terrorism reasons. On May 15, 2008, Rezaei was sentenced to six months of prison (credit for time served), followed by three years of supervised release, and agreed to forfeit $50,000. On February 18, 2010, a 10-year denial of export privileges was imposed on Rezaei, pursuant to Section 11(h) of the EAA.

1155.  During the relevant time period, Mapna International maintained a Eurodollar account with Standard Chartered Bank, Dubai.[211]

1156.  Between 2001 and 2007, Standard Chartered Bank facilitated at least 280 Letters of Credit involving Mapna International FZE (as Beneficiary). In most cases, SCB, Dubai acted as the Advising Bank on these transactions.

---

[209] The Mapna Group lists on its website 41 subsidiaries, some of which were listed by the British government in 2011 as entities of concern for Weapons of Mass Destruction-related procurement.

[210] As noted above, Abbas Aliaabadi, Mapna International FZE's chairman, is a former member of the Iranian Ministry of Construction Jihad and of the Iranian Air Force and former member of the Ministry of Culture & Islamic Guidance, instrumental in the creation of Hezbollah and with close links to the IRGC.

[211] Mapna's subsidiary, Mobin Petrochemicals, was added to the SDN list on June 16, 2010 (and removed from the SDN list in January 2016 as part of the Joint Comprehensive Plan of Action). During the relevant time period, it maintained a USD account with HSBC.

1157.   At least nine Letters of Credit involved Standard Chartered Bank's New York branch serving as the Clearing Bank for the transactions, and in some cases, SCB-London served as the Reimbursing Bank.

1158.   Standard Chartered Bank facilitated at least 7 LCs – totaling $1,384,972 in USD funds – that involved the illegal shipment of U.S. origin goods to the Iran Power Development Company.

1159.   The CBI served as the Issuing Bank on several of these LCs, and six of those seven involved goods shipped by IRISL.

1160.   Of particular note, between 2003 and 2004, Standard Chartered Bank knowingly facilitated at least four unlawful USD funds transfer transactions (cleared through its New York branch) that involved Eurodollar payments to Zener Electronics (UAE), a procurement company for Hezbollah.[212]

1161.   The IPDC was listed as the Applicant for these transactions, and Mapna was identified as the 1st Beneficiary, but assigned the payments under the Letters of Credit to Zener Electronics (UAE) as a "2nd Beneficiary."

1162.   Each unlawful trade-finance transaction involved U.S. goods.

1163.   The Central Bank of Iran acted as the Issuing Bank on at least two of the transactions and SCB, Dubai acted as the Advising and Negotiating Bank.[213]

1164.   On at least one occasion, SCB-London served as the Reimbursing Bank for the payment to Zener Electronics, sending the credit through its New York branch to SCB Dubai's

---

[212] In June 2014, the U.S. Commerce Department identified Zener Electronics as "involved in activities contrary to the national security and foreign policy interests of the United States, specifically the activities described under paragraph (b)(1) (Supporting persons engaged in acts of terror) of § 744.11 of the EAR" and noted its attempts "to procure U.S. technology on behalf of persons involved in activities contrary to the national security and foreign policy interests of the United States. Specifically, these persons have been involved in supplying U.S.-origin items to persons designated by the Secretary of State as Foreign Terrorist Organizations without the required authorizations."

[213] On at least one occasion, SCB London also served as the Reimbursing Bank.

account with Standard Chartered in New York.

1165.   Upon receipt of the funds to its USD account with SCB in New York, Standard Chartered Bank, Dubai instructed Standard Chartered Bank's New York branch to forward the funds to JP Morgan Chase in New York, which held an account for the Commercial Bank of Dubai.

1166.   The Commercial Bank of Dubai, in turn, credited the account of its customer, Zener Electronics.

1167.   These illicit transfers on behalf of Mapna resulted in payments to Zener Electronics (a key link in Hezbollah's illicit supply chain) and were not for the benefit of a legitimate agency, operation or program of Iran. In a Superseding Indictment filed in federal court on March 30, 2016, Mapna was again implicated in the Conspiracy.[214]

1168.   This time, DOJ charged multiple individuals with covert transactions in 2011 through a U.S. bank, wherein Mapna's name was omitted from the transaction to hide its identity as a counterparty.

### K.   STANDARD CHARTERED BANK'S TRADE-FINANCE TRANSACTIONS WITH NATIONAL IRANIAN OIL COMPANY (NIOC) SUBSIDIARIES

1169.   The Iranian Helicopter Aviation Company, Ahwaz Pipe Mill Co. and Kala Naft[215] are all subsidiaries of NIOC, which (as noted *supra*) was controlled by the IRGC during the relevant time period.

1170.   Between 1999 and 2001, Standard Chartered Bank knowingly facilitated two illegal transactions totaling $750,744 on behalf of the Iranian Helicopter Aviation Company (listed as the Applicant).

---

[214] *See*, *U.S. v. Zarrab* filed in the S.D.N.Y (1:15-cr-00867).
[215] Kala Naft was designated by the United States in 2010.

1171.   The Beneficiary listed on both LCs was Limo Sarl. The goods involved in these transactions were U.S. origin helicopter parts.

1172.   Payments for both transactions were cleared through Standard Chartered Bank's New York branch, and refinanced under the CBI's Eurodollar credit facility with Standard Chartered Bank, Dubai.

1173.   The Paris-based Limo Sarl was directed by a Ms. Laleh Moein, reported to have also been in the employ of Iran's Ministry of Intelligence and Security ("MOIS").[216]

1174.   Between 2002 and 2004, SCB knowingly facilitated four (4) illegal transactions totaling $611,713 that involved U.S. origin goods illegally transported to Iran on behalf of Kala Naft.

1175.   At least two of these transactions had Standard Chartered Bank New York's branch serving as its Clearing Bank.

1176.   As early as February 1998, Kala Naft was identified by the UK government "as having procured goods and/or technology for weapons of mass destruction programs."

1177.   Kala Naft was also publicly identified as a NIOC subsidiary in a 2003 Commerce Department action that further stated that Kala Naft was a recipient of illegally exported U.S. origin oilfield equipment from the U.S.

1178.   Between 2001 and 2006, SCB knowingly facilitated at least two illegal transactions totaling $593,307 that involved U.S. origin goods illegally transported to Iran on behalf of Ahwaz Pipe Mill Co.

1179.   The CBI was used as the Refinancing Bank, and Standard Chartered Bank's New York branch served as the Clearing Bank.

1180.   The listed beneficiary of the Ahwaz Pipe Mill Co. trade-finance transactions was

---

[216] MOIS was designated by the U.S. for, *inter alia*, providing support to Terrorist Groups, including Hezbollah.

a Cypriot company named Polygon Co. Ltd.

1181.   Polygon's managing director and its owner had previously been indicted on November 19, 1992, in the Southern District of Florida for illegally conspiring to export oil field equipment and other goods, services and technology to Libya, demonstrating its history of illicit sanctions evasion on behalf of a State Sponsor of Terrorism.

1182.   The litany of trade-finance and Eurodollar transactions discussed *supra* often involved counterparties (such as Mac Aviation, Jetpower and Polygon) with established track records of criminal activity on behalf of Iran.

### L.   STANDARD CHARTERED BANK'S TRADE-FINANCE TRANSACTIONS WITH IRANIAN FRONT COMPANY KHORAM SANAT PRODUCING CO.-IRAN

1183.   On June 20, 2005, Standard Chartered facilitated Khoram Sanat Producing Co.'s purchase of electromotors for hydraulic presses worth $2.79 million dollars.

1184.   The company is likely a subsidiary of another Iranian company known as "Alborz Steel."

1185.   The nominal purchaser of the equipment was an Iranian front company in the UAE called Diamonds Steel.[217]

1186.   Diamonds Steel maintained one or more accounts with Standard Chartered Bank Dubai.

1187.   Between 2001 and 2007, SCB, Dubai facilitated at least 173 transactions involving Diamonds Steel, totaling more than $130 million.

1188.   The aforementioned electromotors were illegally purchased from the United States with the LC facilitated by Standard Chartered Bank's New York branch, which served as

---

[217] SCB facilitated at least a dozen transactions on behalf of Diamonds Steel, mostly for the benefit of Alborz Steel, Iran. Many of these transactions involved both Bank Melli Iran, as well as Credit Suisse in Switzerland, acting on behalf of Bank Melli Iran or Bank Melli, Dubai.

the Clearing Bank for the transaction, while SCB, Dubai served as the Advising Bank.[218]

1189.  Standard Chartered Bank facilitated this transaction despite the fact that the machinery required an export license because the equipment could be used for terrorist purposes.[219]

1190.  Specifically, hydraulic presses are the precise type of machinery required to manufacture EFPs.[220]

1191.  The production of an EFP shaped-charge munition requires at least a 10-ton hydraulic press in order to form sheets of copper and steel, respectively, into the necessary shaped-charge geometry for defeating the plating of American armored vehicles of the type used by the U.S. military in Iraq.

1192.  Even assuming a steep mark-up in costs of delivery, Standard Chartered Bank financed Iran's acquisition of approximately fifty (50) hydraulic presses capable of manufacturing more than a hundred EFPs per day.[221]

1193.  The hydraulic press machinery was transported to Iran by IRISL.

1194.  Because Letters of Credit are intrinsically about the submission of detailed paperwork and required Standard Chartered Bank (Credit Suisse and other Defendants) to examine and retain the documentation evidencing Iran's illegal procurement chain, Standard

---

[218] This occurred during a period of time (between 2004 and 2007) when SCB's New York branch was subject to a formal supervisory action by the New York State Banking Department and the Federal Reserve Bank of New York ("FRBNY") for other regulatory compliance failures involving the Bank Secrecy Act (BSA), anti-money laundering policies and procedures ("AML"), and OFAC regulations.

[219] The product was designated with an ECCN of 2B999 (for Anti-Terrorism reasons) under Supplement 1 to Section 774 of the Commerce Control List (CCL).

[220] SCB facilitated another Letter of Credit on May 12, 2005, involving Khoram Sanat (as Applicant) and Diamonds Steel (as Beneficiary) for over $1.9 million for goods described as "Back Up Roll Change Carriage, Spare Back Up Roll with Chuck and Main Gear Box." These standard terms are used to describe metal working equipment that may be integrated into large hydraulic presses or deployed as stand-alone equipment stations.

[221] The dangers of Iran possessing hydraulic press equipment were evident from a 2009 reported incident wherein Turkish authorities, at the request of the U.S., halted a convoy of trucks heading from Iran to Syria that contained a large hydraulic press and punch press. The U.S. requested this action because "these items are likely intended for the production of explosively formed penetrators (EFPs)."

Chartered Bank's knowledge of its role in the Conspiracy is indisputable.

1195.   Furthermore, because Iran's illegal procurement chain was dependent on access to U.S. dollars, Standard Chartered Bank's (and other Defendants') participation in the Conspiracy was essential to its success.

1196.   In sum, Standard Chartered Bank was integral to Iran's inherently lethal and illegal conduct, which included a wide variety of money laundering techniques in the service of weapons procurement, arms shipments, acquisition of WMDs, and terror financing that substantially and foreseeably assisted MODAFL, the IRGC and Hezbollah in their campaign of violence and terror against Coalition Forces in Iraq.

## M.   REGULATORY   ACTIONS   AND   CRIMINAL INVESTIGATIONS AGAINST STANDARD CHARTERED BANK FROM 2012 – PRESENT

1197.   On September 21, 2012, Standard Chartered Bank and the New York State's Department of Financial Services ("DFS") executed a Consent Order resolving charges that, from at least 2001 through 2007, Standard Chartered Bank provided Eurodollar clearing and settlement services to Iranian customers subject to U.S. economic sanctions, with respect to approximately 59,000 transactions totaling approximately $250 billion, through Standard Chartered's New York branch.

1198.   DFS concluded that "SCB operated as a rogue institution."[222]

1199.   On December 10, 2012, DOJ announced that SCB had agreed to forfeit $227 million to the Justice Department for conspiring to violate the IEEPA, and that the forfeiture was

---

[222] Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby adopt and incorporate by reference: 1) the Order entered by the New York Department of Financial Services on or about August 6, 2012; 2) the Consent Order entered by the New York Department of Financial Services on or about September 21, 2012; 3) the Settlement Agreement entered into between SCB and Department of Treasury on or about December 10, 2012; 4) the DPA entered into between SCB and Department of Justice on or about December 10, 2012; and 5) the Cease and Desist Order entered into between SCB and Board of Governors of the Federal Reserve System on or about December 10, 2012, as if fully set forth herein.

part of Deferred Prosecution Agreements SCB entered into with DOJ and the Manhattan District Attorney's office for illegally moving millions of dollars through the U.S. financial system on behalf of, *inter alia*, sanctioned Iranian entities. SCB also entered into settlement agreements with OFAC and the Board of Governors of the Federal Reserve System, as well as with DFS.

1200.   DOJ filed a criminal information charging SCB with one count of knowingly and willfully conspiring to violate IEEPA. SCB waived the federal indictment, agreed to the filing of the information and, according to DOJ's press release, "accepted responsibility for its criminal conduct and that of its employees."

1201.   DOJ's 2012 press release announcing the Deferred Prosecution Agreement quoted then-Assistant Attorney General Lanny Bruer as stating: "[f]or years, Standard Chartered Bank deliberately violated U.S. laws governing transactions involving Sudan, Iran, and other countries subject to U.S. sanctions. The United States expects a minimum standard of behavior from all financial institutions that enjoy the benefits of the U.S. financial system. Standard Chartered Bank's conduct was flagrant and unacceptable. Together with the Treasury Department and our state and local partners, we will continue our unrelenting efforts to hold accountable financial institutions that intentionally mislead regulators to do business with sanctioned countries."

1202.  Manhattan District Attorney Cyrus Vance Jr. stated in the press release: "Investigations of financial institutions, businesses, and individuals who violate U.S. sanctions by misusing banks in New York are vitally important to national security and the integrity of our banking system. Banks occupy positions of trust. It is a bedrock principle that they must deal honestly with their regulators. I will accept nothing less; too much is at stake for the people of New York and this country. These cases give teeth to sanctions enforcement, send a strong message about the need for transparency in international banking, and ultimately contribute to

237

the fight against money laundering and terror financing."

1203.   Prior to entering into the 2012 DPA and its settlement with DFS, Standard Chartered Bank retained Promontory Financial Group, LLC ("Promontory") in 2009 to provide "consulting services in connection with the identification and collection of historical transaction records relating to cross-border financial transactions."

1204.   In the first half of 2010, Standard Chartered Bank reported to various regulators, including the New York State Banking Department ("NYSBD"), DFS's predecessor, that it had engaged in conduct related to the evasion of U.S. sanctions.

1205.   On April 15, 2010, Standard Chartered hired Promontory again to identify, collect and review historical transaction records implicating sanctions violations.

1206.   Thereafter, Promontory produced a number of reports and made various presentations to government authorities, including the NYSBD (later DFS).

1207.   These Promontory reports included, *inter alia*, interim reports throughout 2010, final reports in January and March of 2011, as well as updates to those final reports in October 2011.

1208.   DFS relied in part upon the work conducted and presented by Promontory to identify the scope of Standard Chartered's improper conduct prior to entering into the September 21, 2012 Consent Order.

1209.   On June 18, 2013, Deloitte entered into a Settlement Agreement with DFS wherein it agreed, *inter alia*, to pay a penalty of $10 million for misusing confidential information from other Bank Defendants.

1210.   For example, Deloitte provided Standard Chartered with copies of transaction review reports that Deloitte had prepared for these other clients and suggested to SCB

238

management that they be used as templates for SCB's transactions review report, and agreeing to Standard Chartered's request that Deloitte remove a recommendation from its written final report explaining how "cover payment" messages used by SWIFT-NET (MT 202s) could be manipulated by banks to evade U.S. money laundering controls.

1211.  On August 19, 2014, DFS announced an order regarding Standard Chartered's failures to remediate AML/CFT compliance problems as required in Standard Chartered's 2012 settlement with DFS.

1212.  Under the August 2014 DFS order, Standard Chartered was required to: (1) suspend dollar clearing through Standard Chartered Bank's New York branch for high-risk retail business clients at SCB's Hong Kong subsidiary; (2) exit high-risk client relationships within certain business lines at SCB's branches in the UAE; (3) decline new dollar-clearing clients or accounts across its operations without prior approval from DFS; (4) pay a $300 million penalty; and (5) take other remedial steps.

1213.  Additionally, according to an October 29, 2014 article in The New York Times, federal and Manhattan prosecutors have reopened their investigation into Standard Chartered Bank.

1214.  The *New York Times* reported that prosecutors were questioning whether Standard Chartered Bank failed to disclose the extent of its wrongdoing to the government, thus imperiling SCB's 2012 settlement.

1215.  In August 2015, DFS issued a "Report on Investigation of Promontory Financial Group, LLC."

1216.  The DFS report stated that:

> On April 15, 2010, Promontory was engaged by Standard Chartered's counsel to identify, collect and review historical transaction records "with

certain countries or certain Specially Designated Nationals ("SDNs") subject to sanctions" administered by OFAC. The engagement was known as Project Green.

As part of the engagement, Promontory produced a number of reports and made various presentations to the Bank and government authorities, including the NYSBD. These reports included interim reports throughout 2010, final reports in January and March of 2011, and updates to those final reports in October 2011.

In connection with the Department's investigation of Standard Chartered, the Department relied in part upon the work conducted and presented by Promontory to identify the scope of the Bank's improper conduct and to determine an appropriate resolution of the investigation.

1217. DFS ultimately concluded that "There are numerous instances where Promontory, at the direction of the Bank or its counsel, or at its own initiative, made changes to 'soften' and 'tone down' the language used in its reports, avoid additional questions from regulators, omit red flag terms or otherwise make the reports more favorable to the Bank."[223]

1218. Examples identified by DFS included a written communication on January 19, 2011, wherein "the Bank's counsel wrote to Promontory that the title of a particular slide entitled 'The 77 non-u-turn payments fell into 3 categories' – meaning the transactions were potential OFAC violations – should be made 'more bland' and suggested a rewording to 'Categories identified in Amendment Analysis.' Promontory made the change to the more vague language requested by the Bank."

1219. The DFS Report further found that "Promontory omitted certain timelines from the reports that would have indicated an increase in violations over time."

1220. The Report went on to cite a December 17, 2010 statement by a senior analyst at Promontory explaining:

---

[223] Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby adopt and incorporate by reference: 1) the Order entered by the New York Department of Financial Services on or about August 19, 2014; and 2) the Report on Investigation of Promontory entered by the New York Department of Financial Services on or about August 18, 2015, as if fully set forth herein.

Generally, the timelines serve a strong purpose with the Jersey payments. That is, there appears to be a positive trend over time to reduce the involvement with potential violations. **This will not be true with Dubai. I have a strong suspicion that people will not want to show the timelines for Dubai ([a particular client for which the Bank processed prohibited transactions] for example shows an upwardly sloping curve of violations).** If we are going to go ahead with the visuals across the workstreams, we should be cognizant of the graphics showing painful information and expect strong pushback from the bank and [the Bank's counsel]. (Emphasis added.)

1221.   As described above, Standard Chartered Bank's Dubai operations were a central hub for the IRGC's and MODAFL's illegal procurement efforts.

1222.   In August 2015, *The New York Times* reported that SCB was once again under investigation: "The Justice Department is examining whether it committed sanctions violations beyond those covered in the 2012 deal, which centered on what the bank called 'Project Gazelle,' an effort to forge 'new relationships with Iranian companies.'"

1223.   The *Financial Times* also reported in September 2015:

Documents seen by the FT suggest that StanChart continued to seek new business from Iranian and Iran-connected companies after it had committed in 2007 to stop working with such clients. These activities include foreign exchange transactions that, people familiar with StanChart operations say, would have involved the US dollar….

The material reviewed by the FT depicts a bank — one of the few foreign lenders with a license [sic] to operate in the country — determined to keep working with Iranian companies. The status of numerous Iranian and Iran-connected entities was still being reviewed by StanChart as late as 2013, according to documents seen by the FT. These included entities that had internal "markers" and "blocks" placed against them, a way for the bank to flag up concern about links to Tehran. Many accounts belonging to Iranian or Iran-connected entities were indeed closed by 2007, as StanChart promised. But some, like Bank Saderat — which had sanctions imposed in 2006, or Bank Sepah — still had open accounts with no markers against them.

1224.   Even as edited to be favorable to Standard Chartered Bank, the 2011 Promontory

Report[224] provides a window into the vast array of wrongdoings undertaken by Standard Chartered Bank in concert with Iran and its agents.[225]

1225.   As the Negotiating Bank on numerous illegal Iranian Letters of Credit, Standard Chartered Bank received the detailed documentation for the shipment of goods, and knew that it was helping Iran's military and terrorist apparatus acquire prohibited U.S. goods and dual-use technologies.

1226.   In sum, as the Negotiating Bank on numerous illegal Iranian transactions for Mahan Air and various MODAFL sub-agencies, and as an active conduit and money-launderer for the CBI and other sanctioned Iranian banks, Standard Chartered Bank knew that: (1) it was dealing with Iran's military and terrorist apparatus; (2) it was conspiring to evade U.S. export sanctions; (3) it was laundering money in USD funds for Iran's military and terrorist apparatus; (4) its own customers were front companies for Iran's military and terrorist apparatus; (5) that these customers were actively engaged in sanctions evasion and money laundering; and (6) that none of this illegal conduct was undertaken for the benefit of a legitimate agency, operation or program of Iran.

1227.   Lastly, Standard Chartered Bank chose to use its presence in the United States (and its New York branch specifically) to effectuate its crimes.

**13.   DEFENDANT ROYAL BANK OF SCOTLAND N.V.'S, ROYAL BANK OF SCOTLAND PLC/NATWEST MARKETS PLC'S, AND ROYAL BANK OF SCOTLAND PLC/NATWEST MARKETS PLC NEW YORK BRANCH'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY**

1228.   As alleged above, Defendant RBS N.V. is the legal successor to ABN Amro

---

[224] Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby adopt and incorporate by reference the 2011 Promontory Report, attached as Exhibit A to the Second Amended Complaint, [DOC. 115. 115-1, 115-2], *Freeman et al. v HSBC Holdings PLC, et al.*, 1:14-cv-6601-DLI-CLP  (E.D.N.Y. 8/17/16).

[225]  Other Promontory reports, which have not (for the time being) been publicly disclosed, detail Standard Chartered's Dubai operations and SCB's activities on behalf of the CBI, as well as its role in financing, *inter alia*, Blue Sky Aviation's acquisitions of various materials and technologies.

Bank. As noted above, this Defendant is referred to herein as "ABN Amro (RBS N.V.)"

1229.   In May 1995, top officials of ABN Amro (RBS N.V.) in Amsterdam e-mailed the entire management of ABN Amro (RBS N.V.) in Europe, Asia, South America, Africa, the Caribbean, and North America, advising them that any financial transactions in USD funds undertaken for or on behalf of Iranian persons or banks were subject to seizure or blocking in the United States.

1230.   Soon after President Clinton signed the Executive Order implementing sanctions against Iran in May 1995, Iranian banks sought the services of ABN Amro (RBS N.V.) and other banks in aiding Iran to circumvent U.S. laws.

1231.   ABN Amro (RBS N.V.) employees were aware of these requests, discussed these requests with the other Co-conspirator banks, and thereafter approved of ABN Amro (RBS N.V.) conducting the illegal transactions, contrary to the advice of outside counsel retained by ABN Amro (RBS N.V.) that its involvement in such transactions would potentially violate U.S. law.

1232.   From approximately 1995 until in or about 2005, ABN Amro (RBS N.V.) conspired with the Iranian Bank Co-conspirators (including the CBI, Bank Melli Iran and Defendant Bank Saderat Plc) and their agents to conceal evidence of ABN Amro (RBS N.V.)'s financial transactions from the U.S. government, law enforcement, and intelligence agencies, as well as U.S. financial institutions charged with detecting and blocking certain Iranian transactions.

1233.   ABN Amro (RBS N.V.) was, at the same time, aware that numerous other non-Iranian financial institutions were engaged in the Conspiracy to conceal evidence of the Iranian Bank Co-conspirators' financial transactions from the U.S. government, law enforcement and intelligence agencies, as well as U.S. financial institutions charged with detecting and blocking

certain Iranian transactions.

1234.   From approximately 1995 until in or about 2005, ABN Amro (RBS N.V.) furthered the Conspiracy by methodically removing and/or falsifying payment messages on its funds transfer systems to disguise the movement of hundreds of millions of U.S. dollars illegally through the U.S. financial system on behalf of the Iranian Bank Co-conspirators (including Bank Melli Iran).

1235.   In furtherance of the Conspiracy, ABN Amro (RBS N.V.) and the Iranian Bank Co-conspirators developed methods by which ABN Amro (RBS N.V.) would format USD payments so that such payments would evade U.S. sanctions and detection by automated filters used by financial institutions in the United States.

1236.   When ABN Amro (RBS N.V.) employees received payment messages from the Iranian Bank Co-conspirators that contained certain words that could trigger a U.S. bank's automated OFAC filter software algorithms, ABN Amro (RBS N.V.) would manually alter or amend the messages (i.e., "strip" the transactions) to ensure that the transaction would go undetected when it was cleared and settled by financial institutions in the United States.

1237.   ABN Amro (RBS N.V.) thereby caused financial institutions in the United States to process transactions involving the Iranian Bank Co-conspirators that U.S. financial institutions would not otherwise have processed.

1238.   Like Standard Chartered Bank, certain offices, branches, and subsidiaries of ABN Amro (RBS N.V.) also altered Letters of Credit and foreign exchange transactions involving USD funds by replacing the names of the Iranian Bank Co-conspirators (including Bank Melli Iran) on those transactions.

1239.   Beginning as early as 1995 and continuing until in or about 2005, ABN Amro

(RBS N.V.) undertook various acts in furtherance of the Conspiracy. For example: The Dubai branch of ABN created procedures and guidelines to facilitate the processing of prohibited USD transactions.

1240. For instance, one section of the ABN payment manual entitled "Special Conditions" listed specific instructions on how to effectuate these payments and avoid OFAC filters.

1241. A specific instruction from this manual stated: "Payments by order of Iranian Banks …maintaining accounts with ABN, Dubai are to be handled with extra care to ensure the wordings "Iran" etc. are not mentioned in the payment due to OFAC regulations."

1242. In June 1995, an Iranian Bank Co-conspirator requested of ABN Amro (RBS N.V.) officials in Dubai that ABN Amro (RBS N.V.) act as a conduit for all U.S. dollar transactions for that Iranian bank in Dubai.

1243. The Iranian bank requested that all of its USD funds transfer be routed through, or be issued in the name of, ABN Amro (RBS N.V.) and carry no reference to the fact that these payments were issued on its behalf, and that all of its U.S. dollar receipts would come into ABN Amro (RBS N.V.)'s account.

1244. Thereafter, ABN Amro (RBS N.V.) undertook various specific acts to conceal its actions on Iran's behalf.

1245. ABN Amro (RBS N.V.) instructed the Iranian Bank Co-conspirators to include the code word "SPARE" in their payment messages through the bank so that ABN Amro (RBS N.V.) could first segregate these messages from normal message payment processing, and then amend the message by removing/altering any potentially problematic text, i.e., any reference to Iran.

1246.   The payment message would then be stopped by ABN Amro (RBS N.V.), routed into a special queue, and manually altered to avoid being blocked by any OFAC sanctions screening filters.

1247.   In this manner, ABN Amro (RBS N.V.) assisted sanctioned entities, and ensured the processing of transactions by formatting payment order messages so that they would not be rejected or blocked by OFAC filters at financial institutions in the United States.

1248.   ABN Amro (RBS N.V.) added to its payment manuals the "Special Conditions" that were to be used on behalf of the Iranian Bank Co-conspirators in order to evade detection and circumvent the laws of the United States.

1249.   ABN Amro (RBS N.V.) used these same or materially similar procedures with respect to Letters of Credit in USD funds, and the processing of USD denominated checks and traveler's checks.

1250.   ABN Amro (RBS N.V.) and the Iranian Bank Co-conspirators knew and discussed the fact that without such alterations, amendments, and code words, the automated OFAC filters at clearing banks in the United States would likely halt most of the payment messages and other transactions, and, in many cases, would reject or block the sanctions-related transactions and report the same to OFAC.

1251.   ABN Amro (RBS N.V.) also removed the names, BICs, and any other identifying information of the Iranian Bank Co-conspirators in the payment order messages sent to ABN Amro (RBS N.V.)'s U.S. correspondent banks.

1252.   In order to circumvent U.S. sanctions, certain Iranian Bank Co-conspirators requested that ABN Amro (RBS N.V.) omit their names and BICs from payment order messages sent by ABN Amro (RBS N.V.) to ABN Amro (RBS N.V.)'s U.S. correspondent banks. ABN

Amro (RBS N.V.) complied with the requests of these Iranian Bank Co-conspirators, and omitted their names and identifiers in order to help bypass the OFAC filtering mechanisms of U.S. financial institutions.

1253.   ABN Amro (RBS N.V.) also used SWIFT-NET MT 202 cover payment messages to shield the identities of the Iranian Bank Co-conspirators.

1254.   Instead of using serial MT 103 payment messages that require the names and details of counter-parties to transactions, ABN Amro (RBS N.V.) began using MT 202 cover payment messages expressly for the purpose of avoiding revealing the true identity of the ordering customer and beneficiary party for U.S. dollar payments sent through financial institutions in the United States.

1255.   The Central Bank of Iran coordinated with ABN Amro (RBS N.V.)'s Central Bank Desk in Amsterdam regarding the procedure to be followed for repayment of USD deposits to their accounts with European Banks in London.

1256.   This procedure stipulated that payment order messages sent to U.S. clearing banks for payment of USD funds to the CBI should not contain any reference to the Central Bank of Iran or any other reference relating to Iran.

1257.   In or about June and July 1995, officials at ABN Amro (RBS N.V.)'s Amsterdam Headquarters and New York offices were advised by outside U.S. counsel that the proposal by Iranian banks for ABN Amro (RBS N.V.) to serve as a conduit or means to bypass and avoid the sanctions imposed by the United States upon Iran risked breaching U.S. law.

1258.   An internal memorandum generated by ABN Amro (RBS N.V.) at the time stated "[t]he fund transfer mechanics proposed by [the first Iranian Bank] are an attempt to circumvent the Iranian trade embargo. Given that violations of the Executive Order and OFAC regulations

carry substantial penalties, not to mention the negative publicity, the [first Iranian Bank] proposal must be strictly scrutinized and ABN Amro must weigh the risks before proceeding with any such transfers."

1259.  Also in June 1995, another Iranian Bank Co-conspirator sent a written communication to certain banks in the UAE and the Iranian Bank's correspondent banks instructing those banks to undertake USD funds transfers for the Iranian bank in the name of a European financial institution "WITHOUT MENTIONING OUR BANK'S NAME" to defeat and circumvent the sanctions imposed upon Iran by the United States.

1260.  Like the first request, the Iranian Bank Co-conspirator's request was forwarded to officials located in several departments of the Amsterdam Headquarters of ABN Amro (RBS N.V.).

1261.  As early as 1997, in an internal strategy paper for the Middle East and Africa region named "Desert Spring," prepared by ABN Amro (RBS N.V.)'s Middle East and Africa Regional Office, ABN Amro (RBS N.V.) described a "product initiative" with "opportunities in LC discounting for Central Bank and Bank Melli, Iran" and "deposit mobilization from Iranian nationals."

1262.  On or about February 5, 2000, an official at the Dubai branch of ABN Amro (RBS N.V.) wrote to a Regional Director of one of the Iranian Bank Co-conspirators assuring him that ABN Amro (RBS N.V.) would take care of carrying out the scheme to evade and defeat the U.S. sanctions.

1263.  The ABN Amro (RBS N.V.) official's note stated: "[w]e understand the special nature of your US$ transactions and will ensure that all operations departments concerned are properly briefed regarding this, as well."

248

1264.  A July 19, 2003 e-mail written by John Ciccarone, Head of ABN Amro (RBS N.V.)'s USD Payments Product Management at ABN Amro (RBS N.V.)'s New York branch, discussed the use of MT 202 cover payments, stating: "There is no way the payment will get stopped as all NY ever sees is a bank to bank instruction."

1265.  In a July 25, 2003 e-mail, John Philbin, Senior Relationship Banker for Iranian Banks, wrote to Ciccarone:

> Surely Iran is the most obvious case in point for these structures. Twenty-four years of US sanctions and OFAC listing and Iran continues to sell oil and gas in USD. And, it imports and pays in USD as well. All of this is clearly done though accounts in Europe and elsewhere. There is a very good case to be made for getting an overall acceptance that when issues are purely US, we should not be a part of it. In fact, we should see it as an opportunity. OFAC is not the Bible for money laundering (e.g. Cuba is prominent on OFAC). It is a tool of broader US policy. We therefore need to distinguish between US foreign policy on the one hand and AML/anti-Terrorism on the other, however much the US administration may wish to insist that the two are closely linked. It is well worth working on a solution for clients who find themselves in this position or who fear (Syria, Saudi Arabia) that they, one day soon might find themselves there.

1266.  Also in 2003, Diane Perrin, a member of ABN Amro (RBS N.V.)'s Group Compliance team at the Defendant's Amsterdam Head Office, stated that "as a European Institution, we do not comply with US Sanctions because those sanctions are politically motivated."

1267.  A 2003 memorandum entitled "Proposal for Establishing a Representative Office in Tehran, Iran" drafted by ABN Amro (RBS N.V.)'s Country Representative in the UAE, Jan Willem van den Bosch, similarly stated:

> The Central Bank of Iran is faced with difficulties for USD denominated clearing transactions due to sanctions imposed by the US. The OFAC filter impounds all Iran related payments and receipts in the US. The Swiss and other European Banks have worked out a solution for this. The payment instructions are sent directly to the beneficiary's bank and cover payment is made to the beneficiary bank's US Correspondent as inter-bank payments.

1268.   Bosch later coordinated the meeting in Dubai between ABN Amro (RBS N.V.)'s Managing Board Member and CFO Tom De Swann and top functionaries of the CBI, including Aziz Farrashi, CBI's Director General.

1269.   During the meeting with the CBI's officials, ABN Amro (RBS N.V.) officials discussed the establishment of the Representative Office by ABN Amro (RBS N.V.) in Tehran and further business development, including the acceptance of USD deposits by the CBI's Desk in Amsterdam.

1270.   In an April 20, 2004 e-mail, the aforementioned Philbin mentioned the possibility of using a Jersey Special Purpose Vehicle as a way to circumvent OFAC restrictions:

> Mike Louwerens [ABN Amro's Vice President and Senior Analyst of Country Risk Management Department] mentioned this to me today and sent the attached. The structure below is very interesting and could have applicability for the banks in Iran as well. But whether that is the case or not, what is clear is that this structure envisages our making and receiving payments in USD which will clear through AA in New York. And for which Mike Bowman sees no objection. I am sending a second note in which OEM (Maarten Seckel) gives a go ahead based on Bowman's nihil obstat. The Way for our doing significant business with the Iranian banks in cash may yet be clear.

1271.   On July 23, 2004, ABN Amro (RBS N.V.) and its New York branch entered into a Written Agreement with the Federal Reserve Banks of New York and Chicago (collectively, the "Reserve Banks") and other regulators that had detected deficiencies at ABN Amro (RBS N.V.)'s New York Branch relating to AML policies, procedures, and practices that included:

> A pattern of previously undisclosed unsafe and unsound practices warranting further enforcement action…. A. ABN AMRO lacked adequate risk management and legal review policies and procedures to ensure compliance with applicable U.S. law, and failed to adhere to those policies and procedures that it did have. As a result, one of ABN AMRO's overseas branches was able to develop and implement "special procedures" for certain funds transfers, check clearing operations, and letter of credit transactions that were designed and used to circumvent the compliance systems established by the Branches to ensure compliance with the laws of the U.S. In particular, the "special procedures"

250

circumvented the Branches' systems for ensuring compliance with the regulations issued by the Office of Foreign Assets Control ("OFAC") (31 C.F.R. Chapter V).

1272.   U.S. regulators also found that "[p]rior to August 1, 2004, the New York Branch processed wire transfers originated by Bank Melli Iran, a financial institution owned or controlled by the Government of Iran. The payment instructions on the wire transfers had been modified by one of ABN Amro's overseas branches such that any reference to Bank Melli Iran was removed."

1273.   U.S. regulators also found that "[p]rior to August 1, 2004, the Branches advised a number of letters of credit issued by Bank Melli Iran. The letters of credit had been reissued by one of ABN Amro's overseas branches such that any reference to Bank Melli Iran was removed."

1274.   As DOJ later concluded: "Each year between and including 1996 and 2004, ABN caused ABN's U.S. affiliate to file false, misleading, and inaccurate Annual Reports of Blocked Property to OFAC. In each of those reports, the U.S. affiliate of ABN certified to OFAC that all information provided was accurate and that all material facts in connection with the report had been set forth."

1275.   Nonetheless, in September 2004, Michael Louwerens, ABN Amro (RBS N.V.)'s Vice President and Senior Analyst of Country Risk Management Department, travelled to Iran at the behest of ABN Amro (RBS N.V.)'s Head Office and reported back that he had communicated with the Chief Representative of HSBC in Tehran (presumably John Richards) and concluded that ABN Amro (RBS N.V.)'s payment procedures (to conceal Iranian financial activity) were in line with prevailing market practices of HSBC and other banks.

1276.   In addition, ABN Amro (RBS N.V.)'s then New York branch was the conduit for at least 90 post-U.S. designation transactions on behalf of IRISL and its various front companies

through March, 2010.

1277.   On May 10, 2010, DOJ issued a press release announcing that ABN Amro's successor entity, Defendant Royal Bank of Scotland N.V., had agreed to forfeit $500 million to the United States in connection with a conspiracy to defraud the United States, to violate the IEEPA, the TWEA, and the Bank Secrecy Act ("BSA").

1278.   In connection with a Deferred Prosecution Agreement ABN Amro (RBS N.V.) entered into, a criminal information was filed in the U.S. District Court for the District of Columbia charging the Defendant with one count of violating the BSA, and one count of conspiracy to defraud the United States and violate the IEEPA and the TWEA. ABN Amro (RBS N.V.) waived indictment, agreed to the filing of the information, and, according to the press release "accepted and acknowledged responsibility for its conduct."[226]

1279.   According to the criminal information, ABN Amro (RBS N.V.)'s participation in the conspiracy continued "until in or about December 2007." Prior to that time, ABN Amro (RBS N.V.) willfully and knowingly conspired, *inter alia*, to "engage in financial transactions with entities affiliated with Iran … in violation of the International Emergency Economic Powers Act, Title 50, United States Code, Section 1705, and regulations and embargoes issued thereunder…."

1280.   The criminal information confirmed that ABN Amro (RBS N.V.) was an active participant in the Conspiracy.

1281.   The criminal information stated that: "It was part of the conspiracy that the defendant discussed with the co-conspirators how to format United States Dollar message

---

[226] Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby adopt and incorporate by reference: 1) the DPA entered into by RBS with the DOJ on or about May 10, 2010; 2) the Settlement Agreement between RBS and the Department of Treasury entered into on or about October 12, 2013; 3) the NYDFS Consent Order entered on December 11, 2013; 4) the Federal Reserve Consent Order entered on December 11, 2013, as if fully set forth herein.

payments so that such payments would avoid detection by automated filters used by financial institutions in the United States and thus evade United States sanctions."

1282.   The criminal information further stated that: "It was part of the conspiracy that the defendant removed names and references to the co-conspirators in United States Dollar message payments routed through the United States."

1283.   The criminal information further stated that: "It was part of the conspiracy that the defendant altered the names and references to the co-conspirators in United States Dollar message payments routed through the United States."

1284.   The criminal information further stated that: "It was part of the conspiracy that the defendant instructed the co-conspirators to use code words in United States Dollar payment messages."

1285.   Additionally, the criminal information stated that: "It was part of the conspiracy that the defendant created a special processing queue to manually and materially alter any of the co-conspirators' United States Dollar message payments that were to be routed through the United States."

1286.   The criminal information also stated that: "It was part of the conspiracy that the defendant created "Special Conditions" in the defendant's payment manuals in order to process any co-conspirators' United States Dollar transactions."

1287.   Finally, the criminal information further stated that: "It was part of the conspiracy that the defendant caused its United States affiliates to submit materially false and misleading reports or statements to the United States Department of the Treasury, OFAC."

## 14.   DEFENDANT CREDIT SUISSE'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

1288.   Like the other Defendants in this Action, Credit Suisse worked hand-in-glove

with Iran and Iranian Bank Co-conspirators acting at Iran's behest to develop procedures to structure USD payments in ways that would evade U.S. sanctions and leave U.S. regulators, law enforcement and financial institutions blind as to Iran's financial activities, and provide Iran the USD it needed to sponsor acts of international terrorism.

1289.   To this end, Credit Suisse worked diligently to (1) develop methods that would avoid disclosing the true originators and/or beneficiaries of Iranian transactions that it was clearing and settling in the United States; (2) delete or omit certain information when transactions were to be processed through the United States; and (3) provide incorrect information in USD funds transfer instructions executed through the United States on behalf of U.S.-sanctioned individuals and entities.

1290.   Credit Suisse worked closely with Bank Melli, Bank Saderat, and Iran's Atomic Energy Organization (and other designated Weapons of Mass Destruction proliferators) for many years.

1291.   Before 2003, Credit Suisse was an active participant in the Conspiracy, but the sheer volume of its illegal conduct accelerated greatly in 2003 when Lloyds exited its Iran business and Bank Melli Plc, Defendant Bank Saderat Plc, and other Iranian agents moved their accounts to Credit Suisse.

1292.   For the next two years, Credit Suisse became one of the main USD funds clearing banks for the Iranian banking system, quadrupling in only 3 years the number of Iranian U.S. dollar payments, from approximately 49,000 in 2002 to nearly 200,000 in 2005.

1293.   The procedures Credit Suisse developed and refined over time to assist Iran were embodied in internal directives, memoranda, e-mails between Credit Suisse and its Iranian bank clients and internal e-mails involving, among others, a Credit Suisse Bank Payments Sector

Head, Credit Suisse's Treasury and Trade Finance Departments, and the Head of Credit Suisse's Iran Desk.

1294.   Since at least the mid-1990s, when it first agreed to assist Iran in carrying out the Conspiracy, Credit Suisse's Iran Desk began adding internal warnings to the accounts of its Iranian bank clients, instructing Credit Suisse employees: *"Do not mention the name of the Iranian bank in payment orders."*

1295.   Such warnings ensured that payment orders given by the Iranian Bank Co-conspirators would not be processed automatically, but rather would be manually reviewed, "corrected" if necessary, and effectuated by Credit Suisse employees.

1296.   For example, in June 1995, the Credit Suisse representative office in Dubai, United Arab Emirates, issued a memorandum recognizing Iran and the Iranian bank's general scheme to ensure that *any* foreign banks the Iranian Bank Co-conspirators did business with masked their transactions, and accordingly advised:

> Following the decision by the American authorities to declare a unilateral embargo against the Islamic Republic of Iran on April 30th, (an Iranian bank) approached Credit Suisse to open (a type of correspondent banking account for U.S. dollar transactions). Crucial to them was that the name of the bank would not be mentioned on the transfer orders... Subsequently, (the Iranian bank) was informed that though payments in such a way are basically feasible, to omit the name of the bank could lead to some problems. Meanwhile, operations through this account have started... Some transfers have been rejected by the American banks as the name of (the Iranian bank) appears under the rubric 'Ordering Bank.' Question: a) what can be done to avoid this?

1297.   Almost immediately after President Clinton issued E.O. Nos. 12957, 12959, and 13059, which strengthened existing U.S. sanctions against Iran, the Iranian Bank Co-conspirators began requesting that Credit Suisse omit their names and BICs from payment messages Credit Suisse sent to its U.S. correspondent banks.

1298.   Credit Suisse complied with the Iranian Bank Co-conspirators' illegal requests

and purposefully omitted their names and identifiers in order to help bypass U.S. financial institutions' sanctions filters.

1299.   After a 1998 corporate reorganization, in order to further its ongoing efforts to evade U.S. sanctions and ensure that other U.S. financial institutions would automatically process this new stream of payments, Credit Suisse notified its Iranian clients about the change in USD funds clearing and settlement from Credit Suisse First Boston AG ("CSFB") to third-party U.S. correspondents, and provided them with a pamphlet entitled "How to transfer USD payments."

1300.   The pamphlet provided detailed payment order formatting instructions for USD funds transfers on how to avoid triggering U.S. OFAC sanction screening filters.

1301.   In a 1998 letter to an Iranian Bank Co-conspirator explaining the transfer of its USD clearing services to the Bank of New York, New York, Defendant Credit Suisse wrote:

> In order to provide your esteemed institution with our clearing services in U.S. Dollars, we have introduced a procedure to facilitate your USD payments through our clearing system. The change of our USD-clearer to Bank of New York, New York, will not affect our mutual relationship on any clearing transaction in U.S. Dollars as long as the established procedure will be followed.

1302.   Beginning as early as 1995 and continuing through 2005, Credit Suisse, both internally and in coordination with the Iranian Bank Co-conspirators, created procedures and guidelines to facilitate the processing of prohibited USD transactions by its U.S. correspondent banks, primarily the Bank of New York, New York.

1303.   By using Credit Suisse's internal processing system, employees manually keyed in "Order of a Customer" when Iranian payments had to be processed as serial payments through U.S. banks.

1304.   This procedure was promoted at Credit Suisse, as demonstrated by an email from

256

a Team Leader in the Bank Payments Unit:

> In order to put an end, once and for all, to the discussions regarding the processing of USD payment orders of Iranian banks, I have worked out various examples that are to be considered binding for everyone.

1305.   Attached to the email were several screenshots of Credit Suisse's payment application illustrating how to format payment order messages to ensure that they would pass through the U.S. financial institutions undetected by U.S. OFAC sanction screening filters.

1306.   For example, one such screenshot showed all incoming payment messages listing an Iranian bank as the ordering institution in SWIFT-NET payment order message field "52" and contained the following explicit instructions: "Population of field 52 with 'one of our clients' in case of serial payments via the US."

1307.   A second screenshot showed an incoming payment with the reference "*without mentioning our banks [sic] name*" in field 52 and contained the following instructions: "Population of field 52 with 'one of our clients' in case of serial payments."

1308.   Until 2004, Credit Suisse's use of "*Order of a Customer*" was its standard procedure for processing bank payment messages involving Credit Suisse's Iranian customers.

1309.   Credit Suisse's internal communications also reveal a continual dialogue about evading U.S. sanctions spanning approximately a decade, assessing how to better process Iranian transactions in order to promote and increase business from existing and future Iranian clients.

1310.   In February 1999, Credit Suisse's Iran Desk added internal warnings to the Customer Information Files (or "CIFs") it maintained for the accounts of its Iranian bank customers, expressly directing Credit Suisse employees: "*Do not mention the name of the Iranian bank in payment orders*."

1311.   Credit Suisse documented similar directives in subsequent years. For example, in 2002, another warning was loaded in the CIF that likewise stated: "FOR USD-PAYMENTS

OUTSIDE CREDIT SUISSE/CS FIRST BOSTON DO NOT MENTION THE NAME OF THE IRANIAN BANK."

1312.   Credit Suisse later decided to remove warnings from the CIFs and replaced them with long-term instructions concerning Iranian entities that instructed: "*Execute USD payment orders always with direct order and cover payment*." These instructions explained that they were intended to ensure (according to Credit Suisse's internal documentation) that "an Iranian origin will never be named in USD payments carried out for Iranian banks (because of the US sanctions)!"

1313.   An internal Credit Suisse memorandum dated March 12, 1999, stated:

> Payment orders in USD can only be paid via the American clearing, if the name of the Iranian party is not mentioned (US sanctions). Otherwise, the amounts are returned by the American banks. Even though corresponding warnings have been loaded, there (sic) almost every week cases that are processed incorrectly by us.

1314.   Between 2000 and 2004, Credit Suisse's Iran Desk provided similar instructions to its Iranian Bank Co-conspirator clients via a standard letter, which stated in part: "*The most important issue is that you and/or your* correspondents do not mention your good bank's name in field 52."

1315.   Credit Suisse's Iran Desk also informed Iranian Bank Co-conspirator clients that Credit Suisse would utilize cover payments to effect payments to or through the United States, stating in one memorandum, for example, "[o]ur payment department will stop all USD payments initiated by your fine bank in any case and shall be effected [by]... 'Direct payment order and cover payment order.'"

1316.   In order to prevent straight-through processing of all payment orders sent by Iranian Bank Co-conspirators, Credit Suisse configured its payment system to interdict the payments for manual review.

1317. Credit Suisse employees then reviewed the payments to ensure that they contained no references to Iran. If such references were detected, Credit Suisse employees would either delete the reference, or contact the Iranian Bank Co-conspirators to request further instructions.

1318. Over time, Credit Suisse employees developed practices to omit information on the involvement of Iranian Bank Co-conspirators, including:

a) Entering in an empty field, or replacing the name of the Iranian Bank Co-conspirators with, "*Order of a Customer*" or a similar phrase instead of the actual name of the ordering institution in SWIFT-NET payment order messages;

b) Forwarding payment messages received from Iranian Bank Co- conspirators falsely referencing "Credit Suisse" or Credit Suisse's SWIFT- NET account code (identified by BIC address CRESCHZZ) instead of an Iranian bank as the originating institution. For example, a November 2000 email circulated by a team leader in Credit Suisse's Bank Payments Unit contained screenshots of an incoming payment order from an Iranian bank co-conspirator in which Credit Suisse was listed as the ordering institution in field "52" of the SWIFT-NET payment message. The instructions were to make no changes to the misleading information in the SWIFT-NET message's field "52" for serial payment messages made to U.S. financial institutions;

c) Inserting "Credit Suisse" as the ordering institution in payments originating with an Iranian Bank Co-conspirator;

d) Removing all references to Iranian names, addresses, cities, and telephone numbers from customer payments;

e) Substituting abbreviations for Iranian customer names. For example, in an April 16, 2003 email, the Head of Credit Suisse's Iran Desk wrote to the Credit Suisse representative office in Tehran, "*entry to their account works when account number plus XXX is stipulated as beneficiary. What is also important of course is that applicant will give details of final beneficiary as reference for the beneficiary, then it should work;*" and

f) Converting SWIFT-NET MT 103 Messages to SWIFT-NET MT 202 Messages to hide the details of Iranian transactions, and using MT 202 cover payment messages approximately 95% of the time to facilitate outgoing customer payments involving Iran or Iranian parties.

1319. A September 24, 2003 Credit Suisse internal email sent from a team leader in

Customer Payments to a Sector Head within Customer Payments, described Credit Suisse's Iranian U.S. dollar processing:

> The procedure is identical for all Iranian banks: 1) We attempt to send all USD payments directly to the bank of the beneficiary. Only cover payments are made through the US. In such cases, the ordering institution is not disclosed. 2) Should 1) not be possible (if the beneficiary bank is an American bank, or if no Swift connection or no correspondent was named), then the payment will be made though America. We make sure that the ordering institution is not mentioned (this has been programmed into the system as a default) and that the ordering customer has no connection to 'Iran'. 3) Should 1) and 2) not be possible, then the payment order will be forwarded to Investigations for further clarifications with the ordering institution.

1320. In addition, Credit Suisse actually instructed its Iranian Bank Co-conspirator customers on how to format U.S. dollar payments so that such payments would evade U.S. sanctions and detection by automated filters used by U.S. financial institutions.

1321. Payment instructions included a letter from Credit Suisse's Iran Desk to an Iranian customer dated October 16, 2003, that stated: "This is to provide you our recommendation for the entry of funds how to handle bank-to-bank payments on your account with Credit Suisse and the following procedures should be applied in order to avoid any difficulties."

1322. In December 2003, an Iranian bank asked Credit Suisse for an additional USD account identifying the Iranian beneficiary bank only by a designated abbreviation (first letter of each word constituting the bank's name, together with the abbreviation commonly used for a type of legal entity, *i.e.*, Plc).

1323. On January 28, 2004, Credit Suisse confirmed that it had opened the requested account, writing to the Iranian bank: "Reference is made to the various conversations and your email, dated December 18, 2003 wherein you asked us to open a new USD account...Now, we would like to confirm the account number …."

1324.   In addition, Credit Suisse promised the Iranian Bank Co-conspirators, including Bank Saderat and Bank Melli, that no messages would leave Credit Suisse without being first hand-checked by a Credit Suisse employee to ensure that they had been formatted to avoid U.S. OFAC filters.

1325.   Credit Suisse also took a further step in the Conspiracy beyond the *provision of expert knowledge to and training of* the Iranian Bank Co-conspirators on how to format their payment messages to evade the OFAC filters; it also gave Iranian Bank Co-conspirators materials to use for training *other* banks or individuals on how to prepare payment messages to evade U.S. OFAC filters and sanctions regimes.

1326.   In August 2003, Credit Suisse reached an agreement with the London branches of a number of Iranian Bank Co-conspirators to take over the banks' London branches' U.S. dollar clearing activity.

1327.   As a result of this agreement, Credit Suisse became one of the main USD clearing banks for the Iranian banking system.

1328.   Through its subsidiary Credit Suisse Asset Management Limited, United Kingdom ("CSAM"), Credit Suisse used code words for Iranian customers, including Iranian Bank Co-conspirators, when executing trades involving U.S. securities that were transmitted through the U.S.

1329.   Credit Suisse knew that without such alterations, amendments, and code words, automated OFAC filters at U.S. clearing banks would likely halt the payment order messages and securities transactions, and, in many cases, reject or block the sanctions-related transactions and report the same to OFAC.

1330.   Credit Suisse manipulated payment order messages and removed any identifying

reference to sanctioned countries and entities so that the OFAC filters at the U.S. clearing banks would not be able to identify the transactions, and the transactions would be automatically processed without detection.

1331.   In July 2004, the Swiss Federal Banking Commission issued an ordinance to implement FATF's Special Recommendation on Terrorist Financing VII.

1332.   The ordinance required the disclosure of the remitter in payment orders, and prompted Credit Suisse to issue an internal directive prohibiting the use of the "Order of a Customer" method when making international wire transfers.

1333.   In April 2004, in preparation for the implementation of the ordinance, Credit Suisse's Iran Desk began to inform its Iranian Bank Co-conspirator clients that neither "Order of a Customer" nor "Credit Suisse" could be used to replace references to Iranian banks on payment messages.

1334.   Credit Suisse again, however, provided information about the use of the cover payment method to send USD payments, ensuring that the Iranian Bank Co-conspirators (and, by extension, Iran and the IRGC-QF) remained cognizant of other means of ensuring an uninterrupted flow of surreptitious USD.

1335.   Although Credit Suisse's payment processing units ceased to use the "Order of a Customer" method following the Swiss Federal Banking Commission's July 2004 ordinance, Credit Suisse employees nonetheless continued removing and/or altering information in SWIFT payment order messages sent to one of its U.S. correspondent banks.

1336.   For example, in May 2005, an internal Credit Suisse email stated:

> If we do not have a key contact with the beneficiary's bank, we have to carry out the payment via the US, e.g. via BKTRUS33. However, no reference to Iran may be made in the field reserved for information on the

ordering party (no Iranian telephone numbers either). No such reference should be made in fields 70 or 72 either.

1337. Between March 2004 and November 2005, Credit Suisse repeatedly sent letters to its Iranian Bank Co-Conspirator customers describing its internal procedures for forwarding Iranian payment orders as:

> Our Payment department will stop all USD-payments initiated by your fine bank in any case and shall be effected as outlined in the drawing "Direct payment order and cover payment order."

1338. From August 2003 to November 2006, Credit Suisse illegally processed electronic funds transfers, in the aggregate amount of at least *$480,072,032*, through financial institutions located in the United States for the benefit of Iran and Iranian financial institutions.

1339. For a brief period of time, Credit Suisse became one of the main U.S. dollar clearing and settlement banks for the Iranian banking system.

1340. In January 2006, Credit Suisse established a "Sensitive Countries" Task Force to implement the exit decision and ultimately ceased U.S. dollar clearing transactions for Iran in November 2006.

1341. On September 11, 2006, Credit Suisse directed its payments centers to discontinue certain prohibited payments by an Iranian Bank Co-conspirator. Using the MT 202 cover payment method, during the six weeks from September 11, 2006 to October 27, 2006, Credit Suisse nevertheless processed 54 outbound payments involving that Iranian Bank Co-conspirator, the total value of which was in excess of $8 million.

1342. As described *supra*, Credit Suisse also facilitated payments on Letters of Credit involving Mahan Air's illegal purchase of U.S. aircraft and aircraft parts.

1343. These included the illegal purchase of an aircraft engine and an Airbus A320-232 financed by Bank Melli, Bank Refah and Bank Sepah.

263

1344.   In each case, Credit Suisse directed USD payments through the United States in furtherance of the Conspiracy.

1345.   In March 2007, following the Deferred Prosecution Agreements of Lloyds and ABN Amro (RBS N.V.), Credit Suisse commenced an internal investigation of its historic USD funds clearing business involving U.S.-sanctioned countries and persons. Shortly thereafter, Credit Suisse was contacted by U.S. and New York law enforcement officials.

1346.   On December 16, 2009, DOJ issued a press release announcing that Credit Suisse had agreed to forfeit $536 million in USD funds to the United States and to the Manhattan District Attorney's Office in connection with violations of the IEEPA and New York State law, as a result of violations relating to transactions Credit Suisse illegally conducted on behalf of customers from, *inter alia*, Iran.

1347.   In connection with a DPA that Credit Suisse entered into, DOJ filed a criminal information in the U.S. District Court for the District of Columbia charging Credit Suisse with one count of violating the IEEPA. Credit Suisse waived the indictment, agreed to the filing of the information, and, according to the press release, accepted and acknowledged responsibility for its criminal conduct.

1348.   Credit Suisse also simultaneously entered into an agreement with OFAC to settle its violations of the IEEPA and agreed to a civil forfeiture as part of the DPA it entered into with DOJ, the Manhattan District Attorney's Office and OFAC.[227]

1349.   The press release announcing the agreements quoted then-Treasury Under-Secretary for Terrorism and Financial Intelligence Stuart Levey as stating "[t]his case provides a timely lesson about how Iran seeks to involve others in deceptive conduct to evade legal and

---

[227] Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby adopt and incorporate by reference: 1) the DPA entered into by Credit Suisse and DOJ on or about December 16, 2009; and 2) the Settlement Agreement entered into by Credit Suisse and the United States Treasury Dept. on or about December 16, 2009, as if fully set forth herein.

regulatory controls. Those who do business with Iran expose themselves to the risk, and the consequences, of participating in transactions supporting proliferation, terrorism or sanctions evasion."

### 15. DEFENDANT BNP PARIBAS S.A.'S AND DEFENDANT BNP PARIBAS, S.A., NEW YORK BRANCH'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

1350. From at least 2002 through November, 2012, BNP Paribas S.A. actively participated in the Conspiracy by knowingly and intentionally structuring, conducting, and concealing USD transactions from regulators on behalf of sanctioned entities, including Iranian entities. These intentionally opaque USD transactions were processed through BNP's office in New York and other financial institutions throughout the United States. The illegal BNP transactions include a variety of trade finance instruments on behalf of or that involved parties subject to U.S. sanctions on Iran and routed the USD payments to go through the United States pursuant to those instruments; correspondent banking or retail banking transactions to or through the United States that involved the interest of a person subject to U.S. sanctions on Iran; processing a number of payments to or through the United States related to syndicated loans involving Iranian parties. Federal government authorities, as part of the investigation into BNP, probed approximately $100 billion of transactions. They found that that $30 billion of that amount were concealed, as part of BNP's effort to evade U.S. sanctions. New York's Department of Financial Services identified $190 billion in transactions that broke federal and state laws, including false books and records violations.

1351. Beginning at least as early as 2002, BNP entered into an agreement with Iran to provide it with access to billions of USD in violation of U.S. and international sanctions on Iran. BNP provided Iran with at least $160 billion USD through 2012 and ultimately pled guilty to violating U.S. and New York law in 2014. As part of the guilty plea to the criminal charges,

which included conspiring with Iranian and Sudanese sanctioned entities to violate U.S. sanctions, BNP agreed to pay an $8.9 billion fine to federal and state authorities, terminate senior executives, and suspend U.S. dollar clearing operations for one year at business lines in which the misconduct centered, starting in 2015. BNP was also sentenced to five years' probation.

1352.   BNP received these punishments because its conduct supported global terrorism, including by violating sanctions. "The most important values in the international community— respect for human rights, peaceful coexistence, and a world free of terror—significantly depend upon the effectiveness of international sanctions," said District Attorney Vance in the DOJ press release accompanying the announcement of BNP's guilty plea. As found by the Superintendent of Financial Services for New York State, Benjamin Lawsky, BNP "illegally funneled money to countries involved in terrorism and genocide" and that "multiple senior executives" knew that BNP was involved in that long-standing scheme. New York Governor Andrew Cuomo likewise stated in connection with the proceedings against BNP: "New York State will not allow companies to break the law, especially when they put our national security at risk . . . . This enforcement action should serve as a warning to any company that provides financial support to global terrorism and enables human rights atrocities. . . ."

1353.   Numerous other officials in the U.S. government similarly concluded that BNP willfully violated U.S. sanctions, provided rogue nations that support terrorism with access to the U.S. financial system, and did not cooperate with law enforcement when it was finally caught, as reflected in the DOJ press release:

    a)   "BNP Paribas went to elaborate lengths to conceal prohibited transactions, cover its tracks, and deceive U.S. authorities. These actions represent a serious breach of U.S. law," Attorney General Holder said. "Sanctions are a key tool in protecting U.S. national security interests, but they only work if they are strictly enforced. If sanctions are to have teeth, violations must be punished. . . . ."

b) "BNP ignored US sanctions laws and concealed its tracks. And when contacted by law enforcement it chose not to fully cooperate," Deputy Attorney General Cole said. "This failure to cooperate had a real effect—it significantly impacted the government's ability to bring charges against responsible individuals, sanctioned entities and satellite banks. This failure together with BNP's prolonged misconduct mandated the criminal plea and the nearly $9 billion penalty that we are announcing today."

c) "By providing dollar clearing services to individuals and entities associated with Sudan, Iran, and Cuba – in clear violation of U.S. law – BNPP helped them gain illegal access to the U.S. financial system," said Assistant Attorney General Caldwell. "In doing so, BNPP deliberately disregarded U.S. law of which it was well aware, and placed its financial network at the services of rogue nations, all to improve its bottom line. Remarkably, BNPP continued to engage in this criminal conduct even after being told by its own lawyers that what it was doing was illegal."

d) "BNPP banked on never being held to account for its criminal support of countries and entities engaged in acts of terrorism and other atrocities," said U.S. Attorney Bharara. "But that is exactly what we do today. BNPP, the world's fourth largest bank, has agreed to plead guilty and pay penalties of almost $9 billion for performing the hat trick of sanctions violations, unlawfully opening the doors of the U.S. financial markets to three sanctioned countries, Sudan, Iran, and Cuba. For years, BNPP provided access to billions of dollars to these sanctioned countries, as well as to individuals and groups specifically identified and designated by the U.S. government as being subject to sanctions. The bank did so deliberately and secretly, in ways designed to evade detection by the U.S. authorities. . . ."

1354.  The District Court at BNP's sentencing expressed similar views regarding BNP's conduct when it addressed some of the victims of state-sponsored terrorism that were present at the sentencing: "Your presence in the room emphatically reminds BNPP and other banks contemplating similar conduct of the pain and suffering states they illicitly transacted with can inflict, and your being here also illustrates why the United States imposes sanctions on the states in the first place."

1355.  For over a decade, BNP provided USD clearing services on behalf of Sudanese, Iranian, and Cuban parties with a value of more than $190 billion which were settled through its New York Branch and other New York-based financial institutions. Several BNP branches,

including Paris, London, Geneva, Rome and Milan, developed and implemented policies and procedures to systematically conceal at least $160 billion in U.S. dollar-denominated payments on behalf of Iranian customers. At least $650 million in transactions from 2004 to 2012 involved sanctioned Iranian entities, including transactions for a petroleum company based in Dubai that was effectively a front for an Iranian petroleum company and an Iranian oil company. BNP continued these illegal transactions for nearly two years after the bank had commenced an internal investigation into its sanctions compliance and pledged to cooperate with the government.

1356.   Moreover, from on or about July 15, 2005, to on or about November 27, 2012 alone, BNP processed at least 318 electronic funds transfers in the aggregate amount of $1,182,075,543 to or through financial institutions located in the United States in apparent violation of the prohibitions against the exportation or re-exportation of services from the United States to Iran, 31 C.F.R. § 560.204. From at least 2009 and again from at least December 2011 to November 2012, BNP transferred at least $686,600,000.00 on behalf of Iranian entities and persons in violation of U.S. sanctions.

1357.   In processing transactions on behalf of these sanctioned entities, BNP engaged in a systematic practice, as directed from high levels of the bank's group management, of removing or omitting Sudanese, Iranian, or Cuban information from USD-denominated payment messages that it sent through the New York Branch and other non-affiliated New York-based U.S. financial institutions. This practice was done to "guarantee the confidentially of the messages and to avoid their disclosure to any potential investigatory authorities." BNP's violations were particularly egregious in part because they continued for many years after other banks were sanctioned for similar violations; involved numerous schemes expressly designed to deceive

regulators; and were committed with the knowledge of multiple senior executives.

1358.  From at least 2003 up through and including 2012, BNP conspired with banks, including Defendants and Iran and/or its Agents and Proxies, as well as other entities located in or controlled by countries subject to U.S. sanctions, other financial institutions located in countries not subject to U.S. sanctions, and others known and unknown, to knowingly, intentionally and willfully move at least $8,833,600,000 through the U.S. financial system on behalf of sanctioned entities in violation of U.S. sanctions laws, including transactions totaling at least $4.3 billion that involved SDNs.

1359.  Among the means and methods by which BNP and its co-conspirators carried out the conspiracy were the following: BNP intentionally used a non-transparent method of payment messages, known as cover payments, to conceal the involvement of sanctioned entities in USD transactions processed through BNP Paribas New York and other financial institutions in the United States; BNP worked with other financial institutions to structure payments in highly complicated ways, with no legitimate business purpose, to conceal the involvement of sanctioned entities in order to prevent the illicit transactions from being blocked when transmitted through the United States; BNP instructed other co-conspirator financial institutions not to mention the names of sanctioned entities in USD payment messages sent to BNP Paribas New York and other financial institutions in the United States; BNP followed instructions from co-conspirator sanctioned entities not to mention their names in USD payment messages sent to BNP Paribas New York and other financial institutions in the United States; and BNP removed information identifying sanctioned entities from USD payment messages in order to conceal the involvement of sanctioned entities from BNP Paribas New York and other financial institutions in the United States. BNP provided expert advice, financial services, financial securities, and access to the

U.S. financial system to make it all possible.

1360.   For example, for one sanctioned Iranian client alone (referred to as "Iranian Controlled Company 1"), from 2006 to 2012, BNP processed at least $650 million in connection with three letters of credit that facilitated the provision of liquefied petroleum gas to an entity in Iraq. The majority of those transactions—approximately $586 million—occurred **after** OFAC revoked the U-turn Exemption, **after** the New York Country District Attorney's Office and the DOJ approached BNP regarding its involvement with sanctioned entities, and **after** multiple other banks blocked BNP's payments relating to Iranian Controlled Company 1.

1361.   BNP knew that Iranian Controlled Company 1 was controlled by an Iranian energy group based in Tehran, Iran ("Iranian Energy Group 1"). Its own internal Know Your Customer documentation on Iranian Controlled Company 1 showed that it was 100% owned by Iranian Energy Group 1. BNP's documentation also showed that Iranian Energy Group I, and in tum Iranian Controlled Company 1, was 100% owned by an Iranian citizen.

1362.   The transactions involving Iranian Controlled Company 1 began in approximately December 2006, at a time when the U-turn Exemption permitted certain transactions involving Iranian entities so long as those transactions were between two non-U.S., non-Iranian banks. BNP's transactions involving Iranian Controlled Company 1 initially complied with the U-Tum Exemption. BNP issued its "Revised Group Policy on Iran" on September 24, 2007, and OFAC revoked the U-turn Exemption in November 2008. Despite this new bank policy and the revocation, BNP continued to process U.S. dollar transactions involving Iranian Controlled Company 1 through November 2012.

1363.   On June 12, 2007, BNP Paribas Paris opened an account for a company incorporated in the UAE with an address listed in Dubai, UAE. An organizational chart

submitted to BNP Paribas Paris indicated the company was part of a network of eight companies—four of which were incorporated in Iran—that comprised an Iranian energy group owned and controlled by an Iranian citizen ordinarily resident in Iran, who was also the sole beneficial owner of the company maintaining an account at BNP Paribas Paris. According to BNP Paribas Paris's account opening materials (and a report the company produced to BNP Paribas Paris in 2007), many of the company's activities involved selling and transporting petroleum products to, from, or through Iran. The company's General Business Plan described its goals to increase a number of Iran-related activities over the following three years (2007-2010). Based upon the records made available to the government, the government concluded that BNP's outbound transactions through the United States on behalf of the company appeared to have violated the prohibition contained in § 560.204 of the Iranian Transactions and Sanctions Regulations because the benefit of these transactions was received in Iran.

1364.   The company referenced above utilized its account at BNP Paribas Paris to receive payments related to its sale of Turkmen liquefied petroleum gas to Iraq. Between November 2008 and November 2012, BNP processed 114 transactions totaling approximately $415 million on behalf of the company to or through the United States. Although the messages related to the transfers sent through the United States did include references to the company's name, they did not include references to Iran or to the company's Iranian ownership or connections. Most of the USD transfers BNP initiated on behalf of the company reached their intended beneficiary. On January 9, 2012, however, BNP Paribas Paris originated a $500,000 wire transfer on behalf of the company, destined for a refinery in Turkmenistan, and an unaffiliated correspondent bank located in the United States stopped the transaction and requested additional details from BNP Paribas New York. BNP Paribas New York informed

BNP Paribas Paris the unaffiliated correspondent bank was holding the payment "due to OFAC concern" and requested information about the payment, the company, the company's owners, and "anyway [sic] the transaction is related to Iran directly or indirectly." BNP Paribas Paris contacted the company directly to relay the questions, and the response—which came from an email address belonging to the Iranian energy group noted above—denied any association between the company and Iran. A BNP Paribas Paris compliance officer reviewed and approved the response for transmission to the unaffiliated correspondent bank without verifying the information or consulting the customer profile form for the company. At the time of the transaction, the customer profile form included a handwritten note for the company that read "Iranian ownership." In light of the available information, BNP appears to have had reason to know of the company's connection to Iran, and it failed to pass any of that information on to the unaffiliated correspondent bank in response to its inquiry. Even after the rejected transaction described above, BNP failed to subsequently investigate either the payment or the company, despite the fact BNP Paribas Paris processed 64 additional transactions valued at over $292 million on behalf of the company through the United States between January 2012 and November 2012, at which time BNP Group Compliance first learned about these transactions (BNP closed the company's account on November 27, 2012).

1365.  BNP also continued to process transactions on behalf of Iranian Controlled Company 1 even after other banks blocked payments that involved that company. In December 2011, a U.K. Bank ("U.K. Bank l") blocked a payment involving Iranian Controlled Company 1 and informed BNP that it would no longer do business with Iranian Controlled Company 1 because of its ties to Iran—thus putting BNP on notice, to the extent that it was not before, that transactions with Iranian Controlled Company 1 were impermissible. Moreover, in January 2012,

a U.S. branch of a German bank ("German Bank 1") rejected a payment made by BNP on Iranian Controlled Company 1's behalf because German Bank 1's research showed that Iranian Controlled Company 1 was "controlled from Iran." And in June 2012, a BNP Paribas Paris compliance officer noted that Iranian Controlled Company 1 was sending payments from its account at BNP Paribas Paris to its account at an Indian bank ("Indian Bank 1") with "known links to Iran." Nevertheless, despite these warnings—and despite claiming to be cooperating fully with the Government's investigation into sanctions violations—BNP continued to process U.S. dollar transactions for Iranian Controlled Company 1 until November 2012.

1366.   From December 2011, when U.K. Bank 1 blocked the payment involving Iranian Controlled Company 1 and in doing so put BNP on notice of the impermissibility of the transactions, through November 2012, when the transactions ended, BNP knowingly, intentionally and willfully processed a total of approximately $586.1 million in transactions with Iranian Controlled Company 1, in violation of U.S. sanctions against Iran.

1367.   BNP engaged in significant transactions with other sanctioned oil-and-gas companies in addition to Iranian Controlled Company 1. In in 2009, for example, BNP knowingly, intentionally, and willfully processed approximately $100.5 million in USD payments involving an Iranian oil company following the revocation of the U-Tum Exemption, in violation of U.S. sanctions. The payments were in connection with six letters of credit issued by BNP that financed Iranian petroleum and oil exports—and the payments were made even after compliance personnel at BNP Paribas Paris alerted employees within BNP's trade finance group that the USD payments associated with these letters of credit "are no longer allowed by American authorities."

1368.   BNP engaged in this conduct despite knowing, almost from the outset, that it was

illegal to do so. As early as June 2003, BNP issued a "general procedure" that pertained to "Financial Embargoes," which stated that "US financial embargoes apply within the US territory, to any US national or resident and to any transaction in US Dollar." In addition, on several occasions during the period covered by the bank's internal review, BNP sought external legal advice regarding its sanctions-related business, and specifically with regard to processing transactions on behalf of or involving sanctioned parties through the United States. Though not always consistent, the legal advice that BNP received described OFAC's comprehensive sanctions and explained why BNP should be careful in its business that involved parties subject to OFAC sanctions. Several BNP entities developed procedures or utilized payment practices that contravened the bank's June 2003 "general procedure" and processed thousands of transactions to or through the United States in violation of U.S. economic sanctions programs against Sudan, Iran, Cuba, and Burma.

1369. When a Dutch bank (ABN Amro) reached a settlement with United States regulators in 2005 for similar avoidance-of-sanctions practices to those conducted by BNP, the Head of Ethics and Compliance North America for BNP stated in an email "***the dirty little secret, isn't so secret anymore, oui?***"

1370. In early 2010, the New York County District Attorney's Office and the DOJ jointly approached BNP regarding its involvement in transactions with sanctioned entities, such as the sanctioned Iranian entities. Despite agreeing to commence an internal investigation into its compliance with U.S. sanctions and cooperate fully with U.S. and New York authorities, BNP continued to process these transactions on behalf of Iranian Controlled Company 1.

1371. BNP also provided access to substantial amounts of USD for sanctioned Sudanese entities, including those tied to Osama Bin Laden and al Qaeda. From at least November 1997

through in or around 2012, BNP conspired with Sudan, the Central Bank of Sudan, Al Shamal Islamic Bank, and al Qaeda to avoid OFAC sanctions that were put in place to deter, disrupt, and defeat terrorist activities. BNP maintained USD-denominated correspondent accounts for several Sudanese banks, including four banks that OFAC identified as SDNs. From 2005 to 2009 alone, BNP processed at least 2,663 electronic funds transfers in the aggregate amount of $8,370,372,624 to or through financial institutions located in the United States in apparent violation of U.S. sanctions on Sudan.

1372.   After other banks stopped doing illegal business with Sudan, Sudan and Sudanese banks began requesting assistance from European banks to defeat the sanctions. For example, on November 9, 1997, one of Credit Lyonnais (Suisse) S.A.'s Sudanese institutional clients "sent a Telex message to all of its correspondents (including [Credit Lyonnais]) informing the banks of the sanctions imposed against Sudan and requested its correspondents 'not to [] channel such transactions by intermediation of any U.S.A. bank, including banks domiciled in the U.S.A. territory, U.S.A. banks overseas branches and subsidiaries [or the] [a]ffiliates of[a] U.S.A. bank incorporated outside the United States.'"

1373.   BNP stepped in and, in 1997, effectively acted as Sudan's central banker for USD—BNP agreed to become Sudan's sole correspondent bank for one of Sudan's government banks. Without BNP providing USD, as the U.S. government found at BNP's criminal sentencing, Sudan and its related entities "would not have had access to the US dollar markets."

1374.   BNP knew that Sudan had assisted al Qaeda prior to entering into the Conspiracy. Despite that knowledge, BNP decided to become their sole correspondent bank in Europe, allowing it access to the U.S. financial market.

1375.   All or nearly all major Sudanese banks had USD accounts with BNP Paribas

Geneva. In addition to processing USD transactions, by or in 2000, BNP Paribas Geneva also developed a business in letters of credit for the Sudanese banks. Due to its role in financing Sudan's export of oil, BNP Paribas Geneva took on a central role in Sudan's foreign commerce market. By 2006, letters of credit managed by BNP Paribas Geneva represented approximately a quarter of all exports and a fifth of all imports for Sudan. Over 90% of these letters of credit were denominated in USD. In addition, the deposits of a Sudanese Government Bank at BNP Paribas Geneva represented about 50% of Sudan's foreign currency assets during this time period.

1376.  For example, soon after the imposition of U.S. sanctions against Sudan in 1997, BNP Paribas Geneva established account relationships with a network of nine unaffiliated regional banks located in Africa, Europe and the Middle East, some with no other business purpose than to clear payments for Sudanese clients. The accounts with the Regional Banks were created and established to provide a means to circumvent U.S. sanctions.

1377.  Specifically, BNP utilized the Regional Banks in a two-step process designed to enable BNP's Sudanese clients to evade U.S. sanctions. In the first step, a Sudanese bank seeking to move USD out of Sudan transferred funds internally within BNP Paribas Geneva to an account specifically maintained by a Regional Bank to facilitate USD transfers from Sudan. In the second step, the Regional Bank transferred the money to the Sudanese bank's intended beneficiary through a U.S. bank without reference to the Sudanese bank. As a result, it appeared to the U.S. bank the transaction was coming from the Regional Bank rather than a Sudanese bank.

1378.  In order to further disguise the true nature of the Regional Bank transactions, employees at BNP Paribas Geneva frequently worked with the Regional Banks to wait between one and two days after the internal transfer before making a dollar-for-dollar, transaction-by-

transaction, clearing of funds through the United States, artificially delinking the U.S. transfer of funds from the prior transfer involving the Regional Banks so that financial institutions in the United States and U.S. authorities would be unable to link the payments to the involved sanctioned party.

1379.  In 2006 and 2007 alone, for example, BNP processed at least approximately $6.4 billion through the United States on behalf of Sudanese sanctioned entities, including approximately $4 billion on behalf of a financial institution owned by the government of Sudan. BNP processed these transactions even though internal emails showed BNP employees expressing concern about the bank's assisting the Sudanese government in light of its role in supporting international terrorism and committing human rights abuses during the same time period. Indeed, in March 2007, a senior compliance officer at BNP wrote to other high-level compliance and legal employees reminding them that certain Sudanese banks with which BNP dealt "play a pivotal part in the support of the Sudanese government which . . . has hosted Osama Bin Laden and refuses the United Nations intervention in Darfur."

1380.  BNP's compliance personnel allowed these transactions to occur because the bank was earning significant money from them. BNP's senior compliance personnel agreed to continue the Sudanese business and rationalized the decision by stating that "the relationship with this body of counterparties is a historical one and the commercial stakes are significant. For these reasons, Compliance does not want to stand in the way."

1381.  BNP also transacted illegal business with Al Shamal Islamic Bank, a Sudanese bank that received at least $50 million in funding from Osama bin Laden in the 1990 time period. Al Shamal knowingly and intentionally provided financial services to al Qaeda, including maintaining and servicing al Qaeda bank accounts, including accounts for Osama bin Laden.

1382.  Al Shamal held a correspondent bank account at United European Bank, a subsidiary of BNP. BNP and/or United European Bank continued its facilitation of Al Shamal transactions even after public reporting of its ties to al Qaeda following the 1998 East African Embassy Attacks.

1383.  BNP used a number of methods, in addition to the two-step approach described above regarding Sudan, to conceal these illegal transactions from other financial institutions and law enforcement.

1384.  BNP internally published manuals instructing employees to cover payment messages being sent through the BNP Paribas New York headquarters to reflect only "the receiving institution (and not the Iranian beneficiary institution!)" As a result, this caused the BNP Paribas New York headquarters to be incapable of maintaining proper records of USD transactions cleared through that institution, and these transactions to go unnoticed by United States regulators.

1385.  From as early as 1995 through at least 2007, BNP circulated memoranda among its operations staff with the blanket directive for USD transactions involving Iran: "[d]o not stipulate in any case the name of the Iranian entities on messages transmitted to American banks or to foreign banks installed in the U.S."

1386.  BNP staff in the New York headquarters knew they were operating without adequate legal and compliance authority to ensure activities conducted by BNP outside of the United States, but directed at the United States, complied with New York and United States sanctions law in dealing with prohibited countries, such as Iran.

1387.  For example, in 2006, when questioning whether BNP practices with respect to whether an internal group at BNP dealing with energy and commodities exports ran the risk of

circumventing United States sanction law, an employee described "a practice exists which consists in [sic] omitting the Beneficiaries/Ordering party's contact information for USD transactions regarding clients from countries that are under U.S. embargo: Sudan, Cuba, Iran. This avoids putting BNP NY in a position to uncover these transactions, to block them, and to submit reports to the regulators."

1388.   The highest levels of compliance authorities at BNP Paribas New York were aware of and accepted the widespread practice of amending, omitting or stripping information from USD payment transactions for the benefit of sanctioned countries, such as Iran.

1389.   BNP Geneva also intentionally implemented a "solution" to the problems presented by United States sanction law by using other, non-BNP financial institutions located in the United States to conduct its knowingly improper USD transactions on behalf of sanctioned countries, such as Iran.

1390.   Another scheme BNP used to evade sanctions and deceive regulators was to shift its illicit USD transactions from its New York Branch to another unaffiliated U.S. bank—once BNP began to come under regulatory pressure for unsatisfactory compliance procedures. BNP engaged in this strategy after authorities identified bank-wide failures in BNP's AML requirements.

1391.   Based on this illegal conduct, BNP pled guilty in the United States District Court for the Southern District of New York to one count of Conspiracy to Violate the IEEPA (50 U.S.C. § 1702, 1705) and the Trading with the Enemy Act (50 U.S.C. §§ 3, 5, 16).[228]

1392.   BNP also entered into a Consent Order with the DFS based on its illegal banking activities with sanctioned Countries, including Iran. In particular, BNP pled guilty to one count

---

[228] Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby adopt and incorporate by reference the Guilty Plea entered into by BNP Paribas on or about July 10, 2014, as if fully set forth herein.

of falsifying business records in the first degree (New York Penal Law § 175.10) and one count of conspiracy.[229]

1393.   Further, BNP entered into a Settlement Agreement with OFAC for violations of a number of federal banking laws, including the breach of 31 C.F.R. § 560.204, prohibiting the exportation or re-exportation of services from the United States to Iran.[230]

1394.   As a result of the above transgressions targeting the United States financial system for the benefit of Iranian entities, BNP pled guilty to and voluntarily entered into multi-faceted, agreements with both the DOJ, the United States Department of the Treasury and the State of New York that required forfeiture of significant assets, extensive reshaping of their internal compliance departments and wide-ranging monitoring by United States law enforcement.

1395.   As required by its guilty plea in the United States District Court for the Southern District of New York, BNP agreed to:

    a)      Forfeit $8,833,600,000 to the United States;

    b)      The entry to a money judgment against it in that amount;

    c)      Be subject to judicial process in the United States for determining the locations of such funds, if not paid;

    d)      Be subject to the continuing jurisdiction of the United States to enforce the terms of its guilty plea and forfeiture;

    e)      Be subject to a term of probation supervised by the United States for a term of five years, including:

            i.      the standard terms of probation for all criminals convicted in the

---

[229] Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby adopt and incorporate by reference the Settlement Agreement entered into between BNP Paribas and the U.S. Department of Treasury on or about June 30, 2014, as if fully set forth herein.

[230] Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby adopt and incorporate by reference the Consent Order entered into between BNP Paribas and the New York Department of Financial Services on or about June 30, 2014, as if fully set forth herein.

United States, and;

    ii.    compliance with all terms of the agreement entered into by BNP with the State of New York.

1396.    As a result of the guilty plea entered into with the State of New York, BNP agreed to:

    a)    Pay over three billion dollars of the amount agreed to be forfeited by its agreement with the United States to the State of New York in the form of reparations and restitution; and

    b)    Suspend its USD clearing services through its New York headquarters starting January 1, 2015 for a period of one year.

1397.    As a result of the guilty plea entered into with the State of New York, BNP agreed to:

    a)    Pay over three billion dollars of the amount agreed to be forfeited by its agreement with the United States to the State of New York in the form of reparations and restitution;

    b)    Suspend its USD clearing services through its New York headquarters starting January 1, 2015 for a period of one year;

    c)    Prohibit, for a period of twenty-four months, USD clearing unaffiliated third party banks in New York and London;

    d)    Not to take any action to avoid or circumvent these suspensions;

    e)    Extend for an additional two years the tenure of a previously agreed to Independent Consultant (through a prior agreement with the state of New York) who is on-site at the BNP Paribas New York headquarters to review BNP compliance with United States regulations affecting transactions with sanctioned countries, such as Iran. The Independent Consultant will also:

        i.    Oversee BNP's remediation efforts to streamline USD transactions process through the BNP Paribas New York headquarters; and

        ii.    Monitor compliance with the previously referenced suspension of USD activities.

    f)    Terminate 13 executives with responsibility for conducting or tacitly

condoning the failure of BNP to comply with United States law regarding transactions with sanctioned entities, such as Iran;

g) Discipline an additional 32 employees who were also responsible for circumventing United States sanction law, with such discipline including cuts in compensation, remedial training and warnings;

h) Not hire, retain or indirectly retain any of the terminated employees; and

i) To be prosecuted to the full extent of United States law in the event it breached the agreement with the State of New York.

1398. As a result of the Settlement Agreement entered into between BNP and OFAC, BNP agreed:

a) Provide all reports generated as a result of its other settlement with governmental entities to the United States Department of the Treasury; and

b) Pay up to $963,619,900 to the United States in the event lesser amounts were assessed by other governmental entities as a result of BNP's improper conduct.

## 16. DEFENDANT DEUTSCHE BANK AG'S AND DEUTSCHE BANK AG, NEW YORK BRANCH'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

1399. In furtherance of Deutsche Bank AG's and Deutsche Bank AG, New York Branch's ("DB's") illegal conduct described in this Complaint, which conduct was a cause of the Plaintiffs' injuries, damages, and losses, DB used its United States' branches/offices and various correspondent banks in New York to execute USD-denominated transactions requested by its customers, and specifically its customers in Iran.

1400. During times relevant to the claims alleged herein, and as part of its business in the United States, DB utilized its United States' offices/branches and correspondent banks to transfer money to certain charitable organizations that were actually Iranian Agents and/or Proxies, money which DB knew was being used to fund the terrorist attacks that killed and injured the Plaintiffs.

282

1401.   In 2015, DB was fined $258 million for violating OFAC regulations and U.S. sanctions by providing billions of dollars to Iran and other sanctioned entities.

1402.   From at least 1999 through 2006, DB used non-transparent methods and practices to conduct more than 27,200 USD clearing transactions valued at over $10.86 billion on behalf of entities subject to U.S. economic sanctions, including Iranian sanctioned entities.

1403.   "Starting at least in 1999, [DB] employees recognized that U.S. sanctions rules, which applied at that time or over the course of subsequent years to Iranian, Syrian, Libyan, Burmese, or Sudanese customers or to customers who were listed on OFAC's SDN list, would pose problems for USD payments sent to or cleared through the U.S., including clearing done through Deutsche Bank New York. Payments involving sanctioned entities were subject to additional scrutiny and might be delayed, rejected, or frozen in the United States. In order to facilitate what it saw as "lucrative" USD business for sanctioned customers, Bank employees developed and employed several processes to handle dollar payments in nontransparent ways that circumvented the controls designed to detect potentially-problematic payments."[231]

1404.   DB intentionally processed these illegal transactions in such a manner as to avoid detection by United States regulators and law enforcement. In particular, DB removed identifying information about Iran and Iranian entities from the SWIFT payment messages, used non-transparent cover payment methods that were stripped of important identifying information about the underlying party, and instructed Iranian clients to include notes or code words in requested payment transactions that would trigger "special processing" by DB employees to ensure DB employees would hide identifying information to avoid having the payment requests picked up by DB New York personnel and OFAC filter software.

---

[231] New York State Department of Financial Services, *In re Deutsche Bank AG, Deutsche Bank AG New York Branch Consent Order Under New York Banking Law §§ 39 and 44*, http://www.dfs.ny.gov/about/ea/ea151103.pdf (last visited Oct. 15, 2017).

1405.  As a result of this conduct, DB failed to maintain adequate and correct financial records of USD payment transactions and the omitted and modified payment requests set forth above likewise prevented DB New York from maintaining adequate and complete financial records as required by New York and United States law.

1406.  One method that DB employed was wire stripping, or alteration of the information included on the payment message. Bank staff in overseas offices handling Message Type 103 serial payment messages, or MT 103s, removed information indicating a connection to a sanctioned entity before the payment was passed along to the correspondent bank in the U.S. With any potentially problematic information removed (or, as was done in some cases, replaced with innocuous information, such as showing the bank itself as the originator), the payment message did not raise red flags in any filtering systems or trigger any additional scrutiny or blocking that otherwise would have occurred if the true details were included.

1407.  A second method was the use of non-transparent cover payments. The cover payment method involved splitting an incoming MT 103 message into two message streams: an MT 103, which included all details, sent directly to the beneficiary's bank, and a second message, an MT202, which did not include details about the underlying parties to the transaction, sent to DB New York or another correspondent clearing bank in the U.S. In this way, no details that would have suggested a sanctions connection and triggered additional delay, blocking, or freezing of the transactions were included in the payment message sent to the U.S. bank.

1408.  DB employees recognized these handling processes were necessary in order to evade the sanctions-related protections and controls of DB New York and other correspondents. For example, a relationship manager who handled significant business for Iranian customers explained the need for special measures as follows, in a 2003 email to colleagues: DB employs

"specific precautionary measures that require a great deal of expertise" because "[i]f we make a mistake, the amounts to be paid could be frozen in the USA and/or DB's business interests in the USA could be damaged." Or, as the Assistant Vice President who oversaw payments processing explained to a colleague who inquired about Iranian payments, DB needed to employ "the tricks and cunning of MT103 and MT202" because of the U.S. sanctions restrictions otherwise applicable to sanctions-related payments.

1409.   Therefore, as explained in another email summing up the process for handling Iran-related payments, DB's preferred method was to process a payment using the cover payment method, and when that was not possible, "we will arrange for the order to be dropped . . . into a further repair queue, where the references to the principal will then be eliminated."

1410.   As new sanctioned customers were brought into the fold, or as newly-enacted U.S. sanctions programs affected existing customers, these processes were extended so as to ensure that payments did not encounter U.S.-based sanctions problems. For example, when DB staff learned that possible new U.S. sanctions might affect certain Syrian customers, they discussed how Syrian payment orders "must be 'anonymised' in the same way as orders from Iran or Libya, i.e. coverage without mention of Syria can be directed via USA and the order is made directly to the beneficiary's bank."

1411.   On some occasions, payments that were rejected by DB New York due to a suspected sanctions connection were simply resubmitted to a different U.S. correspondent by the overseas office. Alternatively, some payments that were rejected in the U.S. when they were sent as MT 103 serial payments (which included details about the underlying parties) were then resubmitted as MT 202 cover payments – in other words, because the information included on the more detailed message caused the rejection, the overseas office simply sent the payment

again using the less transparent method.

1412.   The special processing DB used to handle sanctioned payments was anything but business as usual; it required manual intervention to identify and process the payments that needed "repair" so as to avoid triggering any sanctions-related suspicions in the U.S. Indeed, on occasion, customers whose payments received this special processing questioned the extra fees the bank was charging for the manual processing. They were told that this is what was necessary in order to circumvent the U.S.-based sanctions controls.

1413.   DB instituted a series of policies starting in 2006 to end these practices and wind down business with U.S.-sanctioned entities. However, some instances of resubmitting rejected payments or processing sanctions-related payments through New York persisted even after the formal policies were instituted.

1414.   DB relationship managers and other employees worked with DB's sanctioned customers in the process of concealing the details about their payments from U.S. correspondents.

1415.   During site visits, in emails, and during phone calls, clients were instructed to include special notes or code words in their payment messages that would trigger special handling by the bank before the payment was sent to the United States. Sanctioned customers were told "it is essential for you to continue to include [the note] 'Do not mention our bank's name…' in MT103 payments that may involve the USA. [That note] ensures that the payments are reviewed prior to sending. Otherwise it is possible that the [payment] instruction would be sent immediately to the USA with your full details. . . . [This process] is a direct result of the US sanctions." Customers, in turn, included notes in free-text fields of SWIFT messages such as "Please do not mention our bank's name or SWIFT code in any msg sent via USA," "PLS

DON'T MENTION THE NAME OF BANK SADERAT IRAN OR IRAN IN USA," or "THE NAME BANK MELLI OR MARKAZI SHOULD NOT BE MENTIONED . . . IMPORTANT: NO IRANIAN NAMES TO BE MENTIONED WHEN MAKING PAYMENT TO NEW YORK."

1416.  But DB did not rely on the customer notes and code words alone; DB's payments processing staff were instructed to be on the lookout for any payment involving a sanctioned entity and ensure that no name or other information that might arouse sanctions-related suspicions was sent to the U.S. correspondents, even if the customer failed to include a special note to that effect.

1417.  In fact, DB's "OFAC-safe" handling processes and its experience in handling sanctions-related payments were selling points when soliciting new business from customers subject to U.S. sanctions. On one occasion, a relationship manager visiting a Syrian bank during a time when the U.S. was considering instituting certain Syrian sanctions pitched DB's "OFAC-safe vehicles," and when the client mentioned possibly splitting its business among several Asia-based banks, the relationship manager "highlighted that the Asian banks in general are not very familiar with OFAC procedures [and] [a]sked them to consider who their friends will be in the longer run, DB or Asian banks." In another instance, after DB staff responded to a client inquiry about handling USD payments relating to Iran and Syria with a favorable "OFAC safe" solution, the Bank relationship manager reported the client was so pleased that it "used the opportunity to enquire whether we can also do USD payments into Burma/Myanmar."

1418.  The practice of non-transparent payment processing was not isolated or limited to a specific relationship manager or small group of staff. Rather, DB employees in many overseas offices, in different business divisions, and with various levels of seniority were actively

involved or knew about it.

1419.   In addition, some evidence indicates that at least one member of DB's Management Board was kept apprised about and approved of DB's business dealings with customers who were subject to U.S. sanctions.

1420.   Certain non-U.S. employees, especially those who managed relationships with a high number of Iranian, Libyan, or Syrian clients or who regularly processed USD payments for sanctioned customers, were considered experts in the bank's "OFAC-safe" handling procedures. They regularly educated colleagues in other branches or in other divisions outside the U.S. about handling USD payments.

1421.   Moreover, DB disseminated formal and informal written instructions emphasizing the need for utmost care to ensure that no sanctions-related information was included in U.S.-bound payment messages and setting out the various methods to use when processing sanctions-related payments.

1422.   For example, DB staff told investigators that, at various times, an internal customer database included notes for certain sanctioned customers indicating their name must not be referenced in payment messages sent to the U.S.

1423.   Later, DB payments processing employees prepared a training manual for newly-hired payments staff in an overseas office. The manual included a section titled "US Embargo Payments" that explained how to handle payments with a sanctions connection. An early draft included a warning, in bolded text: "Special attention has to be given to orders in which countries/institutes with embargos are involved. Banks under embargo of the US (e.g., Iranian banks) must not be displayed in any order to [Deutsche Bank New York] or any other bank with American origin as the danger exists that the amount will be frozen in the USA."

1424.   A revised version of the payments manual admonished that payments from Iran and Syria "have to be treated with caution as [ ] the payment gets released from the queue; there is a probability the funds will be frozen by the Federal Reserve thereby causing financial and reputation loss for the Bank." A later version of the manual noted the payment message might include key words such as "Embargo" or "Do not pay via US," but it also cautioned employees that code words might not necessarily be present. In any event, non-U.S. employees were instructed that information linking a customer to a U.S. sanctions program must not be displayed in any message sent to DB New York or any other American bank. The preference, they were told, was to send two messages (that is, to use the cover payment method), but if that was not possible, they must reformat the message so that it gets routed for additional repair and reformatting "in such a way that the Embargo names are not visible to the receiving US banks." The manual included computer screenshots illustrating how these problematic messages might appear and how to handle them.

1425.   Moreover, less formal instructions were disseminated to certain staff via email. In one email chain regarding possible recruitment of a new customer with Libyan connections, DB staff were cautioned to "please be careful in regard to the US, since it does violate OFAC," and were told, "please do not mention OFAC names in the subject line of e-mails!" In another instance, when certain U.S. regulations against a Syrian bank were imposed in 2004, relevant employees were told: "Let us be very careful while effecting USD-denominated transaction[s] with Syria. In case we have to effect any USD-denominated remittance to Syria, please ensure that name of Syria should not appear in the message."

1426.   At the same time, DB staff took care to avoid publicizing details about their non-transparent payments handling, both within and outside the bank. Employees recognized the

289

legal and reputational concerns and acted to keep the payment handling methods—and indeed the fact of the bank's business dealings with sanctioned entities in general—on a need-to-know basis.

1427.   For example, one non-U.S. relationship manager who asked for advice about USD processing was told, "Please be informed that any info on OFAC-safe business patterns (THAT DB does it and HOW DB does it) is strictly confidential information. Compliance does not want us to distribute such info to third parties, and forbids us explicitly to do so in any written or electronic form." In another email, a senior compliance executive with oversight of this area told a non-U.S. relationship manager who was asking about the possibility of doing business with a Syrian customer that Compliance "agreed to do business on a low key level without public announcements etc." Later, when that relationship manager was offering advice to another non-U.S. colleague about assisting a client who needed to make and receive USD payments with Iranian and Syrian connections, he cautioned his colleague: "As usual, let's not revert to the client in writing due to the reputational risk involved if the e-mail goes to wrong places. Someone should call [the client] and tell them orally and ensure that the conversation is not taped. . . . Let's also keep this e-mail strictly on a 'need-know' basis, no need to spread the news in [Deutsche Bank's Asian offices about] what we do under OFAC scenarios."

1428.   Around the same time, that same relationship manager told another non-U.S. colleague: "Please note that while DB is prepared to do business with Syria, we obviously have sizeable business interests in the US, too, which DB wants to protect. So any Syrian transaction should be treated STRICTLY confidential and should involve any colleagues on a 'Must-Know' basis only! . . . [W]e do not want to create any publicity or other 'noise' in the markets or media."

1429.   In addition, while one of the main purposes of the nontransparent practices was to keep the DB's U.S. staff in the dark about the sanctions connections of the payments they were processing, DB New York staff occasionally raised objections to the Bank's business relationship with U.S.-sanctioned parties based on U.S. law. Their European colleagues, however, did nothing to stop the practice but instead redoubled their efforts to hide the details from their American colleagues. For example, a relationship manager who did significant business with Iranian customers complained to his boss that colleagues in the Middle East "participated in a major conference call with senior management of [DB New York] and provided an overview of DB's account activities with Syria outside the U.S. Senior management of [DB New York] complained strongly to DB Frankfurt that they see this as a breach of law." The relationship manager viewed this incident not as a prompt to reexamine the bank's business, however, but rather as indicating a need to better train the non-U.S. staff who handle the "very lucrative" Syrian and Iranian business to ensure such disclosures do not occur in the future.

1430.   Based on the conduct described above, DB entered into Consent Orders with both the DFS and with the Board of Governors of the United States Federal Reserve System based on DB's violation of New York and United States' law. In conjunction with reaching these consent orders, DB and DB New York agreed the facts alleged in the above paragraphs are true and correct.[232]

1431.   Based on this and other illegal conduct on behalf of Iran aimed at the United States financial system, DB chose to enter into a sweeping consent order with the DFS for failing to maintain accurate books, accounts, and records in violation of New York Banking Law §§ 104, 200-c and 3 N.Y.C.R.R. 3.1 and failing to notify the State of New York or United States

---

[232] Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby adopt and incorporate by reference the Consent Orders entered into between DB and the New York Department of Financial Services on or about November 3, 2015, as if fully set forth herein.

regulators upon the discovery of fraudulent conduct in violation of 3 N.Y.C.R.R. 300.1.

1432. In the Consent Order, DB agreed to:

a) Pay a $200,000,000 civil penalty to the State of New York;

b) Implement an independent monitor, at its own expense but chosen by the State of New York, and who will report directly to the State of New York, whose job it will be to fully assess the (1) elements of DB's corporate governance system that contributed in any way to the improper conduct, (2) the thoroughness of DB's existing OFAC compliance mechanisms, (3) the organizational structure of the portion of DB's operations that deal with OFAC compliance, and (4) adequacy of any remedial efforts undertaken by DB;

c) Fully cooperate with all state and federal regulators and the chosen independent monitor in their investigations into DB's money laundering on behalf of sanctioned entities, including Iran and Iranian entities;

d) Develop an action Plan to address shortcomings identified by the independent monitor and submit this action plan to the State of New York;

e) Allow the independent monitor to oversee the implementation of any corrective measures noted by the action Plan;

f) Allow the independent monitor to assess compliance with the corrective measures noted in the action Plan and agree that all findings of the independent monitor in this regard will be submitted to the State of New York;

g) Fire, and not rehire, a number of employees who were directly involved in the illegal USD transactions on behalf of Iran and Iranian entities; and

h) That DB remains subject to prosecution by the State of New York should DB materially breach the terms of this Consent Order.

1433. Based upon the conduct described herein, the United Stated Federal Reserve also investigated DB's conduct with respect to violations of the Trading with the Enemy Act (50 U.S.C. §§ 5, 16) and the IEEPA (50 U.S.C. §§ 1701-06) and found sufficient grounds to compel DB to enter into the Cease and Desist Order. [233]

1434. Based on the conduct described herein, DB also agreed to the following terms

---

[233] Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby adopt and incorporate by reference the Consent Orders entered into between DB and the United States Federal Reserve System on or about November 4, 2015, as if fully set forth herein.

with the United Stated Federal Reserve:

    a)  Pay a $58 million penalty to the Federal Reserve; and

        i.    Implement a timetable for full compliance with OFAC regulations;

    b)  Submit a proposed program, subject to approval by the Reserve, designed to:

        i.    Provide an annual assessment to the Reserve of OFAC compliance risks posed by DB's customer base;

        ii.    Global policies and procedures for DB and all its subsidiaries regarding OFAC compliance;

        iii.    The establishment of a uniform OFAC compliance system that is widely publicized throughout the organization;

        iv.    Ensure that DB's OFAC compliance measures are adequately staffed and funded;

        v.    Training for DB employees that have responsibilities for OFAC compliance that is tailored to their particular job level;

        vi.    Establish an audit program designed to test for OFAC compliance; and

        vii.    Establish an annual OFAC compliance review that will be conducted by a third party as approved by the Reserve and that will be submitted to the Reserve within 90 days of completion.

1435.   The services provided by DB to Iran and its Agents and Proxies consist of the provision of USD funds, expert advice, and/or financial services described above.

## 17.   DEFENDANT CREDIT AGRICOLE S.A., CREDIT AGRICOLE CORPORATE & INVESTMENT BANK, AND CREDIT AGRICOLE CORPORATE & INVESTMENT BANK, NEW YORK BRANCH'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

1436.   Credit Agricole S.A. ("CASA") and Credit Agricole Corporate & Investment Bank New York Branch ("CACIB") agreed to provided Iran, Iranian entities, Iranian SDNs, and others with billions of USD, money that those entities used to finance terrorist activities, including those that injured or killed Plaintiffs. They agreed to provide USD in violation of U.S. law and sanctions put in place to prevent Iranian entities from financing terrorist activities,

293

including those that injured or killed Plaintiffs. They participated by illegally providing billions of USD over a number of years, which ultimately supported the Terrorist Groups involved in the terrorist acts that injured or killed Plaintiffs. That participation earned CACIB and CASA a significant amount of profits. Further, CACIB and CASA engaged in these transactions fully aware the reason for the U.S. laws and sanctions they violated was to inhibit Iran's ability to fund terrorism using USD.

1437.   From at least August 2003 to September 2008, CACIB had a continuous, ongoing relationship with Iran and its Agents and Proxies. CACIB's relationship with, and its illegal processing of USD transactions on behalf of, Iranian entities stretches back even further. In addition to Iranian entities, CACIB during this period processed more than 4,000 transactions on behalf of 11 Sudanese banks, six of which were SDNs.

1438.   During its review of $32 billion of transactions during this time frame, the DFS found that more than 4,000 of those transactions, valued at approximately $442 million, were illegal under various U.S. sanction programs. The DFS also specifically found, from the sample it reviewed, the bank processed 280 transactions totaling approximately $50 million involving SDNs. The DFS also found that about 90% of the bank's illegal transactions (which accounted for approximately 80% of the total value of the illegal transactions) were processed by the bank's Geneva subsidiary.

1439.   During this time, CACIB and its subsidiaries (including CASA), predecessors and affiliates, systematically and repeatedly violated U.S. and New York law by sending prohibited USD payment transactions though its branch in New York on behalf of Iran and Iranian entities. To accomplish this goal, CACIB and its subsidiaries and predecessors designed these payments to hide the fact payments were requested by Iran or Iranian entities to avoid detection by both

United States banking personnel and United States and New York regulators and law enforcement.

1440.   From at least 2003 to 2008, CACIB used a series of schemes to process more than $32 billion in U.S. dollar payments through its New York Branch from its branches in Paris, London, Singapore, Geneva, Hong Kong and the Gulf, providing U.S. dollar clearing services on behalf of Sudanese, Iranian, Burmese and Cuban entities, including SDNs. From at least August 1, 2003 to September 1, 2008, CACIB transferred at least $312,000,000 in transactions on behalf of Iranian entities and other sanctioned persons in violation of U.S. sanctions.

1441.   Specifically, CACIB and its subsidiaries and predecessors (1) sent USD payment transactions through the United States on behalf of Iran and Iranian entities without reference to the payment requestor's origin, (2) eliminated payment data from USD transactions that would have revealed the involvement of Iran or Iranian entities, and (3) used alternative USD payment methods to mask the involvement of Iran and Iranian entities.

1442.   CACIB engaged in billions of dollars of transactions involving Iran while it was the bank's policy to not disclose the Iranian connection of these transactions to authorities in the United States, as detailed further below. Internal procedures at CACIB, found by the DFS investigation, stated that CACIB had been "dealing with these [Iranian] counterparts for over 14 years" and, like "all our competitors in this market," were stripping wire information from USD transactions sent through the United States "in order to prevent funds being seized by the US authorities." CACIB policy during this time instructed those within CACIB to send payment messages to the United States "**WITH NO MENTION OF IRAN**." An internal CACIB memorandum cautioned staff in 2005 that "no mention of Iran is made" in the payment messages transiting through the United States and that "we have been routing USD payments in the

manner specified below in order to prevent funds being seized by the U.S. authorities."

1443. At least by 2002, CLS, a predecessor to CACIB, was routing payment messages through a bank branch in New York that omitted references to Iranian parties and instead referred the ordering party as "one of our customers." In 2004, a CLS senior back office manages disseminated a policy that required the ordering party be reflected on payment messages, except when a risk of embargo was possible, in which case the bank stripped the client information from the messages and often replaced it with ambiguous phrases such as "one of our clients" or "our good customer." Other CACIB entities employed the same tactic during the same timeframe.

1444. Specifically, the bank instructed employees to "send a separate MT 202 (bank to bank transfer) to our NY correspondent instructing the transfer of USD xxx to the NY correspondent of the receiver of the MT 103. No mention on this message of payment to any Iranian counterpart or beneficiary. This, the message containing the 'Iranian details,' is not sent to the U.S." Thus, CACIB would generally process outgoing USD payments on behalf of its Iranian clients by generating an MT 103 payment message destined for the non-U.S. beneficiary with complete information related to the transaction's parties as well as an MT 202 cover payment destined for the intermediary U.S. financial institution that did not include the names of any Iranian entities. CACIB's New York branch knew, or was deliberately and/or recklessly indifferent to these facts.

1445. The various bank departments were aware of "this special treatment." As the DFS found, "it was the policy of the Bank, as directed by its compliance professionals, to intentionally omit Sudanese, Iranian, Burmese or Cuban information from U.S. dollar denominated payment messages." The bank engaged in this conduct even though it knew it was illegal, as explained by a 2005 internal memorandum: "Iran is subject to an embargo from OFAC [] of the U.S. Treasury

Department. This embargo is applicable directly to all 'US persons' and indirectly to all transactions denominated in USD even when performed out of the United States."

1446.  Through this conduct, CACIB and its subsidiaries and predecessors (1) prevented detection by United States and New York regulators and law enforcement, (2) prevented United States and New York financial institutions from filing reports required by the United States government and State of New York, (3) caused false information to be recorded in the records of United States and New York financial institutions, (4) caused United States and New York financial institutions to not make records that should have been made as required by United States and New York law, and (5) caused false entries to be made in the business records of financial institutions located in the United States and the State of New York.

1447.  Based on this conduct, CACIB was charged by the DOJ with violating the Trading with the Enemies Act (18 U.S.C. § 371) by conspiring to commit violations of regulations prohibiting the export of services to Iran and Iranian entities from the United States.

1448.  CACIB, through Crédit Agricole (Suisse) SA ("CAS") and its predecessor entities, intentionally used non-transparent methods for payment messages, as described above, to conceal the involvement of sanctioned entities and SDNs in USD transactions processed in the United States. CACIB, through CAS and its predecessor entities, engaged in those acts with the specific intent to evade U.S. sanctions. The Conspiracy was successful, in part, because the massive number of lawful USD payments that CACIB processed made it easier for the unlawful payments to go unnoticed.

1449.  CACIB was also charged by the State of New York with violations of New York State Penal law 175.05, 3 N.R.C.R.R. § 3.1 for falsifying business records, and failing to maintain accurate books, accounts and records as required by New York Banking Law§ 200-c.

1450.   CACIB also entered into a settlement agreement with the United States Department of the Treasury, relying on the same factual predicate of consistent and widespread abuse of the United States financial system on behalf of Iranian entities that served as the basis for the DOJ and the DFS actions taken. While CACIB, and its predecessors, engaged in billions of dollars of transactions with Iranian entities over many years, OFAC specifically identified sixteen electronic funds transfers in the aggregate amount of $397,453 from October 2003 to December 2006 to or through financial institutions located in the United States in apparent violation of the prohibition against the exportation or re-exportation of services from the United States to Iran, 31 C.F.R. § 560.204.

1451.   CACIB entered into a DPA with the DOJ and OFAC in 2015, agreeing to hundreds of millions of dollars in fines for violating U.S. sanctions, including sanctions on Iran.[234]

1452.   In resolution of these charges, CACIB admitted to certain facts which are examples of the extent to which CACIB and its subsidiaries, predecessors, and affiliates conducted illegal transactions utilizing the United States financial system.

1453.   For example, from at least in or around August 2003 up through and including September 2008, CACIB, through its subsidiary in Switzerland, CAS, and its predecessor entities, Crédit Agricole Indosuez (Suisse) SA ("CAIS") and CLS, violated U.S. laws by sending prohibited payments through the U.S. financial system on behalf of entities subject to U.S. economic sanctions. In an effort to evade detection by U.S. bank personnel as well as U.S. authorities, CAS and its predecessor entities knowingly, intentionally, and willfully concealed

---

[234] Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby adopt and incorporate by reference: 1) the DPA entered into by CACIB and DOJ on or about October 20, 2015; 2) the Consent Order entered by NYDFS on or about October 15, 2015; and 3) the Settlement Agreement entered into by CACIB and the United States Treasury Dept. on or about October, 19, 2015, as if fully set forth herein.

298

the sanctioned entities' involvement with these transactions. Consequently, U.S. financial institutions processed transactions that otherwise should have been rejected, blocked, or stopped for investigation pursuant to regulations promulgated by OFAC relating to transactions involving sanctioned countries and parties.

1454. The conduct of CAS and its predecessor entities included, among other things, (i) sending payments on behalf of sanctioned customers without reference to the payments' origin; (ii) eliminating payment data that would have revealed the involvement of sanctioned countries with the specific intent to evade U.S. sanctions; and (iii) using alternative payment methods to mask the involvement of sanctioned entities, including the use of two payment messages, for payments involving sanctioned financial institutions that were sent to the United States.

1455. By providing banking services on behalf of sanctioned entities, CAS and its predecessor entities: (i) prevented detection by U.S. regulatory and law enforcement authorities of financial transactions that violated U.S. sanctions; (ii) prevented U.S. financial institutions from filing required reports with the U.S. government; (iii) caused false information to be recorded in the records of U.S. financial institutions; (iv) caused U.S. financial institutions not to make records they otherwise would have been required by U.S. law to make; and (v) caused false entries to be made in the business records of financial institutions located in the United States. These payment methods deceived U.S. financial institutions and created the false appearance the transactions had no connection to sanctioned entities.

1456. During times relevant to the claims alleged herein, CACIB typically executed and processed international U.S. dollar denominated wire payments on behalf of clients in two ways. The first method, known as a "serial payment," was to send a single message, commonly referred to as an MT 103, to each financial institution in the transmission chain, identifying the originator

and beneficiary of the USD denominated payment. The second method, known as a "cover payment" involved sending two SWIFT messages in connection with a single payment. In the cover payment method, one message—typically an MT 103—identifying the originating customer and beneficiary of the payment, was sent directly from the customer's bank (i.e., Foreign Bank A) to the ultimate beneficiary's bank (i.e., Foreign Bank B) while a second message—typically an MT 202—identifying only the originating bank (but not the customer or the beneficiary) accompanied the funds as they transferred through the United States. During times relevant to the claims alleged herein, cover payment messages typically did not require the sending bank to identify the party originating a payment or its ultimate beneficiary, whereas serial payment messages did.

1457.  Financial institutions in the United States that process U.S. dollar transactions from overseas, including CACIB's branch in New York ("CACIB NY"), are expected to screen financial transactions, including international wire payments effected through the use of SWIFT messages, to ensure such transactions do not violate U.S. sanctions. Because of the vast volume of wire payments processed by financial institutions in the United States, most institutions employ sophisticated computer software, commonly referred to as filters, to automatically screen all wire payment messages against a list of sanctioned entities. When the filters detect a possible match to a sanctioned entity, the payment is stopped and held for further manual review. When a financial institution detects a transaction that violates sanctions, the institution must "reject" the payment—that is, refuse to process or execute the payment and notify OFAC of the attempted transaction. If a party to the payment is an SDN, then the payment must be frozen or "blocked" and the bank must notify OFAC. The sending bank must then demonstrate to OFAC the payment does not violate sanctions before the funds can be released and the payment processed.

1458.   During times relevant to the claims alleged herein CACIB NY utilized an automated OFAC filter that screened all incoming MT 103 and MT 202 payment messages, including all USD denominated payment messages sent by CAS and other CACIB branches, to identify both SDNs and companies owned or controlled by SDNs, or persons located in targeted countries. CLS, CAIS, and CAS, for the duration of the times relevant to the claims alleged herein, failed to conduct comprehensive filtering akin to the type of filtering conducted by CACIB NY. After September 11, 2001, in accordance with Swiss regulations, CLS and CAIS added terrorists designated by OFAC—a subset of the SDN List—to their filters. However, CAS did not actually filter against the complete SDN List until after September 2005. And it was not until 2008 that CAS began filtering transactions to identify, in a comprehensive fashion, entities involved in transactions that were owned by, controlled by, or located in targeted countries, including Iran.

1459.   The practice of omitting or removing sanctions-identifying information in outbound USD payment messages was spread to multiple business lines throughout the bank and was noted in a February 2, 2004 notice written by a CAIS Back Office Analyst:

> Various payments of ours were stopped by the U.S. banks, because within the text body of our instructions (MTI 03 or 202), certain words such as Iraq, Iran, etc. were used, words which appear on the U.S. Banks [sic] automatic block list. Consequently, be vigilant and do not put too much detailed information in your payments, thus avoiding costly back values.

1460.   CAIS (and subsequently CAS) continued to receive numerous indications that its interpretation of U.S. sanctions laws was incorrect. For example, CACIB's New York branch blocked or rejected a number of transactions originated by CAS for processing and provided CAS with additional information regarding U.S. sanctions, informed the Head Office of such issues and suggested additional sanctions-related training. Later, on December 1, 2005, a Compliance employee from CACIB's Head Office in Paris distributed a memorandum

describing the group's policy with regard to Iran. The memorandum included statements suggesting that CAS's understanding of U.S. sanctions was incorrect, including: "Iran is subject to an embargo from OFAC [] of the U.S. Treasury Department. This embargo is applicable directly to all 'US persons' and indirectly to all transactions denominated in USD even when performed out of the United States." Despite receiving these warnings, CAS did not seek clarification from either its Head Office or its New York branch regarding the applicability of OFAC sanctions to CAS.

1461. With full understanding of the improper nature of its conduct, in September 2005, CACIB London drafted a memorandum entitled Special Treatment of Iranian Related Payments/Operational Risk that directed that "no mention of Iran" should be "made on [the MT 202 cover payment]" to the U.S. correspondent banks. The memo noted the knowledge of "the various departments involved in this process i.e. front, middle and the back-office … of this special treatment as procedures have been implemented to cover this aspect of operational risk." A separate cover memo to the memo stated that this matter had been vetted "through Compliance and Legal to ensure that all aspects are covered. . .. The method for [USD] payments is as follows: no mention of Iran is made on this instruction."

1462. In particular, the memo stated the bank had been "routing USD payments" in a manner that "prevent[ed] funds being seized by the U.S. authorities." Not surprisingly, personnel within the CACIB network viewed this policy as CACIB memorializing a procedure for circumventing U.S. sanctions. For example, in a February 2006 email to a senior compliance officer at CAS, a senior manager within the Monitoring and Investigations Unit ("MOIN") noted "[a]lthough a note has been drawn up by the Group in particular for transactions in USD with Iran as the destination (commercial transactions/oil), the question finally arises of the

302

implementation of a payments system allowing the US embargo rules **to be got around**."
(Emphasis added).

1463.   Furthermore, on March 21, 2007, a Head Office Financial Security employee
wrote in an email to another employee, "…on the express condition the goods are never of
Iranian origin or manufacture-this does not fall within the scope of the note. However, it is
evident that in the event of flows and therefore of SWIFT's references to IRAN in the free fields
must be avoided, so as not to have to provide lengthy justification to the Yankee authorities." On
March 22, 2007, the same employee approved an otherwise permissible U-turn transaction
regarding goods of Iranian origin owned by a Turkish company if there was "No reference to the
country of origin in the SWIFT 10X or 20X messages."

1464.   Compliance staff in the Geneva branch actually developed a presentation detailing
how to conceal USD transactions for Iran and Iranian entities: "Transfer instructions (MT 202)
sent to Bank A's U.S. correspondent **WITH NO MENTION OF IRAN**. . . no reference to Iran
is made regarding this transaction." (Emphasis in bold added).

1465.   Similar instructions were circulated in the head office in Paris: "[w]e send a
separate MT 202 (bank to bank transfer) to our NY correspondent instructing the transfer of
USD xxx to the NY correspondent of the receiver of the MT 103. No mention is made on this
message of payment to an Iranian counterpart or beneficiary. Thus, the message containing the
"Iranian details" is not sent to the US."

1466.   Similarly, in October 2005, an employee at CACIB Dubai—in response to press
reports of RBS's U.S. sanctions violations—referenced the use of cover payments for Iranian
payments, specifically noting the MT 202 message was to be sent "without mentioning the name
of the Iranian Bank, or any related reference to the concerned transaction," and questioned

whether CACIB's practices were lawful. This email was ultimately forwarded to compliance personnel at CACIB NY, who promptly raised the issue with CACIB's compliance department in Paris. In the course of raising concerns, a compliance officer at CACIB NY explained the email raised concerns that "stripping" was occurring within the Bank's network.

1467.   On January 31, 2006, another CACIB NY compliance officer questioned the lack of transparency with cover payments, asking a senior manager responsible for compliance at CACIB Paris whether CACIB policy prohibited bank personnel from noting in MT 202s whether the bank-to-bank payment was related to an underlying customer payment (i.e., an MT 103). The senior manager from CACIB Paris responded, stating that Paris reviewed and approved Iranian-related USD payments and that bank personnel were not precluded from noting that an MT 202 was related to an MT 103. But the senior manager failed to disclose that, for Iranian payments, CACIB Paris had a policy that precluded CACIB from mentioning Iran in messages sent through the United States related to U-turn payments. Accordingly, while CACIB NY Compliance personnel had the broadest knowledge of U.S. sanctions of any personnel within the CASA network, CACIB's, CLS's, CAIS's, and CAS's policies, procedures and/or practices for processing international payments involving sanctioned countries or entities removed CACIB NY compliance personnel, their filter, and their expertise from the review process.

1468.   In 2003, CAIS's Compliance department was divided into two groups: (1) Legal and Compliance, and (2) the MOIN. Both were under the supervision of the Office of the General Secretary. Prior to 2004, Legal and Compliance had responsibility for U.S. sanctions compliance, meaning the business lines and operational units turned to, and relied upon, Legal and Compliance for guidance. In 2004, this responsibility was shifted from Legal and Compliance to MOIN.

1469.  Throughout the time period relevant to the claims alleged herein, certain CAIS and CAS personnel, including personnel within Legal and Compliance and MOIN, knew that U.S. sanctions laws applied to transactions that CAIS and CAS sent through the United States.

1470.  CAS developed policies and procedures to use cover payments (i.e., MT 202 messages) which did not reference any sanctioned entity's involvement in transactions, fully recognizing that this payment method would conceal the fact these transactions concerned sanctioned parties. CAS did not share its policies and procedures for processing international payments with CACIB NY, and CACIB NY lacked access to CAS's systems that contained these policies and procedures.

1471.  As early as 2001, an attorney who was part of CAIS's management team sent an email to a CACIB employee based in Paris, which stated that "to the extent the process used by our establishment via our U.S. correspondent bank ([U.S. Bank 1]), and whereby our establishment erroneously misleads the latter as to the real beneficiary for the transfers…and by the designation of an institutional beneficiary instead and in place of the actual one…whose identity [the U.S. correspondent] is unaware, we could expose ourselves to various sanctions in the USA. To our knowledge, the majority of the Group entities operate in the same manner."

1472.  In 2004, when responsibilities for U.S. sanctions compliance were shifted to MOIN, the group required all transactions concerning countries subject to U.S. sanctions, and sanctions imposed by other jurisdictions, to be forwarded to MOIN for review and authorization.

1473.  As early as June 10, 2004—shortly after this shift—a senior manager within MOIN, after noting in an email that "the reach of the American sanctions is . . . limited" and only applied to the "American territory," acknowledged that a payment involving a sanctioned entity that transited through the United States could potentially be blocked if the U.S. clearer learned of

the existence of the sanctioned entity.

1474. Beginning in April 2005, a senior manager within MOIN commonly acknowledged in emails that U.S. sanctions applied to transactions that were sent through the United States: "OFAC (United States) has taken economic sanctions against Sudan and Iran for transactions which occur on U.S. territory and/or which are made out in Dollars and/or for which U.S. companies and individuals appear . . . and for which individual approval must be obtained from the U.S. authorities." This language demonstrates that certain CAS employees knew that U.S. sanctions applied to transactions that transited through the United States.

1475.  In and around 2006, MOIN's own compliance materials acknowledged the "extra-territorial reach" of U.S. sanctions laws and that these laws cover "all investments and transactions in the United States or that involve a U.S. person anywhere in the world."

1476.  On or about February 2, 2006, the Office of the General Secretary drafted a memorandum that stated, "the simple fact of using a clearing bank in the United States requires complying with [anti-money laundering and OFAC] rules."

1477. Despite this knowledge, MOIN authorized many of the USD transactions forwarded to them, even though they violated U.S. sanctions, often precisely because the payment messages that were going to be sent to the United States would not reference a sanctioned entity's involvement in a transaction. The clear intent of ensuring that payment messages sent to the United States did not reflect information about sanctioned entities is reflected in a series of communications regarding two transactions that were rejected on or about March 29, 2006. After CACIB NY notified a senior manager within the Office of the General Secretary of the rejected payments, the senior manager raised these rejected payments with a senior manager within MOIN and another member of MOIN. Rather than asking how payments

that violated sanctions were sent to the United States, the senior manager within the Office of the General Secretary questioned why MT 103s were sent in connection with the payments and why CAS's systems that were processing payments involving sanctioned entities used this message type (a message type that would clearly reveal the involvement of sanctioned entities). When the senior manager within MOIN reported the back office sent MT 202 messages to CACIB NY containing the ordering party's name and that CACIB NY learned of the Sudanese connection to the transactions through its own due diligence, CAS personnel complained about the heightened due diligence from their U.S. counterparts. No one within CAS took any steps, at that time, to stop all USD MT 202 payments involving sanctioned entities that cleared through the United States.

1478.  Instead, MOIN authorized a number of other transactions involving sanctioned entities to transit through the United States while emphasizing payment messages that would be sent through the United States did not reference Sudan. For example, in March 2006, in an email copying a senior manager within the Office of the General Secretary, MOIN authorized a LC for a Sudanese SDN bank, one of which was not on the SDN List, but was considered an SDN by operation of law. Specifically, the email stated that "at no moment shall information related to the transactions as such (End Beneficiary/Counterparty/End Bank) be transmitted/indicated within the aforementioned messages in accordance with what is acceptable under U.S. regulations." MOIN authorized the transaction despite the fact less than a year earlier CACIB NY rejected a nearly half-million dollar payment involving this Sudanese bank.

1479.  CAS also employed the practice of replacing client information on payment messages with ambiguous phrases such as, "one of our clients" and "our good customer." The practice continued despite the fact CACIB NY had entered into a Commitment Letter in

September 2005 with the Federal Reserve Bank of New York and the DFS (then the New York State Banking Department) in which it committed to enhance its AML and Bank Secrecy Act functions.

1480. In December 2006, the Head Office decided to diversify USD clearing banks and CAS started using a non-affiliated bank based in the United States as its exclusive clearer. After establishing a relationship with a new clearing bank, MOIN persisted in approving transactions involving sanctioned entities, so long as messages that were sent to the United States did not reveal the involvement of the sanctioned entities.

1481. In total, from approximately August 2003 through approximately September 2008, CLS and CAIS, and later CAS, processed at least $312 million in payments in violation of U.S. sanctions laws.

1482. CLS maintained a policy dating back to 2002 to utilize cover payments for outgoing USD Iranian-related transactions. In June 2002, CLS New York sent an inquiry to CLS Paris in relation to an outgoing transaction the latter had originated that referenced the ordering party as "one of our customers." CLS Paris's Head Office Financial Security subsequently identified the originator as an Iranian party and sought legal guidance from external counsel. The bank noted that its external counsel drafted a legal memorandum in October 2002 regarding U.S. sanctions laws, including the U-turn rule. Thereafter, Credit Lyonnais' Financial Security department determined that cover payments were part-and-parcel of the U-turn rule and Credit Lyonnais used cover payments to process U-turns involving Iranian corporate entities. This informal policy was maintained by CACIB Financial Security after the merger, as the unit was largely comprised of the former compliance personnel from CLS Paris. As a result, throughout the review period, CACIB would generally process outgoing USD payments on behalf of its

Iranian clients by generating a SWIFT MT 103 payment message destined for the non-U.S. beneficiary financial institution with complete information related to the transaction's parties, and a SWIFT MT 202 cover payment destined for the intermediary U.S. financial institution that did not include the names of any Iranian banks and/or persons.

1483.  Prior to the merger between CLS and Crédit Agricole Indosuez, Crédit Agricole Indosuez Paris's branch processed Iranian-related capital market transactions (i.e., treasury and foreign exchange transactions) with direct SWIFT MT 202s with the account number of the Iranian bank listed in Field 72. The Paris system would send a SWIFT MT 210 (Notice to Receive) message to the U.S. clearing bank which included the SWIFT BIC of the Iranian bank. Following the merger, the bank's Capital Markets unit requested guidance from Head Office Financial Security regarding these types of transactions. In response, the Head Office Financial Security instructed the Capital Markets unit to begin processing its transactions by using cover payments in the same manner described above (i.e., using an outgoing SWIFT MT 103 and SWIFT MT 202). Although the Capital Markets unit questioned these instructions, the Financial Security department confirmed its instruction, indicating the use of cover payments for Iranian transactions was supported by the October 2002 legal memo received by external counsel.

1484.  The practice of utilizing cover payments for Iranian-related payments was not officially adopted as policy until late 2005, in or around the time at which various U.S. regulatory authorities were preparing to announce a settlement with Defendant and co-conspirator RBS in response to its violations of U.S. economic sanctions (including several related to Iran). The policy adopted by CACIB emphasized that "no mention of Iran" should be "made on the [SWIFT MT202 cover payment.]" At least sixteen Iranian-related transactions did not meet the terms of the U-turn general license and constituted apparent violations of the Iranian

Transactions and Sanctions Regulations.

1485.   From October 2003 to December 2006, CACIB, including its subsidiaries and their predecessors, processed 16 electronic funds transfers in the aggregate amount of $397,453 to or through financial institutions located in the United States in apparent violation of the prohibition against the exportation or re-exportation of services from the United States to Iran, 31 C.F.R. § 560.204.

1486.   The conduct of CACIB and its predecessors was not based on a mistaken assumption, but was intentional.

1487.   As a result of this knowing exploitation of the United States financial system for its own benefit and the benefit of its Iranian customers, CACIB entered into a DPA with the DOJ to be overseen by the United States District Court for the District of Columbia.

1488.   This DPA resulted in the forfeiture of $312 million dollars to the United States government by CACIB, a portion of which was directly attributable to the illegal USD transactions on behalf of Iran.

1489.   In this DPA, CACIB and its subsidiaries subjected itself to the continuing jurisdiction of the DOJ and the United States District Court for the District of Columbia for three years. This level of oversight, directly related to the manipulation of the United States financial system on behalf of sanctioned Iranian entities, consisted of:

  a)   CACIB must cooperate with the Department of Justice and any other United States law enforcement or regulatory agency in any investigation into CACIB and its subsidiaries and predecessors' involvement in the illegal laundering of funds on behalf of Iran and Iranian entities;

  b)   CACIB must make employees available to United States law enforcement officials for interview or testimony related to this investigation;

  c)   CACIB must provide United States law enforcement officials with all documents and information necessary to authenticate documents and

information for purposes of admitting such document or information into evidence in a judicial proceeding; and

d)   CACIB must implement a compliance and ethics program designed to prevent and detect USD payment transactions sought on behalf of sanctioned entities, including Iran and Iranian entities. The terms of this compliance agreement are broad, requiring CACIB to:

   i.   Apply a current and complete OFAC sanctions list against all USD transactions, including both incoming and outgoing payment messages;

   ii.   Specifically agree to not undertake any USD transaction for Iran or any Iranian entity;

   iii.   Complete Financial Economic Crime sanction training addressing United States sanction and trade control laws for all employees;

   iv.   Require the use of SWIFT MT 202COV bank-to-bank payment messages that strictly adhere to the SWIFT guidelines;

   v.   Implement compliance and training designed to ensure the CACIB compliance officer is timely made aware of known requests or attempts by any entity to omit its name or obscure identifying information in an attempt to evade United States sanction law;

   vi.   Maintain all SWIFT payment messages and all documents and material produced by the company to the DOJ for the duration of the DPA;

   vii.   Abide by all measures and actions required by OFAC as a result a settlement reached between OFAC and CACIB in October of 2015;

   viii.   Abide by all measures and requirements of the settlement agreement reached between CACIB and the DFS;

   ix.   Provide the Department of Justice with all reports, disclosures and information that CACIB provides to any other governmental entity as a result of any such agency's investigation into CACIB's conduct with respect to sanctioned entities and USD payment transactions;

   x.   Notify the United States of any criminal, administrative or regulatory investigation commenced against it or any of its executives or personnel;

xi. Report to the Department of Justice every 90 days during the term of the three-year period of the agreement consisting of detailed accounts of CACIB's compliance with all aspects of the agreement;

xii. They agree that it would be subject to federal prosecution in the United States District Court for the District of Columbia should it breach the terms of the agreement, without regard to the statute of limitation;

xiii. At the conclusion of the three-year period, the Head of Compliance must certify its compliance to the DOJ;

xiv. Transfer the material obligations of the agreement to any purchaser of the company; and

xv. Not make any public statement that is inconsistent with the admissions contained in, or obligations undertaken by, entering into the agreement.

1490.   In addition to the terms of the formal DPA, CACIB voluntarily undertook the following steps as a result of the investigation to enhance and optimize its compliance program in an effort to avoid further violations of United States law and regulation:

a) Install more sophisticated filtering software;

b) Create more compliance-focused groups to address sanctions compliance and correspondent bank due diligence;

c) Hiring additional compliance employees; and

d) Adopting written compliance policies that address United States sanctions against Iran and other sanctioned entities.

1491.   CACIB and CASA also entered into a Consent Order with the DFS based on its rampant processing of illegal USD transactions on behalf of Iran and Iranian entities.[235] In this Consent Order, CACIB and CASA were required to submit to the jurisdiction of the State of New York for implementation of the following conditions of its deferred prosecution:

---

[235] Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby adopt and incorporate by reference the Consent Order, as if fully set forth herein.

a)      CACIB and CASA paid a $385,000,000 penalty to the DFS, a portion of which was directly attributable to the illegal transactions processed on behalf of Iranian entities;

b)      Terminate a specific bank employee;

c)      Hire an independent consultant, at their own expense, dictated by the State of New York, for the term of one year to conduct a comprehensive review of the compliance programs, policies and procedures at the CACIB New York branch and its other branches throughout Europe that deal with USD transactions conducted through New York;

d)      CACIB and CASA are required to fully cooperate with the consultant and provide access to all personnel, documents and other items necessary in any of its locations;

e)      In response to the consultant's report at the conclusion of its investigation, CACIB and CASA will be required to submit a Management Oversight Plan to the State of New York to address concerns raised by the consultant's report;

f)      The independent consultant would oversee the implementation of any corrective measures identified by the Management Oversight Plan; and

g)      The independent consultant will also be responsible for assessing CACIB and CASA's compliance with the Management Oversight Plan and will be required to submit progress reports to the State of New York.

1492.    In terms of its Settlement Agreement with OFAC,[236] based on the conduct set forth above, CACIB agreed:

a)      To a contingent fine in the amount of $329,593,585 in the event that amount levied against it by the Department of Justice and the DFS was less that that sum;

b)      That it had terminated, among other things, all of the illegal conduct described herein with respect to Iran and other sanctioned entities;

c)      That is would maintain policies and procedure resulting from the agreements with the Department of Justice and the State of New York that would minimize, and prohibit if possible, the risk of similar conduct in the future; and

---

[236] Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby adopt and incorporate by reference the Settlement Agreement, as if fully set forth herein.

d)     To provide the Department of the Treasury copies of all reports submitted to the United States Federal Reserve relating to its illegal conduct described herein.

## 18.   DEFENDANT COMMERZBANK AG'S AND COMMERZBANK AG NEW YORK BRANCH'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

1493.  As noted in a criminal information entered in connection with, as discussed below, a March 11, 2015 Deferred Prosecution Agreement between Defendant Commerzbank and DOJ:

> COMMERZBANK AG and others … unlawfully, willfully and knowingly combined, conspired, confederated and agreed with one another and with others to commit offenses against the United States, that is, to engage in financial transactions with Sanctioned Entities and SDNs in violation of IEEPA, and the executive orders and regulations issued thereunder.… The goal of the conspiracy was for COMMERZBANK and others …to enrich themselves by engaging in a conspiracy and a scheme to violate IEEPA, and the executive orders and regulations issued thereunder. A further goal of the conspiracy was for COMMERZBANK and others … to violate executive orders and regulations prohibiting the exportation, directly and indirectly, of services from the United States to Sanctioned Entities and SDNs.[237]

1494.  Like many of the other Defendants who entered into the Conspiracy, Commerzbank adopted a variety of methods to facilitate Iran's illegal goals.[238]

1495.  In particular, Commerzbank worked with Bank Sepah, Bank Melli, Bank Saderat and Bank Refah to facilitate the goals of the Conspiracy, stripping, altering or changing tens of thousands of SWIFT-NET payment order messages.

1496.  Since 2002, Commerzbank also appears to have engaged in various illegal gold

---

[237] Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby adopt and incorporate by reference: 1) the DPA entered into between Commerzbank and the DOJ on or about March 11, 2015; 2) the Consent Order entered into between Commerzbank the New York Department of Financial Services on or about March 12, 2015; and 3) the Settlement Agreement entered into between Commerzbank the United States Department of Treasury on or about March 12, 2015, as if fully set forth herein.

[238] *See* New York State Department of Financial Services, *In re Commerzbank AG, Commerzbank AG New York Branch, Consent Order Under New York Banking Law §§ 39 and 44*, http://www.dfs.ny.gov/about/ea/ea150312.pdf (last visited Oct. 15, 2017).

transactions on behalf of the CBI, including trading orders through its New York branch while disguising the Iranian source of the trades.

1497.   A March 2015 Amended Complaint filed in a *qui tam* case against Defendant Commerzbank AG stated that:

> …the gold trade has been essential to Iran's withstanding the increasingly restrictive U.S. sanctions. It has a substantial amount of gold reserves, amounting to $112 billion in gold, which it accumulated in part by trading oil for gold. It used gold to preserve its wealth especially to withstand the devaluation of its currency and to engage in trading that would bypass U.S. sanctions.[239]

1498.   On April 17, 2003, Commerzbank finalized a policy document entitled "Routing Instructions Iranian banks for USD payments." This policy admonished employees to "[u]nder no circumstances mention the Iranian background in the cover order." In other words, the German-based recipients of this policy were instructed to never mention Iranian customers nor Iranian connections to any payment messages sent to the United States.

1499.   Taking advantage of the fact that Lloyds and other competitors were exiting the Iran market, Commerzbank solicited more Iranian clients.

1500.   The resulting increase in the volume and significance of Iranian business at Commerzbank led to the establishment of a centralized process for handling certain Iranian dollar denominated payments within Commerzbank, and the Defendant designated one group of employees within Commerzbank's Frankfurt Back Office to manually process those payments. The task of this group was to review payments and amend them if necessary, to ensure that they would not get stopped by OFAC filters when sent to financial institutions in the United States, including Commerzbank's New York branch.

1501.   This increase in volume was in part due to illicit trade-finance, foreign exchange,

---

[239] In July 2015, Commerzbank settled the *qui tam* case, 13-cv-8095 (S.D.N.Y. 2013), for approximately $866,000.

and Eurodollar transactions undertaken by Commerzbank on behalf of Bank Refah, Bank Sepah, Bank Melli and Bank Saderat.

1502.   In July 2003, a Back Office employee emailed other bank employees explaining that two state-owned Iranian banks, Bank Melli and Bank Saderat, wanted to begin routing their entire USD funds clearing business through Commerzbank. The Back Office employee closed his email by writing, "If for whatever reason [Commerzbank] New York inquires why our turnover has increase [sic] so dramatically under no circumstances may anyone mention that there is a connection to the clearing of Iranian banks!!!!!!!!!!!!!" (Exclamation marks in the original).

1503.   On September 17, 2003, a Back Office employee sent an email advising a major Iranian Bank that maintained a US dollar account with Commerzbank to list "non ref" in the ordering party field in all of its future payment messages.

1504.   The author of the email had tested Commerzbank's compliance systems in Frankfurt, and knew that writing "non ref" would trigger a manual review of the payment, thereby enabling Commerzbank personnel to ensure that the messages did not contain any information revealing the true Iranian involvement in the transaction.

1505.   In fact, Commerzbank personnel explained to employees of Iranian bank clients the kinds of information that could lead to payments being delayed, rejected, or blocked within the United States, and encouraged the Iranian banks to omit this type of information from their payment orders so that Commerzbank employees would not have to manually remove it.

1506.   For example, Bank Sepah's UK subsidiary (Bank Sepah International Plc) provided its Iranian customers with routing instructions for "payments to our US Dollar account from outside the United States" noting the SWIFT Code for Commerzbank's New York branch

and the Bank's account number at Commerzbank followed by the instruction:

> **Please ensure that no mention is made of any recognisable Iranian entity in any message sent through the United States.**

(Emphasis in the original.)

1507.   On October 13, 2003, the Head of Commerzbank's Internal Audit division emailed a member of Commerzbank's senior management advising that Iranian bank names in payment messages transiting through the United States were being "neutralized" and warned that "it raises concerns if we consciously reference the suppression of the ordering party in our work procedures in order to avoid difficulties in the processing of payments with the U.S.A."

1508.   On November 19, 2003, a memo was circulated to senior management memorializing the internal rules Commerzbank had developed for processing Iranian payments, including using MT 202 cover transactions (*i.e.*, splitting a payment into two messages and sending a MT 103 to the foreign (non-U.S.) branch of the beneficiary and an MT 202 to the clearing institution in the United States), and using serial MT 103 messages that manually replaced the name of the (Iranian) ordering party with the bank code for Commerzbank Frankfurt to avoid detection by U.S. authorities.

1509.   It appears that Commerzbank may have ceased stripping some transactions in July 2004, relying primarily on cover payments (MT 202 payment order messages) to effectuate its unlawful conduct. At the same time, Commerzbank conspired with Bank Melli to facilitate over one hundred (100) checks totaling approximately $2 million in USD funds that Commerzbank issued for illegal payments in the United States.

1510.   However, as noted *supra*, Bank Sepah International Plc (Bank Sepah's UK subsidiary) provided "stripping" instructions to its clients even in 2006 directing that U.S. dollars wire transfers be sent through Commerzbank's New York branch.

1511.   DOJ described "the rigor with which the Bank enforced the policy during this period" by citing an email from a Back Office employee who wrote about Commerzbank's procedures for facilitating the Conspiracy "NO EXPERIMENTS PLEASE!!! Have fun with this and greetings." (Emphasis in the original.)

1512.   This ongoing conduct involving both "stripping" transactions and converting otherwise transparent SWIFT-NET MT 103 messages into opaque MT 202 cover transactions resulted in tens of millions of dollars being illegally transferred on Iran's behalf.

1513.   However, parallel to its illegal conduct on behalf of Bank Sepah, Bank Saderat and Bank Melli, as noted above, Commerzbank also directly coordinated with IRISL in laundering U.S. dollars through the United States despite the fact that IRISL was Iran's primary means of transporting both conventional and non-conventional weapons.

1514.   Between 2002 and 2008, Commerzbank worked directly with IRISL to facilitate illicit payments through the United States.

1515.   In January 2005, Commerzbank's New York branch rejected a series of payment transactions on behalf of Lancelin Shipping Company Ltd., an IRISL-formed entity registered in Cyprus, because the payment messages contained references to IRISL Europe GmbH, a wholly-owned IRISL subsidiary registered in Hamburg and designated by the United States in 2008.

1516.   This prompted a direct meeting between the relationship managers in Commerzbank's Hamburg branch and employees from IRISL on January 24, 2005.

1517.   A memorandum summarizing the meeting noted that: "[d]ue to the tense political relations between Iran and the U.S., sanctions that have existed for some years against Iran and Iranian companies have been tightened.… *The number of rejected payments recently increased sharply since the word "IRISL" results in inquiries at foreign banks.* Based on inquiries from

318

Commerzbank, New York we assume that it appears as a term on the embargo list." (Emphasis in the original.)

1518.   In a written presentation that Commerzbank delivered to IRISL on January 25, 2005, following the in-person meeting, the Hamburg relationship manager stated: "*[t]he current rejections show that IRISL is in the OFAC list*" (Emphasis in the original).

1519.   The presentation then explained that "payments which are sent through a ... subsidiary are unlikely to be rejected to our present knowledge."

1520.   Commerzbank ultimately adopted a process it termed a "safe payments solution" by which IRISL initiated USD funds transfers through the U.S., using the accounts of less conspicuous subsidiaries to prevent its New York branch or other clearing banks from flagging IRISL U.S. dollar transactions.

1521.   Moreover, to assist IRISL in its bookkeeping, Commerzbank would sweep those accounts daily and zero them out so that IRISL could keep track of which USD funds belonged to it – as opposed to its subsidiaries.

1522.   On April 18, 2006, Commerzbank's New York branch rejected a payment on behalf of Lancelin, citing "US sanctions against Iran." As a result, Commerzbank altered the structure of the "safe payment solution," suggesting the use of two other subsidiaries to process payments on behalf of IRISL and IRISL Europe GmbH.

1523.   In fact, in only four months *following* IRISL's U.S. designation in 2008, Commerzbank illegally transferred almost $40 million on behalf of IRISL subsidiaries and related entities through Commerzbank's New York branch and other U.S. financial institutions.

1524.   These post-designation transactions, laundered by Commerzbank through the U.S. financial system, were self-evidently not for the benefit of a legitimate agency, operation or

program of Iran.

1525.   Only months earlier, a U.S. State Department diplomatic cable warned of an IRISL-flagged vessel in China loaded with cargo containing weapons for Iran's Defense Industries Organization ("DIO").

1526.   The 2008 diplomatic cable further warned of the dangers of ongoing conventional arms transfers from China to Iran, "particularly given Iran's clear policy of providing arms and other support to Iraqi insurgents and terrorist groups like the Taliban and Hezbollah…. We have specific information that Chinese weapons and components for weapons transferred to Iran are being used against U.S. and Coalition Forces in Iraq, which is a grave U.S. concern."

1527.   Less than a year after Commerzbank in Hamburg provided IRISL with at least $40 million in illegal (post-designation) USD transactions in October 2009, U.S. troops boarded a German-owned freighter, the *Hansa India*, in the Gulf of Suez and found eight containers full of ammunition, and headed to Syria from Iran.

1528.   The *Hansa India* was registered to the Hamburg-based shipping company Leonhardt & Blumberg, but had in fact been under charter to IRISL for several years.

1529.   The *Hansa India* carried seven containers of small arms ammunition, as well as one container containing copper discs, which constitute, as noted *supra*, a key component in EFPs used to kill and maim many of the Plaintiffs herein.

1530.   Although Commerzbank worked to shield its New York branch from knowing all of the details of its illicit activities on behalf of Iran and IRISL, Commerzbank's New York branch was nonetheless aware that it was being used to facilitate unlawful conduct.

1531.   For example, in June 2006, in response to a request from the new Chief Compliance Officer asking if there were any concerns they wanted her to share with the new

Global Head of Compliance in Germany, a New York compliance employee responded "[p]ersistent disregarding of OFAC rules by foreign branches. Hamburg is notorious for it."

1532.   In February 2007, Commerzbank's then Chief Executive Officer Klaus-Peter Mueller and Board Member Martin Blessing met with U.S. Treasury Deputy Secretary Robert Kimmitt. In the meeting, Mueller complained about the portrayal of Commerzbank by The Wall Street Journal (in a January 2007 article) which he said made it appear that the Bank was trying to evade sanctions on Iran. "This," claimed Mueller "is far from the case."

1533.   *The Wall Street Journal* reported on January 10, 2007 that "Commerzbank AG, Germany's second largest bank, said it will stop handling dollar transactions for Iran at its New York branch by Jan. 31." It went on to report that "[a]t present, Commerzbank handles both dollar and euro transactions for Iran's state owned banks. Like several other European banks, it will cease handling only dollar transactions."

1534.   *The Wall Street Journal* article went on to report:

> The risks of doing business with Iran are the same in all currencies," said Mr. [Stuart] Levey. Intelligence officials say Bank Saderat, a large, state-controlled Iranian bank placed on a U.S. Treasury blacklist in October for allegedly funding terrorism, has been able to process dollar transactions through Commerzbank's New York branch in recent months by using the accounts of two other Iranian banks. Commerzbank says it ceased dealing with Saderat after it was put on the U.S. blacklist and has no knowledge of any subsequent transactions. "Commerzbank has no knowledge of Bank Saderat directly or indirectly using the accounts of other Iranian banks to process dollar transactions," the bank said in a statement. Commerzbank, in a response to an inquiry from *The Wall Street Journal* about its dealings with Iran, also said "all such [dollar clearing] transactions are currently being phased out" as of Jan. 31. It added that "any clearing conducted by our U.S. operations is in strict compliance" with U.S. government regulations.

1535.   Commerzbank's assurances to *The Wall Street Journal*, like its assurances to U.S. Treasury Deputy Secretary Robert Kimmitt, were plainly false.

1536.   As noted above, on September 10, 2008, the U.S. designated IRISL, IRISL

Europe GmbH, and several IRISL subsidiaries based on evidence that the IRISL network of companies was engaged in WMD proliferation activity and the fact that "IRISL has pursued new strategies which could afford it the potential to evade future detection of military shipments."

1537.   The next day, on September 11, 2008, a senior official at OFAC personally forwarded the press release announcing IRISL's SDN designation to the Head of Compliance at Commerzbank in New York.

1538.   The press release was then forwarded to Commerzbank employees in Germany with responsibilities related to IRISL. In the email, the relationship manager noted that the U.S. government alleged "that IRISL as Iranian government carrier systematically circumvents the Iranian arms embargo."

1539.   Nonetheless, between September 10, 2008, and December 31, 2008 alone, Commerzbank illegally directed close to $40 million on behalf of IRISL subsidiaries and related entities through the United States.

### 19.   DEFENDANT COMMERZBANK AG'S DIRECT FUNDING OF HEZBOLLAH THROUGH ITS CUSTOMER, ORPHANS PROJECT LEBANON E.V.

1540.   During this same time period, Commerzbank also knowingly, or with deliberate indifference to the fact, maintained account number 7001688 for an open and notorious Hezbollah fundraising organization in Germany known as Waisenkinderprojekt Libanon e.V. ("the Orphans Project Lebanon e.V.").

1541.   Despite prior public German government reports identifying its customer as a Hezbollah fundraising organization, and the fact that on July 24, 2007, the United States designated[240] the Lebanese organization that was primary recipient of funds donated from the account (Hezbollah's Martyrs Foundation), Commerzbank knowingly, or with deliberate

---

[240] *See,* https://www.treasury.gov/press-center/press-releases/Pages/hp503.aspx

indifference to the fact, continued to provide financial services to Waisenkinderprojekt Libanon e.V. and hence continued to transfer funds directly to FTO Hezbollah,

## VI.    THE PLAINTIFFS

1542.    At issue are attacks perpetrated by the Terrorist Groups who were materially supported by Defendants, through Iran and its Agents and Proxies, and that killed or injured Plaintiffs. (hereafter the "Terrorist Attacks").

1543.    The injuries and deaths caused by Defendants and suffered by Plaintiffs were the result of acts of international terrorism as defined by 18 U.S.C. § 2331(1). Each act of international terrorism was committed, planned, or authorized by organizations designated as FTOs as of the date on which such acts of international terrorism were committed, planned, and/or authorized. Further, Defendants provided material support to, conspired with, and aided and abetted Iran and the FTOs in their commission, planning and authorizing of the Terrorist Attacks by, among other things, knowingly providing illegal and undetectable access to the U.S. financial system and USD that was used by Iran and its Agents and Proxies, including the Terrorist Groups, to commit, plan and authorize the Terrorist Attacks.

1544.    All Plaintiffs physically injured or killed in Iraq were, at the time of their injury or extrajudicial killing, participating in a peacekeeping mission intended to contribute to the security of the United Nations Assistance Mission for Iraq, the Governing Council of Iraq and other institutions of the Iraqi interim administration, and key humanitarian and economic infrastructure.

1545.    Without Defendants' conduct and material support described herein, Iran and the Terrorist Groups would not have had the funding or material support necessary to carry out the Terrorist Attacks.

1546.    Plaintiffs are individuals who were injured or killed in terrorist attacks that

occurred in Iraq, and who, as a result, experienced physical and mental pain and suffering and emotional distress. Some Plaintiffs are decedents, whose personal representatives and Estates,[241] bring claims for the named-individuals who were killed in those attacks, as well as all heirs thereof. Other Plaintiffs are family members of the victims of the terrorist attacks and have experienced injuries including anxiety, severe mental anguish, extreme emotional distress, and loss of companionship as a result of their relatives' injuries or death.

1547.   The following Plaintiffs are United States' nationals injured or killed in the acts of international terrorism complained of herein, and estates and/or family members of such U.S. nationals.

1.      **THE MARCH 12, 2008 ATTACK – TALLIL AIR BASE**

A.      **PLAINTIFFS THE JOEL TAVERA FAMILY**

1548.   Plaintiff Joel Tavera is a U.S. citizen domiciled in Florida.

1549.   On March 12, 2008, Joel Tavera was serving in the U.S. military when he was attacked by rockets.

1550.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Tavera.

1551.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1552.   As a result of the attack and the injuries suffered, Joel Tavera is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses,

---

[241] In some instances, families are in the process of establishing estates and the identified family members, as the Anticipated Personal Representatives, bring these actions, individually, and on behalf of the anticipated estates of their deceased family members and all heirs thereof.

lost income, and loss of earning capacity.

1553.   Plaintiff Maritza Tavera is a citizen of the United States domiciled in Florida and is the mother of Joel Tavera.

1554.   Plaintiff Jose Luciano Tavera is a citizen of the United States domiciled in Florida and is the father of Joel Tavera.

1555.   As a result of the attack and the injuries suffered by Joel Tavera, Plaintiff Maritza Tavera and Jose Luciano Tavera are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 2.   THE NOVEMBER 2, 2011 ATTACK – DIWANIYAH

### A.   PLAINTIFFS THE MARCUS JAMIL SULLEN FAMILY

1556.   Plaintiff Marcus Jamil Sullen is a U.S. citizen domiciled in Texas.

1557.   On November 2, 2011, Marcus Jamil Sullen was serving in the U.S. military when he was attacked by a grenade.

1558.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Sullen.

1559.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1560.   As a result of the attack and the injuries suffered, Marcus Jamil Sullen is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1561.   Plaintiff Eunice Henderson Sullen is a citizen of the United States domiciled in

Florida and is the mother of Marcus Jamil Sullen.

1562.   Plaintiff Frederick Daniel Young Jr. is a citizen of the United States domiciled in Florida and is the brother of Marcus Jamil Sullen.

1563.   Plaintiff Arik Bryne Sullen is a citizen of the United States domiciled in Florida and is the brother of Marcus Jamil Sullen.

1564.   As a result of the attack and the injuries suffered by Marcus Jamil Sullen, Plaintiffs Eunice Henderson Sullen, Frederick Daniel Young Jr., and Arik Bryne Sullen are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

3.      THE JULY 8, 2011 ATTACK – BAGHDAD

A.      PLAINTIFFS THE TYLER NICHOLAS OGDEN FAMILY

1565.   Plaintiff Tyler Nicholas Ogden is a U.S. citizen domiciled in Ohio.

1566.   On July 8, 2011, Tyler Nicholas Ogden was serving in the U.S. military when he was attacked by a rocket.

1567.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Ogden.

1568.   The Iranian-supported FTO Hezbollah/JAM planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1569.   As a result of the attack and the injuries suffered, Tyler Nicholas Ogden is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical

expenses, lost income, and loss of earning capacity.

1570.   Plaintiff Sheryl Ann Chen is a citizen of the United States domiciled in Ohio and is the mother of Tyler Nicholas Ogden.

1571.   Plaintiff Jerrin Matthew Ogden is a citizen of the United States domiciled in Ohio and is the brother of Tyler Nicholas Ogden.

1572.   As a result of the attack and the injuries suffered by Tyler Nicholas Ogden, Plaintiffs Sheryl Ann Chen and Jerrin Matthew Ogden are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 4.   THE JULY 3, 2011 ATTACK – AL AMARRA

#### A.   PLAINTIFFS THE MATTHEW TERRANCE WHITESIDE FAMILY

1573.   Plaintiff Matthew Terrance Whiteside is a U.S. citizen domiciled in South Carolina.

1574.   On July 3, 2011, Matthew Terrance Whiteside was serving in the U.S. military when he was attacked by EFP.

1575.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Whiteside.

1576.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1577.   As a result of the attack and the injuries suffered, Matthew Terrance Whiteside is entitled to past and future noneconomic damages, including for severe physical and mental pain

and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1578. Plaintiff Kandi Danielle Whiteside is a citizen of the United States domiciled in South Carolina and is the wife of Matthew Terrance Whiteside.

1579. Plaintiff M.T.W., a minor child, represented by her legal guardians Matthew Terrance Whiteside and Kandi Danielle Whiteside, is a citizen of the United States domiciled in South Carolina and is the daughter of Matthew Terrance Whiteside.

1580. Plaintiff Sharon Smithey Whiteside is a citizen of the United States domiciled in Mississippi and is the mother of Matthew Terrance Whiteside.

1581. Plaintiff Kevin Casey Whiteside is a citizen of the United States domiciled in Mississippi and is the brother of Matthew Terrance Whiteside.

1582. Plaintiff Jackson Wiley Whiteside is a citizen of the United States domiciled in Mississippi and is the brother of Matthew Terrance Whiteside.

1583. Plaintiff Mark Kevin Whiteside is a citizen of the United States domiciled in Mississippi and is the father of Matthew Terrance Whiteside.

1584. Plaintiff Christopher Dewayne Whiteside is a citizen of the United States domiciled in Mississippi and is the brother of Matthew Terrance Whiteside.

1585. As a result of the attack and the injuries suffered by Matthew Terrance Whiteside, Plaintiffs Kandi Danielle Whiteside, M.T.W., a minor child, Sharon Smithey Whiteside, Kevin Casey Whiteside, Jackson Wiley Whiteside, Mark Kevin Whiteside, and Christopher Dewayne Whiteside are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 5.     THE JUNE 29, 2011 ATTACK – ZURBATIYAH

#### A.     PLAINTIFF JOSEPH ANDREW TALBERT

1586.   Plaintiff Joseph Andrew Talbert is a U.S. citizen domiciled in Ohio.

1587.   On June 29, 2011, Joseph Andrew Talbert was serving in the U.S. military when he was attacked by mortars and rockets.

1588.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Talbert.

1589.   The Iranian-supported FTO KH planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1590.   As a result of the attack and the injuries suffered, Joseph Andrew Talbert is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 6.     THE JUNE 18, 2011 ATTACK – AL DAWINIYAH

#### A.     PLAINTIFFS THE MARK ANTONY HALL FAMILY

1591.   Plaintiff Mark Antony Hall is a U.S. citizen domiciled in Montana.

1592.   On June 18, 2011, Mark Antony Hall was serving in the U.S. military when he was attacked by rockets.

1593.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Hall.

1594.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1595.   As a result of the attack and the injuries suffered, Mark Antony Hall is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1596.   Plaintiff Athena L. Hall is a citizen of the United States and domiciled in the State of Montana. She is the wife of Mark Antony Hall.

1597.   Plaintiff Abigail Hall is a citizen of the United States and domiciled in the State of Montana. She is the daughter of Mark Antony Hall.

1598.   Plaintiff Kiersten Hall is a citizen of the United States and domiciled in the State of Montana. She is the daughter of Mark Antony Hall.

1599.   Plaintiff Kaitlyn Adams is a citizen of the United States and domiciled in the State of Montana. She is the daughter of Mark Antony Hall.

1600.   Plaintiff A.M.H., a minor child, represented by his legal guardians Mark Antony Hall and Athena Hall, is a citizen of the United States and domiciled in the State of Montana. He is the minor child of Mark Antony Hall.

1601.   Plaintiff M.G.H., a minor child, represented by her legal guardians Mark Antony Hall and Athena Hall, is a citizen of the United States and domiciled in the State of Montana. She is the minor child of Mark Antony Hall.

1602.   Plaintiff M.J.H., a minor a minor child, represented by her legal guardians Mark Antony Hall and Athena Hall, is a citizen of the United States and domiciled in the State of Montana. She is the minor child of Mark Antony Hall.

1603.   As a result of the attack and the injuries suffered by Mark Antony Hall, Plaintiffs Kaitlyn Adams, Abigail Hall, A.M.H. a minor child, Athena L. Hall, Kiersten Hall, M.G.H. a

minor child, and M.J.H. a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 7. THE JUNE 15, 2011 ATTACK – JSS SIFER

#### A. PLAINTIFFS THE JARRAD JEROME DAVENPORT FAMILY

1604.  Plaintiff Jarrad Jerome Davenport is a U.S. citizen domiciled in Virginia.

1605.  On June 15, 2011, Jarrad Jerome Davenport was serving in the U.S. military when he was attacked by IRAM Rockets.

1606.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Davenport.

1607.  The Iranian-supported FTO KH planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1608.  As a result of the attack and the injuries suffered, Jarrad Jerome Davenport is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1609.  Plaintiff LaToya Shantia Davenport is a citizen of the United States domiciled in Virginia and is the spouse of Jarrad Jerome Davenport.

1610.  Plaintiff Jarrad Elijah Davenport is a citizen of the United States domiciled in Virginia and is the son of Jarrad Jerome Davenport.

1611.  Plaintiff Darrius X. Davenport is a citizen of the United States domiciled in Virginia and is the son of Jarrad Jerome Davenport.

1612.  Plaintiff X.C.D., a minor child, represented by his legal guardians Jarrad Jerome

Davenport and LaToya Shantia Davenport, is a citizen of the United States domiciled in Virginia and is the son of Jarrad Jerome Davenport.

1613. As a result of the attack and the injuries suffered by Jarrad Jerome Davenport, Plaintiffs LaToya Shantia Davenport, Jarrad Elijah Davenport, Darrius X. Davenport, and X.C.D., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 8. THE MAY 13, 2011 ATTACK – NASIRIYAH

### A. PLAINTIFFS THE MATTHEW TERRANCE WHITESIDE FAMILY

1614. Plaintiff Matthew Terrance Whiteside is a U.S. citizen domiciled in South Carolina.

1615. On May 13, 2011, Matthew Terrance Whiteside was serving in the U.S. military when he was attacked by rockets.

1616. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Whiteside.

1617. The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1618. As a result of the attack and the injuries suffered, Matthew Terrance Whiteside is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1619. Plaintiff Kandi Danielle Whiteside is a citizen of the United States domiciled in

South Carolina and is the wife of Matthew Terrance Whiteside.

1620.   Plaintiff M.T.W., a minor child, represented by her legal guardians Matthew Terrance Whiteside and Kandi Danielle Whiteside, is a citizen of the United States domiciled in South Carolina and is the daughter of Matthew Terrance Whiteside.

1621.   Plaintiff Sharon Smithey Whiteside is a citizen of the United States domiciled in Mississippi and is the mother of Matthew Terrance Whiteside.

1622.   Plaintiff Kevin Casey Whiteside is a citizen of the United States domiciled in Mississippi and is the brother of Matthew Terrance Whiteside.

1623.   Plaintiff Jackson Wiley Whiteside is a citizen of the United States domiciled in Mississippi and is the brother of Matthew Terrance Whiteside.

1624.   Plaintiff Mark Kevin Whiteside is a citizen of the United States domiciled in Mississippi and is the father of Matthew Terrance Whiteside.

1625.   Plaintiff Christopher Dewayne Whiteside is a citizen of the United States domiciled in Mississippi and is the brother of Matthew Terrance Whiteside.

1626.   As a result of the attack and the injuries suffered by Matthew Terrance Whiteside, Plaintiffs Kandi Danielle Whiteside, M.T.W., a minor child, Sharon Smithey Whiteside, Kevin Casey Whiteside, Jackson Wiley Whiteside, Mark Kevin Whiteside, and Christopher Dewayne Whiteside are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 9.     THE MAY 4, 2011 ATTACK – CAMP TAJI

### A.     PLAINTIFF OBED JIMENEZ

1627.   Plaintiff Obed Jimenez is a U.S. citizen domiciled in California.

1628.   On May 4, 2011, Obed Jimenez was serving in the U.S. military when he was

attacked by Mortars.

1629.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Jimenez.

1630.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1631.   As a result of the attack and the injuries suffered, Obed Jimenez is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 10.     THE APRIL 29, 2011 ATTACK – BAGHDAD

#### A.      PLAINTIFFS THE TREY NORMAN BAILEY FAMILY

1632.   Plaintiff Trey Norman Bailey is a U.S. citizen domiciled in Oregon.

1633.   On April 29, 2011, Trey Norman Bailey was serving in the U.S. military when he was attacked by an IED.

1634.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Bailey.

1635.   The Iranian-supported FTO Hezbollah/JAM planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1636.   As a result of the attack and the injuries suffered, Trey Norman Bailey is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical

expenses, lost income, and loss of earning capacity.

1637.  Plaintiff McKenzie Bailey is a citizen of the United States domiciled in Oregon and is the spouse of Trey Norman Bailey.

1638.  As a result of the attack and the injuries suffered by Trey Norman Bailey, Plaintiff McKenzie Bailey, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 11.   THE APRIL 15, 2011 ATTACK – SADR CITY

### A.   PLAINTIFF MICHAEL JUNG HYUN PASCO

1639.  Plaintiff Michael Jung Hyun Pasco is a U.S. citizen domiciled in Kentucky.

1640.  On April 15, 2011, Michael Jung Hyun Pasco was serving in the U.S. military when he was attacked by an EFP.

1641.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Pasco

1642.  The Iranian-supported FTO Hezbollah/JAM planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1643.  As a result of the attack and the injuries suffered, Michael Jung Hyun Pasco is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

12.    **THE APRIL 2, 2011 ATTACK – FOB KALSU, ISKANDARIYA**

    A.    **PLAINTIFF DARRYL OWEN DOTSON, JR.**

1644.   Plaintiff Darryl Owen Dotson, Jr. is a U.S. citizen domiciled in Texas.

1645.   On April 2, 2011, Darryl Owen Dotson, Jr. was serving in the U.S. military when he was attacked by a Mortar.

1646.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Dotson.

1647.   The Iranian-supported FTO KH planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1648.   As a result of the attack and the injuries suffered, Darryl Owen Dotson, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

13.    **THE APRIL 2, 2011 ATTACK – ISKANDARIYA**

    A.    **PLAINTIFFS THE CHRISTIAN ANTHONY SARACHO GARCIA FAMILY**

1649.   On April 2, 2011, Christian Anthony Saracho Garcia was a U.S. citizen, domiciled in Texas, and serving in the U.S. military when he was attacked by mortars, causing his death.

1650.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Garcia.

1651.   The Iranian-supported FTO KH planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack,

as well as the munition and tactics, techniques, and procedures utilized.

1652.   Plaintiff Angela M. Garcia is a citizen of the United States and domiciled in the State of Texas. She is the widow of Christian Anthony Saracho Garcia.

1653.   Plaintiff Christopher Satterfield is a citizen of the United States and domiciled in the State of Texas. He is the step-son of Christian Anthony Saracho Garcia.

1654.   Plaintiff Joel Hernandez is a citizen of the United States and domiciled in the State of Texas. He is the step-son of Christian Anthony Saracho Garcia.

1655.   Plaintiff Victoria Hernandez is a citizen of the United States and domiciled in the State of Texas. She is the step-daughter of Christian Anthony Saracho Garcia.

1656.   Plaintiff K.M.G., a minor child, represented by her legal guardian Angela M. Garcia, is a citizen of the United States and domiciled in the State of Texas. She is the daughter of Christian Anthony Saracho Garcia.

1657.   Plaintiff K.R.G., a minor child, represented by her legal guardian Angela M. Garcia, is a citizen of the United States and domiciled in the State of Texas. She is the daughter of Christian Anthony Saracho Garcia.

1658.   Plaintiff Angela M. Garcia brings an action individually, and on behalf of the Estate of Christian Anthony Saracho Garcia, and all heirs thereof, as its legal representative.

1659.   As a result of the attack, and the injuries suffered by and the death of Christian Anthony Saracho Garcia, Plaintiffs Angela M. Garcia, Christopher Satterfield, Joel Hernandez, Victoria Hernandez, K.R.G. a minor child, K.M.G. a minor child, have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Christian Anthony Saracho Garcia.

## 14.   THE FEBRUARY 9, 2011 ATTACK – TALLIL

### A.   PLAINTIFF SHARON SCHINETHA STALLWORTH

1660.   Plaintiff Sharon Schinetha Stallworth is a U.S. citizen domiciled in Georgia.

1661.   On February 9, 2011, Sharon Schinetha Stallworth was serving in the U.S. military when she was attacked by Rockets and Mortars.

1662.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Ms. Stallworth.

1663.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1664.   As a result of the attack and the injuries suffered, Sharon Schinetha Stallworth is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 15.   THE JANUARY 17, 2011 ATTACK – BAGHDAD

### A.   PLAINTIFF OLNEY EUGENE JOHNSON

1665.   Plaintiff Olney Eugene Johnson is a U.S. citizen domiciled in Pennsylvania.

1666.   On January 17, 2011, Olney Eugene Johnson was serving in the U.S. military when he was attacked by an EFP.

1667.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Johnson.

1668.   The Iranian-supported FTO Hezbollah/JAM planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures

338

utilized.

1669.   As a result of the attack and the injuries suffered, Olney Eugene Johnson is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

**16.    THE OCTOBER 11, 2010 ATTACK – MOSUL**

      **A.    PLAINTIFF RICHARD RANDALL HEDGECOCK, II**

1670.   Plaintiff Richard Randall Hedgecock, II is a U.S. citizen domiciled in North Carolina.

1671.   On October 11, 2010, Richard Randall Hedgecock, II was serving in the U.S. military when he was attacked by an IED.

1672.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Hedgecock

1673.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1674.   As a result of the attack and the injuries suffered, Richard Randall Hedgecock, II is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

**17.    THE SEPTEMBER 1, 2010 ATTACK – AL AMARRA**

      **A.    PLAINTIFFS THE MATTHEW TERRANCE WHITESIDE FAMILY**

1675.   Plaintiff Matthew Terrance Whiteside is a U.S. citizen domiciled in South

Carolina.

1676.   On September 1, 2010, Matthew Terrance Whiteside was serving in the U.S. military when he was attacked by rockets.

1677.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Whiteside.

1678.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1679.   As a result of the attack and the injuries suffered, Matthew Terrance Whiteside is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1680.   Plaintiff Kandi Danielle Whiteside is a citizen of the United States domiciled in South Carolina and is the wife of Matthew Terrance Whiteside.

1681.   Plaintiff M.T.W., a minor child, represented by her legal guardians Matthew Terrance Whiteside and Kandi Danielle Whiteside, is a citizen of the United States domiciled in South Carolina and is the daughter of Matthew Terrance Whiteside.

1682.   Plaintiff Sharon Smithey Whiteside is a citizen of the United States domiciled in Mississippi and is the mother of Matthew Terrance Whiteside.

1683.   Plaintiff Kevin Casey Whiteside is a citizen of the United States domiciled in Mississippi and is the brother of Matthew Terrance Whiteside.

1684.   Plaintiff Jackson Wiley Whiteside is a citizen of the United States domiciled in Mississippi and is the brother of Matthew Terrance Whiteside.

1685.   Plaintiff Mark Kevin Whiteside is a citizen of the United States domiciled in Mississippi and is the father of Matthew Terrance Whiteside.

1686.   Plaintiff Christopher Dewayne Whiteside is a citizen of the United States domiciled in Mississippi and is the brother of Matthew Terrance Whiteside.

1687.   As a result of the attack and the injuries suffered by Matthew Terrance Whiteside, Plaintiffs Kandi Danielle Whiteside, M.T.W., a minor child, Sharon Smithey Whiteside, Kevin Casey Whiteside, Jackson Wiley Whiteside, Mark Kevin Whiteside, and Christopher Dewayne Whiteside are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 18.    THE JULY 14, 2010 ATTACK – KADHIMIYAH

### A.    PLAINTIFF JEREMY GEORGE CASHWELL

1688.   Plaintiff Jeremy George Cashwell is a U.S. citizen domiciled in North Carolina.

1689.   On July 14, 2010, Jeremy George Cashwell was serving in the U.S. military when he was attacked by an EFP.

1690.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Cashwell.

1691.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1692.   As a result of the attack and the injuries suffered, Jeremy George Cashwell is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

341

### 19.    THE JUNE 9, 2010 ATTACK – TAJI

#### A.    PLAINTIFFS THE DESHAWN DAVID TURNER FAMILY

1693.    Plaintiff DeShawn David Turner is a U.S. citizen domiciled in Ohio.

1694.    On June 9, 2010, DeShawn David Turner was serving in the U.S. military when he was attacked by an IED.

1695.    Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Turner.

1696.    The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1697.    As a result of the attack and the injuries suffered, DeShawn David Turner is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1698.    Plaintiff Anita A. Turner is a citizen of the United States domiciled in Ohio and is the mother of DeShawn David Turner.

1699.    As a result of the attack and the injuries suffered by DeShawn David Turner, Plaintiff Anita A. Turner, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 20.    THE APRIL 20, 2010 ATTACK – KIRKUK

#### A.    PLAINTIFFS THE JEFFREY LEE PICKARD FAMILY

1700.    Plaintiff Jeffrey Lee Pickard is a U.S. citizen domiciled in California.

1701.    On April 20, 2010, Jeffrey Lee Pickard was serving in the U.S. military when he

was attacked by sniper fire.

1702.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Pickard.

1703.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1704.   As a result of the attack and the injuries suffered, Jeffrey Lee Pickard is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1705.   Plaintiff Natasha Pickard is a citizen of the United States domiciled in California and is the spouse of Jeffrey Lee Pickard.

1706.   Plaintiff Tyler Pickard is a citizen of the United States domiciled in New Mexico and is the son of Jeffrey Lee Pickard.

1707.  Plaintiff E.P., a minor child, represented by his legal guardians Jeffrey Lee Pickard and Natasha Pickard, is a citizen of the United States domiciled in California and is the son of Jeffrey Lee Pickard.

1708.   Plaintiff D.P., a minor child, represented by his legal guardians Jeffrey Lee Pickard and Natasha Pickard, is a citizen of the United States domiciled in California and is the son of Jeffrey Lee Pickard.

1709.  Plaintiff P.P., a minor child, represented by his legal guardians Jeffrey Lee Pickard and Natasha Pickard, is a citizen of the United States domiciled in California and is the son of Jeffrey Lee Pickard.

1710.   As a result of the attack and the injuries suffered by Jeffrey Lee Pickard, Plaintiffs Natasha Pickard, Tyler Pickard, E.P., a minor child, D.P., a minor child and P.P., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 21.   THE APRIL 3, 2010 ATTACK – NEAR TAJI

#### A.   PLAINTIFFS THE JEFFREY MARVIN NICOLAS FAMILY

1711.   Plaintiff Jeffrey Marvin Nicolas is a U.S. citizen domiciled in Georgia.

1712.   On April 3, 2010, Jeffrey Marvin Nicolas was serving in the U.S. military when he was attacked by an IED.

1713.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Nicolas.

1714.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1715.   As a result of the attack and the injuries suffered, Jeffrey Marvin Nicolas is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1716.   Plaintiff Alissa Nicolas is a citizen of the United States and domiciled in the State of Florida. She is the sister of Jeffrey Marvin Nicolas.

1717.   Plaintiff Francois Nicolas is a citizen of the United States and domiciled in the State of Florida. He is the father of Jeffrey Marvin Nicolas.

1718.   As a result of the attack and the injuries suffered by Jeffrey Marvin Nicolas,

Plaintiffs Alissa Nicolas and Francois Nicolas, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 22.   THE FEBRUARY 10, 2010 ATTACK – FOB WARHORSE

### A.   PLAINTIFF SAMUEL ADAM KAUFMAN

1719.   Plaintiff Samuel Adam Kaufman is a U.S. citizen domiciled in Arizona.

1720.   On February 10, 2010, Samuel Adam Kaufman was serving in the U.S. military when he was attacked by rockets.

1721.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Kaufman.

1722.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1723.   As a result of the attack and the injuries suffered, Samuel Adam Kaufman is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 23.   THE FEBRUARY 4, 2010 ATTACK – MOSUL

### A.   PLAINTIFF JASON KILLENS THOMPSON

1724.   Plaintiff Jason Killens Thompson is a U.S. citizen domiciled in North Carolina.

1725.   On February 4, 2010, Jason Killens Thompson was serving in the U.S. military when he was attacked by grenades.

1726.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or

other material support used to commit the attack, which injured Mr. Thompson.

1727.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1728.   As a result of the attack and the injuries suffered, Jason Killens Thompson is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 24.   THE JANUARY 22, 2010 ATTACK – BASRA

### A.   PLAINTIFFS THE ROBIN ANTHONY HONEYCUTT FAMILY

1729.   Plaintiff Robin Anthony Honeycutt is a U.S. citizen domiciled in New York.

1730.   On January 22, 2010, Robin Anthony Honeycutt was serving in the U.S. military when he was attacked by rockets.

1731.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Honeycutt.

1732.   The Iranian-supported FTO Hezbollah/JAM planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1733.   As a result of the attack and the injuries suffered, Robin Anthony Honeycutt is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1734.   Plaintiff Janice Kwilos-Edmonds is a citizen of the United States domiciled in

346

New York and is the mother of Robin Anthony Honeycutt.

1735.   As a result of the attack and the injuries suffered by Robin Anthony Honeycutt, Plaintiff Janice Kwilos-Edmonds is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 25.   THE DECEMBER 24, 2009 ATTACK – AL AMARAH

#### A.   PLAINTIFFS THE RICHARD WILSON SCARLETT FAMILY

1736.   Plaintiff Richard Wilson Scarlett is a U.S. citizen domiciled in Arizona.

1737.   On December 24, 2009, Richard Wilson Scarlett was serving in the U.S. military when he was attacked by IRAM Rockets and Mortars.

1738.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Scarlett.

1739.   The Iranian-supported FTO KH planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1740.   As a result of the attack and the injuries suffered, Richard Wilson Scarlett is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1741.   Plaintiff Deborah Scarlett is a citizen of the United States domiciled in Arizona and is the spouse of Richard Wilson Scarlett.

1742.   Plaintiff R.H.S., a minor child, represented by his legal guardians Richard Wilson Scarlett and Deborah Scarlett, is a citizen of the United States domiciled in Arizona and is the son of Richard Wilson Scarlett.

347

1743. Plaintiff A.W.S., a minor child, represented by his legal guardians Richard Wilson Scarlett and Deborah Scarlett, is a citizen of the United States domiciled in Arizona and is the son of Richard Wilson Scarlett.

1744. As a result of the attack and the injuries suffered by Richard Wilson Scarlett, Plaintiffs Deborah Scarlett, R.H.S., a minor child, and A.W.S., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 26.     THE DECEMBER 16, 2009 ATTACK – BASRA

### A.     PLAINTIFF JEFFREY DAVID EVANS

1745. Plaintiff Jeffrey David Evans is a U.S. citizen domiciled in New Mexico.

1746. On December 16, 2009, Jeffrey David Evans was serving in the U.S. military when he was attacked by an EFP.

1747. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Evans.

1748. The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1749. As a result of the attack and the injuries suffered, Jeffrey David Evans is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

27.     **THE NOVEMBER 24, 2009 ATTACK – MOSUL**

    A.     **PLAINTIFF MATTHEW DEAN ANDERSON**

1750.   Plaintiff Matthew Dean Anderson is a U.S. citizen domiciled in Tennessee.

1751.   On November 24, 2009, Matthew Dean Anderson was serving in the U.S. military when he was attacked by an IED.

1752.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Anderson.

1753.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1754.   As a result of the attack and the injuries suffered, Matthew Dean Anderson is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

28.     **THE OCTOBER 12, 2009 ATTACK – JALAWLA**

    A.     **PLAINTIFF MATTHEW JOSEPH POLOGRUTO**

1755.   Plaintiff Matthew Joseph Pologruto is a U.S. citizen domiciled in Ohio.

1756.   On October 12, 2009, Matthew Joseph Pologruto was serving in the U.S. military when he was attacked by mortars.

1757.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Pologruto.

1758.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

349

1759.   As a result of the attack and the injuries suffered, Matthew Joseph Pologruto is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 29.   THE SEPTEMBER 1, 2009 ATTACK – GHAZALIYA

### A.   PLAINTIFFS THE THOMAS ANTHONY HENSHALL, JR. FAMILY

1760.   Plaintiff Thomas Anthony Henshall, Jr. is a U.S. citizen domiciled in California.

1761.   On or about September 1, 2009, Thomas Anthony Henshall, Jr. was serving in the U.S. military when he was attacked by an RPG.

1762.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Henshall.

1763.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1764.   As a result of the attack and the injuries suffered, Thomas Anthony Henshall, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1765.   Plaintiff Yesenia Henshall Perez is a citizen of the United States domiciled in California and is the spouse of Thomas Anthony Henshall, Jr.

1766.   Plaintiff Thomas A. Henshall, Sr. is a citizen of the United States domiciled in Haverhill, England and is the father of Thomas Anthony Henshall, Jr.

1767.   Plaintiff Danielle Bowen is a citizen of the United States domiciled in South

Carolina and is the mother of Thomas Anthony Henshall, Jr.

1768. As a result of the attack and the injuries suffered by Thomas Anthony Henshall, Jr., Plaintiffs Yesenia Henshall Perez, Thomas A. Henshall, Sr. and Danielle Bowen, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 30.    THE AUGUST 31, 2009 ATTACK - TARMIYAH

####        A.    PLAINTIFF DANIEL JARED WILKERSON

1769. Plaintiff Daniel Jared Wilkerson is a U.S. citizen domiciled in Arkansas.

1770. On August 31, 2009, Daniel Jared Wilkerson was serving in the U.S. military when he was attacked by an anti-tank bomb.

1771. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Wilkerson.

1772. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1773. As a result of the attack and the injuries suffered, Daniel Jared Wilkerson is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 31.    THE AUGUST 15, 2009 ATTACK – DISTRICT OF BAJI

####        A.    PLAINTIFFS THE LUKE PETER HARVEY FAMILY

1774. Plaintiff Luke Peter Harvey is a U.S. citizen domiciled in North Carolina.

1775. On August 15, 2009, Luke Peter Harvey was serving in the U.S. military when he

was attacked by a daisy chained IED.

1776.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Harvey.

1777.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1778.   As a result of the attack and the injuries suffered, Luke Peter Harvey is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1779.   Plaintiff Susan A. Harvey is a citizen of the United States domiciled in Massachusetts and is the mother of Luke Peter Harvey.

1780.   Plaintiff John K. Harvey is a citizen of the United States domiciled in Massachusetts and is the father of Luke Peter Harvey.

1781.   Plaintiff L.K.K., a minor child, represented by his legal guardian Luke Peter Harvey, is a citizen of the United States domiciled in North Carolina and is the son of Luke Peter Harvey.

1782.   As a result of the attack and the injuries suffered by Luke Peter Harvey, Plaintiffs Susan A. Harvey, John K. Harvey and L.K.K., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 32.    THE AUGUST 13, 2009 ATTACK – KIRKUK

#### A.    PLAINTIFF JERRY MATTHEW TEAL

1783.    Plaintiff Jerry Matthew Teal is a U.S. citizen domiciled in Connecticut.

1784.    On August 13, 2009, Jerry Matthew Teal was serving in the U.S. military when he was attacked by an IED.

1785.    Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Teal.

1786.    The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1787.    As a result of the attack and the injuries suffered, Jerry Matthew Teal is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 33.    THE AUGUST 2, 2009 ATTACK – MIQDADIYAH

#### A.    PLAINTIFFS THE KENNETH LEE SMITH FAMILY

1788.    Plaintiff Kenneth Lee Smith is a U.S. citizen domiciled in Arkansas.

1789.    On August 2, 2009, Kenneth Lee Smith was serving in the U.S. military when he was attacked by an EFP.

1790.    Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Smith.

1791.    The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1792.   As a result of the attack and the injuries suffered, Kenneth Lee Smith is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1793.   Plaintiff J.A.S., a minor child, represented by his legal guardian Kenneth Lee Smith, is a citizen of the United States domiciled in Arkansas and is the son of Kenneth Lee Smith.

1794.   As a result of the attack and the injuries suffered by Kenneth Lee Smith, Plaintiff J.A.S., a minor child, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 34.   THE JULY 31, 2009 ATTACK – KIRKUK

### A.   PLAINTIFF JERRY MATTHEW TEAL

1795.   Plaintiff Jerry Matthew Teal is a U.S. citizen domiciled in Connecticut.

1796.   On July 31, 2009, Jerry Matthew Teal was serving in the U.S. military when he was attacked by an IED.

1797.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Teal.

1798.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1799.   As a result of the attack and the injuries suffered, Jerry Matthew Teal is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical

354

expenses, lost income, and loss of earning capacity.

**35.    THE JULY 12, 2009 ATTACK – SHARQAT**

**A.    PLAINTIFFS THE DAVID ALAN CONWAY, II, FAMILY**

1800.   Plaintiff David Alan Conway, II, is a U.S. citizen domiciled in Kansas.

1801.   On July 12, 2009, David Alan Conway, II, was serving in the U.S. military when he was attacked by IED.

1802.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Conway.

1803.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1804.   As a result of the attack and the injuries suffered, David Alan Conway, II, is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1805.   Plaintiff Christopher Conway is a citizen of the United States domiciled in Kansas and is the brother of David Alan Conway, II.

1806.   Plaintiff Dallas Conway is a citizen of the United States domiciled in Kansas and is the brother of David Alan Conway, II.

1807.   Plaintiff David A. Conway is a citizen of the United States domiciled in Kansas and is the father of David Alan Conway, II.

1808.   Plaintiff Kristie Conway is a citizen of the United States domiciled in Kansas and is the mother of David Alan Conway, II.

1809.   As a result of the attack and the injuries suffered by David Alan Conway, II,

Plaintiffs Christopher Conway, Dallas Conway, David A. Conway and Kristie Conway are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 36. THE JULY 1, 2009 ATTACK - TARMIYAH

#### A. PLAINTIFF DANIEL JARED WILKERSON

1810. Plaintiff Daniel Jared Wilkerson is a U.S. citizen domiciled in Arkansas.

1811. On or about July 1, 2009, Daniel Jared Wilkerson was serving in the U.S. military when he was attacked by an IED.

1812. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Wilkerson.

1813. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1814. As a result of the attack and the injuries suffered, Daniel Jared Wilkerson is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 37. THE JUNE 7, 2009 ATTACK – HABBANIYAH

#### A. PLAINTIFF BRYAN EDWARD PLUM

1815. Plaintiff Bryan Edward Plum is a U.S. citizen domiciled in Arizona.

1816. On June 7, 2009, Bryan Edward Plum was serving in the U.S. military when he was attacked by an IED.

1817. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or

other material support used to commit the attack, which injured Mr. Plum.

1818.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1819.   As a result of the attack and the injuries suffered, Bryan Edward Plum is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 38.   THE MAY 25, 2009 ATTACK – BALAD

### A.   PLAINTIFFS THE JOSE LUIS TREVINO FAMILY

1820.   Plaintiff Jose Luis Trevino is a U.S. citizen domiciled in Ohio.

1821.   On May 25, 2009, Jose Luis Trevino was serving in the U.S. military when he was attacked by rockets.

1822.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Trevino.

1823.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1824.   As a result of the attack and the injuries suffered, Jose Luis Trevino is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1825.   Plaintiff Bivian Kay Trevino is a citizen of the United States domiciled in Ohio and is the spouse of Jose Luis Trevino.

1826.  As a result of the attack and the injuries suffered by Jose Luis Trevino, Plaintiff Bivian Kay Trevino is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 39.    THE APRIL 23, 2009 ATTACK – QAYYARAH

#### A.    PLAINTIFFS THE MICHAEL ANDREW HURD, SR. FAMILY

1827.  Plaintiff Michael Andrew Hurd, Sr. is a U.S. citizen domiciled in California.

1828.  On April 23, 2009, Michael Andrew Hurd, Sr. was serving in the U.S. military when he was attacked by an RKG grenade.

1829.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Hurd.

1830.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1831.  As a result of the attack and the injuries suffered, Michael Andrew Hurd, Sr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1832.  Plaintiff Mamta Hurd is a citizen of the United States domiciled in California and is the spouse of Michael Andrew Hurd, Sr.

1833.  Plaintiff Gerald Andrew Hurd is a citizen of the United States domiciled in California and is the father of Michael Andrew Hurd, Sr.

1834.  Plaintiff Karen Ann Clover is a citizen of the United States domiciled in California and is the mother of Michael Andrew Hurd, Sr.

1835.   Plaintiff C.A.H., a minor child, represented by her legal guardians Michael Andrew Hurd, Sr. and Mamta Hurd, is a citizen of the United States domiciled in California and is the daughter of Michael Andrew Hurd, Sr.

1836.   Plaintiff M.A.H., a minor child, represented by his legal guardians Michael Andrew Hurd, Sr. and Mamta Hurd, is a citizen of the United States domiciled in California and is the son of Michael Andrew Hurd, Sr.

1837.   As a result of the attack and the injuries suffered by Michael Andrew Hurd, Sr., Plaintiffs Mamta Hurd, Gerald Andrew Hurd, Karen Ann Clover, C.A.H., a minor child and M.A.H., a minor child are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 40.   THE APRIL 22, 2009 ATTACK – TIKRIT

### A.   PLAINTIFF MATTHEW CARNELL BEATTY

1838.   Plaintiff Matthew Carnell Beatty is a U.S. citizen domiciled in Texas.

1839.   On April 22, 2009, Matthew Carnell Beatty was serving in the U.S. military when he was attacked by an EFP.

1840.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Beatty.

1841.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1842.   As a result of the attack and the injuries suffered, Matthew Carnell Beatty is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including

medical expenses, lost income, and loss of earning capacity.

### 41.   THE APRIL 20, 2009 ATTACK – BAQUBAH

#### A.   PLAINTIFFS THE BRENT JASON WALKER FAMILY

1843.   Plaintiff Brent Jason Walker is a U.S. citizen domiciled in Connecticut.

1844.   On April 20, 2009, Brent Jason Walker was serving in the U.S. military when he was attacked by a suicide bomb.

1845.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Walker.

1846.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1847.   As a result of the attack and the injuries suffered, Brent Jason Walker is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1848.   Plaintiff Leland F. Walker is a citizen of the United States domiciled in Connecticut and is the father of Brent Jason Walker.

1849.   Plaintiff Susan H. Walker is a citizen of the United States domiciled in Connecticut and is the mother of Brent Jason Walker.

1850.   Plaintiff Benjamin L. Walker is a citizen of the United States domiciled in Connecticut and is the brother of Brent Jason Walker.

1851.   Plaintiff Kyle A. Walker is a citizen of the United States domiciled in Connecticut and is the brother of Brent Jason Walker.

1852.   As a result of the attack and the injuries suffered by Brent Jason Walker, Plaintiffs

Leland F. Walker, Susan H. Walker, Benjamin L. Walker, and Kyle A. Walker, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 42. THE APRIL 15, 2009 ATTACK – BALAD

### A. PLAINTIFFS THE MESHALL ELAINE WINNEGAN FAMILY

1853.   Plaintiff Meshall Elaine Winnegan is a U.S. citizen domiciled in Mississippi.

1854.   On April 15, 2009, Meshall Elaine Winnegan was serving in the U.S. military when she was attacked by an IED.

1855.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Ms. Winnegan.

1856.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1857.   As a result of the attack and the injuries suffered, Meshall Elaine Winnegan is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1858.   Plaintiff Devin Winnegan is a citizen of the United States domiciled in Alabama and is the former spouse of Meshall Elaine Winnegan.

1859.   Plaintiff Jazmen Nicole Sampson is a citizen of the United States domiciled in North Carolina and is the daughter of Meshall Elaine Winnegan.

1860.   Plaintiff James Jackson is a citizen of the United States domiciled in Mississippi and is the son of Meshall Elaine Winnegan.

1861.   Plaintiff Ronald Q. Rice is a citizen of the United States domiciled in Mississippi and is the brother of Meshall Elaine Winnegan.

1862.   Plaintiff Tyrone Adams is a citizen of the United States domiciled in Texas and is the brother of Meshall Elaine Winnegan.

1863.   As a result of the attack and the injuries suffered by Meshall Elaine Winnegan, Plaintiffs Devin Winnegan, Jazmen Nicole Sampson, James Jackson, Ronald Q. Rice and Tyrone Adams are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 43.    THE APRIL 12, 2009 ATTACK – MOSUL

### A.    PLAINTIFFS THE CORY LEE THOMAS FAMILY

1864.   Plaintiff Cory Lee Thomas is a U.S. citizen domiciled in Tennessee.

1865.   On April 12, 2009, Cory Lee Thomas was serving in the U.S. military when he was attacked by small arms fire.

1866.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Thomas.

1867.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1868.   As a result of the attack and the injuries suffered, Cory Lee Thomas is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1869.   Plaintiff A.L.T., a minor child, represented by his legal guardian Cory Lee

Thomas, is a citizen of the United States domiciled in Tennessee and is the son of Cory Lee Thomas.

1870.   Plaintiff N.A.T., a minor child, represented by his legal guardian Cory Lee Thomas, is a citizen of the United States domiciled in Tennessee and is the son of Cory Lee Thomas.

1871.   As a result of the attack and the injuries suffered by Cory Lee Thomas, Plaintiffs A.L.T., a minor child and N.A.T., a minor child are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 44.   THE APRIL 1, 2009 ATTACK – BAGHDAD

### A.   PLAINTIFF MARK LEE FLETCHER

1872.   Plaintiff Mark Lee Fletcher is a U.S. citizen domiciled in Washington.

1873.   On April 1, 2009, Mark Lee Fletcher was serving in the U.S. military when he was attacked by EFP.

1874.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Fletcher.

1875.   The Iranian-supported FTO Hezbollah/JAM planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1876.   As a result of the attack and the injuries suffered, Mark Lee Fletcher is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical

expenses, lost income, and loss of earning capacity.

**45.    THE MARCH 14, 2009 ATTACK – MOSUL**

**A.    PLAINTIFFS THE MATTHEW ALBERT JORDAN FAMILY**

1877.  Plaintiff Matthew Albert Jordan is a U.S. citizen domiciled in New Hampshire.

1878.  On March 14, 2009, Matthew Albert Jordan was serving in the U.S. military when he was attacked by an IED.

1879.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Jordan.

1880.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1881.  As a result of the attack and the injuries suffered, Matthew Albert Jordan is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1882.  Plaintiff Katelynn Jordan is a citizen of the United States domiciled in New Hampshire and is the spouse of Matthew Albert Jordan.

1883.  Plaintiff O.J., a minor child, represented by her legal guardians Matthew Albert Jordan and Katelynn Jordan, is a citizen of the United States domiciled in New Hampshire and is the daughter of Matthew Albert Jordan.

1884.  As a result of the attack and the injuries suffered by Matthew Albert Jordan, Plaintiffs Katelynn Jordan and O.J., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services

and support.

**46.    THE MARCH 1, 2009 ATTACK – MADA'IN**

**A.    PLAINTIFFS THE MIGUEL ANGEL GONZALEZ FAMILY**

1885.   Plaintiff Miguel Angel Gonzalez is a U.S. citizen domiciled in California.

1886.   On March 1, 2009, Miguel Angel Gonzalez was serving in the U.S. military when he was attacked by a Mortar.

1887.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Gonzalez.

1888.   The Iranian-supported FTO Hezbollah/JAM planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1889.   As a result of the attack and the injuries suffered, Miguel Angel Gonzalez is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1890.   Plaintiff Elisa Gonzalez is a citizen of the United States domiciled in California and is the spouse of Miguel Angel Gonzalez.

1891.   As a result of the attack and the injuries suffered by Miguel Angel Gonzalez, Plaintiff Elisa Gonzalez is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 47.   THE FEBRUARY 18, 2009 ATTACK – AL AMARAH

#### A.   PLAINTIFF RICHARD RANDALL HEDGECOCK, II

1892.   Plaintiff Richard Randall Hedgecock, II is a U.S. citizen domiciled in North Carolina.

1893.   On February 18, 2009, Richard Randall Hedgecock, II was serving in the U.S. military when he was attacked by an IED.

1894.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Hedgecock.

1895.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1896.   As a result of the attack and the injuries suffered, Richard Randall Hedgecock, II is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 48.   THE FEBRUARY 15, 2009 ATTACK –AS SALAM

#### A.   PLAINTIFFS THE SHAWN MICHAEL DURNEN FAMILY

1897.   Plaintiff Shawn Michael Durnen is a U.S. citizen domiciled in Washington.

1898.   On February 15, 2009, Shawn Michael Durnen was serving in the U.S. military when he was attacked by an EFP.

1899.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Durnen.

1900.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the

attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1901. As a result of the attack and the injuries suffered, Shawn Michael Durnen is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1902. Plaintiff Don Durnen is a citizen of the United States domiciled in Michigan and is the father of Shawn Michael Durnen.

1903. Plaintiff Margaret Durnen is a citizen of the United States domiciled in Michigan and is the mother of Shawn Michael Durnen

1904. As a result of the attack and the injuries suffered by Shawn Michael Durnen, Plaintiffs Don Durnen and Margaret Durnen are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 49. THE FEBRUARY 14, 2009 ATTACK – HUSAYBAH

### A. PLAINTIFFS THE JUSTIN PERRY SEDELMAIER FAMILY

1905. Plaintiff Justin Perry Sedelmaier is a U.S. citizen domiciled in Michigan.

1906. On February 14, 2009, Justin Perry Sedelmaier was serving in the U.S. military when he was attacked by an IED.

1907. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Sedelmaier.

1908. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1909.   As a result of the attack and the injuries suffered, Justin Perry Sedelmaier is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1910.   Plaintiff Amber Nicole Sedelmaier is a citizen of the United States domiciled in Michigan and is the spouse of Justin Perry Sedelmaier.

1911.   As a result of the attack and the injuries suffered by Justin Perry Sedelmaier, Plaintiff Amber Nicole Sedelmaier is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 50.   THE FEBRUARY 11, 2009 ATTACK – BAGHDAD

### A.   PLAINTIFF GRAHAM JACOB THOMAS LINDSEY

1912.   Plaintiff Graham Jacob Thomas Lindsey is a U.S. citizen domiciled in Washington.

1913.   On February 11, 2009, Graham Jacob Thomas Lindsey was serving in the U.S. military when he was attacked by an EFP.

1914.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Lindsey.

1915.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1916.   As a result of the attack and the injuries suffered, Graham Jacob Thomas Lindsey is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including

medical expenses, lost income, and loss of earning capacity.

### 51. THE FEBRUARY 11, 2009 ATTACK – BAGHDAD

#### A. PLAINTIFFS THE CHRISTOPHER JAMES DUNN FAMILY

1917.   Plaintiff Christopher James Dunn is a U.S. citizen domiciled in Texas.

1918.   On February 11, 2009, Christopher James Dunn was serving in the U.S. military when he was attacked by an EFP.

1919.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Dunn.

1920.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1921.   As a result of the attack and the injuries suffered, Christopher James Dunn is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1922.   Plaintiff Steve Dunn is a citizen of the United States domiciled in Texas and is the father of Christopher James Dunn.

1923.   Plaintiff Sandy Dunn is a citizen of the United States domiciled in Texas and is the mother of Christopher James Dunn.

1924.   As a result of the attack and the injuries suffered by Christopher James Dunn, Plaintiffs Steve Dunn and Sandy Dunn, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

52.     **THE FEBRUARY 9, 2009 ATTACK – MOSUL**

A.     **PLAINTIFFS THE JOSHUA ALLEN WARD FAMILY**

1925.   Plaintiff Joshua Allen Ward is a U.S. citizen domiciled in Texas.

1926.   On February 9, 2009, Joshua Allen Ward was serving in the U.S. military when he was attacked by a VBIED causing his death.

1927.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which killed Mr. Ward.

1928.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1929.   As a result of the attack and the injuries suffered, Joshua Allen Ward is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1930.   Plaintiff Patricia Irene Ward is a citizen of the United States domiciled in Texas and is the mother of Joshua Allen Ward.

1931.   Plaintiff Patricia Irene Ward, brings an action individually and on behalf of the Estate of Joshua Allen Ward, and all heirs thereof, as its legal representative.

1932.   As a result of the attack, and the injuries suffered by and the death of Joshua Allen Ward, Plaintiff Patricia Irene Ward, has suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Joshua Allen Ward.

370

### 53.    THE DECEMBER 23, 2008 ATTACK – BALAD

#### A.    PLAINTIFF KEELAN MILES SOUTHERLAND

1933.   Plaintiff Keelan Miles Southerland is a U.S. citizen domiciled in Arkansas.

1934.   On December 23, 2008, Keelan Miles Southerland was serving in the U.S. military when he was attacked by a Rocket.

1935.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Southerland.

1936.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1937.   As a result of the attack and the injuries suffered, Keelan Miles Southerland is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 54.    THE NOVEMBER 22, 2008 ATTACK – VILLAGE OF BEJAT

#### A.    PLAINTIFFS THE GARY DON WHITE FAMILY

1938.   Plaintiff Gary Don White is a U.S. citizen domiciled in Oklahoma.

1939.   On November 22, 2008, Gary Don White was serving in the U.S. military when he was attacked by an IED.

1940.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. White.

1941.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

371

1942.   As a result of the attack and the injuries suffered, Gary Don White is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1943.   Plaintiff Vanessa White is a citizen of the United States domiciled in Oklahoma and is the spouse of Gary Don White.

1944.   Plaintiff Royetta White is a citizen of the United States domiciled in Oklahoma and is the spouse of Gary Don White.

1945.   Plaintiff A.W., a minor child, represented by his legal guardians Gary Don White and Vanessa White, is a citizen of the United States domiciled in Oklahoma and is the son of Gary Don White.

1946.   As a result of the attack and the injuries suffered by Gary Don White, Plaintiffs Vanessa White, Royetta White, and A.W., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 55.    THE NOVEMBER 21, 2008 ATTACK – FALLUJAH

####        A.    PLAINTIFF KYLE WILLIAM DAVENPORT

1947.   Plaintiff Kyle William Davenport is a U.S. citizen domiciled in California.

1948.   On November 21, 2008, Kyle William Davenport was serving in the U.S. military when he was attacked by an IED.

1949.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Davenport.

1950.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack,

as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1951.  As a result of the attack and the injuries suffered, Kyle William Davenport is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 56.    THE OCTOBER 30, 2008 ATTACK – NEAR HOSSEINIA

### A.    PLAINTIFF EMANUEL VALENCIA ALVAREZ

1952.  Plaintiff Emanuel Valencia Alvarez is a U.S. citizen domiciled in Arkansas.

1953.  On October 30, 2008, Emanuel Valencia Alvarez was serving in the U.S. military when he was attacked by an IED.

1954.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Alvarez.

1955.  The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1956.  As a result of the attack and the injuries suffered, Emanuel Valencia Alvarez is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 57.    THE OCTOBER 15, 2008 ATTACK – GHAZALIYA

### A.    PLAINTIFFS THE THOMAS ANTHONY HENSHALL, JR. FAMILY

1957.  Plaintiff Thomas Anthony Henshall Jr. is a U.S. citizen domiciled in California.

1958.   On or about October 15, 2008, Thomas Anthony Henshall Jr. was serving in the U.S. military when he was attacked by an RPG.

1959.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Henshall.

1960.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1961.   As a result of the attack and the injuries suffered, Thomas Anthony Henshall, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1962.   Plaintiff Yesenia Henshall Perez is a citizen of the United States domiciled in California and is the spouse of Thomas Anthony Henshall, Jr.

1963.   Plaintiff Thomas A. Henshall, Sr. is a citizen of the United States domiciled in Haverhill, England and is the father of Thomas Anthony Henshall, Jr.

1964.   Plaintiff Danielle Bowen is a citizen of the United States domiciled in South Carolina and is the mother of Thomas Anthony Henshall, Jr.

1965.   As a result of the attack and the injuries suffered by Thomas Anthony Henshall, Jr., Plaintiffs Yesenia Henshall Perez, Thomas A. Henshall, Sr. and Danielle Bowen, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 58.   THE OCTOBER 8, 2008 ATTACK – BAGHDAD

### A.   PLAINTIFFS THE MARK ALLEN WHETZEL FAMILY

1966.   Plaintiff Mark Allen Whetzel is a U.S. citizen domiciled in West Virginia.

1967.   On or about October 8, 2008, Mark Allen Whetzel was serving in the U.S. military when he was attacked by an IED.

1968.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Whetzel.

1969.   The Iranian-supported FTO Hezbollah/JAM planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1970.   As a result of the attack and the injuries suffered, Mark Allen Whetzel is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1971.   Plaintiff Jennifer Dawn Whetzel is a citizen of the United States domiciled in West Virginia and is the spouse of Mark Allen Whetzel.

1972.   Plaintiff Dianna Elizabeth Whetzel is a citizen of the United States domiciled in West Virginia and is the daughter of Mark Allen Whetzel.

1973.   As a result of the attack and the injuries suffered by Mark Allen Whetzel, Plaintiffs Jennifer Dawn Whetzel and Dianna Elizabeth Whetzel, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

375

**59.     THE SEPTEMBER 6, 2008 ATTACK – BAQUBAH**

**A.     PLAINTIFFS THE JAMES RYAN MCPHERSON FAMILY**

1974.   Plaintiff James Ryan McPherson is a U.S. citizen domiciled in Georgia.

1975.   On September 6, 2008, James Ryan McPherson was serving in the U.S. military when he was attacked by an IED and small arms.

1976.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. McPherson.

1977.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1978.   As a result of the attack and the injuries suffered, James Ryan McPherson is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1979.   Plaintiff Janice B. Rose is a citizen of the United States domiciled in Georgia and is the mother of James Ryan McPherson.

1980.   As a result of the attack and the injuries suffered by James Ryan McPherson, Plaintiff Janice B. Rose, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

**60.     THE AUGUST 31, 2008 ATTACK – AGUR QUF**

**A.     PLAINTIFF RICHARD GEORGE MOORE, JR.**

1981.   Plaintiff Richard George Moore, Jr. is a U.S. citizen domiciled in Florida.

1982.   On August 31, 2008, Richard George Moore, Jr. was serving in the U.S. military

when he was attacked by an IED with landmines.

1983.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Moore.

1984.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1985.   As a result of the attack and the injuries suffered, Richard George Moore, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 61.   THE AUGUST 15, 2008 ATTACK – SAMARA

### A.   PLAINTIFF KENNETH CHRISTIAN ANDERSON

1986.   Plaintiff Kenneth Christian Anderson is a U.S. citizen domiciled in Utah.

1987.   On August 15, 2008, Kenneth Christian Anderson was serving in the U.S. military when he was attacked by an IED.

1988.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Anderson.

1989.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1990.   As a result of the attack and the injuries suffered, Kenneth Christian Anderson is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

62.    **THE AUGUST 14, 2008 ATTACK – AL KHALIS**

A.    **PLAINTIFFS THE THOMAS TAVTIGIAN FAMILY**

1991.   Plaintiff Thomas Tavtigian is a U.S. citizen domiciled in Kansas.

1992.   On August 14, 2008, Thomas Tavtigian was serving in the U.S. military when he was attacked by an IED.

1993.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Tavtigian.

1994.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1995.   As a result of the attack and the injuries suffered, Thomas Tavtigian is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

1996.   Plaintiff Claudia Tavtigian is a citizen of the United States domiciled in Kansas and is the spouse of Thomas Tavtigian.

1997.   Plaintiff Courtney Marshall is a citizen of the United States domiciled in Kansas and is the daughter of Thomas Tavtigian.

1998.   As a result of the attack and the injuries suffered by Thomas Tavtigian, Plaintiffs Claudia Tavtigian  and Courtney Marshall are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 63.    THE AUGUST 14, 2008 ATTACK – BALAD RUZ

#### A.    PLAINTIFFS THE CLINTON DEWARD DURHAM FAMILY

1999.   Plaintiff Clinton Deward Durham is a U.S. citizen domiciled in Texas.

2000.   On August 14, 2008, Clinton Deward Durham was serving in the U.S. military when he was attacked by an IED.

2001.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Durham.

2002.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2003.   As a result of the attack and the injuries suffered, Clinton Deward Durham is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2004.   Plaintiff Doris Martin is a citizen of the United States domiciled in Texas and is the mother of Clinton Deward Durham.

2005.   Plaintiff Clinton Durham, Sr. is a citizen of the United States domiciled in Texas and is the father of Clinton Deward Durham.

2006.   Plaintiff Clinton Durham, Jr. is a citizen of the United States domiciled in Texas and is the brother of Clinton Deward Durham.

2007.   Plaintiff Troy Smith is a citizen of the United States domiciled in Texas and is the brother of Clinton Deward Durham.

2008.   Plaintiff Carrittee Michelle Smith is a citizen of the United States domiciled in Texas and is the sister of Clinton Deward Durham.

2009.   Plaintiff Sabrina Durham is a citizen of the United States domiciled in Texas and is the sister of Clinton Deward Durham.

2010.   Plaintiff Sheila Durham is a citizen of the United States domiciled in Texas and is the sister of Clinton Deward Durham.

2011.   Plaintiff D.N.D., a minor child, represented by his legal guardian Clinton Deward Durham, is a citizen of the United States domiciled in Texas and is the son of Clinton Deward Durham.

2012.   As a result of the attack and the injuries suffered by Clinton Deward Durham, Plaintiffs Doris Martin, Clinton Durham, Sr., Clinton Durham, Jr., Troy Smith, Carrittee Michelle Smith, Sabrina Durham, Sheila Durham, and D.N.D., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 64.     THE JULY 23, 2008 ATTACK – BAGHDAD

#### A.     PLAINTIFFS   THE   RODRICK   BERNARD   ANDERSON FAMILY

2013.   Plaintiff Rodrick Bernard Anderson is a U.S. citizen domiciled in Texas.

2014.   On July 23, 2008, Rodrick Bernard Anderson was serving as a civilian contractor to the U.S. military when he was attacked by an IED.

2015.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Anderson.

2016.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2017.   As a result of the attack and the injuries suffered, Rodrick Bernard Anderson is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2018.   Plaintiff Raena Blair Anderson is a citizen of the United States domiciled in Texas and is the daughter of Rodrick Bernard Anderson.

2019.   Plaintiff Rance Brevin Anderson is a citizen of the United States domiciled in Texas and is the son of Rodrick Bernard Anderson.

2020.   Plaintiff Ryler Brice Anderson is a citizen of the United States domiciled in Texas and is the son of Rodrick Bernard Anderson.

2021.   Plaintiff Ludie Ellen Shinault is a citizen of the United States domiciled in Mississippi and is the mother of Rodrick Bernard Anderson.

2022.   As a result of the attack and the injuries suffered by Rodrick Bernard Anderson, Plaintiffs Raena Blair Anderson, Rance Brevin Anderson, Ryler Brice Anderson and Ludie Ellen Shinault are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 65.   THE JULY 10, 2008 ATTACK – AL QAIM

### A.   PLAINTIFFS THE JUSTIN HULLETT FAMILY

2023.   Plaintiff Justin Hullett is a U.S. citizen domiciled in South Carolina.

2024.   On July 10, 2008, Justin Hullett was serving in the U.S. military when he was attacked by an IED.

2025.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Hullett.

2026. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2027. As a result of the attack and the injuries suffered, Justin Hullett is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2028. Plaintiff Georgina Elaine Gordon is a citizen of the United States domiciled in Tennessee and is the mother of Justin Hullett.

2029. Plaintiff Ronnie Hullett is a citizen of the United States domiciled in Georgia and is the father of Justin Hullett.

2030. Plaintiff Joey Adam Hullett is a citizen of the United States domiciled in Georgia and is the brother of Justin Hullett.

2031. Plaintiff Robbie Jay Hullett is a citizen of the United States domiciled in Georgia and is the brother of Justin Hullett.

2032. Plaintiff Kelsey Noel Adams is a citizen of the United States domiciled in Georgia and is the sister of Justin Hullett.

2033. As a result of the attack and the injuries suffered by Justin Hullett, Plaintiffs Georgina Elaine Gordon, Ronnie Hullett, Joey Adam Hullett, Robbie Jay Hullett, and Kelsey Noel Adams are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 66.    THE JULY 8, 2008 ATTACK – KHANDAHARI

#### A.    PLAINTIFF VUTHA EANG

2034.    Plaintiff Vutha Eang is a U.S. citizen domiciled in California.

2035.    On July 8, 2008, Vutha Eang was serving in the U.S. military when he was attacked by an IED.

2036.    Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Eang.

2037.    The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2038.    As a result of the attack and the injuries suffered, Vutha Eang is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 67.    THE JULY 8, 2008 ATTACK – KHANDAHARI

#### A.    PLAINTIFFS THE ROBERT JOSEPH BARTHEL FAMILY

2039.    Plaintiff Robert Joseph Barthel is a U.S. citizen domiciled in Michigan.

2040.    On July 8, 2008, Robert Joseph Barthel was serving in the U.S. military when he was attacked by an IED.

2041.    Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Barthel.

2042.    The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

383

2043.   As a result of the attack and the injuries suffered, Robert Joseph Barthel is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2044.   Plaintiff D.N.B, a minor child, represented by his legal guardian Robert Joseph Barthel, is a citizen of the United States domiciled in Texas and is the son of Robert Joseph Barthel.

2045.   Plaintiff T.M.B, a minor child, represented by his legal guardian Robert Joseph Barthel, is a citizen of the United States domiciled in Texas and is the son of Robert Joseph Barthel.

2046.   Plaintiff A.A.B, a minor child, represented by his legal guardian Robert Joseph Barthel, is a citizen of the United States domiciled in Texas and is the son of Robert Joseph Barthel.

2047.   As a result of the attack and the injuries suffered by Robert Joseph Barthel, Plaintiffs D.N.B., T.M.B., and A.A.B., minor children, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 68.   THE JULY 8, 2008 ATTACK – KHANDAHARI

### A.   PLAINTIFF NATHAN ALLEN ROLENS

2048.   Plaintiff Nathan Allen Rolens is a U.S. citizen domiciled in Texas.

2049.   On July 8, 2008, Nathan Allen Rolens was serving in the U.S. military when he was attacked by an IED.

2050.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or

other material support used to commit the attack, which injured Mr. Rolens.

2051.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2052.   As a result of the attack and the injuries suffered, Nathan Allen Rolens is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 69.   THE JULY 8, 2008 ATTACK – KHANDAHARI

### A.   PLAINTIFFS THE ERWIN DAVID SADDI FAMILY

2053.   Plaintiff Erwin David Saddi is a U.S. citizen domiciled in California.

2054.   On July 8, 2008, Erwin David Saddi was serving in the U.S. military when he was attacked by an IED.

2055.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Saddi.

2056.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2057.   As a result of the attack and the injuries suffered, Erwin David Saddi is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2058.   Plaintiff Sheila Saddi is a citizen of the United States domiciled in California and is the spouse of Erwin David Saddi.

2059.  Plaintiff S.M.S.1, a minor child, represented by his legal guardians Erwin David Saddi and Sheila Saddi, is a citizen of the United States domiciled in California and is the son of Erwin David Saddi.

2060.  Plaintiff S.M.S.2, a minor child, represented by her legal guardians Erwin David Saddi and Sheila Saddi, is a citizen of the United States domiciled in California and is the daughter of Erwin David Saddi.

2061.  Plaintiff S.F.S., a minor child, represented by her legal guardians Erwin David Saddi and Sheila Saddi, is a citizen of the United States domiciled in California and is the daughter of Erwin David Saddi.

2062.  As a result of the attack and the injuries suffered by Erwin David Saddi, Plaintiffs Sheila Saddi, S.M.S.1, a minor child, S.M.S.2., a minor child, and S.F.S., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 70.    THE JULY 7, 2008 ATTACK – FALLUJAH

### A.    PLAINTIFF BRYANT JOSHUA SCHILTZ

2063.  Plaintiff Bryant Joshua Schiltz is a U.S. citizen domiciled in Iowa.

2064.  On July 7, 2008, Bryant Joshua Schiltz was serving in the U.S. military when he was attacked by an IED.

2065.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Schiltz.

2066.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2067.   As a result of the attack and the injuries suffered, Bryant Joshua Schiltz is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 71.   THE JUNE 20, 2008 ATTACK - MUKHISA

### A.   PLAINTIFF BRIAN DAVID GOULD

2068.   Plaintiff Brian David Gould is a U.S. citizen domiciled in Colorado.

2069.   On June 20, 2008, Brian David Gould was serving in the U.S. military when he was attacked by an IED.

2070.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Gould.

2071.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2072.   As a result of the attack and the injuries suffered, Brian David Gould is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 72.   THE JUNE 20, 2008 ATTACK – FOB MAHMOUDIYAH

### A.   PLAINTIFFS THE MARK ALLEN WHETZEL FAMILY

2073.   Plaintiff Mark Allen Whetzel is a U.S. citizen domiciled in West Virginia.

2074.   On or about June 20, 2008, Mark Allen Whetzel was serving in the U.S. military when he was attacked by a mortar.

2075.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or

other material support used to commit the attack, which injured Mr. Whetzel.

2076.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2077.   As a result of the attack and the injuries suffered, Mark Allen Whetzel is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2078.   Plaintiff Jennifer Dawn Whetzel is a citizen of the United States domiciled in West Virginia and is the spouse of Mark Allen Whetzel.

2079.   Plaintiff Dianna Elizabeth Whetzel is a citizen of the United States domiciled in West Virginia and is the daughter of Mark Allen Whetzel.

2080.   As a result of the attack and the injuries suffered by Mark Allen Whetzel, Plaintiffs Jennifer Dawn Whetzel and Dianna Elizabeth Whetzel, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 73.   THE JUNE 19, 2008 ATTACK – SADR CITY, BAGHDAD

### A.   PLAINTIFF DANIEL RYAN KULICKA

2081.   Plaintiff Daniel Ryan Kulicka is a U.S. citizen domiciled in Alabama.

2082.   On June 19, 2008, Daniel Ryan Kulicka was serving in the U.S. military when he was attacked by an EFP.

2083.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Kulicka.

2084.   The Iranian-supported FTO Hezbollah/JAM planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2085.   As a result of the attack and the injuries suffered, Daniel Ryan Kulicka is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 74.     THE JUNE 17, 2008 ATTACK – BALAD (JOINT BASE BALAD)

### A.     PLAINTIFFS THE JUSTIN NEIL CARY FAMILY

2086.   Plaintiff Justin Neil Cary is a U.S. citizen domiciled in Tennessee.

2087.   On June 17, 2008, Justin Neil Cary was serving in the U.S. military when he was attacked by mortar.

2088.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Cary.

2089.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2090.   As a result of the attack and the injuries suffered, Justin Neil Cary is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2091.   Plaintiff Suzane Elizabeth Cary is a citizen of the United States domiciled in Tennessee and is the spouse of Justin Neil Cary.

2092.  Plaintiff Brittannie Cox is a citizen of the United States domiciled in Tennessee and is the daughter of Justin Neil Cary.

2093.  Plaintiff N.M., a minor child, represented by his legal guardian Justin Neil Cary, is a citizen of the United States domiciled in Tennessee and is the stepson of Justin Neil Cary.

2094.  Plaintiff Sandra D. Cary is a citizen of the United States domiciled Texas and is the mother of Justin Neil Cary.

2095.  Plaintiff Alex Duncan Cary is a citizen of the United States domiciled Texas and is the brother of Justin Neil Cary.

2096.  Plaintiff Kimberly Marie Cary is a citizen of the United States domiciled Texas and is the sister of Justin Neil Cary.

2097.  Plaintiff Audrey Cary Lange is a citizen of the United States domiciled Texas and is the sister of Justin Neil Cary.

2098.  As a result of the attack and the injuries suffered by Justin Neil Cary Plaintiffs Suzane Elizabeth Cary, Brittannie Cox, N.M., a minor child, Sandra D. Cary, Alex Duncan Cary, Kimberly Marie Cary and Audrey Cary Lange, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 75.    THE JUNE 12, 2008 ATTACK – UMM QASR

### A.    PLAINTIFF SEAN PATRICK LYNCH

2099.  Plaintiff Sean Patrick Lynch is a U.S. citizen domiciled in Arkansas.

2100.  On June 12, 2008, Sean Patrick Lynch was serving in the U.S. military when he was attacked by rockets and mortars.

2101.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or

other material support used to commit the attack, which injured Mr. Lynch.

2102.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2103.   As a result of the attack and the injuries suffered, Sean Patrick Lynch is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 76.   THE JUNE 11, 2008 ATTACK – BAGHDAD

### A.   PLAINTIFFS THE RONALD PAUL MCLANE FAMILY

2104.   Plaintiff Ronald Paul McLane is a U.S. citizen domiciled in Oregon.

2105.   On June, 11, 2008, Ronald Paul McLane was serving in the U.S. military when he was attacked by an EFP.

2106.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. McLane.

2107.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2108.   As a result of the attack and the injuries suffered, Ronald Paul McLane is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2109.   Plaintiff Candie Nicole Reed-McLane is a citizen of the United States domiciled in Oregon and is the spouse of Ronald Paul McLane.

2110.   Plaintiff J.P.M., a minor child, represented by his legal guardians Ronald Paul McLane and Candie Nicole Reed-McLane, is a citizen of the United States domiciled in Oregon and is the son of Ronald Paul McLane.

2111.   As a result of the attack and the injuries suffered by Ronald Paul McLane, Plaintiffs Candie Nicole Reed-McLane and J.P.M., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 77.   THE JUNE 5, 2008 ATTACK – FALLUJAH

### A.   PLAINTIFFS THE JACOB DEWAIN HOUSEHOLDER FAMILY

2112.   Plaintiff Jacob Dewain Householder is a U.S. citizen domiciled in Arkansas.

2113.   On or about June 5, 2008, Jacob Dewain Householder was serving in the U.S. military when he was attacked by a VBIED.

2114.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Householder.

2115.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2116.   As a result of the attack and the injuries suffered, Jacob Dewain Householder is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2117.   Plaintiff Janet Baxter is a citizen of the United States domiciled in Arkansas and

392

is the mother of Jacob Dewain Householder

2118.   Plaintiff James C. Householder is a citizen of the United States domiciled in Tennessee and is the father of Jacob Dewain Householder.

2119.   Plaintiff Caelen A. Baxter is a citizen of the United States domiciled in Arkansas and is the stepbrother of Jacob Dewain Householder.

2120.   Plaintiff Marcus S. Baxter is a citizen of the United States domiciled in Arkansas and is the stepfather of Jacob Dewain Householder.

2121.   As a result of the attack and the injuries suffered by Jacob Dewain Householder, Plaintiffs Janet Baxter, James C. Householder, Caelen A. Baxter and Marcus S. Baxter, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 78.    THE MAY 26, 2008 ATTACK – BALD RUZ

### A.    PLAINTIFFS THE WILLIAM BARNS ALLEN FAMILY

2122.   Plaintiff William Barns Allen is a U.S. citizen domiciled in Texas.

2123.   On May 26, 2008, William Barns Allen was serving in the U.S. military when he was attacked by an anti-tank mine.

2124.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Allen.

2125.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2126.   As a result of the attack and the injuries suffered, William Barns Allen is entitled to past and future noneconomic damages, including for severe physical and mental pain and

suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2127. Plaintiff E.G.A., a minor child, represented by her legal guardian William Barns Allen, is a citizen of the United States domiciled in Texas and is the daughter of William Barns Allen.

2128. As a result of the attack and the injuries suffered by William Barns Allen, Plaintiff E.G.A., a minor child, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 79. THE MAY 21, 2008 ATTACK – MOSUL

### A. PLAINTIFFS THE PHILIP LEE CHILDREY FAMILY

2129. Plaintiff Philip Lee Childrey is a U.S. citizen domiciled in Missouri.

2130. On May 21, 2008, Philip Lee Childrey was serving in the U.S. military when he was attacked by mortars.

2131. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Childrey.

2132. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2133. As a result of the attack and the injuries suffered, Philip Lee Childrey is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2134. Plaintiff Stephanie Childrey is a citizen of the United States and domiciled in the

State of Missouri. She is the wife of Philip Lee Childrey.

2135.   As a result of the attack and the injuries suffered by Philip Lee Childrey, Plaintiff Stephanie Childrey, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 80.   THE MAY 15, 2008 ATTACK – HADITHA DAM

#### A.   PLAINTIFF TRAVIS EUGENE SCHNEIDER

2136.   Plaintiff Travis Eugene Schneider is a U.S. citizen domiciled in California.

2137.   On May 15, 2008, Travis Eugene Schneider was serving in the U.S. military when he was attacked by RPGs and small arms.

2138.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Schneider.

2139.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2140.   As a result of the attack and the injuries suffered, Travis Eugene Schneider is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 81.   THE MAY 14, 2008 ATTACK – MUKESHEFAH

#### A.   PLAINTIFFS THE CHRISTOPHER NEIL SHELL FAMILY

2141.   Plaintiff Christopher Neil Shell is a U.S. citizen domiciled in Colorado.

2142.   On May 14, 2008, Christopher Neil Shell was serving in the U.S. military when he was attacked by an IED.

2143.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Shell.

2144.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2145.   As a result of the attack and the injuries suffered, Christopher Neil Shell is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2146.   Plaintiff Lisa Ann Shell is a citizen of the United States domiciled in Colorado and is the mother of Christopher Neil Shell.

2147.   Plaintiff David Lee Shell Jr. is a citizen of the United States domiciled in Virginia and is the brother of Christopher Neil Shell.

2148.   Plaintiff Curtis L. Shell is a citizen of the United States domiciled in Virginia and is the brother of Christopher Neil Shell.

2149.   As a result of the attack and the injuries suffered by Christopher Neil Shell, Plaintiffs Lisa Ann Shell, David Lee Shell Jr., and Curtis L. Shell are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 82.   THE MAY 10, 2008 ATTACK – BUHRIZ

### A.     PLAINTIFFS THE NOAH PARKER MUTRIE FAMILY

2150.   Plaintiff Noah Parker Mutrie is a U.S. citizen domiciled in New York.

2151.   On May 10, 2008, Noah Parker Mutrie was serving in the U.S. military when he

was attacked by an IED.

2152. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Mutrie.

2153. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2154. As a result of the attack and the injuries suffered, Noah Parker Mutrie is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2155. Plaintiff Ashley Mutrie is a citizen of the United States domiciled in New York and is the spouse of Noah Parker Mutrie.

2156. Plaintiff Alexandra Mutrie is a citizen of the United States domiciled in Louisiana and is the sister of Noah Parker Mutrie.

2157. Plaintiff B.M., a minor child, represented by his legal guardians Noah Parker Mutrie and Ashley Mutrie, is a citizen of the United States domiciled in New York and is the son of Noah Parker Mutrie.

2158. Plaintiff J.M., a minor child, represented by his legal guardians Noah Parker Mutrie and Ashley Mutrie, is a citizen of the United States domiciled in New York and is the son of Noah Parker Mutrie.

2159. As a result of the attack and the injuries suffered by Noah Parker Mutrie, Plaintiffs Ashley Mutrie, Alexandra Mutrie, B.M., a minor child, and J.M., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme

emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 83.   THE MAY 7, 2008 ATTACK – SADR CITY

#### A.   PLAINTIFF HENRY JESSIE BREWER, III

2160.   Plaintiff Henry Jessie Brewer, III is a U.S. citizen domiciled in Georgia.

2161.   On May 7, 2008, Henry Jessie Brewer, III was serving in the U.S. military when he was attacked by an EFP.

2162.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Brewer.

2163.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2164.   As a result of the attack and the injuries suffered, Henry Jessie Brewer, III is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 84.   THE MAY 3, 2008 ATTACK – BAGHDAD

#### A.   PLAINTIFFS THE ERIC ZACHARY HURST FAMILY

2165.   Plaintiff Eric Zachary Hurst is a U.S. citizen domiciled in Ohio.

2166.   On May 3, 2008, Eric Zachary Hurst was serving in the U.S. military when he was attacked by an IED.

2167.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Hurst.

2168.   The Iranian-supported FTO Hezbollah/JAM planned, committed, and/or

398

authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2169.   As a result of the attack and the injuries suffered, Eric Zachary Hurst is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2170.   Plaintiff Dwayne Hurst is a citizen of the United States domiciled in Ohio and is the brother of Eric Zachary Hurst.

2171.   Plaintiff Devin Tyler Hurst is a citizen of the United States domiciled in Ohio and is the brother of Eric Zachary Hurst.

2172.   Plaintiff Sierra Hurst is a citizen of the United States domiciled in Ohio and is the sister of Eric Zachary Hurst.

2173.   As a result of the attack and the injuries suffered by Eric Zachary Hurst, Plaintiffs Dwayne Hurst, Devin Tyler Hurst, and Sierra Hurst are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 85.   THE APRIL 30, 2008 ATTACK – SADR CITY

#### A.   PLAINTIFF KYLE LEE WELCH

2174.   Plaintiff Kyle Lee Welch is a U.S. citizen domiciled in Colorado.

2175.   On April 30, 2008, Kyle Lee Welch was serving in the U.S. military when he was attacked by an EFP.

2176.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or

other material support used to commit the attack, which injured Mr. Welch.

2177.  The Iranian-supported FTO Hezbollah/JAM planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2178.  As a result of the attack and the injuries suffered, Kyle Lee Welch is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 86.    THE APRIL 29, 2008 ATTACK – BAGHDAD

### A.    PLAINTIFF JEFFREY CHRISTOPHER HARPER, JR.

2179.  Plaintiff Jeffrey Christopher Harper, Jr. is a U.S. citizen domiciled in Tennessee.

2180.  On April 29, 2008, Jeffrey Christopher Harper, Jr. was serving in the U.S. military when he was attacked by an EFP, IED, RPGs, and Small Arms Fire.

2181.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Harper.

2182.  The Iranian-supported FTO Hezbollah/JAM planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2183.  As a result of the attack and the injuries suffered, Jeffrey Christopher Harper, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

87.   **THE APRIL 28, 2008 ATTACK – FALLUJAH**

    A.   **PLAINTIFFS THE JACOB DEWAIN HOUSEHOLDER FAMILY**

2184.   Plaintiff Jacob Dewain Householder is a U.S. citizen domiciled in Arkansas.

2185.   On April 28, 2008, Jacob Dewain Householder was serving in the U.S. military when he was attacked by small arms fire.

2186.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Householder.

2187.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2188.   As a result of the attack and the injuries suffered, Jacob Dewain Householder is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2189.   Plaintiff Janet Baxter is a citizen of the United States domiciled in Arkansas and is the mother of Jacob Dewain Householder

2190.   Plaintiff James C. Householder is a citizen of the United States domiciled in Tennessee and is the father of Jacob Dewain Householder.

2191.   Plaintiff Caelen A. Baxter is a citizen of the United States domiciled in Arkansas and is the stepbrother of Jacob Dewain Householder.

2192.   Plaintiff Marcus S. Baxter is a citizen of the United States domiciled in Arkansas and is the stepfather of Jacob Dewain Householder.

2193.   As a result of the attack and the injuries suffered by Jacob Dewain Householder,

Plaintiffs Janet Baxter, James C. Householder, Caelen A. Baxter and Marcus S. Baxter, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 88. THE APRIL 27, 2008 ATTACK – SADR CITY

### A. PLAINTIFF ANTHONY SAMUEL FARINA

2194.   Plaintiff Anthony Samuel Farina is a U.S. citizen domiciled in Indiana.

2195.   On April 27, 2008, Anthony Samuel Farina was serving in the U.S. military when he was attacked by an RPG.

2196.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Farina.

2197.   The Iranian-supported FTO Hezbollah/JAM planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2198.   As a result of the attack and the injuries suffered, Anthony Samuel Farina is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 89. THE APRIL 21, 2008 ATTACK – BAIJI

### A. PLAINTIFFS THE ADAM J. KOHLHAAS FAMILY

2199.   On April 21, 2008, Adam J. Kohlhaas was a U.S. citizen, domiciled in Kentucky, and serving in the U.S. military when he was attacked by an IED, causing his death.

2200.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or

other material support used to commit the attack on Mr. Kohlhaas.

2201.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

2202.   Plaintiff Paula Kohlhaas Miller is a citizen of the United States domiciled in California and is the aunt of Adam J. Kohlhaas.

2203.   Plaintiff Paula Kohlhaas Miller, brings an action individually and on behalf of the Estate of Adam J. Kohlhaas, and all heirs thereof, as its legal representative.

2204.   Plaintiff Henry Kohlhaas is a citizen of the United States domiciled in California and is the father of Adam J. Kohlhaas.

2205.   Plaintiff Rebecca Elaine Kohlhaas, brings an action on behalf of the Estate of Adam J. Kohlhaas, and all heirs thereof, as its legal representative.

2206.   As a result of the attack, and the injuries suffered by and the death of Adam J. Kohlhaas, Plaintiffs Paula Kohlhaas Miller and Henry Kohlhaas have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Adam J. Kohlhaas.

## 90.   THE APRIL 19, 2008 ATTACK – TAJI

### A.   PLAINTIFFS THE JESSE DAVID CORTRIGHT FAMILY

2207.   Plaintiff Jesse David Cortright is a U.S. citizen domiciled in New York.

2208.   On April 19, 2008, Jesse David Cortright was serving in the U.S. military when he was attacked by mortars.

2209.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Cortright.

2210.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2211.   As a result of the attack and the injuries suffered, Jesse David Cortright is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2212.   Plaintiff Michaela Faye Nocera Cortright is a citizen of the United States domiciled in New York and is the former spouse of Jesse David Cortright.

2213.   Plaintiff Diana Hotaling is a citizen of the United States domiciled in New York and is the mother of Jesse David Cortright.

2214.   Plaintiff Joseph Cortright is a citizen of the United States domiciled in New York and is the father of Jesse David Cortright.

2215.   Plaintiff Hanna Victoria Cortright is a citizen of the United States domiciled in New York and is the daughter of Jesse David Cortright

2216.   As a result of the attack and the injuries suffered by Jesse David Cortright, Plaintiffs Michaela Faye Nocera Cortright, Diana Hotaling, Joseph Cortright and Hanna Victoria Cortright are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 91.     THE APRIL 9, 2008 ATTACK – BALAD

### A.     PLAINTIFFS THE ANTHONY CAPRA, JR. FAMILY

2217.   On April 9, 2008, Anthony Capra, Jr. was a U.S. citizen, domiciled in Virginia, and serving in the U.S. military when he was attacked by an IED, causing his death.

2218.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Capra.

2219.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

2220.   Plaintiff Angie Capra is a citizen of the United States domiciled in Virginia and is the spouse of Anthony Capra, Jr.

2221.   Plaintiff Angie Capra, brings an action individually and on behalf of the Estate of Anthony Capra, Jr., and all heirs thereof, as its legal representative.

2222.   Plaintiff Anthony Capra, Sr. is a citizen of the United States domiciled in Virginia and is the father of Anthony Capra, Jr.

2223.   Plaintiff Sharon Capra is a citizen of the United States domiciled in Virginia and is the mother of Anthony Capra, Jr.

2224.   Plaintiff Mark Capra is a citizen of the United States domiciled in Virginia and is the son of Anthony Capra, Jr.

2225.   Plaintiff Victoria Capra is a citizen of the United States domiciled in Virginia and is the daughter of Anthony Capra, Jr.

2226.   Plaintiff A.C., a minor child, represented by her legal guardian Angie Capra, is a citizen of the United States domiciled in Virginia and is the daughter of Anthony Capra, Jr.

2227.   Plaintiff J.C., a minor child, represented by her legal guardian Angie Capra, is a citizen of the United States domiciled in Virginia and is the son of Anthony Capra, Jr.

2228.   Plaintiff S.C., a minor child, represented by her legal guardian Angie Capra, is a citizen of the United States domiciled in Virginia and is the son of Anthony Capra, Jr.

2229.   Plaintiff Danielle Capra is a citizen of the United States domiciled in Virginia and is the sister of Anthony Capra, Jr.

2230.   Plaintiff Emily Capra is a citizen of the United States domiciled in Virginia and is the sister of Anthony Capra, Jr.

2231.   Plaintiff Jacob D. Capra is a citizen of the United States domiciled in Virginia and is the brother of Anthony Capra, Jr.

2232.   Plaintiff Joanna Capra is a citizen of the United States domiciled in Virginia and is the sister of Anthony Capra, Jr.

2233.   Plaintiff Joseph E. Capra is a citizen of the United States domiciled in Virginia and is the brother of Anthony Capra, Jr.

2234.   Plaintiff Julia-Anne Capra is a citizen of the United States domiciled in Virginia and is the sister of Anthony Capra, Jr.

2235.   Plaintiff Michael L. Capra is a citizen of the United States domiciled in Virginia and is the brother of Anthony Capra, Jr.

2236.   Plaintiff Rachel M. Capra Lee is a citizen of the United States domiciled in Virginia and is the sister of Anthony Capra, Jr.

2237.   Plaintiff Sarah Capra Johnson is a citizen of the United States domiciled in Virginia and is the sister of Anthony Capra, Jr.

2238.   Plaintiff Jason Capra is a citizen of the United States domiciled in Florida and is the brother of Anthony Capra, Jr.

2239.   As a result of the attack, and the injuries suffered by and the death of Anthony Capra, Jr., Plaintiffs Angie Capra, Anthony Capra, Sr., Sharon Capra, Mark Capra, Victoria Capra, A.C. a minor child, J.C., a minor child, S.C., a minor child, Danielle Capra, Emily Capra,

Jacob D. Capra, Joanna Capra, Joseph E. Capra, Julia-Anne Capra, Michael L. Capra, Rachel M. Capra Lee, Sarah Capra Johnson, and Jason Capra, has suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Anthony Capra, Jr.

**92.    THE APRIL 7, 2008 ATTACK – BAGHDAD**

**A.    PLAINTIFF CHARLES FOSTER HARMON**

2240.   Plaintiff Charles Foster Harmon is a U.S. citizen domiciled in Texas.

2241.   On April 7, 2008, Charles Foster Harmon was serving in the U.S. military when he was attacked by a Mortar.

2242.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Harmon.

2243.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2244.   As a result of the attack and the injuries suffered, Charles Foster Harmon is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

**93.    THE APRIL 3, 2008 ATTACK – BAGHDAD**

**A.    PLAINTIFF DESMOND LEVAR ANTHONY**

2245.   Plaintiff Desmond Levar Anthony is a U.S. citizen domiciled in Washington.

2246.   On April 3, 2008, Desmond Levar Anthony was serving in the U.S. military when he was attacked by an EFP.

2247.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Anthony.

2248.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2249.   As a result of the attack and the injuries suffered, Desmond Levar Anthony is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 94.   THE APRIL 2, 2008 ATTACK – BAGHDAD

### A.   PLAINTIFF GREGORY JOSEPH REGAN, JR.

2250.   Plaintiff Gregory Joseph Regan, Jr. is a U.S. citizen domiciled in Illinois.

2251.   On April 2, 2008, Gregory Joseph Regan, Jr. was serving in the U.S. military when he was attacked by an EFP, RPGs and Small Arms Fire.

2252.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Regan.

2253.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2254.   As a result of the attack and the injuries suffered, Gregory Joseph Regan, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 95.     THE APRIL 2, 2008 ATTACK – BAQUBAH

### A.     PLAINTIFFS THE SENE PE'A POLU FAMILY

2255.   Plaintiff Sene Pe'a Polu is a U.S. National domiciled in Washington.

2256.   On April 2, 2008, Sene Pe'a Polu was serving in the U.S. military when he was attacked by an IED.

2257.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Polu.

2258.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2259.   As a result of the attack and the injuries suffered, Sene Pe'a Polu is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2260.   Plaintiff Rosalind Kemukisa Polu is a citizen of the United States domiciled in Washington and is the spouse of Sene Pe'a Polu.

2261.   Plaintiff Charley S. Polu is a citizen of the United States domiciled in Washington and is the son of Sene Pe'a Polu.

2262.   Plaintiff Chazity Oliana Elesi Polu is a citizen of the United States domiciled in Washington and is the daughter of Sene Pe'a Polu.

2263.   As a result of the attack and the injuries suffered by Sene Pe'a Polu, Plaintiffs Rosalind Kemukisa Polu, Charley S. Polu, and Chazity Oliana Elesi Polu, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including

loss of services and support.

**96.    THE MARCH 29, 2008 ATTACK – FALLUJAH**

      **A.    PLAINTIFFS THE DEVIN JAY MEURER FAMILY**

2264.    Plaintiff Devin Jay Meurer is a U.S. citizen domiciled in Texas.

2265.    On March 29, 2008, Devin Jay Meurer was serving in the U.S. military when he was attacked by an IED.

2266.    Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Meurer.

2267.    The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2268.    As a result of the attack and the injuries suffered, Devin Jay Meurer is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2269.    Plaintiff Donald J. Meurer is a citizen of the United States domiciled in Mississippi and is the father of Devin Jay Meurer.

2270.    Plaintiff Dustin J. Meurer is a citizen of the United States domiciled in Mississippi and is the brother of Devin Jay Meurer.

2271.    Plaintiff Marnie Meurer is a citizen of the United States domiciled in Mississippi and is the stepmother of Devin Jay Meurer.

2272.    As a result of the attack and the injuries suffered by Devin Jay Meurer, Plaintiffs Donald J. Meurer, Dustin J. Meurer, and Marnie Meurer are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and

suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 97.   THE MARCH 28, 2008 ATTACK – SADR CITY

### A.   PLAINTIFFS THE LEROY ESCO JR. FAMILY

2273.   Plaintiff Leroy Esco Jr. is a U.S. citizen domiciled in Arizona.

2274.   On March 28, 2008, Leroy Esco Jr. was serving in the U.S. military when he was attacked by an EFP.

2275.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Esco.

2276.   The Iranian-supported FTO Hezbollah/JAM planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2277.   As a result of the attack and the injuries suffered, Leroy Esco Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2278.   Plaintiff Taryn Esco is a citizen of the United States and domiciled in the State of Arizona. She is the wife of Leroy Esco, Jr.

2279.   Plaintiff Jade Lee-Esco is a citizen of the United States and domiciled in the State of Arizona. She is the daughter of Leroy Esco, Jr.

2280.   Plaintiff Madison Roth is a citizen of the United States and domiciled in the State of Arizona. She is the daughter of Leroy Esco, Jr.

2281.   Plaintiff A.P. a minor child, represented by her legal guardians Leroy Esco, Jr.

and Taryn Esco, is a citizen of the United States and domiciled in the State of Arizona. She is the daughter of Leroy Esco, Jr. and Taryn Esco.

2282.   Plaintiff K.P. a minor child, represented by her legal guardians Leroy Esco Jr. and Taryn Esco, is a citizen of the United States and domiciled in the State of Arizona. She is the daughter of Leroy Esco, Jr. and Taryn Esco.

2283.   Plaintiff L.E. a minor child, represented by her legal guardians Leroy Esco and Taryn Esco, is a citizen of the United States and domiciled in the State of Arizona. He is the son of Leroy Esco, Jr. and Taryn Esco.

2284.   As a result of the attack and the injuries suffered by Leroy Esco, Jr., Plaintiffs Taryn Esco, Jade Lee-Esco, Madison Roth, A.P. a minor child, K.P. a minor child, and L.E. a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 98.   THE MARCH 28, 2008 ATTACK – BAGHDAD

### A.   PLAINTIFFS THE CHARLES FREDDIE WADE, JR. FAMILY

2285.   Plaintiff Charles Freddie Wade, Jr. is a U.S. citizen domiciled in South Carolina.

2286.   On March 28, 2008, Charles Freddie Wade, Jr. was serving in the U.S. military when he was attacked by an EFP.

2287.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Wade.

2288.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2289.   As a result of the attack and the injuries suffered, Charles Freddie Wade, Jr. is

entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2290.  Plaintiff Robyn Wade is a citizen of the United States domiciled in South Carolina and is the spouse of Charles Freddie Wade, Jr.

2291.  Plaintiff R.W., a minor child, represented by his legal guardians Charles Freddie Wade, Jr. and Robyn Wade, is a citizen of the United States domiciled in South Carolina and is the son of Charles Freddie Wade, Jr.

2292.  Plaintiff H.W., a minor child, represented by her legal guardians Charles Freddie Wade, Jr. and Robyn Wade, is a citizen of the United States domiciled in South Carolina and is the daughter of Charles Freddie Wade, Jr.

2293.  Plaintiff C.W., a minor child, represented by his legal guardians Charles Freddie Wade, Jr. and Robyn Wade, is a citizen of the United States domiciled in South Carolina and is the son of Charles Freddie Wade, Jr.

2294.  As a result of the attack and the injuries suffered by Charles Freddie Wade, Jr., Plaintiffs Robyn Wade and R.W., a minor child, H.W., a minor child, C.W., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 99.   THE MARCH 27, 2008 ATTACK – KAHDIMIYAH

### A.   PLAINTIFF WALTER SCOTT GRIGG

2295.  Plaintiff Walter Scott Grigg is a U.S. citizen domiciled in North Carolina.

2296.  On March 27, 2008, Walter Scott Grigg was serving in the U.S. military when he was attacked by RPGs, Mortars and Small Arms Fire.

2297.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Grigg.

2298.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2299.   As a result of the attack and the injuries suffered, Walter Scott Grigg is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 100.   THE MARCH 27, 2008 ATTACK – SADR CITY

#### A.   PLAINTIFF HENRY JESSIE BREWER, III

2300.   Plaintiff Henry Jessie Brewer, III is a U.S. citizen domiciled in Georgia.

2301.   On March 27, 2008, Henry Jessie Brewer, III was serving in the U.S. military when he was attacked by small arms fire.

2302.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Brewer.

2303.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2304.   As a result of the attack and the injuries suffered, Henry Jessie Brewer, III is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

414

### 101.   THE MARCH 23, 2008 ATTACK – BAGHDAD

#### A.   PLAINTIFFS THE PHILIP RYAN TRIMBLE FAMILY

2305.   Plaintiff Philip Ryan Trimble is a U.S. citizen domiciled in Iowa.

2306.   On March 23, 2008, Philip Ryan Trimble was serving in the U.S. military when he was attacked by rockets and mortars.

2307.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Trimble.

2308.   The Iranian-supported FTO Hezbollah/JAM planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2309.   As a result of the attack and the injuries suffered, Philip Ryan Trimble is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2310.   Plaintiff Janet M. Schoonover is a citizen of the United States domiciled in Iowa and is the mother of Philip Ryan Trimble.

2311.   Plaintiff Charlotte Rae Teetsel is a citizen of the United States domiciled in Michigan and is the sister of Philip Ryan Trimble.

2312.   Plaintiff Andrew L. Trimble is a citizen of the United States domiciled in Iowa and is the brother of Philip Ryan Trimble.

2313.   Plaintiff Richard Oren Trimble is a citizen of the United States domiciled in Iowa and is the brother Philip Ryan Trimble.

2314.   Plaintiff LaDonna Renee Langstraat is a citizen of the United States domiciled in

Iowa and is the sister of Philip Ryan Trimble.

2315.   Plaintiff Kayeleen Anne Luloff is a citizen of the United States domiciled in Iowa and is the sister of Philip Ryan Trimble.

2316.   Plaintiff John A. Trimble is a citizen of the United States domiciled in Iowa and is the brother of Philip Ryan Trimble.

2317.   As a result of the attack and the injuries suffered by Philip Ryan Trimble, Plaintiffs Janet M. Schoonover, Charlotte Rae Teetsel, Andrew L. Trimble, Richard Oren Trimble, LaDonna Renee Langstraat, Kayeleen Anne Luloff, and John A. Trimble are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 102.   THE MARCH 19, 2008 ATTACK – BAGHDAD

### A.   PLAINTIFFS THE DAVID ROBERT BAXTER JR. FAMILY

2318.   Plaintiff David Robert Baxter Jr. is a U.S. citizen domiciled in Oregon.

2319.   On March 19, 2008, David Robert Baxter Jr. was serving in the U.S. military when he was attacked by rockets, RPGs and small arms fire.

2320.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Baxter.

2321.   The Iranian-supported FTO Hezbollah/JAM planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2322.   As a result of the attack and the injuries suffered, David Robert Baxter Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain

and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2323.   Plaintiff Nicole Michelle Baxter is a citizen of the United States domiciled in Oregon and is the spouse of David Robert Baxter Jr.

2324.   Plaintiff David Robert Baxter Sr. is a citizen of the United States domiciled in California and is the father of David Robert Baxter Jr.

2325.   As a result of the attack and the injuries suffered by David Robert Baxter Jr., Plaintiffs Nicole Michelle Baxter and David Robert Baxter Sr. are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 103.   THE MARCH 15, 2008 ATTACK – BAGHDAD

### A.   PLAINTIFFS THE WILLIAM DAVID O'BRIEN FAMILY

2326.   On March 15, 2008, William David O'Brien was a U.S. citizen, domiciled in Texas, and serving in the U.S. military when he was attacked by small arms fire, causing his death.

2327.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. O'Brien.

2328.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

2329.   Plaintiff Dawn R. Williamson is a citizen of the United States domiciled in Texas and is the mother of William David O'Brien.

2330.   Plaintiff John A. O'Brien is a citizen of the United States domiciled in Texas and

is the brother of William David O'Brien.

2331.   Plaintiff Dawn R. Williamson brings an action individually and on behalf of the pending Estate of William David O'Brien, and all heirs thereof, as its legal representative.

2332.   As a result of the attack, and the injuries suffered by and the death of William David O'Brien, Plaintiffs Dawn R. Williamson and John A. O'Brien, have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the pending Estate of William David O'Brien.

### 104.   THE MARCH 10, 2008 ATTACK –BAGHDAD

#### A.   PLAINTIFFS THE SCOTT ALEXANDER MCINTOSH FAMILY

2333.   On March 10, 2008, Scott Alexander McIntosh was a U.S. citizen, domiciled in Texas, and serving in the U.S. military when he was attacked by a VBIED, causing his death.

2334.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. McIntosh.

2335.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

2336.   Plaintiff Alexander G. McIntosh is a citizen of the United States domiciled in Texas and is the father of Scott Alexander McIntosh.

2337.   Plaintiff Gwen C. McIntosh is a citizen of the United States domiciled in Texas and is the mother of Scott Alexander McIntosh.

2338.   Plaintiff Eric G. McIntosh is a citizen of the United States domiciled in Texas and is the brother of Scott Alexander McIntosh.

2339.   Plaintiff Alexander G. McIntosh, brings an action individually and on behalf of the Estate of Scott Alexander McIntosh, and all heirs thereof, as its legal representative.

2340.   As a result of the attack, and the injuries suffered by and the death of Scott Alexander McIntosh, Plaintiffs Alexander G. McIntosh, Gwen C. McIntosh, and Eric G. McIntosh have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Scott Alexander McIntosh.

### 105.   THE MARCH 8, 2008 ATTACK – KIRKUK

#### A.      PLAINTIFFS THE WILLIAM MATTHEW PFEIFER FAMILY

2341.   Plaintiff William Matthew Pfeifer is a U.S. citizen domiciled in Arizona.

2342.   On March 8, 2008, William Matthew Pfeifer was serving in the U.S. military when he was attacked by an IED.

2343.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Pfeifer.

2344.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2345.   As a result of the attack and the injuries suffered, William Matthew Pfeifer is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2346.   Plaintiff Dorothy K Pfeifer is a citizen of the United States domiciled in Arizona and is the mother of William Matthew Pfeifer.

2347.   Plaintiff H.S.P., a minor child, represented by her legal guardian William Matthew Pfeifer, is a citizen of the United States domiciled in Arizona and is the daughter of William Matthew Pfeifer.

2348.   As a result of the attack and the injuries suffered by William Matthew Pfeifer, Plaintiffs Dorothy K Pfeifer, and H.S.P., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 106.   THE MARCH 7, 2008 ATTACK – BAGHDAD

### A.   PLAINTIFFS THE DEREK PAUL HADFIELD FAMILY

2349.   Plaintiff Derek Paul Hadfield is a U.S. citizen domiciled in the State of Ohio.

2350.   On March 7, 2008, Derek Paul Hadfield was serving in the U.S. military when he was attacked by an EFP.

2351.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Hadfield.

2352.   The Iranian-supported FTO Hezbollah/JAM planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2353.   As a result of the attack and the injuries suffered, Derek Paul Hadfield is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2354.   Plaintiff Ashley Nicole Hadfield is a citizen of the United States domiciled in the

420

State of West Virginia and is the ex-spouse of Derek Paul Hadfield.

2355.  Plaintiff Robert Walter Hadfield II is a citizen of the United States domiciled in the State of Ohio and is the father of Derek Paul Hadfield.

2356.  Plaintiff Kristi Lynn Hadfield is a citizen of the United States domiciled in the State of Ohio and is the mother of Derek Paul Hadfield.

2357.  Plaintiff Jennifer Christine Roton is a citizen of the United States domiciled in the State of West Virginia and is the sister of Derek Paul Hadfield.

2358.  As a result of the attack and the injuries suffered by Derek Paul Hadfield, Plaintiffs Ashley Nicole Hadfield, Robert Walter Hadfield II, Kristi Lynn Hadfield and Jennifer Christine Roton are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past

## 107.   THE MARCH 5, 2008 ATTACK – TALLIL

### A.      PLAINTIFF JOHN PATRICK HARRIS

2359.  Plaintiff John Patrick Harris is a U.S. citizen domiciled in Texas.

2360.  On March 5, 2008, John Patrick Harris was serving in the U.S. military when he was attacked by a Rocket.

2361.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Harris.

2362.  The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2363.  As a result of the attack and the injuries suffered, John Patrick Harris is entitled to past and future noneconomic damages, including for severe physical and mental pain and

suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 108.    THE FEBRUARY 25, 2008 ATTACK – TIKRIT

### A.    PLAINTIFFS THE RICKY ALLEN PATA FAMILY

2364.    Plaintiff Ricky Allen Pata is a U.S. citizen domiciled in Kansas.

2365.    On February 25, 2008, Ricky Allen Pata was serving in the U.S. military when he was attacked by an IED.

2366.    Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Pata.

2367.    The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2368.    As a result of the attack and the injuries suffered, Ricky Allen Pata is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2369.    Plaintiff R.A.P., a minor child, represented by his legal guardian Ricky Allen Pata, is a citizen of the United States domiciled in Kansas and is the son of Ricky Allen Pata.

2370.    Plaintiff R.R.P., a minor child, represented by his legal guardian Ricky Allen Pata, is a citizen of the United States domiciled in Kansas and is the son of Ricky Allen Pata.

2371.    As a result of the attack and the injuries suffered by Ricky Allen Pata, Plaintiffs R.A.P., a minor child, and R.R.P., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services

and support.

### 109.   THE FEBRUARY 17, 2008 ATTACK – SENEIA TOWN

#### A.   PLAINTIFF JASON RANDY SMITH

2372.   Plaintiff Jason Randy Smith is a U.S. citizen domiciled in Virginia.

2373.   On February 17, 2008, Jason Randy Smith was serving in the U.S. military when he was attacked by a sniper rifle.

2374.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Smith.

2375.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2376.   As a result of the attack and the injuries suffered, Jason Randy Smith is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 110.   THE FEBRUARY 14, 2008 ATTACK – AL TAJI

#### A.   PLAINTIFFS THE DAVID ANDREW HOLLEY FAMILY

2377.   Plaintiff David Andrew Holley is a U.S. citizen domiciled in Tennessee.

2378.   On February 14, 2008, David Andrew Holley was serving in the U.S. military when he was attacked by IED.

2379.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Holley.

2380.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the

423

attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2381.   As a result of the attack and the injuries suffered, David Andrew Holley is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2382.   Plaintiff Teri Tarantino is a citizen of the United States and domiciled in the State of Tennessee. She is the mother of David Andrew Holley.

2383.   As a result of the attack and the injuries suffered by David Andrew Holley, Plaintiff Teri Tarantino, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 111.   THE FEBRUARY 5, 2008 ATTACK – BALAD

#### A.   PLAINTIFFS THE KRISTOPHER KENNETH SIEMON FAMILY

2384.   Plaintiff Kristopher Kenneth Siemon is a U.S. citizen domiciled in Washington.

2385.   On February 5, 2008, Kristopher Kenneth Siemon was serving in the U.S. military when he was attacked by IEDs and small arms.

2386.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr.Siemon.

2387.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2388.   As a result of the attack and the injuries suffered, Kristopher Kenneth Siemon is entitled to past and future noneconomic damages, including for severe physical and mental pain

and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2389.   Plaintiff Kenneth Siemon is a citizen of the United States domiciled in California and is the father of Kristopher Kenneth Siemon.

2390.   Plaintiff Teddie Hernandez is a citizen of the United States domiciled in California and is the sister of Kristopher Kenneth Siemon.

2391.   Plaintiff Pennie Siemon is a citizen of the United States domiciled in California and is the mother of Kristopher Kenneth Siemon.

2392.   Plaintiff Wendie Siemon-Thiel is a citizen of the United States domiciled in California and is the sister of Kristopher Kenneth Siemon

2393.   As a result of the attack and the injuries suffered by Kristopher Kenneth Siemon, Plaintiffs Kenneth Siemon, Teddie Hernandez, Pennie Siemon and Wendie Siemon-Thiel are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 112.   THE JANUARY 28, 2008 ATTACK – MOSUL

### A.   PLAINTIFFS THE BRANDON ABBOTT MEYER FAMILY

2394.   On January 28, 2008, Brandon Abbott Meyer was a U.S. citizen, domiciled in California, and serving in the U.S. military when he was attacked by an IED, causing his death.

2395.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Meyer.

2396.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

425

2397.   Plaintiff Eugenia Marie Meyer is a citizen of the United States domiciled in California and is the mother of Brandon Abbott Meyer.

2398.   Plaintiff Terry Lynn Meyer is a citizen of the United States domiciled in California and is the father of Brandon Abbott Meyer.

2399.   Plaintiff Desiree Suzanne Meyer-Roder is a citizen of the United States domiciled in Texas and is the sister of Brandon Abbott Meyer.

2400.   Plaintiff Eugenia Marie Meyer, brings an action individually and on behalf of the surviving beneficiaries of Brandon Abbott Meyer, and all heirs thereof..

2401.   As a result of the attack, and the injuries suffered by and the death of Brandon Abbott Meyer, Plaintiffs Eugenia Marie Meyer, Terry Lynn Meyer, and Desiree Suzanne Meyer-Roder have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Brandon Abbott Meyer.

### 113.   THE JANUARY 28, 2008 ATTACK – NASIRIYAH

#### A.   PLAINTIFF DAVID ROBERT WENZEL

2402.   Plaintiff David Robert Wenzel is a U.S. citizen domiciled in California.

2403.   On January 28, 2008, David Robert Wenzel was serving in the U.S. military when he was attacked by an EFP.

2404.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Wenzel.

2405.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2406.   As a result of the attack and the injuries suffered, David Robert Wenzel is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 114.   THE JANUARY 21, 2008 ATTACK – SAMARRA

### A.   PLAINTIFFS THE CHARLES LEE STORLIE FAMILY

2407.   Plaintiff Charles Lee Storlie is a U.S. citizen domiciled in Minnesota.

2408.   On January 21, 2008, Charles Lee Storlie was serving as a civilian contractor to the U.S. military when he was attacked by a Suicide Bomber.

2409.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Storlie.

2410.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2411.   As a result of the attack and the injuries suffered, Charles Lee Storlie is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2412.   Plaintiff Marian Leigh Tise is a citizen of the United States domiciled in Minnesota and is the mother of Charles Lee Storlie.

2413.   Plaintiff Chadwick William Storlie is a citizen of the United States domiciled in Minnesota and is the brother of Charles Lee Storlie.

2414.   Plaintiff Richard Nels Storlie is a citizen of the United States domiciled in Minnesota and is the brother of Charles Lee Storlie.

427

2415.   Plaintiff Jordan Antoniazzo Madonna Jonju is a citizen of the United States domiciled in Minnesota and is the sister of Charles Lee Storlie.

2416.   As a result of the attack and the injuries suffered by Charles Lee Storlie, Plaintiffs Marian Leigh Tise, Chadwick William Storlie, Richard Nels Storlie, and Jordan Antoniazzo Madonna Jonju are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 115.   THE DECEMBER 16, 2007 ATTACK – BALAD

####     A.     PLAINTIFFS THE SEAN TAYLOR SCRUGGS FAMILY

2417.   Plaintiff Sean Taylor Scruggs is a U.S. citizen domiciled in Nevada.

2418.   On December 16, 2007, Sean Taylor Scruggs was serving in the U.S. military when he was attacked by mortar.

2419.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Scruggs.

2420.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2421.   As a result of the attack and the injuries suffered, Sean Taylor Scruggs is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2422.   Plaintiff John Charles Scruggs is a citizen of the United States domiciled in California and is the father of Sean Taylor Scruggs.

2423.   Plaintiff Gail Lindley Fryer is a citizen of the United States domiciled in

California and is the sister of Sean Taylor Scruggs.

2424.   Plaintiff Cherokee Raine Scruggs is a citizen of the United States domiciled in California and is the daughter of Sean Taylor Scruggs

2425.   Plaintiff Cheyenne Rose Scruggs is a citizen of the United States domiciled in Oregon and is the daughter of Sean Taylor Scruggs

2426.   Plaintiff Sandra Dee Brice is a citizen of the United States domiciled in California and is the sister of Sean Taylor Scruggs

2427.   As a result of the attack and the injuries suffered by Sean Taylor Scruggs, Plaintiffs John Charles Scruggs, Cheyenne Rose Scruggs, Cherokee Raine Scruggs, Gail Lindley Fryer and Sandra Dee Brice, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 116.   THE DECEMBER 13, 2007 ATTACK – BAGHDAD

####    A.      PLAINTIFFS THE DONALD MARTIN FAMILY

2428.   Plaintiff Donald Martin is a U.S. citizen domiciled in Alabama.

2429.   On December 13, 2007, Donald Martin was serving in the U.S. military when he was attacked by an EFP.

2430.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Martin.

2431.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2432.   As a result of the attack and the injuries suffered, Donald Martin is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering,

429

loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2433.   Plaintiff Bonnie Osmer is a citizen of the United States domiciled in Alabama and is the mother of Donald Martin.

2434.   Plaintiff Cory Osmer is a citizen of the United States domiciled in Alabama and is the brother of Donald Martin.

2435.   As a result of the attack and the injuries suffered by Donald Martin, Plaintiffs Bonnie Osmer and Cory Osmer are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 117.   THE DECEMBER 9, 2007 ATTACK – ISKANDARIYA

### A.   PLAINTIFFS THE KENDRICK LEE DIXON FAMILY

2436.   Plaintiff Kendrick Lee Dixon is a U.S. citizen domiciled in Georgia.

2437.   On December 9, 2007, Kendrick Lee Dixon was serving in the U.S. military when he was attacked by an IED.

2438.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Dixon.

2439.   The Iranian-supported FTO Hezbollah/JAM planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2440.   As a result of the attack and the injuries suffered, Kendrick Lee Dixon is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical

expenses, lost income, and loss of earning capacity.

2441.   Plaintiff KaDaivion LaTrell Dixon is a citizen of the United States domiciled in Georgia and is the son of Kendrick Lee Dixon.

2442.   As a result of the attack and the injuries suffered by Kendrick Lee Dixon, Plaintiff KaDaivion LaTrell Dixon is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 118.   THE DECEMBER 5, 2007 ATTACK – BAQUBAH

#### A.   PLAINTIFF JORDAN KALEB SMITH

2443.   Plaintiff Jordan Kaleb Smith is a U.S. citizen domiciled in Alabama.

2444.   On December 5, 2007, Jordan Kaleb Smith was serving in the U.S. military when he was attacked by an IED.

2445.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Smith.

2446.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2447.   As a result of the attack and the injuries suffered, Jordan Kaleb Smith is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 119.   THE DECEMBER 5, 2007 ATTACK – BAQUBAH

#### A.   PLAINTIFFS THE SHAUN DAVID GARRY FAMILY

2448.   Plaintiff Shaun David Garry is a U.S. citizen domiciled in Illinois.

431

2449.  On December 5, 2007, Shaun David Garry was serving in the U.S. military when he was attacked by an IED.

2450.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Garry.

2451.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2452.  As a result of the attack and the injuries suffered, Shaun David Garry is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2453.  Plaintiff Robert Garry is a citizen of the United States domiciled in Illinois and is the father of Shaun David Garry.

2454.  Plaintiff Susan Garry is a citizen of the United States domiciled in Illinois and is the mother of Shaun David Garry.

2455.  Plaintiff Patrick Garry is a citizen of the United States domiciled in Illinois and is the brother of Shaun David Garry.

2456.  Plaintiff Bridget Garry is a citizen of the United States domiciled in Illinois and is the sister of Shaun David Garry.

2457.  Plaintiff Meghan Garry is a citizen of the United States domiciled in Illionis and is the sister of Shaun David Garry.

2458.  Plaintiff S.D., a minor child, represented by his legal guardian Shaun David Garry, is a citizen of the United States domiciled in Illinois and is the son of Shaun David Garry.

2459.   As a result of the attack and the injuries suffered by Shaun David Garry, Plaintiffs Robert Garry, Susan Garry, Patrick Garry, Bridget Garry, Meghan Garry and S.D., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 120.   THE NOVEMBER 10, 2007 ATTACK – QARYAT AL-ASHIG

### A.   PLAINTIFFS THE JORDAN WILLIAM BOWLING, JR. FAMILY

2460.   On November 10, 2007, Jordan William Bowling, Jr. was a U.S. citizen, domiciled in Maryland, and serving in the U.S. military when he was attacked by VBIED, resulting in injuries causing his death on March 4, 2011.

2461.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Bowling.

2462.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

2463.   Plaintiff Ronda Melton is a citizen of the United States domiciled in Maryland and is the mother of Jordan William Bowling, Jr.

2464.   Plaintiff Ronda Melton, brings an action individually and on behalf of the Estate of Jordan William Bowling, Jr., and all heirs thereof, as its legal representative.

2465.   Plaintiff Shelley Lynn Abbott is a citizen of the United States domiciled in Maryland and is the sister of Jordan William Bowling, Jr.

2466.   Plaintiff Jordan W. Bowling, Sr. is a citizen of the United States domiciled in Maryland and is the father of Jordan William Bowling, Jr.

2467.   Plaintiff D.B., a minor child, represented by her legal guardian Jessica R. Hicks, is a citizen of the United States domiciled in Maryland and is the daughter of Jordan William Bowling, Jr.

2468.   Plaintiff J.B., a minor child, represented by his legal guardian Jessica R. Hicks, is a citizen of the United States domiciled in Maryland and is the son of Jordan William Bowling, Jr.

2469.   As a result of the attack, and the injuries suffered by and the death of Jordan William Bowling, Jr., Plaintiffs Ronda Melton, Shelley Lynn Abbott, Jordan W. Bowling, Sr., D.B., a minor child, and J.B., a minor child, have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Jordan William Bowling, Jr.

## 121.   THE OCTOBER 31, 2007 ATTACK – NASIRIYAH

### A.   PLAINTIFFS THE ABRAHAM MARTINEZ-AYALA FAMILY

2470.   Plaintiff Abraham Martinez-Ayala is a U.S. citizen domiciled in California.

2471.   On October 31, 2007, Abraham Martinez-Ayala was serving in the U.S. military when he was attacked by an IED.

2472.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Martinez-Ayala.

2473.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2474.   As a result of the attack and the injuries suffered, Abraham Martinez-Ayala is entitled to past and future noneconomic damages, including for severe physical and mental pain

434

and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2475. Plaintiff Lucina Martinez-Ayala is a citizen of the United States and domiciled in the State of California. She is the mother of Abraham Martinez-Ayala.

2476. Plaintiff Sebastian Solis-Perez is a citizen of the United States and domiciled in the State of California. He is the father of Abraham Martinez-Ayala.

2477. As a result of the attack and the injuries suffered by Abraham Martinez-Ayala, Plaintiffs Lucina Martinez-Ayala and Sebastian Solis-Perez, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 122. THE OCTOBER 31, 2007 ATTACK – FALLUJAH

### A. PLAINTIFF CHRISTOPHER DAVID CONDREY

2478. Plaintiff Christopher David Condrey is a U.S. citizen domiciled in Texas.

2479. On October 31, 2007, Christopher David Condrey was serving in the U.S. military when he was attacked by an IED.

2480. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Condrey.

2481. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2482. As a result of the attack and the injuries suffered, Christopher David Condrey is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including

medical expenses, lost income, and loss of earning capacity.

### 123.   THE OCTOBER 28, 2007 ATTACK – BAQUBAH

####    A.   PLAINTIFFS THE LUIS HUMBERTO GUTIERREZ, JR. FAMILY

2483.   Plaintiff Luis Humberto Gutierrez, Jr. is a U.S. citizen domiciled in Texas.

2484.   On October 28, 2007, Luis Humberto Gutierrez, Jr., was serving in the U.S. military when he was attacked by an IED.

2485.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Gutierrez.

2486.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2487.   As a result of the attack and the injuries suffered, Luis Humberto Gutierrez, Jr., is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2488.   Plaintiff Diana Gutierrez is a citizen of the United States domiciled in Texas and is the spouse of Luis Humberto Gutierrez, Jr.

2489.   Plaintiff L.A.D., a minor child, represented by his legal guardians Luis Humberto Gutierrez, Jr. and Diana Gutierrez, is a citizen of the United States domiciled in Texas and is the son of Luis Humberto Gutierrez, Jr.

2490.   As a result of the attack and the injuries suffered by Luis Humberto Gutierrez, Jr., Plaintiffs Diana Gutierrez and L.A.D., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of

solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 124. THE OCTOBER 22, 2007 ATTACK – BAGHDAD

### A. PLAINTIFFS THE ROBERT ALLEN HAAF FAMILY

2491.   Plaintiff Robert Allen Haaf is a U.S. citizen domiciled in the State of Kansas.

2492.   On October 22, 2007, Robert Allen Haaf was serving in the U.S. military when he was attacked by an EFP.

2493.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Haaf.

2494.   The Iranian-supported FTO Hezbollah/JAM planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2495.   As a result of the attack and the injuries suffered, Robert Allen Haaf is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2496.   Plaintiff Monica Elizabeth Haaf is a citizen of the United States domiciled in the State of Kansas and is the spouse of Robert Allen Haaf.

2497.   Plaintiff J.A.H, a minor child, represented by his legal guardians Robert Allen Haaf and Monica Elizabeth Haaf, is a citizen of the United States domiciled in the State of Kansas and is the son of Robert Allen Haaf.

2498.   Plaintiff Mary Agnus Haaf is a citizen of the United States domiciled in the State of Missouri and is the mother of Robert Allen Haaf.

2499.   Plaintiff James Joseph Haaf is a citizen of the United States domiciled in the State of Missouri and is the brother of Robert Allen Haaf.

2500.   Plaintiff Ashley Mae Sims is a citizen of the United States domiciled in the State of Kansas and is the step-daughter of Robert Allen Haaf.

2501.   As a result of the attack and the injuries suffered by Robert Allen Haaf, Plaintiffs Monica Elizabeth Haaf, Mary Agnus Haaf, James Joseph Haaf, Ashley Mae Sims, J.A.H., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 125.   THE OCTOBER 18, 2007 ATTACK – MOSUL

### A.   PLAINTIFF JOSHUA JOHN WOLCOTT

2502.   Plaintiff Joshua John Wolcott is a U.S. citizen domiciled in Georgia.

2503.   On October 18, 2007, Joshua John Wolcott was serving in the U.S. military when he was attacked by an IED.

2504.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Wolcott.

2505.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2506.   As a result of the attack and the injuries suffered, Joshua John Wolcott is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 126.   THE OCTOBER 14, 2007 ATTACK – BAGHDAD

### A.   PLAINTIFFS THE KENNETH JAMES IWASINSKI FAMILY

2507.   On October 14, 2007, Kenneth James Iwasinski was a U.S. citizen, domiciled in Massachusetts, and serving in the U.S. military when he was attacked by an IED, causing his death.

2508.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Iwasinski.

2509.   The Iranian-supported FTO Hezbollah/JAM planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

2510.   Plaintiff Tracy Jean Taylor is a citizen of the United States domiciled in Massachusetts and is the mother of Kenneth James Iwasinski.

2511.   Plaintiff Dominick Victor Iwasinski is a citizen of the United States domiciled in Massachusetts and is the father of Kenneth James Iwasinski.

2512.   Plaintiff Amanda Lynn Taylor is a citizen of the United States domiciled in Massachusetts and is the sister of Kenneth James Iwasinski.

2513.   Plaintiffs Tracy Jean Taylor and Dominick Victor Iwasinski bring an action individually and on behalf of the Estate of Kenneth James Iwasinski, and all heirs thereof, as its legal representatives.

2514.   As a result of the attack, and the injuries suffered by and the death of Kenneth James Iwasinski, Plaintiffs Tracy Jean Taylor, Dominick Victor Iwasinski, and Amanda Lynn Taylor, have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate

439

of Kenneth James Iwasinski.

**127.    THE OCTOBER 10, 2007 ATTACK – BAGHDAD**

        **A.    PLAINTIFFS THE KEVIN DANIEL SNOW FAMILY**

2515.    Plaintiff Kevin Daniel Snow is a U.S. citizen domiciled in New Jersey.

2516.    On October 10, 2007, Kevin Daniel Snow was serving in the U.S. military when he was attacked by rockets and mortars.

2517.    Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Snow.

2518.    The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2519.    As a result of the attack and the injuries suffered, Kevin Daniel Snow is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2520.    Plaintiff Adrienne Snow is a citizen of the United States domiciled in New Jersey and is the spouse of Kevin Daniel Snow.

2521.    Plaintiff Jasmyne H. Arquiett is a citizen of the United States domiciled in New Jersey and is the daughter of Kevin Daniel Snow.

2522.    Plaintiff N.A.P.S. a minor child, represented by his legal guardian Kevin Daniel Snow and Adrienne Snow is a citizen of the United States domiciled in New Jersey and is the son of Kevin Daniel Snow.

2523.    Plaintiff G.L.A.S. a minor child, represented by his legal guardian Kevin Daniel Snow and Adrienne Snow is a citizen of the United States domiciled in New Jersey and is the

son of Kevin Daniel Snow.

2524.   As a result of the attack and the injuries suffered by Kevin Daniel Snow, Plaintiffs Adrienne Snow, Jasmyne H. Arquiett, N.A.P.S., a minor child, and G.L.A.S. a minor child are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 128.   THE SEPTEMBER 30, 2007 ATTACK – MOSUL

#### A.   PLAINTIFF ADAM NATHAN ENGELHART

2525.   Plaintiff Adam Nathan Engelhart is a U.S. citizen domiciled in Florida.

2526.   On September 30, 2007, Adam Nathan Engelhart was serving in the U.S. military when he was attacked by an RPG.

2527.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Engelhart.

2528.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2529.   As a result of the attack and the injuries suffered, Adam Nathan Engelhart is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 129.   THE SEPTEMBER 26, 2007 ATTACK – BAGHDAD

#### A.   PLAINTIFFS THE SHAUN SCOTT CHANDLER FAMILY

2530.   Plaintiff Shaun Scott Chandler is a U.S. citizen domiciled in Virginia.

2531.   On September 26, 2007, Shaun Scott Chandler was serving in the U.S. military

441

when he was attacked by an EFP.

2532.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Chandler.

2533. The Iranian-supported FTO Hezbollah/JAM planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2534.   As a result of the attack and the injuries suffered, Shaun Scott Chandler is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2535.   Plaintiff Juleonna Clarke Chandler is a citizen of the United States domiciled in Virginia and is the spouse of Shaun Scott Chandler.

2536.   As a result of the attack and the injuries suffered by Shaun Scott Chandler, Plaintiff Juleonna Clarke Chandler is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 130.   THE SEPTEMBER 24, 2007 ATTACK –BAQUBAH

### A.   PLAINTIFFS THE WAYLAND TODD ALLEN FAMILY

2537.   Plaintiff Wayland Todd Allen is a U.S. citizen domiciled in Texas.

2538.   On September 24, 2007, Wayland Todd Allen was serving in the U.S. military when he was attacked by an IED.

2539.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Allen.

2540.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2541.   As a result of the attack and the injuries suffered, Wayland Todd Allen is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2542.   Plaintiff Debra Allen is a citizen of the United States domiciled in Texas and is the mother of Wayland Todd Allen.

2543.   Plaintiff Braydon Allen is a citizen of the United States domiciled in Texas and is the son of Wayland Todd Allen.

2544.   Plaintiff Koby Allen is a citizen of the United States domiciled in Texas and is the son of Wayland Todd Allen.

2545.   Plaintiff Ronald Jene Allen is a citizen of the United States domiciled in Kansas and is the father of Wayland Todd Allen.

2546.   Plaintiff Trenton Allen is a citizen of the United States domiciled in Kansas and is the brother of Wayland Todd Allen.

2547.   Plaintiff Tanja Blackwell is a citizen of the United States domiciled in Texas and is the former spouse of Wayland Todd Allen.

2548.   As a result of the attack and the injuries suffered by Wayland Todd Allen, Plaintiffs Debra Allen, Braydon Allen, Koby Allen, Ronald Jene Allen, Trenton Allen and Tanja Blackwell are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and

future economic damages, including loss of services and support.

### 131.   THE SEPTEMBER 24, 2007 ATTACK – DIYALA

####      A.      PLAINTIFFS THE ROY ANTHONY BISCARR FAMILY

2549.   Plaintiff Roy Anthony Biscarr is a U.S. citizen domiciled in Texas.

2550.   On September 24, 2007, Roy Anthony Biscarr was serving in the U.S. military when he was attacked by an IED.

2551.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Biscarr.

2552.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2553.   As a result of the attack and the injuries suffered, Roy Anthony Biscarr is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2554.   Plaintiff Angela Clauset is a citizen of the United States domiciled in Texas and is the mother of Roy Anthony Biscarr.

2555.   Plaintiff Khristie Alexa Biscarr is a citizen of the United States domiciled in Alaska and is the daughter of Roy Anthony Biscarr.

2556.   Plaintiff Gabriel Alexander Biscarr is a citizen of the United States domiciled in Alaska and is the son of Roy Anthony Biscarr.

2557.   As a result of the attack and the injuries suffered by Roy Anthony Biscarr, Plaintiffs Angela Clauset, Khristie Alexa Biscarr, and Gabriel Alexander Biscarr are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional

pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 132.   THE SEPTEMBER 3, 2007 ATTACK – FALLUJAH

### A.   PLAINTIFFS THE RONALD DEAN STARK, II FAMILY

2558.   Plaintiff Ronald Dean Stark, II is a U.S. citizen domiciled in Florida.

2559.   On September 3, 2007, Ronald Dean Stark, II was serving in the U.S. military when he was attacked by an IED.

2560.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Stark.

2561.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2562.   As a result of the attack and the injuries suffered, Ronald Dean Stark, II is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2563.   Plaintiff Katie Stark is a citizen of the United States domiciled in Florida and is the spouse of Ronald Dean Stark, II.

2564.   Plaintiff Douglas Arthur Stark is a citizen of the United States domiciled in Armed Forces-Pacific and is the son of Ronald Dean Stark, II.

2565.   Plaintiff Elizabeth Graycerose Stark is a citizen of the United States domiciled in Florida and is the daughter of Ronald Dean Stark, II.

2566.   Plaintiff A.D.S., a minor child, represented by his legal guardians Ronald Dean Stark, II and Katie Stark, is a citizen of the United States domiciled in Florida and is the son of

Ronald Dean Stark, II.

2567.   As a result of the attack and the injuries suffered by Ronald Dean Stark, II, Plaintiffs Katie Stark, Douglas Arthur Stark, Elizabeth Graycerose Stark and A.D.S., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 133.   THE AUGUST 31, 2007 ATTACK – FALLUJAH

### A.   PLAINTIFFS THE GREGORY P. BLINCOE FAMILY

2568.   Plaintiff Gregory P. Blincoe is a U.S. citizen domiciled in California.

2569.   On August 31, 2007, Gregory P. Blincoe was serving in the U.S. military when he was attacked by a suicide bomber.

2570.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Blincoe.

2571.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2572.   As a result of the attack and the injuries suffered, Gregory P. Blincoe is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2573.   Plaintiff Carrie Blincoe is a citizen of the United States domiciled in California and is the spouse of Gregory P. Blincoe.

2574.   Plaintiff Connie Argier is a citizen of the United States domiciled in Kentucky and is the mother of Gregory P. Blincoe.

446

2575.   Plaintiff Z.B., a minor child, represented by his legal guardians Gregory P. Blincoe and Carrie Blincoe, is a citizen of the United States domiciled in California and is the son of Gregory P. Blincoe.

2576.   As a result of the attack and the injuries suffered by Gregory P. Blincoe, Plaintiffs Carrie Blincoe, Connie Argier and Z.B., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 134.   THE AUGUST 30, 2007 ATTACK – NORTH WEST HADITHA

### A.   PLAINTIFF LUIS ALFREDO RANERO

2577.   Plaintiff Luis Alfredo Ranero is a U.S. citizen domiciled in California.

2578.   On August 30, 2007, Luis Alfredo Ranero was serving in the U.S. military when he was attacked by an IED.

2579.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Ranero.

2580.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2581.   As a result of the attack and the injuries suffered, Luis Alfredo Ranero is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 135.   THE AUGUST 29, 2007 ATTACK – AL KARMAH

####    A.   PLAINTIFF JAMES RYAN MOBLEY

2582.   Plaintiff James Ryan Mobley is a U.S. citizen domiciled in Ohio.

2583.   On August 29, 2007, James Ryan Mobley was serving in the U.S. military when he was attacked by an IED.

2584.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Mobley.

2585.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2586.   As a result of the attack and the injuries suffered, James Ryan Mobley is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 136.   THE AUGUST 29, 2007 ATTACK – AL KARMAH

####    A.   PLAINTIFFS THE DAVID JOSEPH BICKNELL FAMILY

2587.   Plaintiff David Joseph Bicknell is a U.S. citizen domiciled in Idaho.

2588.   On August 29, 2007, David Joseph Bicknell was serving in the U.S. military when he was attacked by IED.

2589.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Bicknell.

2590.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

448

2591.  As a result of the attack and the injuries suffered, David Joseph Bicknell is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2592.  Plaintiff Richard Bicknell is a citizen of the United States and domiciled in the State of Idaho. He is the father of David Joseph Bicknell.

2593.  Plaintiff Patricia Bicknell is a citizen of the United States and domiciled in the State of Idaho. She is the mother of David Joseph Bicknell.

2594.  Plaintiff Lauren Bicknell is a citizen of the United States and domiciled in the State of Idaho. She is the sister of David Joseph Bicknell.

2595.  As a result of the attack and the injuries suffered by David Joseph Bicknell, Plaintiffs Richard Bicknell, Patricia Bicknell and Lauren Bicknell, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 137.   THE AUGUST 29, 2007 ATTACK – AL KARMAH

#### A.   PLAINTIFFS THE TYLER JAMES MARTIN FAMILY

2596.  Plaintiff Tyler James Martin is a U.S. citizen domiciled in Utah.

2597.  On August 29, 2007, Tyler James Martin was serving in the U.S. military when he was attacked by an IED.

2598.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Martin.

2599.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack,

the munition used, as well as the tactics, techniques, and procedures utilized.

2600.   As a result of the attack and the injuries suffered, Tyler James Martin is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2601.   Plaintiff Chad Richard Bangerter is a citizen of the United States domiciled in Utah and is the father of Tyler James Martin.

2602.   Plaintiff Kristi Ann Bangerter is a citizen of the United States domiciled in Utah and is the step-mother of Tyler James Martin.

2603.   Plaintiff Mason Chad Bangerter is a citizen of the United States domiciled in Utah and is the brother of Tyler James Martin.

2604.   Plaintiff Trevor Reed Smith is a citizen of the United States domiciled in Texas and is the brother of Tyler James Martin.

2605.   As a result of the attack and the injuries suffered by Tyler James Martin, Plaintiffs Chad Richard Bangerter, Kristi Ann Bangerter, Mason Chad Bangerter, and Trevor Reed Smith are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 138.   THE AUGUST 28, 2007 ATTACK – BUHRIZ

### A.   PLAINTIFFS THE NOAH PARKER MUTRIE FAMILY

2606.   Plaintiff Noah Parker Mutrie is a U.S. citizen domiciled in New York.

2607.   On August 28, 2007, Noah Parker Mutrie was serving in the U.S. military when he was attacked by an IED.

2608.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or

other material support used to commit the attack, which injured Mr. Mutrie.

2609.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2610.   As a result of the attack and the injuries suffered, Noah Parker Mutrie is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2611.   Plaintiff Ashley Mutrie is a citizen of the United States domiciled in New York and is the spouse of Noah Parker Mutrie.

2612.   Plaintiff Alexandra Mutrie is a citizen of the United States domiciled in Louisiana and is the sister of Noah Parker Mutrie.

2613.   Plaintiff B.M., a minor child, represented by his legal guardians Noah Parker Mutrie and Ashley Mutrie, is a citizen of the United States domiciled in New York and is the son of Noah Parker Mutrie.

2614.   Plaintiff J.M., a minor child, represented by his legal guardians Noah Parker Mutrie and Ashley Mutrie, is a citizen of the United States domiciled in New York and is the son of Noah Parker Mutrie.

2615.   As a result of the attack and the injuries suffered by Noah Parker Mutrie, Plaintiffs Ashley Mutrie, Alexandra Mutrie, B.M., a minor child, and J.M., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 139.   THE AUGUST 28, 2007 ATTACK – NEAR FALLUJAH

### A.   PLAINTIFFS THE ADAM SHAFFER BARTON FAMILY

2616.   Plaintiff Adam Shaffer Barton is a U.S. citizen domiciled in Kentucky.

2617.   On August 28, 2007, Adam Shaffer Barton was serving in the U.S. military when he was attacked by an IED.

2618.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Barton.

2619.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2620.   As a result of the attack and the injuries suffered, Adam Shaffer Barton is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2621.   Plaintiff Tammy Selvey-Brock is a citizen of the United States domiciled in Kentucky and is the mother of Adam Shaffer Barton.

2622.   Plaintiff Stephen Barton is a citizen of the United States domiciled in Michigan and is the father of Adam Shaffer Barton.

2623.   Plaintiff T.B., a minor child, represented by his legal guardian Adam Shaffer Barton, is a citizen of the United States domiciled in Kentucky and is the son of Adam Shaffer Barton.

2624.   As a result of the attack and the injuries suffered by Adam Shaffer Barton, Plaintiffs Tammy Selvey-Brock, Stephen Barton and T.B., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and

suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 140.   THE AUGUST 25, 2007 ATTACK – MOSUL

### A.   PLAINTIFF ADAM NATHAN ENGELHART

2625.   Plaintiff Adam Nathan Engelhart is a U.S. citizen domiciled in Florida.

2626.   On August 25, 2007, Adam Nathan Engelhart was serving in the U.S. military when he was attacked by a VBIED.

2627.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Engelhart.

2628.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2629.   As a result of the attack and the injuries suffered, Adam Nathan Engelhart is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 141.   THE AUGUST 22, 2007 ATTACK – HOR AL BOSH

### A.   PLAINTIFFS THE BRYAN ALEXANDER SNYDER FAMILY

2630.   Plaintiff Bryan Alexander Snyder is a U.S. citizen domiciled in Indiana.

2631.   On August 22, 2007, Bryan Alexander Snyder was serving in the U.S. military when he was attacked by VBIEDs and small arms fire.

2632.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Snyder.

2633.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack,

as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2634.  As a result of the attack and the injuries suffered, Bryan Alexander Snyder is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2635.  Plaintiff Jaime Chirie Snyder is a citizen of the United States domiciled in Indiana and is the spouse of Bryan Alexander Snyder.

2636.  As a result of the attack and the injuries suffered by Bryan Alexander Snyder, Plaintiff Jaime Chirie Snyder is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 142.  THE AUGUST 18, 2007 ATTACK – BAGHDAD

### A.  PLAINTIFFS THE TIMOTHY PETER BENNETT FAMILY

2637.  Plaintiff Timothy Peter Bennett is a U.S. citizen domiciled in Utah.

2638.  On August 18, 2007, Timothy Peter Bennett was serving in the U.S. military when he was attacked by an IED.

2639.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Bennett.

2640.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2641.  As a result of the attack and the injuries suffered, Timothy Peter Bennett is entitled to past and future noneconomic damages, including for severe physical and mental pain

and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2642.   Plaintiff Amanda Jane Bennett is a citizen of the United States domiciled in Utah and is the spouse of Timothy Peter Bennett.

2643.   Plaintiff Brittany Amber Bennett is a citizen of the United States domiciled in Utah and is the daughter of Timothy Peter Bennett.

2644.   Plaintiff Savanna Lindsey Bennett is a citizen of the United States domiciled in Utah and is the daughter of Timothy Peter Bennett.

2645.   Plaintiff T.P.B., a minor child, represented by his legal guardians Amanda Jane Bennett and Timothy Peter Bennett, is a citizen of the United States domiciled in Utah and is the son of Timothy Peter Bennett.

2646.   As a result of the attack and the injuries suffered by Timothy Peter Bennett, Plaintiffs Amanda Jane Bennett, Brittany Amber Bennett, Savanna Lindsey Bennett, and T.P.B., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 143.   THE AUGUST 16, 2007 ATTACK – SAQLAWIYAH

### A.   PLAINTIFFS THE DONALD LEE, III, FAMILY

2647.   Plaintiff Donald Lee, III, is a U.S. citizen domiciled in Oregon.

2648.   On August 16, 2007, Donald Lee, III, was serving in the U.S. military when he was attacked by mortar.

2649.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Lee.

2650.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack,

as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2651. As a result of the attack and the injuries suffered, Donald Lee, III, is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2652. Plaintiff Jennie Lee is a citizen of the United States domiciled in Oregon and is the spouse of Donald Lee, III.

2653. Plaintiff S.D.P.L., a minor child, represented by her legal guardian Donald Lee, III, is a citizen of the United States domiciled in Oregon and is the daughter of Donald Lee, III.

2654. Plaintiff Catherine N. Goble is a citizen of the United States domiciled in Illinois and is the sister of Donald Lee, III.

2655. Plaintiff Anna C. Lee is a citizen of the United States domiciled in Illinois and is the sister of Donald Lee, III.

2656. As a result of the attack and the injuries suffered by Donald Lee, III, Plaintiffs Jennie Lee, S.D.P.L., a minor child, Catherine N. Goble and Anna C. Lee are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 144. THE AUGUST 15, 2007 ATTACK – TAJI

### A. PLAINTIFFS THE NUALA KALUOKAU TAYLOR FAMILY

2657. Plaintiff Nuala Kaluokau Taylor is a U.S. citizen domiciled in Texas.

2658. On August 15, 2007, Nuala Kaluokau Taylor was serving in the U.S. military when she was attacked by a rocket.

2659. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mrs. Taylor.

2660. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2661. As a result of the attack and the injuries suffered, Nuala Kaluokau Taylor is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2662. Plaintiff Christopher David Taylor is a citizen of the United States domiciled in Texas and is the spouse of Nuala Kaluokau Taylor.

2663. Plaintiff Tanin Nicholas Taylor is a citizen of the United States domiciled in Alabama and is the son of Nuala Kaluokau Taylor.

2664. Plaintiff Betheni Keanaaina is a citizen of the United States domiciled in Georgia and is the daughter of Nuala Kaluokau Taylor.

2665. Plaintiff X.W.T., a minor child, represented by his legal guardians, Nuala Kaluokau Taylor and Christopher David Taylor, is a citizen of the United States domiciled in Texas and is the son of Nuala Kaluokau Taylor.

2666. As a result of the attack and the injuries suffered by Nuala Kaluokau Taylor, Plaintiffs Christopher David Taylor, Tanin Nicholas Taylor, Betheni Keanaaina, and X.W.T., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 145. THE AUGUST 14, 2007 ATTACK – ROUTE SIOUX FALLS NEAR CAMP BUCCA

#### A. PLAINTIFFS THE JACOB ALBERT BARR FAMILY

2667.   Plaintiff Jacob Albert Barr is a U.S. citizen domiciled in Colorado.

2668.   On August 14, 2007, Jacob Albert Barr was serving in the U.S. military when he was attacked by an EFP.

2669.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Barr.

2670.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2671.   As a result of the attack and the injuries suffered, Jacob Albert Barr is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2672.   Plaintiff Kristina Barr is a citizen of the United States domiciled in Colorado and is the spouse of Jacob Albert Barr.

2673.   Plaintiff E.B., a minor child, represented by her legal guardian Jacob Albert Barr, is a citizen of the United States domiciled in Colorado and is the daughter of Jacob Albert Barr.

2674.   As a result of the attack and the injuries suffered by Jacob Albert Barr, Plaintiffs Kristina Barr and E.B., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 146.   THE AUGUST 12, 2007 ATTACK – SADR CITY

#### A.   PLAINTIFF ANTWON LAVANTE CHILDERS

2675.   Plaintiff Antwon Lavante Childers is a U.S. citizen domiciled in Virginia.

2676.   On August 12, 2007, Antwon Lavante Childers was serving in the U.S. military when he was attacked by an IED.

2677.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Childers.

2678.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2679.   As a result of the attack and the injuries suffered, Antwon Lavante Childers is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 147.   THE AUGUST 9, 2007 ATTACK – MOSUL

#### A.   PLAINTIFF ABRAM WILLIAM MARVIN

2680.   Plaintiff Abram William Marvin is a U.S. citizen domiciled in Michigan.

2681.   On August 9, 2007, Abram William Marvin was serving in the U.S. military when he was attacked by an RPG and small arms.

2682.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Marvin.

2683.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2684.   As a result of the attack and the injuries suffered, Abram William Marvin is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 148.   THE AUGUST 7, 2007 ATTACK – TARMIYAH

#### A.   PLAINTIFFS THE SHANE TROY ULANDAY FAMILY

2685.   Plaintiff Shane Troy Ulanday is a U.S. citizen domiciled in Texas.

2686.   On August 7, 2007, Shane Troy Ulanday was serving in the U.S. military when he was attacked by an IED.

2687.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Ulanday.

2688.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2689.   As a result of the attack and the injuries suffered, Shane Troy Ulanday is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2690.   Plaintiff Cher Ulanday is a citizen of the United States domiciled in Texas and is the spouse of Shane Troy Ulanday.

2691.   As a result of the attack and the injuries suffered by Shane Troy Ulanday, Plaintiff Cher Ulanday, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 149.   THE AUGUST 6, 2007 ATTACK – BAQUBAH

### A.   PLAINTIFFS THE KAREEM RASHAD SULTAN KHAN FAMILY

2692.   On August 6, 2007, Kareem Rashad Sultan Khan was a U.S. citizen, domiciled in New Jersey, and serving in the U.S. military when he was attacked by an IED, causing his death.

2693.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Khan.

2694.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

2695.   Plaintiff Feroze Khan is a permanent resident of the United States domiciled in New Jersey and is the father of Kareem Rashad Sultan Khan.

2696.   Plaintiff Elvena Elsheba Mohammed Ali Khan is a permanent resident of the United States domiciled in Maryland and is the mother of Kareem Rashad Sultan Khan.

2697.   Plaintiff Enesha Baksh is a citizen of the United States domiciled in New Jersey and is the step-mother of Kareem Rashad Sultan Khan.

2698.   Plaintiff Tenesha Charles is a permanent resident of the United States domiciled in New Jersey and is the step-sister of Kareem Rashad Sultan Khan.

2699.   Plaintiffs Feroze Khan and Elvena Elsheba Mohammed Ali Khan bring an action individually and on behalf of the Estate of Kareem Rashad Sultan Khan, and all heirs thereof, as its legal representatives.

2700.   As a result of the attack, and the injuries suffered by and the death of Kareem Rashad Sultan Khan, Plaintiffs Feroze Khan, Elvena Elsheba Mohammed Ali Khan, Enesha Baksh, and Tenesha Charles have suffered severe mental anguish, extreme emotional pain and

suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Kareem Rashad Sultan Khan.

### 150. THE AUGUST 5, 2007 ATTACK – BAGHDAD

#### A. PLAINTIFFS THE ROBERT STEVEN BAUGHN FAMILY

2701.   Plaintiff Robert Steven Baughn is a U.S. citizen domiciled in Texas.

2702.   On August 5, 2007, Robert Steven Baughn was serving in the U.S. military when he was attacked by an RPG.

2703.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Baughn.

2704.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2705.   As a result of the attack and the injuries suffered, Robert Steven Baughn is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2706.   Plaintiff Karly Ann Baughn is a citizen of the United States domiciled in Texas and is the spouse of Robert Steven Baughn.

2707.   As a result of the attack and the injuries suffered by Robert Steven Baughn, Plaintiff Karly Ann Baughn is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 151.   THE AUGUST 4, 2007 ATTACK – BAGHDAD

#### A.   PLAINTIFF ANTHONY ALLEN MATHENY

2708.   Plaintiff Anthony Allen Matheny is a U.S. citizen domiciled in Kentucky.

2709.   On August 4, 2007, Anthony Allen Matheny was serving in the U.S. military when he was attacked by an IED.

2710.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Matheny.

2711.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2712.   As a result of the attack and the injuries suffered, Anthony Allen Matheny is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 152.   THE AUGUST 4, 2007 ATTACK – SOUTHERN BAGHDAD

#### A.   PLAINTIFF SEAN PATRICK REED

2713.   Plaintiff Sean Patrick Reed is a U.S. citizen domiciled in California.

2714.   On August 4, 2007, Sean Patrick Reed was serving in the U.S. military when he was attacked by an IED.

2715.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Reed.

2716.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2717.   As a result of the attack and the injuries suffered, Sean Patrick Reed is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 153.   THE AUGUST 1, 2007 ATTACK – MOSUL

### A.   PLAINTIFFS THE TRAVIS SCOTT BACHMAN FAMILY

2718.   On August 1, 2007, Travis Scott Bachman was a U.S. citizen, domiciled in Kansas, and serving in the U.S. military when he was attacked by IED, causing his death.

2719.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Bachman.

2720.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

2721.   Plaintiff Amber Jolene Bachman Wilson is a citizen of the United States domiciled in Oklahoma and was the spouse of Travis Scott Bachman.

2722.   Plaintiff T.S.B., a minor child, represented by his legal guardian Amber Jolene Bachman Wilson, is a citizen of the United States domiciled in Oklahoma and is the son of Travis Scott Bachman.

2723.   Plaintiff K.P.B., a minor child, represented by her legal guardian Amber Jolene Bachman Wilson, is a citizen of the United States domiciled in Oklahoma and is the daughter of Travis Scott Bachman.

2724.   Plaintiff Amber Jolene Bachman Wilson brings an action individually and on behalf of the Estate of Travis Scott Bachman, and all heirs thereof, as its legal representative.

2725.   As a result of the attack, and the injuries suffered by and the death of Travis Scott

464

Bachman, Plaintiffs Amber Jolene Bachman Wilson, T.S.B., a minor child, and K.P.B., a minor child, have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Travis Scott Bachman.

### 154.   THE JULY 30, 2007 ATTACK – AL KARMAH

#### A.   PLAINTIFFS THE DENVER WESLEY HOUCK, JR. FAMILY

2726.   Plaintiff Denver Wesley Houck, Jr. is a U.S. citizen domiciled in Florida.

2727.   On July 30, 2007, Denver Wesley Houck, Jr. was serving in the U.S. military when he was attacked by an IED.

2728.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Houck.

2729.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2730.   As a result of the attack and the injuries suffered, Denver Wesley Houck, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2731.   Plaintiff Jennifer Houck is a citizen of the United States domiciled in Florida and is the spouse of Denver Wesley Houck, Jr.

2732.   Plaintiff Polly Houck is a citizen of the United States domiciled in Florida and is the mother of Denver Wesley Houck, Jr.

2733.   Plaintiff L.A.H., a minor child, represented by her legal guardians Denver Wesley

465

Houck Jr. and Jennifer Houck, is a citizen of the United States domiciled in Florida and is the daughter of Denver Wesley Houck, Jr.

2734.   As a result of the attack and the injuries suffered by Denver Wesley Houck, Jr., Plaintiffs Jennifer Houck, Polly Houck and L.A.H., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 155.   THE JULY 29, 2007 ATTACK – BAGHDAD

#### A.   PLAINTIFFS THE CODY CLARK GRATER FAMILY

2735.   On July 29, 2007, Cody Clark Grater was a U.S. citizen, domiciled in Florida, and serving in the U.S. military when he was attacked by RPGs, causing his death.

2736.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Grater.

2737.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

2738.   Plaintiff Anita D. Lewis is a citizen of the United States and domiciled in the State of Florida. She is the mother of Cody Clark Grater.

2739.   Plaintiff Anita D. Lewis brings an action individually, and on behalf of the Estate of Cody Clark Grater, and all heirs thereof, as its legal representative.

2740.   As a result of the attack, and the injuries suffered by and the death of Cody Clark Grater, Plaintiff Anita D. Lewis, has suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to

the Estate of Cody Clark Grater.

**156.  THE JULY 28, 2007 ATTACK – RAMADI**

      **A.    PLAINTIFF RANDALL JOSEPH BENNETT, II**

2741.  Plaintiff Randall Joseph Bennett, II is a U.S. citizen domiciled in Indiana.

2742.  On July 28, 2007, Randall Joseph Bennett, II was serving in the U.S. military when he was attacked by a VBIED.

2743.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Bennett.

2744.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2745.  As a result of the attack and the injuries suffered, Randall Joseph Bennett, II is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

**157.  THE JULY 27, 2007 ATTACK – BAGHDAD**

      **A.    PLAINTIFFS THE SCOTT WADE FRITZ FAMILY**

2746.  Plaintiff Scott Wade Fritz is a U.S. citizen domiciled in Michigan.

2747.  On July 27, 2007, Scott Wade Fritz was serving in the U.S. military when he was attacked by mortars.

2748.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Fritz.

2749.  The Iranian-supported FTO Hezbollah/JAM planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and

467

location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2750.  As a result of the attack and the injuries suffered, Scott Wade Fritz is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2751.  Plaintiff Kristen J. Fritz is a citizen of the United States domiciled in Michigan and is the spouse of Scott Wade Fritz.

2752.  As a result of the attack and the injuries suffered by Scott Wade Fritz, Plaintiff Kristen J. Fritz is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 158.   THE JULY 17, 2007 ATTACK – BAGHDAD

### A.   PLAINTIFFS THE ADAM THOMAS GAULDIN FAMILY

2753.  Plaintiff Adam Thomas Gauldin is a U.S. citizen domiciled in Virginia.

2754.  On July 17, 2007, Adam Thomas Gauldin was serving in the U.S. military when he was attacked by a VBIED.

2755.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Gauldin.

2756.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2757.  As a result of the attack and the injuries suffered, Adam Thomas Gauldin is entitled to past and future noneconomic damages, including for severe physical and mental pain

and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2758.   Plaintiff Michael Brian Gauldin is a citizen of the United States domiciled in Virginia and is the father of Adam Thomas Gauldin.

2759.   Plaintiff Georgia Gryder is a citizen of the United States domiciled in Virginia and is the mother of Adam Thomas Gauldin.

2760.   Plaintiff Patrick Gauldin is a citizen of the United States domiciled in Virginia and is the brother of Adam Thomas Gauldin.

2761.   Plaintiff Michael Ryan Gauldin is a citizen of the United States domiciled in Virginia and is the brother of Adam Thomas Gauldin.

2762.   As a result of the attack and the injuries suffered by Adam Thomas Gauldin, Plaintiffs Michael Brian Gauldin, Georgia Gryder, Patrick Gauldin, and Michael Ryan Gauldin are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 159.   THE JULY 17, 2007 ATTACK – KHAN BANI SAAD

#### A.   PLAINTIFFS THE GEORGE ROBERT HARRISON, JR. FAMILY

2763.   Plaintiff George Robert Harrison, Jr. is a U.S. citizen domiciled in Indiana.

2764.   On July 17, 2007, George Robert Harrison, Jr. was serving in the U.S. military when he was attacked by an IED.

2765.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Harrison.

2766.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack,

as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2767.   As a result of the attack and the injuries suffered, George Robert Harrison, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2768.   Plaintiff Jody Lewis Harrison is a citizen of the United States domiciled in Indiana and is the spouse of George Robert Harrison, Jr.

2769.   Plaintiff George Robert Harrison, Sr. is a citizen of the United States domiciled in Indiana and is the father of George Robert Harrison, Jr.

2770.   Plaintiff Debbi Harrison is a citizen of the United States domiciled in Indiana and is the mother of George Robert Harrison, Jr.

2771.   Plaintiff Tabbitha Lyne Norris is a citizen of the United States domiciled in Iowa and is the sister of George Robert Harrison, Jr.

2772.   Plaintiff Mary Harrison is a citizen of the United States domiciled in Indiana and is the sister of George Robert Harrison, Jr.

2773.   Plaintiff Troy R. Harrison, Sr. is a citizen of the United States domiciled in Kentucky and is the brother of George Robert Harrison, Jr.

2774.   As a result of the attack and the injuries suffered by George Robert Harrison, Jr., Plaintiffs Jody Lewis Harrison, George Robert Harrison, Sr., Debbi Harrison, Tabbitha Lyne Norris, Mary Harrison and Troy R. Harrison, Sr., are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services

470

and support.

**160.   THE JULY 16, 2007 ATTACK – BAGHDAD**

    **A.      PLAINTIFFS THE NOAH PARKER MUTRIE FAMILY**

2775.   Plaintiff Noah Parker Mutrie is a U.S. citizen domiciled in New York.

2776.   On July 16, 2007, Noah Parker Mutrie was serving in the U.S. military when he was attacked by an IED.

2777.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Mutrie.

2778.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2779.   As a result of the attack and the injuries suffered, Noah Parker Mutrie is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2780.   Plaintiff Ashley Mutrie is a citizen of the United States domiciled in New York and is the spouse of Noah Parker Mutrie.

2781.   Plaintiff Alexandra Mutrie is a citizen of the United States domiciled in Louisiana and is the sister of Noah Parker Mutrie.

2782.   Plaintiff B.M., a minor child, represented by his legal guardians Noah Parker Mutrie and Ashley Mutrie, is a citizen of the United States domiciled in New York and is the son of Noah Parker Mutrie.

2783.   Plaintiff J.M., a minor child, represented by his legal guardians Noah Parker Mutrie and Ashley Mutrie, is a citizen of the United States domiciled in New York and is the son

of Noah Parker Mutrie.

2784.   As a result of the attack and the injuries suffered by Noah Parker Mutrie, Plaintiffs Ashley Mutrie, Alexandra Mutrie, B.M., a minor child, and J.M., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 161.   THE JULY 15, 2007 ATTACK – BAGHDAD

#### A.   PLAINTIFFS THE MARK ANTHONY HAMBLIN, JR. FAMILY

2785.   Plaintiff Mark Anthony Hamblin, Jr. is a U.S. citizen domiciled in Arizona.

2786.   On July 15, 2007, Mark Anthony Hamblin, Jr. was serving in the U.S. military when he was attacked by an IED.

2787.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Hamblin.

2788.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2789.   As a result of the attack and the injuries suffered, Mark Anthony Hamblin, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2790.   Plaintiff M.H., a minor child, represented by her legal guardian Mark Anthony Hamblin, Jr., is a citizen of the United States domiciled in Arizona and is the daughter of Mark Anthony Hamblin, Jr.

2791.   As a result of the attack and the injuries suffered by Mark Anthony Hamblin, Jr.,

Plaintiff M.H., a minor child, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 162.  THE JULY 14, 2007 ATTACK – BAGHDAD

#### A.    PLAINTIFF EARL ANTHONY MCCRACKEN

2792.  Plaintiff Earl Anthony McCracken is a U.S. citizen domiciled in New Jersey.

2793.  On July 14, 2007, Earl Anthony McCracken was serving in the U.S. military when he was attacked by an IED.

2794.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. McCracken.

2795.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2796.  As a result of the attack and the injuries suffered, Earl Anthony McCracken is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 163.  THE JULY 5, 2007 ATTACK – KARMAH

#### A.    PLAINTIFFS THE NICHOLAS TUBBS FAMILY

2797.  Plaintiff Nicholas Tubbs is a U.S. citizen domiciled in Texas.

2798.  On July 5, 2007, Nicholas Tubbs was serving in the U.S. military when he was attacked by Mortars.

2799.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Tubbs.

2800.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2801.   As a result of the attack and the injuries suffered, Nicholas Tubbs is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2802.   Plaintiff Vanessa Meredith is a citizen of the United States domiciled in Texas and is the aunt of Nicholas Tubbs.

2803.   Plaintiff Troy Meredith is a citizen of the United States domiciled in Texas and is the uncle of Nicholas Tubbs.

2804.   As a result of the attack and the injuries suffered by Nicholas Tubbs, Plaintiffs Vanessa Meredith and Troy Meredith are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 164.   THE JULY 5, 2007 ATTACK – BESMAYA

### A.   PLAINTIFF JESSE BRITTON EVANS

2805.   Plaintiff Jesse Britton Evans is a U.S. citizen domiciled in Alabama.

2806.   On July 5, 2007, Jesse Britton Evans was serving in the U.S. military when he was attacked by Rockets.

2807.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Evans.

2808.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the

474

attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2809.   As a result of the attack and the injuries suffered, Jesse Britton Evans is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 165.   THE JULY 4, 2007 ATTACK – FALLUJAH

#### A.   PLAINTIFF TIMOTHY GRANT CHANDLER

2810.   Plaintiff Timothy Grant Chandler is a U.S. citizen domiciled in Florida.

2811.   On July 4, 2007, Timothy Grant Chandler was serving in the U.S. military when he was attacked by mortars.

2812.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Chandler.

2813.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2814.   As a result of the attack and the injuries suffered, Timothy Grant Chandler is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 166.   THE JULY 2, 2007 ATTACK – HADITHA

#### A.   PLAINTIFF MATTHEW PAUL UKEN

2815.   Plaintiff Matthew Paul Uken is a U.S. citizen domiciled in New Jersey.

2816.   On July 2, 2007, Matthew Paul Uken was serving in the U.S. military when he

475

was attacked by an IED.

2817.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Uken.

2818.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2819.   As a result of the attack and the injuries suffered, Matthew Paul Uken is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 167.   THE JUNE 28, 2007 ATTACK – AR-RUTBAH

#### A.   PLAINTIFF CARLOS ANTONIO MARTINEZ

2820.   Plaintiff Carlos Antonio Martinez is a U.S. citizen domiciled in New York.

2821.   On June 28, 2007, Carlos Antonio Martinez was serving in the U.S. military when he was attacked by small arms.

2822.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Martinez.

2823.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2824.   As a result of the attack and the injuries suffered, Carlos Antonio Martinez is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

476

### 168.   THE JUNE 26, 2007 ATTACK – BAGHDAD

### A.   PLAINTIFFS THE JOHNNY CASTILLO FAMILY

2825.   Plaintiff Johnny Castillo is a U.S. citizen domiciled in New York.

2826.   On June 26, 2007, Johnny Castillo was serving in the U.S. military when he was attacked by an IED and small arms fire.

2827.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Castillo.

2828.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2829.   As a result of the attack and the injuries suffered, Johnny Castillo is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2830.   Plaintiff Laura Castillo is a citizen of the United States domiciled in New York and is the spouse of Johnny Castillo.

2831.   As a result of the attack and the injuries suffered by Johnny Castillo, Plaintiff Laura Castillo is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 169.   THE JUNE 24, 2007 ATTACK – SAQLAWIYAH

### A.   PLAINTIFF KIRK THOMAS MCPHERON

2832.   Plaintiff Kirk Thomas McPheron is a U.S. citizen domiciled in Iowa.

2833.   On June 24, 2007, Kirk Thomas McPheron was serving in the U.S. military when

477

he was attacked by a sniper.

2834.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. McPheron.

2835.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2836.   As a result of the attack and the injuries suffered, Kirk Thomas McPheron is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 170.   THE JUNE 23, 2007 ATTACK – BAGHDAD

#### A.   PLAINTIFF MATTHEW MCIVOR

2837.   Plaintiff Matthew McIvor is a U.S. citizen domiciled in Iowa.

2838.   On June 23, 2007, Matthew McIvor was serving in the U.S. military when he was attacked by EFP.

2839.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. McIvor.

2840.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2841.   As a result of the attack and the injuries suffered, Matthew McIvor is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 171.   THE JUNE 23, 2007 ATTACK – HOR AL-BOSH

### A.   PLAINTIFF JEREMY EDWARD SMITH

2842.   Plaintiff Jeremy Edward Smith is a U.S. citizen domiciled in New York.

2843.   On June 23, 2007, Jeremy Edward Smith was serving in the U.S. military when he was attacked by an IED.

2844.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Smith.

2845.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2846.   As a result of the attack and the injuries suffered, Jeremy Edward Smith is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 172.   THE JUNE 21, 2007 ATTACK – BASRA PALACE

### A.   PLAINTIFFS THE TERRY RAY CARTER FAMILY

2847.   Plaintiff Terry Ray Carter is a U.S. citizen domiciled in Mississippi.

2848.   On June 21, 2007, Terry Ray Carter was serving in the U.S. military when he was attacked by a Mortar.

2849.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Carter.

2850.   The Iranian-supported FTO Hezbollah/JAM planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures

479

utilized.

2851.   As a result of the attack and the injuries suffered, Terry Ray Carter is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2852.  Plaintiff Linda Sue Carter is a citizen of the United States domiciled in Mississippi and is the spouse of Terry Ray Carter.

2853.   As a result of the attack and the injuries suffered by Terry Ray Carter, Plaintiff Linda Sue Carter is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 173.   THE JUNE 21, 2007 ATTACK – BAGHDAD

### A.   PLAINTIFF JASON REGESTER

2854.   Plaintiff Jason Regester is a U.S. citizen domiciled in Nevada.

2855.   On June 21, 2007, Jason Regester was serving in the U.S. military when he was attacked by Rockets.

2856.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Regester.

2857.  The Iranian-supported FTO Hezbollah/JAM planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2858.   As a result of the attack and the injuries suffered, Jason Regester is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering,

480

loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 174.   THE JUNE 20, 2007 ATTACK – BAGHDAD

#### A.   PLAINTIFFS THE STEVEN MICHAEL PADDISON FAMILY

2859.   Plaintiff Steven Michael Paddison is a U.S. citizen domiciled in New York.

2860.   On June 20, 2007, Steven Michael Paddison was serving in the U.S. military when he was attacked by a rocket.

2861.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Paddison.

2862.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2863.   As a result of the attack and the injuries suffered, Steven Michael Paddison is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2864.   Plaintiff Travis Paddison is a citizen of the United States domiciled in Pennsylvania and is the son of Steven Michael Paddison.

2865.   Plaintiff Emily Lynn Paddison is a citizen of the United States domiciled in Pennsylvania and is the daughter of Steven Michael Paddison.

2866.   Plaintiff James W. Paddison is a citizen of the United States domiciled in Pennsylvania and is the father of Steven Michael Paddison.

2867.   Plaintiff Eileen Vivian Paddison is a citizen of the United States domiciled in Pennsylvania and is the mother of Steven Michael Paddison.

2868.   Plaintiff Russell J. Paddison is a citizen of the United States domiciled in New York and is the brother of Steven Michael Paddison.

2869.   Plaintiff Karen Louise Burr is a citizen of the United States domiciled in Pennsylvania and is the sister of Steven Michael Paddison.

2870.   Plaintiff Jennifer J. Lewis is a citizen of the United States domiciled in New York and is the sister of Steven Michael Paddison.

2871.   As a result of the attack and the injuries suffered by Steven Michael Paddison, Plaintiffs Travis Paddison, Emily Lynn Paddison, James W. Paddison, Eileen Vivian Paddison, Russell J. Paddison, Karen Louise Burr and Jennifer J. Lewis are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 175.   THE JUNE 20, 2007 ATTACK – BAGHDAD

### A.   PLAINTIFFS THE EDWARD JAMES TERRY, SR. FAMILY

2872.   Plaintiff Edward James Terry, Sr. is a U.S. citizen domiciled in Alabama.

2873.   On June 20, 2007, Edward James Terry, Sr. was serving in the U.S. military when he was attacked by a Mortar.

2874.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Terry.

2875.   The Iranian-supported FTO Hezbollah/JAM planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2876.   As a result of the attack and the injuries suffered, Edward James Terry, Sr. is

entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2877.   Plaintiff Edward James Terry, Jr. is a citizen of the United States domiciled in Alabama and is the son of Edward James Terry, Sr.

2878.   Plaintiff Glenndon Milton Terry is a citizen of the United States domiciled in Alabama and is the son of Edward James Terry, Sr.

2879.   As a result of the attack and the injuries suffered by Edward James Terry, Sr., Plaintiffs Edward James Terry, Jr., and Glenndon Milton Terry, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 176.   THE JUNE 20, 2007 ATTACK – BAGHDAD

### A.   PLAINTIFFS THE ANDREW JAMES RAYMOND FAMILY

2880.   Plaintiff Andrew James Raymond is a U.S. citizen domiciled in New York.

2881.   On June 20, 2007, Andrew James Raymond was serving in the U.S. military when he was attacked by a rocket.

2882.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Raymond.

2883.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2884.   As a result of the attack and the injuries suffered, Andrew James Raymond is entitled to past and future noneconomic damages, including for severe physical and mental pain

and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2885.   Plaintiff Diana L. Raymond is a citizen of the United States domiciled in New York and is the spouse of Andrew James Raymond.

2886.   Plaintiff Phyllis M. Raymond is a citizen of the United States domiciled in New York and is the mother of Andrew James Raymond.

2887.   Plaintiff Hannah E. Raymond is a citizen of the United States domiciled in New York and is the daughter of Andrew James Raymond.

2888.   Plaintiff Caleb A. Raymond is a citizen of the United States domiciled in New York and is the son of Andrew James Raymond.

2889.   Plaintiff A.J.R., a minor child, represented by his legal guardian Andrew James Raymond, is a citizen of the United States domiciled in New York and is the son Andrew James Raymond.

2890.   As a result of the attack and the injuries suffered by Andrew James Raymond, Plaintiffs Diana L. Raymond, Phyllis M. Raymond, Hannah E. Raymond, Caleb A. Raymond and A.J.R., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 177.   THE JUNE 20, 2007 ATTACK – KARMAH

#### A.      PLAINTIFFS THE GARY DAVID MORAN FAMILY

2891.   Plaintiff Gary David Moran is a U.S. citizen domiciled in Virginia.

2892.   On June 20, 2007, Gary David Moran was serving in the U.S. military when he was attacked by an IED.

2893.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or

other material support used to commit the attack, which injured Mr. Moran.

2894.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2895.   As a result of the attack and the injuries suffered, Gary David Moran is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2896.   Plaintiff Annette C. Moran is a citizen of the United States and domiciled in the State of Texas. She is the ex-wife of Gary David Moran.

2897.   Plaintiff G.D.M., a minor child, represented by his legal guardians Gary David Moran and Annette C. Moran, is a citizen of the United States and domiciled in the State of Virginia. He is the son of Gary David Moran and Annette C. Moran.

2898.   Plaintiff Eric G. Moran is a citizen of the United States and domiciled in the State of Pennsylvania. He is the brother of Gary David Moran.

2899.   Plaintiff Ericka T. Moran-Bacordo is a citizen of the United States and domiciled in the State of Pennsylvania. She is the sister of Gary David Moran.

2900.   Plaintiff Savannah K. Dismuke-Moran is a citizen of the United States and domiciled in the State of Arizona. She is the daughter of Gary David Moran.

2901.   As a result of the attack and the injuries suffered by Gary David Moran, Plaintiffs Annette C. Moran, G.D.M., a minor child, Eric G. Moran, Ericka T. Moran-Bacordo, Savannah K. Dismuke-Moran, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and

past and future economic damages, including loss of services and support.

### 178.   THE JUNE 20, 2007 ATTACK – KARMAH

#### A.   PLAINTIFF JOSHUA MATTHEW BOWER

2902.   Plaintiff Joshua Matthew Bower is a U.S. citizen domiciled in Delaware.

2903.   On June 20, 2007, Joshua Matthew Bower was serving in the U.S. military when he was attacked by a sniper.

2904.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Bower.

2905.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2906.   As a result of the attack and the injuries suffered, Joshua Matthew Bower is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 179.   THE JUNE 20, 2007 ATTACK – BAGHDAD

#### A.   PLAINTIFF TIM THOMAS JULIANO

2907.   Plaintiff Tim Thomas Juliano is a U.S. citizen domiciled in New York.

2908.   On June 20, 2007, Tim Thomas Juliano was serving in the U.S. military when he was attacked by a rocket.

2909.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Juliano.

2910.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the

attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2911.   As a result of the attack and the injuries suffered, Tim Thomas Juliano is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 180.   THE JUNE 15, 2007 ATTACK – BAGHDAD

### A.   PLAINTIFFS THE DAVID MATTHEW BUTCHER FAMILY

2912.   Plaintiff David Matthew Butcher is a U.S. citizen domiciled in Michigan.

2913.   On June 15, 2007, David Matthew Butcher was serving in the U.S. military when he was attacked by an IED.

2914.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Butcher.

2915.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2916.   As a result of the attack and the injuries suffered, David Matthew Butcher is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2917.   Plaintiff Gloria Marie Butcher is a citizen of the United States domiciled in Michigan and is the spouse of David Matthew Butcher.

2918.   Plaintiff Elizabeth Duff Speaks is a citizen of the United States domiciled in Oklahoma and is the mother of David Matthew Butcher.

2919.   Plaintiff Leslie Glenn Speaks is a citizen of the United States domiciled in

Oklahoma and is the step-father of David Matthew Butcher.

2920.   Plaintiff B.W.B., a minor child, represented by his legal guardians Gloria Marie Butcher and David Matthew Butcher, is a citizen of the United States domiciled in Michigan and is the son of David Matthew Butcher.

2921.   As a result of the attack and the injuries suffered by David Matthew Butcher, Plaintiffs Gloria Marie Butcher, Elizabeth Duff Speaks, Leslie Glenn Speaks, and B.W.B., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 181.   THE JUNE 14, 2007 ATTACK – SAQLAWIAH

### A.   PLAINTIFFS THE DAVID KARL LIND FAMILY

2922.   Plaintiff David Karl Lind is a U.S. citizen domiciled in California.

2923.   On June 14, 2007, David Karl Lind was serving in the U.S. military when he was attacked by an IED.

2924.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Lind.

2925.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2926.   As a result of the attack and the injuries suffered, David Karl Lind is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2927.   Plaintiff David A. Lind is a citizen of the United States domiciled in Maine and is

the father of David Karl Lind.

2928.  Plaintiff Catherine Jackman is a citizen of the United States domiciled in Pennsylvania and is the mother of David Karl Lind.

2929.  Plaintiff Michael Lind is a citizen of the United States domiciled in South Carolina and is the brother of David Karl Lind.

2930.  Plaintiff Bradley Joseph Lind is a citizen of the United States domiciled in Pennsylvania and is the brother of David Karl Lind.

2931.  As a result of the attack and the injuries suffered by David Karl Lind, Plaintiffs David A. Lind, Catherine Jackman, Michael Lind, and Bradley Joseph Lind are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 182.  THE JUNE 14, 2007 ATTACK – SAQLAWIAH

### A.  PLAINTIFFS THE BRIAN GEORGE THURMOND FAMILY

2932.  Plaintiff Brian George Thurmond is a U.S. citizen domiciled in Georgia.

2933.  On June 14, 2007, Brian George Thurmond was serving in the U.S. military when he was attacked by an IED.

2934.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Thurmond.

2935.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2936.  As a result of the attack and the injuries suffered, Brian George Thurmond is entitled to past and future noneconomic damages, including for severe physical and mental pain

and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2937.   Plaintiff Mary Barwick is a citizen of the United States domiciled in Georgia and is the mother of Brian George Thurmond.

2938.   Plaintiff George Thurmond is a citizen of the United States domiciled in Georgia and is the father of Brian George Thurmond.

2939.   Plaintiff Jennifer Coalson is a citizen of the United States domiciled in Georgia and is the sister of Brian George Thurmond.

2940.   As a result of the attack and the injuries suffered by Brian George Thurmond, Plaintiffs Mary Barwick, George Thurmond, and Jennifer Coalson are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 183.   THE JUNE 14, 2007 ATTACK – SAQLAWIYAH

### A.   PLAINTIFFS THE SIGIFREDO APODACA FAMILY

2941.   Plaintiff Sigifredo Apodaca is a U.S. citizen domiciled in California,

2942.   On June 14, 2007, Sigifredo Apodaca was serving in the U.S. military when he was attacked by an IED.

2943.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Apodaca.

2944.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2945.   As a result of the attack and the injuries suffered, Sigifredo Apodaca is entitled to

past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2946.   Plaintiff Vanita Apodaca is a citizen of the United States domiciled in Arizona and is the mother of Sigifredo Apodaca.

2947.   Plaintiff Manuel Apodaca is a citizen of the United States domiciled in New Mexico and is the father of Sigifredo Apodaca.

2948.   Plaintiff Saul Apodaca is a citizen of the United States domiciled in Arizona and is the brother of Sigifredo Apodaca.

2949.   Plaintiff Debra Apodaca is a citizen of the United States and domiciled in the State of Arizona. She is the sister of Sigifredo Apodaca.

2950.   Plaintiff Alexia Felix is a citizen of the United States and domiciled in the State of Arizona. She is the sister of Sigifredo Apodaca.

2951.   As a result of the attack and the injuries suffered by Sigifredo Apodaca, Plaintiffs Vanita Apodaca, Manuel Apodaca, Saul Apodaca, Debra Apodaca, and Alexia Felix, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 184.   THE JUNE 13, 2007 ATTACK – BAGHDAD

#### A.   PLAINTIFF JOEL K. GORBUTT

2952.   Plaintiff Joel K. Gorbutt is a U.S. citizen domiciled in Arizona.

2953.   On June 13, 2007, Joel K. Gorbutt was serving in the U.S. military when he was attacked by an IED and Small Arms Fire.

2954.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or

other material support used to commit the attack, which injured Mr. Gorbutt.

2955.   The Iranian-supported FTO Hezbollah/JAM planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2956.   As a result of the attack and the injuries suffered, Joel K. Gorbutt is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 185.   THE JUNE 13, 2007 ATTACK – RAMADI

### A.   PLAINTIFF STEVEN GRANT GILBOY

2957.   Plaintiff Steven Grant Gilboy is a U.S. citizen domiciled in Wisconsin.

2958.   On June 13, 2007, Steven Grant Gilboy was serving in the U.S. military when he was attacked by mortar.

2959.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Gilboy.

2960.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2961.   As a result of the attack and the injuries suffered, Steven Grant Gilboy is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 186.   THE JUNE 11, 2007 ATTACK – BAGHDAD

#### A.   PLAINTIFF CHRISTOPHER JERID RODRIGUEZ

2962.   Plaintiff Christopher Jerid Rodriguez is a U.S. citizen domiciled in California.

2963.   On June 11, 2007, Christopher Jerid Rodriguez was serving in the U.S. military when he was attacked by an RPG and Small Arms Fire.

2964.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Rodriguez.

2965.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2966.   As a result of the attack and the injuries suffered, Christopher Jerid Rodriguez is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 187.   THE JUNE 11, 2007 ATTACK – AL KARMAH

#### A.   PLAINTIFF BILL HUDSON GROSS, II

2967.   Plaintiff Bill Hudson Gross, II is a U.S. citizen domiciled in North Carolina.

2968.   On June 11, 2007, Bill Hudson Gross, II was serving in the U.S. military when he was attacked by an IED.

2969.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Gross.

2970.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2971.   As a result of the attack and the injuries suffered, Bill Hudson Gross, II is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 188.   THE JUNE 11, 2007 ATTACK – BAGHDAD

### A.   PLAINTIFFS THE NOAH PARKER MUTRIE FAMILY

2972.   Plaintiff Noah Parker Mutrie is a U.S. citizen domiciled in New York.

2973.   On June 11, 2007, Noah Parker Mutrie was serving in the U.S. military when he was attacked by an IED.

2974.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Mutrie.

2975.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2976.   As a result of the attack and the injuries suffered, Noah Parker Mutrie is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2977.   Plaintiff Ashley Mutrie is a citizen of the United States domiciled in New York and is the spouse of Noah Parker Mutrie.

2978.   Plaintiff Alexandra Mutrie is a citizen of the United States domiciled in Louisiana and is the sister of Noah Parker Mutrie.

2979.   Plaintiff B.M., a minor child, represented by his legal guardians Noah Parker Mutrie and Ashley Mutrie, is a citizen of the United States domiciled in New York and is the son

494

of Noah Parker Mutrie.

2980.   Plaintiff J.M., a minor child, represented by his legal guardians Noah Parker Mutrie and Ashley Mutrie, is a citizen of the United States domiciled in New York and is the son of Noah Parker Mutrie.

2981.   As a result of the attack and the injuries suffered by Noah Parker Mutrie, Plaintiffs Ashley Mutrie, Alexandra Mutrie, B.M., a minor child, and J.M., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 189.   THE JUNE 10, 2007 ATTACK – FOB Q-WEST

### A.   PLAINTIFFS THE LARRY DUANE WILSON, JR. FAMILY

2982.   Plaintiff Larry Duane Wilson, Jr. is a U.S. citizen domiciled in Iowa.

2983.   On June 10, 2007, Larry Duane Wilson, Jr. was serving in the U.S. military when he was attacked by an IED.

2984.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Wilson, Jr.

2985.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

2986.   As a result of the attack and the injuries suffered, Larry Duane Wilson, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

2987.   Plaintiff Allysa Brooke Wilson is a citizen of the United States domiciled in Iowa

and is the spouse of Larry Duane Wilson, Jr.

2988.   As a result of the attack and the injuries suffered by Larry Duane Wilson, Jr. Plaintiff Allysa Brooke Wilson, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 190.   THE JUNE 9, 2007 ATTACK – BAQUBAH

#### A.   PLAINTIFFS THE SCOTT ALAN MILLER FAMILY

2989.   On June 9, 2007, Scott Alan Miller was a U.S. citizen, domiciled in Wyoming, and serving in the U.S. military when he was attacked by small arms sniper fire, causing his death.

2990.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Miller.

2991.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

2992.   Plaintiff Susan E. Miller is a citizen of the United States domiciled in Wyoming and is the mother of Scott Alan Miller.

2993.   Plaintiff Robert D. Miller is a citizen of the United States domiciled in Wyoming and is the father of Scott Alan Miller.

2994.   Plaintiff Mark D. Miller is a citizen of the United States domiciled in Wyoming and is the brother of Scott Alan Miller.

2995.   Plaintiff Paul E. Miller is a citizen of the United States domiciled in Wyoming and is the brother of Scott Alan Miller.

2996.   Plaintiff Susan E. Miller brings an action individually and on behalf of the Estate

of Scott Alan Miller, and all heirs thereof, as its legal representative.

2997.   As a result of the attack, and the injuries suffered by and the death of Scott Alan Miller, Plaintiffs Susan E. Miller, Robert D. Miller, Mark D. Miller and Paul E. Miller have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Scott Alan Miller.

### 191.   THE JUNE 6, 2007 ATTACK – BAYJI

#### A.   PLAINTIFFS THE GEORDAN EDWARD GANKA FAMILY

2998.   Plaintiff Geordan Edward Ganka is a U.S. citizen domiciled in Georgia.

2999.   On June 6, 2007, Geordan Edward Ganka was serving in the U.S. military when he was attacked by an EFP.

3000.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Ganka.

3001.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3002.   As a result of the attack and the injuries suffered, Geordan Edward Ganka is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3003.   Plaintiff Thomas Alan Ganka is a citizen of the United States domiciled in Georgia and is the father of Geordan Edward Ganka.

3004.   Plaintiff Charles Thomas Ganka is a citizen of the United States domiciled in California and is the brother of Geordan Edward Ganka.

3005.   Plaintiff Thomas Jared Ganka is a citizen of the United States domiciled in Georgia and is the brother of Geordan Edward Ganka.

3006.   As a result of the attack and the injuries suffered by Geordan Edward Ganka, Plaintiffs Thomas Alan Ganka, Charles Thomas Ganka, and Thomas Jared Ganka, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 192.   THE JUNE 3, 2007 ATTACK – SABAA AL BOUR

#### A.   PLAINTIFFS THE JARED MICHAEL ROGERS FAMILY

3007.   Plaintiff Jared Michael Rogers is a U.S. citizen domiciled in Michigan.

3008.   On June 3, 2007, Jared Michael Rogers was serving in the U.S. military when he was attacked by an IED.

3009.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Rogers.

3010.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3011.   As a result of the attack and the injuries suffered, Jared Michael Rogers is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3012.   Plaintiff C.J.R., a minor child, represented by his legal guardian Jared Michael Rogers, is a citizen of the United States domiciled in Oregon and is the son of Jared Michael Rogers.

3013.   As a result of the attack and the injuries suffered by Jared Michael Rogers, Plaintiff C.J.R., a minor child, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 193.   THE JUNE 3, 2007 ATTACK – BAQUBAH

### A.   PLAINTIFFS THE MICHAEL FRANK JACKSON FAMILY

3014.   Plaintiff Michael Frank Jackson is a U.S. citizen domiciled in South Carolina.

3015.   On June 3, 2007, Michael Frank Jackson was serving in the U.S. military when he was attacked by a VBIED and chemical attack.

3016.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Jackson.

3017.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3018.   As a result of the attack and the injuries suffered, Michael Frank Jackson is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3019.   Plaintiff Michele A. Bruno is a citizen of the United States domiciled in South Carolina and is the mother of Michael Frank Jackson.

3020.   Plaintiff John L. Kolmar is a citizen of the United States domiciled in South Carolina and is the brother of Michael Frank Jackson.

3021.   As a result of the attack and the injuries suffered by Michael Frank Jackson, Plaintiffs Michele A. Bruno and John L. Kolmar, are entitled to past and future noneconomic

damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 194. THE MAY 30, 2007 ATTACK – RISALA

#### A. PLAINTIFF MATTHEW BADILLO

3022. Plaintiff Matthew Badillo is a U.S. citizen domiciled in West Virginia.

3023. On May 30, 2007, Matthew Badillo was serving in the U.S. military when he was attacked by an IED.

3024. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Badillo.

3025. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3026. As a result of the attack and the injuries suffered, Matthew Badillo is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 195. THE MAY 27, 2007 ATTACK – MOSUL

#### A. PLAINTIFF CHRISTOPHER FRANKLIN SWARTZ

3027. Plaintiff Christopher Franklin Swartz is a U.S. citizen domiciled in Kansas.

3028. On May 27, 2007, Christopher Franklin Swartz was serving in the U.S. military when he was attacked by an IED.

3029. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Swartz.

3030.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3031.   As a result of the attack and the injuries suffered, Christopher Franklin Swartz is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 196.   THE MAY 25, 2007 ATTACK – RADWANIYAH

### A.   PLAINTIFFS THE ROBERT ALLEN MANSFIELD FAMILY

3032.   Plaintiff Robert Allen Mansfield is a U.S. citizen domiciled in Delaware.

3033.   On May 25, 2007, Robert Allen Mansfield was serving in the U.S. military when he was attacked by an IED.

3034.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Mansfield.

3035.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3036.   As a result of the attack and the injuries suffered, Robert Allen Mansfield is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3037.   Plaintiff Alice Mansfield is a citizen of the United States domiciled in Pennsylvania and is the mother of Robert Allen Mansfield.

3038.   Plaintiff Felicia Mansfield is a citizen of the United States domiciled in

Pennsylvania and is the sister of Robert Allen Mansfield.

3039.   Plaintiff Lionel A. Mansfield is a citizen of the United States domiciled in Pennsylvania and is the brother of Robert Allen Mansfield.

3040.   Plaintiff Larry Fields is a citizen of the United States domiciled in Pennsylvania and is the brother of Robert Allen Mansfield.

3041.   As a result of the attack and the injuries suffered by Robert Allen Mansfield, Plaintiffs Alice Mansfield, Felicia Mansfield, Lionel A. Mansfield and Larry Fields are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 197.   THE MAY 25, 2007 ATTACK – FALLUJAH

### A.   PLAINTIFFS THE CORY ROBERT HOWARD FAMILY

3042.   Plaintiff Cory Robert Howard is a U.S. citizen domiciled in Pennsylvania.

3043.   On May 25, 2007, Cory Robert Howard was serving in the U.S. military when he was attacked by an IED.

3044.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Howard.

3045.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3046.   As a result of the attack and the injuries suffered, Cory Robert Howard is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

502

3047.   Plaintiff Leslie Howard is a citizen of the United States and domiciled in the State of California. She is the mother of Cory Robert Howard.

3048.   As a result of the attack and the injuries suffered by Cory Robert Howard, Plaintiff Leslie Howard, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 198.   THE MAY 22, 2007 ATTACK – RAMADI

#### A.   PLAINTIFFS THE DANIEL FRANCIS PEARSON FAMILY

3049.   Plaintiff Daniel Francis Pearson is a U.S. citizen domiciled in Illinois.

3050.   On May 22, 2007, Daniel Francis Pearson was serving in the U.S. military when he was attacked by an IED, RPGs and small arms fire.

3051.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Pearson.

3052.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3053.   As a result of the attack and the injuries suffered, Daniel Francis Pearson is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3054.   Plaintiff Holly Ann Pearson is a citizen of the United States domiciled in Florida and is the mother of Daniel Francis Pearson.

3055.   As a result of the attack and the injuries suffered by Daniel Francis Pearson, Plaintiff Holly Ann Pearson is entitled to past and future noneconomic damages, including for

severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 199.   THE MAY 22, 2007 ATTACK –TAJI

#### A.   PLAINTIFFS THE KRISTOPHER ALLAN HIGDON FAMILY

3056.   On May 22, 2007, Kristopher Allan Higdon was a U.S. citizen, domiciled in Texas/Washington, and serving in the U.S. military when he was attacked by an IED, causing his death.

3057.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Higdon.

3058.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

3059.   Plaintiff Ronda Elaine Higdon is a citizen of the United States domiciled in Texas and is the mother of Kristopher Allan Higdon.

3060.   Plaintiff Britton Shane Higdon is a citizen of the United States domiciled in Texas and is the brother of Kristopher Allan Higdon.

3061.   As a result of the attack, and the death of Kristopher Allan Higdon, Plaintiffs Ronda Elaine Higdon and Britton Shane Higdon have suffered severe mental anguish, extreme emotional pain and suffering, loss of society, services, companionship, comfort, protection, instruction, advice and counsel of decedent Kristopher Allan Higdon.

### 200.   THE MAY 22, 2007 ATTACK – TAJI

#### A.   PLAINTIFFS THE ROBERT ADRIAN WORTHINGTON FAMILY

3062.   On May 22, 2007, Robert Adrian Worthington was a U.S. citizen, domiciled in

Georgia, and serving in the U.S. military when he was attacked by IEDs, causing his death.

3063.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Worthington.

3064.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

3065.   Plaintiff Rhonda S. Worthington is a citizen of the United States domiciled in Georgia and is the mother of Robert Adrian Worthington.

3066.   Plaintiff Kaylin Worthington is a citizen of the United States domiciled in Georgia and is the sister of Robert Adrian Worthington.

3067.   Plaintiff Rhonda S. Worthington, brings an action individually and on behalf of the Estate of Robert Adrian Worthington, and all heirs thereof, as its anticipated legal representative.

3068.   As a result of the attack, and the injuries suffered by and the death of Robert Adrian Worthington, Plaintiffs Rhonda S. Worthington and Kaylin Worthington have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Robert Adrian Worthington.

## 201.   THE MAY 21, 2007 ATTACK – BAGHDAD

### A.   PLAINTIFF JOHN IOANNIS OUZOUNIDIS

3069.   Plaintiff John Ioannis Ouzounidis is a U.S. citizen domiciled in California.

3070.   On May 21, 2007, John Ioannis Ouzounidis was serving in the U.S. military when he was attacked by small arms fire.

3071.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Ouzounidis.

3072.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3073.   As a result of the attack and the injuries suffered, John Ioannis Ouzounidis is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 202.   THE MAY 20, 2007 ATTACK – BAGHDAD

### A.   PLAINTIFFS THE GIOVANNI ALEXANDER AVALOS FAMILY

3074.   Plaintiff Giovanni Alexander Avalos is a U.S. citizen domiciled in California.

3075.   On or about May 20, 2007, Giovanni Alexander Avalos was serving in the U.S. military when he was attacked by an IED.

3076.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Avalos.

3077.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3078.   As a result of the attack and the injuries suffered, Giovanni Alexander Avalos is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3079.   Plaintiff Maria Avalos is a citizen of the United States domiciled in California and is the spouse of Giovanni Alexander Avalos.

3080.   Plaintiff J.A., a minor child, represented by her legal guardian Giovanni Alexander Avalos, is a citizen of the United States domiciled in California and is the daughter of Giovanni Alexander Avalos.

3081.   As a result of the attack and the injuries suffered by Giovanni Alexander Avalos, Plaintiffs Maria Avalos and J.A., are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 203.   THE MAY 17, 2007 ATTACK – RUSHDI MULLAH

### A.   PLAINTIFFS THE STEVEN MICHAEL PACKER FAMILY

3082.   On May 17, 2007, Steven Michael Packer was a U.S. citizen, domiciled in California, and serving in the U.S. military when he was attacked by IEDs, causing his death.

3083.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Packer.

3084.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

3085.   Plaintiff Robin Renee Davidson is a citizen of the United States domiciled in California and is the mother of Steven Michael Packer.

3086.   Plaintiff Christopher David Packer is a citizen of the United States domiciled in California and is the brother of Steven Michael Packer.

3087.   Plaintiff Danielle Allyson Packer is a citizen of the United States domiciled in California and is the sister of Steven Michael Packer.

3088.   Plaintiff Zachary Tyler Davidson is a citizen of the United States domiciled in California and is the brother of Steven Michael Packer.

3089.   Plaintiff Jason Nolan Davidson is a citizen of the United States domiciled in California and is the brother of Steven Michael Packer.

3090.   Plaintiff Robin Renee Davidson brings an action individually and on behalf of the Estate of Steven Michael Packer, and all heirs thereof, as its legal representative.

3091.   As a result of the attack, and the injuries suffered by and the death of Steven Michael Packer, Plaintiffs Robin Renee Davidson, Christopher David Packer, Danielle Allyson Packer, Zachary Tyler Davidson, and Jason Nolan Davidson have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Steven Michael Packer.

## 204.   THE MAY 14, 2007 ATTACK – BAGHDAD

### A.   PLAINTIFFS THE TERRY LAMONT FLEMING FAMILY

3092.   Plaintiff Terry Lamont Fleming is a U.S. citizen domiciled in Georgia.

3093.   On May 14, 2007, Terry Lamont Fleming was serving in the U.S. military when he was attacked by and IED and RPGs.

3094.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Fleming.

3095.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3096.   As a result of the attack and the injuries suffered, Terry Lamont Fleming is entitled to past and future noneconomic damages, including for severe physical and mental pain

508

and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3097.   Plaintiff Ida Lee Fleming is a citizen of the United States domiciled in South Carolina and is the mother of Terry Lamont Fleming.

3098.   Plaintiff Elaine F. Bennett is a citizen of the United States domiciled in South Carolina and is the sister of Terry Lamont Fleming.

3099.   Plaintiff Ayron L. Bennett is a citizen of the United States domiciled in South Carolina and is the nephew of Terry Lamont Fleming.

3100.   As a result of the attack and the injuries suffered by Terry Lamont Fleming, Plaintiffs Ida Lee Fleming, Elaine F. Bennett and Ayron L. Bennett are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 205.   THE MAY 13, 2007 ATTACK – SAMARRA

### A.   PLAINTIFFS THE DANIEL EUZEB COWART FAMILY

3101.   Plaintiff Daniel Euzeb Cowart is a U.S. citizen domiciled in Texas.

3102.   On May 13, 2007, Daniel Euzeb Cowart was serving in the U.S. military when he was attacked by a suicide bomb.

3103.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Cowart.

3104.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3105.   As a result of the attack and the injuries suffered, Daniel Euzeb Cowart is entitled

509

to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3106.   Plaintiff Clifford Cowart is a citizen of the United States domiciled in Texas and is the father of Daniel Euzeb Cowart.

3107.   Plaintiff Theresa L. Cowart is a citizen of the United States domiciled in Texas and is the mother of Daniel Euzeb Cowart.

3108.   Plaintiff Sarah Earls-Cowart is a citizen of the United States domiciled in Texas and is the wife of Daniel Euzeb Cowart.

3109.   Plaintiff A.R.C., a minor child, represented by her legal guardian Daniel Euzeb Cowart, is a citizen of the United States domiciled in Texas and is the daughter of Daniel Euzeb Cowart.

3110.   Plaintiff A.S.C., a minor child, represented by her legal guardian Daniel Euzeb Cowart, is a citizen of the United States domiciled in Texas and is the daughter of Daniel Euzeb Cowart.

3111.   As a result of the attack and the injuries suffered by Daniel Euzeb Cowart, Plaintiffs Clifford Cowart, Theresa L. Cowart, Sarah Earls-Cowart, A.R.C., a minor child and A.S.C., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 206.   THE MAY 13, 2007 ATTACK – WESTERN BAGHDAD

#### A.   PLAINTIFF JERRY MATTHEW TEAL

3112.   Plaintiff Jerry Matthew Teal is a U.S. citizen domiciled in Connecticut.

3113.   On May 13, 2007, Jerry Matthew Teal was serving in the U.S. military when he

510

was attacked by an IED.

3114.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Teal.

3115.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3116.  As a result of the attack and the injuries suffered, Jerry Matthew Teal is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 207.   THE MAY 12, 2007 ATTACK – UMM QASR

#### A.   PLAINTIFFS THE DAVID KEVIN GASKIN FAMILY

3117.  Plaintiff David Kevin Gaskin is a U.S. citizen domiciled in New York.

3118.  On May 12, 2007, David Kevin Gaskin was serving in the U.S. military when he was attacked by an IED.

3119.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Gaskin.

3120.  The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3121.  As a result of the attack and the injuries suffered, David Kevin Gaskin is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3122.   Plaintiff Damil Gaskin is a citizen of the United States domiciled in New York and is the son of David Kevin Gaskin.

3123.   Plaintiff D.G., a minor child, represented by his legal guardian David Kevin Gaskin, is a citizen of the United States domiciled in New York and is the son of David Kevin Gaskin.

3124.   As a result of the attack and the injuries suffered by David Kevin Gaskin, Plaintiffs Damil Gaskin and D.G., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 208.   THE MAY 12, 2007 ATTACK – UMM QASR

#### A.   PLAINTIFFS THE ANDRE DEWAYNE JOSEPH FAMILY

3125.   Plaintiff Andre Dewayne Joseph is a U.S. citizen domiciled in New York.

3126.   On May 12, 2007, Andre Dewayne Joseph was serving in the U.S. military when he was attacked by IEDs.

3127.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Joseph.

3128.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3129.   As a result of the attack and the injuries suffered, Andre Dewayne Joseph is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

512

3130.   Plaintiff Barbette Joseph is a citizen of the United States and domiciled in the State of California. She is the wife of Andre Dewayne Joseph.

3131.   Plaintiff Qamar Joseph is a citizen of the United States and domiciled in the State of California. He is the son of Andre Dewayne Joseph.

3132.   As a result of the attack and the injuries suffered by Andre Dewayne Joseph, Plaintiffs Barbette Joseph and Qamar Joseph, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 209.   THE MAY 5, 2007 ATTACK – BARWANAH

### A.   PLAINTIFFS THE RONNY PORTA FAMILY

3133.   Plaintiff Ronny Porta is a U.S. citizen domiciled in Virginia.

3134.   On May 5, 2007, Ronny Porta was serving in the U.S. military when he was attacked by an IED.

3135.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Porta.

3136.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3137.   As a result of the attack and the injuries suffered, Ronny Porta is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3138.   Plaintiff Rene Eva Porta is a citizen of the United States domiciled in Maryland

and is the mother of Ronny Porta.

3139.   Plaintiff Natali Porta is a citizen of the United States domiciled in Maryland and is the sister of Ronny Porta.

3140.   Plaintiff Felix A. Porta is a United States permanent resident domiciled in Maryland and is the father of Ronny Porta.

3141.   As a result of the attack and the injuries suffered by Ronny Porta, Plaintiffs Rene Eva Porta, Felix A. Porta and Natali Porta are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 210.   THE MAY 3, 2007 ATTACK – BAQUBAH

### A.   PLAINTIFFS THE JUSTIN LANCE CAMPLIN FAMILY

3142.   Plaintiff Justin Lance Camplin is a U.S. citizen domiciled in Kansas.

3143.   On May 3, 2007, Justin Lance Camplin was serving in the U.S. military when he was attacked by an IED.

3144.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Camplin.

3145.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3146.   As a result of the attack and the injuries suffered, Justin Lance Camplin is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3147.   Plaintiff T.J.C., a minor child, represented by his legal guardian Justin Lance

Camplin, is a citizen of the United States domiciled in Kansas and is the son of Justin Lance Camplin.

3148.   Plaintiff M.B.C., a minor child, represented by her legal guardian Justin Lance Camplin, is a citizen of the United States domiciled in Kansas and is the daughter of Justin Lance Camplin.

3149.   Plaintiff C.R.C., a minor child, represented by her legal guardian Justin Lance Camplin, is a citizen of the United States domiciled in Kansas and is the daughter of Justin Lance Camplin.

3150.   As a result of the attack and the injuries suffered by Justin Lance Camplin Plaintiffs T.J.C., a minor child, M.B.C., a minor child and C.R.C., a minor child are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 211.   THE MAY 1, 2007 ATTACK – BAGHDAD

#### A.   PLAINTIFF WILLIAM COLBY FRASIER

3151.   Plaintiff William Colby Frasier is a U.S. citizen domiciled in Kentucky.

3152.   On May 1, 2007, William Colby Frasier was serving in the U.S. military when he was attacked by an EFP.

3153.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Frasier.

3154.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3155.   As a result of the attack and the injuries suffered, William Colby Frasier is

515

entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 212.   THE APRIL 28, 2007 ATTACK – HADITHA

### A.   PLAINTIFFS THE THEODORE MICHAEL COTHRAN, JR. FAMILY

3156.   Plaintiff Theodore Michael Cothran, Jr. is a U.S. citizen domiciled in North Carolina.

3157.   On April 28, 2007, Theodore Michael Cothran, Jr. was serving in the U.S. military when he was attacked by an IED.

3158.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Cothran, Jr.

3159.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3160.   As a result of the attack and the injuries suffered, Theodore Michael Cothran, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3161.   Plaintiff Elena Martinez Cothran is a citizen of the United States domiciled in Louisiana and is the mother of Theodore Michael Cothran, Jr.

3162.   Plaintiff Theodore Michael Cothran, Sr. is a citizen of the United States domiciled in Louisiana and is the father of Theodore Michael Cothran, Jr.

3163.   Plaintiff Antoinette Cothran Hebert is a citizen of the United States domiciled in

516

Louisiana and is the sister of Theodore Michael Cothran, Jr.

3164.   As a result of the attack and the injuries suffered by Theodore Michael Cothran, Jr., Plaintiffs Elena Martinez Cothran, Theodore Michael Cothran Sr., and Antoinette Cothran Hebert are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 213.   THE APRIL 27, 2007 ATTACK –AL-ISHAQI

#### A.   PLAINTIFFS THE CRAIG STEVEN HALL FAMILY

3165.   Plaintiff Craig Steven Hall is a U.S. citizen domiciled in Massachusetts.

3166.   On April 27, 2007, Craig Steven Hall was serving in the U.S. military when he was attacked by an IED.

3167.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Hall.

3168.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3169.   As a result of the attack and the injuries suffered, Craig Steven Hall is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3170.   Plaintiff D.H., a minor child, represented by his legal guardian Craig Steven Hall, is a citizen of the United States domiciled in Massachusetts and is the son of Craig Steven Hall.

3171.   As a result of the attack and the injuries suffered by Craig Steven Hall, Plaintiff D.H., a minor child, is entitled to past and future noneconomic damages, including for severe

517

mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 214.   THE APRIL 25, 2007 ATTACK – BAGHDAD

####   A.   PLAINTIFF SHAUN CHRISTOPHER STILTNER

3172.   Plaintiff Shaun Christopher Stiltner is a U.S. citizen domiciled in South Carolina.

3173.   On April 25, 2007, Shaun Christopher Stiltner was serving as a civilian contractor to the U.S. military in Iraq when he was attacked by an EFP.

3174.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Stiltner.

3175.   The Iranian-supported FTO Hezbollah/JAM planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3176.   As a result of the attack and the injuries suffered, Shaun Christopher Stiltner is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 215.   THE APRIL 20, 2007 ATTACK – SAQLAWIYAH

####   A.   PLAINTIFF STEVEN ANDREW MAY

3177.   Plaintiff Steven Andrew May is a U.S. citizen domiciled in Texas.

3178.   On April 20, 2007, Steven Andrew May was serving in the U.S. military when he was attacked by a VBIED.

3179.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. May.

3180.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3181.   As a result of the attack and the injuries suffered, Steven Andrew May is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 216.   THE APRIL 18, 2007 ATTACK – TARMIYAH

### A.   PLAINTIFFS THE MATTHEW GENE RAUL MERCADO FAMILY

3182.   Plaintiff Matthew Gene Raul Mercado is a U.S. citizen domiciled in Colorado.

3183.   On April 18, 2007, Matthew Gene Raul Mercado was serving in the U.S. military when he was attacked by an IED and a knife.

3184.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Mercado.

3185.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3186.   As a result of the attack and the injuries suffered, Matthew Gene Raul Mercado is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3187.  Plaintiff Raul Mercado is a citizen of the United States domiciled in New York and is the father of Matthew Gene Raul Mercado.

3188.  Plaintiff Saundra Mercado is a citizen of the United States domiciled in New York and is the mother of Matthew Gene Raul Mercado.

3189.  Plaintiff K.M.M., a minor child, represented by his legal guardian Matthew Gene Raul Mercado, is a citizen of the United States domiciled in Colorado and is the son of Matthew Gene Raul Mercado.

3190.  Plaintiff M.L.M., a minor child, represented by her legal guardian Matthew Gene Raul Mercado, is a citizen of the United States domiciled in Colorado and is the daughter of Matthew Gene Raul Mercado.

3191.  As a result of the attack and the injuries suffered by Matthew Gene Raul Mercado, Plaintiffs Raul Mercado, Saundra Mercado, K.M.M., a minor child, and M.L.M., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 217.  THE APRIL 13, 2007 ATTACK – BAQUBAH

### A.  PLAINTIFFS THE MICHAEL FRANK JACKSON FAMILY

3192.  Plaintiff Michael Frank Jackson is a U.S. citizen domiciled in South Carolina.

3193.  On April 13, 2007, Michael Frank Jackson was serving in the U.S. military when he was attacked by a mortar.

3194.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Jackson.

3195.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3196.  As a result of the attack and the injuries suffered, Michael Frank Jackson is

entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3197.   Plaintiff Michele A. Bruno is a citizen of the United States domiciled in South Carolina and is the mother of Michael Frank Jackson.

3198.   Plaintiff John L. Kolmar is a citizen of the United States domiciled in South Carolina and is the brother of Michael Frank Jackson.

3199.   As a result of the attack and the injuries suffered by Michael Frank Jackson, Plaintiffs Michele A. Bruno and John L. Kolmar, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 218.   THE APRIL 12, 2007 ATTACK – TARMIYAH

#### A.   PLAINTIFFS THE GWILYM JOSEPH NEWMAN FAMILY

3200.   On April 12, 2007, Gwilym Joseph Newman was a U.S. citizen, domiciled in Texas, and serving in the U.S. military when he was attacked by sniper fire, causing his death.

3201.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Newman.

3202.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

3203.   Plaintiff Samantha L.N. Tjaden is a citizen of the United States domiciled in Washington and was the spouse of Gwilym Joseph Newman.

3204.   Plaintiff G.A.N., a minor child, represented by his legal guardian Samantha L.N.

Tjaden, is a citizen of the United States domiciled in Washington and is the son of Gwilym Joseph Newman.

3205.   Plaintiff Christine A. Curtis is a citizen of the United States domiciled in Texas and was the mother of Gwilym Joseph Newman.

3206.   Plaintiff Brittany M. Greene is a citizen of the United States domiciled in Texas and was the sister of Gwilym Joseph Newman.

3207.   Plaintiff Patrick D. Newman is a citizen of the United States domiciled in Texas and was the brother of Gwilym Joseph Newman.

3208.   Plaintiff Samantha L.N. Tjaden, brings an action individually and on behalf of the pending Estate of Gwilym Joseph Newman, and all heirs thereof, as its legal representative.

3209.   As a result of the attack, and the injuries suffered by and the death of Gwilym Joseph Newman, Plaintiffs Samantha L.N. Tjaden, Christine A. Curtis, Brittany M. Greene, Patrick D. Newman and G.A.N., a minor child, have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the pending Estate of Gwilym Joseph Newman.

### 219.   THE APRIL 10, 2007 ATTACK – AL RUSAFA

#### A.   PLAINTIFFS THE MALCOLM CHRISTOPHER CANADA FAMILY

3210.  Plaintiff Malcolm Christopher Canada is a U.S. citizen domiciled in South Carolina.

3211.  On April 10, 2007, Malcolm Christopher Canada was serving in the U.S. military when he was attacked by an IED, small arms, grenades, and RPGs.

3212.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or

other material support used to commit the attack, which injured Mr. Canada.

3213. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3214. As a result of the attack and the injuries suffered, Malcolm Christopher Canada is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3215. Plaintiff Barbara Jean Canada is a citizen of the United States domiciled in South Carolina and is the spouse of Malcolm Christopher Canada.

3216. As a result of the attack and the injuries suffered by Malcolm Christopher Canada, Plaintiff Barbara Jean Canada is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 220.   THE APRIL 5, 2007 ATTACK – BAGHDAD

### A.   PLAINTIFFS THE RENE IVAN GONZALEZ, JR. FAMILY

3217. Plaintiff Rene Ivan Gonzalez, Jr. is a U.S. citizen domiciled in Texas.

3218. On April 5, 2007, Rene Ivan Gonzalez, Jr. was serving in the U.S. military when he was attacked by mortars.

3219. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Gonzalez.

3220. The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3221.  As a result of the attack and the injuries suffered, Rene Ivan Gonzalez, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3222.  Plaintiff Yvette Gonzalez is a citizen of the United States and domiciled in the State of Texas. She is the mother of Rene Ivan Gonzalez, Jr.

3223.  As a result of the attack and the injuries suffered by Rene Ivan Gonzalez, Jr., Plaintiff Yvette Gonzalez, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 221.  THE APRIL 2, 2007 ATTACK – FALLUJAH

### A.  PLAINTIFF IAN REESER

3224.  Plaintiff Ian Reeser is a U.S. citizen domiciled in Indiana.

3225.  On April 2, 2007, Ian Reeser was serving in the U.S. military when he was attacked by an IED.

3226.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Reeser.

3227.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3228.  As a result of the attack and the injuries suffered, Ian Reeser is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 222.   THE MARCH 31, 2007 ATTACK – BAGHDAD

### A.   PLAINTIFF GILBERT PAUL PAIZ, JR.

3229.   Plaintiff Gilbert Paul Paiz, Jr. is a U.S. citizen domiciled in West Virginia.

3230.   On March 31, 2007, Gilbert Paul Paiz, Jr. was serving in the U.S. military when he was attacked by RPGs and an EFP.

3231.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Paiz.

3232.   The Iranian-supported FTO Hezbollah/JAM planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3233.   As a result of the attack and the injuries suffered, Gilbert Paul Paiz, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 223.   THE MARCH 31, 2007 ATTACK – BAGHDAD

### A.   PLAINTIFFS THE BRADLEY ARNOLD BLAZEK FAMILY

3234.   Plaintiff Bradley Arnold Blazek is a U.S. citizen domiciled in Georgia.

3235.   On March 31, 2007, Bradley Arnold Blazek was serving in the U.S. military when he was attacked by a rocket.

3236.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Blazek.

3237.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the

attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3238.   As a result of the attack and the injuries suffered, Bradley Arnold Blazek is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3239.   Plaintiff Terri Machelle Blazek is a citizen of the United States and domiciled in the State of Georgia. She is the wife of Bradley Arnold Blazek.

3240.   As a result of the attack and the injuries suffered by Bradley Arnold Blazek, Plaintiff Terri Machelle Blazek, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 224.   THE MARCH 30, 2007 ATTACK – MOSUL

#### A.   PLAINTIFF RICHARD LEE BURGE, JR.

3241.   Plaintiff Richard Lee Burge, Jr. is a U.S. citizen domiciled in Florida.

3242.   On March 30, 2007, Richard Lee Burge, Jr. was serving in the U.S. military when he was attacked by an IED.

3243.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Burge

3244.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3245.   As a result of the attack and the injuries suffered, Richard Lee Burge, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including

medical expenses, lost income, and loss of earning capacity.

### 225. THE MARCH 29, 2007 ATTACK – NOWFAL

#### A. PLAINTIFFS THE STEPHEN KENNETH VALYOU FAMILY

3246.   Plaintiff Stephen Kenneth Valyou is a U.S. citizen domiciled in New York.

3247.   On March 29, 2007, Stephen Kenneth Valyou was serving in the U.S. military when he was attacked by small arms fire.

3248.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Valyou.

3249.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3250.   As a result of the attack and the injuries suffered, Stephen Kenneth Valyou is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3251.   Plaintiff N.G.V., a minor child, represented by his legal guardian Stephen Kenneth Valyou, is a citizen of the United States domiciled in New York and is the son of Stephen Kenneth Valyou.

3252.   As a result of the attack and the injuries suffered by Stephen Kenneth Valyou, Plaintiff N.G.V., a minor child, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 226.   THE MARCH 29, 2007 ATTACK – BAGHDAD

### A.   PLAINTIFFS THE MANUEL ROMAN FAMILY

3253.   Plaintiff Manuel Roman is a U.S. citizen domiciled in the Commonwealth of Puerto Rico.

3254.   On March 29, 2007, Manuel Roman was serving in the U.S. military when he was attacked by an EFP.

3255.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Roman.

3256.   The Iranian-supported FTO Hezbollah/JAM planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3257.   As a result of the attack and the injuries suffered, Manuel Roman is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3258.   Plaintiff Marco Anthony Roman is a citizen of the United States domiciled in Massachusetts and is the brother of Manuel Roman.

3259.   Plaintiff Maria Christina Murphy is a citizen of the United States domiciled in Kansas and is the sister of Manuel Roman.

3260.   Plaintiff Estrella Roman Padilla is a citizen of the United States domiciled in the Commonwealth of Puerto Rico and is the mother of Manuel Roman.

3261.   Plaintiff Manuel Roman, Sr. is a citizen of the United States domiciled in the Commonwealth of Puerto Rico and is the father of Manuel Roman.

3262.   Plaintiff Thalia Yarie Roman is a citizen of the United States domiciled in Massachusetts and is the daughter of Manuel Roman.

3263.   Plaintiff Aracellys Jasmin Roman is a citizen of the United States domiciled in Connecticut and is the daughter of Manuel Roman.

3264.   Plaintiff Jamilex Yali Roman is a citizen of the United States domiciled in New York and is the daughter of Manuel Roman.

3265.   As a result of the attack and the injuries suffered by Manuel Roman, Plaintiffs Marco Anthony Roman, Maria Christina Murphy, Estrella Roman Padilla, Manuel Roman, Sr., Thalia Yarie Roman, Aracellys Jasmin Roman, and Jamilex Yali Roman are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 227.   THE MARCH 26, 2007 ATTACK – BAGHDAD

### A.   PLAINTIFFS THE MICHAEL LEE OWEN BOLLEY FAMILY

3266.   Plaintiff Michael Lee Owen Bolley is a U.S. citizen domiciled in Nevada.

3267.   On March 26, 2007, Michael Lee Owen Bolley was serving in the U.S. military when he was attacked by a VBIED.

3268.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Bolley.

3269.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3270.   As a result of the attack and the injuries suffered, Michael Lee Owen Bolley is entitled to past and future noneconomic damages, including for severe physical and mental pain

and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3271.   Plaintiff Dakoda Marie Bolley is a citizen of the United States domiciled in Idaho and is the daughter of Michael Lee Owen Bolley.

3272.   Plaintiff Demi Lynn Bolley is a citizen of the United States domiciled in Nevada and is the daughter of Michael Lee Owen Bolley.

3273.   Plaintiff Michael Lee Owen Bolley, II is a citizen of the United States domiciled in Idaho and is the son of Michael Lee Owen Bolley.

3274.   Plaintiff Judy C. Bolley is a citizen of the United States domiciled in Idaho and is the mother of Michael Lee Owen Bolley.

3275.   Plaintiff Donnie Lee Bolley is a citizen of the United States domiciled in Idaho and is the father of Michael Lee Owen Bolley.

3276.   Plaintiff Billy Don Bolley is a citizen of the United States domiciled in Idaho and is the brother of Michael Lee Owen Bolley.

3277.   Plaintiff Kimberly Dawn Deuel is a citizen of the United States domiciled in Idaho and is the sister of Michael Lee Owen Bolley.

3278.   Plaintiff Tracy Allen Bolley is a citizen of the United States domiciled in Idaho and is the brother of Michael Lee Owen Bolley.

3279.   Plaintiff K.T.B. a minor child, represented by his legal guardian Michael Lee Owen Bolley, is a citizen of the United States domiciled in Nevada and is the son of Michael Lee Owen Bolley.

3280.   As a result of the attack and the injuries suffered by Michael Lee Owen Bolley, Plaintiffs Dakoda Marie Bolley, Demi Lynn Bolley, Michael Lee Owen Bolley, II, Judy C.

Bolley, Donnie Lee Bolley, Billy Don Bolley, Kimberly Dawn Deuel, Tracy Allen Bolley, and K.T.B., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 228.   THE MARCH 26, 2007 ATTACK – BAQUBAH

#### A.   PLAINTIFF MARIO DONTAE WHITAKER, SR.

3281.   Plaintiff Mario Dontae Whitaker, Sr. is a U.S. citizen domiciled in Texas.

3282.   On March 26, 2007, Mario Dontae Whitaker, Sr. was serving in the U.S. military when he was attacked by a VBIED.

3283.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Whitaker.

3284.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3285.   As a result of the attack and the injuries suffered, Mario Dontae Whitaker, Sr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 229.   THE MARCH 23, 2007 ATTACK – MOSUL

#### A.   PLAINTIFFS THE MICHAEL THOMAS BEHRENS FAMILY

3286.   Plaintiff Michael Thomas Behrens is a U.S. citizen domiciled in Georgia.

3287.   On March 23, 2007, Michael Thomas Behrens was serving in the U.S. military when he was attacked by an IED.

3288.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or

other material support used to commit the attack, which injured Mr. Behrens.

3289.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3290.   As a result of the attack and the injuries suffered, Michael Thomas Behrens is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3291.   Plaintiff Taylor M. Behrens is a citizen of the United States domiciled in Georgia and is the son of Michael Thomas Behrens.

3292.   Plaintiff Hunter W. Behrens is a citizen of the United States domiciled in North Carolina and is the son of Michael Thomas Behrens.

3293.   Plaintiff Caitlynn Behrens is a citizen of the United States domiciled in North Carolina and is the daughter of Michael Thomas Behrens.

3294.   Plaintiff Kendyl Elizabeth Behrens is a citizen of the United States domiciled in Georgia and is the daughter of Michael Thomas Behrens.

3295.   Plaintiff Jefferson A. Behrens is a citizen of the United States domiciled in North Carolina and is the daughter of Michael Thomas Behrens.

3296.   As a result of the attack and the injuries suffered by Michael Thomas Behrens, Plaintiffs Taylor M. Behrens, Hunter W. Behrens, Caitlynn Behrens, Kendyl Elizabeth Behrens, and Jefferson A. Behrens are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

230.   **THE MARCH 22, 2007 ATTACK – MOSUL**

A.   **PLAINTIFFS THE STEVEN MICHAEL SHAUER FAMILY**

3297.   Plaintiff Steven Michael Shauer is a U.S. citizen domiciled in Texas.

3298.   On March 22, 2007, Steven Michael Shauer was serving in the U.S. military when he was attacked by an IED and small arms fire ambush.

3299.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Shauer.

3300.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3301.   As a result of the attack and the injuries suffered, Steven Michael Shauer is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3302.   Plaintiff Paula Sue Horning is a citizen of the United States domiciled in California and is the mother of Steven Michael Shauer.

3303.   Plaintiff Joseph A. Schmidt is a citizen of the United States domiciled in California and is the brother of Steven Michael Shauer.

3304.   Plaintiff Robert Charles Schmidt is a citizen of the United States domiciled in California and is the brother of Steven Michael Shauer.

3305.   Plaintiff Edward Ronald Schmidt Jr. is a citizen of the United States domiciled in California and is the brother of Steven Michael Shauer.

3306.   Plaintiff B.S.S., a minor child, represented by her legal guardian Steven Michael Shauer, is a citizen of the United States domiciled in Texas and is the daughter of Steven

Michael Shauer.

3307. As a result of the attack and the injuries suffered by Steven Michael Shauer, Plaintiffs Paula Sue Horning, Joseph A. Schmidt, Robert Charles Schmidt, Edward Ronald Schmidt Jr., and B.S.S., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 231. THE MARCH 19, 2007 ATTACK – BAGHDAD

### A. PLAINTIFF MATTHEW LEE ANDREAS

3308. Plaintiff Matthew Lee Andreas is a U.S. citizen domiciled in California.

3309. On March 19, 2007, Matthew Lee Andreas was serving in the U.S. military when he was attacked by an RPG.

3310. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Andreas.

3311. The Iranian-supported FTO Hezbollah/JAM planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3312. As a result of the attack and the injuries suffered, Matthew Lee Andreas is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 232. THE MARCH 16, 2007 ATTACK – BUHRIZ

### A. PLAINTIFFS THE WILLIAM ROBERT INGRAM FAMILY

3313. Plaintiff William Robert Ingram is a U.S. citizen domiciled in Missouri.

3314.   On March 16, 2007, William Robert Ingram was serving in the U.S. military when he was attacked by an EFP, small arms, and RPGs.

3315.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Ingram.

3316.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3317.   As a result of the attack and the injuries suffered, William Robert Ingram is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3318.   Plaintiff X.R.I., a minor child, represented by his legal guardian William Robert Ingram, is a citizen of the United States domiciled in Missouri and is the son of William Robert Ingram.

3319.   Plaintiff W.J.I., a minor child, represented by his legal guardian William Robert Ingram, is a citizen of the United States domiciled in Missouri and is the son of William Robert Ingram.

3320.   As a result of the attack and the injuries suffered by William Robert Ingram, Plaintiffs X.R.I., a minor child and W.J.I., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 233.   THE MARCH 15, 2007 ATTACK – SAMARRA

#### A.   PLAINTIFF BRADLEY ALAN KNEPPER

3321.   Plaintiff Bradley Alan Knepper is a U.S. citizen domiciled in Nevada.

3322.   On March 15, 2007, Bradley Alan Knepper was serving in the U.S. military when he was attacked by an IED.

3323.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Knepper.

3324.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3325.   As a result of the attack and the injuries suffered, Bradley Alan Knepper is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 234.   THE MARCH 14, 2007 ATTACK – BAQUBAH

#### A.   PLAINTIFF MICHAEL SCOTT ERB

3326.   Plaintiff Michael Scott Erb is a U.S. citizen domiciled in Indiana.

3327.   On March 14, 2007, Michael Scott Erb was serving in the U.S. military when he was attacked by an IED.

3328.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Erb.

3329.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3330.   As a result of the attack and the injuries suffered, Michael Scott Erb is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 235.   THE MARCH 11, 2007 ATTACK – AL RUSAFA

#### A.   PLAINTIFFS THE MALCOLM CHRISTOPHER CANADA FAMILY

3331.   Plaintiff Malcolm Christopher Canada is a U.S. citizen domiciled in South Carolina.

3332.   On March 11, 2007, Malcolm Christopher Canada was serving in the U.S. military when he was attacked by an IED and small arms.

3333.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Canada.

3334.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3335.   As a result of the attack and the injuries suffered, Malcolm Christopher Canada is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3336.   Plaintiff Barbara Jean Canada is a citizen of the United States domiciled in South Carolina and is the spouse of Malcolm Christopher Canada.

3337.   As a result of the attack and the injuries suffered by Malcolm Christopher Canada, Plaintiff Barbara Jean Canada is entitled to past and future noneconomic damages, including for

severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 236. THE MARCH 5, 2007 ATTACK – BAQUBAH

#### A. PLAINTIFFS THE MICHAEL FRANK JACKSON FAMILY

3338. Plaintiff Michael Frank Jackson is a U.S. citizen domiciled in South Carolina.

3339. On March 5, 2007, Michael Frank Jackson was serving in the U.S. military when he was attacked by an IED.

3340. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Jackson.

3341. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3342. As a result of the attack and the injuries suffered, Michael Frank Jackson is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3343. Plaintiff Michele A. Bruno is a citizen of the United States domiciled in South Carolina and is the mother of Michael Frank Jackson.

3344. Plaintiff John L. Kolmar is a citizen of the United States domiciled in South Carolina and is the brother of Michael Frank Jackson.

3345. As a result of the attack and the injuries suffered by Michael Frank Jackson, Plaintiffs Michele A. Bruno and John L. Kolmar, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services

538

and support.

**237. THE MARCH 4, 2007 ATTACK – RAMADI**

**A. PLAINTIFFS THE JOSHUA DEAN CRUTCHER FAMILY**

3346. Plaintiff Joshua Dean Crutcher is a U.S. citizen domiciled in Indiana.

3347. On March 4, 2007, Joshua Dean Crutcher was serving in the U.S. military when he was attacked by an IED.

3348. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Crutcher.

3349. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3350. As a result of the attack and the injuries suffered, Joshua Dean Crutcher is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3351. Plaintiff Larry Dean Crutcher is a citizen of the United States and domiciled in the State of Indiana. He is the father of Joshua Dean Crutcher.

3352. As a result of the attack and the injuries suffered by Joshua Dean Crutcher, Plaintiff Larry Dean Crutcher, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

**238. THE MARCH 3, 2007 ATTACK - SAQLAWIYAH**

**A. PLAINTIFFS THE RORY HAMILTON COMPTON FAMILY**

3353. Plaintiff Rory Hamilton Compton is a U.S. citizen domiciled in Guam.

539

3354.   On March 3, 2007, Rory Hamilton Compton was serving in the U.S. military when he was attacked by an IED.

3355.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Compton.

3356.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3357.   As a result of the attack and the injuries suffered, Rory Hamilton Compton is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3358.   Plaintiff Ruth Elizabeth Compton is a citizen of the United States domiciled in Guam and is the wife of Rory Hamilton Compton.

3359.   Plaintiff Lynette Marie Cooper is a citizen of the United States domiciled in the State of Arizona and is the mother of Rory Hamilton Compton.

3360.   Plaintiff Todd Duane Cooper is a citizen of the United States domiciled in the State of Arizona and is the step-father of Rory Hamilton Compton.

3361.   As a result of the attack and the injuries suffered by Rory Hamilton Compton, Plaintiffs Ruth Elizabeth Compton, Lynette Marie Cooper and Todd Duane Cooper are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 239.   THE MARCH 1, 2007 ATTACK – NASIRIYAH

#### A.   PLAINTIFF KARL R. SIMANDL

3362.   Plaintiff Karl R. Simandl is a U.S. citizen domiciled in Wisconsin.

3363.   On March 1, 2007, Karl R. Simandl was serving in the U.S. military when he was attacked by an IED.

3364.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Simandl.

3365.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3366.   As a result of the attack and the injuries suffered, Karl R. Simandl is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 240.   THE FEBRUARY 28, 2007 ATTACK – MAHMUDIYA

#### A.   PLAINTIFF MICHAEL WAYNE MYERS

3367.   Plaintiff Michael Wayne Myers is a U.S. citizen domiciled in New York.

3368.   On February 28, 2007, Michael Wayne Myers was serving in the U.S. military when he was attacked by an IED.

3369.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Myers.

3370.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3371.  As a result of the attack and the injuries suffered, Michael Wayne Myers is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 241.  THE FEBRUARY 22, 2007 ATTACK – RAMADI

### A.  PLAINTIFFS THE RALEIGH JAMES HEEKIN III FAMILY

3372.  Plaintiff Raleigh James Heekin III is a U.S. citizen domiciled in Colorado.

3373.  On February 22, 2007, Raleigh James Heekin III was serving in the U.S. military when he was attacked by an IED.

3374.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Heekin.

3375.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3376.  As a result of the attack and the injuries suffered, Raleigh James Heekin III is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3377.  Plaintiff Misty Dawn Heekin is a citizen of the United States domiciled in Colorado and is the spouse of Raleigh James Heekin III.

3378.  Plaintiff Lynn Heekin is a citizen of the United States domiciled in Colorado and is the mother of Raleigh James Heekin III.

3379.  Plaintiff Patrick Keiran Heekin is a citizen of the United States domiciled in Colorado and is the brother of Raleigh James Heekin III.

542

3380.  Plaintiff Tanner Brennon Heekin is a citizen of the United States domiciled in Colorado and is the son of Raleigh James Heekin III.

3381.  Plaintiff S.J.H., a minor child, represented by her legal guardian Misty Dawn Heekin, is a citizen of the United States domiciled in Colorado and is the daughter of Raleigh James Heekin III.

3382.  As a result of the attack and the injuries suffered by Raleigh James Heekin III, Plaintiffs Misty Dawn Heekin, Lynn Heekin, Patrick Keiran Heekin, Tanner Brennon Heekin, and S.J.H., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 242.   THE FEBRUARY 22, 2007 ATTACK – SADR AL YUSIFIYAH

### A.   PLAINTIFFS THE HANNIBAL ALEXANDER VEGUILLA FAMILY

3383.  Plaintiff Hannibal Alexander Veguilla is a U.S. citizen domiciled in Texas.

3384.  On February 22, 2007, Hannibal Alexander Veguilla was serving in the U.S. military when he was attacked by an IED.

3385.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Veguilla.

3386.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3387.  As a result of the attack and the injuries suffered, Hannibal Alexander Veguilla is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including

543

medical expenses, lost income, and loss of earning capacity.

3388.   Plaintiff Marisa Carmel Veguilla is a citizen of the United States domiciled in Texas and is the spouse of Hannibal Alexander Veguilla.

3389.   Plaintiff S.C.V., a minor child, represented by her legal guardians Hannibal Alexander Veguilla and Marisa Carmel Veguilla, is a citizen of the United States domiciled in Texas and is the daughter of Hannibal Alexander Veguilla.

3390.   As a result of the attack and the injuries suffered by Hannibal Alexander Veguilla, Plaintiffs Marisa Carmel Veguilla and S.C.V., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 243.   THE FEBRUARY 22, 2007 ATTACK – RAMADI

#### A.   PLAINTIFFS THE JOSHUA RYAN HAGER FAMILY

3391.   On February 22, 2007, Joshua Ryan Hager was a U.S. citizen, domiciled in Colorado, and serving in the U.S. military when he was attacked by an IED, causing his death.

3392.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Hager.

3393.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

3394.   Plaintiff Kris Lyle Silas Hager is a citizen of the United States domiciled in Florida and is the father of Joshua Ryan Hager.

3395.   Plaintiff Kris Lyle Silas Hager brings an action individually and on behalf of the Estate of Joshua Ryan Hager, and all heirs thereof, as its legal representative.

3396. As a result of the attack, and the injuries suffered by and the death of Joshua Ryan Hager, Plaintiff Kris Lyle Silas Hager has suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Joshua Ryan Hager.

### 244. THE FEBRUARY 21, 2007 ATTACK – KHALIDIYAH

#### A. PLAINTIFF JOSHUA MATTHEW BOWER

3397. Plaintiff Joshua Matthew Bower is a U.S. citizen domiciled in Delaware.

3398. On February 21, 2007, Joshua Matthew Bower was serving in the U.S. military when he was attacked by an IED.

3399. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Bower.

3400. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3401. As a result of the attack and the injuries suffered, Joshua Matthew Bower is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 245. THE FEBRUARY 20, 2007 ATTACK – BAGHDAD

#### A. PLAINTIFF CHARLES ANTHONY KELLER

3402. Plaintiff Charles Anthony Keller is a U.S. citizen domiciled in North Carolina.

3403. On February 20, 2007, Charles Anthony Keller was serving in the U.S. military when he was attacked by rockets.

3404.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Keller.

3405.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3406.   As a result of the attack and the injuries suffered, Charles Anthony Keller is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 246.   THE FEBRUARY 19, 2007 ATTACK – TARMIYAH

### A.   PLAINTIFF CRAIG BOWES

3407.   Plaintiff Craig Bowes is a U.S. citizen domiciled in Pennsylvania.

3408.   On February 19, 2007, Craig Bowes was serving in the U.S. military when he was attacked by RPG and VBIED.

3409.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Bowes.

3410.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3411.   As a result of the attack and the injuries suffered, Craig Bowes is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 247.   THE FEBRUARY 19, 2007 ATTACK – TARMAYIH

#### A.   PLAINTIFF JEREMY EDWARD SMITH

3412.   Plaintiff Jeremy Edward Smith is a U.S. citizen domiciled in New York.

3413.   On February 19, 2007, Jeremy Edward Smith was serving in the U.S. military when he was attacked by an RPG and VBIED.

3414.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Smith.

3415.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3416.   As a result of the attack and the injuries suffered, Jeremy Edward Smith is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 248.   THE FEBRUARY 17, 2007 ATTACK – FALLUJAH

#### A.   PLAINTIFF SHERMANDRE WESLEY JACKSON

3417.   Plaintiff Shermandre Wesley Jackson is a U.S. citizen domiciled in North Carolina.

3418.   On February 17, 2007, Shermandre Wesley Jackson was serving in the U.S. military when he was attacked by RPGs.

3419.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Jackson.

3420.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack,

the munition used, as well as the tactics, techniques, and procedures utilized.

3421.   As a result of the attack and the injuries suffered, Shermandre Wesley Jackson is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 249.   THE FEBRUARY 15, 2007 ATTACK – FALLUJAH

### A.   PLAINTIFFS THE RYAN PATRICK CLEMENTS FAMILY

3422.   Plaintiff Ryan Patrick Clements is a U.S. citizen domiciled in Texas.

3423.   On February 15, 2007, Ryan Patrick Clements was serving in the U.S. military when he was attacked by an IED.

3424.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Clements.

3425.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3426.   As a result of the attack and the injuries suffered, Ryan Patrick Clements is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3427.   Plaintiff Robin Clements is a citizen of the United States domiciled in Texas and is the spouse of Ryan Patrick Clements.

3428.   Plaintiff C.C., a minor child, represented by his legal guardians Ryan Patrick Clements and Robin Clements, is a citizen of the United States domiciled in Texas and is the son of Ryan Patrick Clements.

3429.   Plaintiff Patrick L. Clements is a citizen of the United States domiciled in Wisconsin and is the father of Ryan Patrick Clements.

3430.   Plaintiff Diane L. Clements is a citizen of the United States domiciled in Wisconsin and is the mother of Ryan Patrick Clements.

3431.   Plaintiff Lucas Clements is a citizen of the United States domiciled in Wisconsin and is the brother of Ryan Patrick Clements.

3432.   Plaintiff Peter Negralle is a citizen of the United States domiciled in Virginia and is the son of Ryan Patrick Clements.

3433.   Plaintiff Nicholas Negralle is a citizen of the United States domiciled in Virginia and is the son of Ryan Patrick Clements.

3434.   As a result of the attack and the injuries suffered by Ryan Patrick Clements, Plaintiffs Robin Clements, Patrick L. Clements, Diane L. Clements, Lucas Clements, Peter Negralle, Nicholas Negralle and C.C., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

**250.   THE FEBRUARY 8, 2007 ATTACK – AL KARMA**

      **A.      PLAINTIFF JOHN JESSE GREENE**

3435.   Plaintiff John Jesse Greene is a U.S. citizen domiciled in Idaho.

3436.   On February 8, 2007, John Jesse Greene was serving in the U.S. military when he was attacked by an IED.

3437.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Greene.

3438.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack,

as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3439.   As a result of the attack and the injuries suffered, John Jesse Greene is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 251.   THE FEBRUARY 7, 2007 ATTACK – FALLUJAH

#### A.   PLAINTIFF JOSHUA KRIS LUTZ

3440.   Plaintiff Joshua Kris Lutz is a U.S. citizen domiciled in Florida.

3441.   On February 7, 2007, Joshua Kris Lutz was serving in the U.S. military when he was attacked by an IED.

3442.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Lutz.

3443.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3444.   As a result of the attack and the injuries suffered, Joshua Kris Lutz is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 252.   THE FEBRUARY 5, 2007 ATTACK – BAGHDAD

#### A.   PLAINTIFFS THE OLEIN NASHAN TSINNIJINNIE FAMILY

3445.   Plaintiff Olein Nashan Tsinnijinnie is a U.S. citizen domiciled in Minnesota.

3446.   On February 5, 2007, Olein Nashan Tsinnijinnie was serving in the U.S. military

when he was attacked by an IED and small arms fire.

3447.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Tsinnijinnie.

3448.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3449.   As a result of the attack and the injuries suffered, Olein Nashan Tsinnijinnie is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3450.   Plaintiff Ross Tsinnijinnie is a citizen of the United States domiciled in Minnesota and is the father of Olein Nashan Tsinnijinnie.

3451.   Plaintiff Ranessa Tsinnijinnie is a citizen of the United States domiciled in Minnesota and is the sister of Olein Nashan Tsinnijinnie.

3452.   Plaintiff Sheldreann Tsinnijinnie is a citizen of the United States domiciled in Minnesota and is the sister of Olein Nashan Tsinnijinnie.

3453.   Plaintiff Shaleshia Tsinnijinnie is a citizen of the United States domiciled in Minnesota and is the sister of Olein Nashan Tsinnijinnie.

3454.   Plaintiff Rossieanne Tsinnijinnie is a citizen of the United States domiciled in Minnesota and is the sister of Olein Nashan Tsinnijinnie.

3455.   As a result of the attack and the injuries suffered by Olein Nashan Tsinnijinnie, Plaintiffs Ross Tsinnijinnie, Ranessa Tsinnijinnie, Sheldreann Tsinnijinnie, Shaleshia Tsinnijinnie and Rossieanne Tsinnijinnie, are entitled to past and future noneconomic damages,

including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 253.   THE JANUARY 26, 2007 ATTACK - MIQDADIYAH

#### A.   PLAINTIFF DOMINIC FRANKLIN MOODY

3456.   Plaintiff Dominic Franklin Moody is a U.S. citizen domiciled in the State of California.

3457.   On January 26, 2007, Dominic Franklin Moody was serving in the U.S. military when he was attacked by an IED.

3458.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Moody.

3459.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3460.   As a result of the attack and the injuries suffered, Dominic Franklin Moody is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 254.   THE JANUARY 25, 2007 ATTACK – ABU GHRAIB

#### A.   PLAINTIFF WESLEY ALLEN GAUTREAUX

3461.   Plaintiff Wesley Allen Gautreaux is a U.S. citizen domiciled in Arkansas.

3462.   On January 25, 2007, Wesley Allen Gautreaux was serving in the U.S. military when he was attacked by an IED.

3463.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Gautreaux.

3464.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3465.   As a result of the attack and the injuries suffered, Wesley Allen Gautreaux is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 255.   THE JANUARY 23, 2007 ATTACK – FADHIL

#### A.   PLAINTIFFS THE BRYAN ALAN WINTON FAMILY

3466.   Plaintiff Bryan Alan Winton is a U.S. citizen domiciled in Texas.

3467.   On January 23, 2007, Bryan Alan Winton was serving in the U.S. military when he was attacked by small arms fire and RPGs.

3468.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Winton.

3469.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3470.   As a result of the attack and the injuries suffered, Bryan Alan Winton is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3471.   Plaintiff Tabitha Winton is a citizen of the United States and domiciled in the State of Texas. She is the wife of Bryan Alan Winton.

3472.   Plaintiff B.M.W., a minor child, represented by her legal guardians Bryan Alan

Winton and Tabitha Winton, is a citizen of the United States and domiciled in the State of Texas. She is the daughter of Bryan Alan Winton and Tabitha Winton.

3473.   As a result of the attack and the injuries suffered by Bryan Alan Winton, Plaintiffs Tabitha Winton and B.M.W., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 256.   THE JANUARY 22, 2007 ATTACK – NORTH OF YSAFIYAH

#### A.   PLAINTIFF CHRISTOPHER MICHAEL RAY

3474.   Plaintiff Christopher Michael Ray is a U.S. citizen domiciled in Louisiana.

3475.   On January 22, 2007, Christopher Michael Ray was serving in the U.S. military when he was attacked by an IED.

3476.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Ray.

3477.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3478.   As a result of the attack and the injuries suffered, Christopher Michael Ray is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 257.   THE JANUARY 20, 2007 ATTACK – KARBALA

#### A.   PLAINTIFFS THE ESDRAS JEAN FAMILY

3479.   Plaintiff Esdras Jean is a U.S. citizen domiciled in Florida.

3480.   On January 20, 2007, Esdras Jean was serving in the U.S. military when he was attacked by grenades and small arms fire.

3481.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Jean.

3482.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3483.   As a result of the attack and the injuries suffered, Esdras Jean is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3484.   Plaintiff Francois Jean is a citizen of the United States domiciled in Maryland and is the father of Esdras Jean.

3485.   Plaintiff Marie Zaie Jean is a citizen of the United States domiciled in Maryland and is the mother of Esdras Jean.

3486.   Plaintiff Franklin Jean is a citizen of the United States domiciled in Maryland and is the brother of Esdras Jean.

3487.   Plaintiff Zachary Jean is a citizen of the United States domiciled in Maryland and is the brother of Esdras Jean.

3488.   Plaintiff Luc Francois Jean is a citizen of the United States domiciled in Pennsylvania and is the brother of Esdras Jean.

3489.   Plaintiff Josue Jean is a citizen of the United States domiciled in Maryland and is the brother of Esdras Jean.

3490.   Plaintiff Joel Samuel Jean is a citizen of the United States domiciled in Florida and is the brother of Esdras Jean.

3491.   Plaintiff Naomie Lore Hall is a citizen of the United States domiciled in Florida and is the sister of Esdras Jean.

3492.   As a result of the attack and the injuries suffered by Esdras Jean, Plaintiffs Francois Jean, Marie Zaie Jean, Franklin Jean, Zachary Jean, Luc Francois Jean, Josue Jean, Joel Samuel Jean, and Naomie Lore Hall are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 258.   THE JANUARY 18, 2007 ATTACK – BAGHDAD

### A.   PLAINTIFF THE WILLIAM JOSHUA RECHENMACHER FAMILY

3493.   On January 18, 2007, William Joshua Rechenmacher was a U.S. citizen, domiciled in Florida, and serving in the U.S. military when he was attacked by an EFP, causing his death.

3494.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Rechenmacher.

3495.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

3496.   Plaintiff J.A.S., a minor child, represented by his legal guardian Melody L. Glasgow, is a citizen of the United States domiciled in Florida and is the son of William Joshua Rechenmacher.

3497.   As a result of the attack, and the injuries suffered by and the death of William

Joshua Rechenmacher, Plaintiff J.A.S., a minor child, has suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, and loss of society, services, companionship, comfort, protection, instruction, advice and counsel.

### 259.   THE JANUARY 14, 2007 ATTACK – BAGHDAD

#### A.      PLAINTIFF RIGOBERTO LOPEZ GARCIA

3498.   Plaintiff Rigoberto Lopez Garcia is a U.S. citizen domiciled in Puerto Rico.

3499.   On January 14, 2007, Rigoberto Lopez Garcia was serving in the U.S. military when he was attacked by an EFP.

3500.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Garcia.

3501.   The Iranian-supported FTO Hezbollah/JAM planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3502.   As a result of the attack and the injuries suffered, Rigoberto Lopez Garcia is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 260.   THE JANUARY 10, 2007 ATTACK – BAGHDAD

#### A.      PLAINTIFF JAMES MICHAEL BUONO

3503.   Plaintiff James Michael Buono is a U.S. citizen domiciled in Florida.

3504.   On January 10, 2007, James Michael Buono was serving in the U.S. military when he was attacked by an IED.

3505.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or

other material support used to commit the attack, which injured Mr. Buono.

3506.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3507.   As a result of the attack and the injuries suffered, James Michael Buono is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 261.   THE JANUARY 9, 2007 ATTACK – BAGHDAD

### A.   PLAINTIFFS THE ROBERT FRANKLIN HARR FAMILY

3508.   Plaintiff Robert Franklin Harr is a U.S. citizen domiciled in Texas.

3509.   On January 9, 2007, Robert Franklin Harr was serving in the U.S. military when he was attacked by small arms fire.

3510.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Harr.

3511.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3512.   As a result of the attack and the injuries suffered, Robert Franklin Harr is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3513.   Plaintiff Luz Harr is a citizen of the United States and domiciled in the State of Texas. She is the wife of Robert Franklin Harr.

3514.   As a result of the attack and the injuries suffered by Robert Franklin Harr, Plaintiff Luz Harr, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 262.   THE DECEMBER 30, 2006 ATTACK – BAGHDAD

### A.   PLAINTIFFS THE CHRISTOPHER MAX HEIDLING FAMILY

3515.   Plaintiff Christopher Max Heidling is a U.S. citizen domiciled in Oklahoma.

3516.   On December 30, 2006, Christopher Max Heidling was serving in the U.S. military when he was attacked by an IED.

3517.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Heidling.

3518.   The Iranian-supported FTO Hezbollah/JAM planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3519.   As a result of the attack and the injuries suffered, Christopher Max Heidling is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3520.   Plaintiff Stanley C. Heidling is a citizen of the United States domiciled in Texas and is the father of Christopher Max Heidling.

3521.   Plaintiff Terra Lorraine Rhoads is a citizen of the United States domiciled in Oklahoma and is the sister of Christopher Max Heidling.

3522.   As a result of the attack and the injuries suffered by Christopher Max Heidling,

Plaintiffs Stanley C. Heidling and Terra Lorraine Rhoads, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 263.   THE DECEMBER 29, 2006 ATTACK – BAQUBAH

### A.   PLAINTIFFS DILLON J. CANNON FAMILY

3523.   Plaintiff Dillon J. Cannon is a U.S. citizen domiciled in Texas.

3524.   On December 29, 2006, Dillon J. Cannon was serving in the U.S. military when he was attacked by a sniper.

3525.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Cannon.

3526.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3527.   As a result of the attack and the injuries suffered, Dillon J. Cannon is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3528.   Plaintiff Patricia A. Cannon is a citizen of the United States domiciled in Texas and is the mother of Dillon J. Cannon.

3529.   Plaintiff Kelsey J. Cannon is a citizen of the United States domiciled in Texas and is the sister of Dillon J. Cannon.

3530.   As a result of the attack and the injuries suffered by Dillon J. Cannon, Plaintiffs Patricia A. Cannon and Kelsey J. Cannon are entitled to past and future noneconomic damages,

including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 264.   THE DECEMBER 29, 2006 ATTACK – BAGHDAD

#### A.   PLAINTIFFS THE GIOVANNI ALEXANDER AVALOS FAMILY

3531.   Plaintiff Giovanni Alexander Avalos is a U.S. citizen domiciled in California.

3532.   On or about December 29, 2006, Giovanni Alexander Avalos was serving in the U.S. military when he was attacked by an IED.

3533.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Avalos.

3534.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3535.   As a result of the attack and the injuries suffered, Giovanni Alexander Avalos is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3536.   Plaintiff Maria Avalos is a citizen of the United States domiciled in California and is the spouse of Giovanni Alexander Avalos.

3537.   Plaintiff J.A., a minor child, represented by her legal guardian Giovanni Alexander Avalos, is a citizen of the United States domiciled in California and is the daughter of Giovanni Alexander Avalos.

3538.   As a result of the attack and the injuries suffered by Giovanni Alexander Avalos, Plaintiffs Maria Avalos and J.A., are entitled to past and future noneconomic damages, including

for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 265.   THE DECEMBER 22, 2006 ATTACK – MOSUL

#### A.   PLAINTIFF ADAM NATHAN ENGELHART

3539.   Plaintiff Adam Nathan Engelhart is a U.S. citizen domiciled in Florida.

3540.   On December 22, 2006, Adam Nathan Engelhart was serving in the U.S. military when he was attacked by an IED.

3541.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Engelhart.

3542.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3543.   As a result of the attack and the injuries suffered, Adam Nathan Engelhart is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 266.   THE DECEMBER 19, 2006 ATTACK – MOSUL

#### A.   PLAINTIFFS THE HECTOR MANUEL LOPEZ, JR. FAMILY

3544.   Plaintiff Hector Manuel Lopez, Jr. is a U.S. citizen domiciled in Texas.

3545.   On December 19, 2006, Hector Manuel Lopez, Jr. was serving in the U.S. military when he was attacked by sniper fire.

3546.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Lopez.

3547.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack,

as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3548.   As a result of the attack and the injuries suffered, Hector Manuel Lopez, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3549.   Plaintiff Catherine Lopez is a citizen of the United States domiciled in Texas and is the spouse of Hector Manuel Lopez, Jr.

3550.   Plaintiff Hector M. Lopez, Sr. is a citizen of the United States domiciled in Texas and is the father of Hector Manuel Lopez, Jr.

3551.   Plaintiff Patricia Santana is a citizen of the United States domiciled in Texas and is the mother of Hector Manuel Lopez, Jr.

3552.   Plaintiff Isaac Lopez is a citizen of the United States domiciled in Massachusetts and is the brother of Hector Manuel Lopez, Jr.

3553.   Plaintiff Vivian Lopez is a citizen of the United States domiciled in Texas and is the sister of Hector Manuel Lopez, Jr.

3554.   Plaintiff Robert Valle is a citizen of the United States domiciled in Texas and is the son of Hector Manuel Lopez, Jr.

3555.   Plaintiff E.L., a minor child, represented by her legal guardian Hector Manuel Lopez, Jr., is a citizen of the United States domiciled in Texas and is the daughter of Hector Manuel Lopez, Jr.

3556.   As a result of the attack and the injuries suffered by Hector Manuel Lopez, Jr., Plaintiffs Catherine Lopez, Hector M. Lopez, Patricia Santana, Isaac Lopez, Vivian Lopez,

Robert Valle and E.L., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 267.   THE DECEMBER 16, 2006 ATTACK – MOSUL

####   A.   PLAINTIFF CHRISTOPHER FRANKLIN SWARTZ

3557.   Plaintiff Christopher Franklin Swartz is a U.S. citizen domiciled in Kansas.

3558.   On December 16, 2006, Christopher Franklin Swartz was serving in the U.S. military when he was attacked by small arms fire.

3559.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Swartz.

3560.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3561.   As a result of the attack and the injuries suffered, Christopher Franklin Swartz is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 268.   THE DECEMBER 7, 2006 ATTACK – BAGHDAD

####   A.   PLAINTIFF DEAN MICHAEL GRAHAM

3562.   Plaintiff Dean Michael Graham is a U.S. citizen domiciled in Indiana.

3563.   On December 7, 2006, Dean Michael Graham was serving in the U.S. military when he was attacked by rockets.

3564.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Graham.

3565.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3566.   As a result of the attack and the injuries suffered, Dean Michael Graham is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 269.   THE DECEMBER 6, 2006 ATTACK – BAQUBAH

#### A.      PLAINTIFFS THE WILLIAM JOHN COLWELL FAMILY

3567.   Plaintiff William John Colwell is a U.S. citizen domiciled in Texas.

3568.   On December 6, 2006, William John Colwell was serving in the U.S. military when he was attacked by an IED.

3569.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Colwell.

3570.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3571.   As a result of the attack and the injuries suffered, William John Colwell is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3572.   Plaintiff Janelle D. Colwell is a citizen of the United States domiciled in Texas and is the spouse of William John Colwell.

3573.   Plaintiff Alanna Colleen Colwell is a citizen of the United States domiciled in

Texas and is the daughter of William John Colwell.

3574.   Plaintiff Joshua Paul Colwell is a citizen of the United States domiciled in Texas and is the son of William John Colwell.

3575.   Plaintiff Michael Jeremiah Bieber-Rice is a citizen of the United States domiciled in Texas and is the step-son of William John Colwell.

3576.   As a result of the attack and the injuries suffered by William John Colwell, Plaintiffs Janelle D. Colwell, Alanna Colleen Colwell, Joshua Paul Colwell, and Michael Jeremiah Bieber-Rice are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 270.   THE DECEMBER 4, 2006 ATTACK – BAGHDAD

### A.   PLAINTIFF JESSE JAMES JACKSON

3577.   Plaintiff Jesse James Jackson is a U.S. citizen domiciled in Nevada.

3578.   On December 4, 2006, Jesse James Jackson was serving in the U.S. military when he was attacked by an RPG.

3579.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Jackson.

3580.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3581.   As a result of the attack and the injuries suffered, Jesse James Jackson is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 271.    THE DECEMBER 4, 2006 ATTACK – HIT

#### A.    PLAINTIFFS THE JUSTIN LEE SINGLETON FAMILY

3582.    Plaintiff Justin Lee Singleton is a U.S. citizen domiciled in Ohio.

3583.    On December 4, 2006, Justin Lee Singleton was serving in the U.S. military when he was attacked by rockets and mortars.

3584.    Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Singleton.

3585.    The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3586.    As a result of the attack and the injuries suffered, Justin Lee Singleton is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3587.    Plaintiff I.D.S., a minor child, represented by his legal guardian Justin Lee Singleton, is a citizen of the United States domiciled in Ohio and is the son of Justin Lee Singleton.

3588.    Plaintiff S.K.S., a minor child, represented by her legal guardian Justin Lee Singleton, is a citizen of the United States domiciled in Ohio and is the daughter of Justin Lee Singleton.

3589.    Plaintiff A.E.S., a minor child, represented by his legal guardian Justin Lee Singleton, is a citizen of the United States domiciled in Ohio and is the son of Justin Lee Singleton.

3590.    As a result of the attack and the injuries suffered by Justin Lee Singleton,

Plaintiffs I.D.S., a minor child, S.K.S., a minor child, and A.E.S., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 272. THE DECEMBER 4, 2006 ATTACK – BAGHDAD

### A. PLAINTIFFS THE BRIAN LEE PORTWINE FAMILY

3591. On December 4, 2006, Brian Lee Portwine was a U.S. citizen, domiciled in Florida, and serving in the U.S. military when he was attacked by an EFP, resulting in injuries causing his death on May 27, 2011.

3592. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Portwine.

3593. The Iranian-supported FTO Hezbollah/JAM planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

3594. Plaintiff Peggy J. Portwine is a citizen of the United States domiciled in Georgia and is the mother of Brian Lee Portwine.

3595. Plaintiff Peggy J. Portwine, brings an action individually and on behalf of the Estate of Brian Lee Portwine, and all heirs thereof, as its legal representative.

3596. As a result of the attack, and the injuries suffered by and the death of Brian Lee Portwine, Plaintiff Peggy J. Portwine has suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Brian Lee Portwine.

### 273.   THE DECEMBER 1, 2006 ATTACK – FALLUJAH

#### A.   PLAINTIFF BRIAN MICHAEL TANCO

3597.   Plaintiff Brian Michael Tanco is a U.S. citizen domiciled in Texas.

3598.   On December 1, 2006, Brian Michael Tanco was serving in the U.S. military when he was attacked by small arms.

3599.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Tanco.

3600.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3601.   As a result of the attack and the injuries suffered, Brian Michael Tanco is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 274.   THE NOVEMBER 21, 2006 ATTACK – ABU GHRAIB

#### A.   PLAINTIFFS THE JONATHAN SCOTT MALLARD FAMILY

3602.   Plaintiff Jonathan Scott Mallard is a U.S. citizen domiciled in North Carolina.

3603.   On November 21, 2006, Jonathan Scott Mallard was serving in the U.S. military when he was attacked by an IED.

3604.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Mallard.

3605.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3606. As a result of the attack and the injuries suffered, Jonathan Scott Mallard is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3607. Plaintiff Connie Mallard is a citizen of the United States domiciled in Florida and is the mother of Jonathan Scott Mallard.

3608. Plaintiff Jessica Mallard Fancher is a citizen of the United States domiciled in Wyoming and is the sister of Jonathan Scott Mallard.

3609. Plaintiff Brian E. Mallard is a citizen of the United States domiciled in Florida and is the brother of Jonathan Scott Mallard.

3610. As a result of the attack and the injuries suffered by Jonathan Scott Mallard, Plaintiffs Connie Mallard, Jessica Mallard Fancher and Brian E. Mallard are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 275. THE NOVEMBER 21, 2006 ATTACK – BAGHDAD

### A. PLAINTIFFS THE GIOVANNI ALEXANDER AVALOS FAMILY

3611. Plaintiff Giovanni Alexander Avalos is a U.S. citizen domiciled in California.

3612. On November 21, 2006, Giovanni Alexander Avalos was serving in the U.S. military when he was attacked by an EFP.

3613. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Avalos.

3614. The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the

attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3615.   As a result of the attack and the injuries suffered, Giovanni Alexander Avalos is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3616.   Plaintiff Maria Avalos is a citizen of the United States domiciled in California and is the spouse of Giovanni Alexander Avalos.

3617.   Plaintiff J.A., a minor child, represented by her legal guardian Giovanni Alexander Avalos, is a citizen of the United States domiciled in California and is the daughter of Giovanni Alexander Avalos.

3618.   As a result of the attack and the injuries suffered by Giovanni Alexander Avalos, Plaintiffs Maria Avalos and J.A., are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 276.   THE NOVEMBER 18, 2006 ATTACK – SAQLAWIYAH

### A.   PLAINTIFF FRANCIS MARTIN HURD

3619.   Plaintiff Francis Martin Hurd is a U.S. citizen domiciled in North Carolina.

3620.   On November 18, 2006, Francis Martin Hurd was serving in the U.S. military when he was attacked by a sniper.

3621.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Hurd.

3622.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack,

the munition used, as well as the tactics, techniques, and procedures utilized.

3623.   As a result of the attack and the injuries suffered, Francis Martin Hurd is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 277.   THE NOVEMBER 15, 2006 ATTACK – DOWNTOWN BAGHDAD

### A.   PLAINTIFFS THE LONNIE MICHAEL FREDRICK GORMAN FAMILY

3624.   Plaintiff Lonnie Michael Fredrick Gorman is a U.S. citizen domiciled in Arizona.

3625.   On November 15, 2006, Lonnie Michael Fredrick Gorman was serving in the U.S. military when he was attacked by a VBIED.

3626.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Gorman.

3627.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3628.   As a result of the attack and the injuries suffered, Lonnie Michael Fredrick Gorman is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3629.   Plaintiff Cecilia A. Bernal is a citizen of the United States domiciled in Arizona and is the mother of Lonnie Michael Fredrick Gorman.

3630.   As a result of the attack and the injuries suffered by Lonnie Michael Fredrick Gorman, Plaintiff Cecilia A. Bernal, is entitled to past and future noneconomic damages,

572

including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 278. THE NOVEMBER 14, 2006 ATTACK – BAGHDAD

### A. PLAINTIFFS THE ROBERT LEE MCCORMICK FAMILY

3631.  Plaintiff Robert Lee McCormick is a U.S. citizen domiciled in Louisiana.

3632.  On November 14, 2006, Robert Lee McCormick was serving in the U.S. military when he was attacked by an EFP.

3633.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. McCormick.

3634.  The Iranian-supported FTO Hezbollah/JAM planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3635.  As a result of the attack and the injuries suffered, Robert Lee McCormick is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3636.  Plaintiff April McCormick is a citizen of the United States domiciled in Louisiana and is the spouse of Robert Lee McCormick.

3637.  Plaintiff Justin McCormick is a citizen of the United States domiciled in Louisiana and is the son of Robert Lee McCormick.

3638.  Plaintiff Brittney McCormick is a citizen of the United States domiciled in Louisiana and is the daughter of Robert Lee McCormick.

3639.  Plaintiff Mackenzie McCormick is a citizen of the United States domiciled in

Louisiana and is the daughter of Robert Lee McCormick.

3640.   Plaintiff Timothy A. McCormick is a citizen of the United States domiciled in Louisiana and is the father of Robert Lee McCormick.

3641.   Plaintiff Sheila McCormick is a citizen of the United States domiciled in Louisiana and is the mother of Robert Lee McCormick.

3642.   Plaintiff Tim McCormick is a citizen of the United States domiciled in Louisiana and is the brother of Robert Lee McCormick.

3643.   Plaintiff Thomas A. McCormick is a citizen of the United States domiciled in Louisiana and is the brother of Robert Lee McCormick

3644.   As a result of the attack and the injuries suffered by Robert Lee McCormick, Plaintiffs April McCormick, Justin McCormick, Brittney McCormick, Mackenzie McCormick, Timothy A. McCormick, Sheila McCormick, Tim McCormick and Thomas A. McCormick are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 279.   THE NOVEMBER 14, 2006 ATTACK – BAGHDAD

#### A.   PLAINTIFF LARRY DIAZ CABRAL, JR.

3645.   Plaintiff Larry Diaz Cabral, Jr. is a U.S. citizen domiciled in Texas.

3646.   On November 14, 2006, Larry Diaz Cabral, Jr. was serving in the U.S. military when he was attacked by an EFP.

3647.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Cabral, Jr.

3648.   The Iranian-supported FTO Hezbollah/JAM planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and

location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3649.   As a result of the attack and the injuries suffered, Larry Diaz Cabral, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 280.   THE NOVEMBER 11, 2006 ATTACK – RAMADI

####    A.   PLAINTIFFS THE JACE ALRIC BADIA FAMILY

3650.   Plaintiff Jace Alric Badia is a U.S. citizen domiciled in Florida.

3651.   On November 11, 2006, Jace Alric Badia was serving in the U.S. military when he was attacked by IED.

3652.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Badia.

3653.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3654.   As a result of the attack and the injuries suffered, Jace Alric Badia is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3655.   Plaintiff K.R.B. a minor child, represented by her legal guardian Jace Alric Badia, is a citizen of the United States and domiciled in the State of Florida. She is the daughter of Jace Alric Badia.

3656.   As a result of the attack and the injuries suffered by Jace Alric Badia, Plaintiff

K.R.B. a minor child, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 281. THE NOVEMBER 9, 2006 ATTACK – RUTBA

#### A. PLAINTIFFS THE BRIAN JOHN JOHNSON FAMILY

3657.   Plaintiff Brian John Johnson is a U.S. citizen domiciled in New Mexico.

3658.   On November 9, 2006, Brian John Johnson was serving in the U.S. military when he was attacked by IED.

3659.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Johnson.

3660.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3661.   As a result of the attack and the injuries suffered, Brian John Johnson is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3662.   Plaintiff Timothy John Johnson is a citizen of the United States and domiciled in the State of South Carolina. He is the father of Brian John Johnson.

3663.   As a result of the attack and the injuries suffered by Brian John Johnson, Plaintiff Timothy John Johnson, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 282.   THE NOVEMBER 8, 2006 ATTACK – RAMADI

### A.   PLAINTIFF ANDREW SCOTT FAYAL

3664.   Plaintiff Andrew Scott Fayal is a U.S. citizen domiciled in California.

3665.   On November 8, 2006, Andrew Scott Fayal was serving in the U.S. military when he was attacked by an IED and small arms.

3666.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Fayal.

3667.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3668.   As a result of the attack and the injuries suffered, Andrew Scott Fayal is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 283.   THE OCTOBER 26, 2006 ATTACK – BAGHDAD

### A.   PLAINTIFFS THE MATTHEW NEIL BOWMAN FAMILY

3669.   Plaintiff Matthew Neil Bowman is a U.S. citizen domiciled in Texas.

3670.   On October 26, 2006, Matthew Neil Bowman was serving in the U.S. military when he was attacked by an IED.

3671.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Bowman.

3672.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3673.   As a result of the attack and the injuries suffered, Matthew Neil Bowman is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3674.   Plaintiff M.E.B., a minor child, represented by her legal guardian Matthew Neil Bowman, is a citizen of the United States domiciled in Texas and is the daughter of Matthew Neil Bowman.

3675.   As a result of the attack and the injuries suffered by Matthew Neil Bowman, Plaintiff M.E.B., a minor child, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 284.   THE OCTOBER 23, 2006 ATTACK - BALAD

#### A.   PLAINTIFF ERIC LEON HORTON

3676.   Plaintiff Eric Leon Horton is a U.S. citizen domiciled in the State of Texas.

3677.   On October 23, 2006, Eric Leon Horton was serving in the U.S. military when he was attacked by an IED.

3678.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Horton.

3679.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3680.   As a result of the attack and the injuries suffered, Eric Leon Horton is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical

expenses, lost income, and loss of earning capacity.

### 285.   THE OCTOBER 17, 2006 ATTACK – MURADIYAH

#### A.   PLAINTIFF WILLIAM ENRIQUEZ SANTOS, JR.

3681.   Plaintiff William Enriquez Santos, Jr. is a U.S. citizen domiciled in Pennsylvania.

3682.   On October 17, 2006, William Enriquez Santos, Jr. was serving in the U.S. military when he was attacked by an EFP.

3683.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Santos.

3684.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3685.   As a result of the attack and the injuries suffered, William Enriquez Santos, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 286.   THE OCTOBER 17, 2006 ATTACK – ANAH

#### A.   PLAINTIFFS THE TATE WAYNE MALLORY FAMILY

3686.   Plaintiff Tate Wayne Mallory is a U.S. citizen domiciled in South Dakota.

3687.   On October 17, 2006, Tate Wayne Mallory was serving as a civilian contractor to the U.S. military in Iraq when he was attacked by RPGs.

3688.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Mallory.

3689.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack,

the munition used, as well as the tactics, techniques, and procedures utilized.

3690. As a result of the attack and the injuries suffered, Tate Wayne Mallory is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3691. Plaintiff Cheyenne Sharon Mallory is a citizen of the United States domiciled in South Dakota and is the daughter of Tate Wayne Mallory.

3692. Plaintiff Shania Shae Mallory is a citizen of the United States domiciled in South Dakota and is the daughter of Tate Wayne Mallory.

3693. Plaintiff Tristin Wayne Mallory is a citizen of the United States domiciled in Colorado and is the son of Tate Wayne Mallory.

3694. Plaintiff T.W.M, a minor child, represented by his legal guardian Tate Wayne Mallory, is a citizen of the United States domiciled in South Dakota and is the son of Tate Wayne Mallory.

3695. As a result of the attack and the injuries suffered by Tate Wayne Mallory, Plaintiffs Cheyenne Sharon Mallory, Shania Shae Mallory, Tristin Wayne Mallory, and T.W.M., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 287. THE OCTOBER 16, 2006 ATTACK – BAGHDAD

### A. PLAINTIFFS THE JOHN PAUL KAISER JR. FAMILY

3696. Plaintiff John Paul Kaiser Jr. is a U.S. citizen domiciled in Washington.

3697. On October 16, 2006, John Paul Kaiser Jr. was serving in the U.S. military when he was attacked by a mortar.

3698. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Kaiser.

3699. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3700. As a result of the attack and the injuries suffered, John Paul Kaiser Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3701. Plaintiff Tina Elizabeth Kaiser is a citizen of the United States domiciled in Washington and is the spouse of John Paul Kaiser Jr.

3702. Plaintiff Kacee Elizabeth Keating is a citizen of the United States domiciled in Washington and is the step-daughter of John Paul Kaiser Jr.

3703. Plaintiff Daniel Scott Webb is a citizen of the United States domiciled in Washington and is the step-son of John Paul Kaiser Jr.

3704. As a result of the attack and the injuries suffered by John Paul Kaiser Jr., Plaintiffs Tina Elizabeth Kaiser, Kacee Elizabeth Keating, and Daniel Scott Webb are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 288. THE OCTOBER 16, 2006 ATTACK – BAGHDAD

#### A. PLAINTIFFS THE GERARD LOUIS MENNITTO FAMILY

3705. Plaintiff Gerard Louis Mennitto is a U.S. citizen domiciled in Washington.

3706. On October 16, 2006, Gerard Louis Mennitto was serving in the U.S. military

when he was attacked by mortars.

3707.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Mennitto.

3708.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3709.   As a result of the attack and the injuries suffered, Gerard Louis Mennitto is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3710.   Plaintiff Jacquelyn Yusko is a citizen of the United States and domiciled in the State of Washington. She is the mother of Gerard Louis Mennitto.

3711.   Plaintiff C.L.M., a minor child, represented by her legal guardian Gerard Louis Mennitto, is a citizen of the United States and domiciled in the State of Washington. She is the daughter of Gerard Louis Mennitto.

3712.   Plaintiff Troy Mennitto is a citizen of the United States and domiciled in the State of Washington. He is the brother of Gerard Louis Mennitto.

3713.   As a result of the attack and the injuries suffered by Gerard Louis Mennitto, Plaintiffs Jacquelyn Yusko, C.L.M., a minor child and Troy Mennitto, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 289.   THE OCTOBER 13, 2006 ATTACK – HABBANIYAH

### A.   PLAINTIFFS THE JOHN TYLER LEE FAMILY

3714.   Plaintiff John Tyler Lee is a U.S. citizen domiciled in Indiana.

3715.   On October 13, 2006, John Tyler Lee was serving in the U.S. military when he was attacked by an IED.

3716.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Lee.

3717.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3718.   As a result of the attack and the injuries suffered, John Tyler Lee is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3719.   Plaintiff J.T.L., a minor child, represented by his legal guardian John Tyler Lee, is a citizen of the United States domiciled in Indiana and is the son of John Tyler Lee.

3720.   Plaintiff M.A.L., a minor child, represented by her legal guardian John Tyler Lee, is a citizen of the United States domiciled in Indiana and is the daughter of John Tyler Lee.

3721.   As a result of the attack and the injuries suffered by John Tyler Lee, Plaintiffs J.T.L. and M.A.L., minor children, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 290.   THE OCTOBER 11, 2006 ATTACK – RAWAH

#### A.   PLAINTIFF JASON WILLIAM ROLLISON

3722.   Plaintiff Jason William Rollison is a U.S. citizen domiciled in North Carolina.

3723.   On October 11, 2006, Jason William Rollison was serving in the U.S. military when he was attacked by an IED.

3724.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Rollison.

3725.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3726.   As a result of the attack and the injuries suffered, Jason William Rollison is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 291.   THE OCTOBER 8, 2006 ATTACK – BALAD

#### A.   PLAINTIFFS   THE   RICHARD   EZELL   PHILEMON,   JR., FAMILY

3727.   Plaintiff Richard Ezell Philemon Jr., is a U.S. citizen domiciled in Texas.

3728.   On October 8, 2006, Richard Ezell Philemon, Jr., was serving as a civilian contractor to the U.S. military in Iraq when he was attacked by an IED.

3729.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Philemon.

3730.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack,

the munition used, as well as the tactics, techniques, and procedures utilized.

3731.  As a result of the attack and the injuries suffered, Richard Ezell Philemon, Jr., is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3732.  Plaintiff Renata Lawson is a citizen of the United States domiciled in Aviano, Italy and is the mother of Richard Ezell Philemon, Jr.

3733.  Plaintiff Casie S. Philemon is a citizen of the United States domiciled in Virginia and is the daughter Richard Ezell Philemon, Jr.

3734.  Plaintiff Dennis A. Philemon is a citizen of the United States domiciled in Texas and is the brother Richard Ezell Philemon, Jr.

3735.  As a result of the attack and the injuries suffered by Richard Ezell Philemon, Jr., Plaintiffs Renata Lawson, Casie S. Philemon and Dennis A. Philemon are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 292.  THE OCTOBER 4, 2006 ATTACK – RAHWAH

### A.  PLAINTIFF JOHN RICHARD CHAO

3736.  Plaintiff John Richard Chao is a U.S. citizen domiciled in Virginia.

3737.  On October 4, 2006, John Richard Chao was serving in the U.S. military when he was attacked by an IED.

3738.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Chao.

3739.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack,

as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3740.  As a result of the attack and the injuries suffered, John Richard Chao is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 293.    THE OCTOBER 3, 2006 ATTACK – AL TAQADDUM

### A.    PLAINTIFFS THE DALE MARTIN HINKLEY FAMILY

3741.  Plaintiff Dale Martin Hinkley is a U.S. citizen domiciled in North Carolina.

3742.  On October 3, 2006, Dale Martin Hinkley was serving in the U.S. military when he was attacked by an IED.

3743.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Hinkley.

3744.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3745.  As a result of the attack and the injuries suffered, Dale Martin Hinkley is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3746.  Plaintiff Sandra Marie Hinkley is a citizen of the United States domiciled in Florida and is the mother of Dale Martin Hinkley.

3747.  As a result of the attack and the injuries suffered by Dale Martin Hinkley, Plaintiff Sandra Marie Hinkley is entitled to past and future noneconomic damages, including for

severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 294. THE OCTOBER 3, 2006 ATTACK – DORA

#### A. PLAINTIFF ANTHONY FRANCIS DEMATTIA

3748. Plaintiff Anthony Francis Demattia is a U.S. citizen domiciled in New York.

3749. On October 3, 2006, Anthony Francis Demattia was serving in the U.S. military when he was attacked by an IED.

3750. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Demattia.

3751. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3752. As a result of the attack and the injuries suffered, Anthony Francis Demattia is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 295. THE OCTOBER 1, 2006 ATTACK – FALLUJAH

#### A. PLAINTIFF JASON EDWARD MIKOLAJCIK

3753. Plaintiff Jason Edward Mikolajcik is a U.S. citizen domiciled in Connecticut.

3754. On October 1, 2006, Jason Edward Mikolajcik was serving in the U.S. military when he was attacked by a VBIED.

3755. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Mikolajcik.

3756. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack,

587

as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3757. As a result of the attack and the injuries suffered, Jason Edward Mikolajcik is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 296. THE SEPTEMBER 30, 2006 ATTACK – SOUTH OF BAIJI

#### A. PLAINTIFFS THE JOHN DAVID, JR. FAMILY

3758. Plaintiff John David, Jr. is a U.S. citizen domiciled in Washington.

3759. On September 30, 2006, John David, Jr. was serving in the U.S. military when he was attacked by an IED.

3760. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. David.

3761. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3762. As a result of the attack and the injuries suffered, John David, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3763. Plaintiff Shawndra David is a citizen of the United States domiciled in Washington and is the spouse of John David, Jr.

3764. Plaintiff Justus Getty is a citizen of the United States domiciled in Washington and is the son of John David, Jr.

588

3765.   Plaintiff Korbin L. David is a citizen of the United States domiciled in Washington and is the son of John David, Jr.

3766.   Plaintiff L.J.D., a minor child, represented by her legal guardians John David, Jr. and Shawndra David, is a citizen of the United States domiciled in Washington and is the daughter of John David, Jr.

3767.   As a result of the attack and the injuries suffered by John David, Jr., Plaintiffs Shawndra David, Justus Getty, Korbin L. David, and L.J.D., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 297.   THE SEPTEMBER 30, 2006 ATTACK – RAMADI

### A.   PLAINTIFF NICHOLAS BERT ANDREWS

3768.   Plaintiff Nicholas Bert Andrews is a U.S. citizen domiciled in Delaware.

3769.   On September 30, 2006, Nicholas Bert Andrews was serving in the U.S. military when he was attacked by an IED.

3770.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Andrews.

3771.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3772.   As a result of the attack and the injuries suffered, Nicholas Bert Andrews is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 298.   THE SEPTEMBER 21, 2006 ATTACK – BAQUBAH

### A.   PLAINTIFFS THE VINCENT JOSEPH SENN FAMILY

3773.   Plaintiff Vincent Joseph Senn is a U.S. citizen domiciled in Colorado.

3774.   On September 21, 2006, Vincent Joseph Senn was serving in the U.S. military when he was attacked by an IED.

3775.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Senn.

3776.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3777.   As a result of the attack and the injuries suffered, Vincent Joseph Senn is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3778.   Plaintiff Shannon Senn is a citizen of the United States domiciled in Colorado and is the spouse of Vincent Joseph Senn.

3779.   Plaintiff S.L.S. a minor child, represented by her legal guardian Vincent Joseph Senn and Shannon Senn, is a citizen of the United States domiciled in Colorado and is the daughter of Vincent Joseph Senn.

3780.   As a result of the attack and the injuries suffered by Vincent Joseph Senn, Plaintiffs Shannon Senn and S.L.S., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 299.   THE SEPTEMBER 20, 2006 ATTACK - BAQUBAH

### A.   PLAINTIFF DOMINIC FRANKLIN MOODY

3781.   Plaintiff Dominic Franklin Moody is a U.S. citizen domiciled in the State of California.

3782.   On September 20, 2006, Dominic Franklin Moody was serving in the U.S. military when he was attacked by mortars.

3783.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Moody.

3784.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3785.   As a result of the attack and the injuries suffered, Dominic Franklin Moody is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 300.   THE SEPTEMBER 19, 2006 ATTACK – FALLUJAH

### A.   PLAINTIFF JEREMIAH KEOHANE LEIBRANDT

3786.   Plaintiff Jeremiah Keohane Leibrandt is a U.S. citizen domiciled in New Hampshire.

3787.   On September 19, 2006, Jeremiah Keohane Leibrandt was serving in the U.S. military when he was attacked by an IED.

3788.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Leibrandt.

3789.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack,

as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3790.   As a result of the attack and the injuries suffered, Jeremiah Keohane Leibrandt is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 301.   THE SEPTEMBER 17, 2006 ATTACK – SADR CITY

#### A.   PLAINTIFF ENDI CISNEROS HERRERA

3791.   Plaintiff Endi Cisneros Herrera is a U.S. citizen domiciled in North Carolina.

3792.   On September 17, 2006, Endi Cisneros Herrera was serving in the U.S. military when he was attacked by an EFP.

3793.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Herrera.

3794.   The Iranian-supported FTO Hezbollah/JAM planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3795.   As a result of the attack and the injuries suffered, Endi Cisneros Herrera is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 302.   THE SEPTEMBER 15, 2006 ATTACK – MOSUL

#### A.   PLAINTIFF TAMI RENEI KEMPER-PENA

3796.   Plaintiff Tami Renei Kemper-Pena is a U.S. citizen domiciled in Florida.

3797.   On September 15, 2006, Tami Renei Kemper-Pena was serving in the U.S. military when she was attacked by Rockets and Mortars.

3798.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mrs. Kemper-Pena.

3799.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3800.   As a result of the attack and the injuries suffered, Tami Renei Kemper-Pena is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 303.   THE SEPTEMBER 15, 2006 ATTACK – MOSUL

### A.   PLAINTIFFS THE GILBERT MATTHEW BOYNTON FAMILY

3801.   Plaintiff Gilbert Matthew Boynton is a U.S. citizen domiciled in California.

3802.   On September 15, 2006, Gilbert Matthew Boynton was serving in the U.S. military when he was attacked by a VBIED and mortars.

3803.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Boynton.

3804.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3805.   As a result of the attack and the injuries suffered, Gilbert Matthew Boynton is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including

medical expenses, lost income, and loss of earning capacity.

3806.   Plaintiff Charles Boynton is a citizen of the United States and domiciled in the State of California. He is the father of Gilbert Matthew Boynton.

3807.   Plaintiff Sofia T. Boynton is a citizen of the United States and domiciled in the State of California. She is the mother of Gilbert Matthew Boynton.

3808.   Plaintiff Robert A. Boynton is a citizen of the United States and domiciled in the State of California. He is the brother of Gilbert Matthew Boynton.

3809.   As a result of the attack and the injuries suffered by Gilbert Matthew Boynton, Plaintiffs Charles Boynton, Sofia T. Boynton, and Robert A. Boynton, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 304.   THE SEPTEMBER 14, 2006 ATTACK – FALLUJAH

#### A.   PLAINTIFFS   THE   CHRISTOPHER   BRIAN   SAUNDERS FAMILY

3810.   Plaintiff Christopher Brian Saunders is a U.S. citizen domiciled in Massachusetts.

3811.   On September 14, 2006, Christopher Brian Saunders was serving in the U.S. military when he was attacked by an IED.

3812.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Saunders.

3813.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3814.   As a result of the attack and the injuries suffered, Christopher Brian Saunders is

entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3815.   Plaintiff Cecelia Anne Saunders is a citizen of the United States domiciled in Massachusetts and is the mother of Christopher Brian Saunders.

3816.   As a result of the attack and the injuries suffered by Christopher Brian Saunders, Plaintiff Cecelia Anne Saunders is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 305.   THE SEPTEMBER 7, 2006 ATTACK – FALLUJAH

#### A.   PLAINTIFFS THE BENJAMIN EDWARD TRAINER FAMILY

3817.   Plaintiff Benjamin Edward Trainer is a U.S. citizen domiciled in Florida.

3818.   On September 7, 2006, Benjamin Edward Trainer was serving in the U.S. military when he was attacked by an IED.

3819.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Trainer.

3820.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3821.   As a result of the attack and the injuries suffered, Benjamin Edward Trainer is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3822.   Plaintiff Edward James Trainer is a citizen of the United States domiciled in

Kentucky and is the father of Benjamin Edward Trainer.

3823.   As a result of the attack and the injuries suffered by Benjamin Edward Trainer, Plaintiff Edward James Trainer is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 306.   THE AUGUST 29, 2006 ATTACK – SADR AL YUSIFIYAH

### A.   PLAINTIFFS THE MATTHEW JOSEPH VOSBEIN FAMILY

3824.   On August 29, 2006, Matthew Joseph Vosbein was a U.S. citizen, domiciled in Tennessee, and serving in the U.S. military when he was attacked by an IED, causing his death.

3825.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Vosbein.

3826.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

3827.   Plaintiff Lynda L. Vosbein is a citizen of the United States domiciled in California and was the spouse of Matthew Joseph Vosbein.

3828.   Plaintiff John Vosbein is a citizen of the United States domiciled in Wyoming and is the son of Matthew Joseph Vosbein.

3829.   Plaintiff Connor Vosbein is a citizen of the United States domiciled in Wyoming and is the son of Matthew Joseph Vosbein.

3830.   Plaintiff Brandon Jackson is a citizen of the United States domiciled in California and is the stepson of Matthew Joseph Vosbein.

3831.   Plaintiff Anna Williams is a citizen of the United States domiciled in Louisiana and is the mother of Matthew Joseph Vosbein.

3832.   Plaintiff Tim Lingle is a citizen of the United States domiciled in Illinois and is the father of Matthew Joseph Vosbein.

3833.   Plaintiff Hagle Williams, III, is a citizen of the United States domiciled in Louisiana and is the brother of Matthew Joseph Vosbein.

3834.   Plaintiff Hagle Williams, Jr., is a citizen of the United States domiciled in Louisiana and is the stepfather of Matthew Joseph Vosbein.

3835.   Plaintiff Chris Williams is a citizen of the United States domiciled in Louisiana and is the brother of Matthew Joseph Vosbein.

3836.   Plaintiff Jason Lingle is a citizen of the United States domiciled in Illinois and is the brother of Matthew Joseph Vosbein.

3837.   Plaintiff Lucas Lingle is a citizen of the United States domiciled in Illinois and is the brother of Matthew Joseph Vosbein.

3838.   Plaintiff Timothy J.B. Lingle is a citizen of the United States domiciled in Illinois and is the brother of Matthew Joseph Vosbein.

3839.   Plaintiff Jeremy Lingle is a citizen of the United States domiciled in Illinois and is the brother of Matthew Joseph Vosbein.

3840.   Plaintiff Lynda L. Vosbein, brings an action individually and on behalf of the pending Estate of Matthew Joseph Vosbein, and all heirs thereof, as its legal representative.

3841.   As a result of the attack, and the injuries suffered by and the death of Matthew Joseph Vosbein, Plaintiffs Lynda L. Vosbein, John Vosbein, Connor Vosbein, Brandon Jackson, Anna Williams, Tim Lingle, Hagle Williams, III, Hagle Williams, Jr., Chris Williams, Jason Williams, Lucas Lingle, Timothy J.B. Lingle and Jeremy Lingle, have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of

society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the pending Estate of Matthew Joseph Vosbein.

### 307. THE AUGUST 27, 2006 ATTACK – HIT

#### A. PLAINTIFFS THE ALBA RYAN TANNER FAMILY

3842. Plaintiff Alba Ryan Tanner is a U.S. citizen domiciled in Florida.

3843. On August 27, 2006, Alba Ryan Tanner was serving in the U.S. military when he was attacked by an IED.

3844. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Tanner.

3845. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3846. As a result of the attack and the injuries suffered, Alba Ryan Tanner is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3847. Plaintiff Barbara West is a citizen of the United States domiciled in Colorado and is the mother of Alba Ryan Tanner.

3848. Plaintiff Tiffany Tanner-Pines is a citizen of the United States domiciled in Louisiana and is the sister of Alba Ryan Tanner.

3849. Plaintiff Scott J. West is a citizen of the United States domiciled in Louisiana and is the uncle of Alba Ryan Tanner.

3850. Plaintiff Carl West is a citizen of the United States domiciled in Louisiana and is the uncle of Alba Ryan Tanner

3851.   As a result of the attack and the injuries suffered by Alba Ryan Tanner, Plaintiffs Barbara West, Tiffany Tanner-Pines, Scott J. West and Carl West are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 308.   THE AUGUST 26, 2006 ATTACK – TIKRIT

#### A.   PLAINTIFF ANDRE CORNELIOUS MOYE

3852.   Plaintiff Andre Cornelious Moye is a U.S. citizen domiciled in Alabama.

3853.   On August 26, 2006, Andre Cornelious Moye was serving in the U.S. military when he was attacked by an IED.

3854.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Moye.

3855.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3856.   As a result of the attack and the injuries suffered, Andre Cornelious Moye is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 309.   THE AUGUST 21, 2006 ATTACK – RAMADI

#### A.   PLAINTIFFS THE SHAWN ALI NELSON FAMILY

3857.   Plaintiff Shawn Ali Nelson is a U.S. citizen domiciled in South Carolina.

3858.   On August 21, 2006, Shawn Ali Nelson was serving in the U.S. military when he was attacked by VBIEDs.

599

3859.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Nelson.

3860.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3861.   As a result of the attack and the injuries suffered, Shawn Ali Nelson is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3862.   Plaintiff Robert Nelson is a citizen of the United States domiciled in New Mexico and is the father of Shawn Ali Nelson.

3863.   Plaintiff Thelma Nelson is a citizen of the United States domiciled in New Mexico and is the mother of Shawn Ali Nelson.

3864.   As a result of the attack and the injuries suffered by Shawn Ali Nelson, Plaintiffs Robert Nelson and Thelma Nelson, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 310.   THE AUGUST 18, 2006 ATTACK – BUHRIZ

#### A.   PLAINTIFF MATTHEW PATRICK HALEY

3865.   Plaintiff Matthew Patrick Haley is a U.S. citizen domiciled in Colorado.

3866.   On August 18, 2006, Matthew Patrick Haley was serving in the U.S. military when he was attacked by an EFP.

3867.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Haley.

600

3868.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3869.   As a result of the attack and the injuries suffered, Matthew Patrick Haley is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 311.   THE AUGUST 18, 2006 ATTACK – BAGHDAD

#### A.   PLAINTIFFS THE BRENTON THOMAS GRAY FAMILY

3870.   On August 18, 2006, Brenton Thomas Gray was a U.S. citizen, domiciled in North Carolina, and serving as a civilian contractor to the U.S. military in Iraq when he was attacked by an EFP, causing his death.

3871.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Gray.

3872.   The Iranian-supported FTO Hezbollah/JAM planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

3873.   Plaintiff Courtnay Scott Gray is a citizen of the United States domiciled in Utah and was the spouse of Brenton Thomas Gray.

3874.   Plaintiff C.S.G., a minor child, represented by his legal guardian Courtnay Scott Gray, is a citizen of the United States domiciled in Utah and is the son of Brenton Thomas Gray.

3875.   Plaintiff Courtnay Scott Gray brings an action individually and on behalf of the Estate of Brenton Thomas Gray, and all heirs thereof, as its legal representative.

3876.   As a result of the attack, and the injuries suffered by and the death of Brenton

Thomas Gray, Plaintiffs Courtnay Scott Gray and C.S.G., a minor child, have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Brenton Thomas Gray.

### 312. THE AUGUST 15, 2006 ATTACK – HADITHA

### A. PLAINTIFFS THE TIMOTHY FRANCIS GRAJKO FAMILY

3877.   Plaintiff Timothy Francis Grajko is a U.S. citizen domiciled in Florida.

3878.   On August 15, 2006, Timothy Francis Grajko was serving in the U.S. military when he was attacked by grenades, small arms fire and RPGs.

3879.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Grajko.

3880.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3881.   As a result of the attack and the injuries suffered, Timothy Francis Grajko is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3882.   Plaintiff Alaina Locurcio is a citizen of the United States domiciled in New York and was the spouse of Timothy Francis Grajko.

3883.   Plaintiff Walter E. Grajko is a citizen of the United States domiciled in New York and is the father of Timothy Francis Grajko.

3884.   Plaintiff Kathleen J. Grajko is a citizen of the United States domiciled in New York and is the mother of Timothy Francis Grajko.

602

3885.   Plaintiff Michael J. Grajko is a citizen of the United States domiciled in New York and is the brother of Timothy J. Grajko.

3886.   As a result of the attack and the injuries suffered by Timothy Francis Grajko, Plaintiffs Alaina Locurcio, Walter E. Grajko, Kathleen J. Grajko and Michael J. Grajko are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 313.   THE AUGUST 6, 2006 ATTACK – BAQUBAH

#### A.      PLAINTIFF MATTHEW PATRICK HALEY

3887.   Plaintiff Matthew Patrick Haley is a U.S. citizen domiciled in Colorado.

3888.   On or about August 6, 2006, Matthew Patrick Haley was serving in the U.S. military when he was attacked by an IED.

3889.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Haley.

3890.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3891.   As a result of the attack and the injuries suffered, Matthew Patrick Haley is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 314.   THE AUGUST 4, 2006 ATTACK – KARMAH

#### A.      PLAINTIFFS THE MICHAEL ANTHONY MENDOZA FAMILY

3892.   Plaintiff Michael Anthony Mendoza is a U.S. citizen domiciled in Illinois.

3893.   On August 4, 2006, Michael Anthony Mendoza was serving in the U.S. military when he was attacked by grenades.

3894.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Mendoza.

3895.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3896.   As a result of the attack and the injuries suffered, Michael Anthony Mendoza is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3897.   Plaintiff Kelly Mendoza is a citizen of the United States and domiciled in the State of Illinois. She is the wife of Michael Anthony Mendoza.

3898.   Plaintiff S.M.M, a minor child, represented by his legal guardians Michael Anthony Mendoza and Kelly Mendoza, is a citizen of the United States and domiciled in the State of Illinois. He is the son of Michael Anthony Mendoza and Kelly Mendoza.

3899.   As a result of the attack and the injuries suffered by Michael Anthony Mendoza, Plaintiffs Kelly Mendoza, and S.M.M, a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 315.   THE AUGUST 2, 2006 ATTACK – HIT

#### A.   PLAINTIFFS THE HENRY PAUL MADSON FAMILY

3900.   Plaintiff Henry Paul Madson is a U.S. citizen domiciled in Utah.

3901.   On August 2, 2006, Henry Paul Madson was serving in the U.S. military when he was attacked by small arms fire.

3902.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Madson.

3903.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3904.   As a result of the attack and the injuries suffered, Henry Paul Madson is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3905.   Plaintiff Alysia L. Madson is a citizen of the United States domiciled in Utah and is the daughter of Henry Paul Madson.

3906.   Plaintiff Kaylee R. Madson is a citizen of the United States domiciled in Utah and is the daughter of Henry Paul Madson.

3907.   Plaintiff Ekaterina Brumit is a citizen of the United States domiciled in Tennessee and is the mother of Henry Paul Madson.

3908.   As a result of the attack and the injuries suffered by Henry Paul Madson, Plaintiffs Alysia L. Madson, Kaylee R. Madson, and Ekaterina Brumit are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

316.   **THE JULY 28, 2006 ATTACK – BAGHDAD**

A.   **PLAINTIFFS THE WESLEY J. HALLECK FAMILY**

3909.   Plaintiff Wesley J. Halleck is a U.S. citizen domiciled in Texas.

3910.   On July 28, 2006, Wesley J. Halleck was serving in the U.S. military when he was attacked by IEDs.

3911.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Halleck.

3912.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3913.   As a result of the attack and the injuries suffered, Wesley J. Halleck is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3914.   Plaintiff Ian M. Brown is a citizen of the United States domiciled in Tennessee and is the son of Wesley J. Halleck.

3915.   Plaintiff Kimberly Ann Brown is a citizen of the United States domiciled in Tennessee and is the sister of Wesley J. Halleck.

3916.   Plaintiff Charley D. Halleck is a citizen of the United States domiciled in Washington and is the brother of Wesley J. Halleck.

3917.   Plaintiff Brendan W. Halleck is a citizen of the United States domiciled in Texas and is the son of Wesley J. Halleck.

3918.   As a result of the attack and the injuries suffered by Wesley J. Halleck, Plaintiffs Ian M. Brown, Kimberly Ann Brown, Charley D. Halleck and Brendan W. Halleck are entitled

to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 317.   THE JULY 27, 2006 ATTACK – RAMADI

#### A.   PLAINTIFFS THE ALFONSO GEOMAR MATOS MESA FAMILY

3919.   Plaintiff Alfonso Geomar Matos Mesa is a U.S. citizen domiciled in New York.

3920.   On July 27, 2006, Alfonso Geomar Matos Mesa was serving in the U.S. military when he was attacked by an IED.

3921.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Matos Mesa.

3922.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3923.   As a result of the attack and the injuries suffered, Alfonso Geomar Matos Mesa is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3924.   Plaintiff Polibia Matos is a citizen of the United States domiciled in New York and is the mother of Alfonso Geomar Matos Mesa.

3925.   Plaintiff Alfonso Argenis Matos is a citizen of the United States domiciled in Maryland and is the brother of Alfonso Geomar Matos Mesa.

3926.   Plaintiff Fabian A. Matos is a citizen of the United States domiciled in New Jersey and is the brother of Alfonso Geomar Matos Mesa

3927.   As a result of the attack and the injuries suffered by Alfonso Geomar Matos Mesa, Plaintiffs Polibia Matos, Alfonso Argenis Matos and Fabian A. Matos are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 318.   THE JULY 26, 2006 ATTACK – MOSUL

### A.   PLAINTIFFS THE SHAWN MICHAEL CUMMINGS FAMILY

3928.   Plaintiff Shawn Michael Cummings is a U.S. citizen domiciled in New York.

3929.   On July 26, 2006, Shawn Michael Cummings was serving in the U.S. military when he was attacked by an IED.

3930.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Cummings.

3931.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3932.   As a result of the attack and the injuries suffered, Shawn Michael Cummings is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3933.   Plaintiff Lisa M. Cummings is a citizen of the United States domiciled in New York and is the spouse of Shawn Michael Cummings.

3934.   Plaintiff Natasha Annmarie O'Neill is a citizen of the United States domiciled in New York and is the daughter of Shawn Michael Cummings.

3935.   Plaintiff Georgia Rose Cummings is a citizen of the United States domiciled in

New York and is the daughter of Shawn Michael Cummings.

3936.   Plaintiff James Michael Cummings is a citizen of the United States domiciled in Kentucky and is the son of Shawn Michael Cummings.

3937.   As a result of the attack and the injuries suffered by Shawn Michael Cummings, Plaintiffs Lisa M. Cummings, Natasha Annmarie O'Neill, Georgia Rose Cummings and James Michael Cummings are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 319.   THE JULY 22, 2006 ATTACK – FALLUJAH

### A.   PLAINTIFF ANDREW JOHN HARRIS

3938.   Plaintiff Andrew John Harris is a U.S. citizen domiciled in the State of South Carolina.

3939.   On July 22, 2006, Andrew John Harris was serving in the U.S. military when he was attacked by an IED.

3940.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Harris.

3941.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3942.   As a result of the attack and the injuries suffered, Andrew John Harris is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3943.   As a result of the attack and the injuries suffered by Andrew John Harris is

entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 320. THE JULY 21, 2006 ATTACK – RAMADI

#### A. PLAINTIFF GREGORY MICHAEL PFAFF

3944. Plaintiff Gregory Michael Pfaff is a U.S. citizen domiciled in Wisconsin.

3945. On July 21, 2006, Gregory Michael Pfaff was serving in the U.S. military when he was attacked by an IED.

3946. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Pfaff.

3947. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3948. As a result of the attack and the injuries suffered, Gregory Michael Pfaff is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 321. THE JULY 20, 2006 ATTACK – KHALIDIYAH

#### A. PLAINTIFFS THE PATRICK ANDREW DIENER FAMILY

3949. Plaintiff Patrick Andrew Diener is a U.S. citizen domiciled in Tennessee.

3950. On July 20, 2006, Patrick Andrew Diener was serving in the U.S. military when he was attacked by small arms fire, rockets and mortars.

3951. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Diener.

3952.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3953.   As a result of the attack and the injuries suffered, Patrick Andrew Diener is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3954.   Plaintiff Deidre Theresa Diener is a citizen of the United States and domiciled in the State of Tennessee. She is the wife of Patrick Andrew Diener.

3955.   Plaintiff Hannah Maria Diener is a citizen of the United States and domiciled in the State of South Carolina. She is the sister of Patrick Andrew Diener.

3956.   As a result of the attack and the injuries suffered by Patrick Andrew Diener, Plaintiffs Deidre Theresa Diener and Hannah Maria Diener, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 322.   THE JULY 20, 2006 ATTACK – RAMADI

#### A.   PLAINTIFFS THE NICHOLAS ANTHONY WEST FAMILY

3957.   Plaintiff Nicholas Anthony West is a U.S. citizen domiciled in Tennessee.

3958.   On July 20, 2006, Nicholas Anthony West was serving in the U.S. military when he was attacked by an IED, RPGs and small arms fire.

3959.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. West.

3960.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack,

as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3961.   As a result of the attack and the injuries suffered, Nicholas Anthony West is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3962.   Plaintiff Christine West is a citizen of the United States domiciled in Tennessee and is the mother of Nicholas Anthony West.

3963.   As a result of the attack and the injuries suffered by Nicholas Anthony West, Plaintiff Christine West is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 323.   THE JULY 15, 2006 ATTACK – RAMADI

### A.   PLAINTIFFS THE LATHAN HILL FAMILY

3964.   Plaintiff Lathan Hill is a U.S. citizen domiciled in California.

3965.   On July 15, 2006, Lathan Hill was serving in the U.S. military when he was attacked by an IED.

3966.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Hill.

3967.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3968.   As a result of the attack and the injuries suffered, Lathan Hill is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering,

loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3969.   Plaintiff Cathleen Holy is a citizen of the United States domiciled in California and is the mother of Lathan Hill.

3970.   Plaintiff Laurence Richard Hill is a citizen of the United States domiciled in California and is the father of Lathan Hill.

3971.   Plaintiff Lisa Hill Bazan is a citizen of the United States domiciled in California and is the sister of Lathan Hill.

3972.   As a result of the attack and the injuries suffered by Lathan Hill, Plaintiffs Cathleen Holy, Laurence Richard Hill and Lisa Hill Bazan are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 324.   THE JULY 15, 2006 ATTACK – RAMADI

#### A.   PLAINTIFF WALTER LEE HAM JR.

3973.   Plaintiff Walter Lee Ham Jr. is a U.S. citizen domiciled in Georgia.

3974.   On July 15, 2006, Walter Lee Ham Jr. was serving in the U.S. military when he was attacked by an IED.

3975.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Ham.

3976.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3977.   As a result of the attack and the injuries suffered, Walter Lee Ham Jr. is entitled to

past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 325.   THE JULY 13, 2006 ATTACK – MUQDADIYAH

#### A.   PLAINTIFFS THE VICTOR JEROME DOMINGUEZ FAMILY

3978.   Plaintiff Victor Jerome Dominguez is a U.S. citizen domiciled in Texas.

3979.   On July 13, 2006, Victor Jerome Dominguez was serving in the U.S. military when he was attacked by an IED.

3980.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Dominguez.

3981.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3982.   As a result of the attack and the injuries suffered, Victor Jerome Dominguez is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3983.   Plaintiff Antonio Aponte is a citizen of the United States domiciled in Florida and is the father of Victor Jerome Dominguez.

3984.   Plaintiff Ivonne Dominguez is a citizen of the United States domiciled in Puerto Rico and is the mother of Victor Jerome Dominguez.

3985.   Plaintiff V.D., a minor child, represented by his legal guardian Victor Jerome Dominguez, is a citizen of the United States domiciled in Texas and is the son of Victor Jerome Dominguez.

3986. As a result of the attack and the injuries suffered by Victor Jerome Dominguez, Plaintiffs Antonio Aponte, Ivonne Dominguez and V.D., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 326. THE JULY 10, 2006 ATTACK – BAGHDAD

#### A. PLAINTIFFS THE JEFFREY JAMES SECKINGER FAMILY

3987. Plaintiff Jeffrey James Seckinger is a U.S. citizen domiciled in Florida.

3988. On July 10, 2006, Jeffrey James Seckinger was serving in the U.S. military when he was attacked by an IED and small arms.

3989. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Seckinger.

3990. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3991. As a result of the attack and the injuries suffered, Jeffrey James Seckinger is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

3992. Plaintiff Michelle Seckinger is a citizen of the United States domiciled in Florida and is the spouse of Jeffrey James Seckinger.

3993. As a result of the attack and the injuries suffered by Jeffrey James Seckinger, Plaintiff Michelle Seckinger is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of

consortium, and past and future economic damages, including loss of services and support.

### 327. THE JULY 10, 2006 ATTACK – BALAD

#### A. PLAINTIFF DHUNTHA SHAYRE WYATT

3994. Plaintiff Dhuntha Shayre Wyatt is a U.S. citizen domiciled in Texas.

3995. On July 10, 2006, Dhuntha Shayre Wyatt was serving in the U.S. military when he was attacked by an IED and small arms fire.

3996. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Wyatt.

3997. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

3998. As a result of the attack and the injuries suffered, Dhuntha Shayre Wyatt is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 328. THE JULY 1, 2006 ATTACK – FALLUJAH

#### A. PLAINTIFFS THE BRANDON WILLIAM LISTON FAMILY

3999. Plaintiff Brandon William Liston is a U.S. citizen domiciled in Illinois.

4000. On July 1, 2006, Brandon William Liston was serving in the U.S. military when he was attacked by an IED.

4001. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Liston.

4002. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack,

the munition used, as well as the tactics, techniques, and procedures utilized.

4003.   As a result of the attack and the injuries suffered, Brandon William Liston is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4004.   Plaintiff Scott William Liston is a citizen of the United States domiciled in Illinois and is the father of Brandon William Liston.

4005.   As a result of the attack and the injuries suffered by Brandon William Liston, Plaintiff Scott William Liston is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 329.   THE JUNE 29, 2006 ATTACK – MOSUL

#### A.   PLAINTIFFS THE BRYAN LUCKEY FAMILY

4006.   On June 29, 2006, Bryan Luckey was a U.S. citizen, domiciled in Alaska, and serving in the U.S. military when he was attacked by small arms fire, causing his death.

4007.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Luckey.

4008.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

4009.   Plaintiff Catherine Makimay Luckey is a citizen of the United States and domiciled in the State of Florida. She is the widow of Bryan Luckey.

4010.   Plaintiff Paula Hutton Luckey is a citizen of the United States and domiciled in the State of Florida. She is the mother of Bryan Luckey.

4011.   Plaintiff Patrick Bryan Luckey is a citizen of the United States and domiciled in the State of Florida. He is the father of Bryan Luckey.

4012.   Plaintiff Joshua C. Luckey is a citizen of the United States and domiciled in the State of Florida. He is the brother of Bryan Luckey.

4013.   Plaintiff Matthew Luckey is a citizen of the United States and domiciled in the State of Florida. He is the brother of Bryan Luckey.

4014.   Plaintiff Catherine Makimay Luckey brings an action individually, and on behalf of the Estate of Bryan Luckey, and all heirs thereof, as its legal representative.

4015.   As a result of the attack, and the injuries suffered by and the death of Bryan Luckey, Plaintiffs Catherine Makimay Luckey, Paula Hutton Luckey, Patrick Bryan Luckey, Joshua C. Luckey, and Matthew Luckey, have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Bryan Luckey.

### 330.   THE JUNE 27, 2006 ATTACK – JURF SAKHAR

#### A.   PLAINTIFFS THE JEREMY SCOTT JONES FAMILY

4016.   On June 27, 2006, Jeremy Scott Jones was a U.S. citizen, domiciled in Nebraska, and serving in the U.S. military when he was attacked by an IED, causing his death.

4017.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Jones.

4018.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

4019.   Plaintiff Jennifer Laura Jones is a citizen of the United States domiciled in

Nebraska and is the spouse of Jeremy Scott Jones.

4020.  Plaintiff Diane Kathleen Jones is a citizen of the United States domiciled in Nebraska and is the mother of Jeremy Scott Jones.

4021.  Plaintiff Joseph Scott Jones is a citizen of the United States domiciled in Nebraska and is the father of Jeremy Scott Jones.

4022.  Plaintiff Abbi Miranda Carreto is a citizen of the United States domiciled in Nebraska and is the sister of Jeremy Scott Jones.

4023.  Plaintiff A.J.J., a minor child, represented by his legal guardian Jennifer Laura Jones, is a citizen of the United States domiciled in Nebraska and is the son of Jeremy Scott Jones.

4024.  Plaintiff M.A.J., a minor child, represented by her legal guardian Jennifer Laura Jones, is a citizen of the United States domiciled in Nebraska and is the daughter of Jeremy Scott Jones.

4025.  Plaintiff Jennifer Laura Jones, brings an action individually and on behalf of the Estate of Jeremy Scott Jones, and all heirs thereof, as its anticipated legal representative.

4026.  As a result of the attack, and the injuries suffered by and the death of Jeremy Scott Jones, Plaintiffs Jennifer Laura Jones, Diane Kathleen Jones, Joseph Scott Jones, Abbi Miranda Carreto, A.J.J., a minor child, and M.A.J., a minor child, have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Jeremy Scott Jones.

### 331.   THE JUNE 22, 2006 ATTACK – AL QAIM

####   A.   PLAINTIFF BRYAN DANIEL ESCOBEDO

4027.  Plaintiff Bryan Daniel Escobedo is a U.S. citizen domiciled in Texas.

619

4028.  On June 22, 2006, Bryan Daniel Escobedo was serving in the U.S. military when he was attacked by an IED.

4029.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Escobedo.

4030.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4031.  As a result of the attack and the injuries suffered, Bryan Daniel Escobedo is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 332.  THE JUNE 16, 2006 ATTACK - BAQUBAH

#### A.  PLAINTIFF ANTHONY GEORGE BRUCE

4032.  Plaintiff Anthony George Bruce is a U.S. citizen domiciled in the State of Maryland.

4033.  On June 16, 2006, Anthony George Bruce was serving in the U.S. military when he was attacked by an IED.

4034.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Bruce.

4035.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4036.  As a result of the attack and the injuries suffered, Anthony George Bruce is entitled to past and future noneconomic damages, including for severe physical and mental pain

and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 333.   THE JUNE 10, 2006 ATTACK –HABBANIYAH

#### A.   PLAINTIFFS THE JACKSON ENRIQUE LUNA FAMILY

4037.   Plaintiff Jackson Enrique Luna is a U.S. citizen domiciled in New Jersey.

4038.   On June 10, 2006, Jackson Enrique Luna was serving in the U.S. military when he was attacked by a sniper.

4039.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Luna.

4040.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4041.   As a result of the attack and the injuries suffered, Jackson Enrique Luna is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4042.   Plaintiff Nancy Ballestas is a citizen of the United States domiciled in New Jersey and is the mother of Jackson Enrique Luna.

4043.   Plaintiff Ana Gregoria Amoros is a citizen of the United States domiciled in Maryland and is the sister of Jackson Enrique Luna.

4044.   Plaintiff J.A.L., a minor child, represented by his legal guardian Jackson Enrique Luna, is a citizen of the United States domiciled in New Jersey and is the son of Jackson Enrique Luna.

4045.   Plaintiff S.G.L., a minor child, represented by her legal guardian Jackson Enrique

Luna, is a citizen of the United States domiciled in New Jersey and is the daughter of Jackson Enrique Luna.

4046.  As a result of the attack and the injuries suffered by Jackson Enrique Luna, Plaintiffs Nancy Ballestas, Ana Gregoria Amoros, J.A.L., a minor child, and S.G.L., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 334.  THE JUNE 7, 2006 ATTACK – BAGHDAD

#### A.  PLAINTIFF JERRY DANIEL WALKER

4047.  Plaintiff Jerry Daniel Walker is a U.S. citizen domiciled in Montana.

4048.  On June 7, 2006, Jerry Daniel Walker was serving in the U.S. military when he was attacked by an IED.

4049.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Walker.

4050.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4051.  As a result of the attack and the injuries suffered, Jerry Daniel Walker is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 335.  THE JUNE 4, 2006 ATTACK - TAJI

#### A.  PLAINTIFFS THE PAUL ERIC HAINES FAMILY

4052.  Plaintiff Paul Eric Haines is a U.S. citizen domiciled in the State of Texas.

4053.   On June 4, 2006, Paul Eric Haines was serving in the U.S. military when he was attacked by an IED.

4054.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Haines.

4055.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4056.   As a result of the attack and the injuries suffered, Paul Eric Haines is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4057.   Plaintiff Ronda Kay Haines is a citizen of the United States domiciled in the State of Texas and is the spouse of Paul Eric Haines.

4058.   Plaintiff Karen Mae Haines is a citizen of the United States domiciled in the State of Texas and is the mother of Paul Eric Haines.

4059.   Plaintiff Jeremy Benjamin Haines is a citizen of the United States domiciled in the State of Texas and is the brother of Paul Eric Haines.

4060.   As a result of the attack and the injuries suffered by Paul Eric Haines, Plaintiffs Ronda Kay Haines, Karen Mae Haines and Jeremy Benjamin Haines are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 336.   THE JUNE 4, 2006 ATTACK – BAIJI

#### A.   PLAINTIFFS THE HECTOR MANUEL LOPEZ, JR. FAMILY

4061.   Plaintiff Hector Manuel Lopez, Jr. is a U.S. citizen domiciled in Texas.

4062.   On June 4, 2006, Hector Manuel Lopez, Jr. was serving in the U.S. military when he was attacked by an RPG.

4063.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Lopez.

4064.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4065.   As a result of the attack and the injuries suffered, Hector Manuel Lopez, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4066.   Plaintiff Catherine Lopez is a citizen of the United States domiciled in Texas and is the spouse of Hector Manuel Lopez, Jr.

4067.   Plaintiff Hector M. Lopez, Sr. is a citizen of the United States domiciled in Texas and is the father of Hector Manuel Lopez, Jr.

4068.   Plaintiff Patricia Santana is a citizen of the United States domiciled in Texas and is the mother of Hector Manuel Lopez, Jr.

4069.   Plaintiff Isaac Lopez is a citizen of the United States domiciled in Massachusetts and is the brother of Hector Manuel Lopez, Jr.

4070.   Plaintiff Vivian Lopez is a citizen of the United States domiciled in Texas and is the sister of Hector Manuel Lopez, Jr.

4071.   Plaintiff Robert Valle is a citizen of the United States domiciled in Texas and is the son of Hector Manuel Lopez, Jr.

4072.   Plaintiff E.L., a minor child, represented by her legal guardian Hector Manuel Lopez, Jr., is a citizen of the United States domiciled in Texas and is the daughter of Hector Manuel Lopez, Jr.

4073.   As a result of the attack and the injuries suffered by Hector Manuel Lopez, Jr., Plaintiffs Catherine Lopez, Hector M. Lopez, Patricia Santana, Isaac Lopez, Vivian Lopez, Robert Valle and E.L., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 337.   THE JUNE 3, 2006 ATTACK – KIRKUK

#### A.   PLAINTIFFS THE MICHAEL BASS LOCKE FAMILY

4074.   Plaintiff Michael Bass Locke is a U.S. citizen domiciled in Florida.

4075.   On June 3, 2006, Michael Bass Locke was serving in the U.S. military when he was attacked by a rocket.

4076.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Locke.

4077.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4078.   As a result of the attack and the injuries suffered, Michael Bass Locke is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4079.  Plaintiff William Alvin Locke is a citizen of the United States domiciled in Florida and is the father of Michael Bass Locke.

4080.  Plaintiff William David Locke, III, is a citizen of the United States domiciled in Florida and is the brother of Michael Bass Locke.

4081.  As a result of the attack and the injuries suffered by Michael Bass Locke, Plaintiffs William Alvin Locke and William David Locke, III, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 338.  THE MAY 25, 2006 ATTACK – RAMADI

#### A.  PLAINTIFFS THE JOSEPH MONFORTE, JR., FAMILY

4082.  Plaintiff Joseph Monforte, Jr., is a U.S. citizen domiciled in Florida.

4083.  On May 25, 2006, Joseph Monforte, Jr., was serving in the U.S. military when he was attacked by an IED.

4084.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Monforte.

4085.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4086.  As a result of the attack and the injuries suffered, Joseph Monforte, Jr., is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4087.  Plaintiff Marylou Monforte is a citizen of the United States domiciled in Florida

and is the mother of Joseph Monforte, Jr.

4088.   Plaintiff Kristen Martinez is a citizen of the United States domiciled in Florida and is the sister of Joseph Monforte, Jr.

4089.   Plaintiff Victoria Monforte is a citizen of the United States domiciled in New York and is the daughter of Joseph Monforte, Jr.

4090.   Plaintiff Amanda Monforte is a citizen of the United States domiciled in New York and is the daughter of Joseph Monforte, Jr.

4091.   As a result of the attack and the injuries suffered by Joseph Monforte, Jr., Plaintiffs Marylou Monforte, Kristen Martinez, Victoria Monforte and Amanda Monforte are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 339.   THE MAY 24, 2006 ATTACK – RAMADI

### A.      PLAINTIFF JOHN PAUL ALVAREZ

4092.   Plaintiff John Paul Alvarez is a U.S. citizen domiciled in Georgia.

4093.   On May 24, 2006, John Paul Alvarez was serving in the U.S. military when he was attacked by an IED, RPG, and small arms.

4094.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Alvarez.

4095.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4096.   As a result of the attack and the injuries suffered, John Paul Alvarez is entitled to past and future noneconomic damages, including for severe physical and mental pain and

suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 340.   THE MAY 15, 2006 ATTACK – BAGHDAD

### A.   PLAINTIFFS THE BRADLEY CHARLSON FAMILY

4097.   Plaintiff Bradley Charlson is a U.S. citizen domiciled in Florida.

4098.   On May 15, 2006, Bradley Charlson was serving in the U.S. military when he was attacked by an IED and Small Arms Fire.

4099.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Charlson.

4100.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4101.   As a result of the attack and the injuries suffered, Bradley Charlson is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4102.   Plaintiff Tania Mahinda is a citizen of the United States domiciled in Florida and is the spouse of Bradley Charlson.

4103.   Plaintiff Nicole Charlson is a citizen of the United States domiciled in Oregon and is the sister of Bradley Charlson.

4104.   As a result of the attack and the injuries suffered by Bradley Charlson, Plaintiffs Tania Mahinda and Nicole Charlson are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 341.   THE MAY 12, 2006 ATTACK – BALAD

#### A.   PLAINTIFF JOHN MICHAEL BRASHEAR

4105.   Plaintiff John Michael Brashear is a U.S. citizen domiciled in Washington.

4106.   On May 12, 2006, John Michael Brashear was serving in the U.S. military when he was attacked by a rocket.

4107.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Brashear.

4108.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4109.   As a result of the attack and the injuries suffered, John Michael Brashear is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 342.   THE MAY 11, 2006 ATTACK – AL MAZRAA

#### A.   PLAINTIFF DEVIN SAMUEL HARVEY

4110.   Plaintiff Devin Samuel Harvey is a U.S. citizen domiciled in Indiana.

4111.   On May 11, 2006, Devin Samuel Harvey was serving in the U.S. military when he was attacked by an IED.

4112.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Harvey.

4113.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack,

the munition used, as well as the tactics, techniques, and procedures utilized.

4114.   As a result of the attack and the injuries suffered, Devin Samuel Harvey is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 343.   THE MAY 6, 2006 ATTACK – ABU GHRAIB

#### A.   PLAINTIFF ROWDY ZANE BURNEY

4115.   Plaintiff Rowdy Zane Burney is a U.S. citizen domiciled in Alabama.

4116.   On May 6, 2006, Rowdy Zane Burney was serving in the U.S. military when he was attacked by an IED.

4117.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Burney.

4118.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4119.   As a result of the attack and the injuries suffered, Rowdy Zane Burney is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 344.   THE APRIL 28, 2006 ATTACK – HADITHA

#### A.   PLAINTIFFS THE JAMES MICHAEL LOTT FAMILY

4120.   Plaintiff James Michael Lott is a U.S. citizen domiciled in Texas.

4121.   On April 28, 2006, James Michael Lott was serving in the U.S. military when he was attacked by an anti-tank mine, small arms, and RPGs.

630

4122.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Lott.

4123.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4124.   As a result of the attack and the injuries suffered, James Michael Lott is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4125.   Plaintiff Gail Fortner Lott is a citizen of the United States domiciled in Alabama, and is the mother of James Michael Lott.

4126.   Plaintiff Ronald Everett Lott is a citizen of the United States domiciled in Alabama, and is father of James Michael Lott.

4127.   As a result of the attack and the injuries suffered by James Michael Lott, Plaintiffs Gail Fortner Lott and Ronald Everett Lott are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 345.   THE APRIL 28, 2006 ATTACK – HADITHA

#### A.   PLAINTIFFS THE LEA ROBERT MILLS FAMILY

4128.   On April 28, 2006, Lea Robert Mills was a U.S. citizen, domiciled in Florida, and serving in the U.S. military when he was attacked by an IED, causing his death.

4129.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Mills.

4130.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack,

as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

4131.   Plaintiff Delores Mills is a citizen of the United States and domiciled in the State of Florida. She is the mother of Lea Robert Mills.

4132.   Plaintiff Keesha Mills is a citizen of the United States and domiciled in the state of Florida. She is the wife of Lea Robert Mills.

4133.   Plaintiff Robert Mills is a citizen of the United States and domiciled in the state of Florida. He is the father of Lea Robert Mills

4134.   Plaintiff Parker Mills is a citizen of the United States and domiciled in the state of Florida. He is the brother of Lea Robert Mills.

4135.   Plaintiff Delores Mills brings an action individually, and on behalf of the Estate of Lea Robert Mills, and all heirs thereof, as its legal representative.

4136.   As a result of the attack, and the injuries suffered by and the death of Lea Robert Mills, Plaintiffs Delores Mills, Keesha Mills, Robert Mills, and Parker Mills, have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Lea Robert Mills.

## 346.   THE APRIL 24, 2006 ATTACK – KARABILAH

### A.   PLAINTIFFS THE SALVADOR LUIS LOERA, JR. FAMILY

4137.   Plaintiff Salvador Luis Loera, Jr. is a U.S. citizen domiciled in New Mexico.

4138.   On April 24, 2006, Salvador Luis Loera, Jr. was serving in the U.S. military when he was attacked by rockets.

4139.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Loera.

4140.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4141.   As a result of the attack and the injuries suffered, Salvador Luis Loera, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4142.   Plaintiff Monica E. Loera is a citizen of the United States and domiciled in the State of New Mexico. She is the mother of Salvador Luis Loera, Jr.

4143.   Plaintiff Salvador Loera, Sr. is a citizen of the United States and domiciled in the State of New Mexico. He is the father of Salvador Luis Loera, Jr.

4144.   Plaintiff Lori A. Loera is a citizen of the United States and domiciled in the State of New Mexico. She is the sister of Salvador Luis Loera, Jr.

4145.   Plaintiff Carolyn V. Lee is a citizen of the United States and domiciled in the State of New Mexico. She is the sister of Salvador Luis Loera, Jr.

4146.   Plaintiff Miguel Loera is a citizen of the United States and domiciled in the State of New Mexico. He is the brother of Salvador Luis Loera, Jr.

4147.   As a result of the attack and the injuries suffered by Salvador Luis Loera, Jr., Plaintiffs Monica E. Loera, Salvador Loera, Sr., Lori A. Loera, Carolyn V. Lee and Miguel Loera, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 347.   THE APRIL 23, 2006 ATTACK – TAJI

#### A.   PLAINTIFFS THE JASON BRENT DANIEL FAMILY

4148.   On April 23, 2006, Jason Brent Daniel was a U.S. citizen, domiciled in Texas, and serving in the U.S. military when he was attacked by IEDs, causing his death.

4149.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Daniel.

4150.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

4151.   Plaintiff Linda May Daniel is a citizen of the United States domiciled in Kansas and is the mother of Jason Brent Daniel.

4152.   Plaintiff Linda May Daniel, brings an action individually and on behalf of the Estate of Jason Brent Daniel, and all heirs thereof, as its legal representative.

4153.   As a result of the attack, and the injuries suffered by and the death of Jason Brent Daniel, Plaintiff Linda May Daniel has suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Jason Brent Daniel.

### 348.   THE APRIL 16, 2006 ATTACK – AL KARMAH

#### A.   PLAINTIFF JOEY JAMES BRAMME

4154.   Plaintiff Joey James Bramme is a U.S. citizen domiciled in Montana.

4155.   On April 16, 2006, Joey James Bramme was serving in the U.S. military when he was attacked by an IED.

4156.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or

other material support used to commit the attack, which injured Mr. Bramme.

4157.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4158.   As a result of the attack and the injuries suffered, Joey James Bramme is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 349.   THE APRIL 15, 2006 ATTACK - SAQLAWIYAH

#### A.   PLAINTIFFS THE DERRICK JOSHUA COTHRAN FAMILY

4159.   On April 15, 2006, Derrick Joshua Cothran was a U.S. citizen, domiciled in Louisiana, and serving in the U.S. military when he was attacked by IEDs, causing his death.

4160.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Cothran.

4161.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

4162.   Plaintiff Elena Martinez Cothran is a citizen of the United States domiciled in Louisiana and is the mother of Derrick Joshua Cothran

4163.   Plaintiff Theodore Michael Cothran, Sr. is a citizen of the United States domiciled in Louisiana and is the father of Derrick Joshua Cothran.

4164.   Plaintiff Antoinette Cothran Hebert is a citizen of the United States domiciled in Louisiana and is the sister of Derrick Joshua Cothran.

4165.   Plaintiff Theodore Michael Cothran, Jr. is a citizen of the United States domiciled

in North Carolina and is the brother of Derrick Joshua Cothran.

4166.   Plaintiff Elena Martinez Cothran, brings an action individually and on behalf of the Estate of Derrick Joshua Cothran, and all heirs thereof, as its legal representative.

4167.   As a result of the attack, and the injuries suffered by and the death of Derrick Joshua Cothran, Plaintiffs Elena Martinez Cothran, Theodore Michael Cothran, Sr., Antoinette Cothran Hebert, and Theodore Michael Cothran, Jr. have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Derrick Joshua Cothran.

## 350.   THE APRIL 13, 2006 ATTACK – AL KARMAH

### A.   PLAINTIFF JOEY JAMES BRAMME

4168.   Plaintiff Joey James Bramme is a U.S. citizen domiciled in Montana.

4169.   On April 13, 2006, Joey James Bramme was serving in the U.S. military when he was attacked by an IED and small arms fire.

4170.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Bramme.

4171.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4172.   As a result of the attack and the injuries suffered, Joey James Bramme is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

636

351. **THE APRIL 7, 2006 ATTACK – FOB FALCON**

   A. **PLAINTIFFS THE JOSHUA DIVON TRAVIS FAMILY**

4173.  Plaintiff Joshua Divon Travis is a U.S. citizen domiciled in Texas.

4174.  On April 7, 2006, Joshua Divon Travis was serving in the U.S. military when he was attacked by a rocket.

4175.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Travis.

4176.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4177.  As a result of the attack and the injuries suffered, Joshua Divon Travis is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4178.  Plaintiff D.R.G., a minor child, represented by his legal guardian Joshua Divon Travis, is a citizen of the United States domiciled in Texas and is the son of Joshua Divon Travis.

4179.  Plaintiff J.S.A., a minor child, represented by her legal guardian Joshua Divon Travis, is a citizen of the United States domiciled in Texas and is the daughter of Joshua Divon Travis.

4180.  Plaintiff A.C.J., a minor child, represented by her legal guardian Joshua Divon Travis, is a citizen of the United States domiciled in Texas and is the daughter of Joshua Divon Travis.

4181.  Plaintiff M.D.T., a minor child, represented by her legal guardian Joshua Divon Travis, is a citizen of the United States domiciled in Texas and is the daughter of Joshua Divon

Travis.

4182.   As a result of the attack and the injuries suffered by Joshua Divon Travis, Plaintiffs D.R.G., a minor child, J.S.A., a minor child, A.C.J., a minor child, and M.D.T., a minor child are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 352.   THE APRIL 1, 2006 ATTACK – UM QASSR

#### A.   PLAINTIFF GARTH LEVI BENEDICT

4183.   Plaintiff Garth Levi Benedict is a U.S. citizen domiciled in the State of Michigan.

4184.   On or about April 1, 2006, Garth Levi Benedict was serving in the U.S. military when he was attacked by small fire arms.

4185.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Benedict.

4186.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4187.   As a result of the attack and the injuries suffered, Garth Levi Benedict is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 353.   THE MARCH 30, 2006 ATTACK – BAGHDAD

#### A.   PLAINTIFFS THE FLOYD C. PETERS, JR. FAMILY

4188.   Plaintiff Floyd C. Peters, Jr. is a U.S. citizen domiciled in Texas.

4189.   On March 30, 2006, Floyd C. Peters, Jr. was serving in the U.S. military when he

was attacked by an IED.

4190.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Peters.

4191.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4192.   As a result of the attack and the injuries suffered, Floyd C. Peters, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4193.   Plaintiff Christina Peters is a citizen of the United States domiciled in Texas and is the spouse of Floyd C. Peters, Jr.

4194.   Plaintiff Katlin Peters is a citizen of the United States domiciled in Texas and is the daughter of Floyd C. Peters, Jr.

4195.   Plaintiff Floyd Andrew Peters is a citizen of the United States domiciled in Indiana and is the son of Floyd C. Peters, Jr.

4196.   Plaintiff A.P., a minor child, represented by his legal guardian Christina Peters, is a citizen of the United States domiciled in Texas and is the son of Floyd C. Peters, Jr.

4197.   Plaintiff Santana Marie Peters is a citizen of the United States domiciled in Texas and is the daughter of Floyd C. Peters, Jr.

4198.   Plaintiff G.P., a minor child, represented by her legal guardian Christina Peters, is a citizen of the United States domiciled in Texas and is the daughter of Floyd C. Peters, Jr.

4199.   Plaintiff Linda Peters is a citizen of the United States domiciled in Texas and is

the mother of Floyd C. Peters, Jr.

4200.   Plaintiff Floyd C. Peters, Sr., is a citizen of the United States domiciled in Texas and is the father of Floyd C. Peters, Jr.

4201.   Plaintiff Disa Peters Clasen is a citizen of the United States domiciled in Texas and is the sister of Floyd C. Peters, Jr.

4202.   Plaintiff Joy White is a citizen of the United States domiciled in Texas and is the sister of Floyd C. Peters, Jr.

4203.   Plaintiff Lisa Peters Smethurst is a citizen of the United States domiciled in Texas and is the sister of Floyd C. Peters, Jr.

4204.   As a result of the attack and the injuries suffered by Floyd C. Peters, Jr., Plaintiffs Christina Peters, Katlin Peters, Floyd Andrew Peters, A. P. a minor child, Santana Marie Peters, G.P., a minor child, Linda Peters, Floyd C. Peters, Sr., Disa Peters Clasen, Joy White, and Lisa Peters Smethurst, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 354.   THE MARCH 28, 2006 ATTACK – HABBANIYAH

#### A.   PLAINTIFFS THE PHILLIP LAWRENCE BELL FAMILY

4205.   Plaintiff Phillip Lawrence Bell is a U.S. citizen domiciled in Illinois.

4206.   On March 28, 2006, Phillip Lawrence Bell was serving in the U.S. military when he was attacked by an IED.

4207.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Bell.

4208.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack,

the munition used, as well as the tactics, techniques, and procedures utilized.

4209.   As a result of the attack and the injuries suffered, Phillip Lawrence Bell is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4210.   Plaintiff Thomas J. Bell is a citizen of the United States domiciled in Illinois and is the father of Phillip Lawrence Bell.

4211.   Plaintiff Maxine C. Bell is a citizen of the United States domiciled in Illinois and is the mother of Phillip Lawrence Bell.

4212.   Plaintiff Jeffrey K. Bell is a citizen of the United States domiciled in Illinois and is the brother of Phillip Lawrence Bell.

4213.   Plaintiff Joseph T. Bell is a citizen of the United States domiciled in Illinois and is the brother of Phillip Lawrence Bell.

4214.   As a result of the attack and the injuries suffered by Phillip Lawrence Bell, Plaintiffs Thomas K. Bell, Maxine C. Bell, Jeffrey K. Bell and Joseph T. Bell, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 355.   THE MARCH 25, 2006 ATTACK – ABU GHRAIB

### A.     PLAINTIFFS THE MICHAEL JOHN SIPPEL FAMILY

4215.   Plaintiff Michael John Sippel is a U.S. citizen domiciled in New York.

4216.   On March 25, 2006, Michael John Sippel was serving in the U.S. military when he was attacked by an IED.

4217.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or

other material support used to commit the attack, which injured Mr. Sippel.

4218.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4219.   As a result of the attack and the injuries suffered, Michael John Sippel is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4220.   Plaintiff John Patrick Sippel is a citizen of the United States domiciled in New York and is the father of Michael John Sippel.

4221.   Plaintiff Marlene Marie Grana is a citizen of the United States domiciled in New York and is the mother of Michael John Sippel.

4222.   Plaintiff Kelly Lynn Ottmar is a citizen of the United States domiciled in New York and is the ex-fiancee of Michael John Sippel.

4223.   Plaintiff M.J.S., a minor child, represented by his legal guardians Michael John Sippel and Kelly Lynn Ottmar, is a citizen of the United States domiciled in New York and is the son of Michael John Sippel.

4224.   As a result of the attack and the injuries suffered by Michael John Sippel, Plaintiffs John Patrick Sippel, Marlene Marie Grana, Kelly Lynn Ottmar and M.J.S., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 356. THE MARCH 21, 2006 ATTACK – MSR TAMPA, NEAR BAGHDAD

#### A. PLAINTIFF ROBBIE DON CHEATHAM

4225. Plaintiff Robbie Don Cheatham is a U.S. citizen domiciled in Oklahoma.

4226. On March 21, 2006, Robbie Don Cheatham was serving in the U.S. military when he was attacked by IED.

4227. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Cheatham.

4228. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4229. As a result of the attack and the injuries suffered, Robbie Don Cheatham is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 357. THE MARCH 17, 2006 ATTACK – RAMADI

#### A. PLAINTIFF JEFFERY ALAN MURTHA

4230. Plaintiff Jeffery Alan Murtha is a U.S. citizen domiciled in Delaware.

4231. On March 17, 2006, Jeffery Alan Murtha was serving in the U.S. military when he was attacked by an IED.

4232. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Murtha.

4233. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack,

the munition used, as well as the tactics, techniques, and procedures utilized.

4234.   As a result of the attack and the injuries suffered, Jeffery Alan Murtha is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 358.   THE MARCH 14, 2006 ATTACK – SADR YUSUFIYAH

#### A.   PLAINTIFF JEFFERY SHANE REDMAN

4235.   Plaintiff Jeffery Shane Redman is a U.S. citizen domiciled in North Carolina.

4236.   On March 14, 2006, Jeffery Shane Redman was serving in the U.S. military when he was attacked by mortars.

4237.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Redman.

4238.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4239.   As a result of the attack and the injuries suffered, Jeffery Shane Redman is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 359.   THE MARCH 13, 2006 ATTACK – BALAD

#### A.   PLAINTIFF JASON ERIC BELL

4240.   Plaintiff Jason Eric Bell is a U.S. citizen domiciled in Pennsylvania.

4241.   On March 13, 2006, Jason Eric Bell was serving in the U.S. military when he was attacked by small arms.

4242.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Bell.

4243.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4244.   As a result of the attack and the injuries suffered, Jason Eric Bell is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 360.   THE MARCH 8, 2006 ATTACK – KHALIDIYAH

### A.   PLAINTIFFS THE JOHN DAVID FRY FAMILY

4245.   On March 8, 2006, John David Fry was a U.S. citizen, domiciled in North Carolina, and serving in the U.S. military when he was attacked by an IED, causing his death.

4246.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Fry.

4247.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

4248.   Plaintiff Malia Fry is a citizen of the United States and domiciled in the State of Texas. She is the wife of John David Fry.

4249.   Plaintiff Kathryn Fry is a citizen of the United States and domiciled in the State of Texas. She is the daughter of John David Fry and Malia Fry.

4250.   Plaintiff Gideon Fry is a citizen of the United States and domiciled in the State of Texas. He is the Son of John David Fry and Malia Fry.

645

4251.   Plaintiff Charles Fry is a citizen of the United States and domiciled in the State of Texas. He is the father of John David Fry.

4252.   Plaintiff Melissa Inman is a citizen of the United States and domiciled in the State of Texas. She is the sister of John David Fry.

4253.   Plaintiff C.L.F., a minor child, represented by his legal guardian Malia Fry, is a citizen of the United States and domiciled in the State of Texas. He is the son of John David Fry and Malia Fry.

4254.   Plaintiff Laura Pricer is a citizen of the United States and domiciles in the State of Texas. She is the sister of John David Fry.

4255.   Plaintiff Malia Fry brings an action individually, and on behalf of the Estate of John David Fry, and all heirs thereof, as its legal representative.

4256.   As a result of the attack, and the injuries suffered by and the death of John David Fry, Plaintiffs, Malia Fry, C.L.F., a minor child, Kathryn Fry, Gideon Fry, Charles Fry, Melissa Inman and Laura Pricer, have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of John David Fry.

## 361.   THE MARCH 7, 2006 ATTACK – MOSUL

### A.   PLAINTIFFS THE RICKY SALAS, JR. FAMILY

4257.   On March 7, 2006, Ricky Salas, Jr. was a U.S. citizen, domiciled in New Mexico, and serving in the U.S. military when he was attacked by an IED, causing his death.

4258.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Salas.

4259.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack,

as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

4260.   Plaintiff April Baca-Salas is a citizen of the United States domiciled in New Mexico and is the widow of Ricky Salas, Jr.

4261.   Plaintiff Ja.R.S. a minor child, represented by his legal guardian April Baca-Salas, is a citizen of the United States domiciled in New Mexico and is the son of Ricky Salas, Jr.

4262.   Plaintiff Jo.R.S., a minor child, represented by her legal guardian April Baca-Salas, is a citizen of the United States domiciled in New Mexico and is the daughter of Ricky Salas, Jr.

4263.   Plaintiff Brenda Sue Robertson, is a citizen of the United States domiciled in Texas and is the mother of Ricky Salas, Jr.

4264.   Plaintiff Melissa Gutierrez, is a citizen of the United States domiciled in Texas and is the sister of Ricky Salas, Jr.

4265.   Plaintiff Randy Salas, is a citizen of the United States domiciled in Texas and is the brother of Ricky Salas, Jr.

4266.   Plaintiff Daniel Salas is a citizen of the United States domiciled in Texas and is the brother of Ricky Salas, Jr.

4267.   Plaintiff Roger Salas is a citizen of the United States domiciled in Texas and is the brother of Ricky Salas, Jr.

4268.   Plaintiff April Baca-Salas, brings an action individually and on behalf of the Estate of Ricky Salas, Jr., and all heirs thereof, as its legal representative.

4269.   As a result of the attack, and the injuries suffered by and the death of Ricky Salas, Jr., Plaintiffs April Baca-Salas, Ja.R.S., a minor child, Jo.R.S., a minor child, Brenda Sue

Robertson, Melissa Gutierrez, Randy Salas, Daniel Salas and Roger Salas have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Ricky Salas, Jr.

### 362. THE MARCH 4, 2006 ATTACK – HAQLANIYAH

#### A. PLAINTIFF MATTHEW GRANT HAVILAND

4270. Plaintiff Matthew Grant Haviland is a U.S. citizen domiciled in California.

4271. On March 4, 2006, Matthew Grant Haviland was serving in the U.S. military when he was attacked by an IED.

4272. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Haviland.

4273. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4274. As a result of the attack and the injuries suffered, Matthew Grant Haviland is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 363. THE MARCH 4, 2006 ATTACK – HAQLANIYAH

#### A. PLAINTIFFS THE JORGE ALEXANDER ROMAN FAMILY

4275. Plaintiff Jorge Alexander Roman is a U.S. citizen domiciled in Texas.

4276. On March 4, 2006, Jorge Alexander Roman was serving in the U.S. military when he was attacked by an IED.

4277. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or

other material support used to commit the attack, which injured Mr. Roman.

4278.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4279.   As a result of the attack and the injuries suffered, Jorge Alexander Roman is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4280.   Plaintiff Diana Canales is a citizen of the United States domiciled in Texas and is the mother of Jorge Alexander Roman.

4281.   Plaintiff Gabriel Martinez is a citizen of the United States domiciled in Texas and is the brother of Jorge Alexander Roman.

4282.   Plaintiff Rocky Martinez is a citizen of the United States domiciled in Colorado and is the brother of Jorge Alexander Roman.

4283.   As a result of the attack and the injuries suffered by Jorge Alexander Roman, Plaintiffs Diana Canales, Gabriel Martinez and Rocky Martinez are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 364.   THE MARCH 4, 2006 ATTACK – HAQLANIYAH

#### A.   PLAINTIFFS THE NICHOLAS HAMILTON KYLE FAMILY

4284.   Plaintiff Nicholas Hamilton Kyle is a U.S. citizen domiciled in California.

4285.   On March 4, 2006, Nicholas Hamilton Kyle was serving in the U.S. military when he was attacked by an IED.

4286.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Kyle.

4287.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4288.   As a result of the attack and the injuries suffered, Nicholas Hamilton Kyle is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4289.   Plaintiff Michael Raymond Kyle is a citizen of the United States domiciled in Missouri and is the father of Nicholas Hamilton Kyle.

4290.   As a result of the attack and the injuries suffered by Nicholas Hamilton Kyle, Plaintiff Michael Raymond Kyle is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 365.   THE MARCH 4, 2006 ATTACK – HAQLANIYAH

#### A.   PLAINTIFFS THE GERARDO CONTRERAS FAMILY

4291.   Plaintiff Gerardo Contreras is a U.S. citizen domiciled in California.

4292.   On March 4, 2006, Gerardo Contreras was serving in the U.S. military when he was attacked by an IED.

4293.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Contreras.

4294.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack,

the munition used, as well as the tactics, techniques, and procedures utilized.

4295.   As a result of the attack and the injuries suffered, Gerardo Contreras is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4296.   Plaintiff Jose Luis Contreras, Sr. is a citizen of the United States domiciled in California and is the father of Gerardo Contreras.

4297.   Plaintiff Elizabeth Contreras is a citizen of the United States domiciled in California and is the sister of Gerardo Contreras.

4298.   Plaintiff Nelly Viveros is a citizen of the United States domiciled in California and is the sister of Gerardo Contreras.

4299.   Plaintiff Jose Luis Contreras, Jr. is a citizen of the United States domiciled in California and is the brother of Gerardo Contreras.

4300.   As a result of the attack and the injuries suffered by Gerardo Contreras, Plaintiffs Jose Luis Contreras, Sr., Elizabeth Contreras, Nelly Viveros, and Jose Luis Contreras, Jr., are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 366.   THE MARCH 4, 2006 ATTACK – HAQLANIYAH

### A.   PLAINTIFFS THE COLIN ALFRED BENJAMIN ANDERSON FAMILY

4301.   Plaintiff Colin Alfred Benjamin Anderson is a U.S. citizen domiciled in Texas.

4302.   On March 4, 2006, Colin Alfred Benjamin Anderson was serving in the U.S. military when he was attacked by an IED.

651

4303. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Anderson.

4304. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4305. As a result of the attack and the injuries suffered, Colin Alfred Benjamin Anderson is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4306. Plaintiff Elizabeth Anderson is a citizen of the United States domiciled in Texas and is the spouse of Colin Alfred Benjamin Anderson.

4307. Plaintiff Karl Anderson is a citizen of the United States domiciled in California and is the father of Colin Alfred Benjamin Anderson.

4308. Plaintiff Jane Anderson is a citizen of the United States domiciled in California and is the mother of Colin Alfred Benjamin Anderson.

4309. Plaintiff Kristi Bao is a citizen of the United States domiciled in Hawaii and is the sister of Colin Alfred Benjamin Anderson.

4310. Plaintiff Heidi Martinez is a citizen of the United States domiciled in Kansas and is the sister of Colin Alfred Benjamin Anderson.

4311. Plaintiff Laurie Anderson is a citizen of the United States domiciled in California and is the sister of Colin Alfred Benjamin Anderson.

4312. As a result of the attack and the injuries suffered by Colin Alfred Benjamin Anderson, Plaintiffs Elizabeth Anderson, Karl Anderson, Jane Anderson, Kristi Bao, Heidi

Martinez and Laurie Anderson, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 367.   THE FEBRUARY 28, 2006 ATTACK – BAGHDAD

####    A.    PLAINTIFF JEREMY MICHAEL GIRDLER

4313.   Plaintiff Jeremy Michael Girdler is a U.S. citizen domiciled in Louisiana.

4314.   On February 28, 2006, Jeremy Michael Girdler was serving in the U.S. military when he was attacked by an EFP.

4315.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Girdler.

4316.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4317.   As a result of the attack and the injuries suffered, Jeremy Michael Girdler is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 368.   THE FEBRUARY 27, 2006 ATTACK – SAYDIYA, WEST RAHEED

####    A.    PLAINTIFF JOHN ALLEN GENTRY, JR.

4318.   Plaintiff John Allen Gentry, Jr. is a U.S. citizen domiciled in Virginia.

4319.   On February 27, 2006, John Allen Gentry, Jr. was serving in the U.S. military when he was attacked by an IED.

4320.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Gentry.

653

4321.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4322.   As a result of the attack and the injuries suffered, John Allen Gentry, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 369.   THE FEBRUARY 25, 2006 ATTACK – RAMADI

#### A.   PLAINTIFF DANIEL MICHAEL JACOBS

4323.   Plaintiff Daniel Michael Jacobs is a U.S. citizen domiciled in California.

4324.   On February 25, 2006, Daniel Michael Jacobs was serving in the U.S. military when he was attacked by an IED and Sniper Fire.

4325.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Jacobs.

4326.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4327.   As a result of the attack and the injuries suffered, Daniel Michael Jacobs is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 370.   THE FEBRUARY 24, 2006 ATTACK – MOSUL

#### A.   PLAINTIFF ROBERT LEROY GERTSCH, JR.

4328.   Plaintiff Robert Leroy Gertsch, Jr. is a U.S. citizen domiciled in Tennessee.

654

4329.  On February 24, 2006, Robert Leroy Gertsch, Jr. was serving in the U.S. military when he was attacked by IEDs.

4330.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Gertsch.

4331.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4332.  As a result of the attack and the injuries suffered, Robert Leroy Gertsch, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 371.   THE FEBRUARY 23, 2006 ATTACK – BAGHDAD

#### A.   PLAINTIFF RONALD ANDRE SAMS, SR.

4333.  Plaintiff Ronald Andre Sams, Sr., is a U.S. citizen domiciled in Texas.

4334.  On February 23, 2006, Ronald Andre Sams, Sr., was serving in the U.S. military when he was attacked by a rocket.

4335.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Sams.

4336.  The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4337.  As a result of the attack and the injuries suffered, Ronald Andre Sams, Sr., is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including

medical expenses, lost income, and loss of earning capacity.

### 372.   THE FEBRUARY 18, 2006 ATTACK – KIRKUK

#### A.   PLAINTIFF CHRISTOPHER DAVID CONDREY

4338.   Plaintiff Christopher David Condrey is a U.S. citizen domiciled in Texas.

4339.   On February 18, 2006, Christopher David Condrey was serving in the U.S. military when he was attacked by an IED.

4340.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Condrey.

4341.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4342.   As a result of the attack and the injuries suffered, Christopher David Condrey is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 373.   THE FEBRUARY 14, 2006 ATTACK – BAGHDAD

#### A.   PLAINTIFFS THE RICHARD WAYNE TUGWELL JR. FAMILY

4343.   Plaintiff Richard Wayne Tugwell Jr. is a U.S. citizen domiciled in Virginia.

4344.   On February 14, 2006, Richard Wayne Tugwell Jr. was serving in the U.S. military when he was attacked by a VBIED.

4345.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Tugwell.

4346.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack,

as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4347.   As a result of the attack and the injuries suffered, Richard Wayne Tugwell Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4348.   Plaintiff Amie N. Carwile-Tugwell is a citizen of the United States domiciled in Virginia and is the spouse of Richard Wayne Tugwell Jr.

4349.   Plaintiff C.C.T., a minor child, represented by her legal guardian Richard Wayne Tugwell Jr., is a citizen of the United States domiciled in Virginia and is the daughter of Richard Wayne Tugwell Jr.

4350.   Plaintiff R.W.T., a minor child, represented by his legal guardian Richard Wayne Tugwell Jr., is a citizen of the United States domiciled in Virginia and is the son of Richard Wayne Tugwell Jr.

4351.   As a result of the attack and the injuries suffered by Richard Wayne Tugwell Jr., Plaintiffs Amie N. Carwile-Tugwell, C.C.T, a minor child, and R.W.T, a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 374.   THE FEBRUARY 10, 2006 ATTACK – AD-DAWR

### A.   PLAINTIFFS THE RICKY AARON BAXTER FAMILY

4352.   Plaintiff Ricky Aaron Baxter is a U.S. citizen domiciled in Florida.

4353.   On February 10, 2006, Ricky Aaron Baxter was serving in the U.S. military when he was attacked by IED.

4354.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Baxter.

4355.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4356.   As a result of the attack and the injuries suffered, Ricky Aaron Baxter is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4357.   Plaintiff Elba Baxter is a citizen of the United States domiciled in Florida and is the spouse Ricky Aaron Baxter.

4358.   As a result of the attack and the injuries suffered by Ricky Aaron Baxter, Plaintiff Elba Baxter, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 375.   THE FEBRUARY 7, 2006 ATTACK – FALLUJAH

#### A.   PLAINTIFFS THE ABELARDO ROSAS FAMILY

4359.   Plaintiff Abelardo Rosas is a U.S. citizen domiciled in Texas.

4360.   On February 7, 2006, Abelardo Rosas was serving in the U.S. military when he was attacked by an IED and small arms.

4361.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Rosas.

4362.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack,

the munition used, as well as the tactics, techniques, and procedures utilized.

4363.   As a result of the attack and the injuries suffered, Abelardo Rosas is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4364.   Plaintiff Juan Alberto Rosas is a citizen of the United States domiciled in Texas and is the brother of Abelardo Rosas.

4365.   Plaintiff Guadalupe Rosas is a citizen of the United States domiciled in Texas and is the brother of Abelardo Rosas.

4366.   As a result of the attack and the injuries suffered by Abelardo Rosas, Plaintiffs Juan Alberto Rosas and Guadalupe Rosas are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 376.   THE FEBRUARY 6, 2006 ATTACK – ALBAGHDADI

### A.   PLAINTIFF NICHOLAS MICHAEL LATONA

4367.   Plaintiff Nicholas Michael Latona is a U.S. citizen domiciled in California.

4368.   On February 6, 2006, Nicholas Michael Latona was serving in the U.S. military when he was attacked by an IED.

4369.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Latona.

4370.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4371.   As a result of the attack and the injuries suffered, Nicholas Michael Latona is

659

entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 377. THE FEBRUARY 6, 2006 ATTACK – RAMADI

#### A. PLAINTIFF NATHAN RAINES

4372. Plaintiff Nathan Raines is a U.S. citizen domiciled in Minnesota.

4373. On February 6, 2006, Nathan Raines was serving in the U.S. military when he was attacked by IEDs.

4374. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Raines.

4375. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4376. As a result of the attack and the injuries suffered, Nathan Raines is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 378. THE FEBRUARY 6, 2006 ATTACK – HIT

#### A. PLAINTIFF JIMMY OWEKA OCHAN

4377. Plaintiff Jimmy Oweka Ochan is a U.S. citizen domiciled in Virginia.

4378. On February 6, 2006, Jimmy Oweka Ochan was serving in the U.S. military when he was attacked by an IED.

4379. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Ochan.

660

4380.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4381.   As a result of the attack and the injuries suffered, Jimmy Oweka Ochan is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 379.   THE FEBRUARY 6, 2006 ATTACK – ALBAGHDADI

### A.   PLAINTIFFS THE BRANDON SCOTT SCHUCK FAMILY

4382.   On February 6, 2006, Brandon Scott Schuck was a U.S. citizen, domiciled in Arizona, and serving in the U.S. military when he was attacked by an IED, causing his death.

4383.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Schuck.

4384.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

4385.   Plaintiff Megan Beth Cash is a citizen of the United States domiciled in Kentucky and is the spouse of Brandon Scott Schuck.

4386.   Plaintiff G.S.S., a minor child, represented by his legal guardian Megan Beth Cash, is a citizen of the United States domiciled in Kentucky and is the son of Brandon Scott Schuck.

4387.   Plaintiff Megan Beth Cash, brings an action individually and on behalf of the Estate of Brandon Scott Schuck, and all heirs thereof, as its legal representative.

4388.   As a result of the attack, and the injuries suffered by and the death of Brandon

Scott Schuck, Plaintiffs Megan Beth Cash and G.S.S., a minor child, have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Brandon Scott Schuck.

### 380.   THE FEBRUARY 4, 2006 ATTACK – RAMADI

#### A.   PLAINTIFF NATHAN RAINES

4389.   Plaintiff Nathan Raines is a U.S. citizen domiciled in Minnesota.

4390.   On February 4, 2006, Nathan Raines was serving in the U.S. military when he was attacked by an IED.

4391.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Raines.

4392.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4393.   As a result of the attack and the injuries suffered, Nathan Raines is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 381.   THE JANUARY 23, 2006 ATTACK – BABIL PROVINCE

#### A.   PLAINTIFFS THE MATTHEW DAVID HUNTER FAMILY

4394.   On January 23, 2006, Matthew David Hunter was a U.S. citizen, domiciled in Florida, and serving in the U.S. military when he was attacked by an IED, causing his death.

4395.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Hunter.

4396.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

4397.   Plaintiff Wendy Kay Hunter is a citizen of the United States domiciled in Florida and is the spouse of Matthew David Hunter.

4398.   Plaintiff Meredith Hunter-Stubbs is a citizen of the United States domiciled in West Virginia and is the daughter of Matthew David Hunter.

4399.   Plaintiff Wendy Kay Hunter, brings an action individually and on behalf of the Estate of Matthew David Hunter, and all heirs thereof, as its legal representative.

4400.   As a result of the attack, and the injuries suffered by and the death of Matthew David Hunter, Plaintiffs Wendy Kay Hunter and Meredith Hunter-Stubbs suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Matthew David Hunter.

## 382.   THE JANUARY 17, 2006 ATTACK – RAMADI

### A.   PLAINTIFFS THE JAMES NELSON SPARKS, III FAMILY

4401.   Plaintiff James Nelson Sparks, III is a U.S. citizen domiciled in North Carolina.

4402.   On January 17, 2006, James Nelson Sparks, III was serving in the U.S. military when he was attacked by IEDs.

4403.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Sparks.

4404.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4405.   As a result of the attack and the injuries suffered, James Nelson Sparks, III is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4406.   Plaintiff Carla White Sparks is a citizen of the United States domiciled in North Carolina and is the spouse of James Nelson Sparks, III.

4407.   Plaintiff Eve Marie Sparks is a citizen of the United States domiciled in North Carolina and is the daughter of James Nelson Sparks, III.

4408.   Plaintiff James Nelson Sparks, IV is a citizen of the United States domiciled in North Carolina and is the son of James Nelson Sparks, III.

4409.   Plaintiff Valerie Caroline Earman is a citizen of the United States domiciled in North Carolina and is the daughter of James Nelson Sparks, III.

4410.   As a result of the attack and the injuries suffered by James Nelson Sparks, III, Plaintiffs Carla White Sparks, Eve Marie Sparks, James Nelson Sparks, IV, and Valerie Caroline Earman are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 383.   THE JANUARY 17, 2006 ATTACK – TAL AFAR

#### A.   PLAINTIFFS THE GARY JAROMIR RUC FAMILY

4411.   Plaintiff Gary Jaromir Ruc is a U.S. citizen domiciled in Maryland.

4412.   On January 17, 2006, Gary Jaromir Ruc was serving in the U.S. military when he was attacked by an IED.

4413.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Ruc.

4414.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4415.   As a result of the attack and the injuries suffered, Gary Jaromir Ruc is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4416.   Plaintiff Xenie Hladik is a citizen of the United States domiciled in Maryland and is the mother of Gary Jaromir Ruc.

4417.   As a result of the attack and the injuries suffered by Gary Jaromir Ruc, Plaintiff Xenie Hladik is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 384.   THE JANUARY 16, 2006 ATTACK – BAGHDAD

#### A.   PLAINTIFFS THE JOSEPH PETER BROWN FAMILY

4418.   Plaintiff Joseph Peter Brown is a U.S. citizen domiciled in Florida.

4419.   On January 16, 2006, Joseph Peter Brown was serving in the U.S. military when he was attacked by mortars.

4420.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Brown.

4421.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4422.   As a result of the attack and the injuries suffered, Joseph Peter Brown is entitled

to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4423. Plaintiff A.E.B., a minor child, represented by his legal guardian Joseph Peter Brown, is a citizen of the United States domiciled in Florida and is the son of Joseph Peter Brown.

4424. Plaintiff J.M.B., a minor child, represented by his legal guardian Joseph Peter Brown, is a citizen of the United States domiciled in Florida and is the son of Joseph Peter Brown.

4425. As a result of the attack and the injuries suffered by Joseph Peter Brown, Plaintiffs A.E.B., a minor child and J.M.B., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 385. THE JANUARY 12, 2006 ATTACK – RAMADI

#### A. PLAINTIFFS THE RALPH EDWARD SWARTZ, II FAMILY

4426. Plaintiff Ralph Edward Swartz, II is a U.S. citizen domiciled in Pennsylvania.

4427. On January 12, 2006, Ralph Edward Swartz, II was serving in the U.S. military when he was attacked by an IED and small arms fire.

4428. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Swartz.

4429. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

666

4430. As a result of the attack and the injuries suffered, Ralph Edward Swartz, II is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4431. Plaintiff Leatha M. Swartz is a citizen of the United States domiciled in Pennsylvania and is the mother of Ralph Edward Swartz, II.

4432. Plaintiff Ralph E. Swartz, Sr. is a citizen of the United States domiciled in Pennsylvania and is the father of Ralph Edward Swartz, II.

4433. Plaintiff Brittany M. Swartz is a citizen of the United States domiciled in Pennsylvania and is the daughter of Ralph Edward Swartz, II.

4434. Plaintiff Lydia A. Hill is a citizen of the United States domiciled in Pennsylvania and is the sister of Ralph Edward Swartz, II.

4435. Plaintiff Robert A. Swartz is a citizen of the United States domiciled in Pennsylvania and is the brother of Ralph Edward Swartz, II.

4436. Plaintiff V.M.S., a minor child, represented by her legal guardian Ralph Edward Swartz, II, is a citizen of the United States domiciled in Pennsylvania and is the daughter of Ralph Edward Swartz, II.

4437. As a result of the attack and the injuries suffered by Ralph Edward Swartz, II, Plaintiffs Leatha M. Swartz, Ralph E. Swartz, Sr., Brittany M. Swartz, Lydia A. Hill, Robert A. Swartz and V.M.S., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 386. THE JANUARY 4, 2006 ATTACK – NORTH OF MAHMUDIYAH

#### A. PLAINTIFFS THE SERGIO DANIEL LOPEZ FAMILY

4438. Plaintiff Sergio Daniel Lopez is a U.S. citizen domiciled in Illinois.

4439. On January 4, 2006, Sergio Daniel Lopez was serving in the U.S. military when he was attacked by an IED.

4440. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Lopez.

4441. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4442. As a result of the attack and the injuries suffered, Sergio Daniel Lopez is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4443. Plaintiff S.C.L., a minor child, represented by her legal guardian Sergio Daniel Lopez, is a citizen of the United States domiciled in Illinois and is the daughter of Sergio Daniel Lopez.

4444. As a result of the attack and the injuries suffered by Sergio Daniel Lopez, Plaintiff S.C.L., a minor child, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 387. THE DECEMBER 30, 2005 ATTACK – BAGHDAD

#### A. PLAINTIFF MARCEL KIM D'ENTREMONT

4445. Plaintiff Marcel Kim D'Entremont is a U.S. citizen domiciled in California.

4446.  On December 30, 2005, Marcel Kim D'Entremont was serving in the U.S. military when he was attacked by an IED.

4447.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. D'Entremont

4448.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4449.  As a result of the attack and the injuries suffered, Marcel Kim D'Entremont is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 388.   THE DECEMBER 29, 2005 ATTACK – HIT

####    A.    PLAINTIFF ANDRE LEONARD MAISON

4450.  Plaintiff Andre Leonard Maison is a U.S. citizen domiciled in Texas.

4451.  On December 29, 2005, Andre Leonard Maison was serving in the U.S. military when he was attacked by an IED.

4452.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Maison.

4453.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4454.  As a result of the attack and the injuries suffered, Andre Leonard Maison is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including

669

medical expenses, lost income, and loss of earning capacity.

### 389.   THE DECEMBER 26, 2005 ATTACK – BAQUBAH

#### A.   PLAINTIFFS THE SANDRA CLAMON FAMILY

4455.   Plaintiff Sandra Clamon is a U.S. citizen domiciled in Texas.

4456.   On or about December 26, 2005, Sandra Clamon was serving in the U.S. military when she was attacked by a mortar.

4457.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Ms. Clamon.

4458.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4459.   As a result of the attack and the injuries suffered, Sandra Clamon is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4460.   Plaintiff Jelissa Talamante is a citizen of the United States domiciled in Washington and is the daughter of Sandra Clamon.

4461.   Plaintiff J.J.C., a minor child, represented by his legal guardian Sandra Clamon, is a citizen of the United States domiciled in Texas and is the son of Sandra Clamon.

4462.   As a result of the attack and the injuries suffered by Sandra Clamon, Plaintiffs Jelissa Talamante and J.J.C., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 390.  THE DECEMBER 24, 2005 ATTACK – MOSUL

#### A.  PLAINTIFF TOMMY LEE FOWLER

4463.  Plaintiff Tommy Lee Fowler is a U.S. citizen domiciled in Florida.

4464.  On December 24, 2005, Tommy Lee Fowler was serving in the U.S. military when he was attacked by an IED.

4465.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Fowler.

4466.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4467.  As a result of the attack and the injuries suffered, Tommy Lee Fowler is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 391.  THE DECEMBER 21, 2005 ATTACK – BAGHDAD

#### A.  PLAINTIFF JEREMY MICHAEL GIRDLER

4468.  Plaintiff Jeremy Michael Girdler is a U.S. citizen domiciled in Louisiana.

4469.  On December 21, 2005, Jeremy Michael Girdler was serving in the U.S. military when he was attacked by a IED.

4470.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Girdler.

4471.  The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

671

4472.   As a result of the attack and the injuries suffered, Jeremy Michael Girdler is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 392.   THE DECEMBER 16, 2005 ATTACK – BALAD

#### A.   PLAINTIFF JAMIE LEE WHITAKER

4473.   Plaintiff Jamie Lee Whitaker is a U.S. citizen domiciled in Florida.

4474.   On December 16, 2005, Jamie Lee Whitaker was serving in the U.S. military when he was attacked by an IED.

4475.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Whitaker.

4476.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4477.   As a result of the attack and the injuries suffered, Jamie Lee Whitaker is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 393.   THE DECEMBER 6, 2005 ATTACK – BAGHDAD

#### A.   PLAINTIFF DANIEL WILLIAMS

4478.   Plaintiff Daniel Williams is a U.S. citizen domiciled in Georgia.

4479.   On December 6, 2005, Daniel Williams was serving in the U.S. military when he was attacked by Mortar.

4480.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or

672

other material support used to commit the attack, which injured Mr. Williams.

4481.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4482.   As a result of the attack and the injuries suffered, Daniel Williams is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 394.   THE DECEMBER 5, 2005 ATTACK – ISKANDARIYA

#### A.   PLAINTIFF CHRISTOPHER TODD HASS

4483.   Plaintiff Christopher Todd Hass is a U.S. citizen domiciled in Mississippi.

4484.   On December 5, 2005, Christopher Todd Hass was serving in the U.S. military when he was attacked by an IED.

4485.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Hass.

4486.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4487.   As a result of the attack and the injuries suffered, Christopher Todd Hass is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 395.    THE NOVEMBER 28, 2005 ATTACK – HAQLANIYAH

### A.    PLAINTIFFS THE GERARDO CONTRERAS FAMILY

4488.   Plaintiff Gerardo Contreras is a U.S. citizen domiciled in California.

4489.   On November 28, 2005, Gerardo Contreras was serving in the U.S. military when he was attacked by a land mine.

4490.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Contreras.

4491.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4492.   As a result of the attack and the injuries suffered, Gerardo Contreras is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4493.   Plaintiff Jose Luis Contreras, Sr. is a citizen of the United States domiciled in California and is the father of Gerardo Contreras.

4494.   Plaintiff Nelly Viveros is a citizen of the United States domiciled in California and is the sister of Gerardo Contreras.

4495.   Plaintiff Jose Luis Contreras, Jr. is a citizen of the United States domiciled in California and is the brother of Gerardo Contreras.

4496.   Elizabeth Contreras is a citizen of United States domiciled in California and is the sister of Gerardo Contreras.

4497.   As a result of the attack and the injuries suffered by Gerardo Contreras, Plaintiffs Jose Luis Contreras, Sr., Nelly Viveros, Elizabeth Contreras, and Jose Luis Contreras, Jr., are

entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 396.   THE NOVEMBER 28, 2005 ATTACK – HADITHA

#### A.   PLAINTIFFS THE TODD EDWARD WINN FAMILY

4498.   Plaintiff Todd Edward Winn is a U.S. citizen domiciled in Utah.

4499.   On November 28, 2005, Todd Edward Winn was serving in the U.S. military when he was attacked by an IED.

4500.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Winn.

4501.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4502.   As a result of the attack and the injuries suffered, Todd Edward Winn is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4503.   Plaintiff Allison Lorraine Wharton is a citizen of the United States domiciled in Kansas and is the sister of Todd Edward Winn.

4504.   Plaintiff Linda Lorraine Winn is a citizen of the United States domiciled in the State of Kansas. She is the mother of Todd Edward Winn.

4505.   As a result of the attack and the injuries suffered by Todd Edward Winn, Plaintiffs Allison Lorraine Wharton and Linda Lorraine Winn are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and

suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 397.  THE NOVEMBER 25, 2005 ATTACK – HIT

#### A.  PLAINTIFF JEFFERY HARMON

4506.  Plaintiff Jeffery Harmon is a U.S. citizen domiciled in Mississippi.

4507.  On November 25, 2005, Jeffery Harmon was serving in the U.S. military when he was attacked by an IED.

4508.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Harmon.

4509.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4510.  As a result of the attack and the injuries suffered, Jeffery Harmon is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 398.  THE NOVEMBER 24, 2005 ATTACK – MOSUL

#### A.  PLAINTIFF TOMMY LEE FOWLER

4511.  Plaintiff Tommy Lee Fowler is a U.S. citizen domiciled in Florida.

4512.  On or about November 24, 2005, Tommy Lee Fowler was serving in the U.S. military when he was attacked by an IED.

4513.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Fowler.

4514.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack,

676

as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4515.   As a result of the attack and the injuries suffered, Tommy Lee Fowler is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 399.   THE NOVEMBER 21, 2005 ATTACK – HABBANIYAH

### A.   PLAINTIFFS THE DUANE JOSEPH DREASKY FAMILY

4516.   On November 21, 2005, Duane Joseph Dreasky was a U.S. citizen, domiciled in Michigan, and serving in the U.S. military when he was attacked by an IED, causing his death.

4517.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Dreasky.

4518.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

4519.   Plaintiff Cheryl Lynn Dreasky is a citizen of the United States domiciled in Michigan and is the mother of Duane Joseph Dreasky.

4520.   Plaintiff Roger James Dreasky is a citizen of the United States domiciled in Michigan and is the father of Duane Joseph Dreasky.

4521.   Plaintiff Dawn Marie Harvey is a citizen of the United States domiciled in Michigan and is the sister of Duane Joseph Dreasky.

4522.   Plaintiff Cheryl Lynn Dreasky, brings an action individually and on behalf of the Estate of Duane Joseph Dreasky, and all heirs thereof, as its anticipated legal representative.

4523.   As a result of the attack, and the injuries suffered by and the death of Duane

677

Joseph Dreasky, Plaintiffs Cheryl Lynn Dreasky, Roger James Dreasky and Dawn Marie Harvey have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Duane Joseph Dreasky.

**400.   THE NOVEMBER 20, 2005 ATTACK – HADITHA**

      **A.   PLAINTIFFS THE JOHN WESLEY URQUHART FAMILY**

4524.   Plaintiff John Wesley Urquhart is a U.S. citizen domiciled in Texas.

4525.   On November 20, 2005, John Wesley Urquhart was serving in the U.S. military when he was attacked by an IED.

4526.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Urquhart.

4527.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4528.   As a result of the attack and the injuries suffered, John Wesley Urquhart is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4529.   Plaintiff Catherine Elizabeth Urquhart is a citizen of the United States domiciled in Texas and is the mother of John Wesley Urquhart.

4530.   Plaintiff Garland Wesley Urquhart is a citizen of the United States domiciled in Texas and is the father of John Wesley Urquhart.

4531.   Plaintiff Christina Wilkerson is a citizen of the United States domiciled in Texas

and is the sister of John Wesley Urquhart.

4532.   Plaintiff Caroline Urquhart is a citizen of the United States domiciled in Texas and is the sister of John Wesley Urquhart.

4533.   Plaintiff Mary Elizabeth Urquhart is a citizen of the United States domiciled in Texas and is the sister of John Wesley Urquhart.

4534.   Plaintiff Virginia Urquhart is a citizen of the United States domiciled in Texas and is the sister of John Wesley Urquhart.

4535.   As a result of the attack and the injuries suffered by John Wesley Urquhart, Plaintiffs Catherine Elizabeth Urquhart, Garland Wesley Urquhart, Christina Wilkerson, Caroline Urquhart, Mary Elizabeth Urquhart, and Virginia Urquhart are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 401.   THE NOVEMBER 19, 2005 ATTACK – BAIJI

### A.   PLAINTIFFS THE WALLACE CASEY NELSON III FAMILY

4536.   Plaintiff Wallace Casey Nelson III is a U.S. citizen domiciled in Tennessee.

4537.   On November 19, 2005, Wallace Casey Nelson III was serving in the U.S. military when he was attacked by an IED.

4538.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Nelson.

4539.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4540.   As a result of the attack and the injuries suffered, Wallace Casey Nelson III is

entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4541.   Plaintiff Raymond H. James is a citizen of the United States domiciled in Tennessee and is the brother of Wallace Casey Nelson III.

4542.   Plaintiff Hannah Rose Nelson is a citizen of the United States domiciled in Wisconsin and is the daughter of Wallace Casey Nelson III.

4543.   Plaintiff D.J.N., a minor child, represented by his legal guardian Wallace Casey Nelson III, is a citizen of the United States domiciled in Tennessee and is the son of Wallace Casey Nelson III.

4544.   As a result of the attack and the injuries suffered by Wallace Casey Nelson III, Plaintiffs Raymond H. James, Hannah Rose Nelson, and D.J.N., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 402.   THE NOVEMBER 9, 2005 ATTACK – FALLUJAH

### A.   PLAINTIFF MARIO ALBERTO MENA

4545.   Plaintiff Mario Alberto Mena is a U.S. citizen domiciled in Illinois.

4546.   On November 9, 2005, Mario Alberto Mena was serving in the U.S. military when he was attacked by RPGs, rockets and machine gun fire.

4547.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Mena.

4548.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack,

the munition used, as well as the tactics, techniques, and procedures utilized.

4549.   As a result of the attack and the injuries suffered, Mario Alberto Mena is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 403.   THE NOVEMBER 8, 2005 ATTACK – HAQLANIYAH

#### A.   PLAINTIFFS THE DOMINIC ANGEL FRANCO FAMILY

4550.   Plaintiff Dominic Angel Franco is a U.S. citizen domiciled in California.

4551.   On November 8, 2005, Dominic Angel Franco was serving in the U.S. military when he was attacked by an IED.

4552.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Franco.

4553.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4554.   As a result of the attack and the injuries suffered, Dominic Angel Franco is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4555.   Plaintiff Yicenia Felo-Franco is a citizen of the United States domiciled in California and is the daughter of Dominic Angel Franco.

4556.   Plaintiff Valerie Peterson is a citizen of the United States domiciled in Oregon and is the mother of Dominic Angel Franco.

4557.   Plaintiff Steve Peterson is a citizen of the United States domiciled in Oregon and

is the father of Dominic Angel Franco.

4558.   Plaintiff X.F., a minor child, represented by his legal guardian Dominic Angel Franco, is a citizen of the United States domiciled in California and is the son of Dominic Angel Franco.

4559.   As a result of the attack and the injuries suffered by Dominic Angel Franco, Plaintiffs Yicenia Felo-Franco, Valerie Peterson, Steve Peterson and X.F., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 404.   THE NOVEMBER 8, 2005 ATTACK – HAQLANIYAH

### A.   PLAINTIFFS THE JOE SANCHEZ, JR. FAMILY

4560.   Plaintiff Joe Sanchez, Jr. is a U.S. citizen domiciled in Texas.

4561.   On November 8, 2005, Joe Sanchez, Jr. was serving in the U.S. military when he was attacked by an IED.

4562.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Sanchez.

4563.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4564.   As a result of the attack and the injuries suffered, Joe Sanchez, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4565.   Plaintiff Cindy Jo Sanchez is a citizen of the United States domiciled in Texas and

is the sister of Joe Sanchez, Jr.

4566.   Plaintiff Sandy Jo Molina is a citizen of the United States domiciled in Texas and is the sister of Joe Sanchez, Jr.

4567.   As a result of the attack and the injuries suffered by Joe Sanchez, Jr., Plaintiffs Cindy Jo Sanchez, and Sandy Jo Molina are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 405.   THE NOVEMBER 7, 2005 ATTACK – HADITHA

#### A.   PLAINTIFFS THE TODD EDWARD WINN FAMILY

4568.   Plaintiff Todd Edward Winn is a U.S. citizen domiciled in Utah.

4569.   On November 7, 2005, Todd Edward Winn was serving in the U.S. military when he was attacked by an IED.

4570.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Winn

4571.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4572.   As a result of the attack and the injuries suffered, Todd Edward Winn is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4573.   Plaintiff Allison Lorraine Wharton is a citizen of the United States and domiciled in the State of Kansas. She is the sister of Todd Edward Winn.

4574.   Plaintiff Linda Lorraine Winn is a citizen of the United States and domiciled in

683

the State of Kansas. She is the mother of Todd Edward Winn.

4575.   As a result of the attack and the injuries suffered by Todd Edward Winn, Plaintiffs Allison Lorraine Wharton, and Linda Lorraine Winn, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 406.   THE NOVEMBER 7, 2005 ATTACK – HADITHA

### A.   PLAINTIFFS THE JAMES MICHAEL GEIGER, III FAMILY

4576.   Plaintiff James Michael Geiger, III is a U.S. citizen domiciled in Kansas.

4577.   On November 7, 2005, James Michael Geiger, III was serving in the U.S. military when he was attacked by an IED.

4578.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Geiger.

4579.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4580.   As a result of the attack and the injuries suffered, James Michael Geiger, III is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4581.   Plaintiff James M. Geiger, Jr. is a citizen of the United States domiciled in North Carolina and is the father of James Michael Geiger, III.

4582.   Plaintiff Patricia L. Geiger is a citizen of the United States domiciled in North Carolina and is the mother of James Michael Geiger, III.

4583.   Plaintiff Joshua H. Geiger is a citizen of the United States domiciled in South Carolina and is the brother of James Michael Geiger, III.

4584.   Plaintiff Elizabeth E. Geiger is a citizen of the United States domiciled in North Carolina and is the sister of James Michael Geiger, III.

4585.   As a result of the attack and the injuries suffered by James Michael Geiger, III, Plaintiffs James M. Geiger, Jr., Patricia L. Geiger, Joshua H. Geiger and Elizabeth E. Geiger, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 407.   THE NOVEMBER 6, 2005 ATTACK – HADITHA

#### A.      PLAINTIFFS THE TERRY LYNN MCELWAIN FAMILY

4586.   Plaintiff Terry Lynn McElwain is a U.S. citizen domiciled in California.

4587.   On November 6, 2005, Terry Lynn McElwain was serving in the U.S. military when he was attacked by an IED.

4588.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. McElwain.

4589.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4590.   As a result of the attack and the injuries suffered, Terry Lynn McElwain is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4591.   Plaintiff Julia Dantong McElwain is a citizen of the United States and domiciled

685

in the State of California. She is the wife of Terry Lynn McElwain.

4592.   Plaintiff S.M, a minor child, represented by her legal guardians Terry Lynn McElwain and Julia Dantong McElwain, is a citizen of the United States and domiciled in the State of California. She is the daughter of Terry Lynn McElwain and Julia Dantong McElwain.

4593.   Plaintiff R.M, a minor child, represented by his legal guardians Terry Lynn McElwain and Julia Dantong McElwain, is a citizen of the United States and domiciled in the State of California. He is the son of Terry Lynn McElwain and Julia Dantong McElwain.

4594.   Plaintiff Eleanor E. McElwain is a citizen of the United States and domiciled in the State of Kansas. She is the mother of Terry Lynn McElwain

4595.   Plaintiff Tracy Rosario is a citizen of the United States and domiciled in the State of Kansas. She is the sister of Terry Lynn McElwain

4596.   Plaintiff Angel Michelle Hughes is a citizen of the United States and domiciled in the State of Kansas. She is the sister of Terry Lynn McElwain.

4597.   Plaintiff Travis McElwain is a citizen of the United States and domiciled in the State of California. He is the brother of Terry Lynn McElwain.

4598.   Plaintiff James S. McElwain is a citizen of the United States and domiciled in the State of Kansas. He is the brother of Terry Lynn McElwain.

4599.   As a result of the attack and the injuries suffered by Terry Lynn McElwain, Plaintiffs Julia Dantong McElwain, S.M, a minor child, R.M, a minor child, Eleanor E. McElwain, Tracy Rosario, Angel Michelle Hughes, Travis McElwain, James S. McElwain, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

**408.   THE NOVEMBER 5, 2005 ATTACK – HUSAYBAH**

**A.   PLAINTIFFS THE BRIAN ELDON WILLIAMS FAMILY**

4600.   Plaintiff Brian Eldon Williams is a U.S. citizen domiciled in Texas.

4601.   On November 5, 2005, Brian Eldon Williams was serving in the U.S. military when he was attacked by an IED.

4602.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Williams.

4603.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4604.   As a result of the attack and the injuries suffered, Brian Eldon Williams is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4605.   Plaintiff Kimberly Kaye Williams is a citizen of the United States domiciled in Texas and is the mother of Brian Eldon Williams.

4606.   Plaintiff Steven Eldon Williams is a citizen of the United States domiciled in Texas and is the father of Brian Eldon Williams.

4607.   Plaintiff Colby Allan Williams is a citizen of the United States domiciled in Texas and is the brother of Brian Eldon Williams.

4608.   As a result of the attack and the injuries suffered by Brian Eldon Williams, Plaintiffs Kimberly Kaye Williams, Steven Eldon Williams and Coly Allan Williams are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic

damages, including loss of services and support.

**409.   THE NOVEMBER 5, 2005 ATTACK – BAGHDAD**

**A.     PLAINTIFFS THE LEO PATRICK MCKEON FAMILY**

4609.   Plaintiff Leo Patrick McKeon is a U.S. citizen domiciled in North Carolina.

4610.   On November 5, 2005, Leo Patrick McKeon was serving in the U.S. military when he was attacked by an IED.

4611.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. McKeon.

4612.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4613.   As a result of the attack and the injuries suffered, Leo Patrick McKeon is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4614.   Plaintiff Keith P. McKeon is a citizen of the United States domiciled in North Carolina and is the son of Leo Patrick McKeon.

4615.   As a result of the attack and the injuries suffered by Leo Patrick McKeon, Plaintiff Keith P. McKeon is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

**410.   THE NOVEMBER 3, 2005 ATTACK – SAQLAWIYAH**

**A.     PLAINTIFFS THE ABELARDO ROSAS FAMILY**

4616.   Plaintiff Abelardo Rosas is a U.S. citizen domiciled in Texas.

4617.   On November 3, 2005, Abelardo Rosas was serving in the U.S. military when he was attacked by an IED.

4618.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Rosas.

4619.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4620.   As a result of the attack and the injuries suffered, Abelardo Rosas is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4621.   Plaintiff Juan Alberto Rosas is a citizen of the United States domiciled in Texas and is the brother of Abelardo Rosas.

4622.   Plaintiff Guadalupe Rosas is a citizen of the United States domiciled in Texas and is the brother of Abelardo Rosas.

4623.   As a result of the attack and the injuries suffered by Abelardo Rosas, Plaintiffs Juan Alberto Rosas and Guadalupe Rosas are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 411.   THE OCTOBER 29, 2005 ATTACK – TAL AFAR

#### A.   PLAINTIFFS THE BRANDON LAMAR DALE FAMILY

4624.   Plaintiff Brandon Lamar Dale is a U.S. citizen domiciled in Texas.

4625.   On October 29, 2005, Brandon Lamar Dale was serving in the U.S. military when he was attacked by an IED.

4626.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Dale.

4627.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4628.   As a result of the attack and the injuries suffered, Brandon Lamar Dale is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4629.   Plaintiff Debbie Simmons is a citizen of the United States domiciled in Louisiana and is the mother of Brandon Lamar Dale.

4630.   As a result of the attack and the injuries suffered by Brandon Lamar Dale, Plaintiff Debbie Simmons is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 412.   THE OCTOBER 27, 2005 ATTACK – RAMADI

### A.   PLAINTIFFS THE BRUCE LEONARD MORROW FAMILY

4631.   Plaintiff Bruce Leonard Morrow is a U.S. citizen domiciled in Pennsylvania.

4632.   On October 27, 2005, Bruce Leonard Morrow was serving in the U.S. military when he was attacked by an IED.

4633.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Morrow.

4634.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack,

the munition used, as well as the tactics, techniques, and procedures utilized.

4635.   As a result of the attack and the injuries suffered, Bruce Leonard Morrow is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4636.   Plaintiff Bruce Leonard Morrow, Jr is a citizen of the United States and domiciled in the State of Pennsylvania. He is the son of Bruce Leonard Morrow.

4637.   Plaintiff Gemini Nichole Wardzinski-Morrow is a citizen of the United States and domiciled in the State of Pennsylvania. She is the daughter of Bruce Leonard Morrow.

4638.   Plaintiff Robert Thomas Wardzinski-Morrow is a citizen of the United States and domiciled in the State of Pennsylvania. He is the son of Bruce Leonard Morrow.

4639.   As a result of the attack and the injuries suffered by Bruce Leonard Morrow, Plaintiffs Bruce Leonard Morrow, Jr., Gemini Nichole Wardzinski-Morrow and Robert Thomas Wardzinski-Morrow, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 413.   THE OCTOBER 26, 2005 ATTACK – BAIJI

### A.   PLAINTIFF ROGER FRANKLIN GRAVES

4640.   Plaintiff Roger Franklin Graves is a U.S. citizen domiciled in Oklahoma.

4641.   On October 26, 2005, Roger Franklin Graves was serving in the U.S. military when he was attacked by an IED.

4642.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Graves.

4643.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack,

as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4644.  As a result of the attack and the injuries suffered, Roger Franklin Graves is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 414.   THE OCTOBER 25, 2005 ATTACK – RUTBAH

### A.   PLAINTIFFS THE JIMI MCMAHON FAMILY

4645.  Plaintiff Jimi McMahon is a U.S. citizen domiciled in Alabama.

4646.  On October 25, 2005, Jimi McMahon was serving in the U.S. military when he was attacked by an IED.

4647.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. McMahon.

4648.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4649.  As a result of the attack and the injuries suffered, Jimi McMahon is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4650.  Plaintiff S.M.M., a minor child, represented by her legal guardian Jimi McMahon, is a citizen of the United States domiciled in Alabama and is the daughter of Jimi McMahon.

4651.  Plaintiff D.J.M., a minor child, represented by his legal guardian Jimi McMahon, is a citizen of the United States domiciled in Alabama and is the son of Jimi McMahon.

4652.   As a result of the attack and the injuries suffered by Jimi McMahon, Plaintiffs S.M.M., a minor child and D.J.M., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 415.   THE OCTOBER 25, 2005 ATTACK – BAGHDAD

#### A.   PLAINTIFF JARED FULTON BROWN

4653.   Plaintiff Jared Fulton Brown is a U.S. citizen domiciled in Indiana.

4654.   On October 25, 2005, Jared Fulton Brown was serving in the U.S. military when he was attacked by an IED.

4655.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Brown.

4656.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4657.   As a result of the attack and the injuries suffered, Jared Fulton Brown is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 416.   THE OCTOBER 20, 2005 ATTACK – HIT

#### A.   PLAINTIFF ROBERT JUSTIN MOULTRIE

4658.   Plaintiff Robert Justin Moultrie is a U.S. citizen domiciled in Georgia.

4659.   On October 20, 2005, Robert Justin Moultrie was serving in the U.S. military when he was attacked by mortars.

693

4660.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Moultrie.

4661.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4662.   As a result of the attack and the injuries suffered, Robert Justin Moultrie is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 417.   THE OCTOBER 18, 2005 ATTACK – AR RUTBAH

### A.   PLAINTIFF BRIAN PATRICK JOYCE, JR.

4663.   Plaintiff Brian Patrick Joyce, Jr. is a U.S. citizen domiciled in Ohio.

4664.   On October 18, 2005, Brian Patrick Joyce, Jr. was serving in the U.S. military when he was attacked by an IED.

4665.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Joyce.

4666.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4667.   As a result of the attack and the injuries suffered, Brian Patrick Joyce, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 418.   THE OCTOBER 17, 2005 ATTACK –SAMARRA

### A.   PLAINTIFFS THE DARREN DEAN HOWE FAMILY

4668.   On October 17, 2005, Darren Dean Howe was a U.S. citizen, domiciled in Nebraska, and serving in the U.S. military when he was attacked by an IED, causing his death.

4669.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Howe.

4670.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

4671.   Plaintiff Nakia LaRee Howe is a citizen of the United States domiciled in Nebraska and is the spouse of Darren Dean Howe.

4672.   Plaintiff S.H., a minor child, represented by her legal guardian Nakia LaRee Howe, is a citizen of the United States domiciled in Nebraska and is the daughter of Darren Dean Howe.

4673.   Plaintiff G.H., a minor child, represented by his legal guardian Nakia LaRee Howe, is a citizen of the United States domiciled in Nebraska and is the daughter of Darren Dean Howe.

4674.   Plaintiff Brandon A. Howe is a citizen of the United States domiciled in Nebraska and is the brother of Darren Dean Howe.

4675.   Plaintiff Alexander G. Klaus is a citizen of the United States domiciled in Nebraska and is the brother of Darren Dean Howe.

4676.   Plaintiff Nakia LaRee Howe, brings an action individually and on behalf of the Estate of Darren Dean Howe, and all heirs thereof, as its legal representative.

4677.   As a result of the attack, and the injuries suffered by and the death of Darren Dean

Howe, Plaintiffs Nakia LaRee Howe, S.H., a minor child, G.H., a minor child, Brandon A. Howe and Alexander Klaus suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Darren Dean Howe.

### 419.   THE OCTOBER 15, 2005 ATTACK –RAMADI

#### A.   PLAINTIFFS THE RICHARD ALLEN HARDY FAMILY

4678.   On October 15, 2005, Richard Allen Hardy was a U.S. citizen, domiciled in Ohio, and serving in the U.S. military when he was attacked by an IED, causing his death.

4679.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Hardy.

4680.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

4681.   Plaintiff Doris Hardy is a citizen of the United States domiciled in Ohio and is the mother of Richard Allen Hardy.

4682.   Plaintiff Richard Dean Hardy is a citizen of the United States domiciled in Ohio and is the father of Richard Allen Hardy.

4683.   Plaintiff Jessica Tackett is a citizen of the United States domiciled in Ohio and is the sister of Richard Allen Hardy.

4684.   Plaintiff Doris Hardy brings an action individually and on behalf of the Estate of Richard Allen Hardy, and all heirs thereof, as its legal representative.

4685.   As a result of the attack, and the injuries suffered by and the death of Richard Allen Hardy, Plaintiffs Doris Hardy, Richard Dean Hardy and Jessica Tackett have suffered

severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Richard Allen Hardy.

### 420. THE OCTOBER 15, 2005 ATTACK – RAMADI

#### A. PLAINTIFFS THE RYAN PATRICK VALLERY FAMILY

4686. Plaintiff Ryan Patrick Vallery is a U.S. citizen domiciled in New York.

4687. On October 15, 2005, Ryan Patrick Vallery was serving in the U.S. military when he was attacked by an IED.

4688. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Vallery.

4689. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4690. As a result of the attack and the injuries suffered, Ryan Patrick Vallery is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4691. Plaintiff Michelle Renowden is a citizen of the United States domiciled in New York and is the sister of Ryan Patrick Vallery.

4692. Plaintiff Patrick Vallery is a citizen of the United States domiciled in New York and is the father of Ryan Patrick Vallery.

4693. Plaintiff Sandra Vallery is a citizen of the United States domiciled in New York and is the mother of Ryan Patrick Vallery.

4694.   As a result of the attack and the injuries suffered by Ryan Patrick Vallery, Plaintiffs Michelle Renowden, Patrick Vallery, and Sandra Vallery are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 421.   THE OCTOBER 13, 2005 ATTACK – TUZ KHURMATU

#### A.   PLAINTIFF CLAYTON TILTON CROWELL

4695.   Plaintiff Clayton Tilton Crowell is a U.S. citizen domiciled in Tennessee.

4696.   On October 13, 2005, Clayton Tilton Crowell was serving in the U.S. military when he was attacked by an IED.

4697.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Crowell.

4698.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4699.   As a result of the attack and the injuries suffered, Clayton Tilton Crowell is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 422.   THE OCTOBER 12, 2005 ATTACK – FALLUJAH

#### A.   PLAINTIFFS THE MARTIN CHRISTOPHER JONES FAMILY

4700.   Plaintiff Martin Christopher Jones is a U.S. citizen domiciled in Maryland.

4701.   On October 12, 2005, Martin Christopher Jones was serving in the U.S. military when he was attacked by an IED.

4702.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Jones.

4703.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4704.   As a result of the attack and the injuries suffered, Martin Christopher Jones is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4705.   Plaintiff Beverly Jones is a citizen of the United States and domiciled in the State of Maryland. She is the mother of Martin Christopher Jones.

4706.   Plaintiff Melissa Jones is a citizen of the United States and domiciled in the State of Maryland. She is the daughter of Martin Christopher Jones.

4707.   Plaintiff Morgan Jones is a citizen of the United States and domiciled in the State of Maryland. She is the daughter of Martin Christopher Jones.

4708.   As a result of the attack and the injuries suffered by Martin Christopher Jones, Plaintiffs Beverly Jones, Melissa Jones, and Morgan Jones, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 423.   THE OCTOBER 12, 2005 ATTACK – SAQLAWIYAH

#### A.      PLAINTIFF PAUL ALLEN JACKSON

4709.   Plaintiff Paul Allen Jackson is a U.S. citizen domiciled in West Virginia.

4710.   On October 12, 2005, Paul Allen Jackson was serving in the U.S. military when

he was attacked by an IED.

4711.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Jackson.

4712.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4713.   As a result of the attack and the injuries suffered, Paul Allen Jackson is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 424.   THE OCTOBER 6, 2005 ATTACK – HIT

#### A.   PLAINTIFFS THE TIMOTHY GEORGE BRANDON SVEJDA FAMILY

4714.   Plaintiff Timothy George Brandon Svejda is a U.S. citizen domiciled in Iowa.

4715.   On October 6, 2005, Timothy George Brandon Svejda was serving in the U.S. military when he was attacked by an IED.

4716.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Svejda.

4717.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4718.   As a result of the attack and the injuries suffered, Timothy George Brandon Svejda is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages,

including medical expenses, lost income, and loss of earning capacity.

4719. Plaintiff Victoria C. Levsen is a citizen of the United States domiciled in Iowa and is the mother of Timothy George Brandon Svejda.

4720. As a result of the attack and the injuries suffered by Timothy George Brandon Svejda, Plaintiff Victoria C. Levsen is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 425. THE OCTOBER 4, 2005 ATTACK – RAMADI

#### A. PLAINTIFF STEVEN MICHAEL MURPHY

4721. Plaintiff Steven Michael Murphy is a U.S. citizen domiciled in Georgia.

4722. On October 4, 2005, Steven Michael Murphy was serving in the U.S. military when he was attacked by an IED.

4723. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Murphy.

4724. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4725. As a result of the attack and the injuries suffered, Steven Michael Murphy is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 426.   THE SEPTEMBER 29, 2005 ATTACK – JABOUR, SOUTHWEST OF BAGHDAD

#### A.   PLAINTIFFS THE JASEN WATTS FAMILY

4726.   Plaintiff Jasen Watts is a U.S. citizen domiciled in California.

4727.   On September 29, 2005, Jasen Watts was serving in the U.S. military when he was attacked by an IED.

4728.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Watts.

4729.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4730.   As a result of the attack and the injuries suffered, Jasen Watts is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4731.   Plaintiff John Duane Tivis is a citizen of the United States domiciled in California and is the father of Jasen Watts.

4732.   Plaintiff Jesse Duane Tivis-Watts  is a citizen of the United States domiciled in California and is the brother of Jasen Watts.

4733.   Plaintiff Jared Luis Tivis-Watts is a citizen of the United States domiciled in California and is the brother of Jasen Watts.

4734.   As a result of the attack and the injuries suffered by Jasen Watts, Plaintiffs John Duane Tivis, Jesse Duane Tivis-Watts and Jared Luis Tivis-Watts are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and

suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 427.   THE SEPTEMBER 27, 2005 ATTACK – RAMADI

#### A.   PLAINTIFFS THE JASON ALAN BENFORD FAMILY

4735.   On September 27, 2005, Jason Alan Benford was a U.S. citizen, domiciled in Georgia, and serving in the U.S. military when he was attacked by SAF, causing his death.

4736.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Benford.

4737.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

4738.   Plaintiff Kimberly Ann Benford is a citizen of the United States domiciled in South Carolina and is the spouse of Jason Alan Benford.

4739.   Plaintiff Lane Alan Benford is a citizen of the United States domiciled in South Carolina and is the son of Jason Alan Benford.

4740.   Plaintiff J.A.B., a minor child, represented by his legal guardian Kimberly Ann Benford, is a citizen of the United States domiciled in South Carolina and is the son of Jason Alan Benford.

4741.   Plaintiff Kimberly Ann Benford, brings an action individually and on behalf of the Estate of Jason Alan Benford, and all heirs thereof, as its anticipated legal representative.

4742.   As a result of the attack, and the injuries suffered by and the death of Jason Alan Benford, Plaintiffs Kimberly Ann Benford, Lane Alan Benford, and J.A.B., a minor child, have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and

counsel, and loss of earnings, income, and net accumulation to the Estate of Jason Alan Benford.

### 428.   THE SEPTEMBER 26, 2005 ATTACK – KADHIMIYAH

####     A.     PLAINTIFFS THE ALAN CHARLES JONES FAMILY

4743.   Plaintiff Alan Charles Jones is a U.S. citizen domiciled in Colorado.

4744.   On September 26, 2005, Alan Charles Jones was serving as a civilian contractor to the U.S. military in Iraq when he was attacked by an IED.

4745.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Jones.

4746.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4747.   As a result of the attack and the injuries suffered, Alan Charles Jones is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4748.   Plaintiff Patricia Ann Jones is a citizen of the United States domiciled in Colorado and is the spouse of Alan Charles Jones.

4749.   Plaintiff Sarah P. Jones is a citizen of the United States domiciled in Colorado and is the daughter of Alan Charles Jones.

4750.   As a result of the attack and the injuries suffered by Alan Charles Jones, Plaintiffs Patricia Ann Jones and Sarah P. Jones, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 429.   THE SEPTEMBER 25, 2005 ATTACK – BAGHDAD

#### A.   PLAINTIFF DEREK BENJAMIN KOLB

4751.   Plaintiff Derek Benjamin Kolb is a U.S. citizen domiciled in Texas.

4752.   On September 25, 2005, Derek Benjamin Kolb was serving in the U.S. military when he was attacked by an IED.

4753.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Kolb.

4754.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4755.   As a result of the attack and the injuries suffered, Derek Benjamin Kolb is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 430.   THE SEPTEMBER 22, 2005 ATTACK – AL ZAIDAN

#### A.   PLAINTIFF LEE PAUL HAYWOOD

4756.   Plaintiff Lee Paul Haywood is a U.S. citizen domiciled in Massachusetts.

4757.   On September 22, 2005, Lee Paul Haywood was serving in the U.S. military when he was attacked by an IED.

4758.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Haywood.

4759.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4760.   As a result of the attack and the injuries suffered, Lee Paul Haywood is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 431.   THE SEPTEMBER 22, 2005 ATTACK – RAMADI

#### A.   PLAINTIFF CHRISTOPHER GODDARD DUNLAP

4761.   Plaintiff Christopher Goddard Dunlap is a U.S. citizen domiciled in Texas.

4762.   On September 22, 2005, Christopher Goddard Dunlap was serving in the U.S. military when he was attacked by an IED.

4763.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Dunlap.

4764.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4765.   As a result of the attack and the injuries suffered, Christopher Goddard Dunlap is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 432.   THE SEPTEMBER 20, 2005 ATTACK – BETWEEN BALAD & AL DULOIYA

#### A.   PLAINTIFFS THE TERRY LEON STEWARD FAMILY

4766.   Plaintiff Terry Leon Steward is a U.S. citizen domiciled in Idaho.

4767.   On September 20, 2005, Terry Leon Steward was serving as a civilian contractor to the U.S. military in Iraq when he was attacked by an IED and small arms fire.

706

4768.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Steward.

4769.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4770.   As a result of the attack and the injuries suffered, Terry Leon Steward is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4771.   Plaintiff Darlene Morgan-Steward is a citizen of the United States domiciled in Idaho and is the spouse of Terry Leon Steward.

4772.   As a result of the attack and the injuries suffered by Terry Leon Steward, Plaintiff Darlene Morgan-Steward, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 433.   THE SEPTEMBER 20, 2005 ATTACK – BAGHDAD

#### A.   PLAINTIFFS THE COEDY DALE JAMES FAMILY

4773.   Plaintiff Coedy Dale James is a U.S. citizen domiciled in Arizona.

4774.   On September 20, 2005, Coedy Dale James was serving in the U.S. military when he was attacked by VBIED, mortars, grenades, and small arms fire.

4775.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. James.

4776.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack,

the munition used, as well as the tactics, techniques, and procedures utilized.

4777.   As a result of the attack and the injuries suffered, Coedy Dale James is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4778.   Plaintiff Lisa James is a citizen of the United States domiciled in Arizona and is the spouse of Coedy Dale James.

4779.   As a result of the attack and the injuries suffered by Coedy Dale James, Plaintiff Lisa James is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 434.   THE SEPTEMBER 20, 2005 ATTACK – BETWEEN BALAD & AL DULOIYA

#### A.   PLAINTIFFS THE SASCHA GRENNER-CASE FAMILY

4780.   On September 20, 2005, Sascha Grenner-Case was a U.S. citizen, domiciled in Arizona, and serving as a civilian contractor to the U.S. military in Iraq when he was attacked by an IED and small arms fire, causing his death.

4781.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

4782.   Plaintiff Karen K. Grenner-Case is a citizen of the United States domiciled in Florida and is the spouse of Sascha Grenner-Case.

4783.   Plaintiff Troy A. Grenner-Case is a citizen of the United States domiciled in Florida and is the son of Sascha Grenner-Case.

4784.   Plaintiff Myra R. Bardo is a citizen of the United States domiciled in Tennessee and is the stepdaughter of Sascha Grenner-Case.

4785.   Plaintiff Karen K. Grenner-Case brings an action individually and on behalf of the surviving beneficiaries of Sascha Grenner-Case, and all heirs thereof.

4786.   As a result of the attack, and the injuries suffered by and the death of Sascha Grenner-Case, Plaintiffs Karen K. Grenner-Case, Troy A. Grenner-Case and Myra R. Bardo, have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Sascha Grenner-Case.

### 435.   THE SEPTEMBER 19, 2005 ATTACK – AL KARMA

### A.   PLAINTIFFS THE BOBBY GENE CHRISTOPHER, III FAMILY

4787.   Plaintiff Bobby Gene Christopher, III is a U.S. citizen domiciled in Missouri.

4788.   On September 19, 2005, Bobby Gene Christopher, III was serving in the U.S. military when he was attacked by an IED.

4789.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Christopher.

4790.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4791.   As a result of the attack and the injuries suffered, Bobby Gene Christopher, III is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including

medical expenses, lost income, and loss of earning capacity.

4792.   Plaintiff Bobby Gene Christopher, Jr. is a citizen of the United States domiciled in Missouri and is the father of Bobby Gene Christopher, III.

4793.   Plaintiff Debi Jean Noelke is a citizen of the United States domiciled in Missouri and is the mother of Bobby Gene Christopher, III.

4794.   Plaintiff Angie Jene Christopher is a citizen of the United States domiciled in Arizona and is the sister of Bobby Gene Christopher, III.

4795.   As a result of the attack and the injuries suffered by Bobby Gene Christopher, III, Plaintiffs Bobby Gene Christopher, Jr., Debi Jean Noelke, and Angie Jene Christopher, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 436.   THE SEPTEMBER 19, 2005 ATTACK – RAMADI

#### A.   PLAINTIFFS THE MICHAEL EGAN FAMILY

4796.   On September 19, 2005, Michael Egan was a U.S. citizen, domiciled in Delaware, and serving in the U.S. military when he was attacked by an IED, causing his death.

4797.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Egan.

4798.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

4799.   Plaintiff Maria Egan is a citizen of the United States and domiciled in the State of New Jersey. She is the wife of Michael Egan.

4800.   Plaintiff S.D.E., a minor child, represented by her legal guardian Maria Egan, is a

710

citizen of the United States and domiciled in the State of New Jersey. She is the daughter of Michael Egan and Maria Egan.

4801.   Plaintiff Maria Egan brings an action individually, and on behalf of the Estate of Michael Egan, and all heirs thereof, as its legal representative.

4802.   As a result of the attack, and the injuries suffered by and the death of Michael Egan, Plaintiffs Maria Egan, and S.D.E., a minor child, have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Michael Egan.

## 437.   THE SEPTEMBER 19, 2005 ATTACK – AL-KARMAH

### A.   PLAINTIFF MATTHEW PAUL DALRYMPLE

4803.   Plaintiff Matthew Paul Dalrymple is a U.S. citizen domiciled in Florida.

4804.   On September 19, 2005, Matthew Paul Dalrymple was serving in the U.S. military when he was attacked by an IED.

4805.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Dalrymple.

4806.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4807.   As a result of the attack and the injuries suffered, Matthew Paul Dalrymple is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 438.   THE SEPTEMBER 19, 2005 ATTACK – RAMADI

#### A.   PLAINTIFFS THE RALPH EDWARD SWARTZ, II FAMILY

4808.   Plaintiff Ralph Edward Swartz, II is a U.S. citizen domiciled in Pennsylvania.

4809.   On September 19, 2005, Ralph Edward Swartz, II was serving in the U.S. military when he was attacked by an IED.

4810.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Swartz.

4811.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4812.   As a result of the attack and the injuries suffered, Ralph Edward Swartz, II is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4813.   Plaintiff Leatha M. Swartz is a citizen of the United States domiciled in Pennsylvania and is the mother of Ralph Edward Swartz, II.

4814.   Plaintiff Ralph E. Swartz, Sr. is a citizen of the United States domiciled in Pennsylvania and is the father of Ralph Edward Swartz, II.

4815.   Plaintiff Brittany M. Swartz is a citizen of the United States domiciled in Pennsylvania and is the daughter of Ralph Edward Swartz, II.

4816.   Plaintiff Lydia A. Hill is a citizen of the United States domiciled in Pennsylvania and is the sister of Ralph Edward Swartz, II.

4817.   Plaintiff Robert A. Swartz is a citizen of the United States domiciled in Pennsylvania and is the brother of Ralph Edward Swartz, II.

4818.   Plaintiff V.M.S., a minor child, represented by her legal guardian Ralph Edward Swartz, II, is a citizen of the United States domiciled in Pennsylvania and is the daughter of Ralph Edward Swartz, II.

4819.   As a result of the attack and the injuries suffered by Ralph Edward Swartz, II, Plaintiffs Leatha M. Swartz, Ralph E. Swartz, Sr., Brittany M. Swartz, Lydia A. Hill, Robert A. Swartz and V.M.S., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 439.   THE SEPTEMBER 19, 2005 ATTACK – AL KARMAH

### A.   PLAINTIFFS THE MARTIN ANTHONY MCCLUNG II FAMILY

4820.   Plaintiff Martin Anthony McClung II is a U.S. citizen domiciled in Michigan.

4821.   On September 19, 2005, Martin Anthony McClung II was serving in the U.S. military when he was attacked by an IED.

4822.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. McClung.

4823.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4824.   As a result of the attack and the injuries suffered, Martin Anthony McClung II is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4825.   Plaintiff Janel Marie McClung is a citizen of the United States domiciled in

Michigan and is the spouse of Martin Anthony McClung II.

4826.   Plaintiff Peggy Joyce McClung is a citizen of the United States domiciled in Michigan and is the grandmother of Martin Anthony McClung II.

4827.   Plaintiff James McClung is a citizen of the United States domiciled in Michigan and is the grandfather of Martin Anthony McClung II.

4828.   Plaintiff M.A.M., a minor child, represented by his legal guardian Martin Anthony McClung II, is a citizen of the United States domiciled in Michigan and is the son of Martin Anthony McClung II.

4829.   As a result of the attack and the injuries suffered by Martin Anthony McClung II, Plaintiffs Janel Marie McClung, Peggy Joyce McClung, James McClung, and M.A.M., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 440.   THE SEPTEMBER 19, 2005 ATTACK – RAMADI

#### A.   PLAINTIFF JEFFERY ALAN MURTHA

4830.   Plaintiff Jeffery Alan Murtha is a U.S. citizen domiciled in Delaware.

4831.   On September 19, 2005, Jeffery Alan Murtha was serving in the U.S. military when he was attacked by IEDs and small arms.

4832.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Murtha.

4833.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4834.   As a result of the attack and the injuries suffered, Jeffery Alan Murtha is entitled

to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

**441.    THE SEPTEMBER 17, 2005 ATTACK – TAJI**

    **A.    PLAINTIFFS THE MARTIN CHRISTOPHER JONES FAMILY**

4835.   Plaintiff Martin Christopher Jones is a U.S. citizen domiciled in Maryland.

4836.   On September 17, 2005, Martin Christopher Jones was serving in the U.S. military when he was attacked by a VBIED.

4837.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Jones.

4838.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4839.   As a result of the attack and the injuries suffered, Martin Christopher Jones is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4840.   Plaintiff Beverly Jones is a citizen of the United States and domiciled in the State of Maryland. She is the mother of Martin Christopher Jones.

4841.   Plaintiff Melissa Jones is a citizen of the United States and domiciled in the State of Maryland. She is the daughter of Martin Christopher Jones.

4842.   Plaintiff Morgan Jones is a citizen of the United States and domiciled in the State of Maryland. She is the daughter of Martin Christopher Jones.

4843.   As a result of the attack and the injuries suffered by Martin Christopher Jones,

Plaintiffs Beverly Jones, Melissa Jones, and Morgan Jones, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 442.   THE SEPTEMBER 15, 2005 ATTACK – HADITHA

#### A.   PLAINTIFF LARRY DWAIN GRIFFIS

4844.   Plaintiff Larry Dwain Griffis is a U.S. citizen domiciled in California.

4845.   On September 15, 2005, Larry Dwain Griffis was serving in the U.S. military when he was attacked by an IED.

4846.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Griffis.

4847.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4848.   As a result of the attack and the injuries suffered, Larry Dwain Griffis is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 443.   THE SEPTEMBER 15, 2005 ATTACK – HADITHA

#### A.   PLAINTIFFS THE ANTHONY WILLIAM GREEN FAMILY

4849.   Plaintiff Anthony William Green is a U.S. citizen domiciled in Missouri.

4850.   On September 15, 2005, Anthony William Green was serving in the U.S. military when he was attacked by an IED.

4851.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or

other material support used to commit the attack, which injured Mr. Green.

4852.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4853.   As a result of the attack and the injuries suffered, Anthony William Green is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4854.   Plaintiff Joan M. Green is a citizen of the United States domiciled in Missouri and is the mother of Anthony William Green.

4855.   Plaintiff Michael T. Green is a citizen of the United States domiciled in Missouri and is the father of Anthony William Green.

4856.   Plaintiff Matthew T. Green is a citizen of the United States domiciled in Missouri and is the brother of Anthony William Green.

4857.   As a result of the attack and the injuries suffered by Anthony William Green, Plaintiffs Joan M. Green, Michael T. Green, and Matthew T. Green are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 444.   THE SEPTEMBER 15, 2005 ATTACK – BAIJI

### A.   PLAINTIFFS THE KURT DUANE BROOKS FAMILY

4858.   Plaintiff Kurt Duane Brooks is a U.S. citizen domiciled in Mississippi.

4859.   On September 15, 2005, Kurt Duane Brooks was serving in the U.S. military when he was attacked by an IED.

4860.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Brooks.

4861.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4862.   As a result of the attack and the injuries suffered, Kurt Duane Brooks is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4863.   Plaintiff McKenzie Paige Brooks is a citizen of the United States domiciled in Mississippi and is the daughter of Kurt Duane Brooks.

4864.   Plaintiff K.F.B., a minor child, represented by her legal guardian Kurt Duane Brooks, is a citizen of the United States domiciled in Mississippi and is the daughter of Kurt Duane Brooks.

4865.   As a result of the attack and the injuries suffered by Kurt Duane Brooks, Plaintiffs McKenzie Paige Brooks and K.F.B., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 445.   THE SEPTEMBER 15, 2005 ATTACK – ABU GHRAIB

### A.   PLAINTIFF ROBERT JOSEPH D'AGOSTINO

4866.   Plaintiff Robert Joseph D'Agostino is a U.S. citizen domiciled in Texas.

4867.   On September 15, 2005, Robert Joseph D'Agostino was serving in the U.S. military when he was attacked by an IED and small arms fire.

4868.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. D'Agostino.

4869.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4870.   As a result of the attack and the injuries suffered, Robert Joseph D'Agostino is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 446.   THE SEPTEMBER 12, 2005 ATTACK – SAMARRA

### A.   PLAINTIFFS THE BRANDON MICHAEL PARROTT FAMILY

4871.   Plaintiff Brandon Michael Parrott is a U.S. citizen domiciled in Maryland.

4872.   On September 12, 2005, Brandon Michael Parrott was serving in the U.S. military when he was attacked by an IED.

4873.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Parrott.

4874.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4875.   As a result of the attack and the injuries suffered, Brandon Michael Parrott is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4876.   Plaintiff Terri L. Storms is a citizen of the United States domiciled in South

719

Carolina and is the mother of Brandon Michael Parrott.

4877.   Plaintiff Donald M. Storms is a citizen of the United States domiciled in South Carolina and is the father of Brandon Michael Parrott.

4878.   As a result of the attack and the injuries suffered by Brandon Michael Parrott, Plaintiffs Terri L. Storms and Donald M. Storms are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 447.   THE SEPTEMBER 12, 2005 ATTACK – SAMARRA

### A.   PLAINTIFFS THE DANIEL FRANCIS PEARSON FAMILY

4879.   Plaintiff Daniel Francis Pearson is a U.S. citizen domiciled in Illinois.

4880.   On September 12, 2005, Daniel Francis Pearson was serving in the U.S. military when he was attacked by an IED.

4881.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Pearson.

4882.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4883.   As a result of the attack and the injuries suffered, Daniel Francis Pearson is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4884.   Plaintiff Holly Ann Pearson is a citizen of the United States domiciled in Florida and is the mother of Daniel Francis Pearson.

4885.   As a result of the attack and the injuries suffered by Daniel Francis Pearson, Plaintiff Holly Ann Pearson is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 448.   THE SEPTEMBER 11, 2005 ATTACK – RAWAH

#### A.   PLAINTIFF JEREMY LEE BALLARD

4886.   Plaintiff Jeremy Lee Ballard is a U.S. citizen domiciled in Kentucky.

4887.   On September 11, 2005, Jeremy Lee Ballard was serving in the U.S. military when he was attacked by a VBIED.

4888.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Ballard.

4889.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4890.   As a result of the attack and the injuries suffered, Jeremy Lee Ballard is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 449.   THE SEPTEMBER 11, 2005 ATTACK –RAMADI

#### A.   PLAINTIFF CHRISTOPHER GODDARD DUNLAP

4891.   Plaintiff Christopher Goddard Dunlap is a U.S. citizen domiciled in Texas.

4892.   On September 11, 2005, Christopher Goddard Dunlap was serving in the U.S. military when he was attacked by an IED.

4893.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or

other material support used to commit the attack, which injured Mr. Dunlap.

4894.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4895.   As a result of the attack and the injuries suffered, Christopher Goddard Dunlap is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 450.   THE SEPTEMBER 9, 2005 ATTACK – SAMARRA

### A.   PLAINTIFF DAVID WILSON BRONSON

4896.   Plaintiff David Wilson Bronson is a U.S. citizen domiciled in New Hampshire.

4897.   On September 9, 2005, David Wilson Bronson was serving in the U.S. military when he was attacked by an IED.

4898.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Bronson.

4899.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4900.   As a result of the attack and the injuries suffered, David Wilson Bronson is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 451.   THE SEPTEMBER 9, 2005 ATTACK – SAMARRA

#### A.   PLAINTIFF ACIE NATHANIEL RAINWATER

4901.   Plaintiff Acie Nathaniel Rainwater is a U.S. citizen domiciled in Mississippi.

4902.   On September 9, 2005, Acie Nathaniel Rainwater was serving in the U.S. military when he was attacked by an IED.

4903.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Rainwater.

4904.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4905.   As a result of the attack and the injuries suffered, Acie Nathaniel Rainwater is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 452.   THE SEPTEMBER 9, 2005 ATTACK – HIT

#### A.   PLAINTIFFS THE ARAGORN THOR WOLD FAMILY

4906.   Plaintiff Aragorn Thor Wold is a U.S. citizen domiciled in Virginia.

4907.   On September 9, 2005, Aragorn Thor Wold was serving in the U.S. military when he was attacked by a VBIED.

4908.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Wold.

4909.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4910.   As a result of the attack and the injuries suffered, Aragorn Thor Wold is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4911.   Plaintiff Catherine S. Wold is a citizen of the United States domiciled in North Carolina and is the mother of Aragorn Thor Wold.

4912.   As a result of the attack and the injuries suffered by Aragorn Thor Wold, Plaintiff Catherine S. Wold, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 453.   THE SEPTEMBER 8, 2005 ATTACK – YUSUFIYAH

### A.   PLAINTIFF MICHAEL L. WELLS

4913.   Plaintiff Michael L. Wells is a U.S. citizen domiciled in Georgia.

4914.   On September 8, 2005, Michael L. Wells was serving in the U.S. military when he was attacked by an IED.

4915.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Wells.

4916.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4917.   As a result of the attack and the injuries suffered, Michael L. Wells is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 454.   THE SEPTEMBER 4, 2005 ATTACK – HIT

#### A.   PLAINTIFF CHARLES JOSEPH VANCHERI

4918.   Plaintiff Charles Joseph Vancheri is a U.S. citizen domiciled in New York.

4919.   On September 4, 2005, Charles Joseph Vancheri was serving in the U.S. military when he was attacked by mortars, VBIED, RPGs, and small arms fire.

4920.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Vancheri.

4921.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4922.   As a result of the attack and the injuries suffered, Charles Joseph Vancheri is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 455.   THE SEPTEMBER 4, 2005 ATTACK – HIT

#### A.   PLAINTIFF BENJAMIN ROBERT JENSEN

4923.   Plaintiff Benjamin Robert Jensen is a U.S. citizen domiciled in Florida.

4924.   On September 4, 2005, Benjamin Robert Jensen was serving in the U.S. military when he was attacked by mortars, VBIED, RPGs, and small arms fire..

4925.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Jensen.

4926.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4927.   As a result of the attack and the injuries suffered, Benjamin Robert Jensen is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 456.   THE SEPTEMBER 4, 2005 ATTACK – ISKANDARIYA

#### A.   PLAINTIFF MICHAEL WAYNE CHRISTOPHERSON

4928.   Plaintiff Michael Wayne Christopherson is a U.S. citizen domiciled in Wyoming.

4929.   On September 4, 2005, Michael Wayne Christopherson was serving in the U.S. military when he was attacked by an IED.

4930.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Christopherson.

4931.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4932.   As a result of the attack and the injuries suffered, Michael Wayne Christopherson is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 457.   THE SEPTEMBER 1, 2005 ATTACK – BAJI

#### A.   PLAINTIFF MATTHEW CARNELL BEATTY

4933.   Plaintiff Matthew Carnell Beatty is a U.S. citizen domiciled in Texas.

4934.   On September 1, 2005, Matthew Carnell Beatty was serving in the U.S. military when he was attacked by an IED.

4935.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or

726

other material support used to commit the attack, which injured Mr. Beatty.

4936. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4937. As a result of the attack and the injuries suffered, Matthew Carnell Beatty is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 458. THE AUGUST 28, 2005 ATTACK – RAMADI

### A. PLAINTIFFS THE SHAWN LARRY NICHOLS FAMILY

4938. Plaintiff Shawn Larry Nichols is a U.S. citizen domiciled in California.

4939. On August 28, 2005, Shawn Larry Nichols was serving in the U.S. military when he was attacked by mortars.

4940. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Nichols.

4941. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4942. As a result of the attack and the injuries suffered, Shawn Larry Nichols is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4943. Plaintiff T.A.N., a minor child, represented by his legal guardian Shawn Larry Nichols, is a citizen of the United States domiciled in California and is the son of Shawn Larry

Nichols.

4944.   As a result of the attack and the injuries suffered by Shawn Larry Nichols, Plaintiff T.A.N., a minor child, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 459.   THE AUGUST 27, 2005 ATTACK – BAQUBAH

#### A.      PLAINTIFFS THE JOHN MICHAEL DRNEK FAMILY

4945.   Plaintiff John Michael Drnek is a U.S. citizen domiciled in Tennessee.

4946.   On August 27, 2005, John Michael Drnek was serving in the U.S. military when he was attacked by an IED.

4947.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Drnek.

4948.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4949.   As a result of the attack and the injuries suffered, John Michael Drnek is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4950.   Plaintiff Tina M. Drnek is a citizen of the United States domiciled in Tennessee and is the spouse of John Michael Drnek.

4951.   Plaintiff Kelly N. Snyder is a citizen of the United States domiciled in Tennessee and is the daughter of John Michael Drnek.

4952.   Plaintiff Chris M. Drnek is a citizen of the United States domiciled in Tennessee

and is the son of John Michael Drnek.

4953.  As a result of the attack and the injuries suffered by John Michael Drnek, Plaintiffs Tina M. Drnek, Kelly N. Snyder and Chris M. Drnek are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 460.   THE AUGUST 25, 2005 ATTACK – AL-QAIM

### A.   PLAINTIFFS THE DANIEL DENNIS IBACH FAMILY

4954.  Plaintiff Daniel Dennis Ibach is a U.S. citizen domiciled in Utah.

4955.  On August 25, 2005, Daniel Dennis Ibach was serving in the U.S. military when he was attacked by an IED.

4956.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Ibach.

4957.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4958.  As a result of the attack and the injuries suffered, Daniel Dennis Ibach is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4959.  Plaintiff Mary Ann Ibach is a citizen of the United States domiciled in Pennsylvania and is the mother of Daniel Dennis Ibach.

4960.  Plaintiff Dennis Burnell Ibach is a citizen of the United States domiciled in Pennsylvania and is the father of Daniel Dennis Ibach.

729

4961.   As a result of the attack and the injuries suffered by Daniel Dennis Ibach, Plaintiffs Mary Ann Ibach and Dennis Burnell Ibach are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 461.   THE AUGUST 25, 2005 ATTACK –TIKRIT

#### A.   PLAINTIFFS THE KEVIN SCOTT JOHNSON FAMILY

4962.   Plaintiff Kevin Scott Johnson is a U.S. citizen domiciled in Minnesota.

4963.   On August 25, 2005, Kevin Scott Johnson was serving in the U.S. military when he was attacked by a rocket.

4964.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Johnson.

4965.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4966.   As a result of the attack and the injuries suffered, Kevin Scott Johnson is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4967.   Plaintiff Anntonette Jane Johnson is a citizen of the United States domiciled in Minnesota and is the spouse of Kevin Scott Johnson.

4968.   Plaintiff Jacob Scott Johnson is a citizen of the United States domiciled in Texas and is the son of Kevin Scott Johnson.

4969.   Plaintiff Julianne Katherine Johnson is a citizen of the United States domiciled in

730

Minnesota and is the daughter of Kevin Scott Johnson.

4970.   As a result of the attack and the injuries suffered by Kevin Scott Johnson, Plaintiffs Anntonette Jane Johnson, Jacob Scott Johnson, and Julianne Katherine Johnson are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 462.   THE AUGUST 23, 2005 ATTACK – RAMADI

### A.   PLAINTIFFS THE RYAN PATRICK VALLERY FAMILY

4971.   Plaintiff Ryan Patrick Vallery is a U.S. citizen domiciled in New York.

4972.   On August 23, 2005, Ryan Patrick Vallery, was serving in the U.S. military when he was attacked by SVBIED, RPGs, mortars, machine gun fire, and small arms fire.

4973.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Vallery.

4974.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4975.   As a result of the attack and the injuries suffered, Ryan Patrick Vallery is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

4976.   Plaintiff Michelle Renowden is a citizen of the United States and domiciled in the State of New York. She is the sister of Ryan Patrick Vallery.

4977.   Plaintiff Patrick Vallery is a citizen of the United States and domiciled in the State of New York. He is the father of Ryan Patrick Vallery.

4978.   Plaintiff Sandra Vallery is a citizen of the United States and domiciled in the State of New York. She is the mother of Ryan Patrick Vallery.

4979.   As a result of the attack and the injuries suffered by Ryan Patrick Vallery, Plaintiffs Michelle Renowden, Patrick Vallery and Sandra Vallery, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 463.   THE AUGUST 23, 2005 ATTACK – RAMADI

#### A.   PLAINTIFF WILLIAM LEE NESTOR

4980.   Plaintiff William Lee Nestor is a U.S. citizen domiciled in Georgia.

4981.   On August 23, 2005, William Lee Nestor was serving in the U.S. military when he was attacked by SVBIED, RPGs, mortars, machine gun fire, and small arms fire.

4982.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Nestor.

4983.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4984.   As a result of the attack and the injuries suffered, William Lee Nestor is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 464.   THE AUGUST 23, 2005 ATTACK – RAMADI

#### A.   PLAINTIFF GEORGE OVID SIMMONS

4985.   Plaintiff George Ovid Simmons is a U.S. citizen domiciled in South Carolina.

4986.   On August 23, 2005, George Ovid Simmons was serving in the U.S. military when he was attacked by SVBIED, RPGs, mortars, machine gun fire, and small arms fire.

4987.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Simmons.

4988.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4989.   As a result of the attack and the injuries suffered, George Ovid Simmons is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 465.   THE AUGUST 23, 2005 ATTACK – RAMADI

### A.   PLAINTIFF NESSIM EDWARD FOURNIER

4990.   Plaintiff Nessim Edward Fournier is a U.S. citizen domiciled in California.

4991.   On August 23, 2005, Nessim Edward Fournier was serving in the U.S. military when he was attacked by SVBIED, RPGs, mortars, machine gun fire, and small arms fire.

4992.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Fournier.

4993.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4994.   As a result of the attack and the injuries suffered, Nessim Edward Fournier is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including

medical expenses, lost income, and loss of earning capacity.

**466.   THE AUGUST 23, 2005 ATTACK – RAMADI**

   **A.      PLAINTIFF ANDREW JOSEPH HIGGINS**

4995.   Plaintiff Andrew Joseph Higgins is a U.S. citizen domiciled in Texas.

4996.   On August 23, 2005, Andrew Joseph Higgins was serving in the U.S. military when he was attacked by SVBIED, RPGs, mortars, machine gun fire, and small arms fire.

4997.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Higgins.

4998.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

4999.   As a result of the attack and the injuries suffered, Andrew Joseph Higgins is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

**467.   THE AUGUST 23, 2005 ATTACK – RAMADI**

   **A.      PLAINTIFFS THE SCOTT BRADLEY RAY FAMILY**

5000.   Plaintiff Scott Bradley Ray is a U.S. citizen domiciled in New Mexico.

5001.   On August 23, 2005, Scott Bradley Ray was serving in the U.S. military when he was attacked by SVBIED, RPGs, mortars, machine gun fire, and small arms fire.

5002.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Ray.

5003.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack,

the munition used, as well as the tactics, techniques, and procedures utilized.

5004.  As a result of the attack and the injuries suffered, Scott Bradley Ray is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5005.  Plaintiff Kerstin Ray is a citizen of the United States and domiciled in the State of New Mexico. She is the wife of Scott Bradley Ray.

5006.  As a result of the attack and the injuries suffered by Scott Bradley Ray, Plaintiff Kerstin Ray is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 468.  THE AUGUST 23, 2005 ATTACK – RAMADI

#### A.  PLAINTIFFS THE MANUEL FIGUEROA FAMILY

5007.  Plaintiff Manuel Figueroa is a U.S. citizen domiciled in Texas.

5008.  On August 23, 2005, Manuel Figueroa was serving in the U.S. military when he was attacked by a SVBIED, RPGs, mortars, machine gun fire, and small arms fire.

5009.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Figueroa.

5010.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5011.  As a result of the attack and the injuries suffered, Manuel Figueroa is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical

735

expenses, lost income, and loss of earning capacity.

5012.   Plaintiff J.C.F., a minor child, represented by her legal guardian Manuel Figueroa, is a citizen of the United States domiciled in Texas and is the daughter of Manuel Figueroa.

5013.   Plaintiff Gilbert Figueroa is a citizen of the United States domiciled in Florida and is the father of Manuel Figueroa.

5014.   Plaintiff Pak Son Figueroa is a citizen of the United States domiciled in Florida and is the mother of Manuel Figueroa.

5015.   Plaintiff Samuel Figueroa is a citizen of the United States domiciled in Georgia and is the brother of Manuel Figueroa.

5016.   Plaintiff Timmy Figueroa is a citizen of the United States domiciled in Florida and is the brother of Manuel Figueroa.

5017.   Plaintiff Gilbert Figueroa, Jr. is a citizen of the United States domiciled in Florida and is the brother of Manuel Figueroa.

5018.   As a result of the attack and the injuries suffered by Manuel Figueroa, Plaintiffs J.C.F., a minor child, Gilbert Figueroa, Pak Son Figueroa, Samuel Figueroa, Timmy Figueroa and Gilbert Figueroa, Jr., are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 469.   THE AUGUST 22, 2005 ATTACK – AL KARMAH

### A.   PLAINTIFFS THE ARTHUR LAVERNE RIZER III FAMILY

5019.   Plaintiff Arthur Laverne Rizer III is a U.S. citizen domiciled in Washington, D.C.

5020.   On August 22, 2005, Arthur Laverne Rizer III was serving in the U.S. military when he was attacked by an IED.

5021.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or

736

other material support used to commit the attack, which injured Mr. Rizer.

5022.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5023.  As a result of the attack and the injuries suffered, Arthur Laverne Rizer III is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5024.  Plaintiff Arthur L. Rizer Jr. is a citizen of the United States domiciled in Virginia and is the father of Arthur Laverne Rizer III.

5025.  Plaintiff Nicole Rizer is a citizen of the United States domiciled in Virginia and is the sister of Arthur Laverne Rizer III.

5026.  Plaintiff Stephanie M. Rizer is a citizen of the United States domiciled in Washington and is the sister of Arthur Laverne Rizer III.

5027.  Plaintiff Arthur Gabriel Rizer is a citizen of the United States domiciled in Virginia and is the son of Arthur Laverne Rizer III.

5028.  Plaintiff A.R., a minor child, represented by his legal guardian Arthur Laverne Rizer III, is a citizen of the United States domiciled in Washington, D.C. and is the son of Arthur Laverne Rizer III.

5029.  As a result of the attack and the injuries suffered by Arthur Laverne Rizer III, Plaintiffs Arthur L. Rizer Jr., Nicole Rizer, Stephanie M. Rizer, Arthur Gabriel Rizer, and A.R., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and

future economic damages, including loss of services and support.

**470.   THE AUGUST 19, 2005 ATTACK – FALLUJAH**

      **A.      PLAINTIFF ADAM CURTIS BIRDSELL**

5030.   Plaintiff Adam Curtis Birdsell is a U.S. citizen domiciled in Washington.

5031.   On August 19, 2005, Adam Curtis Birdsell was serving in the U.S. military when he was attacked by an IED.

5032.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Birdsell.

5033.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5034.   As a result of the attack and the injuries suffered, Adam Curtis Birdsell is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

**471.   THE AUGUST 18, 2005 ATTACK – SAMARRA**

      **A.      PLAINTIFFS THE TIMOTHY JAMES SEAMANS FAMILY**

5035.   On August 18, 2005, Timothy James Seamans was a U.S. citizen, domiciled in Florida, and serving in the U.S. military when he was attacked by an IED, causing his death.

5036.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Seamans.

5037.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

738

5038.   Plaintiff David Robert Seamans is a citizen of the United States domiciled in Florida and is the father of Timothy James Seamans.

5039.   Plaintiff Monica Seamans is a citizen of the United States domiciled in Florida and is the mother of Timothy James Seamans.

5040.   Plaintiff Ashley Marie Knapp is a citizen of the United States domiciled in Florida and is the sister of Timothy James Seamans.

5041.   Plaintiff David Robert Seamans, brings an action individually and on behalf of the Estate of Timothy James Seamans, and all heirs thereof, as its legal representative.

5042.   As a result of the attack, and the injuries suffered by and the death of Timothy James Seamans, Plaintiffs David Robert Seamans, Monica Seamans and Ashley Marie Knapp, have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Timothy James Seamans.

## 472.   THE AUGUST 12, 2005 ATTACK – KHALIDIYA

### A.   PLAINTIFFS THE LARRY ALLAN STILWELL FAMILY

5043.   On August 12, 2005, Decedent Larry Allan Stilwell was a U.S. citizen, domiciled in Florida, and was serving as a civilian contractor to the U.S. military in Iraq when he was attacked by an IED, causing his death.

5044.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Stilwell.

5045.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

5046.   Plaintiff Rachel L. Vera is a citizen of the United States domiciled in Florida and is the daughter of Larry Allan Stilwell.

5047.   Plaintiff Ryan C. Stilwell is a citizen of the United States domiciled in Colorado and is the son of Larry Allan Stilwell.

5048.   Plaintiff Jimmy Stilwell is a citizen of the United States domiciled in Indiana and is the brother of Larry Allan Stilwell Larry Allan Stilwell Larry Allan Stilwell Larry Allan Stilwell Larry Allan Stilwell Larry Allan Stilwell Larry Allan Stilwell.

5049.   Plaintiff Rachel L. Vera, brings an action individually and on behalf of the pending Estate of Larry Allan Stilwell, and all heirs thereof, as its legal representative.

5050.   As a result of the attack, and the injuries suffered by and the death of Larry Allan Stilwell, Plaintiffs Rachel L. Vera, Ryan C. Stilwell and Jimmy Stilwell, have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the pending Estate of Larry Allan Stilwell.

### 473.   THE AUGUST 11, 2005 ATTACK – BETWEEN KIRKUK AND MOSUL

#### A.   PLAINTIFFS THE BRETT ADAM MILLER FAMILY

5051.   Plaintiff Brett Adam Miller is a U.S. citizen domiciled in Oregon.

5052.   On or about August 11, 2005, Brett Adam Miller was serving in the U.S. military when he was attacked by an IED.

5053.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Miller.

5054.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack,

the munition used, as well as the tactics, techniques, and procedures utilized.

5055.   As a result of the attack and the injuries suffered, Brett Adam Miller is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5056.   Plaintiff Faith A. Miller is a citizen of the United States domiciled in Oregon and is the daughter of Brett Adam Miller.

5057.   As a result of the attack and the injuries suffered by Brett Adam Miller, Plaintiff Faith A. Miller, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 474.   THE AUGUST 10, 2005 ATTACK – BAGHDAD

#### A.   PLAINTIFF JOSEPHINE CUELLAR

5058.   Plaintiff Josephine Cuellar is a U.S. citizen domiciled in North Carolina.

5059.   On August 10, 2005, Josephine Cuellar was serving in the U.S. military when she was attacked by mortars.

5060.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Ms. Cuellar.

5061.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5062.   As a result of the attack and the injuries suffered, Josephine Cuellar is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical

expenses, lost income, and loss of earning capacity.

### 475.   THE AUGUST 9, 2005 ATTACK – BAGHDAD

#### A.   PLAINTIFF EDWARD B. JOHNSON JR.

5063.   Plaintiff Edward B. Johnson, Jr. is a U.S. citizen domiciled in Texas.

5064.   On August 9, 2005, Edward B. Johnson, Jr. was serving in the U.S. military when he was attacked by an IED.

5065.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Johnson.

5066.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5067.   As a result of the attack and the injuries suffered, Edward B. Johnson Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 476.   THE AUGUST 7, 2005 ATTACK – MOSUL

#### A.   PLAINTIFFS THE GLENN GILBERT GEFFERT FAMILY

5068.   Plaintiff Glenn Gilbert Geffert is a U.S. citizen domiciled in Florida.

5069.   On August 7, 2005, Glenn Gilbert Geffert was serving in the U.S. military when he was attacked by a VBIED.

5070.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Geffert.

5071.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack,

the munition used, as well as the tactics, techniques, and procedures utilized.

5072.   As a result of the attack and the injuries suffered, Glenn Gilbert Geffert is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5073.   Plaintiff Pamela A. Geffert is a citizen of the United States domiciled in Florida and is the spouse of Glenn Gilbert Geffert.

5074.   Plaintiff Aidan M. Geffert is a citizen of the United States domiciled in Florida and is the son of Glenn Gilbert Geffert.

5075.   Plaintiff Ian C. Drinkwater is a citizen of the United States domiciled in Florida and is the stepson of Glenn Gilbert Geffert.

5076.   Plaintiff Tristan G. Drinkwater is a citizen of the United States domiciled in Florida and is the stepson of Glenn Gilbert Geffert.

5077.   As a result of the attack and the injuries suffered by Glenn Gilbert Geffert, Plaintiffs Pamela A. Geffert, Aidan M. Geffert, Ian C. Drinkwater and Tristan G. Drinkwater, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 477.   THE AUGUST 4, 2005 ATTACK – BAIJI

### A.   PLAINTIFFS THE WENDELL DONALD CHAVIS FAMILY

5078.   Plaintiff Wendell Donald Chavis is a U.S. citizen domiciled in Pennsylvania.

5079.   On August 4, 2005, Wendell Donald Chavis was serving in the U.S. military when he was attacked by an IED.

5080.   Iran and/or its Agents and Proxies provided the funding, weapons, training,

743

and/or other material support used to commit the attack, which injured Mr. Chavis.

5081.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5082.   As a result of the attack and the injuries suffered, Wendell Donald Chavis is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5083.   Plaintiff Wendall D. Patterson is a citizen of the United States domiciled in Pennsylvania and is the father of Wendell Donald Chavis.

5084.   Plaintiff Shirley A. Chavis is a citizen of the United States domiciled in Pennsylvania and is the mother of Wendell Donald Chavis.

5085.   Plaintiff Carol Osbourne Phillips is a citizen of the United States domiciled in Pennsylvania and is the life partner of Wendell Donald Chavis.

5086.   Plaintiff Desirra L. Banks is a citizen of the United States domiciled in South Carolina and is the daughter of Wendell Donald Chavis.

5087.   Plaintiff Audrey A. Jackson is a citizen of the United States domiciled in Pennsylvania and is the daughter of Wendell Donald Chavis.

5088.   Plaintiff Dorenda Brannon is a citizen of the United States domiciled in Virginia and is the sister of Wendell Donald Chavis.

5089.   Plaintiff Lorenzo Chambers is a citizen of the United States domiciled in Delaware and is the brother of Wendell Donald Chavis.

5090.   Plaintiff Wendall Chambers is a citizen of the United States domiciled in

Pennsylvania and is the brother of Wendell Donald Chavis.

5091.   Plaintiff Alphonso L. Chavis is a citizen of the United States domiciled in Pennsylvania and is the brother of Wendell Donald Chavis.

5092.   Plaintiff Crystal N. Chavis is a citizen of the United States domiciled in Pennsylvania and is the sister of Wendell Donald Chavis.

5093.   Plaintiff Dawn Y. Chavis is a citizen of the United States domiciled in Pennsylvania and is the sister of Wendell Donald Chavis.

5094.   Plaintiff Derrick Melton is a citizen of the United States domiciled in Georgia and is the brother of Wendell Donald Chavis.

5095.   Plaintiff Sarah Louise Parker is a citizen of the United States domiciled in South Carolina and is the sister of Wendell Donald Chavis.

5096.   As a result of the attack and the injuries suffered by Wendell Donald Chavis, Plaintiffs Wendall D. Patterson, Shirley A. Chavis, Carol Osbourne Phillips, Desirra L. Banks, Audrey A. Jackson, Dorenda Brannon, Lorenzo Chambers, Wendall Chambers, Alphonso L. Chavis, Crystal N. Chavis, Dawn Y. Chavis, Derrick Melton and Sarah Louise Parker are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 478.   THE AUGUST 3, 2005 ATTACK –HADITHA

### A.   PLAINTIFFS THE NICHOLAS WILLIAM BAART BLOEM FAMILY

5097.   On August 3, 2005, Nicholas William Baart Bloem was a U.S. citizen, domiciled in Montana, and serving in the U.S. military when he was attacked by an IED, causing his death.

5098.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or

other material support used to commit the attack on Mr. Bloem.

5099. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

5100. Plaintiff Rachel Gabriela Bloem is a citizen of the United States domiciled in Montana and is the sister of Nicholas William Baart Bloem.

5101. Plaintiff Debra Leigh Bloem is a citizen of the United States domiciled in Montana and is the mother of Nicholas William Baart Bloem.

5102. Plaintiff Alcides Alexander Bloem is a citizen of the United States domiciled in Montana and is the brother of Nicholas William Baart Bloem.

5103. Plaintiff Victoria Letha Bloem is a citizen of the United States domiciled in Montana and is the sister of Nicholas William Baart Bloem.

5104. Plaintiff Florence Elizabeth Bloem is a citizen of the United States domiciled in Washington and is the sister of Nicholas William Baart Bloem.

5105. Plaintiff Catherine Grace Bloem is a citizen of the United States domiciled in Washtington and is the sister of Nicholas William Baart Bloem.

5106. Plaintiff Sarah Antonia Bloem is a citizen of the United States domiciled in Montana and is the sister of Nicholas William Baart Bloem.

5107. Plaintiff Christina Jewel Charlson is a citizen of the United States domiciled in Montana and is the sister of Nicholas William Baart Bloem.

5108. Plaintiff Juliana Joy Smith is a citizen of the United States domiciled in Washington and is the sister of Nicholas William Baart Bloem.

5109. Plaintiff S.R.B., a minor child, represented by her legal guardian Alcides Nicholas

Bloem, Jr. and Debra Leigh Bloem, is a citizen of the United States domiciled in Montana and is the sister of Nicholas William Baart Bloem.

5110.   Plaintiff Alcides Nicholas Bloem, Jr. is a citizen of the United States domiciled in Washington and is the father of Nicholas William Baart Bloem.

5111.   Plaintiff Alcides Nicholas Bloem, Jr., brings an action individually and on behalf of the Estate of Nicholas William Baart Bloem, and all heirs thereof, as its legal representative.

5112.   As a result of the attack, and the injuries suffered by and the death of Nicholas William Baart Bloem, Plaintiffs Rachel Gabriela Bloem, Debra Leigh Bloem, Alcides Alexander Bloem, Victoria Letha Bloem, Florence Elizabeth Bloem, Catherine Grace Bloem, Christina Jewel Charlson, Juliana Joy Smith, Alcides Nicholas Bloem, Jr., and S.R.B., a minor child, have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Nicholas William Baart Bloem.

### 479.   THE AUGUST 1, 2005 ATTACK – HIT

### A.   PLAINTIFF DANIEL JOEL FOSTER

5113.   Plaintiff Daniel Joel Foster is a U.S. citizen domiciled in New York.

5114.   On August 1, 2005, Daniel Joel Foster was serving in the U.S. military when he was attacked by an IED.

5115.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Foster.

5116.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

747

5117.   As a result of the attack and the injuries suffered, Daniel Joel Foster is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 480.   THE AUGUST 1, 2005 ATTACK – HIT

#### A.   PLAINTIFF LOUIS MICHAEL POPE

5118.   Plaintiff Louis Michael Pope is a U.S. citizen domiciled in Arizona.

5119.   On August 1, 2005, Louis Michael Pope was serving in the U.S. military when he was attacked by an IED.

5120.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Pope.

5121.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5122.   As a result of the attack and the injuries suffered, Louis Michael Pope is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 481.   THE JULY 31, 2005 ATTACK – HIT

#### A.   PLAINTIFF ANDREW JOHN LENZ

5123.   Plaintiff Andrew John Lenz is a U.S. citizen domiciled in New York.

5124.   On July 31, 2005, Andrew John Lenz was serving in the U.S. military when he was attacked by an IED.

5125.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or

other material support used to commit the attack, which injured Mr. Lenz.

5126.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5127.   As a result of the attack and the injuries suffered, Andrew John Lenz is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 482.   THE JULY 29, 2005 ATTACK – FALLUJAH

### A.   PLAINTIFFS THE BOBBY GENE CHRISTOPHER, III FAMILY

5128.   Plaintiff Bobby Gene Christopher, III is a U.S. citizen domiciled in Missouri.

5129.   On July 29, 2005, Bobby Gene Christopher, III was serving in the U.S. military when he was attacked by an IED.

5130.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Christopher.

5131.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5132.   As a result of the attack and the injuries suffered, Bobby Gene Christopher, III is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5133.   Plaintiff Bobby Gene Christopher, Jr. is a citizen of the United States domiciled in

Missouri and is the father of Bobby Gene Christopher, III.

5134.  Plaintiff Debi Jean Noelke is a citizen of the United States domiciled in Missouri and is the mother of Bobby Gene Christopher, III.

5135.  Plaintiff Angie Jene Christopher is a citizen of the United States domiciled in Arizona and is the sister of Bobby Gene Christopher, III.

5136.  As a result of the attack and the injuries suffered by Bobby Gene Christopher, III, Plaintiffs Bobby Gene Christopher, Jr., Debi Jean Noelke, and Angie Jene Christopher, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 483.   THE JULY 29, 2005 ATTACK – SAMARRA

#### A.   PLAINTIFF THE JUSTIN DAVIN SABO

5137.  Plaintiff Justin Davin Sabo is a U.S. citizen domiciled in Minnesota.

5138.  On July 29, 2005, Justin Davin Sabo was serving in the U.S. military when he was attacked by IED.

5139.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Sabo.

5140.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5141.  As a result of the attack and the injuries suffered, Justin Davin Sabo is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

750

**484.   THE JULY 25, 2005 ATTACK – SAMARRA**

**A.   PLAINTIFFS THE MONACA LOUISE GILMORE FAMILY**

5142.   Plaintiff Monaca Louise Gilmore is a U.S. citizen domiciled in North Carolina.

5143.   On July 25, 2005, Monaca Louise Gilmore was serving in the U.S. military when she was attacked by an IED.

5144.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Ms. Gilmore.

5145.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5146.   As a result of the attack and the injuries suffered, Monaca Louise Gilmore is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5147.   Plaintiff Maria Pettis is a citizen of the United States and domiciled in the State of North Carolina. She is the Daughter of Monaca Louise Gilmore.

5148.   Plaintiff T.M.G., a minor child, represented by her legal guardian Monaca Louise Gilmore, is a citizen of the United States and domiciled in the State of North Carolina. She is the Daughter of Monaca Louise Gilmore.

5149.   Plaintiff M.L.G., a minor child, represented by her legal guardian Monaca Louise Gilmore, is a citizen of the United States and domiciled in the State of North Carolina. She is the Daughter of Monaca Louise Gilmore.

5150.   As a result of the attack and the injuries suffered by Monaca Louise Gilmore, Plaintiffs Maria Pettis, T.M.G., a minor child, and M.L.G., a minor child, are entitled to past and

future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 485. THE JULY 24, 2005 ATTACK – KHALIDIYAH

#### A.   PLAINTIFFS THE JOSS WADE PURDON FAMILY

5151.   Plaintiff Joss Wade Purdon is a U.S. citizen domiciled in Arizona.

5152.   On July 24, 2005, Joss Wade Purdon was serving in the U.S. military when he was attacked by IEDs.

5153.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Purdon.

5154.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5155.   As a result of the attack and the injuries suffered, Joss Wade Purdon is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5156.   Plaintiff Shawna Purdon is a citizen of the United States domiciled in Arizona and is the spouse of Joss Wade Purdon.

5157.   Plaintiff Austin Purdon is a citizen of the United States domiciled in Arizona and is the son of Joss Wade Purdon.

5158.   Plaintiff Jacob Purdon is a citizen of the United States domiciled in Arizona and is the son of Joss Wade Purdon.

5159.   As a result of the attack and the injuries suffered by Joss Wade Purdon, Plaintiffs

Shawna Purdon, Austin Purdon and Jacob Purdon are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 486.   THE JULY 24, 2005 ATTACK – KHALIDIYAH

#### A.   PLAINTIFFS THE BERNABE CARRELL MONTEJANO FAMILY

5160.   Plaintiff Bernabe Carrell Montejano is a U.S. citizen domiciled in Texas.

5161.   On July 24, 2005, Bernabe Carrell Montejano was serving in the U.S. military when he was attacked by an IED.

5162.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Montejano.

5163.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5164.   As a result of the attack and the injuries suffered, Bernabe Carrell Montejano is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5165.   Plaintiff Faith Montejano is a citizen of the United States and domiciled in the State of Tennessee. She is the mother of Bernabe Carrell Montejano.

5166.   Plaintiff Sarah M. Humphrey is a citizen of the United States and domiciled in the State of Tennessee. She is the sister of Bernabe Carrell Montejano.

5167.   As a result of the attack and the injuries suffered by Bernabe Carrell Montejano,

Plaintiffs Faith Montejano and Sarah M. Humphrey, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 487.   THE JULY 24, 2005 ATTACK – KHALIDIYAH

### A.   PLAINTIFFS THE JACOB ANDREW MILLER FAMILY

5168.   Plaintiff Jacob Andrew Miller is a U.S. citizen domiciled in Colorado.

5169.   On July 24, 2005, Jacob Andrew Miller was serving in the U.S. military when he was attacked by an IED.

5170.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Miller.

5171.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5172.   As a result of the attack and the injuries suffered, Jacob Andrew Miller is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5173.   Plaintiff Rachel Amber Miller is a citizen of the United States domiciled in Colorado and is the spouse of Jacob Andrew Miller.

5174.   Plaintiff Lafonda Miller is a citizen of the United States domiciled in Colorado and is the mother of Jacob Andrew Miller.

5175.   Plaintiff Lyle Miller is a citizen of the United States domiciled in Colorado and is the father of Jacob Andrew Miller.

754

5176.   Plaintiff Zachary Miller is a citizen of the United States domiciled in Colorado and is the brother of Jacob Andrew Miller.

5177.   As a result of the attack and the injuries suffered by Jacob Andrew Miller, Plaintiffs Rachel Amber Miller, Lafonda Miller, Lyle Miller, and Zachary Miller are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 488.   THE JULY 16, 2005 ATTACK – KIRKUK

#### A.   PLAINTIFFS THE CHRISTOPHER LEE OLSEN FAMILY

5178.   Plaintiff Christopher Lee Olsen is a U.S. citizen domiciled in Utah.

5179.   On July 16, 2005, Christopher Lee Olsen was serving in the U.S. military when he was attacked by IEDs.

5180.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Olsen.

5181.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5182.   As a result of the attack and the injuries suffered, Christopher Lee Olsen is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5183.   Plaintiff Stacie Olsen is a citizen of the United States and domiciled in the State of Utah. She is the wife of Christopher Lee Olsen.

5184.   As a result of the attack and the injuries suffered by Christopher Lee Olsen,

Plaintiff Stacie Olsen, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 489.   THE JULY 15, 2005 ATTACK – BAGHDAD

####    A.      PLAINTIFF JOHN WILLIAM FUHRMAN

5185.   Plaintiff John William Fuhrman is a U.S. citizen domiciled in Washington.

5186.   On July 15, 2005, John William Fuhrman was serving in the U.S. military when he was attacked by mortar.

5187.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Fuhrman.

5188.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5189.   As a result of the attack and the injuries suffered, John William Fuhrman is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 490.   THE JULY 10, 2005 ATTACK – MOSUL

####    A.      PLAINTIFF JARROD SCOTT HALLMAN

5190.   Plaintiff Jarrod Scott Hallman is a U.S. citizen domiciled in Texas.

5191.   On July 10, 2005, Jarrod Scott Hallman was serving in the U.S. military when he was attacked by an IED.

5192.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Hallman.

5193.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5194.   As a result of the attack and the injuries suffered, Jarrod Scott Hallman is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 491.   THE JULY 9, 2005 ATTACK – TAL AFAR

#### A.   PLAINTIFF RYAN CHRISTOPHER SAURS

5195.   Plaintiff Ryan Christopher Saurs is a U.S. citizen domiciled in Pennsylvania.

5196.   On July 9, 2005, Ryan Christopher Saurs was serving in the U.S. military when he was attacked by small arms, grenades, and an IED.

5197.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Saurs.

5198.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5199.   As a result of the attack and the injuries suffered, Ryan Christopher Saurs is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 492.   THE JUNE 29, 2005 ATTACK – HABBANIYAH

#### A.   PLAINTIFF CHARLES EUGENE RUSSELL

5200.   Plaintiff Charles Eugene Russell is a U.S. citizen domiciled in Iowa.

757

5201.  On June 29, 2005, Charles Eugene Russell was serving in the U.S. military when he was attacked by an IED and Small Arms Fire.

5202.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Russell.

5203.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5204.  As a result of the attack and the injuries suffered, Charles Eugene Russell is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 493.  THE JUNE 28, 2005 ATTACK – FOB O'RYAN

#### A.  PLAINTIFF JOSEPHINE CUELLAR

5205.  Plaintiff Josephine Cuellar is a U.S. citizen domiciled in North Carolina.

5206.  On June 28, 2005, Josephine Cuellar was serving in the U.S. military when she was attacked by a VBIED.

5207.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Ms. Cuellar.

5208.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5209.  As a result of the attack and the injuries suffered, Josephine Cuellar is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical

expenses, lost income, and loss of earning capacity.

### 494.   THE JUNE 22, 2005 ATTACK – BAGHDAD

#### A.   PLAINTIFF JESSICA MARIE GRIGGS

5210.   Plaintiff Jessica Marie Griggs is a U.S. citizen domiciled in Ohio.

5211.   On June 22, 2005, Jessica Marie Griggs was serving in the U.S. military when she was attacked by a mortar.

5212.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Ms. Griggs.

5213.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5214.   As a result of the attack and the injuries suffered, Jessica Marie Griggs is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 495.   THE JUNE 16, 2005 ATTACK – RAMADI

#### A.   PLAINTIFFS THE OCTAVIO SANCHEZ FAMILY

5215.   Plaintiff Octavio Sanchez is a U.S. citizen domiciled in California.

5216.   On June 16, 2005, Octavio Sanchez was serving in the U.S. military when he was attacked by IEDs.

5217.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Sanchez.

5218.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack,

the munition used, as well as the tactics, techniques, and procedures utilized.

5219.   As a result of the attack and the injuries suffered, Octavio Sanchez is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5220.  Plaintiff Vanette C. Sanchez is a citizen of the United States domiciled in California and is the spouse of Octavio Sanchez.

5221.  Plaintiff Jacob Andrew Sanchez is a citizen of the United States domiciled in California and is the son of Octavio Sanchez.

5222.  Plaintiff Octavio Manuel Sanchez is a citizen of the United States domiciled in California and is the son of Octavio Sanchez.

5223.  Plaintiff J.S., a minor child, represented by her legal guardian Octavio Sanchez, is a citizen of the United States domiciled in California and is the daughter of Octavio Sanchez.

5224.   As a result of the attack and the injuries suffered by Octavio Sanchez, Plaintiffs Vanette C. Sanchez, Jacob Andrew Sanchez, Octavio Manuel Sanchez and J.S., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 496.   THE JUNE 15, 2005 ATTACK – BATAWEEN NEIGHBORHOOD, BAGHDAD

#### A.     PLAINTIFF ERIC EUGENE RODRIQUEZ

5225.  Plaintiff Eric Eugene Rodriquez is a U.S. citizen domiciled in Idaho.

5226.  On June 15, 2005, Eric Eugene Rodriquez was serving in the U.S. military when he was attacked by an IED.

5227.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Rodriquez.

5228.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5229.   As a result of the attack and the injuries suffered, Eric Eugene Rodriquez is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 497.   THE JUNE 9, 2005 ATTACK – HAQLANIYAH

### A.   PLAINTIFFS THE BRAD DUANE SQUIRES FAMILY

5230.   On June 9, 2005, Brad Duane Squires was a U.S. citizen, domiciled in Ohio, and serving in the U.S. military when he was attacked by an IED, causing his death.

5231.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Squires.

5232.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

5233.   Plaintiff Donna Squires is a citizen of the United States domiciled in Ohio and is the mother of Brad Duane Squires.

5234.   Plaintiff Jodie Marie Dennison is a citizen of the United States domiciled in Ohio and is the sister of Brad Duane Squires.

5235.   Plaintiff Chad Francis Squires is a citizen of the United States domiciled in Ohio and is the brother of Brad Duane Squires.

5236.   As a result of the attack, and the death of Brad Duane Squires, Plaintiffs Donna Squires, Jodie Marie Dennison, and Chad Francis Squires have suffered severe mental anguish, extreme emotional pain and suffering, loss of society, services, companionship, comfort, protection, instruction, advice and counsel of decedent Brad Duane Squires.

### 498.   THE JUNE 9, 2005 ATTACK - HAQLANIYAH

### A.   PLAINTIFFS THE THOMAS OLIVER KEELING FAMILY

5237.   On June 9, 2005, Thomas Oliver Keeling was a U.S. citizen, domiciled in Ohio, and serving in the U.S. military when he was attacked by IEDs, causing his death.

5238.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Keeling.

5239.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

5240.   Plaintiff Sharon Therese Berry is a citizen of the United States domiciled in Ohio and is the mother of Thomas Oliver Keeling.

5241.   Plaintiff Robert James Berry is a citizen of the United States domiciled in Ohio and is the step-father of Thomas Oliver Keeling.

5242.   Plaintiff Kristen Ann Keeling Surovy is a citizen of the United States domiciled in Ohio and is the sister of Thomas Oliver Keeling.

5243.   Plaintiff Erin Lynn Keeling Kurincic is a citizen of the United States domiciled in Ohio and is the sister of Thomas Oliver Keeling.

5244.   Plaintiff Sharon Therese Berry, brings an action individually and on behalf of the Estate of Thomas Oliver Keeling, and all heirs thereof, as its legal representative.

5245.   As a result of the attack, and the injuries suffered by and the death of Thomas

Oliver Keeling, Plaintiffs Sharon Therese Berry, Robert James Berry, Kristen Ann Keeling Surovy, and Erin Lynn Keeling Kurincic have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Thomas Oliver Keeling.

### 499.   THE JUNE 7, 2005 ATTACK – RAMADI

#### A.   PLAINTIFFS THE JOSEPH JOAQUIN TELLEZ FAMILY

5246.   Plaintiff Joseph Joaquin Tellez is a U.S. citizen domiciled in California.

5247.   On June 7, 2005, Joseph Joaquin Tellez was serving in the U.S. military when he was attacked by a sniper.

5248.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Tellez.

5249.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5250.   As a result of the attack and the injuries suffered, Joseph Joaquin Tellez is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5251.   Plaintiff Isabel G. Tellez is a citizen of the United States domiciled in California and is the mother of Joseph Joaquin Tellez.

5252.   Plaintiff Richard A. Tellez is a citizen of the United States domiciled in California and is the father of Joseph Joaquin Tellez.

5253.   Plaintiff Sadie S. Lafromboise is a citizen of the United States domiciled in

California and is the sister of Joseph Joaquin Tellez.

5254.   As a result of the attack and the injuries suffered by Joseph Joaquin Tellez, Plaintiffs Isabel G. Tellez, Richard A. Tellez, and Sadie S. Lafromboise are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 500.   THE JUNE 5, 2005 ATTACK – RASHEED

### A.   PLAINTIFFS THE JUSTIN LEE VASQUEZ FAMILY

5255.   On June 5, 2005, Justin Lee Vasquez was a U.S. citizen, domiciled in Colorado, and serving in the U.S. military when he was attacked by IEDs, causing his death.

5256.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Vasquez.

5257.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

5258.   Plaintiff Riley Nicole Vasquez is a citizen of the United States domiciled in Wyoming and is the spouse of Justin Lee Vasquez.

5259.   Plaintiff Riley Nicole Vasquez, brings an action individually and on behalf of the Estate of Justin Lee Vasquez, and all heirs thereof, as its legal representative.

5260.   Plaintiff Jennifer Lynn Arebalo is a citizen of the United States domiciled in Colorado and is the sister of Justin Lee Vasquez.

5261.   Plaintiff Janneke Leann Eikenberg is a citizen of the United States domiciled in Colorado and is the sister of Justin Lee Vasquez.

5262.   As a result of the attack, and the injuries suffered by and the death of Justin Lee

Vasquez, Plaintiffs Riley Nicole Vasquez, Jennifer Lynn Arebalo, and Janneke Leann Eikenberg have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Justin Lee Vasquez.

### 501.   THE MAY 21, 2005 ATTACK – HADITHAH DAM

#### A.      PLAINTIFF JASON THOMAS WOODLIFF

5263.   Plaintiff Jason Thomas Woodliff is a U.S. citizen domiciled in Ohio.

5264.   On May 21, 2005, Jason Thomas Woodliff was serving in the U.S. military when he was attacked by an IED.

5265.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Woodliff.

5266.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5267.   As a result of the attack and the injuries suffered, Jason Thomas Woodliff is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 502.   THE MAY 15, 2005 ATTACK – TREBIL

#### A.      PLAINTIFF DANIEL WILLIAM BARRON

5268.   Plaintiff Daniel William Barron is a U.S. citizen domiciled in Oklahoma.

5269.   On May 15, 2005, Daniel William Barron was serving in the U.S. military when he was attacked by IED.

5270.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Barron.

5271.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5272.   As a result of the attack and the injuries suffered, Daniel William Barron is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 503.   THE MAY 13, 2005 ATTACK – BALAD

### A.   PLAINTIFF CHRISTOPHER FRANKLIN SWARTZ

5273.   Plaintiff Christopher Franklin Swartz is a U.S. citizen domiciled in Kansas.

5274.   On May 13, 2005, Christopher Franklin Swartz was serving in the U.S. military when he was attacked by small arms fire and a Molotov cocktail grenade.

5275.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Swartz.

5276.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5277.   As a result of the attack and the injuries suffered, Christopher Franklin Swartz is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 504.   THE MAY 11, 2005 ATTACK – RAMADI

#### A.   PLAINTIFF SCOTT BRONSON LYON

5278.   Plaintiff Scott Bronson Lyon is a U.S. citizen domiciled in Iowa.

5279.   On May 11, 2005, Scott Bronson Lyon was serving in the U.S. military when he was attacked by an IED.

5280.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Lyon.

5281.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5282.   As a result of the attack and the injuries suffered, Scott Bronson Lyon is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 505.   THE MAY 11, 2005 ATTACK – BALAD

#### A.   PLAINTIFF AENEAS ROBERT TOCHI

5283.   Plaintiff Aeneas Robert Tochi is a U.S. citizen domiciled in Colorado.

5284.   On May 11, 2005, Aeneas Robert Tochi was serving in the U.S. military when he was attacked by an IED.

5285.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Tochi.

5286.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5287.   As a result of the attack and the injuries suffered, Aeneas Robert Tochi is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 506.   THE MAY 9, 2005 ATTACK – HASWA

#### A.   PLAINTIFF DONNELL DRAIL NELSON, II

5288.   Plaintiff Donnell Drail Nelson, II is a U.S. citizen domiciled in South Carolina.

5289.   On May 9, 2005, Donnell Drail Nelson, II was serving in the U.S. military when he was attacked by IEDs, RPGs and small arms fire.

5290.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Nelson.

5291.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5292.   As a result of the attack and the injuries suffered, Donnell Drail Nelson, II is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 507.   THE MAY 9, 2005 ATTACK – AL KARMAH

#### A.   PLAINTIFFS THE TAYLOR BRADLEY PRAZYNSKI FAMILY

5293.   On May 9, 2005, Taylor Bradley Prazynski was a U.S. citizen, domiciled in Ohio, and serving in the U.S. military when he was attacked by mortars, causing his death.

5294.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Prazynski.

5295.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

5296.   Plaintiff John Francis Prazynski is a citizen of the United States domiciled in Ohio and is the father of Taylor Bradley Prazynski.

5297.   Plaintiff Claudia Catherine Pierce is a citizen of the United States domiciled in Ohio and is the mother of Taylor Bradley Prazynski.

5298.   Plaintiff Carol Rose Prazynski is a citizen of the United States domiciled in Ohio and is the step-mother of Taylor Bradley Prazynski.

5299.   Plaintiff Ryan Andrew Blomer is a citizen of the United States domiciled in Ohio and is the step-brother of Taylor Bradley Prazynski.

5300.   Plaintiff John Francis Prazynski, brings an action individually and on behalf of the Estate of Taylor Bradley Prazynski, and all heirs thereof, as its legal representative.

5301.   As a result of the attack, and the injuries suffered by and the death of Taylor Bradley Prazynski, Plaintiffs John Francis Prazynski, Claudia Catherine Pierce, Carol Rose Prazynski, and Ryan Andrew Blomer have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Taylor Bradley Prazynski.

### 508.   THE MAY 8, 2005 ATTACK – AL QA'IM

#### A.   PLAINTIFF JOSEPH MICHAEL LOWE

5302.   Plaintiff Joseph Michael Lowe is a U.S. citizen domiciled in Idaho.

5303.   On May 8, 2005, Joseph Michael Lowe was serving in the U.S. military when he was attacked by VBIEDs, IEDs, RPGs, and small arms fire.

5304.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Lowe.

5305.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5306.   As a result of the attack and the injuries suffered, Joseph Michael Lowe is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 509.   THE MAY 8, 2005 ATTACK – NEW UBAYDI

### A.   PLAINTIFFS THE COLLEN MATTHEW WEST FAMILY

5307.   Plaintiff Collen Matthew West is a U.S. citizen domiciled in Ohio.

5308.   On May 8, 2005, Collen Matthew West was serving in the U.S. military when he was attacked by RPGs and small arms fire.

5309.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. West.

5310.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5311.   As a result of the attack and the injuries suffered, Collen Matthew West is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5312.   Plaintiff Carla West is a citizen of the United States domiciled in Ohio and is the

770

mother of Collen Matthew West.

5313. Plaintiff Tim West is a citizen of the United States domiciled in Ohio and is the father of Collen Matthew West.

5314. Plaintiff Brenden West is a citizen of the United States domiciled in Ohio and is the brother of Collen Matthew West.

5315. Plaintiff Allison West-Southern is a citizen of the United States domiciled in Ohio and is the sister of Collen Matthew West.

5316. Plaintiff Kiera Paul is a citizen of the United States domiciled in Ohio and is the sister of Collen Matthew West.

5317. Plaintiff Mike Sweeney is a citizen of the United States domiciled in Ohio and is the uncle of Collen Matthew West.

5318. As a result of the attack and the injuries suffered by Collen Matthew West, Plaintiffs Carla West, Tim West, Brenden West, Allison West-Southern, Kiera Paul, and Mike Sweeney, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

**510. THE MAY 3, 2005 ATTACK – MOSUL**

**A.      PLAINTIFFS THE KYLE MATTHEW LEMIEUX FAMILY**

5319. Plaintiff Kyle Matthew Lemieux is a U.S. citizen domiciled in Washington.

5320. On or around May 3, 2005, Kyle Matthew Lemieux was serving in the U.S. military when he was attacked by a VBIED.

5321. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Lemieux.

5322. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack,

as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5323.   As a result of the attack and the injuries suffered, Kyle Matthew Lemieux is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5324.   Plaintiff Elizabeth Lynn Coffin is a citizen of the United States domiciled in Maine, and is the mother of Kyle Matthew Lemieux.

5325.   As a result of the attack and the injuries suffered by Kyle Matthew Lemieux, Plaintiff Elizabeth Lynn Coffin is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 511.   THE MAY 1, 2005 ATTACK – BAGHDAD

### A.   PLAINTIFFS THE JOHN JUJU WILLIAMS FAMILY

5326.   Plaintiff John Juju Williams is a U.S. citizen domiciled in North Carolina.

5327.   On May 1, 2005, John Juju Williams was serving in the U.S. military when he was attacked by a VBIED.

5328.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Williams.

5329.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5330.   As a result of the attack and the injuries suffered, John Juju Williams is entitled to past and future noneconomic damages, including for severe physical and mental pain and

suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5331.   Plaintiff Chiquita S. Williams is a citizen of the United States domiciled in North Carolina and is the spouse of John Juju Williams.

5332.   Plaintiff D.I.W., a minor child, represented by her legal guardians John Juju William and Chiquita S. Williams, is a citizen of the United States domiciled in North Carolina and is the daughter of John Juju Williams.

5333.   As a result of the attack and the injuries suffered by John Juju Williams, Plaintiffs Chiquita S. Williams and D.I.W., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 512.   THE APRIL 28, 2005 ATTACK – TAL AFAR

### A.   PLAINTIFFS THE ERIC WAYNE MORRIS FAMILY

5334.   On April 28, 2005, Eric Wayne Morris was a U.S. citizen, domiciled in Washington, and serving in the U.S. military when he was attacked by IEDs, causing his death.

5335.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Morris.

5336.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

5337.   Plaintiff Jolene Ellen Morris is a citizen of the United States domiciled in Nevada and is the spouse of Eric Wayne Morris.

5338.   Plaintiff Jolene Ellen Morris brings an action individually and on behalf of the

Estate of Eric Wayne Morris, and all heirs thereof, as its legal representative.

5339.   Plaintiff Chyan N. Jache is a citizen of the United States domiciled in Nevada and is the step-daughter of Eric Wayne Morris.

5340.   Plaintiff Chyna M. Jache is a citizen of the United States domiciled in Nevada and is the step-daughter of Eric Wayne Morris.

5341.   As a result of the attack, and the injuries suffered by and the death of Eric Wayne Morris, Plaintiffs Jolene Ellen Morris, Chyan N. Jache, and Chyna M. Jache have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Eric Wayne Morris.

## 513.   THE APRIL 26, 2005 ATTACK – HIT

### A.     PLAINTIFF JACOB P. DAVID

5342.   Plaintiff Jacob P. David is a U.S. citizen domiciled in Pennsylvania.

5343.   On April 26, 2005, Jacob P. David was serving in the U.S. military when he was attacked by an IED.

5344.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. David.

5345.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5346.   As a result of the attack and the injuries suffered, Jacob P. David is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

774

### 514. THE APRIL 24, 2005 ATTACK – HIT

#### A. PLAINTIFF ADAM JEFFERY MCCANN

5347. Plaintiff Adam Jeffery McCann is a U.S. citizen domiciled in Ohio.

5348. On April 24, 2005, Adam Jeffery McCann was serving in the U.S. military when he was attacked by mortar.

5349. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. McCann.

5350. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5351. As a result of the attack and the injuries suffered, Adam Jeffery McCann is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 515. THE APRIL 22, 2005 ATTACK – HABBANIYAH

#### A. PLAINTIFFS THE JAMES MICHAEL HURST FAMILY

5352. Plaintiff James Michael Hurst is a U.S. citizen domiciled in South Carolina.

5353. On April 22, 2005, James Michael Hurst was serving in the U.S. military when he was attacked by small arms fire and RPGs.

5354. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Hurst.

5355. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5356.   As a result of the attack and the injuries suffered, James Michael Hurst is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5357.   Plaintiff Alvia Masayon Hurst is a citizen of the United States domiciled in South Carolina and is the spouse of James Michael Hurst.

5358.   Plaintiff Bausten Cole Hurst is a citizen of the United States domiciled in South Carolina and the son of James Michael Hurst.

5359.   As a result of the attack and the injuries suffered by James Michael Hurst, Plaintiffs Alvia Masayon Hurst and Bausten Cole Hurst, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 516.   THE APRIL 21, 2005 ATTACK – RAMADI

#### A.   PLAINTIFFS THE DAVID VINCENT BEDNARCIK FAMILY

5360.   Plaintiff David Vincent Bednarcik is a U.S. citizen domiciled in the Territory of Guam.

5361.   On April 21, 2005, David Vincent Bednarcik was serving in the U.S. military when he was attacked by an IED.

5362.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Bednarcik.

5363.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

776

5364.  As a result of the attack and the injuries suffered, David Vincent Bednarcik is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5365.  Plaintiff Rene Bednarcik is a citizen of the United States domiciled in the Territory of Guam and is the spouse of David Vincent Bednarcik.

5366.  Plaintiff Vincentine L. Bednarcik is a citizen of the United States domiciled in Pennsylvania and is the mother of David Vincent Bednarcik.

5367.  As a result of the attack and the injuries suffered by David Vincent Bednarcik, Plaintiffs Rene Bednarcik and Vincentine L. Bednarcik, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 517.  THE APRIL 19, 2005 ATTACK – BAGHDAD

#### A.  PLAINTIFFS THE JOEL BENJAMIN DAMIN FAMILY

5368.  Plaintiff Joel Benjamin Damin is a U.S. citizen domiciled in North Carolina.

5369.  On April 19, 2005, Joel Benjamin Damin was serving in the U.S. military when he was attacked by a VBIED.

5370.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Damin.

5371.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5372.  As a result of the attack and the injuries suffered, Joel Benjamin Damin is entitled

to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5373.   Plaintiff Rebecca S. Damin-Moss is a citizen of the United States domiciled in North Carolina and is the mother of Joel Benjamin Damin.

5374.   Plaintiff R.E.D., a minor child, represented by her legal guardian Joel Benjamin Damin, is a citizen of the United States domiciled in North Carolina and is the daughter of Joel Benjamin Damin.

5375.   As a result of the attack and the injuries suffered by Joel Benjamin Damin, Plaintiffs Rebecca S. Damin-Moss and R.E.D., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 518.   THE APRIL 16, 2005 ATTACK – RAMADI

#### A.   PLAINTIFFS THE JOSE MIGUEL JAUREGUI FAMILY

5376.   Plaintiff Jose Miguel Jauregui is a U.S. citizen domiciled in California.

5377.   On April 16, 2005, Jose Miquel Jauregui was serving in the U.S. military when he was attacked by mortar.

5378.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Jauregui.

5379.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5380.   As a result of the attack and the injuries suffered, Jose Miguel Jauregui is entitled

to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5381.   Plaintiff Griselda Jauregui is a citizen of the United States domiciled in California and is the mother of Jose Miguel Jauregui Plaintiff

5382.   Plaintiff Jose Jauregui is a citizen of the United States domiciled in California and is the father of Jose Miguel Jauregui.

5383.   Plaintiff Josefina Jauregui is a citizen of the United States domiciled in Arizona and is the sister of Jose Miguel Jauregui.

5384.   Plaintiff Alfredo Jauregui is a citizen of the United States domiciled in California and is the brother of Jose Miguel Jauregui.

5385.   Plaintiff Lucio Jauregui is a citizen of the United States domiciled in California and is the brother of Jose Miguel Jauregui.

5386.   As a result of the attack and the injuries suffered by Jose Miguel Jauregui, Plaintiffs Griselda Jauregui, Jose Jauregui, Josefina Jauregui, Alfredo Jauregui and Lucio Jauregui are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 519.   THE APRIL 16, 2005 ATTACK – RAMADI

### A.   PLAINTIFFS THE TROMAINE K. TOY, SR., FAMILY

5387.   On April 16, 2005, Tromaine K. Toy, Sr. was a U.S. citizen, domiciled in Virginia, and serving in the U.S. military when he was attacked by mortars, causing his death.

5388.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Toy.

5389.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

5390.   Plaintiff Tyrell R. Toy is a citizen of the United States domiciled in Virginia and is the brother of Tromaine K. Toy, Sr.

5391.   Plaintiff Tyrell R. Toy, brings an action individually and on behalf of the Estate of Tromaine K. Toy, Sr., and all heirs thereof, as its legal representative.

5392.   As a result of the attack, and the injuries suffered by and the death of Tromaine K. Toy, Sr., Plaintiff Tyrell R. Toy has suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Tromaine K. Toy, Sr.

## 520.   THE APRIL 16, 2005 ATTACK – RAMADI

### A.   PLAINTIFFS THE ROBERT WILLIAM BRIGGS FAMILY

5393.   On April 16, 2005, Robert William Briggs was a U.S. citizen, domiciled in Iowa, and serving in the U.S. military when he was attacked by a mortar, resulting in injuries causing his death on June 28, 2011.

5394.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Briggs.

5395.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

5396.   Plaintiff Michelle L. Briggs is a citizen of the United States domiciled in Iowa and is the spouse of Robert William Briggs.

5397.   Plaintiff Michelle L. Briggs, brings an action individually and on behalf of the Estate of Robert William Briggs, and all heirs thereof, as its legal representative.

5398.   Plaintiff C.A.B., a minor child, represented by his legal guardian Michelle L. Briggs, is a citizen of the United States domiciled in Iowa and is the son of Robert William Briggs.

5399.   Plaintiff Ashlea Gabrielle Tadlock is a citizen of the United States domiciled in Iowa and is the daughter of Robert William Briggs.

5400.   As a result of the attack, and the injuries suffered by and the death Robert William Briggs, Plaintiffs Michelle L. Briggs, C.A.B., a minor child, and Ashlea Gabrielle Tadlock have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Robert William Briggs.

### 521.   THE APRIL 16, 2005 ATTACK – RAMADI

#### A.   PLAINTIFFS THE RANDY LEE STEVENS FAMILY

5401.   On April 16, 2005, Randy Lee Stevens was a U.S. citizen, domiciled in Michigan, and serving in the U.S. military when he was attacked by mortars, causing his death.

5402.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Stevens.

5403.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

5404.   Plaintiff David L. Stevens is a citizen of the United States domiciled in Michigan and is the father of Randy Lee Stevens.

5405.   Plaintiff David L. Stevens, brings an action individually and on behalf of the Estate of Randy Lee Stevens, and all heirs thereof, as its legal representative.

5406.   Plaintiff Connie West is a citizen of the United States domiciled in Michigan and is the sister of Randy Lee Stevens.

5407.   Plaintiff Gina Lee Stevens is a citizen of the United States domiciled in Michigan and is the sister of Randy Lee Stevens.

5408.   Plaintiff Jacob Lee Maxwell is a citizen of the United States domiciled in Michigan and is the brother of Randy Lee Stevens.

5409.   As a result of the attack, and the injuries suffered by and the death of Randy Lee Stevens, Plaintiffs David L. Stevens, Connie West, Gina Lee Stevens, and Jacob Lee Maxwell have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Randy Lee Stevens.

## 522.   THE APRIL 15, 2005 ATTACK – KARADA NEIGHBORHOOD, BAGHDAD

### A.   PLAINTIFF JOSEF ERNEST BAUMANN

5410.   Plaintiff Josef Ernest Baumann is a U.S. citizen domiciled in Florida.

5411.   On April 15, 2005, Josef Ernest Baumann, was serving in the U.S. military when he was attacked by a sniper.

5412.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Baumann.

5413.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the

attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5414.   As a result of the attack and the injuries suffered, Josef Ernest Baumann is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 523.   THE APRIL 13, 2005 ATTACK – FOB HIT

#### A.   PLAINTIFF TIMOTHY MICHAEL HATCH

5415.   Plaintiff Timothy Michael Hatch is a U.S. citizen domiciled in Ohio.

5416.   On April 13, 2005, Timothy Michael Hatch was serving in the U.S. military when he was attacked by a rocket.

5417.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Hatch.

5418.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5419.   As a result of the attack and the injuries suffered, Timothy Michael Hatch is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 524.   THE APRIL 10, 2005 ATTACK – FALLUJAH

#### A.   PLAINTIFF MATTHEW PAUL DALRYMPLE

5420.   Plaintiff Matthew Paul Dalrymple is a U.S. citizen domiciled in Florida.

5421.   On April 10, 2005, Matthew Paul Dalrymple was serving in the U.S. military when he was attacked by an IED.

5422.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Dalrymple.

5423.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5424.   As a result of the attack and the injuries suffered, Matthew Paul Dalrymple is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 525.   THE APRIL 10, 2005 ATTACK – FOB FALCON

#### A.   PLAINTIFFS THE JOSHUA DIVON TRAVIS FAMILY

5425.   Plaintiff Joshua Divon Travis is a U.S. citizen domiciled in Texas.

5426.   On April 10, 2005, Joshua Divon Travis was serving in the U.S. military when he was attacked by rockets and a VBIED.

5427.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Travis.

5428.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5429.   As a result of the attack and the injuries suffered, Joshua Divon Travis is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5430.   Plaintiff D.R.G., a minor child, represented by his legal guardian Joshua Divon

Travis, is a citizen of the United States domiciled in Texas and is the son of Joshua Divon Travis.

5431.   Plaintiff J.S.A., a minor child, represented by her legal guardian Joshua Divon Travis, is a citizen of the United States domiciled in Texas and is the daughter of Joshua Divon Travis.

5432.   Plaintiff A.C.J., a minor child, represented by her legal guardian Joshua Divon Travis, is a citizen of the United States domiciled in Texas and is the daughter of Joshua Divon Travis.

5433.   Plaintiff M.D.T., a minor child, represented by her legal guardian Joshua Divon Travis, is a citizen of the United States domiciled in Texas and is the daughter of Joshua Divon Travis.

5434.   As a result of the attack and the injuries suffered by Joshua Divon Travis, Plaintiffs D.R.G., a minor child, J.S.A., a minor child, A.C.J., a minor child, and M.D.T., a minor child are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 526.   THE APRIL 5, 2005 ATTACK – DORA-SOUTHERN BAGHDAD

### A.   PLAINTIFFS THE STEVE NUÑEZ, JR. FAMILY

5435.   Plaintiff Steve Nuñez, Jr. is a U.S. citizen domiciled in California.

5436.   On April 5, 2005, Steve Nuñez, Jr. was serving in the U.S. military when he was attacked by a VBIED.

5437.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Nuñez.

5438.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack,

the munition used, as well as the tactics, techniques, and procedures utilized.

5439.   As a result of the attack and the injuries suffered, Steve Nuñez, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5440.   Plaintiff Audrey O'Donnell is a citizen of the United States and domiciled in the State of California. She is the wife of Steve Nuñez, Jr.

5441.   As a result of the attack and the injuries suffered by Steve Nuñez, Jr., Plaintiff Audrey O'Donnell, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 527.   THE APRIL 5, 2005 ATTACK – SOUTHERN BAGHDAD

### A.   PLAINTIFFS THE CHRISTOPHER JOHN SHIMA FAMILY

5442.   Plaintiff Christopher John Shima is a U.S. citizen domiciled in Arizona.

5443.   On April 5, 2005 Christopher John Shima was serving in the U.S. military when he was attacked by a VBIED.

5444.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Shima.

5445.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5446.   As a result of the attack and the injuries suffered, Christopher John Shima is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including

786

medical expenses, lost income, and loss of earning capacity.

5447.   Plaintiff Christina Louise Shima is a citizen of the United States domiciled in Arizona and is the spouse of Christopher John Shima.

5448.   Plaintiff A.G.S., a minor child, represented by his legal guardians Christopher John Shima and Christina Louise Shima, is a citizen of the United States domiciled in Arizona and is the son of Christopher John Shima.

5449.   As a result of the attack and the injuries suffered by Christopher John Shima, Plaintiffs Christina Louise Shima and A.G.S., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 528.   THE APRIL 2, 2005 ATTACK – ABU GHRAIB

### A.   PLAINTIFF JASON TODD MORRIS

5450.   Plaintiff Jason Todd Morris is a U.S. citizen domiciled in Alabama.

5451.   On April 2, 2005, Jason Todd Morris was serving in the U.S. military when he was attacked by a VBIED and small arms fire.

5452.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Morris.

5453.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5454.   As a result of the attack and the injuries suffered, Jason Todd Morris is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical

expenses, lost income, and loss of earning capacity.

### 529.   THE APRIL 2, 2005 ATTACK – ABU GHRAIB

#### A.      PLAINTIFFS THE CORTNEY MCCABE ROBINSON FAMILY

5455.   Plaintiff Cortney McCabe Robinson is a U.S. citizen domiciled in Michigan.

5456.   On April 2, 2005, Cortney McCabe Robinson was serving in the U.S. military when he was attacked by VBIED, mortars, grenades, and small arms fire.

5457.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Robinson.

5458.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5459.   As a result of the attack and the injuries suffered, Cortney McCabe Robinson is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5460.   Plaintiff Christopher Michael Robinson is a citizen of the United States domiciled in Arizona and is the brother of Cortney McCabe Robinson.

5461.   Plaintiff Nichole Rennea Hoskins is a citizen of the United States domiciled in Missouri and is the sister of Cortney McCabe Robinson.

5462.   Plaintiff Matthew P. Robinson is a citizen of the United States domiciled in Michigan and is the father of Cortney McCabe Robinson.

5463.   As a result of the attack and the injuries suffered by Cortney McCabe Robinson, Plaintiffs Christopher Michael Robinson, Nichole Rennea Hoskins, and Matthew P. Robinson are entitled to past and future noneconomic damages, including for severe mental anguish,

extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 530.   THE APRIL 2, 2005 ATTACK – ABU GHRAIB

### A.   PLAINTIFFS THE WILLIAM JOSEPH PUOPOLO FAMILY

5464.   Plaintiff William Joseph Puopolo is a U.S. citizen domiciled in Florida.

5465.   On April 2, 2005, William Joseph Puopolo was serving in the U.S. military when he was attacked by A VBIED, mortars, grenades and small arms fire.

5466.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Puopolo.

5467.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5468.   As a result of the attack and the injuries suffered, William Joseph Puopolo is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5469.   Plaintiff Stephanie Marie Puopolo is a citizen of the United States and domiciled in the State of Florida. She is the wife of William Joseph Puopolo.

5470.   As a result of the attack and the injuries suffered by William Joseph Puopolo, Plaintiff Stephanie Marie Puopolo, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

789

### 531.   THE APRIL 2, 2005 ATTACK – ABU GHRAIB

### A.   PLAINTIFFS THE LEONDRAE DEMORRIS RICE FAMILY

5471.   Plaintiff Leondrae Demorris Rice is a U.S. citizen domiciled in Mississippi.

5472.   On April 2, 2005, Leondrae Demorris Rice was serving in the U.S. military when he was attacked by a VBIED and small arms fire.

5473.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Rice.

5474.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5475.   As a result of the attack and the injuries suffered, Leondrae Demorris Rice is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5476.   Plaintiff Brandon Leondrae Rice is a citizen of the United States domiciled in Alabama and is the son of Leondrae Demorris Rice.

5477.   Plaintiff Gloria Ervin Williams is a citizen of the United States domiciled in Mississippi and is the mother of Leondrae Demorris Rice.

5478.   Plaintiff Willie James Rice is a citizen of the United States domiciled in Mississippi and is the father of Leondrae Demorris Rice.

5479.   Plaintiff Pamela Rice Harris is a citizen of the United States domiciled in Mississippi and is the sister of Leondrae Demorris Rice.

5480.   Plaintiff Diamond Leshae Marie Rice is a citizen of the United States domiciled in Mississippi and is the sister of Leondrae Demorris Rice.

5481.   Plaintiff Joseph Tyrell Ervin is a citizen of the United States domiciled in Mississippi and is the brother of Leondrae Demorris Rice.

5482.   As a result of the attack and the injuries suffered by Leondrae Demorris Rice, Plaintiffs Brandon Leondrae Rice, Gloria Ervin Williams, Willie James Rice, Pamela Rice Harris, Diamond Leshae Marie Rice, and Joseph Tyrell Ervin are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 532.   THE APRIL 1, 2005 ATTACK – MOSUL

#### A.   PLAINTIFFS THE KYLE MATTHEW LEMIEUX FAMILY

5483.   Plaintiff Kyle Matthew Lemieux is a U.S. citizen domiciled in Washington.

5484.   On or about April 1, 2005, Kyle Matthew Lemieux was serving in the U.S. military when he was attacked by an IED and grenades.

5485.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Lemieux.

5486.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5487.   As a result of the attack and the injuries suffered, Kyle Matthew Lemieux is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5488.   Plaintiff Elizabeth Lynn Coffin is a citizen of the United States domiciled in Maine, and is the mother of Kyle Matthew Lemieux.

5489.   As a result of the attack and the injuries suffered by Kyle Matthew Lemieux, Plaintiff Elizabeth Lynn Coffin is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 533.   THE MARCH 28, 2005 ATTACK – SAMARRA

#### A.   PLAINTIFFS THE MICHAEL EVERETTE GREEN FAMILY

5490.   Plaintiff Michael Everette Green is a U.S. citizen domiciled in California.

5491.   On March 28, 2005, Michael Everette Green was serving in the U.S. military when he was attacked by an IED.

5492.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Green.

5493.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5494.   As a result of the attack and the injuries suffered, Michael Everette Green is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5495.   Plaintiff Melanie Green is a citizen of the United States and domiciled in the State of California. She is the mother of Michael Everette Green.

5496.   Plaintiff Steven Green is a citizen of the United States and domiciled in the State of California. He is the brother of Michael Everette Green.

5497.   As a result of the attack and the injuries suffered by Michael Everette Green, Plaintiffs Melanie Green and Steven Green, are entitled to past and future noneconomic

damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 534.   THE MARCH 27, 2005 ATTACK – CAMP AL-TAQAADUM

### A.      PLAINTIFFS THE EDGAR D. MALDONADO FAMILY

5498.   Plaintiff Edgar D. Maldonado is a U.S. citizen domiciled in Pennsylvania.

5499.   On March 27, 2005, Edgar D. Maldonado was serving in the U.S. military when he was attacked by a mortar.

5500.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Maldonado.

5501.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5502.   As a result of the attack and the injuries suffered, Edgar D. Maldonado is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5503.   Plaintiff Evelisa Maldonado is a citizen of the United States domiciled in Pennsylvania and is the wife of Edgar D. Maldonado.

5504.   Plaintiff J.M.M, a minor child, represented by her legal guardian Edgar D. Maldonado, is a citizen of the United States domiciled in Pennsylvania and is the daughter of Edgar D. Maldonado.

5505.   Plaintiff Ana M. Maldonado is a citizen of the United States domiciled in New York and is the mother of Edgar D. Maldonado.

5506.   Plaintiff Jose L. Maldonado is a citizen of the United States domiciled in New York and is the father of Edgar D. Maldonado.

5507.   Plaintiff Anthony Maldonado is a citizen of the United States domiciled in Florida and is the brother of Edgar D. Maldonado.

5508.   Plaintiff Yanitza Maldonado is a citizen of the United States domiciled in New York and is the sister of Edgar D. Maldonado.

5509.   As a result of the attack and the injuries suffered by Edgar D. Maldonado, Plaintiffs Evelisa Maldonado, Ana M. Maldonado, Jose L. Maldonado, Anthony Maldonado, Yanitza Maldonado, and J.M.M., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 535.   THE MARCH 25, 2005 ATTACK – HIT

### A.      PLAINTIFF BRIAN CHAD BECKWITH

5510.   Plaintiff Brian Chad Beckwith is a U.S. citizen domiciled in Colorado.

5511.   On March 25, 2005, Brian Chad Beckwith was serving in the U.S. military when he was attacked by an IED.

5512.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Beckwith.

5513.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5514.   As a result of the attack and the injuries suffered, Brian Chad Beckwith is entitled to past and future noneconomic damages, including for severe physical and mental pain and

suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 536.   THE MARCH 18, 2005 ATTACK – SADR CITY

### A.   PLAINTIFFS THE DERRICK DEANDRE HEMPHILL FAMILY

5515.   Plaintiff Derrick Deandre Hemphill is a U.S. citizen domiciled in Mississippi.

5516.   On March 18, 2005, Derrick Deandre Hemphill was serving in the U.S. military when he was attacked by sniper.

5517.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Hemphill.

5518.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5519.   As a result of the attack and the injuries suffered, Derrick Deandre Hemphill is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5520.   Plaintiff Marilyn Marie Hemphill is a citizen of the United States domiciled in Mississippi and is the mother of Derrick Deandre Hemphill.

5521.   Plaintiff J.R.H., a minor child, represented by her legal guardian Derrick Deandre Hemphill, is a citizen of the United States domiciled in Mississippi and is the daughter of Derrick Deandre Hemphill.

5522.   Plaintiff Lester Latron Westbrooks is a citizen of the United States domiciled in Tennessee and is the brother of Derrick Deandre Hemphill.

5523.   Plaintiff Marlon Marquet Washington is a citizen of the United States domiciled

in Mississippi and is the brother of Derrick Deandre Hemphill.

5524.   Plaintiff Lukeisha Diming is a citizen of the United States domiciled in Illinois and is the sister of Derrick Deandre Hemphill.

5525.   Plaintiff Marlo Laundrea Lewis is a citizen of the United States domiciled in Mississippi and is the brother of Derrick Deandre Hemphill.

5526.   As a result of the attack and the injuries suffered by Derrick Deandre Hemphill, Plaintiffs Marilyn Marie Hemphill, Lester Latron Westbrooks, Marlon Marquet Washington, Lukeisha Diming, Marlo Laundrea Lewis, and J.R.H., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 537.   THE MARCH 17, 2005 ATTACK – RAMADI

### A.   PLAINTIFFS THE DANIEL J. ERBE FAMILY

5527.   Plaintiff Daniel J. Erbe is a U.S. citizen domiciled in South Carolina.

5528.   On March 17, 2005, Daniel J. Erbe was serving in the U.S. military when he was attacked by a rocket.

5529.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Erbe.

5530.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5531.   As a result of the attack and the injuries suffered, Daniel J. Erbe is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses,

lost income, and loss of earning capacity.

5532.   Plaintiff Earlene E. Erbe is a citizen of the United States domiciled in Iowa and is the mother of Daniel J. Erbe.

5533.   Plaintiff Brian J. Erbe is a citizen of the United States domiciled in Iowa and is the father of Daniel J. Erbe.

5534.   Plaintiff Elizabeth E. Erbe is a citizen of the United States domiciled in Iowa and is the sister of Daniel J. Erbe.

5535.   Plaintiff Stephanie A. Erbe is a citizen of the United States domiciled in Iowa and is the sister of Daniel J. Erbe.

5536.   As a result of the attack and the injuries suffered by Daniel J. Erbe, Plaintiffs Earlene E. Erbe, Brian J. Erbe, Elizabeth E. Erbe, and Stephanie A. Erbe, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 538.   THE MARCH 13, 2005 ATTACK – AR RUTBAH

### A.   PLAINTIFF BRIAN THOMAS SKRABA

5537.   Plaintiff Brian Thomas Skraba is a U.S. citizen domiciled in Illinois.

5538.   On March 13, 2005, Brian Thomas Skraba was serving in the U.S. military when he was attacked by an IED.

5539.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Skraba.

5540.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5541.   As a result of the attack and the injuries suffered, Brian Thomas Skraba is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 539.   THE MARCH 12, 2005 ATTACK - BAGHDAD

### A.   PLAINTIFFS THE BRUCE TERRENCE DURR FAMILY

5542.   On March 12, 2005, Bruce Terrence Durr was a U.S. citizen, domiciled in Mississippi, and serving in the U.S. military when he was attacked by an IED, causing his death.

5543.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Durr.

5544.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

5545.   Plaintiff Walter Ray Smith, Jr. is a citizen of the United States domiciled in Mississippi and is the step-brother of Bruce Terrence Durr.

5546.   Plaintiff Walter Ray Smith, Sr. is a citizen of the United States domiciled in Mississippi and is the step-father of Bruce Terrence Durr.

5547.   Plaintiff Dawn Monesica Traxler is a citizen of the United States domiciled in Mississippi and is the sister of Bruce Terrence Durr.

5548.   Plaintiff Peggie Anne Jones is a citizen of the United States domiciled in Mississippi and is the step-sister of Bruce Terrence Durr.

5549.   Plaintiff Laura Nanitra Weathersby is a citizen of the United States domiciled in Mississippi and is the sister of Bruce Terrence Durr.

5550.   Plaintiff Laura Nanitra Weathersby, brings an action individually and on behalf of

the Estate of Bruce Terrence Durr, and all heirs thereof, as its legal representative.

5551.   As a result of the attack, and the injuries suffered by and the death of Bruce Terrene Durr, Plaintiffs Laura Nanitra Weathersby, Walter Ray Smith, Jr., Walter Ray Smith, Sr., Dawn Monesica Traxler, and Peggie Anne Jones have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Bruce Terrence Durr.

### 540.   THE MARCH 9, 2005 ATTACK – DORA NEIGHBORHOOD, BAGHDAD

#### A.   PLAINTIFF ERIC EUGENE RODRIQUEZ

5552.   Plaintiff Eric Eugene Rodriquez is a U.S. citizen domiciled in Idaho.

5553.   On March 9, 2005, Eric Eugene Rodriquez was serving in the U.S. military when he was attacked by a VBIED.

5554.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Rodriquez.

5555.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5556.   As a result of the attack and the injuries suffered, Eric Eugene Rodriquez is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 541.   THE MARCH 7, 2005 ATTACK – RAMADI

#### A.   PLAINTIFFS THE BRIAN DALE CURRIER FAMILY

5557.   Plaintiff Brian Dale Currier is a U.S. citizen domiciled in Michigan.

5558.   On March 7, 2005, Brian Dale Currier was serving in the U.S. military when he was attacked by a VBIED.

5559.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Currier.

5560.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5561.   As a result of the attack and the injuries suffered, Brian Dale Currier is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5562.   Plaintiff Joanne Currier is a citizen of the United States domiciled in Michigan and is the mother of Brian Dale Currier.

5563.   As a result of the attack and the injuries suffered by Brain Dale Currier, Plaintiff Joanne Currier, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 542.   THE FEBRUARY 28, 2005 ATTACK – BAGHDAD

#### A.   PLAINTIFFS THE STEPHEN JOHN DESROSIER FAMILY

5564.   Plaintiff Stephen John Desrosier is a U.S. citizen domiciled in Florida.

5565.   On February 28, 2005, Stephen John Desrosier was serving in the U.S. military

when he was attacked by an IED.

5566.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Desrosier.

5567.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5568.   As a result of the attack and the injuries suffered, Stephen John Desrosier is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5569.   Plaintiff Regina Lynn Desrosier is a citizen of the United States domiciled in Florida and is the spouse of Stephen John Desrosier.

5570.   Plaintiff Stephen John Desrosier II is a citizen of the United States domiciled in Florida and is the son of Stephen John Desrosier.

5571.   As a result of the attack and the injuries suffered by Stephen John Desrosier, Plaintiffs Regina Lynn Desrosier and Stephen John Desrosier II are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 543.   THE FEBRUARY 28, 2005 ATTACK – FALLUJAH

### A.   PLAINTIFFS THE JOSHUA MICHAEL KRUEGER FAMILY

5572.   Plaintiff Joshua Michael Krueger is a U.S. citizen domiciled in Wisconsin.

5573.   On February 28, 2005, Joshua Michael Krueger was serving in the U.S. military when he was attacked by an IED.

5574.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Krueger.

5575.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5576.   As a result of the attack and the injuries suffered, Joshua Michael Krueger is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5577.   Plaintiff Jill Katherine Krueger is a citizen of the United States domiciled in Wisconsin and is the spouse of Joshua Michael Krueger.

5578.   Plaintiff Karen Jean Krueger is a citizen of the United States domiciled in Wisconsin and is the mother of Joshua Michael Krueger.

5579.   Plaintiff Michael Wayne Krueger is a citizen of the United States domiciled in Wisconsin and is the father of Joshua Michael Krueger.

5580.   As a result of the attack and the injuries suffered by Joshua Michael Krueger, Plaintiffs Jill Katherine Krueger, Karen Jean Krueger, and Michael Wayne Krueger are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 544.   THE FEBRUARY 26, 2005 ATTACK – NIPPUR

#### A.   PLAINTIFFS THE TOLIVER EUGENE NOEY FAMILY

5581.   Plaintiff Toliver Eugene Noey is a U.S. citizen domiciled in Texas.

5582.   On February 26, 2005, Toliver Eugene Noey was serving in the U.S. military

when he was attacked by small arms fire and tracer fire.

5583.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Noey.

5584.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5585.   As a result of the attack and the injuries suffered, Toliver Eugene Noey is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5586.   Plaintiff T.G.N., a minor child, represented by his legal guardian Toliver Eugene Noey, is a citizen of the United States domiciled in Texas and is the son of Toliver Eugene Noey.

5587.   As a result of the attack and the injuries suffered by Toliver Eugene Noey, Plaintiff T.G.N., a minor child, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 545.   THE FEBRUARY 23, 2005 ATTACK – BAQUBAH

### A.   PLAINTIFFS THE EDWARD JAMES TERRY, SR. FAMILY

5588.   Plaintiff Edward James Terry, Sr. is a U.S. citizen domiciled in Alabama.

5589.   On February 23, 2005, Edward James Terry, Sr. was serving in the U.S. military when he was attacked by an IED.

5590.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Terry.

5591.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack,

as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5592.   As a result of the attack and the injuries suffered, Edward James Terry, Sr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5593.   Plaintiff Edward James Terry, Jr. is a citizen of the United States domiciled in Alabama and is the son of Edward James Terry, Sr.

5594.   Plaintiff Glenndon Milton Terry is a citizen of the United States domiciled in Alabama and is the son of Edward James Terry, Sr.

5595.   As a result of the attack and the injuries suffered by Edward James Terry, Sr., Plaintiffs Edward James Terry, Jr., and Glenndon Milton Terry, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 546.   THE FEBRUARY 21, 2005 ATTACK – SAMARRA

### A.   PLAINTIFF EDDIE MICHAEL ABBEY

5596.   Plaintiff Eddie Michael Abbey is a U.S. citizen domiciled in North Carolina.

5597.   On February 21, 2005, Eddie Michael Abbey was serving in the U.S. military when he was attacked by an IED.

5598.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Abbey.

5599.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack,

the munition used, as well as the tactics, techniques, and procedures utilized.

5600.   As a result of the attack and the injuries suffered, Eddie Michael Abbey is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 547.   THE FEBRUARY 21, 2005 ATTACK – RAMADI

### A.    PLAINTIFFS THE MERLIN GERMAN FAMILY

5601.   On February 21, 2005, Merlin German was a U.S. citizen, domiciled in Texas, and serving in the U.S. military when he was attacked by an IED, resulting in injuries causing his death on April 11, 2008.

5602.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. German.

5603.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

5604.   Norma Guerra brings an action on behalf of the Estate of Merlin German, and all heirs thereof, as its legal representative.

5605.   Plaintiff Ariel German is a citizen of the United States domiciled in Florida and is the brother of Merlin German.

5606.   Plaintiff Lourdes German is a citizen of the United States domiciled in Florida and is the mother of Merlin German.

5607.   As a result of the attack, and the injuries suffered by and the death of Merlin German, Plaintiffs Ariel German and Lourdes German have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society,

services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Merlin German.

### 548.   THE FEBRUARY 19, 2005 ATTACK – SAMARRA

#### A.   PLAINTIFFS THE PATRICK JOHN BRADY FAMILY

5608.   Plaintiff Patrick John Brady is a U.S. citizen domiciled in Pennsylvania.

5609.   On February 19, 2005, Patrick John Brady was serving in the U.S. military when he was attacked by IEDs.

5610.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Brady.

5611.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5612.   As a result of the attack and the injuries suffered, Patrick John Brady is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5613.   Plaintiff Debra A. Brady is a citizen of the United States domiciled in Pennsylvania and is the mother of Patrick John Brady.

5614.   Plaintiff Edward J. Brady, III is a citizen of the United States domiciled in Pennsylvania and is the brother of Patrick John Brady.

5615.   Plaintiff Sarah E. Malone is a citizen of the United States domiciled in Pennsylvania and is the sister of Patrick John Brady.

5616.   As a result of the attack and the injuries suffered by Patrick John Brady, Plaintiffs Debra A. Brady, Edward J. Brady, III, and Sarah E. Malone, are entitled to past and future

noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 549. THE FEBRUARY 19, 2005 ATTACK – KADHIMIYAH DISTRICT IN BAGHDAD

#### A. PLAINTIFF JOSHUA DALE COY

5617.  Plaintiff Joshua Dale Coy is a U.S. citizen domiciled in Tennessee.

5618.  On February 19, 2005, Joshua Dale Coy was serving in the U.S. military when he was attacked by an IED/Suicide Bomber.

5619.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Coy.

5620.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5621.  As a result of the attack and the injuries suffered, Joshua Dale Coy is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 550. THE FEBRUARY 19, 2005 ATTACK – BAGHDAD

#### A. PLAINTIFFS THE ADAM MICHAEL MALSON FAMILY

5622.  On February 19, 2005, Adam Michael Malson was a U.S. citizen, domiciled in Michigan, and serving in the U.S. military when he was attacked by a suicide bomber, causing his death.

5623.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or

other material support used to commit the attack on Mr. Malson.

5624. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

5625. Plaintiff Ben W. Malson, Jr. is a citizen of the United States domiciled in Michigan and is the father of Adam Michael Malson.

5626. Plaintiff Ben W. Malson, Jr., brings an action individually and on behalf of the Estate of Adam Michael Malson, and all heirs thereof, as its legal representative.

5627. Plaintiff Debra Lynn Malson is a citizen of the United States domiciled in Michigan and is the mother of Adam Michael Malson.

5628. Plaintiff David Phillip Malson is a citizen of the United States domiciled in Connecticut and is the brother of Adam Michael Malson.

5629. Plaintiff Amy Malson Fly is a citizen of the United States domiciled in Michigan and is the sister of Adam Michael Malson.

5630. As a result of the attack, and the injuries suffered by and the death of Adam Michael Malson, Plaintiffs Ben W. Malson, Jr., Debra Lynn Malson, David Phillip Malson, and Amy Malson Fly have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Adam Michael Malson.

### 551. THE FEBRUARY 12, 2005 ATTACK – MOSUL

#### A. PLAINTIFF JASON BARRETT CARNEY

5631. Plaintiff Jason Barrett Carney is a U.S. citizen domiciled in Washington.

5632. On February 12, 2005, Jason Barrett Carney was serving in the U.S. military

when he was attacked by RPGs, small arms fire, rockets, and mortars.

5633.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Carney.

5634.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5635.   As a result of the attack and the injuries suffered, Jason Barrett Carney is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 552.   THE JANUARY 28, 2005 ATTACK – BAGHDAD

### A.   PLAINTIFF BRIAN LEE RUDOLPH

5636.   Plaintiff Brian Lee Rudolph is a U.S. citizen domiciled in Texas.

5637.   On January 28, 2005, Brian Lee Rudolph was serving in the U.S. military when he was attacked by an IED.

5638.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Rudolph.

5639.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5640.   As a result of the attack and the injuries suffered, Brian Lee Rudolph is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

553.    **THE JANUARY 26, 2005 ATTACK – HADITHA**

   A.    **PLAINTIFFS THE JONATHAN WILLIAMS BOWLING FAMILY**

5641.   On January 26, 2005, Jonathan Williams Bowling was a U.S. citizen, domiciled in Virginia, and serving in the U.S. military when he was attacked by IEDs and RPGs, which lead to his death.

5642.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Bowling.

5643.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

5644.   Plaintiff Darrell Connor Bowling is a citizen of the United States domiciled in Virginia and is the father of Jonathan Williams Bowling.

5645.   Plaintiff Robin Bowling Feron is a citizen of the United States domiciled in Virginia and is the mother of Jonathan Williams Bowling.

5646.   Plaintiff Ashley Bowling Nogueira is a citizen of the United States domiciled in Virginia and is the sister of Jonathan Williams Bowling.

5647.   Plaintiff Brooke Elizabeth Wexler is a citizen of the United States domiciled in Virginia and is the sister of Jonathan Williams Bowling.

5648.   Plaintiff Darrell Connor Bowling, brings an action individually and on behalf of the Estate of Jonathan Williams Bowling, and all heirs thereof, as its legal representative.

5649.   Plaintiff Robin Bowling Feron, brings an action individually and on behalf of the Estate of Jonathan Williams Bowling, and all heirs thereof, as its legal representative.

5650.   As a result of the attack, and the injuries suffered by and the death of Jonathan

Williams Bowling, Plaintiffs Darrell Connor Bowling, Robin Bowling Feron, Ashley Bowling Nogueira and Brooke Elizabeth Wexler have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Jonathan Williams Bowling.

### 554.   THE JANUARY 26, 2005 ATTACK – HADITHA

#### A.   PLAINTIFF ANDREW HOWARD ROTHMAN

5651.   Plaintiff Andrew Howard Rothman is a U.S. citizen domiciled in Florida.

5652.   On January 26, 2005, Andrew Howard Rothman was serving in the U.S. military when he was attacked by small arms, IEDs, and an RPG.

5653.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Rothman.

5654.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5655.   As a result of the attack and the injuries suffered, Andrew Howard Rothman is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 555.   THE JANUARY 24, 2005 ATTACK – HAQLANIYAH

#### A.   PLAINTIFF JUAN MARTINEZ RUBIO

5656.   Plaintiff Juan Martinez Rubio is a U.S. citizen domiciled in Texas.

5657.   On January 24, 2005, Juan Martinez Rubio was serving in the U.S. military when he was attacked by an RPG and small arms fire.

5658.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Rubio.

5659.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5660.   As a result of the attack and the injuries suffered, Juan Martinez Rubio is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 556.   THE JANUARY 23, 2005 ATTACK – SAMARRA

### A.   PLAINTIFF AARON SMITH

5661.   Plaintiff Aaron Smith is a U.S. citizen domiciled in Oklahoma.

5662.   On January 23, 2005, Aaron Smith was serving in the U.S. military when he was attacked by Mortars.

5663.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Smith.

5664.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5665.   As a result of the attack and the injuries suffered, Aaron Smith is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

812

### 557.   THE JANUARY 13, 2005 ATTACK – MOSUL

#### A.   PLAINTIFF RICHARD ALAN CRAWFORD

5666.   Plaintiff Richard Alan Crawford is a U.S. citizen domiciled in Ohio.

5667.   On January 13, 2005, Richard Alan Crawford was serving in the U.S. military when he was attacked by a rocket, small arms fire, and an IED.

5668.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Crawford.

5669.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5670.   As a result of the attack and the injuries suffered, Richard Alan Crawford is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 558.   THE JANUARY 13, 2005 ATTACK – MOSUL

#### A.   PLAINTIFFS THE MATTHEW PAUL SCHAFFER FAMILY

5671.   Plaintiff Matthew Paul Schaffer is a U.S. citizen domiciled in Iowa.

5672.   On January 13, 2005, Matthew Paul Schaffer was serving in the U.S. military when he was attacked by a rocket, small arms fire, and an IED.

5673.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Schaffer.

5674.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5675.  As a result of the attack and the injuries suffered, Matthew Paul Schaffer is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5676.  Plaintiff Lucia A. Schaffer is a citizen of the United States domiciled in Iowa and is the mother of Matthew Paul Schaffer.

5677.  Plaintiff Amy Jo Finnegan is a citizen of the United States domiciled in Iowa and is the sister of Matthew Paul Schaffer.

5678.  As a result of the attack and the injuries suffered by Matthew Paul Schaffer, Plaintiffs Lucia A. Schaffer and Amy Jo Finnegan are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 559.   THE JANUARY 13, 2005 ATTACK – KIRKUK

### A.   PLAINTIFF CHARLES LOY JORDAN, JR.

5679.  Plaintiff Charles Loy Jordan, Jr. is a U.S. citizen domiciled in Oregon.

5680.  On January 13, 2005, Charles Loy Jordan, Jr. was serving in the U.S. military when he was attacked by IED.

5681.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Jordan.

5682.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5683.  As a result of the attack and the injuries suffered, Charles Loy Jordan, Jr. is

entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

**560.   THE JANUARY 13, 2005 ATTACK – DUJAIL**

      **A.   PLAINTIFFS THE DAVID LEE SELLS FAMILY**

5684.   Plaintiff David Lee Sells is a U.S. citizen domiciled in Tennessee.

5685.   On January 13, 2005, David Lee Sells was serving in the U.S. military when he was attacked by an IED.

5686.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Sells.

5687.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5688.   As a result of the attack and the injuries suffered, David Lee Sells is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5689.   Plaintiff Misty Lynn Sells is a citizen of the United States domiciled in Tennessee and is the spouse of David Lee Sells.

5690.   Plaintiff Matthew Kane Sells is a citizen of the United States domiciled in Tennessee and is the son of David Lee Sells.

5691.   Plaintiff Brett Laci Sells is a citizen of the United States domiciled in Tennessee and is the daughter of David Lee Sells.

5692.   As a result of the attack and the injuries suffered by David Lee Sells, Plaintiffs

Misty Lynn Sells, Matthew Kane Sells, and Brett Laci Sells are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 561.   THE JANUARY 11, 2005 ATTACK – TIKRIT

#### A.   PLAINTIFF BRIAN MICHAEL GLIBA

5693.   Plaintiff Brian Michael Gliba is a U.S. citizen domiciled in Colorado.

5694.   On January 11, 2005, Brian Michael Gliba was serving in the U.S. military when he was attacked by an IED.

5695.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Gliba.

5696.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5697.   As a result of the attack and the injuries suffered, Brian Michael Gliba is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 562.   THE JANUARY 9, 2005 ATTACK – HIT

#### A.   PLAINTIFF ENRIQUE LINAN JR.

5698.   Plaintiff Enrique Linan Jr. is a U.S. citizen domiciled in Texas.

5699.   On January 9, 2005, Enrique Linan Jr. was serving in the U.S. military when he was attacked by IEDs and small arms fire.

5700.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or

other material support used to commit the attack, which injured Mr. Linan.

5701.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5702.   As a result of the attack and the injuries suffered, Enrique Linan Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 563.   THE JANUARY 8, 2005 ATTACK – MOSUL

#### A.   PLAINTIFFS THE DON ANTHONY WALLS FAMILY

5703.   Plaintiff Don Anthony Walls is a U.S. citizen domiciled in Arizona.

5704.   On January 8, 2005, Don Anthony Walls was serving in the U.S. military when he was attacked by a RPG.

5705.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Walls.

5706.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5707.   As a result of the attack and the injuries suffered, Don Anthony Walls is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5708.   Plaintiff Daysha Shalee Walls is a citizen of the United States domiciled in Arizona and is the wife of Don Anthony Walls.

817

5709.   Plaintiff Sylvester Walls is a citizen of the United States domiciled in Georgia and is the father of Don Anthony Walls.

5710.   Plaintiff Yun Hui Miyamura is a citizen of the United States domiciled in Hawaii and is the mother of Don Anthony Walls.

5711.   Plaintiff Dorthy L. Mack is a citizen of the United States domiciled in Georgia and is the mother-in-law of Don Anthony Walls.

5712.   Plaintiff Douglas Mack is a citizen of the United States domiciled in Georgia and is the father-in-law of Don Anthony Walls.

5713.   As a result of the attack and the injuries suffered by Don Anthony Walls, Plaintiffs Daysha Shalee Walls, Sylvester Walls, Yun Hui Miyamura, Dorthy L. Mack, and Douglas Mack, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 564.   THE JANUARY 7, 2005 ATTACK – ISKANDARIYA

### A.   PLAINTIFF JOHN F. KUNKEL, JR.

5714.   Plaintiff John F. Kunkel, Jr. is a U.S. citizen domiciled in North Carolina.

5715.   On January 7, 2005, John F. Kunkel, Jr. was serving in the U.S. military when he was attacked by an IED.

5716.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Kunkel.

5717.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5718.   As a result of the attack and the injuries suffered, John F. Kunkel, Jr. is entitled to

past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 565.   THE JANUARY 5, 2005 ATTACK – RAMADI

#### A.   PLAINTIFFS THE DAVID ANTHONY ROSALES FAMILY

5719.   Plaintiff David Anthony Rosales is a U.S. citizen domiciled in Arizona.

5720.   On January 5, 2005, David Anthony Rosales was serving in the U.S. military when he was attacked by an IED.

5721.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Rosales.

5722.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5723.   As a result of the attack and the injuries suffered, David Anthony Rosales is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5724.   Plaintiff Amy Lynn Rosales is a citizen of the United States domiciled in Arizona and is the wife of David Anthony Rosales.

5725.   Plaintiff Madison Haley Rosales is a citizen of the United States domiciled in Arizona and is the daughter of David Anthony Rosales.

5726.   As a result of the attack and the injuries suffered by David Anthony Rosales, Plaintiffs Amy Lynn Rosales and Madison Haley Rosales are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and

suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 566.   THE JANUARY 3, 2005 ATTACK – AMIRIYAH

#### A.   PLAINTIFF JASON PETER SCHAUBLE

5727.   Plaintiff Jason Peter Schauble is a U.S. citizen domiciled in Texas.

5728.   On January 3, 2005, Jason Peter Schauble was serving in the U.S. military when he was attacked by small arms fire.

5729.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Schauble.

5730.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5731.   As a result of the attack and the injuries suffered, Jason Peter Schauble is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 567.   THE JANUARY 3, 2005 ATTACK – BAGHDAD

#### A.   PLAINTIFFS THE SERGE HAGOPIAN FAMILY

5732.   Plaintiff Serge Hagopian is a U.S. citizen domiciled in Arizona.

5733.   On January 3, 2005, Serge Hagopian was serving in the U.S. military when he was attacked by mortars.

5734.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Hagopian.

5735.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack,

as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5736.   As a result of the attack and the injuries suffered, Serge Hagopian is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5737.   Plaintiff Anaheid Mikaelian is a citizen of the United States domiciled in Arizona and is the mother of Serge Hagopian.

5738.   Plaintiff Christine Hagopian is a citizen of the United States domiciled in Arizona and is the sister of Serge Hagopian.

5739.   Plaintiff Sevag Hagopian is a citizen of the United States domiciled in Arizona and is the brother of Serge Hagopian.

5740.   As a result of the attack and the injuries suffered by Serge Hagopian, Plaintiffs Anaheid Mikaelian, Christine Hagopian, and Sevag Hagopian are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 568.   THE JANUARY 3, 2005 ATTACK – BALAD

### A.   PLAINTIFFS THE KEVIN MICHAEL DOHERTY, SR. FAMILY

5741.   Plaintiff Kevin Michael Doherty, Sr. is a U.S. citizen domiciled in Florida.

5742.   On January 3, 2005, Kevin Michael Doherty, Sr. was serving in the U.S. military when he was attacked by VBIED.

5743.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or

other material support used to commit the attack, which injured Mr. Doherty.

5744.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5745.   As a result of the attack and the injuries suffered, Kevin Michael Doherty, Sr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5746.   Plaintiff Cheryl Lee Doherty is a citizen of the United States domiciled in Florida and is the spouse of Kevin Michael Doherty, Sr.

5747.   Plaintiff Kevin Michael Doherty, Jr. is a citizen of the United States domiciled in New York and is the son of Kevin Michael Doherty, Sr.

5748.   Plaintiff Theodore Edward Sill is a citizen of the United States domiciled in New York and is the son of Kevin Michael Doherty, Sr.

5749.   Plaintiff Melissa Lynn Doherty is a citizen of the United States domiciled in New York and is the daughter of Kevin Michael Doherty, Sr.

5750.   Plaintiff Travis James Lamica is a citizen of the United States domiciled in New York and is the step-son of Kevin Michael Doherty, Sr.

5751.   Plaintiff Nicholas Dean Lamica is a citizen of the United States domiciled in New York and is the step-son of Kevin Michael Doherty, Sr.

5752.   Plaintiff Liane Lamica is a citizen of the United States domiciled in Texas and is the step-daughter of Kevin Michael Doherty, Sr.

5753.   As a result of the attack and the injuries suffered by Kevin Michael Doherty, Sr.,

Plaintiffs Cheryl Lee Doherty, Kevin Michael Doherty, Jr., Theodore Edward Sill, Melissa Lynn Doherty, Travis James Lamica, Nicholas Dean Lamica, and Liane Lamica, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

**569.   THE JANUARY 1, 2005 ATTACK – HADITHA**

    **A.    PLAINTIFF JUAN MARTINEZ RUBIO**

5754.   Plaintiff Juan Martinez Rubio is a U.S. citizen domiciled in Texas.

5755.   On January 1, 2005, Juan Martinez Rubio was serving in the U.S. military when he was attacked by small arms fire and an IED.

5756.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Rubio.

5757.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5758.   As a result of the attack and the injuries suffered, Juan Martinez Rubio is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

**570.   THE DECEMBER 29, 2004 ATTACK – MOSUL**

    **A.    PLAINTIFF JARROD SCOTT HALLMAN**

5759.   Plaintiff Jarrod Scott Hallman is a U.S. citizen domiciled in Texas.

5760.   On December 29, 2004, Jarrod Scott Hallman was serving in the U.S. military when he was attacked by IEDs.

5761.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Hallman.

5762.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5763.   As a result of the attack and the injuries suffered, Jarrod Scott Hallman is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 571.   THE DECEMBER 27, 2004 ATTACK – MOSUL

#### A.   PLAINTIFF JOSEPH RICHARD BEEMAN

5764.   Plaintiff Joseph Richard Beeman is a U.S. citizen domiciled in Pennsylvania.

5765.   On December 27, 2004, Joseph Richard Beeman was serving in the U.S. military when he was attacked by mortars.

5766.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Beeman.

5767.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5768.   As a result of the attack and the injuries suffered, Joseph Richard Beeman is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 572.   THE DECEMBER 25, 2004 ATTACK – KHAN AL-BAGHDADI

### A.   PLAINTIFFS THE ANTHONY TERMAINE PLUNKETT, SR. FAMILY

5769.   Plaintiff Anthony Termaine Plunkett, Sr. is a U.S. citizen domiciled in South Carolina.

5770.   On December 25, 2004, Anthony Termaine Plunkett, Sr. was serving in the U.S. military when he was attacked by rockets and mortars.

5771.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Plunkett, Sr.

5772.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5773.   As a result of the attack and the injuries suffered, Anthony Termaine Plunkett, Sr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5774.   Plaintiff Z.L.P., a minor child, represented by his legal guardian Anthony Termaine Plunkett, Sr. is a citizen of the United States domiciled in South Carolina and is the son of Anthony Termaine Plunkett, Sr.

5775.   Plaintiff D.M.P., a minor child, represented by his legal guardian Anthony Termaine Plunkett, Sr. is a citizen of the United States domiciled in South Carolina and is the son of Anthony Termaine Plunkett, Sr.

5776.   As a result of the attack and the injuries suffered by Anthony Termaine Plunkett, Sr., Plaintiffs Z.L.P., a minor child, and D.M.P., a minor child are entitled to past and future

noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

**573.   THE DECEMBER 20, 2004 ATTACK – MOSUL**

      **A.     PLAINTIFFS THE JOSHUA DIVON TRAVIS FAMILY**

5777.   Plaintiff Joshua Divon Travis is a U.S. citizen domiciled in Texas.

5778.   On December 20, 2004, Joshua Divon Travis was serving in the U.S. military when he was attacked by a rocket.

5779.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Travis.

5780.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5781.   As a result of the attack and the injuries suffered, Joshua Divon Travis is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5782.   Plaintiff D.R.G., a minor child, represented by his legal guardian Joshua Divon Travis, is a citizen of the United States domiciled in Texas and is the son of Joshua Divon Travis.

5783.   Plaintiff J.S.A., a minor child, represented by her legal guardian Joshua Divon Travis, is a citizen of the United States domiciled in Texas and is the daughter of Joshua Divon Travis.

5784.   Plaintiff A.C.J., a minor child, represented by her legal guardian Joshua Divon Travis, is a citizen of the United States domiciled in Texas and is the daughter of Joshua Divon

Travis.

5785.   Plaintiff M.D.T., a minor child, represented by her legal guardian Joshua Divon Travis, is a citizen of the United States domiciled in Texas and is the daughter of Joshua Divon Travis.

5786.   As a result of the attack and the injuries suffered by Joshua Divon Travis, Plaintiffs D.R.G., a minor child, J.S.A., a minor child, A.C.J., a minor child, and M.D.T., a minor child are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 574.   THE DECEMBER 20, 2004 ATTACK – AMIRIYAH

### A.   PLAINTIFFS THE JAMES ALAN BELL FAMILY

5787.   Plaintiff James Alan Bell is a U.S. citizen domiciled in Texas.

5788.   On December 20, 2004, James Alan Bell was serving in the U.S. military when he was attacked by small arms fire.

5789.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Bell.

5790.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5791.   As a result of the attack and the injuries suffered, James Alan Bell is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5792.   Plaintiff Linda S. Bell is a citizen of the United States domiciled in Texas and is

the mother of James Alan Bell.

5793.   Plaintiff David Craig is a citizen of the United States domiciled in Florida and is the father of James Alan Bell.

5794.   Plaintiff Jon G. Bell is a citizen of the United States domiciled in Texas and is the brother of James Alan Bell.

5795.   As a result of the attack and the injuries suffered by James Alan Bell, Plaintiffs Linda S. Bell, David Craig and Jon G. Bell, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 575.   THE DECEMBER 13, 2004 ATTACK – BAGHDAD

### A.   PLAINTIFFS THE TODD EDWARD MILLER FAMILY

5796.   Plaintiff Todd Edward Miller is a U.S. citizen domiciled in Washington.

5797.   On December 13, 2004, Todd Edward Miller was serving in the U.S. military when he was attacked by a VBIED.

5798.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Miller.

5799.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5800.   As a result of the attack and the injuries suffered, Todd Edward Miller is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5801.   Plaintiff Edward C. Miller is a citizen of the United States domiciled in Washington and is the father of Todd Edward Miller.

5802.   Plaintiff Beverly Ann Miller is a citizen of the United States domiciled in Washington and is the mother of Todd Edward Miller.

5803.   Plaintiff Tania Renee Barrett is a citizen of the United States domiciled in Washington and is the sister of Todd Edward Miller.

5804.   Plaintiff L.E.M., a minor child, represented by his legal guardian Todd Edward Miller, is a citizen of the United States domiciled in Washington and is the son of Todd Edward Miller.

5805.   As a result of the attack and the injuries suffered by Todd Edward Miller, Plaintiffs Edward C. Miller, Beverly Ann Miller, Tania Renee Barrett and L.E.M., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 576.   THE DECEMBER 12, 2004 ATTACK – FALLUJAH

### A.   PLAINTIFFS THE JONATHAN CUNEY FAMILY

5806.   Plaintiff Jonathan Cuney is a U.S. citizen domiciled in New York.

5807.   On December 12, 2004, Jonathan Cuney was serving in the U.S. military when he was attacked by grenades and small arms fire.

5808.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Cuney.

5809.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

829

5810.  As a result of the attack and the injuries suffered, Jonathan Cuney is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5811.  Plaintiff George L. Cuney is a citizen of the United States domiciled in New York and is the father of Jonathan Cuney.

5812.  Plaintiff Amanda Cuney Lopez is a citizen of the United States domiciled in New York and is the sister of Jonathan Cuney.

5813.  As a result of the attack and the injuries suffered by Jonathan Cuney, Plaintiffs George L. Cuney and Amanda Cuney Lopez, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 577.  THE DECEMBER 12, 2004 ATTACK – HIT

### A.  PLAINTIFFS THE RENE FRANCISCO AVENDAÑO, JR. FAMILY

5814.  Plaintiff Rene Francisco Avendaño, Jr. is a U.S. citizen domiciled in Texas.

5815.  On December 12, 2004, Rene Francisco Avendaño, Jr. was serving in the U.S. military when he was attacked by mortars, RPGs and small arms fire.

5816.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Avendaño.

5817.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5818.   As a result of the attack and the injuries suffered, Rene Francisco Avendaño, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5819.   Plaintiff Olinda Avendaño is a citizen of the United States and domiciled in the State of Texas. She is the mother of Rene Francisco Avendaño, Jr.

5820.   Plaintiff Rhonda Avendaño is a citizen of the United States and domiciled in the State of Texas. She is the sister of Rene Francisco Avendaño, Jr.

5821.   Plaintiff Blanca Lee Avendaño is a citizen of the United States and domiciled in the State of Texas. She is the sister of Rene Francisco Avendaño, Jr.

5822.   As a result of the attack and the injuries suffered by Rene Francisco Avendaño, Jr, Plaintiffs Olinda Avendaño, Rhonda Avendaño and Blanca Lee Avendaño are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 578.   THE DECEMBER 12, 2004 ATTACK – FALLUJAH

### A.   PLAINTIFFS THE SAMUEL JAMES MORTIMER FAMILY

5823.   Plaintiff Samuel James Mortimer is a U.S. citizen domiciled in North Carolina.

5824.   On December 12, 2004, Samuel James Mortimer was serving in the U.S. military when he was attacked by an assault rifle.

5825.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Mortimer.

5826.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack,

the munition used, as well as the tactics, techniques, and procedures utilized.

5827.   As a result of the attack and the injuries suffered, Samuel James Mortimer is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5828.   Plaintiff Kristine Mortimer is a citizen of the United States domiciled in North Carolina and is the spouse of Samuel James Mortimer.

5829.   As a result of the attack and the injuries suffered by Samuel James Mortimer, Plaintiff Kristine Mortimer, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 579.   THE DECEMBER 10, 2004 ATTACK – BALAD

### A.   PLAINTIFFS THE STEPHEN LAMONTE EDWARDS, JR. FAMILY

5830.   Plaintiff Stephen Lamonte Edwards, Jr. is a U.S. citizen domiciled in Oregon.

5831.   On December 10, 2004, Stephen Lamonte Edwards, Jr. was serving in the U.S. military when he was attacked by an IED.

5832.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Edwards.

5833.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5834.   As a result of the attack and the injuries suffered, Stephen Lamonte Edwards, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental

pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5835.   Plaintiff Monique A. Valdez-Edwards is a citizen of the United States domiciled in Oregon and is the spouse of Stephen Lamonte Edwards, Jr.

5836.   Plaintiff Lauren E. Bolobov is a citizen of the United States domiciled in Nebraska and is the daughter of Stephen Lamonte Edwards, Jr.

5837.   As a result of the attack and the injuries suffered by Stephen Lamonte Edwards, Jr., Plaintiffs Monique A. Valdez-Edwards and Lauren E. Bolobov, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 580.   THE NOVEMBER 28, 2004 ATTACK – HABBANIYAH

### A.   PLAINTIFFS THE FRANCIS DANIEL GARREN FAMILY

5838.   Plaintiff Francis Daniel Garren is a U.S. citizen domiciled in North Carolina.

5839.   On November 28, 2004, Francis Daniel Garren was serving in the U.S. military when he was attacked by IED.

5840.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Garren.

5841.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5842.   As a result of the attack and the injuries suffered, Francis Daniel Garren is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical

expenses, lost income, and loss of earning capacity.

5843.   Plaintiff David L. Garren is a citizen of the United States domiciled in Arkansas and is the father of Francis Daniel Garren.

5844.   Plaintiff Mary Kathryn Johnston is a citizen of the United States domiciled in Arkansas and is the mother of Francis Daniel Garren.

5845.   As a result of the attack and the injuries suffered by Francis Daniel Garren, Plaintiffs David L. Garren and Mary Kathryn Johnston, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 581.   THE NOVEMBER 28, 2004 ATTACK – NORTH OF FALLUJAH

### A.   PLAINTIFF ARTHUR WAYNE D'AMATO

5846.   Plaintiff Arthur Wayne D'Amato is a U.S. citizen domiciled in Texas.

5847.   On November 28, 2004, Arthur Wayne D'Amato was serving in the U.S. military when he was attacked by an IED and small arms fire.

5848.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. D'Amato.

5849.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5850.   As a result of the attack and the injuries suffered, Arthur Wayne D'Amato is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

834

### 582.   THE NOVEMBER 26, 2004 ATTACK – FALLUJAH

####    A.   PLAINTIFFS THE ROBERT LOUIS DUNHAM FAMILY

5851.   Plaintiff Robert Louis Dunham is a U.S. citizen domiciled in North Carolina.

5852.   On November 26, 2004, Robert Louis Dunham was serving in the U.S. military when he was attacked by mortars.

5853.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Dunham.

5854.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5855.   As a result of the attack and the injuries suffered, Robert Louis Dunham is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5856.   Plaintiff Michelle Dunham is a citizen of the United States domiciled in North Carolina and is the spouse of Robert Louis Dunham.

5857.   As a result of the attack and the injuries suffered by Robert Louis Dunham, Plaintiff Michelle Dunham is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 583.   THE NOVEMBER 26, 2004 ATTACK – RAMADI

####    A.   PLAINTIFF ROBERT ADAM BELL

5858.   Plaintiff Robert Adam Bell is a U.S. citizen domiciled in Arizona.

5859.   On November 26, 2004, Robert Adam Bell was serving in the U.S. military when

he was attacked by small arms fire.

5860.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Bell.

5861.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5862.   As a result of the attack and the injuries suffered, Robert Adam Bell is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 584.   THE NOVEMBER 23, 2004 ATTACK – AVGHANI

#### A.   PLAINTIFF RUSSELL L. BALDWIN

5863.   Plaintiff Russell L. Baldwin is a U.S. citizen domiciled in California.

5864.   On November 23, 2004, Russell L. Baldwin was serving in the U.S. military when he was attacked by RPGs, snipers and small arms fire.

5865.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Baldwin.

5866.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5867.   As a result of the attack and the injuries suffered, Russell L. Baldwin is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 585.   THE NOVEMBER 23, 2004 ATTACK – ABU GHRAIB

### A.   PLAINTIFFS THE JOHN L. PARCELL FAMILY

5868.   Plaintiff John L. Parcell is a U.S. citizen domiciled in Pennsylvania.

5869.   On November 23, 2004, John L. Parcell was serving in the U.S. military when he was attacked by IED.

5870.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Parcell.

5871.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5872.   As a result of the attack and the injuries suffered, John L. Parcell is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5873.   Plaintiff Kyla Parcell is a citizen of the United States domiciled in Pennsylvania and is the daughter of John L. Parcell.

5874.   Plaintiff Jodi L. Parcell is a citizen of the United States domiciled in Pennsylvania and is the sister of John L. Parcell.

5875.   Plaintiff John R. Parcell is a citizen of the United States domiciled in Pennsylvania and is the son of John L. Parcell.

5876.   As a result of the attack and the injuries suffered by John L. Parcell, Plaintiffs Kyla Parcell, Jodi L. Parcell, and John R. Parcell, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services

and support.

**586.   THE NOVEMBER 18, 2004 ATTACK – FALLUJAH**

      **A.      PLAINTIFFS THE DERRICK ADAM ANTHONY FAMILY**

5877.   Plaintiff Derrick Adam Anthony is a U.S. citizen domiciled in Iowa.

5878.   On November 18, 2004, Derrick Adam Anthony was serving in the U.S. military when he was attacked by a grenade.

5879.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Anthony.

5880.   The Iranian-supported FTO AQ committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5881.   As a result of the attack and the injuries suffered, Derrick Adam Anthony is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5882.   Plaintiff Frances Elizabeth Anthony is a citizen of the United States domiciled in Illinois and is the mother of Derrick Adam Anthony.

5883.   Plaintiff Daniel Alan Anthony is a citizen of the United States domiciled in Illinois and is the father of Derrick Adam Anthony.

5884.   As a result of the attack and the injuries suffered by Derrick Adam Anthony, Plaintiffs Frances Elizabeth Anthony and Daniel Alan Anthony are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

**587.   THE NOVEMBER 18, 2004 ATTACK – LSA ANACONDA**

**A.   PLAINTIFFS THE ANDREW JAMES GREEN FAMILY**

5885.   Plaintiff Andrew James Green is a U.S. citizen domiciled in New Mexico.

5886.   On November 18, 2004, Andrew James Green was serving in the U.S. military when he was attacked by mortar.

5887.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Green.

5888.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5889.   As a result of the attack and the injuries suffered, Andrew James Green is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5890.   Plaintiff Anne Christine Peel is a citizen of the United States domiciled in New Mexico and is the former spouse of Andrew James Green.

5891.   Plaintiff Gillian Green is a citizen of the United States domiciled in New Mexico and is the daughter of Andrew James Green.

5892.   Plaintiff A.G., a minor child, represented by her legal guardian Andrew James Green, is a citizen of the United States domiciled in New Mexico and is the daughter of Andrew James Green.

5893.   As a result of the attack and the injuries suffered by Andrew James Green, Plaintiffs Anne Christine Peel, Gillian Green and A.G., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and

suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 588.   THE NOVEMBER 15, 2004 ATTACK – FALLUJAH

####    A.   PLAINTIFFS THE TERRY LYNN MCELWAIN FAMILY

5894.   Plaintiff Terry Lynn McElwain is a U.S. citizen domiciled in California.

5895.   On November 15, 2004, Terry Lynn McElwain was serving in the U.S. military when he was attacked by RPGs.

5896.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. McElwain.

5897.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5898.   As a result of the attack and the injuries suffered, Terry Lynn McElwain is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5899.   Plaintiff Julia Dantong McElwain is a citizen of the United States and domiciled in the State of California. She is the wife of Terry Lynn McElwain.

5900.   Plaintiff S.M, a minor child, represented by her legal guardians Terry Lynn McElwain and Julia Dantong McElwain, is a citizen of the United States and domiciled in the State of California. She is the daughter of Terry Lynn McElwain and Julia Dantong McElwain.

5901.   Plaintiff R.M, a minor child, represented by his legal guardians Terry Lynn McElwain and Julia Dantong McElwain, is a citizen of the United States and domiciled in the State of California. He is the son of Terry Lynn McElwain and Julia Dantong McElwain.

5902.   Plaintiff Eleanor E. McElwain is a citizen of the United States and domiciled in the State of Kansas. She is the mother of Terry Lynn McElwain

5903.   Plaintiff Tracy Rosario is a citizen of the United States and domiciled in the State of Kansas. She is the sister of Terry Lynn McElwain

5904.   Plaintiff Angel Michelle Hughes is a citizen of the United States and domiciled in the State of Kansas. She is the sister of Terry Lynn McElwain.

5905.   Plaintiff Travis McElwain is a citizen of the United States and domiciled in the State of California. He is the brother of Terry Lynn McElwain.

5906.   Plaintiff James S. McElwain is a citizen of the United States and domiciled in the State of Kansas. He is the brother of Terry Lynn McElwain.

5907.   As a result of the attack and the injuries suffered by Terry Lynn McElwain, Plaintiffs Julia Dantong McElwain, S.M, a minor child, R.M, a minor child, Eleanor E. McElwain, Tracy Rosario, Angel Michelle Hughes, Travis McElwain, James S. McElwain, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 589.   THE NOVEMBER 15, 2004 ATTACK – FALLUJAH

### A.   PLAINTIFF GARRETT MICHAEL MARSH

5908.   Plaintiff Garrett Michael Marsh is a U.S. citizen domiciled in Virginia.

5909.   On November 15, 2004, Garrett Michael Marsh was serving in the U.S. military when he was attacked by an RPG.

5910.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Marsh.

5911.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack,

as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5912.   As a result of the attack and the injuries suffered, Garrett Michael Marsh is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 590.   THE NOVEMBER 15, 2004 ATTACK – RAMADI

#### A.   PLAINTIFFS THE PATRICK MARC M. RAPICAULT FAMILY

5913.   On November 15, 2004, Patrick Marc M. Rapicault was a U.S. citizen, domiciled in California, and serving in the U.S. military when he was attacked by a vehicle borne suicide bomb, causing his death.

5914.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Rapicault.

5915.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

5916.   Plaintiff Vera Rapicault is a citizen of the United States domiciled in California and is the spouse of Patrick Marc M. Rapicault.

5917.   Plaintiff Vera Rapicault, brings an action individually and on behalf of the Estate of Patrick Marc M. Rapicault, and all heirs thereof, as its legal representative.

5918.   Plaintiff Nicole Rapicault is a citizen of the United States domiciled in Florida and is the mother of Patrick Marc M. Rapicault.

5919.   As a result of the attack, and the injuries suffered by and the death of Patrick Marc M. Rapicault, Plaintiff Vera Rapicault and Nicole Rapicault have suffered severe mental

anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Patrick Marc M. Rapicault.

### 591. THE NOVEMBER 15, 2004 ATTACK – FALLUJAH

#### A. PLAINTIFF BRIAN MICHAEL HAYDEN

5920. Plaintiff Brian Michael Hayden is a U.S. citizen domiciled in the State of Mississippi.

5921. On November 15, 2004, Brian Michael Hayden was serving in the U.S. military when he was attacked by an RPG.

5922. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Hayden.

5923. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5924. As a result of the attack and the injuries suffered, Brian Michael Hayden is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 592. THE NOVEMBER 14, 2004 ATTACK – FALLUJAH

#### A. PLAINTIFFS THE DALE ALAN BURGER JR. FAMILY

5925. On November 14, 2004, Dale Alan Burger Jr. was a U.S. citizen, domiciled in Maryland, and serving in the U.S. military when he was attacked by small arms fire, causing his death.

5926. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or

other material support used to commit the attack on Mr. Burger.

5927.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

5928.   Plaintiff Martina Catherine Burger is a citizen of the United States domiciled in Maryland and is the mother of Dale Alan Burger Jr.

5929.   Plaintiff Jennifer Christine Burger is a citizen of the United States domiciled in Australia and is the sister of Dale Alan Burger Jr.

5930.   Plaintiff Rachel Elizabeth Burger is a citizen of the United States domiciled in Maryland and is the sister of Dale Alan Burger Jr.

5931.   Plaintiff Martina Catherine Burger, brings an action individually and on behalf of the Estate of Dale Alan Burger Jr., and all heirs thereof, as its legal representative.

5932.   As a result of the attack, and the injuries suffered by and the death of Dale Alan Burger Jr., Plaintiffs Martina Catherine Burger, Jennifer Christine Burger, and Rachel Elizabeth Burger have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Dale Alan Burger Jr.

### 593.   THE NOVEMBER 14, 2004 ATTACK – FALLUJAH

#### A.      PLAINTIFF SAMUEL WILLIAMS

5933.   Plaintiff Samuel Williams is a U.S. citizen domiciled in California.

5934.   On November 14, 2004, Samuel Williams was serving in the U.S. military when he was attacked by small arms fire and IEDs.

5935.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or

other material support used to commit the attack, which injured Mr. Williams.

5936.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5937.   As a result of the attack and the injuries suffered, Samuel Williams is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 594.   THE NOVEMBER 14, 2004 ATTACK – FALLUJAH

### A.   PLAINTIFFS THE JOE SANCHEZ, JR. FAMILY

5938.   Plaintiff Joe Sanchez, Jr. is a U.S. citizen domiciled in Texas.

5939.   On November 14, 2004, Joe Sanchez, Jr. was serving in the U.S. military when he was attacked by an IED and small arms fire.

5940.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Sanchez.

5941.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5942.   As a result of the attack and the injuries suffered, Joe Sanchez, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5943.   Plaintiff Cindy Jo Sanchez is a citizen of the United States domiciled in Texas and is the sister of Joe Sanchez, Jr.

5944.   Plaintiff Sandy Jo Molina is a citizen of the United States domiciled in Texas and is the sister of Joe Sanchez, Jr.

5945.   As a result of the attack and the injuries suffered by Joe Sanchez, Jr., Plaintiffs Cindy Jo Sanchez, and Sandy Jo Molina are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 595.   THE NOVEMBER 14, 2004 ATTACK – FALLUJAH

### A.   PLAINTIFFS THE CURTIS JOSEPH MIGHACCIO FAMILY

5946.   Plaintiff Curtis Joseph Mighaccio is a U.S. citizen domiciled in Texas.

5947.   On November 14, 2004, Curtis Joseph Mighaccio was serving in the U.S. military when he was attacked by IEDs and small arms fire.

5948.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Mighaccio.

5949.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5950.   As a result of the attack and the injuries suffered, Curtis Joseph Mighaccio is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5951.   Plaintiff Gunhild Mighaccio is a citizen of the United States and domiciled in the State of California. She is the mother of Curtis Joseph Mighaccio.

5952.   Plaintiff Martin Mighaccio is a citizen of the United States and domiciled in the State of California. He is the father of Curtis Joseph Mighaccio.

5953.   As a result of the attack and the injuries suffered by Curtis Joseph Mighaccio, Plaintiffs Gunhild Mighaccio and Martin Mighaccio, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 596.   THE NOVEMBER 13, 2004 Attack – FALLUJAH

####    A.   PLAINTIFFS THE SHANE KEVIN HOUSMANS FAMILY

5954.   Plaintiff Shane Kevin Housmans is a U.S. citizen domiciled in Texas.

5955.   On November 13, 2004, Shane Kevin Housmans was serving in the U.S. military when he was attacked by an IED and Small Arms Fire.

5956.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Housmans.

5957.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5958.   As a result of the attack and the injuries suffered, Shane Kevin Housmans is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5959.   Plaintiff Nicole M. Housmans is a citizen of the United States domiciled in Texas and is the spouse of Shane Kevin Housmans.

5960.   Plaintiff C.F.H., a minor child, represented by her legal guardians Nicole M. Housmans and Shane Kevin Housmans, is a citizen of the United States domiciled in Texas and is the daughter of Shane Kevin Housmans.

5961.   As a result of the attack and the injuries suffered by Shane Kevin Housmans, Plaintiffs Nicole M. Housmans and C.F.H., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 597.   THE NOVEMBER 13, 2004 ATTACK –FALLUJAH

### A.   PLAINTIFFS THE JOSE A. VELEZ FAMILY

5962.   On November 13, 2004, Jose A. Velez was a U.S. citizen, domiciled in Texas, and serving in the U.S. military when he was attacked by Small Arms Fire, causing his death.

5963.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Velez.

5964.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

5965.   Plaintiff Nickie Marie Velez is a citizen of the United States domiciled in Texas and is the spouse of Jose A. Velez.

5966.   Plaintiff Monica Velez is a citizen of the United States domiciled in Texas and is the sister of Jose A. Velez.

5967.   Plaintiff Nickie Marie Velez, brings an action individually and on behalf of the Estate of Jose A. Velez, and all heirs thereof, as its legal representative.

5968.   As a result of the attack, and the injuries suffered by and the death of Jose A. Velez, Plaintiffs Nickie Marie Velez and Monica Velez suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings,

income, and net accumulation to the Estate of Jose A. Velez.

### 598. THE NOVEMBER 13, 2004 ATTACK – RAMADI

#### A. PLAINTIFFS THE JOHN DANIEL SHANNON FAMILY

5969. Plaintiff John Daniel Shannon is a U.S. citizen domiciled in Colorado.

5970. On November 13, 2004, John Daniel Shannon was serving in the U.S. military when he was attacked by a sniper rifle.

5971. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Shannon.

5972. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5973. As a result of the attack and the injuries suffered, John Daniel Shannon is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5974. Plaintiff Torrey Lisa Shannon is a citizen of the United States domiciled in Colorado and is the spouse of John Daniel Shannon.

5975. Plaintiff Dominick Paul Shannon is a citizen of the United States domiciled in Colorado and is the son of John Daniel Shannon.

5976. Plaintiff Talon Dakota Shannon is a citizen of the United States domiciled in Colorado and is the son of John Daniel Shannon.

5977. Plaintiff D.R.S., a minor child, represented by his legal guardian John Daniel Shannon, is a citizen of the United States domiciled in Colorado and is the son of John Daniel Shannon.

5978.   As a result of the attack and the injuries suffered by John Daniel Shannon, Plaintiffs Torrey Lisa Shannon, Dominick Paul Shannon, Talon Dakota Shannon and D.R.S., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 599.   THE NOVEMBER 13, 2004 ATTACK – FALLUJAH

#### A.   PLAINTIFFS THE STANLEY GOODIN, III FAMILY

5979.   Plaintiff Stanley Goodin, III is a U.S. citizen domiciled in Texas.

5980.   On November 13, 2004, Stanley Goodin, III was serving in the U.S. military when he was attacked by sniper fire, small arms fire, rockets and grenades.

5981.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Goodin.

5982.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5983.   As a result of the attack and the injuries suffered, Stanley Goodin, III is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5984.   Plaintiff J.G., a minor child, represented by his legal guardian Stanley Goodin, III, is a citizen of the United States domiciled in Texas and is the son of Stanley Goodin, III.

5985.   As a result of the attack and the injuries suffered by Stanley Goodin, III, Plaintiff J.G., a minor child, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and

past and future economic damages, including loss of services and support.

**600.   THE NOVEMBER 12, 2004 ATTACK – AL KARMAH**

    **A.   PLAINTIFFS THE DANIEL CLAYTON VOTROBEK JR. FAMILY**

5986.   Plaintiff Daniel Clayton Votrobek Jr. is a U.S. citizen domiciled in Florida.

5987.   On November 12, 2004, Daniel Clayton Votrobek Jr. was serving in the U.S. military when he was attacked by IEDs.

5988.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Votrobek.

5989.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5990.   As a result of the attack and the injuries suffered, Daniel Clayton Votrobek Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

5991.   Plaintiff Daniel Clayton Votrobek Sr. is a citizen of the United States domiciled in Florida and is the father of Daniel Clayton Votrobek Jr.

5992.   Plaintiff Lenore Jean Harp is a citizen of the United States domiciled in Florida and is the mother of Daniel Clayton Votrobek Jr.

5993.   As a result of the attack and the injuries suffered by Daniel Clayton Votrobek Jr., Plaintiffs Daniel Clayton Votrobek Sr. and Lenore Jean Harp are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including

loss of services and support.

### 601.   THE NOVEMBER 12, 2004 ATTACK – BAIJI

#### A.   PLAINTIFF JUSTIN MURRAY CROCKER

5994.   Plaintiff Justin Murray Crocker is a U.S. citizen domiciled in Georgia.

5995.   On November 12, 2004, Justin Murray Crocker was serving in the U.S. military when he was attacked by an IED and small arms fire.

5996.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Crocker.

5997.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

5998.   As a result of the attack and the injuries suffered, Justin Murray Crocker is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 602.   THE NOVEMBER 12, 2004 ATTACK – FALLUJAH

#### A.   PLAINTIFFS THE SAMUEL JAMES MORTIMER FAMILY

5999.   Plaintiff Samuel James Mortimer is a U.S. citizen domiciled in North Carolina.

6000.   On November 12, 2004, Samuel James Mortimer was serving in the U.S. military when he was attacked by a mortar.

6001.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Mortimer.

6002.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack,

852

the munition used, as well as the tactics, techniques, and procedures utilized.

6003.   As a result of the attack and the injuries suffered, Samuel James Mortimer is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6004.   Plaintiff Kristine Mortimer is a citizen of the United States domiciled in North Carolina and is the spouse of Samuel James Mortimer.

6005.   As a result of the attack and the injuries suffered by Samuel James Mortimer, Plaintiff Kristine Mortimer, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 603.   THE NOVEMBER 12, 2004 ATTACK – FALLUJAH

### A.   PLAINTIFFS THE BLAKE COLIN COLE FAMILY

6006.   Plaintiff Blake Colin Cole is a U.S. citizen domiciled in Hawaii.

6007.   On November 12, 2004, Blake Colin Cole was serving in the U.S. military when he was attacked by a grenade and small arms fire.

6008.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Cole.

6009.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6010.   As a result of the attack and the injuries suffered, Blake Colin Cole is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical

expenses, lost income, and loss of earning capacity.

6011.   Plaintiff Lynda Sue Murray is a citizen of the United States domiciled in Texas and is the mother of Blake Colin Cole.

6012.   Plaintiff Greg Robert Cole is a citizen of the United States domiciled in Illinois and is the father of Blake Colin Cole.

6013.   As a result of the attack and the injuries suffered by Blake Colin Cole, Plaintiffs Lynda Sue Murray and Greg Robert Cole are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 604.   THE NOVEMBER 11, 2004 ATTACK – HAWIJUH

#### A.   PLAINTIFFS THE LUTHER DARRELL BROWN FAMILY

6014.   Plaintiff Luther Darrell Brown is a U.S. citizen domiciled in South Carolina.

6015.   On November 11, 2004, Luther Darrell Brown was serving in the U.S. military when he was attacked by RPGs and small arms fire.

6016.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Brown.

6017.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6018.   As a result of the attack and the injuries suffered, Luther Darrell Brown is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6019.   Plaintiff Arthur Lee Brown is a citizen of the United States domiciled in South

Carolina and is the father of Luther Darrell Brown.

6020.   Plaintiff Linda Faye Brown is a citizen of the United States domiciled in South Carolina and is the mother of Luther Darrell Brown.

6021.   Plaintiff Akeisha Brown McFadden is a citizen of the United States domiciled in North Carolina and is the sister of Luther Darrell Brown.

6022.   Plaintiff Matthew Laydell Brown is a citizen of the United States domiciled in North Carolina and is the brother of Luther Darrell Brown.

6023.   Plaintiff Aundrea Geronto Brown is a citizen of the United States domiciled in North Carolina and is the brother of Luther Darrell Brown.

6024.   As a result of the attack and the injuries suffered by Luther Darrell Brown, Plaintiffs Arthur Lee Brown, Linda Faye Brown, Akeisha Brown McFadden, Matthew Laydell Brown and Aundrea Geronto Brown, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 605.   THE NOVEMBER 11, 2004 ATTACK – FALLUJAH

### A.   PLAINTIFF RAMON JUNIOR BEJARANO

6025.   Plaintiff Ramon Junior Bejarano is a U.S. citizen domiciled in Illinois.

6026.   On November 11, 2004, Ramon Junior Bejarano was serving in the U.S. military when he was attacked by RPGs.

6027.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Bejarano.

6028.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack,

855

the munition used, as well as the tactics, techniques, and procedures utilized.

6029.  As a result of the attack and the injuries suffered, Ramon Junior Bejarano is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 606. THE NOVEMBER 10, 2004 ATTACK – FALLUJAH

#### A. PLAINTIFFS THE MARTIN J. GONZALEZ FAMILY

6030.  Plaintiff Martin J. Gonzalez is a U.S. citizen domiciled in Texas.

6031.  On November 10, 2004, Martin J. Gonzalez was serving in the U.S. military when he was attacked by Small Arms Fire and Grenades.

6032.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Gonzalez.

6033.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6034.  As a result of the attack and the injuries suffered, Martin J. Gonzalez is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6035.  Plaintiff Betty J. Gonzalez is a citizen of the United States domiciled in Texas and is the mother of Martin J. Gonzalez.

6036.  Plaintiff Tomas Rivera Gonzalez is a citizen of the United States domiciled in Texas and is the father of Martin J. Gonzalez.

6037.  As a result of the attack and the injuries suffered by Martin J. Gonzalez, Plaintiffs

Betty J. Gonzalez and Tomas Rivera Gonzalez entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 607.  THE NOVEMBER 10, 2004 ATTACK – FALLUJAH

#### A.  PLAINTIFF BEAU ANTHONY MATTIODA

6038.   Plaintiff Beau Anthony Mattioda is a U.S. citizen domiciled in California.

6039.   On November 10, 2004, Beau Anthony Mattioda was serving in the U.S. military when he was attacked by a Rocket.

6040.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Mattioda.

6041.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6042.   As a result of the attack and the injuries suffered, Beau Anthony Mattioda is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 608.  THE NOVEMBER 10, 2004 ATTACK – TAJI

#### A.  PLAINTIFFS THE MICHAEL ZIPP HANNA FAMILY

6043.   Plaintiff Michael Zipp Hanna is a U.S. citizen domiciled in South Carolina.

6044.   On November 10, 2004, Michael Zipp Hanna was serving in the U.S. military when he was attacked by a rocket.

6045.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Hanna.

6046.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6047.   As a result of the attack and the injuries suffered, Michael Zipp Hanna is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6048.   Plaintiff Michael Alexander Hanna is a citizen of the United States domiciled in New York and is the son of Michael Zipp Hanna.

6049.   As a result of the attack and the injuries suffered by Michael Zipp Hanna, Plaintiff Michael Alexander Hanna is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 609.   THE NOVEMBER 10, 2004 ATTACK – FALLUJAH

#### A.   PLAINTIFFS THE MICHAEL VINCENT PRATO FAMILY

6050.   Plaintiff Michael Vincent Prato is a U.S. citizen domiciled in Virginia.

6051.   On November 10, 2004, Michael Vincent Prato was serving in the U.S. military when he was attacked by IEDs, RPGs, grenades, and small arms fire.

6052.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Prato.

6053.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6054.   As a result of the attack and the injuries suffered, Michael Vincent Prato is

entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6055.   Plaintiff Tess Rae Prato is a citizen of the United States domiciled in Illinois and is the ex-wife of Michael Vincent Prato.

6056.   Plaintiff Charlene F. Holm is a citizen of the United States domiciled in Florida and is the mother of Michael Vincent Prato.

6057.   Plaintiff Vincent M. Prato is a citizen of the United States domiciled in Nevada and is the father of Michael Vincent Prato.

6058.   Plaintiff Madeline Prato is a citizen of the United States domiciled in Nevada and is the step-mother of Michael Vincent Prato.

6059.   Plaintiff Tyler A. Higuera is a citizen of the United States domiciled in Florida and is the brother of Michael Vincent Prato.

6060.   Plaintiff Nicole C. Prato is a citizen of the United States domiciled in Florida and is the sister of Michael Vincent Prato.

6061.   Plaintiff Christopher T. Higuera is a citizen of the United States domiciled in Florida and is the bother of Michael Vincent Prato.

6062.   Plaintiff Ryan M. Prato is a citizen of the United States domiciled in Nevada and is the bother of Michael Vincent Prato.

6063.   As a result of the attack and the injuries suffered by Michael Vincent Prato, Plaintiffs Tess Rae Prato, Charlene F. Holm, Vincent M. Prato, Madeline Prato, Tyler A. Higuera, Nicole C. Prato, Christopher T. Higuera, and Ryan M. Prato, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and

suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 610.   THE NOVEMBER 10, 2004 ATTACK – FALLUJAH

#### A.   PLAINTIFFS THE ROBERT ALLEN LEATHERWOOD JR. FAMILY

6064.   Plaintiff Robert Allen Leatherwood, Jr. is a U.S. citizen domiciled in Texas.

6065.   On November 10, 2004, Robert Leatherwood was serving in the U.S. military when he was attacked by a daisy-chain IED, small arms, mortars, and RPGs.

6066.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Leatherwood.

6067.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6068.   As a result of the attack and the injuries suffered, Robert Allen Leatherwood, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6069.   Plaintiff Stacey Brooke Leatherwood is a citizen of the United States domiciled in Texas and is the half-sister of Mr. Robert Allen Leatherwood, Jr.

6070.   Plaintiff Lindsay Deanne Reyes is a citizen of the United States domiciled in Texas and is the step-sister of Robert Allen Leatherwood, Jr.

6071.   Plaintiff Wendy Deanne Leatherwood is a citizen of the United States domiciled in Texas and is the step-mother of Robert Allen Leatherwood, Jr.

6072.   Plaintiff Robert Allen Leatherwood, Sr. is a citizen of the United States domiciled

in Texas and is the father of Robert Allen Leatherwood, Jr.

6073.   Plaintiff Debbie Lee Zenk is a citizen of the United States domiciled in Texas and is the mother of Robert Allen Leatherwood, Jr.

6074.   Plaintiff Kenneth Wayne Leatherwood is a citizen of the United States domiciled in Texas and is the brother of Robert Allen Leatherwood, Jr.

6075.   Plaintiff Kenneth Clayton Ronald Wilhelm is a citizen of the United States domiciled in Texas and is the step-brother of Robert Allen Leatherwood, Jr.

6076.   As a result of the attack and the injuries suffered by Robert Allen Leatherwood, Jr., Plaintiffs Stacey Brooke Leatherwood, Lindsay Deanne Reyes, Wendy Deanne Leatherwood, Robert Allen Leatherwood, Sr., Debbie Lee Zenk, Kenneth Wayne Leatherwood, and Kenneth Clayton Ronald Wilhelm are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 611.   THE NOVEMBER 9, 2004 ATTACK –FALLUJAH

### A.   PLAINTIFFS THE ABRAHAM SIMPSON FAMILY

6077.   On November 9, 2004, Abraham Simpson was a U.S. citizen, domiciled in California, and serving in the U.S. military when he was attacked by a RPG, causing his death.

6078.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Simpson.

6079.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

6080.   Plaintiff Maria Luz Simpson is a citizen of the United States domiciled in California and is the mother of Abraham Simpson.

6081.   Plaintiff James T. Simpson is a citizen of the United States domiciled in California and is the father of Abraham Simpson.

6082.   Plaintiff David Simpson is a citizen of the United States domiciled in California and is the brother of Abraham Simpson.

6083.   Plaintiff Paul Simpson is a citizen of the United States domiciled in California and is the brother of Abraham Simpson.

6084.   Plaintiff Maria Luz Simpson brings an action individually and on behalf of the Estate of Abraham Simpson, and all heirs thereof, as its legal representative.

6085.   As a result of the attack, and the injuries suffered by and the death of Abraham Simpson, Plaintiffs Maria Luz Simpson, James T. Simpson, David Simpson and Paul Simpson have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Abraham Simpson.

### 612.   THE NOVEMBER 9, 2004 ATTACK – FALLUJAH

### A.   PLAINTIFFS THE DEREK DAVID MCGINNIS FAMILY

6086.   Plaintiff Derek David McGinnis is a U.S. citizen domiciled in California.

6087.   On November 9, 2004, Derek David McGinnis was serving in the U.S. military when he was attacked by a VBIED and small arms fire.

6088.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. McGinnis.

6089.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6090.   As a result of the attack and the injuries suffered, Derek David McGinnis is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6091.   Plaintiff Andrea Michelle McGinnis is a citizen of the United States domiciled in California and is the spouse of Derek David McGinnis.

6092.   As a result of the attack and the injuries suffered by Derek David McGinnis, Plaintiff Andrea Michelle McGinnis is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 613.   THE NOVEMBER 9, 2004 ATTACK – FALLUJAH

### A.   PLAINTIFFS THE TERRY LYNN MCELWAIN FAMILY

6093.   Plaintiff Terry Lynn McElwain is a U.S. citizen domiciled in California.

6094.   On November 9, 2004, Terry Lynn McElwain was serving in the U.S. military when he was attacked by small arms fire, RPGs, grenades and mortars.

6095.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. McElwain.

6096.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6097.   As a result of the attack and the injuries suffered, Terry Lynn McElwain is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6098.   Plaintiff Julia Dantong McElwain is a citizen of the United States and domiciled in the State of California. She is the wife of Terry Lynn McElwain.

6099.   Plaintiff S.M, a minor child, represented by her legal guardians Terry Lynn McElwain and Julia Dantong McElwain, is a citizen of the United States and domiciled in the State of California. She is the daughter of Terry Lynn McElwain and Julia Dantong McElwain.

6100.   Plaintiff R.M, a minor child, represented by his legal guardians Terry Lynn McElwain and Julia Dantong McElwain, is a citizen of the United States and domiciled in the State of California. He is the son of Terry Lynn McElwain and Julia Dantong McElwain.

6101.   Plaintiff Eleanor E. McElwain is a citizen of the United States and domiciled in the State of Kansas. She is the mother of Terry Lynn McElwain

6102.   Plaintiff Tracy Rosario is a citizen of the United States and domiciled in the State of Kansas. She is the sister of Terry Lynn McElwain

6103.   Plaintiff Angel Michelle Hughes is a citizen of the United States and domiciled in the State of Kansas. She is the sister of Terry Lynn McElwain.

6104.   Plaintiff Travis McElwain is a citizen of the United States and domiciled in the State of California. He is the brother of Terry Lynn McElwain.

6105.   Plaintiff James S. McElwain is a citizen of the United States and domiciled in the State of Kansas. He is the brother of Terry Lynn McElwain.

6106.   As a result of the attack and the injuries suffered by Terry Lynn McElwain, Plaintiffs Julia Dantong McElwain, S.M, a minor child, R.M, a minor child, Eleanor E. McElwain, Tracy Rosario, Angel Michelle Hughes, Travis McElwain, James S. McElwain, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic

damages, including loss of services and support.

### 614.   THE NOVEMBER 9, 2004 ATTACK – FALLUJAH

#### A.     PLAINTIFF DANNY TRAM

6107.   Plaintiff Danny Tram is a U.S. citizen domiciled in Oregon.

6108.   On November 9, 2004, Danny Tram was serving in the U.S. military when he was attacked by an IED and a RPG.

6109.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Tram.

6110.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6111.   As a result of the attack and the injuries suffered, Danny Tram is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 615.   THE NOVEMBER 9, 2004 ATTACK – MUSAYIB

#### A.     PLAINTIFF VINCENT WILLIAM GIZZARELLI

6112.   Plaintiff Vincent William Gizzarelli is a U.S. citizen domiciled in North Carolina.

6113.   On November 9, 2004, Vincent William Gizzarelli was serving in the U.S. military when he was attacked by an RPG.

6114.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Gizzarelli.

6115.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack,

the munition used, as well as the tactics, techniques, and procedures utilized.

6116.   As a result of the attack and the injuries suffered, Vincent William Gizzarelli is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 616.   THE NOVEMBER 9, 2004 ATTACK – FALLUJAH

#### A.   PLAINTIFFS THE JAMES ALAN BELL FAMILY

6117.   Plaintiff James Alan Bell is a U.S. citizen domiciled in Texas.

6118.   On November 9, 2004, James Alan Bell was serving in the U.S. military when he was attacked by a grenade.

6119.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Bell.

6120.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6121.   As a result of the attack and the injuries suffered, James Alan Bell is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6122.   Plaintiff Linda S. Bell is a citizen of the United States domiciled in Texas and is the mother of James Alan Bell.

6123.   Plaintiff David Craig is a citizen of the United States domiciled in Florida and is the father of James Alan Bell.

6124.   Plaintiff Jon G. Bell is a citizen of the United States domiciled in Texas and is the

brother of James Alan Bell.

6125.   As a result of the attack and the injuries suffered by James Alan Bell, Plaintiffs Linda S. Bell, David Craig and Jon G. Bell, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 617.   THE NOVEMBER 9, 2004 ATTACK – FALLUJAH

#### A.   PLAINTIFF GARRETT MICHAEL MARSH

6126.   Plaintiff Garrett Michael Marsh is a U.S. citizen domiciled in Virginia.

6127.   On November 9, 2004, Garrett Michael Marsh was serving in the U.S. military when he was attacked by small arms fire, an RPG, grenades and mortars.

6128.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Marsh.

6129.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6130.   As a result of the attack and the injuries suffered, Garrett Michael Marsh is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 618.   THE NOVEMBER 8, 2004 ATTACK – MOSUL

#### A.   PLAINTIFF ARTHUR LOUIS TOMPKINS

6131.   Plaintiff Arthur Louis Tompkins is a U.S. citizen domiciled in Pennsylvania.

6132.   On November 8, 2004, Arthur Louis Tompkins was serving in the U.S. military

867

when he was attacked by a VBIED.

6133.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Tompkins.

6134.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6135.   As a result of the attack and the injuries suffered, Arthur Louis Tompkins is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 619.   THE NOVEMBER 6, 2004 ATTACK – RAMADI

### A.   PLAINTIFF ERIK DOUGLAS JOHNSON

6136.   Plaintiff Erik Douglas Johnson is a U.S. citizen domiciled in Virginia.

6137.   On November 6, 2004, Erik Douglas Johnson was serving in the U.S. military when he was attacked by a VBIED.

6138.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Johnson.

6139.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6140.   As a result of the attack and the injuries suffered, Erik Douglas Johnson is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 620.   THE NOVEMBER 5, 2004 ATTACK – RAMADI

### A.   PLAINTIFFS THE JAMES MICHAEL HURST FAMILY

6141.   Plaintiff James Michael Hurst is a U.S. citizen domiciled in South Carolina.

6142.   On or about November 5, 2004, James Michael Hurst was serving in the U.S. military when he was attacked by IEDs.

6143.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Hurst.

6144.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6145.   As a result of the attack and the injuries suffered, James Michael Hurst is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6146.   Plaintiff Alvia Masayon Hurst is a citizen of the United States domiciled in South Carolina and is the spouse of James Michael Hurst.

6147.   Plaintiff Bausten Cole Hurst is a citizen of the United States domiciled in South Carolina and is the son of James Michael Hurst.

6148.   As a result of the attack and the injuries suffered by James Michael Hurst, Plaintiffs Alvia Masayon Hurst and Bausten Cole Hurst, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 621.   THE NOVEMBER 4, 2004 ATTACK – FALLUJAH

#### A.   PLAINTIFF ALLEN LAMAR PRATT

6149.   Plaintiff Allen Lamar Pratt is a U.S. citizen domiciled in Pennsylvania.

6150.   On November 4, 2004, Allen Lamar Pratt was serving in the U.S. military when he was attacked by RPGs and small arms fire.

6151.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Pratt.

6152.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6153.   As a result of the attack and the injuries suffered, Allen Lamar Pratt is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 622.   THE NOVEMBER 2, 2004 ATTACK – BAGHDAD

#### A.   PLAINTIFF KENNETH ROBERT GORDON

6154.   Plaintiff Kenneth Robert Gordon is a U.S. citizen domiciled in Pennsylvania.

6155.   On November 2, 2004, Kenneth Robert Gordon was serving in the U.S. military when he was attacked by grenades.

6156.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Gordon.

6157.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6158.   As a result of the attack and the injuries suffered, Kenneth Robert Gordon is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 623.   THE NOVEMBER 1, 2004 ATTACK – BAGHDAD

#### A.   PLAINTIFFS THE BRADLEY CHRISTIAN TANDE, JR. FAMILY

6159.   Plaintiff Bradley Christian Tande, Jr. is a U.S. citizen domiciled in California.

6160.   On November 1, 2004, Bradley Christian Tande, Jr. was serving in the U.S. military when he was attacked by a 122 mm rocket.

6161.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Tande, Jr.

6162.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6163.   As a result of the attack and the injuries suffered, Bradley Christian Tande, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6164.   Plaintiff Dianna D. Tande is a citizen of the United States domiciled in Montana and is the mother of Bradley Christian Tande, Jr.

6165.   As a result of the attack and the injuries suffered by Bradley Christian Tande, Jr., Plaintiff Dianna D. Tande is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of

consortium, and past and future economic damages, including loss of services and support.

### 624.   THE OCTOBER 27, 2004 ATTACK – BALAD

#### A.   PLAINTIFFS THE ALEXANDER RESTIFO FAMILY

6166.   Plaintiff Alexander Restifo is a U.S. citizen domiciled in New York.

6167.   On October 27, 2004, Alexander Restifo was serving in the U.S. military when he was attacked by IEDs, RPGs and small arms fire.

6168.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Restifo.

6169.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6170.   As a result of the attack and the injuries suffered, Alexander Restifo is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6171.   Plaintiff Salvatore A. Restifo is a citizen of the United States domiciled in New York and is the father of Alexander Restifo.

6172.   Plaintiff Nancy A. Restifo is a citizen of the United States domiciled in New York and is the mother of Alexander Restifo.

6173.   As a result of the attack and the injuries suffered by Alexander Restifo, Plaintiffs Salvatore A. Restifo and Nancy A. Restifo, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

**625.   THE OCTOBER 27, 2004 ATTACK – BAGHDAD**

**A.   PLAINTIFFS THE MARTIN FLORES-DOMINGUEZ FAMILY**

6174.   Plaintiff Martin Flores-Dominguez is a U.S. citizen domiciled in Oklahoma.

6175.   On October 27, 2004, Martin Flores-Dominguez was serving in the U.S. military when he was attacked by an RPG.

6176.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Flores-Dominguez.

6177.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6178.   As a result of the attack and the injuries suffered, Martin Flores-Dominguez is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6179.   Plaintiff Carmen Flores is a citizen of the United States and domiciled in the State of Oklahoma. She is the wife of Martin Flores-Dominguez.

6180.   Plaintiff Jessica Flores is a citizen of the United States and domiciled in the State of Oklahoma. She is the daughter of Martin Flores-Dominguez.

6181.   Plaintiff Kasandra Flores is a citizen of the United States and domiciled in the State of Oklahoma. She is the daughter of Martin Flores-Dominguez.

6182.   Plaintiff Katherine Schell is a citizen of the United States and domiciled in Germany. She is the daughter of Martin Flores-Dominguez.

6183.   As a result of the attack and the injuries suffered by Martin Flores-Dominguez, Plaintiffs Carmen Flores, Jessica Flores, Kasandra Flores, and Katherine Schell, are entitled to

873

past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

**626.   THE OCTOBER 24, 2004 ATTACK – HASWA**

      **A.   PLAINTIFF MICHAEL RAFAEL HERNANDO**

6184.   Plaintiff Michael Rafael Hernando is a U.S. citizen domiciled in Florida.

6185.   On October 24, 2004, Michael Rafael Hernando was serving in the U.S. military when he was attacked by RPGs, mortars and small arms fire.

6186.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Hernando.

6187.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6188.   As a result of the attack and the injuries suffered, Michael Rafael Hernando is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

**627.   THE OCTOBER 15, 2004 ATTACK – ISKANDARIYA**

      **A.   PLAINTIFF VINCENT WILLIAM GIZZARELLI**

6189.   Plaintiff Vincent William Gizzarelli is a U.S. citizen domiciled in North Carolina.

6190.   On or about October 15, 2004, Vincent William Gizzarelli was serving in the U.S. military when he was attacked by an IED.

6191.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Gizzarelli.

6192.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6193.   As a result of the attack and the injuries suffered, Vincent William Gizzarelli is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 628.   THE OCTOBER 14, 2004 ATTACK – BAGHDAD

#### A.   PLAINTIFF CHESTER J. ROGERS

6194.   Plaintiff Chester J. Rogers is a U.S. citizen domiciled in Rhode Island.

6195.   On October 14, 2004, Chester J. Rogers was serving in the U.S. military when he was attacked by an IED.

6196.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Rogers.

6197.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6198.   As a result of the attack and the injuries suffered, Chester J. Rogers is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 629.   THE OCTOBER 12, 2004 ATTACK – AL KARMAH

#### A.   PLAINTIFF SIMON PETER FLARITY

6199.   Plaintiff Simon Peter Flarity is a U.S. citizen domiciled in Alabama.

6200.   On October 12, 2004, Simon Peter Flarity was serving in the U.S. military when he was attacked by an RPG and small arms fire.

6201.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Flarity.

6202.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6203.   As a result of the attack and the injuries suffered, Simon Peter Flarity is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 630.   THE OCTOBER 12, 2004 ATTACK – AL KARMAH

### A.   PLAINTIFFS THE MATTHEW JOSEPH SOLBERG FAMILY

6204.   Plaintiff Matthew Joseph Solberg is a U.S. citizen domiciled in Wisconsin.

6205.   On October 12, 2004, Matthew Joseph Solberg was serving in the U.S. military when he was attacked by an IED.

6206.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Solberg.

6207.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6208.   As a result of the attack and the injuries suffered, Matthew Joseph Solberg is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including

medical expenses, lost income, and loss of earning capacity.

6209.   Plaintiff Laurie Hebbe is a citizen of the United States domiciled in Wisconsin and is the mother of Matthew Joseph Solberg.

6210.   Plaintiff Roger Hebbe is a citizen of the United States domiciled in Wisconsin and is the father of Matthew Joseph Solberg.

6211.   Plaintiff Sam Hebbe is a citizen of the United States domiciled in Wisconsin and is the brother of Matthew Joseph Solberg.

6212.   Plaintiff Jacob Hebbe is a citizen of the United States domiciled in Wisconsin and is the brother of Matthew Joseph Solberg.

6213.   As a result of the attack and the injuries suffered by Matthew Joseph Solberg, Plaintiffs Laurie Hebbe, Roger Hebbe, Sam Hebbe and Jacob Hebbe are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 631.   THE OCTOBER 11, 2004 ATTACK – FALLUJAH

### A.   PLAINTIFFS THE RAY LEONARD LOPEZ FAMILY

6214.   Plaintiff Ray Leonard Lopez is a U.S. citizen domiciled in Texas.

6215.   On October 11, 2004, Ray Leonard Lopez was serving in the U.S. military when he was attacked by mortars.

6216.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Lopez.

6217.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6218.   As a result of the attack and the injuries suffered, Ray Leonard Lopez is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6219.   Plaintiff Sierra M. Vasquez is a citizen of the United States domiciled in Texas and is the sister of Ray Leonard Lopez.

6220.   Plaintiff Cassandra M. Nunez is a citizen of the United States domiciled in Texas and is the sister of Ray Leonard Lopez.

6221.   Plaintiff Susanne M. Lopez is a citizen of the United States domiciled in Texas and is the sister of Ray Leonard Lopez.

6222.   Plaintiff Sonia M. Lopez is a citizen of the United States domiciled in Texas and is the sister of Ray Leonard Lopez.

6223.   Plaintiff Rebecca Vasquez is a citizen of the United States domiciled in Texas and is the aunt of Ray Leonard Lopez.

6224.   Plaintiff John R. Stanley is a citizen of the United States domiciled in Texas and is the brother of Ray Leonard Lopez.

6225.   As a result of the attack and the injuries suffered by Ray Leonard Lopez, Plaintiffs Sierra M. Vasquez, Cassandra M. Nunez, Susanne M. Lopez, Sonia M. Lopez, Rebecca Vasquez and John R. Stanley are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 632.   THE OCTOBER 11, 2004 ATTACK – FOB RAMADI

### A.   PLAINTIFF JOSEPH CHRISTOPHER FERRARO

6226.   Plaintiff Joseph Christopher Ferraro is a U.S. citizen domiciled in New Jersey.

878

6227. On October 11, 2004, Joseph Christopher Ferraro was serving in the U.S. military when he was attacked by rockets and mortars.

6228. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Ferraro.

6229. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6230. As a result of the attack and the injuries suffered, Joseph Christopher Ferraro is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 633. THE OCTOBER 11, 2004 ATTACK – RAMADI

### A. PLAINTIFF EDDIE SANTOS FERNANDEZ

6231. Plaintiff Eddie Santos Fernandez is a U.S. citizen domiciled in Nevada.

6232. On October 11, 2004, Eddie Santos Fernandez was serving in the U.S. military when he was attacked by a mortar.

6233. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Fernandez.

6234. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6235. As a result of the attack and the injuries suffered, Eddie Santos Fernandez is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including

medical expenses, lost income, and loss of earning capacity.

**634. THE OCTOBER 9, 2004 ATTACK – KARMAH**

  **A.  PLAINTIFFS THE DANIEL LEONARD POULSEN FAMILY**

6236. Plaintiff Daniel Leonard Poulsen is a U.S. citizen domiciled in Nebraska.

6237. On October 9, 2004, Daniel Leonard Poulsen was serving in the U.S. military when he was attacked by a VBIED and small arms fire.

6238. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Poulsen.

6239. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6240. As a result of the attack and the injuries suffered, Daniel Leonard Poulsen is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6241. Plaintiff Allen Baier is a citizen of the United States and domiciled in the State of Nebraska. He is the step-father of Daniel Leonard Poulsen.

6242. Plaintiff Cindy Baier is a citizen of the United States and domiciled in the State of Nebraska. She is the mother of Daniel Leonard Poulsen.

6243. Plaintiff Brian Poulsen is a citizen of the United States and domiciled in the State of Nebraska. He is the brother of Daniel Leonard Poulsen.

6244. Plaintiff Erik Poulsen is a citizen of the United States and domiciled in the State of Nebraska. He is the brother of Daniel Leonard Poulsen.

6245. As a result of the attack and the injuries suffered by Daniel Leonard Poulsen,

Plaintiffs Allen Baier, Cindy Baier, Brian Poulsen, and Erik Poulsen, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 635.  THE OCTOBER 9, 2004 ATTACK – KARMAH

#### A.  PLAINTIFF KEITH EDWARD ROGERS

6246.  Plaintiff Keith Edward Rogers is a U.S. citizen domiciled in California.

6247.  On October 9, 2004, Keith Edward Rogers was serving in the U.S. military when he was attacked by a VBIED and small arms fire.

6248.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Rogers.

6249.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6250.  As a result of the attack and the injuries suffered, Keith Edward Rogers is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 636.  THE OCTOBER 4, 2004 ATTACK – HASWA

#### A.  PLAINTIFF MICHAEL PAUL SAVOIE

6251.  Plaintiff Michael Paul Savoie is a U.S. citizen domiciled in Louisiana.

6252.  On October 4, 2004, Michael Paul Savoie was serving in the U.S. military when he was attacked by an IED and small arms fire.

6253.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or

other material support used to commit the attack, which injured Mr. Savoie.

6254.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6255.   As a result of the attack and the injuries suffered, Michael Paul Savoie is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 637.   THE OCTOBER 2, 2004 ATTACK – AL-KHALIDIYAH

#### A.   PLAINTIFF LANCE RAYMOND BLYTHE

6256.   Plaintiff Lance Raymond Blythe is a U.S. citizen domiciled in Nebraska.

6257.   On October 2, 2004, Lance Raymond Blythe was serving in the U.S. military when he was attacked by an IED.

6258.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Blythe.

6259.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6260.   As a result of the attack and the injuries suffered, Lance Raymond Blythe is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 638.   THE OCTOBER 1, 2004 ATTACK – SAMARRA

#### A.   PLAINTIFF MICHAEL RICHARD DRUMMOND

6261.   Plaintiff Michael Richard Drummond is a U.S. citizen domiciled in New York.

6262.   On October 1, 2004, Michael Richard Drummond was serving in the U.S. military when he was attacked by an RPG and small arms fire.

6263.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Drummond.

6264.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6265.   As a result of the attack and the injuries suffered, Michael Richard Drummond is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 639.   THE SEPTEMBER 30, 2004 ATTACK – MOSUL

#### A.   PLAINTIFFS   THE   CHRISTOPHER   ROBERT   GALKA FAMILY

6266.   Plaintiff Christopher Robert Galka is a U.S. citizen domiciled in Wisconsin.

6267.   On September 30, 2004, Christopher Robert Galka was serving in the U.S. military when he was attacked by IEDs and small arms fire.

6268.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Galka.

6269.   The Iranian-supported FTO AAI planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the

attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6270.   As a result of the attack and the injuries suffered, Christopher Robert Galka is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6271.   Plaintiff Maria Theresa Galka is a citizen of the United States domiciled in Indiana and is the mother of Christopher Robert Galka.

6272.   Plaintiff Mark Gregory Galka is a citizen of the United States domiciled in Indiana and is the father of Christopher Robert Galka.

6273.   Plaintiff Carrie Elizabeth Kietzman is a citizen of the United States domiciled in Indiana and is the sister of Christopher Robert Galka.

6274.   Plaintiff K.Z.G., a minor child, represented by her legal guardian Christopher Robert Galka, is a citizen of the United States domiciled in Texas and is the daughter of Christopher Robert Galka.

6275.   As a result of the attack and the injuries suffered by Christopher Robert Galka, Plaintiffs Maria Theresa Galka, Mark Gregory Galka, Carrie Elizabeth Kietzman and K.Z.G., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 640.   THE SEPTEMBER 30, 2004 ATTACK – FALLUJAH

#### A.   PLAINTIFFS THE DYLAND LINDSEY DUNWELL FAMILY

6276.   Plaintiff Dyland Lindsey Dunwell is a U.S. citizen domiciled in Maryland.

6277.   On September 30, 2004, Dyland Lindsey Dunwell was serving in the U.S. military when he was attacked by an IED.

6278.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Dunwell.

6279.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6280.   As a result of the attack and the injuries suffered, Dyland Lindsey Dunwell is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6281.   Plaintiff Lemard Dunwell is a citizen of the United States domiciled in Maryland and is the father of Dyland Lindsey Dunwell.

6282.   Plaintiff Joyce Dunwell is a citizen of the United States domiciled in Maryland and is the mother of Dyland Lindsey Dunwell.

6283.   Plaintiff Carl Dunwell is a citizen of the United States domiciled in Maryland and is the brother of Dyland Lindsey Dunwell.

6284.   As a result of the attack and the injuries suffered by Dyland Lindsey Dunwell, Plaintiffs Lemard Dunwell, Joyce Dunwell and Carl Dunwell, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 641.   THE SEPTEMBER 26, 2004 ATTACK – AL KARMAH

#### A.      PLAINTIFFS THE JONATHAN CHANCE THOMAS FAMILY

6285.   Plaintiff Jonathan Chance Thomas is a U.S. citizen domiciled in California.

6286.   On September 26, 2004, Jonathan Chance Thomas was serving in the U.S.

military when he was attacked by an IED.

6287.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Thomas.

6288.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6289.   As a result of the attack and the injuries suffered, Jonathan Chance Thomas is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6290.   Plaintiff Frieda Stephanie Melton is a citizen of the United States domiciled in Mississippi and is the mother of Jonathan Chance Thomas.

6291.   Plaintiff John Burk Thomas is a citizen of the United States domiciled in Texas and is the father of Jonathan Chance Thomas.

6292.   Plaintiff Jack Ryan Wilkerson is a citizen of the United States domiciled in Mississippi and is the brother of Jonathan Chance Thomas.

6293.   Plaintiff Jessie Melton Morgan is a citizen of the United States domiciled in North Carolina and is the brother of Jonathan Chance Thomas.

6294.   Plaintiff Ashley Thomas Gibson is a citizen of the United States domiciled in Oklahoma and is the sister of Jonathan Chance Thomas.

6295.   As a result of the attack and the injuries suffered by Jonathan Chance Thomas, Plaintiffs Frieda Stephanie Melton, John Burk Thomas, Jack Ryan Wilkerson, Jessie Melton Morgan, and Ashley Thomas Gibson are entitled to past and future noneconomic damages,

including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 642.   THE SEPTEMBER 20, 2004 ATTACK – RAMADI

#### A.   PLAINTIFFS THE REX DONALD LACEBY FAMILY

6296.   Plaintiff Rex Donald Laceby is a U.S. citizen domiciled in Colorado.

6297.   On September 20, 2004, Rex Donald Laceby was serving in the U.S. military when he was attacked by small arms fire.

6298.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Laceby.

6299.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6300.   As a result of the attack and the injuries suffered, Rex Donald Laceby is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6301.   Plaintiff Donald S. Laceby is a citizen of the United States domiciled in Wyoming and is the father of Rex Donald Laceby.

6302.   Plaintiff Dolores Schaffer is a citizen of the United States domiciled in Wyoming and is the mother of Rex Donald Laceby.

6303.   Plaintiff Tyler R. Laceby is a citizen of the United States domiciled in Colorado and is the son of Rex Donald Laceby.

6304. As a result of the attack and the injuries suffered by Rex Donald Laceby, Plaintiffs Donald S. Laceby, Dolores Schaffer and Tyler R. Laceby, are entitled to past and

887

future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

**643.   THE SEPTEMBER 19, 2004 ATTACK – BAGHDAD**

      **A.   PLAINTIFF ROBERT ARTHUR DIXON**

6305.   Plaintiff Robert Arthur Dixon is a U.S. citizen and domiciled in Iowa.

6306.   On September 19, 2004, Robert Arthur Dixon was serving in the U.S. military when he was attacked by a grenade.

6307.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Dixon.

6308.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition used, as well as the tactics, techniques, and procedures utilized.

6309.   As a result of the attack and the injuries suffered, Robert Arthur Dixon is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

**644.   THE SEPTEMBER 13, 2004 ATTACK – CAMP SATHER, BAGHDAD**

      **A.   PLAINTIFF ROBERT PAUL POTTS, III**

6310.   Plaintiff Robert Paul Potts, III is a U.S. citizen domiciled in Arizona.

6311.   On September 13, 2004, Robert Paul Potts, III was serving in the U.S. military when he was attacked by rockets, mortars and small arms fire.

6312.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or

other material support used to commit the attack, which injured Mr. Potts.

6313.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6314.   As a result of the attack and the injuries suffered, Robert Paul Potts, III is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 645.   THE SEPTEMBER 13, 2004 ATTACK – MOSUL

#### A.   PLAINTIFF JAMIE LEE FRAZIER

6315.   Plaintiff Jamie Lee Frazier is a U.S. citizen domiciled in Oregon.

6316.   On September 13, 2004, Jamie Lee Frazier was serving in the U.S. military when he was attacked by an IED.

6317.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Frazier.

6318.   The Iranian-supported FTO AAI planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6319.   As a result of the attack and the injuries suffered, Jamie Lee Frazier is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 646.   THE SEPTEMBER 12, 2004 ATTACK – BAGHDAD

### A.   PLAINTIFFS THE MARCO ANTONIO VILLEGAS FAMILY

6320.   Plaintiff Marco Antonio Villegas is a U.S. citizen domiciled in Georgia.

6321.   On September 12, 2004, Marco Antonio Villegas was serving in the U.S. military when he was attacked by an anti-aircraft rocket.

6322.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Villegas.

6323.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6324.   As a result of the attack and the injuries suffered, Marco Antonio Villegas is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6325.   Plaintiff Chase Villegas is a citizen of the United States domiciled in Texas and is the son of Marco Antonio Villegas.

6326.   Plaintiff H.A.V., a minor child, represented by her legal guardian Marco Antonio Villegas, is a citizen of the United States domiciled in Georgia and is the daughter of Marco Antonio Villegas.

6327.   Plaintiff H.S.V., a minor child, represented by her legal guardian Marco Antonio Villegas, is a citizen of the United States domiciled in Georgia and is the daughter of Marco Antonio Villegas.

6328.   As a result of the attack and the injuries suffered by Marco Antonio Villegas, Plaintiffs Chase Villegas, H.A.V., a minor child and H.S.V., a minor child, are entitled to past

and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

**647.  THE SEPTEMBER 12, 2004 ATTACK – KIRKUK**

     **A.**    **PLAINTIFF WILLIAM JAMES MORDEN**

6329.  Plaintiff William James Morden is a U.S. citizen domiciled in South Carolina.

6330.  On September 12, 2004, William James Morden was serving in the U.S. military when he was attacked by an IED and small arms.

6331.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Morden.

6332.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6333.  As a result of the attack and the injuries suffered, William James Morden is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

**648.  THE SEPTEMBER 10, 2004 ATTACK – BALAD RUZ**

     **A.**    **PLAINTIFF JOSEPH FREDERICK LOWIT**

6334.  Plaintiff Joseph Frederick Lowit is a U.S. citizen domiciled in Florida.

6335.  On September 10, 2004, Joseph Frederick Lowit was serving in the U.S. military when he was attacked by IEDs and small arms fire.

6336.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Lowit.

6337.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6338.   As a result of the attack and the injuries suffered, Joseph Frederick Lowit is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 649.   THE SEPTEMBER 10, 2004 ATTACK – SADR CITY

#### A.   PLAINTIFFS THE FRANKLYN LEE DOSS FAMILY

6339.   Plaintiff Franklyn Lee Doss is a U.S. citizen domiciled in Texas.

6340.   On September 10, 2004, Franklyn Lee Doss was serving in the U.S. military when he was attacked by an RPG.

6341.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Doss.

6342.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6343.   As a result of the attack and the injuries suffered, Franklyn Lee Doss is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6344.   Plaintiff Juanita Doss is a citizen of the United States and domiciled in the State of Texas. She is the wife of Franklyn Lee Doss.

6345.   As a result of the attack and the injuries suffered by Franklyn Lee Doss, Plaintiff

892

Juanita Doss, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 650. THE SEPTEMBER 6, 2004 ATTACK – BAGHDAD

#### A. PLAINTIFF TONY ALLEN COVELL

6346. Plaintiff Tony Allen Covell is a U.S. citizen domiciled in Michigan.

6347. On September 6, 2004, Tony Allen Covell was serving in the U.S. military when he was attacked by an IED.

6348. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Covell.

6349. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6350. As a result of the attack and the injuries suffered, Tony Allen Covell is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 651. THE SEPTEMBER 5, 2004 ATTACK – TAL AFAR

#### A. PLAINTIFFS THE ERIK ERNST SANDSTROM FAMILY

6351. Plaintiff Erik Ernst Sandstrom is a U.S. citizen domiciled in Washington.

6352. On September 5, 2004, Erik Ernst Sandstrom was serving in the U.S. military when he was attacked by IEDs, RPGs, mortars, and small arms fire.

6353. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Sandstrom.

6354. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6355. As a result of the attack and the injuries suffered, Erik Ernst Sandstrom is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6356. Plaintiff J.M.S., a minor child, represented by his legal guardian Erik Ernst Sandstrom, is a citizen of the United States domiciled in Washington and is the son of Erik Ernst Sandstrom.

6357. As a result of the attack and the injuries suffered by Erik Ernst Sandstrom, Plaintiff J.M.S., a minor child, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 652. THE SEPTEMBER 4, 2004 ATTACK – FALLUJAH

### A. PLAINTIFFS THE JAMES MICHAEL LOTT FAMILY

6358. Plaintiff James Michael Lott is a U.S. citizen domiciled in Texas.

6359. On September 4, 2004, James Michael Lott was serving in the U.S. military when he was attacked by a VBIED and mortars.

6360. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Lott.

6361. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

894

6362. As a result of the attack and the injuries suffered, James Michael Lott is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6363. Plaintiff Gail Fortner Lott is a citizen of the United States domiciled in Alabama, and is the mother of James Michael Lott.

6364. Plaintiff Ronald Everett Lott is a citizen of the United States domiciled in Alabama, and is father of James Michael Lott.

6365. As a result of the attack and the injuries suffered by James Michael Lott, Plaintiffs Gail Fortner Lott and Ronald Everett Lott are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 653. THE SEPTEMBER 3, 2004 ATTACK – FALLUJAH

#### A. PLAINTIFFS THE JAMES MICHAEL LOTT FAMILY

6366. Plaintiff James Michael Lott is a U.S. citizen domiciled in Texas.

6367. On September 3, 2004, James Michael Lott was serving in the U.S. military when he was attacked by IEDs and small arms.

6368. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Lott.

6369. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6370. As a result of the attack and the injuries suffered, James Michael Lott is entitled to past and future noneconomic damages, including for severe physical and mental pain and

suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6371. Plaintiff Gail Fortner Lott is a citizen of the United States domiciled in Alabama, and is the mother of James Michael Lott.

6372. Plaintiff Ronald Everett Lott is a citizen of the United States domiciled in Alabama, and is father of James Michael Lott.

6373. As a result of the attack and the injuries suffered by James Michael Lott, Plaintiffs Gail Fortner Lott and Ronald Everett Lott are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 654. THE AUGUST 26, 2004 ATTACK – AL KARMAH

### A. PLAINTIFFS THE PHILLIP CHRISTOPHER BAILEY FAMILY

6374. Plaintiff Phillip Christopher Bailey is a U.S. citizen domiciled in Georgia.

6375. On August 26, 2004, Phillip Christopher Bailey was serving in the U.S. military when he was attacked by an IED.

6376. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Bailey.

6377. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6378. As a result of the attack and the injuries suffered, Phillip Christopher Bailey is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including

medical expenses, lost income, and loss of earning capacity.

6379.   Plaintiff Timothy Bailey is a citizen of the United States and domiciled in the State of Georgia. He is the father of Phillip Christopher Bailey.

6380.   Plaintiff Jason Minter is a citizen of the United States and domiciled in the State of Alabama. He is the brother of Phillip Christopher Bailey.

6381.   As a result of the attack and the injuries suffered by Phillip Christopher Bailey, Plaintiffs Timothy Bailey and Jason Minter are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 655.   THE AUGUST 26, 2004 ATTACK – BAGHDAD

### A.   PLAINTIFFS THE JARED RAY WHITE FAMILY

6382.   Plaintiff Jared Ray White is a U.S. citizen domiciled in Texas.

6383.   On August 26, 2004, Jared Ray White was serving in the U.S. military when he was attacked by small arms fire.

6384.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. White.

6385.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6386.   As a result of the attack and the injuries suffered, Jared Ray White is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6387.   Plaintiff Tina Scates is a citizen of the United States domiciled in Texas and is the

mother of Jared Ray White.

6388.   Plaintiff Clinton R. White is a citizen of the United States domiciled in Texas and is the father of Jared Ray White.

6389.   Plaintiff Brenna White is a citizen of the United States domiciled in Texas and is the sister of Jared Ray White.

6390.   As a result of the attack and the injuries suffered by Jared Ray White, Plaintiffs Tina Scates, Clinton R. White and Brenna White, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 656.   THE AUGUST 25, 2004 ATTACK – NAJAF

#### A.   PLAINTIFF ARTHUR WAYNE D'AMATO

6391.   Plaintiff Arthur Wayne D'Amato is a U.S. citizen domiciled in Texas.

6392.   On August 25, 2004, Arthur Wayne D'Amato was serving in the U.S. military when he was attacked by a mortar and small arms fire.

6393.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. D'Amato.

6394.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6395.   As a result of the attack and the injuries suffered, Arthur Wayne D'Amato is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

657. **THE AUGUST 23, 2004 ATTACK – NAJAF**

A. **PLAINTIFFS THE VAITOGI SANI TAETULI FAMILY**

6396. Plaintiff Vaitogi Sani Taetuli is a U.S. citizen domiciled in Texas.

6397. On August 23, 2004, Vaitogi Sani Taetuli was serving in the U.S. military when he was attacked by a hand grenade.

6398. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Taetuli.

6399. The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6400. As a result of the attack and the injuries suffered, Vaitogi Sani Taetuli is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6401. Plaintiff Leticia Taetuli is a citizen of the United States domiciled in Texas and is the spouse of Vaitogi Sani Taetuli.

6402. Plaintiff Taetuli Sani is a national of the United States domiciled in Texas and is the brother of Vaitogi Sani Taetuli.

6403. Plaintiff Like Sani Vili is a national of the United States domiciled in Texas and is the sister of Vaitogi Sani Taetuli.

6404. Plaintiff Roland Casso is a citizen of the United States domiciled in Texas and is the son of Vaitogi Sani Taetuli.

6405. Plaintiff Cassandra Martinez is a citizen of the United States domiciled in Texas and is the stepdaughter of Vaitogi Sani Taetuli.

6406.   Plaintiff Marisol Ojeda is a citizen of the United States domiciled in Texas and is the stepdaughter of Vaitogi Sani Taetuli.

6407.   As a result of the attack and the injuries suffered by Vaitogi Sani Taetuli, Plaintiffs Leticia Taetuli, Taetuli Sani, Like Sani Vili, Roland Casso, Cassandra Martinez and Marisol Ojeda, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 658.   THE AUGUST 22, 2004 ATTACK – AL KARMAH

### A.   PLAINTIFFS THE KEVIN A. MADACHIK FAMILY

6408.   Plaintiff Kevin A. Madachik is a U.S. citizen domiciled in Tennessee.

6409.   On August 22, 2004, Kevin A. Madachik was serving in the U.S. military when he was attacked by an IED.

6410.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Madachik.

6411.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6412.   As a result of the attack and the injuries suffered, Kevin A. Madachik is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6413.   Plaintiff Alfreda Irene Madachik is a citizen of the United States domiciled in Texas and is the mother of Kevin A. Madachik.

6414.   Plaintiff Thomas John Madachik is a citizen of the United States domiciled in

Tennessee and is the father of Kevin A. Madachik.

6415.   Plaintiff Lauren C. Madachik is a citizen of the United States domiciled in Tennessee and is the sister of Kevin A. Madachik.

6416.   Plaintiff Stephen Madachik is a citizen of the United States domiciled in Tennessee and is the brother of Kevin A. Madachik.

6417.   As a result of the attack and the injuries suffered by Kevin A. Madachik, Plaintiffs Alfreda Irene Madachik, Thomas John Madachik, Lauren C. Madachik, and Stephen Madachik are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 659.   THE AUGUST 22, 2004 ATTACK – AL KARMAH

#### A.   PLAINTIFF JAMES H. SPERRY

6418.   Plaintiff James H. Sperry is a U.S. citizen domiciled in Illinois.

6419.   On August 22, 2004, James H. Sperry was serving in the U.S. military when he was attacked by IEDs.

6420.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Sperry.

6421.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6422.   As a result of the attack and the injuries suffered, James H. Sperry is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 660. THE AUGUST 18, 2004 ATTACK – MAHMOUDIYAH

#### A. PLAINTIFF PHILLIP FREDERICK MCCOTTER

6423. Plaintiff Phillip Frederick McCotter is a U.S. citizen domiciled in North Carolina.

6424. On August 18, 2004, Phillip Frederick McCotter was serving in the U.S. military when he was attacked by small arms fire and a hand grenade.

6425. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. McCotter.

6426. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6427. As a result of the attack and the injuries suffered, Phillip Frederick McCotter is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 661. THE AUGUST 17, 2004 ATTACK – FALLUJAH

#### A. PLAINTIFFS THE RYAN DAVID SAWYER FAMILY

6428. Plaintiff Ryan David Sawyer is a U.S. citizen domiciled in California.

6429. On August 17, 2004, Ryan David Sawyer was serving in the U.S. military when he was attacked by rockets.

6430. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Sawyer.

6431. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

902

6432.   As a result of the attack and the injuries suffered, Ryan David Sawyer is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6433.   Plaintiff Laura Sawyer is a citizen of the United States domiciled in Colorado and is sister of Ryan David Sawyer.

6434.   As a result of the attack and the injuries suffered by Ryan David Sawyer, Plaintiff Laura Sawyer is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 662.   THE AUGUST 17, 2004 ATTACK – BAQUBAH

### A.     PLAINTIFFS THE EDWARD JOSEPH PULIDO FAMILY

6435.   Plaintiff Edward Joseph Pulido is a U.S. citizen domiciled in Oklahoma.

6436.   On August 17, 2004, Edward Joseph Pulido was serving in the U.S. military when he was attacked by an IED.

6437.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Pulido.

6438.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6439.   As a result of the attack and the injuries suffered, Edward Joseph Pulido is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

903

6440. Plaintiff Karen Pulido is a citizen of the United States domiciled in Oklahoma and is the spouse of Edward Joseph Pulido.

6441. Plaintiff K.P., a minor child, represented by her legal guardian Edward Joseph Pulido, is a citizen of the United States domiciled in Oklahoma and is the daughter of Edward Joseph Pulido.

6442. Plaintiff Manuel J. Pulido is a citizen of the United States domiciled in Florida and is the father of Edward Joseph Pulido.

6443. Plaintiff Angelita Pulido Rivera is a citizen of the United States domiciled in Florida and is the mother of Edward Joseph Pulido.

6444. Plaintiff Manuel "Mannie" Pulido is a citizen of the United States domiciled in Florida and is the brother of Edward Joseph Pulido.

6445. Plaintiff Yadira Pulido Holmes is a citizen of the United States domiciled in Florida and is the sister of Edward Joseph Pulido.

6446. As a result of the attack and the injuries suffered by Edward Joseph Pulido, Plaintiffs Karen Pulido, K.P., a minor child, Manuel J. Pulido, Angelita Pulido Rivera, Manuel "Mannie" Pulido, and Yadira Pulido Holmes are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 663. THE AUGUST 16, 2004 ATTACK – AL KARMAH

#### A. PLAINTIFFS THE SHANE FITZSIMMONS FAMILY

6447. Plaintiff Shane Fitzsimmons is a U.S. citizen domiciled in Wisconsin.

6448. On August 16, 2004, Shane Fitzsimmons was serving in the U.S. military when he was attacked by an IED and small arms fire.

904

6449. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Fitzsimmons.

6450. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6451. As a result of the attack and the injuries suffered, Shane Fitzsimmons is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6452. Plaintiff John Fitzsimmons is a citizen of the United States domiciled in Wisconsin and is the father of Shane Fitzsimmons.

6453. Plaintiff Kaitlyn Martinez is a citizen of the United States domiciled in Wisconsin and is the sister of Shane Fitzsimmons.

6454. As a result of the attack and the injuries suffered by Shane Fitzsimmons, Plaintiffs John Fitzsimmons and Kaitlyn Martinez are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 664. THE AUGUST 16, 2004 ATTACK – AL KARMAH

### A. PLAINTIFFS THE RYAN EARL GWALTNEY FAMILY

6455. Plaintiff Ryan Earl Gwaltney is a U.S. citizen domiciled in California.

6456. On August 16, 2004, Ryan Earl Gwaltney was serving in the U.S. military when he was attacked by an IED.

6457. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Gwaltney.

6458.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6459.   As a result of the attack and the injuries suffered, Ryan Earl Gwaltney is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6460.   Plaintiff Timothy Earl Gwaltney is a citizen of the United States domiciled in California and is the father of Ryan Earl Gwaltney.

6461.   Plaintiff Holly Ann Mrozinski is a citizen of the United States domiciled in California and is the mother of Ryan Earl Gwaltney.

6462.   Plaintiff Timothy Jacob Gwaltney is a citizen of the United States domiciled in California and is the brother of Ryan Earl Gwaltney.

6463.   Plaintiff Christopher Joseph Mrozinski is a citizen of the United States domiciled in California and is the step-father of Ryan Earl Gwaltney.

6464.   Plaintiff A.M., a minor child, represented by his legal guardian Holly Ann Mrozinski, is a citizen of the United States domiciled in California and is the half-brother of Ryan Earl Gwaltney.

6465.   As a result of the attack and the injuries suffered by Ryan Earl Gwaltney, Plaintiffs Timothy Earl Gwaltney, Holly Ann Mrozinski, Timothy Jacob Gwaltney, Christopher Joseph Mrozinski, and A.M., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services

and support.

**665.    THE AUGUST 15, 2004 ATTACK – FALLUJAH**

**A.    PLAINTIFFS THE PHILLIP CHRISTOPHER BAILEY FAMILY**

6466.   Plaintiff Phillip Christopher Bailey is a U.S. citizen domiciled in Georgia.

6467.   On August 15, 2004, Phillip Christopher Bailey was serving in the U.S. military when he was attacked by a VBIED and small arms fire.

6468.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Bailey.

6469.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6470.   As a result of the attack and the injuries suffered, Phillip Christopher Bailey is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6471.   Plaintiff Timothy Bailey is a citizen of the United States and domiciled in the State of Georgia. He is the father of Phillip Christopher Bailey.

6472.   Plaintiff Jason Minter is a citizen of the United States and domiciled in the State of Alabama. He is the brother of Phillip Christopher Bailey.

6473.   As a result of the attack and the injuries suffered by Phillip Christopher Bailey, Plaintiffs Timothy Bailey and Jason Minter, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services

and support.

**666. THE AUGUST 15, 2004 ATTACK – NAJAF**

**A.     PLAINTIFFS THE STANLEY GOODIN, III FAMILY**

6474.   Plaintiff Stanley Goodin, III is a U.S. citizen domiciled in Texas.

6475.   On or about August 15, 2004, Stanley Goodin, III was serving in the U.S. military when he was attacked by RPGs, mortars, grenades and small arms fire.

6476.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Goodin.

6477.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6478.   As a result of the attack and the injuries suffered, Stanley Goodin, III is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6479.   Plaintiff J.G., a minor child, represented by his legal guardian Stanley Goodin, III, is a citizen of the United States domiciled in Texas and is the son of Stanley Goodin, III.

6480.   As a result of the attack and the injuries suffered by Stanley Goodin, III, Plaintiff J.G., a minor child, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

**667. THE AUGUST 10, 2004 ATTACK – SADR CITY**

**A.     PLAINTIFFS THE NICKOLAS CARL STOWMAN FAMILY**

6481.   Plaintiff Nickolas Carl Stowman is a U.S. citizen domiciled in Texas.

6482. On August 10, 2004, Nickolas Carl Stowman was serving in the U.S. military when he was attacked by an IED.

6483. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Stowman.

6484. The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6485. As a result of the attack and the injuries suffered, Nickolas Carl Stowman is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6486. Plaintiff Rayna L. Moncrief is a citizen of the United States domiciled in Arizona and is the former spouse of Nickolas Carl Stowman.

6487. As a result of the attack and the injuries suffered by Nickolas Carl Stowman, Plaintiff Rayna L. Moncrief, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 668. THE AUGUST 7, 2004 ATTACK – BAGHDAD

### A. PLAINTIFFS THE WILLIAM JONES IV FAMILY

6488. Plaintiff William Jones IV is a U.S. citizen domiciled in Maryland.

6489. On August 7, 2004, William Jones IV was serving in the U.S. military when he was attacked by small arms fire.

6490. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Jones.

6491.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6492.   As a result of the attack and the injuries suffered, William Jones IV is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6493.   Plaintiff Lisa Lynn Luzius is a citizen of the United States domiciled in Maryland and is the mother of William Jones IV.

6494.   Plaintiff William Jones III is a citizen of the United States domiciled in Maryland and is the father of William Jones IV.

6495.   As a result of the attack and the injuries suffered by William Jones IV, Plaintiffs Lisa Lynn Luzius and William Jones III are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 669.   THE AUGUST 6, 2004 ATTACK – GHAZALIYA

### A.   PLAINTIFFS THE JARED RAY WHITE FAMILY

6496.   Plaintiff Jared Ray White is a U.S. citizen domiciled in Texas.

6497.   On August 6, 2004, Jared Ray White was serving in the U.S. military when he was attacked by an RPG.

6498.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. White.

6499.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack,

the munition used, as well as the tactics, techniques, and procedures utilized.

6500.   As a result of the attack and the injuries suffered, Jared Ray White is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6501.   Plaintiff Tina Scates is a citizen of the United States domiciled in Texas and is the mother of Jared Ray White.

6502.   Plaintiff Clinton R. White is a citizen of the United States domiciled in Texas and is the father of Jared Ray White.

6503.   Plaintiff Brenna White is a citizen of the United States domiciled in Texas and is the sister of Jared Ray White.

6504.   As a result of the attack and the injuries suffered by Jared Ray White, Plaintiffs Tina Scates, Clinton R. White and Brenna White, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 670.   THE AUGUST 5, 2004 ATTACK – NAJAF

### A.   PLAINTIFF JESUS ALVAREZ GARCIA

6505.   Plaintiff Jesus Alvarez Garcia is a U.S. citizen domiciled in Texas.

6506.   On August 5, 2004, Jesus Alvarez Garcia was serving in the U.S. military when he was attacked by rockets, mortars, RPGs, and small arms fire.

6507.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Garcia.

6508.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the

attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6509.   As a result of the attack and the injuries suffered, Jesus Alvarez Garcia is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 671.   THE AUGUST 5, 2004 ATTACK – NAJAF

### A.   PLAINTIFF ROBERT ANTHONY PEDREIRO

6510.   Plaintiff Robert Anthony Pedreiro is a U.S. citizen domiciled in Idaho.

6511.   On August 5, 2004, Robert Anthony Pedreiro was serving in the U.S. military when he was attacked by rockets, mortars, RPGs, and small arms.

6512.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Pedreiro.

6513.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6514.   As a result of the attack and the injuries suffered, Robert Anthony Pedreiro is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 672.   THE AUGUST 5, 2004 ATTACK – AL NASR WAL SALAM

### A.   PLAINTIFFS THE SAMUEL JAMES MORTIMER FAMILY

6515.   Plaintiff Samuel James Mortimer is a U.S. citizen domiciled in North Carolina.

6516.   On August 5, 2004, Samuel James Mortimer was serving in the U.S. military

912

when he was attacked by an IED.

6517.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Mortimer.

6518.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6519.   As a result of the attack and the injuries suffered, Samuel James Mortimer is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6520.   Plaintiff Kristine Mortimer is a citizen of the United States domiciled in North Carolina and is the spouse of Samuel James Mortimer.

6521.   As a result of the attack and the injuries suffered by Samuel James Mortimer, Plaintiff Kristine Mortimer, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 673.   THE AUGUST 1, 2004 ATTACK –BALAD

### A.      PLAINTIFFS THE ARMANDO V. HERNANDEZ FAMILY

6522.   On August 1, 2004, Armando V. Hernandez was a U.S. citizen, domiciled in California, and serving in the U.S. military when he was attacked by an IED, causing his death.

6523.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Hernandez.

6524.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack,

as well as the munition and tactics, techniques, and procedures utilized.

6525.   Plaintiff Martha Hernandez is a citizen of the United States domiciled in California and is the mother of Armando V. Hernandez.

6526.   Plaintiff Delia Nava Loera is a citizen of the United States domiciled in California and is the sister of Armando V. Hernandez.

6527.   Plaintiff Raquel Sandoval is a citizen of the United States domiciled in California and is the sister of Armando V. Hernandez.

6528.   Plaintiff Martha Hernandez brings an action individually and on behalf of the Estate of Armando V. Hernandez, and all heirs thereof, as its legal representative.

6529.   As a result of the attack, and the injuries suffered by and the death of Armando V. Hernandez, Plaintiffs Martha Hernandez, Delia Nava Loera and Raquel Sandoval have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Armando V. Hernandez.

### 674.   THE JULY 24, 2004 ATTACK – RAMADI

#### A.   PLAINTIFFS THE JASON BRADLEY FINCH FAMILY

6530.   Plaintiff Jason Bradley Finch is a U.S. citizen domiciled in Tennessee.

6531.   On July 24, 2004, Jason Bradley Finch was serving in the U.S. military when he was attacked by an IED.

6532.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Finch.

6533.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack,

914

the munition used, as well as the tactics, techniques, and procedures utilized.

6534.   As a result of the attack and the injuries suffered, Jason Bradley Finch is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6535.   Plaintiff Bradley Louis Finch is a citizen of the United States domiciled in Tennessee and is the father of Jason Bradley Finch.

6536.   Plaintiff Elizabeth Mary Finch is a citizen of the United States domiciled in Tennessee and is the mother of Jason Bradley Finch.

6537.   As a result of the attack and the injuries suffered by Jason Bradley Finch, Plaintiffs Bradley Louis Finch and Elizabeth Mary Finch are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 675.   THE JULY 24, 2004 ATTACK – RAMADI

### A.   PLAINTIFFS THE JESSE JAMES LONGORIA FAMILY

6538.   Plaintiff Jesse James Longoria is a U.S. citizen domiciled in Texas.

6539.   On July 24, 2004, Jesse James Longoria was serving in the U.S. military when he was attacked by an IED.

6540.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Longoria.

6541.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6542.   As a result of the attack and the injuries suffered, Jesse J. Longoria is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6543.   Plaintiff Ray Longoria is a citizen of the United States domiciled in Texas and is the father of Jesse James Longoria.

6544.   Plaintiff Dolores Longoria is a citizen of the United States domiciled in Texas and is the mother of Jesse James Longoria.

6545.   As a result of the attack and the injuries suffered by Jesse James Longoria, Plaintiffs Ray Longoria and Dolores Longoria, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 676.   THE JULY 21, 2004 ATTACK – SAMARRA

### A.   PLAINTIFFS THE LARRY ALBERT CARR, JR. FAMILY

6546.   Plaintiff Larry Albert Carr, Jr. is a U.S. citizen domiciled in North Carolina.

6547.   On July 21, 2004, Larry Albert Carr, Jr. was serving in the U.S. military when he was attacked by an IED.

6548.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Carr.

6549.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6550.   As a result of the attack and the injuries suffered, Larry Albert Carr, Jr. is entitled

916

to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6551.   Plaintiff Alexis Carr is a citizen of the United States domiciled in Florida and is the daughter of Larry Albert Carr, Jr.

6552.   Plaintiff Hunter Carr is a citizen of the United States domiciled in North Carolina and is the son of Larry Albert Carr, Jr.

6553.   Plaintiff Christopher Carr is a citizen of the United States domiciled in North Carolina and is the son of Larry Albert Carr, Jr.

6554.   As a result of the attack and the injuries suffered by Larry Albert Carr, Jr., Plaintiffs Alexis Carr, Hunter Carr, and Christopher Carr are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 677.   THE JULY 21, 2004 ATTACK – AL-DHULUIYA

#### A.   PLAINTIFF BRADLEY SCOTT SHADDEN

6555.   Plaintiff Bradley Scott Shadden is a U.S. citizen domiciled in Florida.

6556.   On July 21, 2004, Bradley Scott Shadden was serving in the U.S. military when he was attacked by an IED.

6557.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Shadden.

6558.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6559.   As a result of the attack and the injuries suffered, Bradley Scott Shadden is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 678.   THE JULY 20, 2004 ATTACK – AL KARMAH

### A.   PLAINTIFF JAMES THOMAS OLSON

6560.   Plaintiff James Thomas Olson is a U.S. citizen domiciled in Minnesota.

6561.   On July 20, 2004, James Thomas Olson was serving in the U.S. military when he was attacked by a VBIED.

6562.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Olson.

6563.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6564.   As a result of the attack and the injuries suffered, James Thomas Olson is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 679.   THE JULY 20, 2004 ATTACK – FALLUJAH

### A.   PLAINTIFFS THE KRISTOPHER HARRY QUINTANA FAMILY

6565.   Plaintiff Kristopher Harry Quintana is a U.S. citizen domiciled in Texas.

6566.   On July 20, 2004, Kristopher Harry Quintana was serving in the U.S. military when he was attacked by an IED.

6567.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Quintana.

6568.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6569.   As a result of the attack and the injuries suffered, Kristopher Harry Quintana is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6570.   Plaintiff Esther Scaman is a citizen of the United States domiciled in Colorado and is the mother of Kristopher Harry Quintana.

6571.   Plaintiff Justin W. Scaman is a citizen of the United States domiciled in Maryland and is the stepbrother of Kristopher Harry Quintana.

6572.   Plaintiff Cassie Quintana Vasquez is a citizen of the United States domiciled in Texas and is the sister of Kristopher Harry Quintana.

6573.   Plaintiff John W. Scaman is a citizen of the United States domiciled in Colorado and is the stepfather of Kristopher Harry Quintana.

6574.   As a result of the attack and the injuries suffered by Kristopher Harry Quintana, Plaintiffs Esther Scaman, Justin W. Scaman, Cassie Quintana Vasquez and John W. Scaman, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

**680.   THE JULY 15, 2004 ATTACK – HADITHA**

    **A.   PLAINTIFFS THE MOHAMAD KAMAL AKHTAR FAMILY**

6575.   Plaintiff Mohamad Kamal Akhtar is a U.S. citizen domiciled in California.

6576.   On July 15, 2004, Mohamad Kamal Akhtar was serving in the U.S. military when he was attacked by a VBIED.

6577.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Akhtar.

6578.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6579.   As a result of the attack and the injuries suffered, Mohamad Kamal Akhtar is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6580.   Plaintiff Jennifer Akhtar is a citizen of the United States domiciled in California and is the ex-wife of Mohamad Kamal Akhtar.

6581.   Plaintiff Taylor Akhtar is a citizen of the United States domiciled in California and is the daughter of Mohamad Kamal Akhtar.

6582.   Plaintiff Pervez Akhtar is a citizen of the United States domiciled in California and is the father of Mohamad Kamal Akhtar.

6583.   Plaintiff Samira Fathy is a citizen of the United States domiciled in California and is the mother of Mohamad Kamal Akhtar.

6584.   As a result of the attack and the injuries suffered by Mohamad Kamal Akhtar, Plaintiffs Jennifer Akhtar, Taylor Akhtar, Samira Fathy, and Pervez Akhtar are entitled to past

and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

**681. THE JULY 12, 2004 ATTACK – BAGHDAD**

      **A.    PLAINTIFF TONEY MAURICE THOMPSON**

6585.   Plaintiff Toney Maurice Thompson is a U.S. citizen domiciled in Georgia.

6586.   On July 12, 2004, Toney Maurice Thompson was serving in the U.S. military when he was attacked by an IED and small arms fire.

6587.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Thompson.

6588.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6589.   As a result of the attack and the injuries suffered, Toney Maurice Thompson is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

**682. THE JULY 12, 2004 ATTACK – RAMADI**

      **A.    PLAINTIFF MARIO L. BORREGO**

6590.   Plaintiff Mario L. Borrego is a U.S. citizen domiciled in California.

6591.   On July 12, 2004, Mario L. Borrego was serving in the U.S. military when he was attacked by a VBIED and small arms fire.

6592.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Borrego.

6593.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6594.   As a result of the attack and the injuries suffered, Mario L. Borrego is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 683.   THE JULY 11, 2004 ATTACK – NEAR SAMARRA

### A.   PLAINTIFFS THE JEREMY JAMES FISCHER FAMILY

6595.   On July 11, 2004, Jeremy James Fischer was a U.S. citizen, domiciled in Nebraska, and serving in the U.S. military when he was attacked by an IED, causing his death.

6596.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Fischer.

6597.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

6598.   Plaintiff Sarah A. Wattier is a citizen of the United States domiciled in Nebraska and was the spouse of Jeremy James Fischer.

6599.   Plaintiff Sarah A. Wattier, brings an action individually and on behalf of the Estate of Jeremy James Fischer, and all heirs thereof, as its legal representative.

6600.   As a result of the attack, and the injuries suffered by and the death of Jeremy James Fischer, Plaintiff Sarah A. Wattier, has suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net

accumulation to the Estate of Jeremy James Fischer.

### 684. THE JULY 8, 2004 ATTACK – SAMARRA

#### A. PLAINTIFF DARYN JAMES SWALLOW

6601. Plaintiff Daryn James Swallow is a U.S. citizen domiciled in Massachusetts.

6602. On July 8, 2004, Daryn James Swallow was serving in the U.S. military when he was attacked by a VBIED, mortars, and small arms.

6603. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Swallow.

6604. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6605. As a result of the attack and the injuries suffered, Daryn James Swallow is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 685. THE JULY 7, 2004 ATTACK – QARYAT ASH SHAHABI

#### A. PLAINTIFFS THE JUSTIN ANDREW BOSWOOD FAMILY

6606. Plaintiff Justin Andrew Boswood is a U.S. citizen domiciled in Oklahoma.

6607. On July 7, 2004, Justin Andrew Boswood was serving in the U.S. military when he was attacked by an IED.

6608. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Boswood.

6609. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack,

the munition used, as well as the tactics, techniques, and procedures utilized.

6610. As a result of the attack and the injuries suffered, Justin Andrew Boswood is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6611. Plaintiff Carrie L. Boswood is a citizen of the United States domiciled in Michigan and is the mother of Justin Andrew Boswood.

6612. As a result of the attack and the injuries suffered by Justin Andrew Boswood, Plaintiff Carrie L. Boswood, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 686. THE JULY 7, 2004 ATTACK – TIKRIT

### A. PLAINTIFF HAROLD THOMAS ATKINSON, JR.

6613. Plaintiff Harold Thomas Atkinson, Jr. is a U.S. citizen domiciled in Florida.

6614. On July 7, 2004, Harold Thomas Atkinson, Jr. was serving in the U.S. military when he was attacked by rockets and mortars.

6615. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Atkinson.

6616. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6617. As a result of the attack and the injuries suffered, Harold Thomas Atkinson, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including

medical expenses, lost income, and loss of earning capacity.

### 687.   THE JULY 6, 2004 ATTACK – BAJI

#### A.   PLAINTIFF TRAVIS EUGENE GINGRICH

6618.   Plaintiff Travis Eugene Gingrich is a U.S. citizen domiciled in Florida.

6619.   On July 6, 2004, Travis Eugene Gingrich was serving in the U.S. military when he was attacked by an IED.

6620.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Gingrich.

6621.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6622.   As a result of the attack and the injuries suffered, Travis Eugene Gingrich is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 688.   THE JULY 2, 2004 ATTACK – BAGHDAD

#### A.   PLAINTIFF HARRISON MANYOMA

6623.   Plaintiff Harrison Manyoma is a U.S. citizen domiciled in Texas.

6624.   On July 2, 2004, Harrison Manyoma was serving in the U.S. military when he was attacked by a VBIED.

6625.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Manyoma.

6626.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack,

the munition used, as well as the tactics, techniques, and procedures utilized.

6627.   As a result of the attack and the injuries suffered, Harrison Manyoma is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 689.   THE JUNE 27, 2004 ATTACK –HIT

#### A.   PLAINTIFF MARIO ALBERTO MENA

6628.   Plaintiff Mario Alberto Mena is a U.S. citizen domiciled in Illinois.

6629.   On or about June 27, 2004, Mario Alberto Mena was serving in the U.S. military when he was attacked by mortars.

6630.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Mena.

6631.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6632.   As a result of the attack and the injuries suffered, Mario Alberto Mena is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 690.   THE JUNE 26, 2004 ATTACK – BAGHDAD

#### A.   PLAINTIFFS THE ROBERT LANCE CAVER FAMILY

6633.   Plaintiff Robert Lance Caver is a U.S. citizen domiciled in Washington.

6634.   On June 26, 2004, Robert Lance Caver was serving in the U.S. military when he was attacked by RPGs, small arms fire and grenades.

926

6635. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Caver.

6636. The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6637. As a result of the attack and the injuries suffered, Robert Lance Caver is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6638. Plaintiff Tricia Ann Caver is a citizen of the United States domiciled in Washington and is the daughter of Robert Lance Caver.

6639. Plaintiff Alicia Joy Caver is a citizen of the United States domiciled in Washington and is the sister of Robert Lance Caver.

6640. Plaintiff N.R.C., a minor child, represented by her legal guardian Robert Lance Caver, is a citizen of the United States domiciled in Washington and is the daughter of Robert Lance Caver.

6641. As a result of the attack and the injuries suffered by Robert Lance Caver, Plaintiffs Tricia Ann Caver, Alicia Joy Caver, and N.R.C., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 691. THE JUNE 21, 2004 ATTACK – SADR CITY

### A. PLAINTIFFS THE ISRAEL GONZALEZ AREVALO FAMILY

6642. Plaintiff Israel Gonzalez Arevalo is a U.S. citizen domiciled in California.

927

6643. On June 21, 2004, Israel Gonzalez Arevalo was serving in the U.S. military when he was attacked by mortars.

6644. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Gonzalez Arevalo.

6645. The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6646. As a result of the attack and the injuries suffered, Israel Gonzalez Arevalo is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6647. Plaintiff Alicia Gonzalez is a citizen of the United States and domiciled in the State of California. She is the mother of Israel Gonzalez Arevalo.

6648. Plaintiff Jesus Gonzalez Plascencia is a citizen of the United States and domiciled in the State of California. He is the father of Israel Gonzalez Arevalo.

6649. Plaintiff Ricardo Gonzalez is a citizen of the United States and domiciled in the State of California. He is the brother of Israel Gonzalez Arevalo.

6650. As a result of the attack and the injuries suffered by Israel Gonzalez Arevalo, Plaintiffs Alicia Gonzalez, Jesus Gonzalez Plascencia and Ricardo Gonzalez, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

928

### 692.   THE JUNE 21, 2004 ATTACK – SADR CITY

### A.   PLAINTIFFS THE LEONARD BERT SLOAN FAMILY

6651.   Plaintiff Leonard Bert Sloan is a U.S. citizen domiciled in Alabama.

6652.   On June 21, 2004, Leonard Bert Sloan was serving in the U.S. military when he was attacked by a mortar.

6653.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Sloan.

6654.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6655.   As a result of the attack and the injuries suffered, Leonard Bert Sloan is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6656.   Plaintiff Maria L. Sloan is a citizen of the United States domiciled in Alabama and is the spouse of Leonard Bert Sloan.

6657.   Plaintiff Leonard J. Sloan is a citizen of the United States domiciled in Alabama and is the son of Leonard Bert Sloan.

6658.   As a result of the attack and the injuries suffered by Leonard Bert Sloan, Plaintiffs Maria L. Sloan and Leonard J. Sloan, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 693.    THE JUNE 17, 2004 ATTACK – AL ANBAR PROVINCE

#### A.    PLAINTIFF MARIO ALBERTO MENA

6659.   Plaintiff Mario Alberto Mena is a U.S. citizen domiciled in Illinois.

6660.   On June 17, 2004, Mario Alberto Mena was serving in the U.S. military when he was attacked by an IED.

6661.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Mena.

6662.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6663.   As a result of the attack and the injuries suffered, Mario Alberto Mena is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 694.    THE JUNE 16, 2004 ATTACK - BALAD

#### A.    PLAINTIFF RONALD ALLEN EATON

6664.   Plaintiff Ronald Allen Eaton is a U.S. citizen domiciled in the State of Indiana.

6665.   On June 16, 2004, Ronald Allen Eaton was serving in the U.S. military when he was attacked by a rocket.

6666.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Eaton.

6667.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6668. As a result of the attack and the injuries suffered, Ronald Allen Eaton is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 695. THE JUNE 16, 2004 ATTACK – BALAD

#### A. PLAINTIFFS THE ERNESTO SIERRA FAMILY

6669. Plaintiff Ernesto Sierra is a U.S. citizen domiciled in Texas.

6670. On June 16, 2004, Ernesto Sierra was serving in the U.S. military when he was attacked by a rocket.

6671. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Sierra.

6672. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6673. As a result of the attack and the injuries suffered, Ernesto Sierra is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6674. Plaintiff Maria Criselda Sierra is a citizen of the United States domiciled in Texas and is the spouse of Ernesto Sierra.

6675. Plaintiff Kristina Lee Sierra is a citizen of the United States domiciled in Texas and is the daughter of Ernesto Sierra.

6676. Plaintiff Cassandra Sierra is a citizen of the United States domiciled in Texas and is the daughter of Ernesto Sierra.

6677.  As a result of the attack and the injuries suffered by Ernesto Sierra, Plaintiffs Maria Criselda Sierra, Kristina Lee Sierra, and Cassandra Sierra are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 696.  THE JUNE 11, 2004 ATTACK – FALLUJAH

#### A.  PLAINTIFF TIMOTHY EARL BREDBERG, JR.

6678.  Plaintiff Timothy Earl Bredberg, Jr. is a U.S. citizen domiciled in New York.

6679.  On June 11, 2004, Timothy Earl Bredberg, Jr. was serving in the U.S. military when he was attacked by IEDs and smalls arms fire.

6680.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Bredberg.

6681.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6682.  As a result of the attack and the injuries suffered, Timothy Earl Bredberg, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 697.  THE JUNE 7, 2004 ATTACK – MOSUL

#### A.  PLAINTIFFS THE MATTHEW WALKER GOWIN FAMILY

6683.  Plaintiff Matthew Walker Gowin is a U.S. citizen domiciled in Virginia.

6684.  On June 7, 2004, Matthew Walker Gowin was serving in the U.S. military when he was attacked by small arms and mortars.

6685.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Gowin.

6686.   The Iranian-supported FTO AAI planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6687.   As a result of the attack and the injuries suffered, Matthew Walker Gowin is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6688.   Plaintiff Amanda Lynn Gowin is a citizen of the United States domiciled in Virginia, and is the spouse of Matthew Walker Gowin.

6689.   As a result of the attack and the injuries suffered by Matthew Walker Gowin, Plaintiff Amanda Lynn Gowin is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

**698.   THE JUNE 6, 2004 ATTACK – BAGHDAD**

**A.    PLAINTIFFS THE JOHN LAURENCE LAWTON, JR. FAMILY**

6690.   Plaintiff John Laurence Lawton, Jr. is a U.S. citizen domiciled in New Hampshire.

6691.   On June 6, 2004, John Laurence Lawton, Jr., was serving in the U.S. military when he was attacked by RPGs and small arms fire.

6692.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Lawton.

6693.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the

attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6694.  As a result of the attack and the injuries suffered, John Laurence Lawton, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6695.  Plaintiff Arlene F. Lawton is a citizen of the United States domiciled in Massachusetts and is the mother of John Laurence Lawton, Jr.

6696.  Plaintiff Patricia Lynn Lawton is a citizen of the United States domiciled in Massachusetts and is the daughter of John Laurence Lawton, Jr.

6697.  As a result of the attack and the injuries suffered by John Laurence Lawton, Jr., Plaintiffs Arlene F. Lawton and Patricia Lynn Lawton are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 699.  THE JUNE 4, 2004 ATTACK – BAGHDAD

#### A.  PLAINTIFF JESSE ALAN GEER

6698.  Plaintiff Jesse Alan Geer is a U.S. citizen domiciled in Oregon.

6699.  On June 4, 2004, Jesse Alan Geer was serving in the U.S. military when he was attacked by an IED and small arms fire.

6700.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Geer.

6701.  The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the

attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6702.   As a result of the attack and the injuries suffered, Jesse Alan Geer is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 700.   THE JUNE 4, 2004 ATTACK – BAGHDAD

### A.   PLAINTIFFS THE CARL WILLIE OLIVER FAMILY

6703.   Plaintiff Carl Willie Oliver is a U.S. citizen domiciled in New Jersey.

6704.   On June 4, 2004, Carl Willie Oliver was serving in the U.S. military when he was attacked by an RPG, an IED, and small arms fire.

6705.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Oliver.

6706.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6707.   As a result of the attack and the injuries suffered, Carl Willie Oliver is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6708.   Plaintiff Jade Loren Oliver is a citizen of the United States domiciled in New Jersey and is the daughter of Carl Willie Oliver.

6709.   As a result of the attack and the injuries suffered by Carl Willie Oliver, Plaintiff Jade Loren Oliver is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and

935

past and future economic damages, including loss of services and support.

**701.    THE JUNE 3, 2004 ATTACK – RAMADI**

**A.    PLAINTIFFS THE MATTHEW DENNIS BENACK FAMILY**

6710.   Plaintiff Matthew Dennis Benack is a U.S. citizen domiciled in North Carolina.

6711.   On June 3, 2004, Matthew Dennis Benack was serving in the U.S. military when he was attacked by an IED.

6712.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Benack.

6713.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6714.   As a result of the attack and the injuries suffered, Matthew Dennis Benack is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6715.   Plaintiff Dennis Benack is a citizen of the United States and domiciled in the State of Missouri. He is the father of Matthew Dennis Benack.

6716.   As a result of the attack and the injuries suffered by Matthew Dennis Benack, Plaintiff Dennis Benack, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

**702.    THE JUNE 3, 2004 ATTACK – RAMADI**

**A.    PLAINTIFF DANIEL RAYE DUITSMAN**

6717.   Plaintiff Daniel Raye Duitsman is a U.S. citizen domiciled in Virginia.

936

6718.  On June 3, 2004, Daniel Raye Duitsman was serving in the U.S. military when he was attacked by RPGs and small arms fire.

6719.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Duitsman.

6720.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6721.  As a result of the attack and the injuries suffered, Daniel Raye Duitsman is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 703.  THE MAY 29, 2004 ATTACK – RAMADI

#### A.  PLAINTIFFS THE MISAEL NIETO FAMILY

6722.  Plaintiff Misael Nieto is a U.S. citizen domiciled in Florida.

6723.  On May 29, 2004, Misael Nieto was serving in the U.S. military when he was attacked by an IED.

6724.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Nieto.

6725.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6726.  As a result of the attack and the injuries suffered, Misael Nieto is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses,

lost income, and loss of earning capacity.

6727.  Plaintiff J.N.1, a minor child, represented by her legal guardian Alejandro Nieto Martinez, is a citizen of the United States domiciled in Florida and is the sister of Misael Nieto.

6728.  Plaintiff J.N.2, a minor child, represented by her legal guardian Alejandro Nieto Martinez, is a citizen of the United States domiciled in Florida and is the sister of Misael Nieto.

6729.  As a result of the attack and the injuries suffered by Misael Nieto, Plaintiffs J.N.1, a minor child, and J.N.2, a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 704.  THE MAY 26, 2004 ATTACK – HIT

#### A.  PLAINTIFFS THE MATTHEW CHARLES HENDERSON FAMILY

6730.  On May 26, 2004, Matthew Charles Henderson was a U.S. citizen, domiciled in Nebraska, and serving in the U.S. military when he was attacked by an IED, causing his death.

6731.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Henderson.

6732.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

6733.  Plaintiff Jaimie K. Egge is a citizen of the United States domiciled in Nebraska and is the former spouse of Matthew Charles Henderson.

6734.  Plaintiff Owen L. Henderson is a citizen of the United States domiciled in Colorado and is the father of Matthew Charles Henderson.

6735.  Plaintiff Jaimie K. Egge, brings an action individually and on behalf of the Estate

of Matthew Charles Henderson, and all heirs thereof, as its legal representative.

6736.   As a result of the attack, and the injuries suffered by and the death of Matthew Charles Henderson, Plaintiffs Jaimie K. Egge and Owen L. Henderson, have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Matthew Charles Henderson.

## 705.   THE MAY 25, 2004 ATTACK – ISKANDARIYA

### A.   PLAINTIFFS THE THOMAS MATTHEW BROOKS FAMILY

6737.   Plaintiff Thomas Matthew Brooks is a U.S. citizen domiciled in Vermont.

6738.   On May 25, 2004, Thomas Matthew Brooks was serving in the U.S. military when he was attacked by mortars.

6739.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Brooks.

6740.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6741.   As a result of the attack and the injuries suffered, Thomas Matthew Brooks is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6742.   Plaintiff Lynda L. Brooks is a citizen of the United States domiciled in Vermont and is the mother of Thomas Matthew Brooks.

6743.   As a result of the attack and the injuries suffered by Thomas Matthew Brooks, Plaintiff Lynda L. Brooks is entitled to past and future noneconomic damages, including for

939

severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 706.   THE MAY 24, 2004 ATTACK – BAGHDAD

#### A.   PLAINTIFFS THE THOMAS WHITTFIELD THORNHILL FAMILY

6744.   Plaintiff Thomas Whittfield Thornhill is a U.S. citizen domiciled in Louisiana.

6745.   On May 24, 2004, Thomas Whittfield Thornhill was serving in the U.S. military when he was attacked by an IED and small arms fire.

6746.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Thornhill.

6747.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6748.   As a result of the attack and the injuries suffered, Thomas Whittfield Thornhill is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6749.   Plaintiff Desiree Anne Thornhill is a citizen of the United States domiciled in Louisiana and is the wife of Thomas Whittfield Thornhill.

6750.   Plaintiff G.B.T. a minor child, represented by her legal guardian Thomas Whittfield Thornhill, and Desiree Anne Thornhill is a citizen of the United States domiciled in Louisiana and is the daughter of Thomas Whittfield Thornhill.

6751.   As a result of the attack and the injuries suffered by Thomas Whittfield Thornhill, Plaintiffs Desiree Anne Thornhill and G.B.T. a minor child, are entitled to past and future

noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 707.  THE MAY 19, 2004 ATTACK – RAMADI

#### A.  PLAINTIFF SHAWN DAVID SPITZER

6752.  Plaintiff Shawn David Spitzer is a U.S. citizen domiciled in Utah.

6753.  On May 19, 2004, Shawn David Spitzer was serving in the U.S. military when he was attacked by an IED.

6754.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Spitzer.

6755.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6756.  As a result of the attack and the injuries suffered, Shawn David Spitzer is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 708.  THE MAY 19, 2004 ATTACK – RAMADI

#### A.  PLAINTIFFS THE KEVIN DALE MILLER FAMILY

6757.  Plaintiff Kevin Dale Miller is a U.S. citizen domiciled in Virginia.

6758.  On May 19, 2004, Kevin Dale Miller was serving in the U.S. military when he was attacked by an IED.

6759.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Miller.

941

6760.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6761.   As a result of the attack and the injuries suffered, Kevin Dale Miller is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6762.   Plaintiff LaDonna Sue Miller is a citizen of the United States domiciled in Virginia and is the spouse of Kevin Dale Miller.

6763.   Plaintiff Ronnie Dale Miller is a citizen of the United States domiciled in Kentucky and is the father of Kevin Dale Miller.

6764.   As a result of the attack and the injuries suffered by Kevin Dale Miller, Plaintiffs LaDonna Sue Miller and Ronnie Dale Miller are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 709.   THE MAY 14, 2004 ATTACK – ISKANDARIYA

#### A.   PLAINTIFF FELICIA FLAKE

6765.   Plaintiff Felicia Flake is a U.S. citizen domiciled in Louisiana.

6766.   On May 14, 2004, Felicia Flake was serving in the U.S. military when she was attacked by mortars.

6767.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Ms. Flake.

6768.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack,

as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6769.   As a result of the attack and the injuries suffered, Felicia Flake is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 710.   THE MAY 14, 2004 ATTACK – MUHMADIYA

#### A.   PLAINTIFFS THE PATRICK CHRISTOPHER WICKENS FAMILY

6770.   Plaintiff Patrick Christopher Wickens is a U.S. citizen domiciled in Florida.

6771.   On May 14, 2004, Patrick Christopher Wickens was serving in the U.S. military when he was attacked by a mortar.

6772.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Wickens.

6773.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6774.   As a result of the attack and the injuries suffered, Patrick Christopher Wickens is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6775.   Plaintiff Judy Lynn Wickens is a citizen of the United States domiciled in Montana and is the spouse of Patrick Christopher Wickens.

6776.   As a result of the attack and the injuries suffered by Patrick Christopher Wickens,

Plaintiff Judy Lynn Wickens is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 711. THE MAY 7, 2004 ATTACK – KARBALA

#### A. PLAINTIFFS THE WILLIAM ROBERT INGRAM FAMILY

6777. Plaintiff William Robert Ingram is a U.S. citizen domiciled in Missouri.

6778. On or about May 7, 2004, William Robert Ingram was serving in the U.S. military when he was attacked by an RCIED and small arms.

6779. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Ingram.

6780. The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6781. As a result of the attack and the injuries suffered, William Robert Ingram is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6782. Plaintiff X.R.I., a minor child, represented by his legal guardian William Robert Ingram, is a citizen of the United States domiciled in Missouri and is the son of William Robert Ingram.

6783. Plaintiff W.J.I., a minor child, represented by his legal guardian William Robert Ingram, is a citizen of the United States domiciled in Missouri and is the son of William Robert Ingram.

6784. As a result of the attack and the injuries suffered by William Robert Ingram,

Plaintiffs X.R.I., a minor child and W.J.I., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 712.   THE MAY 6, 2004 ATTACK – BAGHDAD

#### A.   PLAINTIFF STACEY DARRELL RICE

6785.   Plaintiff Stacey Darrell Rice is a U.S. citizen domiciled in Arkansas.

6786.   On May 6, 2004, Stacey Darrell Rice was serving in the U.S. military when he was attacked by a VSIED.

6787.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Rice.

6788.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6789.   As a result of the attack and the injuries suffered, Stacey Darrell Rice is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 713.   THE MAY 6, 2004 ATTACK – BAGHDAD

#### A.   PLAINTIFFS THE SIMON MIGUEL GARCIA FAMILY

6790.   Plaintiff Simon Miguel Garcia is a U.S. citizen domiciled in Idaho.

6791.   On May 6, 2004, Simon Miguel Garcia was serving in the U.S. military when he was attacked by an IED.

6792.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or

945

other material support used to commit the attack, which injured Mr. Garcia.

6793.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6794.   As a result of the attack and the injuries suffered, Simon Miguel Garcia is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6795.   Plaintiff Alicia R. Garcia is a citizen of the United States domiciled in Idaho and is the spouse of Simon Miguel Garcia.

6796.   As a result of the attack and the injuries suffered by Simon Miguel Garcia, Plaintiff Alicia R. Garcia, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 714.   THE MAY 5, 2004 ATTACK – BAGHDAD

### A.   PLAINTIFFS THE DANIEL ALTON ROCCO FAMILY

6797.   Plaintiff Daniel Alton Rocco is a U.S. citizen domiciled in Oregon.

6798.   On May 5, 2004, Daniel Alton Rocco was serving in the U.S. military when he was attacked by an IED.

6799.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Rocco.

6800.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

946

6801.   As a result of the attack and the injuries suffered, Daniel Alton Rocco is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6802.   Plaintiff Chad A. Christensen is a citizen of the United States domiciled in Oregon and is the brother of Daniel Alton Rocco.

6803.   As a result of the attack and the injuries suffered by Daniel Alton Rocco, Plaintiff Chad A. Christensen is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 715.   THE MAY 5, 2004 ATTACK – BAGHDAD

#### A.   PLAINTIFFS THE RICHARD LLANCE SCHWAN FAMILY

6804.   Plaintiff Richard Llance Schwan is a U.S. citizen domiciled in California.

6805.   On May 5, 2004, Richard Llance Schwan was serving in the U.S. military when he was attacked by an IED and small arms.

6806.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Schwan.

6807.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6808.   As a result of the attack and the injuries suffered, Richard Llance Schwan is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

947

6809. Plaintiff M.A.S. a minor child, represented by her legal guardian Richard Llance Schwan, is a citizen of the United States domiciled in California and is the daughter of Richard Llance Schwan.

6810. As a result of the attack and the injuries suffered by Richard Llance Schwan, Plaintiff M.A.S., a minor child, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 716. THE MAY 5, 2004 ATTACK – BALAD

#### A. PLAINTIFF DONALD EVAN GRZENA

6811. Plaintiff Donald Evan Grzena is a U.S. citizen domiciled in Florida.

6812. On May 5, 2004, Donald Evan Grzena was serving in the U.S. military when he was attacked by mortars.

6813. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Grzena.

6814. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6815. As a result of the attack and the injuries suffered, Donald Evan Grzena is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 717. THE MAY 4, 2004 ATTACK – RAMADI

#### A. PLAINTIFFS THE BRYON MAURICE SLAY FAMILY

6816. Plaintiff Bryon Maurice Slay is a U.S. citizen domiciled in Tennessee.

948

6817.   On May 4, 2004, Bryon Maurice Slay was serving in the U.S. military when he was attacked by an IED.

6818.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Slay.

6819.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6820.   As a result of the attack and the injuries suffered, Bryon Maurice Slay is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6821.   Plaintiff Sharon Slay DuBose is a citizen of the United States domiciled in Tennessee and is the mother of Bryon Maurice Slay.

6822.   Plaintiff Wilbert DuBose is a citizen of the United States domiciled in Tennessee and is the stepfather of Bryon Maurice Slay.

6823.   Plaintiff Jerrell Slay is a citizen of the United States domiciled in Tennessee and is the brother of Bryon Maurice Slay.

6824.   Plaintiff Akos Slay is a citizen of the United States domiciled in Tennessee and is the former spouse of Bryon Maurice Slay.

6825.   Plaintiff B.D.B.S., a minor child, represented by his legal guardian Akos Slay, is a citizen of the United States domiciled in Tennessee and is the son of Bryon Maurice Slay.

6826.   As a result of the attack and the injuries suffered by Bryon Maurice Slay, Plaintiffs Sharon Slay DuBose, Wilbert DuBose, Jerrell Slay, Akos Slay and B.D.B.S., a minor

child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 718.   THE MAY 2, 2004 ATTACK – RAMADI

#### A.   PLAINTIFF THOMAS LOCKWOOD JOHNSON

6827.   Plaintiff Thomas Lockwood Johnson is a U.S. citizen domiciled in South Carolina.

6828.   On May 2, 2004, Thomas Lockwood Johnson was serving in the U.S. military when he was attacked by a Mortar.

6829.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Johnson.

6830.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6831.   As a result of the attack and the injuries suffered, Thomas Lockwood Johnson is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 719.   THE MAY 2, 2004 ATTACK – BAGHDAD

#### A.   PLAINTIFFS THE MARTIN LYNN WAGNER, JR. FAMILY

6832.   Plaintiff Martin Lynn Wagner, Jr. is a U.S. citizen domiciled in Texas.

6833.   On May 2, 2004, Martin Lynn Wagner, Jr. was serving in the U.S. military when he was attacked by a RPG.

6834.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or

other material support used to commit the attack, which injured Mr. Wagner.

6835. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6836. As a result of the attack and the injuries suffered, Martin Lynn Wagner, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6837. Plaintiff Anna Wagner is a citizen of the United States domiciled in Texas and is the mother of Martin Lynn Wagner, Jr.

6838. Plaintiff Amanda Wagner Ellis is a citizen of the United States domiciled in Texas and is the sister of Martin Lynn Wagner, Jr.

6839. As a result of the attack and the injuries suffered by Martin Lynn Wagner, Jr., Anna Wagner and Amanda Wagner Ellis are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 720. THE MAY 2, 2004 ATTACK – RAMADI

#### A.    PLAINTIFFS THE BRYON MAURICE SLAY FAMILY

6840. Plaintiff Bryon Maurice Slay is a U.S. citizen domiciled in Tennessee.

6841. On May 2, 2004, Bryon Maurice Slay was serving in the U.S. military when he was attacked by mortars.

6842. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Slay.

6843. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack,

as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6844.   As a result of the attack and the injuries suffered, Bryon Maurice Slay is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6845.   Plaintiff Sharon Slay DuBose is a citizen of the United States domiciled in Tennessee and is the mother of Bryon Maurice Slay.

6846.   Plaintiff Wilbert DuBose is a citizen of the United States domiciled in Tennessee and is the stepfather of Bryon Maurice Slay.

6847.   Plaintiff Jerrell Slay is a citizen of the United States domiciled in Tennessee and is the brother of Bryon Maurice Slay.

6848.   Plaintiff Akos Slay is a citizen of the United States domiciled in Tennessee and is the former spouse of Bryon Maurice Slay.

6849.   Plaintiff B.D.B.S., a minor child, represented by his legal guardian Akos Slay, is a citizen of the United States domiciled in Tennessee and is the son of Bryon Maurice Slay.

6850.   As a result of the attack and the injuries suffered by Bryon Maurice Slay, Plaintiffs Sharon Slay DuBose, Wilbert DuBose, Jerrell Slay, Akos Slay and B.D.B.S., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 721.   THE APRIL 27, 2004 ATTACK – RAMADI

#### A.   PLAINTIFF KEVIN BRADLEY OLECH

6851.   Plaintiff Kevin Bradley Olech is a U.S. citizen domiciled in North Carolina.

6852.   On April 27, 2004, Kevin Bradley Olech was serving in the U.S. military when he was attacked by a RPG.

6853.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Olech.

6854.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6855.   As a result of the attack and the injuries suffered, Kevin Bradley Olech is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 722.   THE APRIL 26, 2004 ATTACK – FALLUJAH

### A.   PLAINTIFFS THE CARLOS GOMEZ PEREZ FAMILY

6856.   Plaintiff Carlos Gomez Perez is a U.S. citizen domiciled in California.

6857.   On April 26, 2004, Carlos Gomez Perez was serving in the U.S. military when he was attacked by small arms.

6858.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Gomez Perez.

6859.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6860.   As a result of the attack and the injuries suffered, Carlos Gomez Perez is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical

expenses, lost income, and loss of earning capacity.

6861. Plaintiff Samantha Izaguirre-Gomez is a citizen of the United States domiciled in California and is the spouse of Carlos Gomez Perez.

6862. Plaintiff J.C.I-G, a minor child, represented by his legal guardians Carlos Gomez Perez and Samantha Izaguirre-Gomez, is a citizen of the United States domiciled in California and is the son of Carlos Gomez Perez.

6863. As a result of the attack and the injuries suffered by Carlos Gomez Perez, Plaintiffs Samantha Izaguirre-Gomez and J.C.I-G, a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 723. THE APRIL 25, 2004 ATTACK – TAJI

#### A. PLAINTIFFS THE JOIE LEE WILLIAMS FAMILY

6864. Plaintiff Joie Lee Williams is a U.S. citizen domiciled in North Carolina.

6865. On April 25, 2004, Joie Lee Williams was serving in the U.S. military when he was attacked by rockets.

6866. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Williams.

6867. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6868. As a result of the attack and the injuries suffered, Joie Lee Williams is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical

expenses, lost income, and loss of earning capacity.

6869.  Plaintiff Annette Williams is a citizen of the United States domiciled in North Carolina and is the wife of Joie Lee Williams.

6870.  Plaintiff Shenna Green is a citizen of the United States domiciled in North Carolina and is the daughter of Joie Lee Williams.

6871.  Plaintiff Doris Jean Coger is a citizen of the United States domiciled in North Carolina and is the mother of Joie Lee Williams.

6872.  As a result of the attack and the injuries suffered by Joie Lee Williams, Plaintiffs Annette Williams, Shenna Green and Doris Jean Coger are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 724.  THE APRIL 23, 2004 ATTACK – BAQUBA

### A.  PLAINTIFF JUSTIN ASHLEY GAGE

6873.  Plaintiff Justin Ashley Gage is a U.S. citizen domiciled in North Carolina.

6874.  On April 23, 2004, Justin Ashley Gage was serving in the U.S. military when he was attacked by an IED.

6875.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Gage.

6876.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6877.  As a result of the attack and the injuries suffered, Justin Ashley Gage is entitled to past and future noneconomic damages, including for severe physical and mental pain and

suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 725.  THE APRIL 19, 2004 ATTACK – BAGHDAD

#### A.  PLAINTIFF JOHN FITZGERALD COLEMAN

6878.  Plaintiff John Fitzgerald Coleman is a U.S. citizen domiciled in Arkansas.

6879.  On April 19, 2004, John Fitzgerald Coleman was serving in the U.S. military when he was attacked by an IED.

6880.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Coleman.

6881.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6882.  As a result of the attack and the injuries suffered, John Fitzgerald Coleman is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 726.  THE APRIL 13, 2004 ATTACK – BAGHDADI

#### A.  PLAINTIFF SIGURD MORRIS MATHISEN, JR.

6883.  Plaintiff Sigurd Morris Mathisen, Jr. is a U.S. citizen domiciled in Florida.

6884.  On April 13, 2004, Sigurd Morris Mathisen, Jr. was serving in the U.S. military when he was attacked by an IED.

6885.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Mathisen.

6886.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack,

956

as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6887.  As a result of the attack and the injuries suffered, Sigurd Morris Mathisen, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 727.   THE APRIL 9, 2004 ATTACK – BAGHDAD

### A.   PLAINTIFFS THE JUSTIN ROY ROJAS FAMILY

6888.  Plaintiff Justin Roy Rojas is a U.S. citizen domiciled in North Carolina.

6889.  On April 9, 2004, Justin Roy Rojas was serving in the U.S. military when he was attacked by rockets, mortars, and small arms fire.

6890.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Rojas.

6891.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6892.  As a result of the attack and the injuries suffered, Justin Roy Rojas is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6893.  Plaintiff Amanda Rojas is a citizen of the United States domiciled in North Carolina and is the spouse of Justin Roy Rojas

6894.  As a result of the attack and the injuries suffered by Justin Roy Rojas, Plaintiff Amanda Rojas is entitled to past and future noneconomic damages, including for severe mental

957

anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 728.   THE APRIL 8, 2004 ATTACK – FALLUJAH

### A.   PLAINTIFFS THE ASHOT MALKHASSIAN FAMILY

6895.   Plaintiff Ashot Malkhassian is a U.S. citizen domiciled in California.

6896.   On April 8, 2004, Ashot Malkhassian was serving in the U.S. military when he was attacked by small arms fire.

6897.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Malkhassian.

6898.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6899.   As a result of the attack and the injuries suffered, Ashot Malkhassian is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6900.   Plaintiff Chaken Zanazanian is a citizen of the United States domiciled in California and is the mother of Ashot Malkhassian.

6901.   As a result of the attack and the injuries suffered by Ashot Malkhassian, Plaintiff Chaken Zanazanian is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

958

### 729.   THE APRIL 8, 2004 ATTACK – MAHMUDIYA

#### A.   PLAINTIFFS THE BRIAN MICHAEL YORK FAMILY

6902.   Plaintiff Brian Michael York is a U.S. citizen domiciled in New York.

6903.   On April 8, 2004, Brian Michael York was serving in the U.S. military when he was attacked by an IED.

6904.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. York.

6905.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6906.   As a result of the attack and the injuries suffered, Brian Michael York is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6907.   Plaintiff Edward Raymond York is a citizen of the United States domiciled in New York and is the father of Brian Michael York.

6908.   Plaintiff Elizabeth Anne York is a citizen of the United States domiciled in New York and is the sister of Brian Michael York.

6909.   As a result of the attack and the injuries suffered by Brian Michael York, Plaintiffs Edward Raymond York and Elizabeth Anne York are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

730. **THE APRIL 7, 2004 ATTACK – FALLUJAH**

A. **PLAINTIFFS THE DANIEL JAMES GRIEGO FAMILY**

6910.   Plaintiff Daniel James Griego is a U.S. citizen domiciled in California.

6911.   On April 7, 2004, Daniel James Griego was serving in the U.S. military when he was attacked by RPGs, small arms fire, sniper fire, machine guns, mortars, and IEDs.

6912.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Griego.

6913.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6914.   As a result of the attack and the injuries suffered, Daniel James Griego is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6915.   Plaintiff Amy Griego is a citizen of the United States domiciled in California and is the spouse of Daniel James Griego.

6916.   Plaintiff Lena Parker is a citizen of the United States domiciled in California and is the mother of Daniel James Griego.

6917.   Plaintiff Fred Griego is a citizen of the United States domiciled in California and is the brother of Daniel James Griego.

6918.   Plaintiff Cynthia Leonard is a citizen of the United States domiciled in California and is the sister of Daniel James Griego.

6919.   Plaintiff Priscilla Griego is a citizen of the United States domiciled in California and is the daughter of Daniel James Griego.

6920.  Plaintiff Noah James Griego is a citizen of the United States domiciled in California and is the son of Daniel James Griego.

6921.  As a result of the attack and the injuries suffered by Daniel James Griego, Plaintiffs Amy Griego, Lena Parker, Fred Griego, Cynthia Leonard, Priscilla Griego and Noah James Griego are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 731.  THE APRIL 7, 2004 ATTACK – FALLUJAH

### A.    PLAINTIFFS THE JAMES EDWARD WRIGHT FAMILY

6922.  Plaintiff James Edward Wright is a U.S. citizen domiciled in California.

6923.  On April 7, 2004, James Edward Wright was serving in the U.S. military when he was attacked by RPGs, small arms fire, sniper fire, machine guns, mortars, and IEDs.

6924.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Wright.

6925.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6926.  As a result of the attack and the injuries suffered, James Edward Wright is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6927.  Plaintiff Carmel Fitzgerald is a citizen of the United States domiciled in Ireland and is the mother of James Edward Wright.

6928.  Plaintiff Nora Ann Foutz is a citizen of the United States domiciled in Colorado

and is the sister of James Edward Wright.

6929.   Plaintiff Matthew Wright is a citizen of the United States domiciled in Ireland and is the brother of James Edward Wright.

6930.   As a result of the attack and the injuries suffered by James Edward Wright, Plaintiffs Carmel Fitzgerald, Nora Ann Foutz and Matthew Wright are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 732.   THE APRIL 7, 2004 ATTACK – FALLUJAH

### A.   PLAINTIFF ANTHONY LEE MIELE

6931.   Plaintiff Anthony Lee Miele is a U.S. citizen domiciled in Indiana.

6932.   On April 7, 2004, Anthony Lee Miele was serving in the U.S. military when he was attacked by RPGs, small arms fire, sniper fire, machine guns, mortars, and IEDs.

6933.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Miele.

6934.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6935.   As a result of the attack and the injuries suffered, Anthony Lee Miele is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 733. THE APRIL 7, 2004 ATTACK – FALLUJAH

### A. PLAINTIFFS THE TYLER DAVID NEUMEISTER FAMILY

6936. Plaintiff Tyler David Neumeister is a U.S. citizen domiciled in California.

6937. On April 7, 2004, Tyler David Neumeister was serving in the U.S. military when he was attacked by RPGs, small arms fire, sniper fire, machine guns, mortars, and IEDs.

6938. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Neumeister.

6939. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6940. As a result of the attack and the injuries suffered, Tyler David Neumeister is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6941. Plaintiff Elyse Fink is a citizen of the United States domiciled in California and is the mother of Tyler David Neumeister.

6942. Plaintiff Shoshone Nadene Boudreau is a citizen of the United States domiciled in California and is the sister of Tyler David Neumeister.

6943. Plaintiff Kimberlee Morgan Hinkley is a citizen of the United States domiciled in California and is the sister of Tyler David Neumeister.

6944. As a result of the attack and the injuries suffered by Tyler David Neumeister, Plaintiffs Elyse Fink, Shoshone Nadene Boudreau and Kimberlee Morgan Hinkley are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages,

including loss of services and support.

### 734. THE APRIL 7, 2004 ATTACK – RAMADI

#### A. PLAINTIFF ELISHA JOSEPH ABBOTT

6945. Plaintiff Elisha Joseph Abbott is a U.S. citizen domiciled in Pennsylvania.

6946. On April 7, 2004, Elisha Joseph Abbott was serving in the U.S. military when he was attacked by an RPG.

6947. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Abbott.

6948. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6949. As a result of the attack and the injuries suffered, Elisha Joseph Abbott is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 735. THE APRIL 7, 2004 ATTACK – FALLUJAH

#### A. PLAINTIFFS THE MICHAEL ANTHONY MENDOZA FAMILY

6950. Plaintiff Michael Anthony Mendoza is a U.S. citizen domiciled in Illinois.

6951. On April 7, 2004, Michael Anthony Mendoza was serving in the U.S. military when he was attacked by RPGs, small arms fire, sniper fire, machine guns, mortars, and IEDs.

6952. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Mendoza.

6953. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack,

964

the munition used, as well as the tactics, techniques, and procedures utilized.

6954.   As a result of the attack and the injuries suffered, Michael Anthony Mendoza is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6955.   Plaintiff Kelly Mendoza is a citizen of the United States and domiciled in the State of Illinois. She is the wife of Michael Anthony Mendoza.

6956.   As a result of the attack and the injuries suffered by Michael Anthony Mendoza, Plaintiff Kelly Mendoza is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 736.   THE APRIL 7, 2004 ATTACK – BAIJI

### A.   PLAINTIFFS THE CRAIG SCOTT SOTEBEER FAMILY

6957.   Plaintiff Craig Scott Sotebeer is a U.S. citizen domiciled in Utah.

6958.   On April 7, 2004, Craig Scott Sotebeer was serving in the U.S. military when he was attacked by rockets and mortars.

6959.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Sotebeer.

6960.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6961.   As a result of the attack and the injuries suffered, Craig Scott Sotebeer is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical

expenses, lost income, and loss of earning capacity.

6962.  Plaintiff Maria Catherine Sotebeer is a citizen of the United States domiciled in Utah and is the wife of Craig Scott Sotebeer.

6963.  As a result of the attack and the injuries suffered by Craig Scott Sotebeer, Plaintiff Maria Catherine Sotebeer is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 737.  THE APRIL 7, 2004 ATTACK – LATIFIYA

#### A.     PLAINTIFFS THE STEPHEN KENT FERGUSON FAMILY

6964.  Plaintiff Stephen Kent Ferguson is a U.S. citizen domiciled in West Virginia.

6965.  On April 7, 2004, Stephen Kent Ferguson was serving in the U.S. military when he was attacked by an IED, RPG, mortars and small arms.

6966.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Ferguson.

6967.  The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6968.  As a result of the attack and the injuries suffered, Stephen Kent Ferguson is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6969.  Plaintiff Robert Eugene Ferguson, Jr. is a citizen of the United States domiciled in West Virginia and is the step-father of Stephen Kent Ferguson.

6970.  Plaintiff Clotilde Joy Szelkowski is a citizen of the United States domiciled in

Colorado and is the mother of Stephen Kent Ferguson.

6971.  Plaintiff Owen Eugene Chismar, II is a citizen of the United States domiciled in Colorado and is the brother of Stephen Kent Ferguson.

6972.  As a result of the attack and the injuries suffered by Stephen Kent Ferguson, Plaintiffs Robert Eugene Ferguson, Jr., Clotilde Joy Szelkowski, and Owen Eugene Chismar, II, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 738.  THE APRIL 7, 2004 ATTACK – FALLUJAH

#### A.  PLAINTIFF JULIO ALEXANDER GUZMAN

6973.  Plaintiff Julio Alexander Guzman is a U.S. citizen domiciled in California.

6974.  On April 7, 2004, Julio Alexander Guzman was serving in the U.S. military when he was attacked by RPGs, small arms fire, sniper fire, machine guns, mortars, and IEDs.

6975.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Guzman.

6976.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6977.  As a result of the attack and the injuries suffered, Julio Alexander Guzman is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 739.   THE APRIL 7, 2004 ATTACK – FALLUJAH

### A.   PLAINTIFFS THE BLAIR ELLIS DELL FAMILY

6978.   Plaintiff Blair Ellis Dell is a U.S. citizen domiciled in Washington.

6979.   On April 7, 2004, Blair Ellis Dell was serving in the U.S. military when he was attacked by RPGs, small arms fire, sniper fire, machine guns, mortars, and IEDs.

6980.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Dell.

6981.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6982.   As a result of the attack and the injuries suffered, Blair Ellis Dell is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6983.   Plaintiff Candus Angel Dell is a citizen of the United States domiciled in Washington and is the spouse of Blair Ellis Dell.

6984.   Plaintiff V.J.D., a minor child, represented by her legal guardian Candus Angel Dell, is a citizen of the United States domiciled in Washington and is the daughter of Blair Ellis Dell.

6985.   As a result of the attack and the injuries suffered by Blair Ellis Dell, Plaintiffs Candus Angel Dell and V.J.D., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 740.  THE APRIL 5, 2004 ATTACK – ZAIDON

### A.  PLAINTIFFS THE BRANDON JOHN BERHOW-GOLL FAMILY

6986.  Plaintiff Brandon John Berhow-Goll is a U.S. citizen domiciled in Iowa.

6987.  On April 5, 2004, Brandon John Berhow-Goll was serving in the U.S. military when he was attacked by an IED, RPG, and small arms.

6988.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Berhow-Goll.

6989.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6990.  As a result of the attack and the injuries suffered, Brandon John Berhow-Goll is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6991.  Plaintiff Jennifer Jean Berhow-Hanson is a citizen of the United States domiciled in Iowa and is the mother of Brandon John Berhow-Goll.

6992.  Plaintiff Kevin Douglas Hanson is a citizen of the United States domiciled in Iowa and is the father of Brandon John Berhow-Goll.

6993.  As a result of the attack and the injuries suffered by Brandon John Berhow-Goll, Plaintiffs Jennifer Jean Berhow-Hanson and Kevin Douglas Hanson are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 741.   THE APRIL 4, 2004 ATTACK – SADR CITY

### A.   PLAINTIFFS THE JOSHUA MITCHELL ROUNTREE FAMILY

6994.   Plaintiff Joshua Mitchell Rountree is a U.S. citizen domiciled in Texas.

6995.   On April 4, 2004, Joshua Mitchell Rountree was serving in the U.S. military when he was attacked by IEDs, RPGs, small arms fire, and sniper fire.

6996.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Rountree.

6997.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

6998.   As a result of the attack and the injuries suffered, Joshua Mitchell Rountree is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

6999.   Plaintiff Leigh Rountree is a citizen of the United States domiciled in Texas and is the spouse of Joshua Mitchell Rountree.

7000.   As a result of the attack and the injuries suffered by Joshua Mitchell Rountree, Plaintiff Leigh Rountree is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 742.   THE APRIL 4, 2004 ATTACK – SADR CITY

### A.   PLAINTIFF ALEXANDER RODRIGUEZ BRYANT

7001.   Plaintiff Alexander Rodriguez Bryant is a U.S. citizen domiciled in North Carolina.

970

7002. On April 4, 2004, Alexander Rodriguez Bryant was serving in the U.S. military when he was attacked by RPGs, IEDs, and small arms fire.

7003. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Bryant.

7004. The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7005. As a result of the attack and the injuries suffered, Alexander Rodriguez Bryant is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 743. THE APRIL 4, 2004 ATTACK – SADR CITY

#### A. PLAINTIFFS THE FRANKLYN LEE DOSS FAMILY

7006. Plaintiff Franklyn Lee Doss is a U.S. citizen domiciled in Texas.

7007. On April 4, 2004, Franklyn Lee Doss was serving in the U.S. military when he was attacked by small arms fire, RPGs, pipe bombs and grenades.

7008. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Doss.

7009. The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7010. As a result of the attack and the injuries suffered, Franklyn Lee Doss is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical

expenses, lost income, and loss of earning capacity.

7011.   Plaintiff Juanita Doss is a citizen of the United States and domiciled in the State of Texas. She is the wife of Franklyn Lee Doss.

7012.   As a result of the attack and the injuries suffered by Franklyn Lee Doss, Plaintiff Juanita Doss, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 744.   THE APRIL 4, 2004 ATTACK – SADR CITY

### A.   PLAINTIFFS THE SALVADOR BELTRAN-SOTO FAMILY

7013.   Plaintiff Salvador Beltran-Soto is a U.S. citizen domiciled in California.

7014.   On April 4, 2004, Salvador Beltran-Soto was serving in the U.S. military when he was attacked by small arms, RPGs, grenades, and IEDs.

7015.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Beltran-Soto.

7016.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7017.   As a result of the attack and the injuries suffered, Salvador Beltran-Soto is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7018.   Plaintiff James Salvador Beltran-Daves is a citizen of the United States domiciled in California and is the son of Salvador Beltran-Soto.

7019.   Plaintiff Sidney Ylenne Partida is a citizen of the United States domiciled in

972

California and is the former step-daughter of Salvador Beltran-Soto.

7020. Plaintiff Alonso Beltran-Soto is a citizen of the United States domiciled in California and is the brother of Salvador Beltran-Soto.

7021. Plaintiff Valentin Beltran is a citizen of the United States domiciled in California and is the brother of Salvador Beltran-Soto.

7022. Plaintiff Francisco Felix Beltran is a citizen of the United States domiciled in California and is the brother of Salvador Beltran-Soto.

7023. Plaintiff Beatriz Beltran is a citizen of the United States domiciled in California and is the sister of Salvador Beltran-Soto.

7024. As a result of the attack and the injuries suffered by Salvador Beltran-Soto, Plaintiffs James Salvador Beltran-Daves, Sidney Ylenne Partida, Alonso Beltran-Soto, Valentin Beltran, Francisco Felix Beltran, and Beatriz Beltran are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 745. THE APRIL 4, 2004 ATTACK – SADR CITY

### A. PLAINTIFFS THE RICHARD DEWAYNE FOSTER FAMILY

7025. Plaintiff Richard Dewayne Foster is a U.S. citizen domiciled in Oklahoma.

7026. On April 4, 2004, Richard Dewayne Foster was serving in the U.S. military when he was attacked by an RPG, small arms, and grenades.

7027. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Foster.

7028. The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the

973

attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7029.   As a result of the attack and the injuries suffered, Richard Dewayne Foster is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7030.   Plaintiff Brandon Michael Foster is a citizen of the United States domiciled in Washington and is the son of Richard Dewayne Foster.

7031.   Plaintiff Matthew Ryan Foster is a citizen of the United States domiciled in Washington and is the son of Richard Dewayne Foster.

7032.   As a result of the attack and the injuries suffered by Richard Dewayne Foster, Plaintiffs Brandon Michael Foster and Matthew Ryan Foster are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 746.   THE APRIL 4, 2004 ATTACK – SADR CITY

### A.   PLAINTIFFS THE MATTHEW GENE RAUL MERCADO FAMILY

7033.   Plaintiff Matthew Gene Raul Mercado is a U.S. citizen domiciled in Colorado.

7034.   On April 4, 2004, Matthew Gene Raul Mercado was serving in the U.S. military when he was attacked by an RPG and small arms fire.

7035.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Mercado.

7036.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the

attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7037.   As a result of the attack and the injuries suffered, Matthew Gene Raul Mercado is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7038.   Plaintiff Raul Mercado is a citizen of the United States domiciled in New York and is the father of Matthew Gene Raul Mercado.

7039.   Plaintiff Saundra Mercado is a citizen of the United States domiciled in New York and is the mother of Matthew Gene Raul Mercado.

7040.   Plaintiff K.M.M., a minor child, represented by his legal guardian Matthew Gene Raul Mercado, is a citizen of the United States domiciled in Colorado and is the son of Matthew Gene Raul Mercado.

7041.   Plaintiff M.L.M., a minor child, represented by her legal guardian Matthew Gene Raul Mercado, is a citizen of the United States domiciled in Colorado and is the daughter of Matthew Gene Raul Mercado.

7042.   As a result of the attack and the injuries suffered by Matthew Gene Raul Mercado, Plaintiffs Raul Mercado, Saundra Mercado, K.M.M., a minor child, and M.L.M., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 747.   THE APRIL 4, 2004 ATTACK – SADR CITY

### A.   PLAINTIFF ANTHONY JOHN FERRIS

7043.   Plaintiff Anthony John Ferris is a U.S. citizen domiciled in Arizona.

7044.   On April 4, 2004, Anthony John Ferris was serving in the U.S. military when he

was attacked by an IED, RPG and small arms fire.

7045. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Ferris.

7046. The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7047. As a result of the attack and the injuries suffered, Anthony John Ferris is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 748. THE APRIL 4, 2004 ATTACK – SADR CITY

### A. PLAINTIFFS THE MATTHEW N. WOOTEN, JR. FAMILY

7048. Plaintiff Matthew N. Wooten, Jr., is a U.S. citizen domiciled in Texas.

7049. On April 4, 2004, Matthew N. Wooten, Jr. was serving in the U.S. military when he was attacked by small arms.

7050. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Wooten.

7051. The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7052. As a result of the attack and the injuries suffered, Matthew N. Wooten, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

976

7053.   Plaintiff Matthew N. Wooten, III, is a citizen of the United States domiciled in Texas and is the son of Matthew N. Wooten, Jr.

7054.   As a result of the attack and the injuries suffered by Matthew N. Wooten, Jr., Plaintiff Matthew N. Wooten, III, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 749.   THE APRIL 4, 2004 ATTACK – KIRKUK

### A.   PLAINTIFFS THE GARY LYNN STRICKLAND FAMILY

7055.   Plaintiff Gary Lynn Strickland is a U.S. citizen domiciled in Texas.

7056.   On April 4, 2004, Gary Lynn Strickland was serving in the U.S. military when he was attacked by a VBIED.

7057.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Strickland.

7058.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7059.   As a result of the attack and the injuries suffered, Gary Lynn Strickland is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7060.   Plaintiff Marnita L. Marler is a citizen of the United States domiciled in Arkansas and is the mother of Gary Lynn Strickland.

7061.   Plaintiff Rikki Lynne Marler is a citizen of the United States domiciled in Arkansas and is the sister of Gary Lynn Strickland.

7062. As a result of the attack and the injuries suffered by Gary Lynn Strickland, Plaintiffs Marnita L. Marler and Rikki Lynne Marler, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 750. THE MARCH 30, 2004 ATTACK – ISKANDARIYA

#### A. PLAINTIFF ADAM NATHAN FLEURY

7063. Plaintiff Adam Nathan Fleury is a U.S. citizen domiciled in New York.

7064. On March 30, 2004, Adam Nathan Fleury was serving in the U.S. military when he was attacked by IED.

7065. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Fleury.

7066. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7067. As a result of the attack and the injuries suffered, Adam Nathan Fleury is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 751. THE MARCH 30, 2004 ATTACK – ISKANDARIYA

#### A. PLAINTIFFS THE JACOB RICHARD DEVRIES FAMILY

7068. Plaintiff Jacob Richard DeVries is a U.S. citizen domiciled in Iowa.

7069. On March 30, 2004, Jacob Richard DeVries was serving in the U.S. military when he was attacked by an IED.

7070. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. DeVries.

7071. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7072. As a result of the attack and the injuries suffered, Jacob Richard DeVries is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7073. Plaintiff Jerry L. DeVries is a citizen of the United States domiciled in Illinois and is the father of Jacob Richard DeVries.

7074. Plaintiff Susan M. Moulton is a citizen of the United States domiciled in Illinois and is the mother of Jacob Richard DeVries.

7075. As a result of the attack and the injuries suffered by Jacob Richard DeVries, Plaintiffs Jerry L. DeVries and Susan M. Moulton are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 752. THE MARCH 30, 2004 ATTACK – ISKANDARIYA

#### A. PLAINTIFFS THE STUART HUNTER MCKENZIE FAMILY

7076. Plaintiff Stuart Hunter McKenzie is a U.S. citizen domiciled in Washington.

7077. On March 30, 2004, Stuart Hunter McKenzie was serving in the U.S. military when he was attacked by an IED.

7078. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or

other material support used to commit the attack, which injured Mr. McKenzie.

7079. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7080. As a result of the attack and the injuries suffered, Stuart Hunter McKenzie is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7081. Plaintiff Calise Ann Patterson is a citizen of the United States and domiciled in the State of Louisiana. She is the sister of Stuart Hunter McKenzie.

7082. Plaintiff Colin Jade Darrow is a citizen of the United States and is domiciled in the state of Michigan. She is the sister of Stuart Hunter McKenzie.

7083. As a result of the attack and the injuries suffered by Stuart Hunter McKenzie, Plaintiffs Calise Ann Patterson and Colin Jade Darrow, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 753. THE MARCH 30, 2004 ATTACK – ISKANDARIYA

#### A. PLAINTIFFS THE SHANE MICHAEL PITTS FAMILY

7084. Plaintiff Shane Michael Pitts is a U.S. citizen domiciled in Missouri.

7085. On March 30, 2004, Shane Michael Pitts was serving in the U.S. military when he was attacked by an IED.

7086. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Pitts.

7087. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7088. As a result of the attack and the injuries suffered, Shane Michael Pitts is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7089. Plaintiff Virginia Summer is a citizen of the United States domiciled in Florida and is the mother of Shane Michael Pitts.

7090. As a result of the attack and the injuries suffered by Shane Michael Pitts, Plaintiff Virginia Summer, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 754. THE MARCH 30, 2004 ATTACK – ISKANDARIYA

#### A. PLAINTIFF MATTHEW SLATE HAEGER

7091. Plaintiff Matthew Slate Haeger is a U.S. citizen domiciled in Colorado.

7092. On March 30, 2004, Matthew Slate Haeger was serving in the U.S. military when he was attacked by an IED.

7093. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Haeger.

7094. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7095. As a result of the attack and the injuries suffered, Matthew Slate Haeger is

entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 755. THE MARCH 25, 2004 ATTACK – FOB SPEICHER

#### A. PLAINTIFFS THE JOSHUA CODY BIRCH FAMILY

7096. Plaintiff Joshua Cody Birch is a U.S. citizen domiciled in Ohio.

7097. On n March 25, 2004, Joshua Cody Birch was serving in the U.S. military when he was attacked by mortars.

7098. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Birch.

7099. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7100. As a result of the attack and the injuries suffered, Joshua Cody Birch is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7101. Plaintiff Heather M. Birch is a citizen of the United States and domiciled in the State of Ohio. She is the wife of Joshua Cody Birch.

7102. Plaintiff Caryn M. Giroux is a citizen of the United States and domiciled in the State of Ohio. She is the mother of Joshua Cody Birch.

7103. Plaintiff John R. Birch, Jr. is a citizen of the United States and domiciled in the State of Ohio. He is the father of Joshua Cody Birch.

7104. Plaintiff Jarod L. Birch is a citizen of the United States and domiciled in the State

of Ohio. He is the brother of Joshua Cody Birch.

7105. Plaintiff Judd W. Birch is a citizen of the United States and domiciled in the State of Ohio. He is the brother of Joshua Cody Birch.

7106. As a result of the attack and the injuries suffered by Joshua Cody Birch, Plaintiffs Heather M. Birch, Caryn M. Giroux, John R. Birch, Jr., Jarod L. Birch and Judd W. Birch are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 756. THE MARCH 19, 2004 ATTACK – AL ANBAR PROVINCE

#### A. PLAINTIFF MARIO ALBERTO MENA

7107. Plaintiff Mario Alberto Mena is a U.S. citizen domiciled in Illinois.

7108. On March 19, 2004, Mario Alberto Mena was serving in the U.S. military when he was attacked by an anti-tank mine and small arms fire.

7109. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Mena.

7110. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7111. As a result of the attack and the injuries suffered, Mario Alberto Mena is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

**757.   THE MARCH 19, 2004 ATTACK – FALLUJAH**

     **A.   PLAINTIFFS THE JOHN JAMES DAWDY FAMILY**

7112.   Plaintiff John James Dawdy is a U.S. citizen domiciled in Texas.

7113.   On March 19, 2004, John James Dawdy was serving in the U.S. military when he was attacked by an IED.

7114.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Dawdy.

7115.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7116.   As a result of the attack and the injuries suffered, John James Dawdy is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7117.   Plaintiff Pattie Ann Black is a citizen of the United States domiciled in Texas and is the mother of John James Dawdy.

7118.   Plaintiff Michael John Black is a citizen of the United States domiciled in Texas and is the step-father of John James Dawdy.

7119.   Plaintiff Wendy Ann Law is a citizen of the United States domiciled in Texas and is the sister of John James Dawdy.

7120.   Plaintiff Jennifer Nicole Burelsmith is a citizen of the United States domiciled in Texas and is the sister of John James Dawdy.

7121.   As a result of the attack and the injuries suffered by John James Dawdy, Plaintiffs Pattie Ann Black, Michael John Black, Wendy Ann Law, and Jennifer Nicole Burelsmith are

984

entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 758. THE MARCH 19, 2004 ATTACK – FALLUJAH

#### A. PLAINTIFF MICHAEL ROY RENFRO

7122. Plaintiff Michael Roy Renfro is a U.S. citizen domiciled in Arizona.

7123. On March 19, 2004, Michael Roy Renfro was serving in the U.S. military when he was attacked by an IED.

7124. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Renfro.

7125. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7126. As a result of the attack and the injuries suffered, Michael Roy Renfro is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 759. THE MARCH 13, 2004 ATTACK – RAMADI

#### A. PLAINTIFF BRIAN PATRICK MCPHERSON

7127. Plaintiff Brian Patrick McPherson is a U.S. citizen domiciled in Oklahoma.

7128. On March 13, 2004, Brian Patrick McPherson was serving in the U.S. military when he was attacked by an IED.

7129. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. McPherson.

7130.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7131.   As a result of the attack and the injuries suffered, Brian Patrick McPherson is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 760.   THE MARCH 10, 2004 ATTACK – ISKANDARIYA

### A.   PLAINTIFF LARRY JAMES MAYS, JR.

7132.   Plaintiff Larry James Mays, Jr. is a U.S. citizen domiciled in Tennessee.

7133.   On March 10, 2004, Larry James May, Jr. was serving in the U.S. military when he was attacked by an IED.

7134.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Mays.

7135.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7136.   As a result of the attack and the injuries suffered, Larry James Mays, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 761.   THE MARCH 2, 2004 ATTACK – BAGHDAD

### A.   PLAINTIFFS THE DAVID MICHAEL SIMMS FAMILY

7137.   Plaintiff David Michael Simms is a U.S. citizen domiciled in Mississippi.

7138.   On March 2, 2004, David Michael Simms was serving in the U.S. military when he was attacked by rockets and mortars.

7139.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Simms.

7140.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7141.   As a result of the attack and the injuries suffered, David Michael Simms is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7142.   Plaintiff Alexis B. Riley is a citizen of the United States domiciled in Mississippi and is the granddaughter of David Michael Simms.

7143.   As a result of the attack and the injuries suffered by David Michael Simms, Plaintiff Alexis B. Riley is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 762.   THE FEBRUARY 4, 2004 ATTACK – SAMARRA

### A.   PLAINTIFFS THE JOSHUA CODY BIRCH FAMILY

7144.   Plaintiff Joshua Cody Birch is a U.S. citizen domiciled in Ohio.

7145.   On n February 4, 2004, Joshua Cody Birch was serving in the U.S. military when he was attacked by an IED.

7146.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Birch.

987

7147.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7148.   As a result of the attack and the injuries suffered, Joshua Cody Birch is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7149.   Plaintiff Heather M. Birch is a citizen of the United States and domiciled in the State of Ohio. She is the wife of Joshua Cody Birch.

7150.   Plaintiff Caryn M. Giroux is a citizen of the United States and domiciled in the State of Ohio. She is the mother of Joshua Cody Birch.

7151.   Plaintiff John R. Birch, Jr. is a citizen of the United States and domiciled in the State of Ohio. He is the father of Joshua Cody Birch.

7152.   Plaintiff Jarod L. Birch is a citizen of the United States and domiciled in the State of Ohio. He is the brother of Joshua Cody Birch.

7153.   Plaintiff Judd W. Birch is a citizen of the United States and domiciled in the State of Ohio. He is the brother of Joshua Cody Birch.

7154.   As a result of the attack and the injuries suffered by Joshua Cody Birch, Plaintiffs Heather M. Birch, Caryn M. Giroux, John R. Birch, Jr., Jarod L. Birch and Judd W. Birch are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 763. THE JANUARY 31, 2004 ATTACK – AL ANBAR PROVINCE

#### A. PLAINTIFFS THE MICHAEL LAWRENCE NEUMANN FAMILY

7155.   Plaintiff Michael Lawrence Neumann is a U.S. citizen domiciled in Colorado.

7156.   On or about January 31, 2004, Michael Lawrence Neumann was serving in the U.S. military when he was attacked by an IED.

7157.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Neumann.

7158.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7159.   As a result of the attack and the injuries suffered, Michael Lawrence Neumann is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7160.   Plaintiff Jasmine Nagel is a citizen of the United States domiciled in Illinois and is the former spouse of Michael Lawrence Neumann.

7161.   Plaintiff Jorie Miller is a citizen of the United States domiciled in Colorado and is the daughter of Michael Lawrence Neumann.

7162.   Plaintiff Caleb Neumann is a citizen of the United States domiciled in Illinois and is the son of Michael Lawrence Neumann.

7163.   Plaintiff R.N., a minor child, represented by his legal guardians, Jasmine Nagel and Michael Lawrence Neumann, is a citizen of the United States domiciled in Illinois and is the son of Michael Lawrence Neumann.

7164.   Plaintiff Tammy Bowman is a citizen of the United States domiciled in Louisiana and is the mother of Michael Lawrence Neumann.

7165.   Plaintiff Vicki Aversano is a citizen of the United States domiciled in Illinois and is the sister of Michael Lawrence Neumann.

7166.   As a result of the attack and the injuries suffered by Michael Lawrence Neumann, Plaintiffs Jasmine Nagel, Jorie Miller, Caleb Neumann, R.N., a minor child, Tammy Bowman and Vicki Aversano, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 764.   THE JANUARY 31, 2004 ATTACK – MOSUL

#### A.   PLAINTIFFS THE NATHANIEL RAY LAMBERT FAMILY

7167.   Plaintiff Nathaniel Ray Lambert is a U.S. citizen domiciled in Washington.

7168.   On January 31, 2004, Nathaniel Ray Lambert was serving in the U.S. military when he was attacked by a VBIED.

7169.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Lambert.

7170.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7171.   As a result of the attack and the injuries suffered, Nathaniel Ray Lambert is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7172.   Plaintiff Jannell D. Lambert is a citizen of the United States domiciled in

990

Washington and is the sister of Nathaniel Ray Lambert.

7173.   As a result of the attack and the injuries suffered by Nathaniel Ray Lambert, Plaintiff Jannell D. Lambert is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 765.   THE JANUARY 27, 2004 ATTACK – BAGHDAD

#### A.    PLAINTIFFS THE DAVID GLENN MCKENZIE, SR. FAMILY

7174.   Plaintiff David Glenn McKenzie, Sr. is a U.S. citizen domiciled in Georgia.

7175.   On January 27, 2004, David Glenn McKenzie, Sr. was serving in the U.S. military when he was attacked by a RPG.

7176.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. McKenzie.

7177.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7178.   As a result of the attack and the injuries suffered, David Glenn McKenzie, Sr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7179.   Plaintiff David Glenn McKenzie, Jr. is a citizen of the United States domiciled in Georgia and is the son of David Glenn McKenzie, Sr.

7180.   Plaintiff Donna LaGina Reid is a citizen of the United States domiciled in Georgia and is the daughter of David Glenn McKenzie, Sr.

7181.   Plaintiff Pearl Jean McKenzie is a citizen of the United States domiciled in

Oregon  and is the mother of David Glenn McKenzie, Sr.

7182.   Plaintiff Lisa Jean Crowder is a citizen of the United States domiciled in Texas and is the  sister of David Glenn McKenzie, Sr.

7183.   Plaintiff Rosemary Middleton is a citizen of the United States domiciled in Georgia and is the aunt of David Glenn McKenzie, Sr.

7184.   As a result of the attack and the injuries suffered by David Glenn McKenzie, Sr., Plaintiffs David Glenn McKenzie, Jr., Donna LaGina Reid, Pearl Jean McKenzie, Lisa Jean Crowder and Rosemary Middleton are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 766.   THE JANUARY 24, 2004 ATTACK - KHALIDIYAH

### A.   PLAINTIFF DAVID KENNETH WILLIAMS

7185.   Plaintiff David Kenneth Williams is a U.S. citizen domiciled in the State of New Mexico.

7186.   On January 24, 2004, David Kenneth Williams was serving in the U.S. military when he was attacked by a VBIED.

7187.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Williams.

7188.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7189.   As a result of the attack and the injuries suffered, David Kenneth Williams is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including

medical expenses, lost income, and loss of earning capacity.

**767. THE JANUARY 18, 2004 ATTACK – BAGHDAD**

    **A.    PLAINTIFF CORY LAMAR EGGLESTON**

7190.  Plaintiff Cory Lamar Eggleston is a U.S. citizen domiciled in Utah.

7191.  On January 18, 2004, Cory Lamar Eggleston was serving in the U.S. military when he was attacked by a VBIED.

7192.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Eggleston.

7193.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7194.  As a result of the attack and the injuries suffered, Cory Lamar Eggleston is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

**768. THE JANUARY 7, 2004 ATTACK – BAGHDAD**

    **A.    PLAINTIFFS THE MICHAEL BENAVIDES, JR. FAMILY**

7195.  Plaintiff Michael Benavides, Jr. is a U.S. citizen domiciled in Texas.

7196.  On January 7, 2004, Michael Benavides, Jr. was serving in the U.S. military when he was attacked by mortars and RPGs.

7197.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Benavides.

7198.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack,

the munition used, as well as the tactics, techniques, and procedures utilized.

7199.  As a result of the attack and the injuries suffered, Michael Benavides, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7200.  Plaintiff Linda Benavides is a citizen of the United States domiciled in Texas and is the mother of Michael Benavides, Jr.

7201.  Plaintiff Michael Benavides is a citizen of the United States domiciled in Texas and is the father of Michael Benavides, Jr.

7202.  Plaintiff Daniel Benavides is a citizen of the United States domiciled in Texas and is the brother of Michael Benavides, Jr.

7203.  Plaintiff Joseph Benavides is a citizen of the United States domiciled in Texas and is the son of Michael Benavides, Jr.

7204.  Plaintiff I.M.B., a minor child, represented by his legal guardian Michael Benavides Jr., is a citizen of the United States domiciled in Texas and is the son of Michael Benavides, Jr.

7205.  Plaintiff Z.M.B., a minor child, represented by his legal guardian Michael Benavides Jr., is a citizen of the United States domiciled in Texas and is the son of Michael Benavides, Jr.

7206.  As a result of the attack and the injuries suffered by Michael Benavides, Jr., Plaintiffs Linda Benavides, Michael Benavides, Daniel Benavides, Joseph Benavides, I.M.B., a minor child and Z.M.B., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss

of consortium, and past and future economic damages, including loss of services and support.

**769. THE DECEMBER 31, 2003 ATTACK – WEST OF SADR CITY**

**A.     PLAINTIFFS THE BENJAMIN VERNON DOLBY FAMILY**

7207.   Plaintiff Benjamin Vernon Dolby is a U.S. citizen domiciled in Pennsylvania.

7208.   On December 31, 2003, Benjamin Vernon Dolby was serving in the U.S. military when he was attacked by a VBIED.

7209.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Dolby.

7210.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7211.   As a result of the attack and the injuries suffered, Benjamin Vernon Dolby is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7212.   Plaintiff Delores Arnold is a citizen of the United States and domiciled in the State of Pennsylvania. She is the ex-wife of Benjamin Vernon Dolby.

7213.   Plaintiff Abbigail Dolby is a citizen of the United States and domiciled in the State of Pennsylvania. She is the daughter of Benjamin Vernon Dolby.

7214.   Plaintiff Valerie Vickery is a citizen of the United States and domiciled in the State of Kentucky. She is the step-daughter of Benjamin Vernon Dolby.

7215.   Plaintiff Vernon Dolby is a citizen of the United States and domiciled in the State of Pennsylvania. He is the father of Benjamin Vernon Dolby.

7216.   Plaintiff Vicki Dolby is a citizen of the United States and domiciled in the State of

Pennsylvania. She is the mother of Benjamin Vernon Dolby.

7217. As a result of the attack and the injuries suffered by Benjamin Vernon Dolby, Plaintiffs Delores Arnold, Abbigail Dolby, Vernon Dolby, Vicki Dolby, and Valerie Vickery, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 770. THE DECEMBER 27, 2003 ATTACK – BAGHDAD

### A. PLAINTIFFS THE RICHARD DEWAYNE FOSTER FAMILY

7218. Plaintiff Richard Dewayne Foster is a U.S. citizen domiciled in Oklahoma.

7219. On December 27, 2003 Richard Dewayne Foster was serving in the U.S. military when he was attacked by RPGs, small arms, and grenades.

7220. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Foster.

7221. The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7222. As a result of the attack and the injuries suffered, Richard Dewayne Foster is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7223. Plaintiff Brandon Michael Foster is a citizen of the United States domiciled in Washington and is the son of Richard Dewayne Foster.

7224. Plaintiff Matthew Ryan Foster is a citizen of the United States domiciled in Washington and is the son of Richard Dewayne Foster.

7225.   As a result of the attack and the injuries suffered by Richard Dewayne Foster, Plaintiffs Brandon Michael Foster and Matthew Ryan Foster are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 771.   THE DECEMBER 25, 2003 ATTACK – FOB SPEICHER

### A.   PLAINTIFFS THE JOSHUA CODY BIRCH FAMILY

7226.   Plaintiff Joshua Cody Birch is a U.S. citizen domiciled in Ohio.

7227.   On December 25, 2003, Joshua Cody Birch was serving in the U.S. military when he was attacked by mortars.

7228.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Birch.

7229.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7230.   As a result of the attack and the injuries suffered, Joshua Cody Birch is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7231.   Plaintiff Heather M. Birch is a citizen of the United States and domiciled in the State of Ohio. She is the wife of Joshua Cody Birch.

7232.   Plaintiff Caryn M. Giroux is a citizen of the United States and domiciled in the State of Ohio. She is the mother of Joshua Cody Birch.

7233.   Plaintiff John R. Birch, Jr. is a citizen of the United States and domiciled in the

State of Ohio. He is the father of Joshua Cody Birch.

7234. Plaintiff Jarod L. Birch is a citizen of the United States and domiciled in the State of Ohio. He is the brother of Joshua Cody Birch.

7235. Plaintiff Judd W. Birch is a citizen of the United States and domiciled in the State of Ohio. He is the brother of Joshua Cody Birch.

7236. As a result of the attack and the injuries suffered by Joshua Cody Birch, Plaintiffs Heather M. Birch, Caryn M. Giroux, John R. Birch, Jr, Jarod L. Birch and Judd W. Birch are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 772. THE DECEMBER 25, 2003 ATTACK – BAQUBA

### A. PLAINTIFFS THE TIMOTHY PADRAIC MCKENZIE FAMILY

7237. Plaintiff Timothy Padraic McKenzie is a U.S. citizen domiciled in Minnesota.

7238. On December 25, 2003, Timothy Padraic McKenzie was serving in the U.S. military when he was attacked by mortars.

7239. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. McKenzie.

7240. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7241. As a result of the attack and the injuries suffered, Timothy Padraic Mckenzie is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7242.   Plaintiff Sara Jayne McKenzie is a citizen of the United States domiciled in Minnesota and is the spouse of Timothy Padraic McKenzie.

7243.   As a result of the attack and the injuries suffered by Timothy Padraic McKenzie, Plaintiff Sara Jayne McKenzie is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 773.   THE DECEMBER 15, 2003 ATTACK – ADHAMIYA

#### A.   PLAINTIFFS THE STEVEN RENALD PEOPLES FAMILY

7244.   Plaintiff Steven Renald Peoples is a U.S. citizen domiciled in Alabama.

7245.   On December 15, 2003, Steven Renald Peoples was serving in the U.S. military when he was attacked by small arms fire, RPGs and mortars.

7246.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Peoples.

7247.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7248.   As a result of the attack and the injuries suffered, Steven Renald Peoples is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7249.   Plaintiff Ajai Lashawn Peoples is a citizen of the United States and domiciled in the State of Alabama. She is the wife of Steven Renald Peoples.

7250.   Plaintiff Jayla Danielle Peoples is a citizen of the United States and domiciled in the State of Alabama. She is the daughter of Steven Renald Peoples.

7251.   Plaintiff A.K.P., a minor child, represented by her legal guardians Steven Renald Peoples and Ajai Lashawn Peoples, is a citizen of the United States and domiciled in the State of Alabama. She is the daughter of Steven Renald Peoples.

7252.   Plaintiff Martrel Ja'quez Peoples is a citizen of the United States and domiciled in the State of Alabama. He is the son of Steven Renald Peoples.

7253.   As a result of the attack and the injuries suffered by Steven Renald Peoples, Plaintiffs Ajai Lashawn Peoples, A.K.P., a minor child, Jayla Danielle Peoples, and Martrel Ja'quez Peoples, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 774.   THE DECEMBER 10, 2003 ATTACK – MOSUL

### A.   PLAINTIFF AARON SCOTT ARTHUR BURKS, SR.

7254.   Plaintiff Aaron Scott Arthur Burks, Sr. is a U.S. citizen domiciled in Ohio.

7255.   On December 10, 2003, Aaron Scott Arthur Burks, Sr. was serving in the U.S. military when he was attacked by an IED.

7256.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Burks.

7257.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7258.   As a result of the attack and the injuries suffered, Aaron Scott Arthur Burks, Sr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 775.  THE DECEMBER 4, 2003 ATTACK – TIKRIT

#### A.  PLAINTIFFS THE KORYLEE CHARLES KAAI FAMILY

7259.  Plaintiff Korylee Charles Kaai is a U.S. citizen domiciled in Texas.

7260.  On December 4, 2003, Korylee Charles Kaai was serving in the U.S. military when he was attacked by RPGs and small arms fire.

7261.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Kaai.

7262.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7263.  As a result of the attack and the injuries suffered, Korylee Charles Kaai is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7264.  Plaintiff A.C.K., a minor child, represented by his legal guardian Korylee Charles Kaai, is a citizen of the United States domiciled in Texas and is the son of Korylee Charles Kaai.

7265.  As a result of the attack and the injuries suffered by Korylee Charles Kaai, Plaintiff A.C.K., a minor child, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 776.  THE NOVEMBER 23, 2003 ATTACK –BAQUBAH

#### A.  PLAINTIFFS THE EDDIE EUGENE MENYWEATHER FAMILY

7266.  On November 23, 2003, Eddie Eugene Menyweather was a U.S. citizen,

domiciled in Texas, and serving in the U.S. military when he was attacked by an IED, causing his death.

7267. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Menyweather.

7268. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

7269. Plaintiff Veronica M. Menyweather is a citizen of the United States domiciled in Texas and is the spouse of Eddie Eugene Menyweather.

7270. Plaintiff Eddie E. Menyweather, Jr. is a citizen of the United States domiciled in Texas and is the son of Eddie Eugene Menyweather.

7271. Plaintiff Gynia M. Menyweather is a citizen of the United States domiciled in Texas and is the daughter of Eddie Eugene Menyweather.

7272. Plaintiff Alfred D. Menyweather is a citizen of the United States domiciled in California and is the brother of Eddie Eugene Menyweather.

7273. Plaintiff Gary A. Menyweather is a citizen of the United States domiciled in Louisiana and is the brother of Eddie Eugene Menyweather.

7274. Plaintiff Linda E. Menyweather is a citizen of the United States domiciled in California and is the sister of Eddie Eugene Menyweather.

7275. Plaintiff Katherine L. Lawler is a citizen of the United States domiciled in California and is the sister of Eddie Eugene Menyweather.

7276. Plaintiff Stephanie M. Menyweather is a citizen of the United States domiciled in California and is the sister of Eddie Eugene Menyweather.

7277.   Plaintiff Dorothy M. Menyweather is a citizen of the United States domiciled in California and is the sister of Eddie Eugene Menyweather.

7278.   Plaintiff Sharon D. Menyweather is a citizen of the United States domiciled in Washington and is the sister of Eddie Eugene Menyweather.

7279.   Plaintiff Lillie R. Menyweather is a citizen of the United States domiciled in California and is the sister of Eddie Eugene Menyweather.

7280.   Plaintiff Eddie E. Edwards is a citizen of the United States domiciled in Louisiana and is the father of Eddie Eugene Menyweather.

7281.   Plaintiff Molivere M. Menyweather is a citizen of the United States domiciled in California and is the mother of Eddie Eugene Menyweather.

7282.   Plaintiff Billie Joyce Edwards is a citizen of the United States domiciled in Louisiana and is the stepmother of Eddie Eugene Menyweather.

7283.   Plaintiff LaTonya R. Edwards is a citizen of the United States domiciled in Louisiana and is the stepsister of Eddie Eugene Menyweather.

7284.   Plaintiff Sharon D. Edwards is a citizen of the United States domiciled in Michigan and is the stepsister of Eddie Eugene Menyweather.

7285.   Plaintiff Shontae T. Edwards is a citizen of the United States domiciled in Louisiana and is the stepbrother of Eddie Eugene Menyweather.

7286.   Plaintiff Eddie E. Edwards, Jr. is a citizen of the United States domiciled in Michigan and is the stepbrother of Eddie Eugene Menyweather.

7287.   Plaintiff Martaveon C. Edwards is a citizen of the United States domiciled in Louisiana and is the stepbrother of Eddie Eugene Menyweather.

7288.   Plaintiff Veronica M. Menyweather, brings an action individually and on behalf

of the pending Estate of Eddie Eugene Menyweather, and all heirs thereof, as its legal representative.

7289. As a result of the attack, and the injuries suffered by and the death of Eddie Eugene Menyweather, Plaintiffs Veronica M. Menyweather, Eddie E. Menyweather, Jr., Gynia M. Menyweather, Alfred D. Menyweather, Gary A. Menyweather, Linda E. Menyweather, Katherine L. Lawler, Stephanie M. Menyweather, Dorothy M. Menyweather, Sharon D. Menyweather, Lillie R. Menyweather, Eddie E. Edwards, Moilvere M. Menyweather, Billie Joyce Edwards, LaTonya R. Edwards, Sharon D. Edwards, Shontae T. Edwards, Eddie E. Edwards, Jr., and Martaveon C. Edwards have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the pending Estate of Eddie Eugene Menyweather.

### 777. THE NOVEMBER 20, 2003 ATTACK – KIRKUK

### A. PLAINTIFF MICHAEL JOSEPH JAMES

7290. Plaintiff Michael Joseph James is a U.S. citizen domiciled in California.

7291. On November 20, 2003, Michael Joseph James was serving in the U.S. military when he was attacked by a VBIED.

7292. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. James.

7293. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7294. As a result of the attack and the injuries suffered, Michael Joseph James is entitled to past and future noneconomic damages, including for severe physical and mental pain

and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 778. THE NOVEMBER 20, 2003 ATTACK – ISKANDARIYA

### A. PLAINTIFFS THE MICHAEL LAMOYNE BURNS FAMILY

7295. Plaintiff Michael LaMoyne Burns is a U.S. citizen domiciled in Texas.

7296. On November 20, 2003, Michael LaMoyne Burns was serving in the U.S. military when he was attacked by rocket mortars.

7297. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Burns.

7298. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7299. As a result of the attack and the injuries suffered, Michael LaMoyne Burns is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7300. Plaintiff Robyn Jeanne Burns is a citizen of the United States domiciled in Texas and is the wife of Michael LaMoyne Burns.

7301. Plaintiff Michaela Nicole Burns is a citizen of the United States domiciled in Texas and is the daughter of Michael LaMoyne Burns.

7302. Plaintiff Ashley Mariah Burns is a citizen of the United States domiciled in Texas and is the daughter of Michael LaMoyne Burns.

7303. Plaintiff Madisson Rose Burns is a citizen of the United States domiciled in Texas and is the daughter of Michael LaMoyne Burns.

7304.   Plaintiff P.M.B., a minor child, represented by her legal guardian Michael LaMoyne Burns and Robyn Jeanne Burns, is a citizen of the United States domiciled in Texas and is the daughter of Michael LaMoyne Burns.

7305.   As a result of the attack and the injuries suffered by Michael LaMoyne Burns, Plaintiffs Robyn Jeanne Burns, Michaela Nicole Burns, Ashley Mariah Burns, Madisson Rose Burns, and P.M.B., a minor, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 779.   THE NOVEMBER 12, 2003 ATTACK – AL-NASIRIYAH

### A.   PLAINTIFFS THE FREDDIE LEE KING, JR. FAMILY

7306.   Plaintiff Freddie Lee King, Jr. is a U.S. citizen domiciled in Texas.

7307.   On November 12, 2003, Freddie Lee King, Jr. was serving in the U.S. military when he was attacked by a VBIED.

7308.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. King.

7309.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7310.   As a result of the attack and the injuries suffered, Freddie Lee King, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7311.   Plaintiff Seda King is a citizen of the United States domiciled in Texas and is the spouse of Freddie Lee King, Jr.

7312.   As a result of the attack and the injuries suffered by Freddie Lee King, Jr., Plaintiff Seda King is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 780.   THE NOVEMBER 12, 2003 ATTACK – NASIRIYA

### A.   PLAINTIFFS THE FLOYD C. PETERS, JR. FAMILY

7313.   Plaintiff Floyd C. Peters, Jr. is a U.S. citizen domiciled in Texas.

7314.   On November 12, 2003, Floyd C. Peters, Jr. was serving in the U.S. military when he was attacked by an RPG, VBIED, mortars, and small arms fire.

7315.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Peters.

7316.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7317.   As a result of the attack and the injuries suffered, Floyd C. Peters, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7318.   Plaintiff Christina Peters is a citizen of the United States domiciled in Texas and is the spouse of Floyd C. Peters, Jr.

7319.   Plaintiff Katlin Peters is a citizen of the United States domiciled in Texas and is the daughter of Floyd C. Peters, Jr.

7320.   Plaintiff Floyd Andrew Peters is a citizen of the United States domiciled in Indiana and is the son of Floyd C. Peters, Jr.

7321.   Plaintiff A.P., a minor child, represented by his legal guardian Christina Peters, is a citizen of the United States domiciled in Texas and is the son of Floyd C. Peters, Jr.

7322.   Plaintiff Santana Marie Peters is a citizen of the United States domiciled in Texas and is the daughter of Floyd C. Peters, Jr.

7323.   Plaintiff G.P., a minor child, represented by her legal guardian Christina Peters, is a citizen of the United States domiciled in Texas and is the daughter of Floyd C. Peters, Jr.

7324.   Plaintiff Linda Peters is a citizen of the United States domiciled in Texas and is the mother of Floyd C. Peters, Jr.

7325.   Plaintiff Floyd C. Peters, Sr., is a citizen of the United States domiciled in Texas and is the father of Floyd C. Peters, Jr.

7326.   Plaintiff Disa Peters Clasen is a citizen of the United States domiciled in Texas and is the sister of Floyd C. Peters, Jr.

7327.   Plaintiff Joy White is a citizen of the United States domiciled in Texas and is the sister of Floyd C. Peters, Jr.

7328.   Plaintiff Lisa Peters Smethurst is a citizen of the United States domiciled in Texas and is the sister of Floyd C. Peters, Jr.

7329.   As a result of the attack and the injuries suffered by Floyd C. Peters, Jr., Plaintiffs Christina Peters, Katlin Peters, Floyd Andrew Peters, A. P. a minor child, Santana Marie Peters, G.P., a minor child, Linda Peters, Floyd C. Peters, Sr., Disa Peters Clasen, Joy White, and Lisa Peters Smethurst, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 781.  THE NOVEMBER 11, 2003 ATTACK – BAGHDAD

### A.  PLAINTIFFS THE ANTOINETTE VERNESTINE SCOTT FAMILY

7330.  Plaintiff Antoinette Vernestine Scott is a U.S. citizen domiciled in the District of Columbia.

7331.  On November 11, 2003, Antoinette Vernestine Scott was serving in the U.S. military when she was attacked by an IED.

7332.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Ms. Scott.

7333.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7334.  As a result of the attack and the injuries suffered, Antoinette Vernestine Scott is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7335.  Plaintiff Rhonda Johnette Hawkins is a citizen of the United States domiciled in the District of Columbia and is the daughter of Antoinette Vernestine Scott.

7336.  Plaintiff Bryttni DeShaun Hawkins is a citizen of the United States domiciled in the District of Columbia and is the daughter of Antoinette Vernestine Scott.

7337.  Plaintiff Renee Balincia Robinson is a citizen of the United States domiciled in the District of Columbia and is the daughter of Antoinette Vernestine Scott.

7338.  Plaintiff Jennie S. Glasgow is a citizen of the United States domiciled in the District of Columbia and is the mother of Antoinette Vernestine Scott.

7339.   Plaintiff Micola Kristy Glasgow is a citizen of the United States domiciled in the District of Columbia and is the sister of Antoinette Vernestine Scott.

7340.   Plaintiff Anthony B. Hawkins is a citizen of the United States domiciled in the District of Columbia and is the brother of Antoinette Vernestine Scott.

7341.   Plaintiff C.S.S., a minor child, represented by her legal guardian Antoinette Vernestine Scott, is a citizen of the United States domiciled in the District of Columbia and is the daughter of Antoinette Vernestine Scott.

7342.   As a result of the attack and the injuries suffered by Antoinette Vernestine Scott, Plaintiffs Rhonda Johnette Hawkins, Bryttni DeShaun Hawkins, Renee Balincia Robinson, Jennie S. Glasgow, Micola Kristy Glasgow, Anthony B. Hawkins and C.S.S., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

**782.   THE NOVEMBER 9, 2003 ATTACK – KIRKUK**

**A.   PLAINTIFFS THE ANDREW PATRICK NALLY FAMILY**

7343.   Plaintiff Andrew Patrick Nally is a U.S. citizen domiciled in Kentucky.

7344.   On November 9, 2003, Andrew Patrick Nally was serving in the U.S. military when he was attacked by an IED.

7345.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Nally.

7346.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7347.   As a result of the attack and the injuries suffered, Andrew Patrick Nally is entitled

1010

to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7348.  Plaintiff Danyelle M. Nally is a citizen of the United States domiciled in Kentucky and is the spouse of Andrew Patrick Nally.

7349.  Plaintiff Andrea D. Nally is a citizen of the United States domiciled in Kentucky and is the daughter of Andrew Patrick Nally.

7350.  Plaintiff Andrew Michael Nally is a citizen of the United States domiciled in Kentucky and is the son of Andrew Patrick Nally.

7351.  Plaintiff Brittany R. Nally is a citizen of the United States domiciled in Kentucky and is the daughter of Andrew Patrick Nally.

7352.  Plaintiff Jasmin M. Grady is a citizen of the United States domiciled in Kentucky and is the step-daughter of Andrew Patrick Nally.

7353.  As a result of the attack and the injuries suffered by Andrew Patrick Nally, Plaintiffs Danyelle M. Nally, Andrea D. Nally, Andrew Michael Nally, Brittany R. Nally, and Jasmin M. Grady, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 783.  THE NOVEMBER 7, 2003 ATTACK – BAGHDAD

### A.  PLAINTIFF RUSSELL LEE COOK JR.

7354.  Plaintiff Russell Lee Cook Jr. is a U.S. citizen domiciled in Florida.

7355.  On November 7, 2003, Russell Lee Cook Jr. was serving in the U.S. military when he was attacked by an IED, RPGs, and small arms fire.

7356.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or

other material support used to commit the attack, which injured Mr. Cook.

7357.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7358.   As a result of the attack and the injuries suffered, Russell Lee Cook Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 784.   THE NOVEMBER 7, 2003 ATTACK – BAGHDAD

### A.   PLAINTIFF JOHN ELDON ADAMIC

7359.   Plaintiff John Eldon Adamic is a U.S. citizen domiciled in Wisconsin.

7360.   On November 7, 2003, John Eldon Adamic was serving in the U.S. military when he was attacked by an IED.

7361.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Adamic.

7362.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7363.   As a result of the attack and the injuries suffered, John Eldon Adamic is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 785. THE NOVEMBER 2, 2003 ATTACK – LATIFIYA

### A. PLAINTIFFS THE TIMOTHY DEMETRIUS JORDAN FAMILY

7364. Plaintiff Timothy Demetrius Jordan is a U.S. citizen domiciled in Alabama.

7365. On November 2, 2003, Timothy Demetrius Jordan was serving in the U.S. military when he was attacked by an IED.

7366. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Jordan.

7367. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7368. As a result of the attack and the injuries suffered, Timothy Demetrius Jordan is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7369. Plaintiff Carolyn Jordan is a citizen of the United States domiciled in Alabama and is the spouse of Timothy Demetrius Jordan.

7370. Plaintiff Chastity J. Jordan is a citizen of the United States domiciled in Alabama and is the daughter of Timothy Demetrius Jordan.

7371. Plaintiff Timeka Denise Tyler is a citizen of the United States domiciled in Georgia and is the daughter of Timothy Demetrius Jordan.

7372. Plaintiff Denson Jordan, Sr., is a citizen of the United States domiciled in Alabama and is the father of Timothy Demetrius Jordan.

7373. Plaintiff Linda Rose Jordan is a citizen of the United States domiciled in Alabama and is the mother of Timothy Demetrius Jordan.

7374.  Plaintiff Denson Jordan, Jr., is a citizen of the United States domiciled in Alabama and is the brother of Timothy Demetrius Jordan.

7375.  Plaintiff Monique Jordan is a citizen of the United States domiciled in South Carolina and is the sister of Timothy Demetrius Jordan.

7376.  Plaintiff Samaria Jordan is a citizen of the United States domiciled in Georgia and is the sister of Timothy Demetrius Jordan.

7377.  Plaintiff Melanie Jordan Thomas is a citizen of the United States domiciled in Alabama and is the sister of Timothy Demetrius Jordan.

7378.  As a result of the attack and the injuries suffered by Timothy Demetrius Jordan, Plaintiffs Carolyn Jordan, Chastity J. Jordan, Timeka Denise Tyler, Denson Jordan, Sr., Linda Rose Jordan, Denson Jordan, Jr., Monique Jordan, Samaria Jordan, and Melanie Jordan Thomas are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 786.  THE NOVEMBER 1, 2003 ATTACK – BAQUBAH

### A.  PLAINTIFFS THE DERRICK JERMALE MITCHELL FAMILY

7379.  Plaintiff Derrick Jermale Mitchell is a U.S. citizen domiciled in Virginia.

7380.  On November 1, 2003, Derrick Jermale Mitchell was serving in the U.S. military when he was attacked by an IED.

7381.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Mitchell.

7382.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

1014

7383.  As a result of the attack and the injuries suffered, Derrick Jermale Mitchell is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7384.  Plaintiff Raphael Mitchell is a citizen of the United States domiciled in North Carolina and is the father of Derrick Jermale Mitchell.

7385.  Plaintiff Deyonne Mitchell is a citizen of the United States domiciled in Virginia and is the daughter of Derrick Jermale Mitchell.

7386.  As a result of the attack and the injuries suffered by Derrick Jermale Mitchell, Plaintiffs Raphael Mitchell and Deyonne Mitchell, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 787.  THE OCTOBER 27, 2003 ATTACK – BAGHDAD

### A.  PLAINTIFFS THE AUBREY DALE BELL FAMILY

7387. On October 27, 2003, Aubrey Dale Bell was a U.S. citizen, domiciled in Alabama, and serving in the U.S. military when he was attacked by small arms fire and a VBIED, causing his death.

7388.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Bell.

7389.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

7390.  Plaintiff Philandria Ezell is a citizen of the United States and domiciled in the

State of Alabama. She is the widow of Aubrey Dale Bell.

7391. Plaintiff Roxie Bell is a citizen of the United States and domiciled in the state of Alabama. She is the mother of Aubrey Dale Bell.

7392. Plaintiff Tiffany Nicole Ezell is a citizen of the United States and domiciled in the state of Alabama. She is the daughter of Aubrey Dale Bell.

7393. Plaintiff La'Darius Bernard Ezell is a citizen of the United States and domiciled in the State of Alabama. He is the son of Aubrey Dale Bell.

7394. Plaintiff Kyser Ezell is a citizen of the United States and domiciled in the state of Alabama. He is the son of Aubrey Dale Bell.

7395. Plaintiff D'Zundria Ezell is a citizen of the United States and domiciled in the State of Georgia. She is the daughter of Aubrey Dale Bell.

7396. Plaintiff Philandria Ezell brings an action individually, and on behalf of the Estate of Aubrey Dale Bell, and all heirs thereof, as its legal representative.

7397. As a result of the attack, and the injuries suffered by and the death of Aubrey Dale Bell, Plaintiffs Philandria Ezell, Roxie Bell, D'Zundria Ezell, Tiffany Nicole Ezell, Kyser Ezell, and La'Darius Bernard Ezell have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Aubrey Dale Bell.

## 788. THE OCTOBER 27, 2003 ATTACK – BAGHDAD

### A. PLAINTIFF TROY JAMES TUSCHEL

7398. Plaintiff Troy James Tuschel is a U.S. citizen domiciled in Wisconsin.

7399. On October 27, 2003, Troy James Tuschel was serving in the U.S. military when he was attacked by a VBIED.

7400.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Tuschel.

7401.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7402.   As a result of the attack and the injuries suffered, Troy James Tuschel is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 789.   THE OCTOBER 27, 2003 ATTACK – BAGHDAD

### A.   PLAINTIFFS THE ROOSEVELT ROSS, JR. FAMILY

7403.   Plaintiff Roosevelt Ross, Jr. is a U.S. citizen domiciled in Alabama.

7404.   On October 27, 2003, Roosevelt Ross, Jr. was serving in the U.S. military when he was attacked by a Suicide Bomb/VBIED.

7405.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Ross.

7406.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7407.   As a result of the attack and the injuries suffered, Roosevelt Ross, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7408.   Plaintiff Trinity G. Ross is a citizen of the United States domiciled in Alabama

1017

and is the daughter of Roosevelt Ross, Jr.

7409.   Plaintiff Roosevelt Ross, Sr. is a citizen of the United States domiciled in Alabama and is the father of Roosevelt Ross, Jr.

7410.   Plaintiff Ethel Ross Gowdy is a citizen of the United States domiciled in Alabama and is the sister of Roosevelt Ross, Jr.

7411.   Plaintiff Theresa Ross Jones is a citizen of the United States domiciled in Alabama and is the sister of Roosevelt Ross, Jr.

7412.   Plaintiff Jemilia Ross Polius is a citizen of the United States domiciled in Alabama and is the sister of Roosevelt Ross, Jr.

7413.   Plaintiff Darel Ross is a citizen of the United States domiciled in Alabama and is the brother of Roosevelt Ross, Jr.

7414.   Plaintiff Deborah Barnett Ross is a citizen of the United States domiciled in Alabama and is the sister of Roosevelt Ross, Jr.

7415.   Plaintiff Helen Ross is a citizen of the United States domiciled in Alabama and is the sister of Roosevelt Ross, Jr.

7416.   Plaintiff John Henry Ross is a citizen of the United States domiciled in Georgia and is the brother of Roosevelt Ross, Jr.

7417.   Plaintiff Syderia Rosate Ross is a citizen of the United States domiciled in Alabama and is the sister of Roosevelt Ross, Jr.

7418.   Plaintiff Conilia Ross Yobo is a citizen of the United States domiciled in Alabama and is the sister of Roosevelt Ross, Jr.

7419.   As a result of the attack and the injuries suffered by Roosevelt Ross, Jr., Plaintiffs Trinity G. Ross, Roosevelt Ross, Sr., Ethel Ross Gowdy, Theresa Ross Jones, Jemilia Ross

Polius, Darel Ross, Deborah Barnett Ross, Helen Ross, John Henry Ross, Syderia Rosate Ross, Conilia Ross Yobo, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 790. THE OCTOBER 25, 2003 ATTACK – BAQUBA

#### A. PLAINTIFFS THE TIMOTHY PADRAIC MCKENZIE FAMILY

7420. Plaintiff Timothy Padraic McKenzie is a U.S. citizen domiciled in Minnesota.

7421. On October 25, 2003, Timothy Padraic McKenzie was serving in the U.S. military when he was attacked by an IED.

7422. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. McKenzie.

7423. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7424. As a result of the attack and the injuries suffered, Timothy Padraic McKenzie is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7425. Plaintiff Sara Jayne McKenzie is a citizen of the United States domiciled in Minnesota and is the spouse of Timothy Padraic McKenzie.

7426. As a result of the attack and the injuries suffered by Timothy Padraic McKenzie, Plaintiff Sara Jayne McKenzie is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 791.  THE OCTOBER 22, 2003 ATTACK – KADIMIYAH

#### A.  PLAINTIFF JUSTIN RAY MORGAN

7427.  Plaintiff Justin Ray Morgan is a U.S. citizen domiciled in Oklahoma.

7428.  On October 22, 2003, Justin Ray Morgan was serving in the U.S. military when he was attacked by RPGs and small arms.

7429.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Morgan.

7430.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7431.  As a result of the attack and the injuries suffered, Justin Ray Morgan is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 792.  THE OCTOBER 21, 2003 ATTACK – ABU GHRAIB

#### A.  PLAINTIFFS THE JOHN DERRICK FLAMER FAMILY

7432.  Plaintiff John Derrick Flamer is a U.S. citizen domiciled in Maryland.

7433.  On October 21, 2003, John Derrick Flamer was serving in the U.S. military when he was attacked by an IED.

7434.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Flamer.

7435.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7436. As a result of the attack and the injuries suffered, John Derrick Flamer is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7437. Plaintiff Thelma Flamer is a citizen of the United States domiciled in Maryland and is the spouse of John Derrick Flamer.

7438. Plaintiff Derrick Lamar Flamer is a citizen of the United States domiciled in Maryland and is the son of John Derrick Flamer.

7439. Plaintiff Kennard Williams is a citizen of the United States domiciled in Maryland and is the son of John Derrick Flamer.

7440. Plaintiff Cherlyn F. Williams is a citizen of the United States domiciled in Pennsylvania and is the sister of John Derrick Flamer.

7441. Plaintiff Reginald Boyd is a citizen of the United States domiciled in Pennsylvania and is the half-brother of John Derrick Flamer.

7442. Plaintiff Olivia J. Flamer is a citizen of the United States domiciled in Pennsylvania and is the mother of John Derrick Flamer.

7443. As a result of the attack and the injuries suffered by John Derrick Flamer, Plaintiffs Thelma Flamer, Derrick Lamar Flamer, Kennard Williams, Cherlyn F. Williams, Reginald Boyd, and Olivia J. Flamer are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 793. THE OCTOBER 11, 2003 ATTACK – TAJI

### A. PLAINTIFF JASON RICHARD GOLBRANSON

7444. Plaintiff Jason Richard Golbranson is a U.S. citizen domiciled in Massachusetts.

7445. On October 11, 2003, Jason Richard Golbranson was serving in the U.S. military when he was attacked by an IED.

7446. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Golbranson.

7447. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7448. As a result of the attack and the injuries suffered, Jason Richard Golbranson is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 794. THE OCTOBER 10, 2003 ATTACK – KIRKUK

### A. PLAINTIFFS THE KORYLEE CHARLES KAAI FAMILY

7449. Plaintiff Korylee Charles Kaai is a U.S. citizen domiciled in Texas.

7450. On or about October 10, 2003, Korylee Charles Kaai was serving in the U.S. military when he was attacked by an IED.

7451. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Kaai.

7452. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7453. As a result of the attack and the injuries suffered, Korylee Charles Kaai is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical

expenses, lost income, and loss of earning capacity.

7454.   Plaintiff A.C.K., a minor child, represented by his legal guardian Korylee Charles Kaai, is a citizen of the United States domiciled in Texas and is the son of Korylee Charles Kaai.

7455.   As a result of the attack and the injuries suffered by Korylee Charles Kaai, Plaintiff A.C.K., a minor child, is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 795.   THE OCTOBER 7, 2003 ATTACK –BALAD

### A.   PLAINTIFFS THE BRIAN BUCK WILHELM FAMILY

7456.   Plaintiff Brian Buck Wilhelm is a U.S. citizen domiciled in Illinois.

7457.   On October 7, 2003, Brian Buck Wilhelm was serving in the U.S. military when he was attacked by an RPG.

7458.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Wilhelm.

7459.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7460.   As a result of the attack and the injuries suffered, Brian Buck Wilhelm is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7461.   Plaintiff Michael Wilhelm is a citizen of the United States domiciled in Iowa and is the father of Brian Buck Wilhelm.

7462.   Plaintiff Rhonda Wilhelm is a citizen of the United States domiciled in Iowa and

is the mother of Brian Buck Wilhelm.

7463. Plaintiff A.M.W., a minor child, represented by her legal guardian Brian Buck Wilhelm, is a citizen of the United States domiciled in Illinois and is the daughter of Brian Buck Wilhelm.

7464. As a result of the attack and the injuries suffered by Brian Buck Wilhelm, Plaintiffs Michael Wilhelm, Rhonda Wilhelm and A.M.W., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 796. THE OCTOBER 7, 2003 ATTACK – BAGHDAD

### A. PLAINTIFFS THE DONALD DANIEL GRANT FAMILY

7465. Plaintiff Donald Daniel Grant is a U.S. citizen domiciled in Georgia.

7466. On October 7, 2003, Donald Daniel Green was serving in the U.S. military when he was attacked by a grenade.

7467. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Grant.

7468. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7469. As a result of the attack and the injuries suffered, Donald Daniel Grant is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7470. Plaintiff Beverly Grant is a citizen of the United States domiciled in Georgia and

is the spouse of Donald Daniel Grant.

7471.   Brionna Denise Grant is a citizen of the United States domiciled in Georgia and is the daughter of Donald Daniel Grant.

7472.   As a result of the attack and the injuries suffered by Donald Daniel Grant, Plaintiffs Beverly Grant and Brionna Denise Grant  are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 797.   THE OCTOBER 3, 2003 ATTACK – BALAD, SALAH AD DIN

### A.   PLAINTIFFS THE PETER KEVIN LANDSTEINER FAMILY

7473.   Plaintiff Peter Kevin Landsteiner is a U.S. citizen domiciled in Texas.

7474.   On October 3, 2003, Peter Kevin Landsteiner was serving in the U.S. military when he was attacked by mortar.

7475.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Landsteiner.

7476.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7477.   As a result of the attack and the injuries suffered, Peter Kevin Landsteiner is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7478.   Plaintiff Florence L. Eichten-Landsteiner is a citizen of the United States domiciled in Texas and is the spouse of Peter Kevin Landsteiner.

7479.  Plaintiff Jacob Dakota Landsteiner is a citizen of the United States domiciled in Texas and is the son of Peter Kevin Landsteiner.

7480.  Plaintiff Jackson Cole Landsteiner is a citizen of the United States domiciled in Texas and is the son of Peter Kevin Landsteiner.

7481.  As a result of the attack and the injuries suffered by Peter Kevin Landsteiner, Plaintiffs Florence L. Eichten-Landsteiner, Jacob Dakota Landsteiner and Jackson Cole Landsteiner are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 798.    THE OCTOBER 3, 2003 ATTACK - SADIYAH

### A.    PLAINTIFFS THE JAMES HEATH PIRTLE FAMILY

7482.  On October 3, 2003, James Heath Pirtle was a U.S. citizen, domiciled in Texas, and serving in the U.S. military when he was attacked by RPGs, causing his death.

7483.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Pirtle.

7484.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

7485.  Plaintiff Ursula Youngerman Pirtle is a citizen of the United States domiciled in Texas and is the spouse of James Heath Pirtle.

7486.  Plaintiff Shane Kaniela Youngerman is a citizen of the United States domiciled in Texas and is the step-son of James Heath Pirtle.

7487.  Plaintiff Kai Samuel Youngerman is a citizen of the United States domiciled in Texas and is the step-son of James Heath Pirtle.

7488. Plaintiff Kay Lynn Beeman is a citizen of the United States domiciled in New Mexico and is the mother of James Heath Pirtle.

7489. Plaintiff Lannie Doyle Pirtle is a citizen of the United States domiciled in Colorado and is the father of James Heath Pirtle.

7490. Plaintiff Houston Ty Pirtle is a citizen of the United States domiciled in Colorado and is the brother of James Heath Pirtle.

7491. Plaintiff Jarrod Matthew Pirtle is a citizen of the United States domiciled in California and is the brother of James Heath Pirtle.

7492. Plaintiff Ranger Ira Pirtle is a citizen of the United States domiciled in Colorado and is the brother of James Heath Pirtle.

7493. Plaintiff Ursula Youngerman Pirtle, brings an action individually and on behalf of the Estate of James Heath Pirtle, and all heirs thereof, as its anticipated legal representative.

7494. As a result of the attack, and the injuries suffered by and the death of James Heath Pirtle, Plaintiffs Ursula Youngerman Pirtle, Shane Kaniela Youngerman, Kai Samuel Youngerman, Kay Lynn Beeman, Lannie Doyle Pirtle, Houston Ty Pirtle, Jarrod Matthew Pirtle, and Ranger Ira Pirtle have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of James Heath Pirtle.

### 799. THE OCTOBER 1, 2003 ATTACK - SAMARRA

#### A. PLAINTIFFS THE JAMES DAVID BLANKENBECLER FAMILY

7495. On October 1, 2003, James David Blankenbecler was a U.S. citizen, domiciled in Texas, and serving in the U.S. military when he was attacked by RPGs, causing his death.

1027

7496.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Blankenbecler.

7497.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

7498.   Plaintiff Linnie Alma Blankenbecler is a citizen of the United States domiciled in Texas and is the spouse of James David Blankenbecler.

7499.   Plaintiff Joseph Alexander Morales is a citizen of the United States domiciled in Texas and is the son of James David Blankenbecler.

7500.   Plaintiff Amanda Marie Villalobos is a citizen of the United States domiciled in Florida and is the daughter of James David Blankenbecler.

7501.   Plaintiff Jessica Marie Scaduto is a citizen of the United States domiciled in Texas and is the daughter of James David Blankenbecler.

7502.   Plaintiff Linnie Alma Blankenbecler, brings an action individually and on behalf of the Estate of James David Blankenbecler, and all heirs thereof, as its legal representative.

7503.   As a result of the attack, and the injuries suffered by and the death of James David Blankenbecler, Plaintiffs Linnie Alma Blankenbecler, Joseph Alexander Morales, Amanda Marie Villalobos, and Jessica Marie Scaduto have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of James David Blankenbecler.

### 800.   THE SEPTEMBER 26, 2003 ATTACK – BAGHDAD

### A.    PLAINTIFFS THE BRIAN DOUGLAS KING FAMILY

7504.   Plaintiff Brian Douglas King is a U.S. citizen domiciled in Texas.

7505.   On September 26, 2003, Brian Douglas King was serving in the U.S. military when he was attacked by an IED and small arms.

7506.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. King.

7507.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7508.   As a result of the attack and the injuries suffered, Brian Douglas King is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7509.   Plaintiff Nathan Zachary King is a citizen of the United States domiciled in Texas and is the son of Brian Douglas King.

7510.   Plaintiff Samantha Rose Wendland is a citizen of the United States domiciled in California and is the daughter of Brian Douglas King.

7511.   Plaintiff Amanda Marie Wendland is a citizen of the United States domiciled in Texas and is the daughter of Brian Douglas King.

7512.   Plaintiff Yvette Renee Rennaker is a citizen of the United States domiciled in Texas and is the sister of Brian Douglas King.

7513.   As a result of the attack and the injuries suffered by Brian Douglas King, Plaintiffs Nathan Zachary King, Samantha Rose Wendland, Amanda Marie Wendland and Yvette Renee Rennaker are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of

consortium, and past and future economic damages, including loss of services and support.

### 801.   THE SEPTEMBER 18, 2003 ATTACK – BAGHDAD

### A.   PLAINTIFFS THE WILLIAM FRANKLIN GUNTER FAMILY

7514.   Plaintiff William Franklin Gunter is a U.S. citizen domiciled in Tennessee.

7515.   On September 18, 2003, William Franklin Gunter was serving in the U.S. military when he was attacked by a mortar.

7516.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Gunter.

7517.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7518.   As a result of the attack and the injuries suffered, William Franklin Gunter is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7519.   Plaintiff Dianne Gunter is a citizen of the United States domiciled in South Carolina and is the spouse of William Franklin Gunter.

7520.   Plaintiff Clifford Edward Gunter is a citizen of the United States domiciled in South Carolina and is the son of William Franklin Gunter.

7521.   Plaintiff Victoria Lee Gunter is a citizen of the United States domiciled in South Carolina and is the daughter of William Franklin Gunter.

7522.   Plaintiff Sara Moon is a citizen of the United States domiciled in South Carolina and is the mother of William Franklin Gunter.

7523.   Plaintiff Patricia Sue Malpass is a citizen of the United States domiciled in South

Carolina and is the sister of William Franklin Gunter.

7524.  Plaintiff Peggy Ann Lewis is a citizen of the United States domiciled in South Carolina and is the sister of William Franklin Gunter.

7525.  As a result of the attack and the injuries suffered by William Franklin Gunter, Plaintiffs Dianne Gunter, Clifford Edward Gunter, Victoria Lee Gunter, Sara Moon, Patricia Sue Malpass, and Peggy Ann Lewis are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 802.  THE SEPTEMBER 14, 2003 ATTACK – FALLUJAH

### A.  PLAINTIFF GEORGE PEREZ

7526.  Plaintiff George Perez is a U.S. citizen domiciled in North Carolina.

7527.  On September 14, 2003, George Perez was serving in the U.S. military when he was attacked by an IED.

7528.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Perez.

7529.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7530.  As a result of the attack and the injuries suffered, George Perez is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 803. THE SEPTEMBER 1, 2003 ATTACK – BALAD

### A. PLAINTIFFS THE ALEX PHONGPHACHONE FAMILY

7531.  Plaintiff Alex Phongphachone is a U.S. citizen domiciled in Pennsylvania.

7532.  On September 1, 2003, Alex Phongphachone was serving in the U.S. military when he was attacked by a daisy-chain IED.

7533.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Phongphachone.

7534.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7535.  As a result of the attack and the injuries suffered, Alex Phongphachone is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7536.  Plaintiff Ryan Michael Phongphachone is a citizen of the United States domiciled in Pennsylvania and is son of Alex Phongphachone.

7537.  Plaintiff Lauren Macey Phongphachone is a citizen of the United States domiciled in Pennsylvania and is the daughter of Alex Phongphachone.

7538.  As a result of the attack and the injuries suffered by Alex Phongphachone, Plaintiffs Ryan Michael Phongphachone and Lauren Macey Phongphachone are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

**804. THE AUGUST 30, 2003 ATTACK – DORA**

    **A. PLAINTIFF WILLIAM LEE NELSON**

7539. Plaintiff William Lee Nelson is a U.S. citizen domiciled in Texas.

7540. On August 30, 2003, William Lee Nelson was serving in the U.S. military when he was attacked by an IED and small arms.

7541. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Nelson.

7542. The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7543. As a result of the attack and the injuries suffered, William Lee Nelson is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

**805. THE AUGUST 28, 2003 ATTACK – ABU GHRAIB**

    **A. PLAINTIFF CHRISTOPHER MICHAEL KNAPP**

7544. Plaintiff Christopher Michael Knapp is a U.S. citizen domiciled in Kansas.

7545. On August 28, 2003, Christopher Michael Knapp was serving in the U.S. military when he was attacked by an IED.

7546. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Knapp.

7547. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7548.   As a result of the attack and the injuries suffered, Christopher Michael Knapp is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 806.   THE AUGUST 25, 2003 ATTACK – FALLUJAH

#### A.   PLAINTIFF ERICK CASTRO

7549.   Plaintiff Erick Castro is a U.S. citizen domiciled in California.

7550.   On August 25, 2003, Erick Castro was serving in the U.S. military when he was attacked by RPG.

7551.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Castro.

7552.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7553.   As a result of the attack and the injuries suffered, Erick Castro is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 807.   THE AUGUST 16, 2003 ATTACK – KIRKUK

#### A.   PLAINTIFFS THE FRANCISCO RAMIREZ FAMILY

7554.   Plaintiff Francisco Ramirez is a U.S. citizen domiciled in California.

7555.   On August 16, 2003, Francisco Ramirez was serving in the U.S. military when he was attacked by small arms fire.

7556.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or

other material support used to commit the attack, which injured Mr. Ramirez.

7557.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7558.   As a result of the attack and the injuries suffered, Francisco Ramirez is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7559.   Plaintiff Delfina Zarate is a citizen of the United States domiciled in California and is the mother of Francisco Ramirez.

7560.   Plaintiff Mario Aurelio Nunez is a citizen of the United States domiciled in California and is the brother of Francisco Ramirez.

7561.   Plaintiff Salvador Ramirez is a citizen of the United States domiciled in California and is the step-brother of Francisco Ramirez.

7562.   Plaintiff Francisco Ramirez Figueroa is a citizen of the United States domiciled in California and is the father of Francisco Ramirez.

7563.   Plaintiff Marisela Ramirez Perez is a citizen of the United States domiciled in California and is the step-sister of Francisco Ramirez.

7564.   Plaintiff Hector Ramirez Perez is a citizen of the United States domiciled in Arizona and is the step-brother of Francisco Ramirez.

7565.   As a result of the attack and the injuries suffered by Francisco Ramirez, Plaintiffs Delfina Zarate, Mario Aurelio Nunez, Salvador Ramirez, Francisco Ramirez Figueroa, Marisela Ramirez Perez and Hector Ramirez Perez are entitled to past and future noneconomic damages,

including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 808. THE AUGUST 11, 2003 ATTACK – NEAR BAGHDAD

### A. PLAINTIFFS THE ANTONIO JOSE MORA FAMILY

7566. Plaintiff Antonio Jose Mora is a U.S. citizen domiciled in New Mexico.

7567. On August 11, 2003, Antonio Jose Mora was serving in the U.S. military when he was attacked by an RPG and small arms fire.

7568. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Mora.

7569. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7570. As a result of the attack and the injuries suffered, Antonio Jose Mora is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7571. Plaintiff Francis M. Lovato is a citizen of the United States domiciled in New Mexico and is the mother of Antonio Jose Mora.

7572. Plaintiff A.R.M., a minor child, represented by her legal guardian Antonio Jose Mora, is a citizen of the United States domiciled in New Mexico and is the daughter of Antonio Jose Mora.

7573. As a result of the attack and the injuries suffered by Antonio Jose Mora, Plaintiffs Francis M. Lovato and A.R.M., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of

solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 809.  THE AUGUST 1, 2003 ATTACK – JAR SILAH

#### A.  PLAINTIFFS THE JUSTIN WILLIAM HEBERT FAMILY

7574.  On August 1, 2003, Justin William Hebert was a U.S. citizen, domiciled in Washington, and serving in the U.S. military when he was attacked by RPGs, causing his death.

7575.  Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Hebert.

7576.  The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

7577.  Plaintiff Jessica Michele Hebert is a citizen of the United States domiciled in Washington and is the sister of Justin William Hebert.

7578.  Plaintiff Jessica Michele Hebert, brings an action individually and on behalf of the Estate of Justin William Hebert, and all heirs thereof, as its legal representative.

7579.  As a result of the attack, and the injuries suffered by and the death of Justin William Hebert, Plaintiff Jessica Michele Hebert has suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Justin William Hebert.

### 810.  THE JULY 31, 2003 ATTACK – BAGHDAD

#### A.  PLAINTIFFS THE SAMUEL SPARKS, III FAMILY

7580.  Plaintiff Samuel Sparks, III is a U.S. citizen domiciled in Alabama.

7581.  On July 31, 2003, Samuel Sparks, III was serving in the U.S. military when he

was attacked by an RPG.

7582.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Sparks.

7583.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7584.   As a result of the attack and the injuries suffered, Samuel Sparks, III is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7585.   Plaintiff Cassandra Williams Sparks is a citizen of the United States domiciled in Alabama and is the ex-spouse of Samuel Sparks, III.

7586.   Plaintiff Samuel Sparks, IV, is a citizen of the United States domiciled in Alabama and is the son of Samuel Sparks, III.

7587.   Plaintiff Brandon M. Williams is a citizen of the United States domiciled in Alabama and is the step-son of Samuel Sparks, III.

7588.   Plaintiff Douglas Sparks is a citizen of the United States domiciled in Alabama and is the brother of Samuel Sparks, III.

7589.   Plaintiff Pamela Sparks-Smith is a citizen of the United States domiciled in Alabama and is the sister of Samuel Sparks, III.

7590.   Plaintiff Brenda Elaine Stephens is a citizen of the United States domiciled in Alabama and is the sister of Samuel Sparks, III.

7591.   As a result of the attack and the injuries suffered by Samuel Sparks, III, Plaintiffs

Cassandra Williams Sparks, Samuel Sparks, IV, Brandon M. Williams, Douglas Sparks, Pamela Sparks-Smith, and Brenda Elaine Stephens are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 811.    THE JULY 30, 2003 ATTACK – NASIRIYAH

### A.    PLAINTIFFS THE DAMIEN CARL WEEKS FAMILY

7592.   Plaintiff Damien Carl Weeks is a U.S. citizen domiciled in Alabama.

7593.   On or about July 30, 2003, Damien Carl Weeks was serving in the U.S. military when he was attacked by small arms fire.

7594.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Weeks.

7595.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7596.   As a result of the attack and the injuries suffered, Damien Carl Weeks is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7597.   Plaintiff Delilah L. Griffith is a citizen of the United States domiciled in Alabama and is the mother of Damien Carl Weeks.

7598.   As a result of the attack and the injuries suffered by Damien Carl Weeks, Plaintiff Delilah L. Griffith is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 812.   THE JULY 23, 2003 ATTACK – RAMADI

### A.   PLAINTIFFS THE JOSHUA TODD BYERS FAMILY

7599.   On July 23, 2003, Decedent Joshua Todd Byers was a U.S. citizen, domiciled in Colorado, and serving in the U.S. military when he was attacked by an IED, causing his death.

7600.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack on Mr. Byers.

7601.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, as well as the munition and tactics, techniques, and procedures utilized.

7602.   Plaintiff Milam Byers is a citizen of the United States domiciled in Arizona and is the brother of Joshua Todd Byers.

7603.   Plaintiff Milam Byers, brings an action individually and on behalf of the Estate of Joshua Todd Byers, and all heirs thereof, as its legal representative.

7604.   Plaintiff Mary A. Byers is a citizen of the United States domiciled in Tennessee and is the mother of Joshua Todd Byers.

7605.   Plaintiff Lloyd Charles Byers is a citizen of the United States domiciled in Tennessee and is the father of Joshua Todd Byers.

7606.   Plaintiff Jared Ryan Byers is a citizen of the United States domiciled in Tennessee and is the brother of Joshua Todd Byers.

7607.   As a result of the attack, and the injuries suffered by and the death of Joshua Todd Byers, Plaintiffs Milam Byers, Mary A. Byers, Lloyd Charles Byers, and Jared Ryan Byers have suffered severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of society, services, companionship, comfort, protection, instruction, advice and counsel, and loss of earnings, income, and net accumulation to the Estate of Joshua Todd Byers.

### 813. THE JULY 15, 2003 ATTACK – TIKRIT

#### A. PLAINTIFF JASON KELLY WASHBURN

7608. Plaintiff Jason Kelly Washburn is a U.S. citizen domiciled in Texas.

7609. On July 15, 2003, Jason Kelly Washburn was serving in the U.S. military when he was attacked by an RPG.

7610. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Washburn.

7611. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7612. As a result of the attack and the injuries suffered, Jason Kelly Washburn is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 814. THE JULY 8, 2003 ATTACK – BAGHDAD

#### A. PLAINTIFFS THE JOHNNY JEFFERSON CRAIN FAMILY

7613. Plaintiff Johnny Jefferson Crain is a U.S. citizen domiciled in North Carolina.

7614. On July 8, 2003, Johnny Jefferson Crain was serving in the U.S. military when he was attacked by an IED.

7615. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Crain.

7616. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7617.  As a result of the attack and the injuries suffered, Johnny Jefferson Crain is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7618.  Plaintiff Wilma Jane Kidd is a citizen of the United States domiciled in North Carolina and is the mother of Johnny Jefferson Crain.

7619.  Plaintiff Tonja Davenport is a citizen of the United States domiciled in Georgia and is the former spouse of Johnny Jefferson Crain.

7620.  Plaintiff Amaris Brook Crain is a citizen of the United States domiciled in Georgia and is the daughter of Johnny Jefferson Crain.

7621.  Plaintiff Darby Jane Crain is a citizen of the United States domiciled in Georgia and is the daughter of Johnny Jefferson Crain.

7622.  Plaintiff John Sawyer Crain is a citizen of the United States domiciled in North Carolina and is the son of Johnny Jefferson Crain.

7623.  As a result of the attack and the injuries suffered by Johnny Jefferson Crain, Plaintiffs Wilma Jane Kidd, Tonja Davenport, Amaris Brook Crain, Darby Jane Crain and John Sawyer Crain are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 815.  THE JULY 8, 2003 ATTACK – BAGHDAD

### A.  PLAINTIFFS THE RAY BOYD ROBINSON FAMILY

7624.  Plaintiff Ray Boyd Robinson is a U.S. citizen domiciled in Colorado.

7625.  On July 8, 2003, Ray Boyd Robinson was serving in the U.S. military when he was attacked by an anti-tank mine.

7626.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Robinson.

7627.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7628.   As a result of the attack and the injuries suffered, Ray Boyd Robinson is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7629.   Plaintiff April D. McTighe is a citizen of the United States domiciled in Florida and is the former spouse of Ray Boyd Robinson.

7630.   Plaintiff Aurora D. Robinson is a citizen of the United States domiciled in Colorado and is the daughter of Ray Boyd Robinson.

7631.   Plaintiff Faith Robinson is a citizen of the United States domiciled in Colorado and is the daughter of Ray Boyd Robinson.

7632.   Plaintiff Dakotah Robinson is a citizen of the United States domiciled in Colorado and is the son of Ray Boyd Robinson.

7633.   As a result of the attack and the injuries suffered by Ray Boyd Robinson, Plaintiffs April D. McTighe, Aurora D. Robinson, Faith Robinson and Dakotah Robinson, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 816.   THE JULY 5, 2003 ATTACK – BAGHDAD

#### A.   PLAINTIFFS THE RICARDO ALFREDO BRIZUELA, JR. FAMILY

7634.   Plaintiff Ricardo Alfredo Brizuela, Jr. is a U.S. citizen domiciled in California.

7635.   On July 5, 2003, Ricardo Alfredo Brizuela, Jr. was serving in the U.S. military when he was attacked by RPGs and small arms fire.

7636.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Brizuela.

7637.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7638.   As a result of the attack and the injuries suffered, Ricardo Alfredo Brizuela, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7639.   Plaintiff Alexander Anthony Brizuela is a citizen of the United States domiciled in California and is the son of Ricardo Alfredo Brizuela, Jr.

7640.   As a result of the attack and the injuries suffered by Ricardo Alfredo Brizuela, Jr., Alexander Anthony Brizuela is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 817.   THE JULY 3, 2003 ATTACK – RAMADI

#### A.   PLAINTIFFS THE JOSEPH RAY EASON, SR. FAMILY

7641.   Plaintiff Joseph Ray Eason, Sr. is a U.S. citizen domiciled in Florida.

7642.   On July 3, 2003, Joseph Ray Eason, Sr. was serving in the U.S. military when he was attacked by a mortar.

7643.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Eason.

7644.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7645.   As a result of the attack and the injuries suffered, Joseph Ray Eason, Sr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7646.   Plaintiff Ashley R. Rebstein is a citizen of the United States domiciled in New York and is the daughter of Joseph Ray Eason, Sr.

7647.   Plaintiff F.L.E., a minor child, represented by her legal guardian Joseph Ray Eason, Sr., is a citizen of the United States domiciled in Florida and is the daughter of Joseph Ray Eason, Sr.

7648.   As a result of the attack and the injuries suffered by Joseph Ray Eason, Sr., Plaintiffs Ashley R. Rebstein and F.L.E., a minor child, are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 818.   THE JUNE 30, 2003 ATTACK – HASWA

### A.   PLAINTIFF NELSON ANTONIO MARTINEZFLORES

7649.   Plaintiff Nelson Antonio Martinezflores is a U.S. citizen domiciled in North

Carolina.

7650.   On June 30, 2003, Nelson Antonio Martinezflores was serving in the U.S. military when he was attacked by an IED, RPGs and small arms fire.

7651.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Martinezflores.

7652.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7653.   As a result of the attack and the injuries suffered, Nelson Antonio Martinezflores is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 819.   THE JUNE 3, 2003 ATTACK – BALAD RUZ

#### A.   PLAINTIFF MICHAEL ANDRE DARCY

7654.   Plaintiff Michael Andre Darcy is a U.S. citizen domiciled in Arizona.

7655.   On June 3, 2003, Michael Andre Darcy was serving in the U.S. military when he was attacked by an IED.

7656.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Darcy.

7657.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7658.   As a result of the attack and the injuries suffered, Michael Andre Darcy is entitled to past and future noneconomic damages, including for severe physical and mental pain and

suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 820. THE MAY 28, 2003 ATTACK – BAGHDAD

#### A. PLAINTIFFS THE MICHAEL GAMBLE FAMILY

7659. Plaintiff Michael Gamble is a U.S. citizen domiciled in Kentucky.

7660. On May 28, 2003, Michael Gamble was serving in the U.S. military when he was attacked by small arms fire.

7661. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Gamble.

7662. The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7663. As a result of the attack and the injuries suffered, Michael Gamble is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7664. Plaintiff Shirley Gamble is a citizen of the United States domiciled in Kentucky and is the spouse of Michael Gamble.

7665. As a result of the attack and the injuries suffered by Michael Gamble, Plaintiff Shirley Gamble is entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 821. THE MAY 8, 2003 ATTACK – BAGHDAD

### A. PLAINTIFFS THE BRIAN DOUGLAS KING FAMILY

7666. Plaintiff Brian Douglas King is a U.S. citizen domiciled in Texas.

7667. On May 8, 2003, Brian Douglas King was serving in the U.S. military when he was attacked by a sniper rifle.

7668. Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. King.

7669. The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7670. As a result of the attack and the injuries suffered, Brian Douglas King is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7671. Plaintiff Nathan Zachary King is a citizen of the United States domiciled in Texas and is the son of Brian Douglas King.

7672. Plaintiff Samantha Rose Wendland is a citizen of the United States domiciled in California and is the daughter of Brian Douglas King.

7673. Plaintiff Amanda Marie Wendland is a citizen of the United States domiciled in Texas and is the daughter of Brian Douglas King.

7674. Plaintiff Yvette Renee Rennaker is a citizen of the United States domiciled in Texas and is the sister of Brian Douglas King.

7675. As a result of the attack and the injuries suffered by Brian Douglas King, Plaintiffs Nathan Zachary King, Samantha Rose Wendland, Amanda Marie Wendland and

1048

Yvette Renee Rennaker are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

### 822.   THE MAY 8, 2003 ATTACK – BAGHDAD

#### A.   PLAINTIFFS THE ARTHUR LEE MOYE FAMILY

7676.   Plaintiff Arthur Lee Moye is a U.S. citizen domiciled in Alabama.

7677.   On May 8, 2003, Arthur Lee Moye was serving in the U.S. military when he was attacked by an IED.

7678.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Moye.

7679.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7680.   As a result of the attack and the injuries suffered, Arthur Lee Moye is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

7681.   Plaintiff Debra Blackmon Moye is a citizen of the United States domiciled in Alabama and is the spouse of Arthur Lee Moye.

7682.   Plaintiff Eddie Mae Moye is a citizen of the United States domiciled in Alabama and is the mother of Arthur Lee Moye.

7683.   Plaintiff Shayla Finklea-Pettway is a citizen of the United States domiciled in Alabama and is the daughter of Arthur Lee Moye.

7684.   Plaintiff Jade Moye Berrong is a citizen of the United States domiciled in

Alabama and is the daughter of Arthur Lee Moye.

7685.   As a result of the attack and the injuries suffered by Arthur Lee Moye, Plaintiffs Debra Blackmon Moye, Eddie Mae Moye, Shayla Finklea-Pettway, and Jade Moye Berrong are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## 823.   THE MAY 5, 2003 ATTACK – SAMAWAH

### A.   PLAINTIFF CHARLES EDWARD SLACKS, JR.

7686.   Plaintiff Charles Edward Slacks, Jr. is a U.S. citizen domiciled in Texas.

7687.   On May 5, 2003, Charles Edward Slacks, Jr. was serving in the U.S. military when he was attacked by mortars and small arms fire.

7688.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Slacks.

7689.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7690.   As a result of the attack and the injuries suffered, Charles Edward Slacks, Jr. is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

## 824.   THE MAY 1, 2003 ATTACK – BASRAH

### A.   PLAINTIFF YVENSON GALA

7691.   Plaintiff Yvenson Gala is a U.S. citizen domiciled in Florida.

7692.   On May 1, 2003, Yvenson Gala was serving in the U.S. military when he was

attacked by an IED.

7693.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Gala.

7694.   The Iranian-supported FTO Hezbollah planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7695.   As a result of the attack and the injuries suffered, Yvenson Gala is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity.

### 825.   THE MAY 1, 2003 ATTACK – BAGHDAD

#### A.   PLAINTIFFS THE QUANTE MAURICE EGGLESTON FAMILY

7696.   Plaintiff Quante Maurice Eggleston is a U.S. citizen domiciled in Virginia.

7697.   On May 1, 2003, Quante Maurice Eggleston was serving in the U.S. military when he was attacked by an IED and small arms.

7698.   Iran and/or its Agents and Proxies provided the funding, weapons, training, and/or other material support used to commit the attack, which injured Mr. Eggleston.

7699.   The Iranian-supported FTO AQ planned, committed, and/or authorized the attack, as evident from operational data, including but not limited to the date and location of the attack, the munition used, as well as the tactics, techniques, and procedures utilized.

7700.   As a result of the attack and the injuries suffered, Quante Maurice Eggleston is entitled to past and future noneconomic damages, including for severe physical and mental pain and suffering, loss of enjoyment of life, and past and future economic damages, including

medical expenses, lost income, and loss of earning capacity.

7701.   Plaintiff Tanya Merlon Diggs is a citizen of the United States domiciled in Maryland and is the mother of Quante Maurice Eggleston.

7702.   Plaintiff Terra Simone Eggleston is a citizen of the United States domiciled in Maryland and is the sister of Quante Maurice Eggleston.

7703.   As a result of the attack and the injuries suffered by Quante Maurice Eggleston, Plaintiffs Tanya Merlon Diggs and Terra Simone Eggleston are entitled to past and future noneconomic damages, including for severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services and support.

## VII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### SECONDARY CIVIL LIABILITY UNDER 18 U.S.C. § 2333(d) AGAINST ALL DEFENDANTS FOR CONSPIRACY TO PROVIDE MATERIAL SUPPORT FOR INTERNATIONAL TERRORISM

7704.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

7705.   In knowingly agreeing to provide, and providing, material support or resources explicitly to Foreign Terrorist Organizations (FTOs) in violation of 18 U.S.C. § 2339B, or to other entities who would commit criminal acts, in violation of 18 U.S.C. § 2339A, and knowing, or deliberately indifferent to the fact that the object of the Conspiracy was to provide material support for terrorism, and having committed and completed overt acts in furtherance of the Conspiracy, each Defendant is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(d).

### The Conspiracy

7706. The Bank Defendants conspired with Iran, and Iran's terrorist proxies, to provide material support for terrorism, through providing support to a State Sponsor of Terrorism and its Agents and Proxies, including FTOs Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq.

7707. Once the Conspiracy was formed, all its members, including the Bank Defendants became liable for injuries caused by acts pursuant to or in furtherance of the conspiracy. The Bank Defendants need not have participated actively in or benefited from the wrongful action in order to be found liable. The Bank Defendants need not even have planned or known about the injurious action so long as the purpose of the tortious action was to advance the overall object of the Conspiracy.

### Object of The Conspiracy and the Goals of the Co-Conspirators

7708. The object of the Conspiracy was to provide material support for terrorism.

7709. The Bank Defendant's goal in participating in the conspiracy was based on greed and for financial gain. The bank defendants gained business worth hundreds of millions of dollars.

7710. Iran's goal in participating in the Conspiracy was threefold. By providing material support for terrorism they would: First push coalition forces out of Iraq; second keep Shiites in power, who have strong ties to Iran; and third support Iraqi federalism, as a federal Iraq divided among Shiite, Kurdish, and Sunni regions would be weaker than a strong centralized state.

7711. Iran's terrorist proxies' goals in participating in the Conspiracy were to obtain much needed money and supplies to fund their attacks against the U.S. and coalition forces, and

pay for the terrorist work and activities of their supporters.

## Elements of Conspiracy

7712.   The elements of a conspiracy are:

1.  An agreement to join a conspiracy, which can be inferred from a tacit understanding;
2.  The performance of unlawful acts as part of the conspiracy;
3.  Injury caused by one or more of the parties; and
4.  That these overt acts were pursuant to the common scheme and objective of the conspiracy.

## Evidence of the Agreement

7713.   Each of the Bank Defendants signed Deferred Prosecution Agreements with the Department of Justice, as well as Consent Orders with the NYDFS, outlining the duration, scope, techniques, and volume of transactions, documenting the Bank Defendants' involvement in the conspiracy.   The Statement of Facts in each of those agreements, admitted by the Bank Defendants, detail how each of the Defendants provided illegal access to the U.S. financial system, to Iran and Iran's terrorist proxies, as well as other state sponsors of terror.

7714.   Similarly, many public documents and government reports document how Iran provided direct monetary support by paying terror proxies in Iraq between $4,000 and $13,000 per rocket or roadside bomb.   Public documents and government reports also reveal how Iran established training camps within its border to train its proxies and agents on how to build and place roadside bombs in Iraq.   As one of many examples, the trainer in charge of the attacks in Karbala was paid $3 million in U.S. currency every month.

7715.   Numerous government reports and other publicly available information disseminated prior to and during the period of the conspiracy, of which the Bank Defendants were aware or should have been aware, describe Iran's role in providing assistance to FTOs such as Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq.   State

1054

Department reports issued in 2006, 2007, and 2008 documented Iran's efforts to provide terrorists in Iraq with EFPs, IEDs, rockets, mortars and small arms and to provide training and funding to terror proxies. These reports also connect Hezbollah and the IRGC-QF to sophisticated IED technology.

7716. By agreeing to participate in the funding scheme, the Bank Defendants knew, or should have known, that they were potentially providing material support for terrorism, particularly since Iran had been designated as a State Sponsor of Terrorism as early as 1984, and had been subject to sanctions for many years. The information available to the bank defendants at the time, combined with the banks intentionally seeking ways to surreptitiously arrange for funding and U.S. dollar transfers that did not identify Iranian connections even though legitimate means were in fact available, indicates that at a minimum, the defendant banks knew that what they were doing was illegal.

**Unlawful Acts**

7717. The numerous unlawful acts committed by the Bank Defendants – including stripping financial transactions, disguising payment sources, transferring funds to sanctioned entities, and manually altering payment information – all in an effort to provide material support either explicitly to FTOs, in violation of 18 U.S.C. § 2339B or to other entities who would commit criminal acts, in violation of 18 U.S.C. § 2339A – constitute the "unlawful acts" of defendants in their roles as members of the Conspiracy.

7718. The conduct of the Bank Defendants working with the Iranian entities to develop sophisticated means to evade detection and avoid U.S. sanctions and prevent U.S., U.K., and other law enforcement agencies from interdicting the illegally transferred funds and preventing the funding of the FTOs and their affiliated agencies and other terrorist groups, is anything but

routine business transactions. Each Bank Defendant engaged in multiple illegal transactions over a period of years, involving manipulative and deceptive methods designed to conceal the identity of the Iranian participants.

7719. Details of the unlawful acts performed by each of the bank defendants, in concert with Iran and its proxies and agents, are further summarized in the body of the complaint, as well as in the Deferred Prosecution Agreements and Consent Orders signed by each of the bank defendants and also referenced in the body of the complaint.

### Overt Act Pursuant to Common Scheme

7720. Once the conspiracy was formed, all its members, including the Bank Defendants became liable for the injuries caused by the overt acts committed pursuant to or in furtherance of the conspiracy, regardless of who committed them. Each of the conspirators played a crucial role in the success of the Conspiracy:

a) the Bank Defendants provided funding, financial services and securities, and expert advice and assistance, to Iran and its Agents and Proxies through their methods for circumventing U.S. sanctions and regulations. The Bank Defendants also provided assurances that U.S., U.K. and other law enforcement agencies would not interdict their illegal transfers

b) Iran and Iran's Agents and Proxies, including the IRGC, MODAFL, and others, were conduits for the funds obtained through the Bank Defendants that were then transferred to FTOs, along with other terror groups, which committed, planned, and/or authorized the terror acts.

7721. The Bank Defendants' overt acts were in "furtherance of the conspiracy." Without the Bank Defendant funding, the terrorist entities would not have been able to engage in the overt acts of actualizing the Terrorist Attacks that killed or injured Plaintiffs to "the same extent and magnitude" as they did, and Iran and its entities would have been severely hampered in its terror financing.

7722. Although the Bank Defendants may not have committed the ultimate act of

1056

murder or bombing, they, as members of the Conspiracy, are liable for the injuries suffered as a result.

7723.  Each Defendant's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and foreseeably, substantially accelerated and multiplied Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq's ability to engage in terrorist activity (8 U.S.C. § 1182(a)(3)(B)(iii)- (iv)), terrorism (22 U.S.C. § 2656f), and acts of international terrorism under the definition set forth in 18 U.S.C. § 2331. Each Defendant's conduct was thus also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

### Material Support in the Form of U.S. Dollars

7724.  The Defendants herein and Iran agreed to, and did in fact, purposefully transfer hundreds of billions of dollars through the United States in a manner expressly designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies and evade U.S. sanctions; minimize the transparency of their financial activities; and knowingly, or with deliberate indifference: (1) facilitate the transfer of hundreds of millions of U.S. dollars in payments to Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq, through the international financial system; and (2) prevent the U.S. government as well as U.S., and U.K. law enforcement agencies from interdicting the illegal transfers of funds.  In doing so, the Defendants were willing to, and did, commit numerous felonies under U.S. law to assist Iran in concealing its financial activities and violated 18 U.S.C. § 2339B by knowingly, or with deliberate indifference, entering the Conspiracy, which provided material support to FTOs that were responsible for Plaintiffs' injuries.

## Material Support in the Form of Financial Services and Securities

7725.   Each Defendant also provided material support, in the form of financial services and financial securities, by underwriting billions of dollars in illegal Iranian trade finance transactions.  Congress defined "Material support or resources" in 18 U.S.C. § 2339B(g)(4) as having the same meaning given that term in 18 U.S.C. § 2339A to include "…any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services,…"  Facilitating the transfer of hundreds of billions of U.S. dollars to known front companies of terrorists, using the Bank Defendant dollar clearing services, as well as the underwriting billions of dollars in trade finance transactions, are squarely within the definition of "material support or resources" contemplated by Congress when enacting 18 U.S.C. § 2339B, and violate Congress' stated goal of cutting off the flow of money to terrorists.

## Material Support in the Form of Expert Advice

7726.   Each Defendant also provided material support in the form of expert advice and assistance to FTOs, or known front companies of FTOs. Included in the definition of "Material support or resources" is "expert advice or assistance."  Congress defined "expert advice or assistance" in 18 U.S.C. § 2339A to include "advice or assistance derived from …technical or other specialized knowledge."  The Bank Defendant each received extensive training on detecting and preventing the flow of money to terrorists from the government agencies tasked with enforcing the laws.  The Defendants brazenly provided that technical, and highly specialized knowledge to SDNs, SDGTs, and FTOs, including the National Iranian Oil Company (NIOC), Mahan Air, Khatam-al Anbiya Construction, IRISL and multiple IRISL entities, Bank Melli including Bank Melli plc, Bank Saderat including Bank Saderat plc, Bank Mellat, Bank Sepah, and Bank Markazi as part of their package of financial services to specifically ensure that

such known front organizations of FTOs and their individual members, would know how to conduct illegal dollar transfers without being detected by the various enforcement agencies, all of which led to the financing of the Terrorist Attacks.

### Foreseeable Risk

7727.  Violence against American and other Coalition troops and civilians is a "foreseeable risk" and not outside the scope of a conspiracy to provide material support for terrorism.

7728.  Each Plaintiff's injuries constitutes a harm falling within the risk contemplated by each Defendant's violations, including each Defendant's knowing agreement to enter into the Conspiracy, the overt acts each Defendant performed in furtherance of the Conspiracy, and each Defendant's knowledge of, or deliberate indifference to, the fact that a specific, foreseeable aim and purpose of the Conspiracy was to provide material support to Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq. Injuries resulting from terrorist attacks planned, designed, assisted, funded, initiated, and/or overseen by Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq, are precisely the risks contemplated by statutes, regulations and Executive Orders designed to ensure that Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq's sponsor, principal, and strategic partner – Iran – had restricted access to U.S. dollars and financial services, and that any funds it did receive that touched U.S. depository institutions were transparent and could be blocked if warranted.

### Injury Caused by One of the Parties

7729.  Each of the Plaintiffs was injured by an act of international terrorism – namely, the Terrorist Attacks and other conduct designed to kill and maim Coalition troops and terrorize ordinary Iraqis.  These overt acts committed by other members of the Conspiracy qualify as

"violent acts or acts dangerous to human life" intended to "intimidate and coerce a civilian population", "influence government policy or affect the conduct of the government by mass destruction, assassination or kidnapping" as required by 18 U.S.C. § 2331.

### Acts of International Terrorism

7730. The Defendants' acts either occurred primarily outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished.

7731. Each Defendant's agreement to enter into the Conspiracy and clandestine purposeful transfer (collectively) of hundreds of billions of U.S. dollars through the United States in a manner designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies foreseeably resulted in material support being provided to FTOs, and were thus themselves acts of international terrorism because they either were, or objectively appear to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion (in part to cause them to withdraw Coalition Forces from Iraq), and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq's role in killing and injuring hundreds of American nationals in Iraq.

7732. Each terrorist entity that is alleged to have injured Plaintiffs is a part of the Conspiracy, as are the Bank Defendants that funded and supported their activities as described above.

7733. Through the conduct as described above, by knowingly entering into the Conspiracy and violating 18 U.S.C. § 2339A or 18 U.S.C. § 2339B in the manner and with the

state of mind alleged above, each Defendant is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(d).

## SECOND CLAIM FOR RELIEF

## SECONDARY CIVIL LIABILITY AGAINST ALL DEFENDANTS UNDER 18 U.S.C. § 2333(d) FOR AIDING AND ABETTING

7734. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

7735. In knowingly agreeing to provide, and providing, material support and resources to Iran, and Iran's Agents and Proxies, in an illegal manner, and knowing that by aiding and abetting Iran, and Iran's Agents and Proxies, to provide material support to Foreign Terrorist Organizations (FTOs), including Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq, each Defendant violated § 2339B's express prohibition against aiding and abetting any person to provide material support to an FTO, within the meaning of § 2339B.

7736. The Defendants aided and abetted the acts of international terrorism sponsored by Iran and planned, committed and authorized by FTOs Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq.

## Types of Material Support Provided

7737. Congress defined "Material support or resources" in 18 U.S.C. § 2339B(g)(4) as having the same meaning given that term in 18 U.S.C. § 2339A to include "…any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services,…expert advice or assistance…false documentation or identification…" The Defendants aided and abetted Iran with three broad forms of material support: currency and monetary instruments; expert advice and false documentation; financial services and securities.

## Material Support in the Form of U.S. Dollars

7738.  The Defendants aided and abetted Iran by purposefully transferring hundreds of billions of dollars through the United States in a manner expressly designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies and evade U.S. sanctions; minimize the transparency of their financial activities; and knowingly, or with deliberate indifference, facilitated the transfer of tens of millions of dollars in payments to Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq through the international financial system. In doing so, the Defendants were willing to, and did, commit numerous felonies under U.S. law to substantially assist Iran in concealing its financial activities and violated 18 U.S.C. § 2339B by knowingly, or with deliberate indifference, aiding and abetting Iran to provide material support to FTOs that were responsible for Plaintiffs' injuries.

7739.  Each of the Defendants also knew or was deliberately indifferent to the fact that providing tens of millions of dollars to Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq, clandestinely using the defendant banks dollar clearing services, is squarely within the definition of "material support or resources" contemplated by Congress when enacting 18 U.S.C § 2339B, and violates Congress' stated goal of cutting off the flow of money to terrorists.

## Material Support in the Form of Expert Advice and False Documentation

7740.  The Defendants also aided and abetted Iran by purposefully providing Iran with expert advice and assistance in an illegal manner, knowing or deliberately indifferent to the fact that such illegal expert advice and assistance facilitated Iran's well-known support for FTOs including Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq. Congress defined material support or resources to include "expert advice or assistance" which is

defined in 18 U.S.C. § 2339 to include "advice or assistance derived from …technical or other specialized knowledge."  The defendant banks each received extensive training and guidance on detecting and preventing the flow of money to terrorists from the government agencies tasked with enforcing the laws.  The defendant banks brazenly provided that technical and highly specialized knowledge to Iran, as part of their package of illicit financial services knowing, or with deliberate indifference to the fact that Iran would use that knowledge to conduct tens of millions of dollars of illegal dollar transfers, to Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq, without being detected by the various enforcement agencies. The defendant banks also altered Fedwires to conceal their client's identities from authorities.

### Material Support in the Form of Financial Services and Securities

7741.  Each defendant also provided material support, in the form of financial services and financial securities, by underwriting billions of dollars in illegal Iranian trade finance transactions.  Congress defined "Material support or resources" in 18 U.S.C. § 2339A to include "…any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services,…"  Facilitating the transfer of hundreds of billions of U.S. dollars to known front companies of terrorists, using the defendant banks dollar clearing services, as well as the underwriting billions of dollars in trade finance transactions, are squarely within the definition of "material support or resources" contemplated by Congress when enacting 18 U.S.C. § 2339A, and violate Congress' stated goal of cutting off the flow of money to terrorists.

### Aiding and Abetting

7742.  Each of the Defendants was aware of Iran's designation as a state sponsor of terror; Iran's stated goal of "Death to America"; and Iran's involvement with sponsoring

terrorism in Iraq against U.S. peacekeepers as a means to push the U.S. out of Iraq.  Each of the Defendants was generally aware that by aiding and abetting Iran, and Iran's Agents and Proxys, they were violating both U.S. and international laws, and their participation was not only criminal but they risked significant reputational harm if caught.  Each Defendant was also aware of OFAC's SDN List, and the dangers presented by the entities and individuals on that list.  In spite of the above dangers to American lives, the Defendant's willingly engaged in illegal activities to aid and abet Iran, and Iran's Agents and Proxies. The assistance which the Defendants knowingly provided Iran, and Iran's Agents and Proxies, was substantial according to the factors outlined in *Halberstam*.

### Nature of the Acts Encouraged

### (First *Halberstam* Factor)

7743.  The conduct of the Defendants, and the acts that they encouraged, are extreme and outrageous such that it demonstrates either the specific intent to commit terrorism, or the reckless indifference to, the harm and severe physical and emotional distress suffered by the victims of Iranian-sponsored terrorism. Each of the Defendants took purposeful and concerted steps to deny, conceal, and mask their role in aiding and abetting Iran, and Iran's Agents and Proxies.  In the process, Defendants knowingly violated U.S. and international sanctions, laws, and treaties.

7744.  The Defendants were instrumental in providing Iran with an illegal financial structure, with which they secretly transferred money to, from and between SDNs, enabling such SDNs and associated front companies, to facilitate the sourcing of essential parts for IEDs, fund training housing, supplies and transportation for terrorist cells, as well as provide bank notes to ensure further anonymity. Specifically, Defendants conduct encouraged and allowed Iran to

focus its finances, infrastructure, agents and instrumentalities to support, encourage and increase the infliction of maximum pain and suffering on innocent people and their families.

7745. By training Iran, and Iran's Agents and Proxies, on how to circumvent U.S. counterterrorism sanctions, Defendants encouraged and promoted Iran's sponsorship of terrorism. The Defendants conduct demonstrates a policy of encouraging, supporting and directing Iran to access the U.S. financial system in order to conduct a campaign of deadly acts of terrorism directed at civilians and peacekeeping forces, and in particular against U.S. nationals, such that the monstrous character of the Terrorist Attacks is obvious.

7746. The fact that the Defendants were successfully able to hide their illegal activities for so many years from U.S. regulators, and thereby undermine sanctions, not only removed the intended consequences of such sanctions but encouraged and emboldened Iran's, and Iran's Agents and Proxies, deep-seated and malicious hatred of the United States and allowed Iran, through its FTO Agents and Proxies to intentionally authorize, plan and commit terrorism against U.S. Nationals.

### The Amount of Material Support Provided Was Substantial and Essential

### (Second *Halberstam* Factor)

7747. The Defendants' assistance to Iran was substantial for the following reasons. As a result of the assistance received from each of the defendants, Iran was able to transfer U.S. dollars to and from any party, at any time, regardless of the laws declaring such transfers illegal, regardless of whether the recipient was a Foreign Terrorist Organization, and regardless of the bank's legal obligations under the laws of the United States to stop such transfers. As a result of the assistance received from each of the defendants, Iran was able to hide billions of dollars in illegal transfers, within a much larger pool of legal dollar transfers. As a result of the assistance

received from each of the Defendants, the economic sanctions against Iran, which aimed at stopping Iran from sponsoring terrorism, were ineffective. As a result of the assistance received from each of the Defendants', Iran learned how to evade the vast network of tools established by regulators to prevent terrorism. Finally, as a result of the assistance received from each of the Defendants, Iran was able to achieve their goal of providing material support to Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq and other FTO's for many years, while evading detection from authorities.

7748. The Defendants' assistance to Iran was not only substantial because of what each of the Defendants did for Iran, but also substantial because of what each of the defendants did not do, that they were legally required to do. Each of the Defendant banks were legally obligated to report to the authorities, transfers to all SDNs or from Foreign Terrorist Organizations. Instead, each of the Defendants remained silent, content with the enormous fees paid to them by Iran and Iran's Agents and Proxies, for violating U.S. laws, and turning a blind eye to the horrific injuries and loss of life experienced by the plaintiffs and their families in this case.

### The Material Support Provided Was Essential

7749. The assistance provided by each of the Defendants to Iran was essential. Each of the banks illegally allowed Iran access to the U.S. financial system, the largest U.S. dollar clearing system in the world. There is no alternative financial system capable of transferring the hundreds of billions of U.S. dollars, around the world that Iran and Iran's Agents and Proxies required. Alternative methods such as black market exchanges, bulk cash smugglers, and third party intermediaries, are not only unsafe and inefficient, but they do not have the collective ability to transfer hundreds of billions of dollars. Perhaps even more importantly, unlike the cartels whose business is conducted in "cash", proceeds from oil sales are denominated in U.S.

dollars and transferred electronically.

7750. Having gained access to the U.S. financial system it was essential to the success of the conspiracy that the thousands of illegal wire transfers and letters of credit made on behalf of Iran and its Proxies and Agents be concealed from regulatory agencies and law enforcement. Only the Bank Defendants were in a position to provide access to the U.S. financial system, provide the necessary services, and hide such transfers from regulatory and law enforcement agencies. As a result, it was essential for Iran and Iran's Agents and Proxies to obtain the assistance from the Bank Defendants.

## The Defendants' Presence During the Commission of the Terrorist Attacks

### (Third *Halberstam* Factor)

7751. Each of the Defendant banks remained ever present during the commission of the terrorist attacks. The Defendants provided the trade finance that enabled the terrorists to acquire essential parts from the around the world, necessary for the construction of IEDs and EFPs. The Defendants provided access to the US financial system which enabled funds to be secretly transferred to, from and between SDNs. The Defendants provided bulk bank notes, sometimes pallets at a time, which were used to fund those terrorists on the ground responsible for building and placing bombs, as well as providing safe harbor, training, feeding and housing terrorists. The Defendants enabled Iran to circumvent the sanctions that had been implemented to pressure Iran to stop sponsoring terrorism. The banks served as money launderers to the terrorists effectively hiding their flow of dirty money in the vast pool of legitimate dollar transfers in the U.S. financial system. The Defendants did all of the above while obligated to abide by laws which required them to report each such instance to U.S. regulators.

## The Defendants' Relationship with Iran, and Iran's Agents and Proxies

### (Fourth *Halberstam* Factor)

7752.  Each of the bank Defendants had a close relationship with Iran, and many of Iran's Agents and Proxies, that lasted many years.  In fact, many of the defendants have been operating in the Middle East, since the inception of OPEC in 1960.  As a result, as a member of OPEC, Iran has been a client for many years prior to the start of this conspiracy.  Iran trusted the Bank Defendants and the Bank Defendants trusted Iran to keep their collective illegal affairs a secret.  Iran trusted the banks to clear hundreds of millions of U.S. dollars each day, in oil sale proceeds, in violation of international sanctions.  Iran trusted the Defendants to not disclose to authorities their illegal transfers of U.S. dollars to FTO's.

## The Defendants' State of Mind

### (Fifth *Halberstam* Factor)

7753.  Each of the Defendants knew that Iran was classified as a state sponsor of terror, for committing the same types of acts that caused the injuries to the Plaintiffs in this case.  Each of the banks knew of the prohibition against transferring funds to people/entities on the Specially Designated Nationals (SDN) list, and knew of the dangers that these individuals/entities represented. Despite this knowledge each of the Defendants agreed to covertly and illegally transfer funds to and from entities, including FTOs, listed on the SDN list, on behalf of Iran.  Each of the Defendant's knew of the sanctions in place against Iran, knew the reason those sanctions were implemented, and knew that the types of transactions they were performing on behalf of Iran, and Iran's Agents and Proxies, were illegal, but performed them anyway. The banks acted knowingly or with deliberate indifference to the fact that the substantial assistance would be used to provide material support to Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al

Qaeda and al Qaeda in Iraq, and were deliberately indifferent to the irreparable harm that it would cause American peacekeepers.

## Defendants' Knowledge of their Iranian Customers

### (Sixth *Halberstam* Factor)

7754.   As part of the Know Your Customer – Anti Terrorist Act / Bank Secrecy Act laws, each of the defendant banks were required to know their customers. To accomplish this requirement each of the defendant banks had extensive tools and procedures in place to understand their customer, the nature of their customer's business, the laws that apply to their customers, as well as the risks associated with each of their customers.  As bankers, the Defendants were able to access information about their customers not available to governments or the public. These tools gave the Defendants an insider's view as to the source and use of their customer's funds.

## Knowledge of FTOs Designation and Engagement in Terrorism

7755.   Because Defendants are financial institutions operating in the United States, at all times relevant to the Complaint, each is deemed by law to be aware of all designations made to the SDN list, including without limitation designations for Iran, Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq.

7756.   While each Defendant was aiding and abetting Iran, by providing Iran with material support in an illegal manner, each Defendant knew that Iran had, since 1984, been officially designated by the United States as a State Sponsor of Terrorism, subject to numerous U.S. sanctions, and knew or were deliberately indifferent to the fact that such designation was based in part on Iran's sponsorship and patronage of Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq and other FTOs, and that Iran used Hezbollah as a primary

mechanism to enable it to cultivate and support terrorism.

7757.   Each Defendant knew that Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq, were designated an FTO at all times relevant to this action and that Kata'ib Hezbollah was designated an FTO on June 24, 2009.   Each Defendant also knew that Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq engaged in terrorist activities (8 U.S.C. § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and acts of international terrorism (18 U.S.C. § 2331).

7758.   Each Defendant knew or was deliberately indifferent to the fact that by aiding and abetting Iran to provide material support in an illegal manner, each unlawfully evaded U.S. sanctions and regulations directed at mitigating the risk that Iran would carry out, support, fund, plan for, prepare, conspire with, or facilitate acts of international terrorism by FTOs, including acts planned, attempted, and perpetrated by Iran's proxies, agents, and strategic partners, Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq.

7759.   The acts of aiding and abetting, as well as the acts of international terrorism that injured the Plaintiffs, constitute acts of international terrorism under 18 U.S.C. § 2331, and constitute "engaging in terrorist activity" under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), and/or "engaging in terrorism" under 22 U.S.C. § 2656f.

7760. Each Defendant also: knew of the existence of some or all of the other Defendants; was aware that the other Defendants and Iranian Banks engaged in the same or similar conduct, and that the other Defendants also provided material support and services to Iran in an illegal manner for the explicit purpose of enabling Iran to avoid U.S. sanctions and regulations enacted specifically to prevent Iran's ability to finance, support, prepare for, plan, or carry out acts by FTOs including Iran's proxies, agents, and strategic partners, Hezbollah,

Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq.

7761.  Each Defendant also knew or was deliberately indifferent to the fact that one of the specific objectives in providing material support to Iran was to keep U.S. depository institutions, law enforcement and counter-terrorism agencies blind to Iran's movement of U.S. dollars through the international financial system, in order to prevent the interdiction of the illegally-transferred funds which would have prevented the funds from reaching the FTOs and other Iranian sponsored terrorists, and thus also knew or was deliberately indifferent to the fact that the material support each provided facilitated that specific objective.

7762.  Having aided and abetted Iran by providing Iran material support in an illegal manner, in direct contravention of U.S. laws and regulations enacted expressly to mitigate Iran's sponsorship of terrorism and terrorist organizations (including Weapons of Mass Destruction proliferation activities in furtherance of such sponsorship), each Defendant knew or was deliberately indifferent to the fact, that aiding and abetting Iran would foreseeably result in Iran and Iran's Agents and Proxies transferring millions of dollars to Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq all of which are FTOs.

7763.  The material support that each Defendant, through aiding and abetting Iran, knowingly, or with deliberate indifference, provided to Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq, constituted material and substantial assistance to Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq, thereby facilitating acts of terrorism in violation of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f, and have caused injuries to Plaintiffs.

7764.  The Defendants' knowingly provision of material support to Iran – a known and designated State Sponsor of Terrorism – in an illegal manner, and the resultant, purposeful

transfer of hundreds of billions of USD through the United States in a manner expressly designed

to ensure that the funds could be transferred without being monitored by U.S. regulators and law

enforcement agencies – involved acts that were dangerous to human life, by their nature, and as

further evidenced by their consequences.

7765.   The Defendants' acts either occurred primarily outside the territorial jurisdiction

of the United States or transcended national boundaries in terms of the means by which they

were accomplished.

7766.   Each Defendant's purposeful transfer (collectively) of hundreds of billions of

dollars through the United States in a manner designed to purposefully circumvent monitoring by

U.S. regulators and law enforcement agencies foreseeably resulted in material support being

provided to FTOs, and were thus themselves acts of international terrorism because they either

were, or objectively appear to have been intended to: (a) intimidate or coerce the civilian

population of the United States and other nations, (b) influence the policy of the governments of

the United States and other nations by intimidation or coercion (in part to cause them to

withdraw Coalition Forces from Iraq), and/or (c) affect the conduct of the governments of the

United States and other nations by facilitating Hezbollah's, Kata'ib Hezbollah's, Ansar al-Islam,

al Qaeda, and al Qaeda in Iraq's role in killing and injuring hundreds of American nationals in

Iraq.

7767.   Each Defendant's conduct was a substantial cause in fact and a significant factor

in the chain of events leading to the Plaintiffs' injuries, and foreseeably, substantially accelerated

and multiplied Hezbollah's, Kata'ib Hezbollah's, Ansar al-Islam, al Qaeda, and al Qaeda in

Iraq's ability to engage in terrorist activity (8 U.S.C. § 1182(a)(3)(B)(iii)-(iv)), terrorism (22

U.S.C. § 2656f), and acts of international terrorism under the definition set forth in 18 U.S.C. §

2331. Each Defendant's conduct was thus also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

7768. Furthermore, each Plaintiff's injuries constitutes a harm falling within the risk contemplated by each Defendant's violations, including each Defendant's knowledge of, or deliberate indifference to, the fact that by illegally aiding and abetting Iran, it was foreseeable they would be providing material support to FTOs Hezbollah, Kata'ib Hezbollah's, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq. Injuries resulting from terrorist attacks committed, planned, authorized, designed, assisted, funded, initiated, and/or overseen by Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq are precisely the risks contemplated by statutes, regulations and Executive Orders designed to ensure that Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq's sponsor, principal, and strategic partner – Iran – had restricted access to U.S. dollars and financial services, and that any funds it did receive that touched U.S. depository institutions were transparent and could be blocked if warranted.

7769. Through its conduct as described above, by knowingly aiding and abetting Iran, and Iran's Agents and Proxies, by providing material support to Iran, and Iran's Agents and Proxies, in an illegal manner, and knowing, or deliberately indifferent to the fact, that the material support would be used to provide material support to Foreign Terrorist Organizations (FTOs), including Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq, each Defendant violated § 2339B, and is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(d).

## THIRD CLAIM FOR RELIEF

## SECONDARY CIVIL LIABILITY AGAINST COMMERZBANK AG AND COMMERZBANK AG, NEW YORK BRANCH UNDER 18 U.S.C. § 2333(d) FOR AIDING AND ABETTING ORPHAN'S PROJECT

**(Providing material support to FTO by aiding and abetting Orphans Project's attempt to provide same to Hezbollah under 2339B)**

7770. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

7771. During the relevant period of time, Commerzbank AG and Commerzbank AG New York Branch knowingly and unlawfully provided material support and resources, including U.S. dollars, expert advice, services and false documentation, and financial services, by aiding and abetting Waisenkinderprojekt Libanaon e.V.'s (Orphans Project Lebanon e.V.) attempt to provide same, to Hezbollah, which at all relevant times was designated by the Secretary of State as a FTO, knowing that Hezbollah was a designated FTO, that Hezbollah engages and has engaged in terrorist activity, and that Hezbollah engages and has engaged in terrorism, in violation of 18 USC 2339B.

7772. Commerzbank AG and Commerzbank AG New York Branch aided and abetted the acts of international terrorism sponsored by Waisenkinderprojekt Libanaon e.V. (Orphans Project Lebanon e.V.) and planned, committed and authorized by FTO Hezbollah.

### Types of Material Support Provided

7773. Congress defined "Material support or resources" in 18 USC 2339B(g)(4) as having the same meaning given that term in 18 USC 2339A to include "…any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services,…expert advice or assistance…false documentation or identification…" Commerzbank AG and Commerzbank AG New York Branch aided and abetted

Waisenkinderprojekt Libanaon e.V. (Orphans Project Lebanon e.V.) with three broad forms of material support: currency and monetary instruments; financial services and securities; and expert advice, services, and false documentation.

### Material Support in the Form of Currency and Monetary Instruments

7774. Commerzbank AG and Commerzbank AG New York Branch and Orphans Project Lebanon e.V., purposefully transferred U.S. dollars through the United States in a manner expressly designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies and evade U.S. sanctions; minimize the transparency of their financial activities; and knowingly, or with deliberate indifference, facilitated the transfer of millions of dollars in payments to Hezbollah, through the international financial system. In doing so, Commerzbank AG and Commerzbank AG New York Branch was willing to, and did, commit numerous felonies under U.S. law to assist Orphans Project Lebanon e.V. in concealing its financial activities and violated 18 U.S.C. § 2339B by knowingly, or with deliberate indifference, providing material support to Hezbollah that was responsible for Plaintiffs' injuries.

### Material Support in the Form of Financial Services and Securities

7775. Commerzbank AG and Commerzbank AG New York Branch also provided material support, in the form of financial services and financial securities, by underwriting millions of dollars in illegal trade finance transactions. Congress defined "Material support or resources" in 18 USC 2339B to include "…any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services,…" Secretly facilitating the transfer of millions of U.S. dollars to a known front company of Hezbollah, using the defendant banks dollar clearing services are squarely within the definition of "material support or resources" contemplated by Congress, and violate Congress' stated goal

of cutting off the flow of money to terrorists.

**Material Support in the Form of Expert Advice, Services and False Documentation**

7776.   Commerzbank AG and Commerzbank AG New York Branch also provided material support in the form of expert advice and assistance to Hezbollah, and Orphans Project Lebanon e.V., a known front company of Hezbollah. Included in the definition of "Material support or resources" is "expert advice or assistance."  Congress defined "expert advice or assistance" in 18 USC 2339A and 18 USC 2339B to include "advice or assistance derived from …technical or other specialized knowledge."  Commerzbank AG and Commerzbank AG New York Branch received highly specialized and technical training and guidance, on detecting and preventing the flow of money to terrorists, from the government agencies tasked with enforcing the laws.  Commerzbank AG and Commerzbank AG New York Branch brazenly provided that technical, and highly specialized knowledge to Orphans Project Lebanon e.V. and Hezbollah as part of their package of illicit financial services to specifically ensure that the known front organization of Hezbollah, would know how to conduct illegal dollar transfers without being detected by the various enforcement agencies.  Commerzbank AG and Commerzbank AG New York Branch also falsified Fedwires to conceal their client's identities from authorities.

7777.   Commerzbank AG and Commerzbank AG New York Branch's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and foreseeably, substantially accelerated and multiplied Hezbollah's ability to engage in terrorist activity (8 U.S.C. § 1182(a)(3)(B)(iii)- (iv)), terrorism (22 U.S.C. § 2656f), and acts of international terrorism under the definition set forth in 18 U.S.C. § 2331. Commerzbank AG and Commerzbank AG New York Branch's conduct was thus also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

## Aiding and Abetting

7778.  Commerzbank AG and Commerzbank AG New York Branch was aware of Hezbollah's designation as a FTO, that Hezbollah engages and has engaged in terrorist activity, and that Hezbollah engages and has engaged in terrorism.  Commerzbank AG and Commerzbank AG New York Branch was also aware of Iran's designation as a state sponsor of terrorism; Iran's involvement with sponsoring terrorism in Iraq against U.S. peacekeepers; and Hezbollah's role in committing terrorism on behalf of Iran.  Commerzbank AG and Commerzbank AG New York Branch was aware that by aiding and abetting Orphans Project Lebanon e.V., attempt to provide material support to Hezbollah, they were violating both U.S. and international laws, and their participation was not only criminal but risked significant reputational harm if caught.  In spite of those dangers, Commerzbank AG and Commerzbank AG New York Branch knowingly provided material support and resources, by aiding and abetting Orphans Project Lebanon e.V. attempt to provide material support to Hezbollah.   The assistance which Commerzbank AG and Commerzbank AG New York Branch knowingly provided Orphans Project Lebanon e.V., and Hezbollah, was substantial according to the factors outlined in *Halberstam*.

## Nature of the Acts Encouraged

### (First *Halberstam* Factor)

7779.  Commerzbank AG and Commerzbank AG New York Branch's conduct, and the acts it encouraged, is extreme and outrageous such that it demonstrates either the specific intent to commit terrorism, or the reckless indifference to, the harm and severe physical and emotional distress suffered by the victims of terrorism planned, authorized or committed by Hezbollah. The Defendants took purposeful and concerted steps to deny, conceal, and mask their role in aiding and abetting Orphans Project Lebanon e.V., and Hezbollah.  In the process, Commerzbank AG

and Commerzbank AG New York Branch knowingly violated U.S. and international sanctions, laws, and treaties.

7780.  Commerzbank AG and Commerzbank AG New York Branch were instrumental in providing Orphans Project Lebanon e.V.  with an illegal financial structure, with which they secretly transferred money to, from and between Orphans Project Lebanon e.V. and Hezbollah, enabling Orphans Project Lebanon e.V.  and Hezbollah, to facilitate the sourcing of essential parts for IEDs, fund training housing, supplies and transportation for terrorist cells, as well as provide bank notes to ensure further anonymity. Specifically, the Defendants' conduct encouraged and allowed Orphans Project Lebanon e.V. to transfer millions of dollars to support, encourage and increase the infliction of maximum pain and suffering on innocent people and their families.

7781.  By training Orphans Project Lebanon e.V. and Hezbollah, on how to circumvent U.S. counterterrorism sanctions, Commerzbank AG and Commerzbank AG New York Branch encouraged and promoted both Orphans Project Lebanon e.V.'s and Hezbollah's sponsorship of terrorism. The Defendants' conduct demonstrates a policy of encouraging, supporting and directing Orphans Project Lebanon e.V. to access the U.S. financial system in order to conduct a campaign of deadly acts of terrorism directed at civilians and peacekeeping forces, and in particular against U.S. nationals, such that the monstrous character of the Terrorist Attacks is obvious.

7782.  The fact that Commerzbank AG and Commerzbank AG New York Branch was successfully able to hide their illegal activities for so many years from U.S. regulators, undermining sanctions and their intended consequences, enabled Hezbollah's efforts to authorize, plan and commit terrorism against U.S. Nationals.

**The Amount of Material Support Provided Was Substantial and Essential**

**(Second *Halberstam* Factor)**

7783.  Commerzbank AG and Commerzbank AG New York Branch's assistance to Hezbollah via Orphans Project Lebanon e.V. was substantial for the following reasons. As a result of the assistance received from the Defendants, Orphans Project Lebanon e.V. was able to transfer USDs to Hezbollah, despite laws declaring such transfers illegal, despite Hezbollah's designation as a FTO, and despite the Defendant's legal obligations under the laws of the United States to stop such transfers. As a result of the substantial material support received from Commerzbank AG and Commerzbank AG New York Branch, Orphans Project Lebanon e.V. was able to hide their illegal transfers, within a much larger pool of legal USD transfers. As a result of the substantial material support received from the Defendants, Orphans Project Lebanon e.V. learned how to evade the vast network of tools established by regulators to prevent terrorism. Finally, as a result of the substantial material support received from Commerzbank AG and Commerzbank AG New York Branch, Orphans Project Lebanon e.V. was able to achieve their goal of providing material support to Hezbollah for many years while evading detection from authorities.

7784.  Commerzbank AG and Commerzbank AG New York Branch's substantial material support to Orphans Project Lebanon e.V. was not only substantial because of what each Defendant did for Orphans Project Lebanon e.V., but also substantial because of what each Defendant did not do, but that each Defendant was legally required to do. Commerzbank AG and Commerzbank AG New York Branch were legally obligated to report to the appropriate authorities, USD transfers to or from FTOs. Instead, the Defendants remained silent, content with the enormous fees paid to them by Orphans Project Lebanon e.V. and others, for violating

U.S. laws, and turning a blind eye to the horrific injuries and loss of life experienced by Plaintiffs and their families in this case.

## The Material Support Provided Was Essential

7785.    The assistance provided by Commerzbank AG and Commerzbank AG New York Branch to Orphans Project Lebanon e.V. was essential.   The Defendants illegally allowed Orphans Project Lebanon e.V. access to the U.S. financial system, the largest U.S. dollar clearing system in the world.   There is no alternative financial system capable of instantly transferring millions of U.S. dollars around the world that Iran required.   Alternative methods such as black market exchanges, bulk cash smugglers, and third party intermediaries, are not only unsafe and inefficient, but they do not have the collective ability to transfer millions of dollars virtually anywhere in the world instantly. Perhaps even more importantly, unlike the cartels whose business is conducted in "cash", proceeds from oil sales are transferred electronically in U.S dollars.   As a result, it was essential for Iran, Orphans Project Lebanon e.V., and Hezbollah to obtain access to the U.S. financial system.

## Commerzbank's Presence During the Commission of the Terrorist Attacks

### (Third *Halberstam* Factor)

7786.    Commerzbank AG and Commerzbank AG New York Branch remained ever present during the commission of the terrorist attacks.   Commerzbank provided the trade finance that enabled the Hezbollah to acquire essential parts from the around the world, necessary for the construction of IEDs and EFPs.   The Defendants provided access to the US financial system which enabled funds to be secretly transferred to, from and between Orphans Project Lebanon e.V. and Hezbollah.   The Defendants provided bulk bank notes, which were used to fund those terrorists on the ground responsible for building and placing bombs, as well as training, feeding

and housing terrorists. The Defendants enabled Orphans Project Lebanon e.V. to circumvent the sanctions that had been implemented to pressure Iran to stop sponsoring terrorism. The Defendants served as money launderers for Orphans Project Lebanon e.V. and Hezbollah effectively hiding their flow of dirty money in the vast pull of legitimate dollars transfers in the U.S. financial system. Commerzbank AG and Commerzbank AG New York Branch did all of the above while obligated to abide by laws which required them to report each such instance to U.S. regulators.

## Commerzbank's Relationship with Orphans Project Lebanon e.V. and Hezbollah

### (Fourth *Halberstam* Factor)

7787. Commerzbank AG and Commerzbank AG New York Branch had a close relationship with both, Orphans Project Lebanon e.V. and Hezbollah that lasted many years. Orphans Project Lebanon e.V. was a customer of Commerzbank AG and Commerzbank AG New York Branch. Despite prior public German government reports identifying its customer as a Hezbollah fundraising organization, and the fact that on July 24, 2007, the United States designated the Lebanese organization that was the primary recipient of funds donated from the account (Hezbollah's Martyrs Foundation), Commerzbank AG and Commerzbank AG New York Branch knowingly, or with deliberate indifference to the fact, continued to provide financial services to Orphans Project Lebanon e.V. and hence continued to transfer funds directly to FTO Hezbollah.

## Commerzbanks' State of Mind

### (Fifth *Halberstam* Factor)

7788. Commerzbank AG and Commerzbank AG New York Branch knew that Iran was classified as a state sponsor of terror, for committing the same types of acts that caused the

injuries to the plaintiff's in this case. The Defendants knew that Hezbollah was a designated FTO and that Hezbollah was created, funded and controlled by Iran. The Defendants knew of the prohibition against transferring funds to people/entities on the Specially Designated Nationals (SDN) list, and knew of the dangers that these individuals/entities represented as a result of their connections to terrorism. Despite this knowledge, Commerzbank AG and Commerzbank AG New York Branch agreed to covertly and illegally transfer funds to and from Orphans Project Lebanon e.V. and prevent disclosure of such illegal transfers to U.S. and other law enforcement, military and intelligence agencies, thereby ensuring that such funds would not be interdicted by the U.S. or other governments. The Defendants knew of the sanctions in place against Iran, knew the reason those sanctions were implemented, and knew that the types of transactions they were performing on behalf of Orphans Project Lebanon e.V.  were illegal, but performed them anyway.  Commerzbank AG and Commerzbank AG New York Branch acted knowingly or with deliberate indifference to the fact that the substantial assistance would be used to provide material support to Hezbollah and were deliberately indifferent to the irreparable harm that it would cause American peacekeepers.

### Commerzbank's  Knowledge of Waisenkinderprojekt Libanaon e.V.'s (Orphans Project Lebanon e.V.)

### (Sixth *Halberstam* Factor)

7789.  As part of the Know Your Customer – Anti Terrorist Act / Bank Secrecy Act laws, Commerzbank AG and Commerzbank AG New York Branch was required to know its customers. To meet its legal obligation the Defendants had teams of professionals armed with extensive tools and procedures in place to understand their customers, the nature of its customer's business, the laws that apply to its customers, as well as the risks associated with each of its customers.  The Defendants had information about its customers not available to

governments or the public. These tools gave the Defendants an insider's view as to the source and use of its customer's funds.  As a result, Commerzbank knew who controlled Orphans Project Lebanon e.V., the source of its funds, where and to whom its funds were being sent, and who its associates were.

### Knowledge of Hezbollah's Designation and Engagement in Terrorism

7790.   Because Commerzbank AG and Commerzbank AG New York Branch operated in the United States, at all times relevant to the Complaint, Commerzbank is deemed by law to be aware of all designations made to the SDN list.

7791.  While the Defendants were aiding and abetting Orphans Project Lebanon e.V, attempt to provide material support to Hezbollah, the Defendants knew that Iran had, since 1984, been officially designated by the United States as a State Sponsor of Terrorism, subject to numerous U.S. sanctions, and knew or were deliberately indifferent to the fact that such designation was based in part on Iran's sponsorship and patronage of Hezbollah and other FTOs, and that Iran used Hezbollah as a primary mechanism to enable it to cultivate and support terrorism.

7792.  Commerzbank AG and Commerzbank AG New York Branch knew that Hezbollah engaged in terrorist activities (8 U.S.C. § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and acts of international terrorism (18 U.S.C. § 2331). Commerzbank AG and Commerzbank AG New York Branch knew, or were deliberately indifferent to the fact that Hezbollah and Iran sponsored terrorists were perpetrating lethal attacks against U.S. nationals (including Plaintiffs) and others in Iraq during the period it processed the illegal financial transactions referenced herein.

7793.   The acts of aiding and abetting, as well as the acts of international terrorism that

injured the Plaintiffs, constitute acts of international terrorism under 18 U.S.C. § 2331, and constitute "engaging in terrorist activity" under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), and/or "engaging in terrorism" under 22 U.S.C. § 2656f.

7794.   The material support that Commerzbank AG and Commerzbank AG New York Branch, through aiding and abetting Orphans Project Lebanon e.V., knowingly, or with deliberate indifference, provided to Hezbollah, constituted material and substantial assistance to Hezbollah, thereby facilitating acts of terrorism in violation of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f, and that have caused injuries to Plaintiffs.

7795.   Commerzbank AG and Commerzbank AG New York Branch's overt acts in providing material support by aiding and abetting Orphans Project Lebanon e.V. to attempt to provide same, to Hezbollah in a manner expressly designed to ensure that the funds could be transferred without being monitored by U.S. regulators and law enforcement agencies – involved acts that were dangerous to human life, by their nature, and as further evidenced by their consequences.

7796.   The Defendants' acts either occurred primarily outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished.

7797.   The Defendants' purposeful transfer of millions of dollars through the United States in a manner designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies foreseeably resulted in material support being provided to Hezbollah, and were thus themselves acts of international terrorism because they either were, or objectively appear to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and

other nations by intimidation or coercion (in part to cause them to withdraw Coalition Forces from Iraq), and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Hezbollah's role in killing and injuring hundreds of American nationals in Iraq.

7798.   Furthermore, each Plaintiff's injuries constitute a harm falling within the risk contemplated by the Defendants' violations, including the Defendants' agreement to maintain a customer relationship with Orphans Project Lebanon e.V., the overt acts the Defendants performed on behalf of Orphans Project Lebanon e.V., and the Defendants' knowledge of, or deliberate indifference to, the fact that a specific, foreseeable aim and purpose of Orphans Project Lebanon e.V. was to provide material support to Hezbollah. Injuries resulting from terrorist attacks planned, designed, assisted, funded, initiated, and/or overseen by Hezbollah, are precisely the risks contemplated by statutes, regulations and Executive Orders designed to ensure that Hezbollah, had restricted access to U.S. dollars, financial services, and expert advice, and that any funds it did receive that touched U.S. depository institutions were transparent and could be blocked.

7799.   Through its conduct as described above, Commerzbank AG and Commerzbank AG New York Branch knowingly and unlawfully aided and abetted Orphans Project Lebanon e.V.'s attempt to provide material support and resources to Hezbollah, in violation of 18 USC 2339B and is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(d).

## FOURTH CLAIM FOR RELIEF

### SECONDARY CIVIL LIABILITY UNDER 18 U.S.C. § 2333(d) AGAINST COMMERZBANK AG AND COMMERZBANK AG NEW YORK BRANCH FOR CONSPIRING WITH ORPHAN'S PROJECT

**(Conspiring with Orphans Project to provide material support to Hezbollah under 2339B)**

7800.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

7801.   Commerzbank AG and Commerzbank AG New York Branch violated 18 U.S.C. § 2339B by conspiring with Waisenkinderprojekt Libanaon e.V. (Orphans Project Lebanon e.V.) to provide material support to Hezbollah by knowingly agreeing to provide, and providing, material support to Orphans Project Lebanon e.V. in an illegal manner, and knowing, or deliberately indifferent to the fact, that the objects and aims of the Conspiracy were to provide material support to Hezbollah, an FTO, Commerzbank AG and Commerzbank AG New York Branch violated 18 U.S.C § 2339B's express prohibition against conspiring to provide material support within the meaning of 18 U.S.C. § 2339B, and committed and completed overt acts in furtherance of the Conspiracy, including acts of international terrorism sponsored planned, committed and/or authorized by one or more FTOs, as alleged hereinabove, which caused injuries to Plaintiffs.

### Evidence of the Agreement

7802.   Commerzbank AG and Commerzbank AG New York Branch signed a Deferred Prosecution Agreement with the Department of Justice, as well as Consent Orders with the NYDFS, outlining the duration, scope, techniques, and volume of transactions, documenting the their involvement in the conspiracy.   The Statement of Facts in each of those agreements, admitted by Commerzbank AG and Commerzbank AG New York Branch, detail how they

provided illegal access to the U.S. financial system, to Iran and Iran's terrorist proxies.

## Unlawful Acts

7803.   Numerous unlawful acts, admitted to by Commerzbank AG and Commerzbank AG New York Branch in its Deferred Prosecution Agreement - including stripping financial transactions, disguising payment sources, transferring funds to sanctioned entities, and manually altering payment information – all in an effort to provide material support either explicitly to Hezbollah via Orphans Project Lebanon e.V, in violation of 18 U.S.C. § 2339B or to other entities who would commit criminal acts, in violation of 18 U.S.C. § 2339A – constitute the "unlawful acts" of Commerzbank in its role as a member of the Conspiracy.

## Overt Act Pursuant to Common Scheme

7804.   Once the conspiracy was formed, Commerzbank AG and Commerzbank AG New York Branch became liable for the injuries caused by the overt acts committed pursuant to or in furtherance of the conspiracy, regardless of who committed them.

7805.   Commerzbank AG and Commerzbank AG New York Branch played a essential role in the success of the Conspiracy. Commerzbank AG and Commerzbank AG New York Branch provided funding, financial services and securities, and expert advice and assistance, to Orphans Project Lebanon e.V., knowing that it was a conduit and a solicitor of funds for FTO Hezbollah, by circumventing U.S. sanctions and regulations and ensured that U.S., U.K. and other law enforcement agencies would be prevented from interdicting the illegally transfers of funds to Hezbollah.

7806.   Commerzbank AG and Commerzbank AG New York Branch's overt acts were in "furtherance of the conspiracy" by providing funding to FTO Hezbollah which committed, planned and authorized hundreds of terrorist attacks against U.S. nationals in Iraq, including the

Plaintiffs.

7807. Commerzbank AG and Commerzbank AG New York Branch's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and foreseeably, substantially accelerated and multiplied Hezbollah's ability to engage in terrorist activity (8 U.S.C. § 1182(a)(3)(B)(iii)- (iv)), terrorism (22 U.S.C. § 2656f), and acts of international terrorism under the definition set forth in 18 U.S.C. § 2331. Commerzbank AG and Commerzbank AG New York Branch's conduct was thus also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

### Material Support in the Form of U.S. Dollars

7808. Commerzbank AG, Commerzbank AG New York Branch, and Orphans Project Lebanon e.V. agreed to, and did in fact, purposefully transfer U.S. dollars through the United States in a manner expressly designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies and evade U.S. sanctions; minimize the transparency of their financial activities; and knowingly, or with deliberate indifference, facilitated the transfer of millions of dollars in payments to Hezbollah, through the international financial system. In doing so, the Defendants were willing to, and did, commit numerous felonies under U.S. law to assist Orphans Project Lebanon e.V. in concealing its financial activities and violated 18 U.S.C § 2339B by knowingly, or with deliberate indifference, entering the Conspiracy, which provided material support to Hezbollah that were responsible for Plaintiffs' injuries.

### Material Support in the Form of Financial Services

7809. Commerzbank AG and Commerzbank AG New York Branch also provided material support, in the form of financial services and financial securities, by underwriting billions of dollars in illegal Iranian trade finance transactions and concealed the material support

they provided from regulatory and law enforcement officials. Congress defined "Material support or resources" in 18 USC 2339B to include "…any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services,…" Facilitating the transfer of millions of U.S. dollars to a known front company of Hezbollah, using the defendant banks dollar clearing services are squarely within the definition of "material support or resources" contemplated by Congress, and violate Congress' stated goal of cutting off the flow of money to terrorists.

### Material Support in the Form of Expert Advice

7810.   Commerzbank AG and Commerzbank AG New York Branch also provided material support in the form of expert advice and assistance to Hezbollah, and Orphans Project Lebanon e.V., a known front company of Hezbollah. Included in the definition of "Material support or resources" is "expert advice or assistance." Congress defined "expert advice or assistance" in 18 U.S.C. § 2339A and 18 U.S.C. § 2339B to include "advice or assistance derived from …technical or other specialized knowledge." The Bank Defendants each received extensive training on detecting and preventing the flow of money to terrorists from the government agencies tasked with enforcing the laws. Commerzbank AG and Commerzbank AG New York Branch brazenly provided that technical, and highly specialized knowledge to Orphans Project Lebanon e.V. and Hezbollah as part of their package of financial services to specifically ensure that the known front organization of Hezbollah, would know how to conduct illegal dollar transfers without being detected by the various enforcement agencies.

7811.   Commerzbank AG and Commerzbank AG New York Branch's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and foreseeably, substantially accelerated and multiplied Hezbollah's ability to engage

in terrorist activity (8 U.S.C. § 1182(a)(3)(B)(iii)- (iv)), terrorism (22 U.S.C. § 2656f), and acts of international terrorism under the definition set forth in 18 U.S.C. § 2331. Commerzbank AG and Commerzbank AG New York Branch's conduct was thus also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

### Knowledge of the Organizations' Connection to Terrorism

7812.   Commerzbank AG and Commerzbank AG New York Branch knew, or were deliberately indifferent to the fact that, Hezbollah was designated an FTO at all times relevant to this action, in addition to being designated as a SDT and SDGT.

7813.   Commerzbank AG and Commerzbank AG New York Branch knew, or were deliberately indifferent to the fact that, their agreement to provide Hezbollah material support in an illegal manner, and the overt acts they completed in connection with the Conspiracy unlawfully evaded U.S. sanctions and regulations directed at mitigating the risk that Hezbollah would carry out, support, fund, plan for, prepare, or facilitate acts of international terrorism.

7814.   Both the Conspiracy itself and the acts of international terrorism that injured the Plaintiffs constitute acts of international terrorism under 18 U.S.C. § 2331, and constitute "engaging in terrorist activity" under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), and/or "engaging in terrorism" under 22 U.S.C. § 2656f.

7815.   Commerzbank AG and Commerzbank AG New York Branch also knew, or were deliberately indifferent to the fact that, one of the specific aims and objectives of the Conspiracy was to keep U.S. depository institutions, law enforcement and counter-terrorism agencies blind to the illicit movement of U.S. dollars through the international financial system, who would otherwise block such transfers, and thus also knew or was deliberately indifferent to the fact that the overt acts it performed in furtherance of the Conspiracy facilitated that specific objective.

7816.   Commerzbank AG and Commerzbank AG New York Branch also knew, or was deliberately indifferent to the fact, that Orphans Project Lebanon e.V. was using them to transfer funds to Hezbollah, and it was foreseeable that Hezbollah would use that support in preparation for, or in carrying out, acts of international terrorism, including violations of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f.

7817.   Commerzbank AG and Commerzbank AG New York Branch's overt acts in entering into the Conspiracy and knowingly agreeing to provide Hezbollah – a designated FTO – material support and services in an illegal manner, and resultant, purposeful transfer of millions of USD through the United States in a manner expressly designed to ensure that the funds could be transferred without being monitored by U.S. regulators and law enforcement agencies – involved acts that were dangerous to human life, by their nature, and as further evidenced by their consequences.

7818.   Commerzbank AG and Commerzbank AG New York Branch's acts either occurred primarily outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished.

7819.   Commerzbank AG and Commerzbank AG New York Branch's agreement to enter into the Conspiracy and purposeful transfer of millions of dollars through the United States in a manner designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies foreseeably resulted in material support being provided to Hezbollah, and were thus themselves acts of international terrorism because they either were, or objectively appear to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion (in part to cause them to withdraw Coalition Forces

1091

from Iraq), and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Hezbollah's role in killing and injuring hundreds of American nationals in Iraq.

7820. Furthermore, each Plaintiff's injuries constitutes a harm falling within the risk contemplated by the Bank Defendants' violations, including Commerzbank AG and Commerzbank AG New York Branch's knowing agreement to enter into the Conspiracy, the overt acts they each performed in furtherance of the Conspiracy, and their knowledge of, or deliberate indifference to, the fact that a specific, foreseeable aim and purpose of the Conspiracy was to provide material support to Hezbollah. Injuries resulting from terrorist attacks planned, designed, assisted, funded, initiated, and/or overseen by Hezbollah, are precisely the risks contemplated by statutes, regulations and Executive Orders designed to ensure that Hezbollah had restricted access to U.S. dollars and financial services, and that any funds it did receive that touched U.S. depository institutions were transparent and could be blocked if warranted.

7821. Through its conduct as described above, by knowingly entering into the Conspiracy and violating 18 U.S.C. § 2339B in the manner and with the state of mind alleged above, Commerzbank AG and Commerzbank AG New York Branch committed acts of international terrorism and is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(d).

## **FIFTH CLAIM FOR RELIEF**

### **SECONDARY CIVIL LIABILITY UNDER 18 U.S.C. § 2333(d) AGAINST ALL DEFENDANTS FOR CONSPIRACY TO PROVIDE MATERIAL SUPPORT FOR INTERNATIONAL TERRORISM IN VIOLATION OF 18 U.S.C. § 2339A**

**(Conspiring to Provide Material Support to Terrorists under 2339A)**

7822. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

7823.   By knowingly agreeing to provide, and providing, material support to Iran and Iran's Agents and Proxies, in an illegal clandestine manner, and knowing, or with deliberate indifference to the fact, that the objects and aims of the Conspiracy were to be used in preparation for or carrying out multiple acts set forth in 18 U.S.C. § 2339A, each Defendant violated § 2339A's express prohibition against conspiring to provide material support within the meaning of § 2339A, and committed and completed overt acts in furtherance of the Conspiracy, including acts of international terrorism sponsored planned, committed and/or authorized by one or more FTOs, as alleged hereinabove, which caused injuries to Plaintiffs.

## **The Conspiracy**

7824.   The Bank Defendants conspired with Iran, and Iran's terrorist proxies, to provide material support for terrorism, through providing support to a State Sponsor of Terrorism and its Agents and Proxies, including FTOs Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq.

7825.   Once the Conspiracy was formed, all its members, including the Bank Defendants became liable for injuries caused by acts pursuant to or in furtherance of the conspiracy.  The Bank Defendants need not have participated actively in or benefited from the wrongful action in order to be found liable.  The Bank Defendants need not even have planned or known about the injurious action so long as the purpose of the tortious action was to advance the overall object of the Conspiracy.

## **Object of The Conspiracy and the Goals of the Co-Conspirators**

7826.   The object of the Conspiracy was to provide material support for terrorism.

7827.   The Bank Defendant's goal in participating in the conspiracy was based on greed and for financial gain. The bank defendants gained business worth hundreds of millions of

dollars.

7828.   Iran's goal in participating in the Conspiracy was threefold.   By providing material support for terrorism they would: First push coalition forces out of Iraq; second keep Shiites in power, who have strong ties to Iran; and third support Iraqi federalism, as a federal Iraq divided among Shiite, Kurdish, and Sunni regions would be weaker than a strong centralized state.

7829.   Iran's terrorist proxies' goals in participating in the Conspiracy were to obtain much needed money and supplies to fund their attacks against the U.S. and coalition forces, and pay for the terrorist work and activities of their supporters.

## Elements of Conspiracy

7830.   The elements of a conspiracy are:

1.   An agreement to join a conspiracy, which can be inferred from a tacit understanding;
2.   The performance of unlawful acts as part of the conspiracy;
3.   Injury caused by one or more of the parties; and
4.   That these overt acts were pursuant to the common scheme and objective of the conspiracy.

## Evidence of the Agreement

7831.   Each of the Bank Defendants signed Deferred Prosecution Agreements with the Department of Justice, as well as Consent Orders with the NYDFS, outlining the duration, scope, techniques, and volume of transactions, documenting the Bank Defendants' involvement in the conspiracy.   The Statement of Facts in each of those agreements, admitted by the Bank Defendants, detail how each of the Defendants provided illegal access to the U.S. financial system, to Iran and Iran's terrorist proxies, as well as other state sponsors of terror.

7832.   Similarly, many public documents and government reports document how Iran provided direct monetary support by paying terror proxies in Iraq between $4,000 and $13,000

1094

per rocket or roadside bomb.  Public documents and government reports also reveal how Iran established training camps within its border to train its proxies and agents on how to build and place roadside bombs in Iraq.  As one of many examples, the trainer in charge of the attacks in Karbala was paid $3 million in U.S. currency every month.

7833.  Numerous  government  reports  and  other  publicly  available  information disseminated prior to and during the period of the conspiracy, of which the Bank Defendants were aware or should have been aware, describe Iran's role in providing assistance to Iran's terror Agents and Proxies including FTOs such as Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq.  State Department reports issued in 2006, 2007, and 2008 documented Iran's efforts to provide terrorists in Iraq with EFPs, IEDs, rockets, mortars and small arms and to provide training and funding to terror proxies.  These reports also connect Hezbollah and the IRGC-QF to sophisticated IED technology.

7834.  By agreeing to participate in the funding scheme, the Bank Defendants knew, or should  have  known,  that  they  were  potentially  providing  material  support  for  terrorism, particularly since Iran had been designated as a State Sponsor of Terrorism as early as 1984, and had been subject to sanctions for many years.  The information available to the bank defendants at the time, combined with the banks intentionally seeking ways to surreptitiously arrange for funding and U.S. dollar transfers that did not identify Iranian connections even though legitimate means were in fact available, indicates that at a minimum, the defendant banks knew that what they were doing was illegal.

### Unlawful Acts

7835.  The numerous unlawful acts committed by the Bank Defendants – including stripping financial transactions, disguising payment sources, transferring funds to sanctioned

1095

entities, and manually altering payment information – all in an effort to provide material support to entities who would commit criminal acts, in violation of 18 U.S.C. § 2339A – which constitute the "unlawful acts" of defendants in their roles as members of the Conspiracy.

7836.   The conduct of the Bank Defendants working with the Iranian entities to develop sophisticated means to evade detection and avoid U.S. sanctions and prevent U.S., U.K., and other law enforcement agencies from interdicting the illegally transferred funds and preventing the funding of the FTOs and their affiliated agencies and other terrorist groups, is anything but routine business transactions. Each Bank Defendant engaged in multiple illegal transactions over a period of years, involving manipulative and deceptive methods designed to conceal the identity of the Iranian participants.

7837.   Details of the unlawful acts performed by each of the bank defendants, in concert with Iran and its proxies and agents, are further summarized in the body of the complaint, as well as in the Deferred Prosecution Agreements and Consent Orders signed by each of the bank defendants and also referenced in the body of the complaint.

### Overt Act Pursuant to Common Scheme

7838.   Once the conspiracy was formed, all its members, including the Bank Defendants became liable for the injuries caused by the overt acts committed pursuant to or in furtherance of the conspiracy, regardless of who committed them.   Each of the conspirators played a crucial role in the success of the Conspiracy:

a) the Bank Defendants provided funding, financial services and securities, and expert advice and assistance, to Iran and its Agents and Proxies through their methods for circumventing U.S. sanctions and regulations.   The Bank Defendants also provided assurances that U.S., U.K. and other law enforcement agencies would not interdict their illegal transfers

b) Iran and Iran's Agents and Proxies, including the IRGC, MODAFL, and others, were conduits for the funds obtained through the Bank Defendants that were

then transferred to FTOs, along with other terror groups, which committed, planned, and/or authorized the terror acts.

7839.  The Bank Defendants' overt acts were in "furtherance of the conspiracy." Without the Bank Defendant funding, the terrorist entities would not have been able to engage in the overt acts of actualizing the Terrorist Attacks that killed or injured Plaintiffs to "the same extent and magnitude" as they did, and Iran and its entities would have been severely hampered in its terror financing.

7840.  Although the Bank Defendants may not have committed the ultimate act of murder or bombing, they, as members of the Conspiracy, are liable for the injuries suffered as a result.

7841.  Each Defendant's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and foreseeably, substantially accelerated and multiplied Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq's ability to engage in terrorist activity (8 U.S.C. § 1182(a)(3)(B)(iii)- (iv)), terrorism (22 U.S.C. § 2656f), and acts of international terrorism under the definition set forth in 18 U.S.C. § 2331. Each Defendant's conduct was thus also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

## Material Support in the Form of U.S. Dollars

7842.  Each Defendant's conduct in agreeing to provide Iran, and Iran's Agents and Proxies,  with hundreds of millions (or more) of USD in an illegal manner, violated 18 U.S.C. § 2339A's express prohibition against concealing or disguising the nature, location, source, or ownership of material support or resources, knowing that the material support or resources are to be used in preparation for, or in carrying out, a violation of any of 18 U.S.C. §§ 32, 37, 81, 175, 229, 351, 831, 842(m)-(n), 844(f) or (i), 930 (c), 956, 1091, 1114, 1116, 1203, 1361, 1362, 1363,

1366, 1751, 1992, 2155, 2156, 2280, 2281, 2332, 2332a, 2332b, 2332f, 2340A, or 2442, 42 U.S.C. § 2284, 49 U.S.C. §§46502 or 60123 (b), or any offense listed in 18 U.S.C. § 2332b (g)(5)(B) (except for §§ 2339A and 2339B).

## Material Support in the Form of Financial Services and Securities

7843.   Each defendant also provided material support, in the form of financial services and financial securities, by underwriting billions of dollars in illegal Iranian trade finance transactions.  Congress defined "Material support or resources" in 18 U.S.C. § 2339A to include "…any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services,…"  Facilitating the transfer of hundreds of billions of U.S. dollars to known front companies of terrorists, using the defendant banks dollar clearing services, as well as the underwriting billions of dollars in trade finance transactions, are squarely within the definition of "material support or resources" contemplated by Congress when enacting 18 U.S.C. § 2339A, and violate Congress' stated goal of cutting off the flow of money to terrorists.

## Material Support in the Form of Expert Advice

7844.   Each Defendant also provided material support in the form of expert advice and assistance to terrorist organizations, or known front companies of terrorist organizations. Included in the definition of "Material support or resources" is "expert advice or assistance." Congress defined "expert advice or assistance" in 18 U.S.C. § 2339A to include "advice or assistance derived from …technical or other specialized knowledge."  The Defendant Banks each received extensive training on detecting and preventing the flow of money to terrorists from the government agencies tasked with enforcing the laws.  The defendant banks brazenly provided that technical, and highly specialized knowledge to the National Iranian Oil Company (NIOC),

Mahan Air, Khatam-al Anbiya Construction, IRISL and multiple IRISL entities, Bank Melli including Bank Melli plc, Bank Saderat including Bank Saderat plc, Bank Mellat, Bank Sepah, and Bank Markazi as part of their package of financial services to specifically ensure that such known front organizations of terrorists would know how to conduct illegal dollar transfers without being detected by the various enforcement agencies.

## Knowledge of the Organizations' Connection to Terrorism

7845.  Each Defendant also had knowledge of Iran's and Iran's Agents and Proxies connection to terrorism.

7846.  Each Defendant knew, or was deliberately indifferent to the fact, that Hezbollah had been designated an FTO, SDT and SDGT.

7847.  Each Defendant knew, or was deliberately indifferent to the fact, that al Qaeda had been designated an FTO.

7848.  Each Defendant knew, or was deliberately indifferent to the fact, that al Qaeda in Iraq had been designated an FTO.

7849.  Each Defendant knew, or was deliberately indifferent to the fact, that Ansar al-Islam, had been designated an FTO.

7850.  Each Defendant knew, or was deliberately indifferent to the fact, that the IRGC-QF had been designated an SDGT and that OFAC had issued a public statement that Bank Saderat has been a significant facilitator of Hezbollah's financial activities and has served as a conduit between the Government of Iran and Hezbollah.

7851.  Each Defendant knew, or was deliberately indifferent to the fact, that Bank Saderat (including Defendant Bank Saderat Plc) had been designated an SDGT.

7852.  Each Defendant knew, or was deliberately indifferent to the fact, that the IRGC

had been designated an SDN.

7853.   Each Defendant knew or was deliberately indifferent to the fact that Bank Melli (including Melli Bank Plc), Bank Saderat (including Defendant Bank Saderat Plc), Bank Mellat, and Bank Sepah had been designated SDNs before November 2008, and, as such, were excluded from accessing the U-Turn exemption in the Iranian Transaction Regulations.

7854.   Each Defendant also knew or was deliberately indifferent to the fact that the IRISL and multiple IRISL entities had been designated SDNs.

7855.   Because Defendants are financial institutions operating in the United States, at all times relevant to the Complaint, each is deemed by law to be aware of all designations made to the SDN list, including without limitation designations for Iran, Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, al Qaeda in Iraq, the IRGC, the IRGC-QF, Bank Saderat (including Defendant Bank Saderat Plc), Bank Melli, Bank Mellat, Bank Sepah, IRISL (and multiple IRISL entities).

7856.   Both the Conspiracy itself and the acts of international terrorism that injured the Plaintiffs constitute acts of international terrorism under 18 U.S.C. § 2331, and constitute "engaging in terrorist activity" under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), and/or "engaging in terrorism" under 22 U.S.C. § 2656f.

7857.   The Conspiracy between Iran and Iran's Agents and Proxies, and the Defendants and other non-defendant Co-conspirators resulted in the transfer of: (a) almost one trillion dollars through the United States in a manner designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies; and (b) hundreds of millions of dollars to Hezbollah, Kata'ib Hezbollah, al Qaeda, al Qaeda in Iraq, Ansar Al Sunna/Ansar Al Islam (AAI), Asa'ib Ahl al-Haq (AAH), Jaysh al Mehdi (JAM), Promise Day Brigades (PDB), Badr Organization,

Quds Force, the IRGC and other terrorist organizations (including the Special Groups), or to known front companies for such terrorist organizations, such as the National Iranian Oil Company (NIOC), Mahan Air, Khatam-al Anbiya Construction, IRISL and multiple IRISL entities, Bank Melli, Bank Melli plc, Bank Saderat including Bank Saderat plc, Bank Mellat, Bank Sepah, and Bank Markazi, actively engaged in murdering and maiming U.S. nationals in Iraq.

7858. The Defendants together with other non-defendant Co-conspirators (including Iran and Iran's Agents and Proxies) agreed to, and did in fact, purposefully transfer billions of USD through the United States knowing that such funds would be delivered to Iran and Iranian agents, and that the payment order messages facilitating such funds transfers had been deliberately and intentionally structured, designed, and processed in a manner expressly designed to ensure that such funds would not be detected or monitored by U.S. regulators and law enforcement agencies.

7859. At the time each Defendant knowingly agreed to provide Iran and Iran's Agents and Proxies, material support in an illegal manner, each Defendant knew that the United States had formally designated Iran as a State Sponsor of Terrorism and knew, or was deliberately indifferent to the fact that, inter alia, Iran used the IRGC and Hezbollah as primary mechanisms to cultivate and support terrorism and that the financial services provided would generally facilitate the activities of these organizations.

7860. Among other things, and as documented in the U.S. State Department's 2013 Country Reports on Terrorism, between 2004 and 2011 the IRGC, in concert with Hezbollah, provided training outside of Iraq, as well as sending advisors to Iraq, to assist, train, supply and guide Special Groups in the construction and use of EFPs, IEDs, Mortars, Rockets and other

advanced weaponry, devices that constitute "weapons of mass destruction" as defined in 18 U.S.C. § 2332a, incorporating the definition of "destructive devices" set forth in 18 U.S.C. § 924(4)(A)-(C).

7861. Each Defendant knew or was deliberately indifferent to the fact that Iran, the IRGC, Hezbollah, and the Special Groups engaged or engages in terrorist activity (8 U.S.C. § 1182(a)((3)(B)(iii)-(iv)), terrorism (22 U.S.C § 2656f), and acts of international terrorism (18 U.S.C. § 2331), including facilitating, funding, preparing for, and supporting terrorist activity by the Special Groups. Each Defendant knew or was deliberately indifferent to the fact that the financial services provided would generally facilitate these activities.

7862. Each Defendant knew or was deliberately indifferent to the fact that AQ, AQI and AAI engaged or engages in terrorist activity (8 U.S.C. § 1182(a)((3)(B)(iii)-(iv)), terrorism (22 U.S.C § 2656f), and acts of international terrorism (18 U.S.C. § 2331), and that Iran, IRGC and MOIS provided material support for these FTOs, including training, safe haven and a protected environment for command and control within Iran, safe passage across international borders, weapons and other material support. Each Defendant knew or was deliberately indifferent to the fact that the financial services provided would generally facilitate these activities.

7863. Through this clandestine stream of U.S. dollars, each Defendant knew, or was deliberately indifferent to the fact that as a result of knowingly agreeing to join the Conspiracy to provide Iran and Iran's Agents and Proxies, with illegal material support, such conduct foreseeably (and in fact did) facilitate the transfer of hundreds of millions of dollars in payments to the IRGC and Hezbollah and alter-ego of FTOs through the international financial system, including payments initiated, processed, altered, modified, falsified, or released by or through the Defendants, and that these financial services would generally facilitate the terrorist activities of

these organizations.

7864. Each Defendant knowingly and purposefully agreed to provide material support and services to Iran and Iran's Agents and Proxies, in an illegal manner, knowing or deliberately indifferent to the fact that such illegal support and services facilitated Iran's clandestine support for the IRGC and Hezbollah, and that such agreements and resultant overt acts and conduct would foreseeably facilitate acts of international terrorism, terrorist activities, and terrorism, including homicides, attempted homicides, or conspiracies to commit homicide against U.S. nationals by the IRGC, Hezbollah and/or the Special Groups (including KH, JAM and AAH), as well as attacks conducted by weapons of mass destruction, such as EFPs, IEDs, Rockets, Mortars and other bombings, attempted bombings, or conspiracies to bomb places of public use, state or government facilities, public transportation systems, or infrastructure facilities by the IRGC, Hezbollah, and/or the Special Groups.

7865. The material support that Defendants knowingly agreed to illegally provide to Iran, provided foreseeable, substantial assistance to the IRGC, Hezbollah and the Special Groups, thereby preparing and facilitating acts of terrorism in violation of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f that caused Plaintiffs' injuries.

7866. The material support that Defendants knowingly agreed to illegally provide to Iran and Iran's Agents and Proxies, included facilitating tens of millions of dollars in illicit transactions on behalf of MODAFL, the IRGC, Mahan Air and other instrumentalities of Iranian state-sponsored terror to enable numerous violations of the U.S. trade embargo against Iran, concealing Iran's efforts to evade U.S. sanctions and enabling Iran's acquisition from the United States of goods and technologies prohibited by U.S. law to be sold or transferred to Iran, including components of IEDs deployed against Coalition Forces in Iraq.

7867.  Each Defendant also knew of the existence of other conspirators including some or all of the Defendants, was aware that the other conspirators (including Defendants and Iranian Bank Co-conspirators) engaged in the same or similar conduct, and that the other conspirators shared the objective of providing material support to Iran, and Iran's Agents and Proxies, in an illegal manner for the explicit purpose of enabling Iran to avoid U.S. sanctions and regulations enacted specifically to prevent Iran's ability to finance, support, prepare for, plan, or carry out acts of international terrorism, including the types of acts that injured the Plaintiffs.

7868.  Each Defendant also knew or was deliberately indifferent to the fact that one of the specific aims and objectives of the Conspiracy was keeping U.S. depository institutions, law enforcement and counter-terrorism agencies blind to Iran's, and Iran's Agents and Proxy's, movement of U.S. dollars through the international financial system, and preventing the interdiction of illegal funds supporting terrorism by U.S. law enforcement, military and intelligence agencies, and thus also knew or was deliberately indifferent to the fact that the overt acts they performed in furtherance of the Conspiracy facilitated that specific objective.

7869.  Having entered into an agreement to provide Iran, and Iran's Agents and Proxies, material support in an illegal manner, in direct contravention of U.S. laws and regulations enacted expressly to mitigate Iran's sponsorship of terrorism and terrorist organizations (including Weapons of Mass Destruction proliferation activities in furtherance of such sponsorship) each Defendant also knew or was deliberately indifferent to the fact, that the Conspiracy's aims would foreseeably result in Iran, and Iran's Agents and Proxies, transferring millions of dollars in order to engage in terrorist activities (8 U.S.C. § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and acts of international terrorism (18 U.S.C. § 2331).

7870.  The Defendants' overt acts and agreement to purposefully transfer billions of

dollars through the United States to Iran in a manner expressly designed to ensure that the funds could be transferred by and to Iran without being monitored by U.S. regulators and law enforcement agencies, involved acts that were dangerous to human life, by their nature, and as further evidenced by their consequences.

7871. The Defendants' acts either occurred primarily outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished.

7872. Each Defendant's agreement to enter into the Conspiracy and purposeful transfer of almost one trillion dollars through the United States in a manner designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies foreseeably resulted in material support being delivered in order to carry out or prepare for violations of, inter alia, 18 U.S.C. §§ 2332(a)-(c), 2332a, and § 2332f by the IRGC, Hezbollah and/or the Special Groups, and were thus themselves acts of international terrorism because they either were, or objectively appear to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations by facilitating the IRGC, Hezbollah and/or the Special Groups' abilities to prepare for, support, fund, train, initiate, and/or carry out mass destruction and murder.

7873. Each Defendant's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and foreseeably, substantially enhanced the IRGC, MOIS, the FTOs and the Special Groups' ability to engage in terrorist activity (8 U.S.C. § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and/or commit acts of

international terrorism (18 U.S.C. § 2331) (including violations of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f and 2339A). Each Defendant's conduct was thus also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

7874. Furthermore, each Plaintiff's injuries constitutes a harm falling within the foreseeable risk contemplated by each Defendant's violations, including each Defendant's knowing agreement to enter into the Conspiracy, each Defendant's performance of overt acts in furtherance of the Conspiracy, and each Defendant's knowledge or deliberate indifference to the full scope, objectives, and results of the Conspiracy.

7875. Injuries resulting from terrorist attacks (including attacks launched by the IRGC, Hezbollah and the Special Groups) that were planned, supported by, funded, or assisted by Iran are precisely the risks contemplated by Executive Orders, statutes and regulations (including, without limitation, designations under Executive Orders specifically concerning the IRGC, Defendant Bank Saderat Plc, and the IRISL) enacted specifically to ensure that Iran had restricted access to USD and financial services under conditions of maximum transparency, that such dollars were used only for legitimate agencies, operations, and programs and not by or for the benefit of SDNs, and not for Iran's efforts to acquire, develop, and distribute Weapons of Mass Destruction (including weapons such as EFPs directed at Coalition Forces), and to ensure that any funds Iran did receive that touched U.S. depository institutions could be monitored by U.S. regulators and law enforcement agencies.

7876. Through its conduct as described above, by knowingly entering into the Conspiracy and violating 18 U.S.C. § 2339A in the manner and with the state of mind alleged above, each Defendant committed acts of international terrorism and is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

## SIXTH CLAIM FOR RELIEF

## PRIMARY CIVIL LIABILITY UNDER 18 U.S.C. § 2333(a) AGAINST ALL DEFENDANTS FOR VIOLATIONS OF 18 U.S.C. § 2339A CONSTITUTING ACTS OF INTERNATIONAL TERRORISM

### (Direct Material Support to Terrorists under 2339A)

7877.  Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

7878.  The Defendants by knowingly providing, U.S. dollars, expert services, and trade finance to individuals, groups and entities on OFAC's SDN list who served as front companies and agents of terrorists, provided material support to terrorists in violation of 18 U.S.C. § 2339A.

### Material Support in the Form of U.S. Dollars

7879.  Each Defendant's conduct in clandestinely providing front companies and agents of terrorists with hundreds of millions (or more) of USD in an illegal manner, violated 18 U.S.C. § 2339A's express prohibition against concealing or disguising the nature, location, source, or ownership of material support or resources, knowing that the material support or resources are to be used in preparation for, or in carrying out, a violation of any of 18 U.S.C. §§ 32, 37, 81, 175, 229, 351, 831, 842(m)-(n), 844(f) or (i), 930 (c), 956, 1091, 1114, 1116, 1203, 1361, 1362, 1363, 1366, 1751, 1992, 2155, 2156, 2280, 2281, 2332, 2332a, 2332b, 2332f, 2340A, or 2442, 42 U.S.C. § 2284, 49 U.S.C. §§46502 or 60123 (b), or any offense listed in 18 U.S.C. § 2332b (g)(5)(B) (except for §§ 2339A and 2339B).

### Material Support in the Form of Financial Services and Securities

7880.  Each Defendant also provided material support, in the form of financial services and financial securities, and concealed the provision of such financial services and funding from the U.S. government and U.S., U.K. and other law enforcement agencies, by underwriting

billions of dollars in illegal trade finance transactions.  Congress defined "Material support or resources" in 18 U.S.C. § 2339A to include "…any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services,…" Facilitating the transfer of hundreds of billions of U.S. dollars to known front companies and agents of terrorists, using the defendant banks dollar clearing services, as well as the underwriting billions of dollars in trade finance transactions, are squarely within the definition of "material support or resources" contemplated by Congress when enacting 18 U.S.C. § 2339A, and violate Congress' stated goal of cutting off the flow of money to terrorists.

### Material Support in the Form of Expert Advice

7881.  Each Defendant also provided material support in the form of expert advice and assistance to known front companies and agents of terrorist organizations.  Included in the definition of "Material support or resources" is "expert advice or assistance." Congress defined "expert advice or assistance" in 18 U.S.C. § 2339A to include "advice or assistance derived from …technical or other specialized knowledge."   The defendant banks each received extensive training on detecting and preventing the flow of money to terrorists from the government agencies tasked with enforcing the laws.  The defendant banks brazenly provided that technical, and highly specialized knowledge to the many front companies and agents of terrorists on OFACs SDN list, in addition to National Iranian Oil Company (NIOC), Mahan Air, Khatam-al Anbiya Construction, IRISL and multiple IRISL entities, Bank Melli including Bank Melli plc, Bank Saderat including Bank Saderat plc, Bank Mellat, Bank Sepah, and Bank Markazi, as part of their package of financial services to specifically ensure that such known front companies and agents of terrorists, would know how to conduct illegal dollar transfers without being detected by the various enforcement agencies.

## Knowledge of the Organizations' Connection to Terrorism

7882.   Because Defendants are financial institutions operating in the United States, at all times relevant to the Complaint, each is deemed by law to be aware of all designations made to the SDN list, including without limitation designations for Iran, Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, al Qaeda in Iraq, the IRGC, the IRGC-QF, Bank Saderat (including Defendant Bank Saderat Plc), Bank Melli, Bank Mellat, Bank Sepah, IRISL (and multiple IRISL entities).

7883.   Each Defendant had knowledge of the front companies and agents connections to terrorism.

7884.   Each Defendant knew, or was deliberately indifferent to the fact, that Hezbollah had been designated an FTO, SDT and SDGT.

7885.   Each Defendant knew, or was deliberately indifferent to the fact, that al Qaeda had been designated an FTO.

7886.   Each Defendant knew, or was deliberately indifferent to the fact, that al Qaeda in Iraq had been designated an FTO.

7887.   Each Defendant knew, or was deliberately indifferent to the fact, that Ansar al-Islam, had been designated an FTO.

7888.   Each Defendant knew, or was deliberately indifferent to the fact, that the IRGC-QF had been designated an SDGT.

7889.   Each Defendant knew, or was deliberately indifferent to the fact, that Bank Saderat (including Defendant Bank Saderat Plc) had been designated an SDGT and that OFAC had issued a public statement that Bank Saderat has been a significant facilitator of Hezbollah's financial activities and has served as a conduit between the Government of Iran and Hezbollah.

1109

7890. Each Defendant knew, or was deliberately indifferent to the fact, that the IRGC had been designated an SDN.

7891. Each Defendant knew or was deliberately indifferent to the fact that Bank Melli (including Melli Bank Plc), Bank Saderat (including Defendant Bank Saderat Plc), Bank Mellat, and Bank Sepah had been designated SDNs before November 2008, and, as such, were excluded from accessing the U-Turn exemption in the Iranian Transaction Regulations.

7892. Each Defendant also knew or was deliberately indifferent to the fact that the IRISL and multiple IRISL entities had been designated SDNs.

7893. The acts of international terrorism that injured the Plaintiffs constitute acts of international terrorism under 18 U.S.C. § 2331, and constitute "engaging in terrorist activity" under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), and/or "engaging in terrorism" under 22 U.S.C. § 2656f.

7894. The acts of the Defendants in providing material support in the form of U.S. dollars, financial services and securities, as well as expert advice to include preventing the blocking or interdiction by U.S. and other law enforcement, military and intelligence agencies of the illegal funds transfers to known front companies and agents of terrorists, are acts dangerous to human life and were in violation of the criminal laws of the United States and would be a criminal violation if committed within the jurisdiction of the United States or of any State.

7895. The Defendants' actions resulted in the transfer of: (a) almost one trillion dollars through the United States in a manner designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies; and (b) hundreds of millions of dollars to known front companies and agents of terrorists including Hezbollah, Kata'ib Hezbollah, Al Qaeda, al Qaeda in Iraq, Ansar Al Sunna/Ansar Al Islam (AAI), Asa'ib Ahl al-Haq (AAH), Jaysh al Mehdi (JAM), Promise Day Brigades (PDB), Badr Organization, Quds Force, the IRGC and other

terrorist organizations (including the Special Groups), actively engaged in murdering and maiming U.S. nationals in Iraq.

7896.   The Defendants agreed to, and did in fact, purposefully transfer billions of USD through the United States knowing that such funds would be delivered to known front companies and agents of terrorists, and that the payment order messages facilitating such funds transfers had been deliberately and intentionally structured, designed, and processed in a manner expressly designed to ensure that such funds would not be detected or monitored by U.S. regulators and law enforcement agencies.

7897.   At the time each Defendant knowingly agreed to provide the front companies and agents of terrorists with material support in an illegal manner, each Defendant knew that the United States had formally designated Iran as a State Sponsor of Terrorism and knew, or was deliberately indifferent to the fact that, inter alia, Iran also used the front companies and agents of terrorists, as primary mechanisms to cultivate and support terrorism, and that the U.S. dollars, financial services and securities, and expert advice provided by the Defendants would generally facilitate the activities of these front companies and agents of terrorists.

7898.   Each Defendant knew or was deliberately indifferent to the fact that many of the companies and individuals on OFACs SDN list engaged in terrorist activity (8 U.S.C. § 1182(a)((3)(B)(iii)-(iv)), terrorism (22 U.S.C § 2656f), and acts of international terrorism (18 U.S.C. § 2331), including facilitating, funding, preparing for, and supporting terrorist activity by the Special Groups.  Each Defendant knew or was deliberately indifferent to the fact that the U.S. dollars, financial services, and expert advice they provided would generally facilitate these activities.

7899.   Through this clandestine stream of U.S. dollars, each Defendant knew, or was

deliberately indifferent to the fact that as a result of providing known front companies and agents of terrorists with illegal material support, such conduct foreseeably (and in fact did) facilitate the transfer of hundreds of millions of dollars to terrorists through the international financial system, including payments initiated, processed, altered, modified, falsified, or released by or through the Defendants, and that these U.S. dollars, financial services, along with their expert advice would generally facilitate terrorism.

7900.   Each Defendant knowingly and purposefully agreed to provide material support to known front companies and agents connected with terrorism on OFAC SDN list, in an illegal manner, knowing or deliberately indifferent to the fact that such illegal U.S. dollar transfers, financial services, and expert advice facilitated acts of terrorism, including homicides, attempted homicides, or conspiracies to commit homicide against U.S. nationals by terrorists, as well as attacks conducted using weapons of mass destruction, such as EFPs, IEDs, Rockets, Mortars and other bombings, attempted bombings, or conspiracies to bomb places of public use, state or government facilities, public transportation systems, or infrastructure facilities.

7901.   The material support and the concealing of such material support, that Defendants knowingly agreed to illegally provide to known front companies and agents of terrorists, provided foreseeable, substantial material support, thereby preparing and facilitating acts of terrorism in violation of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f that caused Plaintiffs' injuries.

7902.   The material support that Defendants knowingly agreed to illegally provide to the known front companies and agents of terrorists enabled numerous violations of the U.S. trade embargo against Iran, concealed the known front companies and agents of terrorists efforts to evade U.S. sanctions and enabled their acquisition from the United States of goods and

technologies prohibited by U.S. law to be sold or transferred to Iran, including components of IEDs deployed against Coalition Forces in Iraq.

7903. The Defendants' overt acts and agreement to purposefully transfer billions of dollars through the United States to front companies and agents of terrorists, in a manner expressly designed to ensure that the funds could be transferred by and to such front companies and agents of terrorists without being monitored or interdicted by U.S. regulators and law enforcement agencies, involved acts that were dangerous to human life, by their nature, and as further evidenced by their consequences.

7904. The Defendants' acts either occurred primarily outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished.

7905. Each Defendant's purposeful transfer of billions of dollars through the United States in a manner designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies, as well as their provision of financial services and expert advice, foreseeably resulted in material support being delivered in order to carry out or prepare for violations of, inter alia, 18 U.S.C. §§ 2332(a)-(c), 2332a, and § 2332f by terrorists, and were thus themselves acts of international terrorism because they either were, or objectively appear to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations by facilitating terrorists abilities to prepare for, support, fund, train, initiate, and/or carry out mass destruction and murder.

7906. Each Defendant's conduct was a substantial cause in fact and a significant factor

in the chain of events leading to the Plaintiffs' injuries, and foreseeably, substantially enhanced terrorists' ability to engage in terrorist activity (8 U.S.C. § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and/or commit acts of international terrorism (18 U.S.C. § 2331) (including violations of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f and 2339A). Each Defendant's conduct was thus also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

7907. Furthermore, each Plaintiff's injuries constitutes a harm falling within the foreseeable risk contemplated by each Defendant's violations. The injuries resulting from terrorist attacks that were planned, supported by, funded, or assisted by the known front companies and agents of terrorists, are precisely the risks contemplated by the Executive Orders, statutes and regulations enacted specifically to restrict access to USD, financial services and expert advice, and ensure that any funds flowing through U.S. depository institutions could be monitored by U.S. regulators and law enforcement agencies.

7908. Through its conduct as described above, by knowingly violating 18 U.S.C. § 2339A in the manner and with the state of mind alleged above, each Defendant committed acts of international terrorism and is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

## SEVENTH CLAIM FOR RELIEF

### PRIMARY CIVIL LIABILITY UNDER 18 U.S.C. § 2333(a) AGAINST ALL DEFENDANTS FOR VIOLATIONS OF 18 U.S.C. § 2339B CONSTITUTING ACTS OF INTERNATIONAL TERRORISM

**(Direct Material Support to FTOs under 2339B)**

7909. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

7910. The Defendants by knowingly providing, U.S. dollars, expert services, and trade

finance to individuals, groups and entities on OFAC's SDN list who served as front companies and agents to Foreign Terrorist Organizations (FTOs) designated under section 219 of the Immigration and Nationality Act, including Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq, provided material support to FTOs in violation of 18 U.S.C. § 2339B.

## Material Support in the Form of U.S. Dollars

7911.  The Defendants herein, purposefully transferred hundreds of billions of dollars through the United States in a manner expressly designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies, prevent the interdiction of illegal funds by U.S. and other law enforcement, military and intelligence agencies, and evade U.S. sanctions; minimize the transparency of their financial activities; and knowingly, or with deliberate indifference, facilitated the transfer of hundreds of millions of U.S. dollars in payments to known front companies and agents of Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq, through the U.S financial system. In doing so, the Defendants were willing to, and did, commit numerous felonies under U.S. law to conceal their financial activities and violated 18 U.S.C. § 2339B by knowingly, or with deliberate indifference providing material support to FTOs that were responsible for Plaintiffs' injuries.

## Material Support in the Form of Financial Services and Securities

7912.  Each Defendant also provided material support, in the form of financial services and financial securities, by underwriting billions of dollars in illegal trade finance transactions. Congress defined "Material support or resources" in 18 U.S.C. § 2339B(g)(4) as having the same meaning given that term in 18 U.S.C. § 2339A to include "…any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial

services,…"   Facilitating the transfer of hundreds of billions of U.S. dollars to known front companies and agents of FTOs; using the defendant banks dollar clearing services; as well as underwriting billions of dollars in trade finance transactions, are squarely within the definition of "material support or resources" contemplated by Congress when enacting 18 U.S.C. § 2339B, and violate Congress' stated goal of cutting off the flow of money to terrorists.

### Material Support in the Form of Expert Advice

7913.   Each Defendant also provided material support in the form of expert advice and assistance to FTOs, or known front companies and agents of FTOs -included in the definition of "Material support or resources" is "expert advice or assistance."   Congress defined "expert advice or assistance" in 18 U.S.C. § 2339A to include "advice or assistance derived from …technical or other specialized knowledge."   The defendant banks each received extensive training on detecting and preventing the flow of money to terrorists from the government agencies tasked with enforcing the laws.   The Defendants brazenly provided that technical, and highly specialized knowledge to the many front companies and agents of FTOs on OFACs SDN list, as part of their package of financial services to specifically ensure that such known front companies and agents of FTOs would know how to conduct illegal dollar transfers without being detected by the various enforcement agencies.

### Knowledge of FTO's Designation and Engagement in Terrorism

7914.   Because Defendants are financial institutions operating in the United States, at all times relevant to the Complaint, each is deemed by law to be aware of all designations made to the SDN list, including without limitation designations for Iran, Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, al Qaeda in Iraq,  and individuals or entities belonging to or controlled by them.

7915.   At the time each Defendant knowingly agreed to provide front companies and agents of FTOs with material support in an illegal manner, each Defendant knew that Iran had, since 1984, been officially designated by the United States as a State Sponsor of Terrorism, subject to various U.S. sanctions, and knew or were deliberately indifferent to the fact that such designation was based in part on Iran's sponsorship and patronage of FTOs Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, al Qaeda in Iraq, and that Iran used Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq, as primary mechanisms to enable it to cultivate and support terrorism.

7916.   Each Defendant knew that Hezbollah Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq, were designated an FTO at all times relevant to this action. Each Defendant also knew that Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq, engaged in terrorist activities (8 U.S.C. § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and acts of international terrorism (18 U.S.C. § 2331).

7917.   Each Defendant knew or was deliberately indifferent to the fact that by providing front companies and agents of FTOs with material support in an illegal manner evaded U.S. sanctions and regulations directed at mitigating the risk that such front companies and agents would facilitate acts of international terrorism by and through FTOs.

7918.   The acts of international terrorism that injured the Plaintiffs constitute acts of international terrorism under 18 U.S.C. § 2331, and constitute "engaging in terrorist activity" under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), and/or "engaging in terrorism" under 22 U.S.C. § 2656f.

7919.   Each Defendant also knew or was deliberately indifferent to the fact that by keeping U.S. depository institutions, law enforcement and counter-terrorism agencies blind to the front companies and agents' movement of U.S. dollars through the international financial

system, they were providing material support to FTOs.

7920.  Providing known front companies and agents with material support in an illegal manner, in direct contravention of U.S. laws and regulations enacted expressly to mitigate terrorism and terrorist organizations, each Defendant knew or was deliberately indifferent to the fact that the material support would foreseeably result in transferring millions of dollars to FTOs Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq,  and would be used to plan, authorize and commit terrorism.

7921.  The material support that each Defendant, knowingly, or with deliberate indifference, provided to front companies and agents of FTOs Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq, facilitated acts of terrorism in violation of §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f, and caused Plaintiffs injuries.

7922.  The Defendants' knowingly transfer of hundreds of billions of USD to front companies and agents of FTOs through the United States in a manner expressly designed to ensure that the funds could be transferred without being monitored by U.S. regulators and law enforcement agencies – involved acts that were dangerous to human life, by their nature, and as further evidenced by their consequences.

7923.  The Defendants' acts either occurred primarily outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished.

7924.  Each Defendant transferred (collectively) hundreds of billions of U.S. dollars through the United States in a manner designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies and prevent the interdiction of such illegal funds, foreseeably resulted in material support being provided to FTOs, and were thus themselves acts

of international terrorism because they either were, or objectively appear to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion (in part to cause them to withdraw Coalition Forces from Iraq), and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq's role in killing and injuring hundreds of American nationals in Iraq.

7925.  Each Defendant's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and foreseeably, substantially accelerated and multiplied Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq's ability to engage in terrorist activity (8 U.S.C. § 1182(a)(3)(B)(iii)- (iv)), terrorism (22 U.S.C. § 2656f), and acts of international terrorism under the definition set forth in 18 U.S.C. § 2331. Each Defendant's conduct was thus also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

7926.  Furthermore, each Plaintiff's injuries constitutes a harm falling within the risk contemplated by each Defendant's overt acts, and each Defendant's knowledge of, or deliberate indifference to, the fact that they were providing material support to front companies and agents of Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq. Injuries resulting from terrorist attacks planned, designed, assisted, funded, initiated, and/or overseen by Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq, are precisely the risks contemplated by statutes, regulations and Executive Orders designed to ensure that such front companies and agents of FTOs were restricted from accessing U.S. dollars, financial services, and expert advice and services, and that any funds it did receive that touched U.S.

depository institutions were transparent and could be blocked if warranted.

7927.  Through its conduct as described above, by knowingly violating 18 U.S.C. § 2339B in the manner and with the state of mind alleged above, each Defendant committed acts of international terrorism and is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

## EIGHTH CLAIM FOR RELIEF

### PRIMARY CIVIL LIABILITY AGAINST COMMERZBANK AG AND COMMERZBANK AG, NEW YORK BRANCH UNDER 18 U.S.C. § 2333(a) FOR VIOLATIONS OF 18 U.S.C. § 2339A CONSTITUTING ACTS OF INTERNATIONAL TERRORISM

**(Providing Direct Material Support to terrorists under 2339A)**

7928.  Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

7929.  Defendant Commerzbank AG and Commerzbank AG, New York Branch provided material support to the IRGC through their acts on behalf of IRISL, and Commerzbank AG and Commerzbank AG, New York Branch violated § 2339A in concealing and disguising the nature, location, source, and ownership of material support it provided to IRISL, knowing or deliberately indifferent to the fact, that IRISL and the IRGC would use that support in preparation for, or in carrying out acts of international terrorism, including violations of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f.

7930.  Defendant Commerzbank AG and Commerzbank AG, New York Branch knew or was deliberately indifferent to the fact that the IRISL had been designated an SDN for Weapons of Mass Destruction-related activities that included arms shipments, including shipments destined for Hezbollah and other terrorists.

7931.  Defendant Commerzbank AG and Commerzbank AG, New York Branch's

conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and substantially accelerated and multiplied the IRGC's, Hezbollah, and the Special Groups ability to engage in terrorist activity (8 U.S.C § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and/or commit acts of international terrorism as that terms is defined in 18 U.S.C. § 2331.

7932.   The material support that Commerzbank AG and Commerzbank AG, New York Branch knowingly and illegally provided to the IRISL provided foreseeable, substantial assistance to the IRGC, Hezbollah and the Special Groups, thereby preparing and facilitating acts of terrorism in violation of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f that caused Plaintiffs' injuries, and thus Commerzbank AG and Commerzbank AG, New York Branch's conduct was also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

7933.   Commerzbank AG and Commerzbank AG, New York Branch's illegal conduct transcended national boundaries in terms of the means by which it was accomplished.

7934.   Commerzbank AG and Commerzbank AG, New York Branch's knowing or deliberately indifferent provision of illegal financial services to the IRGC and IRISL involved acts that were dangerous to human life, by their nature and as evidenced by their consequences.

7935.   Commerzbank AG and Commerzbank AG, New York Branch's conduct itself constitutes an act of international terrorism because it either was, or objectively appears to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Iran's ability to prepare for and/or carry out mass destruction

and murder.

7936.   Furthermore, each Plaintiff's injuries constitute a harm falling within the risk contemplated by Commerzbank AG and Commerzbank AG, New York Branch's material support to the IRGC and IRISL. Injuries resulting from terrorist attacks perpetrated, planned, supported by, funded, or assisted by Iran and Hezbollah are precisely the risks contemplated by statutes and regulations designed to ensure that the IRGC, IRISL and Iran had restricted access to USD and financial services, and that any funds they did receive that touched U.S. depository institutions were transparent and could be blocked if warranted, and did not benefit an SDN.

7937.   Through its conduct as described above, by knowingly or with deliberate indifference, providing material support to Iran, the IRGC, and IRISL, and thereby violating 18 U.S.C. § 2339A in the manner and with the state of mind alleged above, Commerzbank AG and Commerzbank AG, New York Branch is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

## NINTH CLAIM FOR RELIEF

### PRIMARY CIVIL LIABILITY AGAINST STANDARD CHARTERED BANK AND STANDARD CHARTERED BANK, NEW YORK BRANCH UNDER 18 U.S.C. § 2333(a) FOR VIOLATIONS OF 18 U.S.C. § 2339A CONSTITUTING ACTS OF INTERNATIONAL TERRORISM

**(Standard Chartered provided material support to the IRGC, the IRGC-QF, Hezbollah, al Qaeda, AQI, AAI, the Badr Corps/Badr Organization, KH, JAM, the PDB, AAH, Abu Mustafa Al-Sheibani network, Abu Mahdi al-Muhandis network, and/or other terrorist organizations, through its acts on behalf of Mahan Air, MODAFL under 2339A)**

7938.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

7939.   Defendant Standard Chartered Bank and Standard Chartered Bank, New York Branch provided material support to the IRGC, the IRGC-QF, Hezbollah, al Qaeda, AQI, AAI,

the Badr Corps/Badr Organization, KH, JAM, the PDB, AAH, Abu Mustafa Al-Sheibani network, Abu Mahdi al-Muhandis network, and/or other terrorist organizations,  through its acts on behalf of Mahan Air, MODAFL and other entities identified *supra* in violation of § 2339A by concealing and disguising the nature, location, source, and ownership of material support it provided to Mahan Air, MODAFL and other entities identified *supra*, knowing or deliberately indifferent to the fact that the IRGC, the IRGC-QF, Hezbollah, al Qaeda, AQI, AAI, the Badr Corps/Badr Organization, KH, JAM, the PDB, AAH, Abu Mustafa Al-Sheibani network, Abu Mahdi al-Muhandis network, and/or other terrorist organizations, would use that support in preparation for, or in carrying out, acts of international terrorism, including violations of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f.

7940.  Defendant Standard Chartered Bank and Standard Chartered Bank, New York Branch knew or was deliberately indifferent to the fact that Mahan Air, MODAFL and other entities identified *supra* were utilizing Letters of Credit facilitated by Standard Chartered Bank and Standard Chartered Bank, New York Branch to evade U.S. sanctions and acquire materials used, inter alia, to effectuate arms shipments, transport weapons, personnel and technology to the IRGC-QF and Hezbollah.

7941.  Mahan Air did, in fact, transport weapons, personnel and technology into Iraq on behalf of the IRGC-QF and Hezbollah and did, in fact, transport modules used to control and activate IEDs and EFPs deployed against Coalition Forces in Iraq.

7942. Iran could not have successfully evaded U.S. sanctions and obtained raw materials and manufacturing equipment prohibited by the International Traffic in Arms Regulations ("ITARs"), Export Administration Regulations ("EARs"), and Iran Trade Regulations ("ITRs") simply by establishing front companies in foreign jurisdictions like

Malaysia, Singapore or Dubai because those front companies could not have negotiated international payments without being able to provide U.S. and other suppliers with conventional letters of credit drawn on Western banks with established correspondent accounts with U.S. clearing banks.

7943.  Nor could the front companies that participated in Iran's clandestine supply chain have succeeded in their efforts had they been forced to rely solely on financing by Iranian banks because those banks could not have provided financing directly since they could not maintain correspondent accounts with U.S. clearing banks and most of them were blacklisted at one point in time or another and frozen out of the US dollar-clearing system.

7944.  For example, no legitimate U.S. manufacturer would have agreed to transport materials subject to the ITARs, EARs or ITRs to an unknown company in Singapore or Dubai based on a letter of credit issued by Bank Saderat or Bank Melli.

7945.  The linchpin of Iran's illegal and clandestine supply chain was the cooperation of Standard Chartered Bank and Standard Chartered Bank, New York Branch and the other Western Bank Defendants who concealed both the role of Iranian banks in providing the credit necessary to finance the transactions and the identities of the Iranian military and IRGC sub-agencies that were actually purchasing the raw materials and manufacturing equipment (invariably being transported to Iran by IRISL, Mahan Air or Iran Air).

7946.  Defendant Standard Chartered Bank and Standard Chartered Bank, New York Branch knew, or was deliberately indifferent to the fact, that Mahan Air, MODAFL and other entities identified *supra* were utilizing Letters of Credit facilitated by Standard Chartered Bank and Standard Chartered Bank, New York Branch to evade U.S. sanctions and acquire materials used, inter alia, to effectuate arms shipments, transport weapons, personnel and technology to the

IRGC-QF and Hezbollah.

7947.   Mahan Air did, in fact, transport weapons, personnel and technology into Iraq on behalf of the IRGC-QF and Hezbollah and did, in fact, transport modules used to control and activate IEDs and EFPs deployed against Coalition Forces in Iraq.

7948.   With the necessary assistance of Standard Chartered Bank and Standard Chartered Bank, New York Branch and the other Western Bank Defendants, MODAFL did in fact acquire spare parts for various military aircraft.

7949.   With the necessary assistance of Standard Chartered Bank and Standard Chartered Bank, New York Branch and the other Western Bank Defendants, Iranian front companies did purchase hydraulic press components of the kind used to manufacture EFPs and did purchase steel and copper and other materials necessary for the manufacturing of EFPs and other weapons deployed against Coalition Forces in Iraq.

7950.   This substantial assistance to Iran's terror apparatus (including the IRGC and MODAFL), knowingly provided by Defendant Standard Chartered Bank and Standard Chartered Bank, New York Branch, made it possible for Iran to procure the radio frequency modules, metals, and hydraulic presses used to manufacture the copper plates and steel cylinders necessary to manufacture the EFPs and other Iranian weapons used in the attacks on the Plaintiffs, as well Iran's transport of weapons, supplies, and IRGC and Hezbollah operatives (who conducted, supervised, and trained the perpetrators of those attacks).

7951.   Defendant Standard Chartered Bank and Standard Chartered Bank, New York Branch's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and substantially accelerated and multiplied the IRGC's ability to engage in terrorist activity (8 U.S.C § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f),

and commit acts of international terrorism as that terms is defined in 18 U.S.C. § 2331.

7952.   The substantial assistance that Standard Chartered Bank and Standard Chartered Bank, New York Branch knowingly and illegally provided to Iran through its Agents and Proxies, including Mahan Air, MODAFL and other entities identified *supra* provided foreseeable material support to the IRGC, the IRGC-QF, Hezbollah, al Qaeda, AQI, AAI, the Badr Corps/Badr Organization, KH, JAM, the PDB, AAH, Abu Mustafa Al-Sheibani network, Abu Mahdi al-Muhandis network, and/or other terrorist organizations, thereby preparing and facilitating acts of terrorism in violation of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f that caused Plaintiffs' injuries, and thus Standard Chartered Bank and Standard Chartered Bank, New York Branch's conduct was also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

7953.   Standard Chartered Bank and Standard Chartered Bank, New York Branch's illegal conduct transcended national boundaries in terms of the means by which it was accomplished.

7954.   Standard Chartered Bank and Standard Chartered Bank, New York Branch's knowing or deliberately indifferent provision of illegal financial services to the IRGC, Mahan Air, MODAFL and other entities identified *supra*, involved acts that were dangerous to human life, by their nature and as evidenced by their consequences.

7955.   Standard Chartered Bank and Standard Chartered Bank, New York Branch's conduct itself constitutes an act of international terrorism because it either was, or objectively appears to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion, and/or (c) affect the conduct of the governments of the

United States and other nations by facilitating Iran's ability to prepare for and/or carry out mass destruction and murder.

7956.   Furthermore, each Plaintiff's injuries constitute a harm falling within the risk contemplated by Standard Chartered Bank and Standard Chartered Bank, New York Branch's material support to the IRGC, the IRGCQF, Hezbollah, al Qaeda, AQI, AAI, the Badr Corps/Badr Organization, KH, JAM, the PDB, AAH, Abu Mustafa Al-Sheibani network, Abu Mahdi al-Muhandis network, and/or other terrorist organizations. Injuries resulting from terrorist attacks perpetrated, planned, supported by, funded, or assisted by Iran and Hezbollah are precisely the risks contemplated by statutes and regulations designed to ensure that Iran had restricted access to U.S. dollars and financial services, and that any funds they did receive that touched U.S. depository institutions were transparent and could be blocked if warranted, and did not benefit an SDN.

7957.   Through its conduct as described above, by knowingly or with deliberate indifference, violating 18 U.S.C. § 2339A in the manner and with the state of mind alleged above, Standard Chartered Bank and Standard Chartered Bank, New York Branch is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

## TENTH CLAIM FOR RELIEF

### PRIMARY CIVIL LIABILITY AGAINST COMMERZBANK AG AND COMMERZBANK AG, NEW YORK BRANCH UNDER 18 U.S.C. § 2333(a) FOR VIOLATIONS OF 18 U.S.C. § 2339B CONSTITUTING ACTS OF INTERNATIONAL TERRORISM

### (Providing Direct Material Support to FTOs under 2339B)

7958.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

7959.   Defendant Commerzbank AG and Commerzbank AG, New York Branch violated

§ 2339B by providing material support to Hezbollah through Commerzbank AG and Commerzbank AG, New York Branch's acts on behalf of its customer Waisenkinderprojekt Libanon e.V. (Orphans Project Lebanon e.V.).

7960.  Commerzbank AG and Commerzbank AG, New York Branch knew, or was deliberately indifferent to the fact, that Orphans Project Lebanon e.V. was transferring funds through Commerzbank AG and Commerzbank AG, New York Branch to FTO Hezbollah and that Hezbollah would use that support in preparation for, or in carrying out, acts of international terrorism, including violations of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f.

7961.  Defendant Commerzbank AG and Commerzbank AG, New York Branch's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and substantially accelerated and multiplied Hezbollah's ability to engage in terrorist activity (8 U.S.C § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and acts of international terrorism as that term is defined in 18 U.S.C. § 2331.

7962.  The material support that Commerzbank AG and Commerzbank AG, New York Branch knowingly and illegally provided to the Orphans Project Lebanon e.V. and hence to Hezbollah, provided foreseeable, substantial assistance to the Hezbollah and the Special Groups, thereby preparing and facilitating acts of terrorism in violation of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f that caused Plaintiffs' injuries, and thus Commerzbank's conduct was also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

7963.  Commerzbank AG and Commerzbank AG, New York Branch's illegal conduct transcended national boundaries in terms of the means by which it was accomplished.

7964.   Commerzbank AG and Commerzbank AG, New York Branch's knowing or deliberately indifferent provision of illegal financial services to Hezbollah involved acts that were dangerous to human life, by their nature and as evidenced by their consequences.

7965.   Commerzbank AG and Commerzbank AG, New York Branch's conduct itself constitutes an act of international terrorism because it either was, or objectively appears to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Iran's ability to prepare for and/or carry out mass destruction and murder.

7966.   Commerzbank AG and Commerzbank AG, New York Branch knew, or was deliberately indifferent to the fact, that Hezbollah had been designated an FTO, SDT and SDGT.

7967.   Each Defendant also knew that Hezbollah engaged in terrorist activities (8 U.S.C. § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and acts of international terrorism (18 U.S.C. § 2331).

7968.   Furthermore, each Plaintiff's injuries constitute a harm falling within the risk contemplated by Commerzbank AG and Commerzbank AG, New York Branch's material support to Hezbollah.  Injuries resulting from terrorist attacks that were planned, supported by, funded, or assisted by Hezbollah are precisely the risks contemplated by Executive Orders, statutes and regulations designed to ensure that Iran had restricted access to U.S. dollars and financial services, and that any funds it did receive that touched U.S. depository institutions could be monitored by U.S. regulators and law enforcement agencies.

7969.   Through its conduct as described above, by knowingly or with deliberate

indifference, providing material support to Hezbollah, and thereby violating 18 U.S.C. § 2339B in the manner and with the state of mind alleged above, Commerzbank AG and Commerzbank AG, New York Branch is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

## ELEVENTH CLAIM FOR RELIEF

### PRIMARY CIVIL LIABILITY AGAINST HSBC BANK USA, N.A. AND HSBC NORTH AMERICA HOLDINGS, INC AND HSBC HOLDINGS PLC AND HSBC BANK PLC AND HSBC BANK MIDDLE EAST LIMITED UNDER 18 U.S.C. § 2333(a) FOR VIOLATIONS OF 18 U.S.C. § 2332d CONSTITUTING ACTS OF INTERNATIONAL TERRORISM

### (Conducting financial transactions with Iran under 2332d)

7970.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

7971.   As alleged above, at all relevant times HBSC Bank USA, N.A. and HSBC North America Holdings, Inc. and HSBC Holdings Plc and HSBC Bank Plc and HSBC Bank Middle East Limited knew that Iran was a country designated by the United States under section 6(j) of the Export Administration Act of 1979 (50 App. U.S.C. 2405) as a country supporting international terrorism, yet HBSC Bank USA, N.A. nevertheless engaged in thousands of financial transactions with Iran in violation of 18 U.S.C. § 2332d.

7972.   Defendant HSBC Bank USA, N.A. AND HSBC North America Holdings, Inc. are juridical person organized under the laws of the United States pursuant to 18 U.S.C. § 2332d(b)(2)(C), and each is also deemed to be a person within the United States pursuant to 18 U.S.C. § 2332d(b)(2)(D).

7973.   Section 2331(3) explicitly defines "person" to include "any individual or entity capable of holding a legal or beneficial interest in property"

7974.   HSBC Bank USA, N.A. is a federally chartered banking institution and subsidiary

of HSBC North America Holdings, Inc. ("HSBC North America"). HSBC North America is an indirect subsidiary of HSBC Holdings. HSBC Holdings Plc is the ultimate parent company of one of the world's largest banking and financial services groups with approximately 6,900 offices in over 80 countries (collectively, HSBC Holdings and its subsidiaries are the "HSBC Group").

7975.  Both HSBC Bank USA, N.A. and HSBC Holdings Plc acknowledged their responsibility violating the International Emergency Economic Powers Act ("IEEPA") and violating the Trading with the Enemy Act ("TWEA") in the Statement of Facts incorporated by reference as part of the Deferred Prosecution Agreement they entered with the Department of Justice.

7976.  Each Defendant knew, or was deliberately indifferent to the fact, that Hezbollah had been designated an FTO.

7977.  Each Defendant also knew, or was deliberately indifferent to the fact, that Kata'ib Hezbollah had been designated an FTO.

7978.  Each Defendant also knew, or was deliberately indifferent to the fact, that Ansar al-Islam had been designated an FTO.

7979.  Each Defendant also knew, or was deliberately indifferent to the fact, that al Qaeda had been designated an FTO.

7980.  Each Defendant also knew, or was deliberately indifferent to the fact, that al Qaeda in Iraq had been designated an FTO.

7981.  Each Defendant also knew, or was deliberately indifferent to the fact, that the IRGC-QF had been designated an SDGT.

7982.  Each Defendant also knew, or was deliberately indifferent to the fact, that Bank

Saderat (including Defendant Bank Saderat Plc) had been designated an SDGT and that OFAC had issued a public statement that Bank Saderat has been a significant facilitator of Hezbollah's financial activities and has served as a conduit between the Government of Iran and Hezbollah.

7983.   Each Defendant also knew, or was deliberately indifferent to the fact, that the IRGC had been designated an SDN.

7984.   Each Defendant also knew or was deliberately indifferent to the fact that Bank Melli (including Melli Bank Plc), Bank Saderat (including Defendant Bank Saderat Plc), Bank Mellat, and Bank Sepah had been designated SDNs before November 2008, and, as such, were excluded from accessing the U-Turn exemption in the Iranian Transaction Regulations.

7985.   Each also knew or was deliberately indifferent to the fact that the IRISL and multiple IRISL entities had been designated SDNs.

7986.   As alleged above, the Defendants knowingly conducted illegal financial transactions on behalf of Iran through Bank Melli and other Iranian counter-parties that did not fall within the safe harbor provisions of the regulations issued by the U.S. Treasury Department – regulations passed for the specific purposes of mitigating the risk that funds transfers to Iran could be used to: engage in terrorist activity under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), terrorism under 22 U.S.C.§ 2656f, or acts of international terrorism under 18 U.S.C. § 2331.

7987.   In fact, the transactions at issue (including at least the $183 million HBSC Bank USA, N.A. facilitated on behalf of sanctioned entities in Iran that were identified in HSBC Bank USA, N.A.'s December 11, 2012 Deferred Prosecution Agreement with DOJ) explicitly violated 31 C.F.R § 535.701 (a)(2) and 31 C.F.R § 560.203.

7988.   Defendant HBSC Bank USA, N.A. knew that Defendants HSBC-Europe and HSBC-Middle East were deliberately altering and omitting information in funds transfer

payment order messages being processed through HSBC Bank USA, N.A., thereby evading U.S. laws and regulations whose express purpose was (and is) to ensure that only a very limited class of payments could be facilitated to Iran, and that payment order messages for such funds transfers required transparency in order to ensure that the transfers qualified for the limited exceptions and exemptions, and did not result in U.S. depository institutions processing transactions for the benefit of SDNs.

7989.  As alleged in detail above, throughout the relevant time period, HBSC Bank USA, N.A. knew that other HSBC Defendants such as HSBC-London and HSBC-Middle East were providing material support to Iran in a manner violating U.S. laws and regulations, and HBSC Bank USA, N.A. also knew its own systems and networks were being used to facilitate the HSBC Defendants' illegal conduct.

7990.  Defendant HBSC Bank USA, N.A. also thus knew or was deliberately indifferent to the fact that Iran, the IRGC, IRISL, Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, al Qaeda in Iraq and Defendant Bank Saderat Plc all engaged in terrorist activity under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), terrorism under 22 U.S.C. § 2656f, and acts of international terrorism under 18 U.S.C. § 2331 (including violations of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f), and that Iran provided massive support and sponsorship for violations of all these statutes, while also providing support for other acts of international terrorism, such as those planned, attempted, and/or perpetrated by the Special Groups.

7991.  Knowing that Defendants HSBC-London and HSBC-Middle East were moving billions of sanctions-evading Iranian USD through HSBC Bank USA, N.A.'s offices with the specific intent of defeating HSBC Bank USA, N.A.'s OFAC filters and violating HBSC Bank USA, N.A. reporting requirements, it was reasonably foreseeable that HSBC Bank USA, N.A.'s

conduct would aid Iran and Iran's agents, proxies, and strategic partners (including Hezbollah, Kata'ib Hezbollah, al Qaeda, al Qaeda in Iraq, the IRGC, and Special Groups) to engage in terrorist activity under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), terrorism under 22 U.S.C. § 2656f, and acts of international terrorism under 18 U.S.C. § 2331.

7992.   Because Defendant HBSC Bank USA, N.A. is a financial institution operating in the United States, at all times relevant to the Complaint, it is deemed by law to be aware of all designations made to the SDN list, including without limitation designations for Iran, Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq, the IRGC, the IRGC-QF, Bank Saderat (including Defendant Bank Saderat Plc), Bank Melli, Bank Mellat, Bank Sepah, IRISL (and multiple IRISL entities).

7993.   Defendant HBSC Bank USA, N.A. thus also knew or was deliberately indifferent to the fact that Bank Melli (including Melli Bank Plc), Bank Saderat (including Defendant Bank Saderat Plc) Bank Mellat, and Bank Sepah had been designated SDNs before November 2008, and, as such, were excluded from accessing the U-Turn exemption in the Iranian Transaction Regulations.

7994.   Defendants' illegal U.S. dollar clearing transactions on behalf of Iran and Iranian banks were not separate from Iran's material support of terrorism; they were the mechanism through which the material support was accomplished.

7995.   Defendant HSBC Bank USA, N.A.'s conduct foreseeably and substantially enhanced Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, al Qaeda in Iraq, the IRGC's and the Special Groups' and other Iranian-sponsored terrorists' ability to engage in terrorist activity, including preparing and facilitating acts of terrorism in violation of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f that caused Plaintiffs' injuries, and

thus HSBC Bank USA, N.A.'s conduct was also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

7996. Defendant HSBC Bank USA, N.A.'s knowing, or deliberately indifferent provision of illegal financial services to Iran, enabled Iran to move billions of U.S. dollars through the United States without those funds being monitored by U.S. regulators and law enforcement agencies and therefore involved acts that were dangerous to human life, by their nature and as evidenced by their consequences.

7997. Defendant HSBC Bank USA, N.A.'s acts transcended national boundaries in terms of the means by which they were accomplished.

7998. Defendant HSBC Bank USA, N.A.'s conduct itself constitutes an act of international terrorism because it either was, or objectively appears to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Iran's ability to prepare for and/or carry out mass destruction and murder.

7999. Furthermore, each Plaintiff's injuries constitute a harm falling within the risk contemplated by Defendant HSBC Bank USA, N.A.'s violations, including its knowing agreement to provide illegal services to Iran. Injuries resulting from terrorist attacks (including attacks launched by Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, and al Qaeda in Iraq, or the Special Groups) that were planned, supported by, funded, or assisted by the IRGC and/or Hezbollah and/or Kata'ib Hezbollah, and/or Ansar al-Islam, and/or al Qaeda, and/or al Qaeda in Iraq are precisely the risks contemplated by Executive Orders, statutes and regulations designed  to  ensure that Iran had restricted access to U.S. dollars and financial services, and that

any funds it did receive that touched U.S. depository institutions could be monitored by U.S. regulators and law enforcement agencies, and that the transactions were not for the benefit of SDNs.

8000.   Through its conduct as described above, by violating § 2332d in the manner and with the state of mind alleged above, HBSC Bank USA, N.A. and HSBC North America Holdings, Inc. and HSBC Holdings PLC and HSBC Bank PLC and HSBC Bank Middle East Limited committed acts of international terrorism, and is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

## TWELFTH CLAIM FOR RELIEF

### CIVIL LIABILITY UNDER 18 U.S.C. § 2333(a) AGAINST ALL DEFENDANTS FOR VIOLATIONS OF 18 U.S.C § 2332d CONSTITUTING ACTS OF INTERNATIONAL TERRORISM

#### (Conducting financial transactions with Iran under 2332d)

8001.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

8002.   As set forth above, each of the Defendants knew or had reasonable cause to know that Iran was designated under section 6(j) of the Export Administration Act of 1979 (50 App. U.S.C. 2405) as a country supporting international terrorism and nonetheless knowingly engaged in thousands of illegal financial transactions with the government of Iran through their U.S. operations.

8003.   Each of the Bank Defendants signed Deferred Prosecution Agreements with the U.S. Department of Justice, as well as Consent Orders with the NYDFS, outlining the duration, scope, techniques, and volume of transactions, documenting the Bank Defendants' illegal financial transactions.  The Statement of Facts in each of those agreements, admitted by the Bank

Defendants, detail how the Defendants provided illegal access to the U.S. financial system, to Iran and other state sponsors of terror, violating the International Emergency Economic Powers Act ("IEEPA") and violating the Trading with the Enemy Act ("TWEA").

8004.  Defendants each utilized their respective New York branches in connection with their agreement to provide Iran material support in an illegal manner in order to effectuate and facilitate the Conspiracy, and each of those respective New York branches is a "person in the United States" within the scope of 18 U.S.C. § 2332d(b)(2)(D).

8005.  Section 2331(3) explicitly defines "person" to include "any individual or entity capable of holding a legal or beneficial interest in property."

8006.  The Defendants knew, or were deliberately indifferent to the fact, that Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq had been designated an FTO, that the IRGC-QF and Bank Saderat (including Defendant Bank Saderat Plc) had each been designated an SDGT, and that multiple other Iranian actors and agents (including the IRGC, Bank Melli, Bank Mellat, Bank Sepah, IRISL (and multiple IRISL entities)) had been designated SDNs.

8007.  The Defendants also knew or were deliberately indifferent to the fact that Bank Melli (including Melli Bank Plc), Bank Saderat (including Defendant Bank Saderat Plc), Bank Mellat, and Bank Sepah had been designated SDNs before November 2008, and, as such, were excluded from accessing the U-Turn exemption in the Iranian Transaction Regulations.

8008.  As set forth above, the illegal transactions knowingly facilitated through New York by the respective New York branches of the above-referenced Defendants thus did not fall within the safe harbor provisions of the regulations issued by the U.S. Treasury Department for U-Turn exemption transactions, and therefore violated the criminal provisions of 18 U.S.C §

2332d(a).

8009.   In fact, the transactions at issue explicitly violated 31 C.F.R 535.701(a)(2) and 31 C.F.R 560.203.

8010.   Each of the above-referenced Defendants' New York branch's acts transcended national boundaries in terms of the means by which they were accomplished.

8011.   Each of the above-referenced Defendants' New York branch's conduct foreseeably and substantially enhanced Hezbollah's, Kata'ib Hezbollah's, Ansar al-Islam's, al Qaeda's, al Qaeda in Iraq's, the IRGCs and Special Groups' and other Iranian sponsored terrorists' ability to engage in terrorist activity, including preparing and facilitating acts of terrorism in violation of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f that caused Plaintiffs' injuries, and thus each of the above Defendants' New York branch's conduct was also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

8012.   Each of the above-referenced Defendant's New York branch knowingly, or with deliberate indifference, provided financial services to Iran in the United States, knowing that its conduct enabled Iran to move millions (or in some cases, billions) of USD through the United States without those funds being monitored by U.S. regulators and law enforcement agencies. That conduct involved acts that were dangerous to human life, by their nature and as evidenced by their consequences.

8013.   Defendants' illegal U.S. dollar clearing transactions on behalf of Iran and Iranian banks were not separate from Iran's material support of terrorism, they were the mechanism through which the material support was accomplished.

8014.   Each of the above-referenced Defendant's conduct itself constitutes an act of

international terrorism because it either was, or objectively appears to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Iran's ability to prepare for and/or carry out mass destruction and murder.

8015.  Furthermore, each Plaintiff's injuries constitute a harm falling within the risk contemplated by each of the Defendants' unlawful conduct, including their knowing agreement to provide illegal services to Iran. Injuries resulting from terrorist attacks (including attacks launched by Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, al Qaeda in Iraq, or the Special Groups) that were planned, supported by, funded, or assisted by the IRGC and/or Hezbollah, and/or Kata'ib Hezbollah, and/or Ansar al-Islam, and/or al Qaeda and/or al Qaeda in Iraq are precisely the risks contemplated by Executive Orders, statutes and regulations designed to ensure that Iran had restricted access to U.S. dollars and financial services, and that any funds it did receive that touched U.S. depository institutions could be monitored by U.S. regulators and law enforcement agencies.

8016.  Through the conduct as described herein, by knowingly violating 18 U.S.C. § 2332d in the manner and with the state of mind alleged herein, Defendants committed acts of international terrorism and are liable for damages to Plaintiffs for their injuries or deaths pursuant to 18 U.S.C. § 2333(a).

## THIRTEENTH CLAIM FOR RELIEF

## CIVIL LIABILITY UNDER 18 U.S.C. § 2333(a) AGAINST BNP PARIBAS, S.A. AND BNP PARIBAS, S.A. NEW YORK BRANCH FOR VIOLATIONS OF 18 U.S.C. § 2332d CONSTITUTING ACTS OF INTERNATIONAL TERRORISM

### (Conducting financial transactions with Iran under 2332d)

8017.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

8018.   As set forth above, the BNP Paribas and BNP Paribas, S.A. New York Branch knew or had reasonable cause to know that Iran was designated under section 6(j) of the Export Administration Act of 1979 (50 App. U.S.C. 2405) as countries supporting international terrorism and nonetheless knowingly engaged in thousands of illegal financial transactions with the government of Iran through their U.S. operations.

8019.   Defendant BNP Paribas, S.A. New York Branch, is a juridical person organized under the laws of the United States pursuant to 18 U.S.C. § 2332d(b)(2)(C).

8020.   Defendant BNP Paribas, S.A. and BNP Paribas, S.A., New York Branch  are each deemed to be a person within the United States pursuant to 18 U.S.C. § 2332d(b)(2)(D).

8021.   Section 2331(3) explicitly defines "person" to include "any individual or entity capable of holding a legal or beneficial interest in property."

8022.   BNP Paribas, S.A. utilized its BNP Paribas, S.A. New York Branch in connection with its agreement to provide Iran material support in an illegal manner in order to effectuate and facilitate the Conspiracy.

8023.   BNP Paribas pled guilty to a one-count information filed in the U.S. District Court for the Southern District of New York on June 30, 2014, which accused the Bank of conspiracy to commit an offense against the United States in violation of Title 18, United States

1140

Code, Section 371, by conspiring to violate the International Emergency Economic Powers Act ("IEEPA"), codified at Title 50, United States Code, Section 1701 et seq., and regulations issued thereunder, and the Trading with the Enemy Act ("TWEA"), codified at Title 50. United States Code Appendix. Section 1 et seq., and regulations issued thereunder.

8024.   BNP Paribas also pled guilty to one count of Falsifying Business Records in the First Degree, pursuant to New York Penal Law Section 175.10, and one count of Conspiracy in the Fifth Degree, pursuant to New York Penal Law Section 105.05(1).

8025.   In connection with the federal and state charges listed above, BNP Paribas admitted certain facts and conduct, including:

- that BNPP developed and implemented policies and procedures for processing U.S. dollar-denominated transfers through the New York Branch and unaffiliated U.S. financial institutions in a manner that was designed to conceal relevant information regarding Sudan, Iran and Cuba that would permit the institutions and their regulators to determine whether the transactions were lawful and consistent with New York State and U.S. laws and regulations; and

- that BNPP's conduct allowed sanctioned countries and entities, including Specially Designated Nationals, to access the U.S. financial system and engage in billions of dollars' worth of U.S. dollar-based financial transactions, significantly undermining the U.S. sanctions and embargos.

- From at least 2002 through 2012, BNP Paribas provided U.S. dollar clearing services on behalf of Sudanese, Iranian, and Cuban parties ("Sanctioned Parties") with a value of more than $190 billion which were settled through the New York Branch and other New York-based financial institutions.

- Even the highest levels of the compliance division for the New York Branch recognized and accepted that amending, omitting and stripping was widespread among foreign banks transmitting funds through the U.S. When a settlement with U.S regulators and Dutch bank ABN AMRO was announced for violations of U.S. sanctions law, the Head of Ethics and Compliance North America wrote in an email to another employee, "the dirty little secret isn't so secret anymore, oui?"

8026.   On June 29, 2014 Jean-Laurent Bonnafe, CEO of BNP Paribas, signed a Consent

Order with the NYDFS on behalf of BNP Paribas, S.A. New York Branch admitting the above violations.

8027.   In fact, the transactions at issue explicitly violated 31 C.F.R § 535.701(a)(2) and 31 C.F.R § 560.203.

8028.   The Defendants acts transcended national boundaries in terms of the means by which they were accomplished.

8029.   The Defendants' conduct foreseeably and substantially enhanced Hezbollah's, Kata'ib Hezbollah's, Ansar al-Islam's, al Qaeda's, al Qaeda in Iraq, the IRGCs and Special Groups' and other Iranian sponsored terrorists' ability to engage in terrorist activity, including preparing and facilitating acts of terrorism in violation of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f that caused Plaintiffs' injuries, and thus each of the above Defendants' New York branch's conduct was also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

8030.   The Defendants knowingly, or with deliberate indifference, provided financial services to Iran in the United States, knowing that its conduct enabled Iran to move millions (or in some cases, billions) of USD through the United States without those funds being monitored by U.S. regulators and law enforcement agencies. That conduct involved acts that were dangerous to human life, by their nature and as evidenced by their consequences.

8031.   Defendants' illegal U.S. dollar clearing transactions on behalf of Iran and Iranian banks were not separate from Iran's material support of terrorism, they were the mechanism through which the material support was accomplished.

8032.   The Defendants also knew, or were deliberately indifferent to the fact, that Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda and al Qaeda in Iraq had been

designated an FTO, that the IRGC-QF and Bank Saderat (including Defendant Bank Saderat Plc) had each been designated an SDGT, and that multiple other Iranian actors and agents (including the IRGC, Bank Melli, Bank Mellat, Bank Sepah, IRISL (and multiple IRISL entities)) had been designated SDNs.

8033.   The Defendants also knew or were deliberately indifferent to the fact that Bank Melli (including Melli Bank Plc), Bank Saderat (including Defendant Bank Saderat Plc), Bank Mellat, and Bank Sepah had been designated SDNs before November 2008, and, as such, were excluded from accessing the U-Turn exemption in the Iranian Transaction Regulations.

8034.   As set forth above, the illegal transactions knowingly facilitated through New York by BNP Paribas, S.A. and BNP Paribas, S.A. New York Branch did not fall within the safe harbor provisions of the regulations issued by the U.S. Treasury Department for U-Turn exemption transactions, and therefore violated the criminal provisions of 18 U.S.C § 2332d(a).

8035.   The Defendants' conduct itself constitutes an act of international terrorism because it either was, or objectively appears to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Iran's ability to prepare for and/or carry out mass destruction and murder.

8036.   Furthermore, each Plaintiff's injuries constitute a harm falling within the risk contemplated by each of the Defendants' unlawful conduct, including their knowing agreement to provide illegal services to Iran. Injuries resulting from terrorist attacks (including attacks launched by Hezbollah, Kata'ib Hezbollah, Ansar al-Islam, al Qaeda, al Qaeda in Iraq, or the Special Groups) that were planned, supported by, funded, or assisted by the IRGC and/or

Hezbollah, and/or Kata'ib Hezbollah, and/or Ansar al-Islam, and/or al Qaeda and/or al Qaeda in Iraq are precisely the risks contemplated by Executive Orders, statutes and regulations designed to ensure that Iran had restricted access to U.S. dollars and financial services, and that any funds it did receive that touched U.S. depository institutions could be monitored by U.S. regulators and law enforcement agencies.

8037.   Through the conduct as described herein, by knowingly violating 18 U.S.C. § 2332d in the manner and with the state of mind alleged herein, BNP Paribas, S.A. and BNP Paribas, S.A. New York Branch, committed acts of international terrorism and are liable for damages to Plaintiffs for their injuries or deaths pursuant to 18 U.S.C. § 2333(a).

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

a)   Accept jurisdiction over this action;

b)   Enter judgment against the Defendants and in favor of Plaintiffs for compensatory damages in amounts to be determined at trial;

c)   Enter judgment against Defendants and in favor of Plaintiffs for treble damages pursuant to 18 U.S.C. § 2333;

d)   Enter judgment against Defendants and in favor of Plaintiffs for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333;

e)   Enter an Order declaring that Defendants have violated the Anti-Terrorism Act, 18 U.S.C. § 2331 et seq.; and

f)   Grant such other and further relief as justice requires.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully Submitted,                    Dated: December 21, 2018

**THE NATIONS LAW FIRM**

/s/ Howard L. Nations
Howard L. Nations
EDNY Bar No. HN4663
3131 Briarpark Drive, Suite 208
Houston, Texas 77042
Telephone: 713.807.8400
Facsimile: 713.807.8423
Email: howard@howardnations.com

**BURG, SIMPSON, ELDREDGE, HERSH AND JARDINE, P.C.**

Seth Katz
EDNY Bar No. SK4518
40 Inverness Drive East
Englewood, Colorado 80112
Telephone: 303.792.5595
Facsimile: 303.708.0527
Email: skatz@burgsimpson.com

*Counsel for Plaintiffs*